**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. RDB 10-0744** |
| **ANTONIO HALL, a/k/a Mack** | : | **(MOTION FILED UNDER SEAL)** |
| | : | |
| | **...oOo...** | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**PRETRIAL MOTIONS**

Now comes the United States of America by its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland,  and John F. Purcell, Jr., Assistant United States Attorney for said District and respectfully submits the following response to the Defendant's pretrial motions.

**TABLE OF CONTENTS**

PAGE

I.    BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Murder of Federal Witness Kareem Guest on September 20, 2009  . . . 1

        1.    FBI 302s that expose Guest as a a witness are distributed
              in Westport . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Hall Is A Long Time Violent Westport Crack  Dealer . . . . . . . . . . . . . . . . . . 3

        1.    The Government will present evidence of crack seizures from
              Hall, and testimony from long time crack customers, trafficking
              associates and victims of firearm violence. . . . . . . . . . . . . . . . . . . . . 3

        2.    Hall has previously used a firearm to retaliate against a perceived

cooperating witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.    The Investigation and the Indictment of Hall for the Murder of Kareem
      Guest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      1.    The Testimony of Eyewitness Raine Curtis  . . . . . . . . . . . . . . . . . . 5

      2.    The Testimony of Eyewitness Kevin Duckett . . . . . . . . . . . . . . . . . 7

      3.    The Testimony of Eyewitness Shameka Ross . . . . . . . . . . . . . . . . 10

      4.    The Testimony of Eyewitness 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.    Hall Denies Being Present at the Murder; Is Arrested On
      December 2, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      1.    Hall's non-custodial statement to Detective Kershaw . . . . . . . . . . 12

      2.    Hall is arrested: Asks if he can take "50 years"  . . . . . . . . . . . . . . 13

      3.    The drug trafficking conduct is necessary to put the murder
            of Guest in context  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   Hall's Post-Arrest Statements Were Preceded By *Miranda* Warnings and Were
      Not The Product of Interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A     Hall's Custodial Statements Were Spontaneous  . . . . . . . . . . . . . . . . . . . 16

      B.    Hall's Statements Were Voluntary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    Any testimony by Hall at the suppression hearing would be inherently
            suspect  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    Hall's Statements Are Admissible Pursuant to FRE 801 (d) (2) (A)  . . . . . 20

III.  No Factual or Legal Justification Exists for Conducting a Pretrial Witness
      "Reliability Hearing" Which Would be Tantamount to Trying the Case
      Twice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.      The Government has No "Compensated Witnesses" . . . . . . . . . . . . . . . . . 21

B.      The Eyewitnesses are Not "Cooperators" . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   Evidence of Hall's Prior Drug Trafficking and Firearm Use Is Intrinsic to the
        Conspiracies Charged in Counts One and Two. That Conduct is Also Intrinsic to
        Elements of the Murder Charged in Count Three. Even Absent the Addition of
        Count One to the Indictment, that Evidence Is Relevant and Necessary to
        Establishing Hall's   Motive to Retaliate Against Guest
        Pursuant to Rule 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.      The Count One drug trafficking conspiracy is logically connected to the
                murder/retaliation charged in Count Three; both offenses are inextricably
                intertwined with Hall's drug trafficking . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                1.      Joinder of the drug trafficking and murder counts is proper . . . . . 28

                2.      Even if Count One had not been added, evidence of Hall's drug
                        trafficking would be intrinsic to proving the elements of Count
                        Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                3.      The prior firearm use alleged in Count Two is also
                        properly joined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        B.      Severance of Count One would be improper where the drug trafficking
                evidence would still be admissible pursuant to Rule 404(b) because it is
                relevant and necessary to establish Hall's motive . . . . . . . . . . . . . . . . . . . 38

                1.      Guest's information to the FBI about Hall's drug trafficking
                        conduct was the motive for the murder . . . . . . . . . . . . . . . . . . . . . . . 38

                2.      Relevance and Necessity under Rule 404 (b) . . . . . . . . . . . . . . . . . 40

                3.      Rule 404 Allows "Prior Bad Acts Evidence" to establish Motive  . 43

                4.      The Drug Trafficking Evidence Satisfies Rule 404(b)'s Reliability
                        Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5.      The drug trafficking evidence is not unfairly prejudicial . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

EXHIBIT A: Aerial Photograph of Westport . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

EXHIBIT B: Photograph of Murder Scene . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

I.      BACKGROUND

A. <u>The Murder of Federal Witness Kareem Guest on September 20, 2009</u>

*1. FBI 302s that expose Guest as a Witness are distributed in Westport.*

On September 20, 2009, at approximately 10:00 p.m., Kareem Guest, age 29, was shot and killed on the 2400 block of Maisel Court in the South Baltimore community of Westport.  Mr. Guest had recently returned to the neighborhood and was living at the Westport home of his mother.  When he was killed, Guest was walking to the residence of the mother of his three-year-old daughter, who lived on Wilgrey Court in Westport. In all, Guest suffered six 9mm gunshot wounds - two in the back and four in the head, one of which, based on the presence of soot and stippling in the bullet track, was fired at extremely close range.  The evidence will show that Kareem Guest was murdered by the Defendant, Antonio Hall,  in retaliation for Guest providing information about Hall to the Federal Bureau of Investigation (the "FBI").

In January 2008,  special agents and deputized task force officers of the FBI were conducting an investigation into the violation of federal drug trafficking and firearms laws in Westport.  The FBI case number for the Westport investigation was 281-BA -10642.  On January 9, 2008,  FBI agents interviewed  Kareem Guest concerning his

1

knowledge of individuals involved in drug trafficking and related firearm violence in

Westport.  The substance of the FBI's interview of Guest was detailed in a nine-page

typewritten report ("Guest FBI 302").  One of the individuals named in the Guest FBI

302 was the Defendant, Antonio Hall, a/k/a Mack (DOB 10/1/80.)  According to the

Guest FBI 302, Hall was known as someone to "bang the gun" (commit murders) and he

further described Hall to be involved in several murders and shootings committed by or

on behalf of drug traffickers in Westport that were the subject of the ongoing

investigation.

The FBI investigation resulted in the indictment and prosecution of eight

defendants in the United States District Court for the District of Maryland (Northern

Division), *United States v. Jamal Stewart, et. al.*, Case Number WDQ 08-0415.  By late May

2009, six of the eight defendants had entered guilty pleas, thus only two remained, one

of whom was Larry Cheese.   Cheese and other remaining codefendant were scheduled

for trial on June 1, 2009.   In late May 2009 the federal prosecutors in the *Stewart* case

provided discovery materials, including the Guest FBI 302 (in which Guest was

identified as the person interviewed) to counsel for the two then remaining defendants

in the *Stewart* case.   The Guest FBI 302 and other FBI 302's were provided pursuant to a

written discovery agreement, signed by counsel, pursuant to which defense counsel had

agreed not to distribute copies of the FBI 302s to their clients (or anyone else.)  Up to the

point that the Guest FBI 302 was provided in May 2009, these materials had not been

otherwise provided by the government.

The evidence presented to the grand jury in this case has revealed that during the

summer of 2009, numerous individuals in Westport were shown or obtained copies of

the Guest 302 and other FBI 302's that had been provided in discovery to *Stewart*

counsel in May 2009.  At trial it will be shown that the Defendant was among the people

who saw the Guest FBI 302.  When questioned by the FBI, counsel for Cheese initially

denied that he had distributed the discovery materials.  However,  in January 2010,

counsel admitted that he had provided Cheese with copies of the discovery materials,

including the Guest 302, in late May 2009.   Other witnesses confirm that on or about

June 1, 2009, after Cheese had entered a guilty plea before Judge Quarles, his attorney

provided a package containing copies of the discovery to members of Cheese's family.

Over the next few weeks these materials were widely distributed throughout Westport.

It seems that the materials were displayed by Cheese's family in an attempt to refute

rampant allegations that Cheese cooperated with the government–which he had not.

   **B.  <u>Hall Is A Long Time Violent Westport Crack  Dealer</u>**

        **1.  *The Government will present evidence of crack seizures from Hall, and testimony from long time crack customers, trafficking associates and victims of firearm violence*.**

The evidence at trial (whether presented as intrinsic evidence of the drug

3

trafficking conspiracy alleged in Count One of the Superseding Indictment or, in the alternative, as evidence presented pursuant to Rule 404(b) that is necessary to establish Hall's motive) will show that Hall has been a crack distributor in Westport since at least 2004. Hall continued this activity until his arrest in December 2010.[1] Indeed, Hall has never done much else but sell crack and shoot people. Guest was not the first person Hall shot in retaliation for providing information to the police. At trial, the government will produce numerous witnesses (most of whose statements have already been provided to the defense) who will testify as to their personal knowledge of Hall's drug trafficking in Westport since 2004. Several will testify to making hundreds of crack purchases from Hall. Others will testify to being with Hall at locations in Westport where, for years preceding his arrest, Hall directed the "cooking" of cocaine into crack several times a week. At least one witness will testify that on numerous occasions he pooled money with Hall to purchase as much as a kilo of cocaine at a time that they sold as crack in Westport.

    **2.**    *Hall has previously used a firearm to retaliate against a perceived cooperating witness.*

    One witness, identified as R.P. in the Superseding Indictment and whose identity has been revealed to the defense, will testify that he was a long time, daily

---

[1] While materials provided in discovery may reflect Hall's lifetime of drug trafficking, the government will not seek to introduce any specific reference to any arrests or conduct when he was fifteen or any other juvenile conduct (to which Hall objected in his motion).

crack customer of Hall's. He will also testify that Hall shot him on February 10, 2004, on the 2400 block of Huron Avenue in Westport, in retaliation for the witness providing information that led to the arrest of one of Hall's associates. The witness survived and will testify. The evidence will also show that Hall admitted this shooting to another witness.

In the present case, the evidence will show that on September 20, 2009, Hall shot Guest after Hall happened to see Guest walking on the 2400 block of Maisel Court. Upon seeing Guest that evening, Hall commented to a witness that he was going to "smash" Guest for naming Hall to the FBI "in those papers."

**C.      The Investigation and the Indictment of Hall for the Murder of Kareem Guest**

*1. The Testimony of Eyewitness Raine Curtis*

Kareem Guest was murdered on Sunday night, September 20, 2009. On September 21, 2009, due to Guest's status as a source of information in the *Stewart* case, the U.S. Attorney's Office initiated an investigation in coordination with that being conducted by the Baltimore Police Homicide Unit. From the outset, it was learned that numerous individuals had seen copies of the Guest FBI 302 and materials that had been only provided to counsel for the final two defendants in the *Stewart* case.

In late 2009, investigators received information from a witness who stated that on the night of the murder she had spoken to two individuals, Tamika Mouzon and

Raine Curtis, who told the witness that they were present when Guest was killed.[2]   On February 4, 2010, Mouzon and Curtis were called before the federal grand jury.  These witnesses (whose several grand jury transcripts have been provided to counsel) admitted being in the vicinity of the 2400 block of Maisel Court that evening. However, they denied being present at the time of the shooting or knowing who committed the murder.

Another grand jury witness in early 2010 revealed that he was present at the time of the shooting but that he was unable to identify anyone since the gunman was wearing a mask or hat over his face.  However, this witness confirmed that Curtis and Mouzon were present when the shooting occurred and that just prior to the shooting, Curtis had been on the phone with her incarcerated boyfriend, "Hershl," to whom the witness had also spoken.  Further investigation led to the recovery of recordings of telephone calls Hershl made from a Maryland penal facility on the evening of the murder and the next day.  The recorded calls from September 20, 2009, revealed that Curtis was present at the time of the murder. Furthermore, in a recorded call between

---

[2] Since it seems to be necessary to an understanding of the facts of this case, this response identifies certain witnesses, which is why the response has been filed Under Seal.  The government is requesting counsel to redact the names of the witnesses provided herein before showing this response to the Defendant or anyone outside the defense team.  Distribution of this response at this time would be as dangerous to the witnesses as disclosure of the discovery materials was the Guest.  As is clear from this case, being suspected of cooperation is one thing, but confirmation of cooperation, in black and white, can be fatal.

Curtis and Hershl on September 21, 2009 - the day after the murder - Curtis admitted that the shooting had occurred "right in front of her." As the court is aware,  Curtis (with her attorney) was confronted with this additional evidence.  She refused an opportunity to recant her grand jury testimony of February 4, 2010.   In April  2010, Curtis was indicted for perjury and obstruction of justice.  Curtis was subsequently arrested and ordered detained. [3]

In July 2010, Curtis met with investigators again at which time she admitted that she had previously committed perjury in the grand jury. Curtis admitted that she was present for the murder and that she witnessed the Defendant murder Kareem Guest. Like all of the eyewitnesses, Curtis has known Hall for many years.  Curtis also identified other individuals who were present that night. Curtis's  account concerning the murder has remained unchanged since July 2010.

As the court is aware, Curtis subsequently entered a guilty plea to the offense of perjury following which she remained in detention.  Curtis's cooperation was not disclosed until December 2010.  In the interval, individuals who Curtis confirmed were present were questioned in the grand jury.

### 2. The Testimony of Eyewitness Kevin Duckett

In October 2010, Kevin Duckett met with investigators.   According to several

---

[3] The Curtis case remains under seal, although the indictment and copies of transcripts of  Curtis' grand jury testimony have been provided to the defense.

witnesses, he was present at time of the murder and left the scene, with Hall, in a vehicle driven by Shameka Ross.  Duckett was already believed to be a drug trafficking associate of Hall as they had often been seen together in Westport.  Duckett has known Hall since boyhood and he described his knowledge of Hall's drug trafficking activities in Westport, much of which was based on his involvement with Hall in such activities.

Duckett is expected to testify that on the night of the murder he went to the 2400 block of Maisel Court (a local meeting place)  with Shameka Ross,  who had picked him up on her way to Walmart.  On the way, they stopped in Westport, where Duckett got out.  He saw Hall and some other people he knew in the middle of the 2400 block of Maisel Court.  While Duckett was talking to Hall, they observed Kareem Guest on the block.[4]  Upon seeing Guest, Hall told Duckett that he was going to "smash'" Guest.  Hall went off to use the bathroom at a nearby residence.  When he returned, Hall was standing in the gap between the housing units near Ross's parked Acura SUV when another individual, herein referred to as Witness One (as described in Discovery letter 8) approached Hall from the Wilgrey Court side of Maisel Court and handed Hall a gun.

_____

[4]Guest had only been home from jail for about two weeks and was living with his mother on Maisel Street, which adjoins Maisel Court in Westport. Witnesses will testify that Guest knew that his FBI 302 had been circulating in the neighborhood and Guest had actually told several people that he was not cooperating but that the police had circulated the papers to induce him to do so.

After Hall stated that he was going to "smash" Guest, Duckett told Hall that it was neither a good time nor place to do anything to Guest, since there were witnesses around. Duckett suggested that Hall let someone else handle it. Hall responded that it was *his* name, not Duckett's, in "those papers." [5]  Within a short time, while Hall and Duckett were standing near the curb opposite Ross's parked car, they observed Guest walking towards them on Maisel Court. Referring to Exhibit A, and placing the aerial photograph so that the 2400 block of Maisel is horizontal to the viewer, Guest was walking from right to left towards the #3. Hall and Duckett were standing in the break between the groups of homes on the 2400 block of Maisel Court, along the curb just to the left of the #3. As Guest approached, he turned right at the break, away from Hall and Duckett. Hall, who was standing next to Duckett, pulled out the gun, ran after Guest and started shooting at Guest from behind. After Guest fell, Hall stood over him and continued to shoot. Duckett (and others) heard Guest scream, "No, Mack, no. I didn't tell them anything," which were Guest's last words. The painted orange mark on the sidewalk in the foreground of Exhibit 2 shows the approximate location of Guest's body. Hall and Duckett had been standing on the opposite side of the court, in front of the grass to the right of the steps.

Duckett will testify that when he saw Hall pull out the gun, he ran across the

---

[5] Hall was correct. Duckett's name does not appear in the Guest 302.

street and entered the rear driver's side of Ross's SUV.  When the shooting stopped,

Hall entered the rear passenger side (which faced the murder scene.)  Ross then drove

from the scene and dropped Hall off a shot time later.  Ross, Witness 5 and Duckett then

drove back to Westport, by which time the police had arrived.  Duckett's account is

consistent with that of Ross and Curtis–in their final iterations–and Duckett has only

ever given ONE account of the events of that night.

### 3. The Testimony of Eyewitness Shameka Ross

Shameka Ross, who initially denied being present when the shooting occurred,

ultimately admitted that she picked up Kevin Duckett on her way to Walmart.  She was

diverted to the 2400 block of Maisel Avenue in Westport, were she went to look for her

niece.  In Westport, she met with a female friend (described as Witness 5 in Discovery

Letter 8).  Ross ultimately admitted that she was sitting in her car on the 2400 block of

Maisel Court with Witness 5 when she heard shooting to the right (passenger side) of

her car, which was parked adjacent to the murder scene.  Ross stated that immediately

following the shots, the Defendant (whom she has known for years) and Kevin Duckett

jumped into the back seat of her car.  Ross stated that she was concerned for safety and

that she quickly drove from the scene with Hall and Duckett in the back seat.  She left

Westport and dropped Hall off, following which she, Duckett and Witness 5 returned to

Westport.

Ross's final account of where she was and what occurred at the time of the shooting is  consistent with the final account of events given by Raine Curtis (who was standing outside the driver's side of Ross's car when the shooting occurred).[6]  Ross told investigators and the grand jury that she had denied being present (on several occasions) because she was afraid of Hall.

### 4. *The Testimony of Eyewitness 1*

Based on the information obtained from Duckett and Curtis, in December 2010, investigators re-interviewed Witness 1, who Duckett identified as having given the gun to Hall.  Witness 1 had previously been interviewed and had testified in the grand jury twice,  stating first that he was not present and later that he *was* present but could not identify the shooter.   In December 2010, Witness 1 admitted that on the evening of the murder Hall directed him to go to a particular spot and bring Hall what he found.  The witness did as directed and found a handgun, which he retrieved and gave to Hall, who was talking to Duckett.  The witness then left and went briefly to the home of a friend.  As he returned, the witness passed Kareem Guest as Guest was walking on the sidewalk from Maisel Court towards Wilgrey Court.  The witness then saw Hall run past, following Guest.  Hall had pulled his hat down over his face and was shooting at Guest.  The witness heard Guest scream, "No, Mack, I didn't say nothing," as Hall stood

---

[6] The grand jury transcripts of Ross and Witness 5 have been provided to the defense, as have those of Curtis.

continued to shoot Guest.  As have other witnesses, Witness 1 explained to the grand

jury that he had previously been untruthful because he was afraid of Hall, especially

after watching Hall shoot Guest.

### D.  Hall Denies Being Present at the Murder;  Is Arrested On December 2, 2010

#### 1. Hall's non-custodial statement to Detective Kershaw

On November 22, 2010, by which time Hall had been identified as the murderer,

Detective Bryan Kershaw, the lead city homicide investigator, undertook to conduct a

non-custodial interview of Hall as to his whereabout on the night of the Guest murder.

The detective first sought to locate Hall at 2446 Wilgrey Court, in Westport, where Hall

was believed to  reside with a girlfriend, Caprese Diggs.  After getting no response at

the front door, the detective left his card.  At 12:15 p.m. Detective Kershaw was

contacted by Diggs, who told Detective Kershaw that Hall did not reside with her.  At

12:30 p.m., Hall contacted Detective Kershaw by phone.  Upon being advised that the

detective was investigating the murder of Kareem Guest, Hall stated that he had no

knowledge of the incident and stated that he was not present when Guest was shot.

Hall then stated that he *may* have been in the general area and may have heard shots.

Detective Kershaw asked Hall if he would agree to come to the homicide office to be

interviewed, but Hall declined, ending the call.  A few minutes later, Hall called back

and asked if he could meet Detective Kershaw in person. At 12:50 p.m., Hall met Det. Kershaw on Dorton Court.  See, Exhibit A, "Blacktop."   Detective Kershaw told Hall that he had information that Hall may have been in the vicinity at the time of the murder. Hall again stated that he was not present but that he might have been in the area and heard gunshots.  Hall again declined to go to the homicide office for an interview and told the Detective that if he wanted to question him about the murder Hall would want his attorney present, thus concluding the interview.  Detective Kershaw's report of this contact with Hall has been provided to the defense.

In late November 2010,  agents used a recorder that was consensually concealed on Duckett to record several conversations between Hall and Duckett.  In one recorded conversation,  Hall is heard expressing his concern that the government had asked certain questions about what had happened to the murder weapon. The disposition of the weapon is something about which only four people other than Hall might possibly have knowledge, they being the three people in Ross's car with Hall and the person to whom the gun was given.  Hall's questioning of Duckett indicated that Hall had concluded that a certain individual had told the police what happened to the murder weapon, raising concerns for the safety of this individual and Duckett.  Accordingly, plans were made to take Hall into custody.

   *2.  Hall is arrested: asks if he can take "50  years."*

13

Hall was indicted for the murder of Kareem Guest on December 2, 2010.   Agents located Hall in Westport and arrested him at approximately 6:18 p.m. pursuant to the warrant issued following his indictment earlier that day.   At 6:20 p.m., Hall was advised of his *Miranda* rights which he indicated that he understood.   At no time did Hall ask for an attorney, nor was he questioned.   Hall was transported to the Baltimore County Police Woodlawn Precinct pending his initial appearance in federal court in Baltimore the next morning.

At 8:34 p.m., county police notified the federal investigators that Hall appeared to be having an asthma attack.   At 9:30 p.m., federal agents transported Hall to Harbor Hospital in Baltimore for examination.   The agents report that while en route both to and from the hospital (where Hall was simply given an inhaler and released) Hall inquired about "his girl" Raine Curtis (who had been in custody since her arrest in April.[7])   Hall asked why Curtis had been arrested and when she was going to court.   He also stated that she had never done anything to anyone.   Hall also asked about Kevin Duckett, who due to safety concerns has been relocated at federal expense.   While Hall was being walked back to the agents' car on the hospital parking lot, and without any prior questioning by the agents, Hall asked the agents what the federal process was and what penalties he faced. The agents told Hall, correctly, that he was facing the

---

[7] The FBI 302 describing Hall's post-arrest statements has been provided to the defense.

possibility of life imprisonment or the death penalty.  Hall responded by stating that he could not do life and asked the agents to ask the prosecutor if Hall could plead to 50 years, because that was "at least a number."[8]

Hall was returned to the Woodlawn Precinct for the night and transported to the U.S. Courthouse the following morning.  After arrival at the federal courthouse, while the  agents were walking Hall to the courtroom from the lockup for his initial appearance, Hall spontaneously asked the agents if he had "made the paper."

     **3.**     ***The drug trafficking conduct is necessary to put the murder of Guest in context.***

As noted, Hall was indicted in December 2, 2010.  In Count One (now Count Three of the Superseding Indictment) Hall was charged with murder of a federal witness in violation of 18 U.S.C. § 1512 (a)(1)(B).  In Count Two ( Superseding Count Four) Hall was charged with using and discharging a firearm during and in relation the commission of Count One, in violation of 18 U.S.C. § 924 (c).  In Count Three (Superseding Count Five) Hall was charged with possession of ammunition by a

---

[8] The government suggests that any reference to the death penalty before the jury be omitted from the witness's explanation of the context of Hall's statement. Any reference to the death [penalty is potentially misleading, inflammatory and distracting in that it relates to a matter (sentencing) about which the jury is expressly precluded from considering.  The government also requests that at the outset of *voir dire* the jury panel be informed that this is not a death penalty case. It has been observed that jurors in murder cases may incorrectly presume the defendant is facing the death penalty case and that they should be informed otherwise.  Clarifying that issue at the outset is an important matter of fairness to the parties and the jurors.

convicted felon in connection with the Guest murder, in violation of 18 U.S.C. § 922(g)
(1).

On May 3, 2010, the grand jury returned a Superseding Indictment in which
superseding Counts One and Two were added to the indictment.  In the new Count
One, Hall is charged with conspiracy to distribute 280 grams or more of cocaine base, in
violation of 21 U.S.C. § 846.  While the law does not require that *any* overt acts be
charged to establish a drug conspiracy, Count One includes several overt acts that serve
to provide notice and definition as to the nature and scope of the alleged drug
conspiracy.  Most of these are based on crack seizures from Hall in Westport.  In Count
Two, Hall is charged with conspiracy to use firearms during and in relation to drug
trafficking, in violation of 18 U.S.C. § 924(0).  The remaining counts are unchanged.

Hall has filed several pretrial motions,  as follows: Motion to Suppress
Statements (Doc. 39); Motion to Preclude Admission of 404 (b) Evidence (Doc. 40);
Motion to Exclude Cooperating Witness Testimony)(Doc. 41); and Motion to Sever
Charges (Doc. 42).  The defendant's motions are discussed in turn below. They are all
without merit and should be denied.

## II.   Hall's Post-Arrest Statements Were Preceded By *Miranda* Warnings and Were Not the Product of Interrogation

### A. Hall's Custodial Statements Were Spontaneous

Hall has moved to suppress the above described post-arrest statements.  Of

16

course, Hall was in custody, as he had been arrested pursuant to the warrant issued following his indictment earlier on December 2, 2010, the day of his arrest. While Hall's motion to suppress incorrectly asserts otherwise, Hall <u>was</u> verbally advised of his *Miranda* rights at the point of arrest, at which time he acknowledged that he understood his rights, which, of course, he had heard before. **No** interview of Hall was undertaken following his arrest that evening.

Hall has identified two particular statements for suppression. Document 39 at 2. The first is the statement Hall made on the parking lot of Harbor Hospital as Hall was being returned to Woodlawn Precinct after being given an inhaler. Hall made that statement (that he would take fifty years) in response to being informed of the possible maximum sentences. The second statement that Hall seeks to suppress is Hall's inquiry (the next morning) as to whether his arrest had made the newspaper. That statement was made in a manner in which it appeared to the agents that Hall was pleased by his momentary notoriety. Hall's statement–a question really- was made by Hall the following morning as he was being escorted to Courtroom 7B for his initial appearance. Both statements were spontaneous. The facts present no issue of a *Miranda* violation, since there was no interrogation of Hall. It was *Hall's* election (and his right) to ask questions of the agents, and he did so with full notice of the possible consequences.

**B. <u>Hall's Statements Were Voluntary</u>**

17

Any statement by a defendant given freely and voluntarily without any compelling influences is admissible in evidence. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966).  Hall's motion suggests that the challenged statements were rendered involuntary by the circumstances under which they were made.  The controlling law is numbingly familiar. The test for determining whether a statement is voluntary under the Due Process Clause "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.' " *Hutto v. Ross*, 429 U.S. 28, 30,(1976).  In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id*. at 167.  Here, setting all melodrama aside, there was nothing in the least coercive about the conduct of the agents in regard to Hall.  There were no promises, threats or influence exercised by the agents.  Moreover, as is well known, the mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, does not automatically render a confession involuntary. The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired. " *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir.1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).  Of course, the Government bears the burden of proving by a preponderance of

the evidence that the statement was voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).

To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Pelton*, 835 F.2d at 1071 (quoting *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir.1980)); *accord Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir.1977) (per curiam) (holding that "a finding of coercion and involuntariness must be based upon a careful consideration of the totality of the circumstances" (*citing Schneckloth*, 412 U.S. at 226). Here, the very spontaneity of Hall's questions and the non-coercive circumstances in which they were made are the best evidence that Hall's statements were made voluntarily. Neither the circumstances in the hospital parking lot nor anything about the walk to the courtroom the next day were such that they undermined Hall's will and compelled him to make the statements he has now moved to suppress, as will be shown at any hearing on the defendant's motion.

### C.   Any testimony by Hall at the suppression hearing would be inherently suspect.

At the suppression hearing, Hall may seek to assert that his "will was overborne" and that he was overly vulnerable due to the circumstances exiting at the time the statements were made. The Fourth Circuit has recognized, however, that self-serving

testimony by a defendant such as Hall at a suppression hearing must be considered

with great care. *See  United States v.  Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (where

there was no evidence in the record-other than defendant's self-serving testimony - to

establish that the officers were so intimidating and overpowering that defendant's will

to resist was overcome.)  "We attach little significance to Braxton's testimony that he felt

intimidated in the presence of [the Officers]." *Id*.  The Fourth Circuit has recognized that

subsequent testimony by an accused about his prior subjective mental impressions and

reactions when he made a statement to the police must be carefully scrutinized, as such

testimony is "always influenced by the defendant's self-interest."  *Id*.

### D. <u>Hall's Statements Are Admissible Pursuant to FRE 801 (d) (2) (A)</u>

In criminal cases at least, the most commonly rule of evidence concerning the

admission of a defendant's statements is FRE 801(d)(2)(A), which provides that when

admitted against the party (the defendant) by the party-opponent (the government) the

defendant's statements are not hearsay. *See, e.g. United States. v. Fowler*, 74 Fed.Appx.

262,  263 4th Cir. 2003) (not error for court to allow government to admit defendant's

own taped statements as statement by a party-opponent pursuant to F.R.E.

801(d)(2)(A)).  Here, Hall's statements are not hearsay if used by the government.  How

the jury might construe the meaning of these statements is solely up to them. Certainly,

one permissible construction of Hall's statement that he would take fifty years is that it

amounts to an admission.   Similarly, Hall's interest in whether his arrest made the press reveals could be seen to reveal that Hall was pleased by his notoriety and that he was vainly reveling in the prospect of his being mentioned in connection with a witness murder. Certainly Hall never *denied* committing the crime. Evidence of Hall's reaction to publicity connected to his arrest for a horrible crime is relevant evidence that informs the jury as to his possible guilt. The weight to be given this evidence is a matter for the jury to determine.

III.   **No Factual or Legal Justification Exists for Conducting a Pretrial Witness "Reliability Hearing" Which Would be Tantamount to Trying the Case Twice**.

A.   **The Government has No "Compensated Witnesses"**

The defendant has filed a "Motion to Exclude Cooperating Witness Testimony and Request for a Reliability Hearing." Doc. 41.  The motion must be denied for several reasons. First, the asserted need for such a hearing is based upon a fundamentally incorrect characterization of the eyewitnesses to the murder and their relationship to the government. If Hall is asserting that such a hearing is warranted because the government is using witnesses whose  "compensation is based on the content and nature of the testimony given," then no hearing is warranted because no such witnesses will be presented by the government.  In addition, even where such witnesses are presented in a government case, Hall has presented NO Fourth Circuit authority or

authority from *any* federal court that supports his request for a pretrial "reliability"

hearing.  The circumstances of the witnesses in *United States v. Levenite*, 277 F.3d 454 (4th

Cir. 2002), upon which Hall seems to base his claim, are distinctly different from those

of the eyewitnesses in the present case.  There, the court was addressing the importance

of the government disclosing its relationship with "compensated witnesses" who testify

pursuant to a contingency payment agreement.  There are no such witnesses in this

case, as Hall well knows.

In *Levenite* (where no pretrial reliability hearing was held, contemplated or

recommended)  some of the evidence against the various defendants charged in a large

scale outlaw motorcycle gang drug conspiracy had been provided by a witness the FBI

had hired to infiltrate the group and whose payment was in part contingent on his

testimony. *Levenite*, 277 F.3d at 459. 62-63. In the present case there is no witness

remotely like the compensated witness in *Levenite*, who was described by that court as

follows:

> The agreement recited that the FBI was conducting an investigation into
> racketeering and drug distribution by "an outlaw motorcycle organization
> known as the Renegades" and that Lowe had information and was willing
> to "furnish assistance" to the FBI. Under the agreement, Lowe agreed to
> disclose information to the FBI, to introduce undercover FBI agents to
> members of the Renegades, to wear wires and make recordings, and to
> testify in "any and all court proceedings." He agreed not to initiate any
> criminal acts and not to participate in unlawful acts except as authorized
> by the FBI. The FBI retained the right to control the investigation, as well
> as the right to terminate it at any time.

In accordance with the agreement, Lowe received $2,000 per month for his services and $1,300 per month for his expenses. Later, the FBI also purchased a motorcycle for him so that he could become a member of the Renegades. In addition, the agreement provided for a potential lump-sum payment of up to $100,000, at the discretion of the FBI at the end of the case. With respect to this $100,000 payment, the agreement provided:

The FBI may, at its sole option and choice, elect to furnish Mr. Lowe with a lump sum of money, not to exceed $100,000.00, upon the completion of the investigation. Factors to be considered by the FBI in [determining] the amount shall include, but not be limited to the following: the extent of cooperation in the investigation by Mr. Lowe, the activities of Mr. Lowe in the furtherance of the investigation and in attaining the objectives of the investigation, and the degree of compliance with this Agreement by Mr. Lowe.

The agreement not only made any payment contingent upon Lowe's compliance with the agreement but also upon his maintenance of confidentiality.

Id. at 459. [9]

Hall's assertion that, "several witness are being compensated specifically for testimony adverse to Mr. Hall" (Document 41 at 4) is misleading and unsupportable.

*None* of the government's witnesses are being "compensated specifically for testimony

---

[9] As is the court, the undersigned is familiar with and has supervised federal investigations involving "compensated witnesses," usually in the conduct of long term "front" operations in the drug or money laundering arena. There, contacts may made with hired witnesses who may have fees paid to them for operating the front enterprise. It is THAT sort of witness that was addressed in *Levetan* as requiring full disclosure. That case, however, and the issues addressed therein, have nothing to do with this case.

adverse to Mr. Hall," nor do any have arrangements with the government like the witness in *Levenite*.

**B. The Eyewitnesses are Not "Cooperators"**

Actually, it is a gross mischaracterization to even characterize most of the eyewitnesses to be called by the government as "cooperators." The term "cooperators" applies to witnesses who are co-conspirators or otherwise culpable participants in the crime--accessories. As to involvement in the actual murder of Guest, the government's eyewitnesses (based upon the evidence to date) are not culpable. With the arguable exception of Duckett, to whom Hall stated that he was going to "smash" Guest, and Witness 1, who retrieved the 9mm handgun used by Hall, none of the eyewitness can be shown to be accessories to the murder. Regardless, even "cooperators" are not the sort of compensated witnesses addressed in *Levenite*. Moreover, the disclosure issues discussed in *Levenite* do not pertain here, where - at no small risk to the eyewitnesses - the government has provided their grand jury transcripts and other identifying information well before trial. The government has done so precisely because it recognizes that it would be unfair, in light of the material differences in the testimony of some of these eyewitnesses, to withhold the prior testimony of the witnesses until a week or two before trial. The government's witnesses, however, are not "cooperators." They are eyewitnesses. It can be said this way: if eyewitnesses such as Shameka Ross,

24

Witness 5, Raine Curtis, and Tamika Mouzon were to inform the government that they refused to testify, they would *still* not be charged with the murder of Guest, since there is no evidence of their knowing, wilful, and intentional participation in the murder.  To equate these eyewitnesses with "compensated witnesses" is a more than a bit misleading.

Two other eyewitnesses (to the murder) that the government may call, are likewise not "compensated witnesses."  Kevin Duckett might be characterized as a "cooperator," in the sense that in his immunized proffer he admitted that jsut before the murder Hall told him that he was going to "smash"(kill) Guest.  As a member of the drug conspiracy charged in Count One, Duckett would arguably be culpable (under a *Pinkerton* theory) for the  Guest murder.  Duckett also admitted to an accessory role in the murder by Hall of Martie Williams in March 2009.  Notably, unlike several other of the eyewitnesses, Duckett has only given but one version of events.

Witness 1 initially denied being present at the murder but he ultimately admitted he retrieved the handgun for Hall.  However, there is no evidence that Witness 1 knew *why* Hall requested the gun or that Witness 1 had a intentional part in the murder, as would be required to convict Witness 1 as an accessory.

 The fact that several eyewitnesses have admitted that they testified falsely, however, is not a basis for a "reliability hearing."  Hall has not shown a single instance

of a federal court holding such a hearing.  It is, after all, the unique function of the jury to assess witnesses, and particularly eyewitnesses.  *See e.g. United States v. Manbeck*, 744 F.2d 360, 392 (4th Cir.1984). ("[I]it is the role of the fact-finder to judge the credibility of witnesses, resolve conflicts in testimony, and weigh the evidence.)  The court likely recalls that in *United States v. Byers*, RDB 08 -056, in which Byers was tried in 2009 for the murder of witness Carl Lackl, the government's case relied significantly upon a single witness, Marcus Pearson, to show that Byers was the person who orchestrated the murder of witness Carl Lackl.  The court may recall that Pearson made at least *seven* distinctly different statements as to what happened,  six of which were video taped.  Still, there was no need for a mini-trial to assess Pearson's reliability, nor is one needed here.

While the court has broad discretion in admitting testimony, Hall's motion seems to suggest that FRE 104 (c), which provides that hearings concerning the admissibility of a *defendant's confession* be held outside the presence of the jury can be extended to witness reliability hearings. Not so.  Indeed, in a more analogous context, courts of appeals have routinely affirmed a district court's *denial* of motions seeking preliminary hearings pursuant to Rule 104 to establish the existence of a conspiracy prior to admitting evidence of coconspirator statements pursuant to FRE 801(d)(2)(E).   *See e.g,. United States v. Hines*, 717 F.2d 1481, 1488 ( 4th Cir. 1983) (Trial judge retains option to

admit conditionally declarations of coconspirators before conspiracy has been independently established, subject to subsequent fulfillment of that factual predicate.)

Furthermore,  the eyewitnesses at whom Hall's motion is directed are also not "jailhouse snitches." Doc. 41 at 12. The government's witnesses are non-cooperator eyewitnesses-quite a different thing from a jailhouse informant who may have something to lose.  The only criminal penalties these *eyewitnesses* face are the same ones faced by *any* witness who takes the oath.

Neither can these *eye*witnesses be fairly compared to expert witnesses. Document 41 at 13. Indeed, if Hall's motion for a reliability hearing were granted, it would logically require such hearings for *every* witness, in every trial.  Every *lay* witness, every *eyewitness*, every *cooperating* witness, every *expert* witness would face a "reliability hearing" before being permitted to testify at trial.  A novel idea, and no doubt a boon for the defense, but also unnecessary, wasteful, burdensome, time consuming and, in the end, a practice that would substitute juries with judges to do the job juries are supposed to do– assess witnesses.  History proves that no such judicial substitution is necessary.

The requested hearing would also seem to be tactically unnecessary since Hall has received extensive discovery and already knows what the witnesses have said and what they will say.  At any rate, federal jurors have been themselves quite able to assess

credibility and reliability, even of witnesses who may have provided conflicting

accounts.  In sum, Hall's motion is frivolous. There simply is no need for a time

consuming mini- trial.  The government therefore respectfully submits that Hall's

motion should be denied and the jury allowed to do its job.

IV.    **Evidence of Hall's Prior Drug Trafficking and Firearm Use  Is Intrinsic to the Conspiracies Charged in Counts One and Two. That Conduct is Also Intrinsic to Elements of the Murder Charged in Count Three;  Even Absent the Addition of Count One the Indictment, that Evidence Is Relevant and         Necessary to Establishing Hall's** Motive to         **Retaliate Against Guest Pursuant to Rule 404(b)**.

A.     **The Count One drug trafficking conspiracy is logically connected to the murder/retaliation charged in Count Three; both offenses <u>are inextricably intertwined to Hall's drug trafficking</u>.**

*1. Joinder of the drug trafficking and murder counts is proper.*

Hall has moved for severance of Counts One and Two of the Superseding

Indictment. Alternatively, in the absence of the Superseding Indictment, he would seek

to preclude the introduction of extrinsic evidence of Hall's drug trafficking and firearm

use pursuant to Rule 404(b).  *See,* Docs. 40 and 42.  In addition to several witnesses who

will testify that Hall has been a crack dealer since at least 2004, the evidence at trial will

include several drug seizures from Hall (*three* of which resulted in felony drug

trafficking convictions in Baltimore Circuit Court) and two drug related shootings, one

28

being the retaliatory shooting of R.P., for talking to the police. [10]  Hall's drug trafficking

is described in discovery materials consisting of over 1000 pages of police reports,

criminal records, FBI 302s and grand jury transcripts. That evidence is intrinsic to

elements of the murder charged in Count Three because it provides the framework

without which the murder cannot be understood.  "Evidence, when not part of the

crime charged but pertaining to the chain of events explaining the context, motive and

set-up of the crime, is properly admitted if it forms **an integral and natural part of an**

**account of the crime, or is necessary to complete the story of the crime for the jury**.  In

such a situation, because the evidence is intrinsic, not extrinsic, we do not engage in a

Rule 404(b) analysis." *United States. v. Johnson*, Slip Copy, 2011 WL 288522 at *8 (4th Cir.

2011) (emphasis added).  *See,  United States v. Foutz*, 540 F.2d 733( 4th Cir. 1976) (Where

evidence that defendant has committed one crime would be of probative value at

defendant's separate trial for another crime, and thus admissible, defendant does not

suffer any additional prejudice if two offenses are tried together.)  "Evidence is

necessary, even if it does not relate to an element of a charged offense, when it furnishes

part of the context of the crime."F.3d ----, 2011 WL 1718895 at *9. (4th Cir. 2011).  "[A]cts

---

[10] The government will seek to introduce evidence of both the drug trafficking
conduct (which are intrinsic to Counts One and Three) and of Hall's three felony drug
trafficking convictions. The underlying reports and transcripts in support of the overt
acts alleged in the Superseding Indictment and other drug trafficking conduct have
been provided to Hall.

intrinsic to the alleged crime do not fall under Rule 404(b) ' s of uncharged conduct is

not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of

the same series of transactions as the charged offense, or if [evidence of the uncharged

conduct] is necessary to complete the story of the crime on trial." *United States v.*

*Redding*, Slip Copy, 2011 WL 1252746 at *2 (4th Cir. 2011) . "Other criminal acts are

intrinsic when they are inextricably intertwined or both acts are part of a single criminal

episode or the other acts were necessary preliminaries to the crime charged.  Evidence is

intrinsic if it is necessary to "provide *context* relevant to the criminal charges." *United*

*States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007).

Hall argues that joinder of Count One (and Two) of the Superseding Indictment

with Counts Three - Five  is improper under Fed. R. Crim. P. 8 and that severance is

required under Fed. R. Crim. P. 14.  Not so.  The Fourth Circuit has recognized that

"Rule 8(a) permits very broad joinder because of the efficiency in trying the defendant

on related counts in the same trial." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir.

2005).  Moreover, the court has repeatedly held that joinder is the "rule rather than the

exception," *United States v. Acker*, 52 F.3d 509, 514 (4th Cir.1995);  *United States v. Roberts*,

233 Fed.Appx. 305 (4th Cir. 2007);  *United States v. Hawkins*, 589 F.3d 694 (4th Vir. 2009)

(joinder is the rule rather than the exception because of the efficiency in trying the

defendant on related counts in the same trial, therefore Rule 8 permits very broad

joinder because the prospect of duplicating witness testimony, impaneling additional

jurors, and wasting limited judicial resources suggests that related offenses should be

tried in a single proceeding).  In *United States v. Cardwell*, 433 F.3d 378 ( 4th Cir. 2005) the

Fourth Circuit held that there was a "logical connection" between the counts in the

indictment and that joinder was proper under Rule 8(a).  *Id.*  at 387.  The court affirmed

the denial of the motion for severance, noting that the Supreme Court has admonished

that "when defendants properly have been joined under [Rule 8], a district court should

grant a severance under Rule 14 only if there is a serious risk that a joint trial would ...

prevent the jury from making a reliable judgment about guilt or innocence." *Id., quoting,*

*Zafiro*, 506 U.S. at 539.

Furthermore, it is *Hall's* burden to show that Counts One and Two are

improperly joined and that severance is required under Rule 14.  *United States v.*

*Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984) (party seeking severance bears the burden of

demonstrating "a strong showing of prejudice.")  *United States v. Branch*, 537 F.3d 328,

341 (4th Cir.2008) (Under Rule 14, the party seeking severance bears the burden of

demonstrating a "strong showing" of prejudice.)  Rule 14(a)  provides that  "[i]f the

joinder of offenses ... appears to prejudice a defendant or the government, the court may

order separate trials of counts." Fed.R.Crim.P. 14(a).  The Fourth Circuit has held that a

district court's denial of a motion to sever "should be left undisturbed, absent a showing

31

of clear prejudice or abuse of discretion." *United States v. Acker*, 52 F.3d at 514 (defendant appealing the denial of his Rule 14(a) motion for severance must show that the joinder was "so manifestly prejudicial that it outweighed the dominant concern with judicial economy".

For years before he murdered Kareem Guest in September 2009, Hall sold crack in and around Westport.  Indeed, as a practical matter, it is would be almost impossible for the government's witness to even explain how they know Hall without reference to his drug trafficking activity, since that is a big part of Hall's identity.  Hall killed Kareem Guest to eliminate him from becoming a witness against him and to retaliate for providing information to the FBI about Hall's drug trafficking.  By killing Guest Hall also sent a message to anyone else who might think about talking to the FBI.  It is no secret that drug trafficking can only survive and thrive in an environment where it is known that anyone who "tells" will be punished.  In Baltimore, drug traffickers like Hall employ fear, intimidation and brutal retaliation to create an atmosphere in which they can survive.  *"Snitches get stitches"* is not just a crude urban jingle. It is an unfortunate condition of life in those Baltimore neighborhoods most afflicted by drug dealing. That reality caused several of the government's eyewitness to risk being jailed for perjury rather than testify truthfully.  To a one, they told the grand jury that they were simply afraid, since, after all, they had seen what happens to "snitches."  Several

witnesses will testify that Guest's last words were, 'No, Mack , no. I didn't tell them anything."  Without the drug trafficking evidence that supports Count 1, the jury will never understand the meaning of Mr. Guest's last words.

The killing of Guest, then, was part and parcel of Hall's drug trafficking, and would be admissible whether or not Count One had been added.  The government is not seeking to show that Hall is a murderer who just *happens* to be a drug dealer.  The drug trafficking evidence is not gratuitous.  Hall was a drug dealer who killed Guest because he had identified Hall as such to the FBI.  Hall killed Guest with a 9mm handgun that he kept in the very neighborhood where he sold drugs. Hall also told a member of his conspiracy, a friend and fellow drug dealer (who will testify at trial) that he was going to kill Guest because Guest put Hall's name in "those papers."  Were Hall not a drug dealer he would have had no motive to kill Guest.

In  *United States v. Mir*, 525 F.3d 351, 356 (4th Cir. 2008), the Fourth Circuit held that a "logical connection" between charged offenses for purposes of joinder under Rule 8 exists where one crime provides the *motive* for another charged  offense.  In *Mir*,  the court refused to sever the defendant's witness tampering charge where the obstructive conduct was designed to impede the government's investigation of the underlying labor certification fraud. *Mir*,  525 F.3d at 357 (denying severance because trying the  charges separately would have led to "significant inconvenience for the government and its

witnesses, and required a needless duplication of judicial effort in light of the legal, factual, and logistical relationship between the charges").  The defendant in *Mir* had attempted to persuade witnesses to lie before the grand jury and flee the jurisdiction before testifying.  *Id*. at 357.  The court noted that even if the tampering charges had been severed, the government would still have needed to introduce evidence pertaining to the underlying labor certification fraud in the tampering case for a jury to "*make sense*" of the witness tampering charge.  *Id*.  That logic likewise applies here.  *See also*, *United States v. Foutz*, 540 F.2d 733( 4th Cir. 1976) (Where evidence that defendant has committed one crime would be of *probative value* at defendant's separate trial for another crime, and thus admissible, defendant does not suffer any additional prejudice if two offenses are tried together.)

Finally, the Fourth Circuit has recognized that severance is not needed where the court's instructions to the jury sufficiently neutralized the possibility that the jury would hold a defendant's felony status against him when considering his guilt on other charges." *Id*.;  *United States v. Mackins*, 315 F.3d 399, 412, 415 (4th Cir. 2003); *see also,* *United States v. Smith,* 281 Fed.Appx. 303 (5th Cir. 2008) (Joinder of one count of selling crack and one count of using telephone in connection with murder-for-hire plot did not unduly prejudice defendant by allowing introduction of additional evidence of drug dealing relevant to murder-for-hire plot that would not have been admissible on crack

charge, so as to require severance, given strong evidence that defendant was involved in charged crack sale and use of limiting instruction); *United States  v. Ervin*, 540 F.3d 623 (7th Cir.2008 ) (There was no "spill-over-effect" from jointly trying drug conspiracy counts with homicide counts, as would require severance; district court instructed jury to consider each count and its related evidence separately, and nothing indicated that jury ignored court's instructions.)

> **2.**       ***Even if Count One had not been added, evidence of Hall's drug trafficking would be intrinsic to proving the elements of Count Three.***

There is an obvious, logical, factual connection between Hall's drug trafficking and the murder of Guest.  Beyond that, however, the drug trafficking conduct alleged in Count One and the witness murder in Count Three of the Superseding Indictment are connected as a matter of law.  To prove Count Three the government must show that Hall retaliated against Mr. Guest for "**providing to a law enforcement officer any information relating to the commission or possible commission of a federal offense**..."  18 U.S.C. § 1513 (a)(1)(B).  The evidence will show that in February 2008, when FBI agents questioned him about drug trafficking in Westport, Kareem Guest identified Hall as a violent drug trafficker.  As noted, Hall even told a member of his conspiracy, a friend and fellow drug dealer that he was going to kill Guest because Guest put is name in "those papers."   That statement, like the information Guest

provided about Hall to the FBI, was evidence that Hall committed several federal firearm and drug trafficking crimes, to which the information received by the FBI from Guest related. Evidence that the crimes about which Guest provided information are federal crimes is therefore *intrinsic* to proving an element of Count Three. That drug trafficking evidence is therefore intrinsic to proving Count Three and would be admissible regardless of whether Count One was added.

### 3. *The prior firearm use alleged in Count Two is also properly joined*

It is also well settled that Hall's use of firearms (as charged in Count 2) is logically connected to Counts 1, 3, 4 and 5. The Fourth Circuit has repeatedly held that a person's prior possession of a firearm renders it more likely that any subsequent possession of a firearm is knowing and intentional, rather than unknowing or by mistake. *United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir. 1997); *United States v. Brewer*, 1 F.3d 1430, 1433 (4th Cir. 1993); *Mark*, 943 F.2d at 448. *United States v. Walker*, 217 F.3d 843 at *1 (4th Cir. 2000) ( affirming that gun possessed by defendant when he assaulted informant for setting him up was connected to the offense.)

The Fourth Circuit has also recognized that firearms and drug trafficking go together like peanut butter and jelly. *See United States v. Grogins*, 163 F.3d 795, 799 (4th Cir. 1998) ("the connection between illegal drug operations and guns in our society is a tight one"); *United States v Davis*, 383 Fed.Appx. 269 (4th Cir. 2010) ("[T]his court has

36

noted several ways a firearm could further or advance drug trafficking, including

protection and intimidation."); *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997)

("As we have often noted, where there are drugs, there are almost always guns.");

*United States v. White*, 875 F.2d 427, 433 (4th Cir. 1989) (recognizing that weapons have

become "tools of the trade" in illegal narcotics operations); *See also*, *United States v.*

*Hines*, 856 F.2d 438, 443 (1st Cir. 1988) ("We have only to read the daily newspapers or

watch the news on television to recognize that narcotic dealing and guns go hand in

hand.").

    The Fourth Circuit recently reiterated its recognition of this connection and took

note of some of the many ways guns relate to drug trafficking in *United States v.*

*Waldron*, 389 Fed.Appx. 283, 286 (4th Cir. 2010):

> ...the fact finder is free to consider the numerous ways in which a firearm
> might further or advance drug trafficking. For example, a gun could
> provide a defense against someone trying to steal drugs or drug profits, or
> it might lessen the chance that a robbery would even be attempted.
> Additionally, a gun might enable a drug trafficker to ensure that he
> collects during a drug deal. And a gun could serve as protection in the
> event that a deal turns sour. Or it might prevent a transaction from
> turning sour in the first place. Furthermore, a firearm could help a drug
> trafficker defend his turf by deterring others from operating in the same
> area.

*United States v. Waldron*, 389 Fed.Appx. at 286.

    Hall has pleaded not guilty, therefore the government is entitled prove both that

he committed the murder and *why*.  In that sense, the drug and firearm conspiracies are

inextricably intertwined with the murder counts.

**B.  Severance of Count One would be improper where the drug trafficking evidence would still be admissible pursuant to Rule 404(b) because it is <u>relevant and necessary to establish Hall's motive.</u>**

  1.  *Guest's information to the FBI about of Hall's drug trafficking conduct was the motive for the murder.*

As seen, evidence concerning Hall's drug trafficking as charged in Count One is

intrinsic to proving that Guest provided information about a federal crime, which is an

element of  Count Three.  Apart from that, and regardless of whether Count One had

been added, evidence of Hall's drug trafficking would be admissible as extrinsic, "other

bad acts" evidence  pursuant to Rule 404(b) because it is *relevant* and *necessary* to

proving Hall's *motive*.  Simply, were Hall not a drug dealer he would have no motive,

no *reason*, to murder Guest.

 Rule 404(b) prohibits evidence of "other crimes, wrongs, or acts  " *solely* to prove

a defendant's bad character, but "such evidence ... may 'be admissible for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident." *United States  v. Byers*, --- F.3d ----, 2011 WL

1718895 at *6 (4th Cir 2011);  *United States v. Basham*, 561 F.3d 302, 326 (4th Cir.2009).

Rule 404(b) is a rule of inclusion, "admitting all evidence of other crimes or acts except

that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271–72 (4th Cir.2001).

As the Fourth Circuit recently reiterated in *United States v. Byers*, *supra*, for prior bad acts to be admissible under Rule 404(b), the proffered evidence "(1) must be ... relevant to an issue other than character," such as identity or motive, *United States v. Siegel*, 536 F.3d 306, 317–18 (4th Cir.2008); (ii) "must be necessary to prove an element of the crime charged," *United States v. Queen*, 132 F.3d 991, 995 (4th Cir.1997), or to prove context, and (iii) "must be reliable." *Byers*, 2011 WL 1718895 at *6 .

In addition, "the probative value of the evidence must not be substantially outweighed by its prejudicial effect," which "involves a Rule 403 determination." *Byers, citing United States v. Lighty*, 616 F.3d 321, 352 (4th Cir.2010).  As used in Rule 403, prejudice refers only to evidence that has an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note; *see also United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir.1995) (ruling that prejudice is shown only where court believes the evidence will unduly excite the emotions of the jury and thereby cause it to act irrationally). Under Rule 404(b) evidence should be excluded only when it serves *no other* purpose other than to show that a defendant  possesses bad character.  *See Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (explaining that propensity evidence is excluded because it

might "overpersuade" a jury and cause them to "prejudge one with a bad general

record"); *United States v. Queen*, 132 F.3d at 831.   On appeal, a  district court's decision

to admit evidence under Rule 404(b) is reviewed for abuse of discretion, which will not

be found unless the court's decision to admit evidence under Rule 404(b) was "arbitrary

and irrational." *United States v. Weaver*, 282 F.2d 302, 313 (4th Cir.2003).

> 2.      *Relevance and Necessity  under Rule 404 (b)*

As recently reiterated in *United States v. Byers, supra,*  to be admissible pursuant

to Rule 404(b), the "other act" evidence must be *relevant* and *necessary*. The test is not an

especially rigorous one.  "Relevance" is the lowest of evidentiary thresholds; it is

defined for these purposes to include any evidence that is "sufficiently related to the

charged offense." *Rawle,* 845 F.2d at 1244, n. 3.   Evidence is relevant under Rule 404

where it tends to make the existence of an offense element more probable than without

the evidence. The rules of evidence give trial judges broad discretion in evaluating

whether evidence is probative, requiring only a "plus value" to make it admissible.

Once admitted, the value or weight of the evidence is determined by the jury. The

evidentiary fact offered merely needs to be "worth consideration" by the jury. It is for

the jury to give the fact the appropriate weight in effecting persuasion.  relevant even in

those counts were severed–which is precisely why they should not be severed.  Here,

the drug trafficking evidence underlying Counts One and Two is relevant to

40

establishing Hall's motive, plan and intent to murder Guest as charged in Counts Three and Four.

Rule 404(b) evidence is *necessary* "where it is an essential part of the crimes on trial, or where it furnishes part of the *context* of the crime." *United States v. Mark*, 943 F.2d 444, 448 (4th Cir.1991); *see United States v. Smith*, 441 F.3d 254, 262 (4th Cir.2006) ("Evidence is necessary, even if it does not relate to an element of a charged offense, **when it furnishes part of the context of the crime**.") (emphasis added);   The Fourth Circuit has found that the testimony is admissible under Rule 404(b) where it "was necessary to inform the jury of the context of the defendant's  participation in the conspiracy and to **complete the story** presented by the government at trial." *United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998), *cert denied*, 524 U.S. 932 (1998) (*citing United States v. Kennedy*, 32 F.3d 876, 885–86 (4th Cir. 1994)).

Significantly, courts must determine whether prior bad acts evidence is "necessary" under Rule 404(b) in "light of other evidence available to the government ." *Queen*, 132 F.3d at 998.  Thus, "as the quantum of other non-Rule 404(b) evidence available to prove an issue unrelated to character increases, the need for the Rule 404(b) evidence decreases." *Lighty*, 616 F.3d at 354 ("[I]f the [uncharged] Rule 404(b) evidence is entirely cumulative to other non-Rule 404(b) evidence available to the government,

the Rule 404(b) evidence may not meet the necessity prong."[11]).  In *Byers*, the Fourth

Circuit also recognized that the inverse is also true and the evidence becomes more

necessary where, as here, the crux of the defense is to establish the non-credibility of the

government's witnesses.  "Rule 404(b) evidence is more likely to become necessary

where the evidence intrinsic to the crime at issue is sparse or weak. *Byers*, 2011 WL

1718895, at*10;  *United States v. Wilson*, 624 F.3d 640, 654 (4th Cir.2010); *United States v.*

*DiZenzo*, 500 F.2d 263, 266 (4th Cir.1974).  What weakened the evidence in *Byers* and

thereby justified the introduction of the uncharged Coleman shooting pursuant to Rule

404 was Byers' attack on the credibility of the witnesses, and in particular upon Lackl

himself.

Here, it is clear that Hall contemplates a similar attack on witness credibility

attack, as already demonstrated by motion seeking a "reliability hearing" prior to the

court allowing testimony from the government's lay witnesses.   In an identical

situation, the Fourth Circuit has affirmed the use of Rule 404(b) evidence to support

credibility, holding that, "Logically, then, when the evidence presented to the jury

"generate [s] uncertainty about motive or identity, resort to ... other crimes evidence

[may be] appropriate." *Byers*, 2011 WL 1718895, at*10.   "Byers's cross-examination of

_____

[11] Of course, here,  no Rule 404(b) analysis is necessary since the drug trafficking
conduct is properly joined to Count Three.  In *Byers*, the Coleman shooting that was at
issue was uncharged conduct, so it was subject to Rule 404 analysis.

the government witnesses created a significant credibility issue, thereby "generat[ing] uncertainty" about whether Byers was the person who shot Haynes." *Id.*; *United States v. Hadaway*, 681 F.2d 214, 218 (4th Cir.1982); *United States v. Lamarr*, 75 F.3d 964, 970–71 (4th Cir.1996) (evidence necessary to prove lack of credibility is an issue separate from character and satisfies Rule 404(b)).

Perhaps if the defense here was something other than that the prosecution was based on a conspiracy of liars who have joined together to blame Hall while protecting the real murderer, then it might not be necessary to show that Hall was a drug trafficker.  Hall has declaimed the government's witnesses, individually and as a group, as incredible, compensated, "snitches" who,  in his view, should not even be permitted to testify. There is no question but that witness credibility will be the key issue at trial. Corroborative evidence of Hall's drug trafficking as his motive, then, becomes only more relevant and more necessary.

### 3.  Rule 404 Allows "Prior Bad Acts Evidence" to establish Motive

In many instances, including cases involving murder, the Fourth Circuit has affirmed the admission of motive evidence pursuant to Rule 404(b).  *See*,  *United States v. Byers*, --- F.3d ----, 2011 WL 1718895 at *6 ;  *United States v.  Siegel*, 536 F.3d at 318-19 (where other crime evidence is important to establishing motive, an essential element of the § 1512 charge, it is "necessary"); *United States v. Aramony*, 88 F.3d 1369, 1377 (4th

Cir.1996); *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir.1992) (holding evidence of defendant's extramarital affairs and discharge from the Marine Corps admissible to show motive in the murder of defendant's wife).

In *United States v. Gray*, 405 F.3d 227 (4th Cir. 2005), *cert denied*, 546 U.S. 912 (2005),  the Defendant challenged the lower court's admission of testimony relating to the murder of defendant's first husband. The Fourth Circuit affirmed and held that the evidence was properly admitted under Rule 404(b) not only to show that the defendant intentionally killed her second husband and intentionally concealed her crime from the insurance companies, but also to show the defendant's *motivation* to kill him in order to eliminate the only witness to her first husband's murder. *Id*. at 239.

There are numerous other examples of the admission of motive evidence pursuant to Rule 404(b).  In *United States v. Foster*, 2004 U.S. Dist. LEXIS 1039, Criminal No. CCB-02-0410),  the defendants were charged with narcotics conspiracy and capital murder.  *Id*. at *1.  One of the defendants sought to exclude evidence of two uncharged double murders committed before he turned 18 years old.  *Id*. at *2.  The government argued that the evidence was necessary to explain the defendant's motive to commit the murder with which he was charged in that the defendant killed the victim because he had spoken to the police about one of the other defendants with whom he had committed the double murder.  *Id*. at *5.  The Fourth Circuit held that, as crimes

44

committed by the defendant in furtherance of the charged conspiracy, the double

murder was "intrinsic" to that conspiracy, and evidence of the murders could be

admitted without regard to Fed. R. Evid. 404(b).  *Id.* at *3.  The court *further* held that the

evidence was also admissible under Rule 404(b) as relevant to the defendant's *motive*,

intent, and absence of mistake in killing the victim.  *Id*.

In *United States v. Higgs*, 353 F.3d 281, 312 (4th Cir. 2003), *cert. denied*, 543 U.S.

1004 (2004), the Defendant challenged lower court's admission of a former girlfriend's

testimony that he had threatened her and another individual with death if either

implicated him in an unrelated bank fraud scheme.  *Id*. at 312.  The Fourth Circuit

concluded that the challenged bank fraud and related death threats issued by the

defendant when he became concerned that his partners in the fraud scheme might

"snitch" on him were admissible to show the defendant's <u>motive</u> and intent to murder

one of the victims in an unrelated matter to likewise keep her from taking steps that

might implicate him in criminal activities or otherwise harm him in some way.

### 4. The Drug Trafficking Evidence Satisfies Rule 404(b)'s Reliability Requirement

Evidence is *reliable* for purposes of Rule 404(b) "unless it is so preposterous that

it could not be believed by a rational and properly instructed juror." *United States  v.*

*Siegel*, 536 F.3d at 319 *quoting United States v. Aramony*, 88 F.3d at 1378.   Further,

"reliability" only requires proof of the identified acts by a preponderance of the

evidence.  *See Huddleston v. United States*, 485 U.S. 681 (1988). Even uncorroborated testimony from cooperating witnesses may be strong enough by itself to satisfy the reliability prong.  *See Hadaway*, 681 F.2d at 218. Here, the proffered Count One/Rule 404 drug trafficking evidence will be established by the testimony of several fellow members of the conspiracy, police officers who observed Hall selling drugs and seized crack from him on the occasions set out in the overt acts section of the Superseding Indictment, and court records of Hall's three convictions for drug trafficking.  That Hall has three felony drug trafficking convictions that are based upon three of the alleged overt acts also tend to greatly reinforce the overall reliability of the evidence that Hall is a drug trafficker and thus motivated to murder Guest.

### 5. The drug trafficking evidence is not unfairly prejudicial.

Finally, the probative value of the Count One/Rule 404 drug trafficking evidence is not outweighed by its prejudicial effect. Evidence sought to be admitted under Rule 404(b) must satisfy Rule 403's requirement that the probative value of the evidence must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. "[G]eneral prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence. Evidence may be excluded under Rule 403 only if the evidence is unfairly prejudicial

and, even then, only if the unfair prejudice substantially outweighs the probative value

of the evidence." *United States v. Siegel*, 536 F.3d at 319.  In turn, unfair prejudice exists

"when there is a genuine risk that the emotions of a jury will be excited to irrational

behavior, and this risk is disproportionate to the probative value of the offered

evidence." *Id.* Generally speaking, "bad acts" evidence, admissible under Rule 404, is

not barred by Rule 403 where such evidence "did not involve conduct any more

sensational or disturbing than the crimes with which [the defendant] was charged."

*United States v. Boyd*, 53 F.3d 631, 637 (4th Cir.1995).

Here, there is no danger that the jury will be unfairly prejudiced by the evidence

that Hall, who is accused of the brutal murder of witness, was also a street level crack

dealer, a far less serious accusation.  The probative value of this evidence is not likely to

be substantially outweighed by confusion or unfair prejudice that would tend to cause a

fact finder to subordinate "reason to emotion."  Further, as noted, the story of the

murder of Mr. Guest simply cannot be told without explaining *why* it happened.

## CONCLUSION

For the reasons stated above, the government respectfully submits that the

defendant's motion to suppress his post-arrest statements should be denied because

those statements were spontaneously and voluntarily made.  There is also no legal or

factual basis upon which to grant a "reliability hearing."  Finally, Counts One and Three

are inextricably intertwined, and thus they are properly joined. The evidence is an

"essential part of the crimes on trial, [and] furnishes part of the context of the crime."

*Mark*, 943 F.2d at 448.  Moreover, the drug trafficking charged in Count One would be

admissible to establish Hall's motive to kill Mr. Guest pursuant to Rule 404(b) even

absent the superseding indictment.  The drug trafficking evidence is necessary and

relevant to the key issue in the case and without which the murder can neither be

explained or understood.

The government further submits that only the motion to suppress Halls's

statements may require a hearing, and that the remaining pretrial motions may be

decided on the papers as filed.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____/s/_____
John F. Purcell
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26 th day of May, 2011, this Government's

Response to Defendant's Pretrial Motions was electronically filed (Under Seal) with the

clerk of the United States District Court for Maryland, Northern Division, and that copies have also been mailed to Gary Proctor, Esq. and Timothy Sullivan, Esq., counsel for the defendant, Antonio Hall.

_____/s/_____
John F. Purcell, Jr.
Assistant United States Attorney