UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,


Plaintiff,


vs.                      Case No. 1:10-CR-0744-RDB


ANTONIO HALL,


Defendant.

------------------------------------------------------

**AUGUST 2, 2011**

**Transcript of Trial Proceedings**

**Before The Honorable RICHARD D. BENNETT**
**United States District Judge, and a Jury**

APPEARANCES:

For the Plaintiff:     John F. Purcell, Jr.
                       Clinton J. Fuchs
                       Assistant U.S. Attorney


For the Defendant:     Gary E. Proctor
                       Timothy J. Sullivan




Proceedings recorded by mechanical stenography,
transcript produced with computer-aided
transcription.

<pre>
 1                    P R O C E E D I N G S
 2              THE COURT:  Good morning, everyone.
 3     We're ready to proceed.  Good morning, Mr. Hall.
 4              THE DEFENDANT:  Good morning.
 5              THE COURT:  We're ready to proceed with
 6     the opening statements in this case.  There's a few
 7     key preliminary matters.
 8              Mr. Proctor, I received this morning your
 9     motion for mistrial with respect to -- the motion
10     being captioned, motion for mistrial due to the
11     court's impaneling of an anonymous jury.  For reasons
12     indicated yesterday, that motion was denied, and I'll
13     file a memorandum in that respect later today.
14              So that motion, the motion for mistrial,
15     is denied.  And I'll -- for reasons indicated.  And
16     I'll put reasons on the record with respect to,
17     clearly, there's plenty of precedent for anonymous
18     juries, and this jury has no idea they're anonymous.
19     As a matter of fact, they don't have any idea that
20     they're anonymous.  It's just a matter of whether
21     anyone had access to their names or not.  But I will
22     file something today.  But the motion for mistrial,
23     for that reason, is denied.  It's well-established in
24     the Fourth Circuit with respect to impaneling of an
25     anonymous jury.
</pre>

1            We have an issue as to alternate number

2     two having to appear in court tomorrow, Wednesday,

3     August 3, and then on August 10.  That was not so

4     indicated during voir dire, I don't think, according

5     to my notes.  But what we will do in that regard

6     is -- yes, there's no indication documenting

7     alternate number two.

8            Miss West, during the break, if you'll

9     just try to clarify what court she is to be in, and

10    we'll probably make some telephone calls during the

11    break to ensure that she does not need to have to be

12    there at that state proceeding.

13            So unless there is anything further from

14    the point of view of the government or the defendant,

15    we're ready to proceed with opening statements.

16            Anything further from the point of view

17    of the government, Mr. Purcell?

18            MR. PURCELL:  No, Your Honor.  Thank you.

19            THE COURT:  All right.  Anything further

20    from the point of view of the defense, Mr. Proctor?

21            MR. PROCTOR:  Briefly, Your Honor.  I

22    always make an objection, which is always denied, to

23    a case agent being present, if they're planning to

24    testify.  With that said, the rule is in the

25    singular, case agent.  So, anyone who's not a case

4

1    agent, we would move for sequestration at this time

2    and expect, without further argument, Your Honor to

3    deny my motion for the case agent.

4              THE COURT:  Well, the Fourth Circuit has

5    clearly held that there can be a case agent in the

6    courtroom and be so designated.  Only one.  So who is

7    the case agent in this case, Mr. Purcell?

8              MR. PURCELL:  Detective Moody,

9    Your Honor.

10             THE COURT:  All right.  So he's the only

11   case agent who will be here, and he's allowed in the

12   Fourth Circuit laws --

13             MR. PURCELL:  Your Honor, there are a

14   number -- maybe Mr. Proctor is talking about this.

15   But there are a couple of FBI agents who are here

16   helping us with transportation, not witnesses.  I

17   don't even know their names.  They're not witnesses.

18   They're just here.

19             THE COURT:  Well, there's a rule of

20   sequestration under Rule 615 that would be applicable

21   starting right now with respect to any witnesses.

22   That applies not only to witness testimony, but to

23   any statements, opening statements, of counsel.  So

24   Rule 615 now applies, and to the extent that anyone

25   will be a witness, they have to -- they cannot be in

1    the courtroom.  As to any agents assisting with

2    transportation, that's fine.

3                MR. PROCTOR:  Secondly, Judge, I have an

4    issue I want to take up at the bench.  It'll take one

5    minute or less, before the government calls its first

6    witness.  I don't have a preference if we do it right

7    now or after.

8                THE COURT:  Why don't we do it right now

9    so we can get rolling with your opening statement.

10               Mr. Hall, you have your headset there.

11   Just put that in so you can hear the conference up

12   here.

13               (BENCH CONFERENCE ON THE RECORD.)

14               MR. PROCTOR:  Judge, I just wanted to

15   raise an issue.  The government's first witness, as I

16   understand it, is Miss Guest, the victim's mother.

17               THE COURT:  Is that Deborah Guest?  Okay.

18               MR. PROCTOR:  I'm sure Mr. Purcell is

19   calling her for a legitimate reason.  There's no

20   chance I'm not fully apprised here.  But if we get

21   into victim impact and her crying, I just want to

22   raise it ahead of time rather than having a big

23   discussion at the bench.

24               THE COURT:  Well, here's the thing:  With

25   respect to -- she can testify as to the facts.

1    Clearly, it's the mother of someone who was murdered,

2    and so she may show some emotion, but we're not going

3    to get into all the impact on her life or anything.

4              MR. PURCELL:  Your Honor, I'm only going

5    to say this once:  I know how to try a case.  I know

6    what to do and what not to do with victim impact.

7    And I'm not going to do that.

8              MR. PROCTOR:  I'm sure.  I just want -- I

9    didn't want her crying on the stand.

10             THE COURT:  And I'm glad you brought this

11   up ahead of time.  Let me emphasize something here,

12   as well.  I never ever cut lawyers off in terms of

13   length of time.  But if I get a sense that there are

14   too many objections being made and that there are too

15   many conferences here at the bench, and given that

16   we've already gotten off to a very slow start -- we

17   already had a significant matter raised that I wasn't

18   expecting -- I will put clocks on everybody.  This

19   case is going to move.

20             MR. PROCTOR:  We're all fine with that,

21   Judge.

22             THE COURT:  Do you understand that?  This

23   case is going to move.  So to the extent that I have

24   any sense that we're getting dragged along and we're

25   having bench conference after bench conference, you

1      all know me.  I let lawyers try their case.  I think

2      once in eight years have I ever started putting time

3      limits on questioning of witnesses, because I don't

4      believe in that.

5              But having said that, this case has to

6      conclude by next Friday, August 12.  So everyone be

7      mindful of that, and we'll move along.  You're all

8      very experienced lawyers.  You're all good lawyers.

9      You know how to try cases.  So that's fine.  And with

10     that, we're ready to go.

11             MR. PROCTOR:  We discussed this ourselves

12     last night, Your Honor.

13             THE COURT:  Particularly in light of the

14     fact that you've got witnesses you may want to call,

15     Mr. Proctor, it's important to have time for the

16     defendant to be able to present his witnesses.  Let's

17     just all stay on schedule and to the point.  That's

18     good.

19             (END OF BENCH CONFERENCE.)

20             THE COURT:  We're now ready for the jury.

21     Thank you.

22             MR. PURCELL:  Thank you, Your Honor.

23             (JURY IN.)

24             THE COURT:  Good morning, everyone.  You

25     all can be seated.  We're ready now to proceed.  I'm

1      sorry we're getting a little bit of a late start, we

2      had some procedural matters to go through.  We are

3      now ready to proceed with opening statements in the

4      case and we'll first hear from the government.

5                    Mr. Purcell.

6                    MR. PURCELL:  Thank you.

7                    Good morning.  These are my notes.  And

8      I'm already off message, so I don't usually use

9      these, but I may refer to them from time to time.

10     And I'm already going to start somewhere where I

11     wasn't going to start, but let me just say that we

12     all appreciate the sacrifice that you are about to

13     make.

14                    I don't think you had any idea yesterday

15     when you woke up and came down to the courthouse, "I

16     have my little jury slip," that you'd end up in this

17     case.  It is not in any stretch an everyday sort of

18     event because the murder of a witness, thankfully,

19     has not reached the point where it is an everyday

20     circumstance or sort of event.  That is exactly what

21     kind of case you're going to hear.  And you almost

22     weren't because, as you're going to find -- Mr. Hall

23     is his name -- you'll be hearing a lot from

24     individuals who know him far better than any of us --

25     is Mack.

1          Mr. Hall almost got away with murder.

2     Actually he almost got away with two murders and a

3     shooting and with being a drug dealer in Westport,

4     you're going to hear, right here in Baltimore.  And

5     this case as much as anything is going to be the

6     story of how he did not get away with murder.  And as

7     much as anything, it is going to be a presentation of

8     evidence about how a murder is committed by the

9     defendant in his neighborhood in front of a bunch of

10    people he has known all his life; done in a

11    particularly savage manner; with complete nonchalance

12    for the presence of these witnesses.  Because he is

13    absolutely confident that the rule of the street,

14    which is:  I didn't see anything, I didn't hear

15    anything, I will not say anything no matter how many

16    times they ask.  He was sure that particular rule

17    would be adhered to.  And it was, for a very, very

18    long time.

19          You come here, you've been here in this

20    case for about 24 hours.  Kareem Guest, the person

21    you'll be hearing about -- will you put his picture

22    up?  You'll never meet this man.  Thirty-one years

23    old when the defendant murdered him.  A father.  A

24    son.  A brother.  And a friend to people, some of

25    whom you will meet.  And that's about the closest

OPENING - PIERCE

10

1    you'll ever get to him.

2              But the people who saw his murder also

3    knew him and liked him were completely quiet because

4    the law of the streets says:  You don't see anything.

5              But we got lucky.  And from that luck,

6    because it's a federal witness, and we have the

7    federal resources to put into this and the time to

8    follow the evidence and bring the witnesses back not

9    once, not twice, not three times, but sometimes four

10   times until they finally told us the truth, or most

11   of the truth -- it will be for you to determine

12   whether they're telling all of the truth, at least

13   some of them -- that the defendant is here.

14              The family of Kareem Guest, those people

15   who love him, have been waiting for this day for a

16   long time; since September 20, 2009, when they lost

17   their Kareem.  That's how long they've been waiting.

18   And we have a couple of weeks and we'll move as

19   quickly as we can.  We have a couple of weeks to lay

20   out the evidence of what happened in a span of time

21   that we will microanalyze here; but a span of time

22   that took basically no longer than it would take me

23   to stand here, see you or somebody walking past me,

24   and turn away from me in the direction of that flag,

25   and for me to walk after them, pull out a gun, pull

```
 1    down my mask, shoot them twice, bang, bang, with a
 2    semiautomatic pistol.
 3              And this man is a good shot.  Those first
 4    two shots broke Kareem's spine twice.  He would have
 5    been dead even if he hadn't been shot any more.  But
 6    he was shot more.  After those two shots -- and by
 7    the way, you'll be asked to consider whether this
 8    case is a case of premeditated murder, premeditation
 9    meaning that you have consciousness of what you are
10    doing; that you are making a decision, not just
11    acting instantaneously.  Bang, bang.  And then
12    walking over to Kareem lying on a sidewalk -- I can
13    show you where, you'll be seeing this a lot.  This
14    little X is where Mr. Hall was standing.
15              Kareem, who had just been at his mother's
16    house -- she's outside, we'll meet here in a
17    minute -- was walking down from a friend's house and
18    turning down that sidewalk, as we follow the laser
19    pointer, past a car that was parked here with
20    witnesses in it who were witnesses that night and
21    said nothing for months; past these witnesses; turned
22    and walked down the sidewalk.
23              You know where he was going?  He was
24    going to see his baby.  And they knew it.  They all
25    knew.  He was walking down to Wilgrey Court.  This is
```

1    over in Westport.  This is Maisel Court.  You'll be

2    hearing a lot about it.  Wilgrey Court is right here.

3    Mack was standing right here.  Walking down.  And he

4    walked over to him just about where I'm pointing

5    right now.  And Kareem is laying on his side.  And he

6    could have been stitching him with the gun.  He fired

7    four shots, one, two, three, four, into his head.  I

8    was going to show you the picture of that; you'll see

9    it later today when the medical examiner testifies.

10   But the family's here and I'm not going to put them

11   through that.  But they go from front to back, or

12   back to front, I don't know, nobody can say.  But

13   bang, bang, bang, bang.  He was already dead.

14            Why did this happen?  Because Kareem

15   violated the rule that these people, once they saw

16   what happened, they were not going to violate that

17   rule.  He was arrested himself in 2008.  Actually by

18   one of the detectives you'll be seeing here or who is

19   on the team.  Arrested him with four or five little

20   pills of heroin that he was selling.

21            I don't care that he sold heroin.  I

22   don't care that the defendant sold crack.  They're

23   not in here for selling crack.  Who cares?  He's here

24   because he's a crack dealer who kills people.

25            But in 2008 Kareem himself was arrested

1      and he was interviewed by people who were

2      investigating this area here called Westport.  And

3      like many others in this federal investigation, he

4      talked to the FBI.  And the FBI prepared what they do

5      when they talk to you; they prepared a report.  It's

6      called a 302.  I used to wonder why they call it a

7      302.  Like any other federal form, it's like any

8      other federal form, has a tiny 302 on the edge.  It's

9      called 302.  But you will hear that he talked about

10     some people he knew in Westport that were involved in

11     drugs and guns and murder.

12             One of the people he mentioned in the

13     nine-page report was the defendant, Mr. Hall, who he

14     told the police was involved with a drug dealer and

15     involved and he was involved in shootings and murder,

16     and murder; retaliatory shootings and murder.  And

17     Mack knew about that; and that's why he killed him.

18     Because you don't talk.  You don't tell, is the

19     street vernacular for it.

20             And yet our witnesses in this case,

21     they'll tell you today when we start bringing them

22     in.  They told me in the grand jury.  They told the

23     grand jurors:  I wasn't there, I didn't see anything.

24     And they'll tell you they lied when they told the

25     grand jury that.

```
 1                  And they'll also tell you that the last
 2    person now they want to face in a courtroom or
 3    anywhere else is sitting right here.  And the last
 4    person they would ever set up and frame as the fall
 5    guy for a murder that they finally were forced to
 6    admit they saw is sitting right here.  They'd
 7    implicate their mothers or fathers before they'd
 8    implicate him.  And every single one of them is
 9    scared of him today.
10                  So you wake up yesterday; you come to the
11    courthouse; and now you're in this.  So I, in a way,
12    feel sorry for you.  But I can't because I have to
13    feel more sorry for those people who lost their son.
14    And this is what we have to do, all of us.
15                  Now, when you woke up yesterday and came
16    down here and got picked for this jury, the judge
17    told you what it was about, you might have been
18    thinking, "Well, you know, what do I bring to this?"
19    You've all been alive all of your lives.  That makes
20    sense, of course.  But you have experience that you
21    bring to this, and that's all you need.  You have
22    common sense.
23                  This is not a technical case.  This is
24    not a DNA case.  What would there be?  A person walks
25    up and shoots somebody.  There's no fingerprints.
```

1    There's eyewitnesses.  And your job here, and what

2    your experience will help you do, is sit where you're

3    sitting and listen to the people who will come into

4    this courtroom, one by one.  And in a courtroom --

5    which if you look at it, it is sort of like a stage,

6    something between a stage and a church actually -- we

7    hope -- and tell you from here what they saw, what

8    they heard, and what they know.  And what they said

9    to the government and to the investigators, the

10   federal grand jury, when we were probing them and

11   asking them, based on basically tips, as to who might

12   have been there that night, what they saw.

13          And you will determine, this is your job,

14   who's telling the truth.  Were they there?  Did they

15   lie?  Why did they lie?  Who were they protecting?

16          And if you can answer the question who

17   were they protecting besides themselves, you will

18   come to the conclusion that the defendant is the

19   person they're protecting.  Person after person,

20   witness after witness, came to the grand jury.  And

21   you'll hear their accounts, that is, their real

22   accounts and their original accounts.  When I bring

23   them in I'm going to ask them what really happened

24   first.  Then I'll ask them what they told the grand

25   jury.  And these witnesses will give you accounts

1        about their prior testimony that are interesting,

2        particularly in one common way.

3                Guess who they never mentioned in any of

4        their early accounts?  They mentioned they remember

5        the guy in the wheelchair; they remember seeing Ferl,

6        another witness you'll meet; they remember seeing

7        each other.  I didn't know, I was just investigating,

8        that's what we do.

9                We heard you were there, what did you

10       see?

11               I saw Kevin Duckett, a person you'll

12       meet.  I saw Rain Curtis, a person you'll meet.  But

13       none of them say -- I would ask:  Did you see Mack?

14               "No, I didn't see Mack.  Did not see

15       Mack.  Nope".  One after the other.  Until we got a

16       break.

17               So you do, I think, I know, have the

18       tools to do this job.  You don't have to worry about

19       it.  You don't have to wonder about it.  You have the

20       tools.  Among the 12 of you, you'll be fine.  Every

21       jury is.  And at the end of this case -- as much as

22       you may not want to be here, I think every juror

23       feels the same way -- you'll feel this is one of the

24       most important things you've done.  No matter what

25       verdict you return.  No matter whether you find me to

1    be a clown and my case to be built on paper clips,

2    you'll still feel good for coming to that conclusion.

3              But that's not the conclusion you're

4    going to reach.  Because the witnesses who were there

5    are going to come in and tell you who committed this

6    murder.  And they'll tell you why:  Because he was a

7    snitch.  And he really wasn't.

8              Now, that's what the case is about.  But

9    every case, all of the facts, have to be marshaled in

10   a structure called an indictment.  Not everything a

11   human being does that is bad is against the law.  So

12   there are certain laws in federal court that the

13   conduct has to fit the framework of; and that's what

14   we're going to look at right now.  Let's take a look,

15   please, at the indictment.  Can you put count one up?

16             Count one of this indictment, that is,

17   the grand jury charge against the defendant -- which

18   as the Court will tell you for your purposes means

19   nothing; it's just the framework of the law in which

20   his conduct is being assessed.

21             Count one is the framework of all of the

22   defendant's conduct; basically charges the defendant

23   in being involved in a conspiracy to distribute and

24   possess with intent to distribute -- I think there's

25   a specified amount there of 280 grams of crack

18

1    cocaine.  Well, that amount specified is for a legal

2    reason we won't get into; it's just the way Congress

3    wrote the statute.  But it's an amount that you'll

4    find this defendant distributed in multiples of that,

5    kilos.  A kilo is a thousand grams.  We're talking

6    about just 280 grams of crack he distributed.

7              Crack is just processed cocaine.  You

8    take cocaine, cook it up, as you'll hear.  The

9    defendant, we're going to bring a witness in, she's

10   going to testify she allowed him to use her house to

11   cook cocaine.  He couldn't cook it.  He wasn't smart

12   enough to do it.  He couldn't figure out how to cook

13   cocaine.  He would get other people to do it,

14   junkies.  And this woman was a junkie, too.  He'd

15   give her some crack; "Let me use your house"; cut up

16   the crack and sell it in this area called Westport.

17             Just about everything you're going to

18   hear about happened in this little tiny area that, if

19   we wanted to, we could walk through there by lunch.

20   There's really no place to eat over there, but we

21   could do it.  It's one rail stop down the light rail

22   line.  And the people there are nice.  You're going

23   to meet some of them.  And they've been living under

24   this guy's boot for years.

25             He sold crack.  You're going to have a

1    witness we're going to bring in; I know what they're

2    going to say to some extent, I've talked to them.

3    And when I asked him the question:  Where would you

4    see Mack sell, I'm telling you he's going to say:

5    Mr. Purcell, there's nowhere on this map that I

6    didn't see him sell crack.  He would have it cooked

7    up here on Dorton Court and then distribute it with

8    some of our own witnesses.

9           One of our witnesses is one of his best

10   friends.  Another one of our witnesses is a woman who

11   was his lover.  And every one of them will tell you

12   that the least of the problems was that he was a

13   crack dealer.  If he had just stayed a crack dealer,

14   we couldn't care less.  Really.  He wasn't a big

15   kingpin.  He was just a guy putting out bags of

16   crack; feeding the junkies that would come in.

17          You're going to meet some of those

18   junkies.  One of them, his name is Robert Parsons,

19   he's going to tell you that he bought from Mack

20   hundreds of times just in 2004.  And you know when he

21   stopped buying from the defendant?  When the

22   defendant shot him seven times.  You know why he shot

23   him?  He shot him for snitching.  But he lived.  And

24   he's going to come in here in a couple of days and

25   he's going to sit in that chair and he's going to

1      tell you:  Yes, he's a drug dealer; I was a junkie.

2                      This guy was.  He's going to tell you his

3      story; to some extent, tragic, as is the story for

4      every one of these drug users.  He had a life that

5      went right down the hole.  And the defendant made him

6      that way.  He bought his drugs from him.  He doesn't

7      have any guilt for that.  He doesn't blame him for

8      selling the drugs.  He doesn't really appreciate the

9      fact that he shot him.  But you'll hear from this

10     guy; his name is Robert Parsons.  Robert Parsons is

11     going to tell you he came home one summer, baseball

12     scholarship somewhere, ended up being a junkie.

13                     Westport, Anne Arundel County, it's

14     accessible.  The Westport exit, 295.  Don't take it.

15                     But he'd go there and buy.  He'd say:

16     `Sometimes, I would buy from him two or three times a

17     day.  I'm a junkie.  Whenever I can get it, I'm going

18     to buy it.  So I know.  But one day I didn't have any

19     money.  So what he did is, this Robert Parsons, is he

20     allowed a friend of Mr. Hall to use his car, that is:

21     Just use my car.  He'll give it back, but you can use

22     it for some time and I can give you some crack.  I

23     didn't know they did that, and I've been doing this

24     28 years.

25                     So that guy borrowed his car, Parsons'

21

```
 1    car, and went off and committed a crime in it.  The
 2    crime doesn't matter.  But the police investigating
 3    that crime, the only lead they had, unfortunately for
 4    Mr. Parsons, was somebody saw the car and got the
 5    tag.  So the police, they were in Baltimore County,
 6    trundled down to Mr. Parsons' mother's house and she
 7    said, "Yes, that's my son's car".  So they trundled
 8    over to Mr. Parsons and the detectives find out that,
 9    yes, Mr. Parsons loaned his car to a friend of Hall.
10    They promptly go and arrest him and he becomes a
11    witness in that case.
12              He didn't want to be there; he just, you
13    know, didn't remember to say, "I don't know who had
14    my car".  That's what he should have said.
15              Then on February 10, 2004, which is
16    specified as one of the overt acts in count one, it's
17    the very first one -- can you focus on A and then go
18    to the second page, page two at the top; just make
19    sure I had the date right.  February 10.  The
20    defendant arranges for a meeting with Mr. Parsons
21    through somebody else; drives up on Mr. Parsons and
22    shoots him seven times.
23              Now, he's wearing a mask.  We'll hear the
24    defendant always wears a mask when he does the
25    shootings.  But this is a guy who's met him hundreds
```

OPENING - PIERCE

22

```
1    of time.  And he'll tell you he knew immediately it

2    was Mack.  In fact, Mack later tells a witness who

3    you'll hear from that Mack even told the witness

4    that, "Yeah, he knew who I was.  I had to start

5    shooting him from a distance because he was going to

6    run away".  And, you know, you can't make this stuff

7    up.  You can't.  Which is part of our point.

8              He shot him seven times to the point that

9    Mr. Parsons actually was yelling, "Enough, enough".

10   And thank God for shock trauma, he was saved.  After

11   months and months and months of rehabilitation and

12   injuries he's still suffering.

13             Why?  Mack told a witness who will be

14   coming in here that he shot him because he was

15   snitching.  Shot him as casually as that and talked

16   about it and admitted it as casually as that.  That's

17   the defendant.  He's a drug dealer who enforces his

18   turf in the most imaginative way his imagination can

19   handle, that is very direct.  I just shoot you.

20             One of the things that Kareem told the

21   police when he was interviewed about Mack and a bunch

22   of other people is that he said that Mack is a guy

23   who likes to bang the gun.  And he does.  That's what

24   brought him here today.  Not the drug dealing.  But

25   we'll take the drug dealing because it's the
```

23

1      framework for everything else.

2                  Now, in addition to Mr. Parsons, as I

3      mentioned, you'll also meet a woman named Jocelyn

4      Hamlet.  And she is the woman who lived on Dorton

5      Court.  And she will come in and testify.  She

6      doesn't want to be here.  If you see one witness who

7      comes in here during this trial who looks like they

8      want to be here, you're in a different trial.  None

9      of them want to be here.  The biggest problem I'll

10     have logistically here during this trial is getting

11     these people here.  All I can say is thank God for

12     the FBI because we'll get them here.

13                 Miss Hamlet will tell you:  She lives on

14     Dorton Court, she used the crack, the defendant gave

15     her crack.  She let him use her house.  I've already

16     mentioned that.  Other witnesses will say the same

17     thing.

18                 You'll meet another woman, Tracy

19     Brandenburg.  Tracy Brandenburg is a woman who

20     became, from a back injury which she took

21     prescription drugs -- she'll tell you if we have

22     time, from there to like name a drug and she used it.

23     Until she found crack.  Because it was cheap and easy

24     to get.  And she started going to Westport.  And you

25     go to Westport, there's only so many places to sell.

1    The defendant Mack was always there with his loyal

2    boys selling with him.  And she did not like buying

3    from him.  She'll tell you:  I didn't buy from him

4    that many times, because she didn't like the product.

5    It was too cut.  It was cheap.

6              And too, one time when she went there and

7    bought in the morning with her girlfriend -- she

8    would always go with a girlfriend or often would go

9    with the girlfriend.  She actually knows the

10   defendant well.  She actually was in the house where

11   one of his babies was delivered.  She knows him very

12   well.  But one morning they went and got drugs she'll

13   tell you, the crack.  And the girlfriend didn't like

14   it so she went back to get more.  And Mack came up to

15   her curbside, and basically:  No, we'll do it again.

16   And he didn't like that.  So he threw a brick through

17   their window.  At least he didn't shoot them.

18              These are witnesses we'll bring in to

19   show he's a drug dealer.  And his reason for the

20   shooting here is to protect himself, protect his

21   business.  It's the only business he's ever had.

22   Never been anything but a drug dealer.

23              One of the people you'll meet, and

24   probably the most important witness in the

25   investigation because she was the witness I'll be

```
1    telling you about more in a minute who broke first,
2    not because she wanted to, because we broke her.
3    I'll tell you how, was a one-time girlfriend of the
4    defendant.  Her name is Rain Curtis.  And she'll tell
5    you about the drugs, "Oh, yeah, I was there.  I was
6    at Mama's house".  That's what they call her, Mama.
7    Your friend Mama will be here.
8            Mama will come in and say what she'll
9    say.  And Rain Curtis will come in and say:  I used
10   to go to Mama's with him, when they would be cooking
11   there.  We'll actually bring one of the people in
12   that used to cook crack.  "I saw that".
13           And when I asked her did Mack keep guns
14   around, and she'll tell you, if she's consistent,
15   yes, that he always had a gun around.  In fact, he
16   used to wear a gun around his neck on a string, which
17   is not uncommon in the city.  Nice and accessible,
18   doesn't show a bulge.  Just keep it in the low of
19   your back or in your front, wear a baggy shirt.
20   Always had a gun, always had a gun around.
21           So these witnesses will come in and
22   establish the drug trafficking, count one.  There's
23   one other set of witnesses that will establish this
24   as well and that is the police.  Yes, there are
25   police in Westport and they know Mack very well.  And
```

1    between -- I think in the indictment we have

2    specified some events between 2007 and 2008, five

3    different times the defendant was arrested selling

4    crack.

5              Sometimes the guy just taunted the

6    police.  This was his turf.  He could get away very

7    quickly.  He'd keep vials in his mouth and when the

8    police came up on him he'd take a bottle of water,

9    drink it, smile at them.  He's brazen.  Not

10   particularly a bright thing to do, but brazen.  And

11   five different times or so -- you'll meet the

12   officers -- he was caught selling crack.  So just in

13   case you don't believe them, or you don't believe the

14   police, we have the other witnesses.

15             He would even brag to the police.  One of

16   the incidents you'll hear about -- and my co-counsel

17   will be introducing these witnesses -- one of the

18   officers I sat in a meeting and he's written and

19   he'll testify that one time they rolled up on the

20   defendant and he ran.  This was one time in the

21   summer.  It's in the overt acts, I'm not sure which

22   one.  And then later the next summer they saw him and

23   he actually approached, he'd always walk up and talk

24   to the cops.  He knows our case agent, they call him

25   Moody.  He calls his partner -- you'll meet Vin

```
 1        Diesel.  This is Detective Moody, the case agent in
 2        the case, he led the case.  He actually called him
 3        Van Diesel.  It's Vin Diesel.
 4                  He actually bragged to him.  "Remember
 5        last time you were chasing me?"  He told them, "I had
 6        two heaters, I had two guns".  Another time they'd
 7        roll over and he'd walk up and talk to them.  And why
 8        not?  It's just the cops.  They're not particularly
 9        aggressive.  They're just rolling through, getting
10        through their shift.  He'd walk over and say -- on
11        this particular occasion he was talking about his
12        proficiency with firearms.  He told them how his
13        brother got in a shootout and maybe he was even shot.
14        He was shot.  Tatum.  He has a brother named Tatum
15        that was shot.  His brother's a drug dealer too.  And
16        he said, "Yeah, so I had to go over there to another
17        part of town and take care of it".  He said, "I shot
18        the guy".  He was bragging.  "I shot the guy and hit
19        him from long range.  I was very proficient with my
20        firearm".
21                  And he is.  With a pistol he hit Kareem
22        twice from probably twenty some feet away in the
23        spine.  Good center of mass shooting.
24                  I think he wanted to be here.  I think
25        the defendant wanted to be where he is today.  I'm
```

1    just going to ask you at the end of all of this to

2    give him what he wants, and give this community what

3    it wants, and give the family what it wants and

4    needs.

5            Now, let me talk to you about count

6    three.  Count two is just a gun count, firearm count

7    that goes with count one.  Let's look at count three,

8    please, which is page four.  I'm sorry.  Page five.

9    This is the count that brought Mr. Hall to you today.

10   Count three, a violation of 18 U.S.C. 1513, which is

11   Congress's statute that makes it a crime, a federal

12   crime, to retaliate against a person for providing

13   information about or relating to possible federal

14   crimes.  Snitching.

15           And in this particular case, because the

16   retaliation took the form of killing, that is why it

17   reads as it does.  That on September 20, the

18   defendant did willfully, deliberately, maliciously

19   with premeditation kill Kareem Guest with the intent

20   to retaliate, highlighted.  Can you see that clearly?

21   If not, we can just say something while we're doing

22   this, folks.  Part of the opening is to sort of

23   acclimate you to this screen that you'll be seeing.

24   So if you can't see it, just let the judge know and

25   he'll take care of it by directing us to make it

1       clear.

2                   But that's what the count that we're here

3       for is.  And you see the date when it happened.  I

4       told you a little bit about how it happened.  And

5       this is basically how it happened.  Kareem was, as I

6       said, visiting his mother, who you will meet, who

7       lives up further on Maisel Court.  Walked down.  He

8       had been up the street a little bit.  There's a house

9       you can't see here.  Can you see the lower part?  Can

10      you put up the Westport picture, please?  You don't

11      need the indictment any more.

12                  Put up A -- I'm sorry, the A, B, C

13      picture that I call it, which is exhibit 47.  I'll be

14      giving you each a copy of these little maps later.  I

15      think the judge will allow me.  It will make it

16      easier for you to follow the witnesses when I don't

17      have the exhibit up because I'll be talking about

18      streets.  But if you have that up now, essentially

19      what you're looking at is the smaller version of

20      this.

21                  Now, the defendant that day had been at

22      his mother's house.  Now, he had been in jail himself

23      until about two weeks before he was killed.  He came

24      home, I think his mother will tell you, on August 27

25      and he came back to Westport.  Shouldn't have done

1    that and you'll hear why in a moment.  But he was at

2    his mother's and wandered around, went down here.

3    Some of the witnesses will say they saw him at the

4    bottom of the street at one point, hanging out,

5    talking to some girls.  Then he walked by, right up

6    to where I'm pointing right now up to a house on this

7    side.

8              A lady up there, her name is Miss Trina.

9    She's not going to come in, she's in pretty bad

10   shape.  She runs a little store.  You can buy stuff

11   there, you can also buy a blunt if you want to, which

12   is marijuana.  I'm not sure.  You can buy cigarettes

13   I'm told, if you're asking people for cigarettes.

14   Then when he came down again, he walked past -- you

15   see where the G is -- he started walking through that

16   cut, that's the cut I was telling you about earlier.

17             Now, this Maisel Court where this

18   happened it's a local community and where people hang

19   out.  All the people that you'll meet here that the

20   government is bringing in as witnesses all have their

21   own reasons for going there.  They knew Mack, they

22   expected to see him.  She was having sex with him.

23   That's where they hang out.  But Kareem made the

24   mistake of being out on the street and walking by,

25   and that's when Mack took the opportunity of telling

```
 1      someone to go get a gun.  You'll meet that person.
 2      His name is Ferl.  Yes, Ferl is testifying.  He told
 3      Ferl to go get a gun.  Ferl brought it back and gave
 4      it to him.  And when Kareem came back and showed
 5      himself and was walking by, the defendant went after
 6      him and shot him, did as I described.
 7                   Now, when this murder happened -- I'm
 8      going to talk to you now a little bit about the
 9      investigation and then I'll finish because I want to
10      get to how we got him, or how he got himself.  That's
11      the murder.
12                   September 20th the murder occurs.
13      September 21st, maybe even hours earlier, later on
14      the 20th, in the evening, it was around ten o'clock
15      by the way when it happened, P.M., Detective Moody
16      and others are notified that a person who had been
17      interviewed in a federal case, one of many people who
18      had been interviewed in this federal case, another
19      case of Westport drug dealers, had been murdered.  So
20      now this case went from being, because of that, a
21      Baltimore city case with no witnesses -- and you
22      you're going to meet in a few minutes the first
23      officer who responded to the scene.  And I'll ask
24      him:  Hey, were there any eyewitnesses that night?
25      You know what his answer is of course:  Nothing.
```

1    Nobody saw anything.  And that's the way it stayed

2    for a long time.

3            But when the federal agents took over --

4    and actually Detective Moody is a task force officer,

5    he's deputized.  He didn't actually go to the FBI

6    academy.  In my view the best guys in the FBI are the

7    ones who are actual cops.  And he's a cop and an FBI

8    agent.  And his witness has been murdered, so the

9    investigation went to him.  And others in the FBI,

10   and to the U.S. Attorney's Office.  So we worked with

11   homicide, but we did it our way.  We began to chip,

12   just listen who was out there, who could we bring in,

13   and we began to bring people in.  And every one of

14   them said they weren't there.

15           Now, we were still chipping and learning.

16   On February 4 -- let me just get to something first.

17   Before we got to February 4, we wanted to make sure

18   it was a federal case.  We wanted to make sure this

19   was a retaliation case.  What was the motive?  You

20   know, people get killed for other reasons than being

21   federal witnesses.  And you're going to meet, in a

22   very few minutes because I am going to finish, a

23   lawyer, his name is Michael Carithers.  Can you put

24   the indictment up, please?  The indictment of Larry

25   Cheese and Stewart?

```
 1                    In 2008, January, when Kareem was
 2       interviewed, the FBI was investigating a bunch of
 3       other guys.  And these are those guys.  I can't see
 4       the indictment but I see -- there they are.  That's
 5       an indictment, federal indictment.  We call it the
 6       Stewart case because the first guy's name is Jamar
 7       Stewart.  And it was in that case and another matter,
 8       but mainly in that case, that Kareem would have been
 9       a witness.  Except for one thing; everybody pled
10       guilty so he wasn't needed.
11                    But what you'll hear is in May -- in
12       fact, the prosecutor is outside, he'll be coming in,
13       one of my colleagues.  The prosecutor in that case
14       got guilty pleas from almost everybody in that case
15       except for two people.  And if you could take a
16       highlighter if you have one, just highlight the name
17       Larry Cheese.  I'm sure the defense will not object
18       to that.
19                    And in a case, even in this case or
20       especially in this case, but in the legal criminal
21       case process, what happens is we indict somebody and
22       then the government among other things has to provide
23       what we call discovery.  That is, we have to give the
24       defense large portions defined by the law of what our
25       evidence is, including -- that's why counsel will
```

1    have many things that I have.  They'll have -- many

2    things that I have they'll have as well in this case,

3    as they should.  That's the way it should be.  And

4    prosecutors should not violate that rule, and there's

5    no violations in this case that I'm talking about.

6    But it's an important rule, it's called discovery.

7            And in this case, when a defendant pleads

8    guilty, sometimes we don't have to give discovery.

9    That is, we don't have to tell them all the people

10   from the community who cooperated against them.  It's

11   one of the reasons why we want to get guilty pleas,

12   we want to protect those people.  But in this case,

13   in that case, as of I guess May 20th of 2009, just a

14   few months before this murder, there were still two

15   defendants left in that group of defendants who

16   hadn't pled guilty.  One of them was Larry Cheese.

17           So when this all happened we began to

18   hear, that is, when the murder happened, we began to

19   hear people were saying that the discovery materials,

20   including the 302 that I was talking to you about

21   that has Mr. Guest's name on it and all the people

22   that he talked about was floating around Westport.

23   His and all the other ones from this prosecutor's

24   case.  So we knew they had only gone to two lawyers.

25   So, well, let's ask the lawyers if they gave these

1     materials to their clients.  It's not against the

2     law.  They're not supposed to do it.  They have an

3     agreement called a discovery agreement not to do it.

4               So we investigated one and found, no, he

5     didn't do it.  So we investigated another one, we

6     investigated Larry Cheese's lawyer.  His name is

7     Michael Carithers as I mentioned.  And we asked Mr.

8     Carithers:  It's not against the law, Mr. Carithers,

9     you shouldn't have done it, but did you give these

10    materials to anybody?  Because they're all over

11    Westport.

12               No, I didn't.

13               You know, it's not against the law to put

14    the materials out, I told him.  And he'll tell you we

15    said that to him.  But it's against the law not to be

16    truthful about it.

17               So we asked him again in another meeting.

18    And we had more evidence including people that told

19    us they got the materials from him, Larry Cheese's

20    mother and girlfriend, and:  No, I didn't do it.

21               Finally, in the third meeting, he

22    admitted he did.  So now we had the source.  We knew

23    how these materials, in particular this Guest 302,

24    that on page -- forgive me for getting into your

25    space here.  But as you'll see, turn to page four,

1    please, which is Bates 246 of the Guest 302.  And I'm

2    almost finished, Counsel and Court.

3                 If you look at the bottom, the last

4    paragraph, this is where the report -- Detective

5    Moody who wrote this report and conducted this

6    interview of Mr. Guest starts talking about Mr. Hall.

7    And let's go to the back -- turn the page, please, to

8    227.

9                 Now, the guy Mr. Guest was talking about,

10   Black, his real name was Maurice Mouzon, he was

11   already in jail, in federal prison when this was

12   released.  A lot of these people were already in jail

13   including all of these co-defendants.  But can you

14   see, see where it says Antonio Hall?  Can you

15   highlight that, please?  Said that Guest said that

16   Black hung with Mack, Antonio Hall, and some other

17   people.  And Guest stated that Mack is someone known

18   to bang the gun and that Mack could have been

19   involved in the murders and shootings that occurred

20   after a home invasion at Black's house.

21                 Now, you'll hear not from Black, you're

22   going to hear from his wife.  Her name is Tamica

23   Mouzon.  Yes, Tamica Mouzon will be here.  They call

24   her Little Mike.  And it's her house that was home

25   invaded for drugs and money.  And there was

1    retaliation for that.  And I don't know who the

2    retaliation -- it doesn't matter.  Mr. Guest said to

3    the FBI, "I think it was Hall.  I think it was Mack".

4    So this is what went into the street about Mack.

5              And you're going to hear from a witness

6    as I'm talking about this, in terms of motive, named

7    Kevin Duckett who was right there when this shooting

8    happened.  Mr. Duckett will tell you that when he saw

9    the defendant get a gun and the defendant told him,

10   "I'm going to smash Kareem," this is on the night of

11   the murder.  Duckett, who is not a saint, didn't say

12   to him, "Don't do it, Mack, don't kill him".  He just

13   said, "Don't do it now.  There's too many people

14   around".  And he actually said, "Why don't you let

15   somebody else do that work," which is the work of

16   killing somebody.

17             But Mack said to him -- not particularly

18   a sympathetic statement that Duckett said.  But Mack

19   said to him, "No, no, that was my name in those

20   papers, not yours".  And actually it's true, Duckett

21   is not mentioned in these papers or, as far as I

22   know, in any of the papers that went out.  So that's

23   the motive.

24             Now, we figured out then as the

25   investigation went along, that is, the

1    investigators -- when I say, "we," I mean they --

2    figured out where the motive, how it got leaked into

3    the street.  You're going to meet a woman in a few

4    minutes named Rosa Knox, or somewhere during the

5    trial, who is Larry Cheese's mother.  And she'll tell

6    you that right outside the courtroom in this building

7    Mr. Carithers gave her the paperwork and she took it

8    back and she showed it to people in Westport.  Kept

9    it in her car.

10           You're going to hear lots of people,

11   almost every witness I think we have will say:  We

12   saw those papers.  Kareem's mother saw the papers and

13   thought:  This is not safe for my son.  In fact, when

14   people saw, we'll hear from -- you'll hear from Rain

15   Curtis, when she saw the defendant -- I'm sorry --

16   the victim walking down the street that night past

17   Mack, she thought this is not a smart place for him

18   to be, and of course it turned out not to be.

19           Now, let's get to how the case was

20   cracked.  In February 2004, based on information that

21   the government had to this point, we brought into the

22   grand jury Tamica Mouzon, this woman, Little Mike,

23   and Rain Curtis, because we had information that they

24   might have been there.  Were you there?  Asked them

25   both.  Were you there that night?

1                    Both of them said:  Well, we were around
2      that night, but we were not there when the shooting
3      happened.  One of them said she might have heard some
4      shots but didn't see anything.  I asked them
5      specifically if they saw Mack?  No, didn't see Mack.
6      Wasn't there at the time of the shooting.  Under
7      oath, swore wasn't there, wasn't around when it
8      happened.
9                    Well, another witness that day gave
10     information that made us, as I think I may have
11     mentioned, look into some telephone calls that were
12     made or might have been made to Rain Curtis by her
13     boyfriend.  One of the witnesses was like basically:
14     I wasn't there, I was on the phone with this guy,
15     Rain's boyfriend.
16                    Where was he?
17                    He's in jail.
18                    You may or may not know this, but many
19     jails record all of their phone calls by inmates.  So
20     Detective Moody -- now, this is in February of 2009,
21     months after the murder.  February 4th, a woman comes
22     in and says:  I wasn't there, didn't see anything.
23     Detective Moody trundles off to whatever facility he
24     was in, we got the tapes -- the defense has them,
25     we'll play them a little bit later.  And we get the

1    telephone calls of the night of the murder and the

2    day after.

3             And sure enough, this guy's name is

4    Hershel, had called Miss Curtis on her phone the

5    following day and he actually starts yelling at her,

6    "Why didn't you answer the phone when I called you

7    last night?"  He's calling from a jail phone to her

8    cellphone.  You're allowed to do that.  Inmates are

9    allowed, encouraged to use the phone.  And they know

10   it's recorded, nothing illegal about that.  It's just

11   for the protection of everybody.

12            And on that tape, what you'll hear, she

13   answers to his, like, inquiry about why she didn't

14   pick up the phone.  Because she was running.  And she

15   says, "They shot that boy Kareem last night, I was

16   standing right there".

17            Now, she had like two days before been in

18   the federal grand jury and said she didn't know

19   anything about it.  So even I can make a perjury case

20   out of something like that.  And that's what perjury

21   is, you lie under oath.  And I had pretty good

22   evidence.  We had good evidence.  So we brought her

23   back with her attorney.  Almost every witness had an

24   attorney as they went through this process.  If they

25   didn't have one it's because they didn't want one.

1          And we played it for him.  You know:  You

2    were in front of the grand jury.

3          I'm not saying anything.

4          She was adhering to the rule of the law

5    of the street.  So she forced us to indict her.  And

6    she was indicted in April of 2009 -- I'm sorry, 2010.

7    She had committed perjury on February 4, 2010.  She

8    came into a courtroom very much like this and she was

9    sent to a prison pretty far away from here while she

10   waited for her trial.  So she was not out in the

11   street, she was locked in.  And this is a woman with

12   some babies.

13         And what you're going to hear in this

14   case, what I've learned, maybe you'll learn, is that

15   the rule of the street, the law of the street about

16   keeping your mouth shut doesn't always do so well

17   when it's up against another law, the law of nature.

18   That is, moms love their babies and don't want to be

19   in jail away from their baby for some person they're

20   trying to protect.  That's when they step up and they

21   take the risk.  So Rain Curtis sat in jail and she

22   sat in jail until July.  And in July of 2010 her

23   lawyer called and said she's ready to talk.  And that

24   was the break.

25         And Rain Curtis came in and she told us

 1     and she told the grand jury and what she'll tell you,

 2     that she was there that night with Tamica Mouzon, who

 3     at this point was still saying, "I wasn't even

 4     there".  And they had just gone over to Westport to

 5     hang out like they always do, have some beers or

 6     drinks or whatever, all hanging out here.  And

 7     another woman shows up, who had up to this point been

 8     lying, in her SUV.  And I just happen to have an SUV,

 9     so we'll put it here.  And that's Shameka Ross and

10     Shaquanda Isaac.

11            These girls aren't particularly friends.

12     Tamica Mouzon's husband is already in jail at this

13     point by us, by the feds.  Shameka Ross's husband is

14     Larry Cheese, he's the one who put the paper out

15     there through her and through his mother.  She's just

16     hanging out with Shaquanda Isaac.  It's where they

17     hang out.  She's with these two girls who are with

18     Kevin Duckett, who you'll be meeting, who is a close

19     friend of the defendant.

20            And she tells us this:  We're all

21     standing around just talking in our little group.

22     She wasn't talking to the girls in the car because

23     they're not close.  But they know each other, they're

24     cool.  And they see Kareem walk up.  And she sees the

25     reaction from Mack, because Mack was there.  She told

43

1    us:  Yes, he was there.  And he had his little hat

2    on.  She said that he always wore a little hat.  He

3    always wore two, so he could pull one down and have

4    an instant mask.  She knows.  She slept with the guy

5    for months.  She knows.

6              Kareem walked up, went to Miss Trina's,

7    came back.  And when she was there, she saw Mack run

8    after him and Kevin.  Kevin ran over there too.  Mack

9    shot him, shot him; walked over, shot him, shot him,

10   shot him, shot him.  And she heard, and another

11   witness will tell you, Kareem's last words:  No,

12   Mack, no, Mack, you don't have to do this.  One of

13   the witnesses actually heard the witness say -- or

14   the victim say, "No, Mack" -- and this is Jamal

15   Howard I think -- "No, Mack, I didn't tell them

16   anything".  Last words.

17             And she said:  In fact, I tried to jump

18   into this car.  This woman Shameka is not a friend of

19   mine, I don't know her very well.  But I jumped in

20   her car and tried to get the hell out of there.  And

21   Tamica tried to jump into the car.  But she can't.

22   Because she's being pushed out.  Kevin had already

23   been in the car, pushing her out, and Mack is getting

24   in the back seat on that passenger side, which is the

25   side of the shooting.

1          So now we know what happened.  They took

2     off.  She says she went -- basically, she ran, she

3     and Tamica ran up here across the court and back to

4     Annapolis Road, which is up there somewhere, got back

5     into the car and left.  And they agree:  We didn't

6     see anything.

7          Rain Curtis will tell you that Mack told

8     her once in a conversation, "That you don't ever want

9     to be snitching".  I think he said, "Y'all know what

10    will happen if you snitch".  This is a guy who lived

11    by that code.  He's not alone in that.  Ask any

12    Baltimore City homicide detective how many

13    eyewitnesses pop up after a murder.  But she broke

14    because she cared more about her babies than the

15    defendant.

16         And I think she'll tell you her life is

17    better now that she's out of there because she's not

18    there any more.  She's gone.  She's somewhere safe.

19         Ultimately, after a lot of bringing

20    people back to the grand jury, ultimately Tamica

21    Mouzon admitted that she was there.  That, yes, Mack

22    was there.  That she saw the shooting.  She still

23    won't say she saw Mack do it.  But she'll say and

24    she'll tell you and she told the grand jury that they

25    were standing right around here, the other side of

OPENING - PIERCE

45

1     the street, and that, "I was over here by the car,

2     and that when I heard the shots, I saw somebody who

3     was Mack's shape, who looked like Mack, who could

4     have been Mack, in a mask shooting at Kareem.  And I

5     heard Kareem yell, 'No, Mack, no'".  But she won't

6     say it to his face.

7              Maybe she didn't see it.  You decide.

8     But she admitted at least that she was there.  Her

9     first couple times in the grand jury, it was:  Nope,

10    wasn't there.

11             Finally the two girls in the car,

12    Shaquanda Isaac and Shameka Ross.  After first saying

13    they weren't even there, they were with Kevin

14    Duckett, they left long before the shooting,

15    admitted, yes, they were there, and the shooting

16    happened right next to them.  And that, yes, they saw

17    Mack there.  And that after the shooting Mack and

18    Kevin Duckett jumped in the car, Mack on the side of

19    the shooting, that is in the passenger side rear, and

20    they drove from the scene and they dropped him off

21    somewhere.

22             It took months to get them to be here.

23    And I'll tell you when they come in here, you look at

24    them and ask yourself:  Do they want to be here?

25    That's why we have jurors.  That's why you're here,

1   to make those assessments.  And are they telling the

2   truth?  Or are they telling on somebody, on him, to

3   help somebody else?  And they would laugh at that.

4   The last person they would make something up about is

5   him.

6            Finally, finally, the government, knowing

7   who it was -- we thought, we don't know -- we don't

8   know anything, it's up to you to say who did it, not

9   me.  You.  But the evidence up to this point suggests

10  now that Kevin Duckett can be approached, that he

11  isn't the shooter.  So we bring Kevin Duckett in with

12  his lawyer and he decides -- he's told, I think, that

13  we know.  He's told that nobody suspects him of being

14  the shooter, but he could get wrapped up in this

15  because we know he sells drugs with Mack.  And in

16  federal court, if you're in a conspiracy, even if you

17  don't do the shooting, somebody else in the

18  conspiracy does it, guess whose head that can land on

19  anyway?  Yours.  So he met with his lawyer and he

20  said:  I'll talk.  He's the only witness who never

21  changed his story.

22            Came in, very nervous.  I'm sure he's not

23  eating a lot these days.  But he came in and said:

24  Yes, I went over there with Shameka and that is in

25  the car, they picked me up, we were going to

47

```
 1        Wal-Mart, that's what he was supposed to do.  Her
 2        niece was having an issue, which is what Ross says as
 3        well, and was in a fight.  So we went over there to
 4        see what was going on.  Then we heard the niece was
 5        okay in Cherry Hill, so we're just talking.  Mack is
 6        there.  Kareem walks by and Mack says, "I'm going to
 7        smash him".  He tells him, "Not a good idea, dude,
 8        there's people all over the place".  Of course,
 9        they're his people.  Says, "No, man".
10              Sends Ferl to get a gun.  Ferl brings him
11        the gun.  I'm going to move the car for a minute.
12        Brings him the gun, comes around the corner.  He's
13        there when this happens.  Brings him the gun right
14        here in the grass.  It's a semiautomatic pistol,
15        which we do not have.  Brings him the pistol.  Mack
16        takes it, operates the slide and a bullet pops out
17        and he starts -- they all start looking for the
18        bullet.
19              Now, I mention this because Tamica Mouzon
20        will tell you when I first asked her, "When did you
21        first see Mack that night," I think she'll tell you,
22        "I saw him over in the grass.  Looked like he was
23        looking for something".  They don't find the bullet,
24        or maybe they do, I don't know.
25              Kareem now is still up here, that is up
```

```
 1    the street further.  He's right up here on Maisel.
 2    They go back to the side of the street, up there
 3    talking.  Here, this is a break.  There's steps up
 4    here, you'll see them in a different picture.  I'm
 5    not going to show it now.  But there's basically
 6    steps here that walk over to here and it's basically
 7    a mirror image like this, instead the steps go up the
 8    hill instead of down the hill.  Sit there talking and
 9    then they see Kareem come back.  Walking down here.
10              Mack just pulled his mask down, went
11    after him, shot him.  He said he jumped right in the
12    car.  Mack got into the other side.  He said the
13    girls tried to get in the car as well but he pushed
14    them out, that is Rain and Tamica, and they took off.
15    Mack said, "Just take me uptown," and they took Mack
16    away, dropped him off, and then they all came back.
17    And he also said that Mack told him he gave the gun
18    to somebody; he jumped out of the car and he gave the
19    gun to somebody else, a guy named Roddy.  And Roddy
20    is a person who other witnesses will say they saw him
21    there as well.  Roddy didn't do anything.  He just
22    got the gun, got rid of the gun.
23              That's what Kevin Duckett told us.  And
24    he told us, "I was there when Ferl gave him the gun".
25              Now, Ferl is Jamar Howard.  He's the last
```

```
 1        of the eyewitnesses and I'm almost done.  Jamar
 2        Howard is going to testify -- the last thing he wants
 3        to do in his entire life, the least thing, doesn't
 4        want it to be the last thing he ever does -- but he's
 5        worried it will be the last thing he ever does.
 6        He'll tell you that.  He told the grand jury at one
 7        point when they asked him, after he finally admitted
 8        what he did, they asked him, "What are you afraid
 9        of?"  He said, "Antonio Hall".  This is what Ferl
10        will say.
11                  Now, Ferl is somebody we brought in in
12        November of 2009, just a few months after the murder.
13        We had heard he might be around.  He was always
14        around.  All these people are always around.  And he
15        said:  Oh, Mr. Purcell, oh, grand jury, I was around
16        that night, but I was completely on the other side of
17        these houses.  I was in this break here where I'm
18        pointing and I heard the shots but I didn't see
19        anything.
20                  And what were you doing back there, he
21        was asked.  He said:  I was actually selling drugs.
22        So this is a guy that came in and put himself in a
23        drug deal rather than being in a murder.  So finally,
24        after getting other witnesses come forward, we bring
25        him back again and then again.  And he ultimately
```

1  admits in two different proceedings.  In the first

2  one he admits:  I was there, I saw it.  In fact, I

3  saw Mack there and I was -- switch again, last time

4  I'll switch.  Ferl will tell you:  I saw him there.

5  And I was coming back, walking towards Maisel Court,

6  that is walking from down here to here, and I saw

7  Kareem walk by, walking, passing him basically.

8  Kareem's going this way, Ferl's going this way.  And

9  he says:  I see Mack running after him shooting him.

10 And he's the one who hears the last words of, "No,

11 Mack, no.  I didn't tell them anything".  He's

12 basically right next to Kareem when he gets killed.

13          Now, it took him months to tell us that.

14 And he told us why he didn't tell us.  Because he was

15 terrified.

16          Now, at that particular session of the

17 grand jury, at that point in the chronology we had

18 already talked to Duckett, so I asked him this

19 question:  Did you get that gun?  No.  In fact, he

20 swore it.  I asked him:  You need to tell us.  No.  I

21 didn't get the gun.

22          So we tried again -- this was November of

23 2010.  In December of 2010, which is when we indicted

24 the defendant based on the evidence you've heard

25 today, that is the grand jury indictment, he came

```
1    back in and was asked again.  Is there something more
2    you want to tell us.  We met him outside.  He
3    admitted to us in a meeting that, yes, he had got a
4    gun.  He said the defendant told him -- he said the
5    defendant told him, "Ferl, do me a favor".  See these
6    boxes on the sides of the buildings?  These are
7    electrical boxes.  He sent him off to somewhere off
8    in Wilgrey, he can show you where.  It was one of
9    those electrical boxes.  He said, "Go there, reach in
10   and bring me what you find".  And it was a nine
11   millimeter pistol.  He gave it to him.  He brought it
12   back and said:  Yeah, in fact, he cocked it, a bullet
13   came out.  Same thing Kevin Duckett and same thing
14   Tamica Mouzon saw.
15            If any of these people you think should
16   be charged with the shooting and they're not, don't
17   blame them, blame me.  He wasn't charged.  He got the
18   gun.  That's the way it is in the street.  You get
19   the gun, it may be assumed it's going to be used for
20   something and maybe it's going to be held.  At any
21   rate, the reason he held back is he didn't want to be
22   charged with that gun.  That's what he'll tell you.
23            He then went to his girlfriend's house
24   and it was when he was coming from his girlfriend's
25   house that he saw the shooting and heard Kareem yell.
```

1            September 20th of 2009 to December 2nd of

2    2010 is how long it took to build that case.  I know

3    I've talked a long time, but I didn't talk to you for

4    15 months.  But I want to tell you the entire

5    investigation.  That's how long it took, 15 months.

6    And in that 15 months we went from:  I didn't see it,

7    I don't know, I wasn't there, to:  He did it.  And we

8    know why.  And now you know why.  You know who did it

9    and you know why.

10           Now, what I'm saying to you, as the judge

11   will tell you, is just so much drivel because what I

12   say doesn't count.  But I'm allowed to tell you what

13   the evidence will show.  And at the end of the case,

14   if the evidence doesn't show that -- Mr. Hall has

15   some of the best attorneys there are in this

16   district, they're experienced, they do what I do.

17   And they do it better than I do.  And if I don't do

18   what I'm saying, believe me, they'll let you know.

19   But I'm happy to leave it with you.

20           Thank you very much.

21           THE COURT:  Thank you, Mr. Purcell.

22           Mr. Proctor or Mr. Sullivan.

23           MR. PROCTOR:  Judge, can we approach?

24           THE COURT:  Certainly.

25           (BENCH CONFERENCE ON THE RECORD.)

1          MR. PROCTOR:  Judge, based on the length

2     of Mr. Purcell's, I'm worried I may go 20 minutes or

3     so.  And in light of it being eleven, do you want to

4     take a five minute recess first?

5          THE COURT:  I don't think so.  The jury's

6     only been sitting for an hour.  Twenty minutes is

7     fine.

8          (END OF BENCH CONFERENCE.)

9          THE COURT:  Mr. Proctor, on behalf of the

10     defendant, we'll be delighted to hear from you.

11          MR. PROCTOR:  May it please the Court,

12     Counsel.

13          Quite a story Mr. Purcell had for you.

14     The problem is, he's got to prove it.  You know,

15     Mr. Purcell said words to the effect of, it's not up

16     to me who said -- to determine who did it.  It's up

17     to you.  Respectfully, he's wrong.  It's not up to

18     you to determine who did it.  It's not a hunch.  It's

19     not a more likely than not.  It's a

20     beyond-a-reasonable-doubt standard.  That's what

21     Judge Bennett will tell you at the end of the trial.

22          I submit at the end of this trial, you

23     will find the government has not proven its case

24     beyond a reasonable doubt.

25          Step back for a minute.  This is

1        Timothy Sullivan, my co-counsel, sitting on the far

2        left.  And it is our pleasure to represent

3        Antonio Hall, seated there in the red shirt.  He's no

4        angel.  I'm not going to stand here and misrepresent

5        something to you.  He is no angel.  But what he's not

6        is a murderer.  What he's not is a person that killed

7        Kareem Guest, certainly not beyond a reasonable

8        doubt.

9                    Something I tell every jury, I'm Irish.

10       I was born there.  I went to school there.  I went to

11       law school there.  The reason I tell them this, there

12       are just certain words I can't say in a way that

13       anyone on this continent could understand.  The

14       opposite of up is one of them.  Like, did you descend

15       the stairs?  I use the word that's the opposite of

16       up.  No one has any clue what I'm saying.

17                    So I just tell you that in advance.  And

18       I don't have all these fancy laser pointers,

19       exhibits, stick-on SUVs.  It's just you and me,

20       folks, and a scrap of paper.

21                    These are serious charges, almost as

22       serious as you can get in this court or any other

23       one.  And I don't dispute, none of us dispute, that

24       Kareem Guest died in a horrible manner.  That's not

25       here before you.  None of us are going to guess or

1   even hint that he had it coming or deserved it.  It

2   was a tragedy.  We're not here to speak ill of the

3   dead.  We don't need to speak ill of the dead.

4          But that's not the question.  We agree,

5   he was murdered and he was murdered in a horrible

6   manner.  It's who did it; but rather, did that man do

7   it and can you find so beyond a reasonable doubt?

8          Here's what the evidence will show:

9   Westport is a violent area.  Unfortunately, in

10  Baltimore City, there's a lot of places that have a

11  claim to infamy, I guess, is the word.  But Westport

12  may be, pound for pound, the most dangerous, violent,

13  drug-dealing, shooting, gun-slinging place in the

14  whole of Maryland, maybe in the whole of the

15  Mid-Atlantic region.

16         So the federal government decides -- and

17  I've got no qualms with it -- that they're going to

18  clean it up.  They launch -- if I remember, I'll ask

19  the FBI agent where they come up with these names --

20  Operation Manhole.  They always give it operation

21  names.  And they investigate and they indict a bunch

22  of bad folks.  Larry Cheese is one of them.  You saw

23  the indictment -- Mr. Purcell showed it to you -- who

24  are linked with drugs and the violence that goes

25  along with it, and they lock them up.  And some of

1        them get 20, 25, 30 years in jail.

2                Who they don't indict is Mr. Hall.  He's

3        not indicted.  He's not a target of that

4        investigation.  He's nothing.  Kareem Guest is a

5        witness in that case, Mr. Cheese's case.  And it's

6        true, he mentions Mr. Hall.  He mentions him on

7        page 5 out of 6 and it's a sentence.  I counted one

8        time; and I forget the exact number, but he mentions

9        18 people before he mentions Mr. Hall, 18 people who

10       have more of a motive to shoot him than Mr. Hall

11       does.  He mentions people who got indicted, some of

12       whom are related to the eyewitnesses.  Mr. Purcell

13       told you that.  Some of the people who were indicted

14       in this case, in the Cheese case, were related to the

15       eyewitnesses.

16               You think they didn't have a motive?

17               Mr. Guest put their loved ones in jail.

18       And then to compound the problem, the discovery is

19       given to Mr. Carithers -- who, by the way, is now

20       disbarred in this state for reasons that have

21       entirely nothing to do with lying to the FBI.  And

22       Mr. Sullivan and I, by the way, signed the same

23       discovery agreement.  We take them seriously.

24               Mr. Carithers didn't, and someone died

25       because of it.  He handed the discovery out.  And

1   witnesses will come in and tell you -- and the

2   government doesn't dispute it -- that discovery was

3   everywhere.  People were talking about it in the

4   streets.  It was nailed to the basketball court.  The

5   local corner bar had the discovery pasted on its

6   wall.

7          A lot of people knew Kareem was

8   snitching.  A lot of people had a motive to kill him.

9   18 other names mentioned before Mr. Hall.

10          You know, I was thinking about it a

11   couple of days ago.  I once, ten years ago, maybe,

12   read an Al Franken book called *Lies and the Lying*

13   *Liars Who Tell Them*.  And that book, the title of

14   that book could have had this case in mind because

15   every single witness in this case lied multiple

16   times.  And I'm not talking lying like the size of

17   the fish I caught last weekend or, Mr. Sullivan, what

18   I shot on the front nine the last time I played golf.

19   I'm talking, came in, took an oath, the same oath

20   they will take over there in that chair, swearing to

21   tell the truth, the whole truth, and nothing but the

22   truth, so help me God, and then they lied.

23          They lied about material things.  They

24   lied about whether they were there, whether they saw

25   the shooting, whether they heard the shooting, who

```
 1    had a gun, where they got it from, where it went back
 2    afterwards.  They lied about every material question
 3    they were asked.
 4              And one of them, and only one of them,
 5    was charged with perjury.  And after she testifies,
 6    she's going to get time served, is what she'll tell
 7    you, I believe.
 8              Let's count the lying liars, if you will.
 9    Mr. Carithers, the first one, the first one going off
10    the list, the first couple of times, he told us he
11    didn't give it out.  The third time, he told us he
12    did, sort of.  Twice he lied to the FBI, which is a
13    crime that carries ten years in prison.  And then the
14    third time, he finally admitted he gave it out and
15    claimed he just remembered when he looked at his time
16    sheets, and that's why he lied the first two times.
17              Attorney at law, that's the first
18    government liar you'll probably hear from.
19              Rosa Knox, she may or may not testify.
20    She is the person who received the papers.  She lied
21    and said:  I didn't get them or I didn't give them
22    out or -- not a big lie, but a lie, nonetheless.
23              Kevin Duckett, Mr. Purcell said, not a
24    saint.  I believe the evidence will show that's the
25    understatement of the century.  Mr. Purcell said he
```

1    didn't really lie, he just wasn't forthcoming with

2    the truth.  I believe the evidence will show quite

3    contrary.  He lied, and I submit you will find, will

4    lie on the stand again about where he was standing

5    the night of the murder.  He distanced himself, I was

6    already on my way back to the car.  Other witnesses

7    will tell you he's standing right there.

8              Another crime you'll hear about is the

9    shooting of Marty Williams.  Mr. Duckett fabricated

10   himself an alibi.  Went to the store, bought a pair

11   of jeans or had someone else go to the store and buy

12   a pair of jeans.  We'll find out soon enough.  He was

13   so cognizant that he created a lie for later use.

14   That's a government witness.

15             Rain Curtis, you'll probably hear from

16   her this afternoon, probably the most prolific liar

17   in this case, although there are a few that would

18   challenge that accolade.

19             First trip to the grand jury, January

20   21st, 2010, swear to tell the truth, the whole truth,

21   and nothing but the truth?  Absolutely, just like

22   she'll do over there.  Said she didn't see anything.

23   Nonsense.  That's not true.

24             Not content with lying to the grand jury

25   once, she goes back February 4th, 2010.  I wasn't in

60

 1    the area.  I only learned of the shooting later.  I

 2    didn't see anything.  I didn't hear anything.  I

 3    don't know what happened.  That's twice she lied

 4    under the penalty of perjury.  What's the saying:

 5    Fool me once, shame on you?

 6              A few weeks later, they bring her in the

 7    U.S. Attorney's Office.  Again, she's talking to an

 8    FBI agent.  You can't lie to them.  You can go to

 9    jail for ten years.  Lied again.  Then she gets

10    arrested May 26th.  She is denied bail.  She sits in

11    jail two months.

12              Mr. Purcell talks about the love of your

13    children being more important than the law of the

14    streets.  Desperation is what I call it.  She needed

15    to give law enforcement a story to get her butt out

16    of the pokey.  Ergo, Mr. Hall did it.

17              Tamica Mouzon, you'll hear from her.  I

18    think her lawyer's in the courtroom, actually.  First

19    time in the grand jury, under penalty of perjury:  I

20    didn't see anything.  That's a lie.  And,

21    incidentally, never charged with perjury.

22              Mr. Purcell said, if you feel like they

23    committed a crime and they weren't charged with it,

24    don't blame them.  They blame me.  There's plenty of

25    blame to go around in this case, folks.

61

```
 1                    First time she goes to the grand jury:  I
 2       didn't see anything.  Second time, there was a
 3       shooter all in black, but I can't point him out.  And
 4       here's -- it's very easy to lose sight of this, but I
 5       think it's very important.  After Miss Mouzon the
 6       second time says:  I didn't see anything, the shooter
 7       was in all black, I didn't see it, what does the
 8       government do?  They wheeled Rain Curtis into the
 9       room, who everybody knows has been charged with
10       perjury and has been locked up.  And she says:  Don't
11       end up like me, talk to these people.
12                    And you have the specter of someone who's
13       been in jail two months standing in front of you just
14       saying:  Talk to these people, don't end up like me.
15       And talk about a roadmap, a sign, a flashing neon
16       light?  You got to say what the government wants to
17       hear.  And what the government wants to hear is:
18       Mack did it.
19                    I could go on, but you're going to get
20       the picture.  The horse is sufficiently dead.  I
21       don't need to keep gloating.  Shameka Ross lied
22       multiple times.  Shaquanda Isaac lied numerous times.
23       Jamal Howard, Ferl, who you will hear, lied numerous
24       times.  Avery Galt lied a panoply of times.
25                    Suppose you don't believe these admitted
```

1    perjurers?  The government agrees they're perjurers.

2    Don't take my word for it.  Ask them if they're

3    perjurers.

4              What else you got?  You got DNA?  Nope.

5    You got the gun?  Nope.  You got ballistics?

6    Ballistics says the gun was all fired -- the bullets

7    were all fired from the same gun.  Who cares?  It

8    doesn't say who fired it.

9              You've got a confession from Mr. Hall?

10   Nope.  You got nothing.  The liars, the lying liars,

11   the perjurers, whatever you want to call them, that's

12   what you got.

13             If the government's witness told you

14   today was Tuesday, you'd check the calendar, folks.

15   And the government, in their zeal to close the

16   case -- and homicide cops call it a red ball.  The

17   murder of a federal witness is a red ball.  The cops

18   arrive, they're harassing people, they're leaning on

19   them, they're calling them names.  People will come

20   in here and tell you that.  They're threatening them,

21   threatening their families.  So everybody toes the

22   party line.  And the party line is:  Mack, who's no

23   angel, did it.  That's what you'll hear.

24             And another incentive for the witness to

25   lie, you know, Mr. Purcell told you, Rain will come

```
 1        in and tell you life's a lot better since she got out
 2        of the neighborhood.  Life's a lot better because the
 3        federal government has paid $26,000 to her this year
 4        already in return for her testimony in this case.
 5                    MR. PURCELL:  Objection.
 6                    THE COURT:  Overruled.
 7                    MR. PROCTOR:  $26,000.  No wonder we need
 8        to raise the debt ceiling.
 9                    Kevin Duckett, who Mr. Purcell talks
10        about -- and by his own admission, folks, by the way,
11        set up a murder.  $35,000 the government has paid him
12        this year already.
13                    MR. PURCELL:  Objection.
14                    THE COURT:  Overruled.
15                    MR. PURCELL:  Can we approach,
16        Your Honor?
17                    THE COURT:  We'll discuss it after he
18        finishes his opening statement.
19                    MR. PROCTOR:  I've nothing more to say on
20        that topic, Judge.
21                    You know, I'm not standing here telling
22        you who killed Kareem Guest.  I don't know.
23                    But at the end of the trial, I don't
24        believe you'll know, either.  I certainly don't
25        believe you'll find it was Mr. Hall beyond a
```

1   reasonable doubt.  It could have been Mr. Duckett.

2   Could have been a guy you'll hear about named

3   Seattle.  I can't -- and, again, that's to say, I've

4   got a reasonable doubt and I admit it.  By the end of

5   the case, you will too.

6           You know, I want to echo one thing

7   Mr. Purcell said about being a jury being an act of

8   sacrifice.  We all appreciate why you're here.

9   Jurors were one of the first things this country

10   brought in.  It's important.  You're the check and

11   the balance on the system.  I grew up in northern

12   Ireland in the '80s.  We didn't have juries.  We had

13   what's called deadlock courts for our trials.

14           And you'd be surprised how much it

15   permeates the natural psyche to know it's one judge

16   who you're never going to meet who isn't part of your

17   community who decides your fate.  It's really

18   important what you're doing here today.

19           At the end of the day -- I'm sorry -- at

20   the end of the trial, we'll get a chance to address

21   you again.  And we submit, at the end of the trial,

22   you will have a reasonable doubt, and you will find

23   Mr. Hall not guilty and send him home.

24           Thank you, folks.

25           THE COURT:  Thank you very much,

65

1    Mr. Proctor.

2              Counsel, if you'll approach the bench for

3    one second, please.

4              (BENCH CONFERENCE ON THE RECORD.)

5              THE COURT:  Mr. Purcell, with respect to

6    your objection, I gather the basis of the objection

7    was -- is that the $26,000 to Rain Curtis and the

8    $35,000 to Kevin Duckett relate to expenses that have

9    incurred in terms of placing -- the witness

10   protection.

11             MR. PURCELL:  It could have been much

12   more accurately stated.

13             THE COURT:  I understand.  It's a matter

14   of how you apply the 26 and $35,000.  Essentially,

15   it's for witness protection costs, correct?

16             MR. PURCELL:  Yes.

17             THE COURT:  Then you're certainly free to

18   indicate that the costs are related to witness

19   protection, that they're not just checks handed to

20   Mr. Curtis and Mr. Duckett.  So I overruled your

21   objection because counsel can certainly comment upon

22   it as some kind of financial incentive, but the

23   government is certainly free to explain exactly what

24   the cost is for.  It's for witness protection.  So

25   you can deal with it in that fashion so the record's

```
 1        clear.  Thank you very much.
 2                  (END OF BENCH CONFERENCE.)
 3                  THE COURT:  All right.  Ladies and
 4        gentlemen, with that, we're going to take a morning
 5        break, we normally take a morning break around this
 6        time, for ten minutes.  And we'll start with witness
 7        testimony at 11:30.  A ten-minute recess.
 8                  (BRIEF RECESS.)
 9                  (JURY OUT.)
10                  THE COURT:  Government ready for the
11        jury?
12                  MR. PURCELL:  Yes, Your Honor.
13                  THE COURT:  Defense ready for the jury?
14                  MR. PROCTOR:  Yes, sir.
15                  THE COURT:  Incidentally, Counsel, to the
16        extent that there are any plea letters, clearly the
17        statement of facts is not included.  I'm just
18        verifying that.  Just remind you just to delete
19        those.
20                  (JURY IN.)
21                  THE COURT:  Ladies and gentlemen, with
22        that, we're ready to proceed with the first witness.
23        We'll be going to a little before one o'clock today.
24        We'll break for lunch from one to two, and we will be
25        sitting until 4:30 this afternoon.  So with that,
```

DEBORAH GUEST - DIRECT

67

```
 1      we'll be ready to hear witness testimony.

 2                  Mr. Purcell, the government's first

 3      witness.

 4                  MR. PURCELL:  Deborah Guest, please.

 5      Whereupon:

 6                        DEBORAH GUEST,

 7      called as a witness, having been first duly sworn

 8      according to law, testified as follows:

 9                  THE DEPUTY CLERK:  State your name for

10      the record and keep your voice up for us, please.

11                  THE WITNESS:  Deborah Guest.

12                     DIRECT EXAMINATION

13      BY MR. PURCELL:

14      Q.      Good morning, Miss Guest.  Thanks for coming

15      in this morning.

16                  Can you just tell the jury, please, your

17      relationship to Kareem Guest?

18      A.      I'm his mother.

19      Q.      And how long -- I'm sorry, how old was Kareem

20      when he passed away?

21      A.      He was 29.  He had just turned 29 years old.

22      Q.      Now, can you tell the grand jury -- the jury,

23      please, where Kareem was living at the time of his

24      death?

25      A.      At home with me.
```

```
 1      Q.      And where is that or where was that?

 2      A.      In Westport, on Maisel Street.

 3      Q.      Now, how long have you lived in Westport?

 4      A.      Oh, since -- well, all my life.  All my life,

 5      yes.  We moved to Westport in 1958.  I was a child.

 6      I was a little girl.

 7      Q.      And how many children do you have?

 8      A.      Four.

 9      Q.      Did you raise your children there?

10      A.      Yes.

11      Q.      Did you raise Kareem there?

12      A.      Yes.

13      Q.      And up to this point, your children have all

14      survived?

15      A.      Yes.

16      Q.      And you like Westport?

17      A.      Yes.

18      Q.      You've got friends there?

19      A.      Yes.

20      Q.      Can you tell the jury, please, about -- I know

21      you've lived there all your life.  But how big -- how

22      many people live over there?

23      A.      Oh, approximately, I would say about 2,000

24      people.

25      Q.      And how far off of Center City, could you tell
```

1    us -- if you would walk out of the courthouse today,

2    how would we get there?

3    A.      You would go south about -- maybe about two or

4    three miles, I guess, and you're right in the heart

5    of Westport.

6    Q.      Can you get there on the light rail?

7    A.      Yes.

8    Q.      If you know, how many stops is it from the

9    Camden Yards to here?

10   A.      One stop.

11   Q.      So it's really close to downtown?

12   A.      Well, two stops now.  The Ravens stadium is

13   there.  It used to be one; now it's two stops.

14   Q.      If you don't stop at the Ravens, it's one

15   stop?

16   A.      It's one stop, yes.

17   Q.      Now, we're going to show some photographs of

18   the general location of Westport.  It's essentially

19   on the western edge of the inner harbor where the --

20   or the harbor area for Baltimore; is that right?

21   A.      Yes.

22   Q.      And I understand that you're fairly active in

23   the community over there?

24   A.      Yes.

25   Q.      What are you involved in there in terms of the

```
 1      community?

 2      A.      Well, I'm on the board of directors for the

 3      Westport neighborhood association.  And I work at the

 4      Boys & Girls Club and the PTA.  I have grandchildren

 5      in the school now.  And I just live there.  I'm just

 6      a neighbor to everybody.

 7      Q.      Now, I'm just -- based on my experience, it

 8      seems that everybody in Westport knows everybody

 9      else.

10      A.      Yes.

11      Q.      Do you know Mr. Hall here?

12      A.      Yes, I do.

13      Q.      How long have you known him?

14      A.      I would say maybe about ten years.

15      Q.      You're familiar with some of the witnesses in

16      the government's case.  You know a lot of them too,

17      don't you?

18      A.      Yes.

19      Q.      Tamica Mouzon?

20      A.      Yes.

21      Q.      Little Mike?

22      A.      Yes.

23      Q.      Others, as well?

24      A.      Yes, sir.

25      Q.      Did you know Rain Curtis?
```

71

```
 1        A.      I met Rain.  I saw her, but I really didn't
 2    know her, you know.  A lot of the younger people I
 3    know, but more of them know me than I know them.  But
 4    I do, I have touched base with them for general
 5    purposes, you know, children, grandchildren.  I may
 6    know their moms more than I know them.  But we know
 7    -- Westport, if I can say, is a community where
 8    everybody knows everybody, just about.  It's not
 9    like, if you're a stranger in Westport, you know that
10    you're a stranger in Westport because nobody would
11    know you.  It's like the old TV show Cheers, isn't it
12    nice to know where everybody knows your name.  And
13    that's kind of like Westport, you know.
14        Q.      You've had opportunities to leave there?
15        A.      Yes.
16        Q.      And you haven't left since even Kareem passed
17    away?
18        A.      No.
19        Q.      Now, there are issues there.  There are drug
20    and violence issues there; is that right?
21        A.      Yes, there is.
22        Q.      And you've seen them?
23        A.      Yes.
24        Q.      But you're still there?
25        A.      I'm still here.
```

```
1    Q.      Now, Kareem is your son.  Did he have any

2    children?

3    A.      Yes.

4    Q.      Could you put that picture up, please?

5            This is Government's Exhibit 399.  And if

6    you would take a look at this photograph and just

7    tell the jury what they're looking at in Exhibit 399.

8    A.      This is Kareem and Jai la.  And I believe at

9    her birthday party.  Jai la looks about three.

10   Q.      How old is Jai la now?

11   A.      She's eight.

12   Q.      So this is a few years ago?

13   A.      Yes.

14   Q.      And you gave us this picture; is that right?

15   A.      Yes.  Yes, I did.

16   Q.      Now, at the time of Kareem's passing, where

17   did Jai la live?

18   A.      About three blocks from me.  Excuse me.  About

19   three blocks.  I'm okay.  Go ahead, Jack.  I'm okay.

20   I'm okay.

21   Q.      Now, prior to -- well, let me direct your

22   attention to the summer of 2009.  All right?  Had

23   Kareem been in jail at some point, or been held, at

24   some point during that summer?

25   A.      Yes, he had.
```

```
1    Q.      And can you tell the jury when it was that he
2    came home?
3    A.      He came home in August.  Kareem came home in
4    August, I believe, August the 27th.  He had been home
5    three weeks before he was murdered.
6    Q.      And he stayed with you?
7    A.      Yes.
8    Q.      Now, the baby was not with you but was with
9    her mother?
10   A.      Yes.
11   Q.      And you mentioned where she lived not being
12   far away.  I'm going to ask you to take a look, Mrs.
13   Guest, over at this exhibit, which the jury has seen
14   but not been introduced.  This is Exhibit No. 1.
15   It's a poster.  And I'm putting it here so the judge
16   and jury can still see each other.  And I think you
17   can just -- this is a touchscreen.  Is it working?
18              THE COURT:  It should be.  Yes.
19              MR. PURCELL:  May I approach the witness?
20              THE COURT:  Certainly.
21   BY MR. PURCELL;
22   Q.      If you touch this, there will be a little
23   highlight where you're touching.  And then we can
24   erase it.
25   A.      Okay.
```

```
 1    Q.      Show the jury.  I know your home is not

 2    actually on this, but can you orient yourself on this

 3    photograph of Westport?

 4    A.      Okay.  My home would be here.  You can't see

 5    it.  It's further down the street.  And you're coming

 6    this way on Maisel Street, and you come into the

 7    center, this is Norfolk Street.  And Kareem would

 8    always come up Maisel Street.  And this was his

 9    little trail and it come through Maisel Court.  That

10    was -- you know, that was the block.  Everybody hung

11    in this block, Maisel Court.  And he would go down

12    one block, usually cut right through this trail, and

13    come down to his daughter's house, which was on

14    Wilgrey.

15    Q.      On the day of -- I'm just going to -- is it

16    the right or the left corner?

17              THE COURT:  Touch the bottom left corner,

18    it'll disappear.

19    BY MR. PURCELL:

20    Q.      On the day of his murder, did you see Kareem

21    -- this was a Sunday, am I correct?

22    A.      Yes.

23    Q.      Did you see Kareem that day?

24    A.      Yes.

25    Q.      Did there come a point that he left the house?
```

1    A.      Yes.  He had been home all day.  His daughter

2    had been wanting him to fix her room in my house.

3    She wanted a room.  She loved her daddy.  You know,

4    they were like this.  And he had worked all day on

5    the room, fixing the room, putting the bed together,

6    just make it comfortable for her.  And he was going

7    to get it, a surprise to bring her back, so she could

8    see this room that he had fixed up for her.  And he

9    had worked all day.  I mean, he was like, when he got

10   up that morning, he said, "Man, I got to do this room

11   for Jai la because she's going to have a fit if she

12   come and don't see this room together".

13          And he had fixed the room, and it was

14   just about dusk, you know.  He was getting ready to

15   leave.  I said, "Where are you going?"  He said,

16   "Walking to get Jai la to see the room".  I said,

17   "Don't be long, Kareem".  He said, "I ain't be long.

18   I going to over here to just stretch my legs and, you

19   know, I'm coming right back".  And I said he'd only

20   been home three weeks.  And that's what he did.

21   Q.      That's the last time you saw him?

22   A.      That's the last time I saw him.

23   Q.      He was going to Jai la's?

24   A.      Yes.

25   Q.      And the route that he took would be the route

REBORN DIRECT DIRECT

76

1     that he normally took, as you indicated?

2     A.      Exactly.  Exactly.

3     Q.      Now, you said, talking about -- I heard your

4     testimony -- you said something about where people

5     would hang out.  Would you just indicate for the jury

6     where it was on Maisel people were known by you to

7     hang out?

8     A.      In this block right here.  This whole block of

9     Maisel.  That was the hangout.  Come up -- you know,

10    this is a dead end here.  So everybody just hung

11    right in this little block, in that little area

12    there.

13    Q.      And you've seen that yourself?

14    A.      Yes.

15    Q.      Now, during the summer, again, of 2009, did

16    you have occasion to see any -- I think, when you and

17    I talked about it, just talked called it paperwork?

18    A.      Yes.

19    Q.      For the record, it's our discovery materials

20    that I'm talking about.  But did you see any

21    paperwork that pertained to Kareem?  That is,

22    statements that he made to the FBI or at least papers

23    representing these statements that he said to the

24    FBI?

25    A.      Yes.

```
 1     Q.      Did you see them yourself?

 2     A.      Yes, I did.

 3     Q.      Did you see the paperwork of anybody else?

 4     A.      Yes.

 5     Q.      Do you remember just off the top of your

 6     head -- I'm not going to put any lists in front of

 7     you.  But do you remember off the top of your head

 8     any other reports that you might have seen, or any

 9     other people's discovery materials?

10     A.      I remember the whites and the white, they

11     called him Monster.

12     Q.      Is that Dwight Hickman?

13     A.      Yes.  Dwight Hickman, I'm sorry.

14     Q.      Do you know him?

15     A.      Yes, I do.

16     Q.      How well do you know Monster?

17     A.      Very well.  He was -- me and his sister -- me

18     and his mother, we were raised up like sisters.

19     Q.      Was he a monster?

20     A.      Not what they portrayed him to be.  But as he

21     got older, like all the other boys, they didn't have

22     anything to do.  You know.

23     Q.      Who else did you know?

24     A.      Taglin, I remember Taglin's papers, I saw

25     hers.  Amber.
```

```
1    Q.      Where did you see them?

2    A.      I was coming from the store, which is another

3    place.  Annapolis Road, everybody, you know, that's

4    their little store thing.  I was coming from the

5    store and two ladies, three ladies stopped me, three

6    women stopped me.  And I know them well.  Wanda

7    Partlow, Penny Hopkins and Peggy.  I really don't

8    know Peggy because she came -- like I say, she's a

9    new face in Westport.

10   Q.      I'm going to stop you for a second.  You

11   mentioned Wanda Partlow.

12   A.      Yes.

13   Q.      Is Wanda Partlow, if you know, related to

14   Tamica Mouzon, Little Mike?

15   A.      Yes.

16   Q.      How is she related?

17   A.      That's her daughter-in-law.  Yes, that's her

18   daughter-in-law.

19   Q.      And do you know her son?

20   A.      Yes.

21   Q.      Or her sons, I should say.

22   A.      Yes.

23   Q.      Do you know one of her sons named Maurice?

24   A.      Yes, I do.

25   Q.      Can you tell the jury what happened to Maurice
```

```
1     in terms of law enforcement?

2     A.      He received about 20-something years for drug

3     trafficking.

4     Q.      What was his nickname?

5     A.      Black.

6     Q.      Did you know a person named Larry, Larry

7     Cheese?

8     A.      Yes.

9     Q.      Did you know his mother?

10    A.      I met her, but I never really knew her.

11    Q.      Do you know who I mean?

12    A.      I know what you're speaking of.

13    Q.      Did you see her today?

14    A.      Is she here today?

15    Q.      Did you see her today?

16    A.      Yes, I did.

17    Q.      All right.

18    A.      Yes, I did.

19    Q.      Did you know Shameka Ross?

20    A.      Yes.

21    Q.      And how do you know her?

22    A.      She lived in the community.  I knew her mother

23    as well.  You know, me and her mother went to school

24    together.  And I knew her growing up also.

25    Q.      Did you know who the father of her -- at least
```

```
 1     one of her children is?

 2     A.      Yes.  Larry Cheese.

 3     Q.      You knew this from the neighborhood --

 4     A.      Yes.

 5     Q.      -- and knowing these people?

 6     A.      Yes.

 7     Q.      Now, you said -- and you've told us some of

 8     the other paperwork that you've seen and where you

 9     saw it.  Did these people have the paperwork with

10     them?

11     A.      Yes, they had everything.  I mean, those were

12     the --

13     Q.      Now, I'm not going to show you a pile of

14     paper, but just direct your attention to the --

15                 THE COURT:  Counsel, approach just one

16     second, if we can for one second, please.  To the

17     bench.

18                 (BENCH CONFERENCE ON THE RECORD.)

19                 THE COURT:  Just for the record, we

20     haven't discussed this, we discussed it before.  I

21     think it might be appropriate to indicate to the jury

22     this is being -- this is an item in evidence just

23     with respect to the context of the allegations in

24     this case.  The assertions in the documents are not

25     being put in for the truth of the matter asserted
```

1    therein.  This is the time to do it now.  I didn't

2    want to interrupt your opening statement, Mr.

3    Purcell.  Any objection from the defense?

4                 MR. PROCTOR:  No, sir.

5                 THE COURT:  That's fine.

6                 (END OF BENCH CONFERENCE.)

7                 THE COURT:  Ladies and gentlemen, as to

8    these law enforcement documents, what are known as

9    FBI 302 forms, they are admissible in evidence with

10   respect to the context of the allegations in this

11   case.  In terms of what is actually contained therein

12   as to who did what, they're not being offered for the

13   truth of the matter asserted therein.  So the purpose

14   is just that people were listed in the report.  But

15   you're not to worry about what was stated in the

16   allegations therein.  It's being offered in terms of

17   the context of people being listed in the report

18   itself, but the contents of it are not being admitted

19   for the truth of the matter asserted therein.  So

20   it's not hearsay.  But you should not take that and

21   worry about what is actually asserted there.  It's

22   just the fact that there are names there.

23                 You may continue, Mr. Purcell.  This is

24   government exhibit --

25                 MR. PURCELL:  306.

82

```
 1        BY MR. PURCELL:
 2        Q.      Miss Guest, I'm just going to put in front of
 3        you, instead of looking at the screen, Exhibit No.
 4        306.  Just take your time.  I know you've looked at
 5        them before, but just tell the jury what that is.
 6        A.      These are the papers that I saw that Kareem
 7        had talked to Officer Moody about the different
 8        people in the neighborhood.
 9        Q.      And did the ladies have other papers as well
10        besides that paper?
11        A.      Yes, they did.
12        Q.      Did they give you any copies?
13        A.      No, no.
14        Q.      But they had copies?
15        A.      Yes.
16        Q.      I don't know if I ever asked you this.  But
17        can you tell us how big a stack of paper they had?
18        A.      All three of them had copies.  So one had them
19        in her purse and it was like this high, you know.
20        And then another one had maybe this much.  And then
21        -- well, Peggy had the pocketbook full of them.  And
22        then she was giving them to Wanda, but Wanda already
23        had some papers.  And then Wanda in turn was handing
24        them to me.  And then she would give Penny some.  But
25        it was -- in retrospect, it was a stack this high.
```

1    Q.      Now, did you see, other than that particular

2    occasion -- and just to clarify, was Kareem home yet

3    when that happened?

4    A.      No.

5    Q.      Other than that one particular occasion, did

6    you see those papers or any similar papers, that is,

7    that type of paper, anywhere else in Westport or were

8    shown to you by anybody else in Westport?

9    A.      No.

10   Q.      You don't remember seeing them anywhere?

11   A.      No.

12   Q.      Did you get copies of those?

13   A.      I had asked.  But then they was like

14   everything went underground, you know.  Oh, I don't

15   have them.  You know, I didn't have them.  You know,

16   it was one of those things.  They didn't want me to

17   see it.  They had mentioned it and then they took it

18   all back.  So I don't know what happened.

19   Q.      So they never showed you any papers?

20   A.      Exactly.  As far as they were concerned, it

21   was my imagination.

22   Q.      You're not hallucinating, though, about seeing

23   them, are you?

24   A.      No, I'm not.

25   Q.      I asked you if you knew the defendant, Mr.

```
 1      Hall.  Can you tell the jury where it was you had
 2      seen Mr. Hall.  And I guess you saw him often; is
 3      that right?
 4      A.      Yes.
 5      Q.      Particularly like just in the summer of 2009.
 6      In that period of time, can you tell the jury where
 7      you remembered seeing him in that area.
 8      A.      He would be on Maisel Court and then Annapolis
 9      Road.  Like, 2009, it seemed like the traffic moved
10      over to Annapolis Road.
11      Q.      What traffic are you talking about?
12      A.      You know --
13              MR. PROCTOR:  Objection, Judge.
14              THE COURT:  Sustained.  Sustained.
15      MR. PURCELL:
16      Q.      What sorts of things?
17      A.      When I say, "traffic" --
18              MR. PROCTOR:  Objection, Judge.
19              THE COURT:  Just rephrase the question.
20      MR. PURCELL:
21      Q.      I'm just going to ask you this instead of you
22      using that word.  Just when you saw Hall in
23      particular, the person we're interested in, what was
24      he doing?  Just describe what he was doing.  What you
25      would see him do and who he was with?
```

1    A.      Just hanging around on the corner, hanging

2    around.  With his brother.  They said Kevin, they

3    called him Big Kev, that was a cousin.  And a couple

4    other guys in the neighborhood, you know.  They all

5    just hung together.

6    Q.      How often -- what time of day would they be

7    there?

8    A.      All day.

9    Q.      All day?

10   A.      All day.

11   Q.      Just hanging out?

12   A.      Yes.

13   Q.      Did you see them interact with people in cars

14   or anything like that?

15   A.      Yes.

16   Q.      Tell us what you would see in terms of

17   interaction with people in cars.

18   A.      What I would see, they would go to cars and

19   talk to people, you know.  Different folks would come

20   and they would talk to them, so.  They actually be

21   right there in the car and say what was going, I

22   couldn't say that.  But I would see them going to

23   different cars talking to people.

24   Q.      And then the cars would go away?

25   A.      Yes.

86

```
 1     Q.      Now, when the papers were on the street,

 2     was -- is that something that was being spoken of?

 3     Was that causing a buzz in the community?

 4     A.      Yes.

 5     Q.      Tell us.

 6     A.      Well, everybody said Kareem was the rat.

 7     Kareem told on other people, these people in these

 8     papers, and sent them to jail.  But this happened --

 9     all of them were in jail before these papers came

10     out.  Everybody had 20, 25.  I guess 25 was the most

11     time.  That the other guys that are mentioned in this

12     form, they were already incarcerated.  They had been

13     incarcerated maybe two, three years.

14     Q.      Well, Mack wasn't in jail, though, was he?

15     A.      No, he wasn't.  No, he wasn't.  He was about

16     the only one.

17     Q.      Did he mention Mack?

18     A.      Yes, he's mentioned in his papers, yes.

19     Q.      Did you see that?

20     A.      Yes.

21     Q.      He mentioned Black, for instance, quite a bit?

22     A.      Yes.

23     Q.      Black was where when all these papers came

24     out?

25     A.      In jail.
```

1    Q.      Federal jail?

2    A.      Federal jail, yes.

3    Q.      These weren't used against Black, were they?

4    A.      No.

5    Q.      But we'll have somebody else we'll ask

6    questions about that.

7              Now, one other thing I wanted to ask you

8    about is one of the people that you told me you knew

9    is Marty Williams.

10   A.      Yes.

11   Q.      Can you tell the jury where Marty Williams

12   lived until he was murdered?

13   A.      He lived up the street from me.  I lived in

14   2700 block and he lived in the 2600 block.

15   Q.      We may have a photograph, an aerial, that

16   shows that neighborhood.  You're right off of

17   Norfolk, right, Maisel?

18   A.      No.  I'm off of Westport Street.

19   Q.      Okay.  Take a look at Exhibit 47A.  Do you

20   recognize that?

21   A.      Yes.

22   Q.      I know it's an aerial.  And if you could, if

23   that shows where you live and live now, could you

24   just put a finger dot on that?

25   A.      Right here.

```
 1      Q.      All right.  And that's where you live now?
 2    Just to show the jury, to orient them because it
 3    doesn't show quite everything.  If you were Kareem on
 4    the day he was murdered, just show us, just use your
 5    finger, show us he would have walked out of your
 6    house and gone in what direction?
 7      A.      He walked out this way.  He would have walked
 8    all the way up.
 9      Q.      So he would have been going towards this
10    field; is that right?
11      A.      Exactly.
12      Q.      And that field we're looking at, if you look
13    at the big picture, number one, that would be this
14    field here; is that right?
15      A.      Yes.
16      Q.      I'm showing with the dot.  And this is Maisel.
17    So your house would have been a little bit above
18    where that orange dot is on Exhibit No. 1.
19      A.      Yes.
20      Q.      He would have walked down the avenue.  He
21    would have walked over and then down the cut?
22      A.      Yes.
23      Q.      Now, where was Marty Williams live.  Not
24    live -- but where was he murdered, if you know?
25      A.      He was murdered here, the second house from
```

1    the corner.

2    Q.     Okay.  And how do you know that?

3    A.     I saw him.

4    Q.     What do you mean, you saw him?

5    A.     I was coming from the store, me and my son,

6    and my neighbor that was living there in the house at

7    that time, he came running to my car.  He said,

8    "Debbie, they shot little Marty".  I said, "They shot

9    little Marty?  "And I'm thinking he was just shot and

10   I could go and help him in some kind of way.  And

11   when I got there, he was dead.  He was just --

12   Q.     Where did you see him?

13   A.     Inside the house.  He was sitting in his chair

14   facing the wall.

15   Q.     What was on the wall?

16   A.     His brains was just splattered all over the

17   place.

18   Q.     Now, this was March of 2009?

19   A.     Yes.

20   Q.     A couple of months before Kareem?

21   A.     Yes.  Not knowing that he was dead, I thought

22   that he was, you know, just shot and he needed some

23   help.  And I know his parents.  And that's why I went

24   to help him, you know, because I would want someone

25   to help mine.  If they could help him, you know.  And

1    he was gone.  He was gone.

2    Q.     Did the police arrive soon after that, or were

3    they there when you got there?

4    A.     No.  They came after, they came after.  I may

5    have been at the house maybe 10 or 15 minutes, then I

6    left.  I mean, not in the house, but I went there.

7    But after I saw what I saw, I left.  And then my

8    granddaughter, one of my grandkids had already called

9    the police and a couple of our neighbors, you know.

10   I was telling them to call the police because from

11   what I saw there was no need for an ambulance.  There

12   was no need.

13   Q.     Do you know Leonard?

14   A.     Yes.

15   Q.     Did you see him that day?

16   A.     Earlier that day.

17   Q.     Did you see him at the time of the murder?

18   A.     No, I didn't.

19   Q.     You know who I'm talking about, Leonard

20   Cunningham; is that who you're talking about?

21   A.     Yes.  Yes.

22   Q.     Ma'am, I don't have any further questions.

23   Counsel may, so just stay seated for a moment.

24              THE COURT:  Thank you, Mr. Purcell.

25              Mr. Proctor.

DEBORAH WEST - CROSS

91

```
 1              MR. PROCTOR:  Can I have just a moment?
 2              THE COURT:  Sure.
 3              (Discussion off the record.)
 4                   CROSS-EXAMINATION
 5   BY MR. PROCTOR:
 6   Q.      Good afternoon, ma'am.
 7   A.      Good afternoon.
 8   Q.      I'm sorry for your loss.  I only have a couple
 9   questions.  It won't take a minute.  I didn't write
10   it down properly or accurately, I suspect.  But you
11   said people were telling you Kareem was a rat or
12   something like that?
13   A.      Yes.
14   Q.      Who were those people?
15   A.      Just in the neighborhood.  They didn't say it
16   to me per se, but that was the undercurrent, you
17   know.  It was just, you know, in the grapevine.  You
18   hear about Kareem:  Kareem told the feds about this
19   one, told the feds about that.  But I heard it from,
20   like, some of his peers, my son's peers, the girls,
21   really.  The guys would never say nothing, you know,
22   but it came from -- the people that actually came to
23   me and said was Wanda Partlow, Peggy and Penny
24   Hopkins.  They said it:  Your son, you know, he
25   ratted on all these boys.  And when I looked at it, I
```

DEBORAH GUEST - CROSS

92

```
 1    said to her, I said:  These boys been in jail.  You

 2    know.  That wasn't nothing Kareem did.  Because they

 3    been in jail.  And what's the date on here?  So they

 4    were locked up before that, two, three years before

 5    that.  So that's why I didn't take it into

 6    consideration as far as them saying he was a rat

 7    because they had already been to jail, you know.

 8    Q.    Right.  Well, I guess my question is -- I

 9    mean, you know Mr. Hall, right?

10    A.    Yes, I do.

11    Q.    You seen him around a lot.  You testified to

12    that already?

13    A.    Yes.

14    Q.    Mr. Hall certainly never approached you and

15    said anything negative about your son, did he?

16    A.    No, he didn't.

17              MR. PROCTOR:  That's all I have, Judge.

18              THE COURT:  Thank you, Miss Guest.  You

19    may step down.  Thank you very much.  There's a

20    sequestration order in effect, so don't discuss your

21    testimony with anyone in the unlikely event you're

22    called back to the witness stand.  Thank you, Mrs.

23    Guest.

24              MR. PURCELL:  Your Honor, I want to just

25    thank counsel on the record.  Miss Guest would be
```

CHRISTOPHER MASON - DIRECT

93

```
 1    sequestered, but they have agreed to allow her to sit

 2    in the courtroom.

 3              THE COURT:  That's fine.  Is there any

 4    objection --

 5              MR. PROCTOR:  She's not subject to

 6    recall.

 7              THE COURT:  Miss Guest, there's normally

 8    a sequestration order as to witnesses.  But as to you

 9    there will be an exception.  You may certainly stay

10    in the courtroom if you like.

11              MR. PURCELL:  Don't discuss what you

12    hear.

13              THE COURT:  Ladies and gentlemen, just so

14    you understand, it's one aspect that's not the same

15    as you see on television.  Witnesses, if they're

16    going to be called back, there's a potentiality,

17    don't sit in the courtroom.  Future witnesses don't

18    sit in the courtroom.  Whoever is going to testify in

19    this case in the future is not sitting in the

20    courtroom now.  The one exception is a case agent can

21    be designated, and that one person can stay in the

22    courtroom.  An exception is being made for Miss Guest

23    because she's not going to be called back to the

24    witness stand.  But you'll note that all the

25    witnesses from the trial have come from outside in
```

```
 1      the hallway; they're not sitting here in the
 2      courtroom.
 3                   MR. PURCELL:  The government calls Chris
 4      Mason from the U.S. Attorney's Office.
 5      Whereupon:
 6                   CHRISTOPHER MASON,
 7      called as a witness, having been first duly sworn
 8      according to law, testified as follows:
 9                   THE DEPUTY CLERK:  State your full name
10      for the record.
11                   THE WITNESS:  Christopher Mason.
12                   THE DEPUTY CLERK:  Thank you.
13                   DIRECT EXAMINATION
14      BY MR. PURCELL:
15      Q.      Mr. Mason -- I've never called you Mr. Mason.
16      You work with me, don't you?
17      A.      I do.
18      Q.      U.S. Attorney's Office?
19      A.      Yes.
20      Q.      And you're actually employed with our office.
21      And tell the jury where you otherwise work.
22      A.      I am also employed by the State's Attorneys
23      Office for Baltimore City.
24      Q.      And how long have you been an assistant
25      state's attorney?
```

```
 1    A.      Since 2002.  So nine years.

 2    Q.      Now, you and I have talked about your being

 3    here today?

 4    A.      Yes.

 5    Q.      Let's try to get right to it.  I want to

 6    direct your attention, please, back to 2009.  Were

 7    you involved in a prosecution before which resulted

 8    in an indictment before Judge Quarles, actually, the

 9    lead defendant being one person named Jamar Stewart?

10    A.      Yes, I was.

11    Q.      Okay.  Just tell the jury what that case was

12    about.

13    A.       It was a drug conspiracy involving heroin and

14    crack cocaine.  And it was in the Westport area of

15    Baltimore City.

16    Q.      Now, is that the first case or was that the

17    second case that you were aware of that our office

18    was doing in the Westport area?

19    A.      It was I believe the second case.

20    Q.      Are you familiar with a person named Maurice

21    Mouzon?

22    A.      Yes, I am.

23    Q.      And what are -- I think he was indicted under

24    the name Maurice Mouzon, AKA Black?

25    A.      Black, correct.
```

CHRISTOPHER MASON - DIRECT

96

```
 1    Q.      Had that case already been concluded --
 2    A.      Yes, it had.
 3    Q.      -- or had been indicted?
 4    A.      Yes.
 5    Q.      Okay.  We'll talk about that in a second.  Let
 6    me just show you what's been marked as government
 7    Exhibit No. 338.
 8            Do you recognize what you're seeing
 9    there?
10    A.      Yes, I do.
11    Q.      And what is that?
12    A.      That is the indictment in the Jamal Stewart,
13    the Jamar Stewart case.
14    Q.      Now, just tell me, I see one, two, three,
15    four, five, six, seven eight defendants?
16    A.      Correct.
17    Q.      Now, was the person named Larry Cheese one of
18    those defendants?
19    A.      Yes, he was.
20    Q.      And who represented Larry Cheese in this
21    indictment?
22    A.      Michael Carithers.
23    Q.      Now, I want to direct your attention to the
24    process of discovery.  Which we know that's why
25    you're here; is that right?
```

97

1    A.    That's correct.

2    Q.    Okay.  Now, can you tell the jury, please,

3    just essentially once a case is indicted and the

4    defendants are brought before a magistrate judge for

5    their very brief initial appearance --

6    A.    Right.

7    Q.    -- what follows in terms of government's

8    obligation for discovery?

9    A.    The first thing we to is send out what's

10   called a discovery agreement.  Which is essentially

11   an agreement between the government and the defense

12   attorney about exactly how discovery is going to be

13   dispensed to the attorney and what they can do with

14   it and in our case what they can't do with it.

15   There's a provision within the agreement which states

16   that the defense attorney is not permitted to

17   actually give the discovery materials to their

18   client.  They can obviously show the materials to

19   them and go over them with them, but they're not

20   entitled to give their client the materials without

21   the permission of the United States Attorney's

22   Office.

23   Q.    And was there a discovery agreement in this

24   case with the attorney for Mr. Cheese?

25   A.    Yes, there was.

98

```
 1    Q.     And just for the record, what is his name?

 2    A.     Michael Carithers.

 3    Q.     All right.  Mr. Carithers is here and will be

 4    testifying in a minute; is that right?

 5    A.     Yes.

 6    Q.     Okay.  Let me show you what's been marked as

 7    Exhibit No. 336.  And it should be also, you can

 8    remove the -- I'm sorry.  My version is off.

 9              THE COURT:  This is Exhibit 336?

10              MR. PURCELL:  Yes, sir.

11    BY MR. PURCELL:

12    Q.     Can you tell us what that is?

13    A.     That is the discovery agreement that was given

14    to Mr. Carithers in the Larry Cheese case.

15    Q.     Now, you mention that it says somewhere on

16    here that -- how it's to be restricted from the

17    defendant.  Just show the jury, just type on the

18    touch screen where that would be.  Look at it and

19    tell us where it is and we'll just point to that to

20    the jury.

21    A.     I believe it's on the second page.

22    Q.     All right.  And looking at the third

23    paragraph; is that right?

24    A.     That's correct.  The second full paragraph on

25    the second page.
```

1    Q.     Just put that up there.  Now, if you can zoom

2    that for the jury just to make sure they can see it.

3    Just indicate to the jury where that paragraph is and

4    read it out loud.

5    A.     It's this paragraph right here.  And it says,

6    "All discovery is provided on the condition that

7    counsel will not give copies of this material to the

8    client or to anyone outside counsel's office, absent

9    prior approval of this office.  Counsel may, of

10   course, review this material with the client at any

11   time or place, and may provide copies to any expert

12   consulted by the defense.  If copies are provided" --

13   Q.     You can stop there.  We agree there weren't

14   experts that we're concerned about.  Now, was this

15   agreement entered into by the defense attorney for

16   Mr. Cheese?

17   A.     Yes, it was.

18   Q.     And where is that indicated?

19   A.     On page number three.

20   Q.     Just point to where that is.

21   A.     Right here.  That's where Mr. Carithers signed

22   it.

23   Q.     Now, I see this has Mr. Wallner's name on it

24   as well.  Was he your co-counsel?

25   A.     Yes, he was.

1    Q.      All right.  Now, so there was a discovery

2    agreement; is that correct?

3    A.      Correct.

4    Q.      And that was dated September 15, 2008?

5    A.      Correct.

6    Q.      Now, can you put that indictment up, please,

7    whatever exhibit that is.  I'm sorry.  The Jamal

8    Stewart indictment, which is Exhibit No. 338.

9            Now, can you tell the jury how discovery

10   in terms of materials you obtained from the FBI, that

11   is things called 302s which we'll look at in a

12   second, how did that take place with all of the

13   defendants other than Cheese and Elliott Brown?  You

14   know what I mean?

15   A.      I believe I do.  The discovery that we

16   received, whether it be FBI 302s, which are reports

17   produced by FBI agents, or whether it be police

18   reports from the Baltimore City Police Department, or

19   lab analyses or anything such as that, they were all

20   distributed to each defense attorney.  And as long as

21   there wasn't any information in it regarding any type

22   of cooperator, so any type of sensitive information

23   that may have jeopardized the safety of any of our

24   witnesses, that information was not disseminated to

25   the defense attorneys at the same time as all these

CHRISTOPHER MASON - DIRECT

—101—

```
 1    other police reports were.
 2    Q.      Now, let me ask you this question:  I direct
 3    your attention to May 20th, 2009.
 4    A.      Okay.
 5    Q.      By that date -- and we'll talk with that date
 6    why it's important in a second -- but by that date,
 7    looking at the indictment, what was the status of all
 8    of the defendants other than Mr. Cheese and Mr.
 9    Brown?
10    A.      As of May 20, 2009, all of the defendants
11    except for Mr. Cheese and Mr. Brown had pled guilty
12    at that point.
13    Q.      And had those, any of those lawyers or any of
14    those defendants, received what we're calling in this
15    case the Guest 302?
16    A.      No, they had not.
17    Q.      So it hadn't been given to any of those
18    lawyers?
19    A.      No.
20    Q.      And they all pled without it?
21    A.      That's correct.
22    Q.      And by this time what had happened already to
23    Maurice Mouzon, that is the person known as Black?
24    A.      At that time by May 20th, 2009?
25    Q.      Yes.
```

CHRISTOPHER MASON - DIRECT

102

```
 1    A.      Mr. Mouzon was in federal jail somewhere.

 2    Q.      He already pled guilty?

 3    A.      Yes.

 4    Q.      So whatever made him plead guilty, it wasn't

 5    the Guest 302?

 6    A.      That's correct.

 7    Q.      Now, I'm going to look at the Guest 302.

 8    Actually, let's just look at it now.  306 is it?  Do

 9    you have a copy of it?

10    A.      I don't have one.

11    Q.      Let me give you one.  Do you recognize that?

12    A.      I do.

13    Q.      Now, was that the only 302 that you received

14    in this case, that is, the only report of witnesses

15    who had talked about various people in Westport that

16    might be relevant to your investigation that you

17    received from the FBI?

18    A.      The only one?  No.

19    Q.      Okay.  Now, did this -- and this hadn't been

20    given to any other defendants in the Cheese case,

21    right?

22    A.      It had not been, no.

23    Q.      Let's take a look at it for a second.  By May

24    20th, 2009, did you undertake to provide discovery

25    including the 302s to the two remaining defendants?
```

103

1      A.      Yes.

2      Q.      May 20th?

3      A.      May 20th.

4      Q.      Okay.  And did that information include the

5      Guest 302?

6      A.      Yes, it would have.

7      Q.      That was only going to two people?

8      A.      Correct.

9      Q.      Now, did you prepare a letter that described

10     the materials that you were providing?

11     A.      Yes, I did.

12     Q.      Could you put up 337 if you have it there?

13             Do you see 337 on the side there while

14     I'm looking for my own copy?

15     A.      Yes, I do.

16     Q.      Now, before I get my own, just tell us

17     whether Exhibit 337 is -- just tell the jury what it

18     is.

19     A.      That is a letter that I sent to Mr. Carithers

20     on -- it's dated May 20th, 2009.  I don't believe it

21     was actually sent on 20th, 2009.

22     Q.      Was it sent earlier?

23     A.      No.  It was actually sent later.

24     Q.      Okay.

25     A.      It was -- I'm sorry, it's a letter outlining

1    the remainder of the discovery that needed to be

2    supplied to Mr. Carithers, which included any prior

3    statements of witnesses we may have been calling, the

4    records of cooperators, and it essentially outlines

5    each individual disclosure that I was making.

6    Q.    Okay.  A very organized letter.

7    A.    Thank you.

8    Q.    A good way to do it for a young assistant.

9          Now, this also had a caution as to how it

10   could be used; is that correct?

11   A.    Yes, it did.

12   Q.    And is that where it says in the first

13   paragraph, "Finally, with the disclosure of this

14   information" -- I'm sorry, that's the wrong place.

15         "I remind you that pursuant to the

16   discovery agreement you signed"?

17   A.    Correct.

18   Q.    That part there?

19   A.    Yes.

20   Q.    "That these materials may not be disseminated

21   to anyone outside your office".  So that was the

22   understanding that covered the disclosure of these

23   materials?

24   A.    Exactly.

25   Q.    Now, this is, you said, around May 20th.  Can

1    you tell us, please, why did you have to provide

2    these materials on May 20th?  What was the next thing

3    that was going to happen in terms of Cheese and

4    Elliott Brown's trial at that point?

5    A.      The next thing that was going to happen was

6    that Mr. Cheese and Mr. Brown were going to go to

7    trial.

8    Q.      Okay.  So these were provided how close to

9    trial?

10   A.      At least a week before.  But I think actually

11   a little bit less than a week prior to trial.

12   Q.      And this was, again, pursuant to the discovery

13   agreement?

14   A.      That's correct.

15   Q.      So you send these things out to just these two

16   lawyers, correct?

17   A.      Just to those two, yes.

18   Q.      Now, did the 302 -- that we call the Guest

19   302.  I think it's Exhibit 306?

20   A.      Yes.

21   Q.      Did it identify the source of the information

22   in the 302?  Did it name who it came from?

23   A.      Yes, it did.

24   Q.      Now, let's take a look.  You say that this is

25   sort of an itemized list.  And I see on page one some

1    information about a Randolph Beale, his 302; is that

2    right, the first thing?

3    A.      Yes.

4    Q.      That's how you describe him, right?

5    A.      Yes.

6    Q.      And there's another FBI 302.

7            And there's one on page -- if you go to

8    the second page, if you're following me.

9    A.      I don't have that in front of me.  But I can

10   follow along on the screen fine.

11   Q.      If you can see the screen, sure.  So there was

12   an FBI 302 from a woman named Tracy Brandenburg, a

13   witness here.  And I see one Paul Delauder?

14   A.      Correct.

15   Q.      And do you also provide other things besides

16   their 302s.  It's *Giglio* material we call it.

17   Records, information, deals they have with the

18   government?

19   A.      Correct.  We're also required to disclose that

20   information.

21   Q.      Okay.  I also see Eric Gasque?

22   A.      That's right.

23   Q.      And number 16, Kareem Guest.

24   A.      Correct.

25   Q.      And it describes the 302 of January 9th, 2008.

1    A.      That is correct.

2    Q.      Now, you also -- there are page numbers, if

3    you look at exhibit number 16 or item number 16.

4    What are those -- tell the jury what those page

5    numbers mean.

6    A.      When I disclose the information to the defense

7    attorneys, I actually put page numbers down in the

8    corners of each page, essentially just from 1 to

9    however many pages we had.  Which made it easy for

10   the defense attorneys to find the material within the

11   stacks.  I think it was probably close to a thousand

12   pages of material that we gave them.

13   Q.      We call it Bates stamping?

14   A.      Correct.

15   Q.      Allows it easier to be index file by both

16   sides?

17   A.      Yes.

18   Q.      Okay.  So that's what you did.  And you gave

19   him pages 243 to 251?

20   A.      Yes.

21   Q.      Now, these materials were sent no sooner than

22   May 20th, 2009?

23   A.      That's correct.

24   Q.      And they weren't sent in any -- or if you

25   can't tell me, I'll ask it this way:  Were these

108

1    materials, and particularly the Guest 302, was that

2    302 sent to any defendant in any case anywhere prior

3    to May 20th, 2009?

4    A.      No.

5    Q.      So Mouzon didn't have it, his co-defendants

6    didn't have it, etcetera?

7    A.      No.

8    Q.      Just these two defendants?

9    A.      Just these two defendants.

10   Q.      Or their lawyers?

11   A.      Correct.

12   Q.      Now, let's take a look at the Guest 302, which

13   is Exhibit No. 306.  And you and I have talked about

14   what I'd be asking you here today; is that right?

15   A.      Yes, it is.

16   Q.      Now, this -- what you're looking at is an

17   exact copy of what you sent out to Mr. Carithers?

18   A.      Yes, it is.

19   Q.      And look at the bottom, if you would look at

20   the Bates stamp numbers, does that correspond to what

21   you provided?

22   A.      Yes, it does.

23   Q.      I see there's something redacted here in the

24   302.  What is it?  An address or something?

25   A.      That would have been Mr. Guest's personal

1    identifying information, date of birth, address,

2    Social Security number, things like that.

3    Q.      But it doesn't -- doesn't hide his name, does

4    it?

5    A.      No, it does not.

6    Q.      Now, this 302, would you tell the jury what it

7    basically represented?

8    A.      It represented the statement that Mr. Guest

9    had given to task force officer Todd Moody and

10   special agent Michael Mizer, who had both worked for

11   the Federal Bureau of Investigation.

12   Q.      To your knowledge, these are federal officers?

13   A.      Yes, they are.

14   Q.      Now, you understand why I'm asking these

15   questions.  We talked about it.  So there was

16   information provided, correct?

17   A.      Correct.

18   Q.      To federal officers?

19   A.      To federal officers, yes.

20   Q.      Now, did this information that was provided

21   pertain to or relate to the commission of any federal

22   offenses?  Just generally.  Not just about Mr. Hall,

23   but the people in the 302 generally?

24   A.      In general, yes, it did.

25   Q.      What federal offenses were described in this

CHRISTOPHER MASON - DIRECT

110

1        302?

2        A.      In general?

3        Q.      Yes.

4                    MR. PROCTOR:  Objection, Judge.

5                    THE COURT:  Overruled.  Overruled.

6                    THE WITNESS:  Some of the offenses that

7        would have been described in here would have been

8        offenses involving felon in possession of a firearm,

9        which is 18 U.S.C. 922(g)(1).

10       BY MR. PURCELL

11       Q.      Unless I ask you, you don't have to give us

12       the code sections.  We'll take your word for it.

13       A.      Using and carrying a firearm during and in

14       relation to a drug trafficking crime or a crime of

15       violence.  Distribution of and possession with intent

16       to distribute controlled substances.  As well as

17       conspiracy to distribute and possess with intent to

18       distribute controlled substances.

19       Q.      Now, as to any of the -- is it correct that

20       there were several people identified or named by Mr.

21       Guest relating to the questioning about federal

22       offenses?

23       A.      Yes, there were.

24       Q.      And was one of them Black, Mr. Mouzon?

25       A.      Yes.

CHRISTOPHER MASON - DIRECT

111

```
1    Q.      Now, by the date of the disclosure of this,

2    you said he was already convicted and in jail?

3    A.      Yes, he was.

4    Q.      And this was not sent to him?

5    A.      That's correct.

6    Q.      Now, did he provide any information against

7    people who were, in fact, also cooperating?

8    A.      Yes, he did.

9    Q.      Do you know a person named Monster?

10   A.      Yes.

11   Q.      Did he describe anything about Monster's

12   behavior on the street?

13   A.      Yes, he did.

14   Q.      And was that information disclosed to -- for

15   the record, Mr. Monster -- Monster's real name is?

16   A.      Dwight Hickman.

17   Q.      Okay.  And by the time this was disclosed can

18   you tell the jury what Mr. Hickman's status was with

19   the government?

20   A.      Mr. Hickman was a cooperator.

21   Q.      So this information wouldn't have been used

22   against him because he was providing information

23   himself?

24   A.      Right.

25   Q.      Did he end up pleading guilty?
```

CHRISTOPHER MASON - DIRECT

112

```
 1      A.      Yes, he did, in a separate case.

 2      Q.      Now, in this overall report, did Mr. Guest

 3   provide information about anybody involved in the

 4   crime of murder, that is murder in relation to drug

 5   trafficking or federal murder?

 6      A.      In this -- I'm sorry, in this 302?

 7      Q.      In this 302 totally?

 8      A.      He did.  He provided that type of information

 9   against Mr. Mouzon who we mentioned also known as

10   Black.

11      Q.      Who was already in jail?

12      A.      Right.

13      Q.      Who else?

14      A.      Dwight Hickman, also known as Monster.

15      Q.      Who was cooperating?

16      A.      That's correct.

17      Q.      Okay.  Let me ask you:  Did Hickman admit his

18   murders in his cooperation?

19      A.      Yes, he did.

20      Q.      So we already knew about that?

21      A.      Yes.

22      Q.      Who else?

23      A.      Antonio Hall.

24      Q.      Who is Antonio Hall?

25      A.      He is the defendant.
```

1    Q.      Did he give his nickname in there?

2    A.      Yes, he did.  If you don't mind.

3    Q.      I don't mind.

4    A.      It's been a long time since I looked at this.

5    Mack.

6    Q.      Now, do you know Mack?

7    A.      I do not, no.

8    Q.      Did you prosecute him?

9    A.      No.

10   Q.      Wouldn't know him if you saw him?

11   A.      No.

12   Q.      But you were given information that Mack was

13   involved in murders?

14   A.      That's correct.

15   Q.      In the entire nine-page report there were

16   three people given, two in jail and Mack?

17   A.      Mack, yes.

18   Q.      I thought I saw a Giggles related to a murder?

19   A.      There was some information given by Mr. Guest

20   about an individual by the name of Giggles.  He

21   didn't know anything other than the fact that the

22   individual went by the nickname of Giggles.  There

23   was no real name or government name, as you would,

24   associated with that.

25   Q.      Was Giggles ever prosecuted?

```
 1     A.      Not to my knowledge, no.

 2     Q.      Do you know today who that is?

 3     A.      I have no idea who that is.

 4     Q.      So there's no Giggles AKA or name of Joe Smith

 5     or something like that?

 6     A.      No, there was not.

 7     Q.      In terms of the crime of murder, is that fair

 8     to say it's the most serious federal crime?

 9     A.      Yes.

10     Q.      Two people and one other WHO wasn't in jail

11     or -- as far as you know -- and that is Mack?

12     A.      Yes.

13     Q.      Who were not cooperating?

14     A.      Correct.

15     Q.      Now, let's draw our attention -- we're almost

16     finished.  Let's draw our attention to what the

17     defendant told you about Mack.  You say you don't

18     know, so we'll just ask you what was told.  We'll go

19     to your Bates 246 or page number 4.

20     A.      Okay.

21     Q.      Now, your understanding, if you go to the very

22     last paragraph, as it leads into the next paragraph,

23     Guest was talking about Mack in the context of a

24     person named Black; is that right?

25     A.      That is correct.
```

1    Q.      And who is Black?

2    A.      Black is Maurice Mouzon.

3    Q.      We've established that.  Who did he say about

4    Mouzon?  What did he say about -- of course it sounds

5    like you already knew this.  But what did he tell you

6    he knew about Mouzon?

7    A.      Just in general that there was a home invasion

8    that occurred at Mr. Mouzon's house.

9    Q.      Tell the jury what a home invasion is in the

10   drug context.

11   A.      A home invasion is where --

12            MR. PROCTOR:  Objection, Judge.

13            THE COURT:  Overruled.

14            THE WITNESS:  Certain individuals will

15   run -- essentially run into someone's house with guns

16   looking to rob, steal, either money or drugs from the

17   individuals in the house.

18   BY MR. PURCELL:

19   Q.      And you've prosecuted people for this?

20   A.      Yes.

21   Q.      Now, so he said there was a home invasion at

22   Mouzon's house?

23   A.      That's correct.

24   Q.      And in fact, did your investigation reveal

25   that, in fact, had occurred?

1   A.      Yes.

2   Q.      Now, did he say anything about Mack's role in

3   relation to that particular home invasion, whoever

4   did that home invasion?

5   A.      He did.

6   Q.      What page?

7             THE COURT:  Approach the bench for one

8   second again, please, Counsel.

9             (BENCH CONFERENCE ON THE RECORD.)

10            THE COURT:  Again, this document has been

11  admitted into evidence and the contents in it are not

12  being asserted for the truth of the matter asserted.

13  I've overruled a couple objections.  But I don't want

14  to get into a seriatim discussion about what was said

15  about hall.  I'll give another cautionary

16  instruction.  It was in the context of the

17  information was in the context of these charges as to

18  the allegations made.  They're not offered for the

19  truth of the matter asserted herein nor should jury

20  accept that.  It's in the context of information.

21            MR. PURCELL:  Your Honor, I understand

22  that and I totally accept it, of course.  However, in

23  the context of the defendant's motive, we will

24  establish independently through a couple of

25  witnesses, including the victim, of the home

CHRISTOPHER MASON - DIRECT

—117

1    invasion; that such an act occurred.

2              THE COURT:  That's fine.  They can come

3    and identify what actors, but as to this document --

4              MR. PURCELL:  I totally understand.

5              (JURY IN.)

6              THE COURT:  Ladies and gentlemen, again,

7    you may or may not have other witnesses who give you

8    information about the contents of this report.  But,

9    again, this is in the context of information being

10   provided as to what was actually said or what is

11   alleged to have occurred in these events.  You're not

12   necessarily to accept that for the truth of the

13   matter asserted therein.  It's merely in context of

14   it.  There may or may not be other witnesses who will

15   testify directly about those events and be subject to

16   cross-examination.  But it's for that limited purpose

17   that the document is in evidence.

18              So as to the whys and the wherefores of

19   each event, they're not to be necessarily accepted as

20   having occurred.  That's just an allegation.  So, you

21   may continue, Mr. Purcell.

22              MR. PURCELL:  Thank you.

23   BY MR. PURCELL:

24   Q.    Now, looking at the first sentence on page

25   five, it looks like Mr. Guest already knew that Black

CHRISTOPHER MASON - DIRECT

118

1    was in jail; is that right?

2    A.    Yes, it does.

3    Q.    So he was not getting this 302.  Now, what

4    then did Mr. Guest say about Mr. Hall?  For the

5    record is -- well, never mind.  I'll strike that.

6              Just tell us what was said about this

7    person, Antonio Hall, Mack.

8    A.    It was said that Mr. Guest believed that Mack

9    could have been involved in the murders or shootings

10   that occurred following the home invasion at Black's

11   house.  He also stated that Black, Mr. Mouzon, hung

12   with Mack.  And that he is -- Mack that is -- is

13   someone known to quote/unquote, bang the gun.

14   Q.    Bang the gun were Mr. Guest's words, correct?

15   A.    Yes.

16   Q.    Okay.  Thank you.  Is murder, as you said, a

17   serious crime?

18   A.    Yes, it is.

19   Q.    If you're on the street, having been

20   arrested --

21              MR. PROCTOR:  Objection, Judge.

22              MR. PURCELL:  Withdrawn.

23              THE COURT:  Sustained.

24              MR. PURCELL:  Thank you, Judge.

25              Now, did you -- I think you mentioned

1    that the overall 302 referred to -- as is set out in

2    1513 of the code that we're operating under here

3    today -- but did the information that you saw relate

4    as to the defendant as to provision of information

5    about potential federal crimes?

6                MR. PROCTOR:  Objection, Judge.  Legal

7    conclusion.

8                MR. PURCELL:  Which he's entitled to

9    make.

10               THE COURT:  Yes.  Overruled.  The

11   objection is overruled.  You may answer that

12   question.

13               THE WITNESS:  Yes, it does.

14   BY MR. PURCELL:

15   Q.     And what crimes?

16   A.     Based on the information in this 302, it's the

17   crimes that I had indicated before, which is felon in

18   possession of a firearm or ammunition; using or

19   carrying a firearm during and/or in relation to a

20   drug trafficking crime, and/or a crime of violence,

21   that in this case being murder; possession with

22   intent to distribute controlled substances; and

23   conspiracy to distribute or possess with intent to

24   distribute controlled substances.

25   Q.     That's what he was talking about generally,

120

1    Mr. Guest, for all these defendants?

2    A.    Yes, he was.

3    Q.    All these named people.

4          All right.  Thank you.  Now, just going

5    through the 302, just if you would go back to page

6    one and flip through it.  And I don't know if I've

7    asked you this before, but, as you go through it and

8    see different individuals that were named by Mr.

9    Guest, can you tell us whether any of them were also

10   cooperators.

11   A.    Okay.

12   Q.    And I'll just follow on the machine here with

13   the jury.

14         Direct your attention to page two, a

15   woman named Amber?

16   A.    Yes, that's a reference to Amber Jackson.  She

17   was a cooperator.

18   Q.    Now, do you disclose 302 information about

19   Amber?

20   A.    Yes, we did.

21   Q.    In the same package?

22   A.    Yes.

23   Q.    So anybody who had this package would have

24   Amber's stuff; is that right?

25   A.    That is correct.

CHRISTOPHER MASON - DIRECT

121

```
1     Q.      Amber's materials?

2     A.      Correct.

3     Q.      All right.

4             MR. PROCTOR:  Judge, I want to make an

5     objection on the relevance grounds.

6             THE COURT:  Overruled.

7     BY MR. PURCELL:

8     Q.      All right.

9     A.      There is a statement in here about, obviously,

10    Monster, who is Dwight Hickman.  He was a cooperator.

11    Q.      And would that begin at page three?

12    A.      That's correct.  The first time I see his name

13    was on page three.

14    Q.      This is where he's talking about Monster.

15    Monster was already cooperating?

16    A.      Yes.

17    Q.      Okay.  And let's go to page four.  Is that the

18    reference you were talking about with Giggles in the

19    top of the page?

20    A.      Yes, it is.

21    Q.      No other identifying information?

22    A.      None.  None.

23    Q.      Let's scan down the page.  Then we get into

24    the home invasion?

25    A.      That's correct.  I don't see anything in
```

122

1     there.

2     Q.     Now, does it refer to -- the 302, does it

3     refer to an individual named Larry Cheese, that is,

4     your defendant who you're about to go to trial?

5     A.     He did.

6     Q.     Is that why you provided it?

7     A.     Yes.  I believe there's a quick reference to

8     Mr. Cheese on page number one.

9     Q.     Okay.  And what about page six?

10    A.     Yeah, it's a page six as well.  There's a

11    longer reference to Mr. Cheese.

12    Q.     Okay.  I'm going to point to that for the

13    jury.  Basically it identifies Cheese as an associate

14    of Jamal.  Is that Jamal Stewart, the defendant that

15    he was indicted with?

16    A.     That would have been Jamal Stewart, yes.

17    Q.     Okay.  Now, there's reference and information

18    in there about Jamal, too; is that right?

19    A.     That is correct.

20    Q.     Now, did Jamal Stewart, the lead defendant in

21    this case and person who Cheese is alleged with

22    kissing his butt, was he in jail then?  He had

23    already pled guilty by the time this thing went out?

24    A.     By the time this 302 went out, yes, Mr.

25    Stewart had already pled guilty.

1    Q.      So Mr. Stewart never got this particular

2    information?

3    A.      No, he did not.

4    Q.      But it does describe Cheese as you've noted?

5    A.      Yes, it does.

6    Q.      Now, did Mr. Guest talk about anybody named

7    Kevin Duckett?

8    A.      No.

9    Q.      If you need to take at look, go through there

10   and see if the name Kevin Duckett is in that 302.

11   A.      Not that I can recall.  But if I can take a

12   quick glance --

13   Q.      Sure.  I may have asked you that before when

14   we met, but just to be sure.

15   A.      No.  There are no references to Kevin Duckett

16   in this 302.

17   Q.      Do you know Kevin Duckett?

18   A.      I don't know him, no.

19   Q.      Now, at this time in the Jamal Stewart

20   investigation Mr. Hall was not indicted; is that

21   right?

22   A.      That's correct, he was not.

23   Q.      Or this guy named Mack wasn't indicted?

24   A.      No, he was not.

25   Q.      Did you indict everybody that people gave

1 information to you about?

2 A. No, we did not.

3 Q. Can you even do that?  Would you be allowed to

4 do that?

5 A. No, I'm sure we would not.

6 Q. Some assistants would, actually?

7 A. Some would.

8 Q. But not you and not me.  All right.

9   Now, this 302 also describes -- my last

10 couple of questions -- that the witness, Mr. Guest,

11 also looked at a photo book?

12 A. That's correct.

13 Q. Can you just confirm that the photo book did

14 not include Duckett or Mr. Hall, that is Mack?

15 A. I know that the photo book did not include

16 either Mr. Hall, Mack, or Kevin Duckett.

17   MR. PURCELL:  Your Honor, if I can have

18 two seconds to look at this.

19 BY MR. PURCELL:

20 Q. Now, just to be clear, we've put in, Counsel,

21 I've put in the discovery letter itself.  If I

22 didn't, I'd like to make sure I've introduced 337,

23 which is your discovery letter itself, with which

24 this was all provided.

25 A. Yes.

CHRISTOPHER MASON - CROSS

125

```
1    Q.     If I didn't, I'm moving it now.  The discovery

2    agreement, Exhibit No. 336.  And the indictment of

3    Mr. Stewart and Cheese, 338.

4              THE COURT:  Under the local rules they

5    were deemed to be admitted already, Mr. Purcell.  But

6    they're admitted now.

7              MR. PURCELL:  I understand that, Your

8    Honor.  Thank you.

9              THE COURT:  Cross-examination.

10              MR. PROCTOR:  Do you mind if I remain

11   seated, Judge?

12              THE COURT:  Go right ahead.

13                    CROSS-EXAMINATION

14   BY MR. PROCTOR:

15   Q.     Good afternoon, Mr. Mason.

16   A.     Thank you.

17   Q.     I don't believe I've ever called you Mr.

18   Mason.  And may I say that you dress much nicer for

19   the witness stand than you do for counsel table?

20   A.     Thanks very much.

21   Q.     So you -- a case is lying on your desk and

22   you're investigating Westport, right?

23   A.     Yes.

24   Q.     And the reason you're investigating Westport

25   is that you learned through your investigation that
```

126

```
1     there are a lot of drug activity, violent crimes,

2     guns, shooting, etcetera, correct?

3     A.      That's correct.

4     Q.      I mean, you haven't opened up a case file on

5     Roland Park recently, I presume?

6     A.      I specifically myself have not.

7     Q.      Okay.  And you're not aware of any ongoing

8     federal investigations into the Roland Park crew?

9                 MR. PURCELL:  We stipulate there's no

10    investigations.

11                THE COURT:  Overruled.  You may continue,

12    Mr. Proctor.

13                MR. PROCTOR:  Thank you, sir.

14    BY MR. PROCTOR:

15    Q.      The reason you picked Westport is because

16    there's a lot of federal crimes being committed?

17    A.      I myself didn't pick Westport.  I mean, it was

18    the FBI who picked Westport or who was investigating

19    Westport and that's what came to me.  So --

20    Q.      Got it.  And you're trying to make a dent in

21    that, right?

22    A.      Yes.  Absolutely.

23    Q.      And so you went after Westport's most wanted?

24    A.      Yes.

25    Q.      And in fact, some had already bitten off a few
```

127

```
1     of the apples and you went after Mr. Cheese and his

2     cohorts because they were doing a lot of bad things

3     in Westport?

4     A.      Correct.

5     Q.      And, in fact, you were very successful, right?

6     There were some big sentences meted out?

7     A.      Yes, there were.

8     Q.      Jamal Stewart, 22 years?

9     A.      Yeah, that sounds right.

10    Q.      Elliott Brown, 30 years?

11    A.      Yes.

12    Q.      Larry Cheese himself got 24?

13    A.      Yes.

14    Q.      But I guess my point is:  Mr. Hall was not

15    indicted in that case, was he?

16    A.      No, he was not.

17    Q.      You didn't open up an investigation or the FBI

18    didn't to your knowledge open up an investigation

19    into Mr. Hall at that time?

20    A.      At the time of the Westport investigation?

21    Q.      Yes.

22    A.      No.  There wasn't a separate investigation

23    into Mr. Hall.

24    Q.      Okay.  And let me ask you, the 302 that we've

25    been showing, I forget the exhibit number --
```

CHRISTOPHER MASON - CROSS

128

1                MR. PURCELL:  306.

2                THE COURT:  306.  Government Exhibit 306.

3     BY MR. PROCTOR:

4     Q.     Were you present for that interview?

5     A.     No, I was not.

6     Q.     Did you ever meet Mr. Guest?

7     A.     Face-to-face, no, I had never met him.

8     Q.     Okay.  So when you say -- when Mr. Purcell is

9     asking you what did Mr. Guest tell about this or what

10    did he tell about that, you're just relating what's

11    on the piece of paper because you never met the man,

12    right?

13    A.     That's correct.  I was just saying what was in

14    the 302.

15    Q.     Okay.  And you mentioned that Mr. Hall's name

16    wasn't in the photo book.  Do you recall saying that?

17    A.     Yes.  I mean, as far as the photos that were

18    shown to Kareem Guest, to Mr. Guest, he did not

19    identify Mr. Hall.

20    Q.     And do you know if Mr. Hall was in the photo

21    book?

22    A.     The photo book would have been shown back on

23    January 9, 2008.  And I wasn't there, so I don't know

24    if his picture was in the photo book or not.

25    Q.     Okay.  So either his picture wasn't there or

CHRISTOPHER MASON - CROSS

1    he didn't recognize him from whatever picture that

2    was?

3    A.      It had to be one of those two, yes.

4    Q.      Okay.  And you related to the jury that Mr.

5    Guest told Officer Moody and others about -- I think

6    the words you said were some murders he may have

7    committed?

8    A.      That Mr. Hall may have committed?

9    Q.      Yes.

10   A.      That's correct.

11   Q.      Did Mr. Guest give a date that he committed

12   the murders?

13   A.      No, he did not give dates.

14   Q.      Did he give a time?

15   A.      No.

16   Q.      Did he give a place?

17   A.      No.

18   Q.      Did he say who he murdered?

19   A.      No, he did not.

20   Q.      Did he say what type of gun he used?

21   A.      No.

22   Q.      If a gun at all?  He said bang the gun, right?

23   A.      Right.  He said he likes to bang the gun.

24   Well, he did say murders or shootings.  So obviously,

25   if there's a shooting there's a gun involved.

CHRISTOPHER MASON - CROSS

130

1    Q.      And certainly you didn't seek an arrest

2    warrant and neither did the officers to your

3    knowledge because of what was relayed about Mr. Hall,

4    right?

5    A.      To my knowledge no arrest warrants were

6    obtained.

7    Q.      You mentioned -- Mr. Purcell asked you that

8    murder is the most serious crime in federal court?

9    A.      Right.

10   Q.      You can get life for drugs, right?

11   A.      You can, yes.

12   Q.      You can get life for simply possessing a

13   firearm?

14   A.      Yes.

15   Q.      I mean, there are a slew of serious crimes in

16   federal court.  There's no shortage, right?

17   A.      That's correct.  Serious crimes.  Other

18   serious crimes.

19   Q.      And serious sentences?

20   A.      Yes.

21   Q.      Mr. Guest was murdered on September 20th,

22   2009.  That sound right?

23   A.      Yeah, that sounds right.

24   Q.      When did you learn of it?  It was a Sunday

25   night.

1    A.      I believe I learned of it on Monday, coming

2    into work the next day.

3    Q.      And in short order you learned that the

4    discovery that you had turned over had been handed

5    out, right?

6    A.      That's correct.

7    Q.      Did you call Mr. Carithers?

8    A.      At some point Mr. Carithers was called, yes.

9    Q.      Did you talk to him on the phone?

10   A.      Yes.

11   Q.      Did you ask him if he had given the discovery

12   out?

13   A.      Yes.

14   Q.      Did he lie to you?

15           MR. PROCTOR:  Objection.

16           THE COURT:  Overruled.

17           THE WITNESS:  I really can't answer the

18   question of whether he lied to me or not because I

19   haven't been involved in any type of interviews or

20   anything with Mr. Carithers since that point.

21   BY MR. PROCTOR:

22   Q.      Did he tell you that he gave it out?

23   A.      He indicated to me that he had given it to --

24   that he didn't himself give it to anyone other than

25   his investigator.

1    Q.      Okay.  And as you sit here today, you don't

2    know whether that's true or not?

3    A.      I have no idea.

4    Q.      Was anyone else present when you talked to

5    him?

6    A.      Mr. Wallner also, who was also involved in the

7    case.  I was either in his office or he was in my

8    office when we were speaking to Mr. Carithers.

9    Q.      Did you ever sit down with Mr. Carithers and

10   federal agents?

11   A.      I never did, no.

12   Q.      Your call was just that one call with Mr.

13   Wallner?

14   A.      That's all I can remember.

15   Q.      As best you recall, it was a while ago.

16           Can I have a moment, please, Judge?

17           THE COURT:  Certainly.

18           (Discussion off the record.)

19           MR. PROCTOR:  That's all we have.

20           THE COURT:  Thank you, Mr. Proctor.  Any

21   redirect?

22           MR. PURCELL:  Very briefly.

23                   REDIRECT EXAMINATION

24   BY MR. PURCELL:

25   Q.      Can you go to Exhibit 306, please, Mr. Mason,

1    which is the Guest 302?

2    A.       I have it.

3    Q.       And you were asked questions about did Mr.

4    Guest give you dates and times and locations as to

5    things described by Mr. Guest and attributed to Mr.

6    Hall or possibly being attributed to him.  Now, on

7    your Bates 246, page four, the very last paragraph,

8    did Guest in the 302 identify people who were

9    suspected of having committed the home invasion of

10   the Mouzon house?

11   A.       Yes, he did.

12   Q.       And who did he say they were?

13            He named them, did he not?

14   A.       Yes, he did.

15   Q.       What he did say?

16   A.       Guest indicated that Marvin and Michael Raines

17   had ran into Black's house and tied everyone up.

18   Q.       Okay.

19            And then he stated in the next page that

20   he heard that Mack was involved in murders and

21   shootings done in retaliation?

22   A.       Yes.

23   Q.       Okay.  But the people that he told you about

24   who he believed had done it were those two?

25   A.       That's correct.

1    Q.      Now, do you know what happened to Marvin and

2    Michael Raines after this home invasion?

3                MR. PROCTOR:  Objection, Judge.

4                THE COURT:  Approach the bench.

5                MR. PURCELL:  I'll withdraw it, Judge.

6    I'm calling another witness.

7    BY MR. PURCELL:

8    Q.      Now, just another point, or question, I'm

9    sorry.  You were asked some questions about your

10   relation with Mr. Carithers.  The conversation you

11   just described in your cross-examination with Mr.

12   Carithers, did that occur after Kareem was murdered

13   or sometime prior?

14   A.      If I can -- if memory serves me, I believe

15   that actually happened prior to Mr. Guest being

16   murdered.

17   Q.      And was there a reason for you asking even

18   prior to that if he had made a disclosure?

19   A.      Yes.  Because discovery had been -- the

20   discovery that we had sent out had been found in

21   someone's jail cell.  I believe it was in New Jersey.

22   Q.      That was during the summer of 2009?

23   A.      Yes, that's correct.

24   Q.      That stuff was starting to pop up sometime

25   after you distributed it but before Kareem was

1    killed?

2    A.      That's correct, yes.

3    Q.      And you asked Mr. Carithers about it and he

4    said what?

5    A.      He said that he didn't give it to anyone

6    except for his investigator.  He had given a copy of

7    some of the paperwork to his investigator.

8    Q.      Okay.  Now, once the murder occurred, that is

9    the murder of Mr. Guest occurred on September 20th,

10   can you tell the jury what your -- in terms of your

11   involvement in the investigation of the murder of

12   your witness, was it you were out of the case and it

13   was handled by other people, or just tell the jury

14   what happened.

15   A.      Yeah, that's correct.  Once Mr. Guest was

16   murdered, the investigation of that murder itself,

17   was -- I was -- I will say walled off from that.  I

18   wasn't involved in the investigation of the murder of

19   Mr. Guest.

20   Q.      It's fair to say that was my investigation and

21   Mr. Fuchs?

22   A.      That's correct.

23   Q.      And the detective's?

24   A.      Yes.

25   Q.      And that we conducted the investigation of Mr.

1     Carithers --

2     A.      Yes.

3     Q.      -- not you?

4     A.      Yes.

5              MR. PURCELL:  Thank you.  No further

6     questions.

7              THE COURT:  Any redirect, Mr. Proctor?

8              MR. PROCTOR:  No, Your Honor.

9              THE COURT:  All right.  Thank you, Mr.

10    Mason, you may step down.  There is a sequestration

11    order in effect, so you shouldn't discuss this

12    testimony in the unlikely event you're called back to

13    the witness stand.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Thank you very much.

16             MR. PURCELL:  The government calls

17    Michael Carithers.

18    Whereupon:

19              MICHAEL R. CARITHERS, JR.,

20    called as a witness, having been first duly sworn

21    according to law, testified as follows:

22             THE DEPUTY CLERK:  Please state your full

23    name for the record.  You can adjust the microphone.

24    Keep your voice up for us, please.

25             THE WITNESS:  Michael R. Carithers, Jr.

MICHAEL R. CARITHERS, JR. - DIRECT

137

```
1                THE DEPUTY CLERK:  Thank you.
2                    DIRECT EXAMINATION
3     BY MR. PURCELL:
4     Q.    Good morning, Mr. Carithers.  Thank you for
5     waiting.  I know we got you here a little earlier
6     than we thought we would be calling you.
7                Now, you know why you're here?
8     A.    Yes.
9     Q.    Now, prior to getting into the questioning
10    today, I just want to bring a couple of matters to
11    the attention of the Court and jury about your
12    situation.  First of all, is it correct that you're
13    today testifying under a letter granted by the
14    attorney general, granting you immunity under the
15    appropriate federal statute for granting use and
16    derivative use immunity?
17    A.    Yes.
18                MR. PURCELL:  And, Your Honor, if I may,
19    I'm going to introduce what I thought had been
20    marked, but if not, give it a number, and counsel has
21    this.
22    BY MR. PURCELL:
23    Q.    And I've met with you and counsel before your
24    coming in here today; is that right?
25    A.    That's right.
```

1    Q.    And, Mr. Carithers, you're represented?

2    A.    Yes.

3    Q.    And just put on the record who you're

4    represented by?

5    A.    Steve Levine.

6    Q.    Is Mr. Levine here with you today?

7    A.    He is not.

8            THE COURT:  What is the exhibit number on

9    that letter, please?

10           MR. PURCELL:  341.

11           THE COURT:  341.

12   BY MR. PURCELL:

13   Q.    Now, you and Mr. Levine and myself met -- and

14   agents of course -- met as recently as last week, I

15   think?

16   A.    That's correct.

17   Q.    And you agreed at that time to proceed without

18   counsel present; is that right?

19   A.    Yes.

20   Q.    You understand at any time, however, that if

21   you need to, you may invoke your right to counsel and

22   we'll give you a break --

23   A.    Yes.

24   Q.    -- to meet with your attorney.

25           Now, Your Honor, may I just state on the

MICHAEL R. CARITHERS, JR. - DIRECT

139

 1    record that:  It's an understanding of the United

 2    States that even though an order hasn't been issued,

 3    that this testimony is pursuant to the letter of July

 4    15.  And I believe I've sent a copy to the Court.

 5              THE COURT:  Yes.  Any dispute about this

 6    from the point of view of the defense, Mr. Sullivan?

 7              MR. SULLIVAN:  No, Your Honor.

 8              THE COURT:  All right.  That's fine.  Let

 9    me just explain the context of this.

10              Ladies and gentlemen, people have Fifth

11    Amendment privileges against self-incrimination.

12    They cannot be compelled to testify.  One of the

13    mechanisms whereby one can come forward is if he or

14    she is given a grant of immunity, which means that

15    the content of their testimony cannot be used against

16    him.  Mr. Carithers is testifying here pursuant to a

17    grant of immunity as set forth in this letter.

18    Thereby he cannot be prosecuted for any comments he

19    makes here.

20              THE WITNESS:  Okay.

21              THE COURT:  You may continue.

22              MR. PURCELL:  Thank you for that, Your

23    Honor.

24    BY MR. PURCELL:

25    Q.    Now, Mr. Carithers, can you just tell -- well,

1    in your own words, just tell the jury why it was that

2    you and your attorney thought it was prudent to

3    get -- to seek at least immunity which we granted you

4    prior to testifying here today?

5    A.      Well, it's my understanding that there is an

6    investigation as to my handling of discovery for one

7    of my clients, Larry Cheese, in terms of whether I

8    was truthful in giving him -- or telling agents and

9    yourself whether I gave him discovery.  And there is

10   an investigation.  It's my understanding that there's

11   some belief that I wasn't truthful, although, of

12   course, I disagree with that.

13                  MR. SULLIVAN:  Objection.

14                  THE COURT:  Overruled.

15                  THE WITNESS:  And that's my

16   understanding.

17   BY MR. PURCELL:

18   Q.      And the information, to be specific, is that

19   what you understand is you were asked pointed

20   questions or you were asked questions about whether

21   or not you distributed particular discovery

22   materials.  And the investigation is not about the

23   fact of the discovery itself, but about your

24   responses to those inquiries by the government?

25   A.      That's right.

MICHAEL R. CAROTHERS, JR. - DIRECT

141

1    Q.      And your understanding, I've told you myself,

2    I believe, you can correct me if I'm wrong, that the

3    provision of the materials is not a matter of the

4    criminal investigation, itself.  It's the matter of

5    your response to your questions about this?

6    A.      That's correct.

7    Q.      So because you're going to be asked with that

8    today, you sought immunity; is that correct?

9    A.      That's correct.

10   Q.      And it's been granted.

11           Now, if we may proceed then with the

12   reason why you're here.

13           Let me direct your attention, please,

14   back to -- I'm I guess -- not really sure it's still

15   in 2009, but at some point in 2009 you became -- you

16   were appointed, I suppose, for a defendant named

17   Larry Cheese?

18   A.      I believe it was 2008.

19   Q.      2008.  And, in fact, as I look at the -- let's

20   take at look at this together.  This is Government

21   Exhibit 338, and I think you can see it's a file copy

22   of the indictment of your client.

23           Can you tell us when that was entered by

24   the Court and clerk here in the courthouse?

25   A.      August 28th, 2008.

MICHAEL R. CARUTHERS, JR. - DIRECT

142

```
 1      Q.      And about how long after that were you
 2   appointed for Mr. Cheese?
 3      A.      I believe it was maybe a month or two months
 4   after this.
 5      Q.      So you represented him in this process?
 6      A.      Yes.
 7      Q.      Now, did there come a point in 2009 that you
 8   were facing -- with Mr. Cheese, facing the
 9   possibility of going to trial?
10      A.      Yes.
11      Q.      And prior to trial did the government have
12   certain obligations to provide discovery materials to
13   you as to reports about anybody relating to your
14   client?
15      A.      Yes.
16      Q.      Now, when you entered the case, did you enter
17   into an agreement with the government as to
18   discovery?  What we call the discovery agreement?
19      A.      Yes.
20      Q.      You and I, when we met the other day, we
21   looked at these documents; is that correct?
22      A.      That's correct.
23      Q.      So if I move through them quickly, that's why.
24              Exhibit No. 336, which the jury has
25   already seen, and you have a copy in front of you, do
```

143

1        you recognize that?

2        A.      Yes, I recognize it.

3        Q.      And what is that?

4        A.      This is the letter agreement that I signed in

5        September of 2008.

6        Q.      And this controlled the discovery?

7        A.      Yes.

8                THE COURT:  Mr. Purcell, we're going to

9        stop here now for lunch.  I just have to do a few

10       matters because it's almost one o'clock.  So we'll

11       stop here now.

12               Mr. Carithers, you should not discuss

13       your testimony with anyone while you're on break for

14       lunch.  And we'll return again, ladies and gentlemen,

15       at two o'clock after lunch.  I have to attend just to

16       a matter here in court for a few minutes with the

17       lawyers.  So, Mr. Carithers, you're excused and we'll

18       see you all at two o'clock after lunch.

19               (JURY OUT.)

20               THE COURT:  All right.  Counsel, just one

21       matter I want to address here before we break for

22       lunch.  As I indicated yesterday with respect to a

23       late objection as to the manner in which voir dire

24       was conducted and then a motion that was filed by --

25       you all may be seated for a moment -- a motion that

1    was filed by the defendant, defendant's motion for

2    mistrial due to empaneling of an anonymous jury.  The

3    request for mistrial was denied as previously

4    indicated on the record and I'll add these reasons,

5    as well.

6              Counsel for defendant has moved for

7    mistrial as a result of this Court's empaneling of an

8    anonymous jury.  Defendant has two complaints.  First

9    was an objection, what was essentially a clerical

10   error by the clerk of the court whereby the

11   prosecution was given a list of the venire panel

12   complete with names and other information and the

13   defendant was given a list void of all information

14   save only the juror numbers.

15             Second, and more importantly, the

16   defendant objects to the empaneling of an anonymous

17   jury.

18             With regard to the first issue, both

19   parties received -- first of all, received incorrect

20   jury venire lists, as I've noted, by error of the

21   clerk of court.  Defendant received a list with no

22   identifying information and the government received a

23   list with all of the identifying information.

24             When this issue was brought to the

25   Court's attention, it was immediately cured.  The

1    names of the venire members were redacted from the

2    government's list and the defendant was provided a

3    venire list with all identifying information.

4    Critically, the mistake was cured before conducting

5    any voir dire in this case.  And during the conduct

6    of the voir dire, the defendant had access to the

7    same information as the government during the actual

8    voir dire process.

9              With regard to the issue of an anonymous

10   jury, defendant argues that two constitutional

11   amendments are infringed by empaneling an anonymous

12   jury.  First he argues that his Fifth Amendment right

13   to a presumption of innocence is infringed because an

14   anonymous jury raises the spectre that the defendant

15   is a dangerous person.  Next he argues that the use

16   of an anonymous jury infringes his Sixth Amendment

17   right to an impartial jury, essentially arguing that

18   it hinders his ability to exercise peremptory

19   strikes.

20             Here the jury panel is not strictly

21   anonymous.  The parties knew everything including

22   town, zip code, occupation, age, spouse's occupation,

23   and -- occupation and spouse's occupation, except for

24   the panelist actual names.  More to the point, the

25   jurors themselves do not know that their names were

1    withheld.   Absolutely nothing occurred during the

2    voir dire that would indicate to the panelist or the

3    members of the jury panel having been empanelled that

4    their names were withheld.

5                    This is markedly different from the case

6    of *United States v. Byers* over which I presided and

7    as to which an appeal of that conviction was

8    affirmed, 603 F.Supp.2d 826.   That was my earlier

9    opinion in 2009 where this Court specifically told

10   potential jurors to not divulge their names during

11   voir dire.

12                   Here there was nothing in this case to

13   indicate to the prospective jurors that Mr. Hall is a

14   dangerous person and that they are in need of

15   protection.

16                   A district court is permitted under 28

17   USC 1863(b)7 to empanel an anonymous jury when the,

18   quote, "interests of justice so require," end of

19   quote.   This Court addressed the issue of juror and

20   anonymity, an issue of first impression in this

21   circuit, in my opinion in *United States v. Byers*.   In

22   that case I held that a court should empanel an

23   anonymous jury only after concluding that, one, there

24   is a strong reason to believe the jury needs

25   protection; and two, taking reasonable precautions to

1        minimize any prejudicial effects on the defendant and

2        to insure that his fundamental rights are protected.

3                    Here this Court concludes after reviewing

4        the entire record -- actually yesterday as we were

5        empaneling the jury as well as after the first few

6        witnesses here today -- that there is a strong reason

7        to believe that the jury needs protection.  In this

8        regard this Court's decision is informed by a number

9        of circuit court cases, most notably *United States v.*

10       *Shryock*, S-h-r-y-o-c-k, 342 F.3d 948, a Ninth Circuit

11       opinion, 2003.  In that case the Ninth Circuit

12       promulgated five factors to inform a district court's

13       discretion to empanel an anonymous jury.

14                    Those five factors are the defendant's

15       involvement in organized crime; the defendant's

16       participation in a group with the capacity to harm

17       jurors; the defendant's past attempts to interfere

18       with the judicial process; the potential that, if

19       convicted, the defendant will suffer a lengthy

20       incarceration and substantial monetary penalties;

21       and, five, extensive publicity that could enhance the

22       possibility that jurors' names would become public

23       and expose them to intimidation and harassment.

24                    Here the record indicates that Mr. Hall

25       has made past attempts to interfere with the judicial

1    process.  Indeed, the very nature of this case is

2    it's alleged by the grand jury that he murdered a

3    witness in another federal case in this courthouse.

4    Moreover, Mr. Hall faces two mandatory life sentences

5    should he be convicted, which provides an incentive

6    to resort to any extreme measures in an effort to

7    influence the outcome of the trial.  And, as to that

8    matter, I'll refer you to *United States v. Deluca,*

9    First Circuit opinion, 1998.

10              Finally, the defendant has shown no

11   prejudicial effects through removing the jurors'

12   panelist names from the venire list.  That was all

13   that was removed.  The jurors themselves do not know

14   they are anonymous and no voir dire questions were

15   asked that would lead the jurors to fear for their

16   safety.  The panelists have been repeatedly reminded

17   of the presumption of innocence afforded to Mr. Hall.

18   So there was no merit to the defendant's motion for a

19   mistrial due to the empaneling of the jury in the

20   fashion in which it's been impaneled and the motion

21   is denied for that reason.

22              So with that we will take a one-hour

23   break now for lunch and we will start again at two

24   o'clock with the continued testimony of Mr.

25   Carithers.

1          MR. PROCTOR:  Judge, I would at some

2     point like to put -- I'm not expecting Your Honor to

3     reverse himself.

4          THE COURT:  Sure.

5          MR. PROCTOR:  It doesn't have to be right

6     now.  But I would at some point like to put something

7     on the record to preserve for appeal --

8          THE COURT:  Sure.  Go ahead.  Do it now.

9          MR. PROCTOR:  Okay.  I want to pick on

10    where I know I'm good.  The Court mentioned the

11    jurors do not know.  I don't believe we have a record

12    of that.  What happened, of course, the Court will

13    recall was someone took a black marker and redacted

14    the jurors' names.  We all had jury lists with

15    redacted pieces of paper.  Jurors approached the

16    bench as we were all standing around.  This

17    courtroom, while bigger than most, is certainly cozy.

18    My experience has always been in state court.  We're

19    allowed to talk to jurors.

20          With 90 people in the room, someone sees

21    everything.  If a juror sees everything about

22    themself except a big black line where their name

23    should be, ergo they know it's anonymous.  We can't

24    unring that bell.  So I don't agree that the jurors

25    have no knowledge that it's anonymous.

1                THE COURT:  What are you proffering that

2      the jurors have any of that information, Mr. Proctor?

3                MR. PROCTOR:  We don't know.

4                THE COURT:  I find that's too

5      speculative.

6                Go on to your next point, then.

7                MR. PROCTOR:  Okay.  My second point is

8      the Court says there's no prejudicial effect to Mr.

9      Hall.  First of all, if they saw lines redacted and

10     know it's anonymous, there is a prejudicial effect.

11     Second of all, I believe this comes under structural

12     error, and my impression is this is needed.  And,

13     third of all, you know, I've tried identity theft

14     cases in this Court.  Most of my clients would love a

15     name, zip code, an employer of jurors for identity

16     theft purposes.  But we don't redact those.  I don't

17     believe there has to be a showing of prejudice.

18     There has to be a showing that it's an extreme and

19     drastic measure.  And that didn't happen in this

20     case.  So, I'd just like to preserve that argument.

21               THE COURT:  I understand, Mr. Proctor.

22     You've raised it.  As far as I'm concerned there's no

23     merit and we'll continue.

24               Incidentally, Mr. Proctor, by the way, I

25     meant to emphasize no other lawyers here are drinking

1     bottles of Coca-Cola at the table.  The jurors -- I

2     thought the deputy clerk required that you did not;

3     the jurors were not allowed to do that.  You're

4     allowed to drink water out of cups.  You're not

5     allowed to have a bottle of Coca-Cola at the trial

6     table.  And I noticed you were doing that.  I didn't

7     correct you at the time because it's not fair because

8     the jurors are not allowed.

9               MR. PROCTOR:  I certainly won't do it any

10    more.  Thank you.

11              THE COURT:  I thought the clerk had

12    corrected that.  But it's usually the process here in

13    my courtroom with respect to courtroom etiquette.

14    So, thank you very much.

15              (LUNCH RECESS.)

16

17

18

19

20

21

22

23

24

25

1                         AFTERNOON SESSION

2                 (JURY OUT.)

3                 MR. PURCELL:  Your Honor, I've mentioned

4    to counsel, I don't believe they have a problem.  Can

5    I call a witness out of order very briefly?  Her name

6    is Rosa Knox.

7                 THE COURT:  Sure.  Any objection, Mr.

8    Proctor, Mr. Sullivan?

9                 MR. PROCTOR:  No.

10                 MR. PURCELL:  She'll be a brief witness

11   and we'll get back to Mr. Carithers.  We're just

12   reversing the order.  She would have been the next

13   witness.

14                 (JURY IN.)

15                 THE COURT:  Good afternoon, ladies and

16   gentlemen.

17                 With that, we're ready to proceed.

18                 Mr. Purcell, I understand there's a

19   witness that's going to be taken out of order now; is

20   that correct?

21                 MR. PURCELL:  We're going to basically

22   inverse, we have a witness that has an appointment

23   that we're going to get her to.

24                 THE COURT:  Mr. Carithers is waiting to

25   come back on the witness stand.  Any objection, Mr.

153

1       Proctor, Mr. Sullivan?

2                   MR. PROCTOR:  No, Your Honor.

3                   THE COURT:  I appreciate it.  Come

4       forward then, ma'am.

5                           ROSA KNOX,

6       called as a witness, having been first duly sworn

7       according to law, testified as follows:

8                   THE CLERK:  Please state your full name

9       for and spell your last name for the record.

10                  THE WITNESS:  Rosa Knox, K-n-o-x.

11                      DIRECT EXAMINATION

12      BY MR. PURCELL:

13      Q.      Good afternoon, Miss Knox.  And thank you for

14      coming in.  I know it's not where you want to be.

15                  Could you just tell us, please, let me

16      get right to it, what is your relationship to Larry

17      Cheese?

18      A.      I'm his mother.

19      Q.      And do you recall when Larry was being

20      prosecuted here in the United States District Court?

21      A.      Yes.

22      Q.      Can you tell the jury, if you know, who was

23      his lawyer?

24      A.      Mr. Carithers.

25      Q.      And did there come a time when you met Mr.

1    Carithers here in the courthouse?

2    A.      Yes.

3    Q.      Now, during the time that Larry -- before he

4    ended up having his case being finished, where was he

5    being held?

6             After he was arrested but before he pled

7    guilty and went off to federal prison, where was he

8    being held, do you know?

9    A.      I think on Madison Street.

10   Q.      But he was in custody?

11   A.      Yes.

12   Q.      Now, to move along, I want to direct your

13   attention, please, to early June of 2009.  Did you

14   come to court on the day that Larry ended up pleading

15   guilty to the charges against him?

16   A.      Yes.

17   Q.      And do you remember coming to the grand jury

18   and being interviewed by me some -- over a couple

19   years ago, I guess, in 2009?

20   A.      Yes.

21   Q.      And, other than that, is that the only time

22   we've ever met?

23   A.      Yes, it is.

24   Q.      Now, if you remember, I asked you then, I'm

25   going to ask you now, could you tell the Court what

ROSA KNOX - DIRECT

155

1    happened in terms of interaction with Mr. Carithers

2    after Larry pled guilty and the proceeding was over?

3    A.      Are you asking me whether Mr. Carithers gave

4    me anything?

5    Q.      Yes.

6    A.      Yes.  Mr. Carithers gave me a yellow envelope

7    filled with some papers.

8    Q.      Did you take a look at those papers?

9    A.      Yes.

10   Q.      Can you tell the jury what they contained, if

11   you remember?

12   A.      A whole bunch of papers with people's names,

13   testimonies and stuff people said.

14   Q.      What did you do with them?

15   A.      Eventually I threw them away.

16   Q.      Before you threw them away, what did you do

17   with them?

18   A.      Well, a couple of people saw them.

19   Q.      And where did they see them?

20   A.      I was in my truck.  And two people approached

21   my truck and asked me if I had some papers and if

22   they could see them and I showed it to them.

23   Q.      Are they the only two people you showed it to?

24   A.      They're the only two people THAT I handed them

25   to, but there were other people around.  So -- but

```
 1    directly showing them to them, it was two guys, yes.
 2    Q.      Now, after the papers were given to you, where
 3    did you take them that day, that very day?
 4    A.      I took them to my house.
 5    Q.      Where is that?  Where was that?
 6    A.      In northwest Baltimore.
 7    Q.      And who else was present -- let me ask you
 8    this.
 9            Do you know Shameka Ross?
10    A.      Yes.
11    Q.      What is her relationship to Larry Cheese?
12    A.      She's got to -- she's Larry's baby's mother.
13    Q.      And was she here for the -- what we call an
14    arraignment for a guilty plea for Mr. Cheese?
15    A.      Yes.
16    Q.      And was she there when Mr. Carithers provided
17    the paperwork?
18    A.      Yes.
19    Q.      Did she see the paperwork?
20    A.      She was right there with me, yeah.
21    Q.      Did she go back to your house and see the
22    paperwork as well?
23    A.      She went back to my house with me, yes.
24    Q.      Well --
25    A.      Yeah, she was there with me.
```

```
 1     Q.      Now, at the house did you all look at the
 2     paperwork with a bit more care or interest?
 3     A.      It was a lot of papers.  We just was skimming
 4     through them.
 5     Q.      Now, I asked you, when you came to the grand
 6     jury in 2009 -- if you take a look at what's been
 7     marked as government Exhibit No. 422 -- we're almost
 8     finished -- 422.  I asked you -- I gave you a list of
 9     materials and asked you if you remembered seeing
10     them.  And, if you remembered seeing them, to mark
11     next to the name.  Did you do that?
12     A.      Yes.
13     Q.      And you recognize that as your handwriting on
14     that document?
15     A.      Yes.
16     Q.      And you basically initialed next to some of
17     the materials you remember seeing; is that correct?
18     A.      That's correct.
19             MR. PURCELL:  I'll publish this later.
20             THE COURT:  Counsel, you've seen this
21     exhibit before, Counsel?
22             MR. PROCTOR:  We have.
23             THE COURT:  Okay.  Thank you.
24             That's government Exhibit 422, Mr.
25     Purcell?
```

1            MR. PURCELL:  Yes, Your Honor.

2            THE COURT:  Now being offered into

3    evidence?

4            MR. PURCELL:  Yes.

5            THE COURT:  All right.

6    BY MR. PURCELL:

7    Q.      And among the paperwork that you remember

8    seeing, I think you marked off -- I'll show this to

9    you.  You remember see Kareem Guest's paperwork in

10   there; is that right?

11   A.      Yes.

12   Q.      How long did you have this paperwork before

13   you got rid of it?

14   A.      Maybe three days.

15   Q.      Three days.  And is that all?  Are you sure?

16   A.      It was less than a week.

17   Q.      Did you ever make copies of it?

18   A.      No, I never made copies of them.

19   Q.      Do you know of anybody else making copies of

20   them?

21   A.      I don't know.

22   Q.      Now, when you were -- you don't live in

23   Westport; is that right?

24   A.      No, I don't.

25   Q.      But you mentioned to the grand jury -- and you

1    can look to see to refresh your memory if you like.

2    But you told the grand jury about seeing these papers

3    in Westport.  Can you tell the jury what you remember

4    telling the grand jury?

5    A.    No.  Somebody told me that the papers was out

6    somewhere in Westport somewhere called Blacktop.

7    Q.    Okay.  Did you ever see -- I think in the

8    grand jury you might have mentioned seeing them up on

9    a pole?

10   A.    On Annapolis Road, yes.  I did see up on a

11   pole on Annapolis Road.

12   Q.    That is right near Westport; is that right?

13   A.    Yeah.

14   Q.    When you're coming in or going out?

15   A.    Right.

16          MR. PURCELL:  Thank you.  I have no

17   further questions.

18          THE COURT:  The defense lawyers have an

19   opportunity to cross-examine you, Ms. Knox.  Just

20   wait still.

21          Mr. Proctor.

22                  CROSS EXAMINATION

23   BY MR. PROCTOR:

24   Q.    Thank you, sir.  Good afternoon, ma'am.

25   A.    Good afternoon.

1     Q.      Mr. Carithers, when he gave you the yellow

2     envelope, was it sealed?

3     A.      No.

4     Q.      Did he tell you where he got it from?

5     A.      The thing Mr. Carithers said to me, "Miss

6     Knox, hold up, I have something for you".  He went in

7     the back, and came back and gave me the papers.

8     Q.      Okay.  Were the papers visible?

9     A.      Yeah.  I was taking them out.  As I was

10    walking in the hallway, I was pulling them out,

11    looking at them.

12    Q.      Was Mr. Carithers present for that?

13    A.      Once he gave me the papers, he walked off.  So

14    I really didn't pay Mr. Carithers any more mind --

15    attention after that.  I was concentrating on the

16    papers.

17    Q.      Did he tell you they were witness statements

18    or anything like that?

19    A.      He didn't say they were legal statements.  But

20    he used the legal name of what kind of papers they

21    were.

22    Q.      Was that *Jencks*?

23    A.      Who, what?

24    Q.      *Jencks*?  Discovery?

25    A.      Discovery.

```
1    Q.      Okay.  So he said, "I have discovery papers

2    for you"?

3    A.      No.  He said -- I said, "What is it?"  He

4    said, "Some discoveries".

5    Q.      Okay.  And he -- did he tell you they were

6    from your son, or did you know where they came from?

7    A.      No, I don't think -- I don't remember.  He

8    just said he had something for me.  And he said these

9    are the discoveries and gave me an envelope.

10   Q.      Okay.  And you mentioned one of the people

11   that was there when you looked through them was

12   Shameka Ross?

13   A.      Yes.

14   Q.      And Shameka Ross is, I guess, the mother of

15   your grandchild?

16   A.      Yes.

17   Q.      Do you know if she's also close with Kevin

18   Duckett?

19   A.      I don't know.

20   Q.      You haven't seen them hang out and talk?

21   A.      I don't know.  Who is Kevin Duckett?

22   Q.      Big Kev?

23   A.      Oh, I don't know.

24   Q.      Okay.  You mentioned seeing copies here,

25   there, and everywhere?  Well, you saw copies in
```

1    Westport, right?

2    A.      On a pole on Annapolis Road, yes.

3    Q.      You didn't make any copies?

4    A.      No.

5    Q.      To your knowledge, did anyone else take them

6    away to make copies?

7    A.      I don't know.

8    Q.      Were they ever out of your sight?

9    A.      I hand them to the -- you know, it was two

10   guys.  The guy Kev was one of them.  I was in my

11   truck.  I hand them the papers.  They looked at them

12   and they hand it back to me.

13   Q.      Okay.  But do you know if they handed you back

14   everything or if they kept some?

15   A.      I don't know.

16   Q.      You said Big Kev was one of them.  Do you

17   remember who else was there?

18   A.      Somebody, I think his name was Larry.  Larry.

19   I can't remember his second name.

20   Q.      Okay.  But he's a friend of Big Kev's?

21   A.      I don't know if he's Big Kev's friend or not.

22   I don't know.

23   Q.      And where was this when you showed them to Big

24   Kev?

25   A.      It was, I think Mannequin Street.

```
 1     Q.      Which is what area?

 2     A.      It's in Westport.  It's a side street coming

 3     off of Annapolis Road.

 4     Q.      Okay.  Do you remember showing them to anyone

 5     else other than Big Kev and Shameka?

 6     A.      And the other guy that was at the car.

 7     Q.      Larry, yeah.

 8     A.      Right.  No.

 9     Q.      You remember showing them -- you're working,

10     right?  I mean, you've got to go to work soon, right?

11     A.      Yes.

12     Q.      When you would go to work during these few

13     days you had had it, did the papers stay at home?

14     A.      They was in my truck.

15     Q.      Okay.  Did other people have access to your

16     truck?

17     A.      No.

18     Q.      Let me ask you this:  Mr. Carithers

19     represented your son?

20     A.      Yes.

21     Q.      Did there ever come a time where he told you

22     to throw the papers away?

23     A.      After the fact.

24     Q.      After you had already thrown them away?

25     A.      Uh-huh.
```

1    Q.      Did he tell you why he wanted you to throw

2    them away?

3    A.      No.

4                 MR. PROCTOR:  Can I have a second,

5    please, Judge?

6                 THE COURT:  Certainly.

7                 MR. PROCTOR:  That's all I have, Judge.

8                 THE COURT:  Thank you.  Any redirect?

9                 MR. PURCELL:  No.  Thank you, Your Honor.

10                THE COURT:  Thank you.  You may step

11   down, Miss Knox.  You should not discuss your

12   testimony with anyone in the event you are called

13   back to the witness stand until this trial concludes.

14                MR. PURCELL:  Thank you, Miss Knox.

15                THE COURT:  Now Mr. Carithers will come

16   back to the witness stand.

17                    MICHAEL R. CARITHERS, JR.,

18   called as a witness, having been previously duly

19   sworn according to law, testified further as follows:

20                MR. PURCELL:  Thanks for waiting, Mr.

21   Carithers.

22                THE COURT:  Mr. Carithers, you're still

23   under oath, sir.

24                THE WITNESS:  Yes, sir.

25

```
 1                    DIRECT EXAMINATION (Resumed)

 2      BY MR. PURCELL:

 3      Q.      Mr. Carithers, just a very few questions left,

 4      I believe.  We were just about to ask you -- I was

 5      about to ask you -- as of, say, May 2009, at the what

 6      point were you expecting Mr. Cheese's case to go to

 7      trial?

 8      A.      June 1st, 2009.

 9      Q.      Okay.  And what federal judge was that case

10      scheduled before?

11      A.      Judge Quarles.

12      Q.      And who was the Assistant U.S. Attorney in

13      that case?

14      A.      Chris Mason and Jim Wallner.

15      Q.      Okay.  And are they the attorneys with whom

16      you entered into the discovery agreement?

17      A.      Yes.

18      Q.      And were they the attorneys who were providing

19      discovery to you pursuant to that agreement?

20      A.      Yes.

21      Q.      Okay.  Now, I want to direct your attention,

22      please, to a letter you received from the government,

23      from those attorneys, around -- sometime after May

24      20th, 2009 that included what we all called the

25      *Jencks* materials and the materials that you would get
```

```
 1        as to witness statements, those sorts of things in

 2        the week or so prior to trial.

 3                   Did you receive such a letter?

 4        A.    I did.

 5        Q.    And did you receive such materials?

 6        A.    Yes.

 7        Q.    Okay.  May I approach?

 8                   Showing you what's been marked as

 9        government Exhibit No. 337 and already admitted.  I

10        think I have a copy for you here already.

11                   Just take a look at Exhibit 337, if you

12        have it.  Counsel and the jury's seen it already.

13                   Can you just describe what that letter --

14        it's a cover letter really, isn't it?

15        A.    Yes.

16        Q.    And what did it purport to provide to you?

17        A.    It outlined in several pages the specific

18        materials that were being provided to me, I believe

19        by hand delivery, on or about May 20th, 2009.

20        Q.    And as you go through it, were they numbered?

21        You have my copy.  Were they numbered?  The items?  I

22        see several pages of description.

23        A.    Yes, they appear to all be numbered.

24        Q.    And from what to what?

25        A.    From 1 through 65.  And then a separate
```

1    numbering of the CDs and DVDs that were provided to

2    me.

3    Q.      Okay.  So you received materials other than

4    just paper materials; is that right?

5    A.      Yes.

6    Q.      And in addition to -- and we talked about some

7    FBI 302s which we'll discuss more in a second.  But

8    in addition to the 02s, can you just describe for the

9    jury what other sorts of paper materials were

10   provided by the government at that time in the normal

11   course of discovery.

12   A.      Grand jury material, background information as

13   to cooperating witnesses, criminal history.

14   Different --

15   Q.      Impeachment material, that sort of thing?

16   A.      Yes.

17   Q.      And plea agreements, if there were any, for

18   cooperators, would that be included?

19   A.      Correct, yes.

20   Q.      Now, you've looked at this before with your

21   counsel and with myself.  Did that package of

22   materials include a 302, an FBI 302, describing an

23   interview in January 2008 with Kareem Guest?

24   A.      Yes, it did.

25   Q.      And I think that would have been item -- is it

MICHAEL CARITHERS - DIRECT (ABRAMS)

168

1    16, page two?

2    A.      Yes.

3    Q.      Now, if I may approach again, I'm going to

4    show you all these exhibits.

5            Now, if I may approach again, I'm showing

6    you -- I'm not going to show you all these exhibits.

7    But showing you just showing you this particular one,

8    government Exhibit 306.  And whether you can confirm

9    306, what we're calling the Guest 302, is one of the

10   materials that you were provided by the government?

11   A.      Yes.

12   Q.      Now, after you received these materials, did

13   you have an opportunity to review them with your

14   client -- Mr. Cheese?

15   A.      Yes.

16   Q.      -- Mr. Cheese?  And where was Mr. Cheese at

17   this point in May of 2009?

18   A.      He was in a facility commonly known as

19   Supermax here in Baltimore.

20   Q.      Okay.  Is that a facility where at least

21   federal prisoners -- that's where often federal

22   prisoners at that time were being housed prior to

23   trial if they were detained?

24   A.      Yes.

25   Q.      And did you have occasion to review these

1    materials?

2              It sounds like you only had a week or so

3    before trial at that point; is that right?

4    A.      That's correct.

5    Q.      And a lot of things to review with him?

6    A.      Yes.

7    Q.      And, so, describe to the jury how you did

8    that.  That is, you reviewed the materials with him.

9    A.      I had a significant volume, a box, actually

10   boxes of materials to prepare by way of

11   cross-examining witnesses; prepare by way of working

12   with my client to see what he knew about the

13   witnesses in terms of possible impeachment or cross-

14   examination information.  I had to organize materials

15   in terms of using them, as here in a trial, for

16   exhibits, in terms of working with my investigator on

17   the case.  So he had copies as well so we could work

18   together in terms of preparing cross- examinations of

19   a number of witnesses during that timeframe.

20   Q.      And did you review these yourself?

21   A.      Yes.

22   Q.      And at this point, am I correct -- you tell

23   me -- at this point what was your expectation as to

24   what was going to happen with Mr. Cheese's case?

25   A.      We were going to trial.

1     Q.    You were getting ready for a trial and all

2    that goes with it?

3     A.    Yes.

4     Q.    And in the course of your preparation, did

5    there come a point where you actually gave Mr. Cheese

6    a copy of the materials you had received, at least of

7    the written materials, the paper materials I guess we

8    can call them, that were provided to you in

9    discovery?

10    A.    Yes.

11    Q.    Okay.  Can you tell us how that went -- how

12    that occurred, please?

13    A.    During the process of organizing the written

14    materials, copies were made and -- copies of the 302s

15    and grand jury and other materials were put in

16    Redwelds.  And there was different sets of Redwelds,

17    one for myself and one for my investigator, and one

18    for -- one was prepared for the client.

19    Q.    What happened with the one that was prepared

20    for your client?

21    A.    They were given to him.

22    Q.    Given to him at the facility?

23    A.    Yes.

24    Q.    Were they given back?

25    A.    I never received them back.

1    Q.      So you gave it to him and that was it?

2    A.      Yes.

3    Q.      Now, at that time you were -- as you said, you

4    were trying to educate your client, fair enough to

5    say?

6    A.      And both ways.

7    Q.      And the other way around.  You needed to know

8    what he knew --

9    A.      Yes.

10   Q.      -- about these witnesses?

11           Now, as you prepared for trial, you gave

12   him many, many files as described in the discovery

13   letter.  And you were yourself assessing the

14   witnesses against him; is that right?

15   A.      Yes.

16   Q.      Now, let me ask you about Kareem Guest.  Where

17   did he rank in the concerns you had about the

18   witnesses against your client?

19   A.      I do not recall Mr. Guest being among the top

20   four or five we were talking about with my client.

21   Q.      Was he any --

22   A.      As to ranking him, I would say below the top

23   five.

24   Q.      And there were more than five?

25   A.      There were a significant number.

1    Q.      Now, you said you had been preparing for

2    trial.  Did the case go to trial?

3    A.      No.

4    Q.      What happened?

5    A.      On the day, the first day of trial on June 1

6    we were in court getting ready to go through motion,

7    argument, and then pick a jury.  And during that

8    process it came about that my client entered a plea.

9    Q.      So he decided that very day to plead?

10   A.      Yes.

11   Q.      And that is something that is not unusual; is

12   that correct?

13   A.      That's correct.

14   Q.      How long -- up to that point, how long had you

15   been practicing here in Maryland?

16           You don't have to give me the number of

17   months, but generally.

18   A.      Well, specific to this jurisdiction as of

19   2009, four years.

20   Q.      Four years.  And where had you been practicing

21   before that?

22   A.      In the Detroit, Michigan jurisdiction as well

23   as D.C.

24   Q.      Have you ever been a prosecutor?

25   A.      Yes.

1    Q.      Have you ever been a federal prosecutor?

2    A.      Yes.

3    Q.      With what office?

4    A.      The United States Attorney's Office in

5    Detroit, Michigan.

6    Q.      So you knew the discovery process and you've

7    tried cases?

8    A.      Yes.

9    Q.      Now, did you recognize the woman who was

10   walking out as you were walking in?

11   A.      I did.

12   Q.      Who was that?

13   A.      That was Miss Rosa Knox.

14   Q.      And what is her relationship to Mr. Cheese,

15   your former client?

16   A.      His mother.

17   Q.      Did you know Shameka Ross?

18   A.      I did.

19   Q.      All right.  Now, let's -- so on June 1st there

20   was a guilty plea instead of a trial; is that right?

21   A.      Yes.

22   Q.      Okay.  So following the guilty plea, can you

23   tell the jury whether -- what happened in terms of

24   Mr. Cheese asking you to do something for him?

25   A.      I do recall after the proceedings that morning

```
 1     that he asked me to pass a -- it was an envelope, a

 2     large envelope.  It was, I think -- if I recall, it

 3     had string, like an office envelope.  He asked me to

 4     give that to his mother.

 5     Q.     And did you do that?

 6     A.     I did.

 7     Q.     And where did you do that?

 8     A.     I think we were in the process of leaving or

 9     he was leaving the courtroom and I was leaving in the

10     other direction.  And he said, "Can you get this to

11     my mother?"  So as I walked out to of the courtroom,

12     I handed it to -- she was outside at the time I

13     believe I handed it to her.

14     Q.     Now, did you tell her what it was?

15     A.     I didn't know what it was.  So, no, I didn't

16     tell her.

17     Q.     Now, do you know what she did with it?

18     A.     I have no idea.

19     Q.     Now, during the summer of 2009, did it come to

20     your attention that there were discovery materials

21     circulating around the community; and particularly

22     some had been recovered, I think, out of prison of

23     somebody from Baltimore, mailed to him or something?

24     A.     I recall a call from Mr. Mason in August of

25     2009.
```

1    Q.      What was the nature of that call?

2    A.      Asking was I aware of materials from this

3    case -- I want to say specifically a 302 -- an FBI

4    302 statement being disseminated to the public or

5    released to the public.  And specifically I remember

6    Mr. Mason indicating a facility in New Jersey, I

7    believe.

8    Q.      Fairton?

9    A.      That's right.

10   Q.      Okay.  Fairton.  Okay.  Thank you.

11           Now, at that time did you know that you

12   had provided materials, that is, the discovery

13   materials to your client?

14   A.      I actually was adamant that I had not provided

15   him any of the 302 materials.

16   Q.      Let me direct your attention now to September

17   of 2009.  Where did you first hear of the murder of

18   Kareem Guest?

19   A.      From Mr. Cheese's mother.

20   Q.      And did there come a time in the days

21   following that murder that you and I had

22   conversations in the presence of federal agents about

23   these materials and we questioned you about whether

24   you had any memory of or, in fact, did distribute

25   these materials throughout the community or to

1    anybody?

2    A.     Yes.

3    Q.     And do you remember or can you tell the jury,

4    please, what your initial responses were to those

5    inquiries?

6    A.     Yeah.  I was -- like I said before, I was

7    adamant that I had not given him any materials to

8    keep at the facility.  I recall reviewing them with

9    him.  But when I was talking to you all, I was very

10   certain that I did not let him keep the materials.

11   Q.     Now, then we actually brought you back and

12   questioned you again a second time; is that right?

13   A.     Yes.

14   Q.     And confronted you again as to our concern

15   about whether you did, in fact, have knowledge.  Do

16   you remember that?

17   A.     Yes.

18   Q.     And can you tell the jury what your response

19   to us was at that time?

20   A.     At some point --

21   Q.     I'm sorry.  Response to us.

22   A.     More or less the same.  At some point, I'm not

23   sure whether it was during that second meeting or

24   another meeting afterwards that I recall having a --

25   materials received that were also put in a Redweld

1    regarding Mr. Cheese's -- it's called a base file, a

2    prison file, that I had given to him.  And without

3    looking at my notes at the time, my daily planner

4    notes, I still was under the impression that I had

5    not let him keep the Redweld that contained the 302

6    materials.

7    Q.     Now, after that did you receive notification

8    that now you were under investigation yourself for

9    possible false statements to federal officers?

10   A.     Yes.

11   Q.     And as a result of that letter, -- it was by

12   letter you were notified?

13   A.     Yes.

14   Q.     By another assistant in my office, supervisory

15   assistant.  What did you do to address the concerns

16   we had about the truthfulness of your statements?

17   A.     I basically uprooted all my storage files

18   looking for my daily planners, which sort of track

19   day by day the work I did for my clients.  And I came

20   across a 2009 planner that I had not looked at before

21   when I spoke to you all.

22   Q.     What did it say?

23   A.     It said specifically on one particular date,

24   May 26, I believe, "Copied 302s for client".  And

25   then it had above that notation, "Cheese".

MICHAEL CARUTHERS - DIRECT (REDIRECT)

178

```
1    Q.      And that May 26 would have been just a couple
2    of days before the guilty plea?
3    A.      Correct.
4    Q.      So did you actually go see Cheese at that
5    time?
6            Does your planner reflect you went to see
7    Cheese at that time?
8    A.      It does.  I saw him on the 28th and the 29th
9    of May.
10   Q.      Okay.  So did that -- I mean, we met again and
11   you -- I think the third time -- now you had counsel;
12   is that right?
13   A.      That's correct.
14   Q.      And that would be Miss Gallagher?
15   A.      That's correct.
16   Q.      And what did you tell us at that point?
17   Basically what you just told us now?
18   A.      Yes.
19   Q.      Okay.  But is the -- is it correct that it was
20   the existence of this investigation which was made
21   known to you by a letter from my office that caused
22   you to request immunity today; is that right?
23   A.      Yes.
24   Q.      You haven't been notified of any conclusion of
25   that investigation?
```

```
 1    A.      No.

 2    Q.      Just for the record, I think it should be

 3    clear that that investigation is not being undertaken

 4    by my office anymore, but by a different U.S.

 5    Attorney's Office; is that right?

 6    A.      That's right.

 7    Q.      So I'm not sitting here investigating you; is

 8    that correct?

 9    A.      That's correct.

10    Q.      All right.  Did you ever intend as a

11    consequence of giving these materials to Mr. Cheese

12    that ultimately witnesses in the case might be

13    intimidated or killed?

14    A.      Absolutely not.

15             MR. PURCELL:  I have no further

16    questions.  Thank you.

17             THE COURT:  Thank you.

18    Cross-examination.  Mr. Sullivan.

19             MR. SULLIVAN:  Thank you, Your Honor.

20                    CROSS EXAMINATION

21    BY MR. SULLIVAN:

22    Q.      Mr. Carithers, let me ask you this.  You and I

23    have never talked before, have we?

24    A.      No.

25    Q.      So I didn't sit down with you with my
```

180

```
 1        investigators like you sat down with the government
 2        in preparation for your testimony today, correct?
 3        A.      Correct.
 4        Q.      So Mr. Purcell just asked you:  You never
 5        intended that your giving Mr. Cheese the 302s with
 6        people's names on them and what they were saying to
 7        the government, you never intended for someone to get
 8        killed; is that what I understood you to say?
 9        A.      Most definitely that's true.
10        Q.      But help me understand something.  You're an
11        officer of the Court, correct?
12        A.      Correct.
13        Q.      You signed a discovery agreement that we use
14        in this district, correct?
15        A.      Yes.
16        Q.      And you were quite familiar with the contents
17        of that discovery agreement, correct?
18        A.      Correct.
19        Q.      And would you like me to show you one, or do
20        you know the provision that says you will not give
21        discovery to the client without the express approval
22        of the United States Attorney's Office?  Do you
23        remember that?
24                Let me help you.  Looking at government
25        Exhibit 336, let me ask you to turn to page two and
```

MICHAEL CARITHERS - CROSS

181

1    just read out loud the third paragraph, sir, if you

2    would.

3    A.      That begins, "All discovery"?

4    Q.      The third paragraph, Mr. Carithers.  You can

5    read it out loud.

6    A.      Okay.  I was asking.  "All discovery provided

7    on the condition that counsel will not give copies of

8    this material to the client or to anyone outside

9    counsel's office without the prior approval of this

10   office.  Counsel may of course review this material

11   with the client at any time and place and may provide

12   copies to any expert consulted by the defense.  If

13   copies are provided to an expert, defense counsel

14   must instruct the expert that further disclosure of

15   the documents is prohibited absent prior approval of

16   this office".

17   Q.      Now, you never got prior approval of the

18   office to give Mr. Cheese any 302s, did you?

19   A.      No, I did not.

20   Q.      And, sir, you weren't a new lawyer at the time

21   you came to practice in this district, correct?

22   A.      Correct.

23   Q.      I mean, my understanding from your testimony

24   was you were a former Assistant United States

25   Attorney working for the Department of Justice in, I

MICHAEL CARITHERS - CROSS

182

1      guess, the Eastern District of Michigan?

2      A.      Correct.

3      Q.      So you knew -- and I guess in that capacity

4      you prosecuted drug cases?

5      A.      Correct.

6      Q.      So if anyone knew, Mr. Carithers knew the

7      risks that's associated with people who decide to

8      cooperate with the government, correct?

9      A.      Certainly, yes, people who cooperate with the

10     government are at risk.

11     Q.      And in light of your experience as an

12     Assistant United States Attorney like Mr. Purcell or

13     a defense attorney in this district, what are some of

14     those risks?

15     A.      Intimidation.  Whatever would impede the

16     witness from coming to court.

17     Q.      In the context of Baltimore City, you know,

18     don't you, sir, that there's a strong movement about

19     going after snitches, correct?

20     A.      I don't know anything about a strong movement.

21     Q.      You don't know anything about what?

22     A.      A strong movement.

23     Q.      Okay.  Do you know anything about retaliation

24     to people who cooperate with the government?

25     A.      Yes.

MICHAEL CARUTHERS - CROSS

183

```
1    Q.      You know that from your cases in Baltimore
2    City, your appointed cases in Baltimore City,
3    correct?
4    A.      I know as a general matter that witnesses who
5    are cooperating with the government will be -- there
6    is a desire by those accused to at times to try to
7    stop them from cooperating.
8    Q.      So just so I understand, you met with the
9    government multiple times and some of those were
10   recorded, did you know that?  Some of the meetings
11   that you had with the government about your actions
12   were recorded, right?
13   A.      Yes.
14   Q.      Okay.  And we have those.  And we have the
15   reports.  But just to short-circuit it, you now admit
16   under immunity -- and while I'm there, could you tell
17   the ladies and gentlemen of the jury in your own
18   words what immunity is and why you asked for it?
19   A.      Immunity is when you're under investigation
20   for a possible criminal case to be brought against
21   you.  So under the Constitution you have a right
22   under the Fifth Amendment not to incriminate yourself
23   by way of your own statements.  So as long as the
24   investigation is pending and you're asked to testify,
25   there's a conflict there unless you have immunity.
```

MICHAEL CARTERS - CROSS

184

1    Q.     So you could have asserted your Fifth

2    Amendment privilege against self-incrimination and

3    not testified at all, correct?

4    A.     Today, yes.

5    Q.     Okay.  But you and your lawyer chose to meet

6    with the government and negotiate an agreement where

7    the Associate Attorney General of the United States

8    granted you formal immunity?

9    A.     We were asked to cooperate and we want to

10   cooperate, or I want to cooperate.  So this is how

11   this worked out.

12   Q.     Which means anything you say today, even after

13   you took the oath, you can't be prosecuted for,

14   correct?

15   A.     So long as it's the truth.

16   Q.     Okay.  Now, when you gave Miss Knox that

17   envelope of discovery -- or, you did not know it was

18   discovery, I'm sorry.

19   A.     Yeah, I did not know.

20   Q.     Yeah.  I'm sorry.  You gave her that envelope.

21   Was it sealed or unsealed?

22   A.     I remember it being an envelope that has a

23   string.  So I don't know whether that string was

24   wrapped around where it was contained in terms of not

25   being open or not, I don't remember.

MICHAEL CARTERS - CROSS

185

```
1    Q.      So you don't remember if it was open or
2    closed?
3    A.      I do not remember.
4    Q.      Do you remember telling Miss Knox that,
5    "Here's some discovery"?
6    A.      I do not remember that at all.
7    Q.      Would you remember that if that's what you
8    said to her?
9    A.      Oh, yes, most certainly.
10   Q.      Because given the perilous condition and
11   circumstances where you're under active investigation
12   by the U.S. Attorney's Office in a neighboring
13   jurisdiction, you would definitely remember if you
14   said to Miss Knox immediately after the
15   re-arraignment of Mr. Cheese, "Here's discovery".
16   You would remember that?
17   A.      Just regardless, yes, whatever.
18   Q.      And as you sit here today, August 2nd at
19   almost a quarter of 3, you deny saying that to Miss
20   Knox, "Here's discovery"?
21   A.      I don't remember saying anything to her other
22   than just handing her the envelope.
23   Q.      Okay.  Now, you also testified earlier -- Mr.
24   Purcell asked you about the Stewart indictment.  Do
25   you remember that?
```

MICHAEL CARITHERS - CROSS

```
 1                 He showed you -- he put up on the screen

 2      here the date of the indictment?

 3      A.      Yes.

 4      Q.      And do you remember telling the ladies and

 5      gentlemen of the jury before we broke for lunch that

 6      it was about one or two months after the indictment

 7      that you were appointed by the Court to represent Mr.

 8      Cheese?  Do you remember that?

 9      A.      I was guessing.

10      Q.      What?

11      A.      I was guessing.

12      Q.      You took an oath to testify truthfully in

13      front of this jury.  And are you telling them that

14      you're guessing -- in your immunity status, you're

15      guessing?

16      A.      What I was trying to say is that, when he

17      asked me when were you appointed, my best guess was

18      one or two months.

19      Q.      No.  Mr. Carithers, you did not say, "My best

20      guess".  Mr. Carithers, you said, "One to two months

21      after the indictment I was appointed by the Court to

22      represent Mr. Cheese".  Isn't that your testimony

23      before lunch?

24      A.      That's right.

25      Q.      Okay.  Look at the indictment.  And let me
```

MICHAEL CARITHERS - CROSS

187

```
1      just help you with it, I've had it marked as
2      Carithers No. 1, it's the indictment -- I mean, the
3      docket sheet in Mr. Cheese's case.  And I've
4      highlighted something here.
5                 What was the date of the indictment?
6      A.      It's August 28th, 2008.
7      Q.      And what date did you enter your appearance
8      for Mr. Cheese?
9      A.      September 2nd, 2008.
10     Q.      Now, help me out here, Mr. Carithers.  That's
11     four days, isn't it?  And you're a solo practitioner
12     at the time, right?
13     A.      Correct.
14     Q.      So you entered your own appearance; nobody
15     else did it for you, no paralegal or assistant; you
16     did it yourself, right?
17     A.      That's right.
18     Q.      Four days later.  Correct?
19     A.      Correct.
20     Q.      And you told the ladies and gentlemen of the
21     jury about an hour and a half ago that it was one to
22     two months, correct?
23     A.      September is one month after August.
24     Q.      That's right.  Well, no.  Mr. Carithers.  All
25     right.  You're right.  12 months in a year.
```

1            Let's look at this again.  Sealed

2     indictment, August 28, 2008.  Do you agree with me so

3     far?

4     A.     Yes.

5     Q.     Michael Carithers, you yourself entering your

6     appearance September 2nd, 2008.  Is it your testimony

7     now that when you told the ladies and gentlemen of

8     the jury one to two months later -- you were saying:

9     I did it at the end of August, I did it four days

10    later, that counts as a month?

11    A.     No.  My testimony was that this was filed in

12    August.  And in my mind I'm thinking how many months

13    after August did I enter an appearance.  One or two

14    months in my mind, what I meant is September or

15    October of 2008.

16    Q.     Okay.  Now, going back to Miss Knox for a

17    second.  Did you ever -- and please don't guess --

18    did you ever tell Miss Knox to throw away the

19    envelope of materials that you gave her?

20    A.     Never.

21    Q.     Would you remember as we sit here, without

22    guessing, that if you told Miss Knox, "Throw away the

23    envelope that Larry gave me to give you in the

24    courthouse, throw it away," you would have remembered

25    that?

189

1     A.      Most definitely.

2     Q.      And as you're sitting there today under your

3     grant of immunity by the government, you did not say

4     that?

5     A.      Never.

6     Q.      Now, my understanding is you made a copy of

7     the -- we're just talking about the Guest 302 here

8     and the related documents.  But really just

9     government Exhibit 306.

10            You made a copy for yourself, a copy for

11    your investigator, and now apparently a copy for Mr.

12    Cheese, correct?

13    A.      I made a few copies.  I'm not sure how many

14    copies of this particular document.

15    Q.      Well, didn't you just testify that you made

16    three copies?  One for yourself, one for your

17    investigator, and one for Mr. Cheese?

18    A.      At least three.

19    Q.      So at least three.  So you might have made

20    more copies of these 302s?

21    A.      I'm not sure about this particular 302.  But

22    the whole material, packet of materials I got, I made

23    several copies in preparing for trial.

24    Q.      Who were the other ones for?

25    A.      Well, for 302s or grand jury testimony, I will

1     make at least two copies that I'll keep in my own

2     working file.  One copy at least will be used as

3     trial exhibits.  Another copy at least we use as a

4     working copy where I'll mark it up.  And there may

5     even be another copy that I would keep.

6     Q.      And by the way, before I forget, when you got

7     the unredacted -- and when we use the word,

8     "unredacted," we mean that the black stuff is removed

9     from the 302s, correct?

10    A.      Correct.

11    Q.      So there's -- at some point you got redacted

12    302s that, for example, wouldn't identify Mr. Guest;

13    it would just be a black line across his name and

14    everything.  Do you remember that?

15    A.      I don't know if I got a black line version of

16    this document.

17    Q.      Well, do you remember getting about ten

18    redacted witness statements from Mr. Mason in

19    connection with your ramp-up for the Cheese case?

20    A.      I got redacted 302s during a time of my

21    representation of Mr. Cheese where we were looking at

22    plea discussions.

23    Q.      And then there came a point where there were

24    no more plea discussions; you were preparing for

25    trial; and you got the unredacted 302s, correct?

MICHAEL CARITHERS - CROSS

191

```
 1        A.       Correct.

 2        Q.       And those are the ones that you made the

 3     multiple copies of?

 4        A.       Correct.

 5        Q.       Okay.  Now, when this matter first came to

 6     your attention, wasn't it that government agents,

 7     including Detective Moody, had believed that your

 8     investigator gave the 302 statements to Mr. Cheese;

 9     do you remember that?

10        A.       I don't know.

11        Q.       You don't know what?

12        A.       What Detective Moody believed.

13        Q.       Well, I'll strike that.

14                 Do you remember a time where the

15     government believed your investigator gave the 302s

16     to Mr. Cheese?

17        A.       I don't have any knowledge of what the

18     government believed.

19        Q.       Were you ever told by the government, by an

20     Assistant United States Attorney, that they believe

21     your investigator gave the 302s to Mr. Cheese?

22        A.       I don't recall that.

23        Q.       Let me show you what's going to be marked

24     Carithers 2 for identification purposes.  I'm going

25     to show you -- approach the witness, Your Honor?
```

```
 1                  THE COURT:  Certainly.

 2                  MR. SULLIVAN:  I show you a letter dated

 3      September 25th, 2009.  Take a look at that, if you

 4      would, sir.

 5                  THE COURT:  Is the date of that letter,

 6      December 25, 2009?

 7                  MR. SULLIVAN:  Yes, Your Honor.

 8                  THE COURT:  I thought you said --

 9                  MR. PROCTOR:  Christmas Day?

10                  MR. SULLIVAN:  I thought you said

11      September.

12                  THE COURT:  September 25.

13                  THE WITNESS:  Okay.

14      BY MR. SULLIVAN:

15      Q.    Now, that is a letter -- who wrote the letter?

16      A.    I did.

17      Q.    Any dispute about that?

18      A.    No.

19      Q.    Any confusion about that?

20      A.    No.

21      Q.    This is your signature, correct?

22      A.    Correct.

23      Q.    Now, you just had an opportunity to read that

24      letter.  Does that refresh your recollection about

25      whether anybody in the U.S. Attorney's Office for
```

193

1    Maryland or the FBI believed that your investigator

2    had given Mr. Cheese the 302s?

3    A.      It does refresh my recollection as to why

4    you're asking that question.

5    Q.      Well.  Why don't you answer the second part?

6    Wasn't there a concern that your investigator was

7    being blamed for giving Mr. Cheese the 302s, and you

8    were adamant that that did not happen, correct?

9    A.      Right.  What I said in this letter was based

10   on what my investigator's attorney told me.  He

11   believed -- or, either the attorney believed it or

12   his client, my investigator, told him.  But I have no

13   knowledge directly of what the government or what an

14   agent may have believed.

15   Q.      My point is, Mr. Carithers, on September 25th,

16   2009, you didn't tell Mr. Mason, Assistant U.S.

17   Attorney Mason or Assistant U.S. Attorney Wallner,

18   "Wait a minute.  I gave Mr. Cheese a copy of the

19   302s".  You never said that, did you?

20   A.      No.  At that time I did not believe that I

21   had.

22   Q.      Because if I understand your testimony

23   correctly, despite meeting with the government on one

24   occasion, two occasions, three occasions, four

25   occasions, it wasn't until you went to some storage

1    place and dug up your 2009 day planner that you saw

2    written down there, "Copied 302s for Cheese"?

3    A.      I believe there was only two meetings that I

4    had with Mr. Purcell.  I want to say one was in

5    October and the other one was in November.  Where I

6    talked to him on both occasions without having looked

7    through my planner.  And after that time in December,

8    after the letter came out, then I --

9    Q.     Do you remember meeting with the government on

10   October 9th, 2009?

11   A.      Correct.

12   Q.     Do you remember meeting with the government on

13   November 30th, 2009?

14   A.      Correct.

15   Q.      Do you remember meeting with the government on

16   January 13th, 2010?

17   A.      I do.

18   Q.      Do you remember meeting with the government

19   down in Greenbelt, my neck of the woods, on July

20   19th, 2010?  So that's one, two, three, four meetings

21   that you had to discuss whether you gave Mr. Cheese

22   the 302s.  And all four meetings -- all three

23   meetings before the last one you denied it, correct?

24   A.      No.  My recollection is that I had two

25   meetings with Jack Purcell with counsel before I

MICHAEL CARUTHERS - CROSS

195

1      reviewed the planner and before December 2009.  And

2      after December 2009, which is when I got the letter,

3      I had had one meeting with Mr. Purcell with counsel

4      and then another meeting with Ms. Johnson with

5      counsel.  Those subsequent or last two meetings were

6      after I reviewed the planner.  And it's my

7      recollection that in those two meetings was when I

8      had the recollection that I had given that Redweld to

9      Mr. Cheese.

10     Q.      Well, in the meeting that you had with the

11     government on July 19th, didn't you tell the

12     government agents and the Assistant United States

13     Attorneys that you didn't mean to lie before?

14     A.      Certainly.  I would never lie intentionally.

15     Q.      Okay.

16     A.      Or not give true information.

17     Q.      Now, let me ask -- and I'm almost done.  Let

18     me ask:  This business planner that you found for

19     2009, was anybody, any agents or investigators, with

20     you when you came upon this discovery of the business

21     planner?

22     A.      No.

23     Q.      And you also just testified that this was a

24     business planner that you kept your daily activities

25     of all of your clients in, right?

MICHAEL CARITHERS - CROSS

196

```
 1     A.      Correct.
 2     Q.      Now, Mr. Carithers, you were disbarred by the
 3     Maryland Court of Appeals on July 18th, 2011,
 4     correct?
 5     A.      It's being disputed.  But there was a decision
 6     that came out on July 18th --
 7     Q.      Whether it's being disputed or not, the Court
 8     of Appeals of Maryland in Annapolis --
 9              MR. PURCELL:  Objection.
10              THE COURT:  Overruled.
11     BY MR. SULLIVAN:
12     Q.      The Court of Appeals in Maryland -- which is
13     our highest state appellate court, correct?  Correct?
14     A.      Correct.
15     Q.      Issued an opinion on July 18, 2011 disbarring
16     you from your abilities to practice law in the State
17     of Maryland, correct?
18     A.      Effective in 30 days.
19     Q.      Effective in 30 days.  So 30 days from the
20     18th you can no longer practice law in Maryland,
21     correct?
22     A.      If our motion is denied.
23     Q.      And you filed a motion for reconsideration,
24     apparently?
25     A.      Correct.
```

1    Q.      Okay.  Now, in that opinion the Court

2    disbarred you -- and correct me if I'm misstating

3    anything -- because you had clients that you did not

4    give the money to, to the firm you were working for.

5    So you had a separate clientele that you were doing

6    legal work for but not giving the money to the firm,

7    correct?  You have immunity.

8    A.      Yeah.  I can't answer that.  That's not a fair

9    statement.

10   Q.      Well, do you want me to go through your

11   attorney grievance transcripts from when you

12   testified in Baltimore City to talk about the slip

13   and fall case, the employment discrimination cases,

14   all the fees that you got, that you kept and didn't

15   give to the firm?  Should we go through those?

16   A.      You are certainly welcome to.  Those are

17   clients of mine that I had in a side practice as of

18   counsel at the firm.  Where at the firm for the

19   firm's clients I billed over the requirement and the

20   firm got all those revenues.  There was no

21   prohibition for me to have a side practice after I

22   satisfied all of my conditions with the firm, which I

23   did.

24   Q.      The 1800 hours and those things, correct?

25   A.      Correct.

198

```
1    Q.      But you never got approval from that law firm

2    here in the city to have the side practice in the

3    first place, did you?

4    A.      I never got approval one way or the other.

5    Q.      And, in fact, sir, just to end it, you've read

6    this opinion probably a million times, haven't you?

7    A.      I've read it considerably -- a lot of times,

8    yes.

9    Q.      Right.  Because this is your livelihood,

10   correct?

11   A.      In Maryland.

12   Q.      And you know that the Court of Appeals in

13   Maryland said you committed criminal acts by

14   intentionally and deceptively misappropriating fees

15   from former law firm clients that represent that law

16   firm's fees.  And that you engaged in deceitful and

17   dishonest conduct.  Do you remember seeing that in

18   the opinion?

19   A.      That's what the opinion says, yes, sir.

20             MR. SULLIVAN:  I have no further

21   questions.

22             THE COURT:  All right.  Any redirect?

23             MR. PURCELL:  Yes, sir, just a brief

24   couple of questions.

25
```

MICHAEL CARITHERS - REDIRECT

```
 1                    REDIRECT EXAMINATION

 2   BY MR. PURCELL:

 3   Q.     Mr. Carithers, you were asked -- I think -- I

 4   wrote them down as counsel was going over them with

 5   you, the dates that you met with government counsel

 6   including myself.  Excuse me for the unprofessional

 7   exhibit, but -- you can pull that screen up.

 8                    Please mark that for identification.

 9                    October 9th, 2010, 11-30, 2010, and

10   January -- and twice, January and July of 2011,

11   correct?

12   A.     Correct.

13   Q.     Now, you met with myself and agents, you

14   recall, three times?

15   A.     Yes.

16   Q.     And the first time when I asked you or you

17   were asked about whether you provided any materials

18   to Mr. Cheese, what was your response?

19   A.     Absolutely not.

20   Q.     Is that what you believed at the time?

21   A.     Most definitely.

22   Q.     Now we brought you back according to your

23   testimony sometime probably in November.  And we told

24   you we were still continuing our investigation and we

25   wanted to talk to you more.  And what did you tell us
```

-200-

1      the second time we met?

2      A.      More of the same of what I told you the first

3      time.

4      Q.      Now, after that second time, is that when

5      there was a letter that was sent to you telling you

6      essentially that you need to alert all of your

7      clients that you are under a criminal investigation

8      and that was a real threat to your practice because

9      essentially judges would be not appointing you to

10     cases; is that right?

11     A.      That's right.

12     Q.      And that caused you, as you've testified, to

13     go find the daily planner?

14     A.      I looked through everything.  I looked through

15     all possible files.

16     Q.      Well, regardless of what you did, when we met

17     the third time, did you admit to myself and the

18     agents that were present and on a tape recorded

19     statement that, yes, in fact, you had given the

20     material to Mr. Cheese?

21     A.      Yes.

22     Q.      And it wasn't your investigator, it was you?

23     A.      Yes.

24     Q.      And you admit that?

25     A.      Yes.

201

```
 1      Q.      And you've admitted it ever since?

 2      A.      Yes.

 3      Q.      Counsel was incorrect to say that you met with

 4      government four times and four times denied giving

 5      those materials to the -- to Mr. Cheese; is that

 6      right?

 7      A.      That's incorrect.

 8      Q.      It is incorrect, isn't it?

 9      A.      It is incorrect.

10      Q.      Now, you've also been shown or asked about --

11      let me get to this.  There's been a lot asked or said

12      to you today about the immunity letter that you have

13      and the immunity authorization that's been granted to

14      you for your testimony in this case.  Is it your

15      understanding that that immunity applies only to your

16      testimony in this case?

17      A.      Correct.

18      Q.      And it does not apply to those statements you

19      made to government officials, FBI agents, back in

20      2010?

21      A.      That's correct.

22      Q.      Up through the summer of 2011?

23      A.      That's correct.

24      Q.      And that is what you're under investigation

25      for now; is that correct?
```

```
1    A.      That's my understanding.

2    Q.      And this immunity letter does not affect that?

3    A.      That's correct.

4    Q.      So you haven't been given anything in terms of

5    protection for what's pending against you in terms of

6    an investigation, wherever it may go, by whoever is

7    doing it; is that correct?

8    A.      That's my understanding.

9            MR. PURCELL:  Thank you.  I have no

10   further questions.

11           THE COURT:  Any recross, Mr. Sullivan?

12           MR. SULLIVAN:  Just briefly, Your Honor.

13                  RECROSS-EXAMINATION

14   BY MR. SULLIVAN:

15   Q.      Maybe I misspoke in the heat of the moment,

16   but you denied it three times.  And only when you

17   met -- after you got the letter did you admit that

18   you gave the 302s to Mr. Cheese; that is correct?

19   A.      No.

20   Q.      Okay.  Back up.  Two times you denied it.

21   Then the third time you admitted it?

22   A.      You asked me about the meetings.

23   Q.      Right.  The meetings.

24   A.      There was two meetings where I denied it.

25   Two.
```

MICHAEL CARITHERS - CROSS

203

```
 1    Q.      Two meetings that you denied it.  Then you got
 2    a letter?
 3    A.      I got the investigation letter in December.
 4    And there were two meetings after that letter.
 5    Q.      Where you said that you did do it?
 6    A.      And after I reviewed all of my materials.
 7    Q.      So when I said four meetings, I should have
 8    said two meetings you denied it?
 9    A.      That's correct.
10    Q.      And finally, just so I understand this, you
11    needed a 2009 daily planner to tell the United States
12    Attorney's Office for the District of Maryland that
13    you improperly gave your client -- not illegally --
14    but that you improperly in violation of the discovery
15    agreement gave your client those 302s; you needed to
16    refer to your daily planner to make your decision on
17    that?
18    A.      That was one of the things that helped refresh
19    my memory.
20             MR. SULLIVAN:  Okay.  Thank you.
21             THE COURT:  Mr. Carithers, you may step
22    down, sir.  You shouldn't discuss your testimony with
23    anyone in the event you're called back to the witness
24    stand until this trial concludes because there is a
25    sequestration order in effect.
```

EMMANUEL CABREJA - DIRECT

204

```
1                    THE WITNESS:  Yes, Your Honor.  Thank
2        you.
3                    MR. PURCELL:  The government calls
4        officer Emmanuel Cabreja.
5        Whereupon:
6                        EMMANUEL CABREJA,
7        called as a witness, having been first duly sworn
8        according to law, testified as follows:
9                    THE DEPUTY CLERK:  Please state your full
10       name for the record.
11                   THE WITNESS:  Emmanuel Cabreja.
12                   THE DEPUTY CLERK:  Spell your last name,
13       please.
14                   THE WITNESS:  C-a-b-r-e-j-a.
15                   THE DEPUTY CLERK:  Thank you.
16                       DIRECT EXAMINATION
17       BY MR. PURCELL:
18       Q.    Good afternoon, Officer.  And thank you.  I
19       know you were here early this morning and waiting all
20       day now.  I just ask you where do you work?
21                   I see your uniform, but tell us anyway.
22       A.    Baltimore City Police.
23       Q.    And how long have you been with the Baltimore
24       City Police Department?
25       A.    A little over five years.
```

EMMANUEL LABREJA - DIRECT

205

```
 1     Q.      And where are you assigned?  You work for the
 2     city, you're assigned to different districts in the
 3     city; is that right?
 4     A.      Yes, sir.
 5     Q.      And what district are you assigned to?
 6     A.      Southern District.
 7     Q.      Where is that?
 8     A.      10 Cherry Hill Road.
 9     Q.      That's where the headquarters?
10     A.      No.  That's the district itself.
11     Q.      The district itself.  Okay.  What I meant is
12     the district headquarters.
13     A.      Yes.
14     Q.      The actual headquarters is downtown not far
15     from us; is that right?
16     A.      Yes.
17     Q.      All right.  Now, Officer, does Southern
18     District encompass an area of Baltimore known as
19     Westport?
20     A.      Yes.
21     Q.      I direct your attention, please, to Exhibit
22     No. 1 there.  Do you recognize that area?
23     A.      Yes.
24     Q.      Now, for the record, you and I have met prior
25     to trial and gone over some of these photographs to
```

1    get us through trial; is that correct?

2    A.      Yes, sir.

3    Q.      And I'm going to show you, if I may, when you

4    talk about Westport, are you talking about the area

5    that I'm sort of circling here with my red pointer?

6    A.      Yes, sir.

7    Q.      Now, districts, Baltimore City districts, are

8    they also further broken down in terms of areas of

9    patrol for officers like yourself?

10   A.      Yes, it is.

11   Q.      And what is your -- are you a street officer,

12   are you a patrol officer?

13   A.      Yes.

14   Q.      And what do they call those further subdivided

15   districts?

16   A.      They're called posts.

17   Q.      And are officers like yourself, you guys work

18   shifts?

19   A.      Yes.

20   Q.      Which shift are you on right now?

21   A.      Morning shift, 7 to 3.

22   Q.      You're working days today?

23   A.      Yes.

24   Q.      Now, when you're working in a district, do

25   you -- are you typically appointed or assigned to a

1      particular district -- I'm sorry, a particular post?

2      A.      There are post officers that are assigned to a

3      post.  I'm actually a secondary post officer.

4      Q.      What were you back in September of 20096789?

5      A.      That day I was Unit No. 9 Charley 23.

6      Q.      Okay.  And what post were you working?

7      A.      23 Post.

8      Q.      And does that include Westport?

9      A.      Yes.

10     Q.      Now, this area of Westport I'm showing right

11     you now, we've seen in Exhibit 1, was that your

12     primary area of patrol?

13     A.      It's part of the area of patrol.

14     Q.      I talked to you about this before.  You

15     described a different area or a nearby area, that was

16     your primary area; is that correct?

17     A.      I'm not the primary officer that patrols the

18     area.

19     Q.      No, no.  I'm not talking about your primary.

20     Maybe I am.  That is not your primary area of patrol,

21     is it?

22     A.      No.

23     Q.      Where do you typically -- when you went out on

24     your shift in your car where would you typically go?

25     A.      I'm basically a floater.

1    Q.    A floater.  Now, let me direct your attention,

2    please, to September 20th, 2009.  Did you have

3    occasion to respond to a homicide of an individual

4    later identified as Kareem Guest?

5    A.    Yes.

6    Q.    And can you show us -- I'm going to give you

7    the pointer.

8              And actually, may the witness approach

9    the exhibit, Your Honor?

10             THE COURT:  Certainly.

11   BY MR. PURCELL:

12   Q.    Okay.  Can you get up, please?  If you need to

13   report -- now, could you just tell the jury, please,

14   where you were when you received the first call to

15   respond.

16   A.    When I received the first call to respond I

17   was about the 200 block of Cherry Hill Road.

18   Q.    OKAY.  And that's not shown on the picture, is

19   it?

20   A.    No, it's not.

21   Q.    Tell us what route you took to get to the

22   scene.

23   A.    I took Cherry Hill Road to Waterview.  Once I

24   came off of Waterview, I drove on to Dorton Court

25   which is right here.

```
 1      Q.      How did you approach the scene?
 2              Where were you told -- if you remember,
 3      where were you told the incident had occurred?
 4      A.      The walkway of the 2400 block of Maisel
 5      Street, Court.
 6      Q.      So how do you approach that particular
 7      location?
 8      A.      I drove my patrol car up -- it's actually
 9      called Norfolk.  Down Alaska Court, down Annor Court.
10      I parked right there.  And then I walked, sorry,
11      here.
12      Q.      Okay.
13      A.      Yes.  Sorry.  Correct.  Here.  I parked here.
14      Q.      You're indicating you parked on Annor Court;
15      is that right?
16      A.      That's right.
17      Q.      Can you make sure this exhibit, with my -- can
18      you put this up, please?
19              Okay.  Can the jury see where he's
20      talking about?
21              Okay.  So you were just approaching the
22      scene.  And you walked up -- and do you know where
23      the body was or where the injury had occurred or the
24      shooting had occurred?
25      A.      I was not sure.  Just I knew the hundred
```

EMMANUEL LABREEJA - DIRECT

210

1    block.  I got out of the vehicle and started pretty

2    much looking everywhere, in every direction.

3    Q.      Let me ask you:  Did any of the eyewitnesses

4    run up to you and say, "I know who did it and I can

5    tell you exactly who it was, and it was this guy who

6    I saw who did it"?

7    A.      No.

8    Q.      What was it like that on that street?

9    A.      It's usually.

10   Q.      That night.

11   A.      That night it was pretty quiet.

12   Q.      Okay.  Tell us how you came upon the body of

13   Mr. Guest.

14   A.      Before I approached the body of Mr. Guest I

15   observed one adult male approaching, actually walking

16   towards me.

17   Q.      All right.

18   A.      He was dressed in all black clothing.  I

19   immediately asked him, "Hey, did you hear any

20   gunshots?  He said, "No".  Right behind me was a

21   sergeant.  The sergeant held onto that individual

22   momentarily while I continued looking for the

23   possible shooting victim.

24   Q.      Okay.  So where did you go?

25   A.      The person I stopped first was approximately

EMMANUEL LABREJA - DIRECT

211

```
1     around this area here.  I continued walking up.  And

2     right in the cut -- you can't really actually see it

3     because it's blocked by the roof of the building --

4     but the victim was actually laying on that pathway.

5     Q.     Now, you can take a seat.

6            You've had some medical training I

7     understand?  Some First Aid training you've had?

8     A.     Very little.

9     Q.     Very little?

10    A.     Yes.

11    Q.     Well, I'm not asking you if you're a doctor.

12    But you told me in a meeting that you had some

13    experience.  What did you use, did you do EMT or

14    something?

15    A.     No.

16    Q.     No.  That's somebody else.

17           All right.  What was the condition you

18    observed of the witness?  I'm sorry.  Of the victim.

19    A.     When I observed the victim, he was laying on

20    his left side -- yes, left side.  And he appeared to

21    have a gunshot wound to the head.

22    Q.     Okay.  Can you describe the victim any more in

23    terms of his appearance?  That is, did he seem to

24    have long hair, short hair like you, no hair like me?

25    A.     He had long dreads.
```

EMMANUEL LABRERA - DIRECT

1   Q.      Okay.  So he had thick hair?

2   A.      Yes.  First the call actually came out as a

3   female because of the confusion of with the hair.

4   Q.      Uh-huh.

5   A.      Then after I realized -- after I looked at the

6   face, it was a male.

7   Q.      Did the victim appear to be alive?

8   A.      Not at the time.

9   Q.      Not when you were there?

10  A.      No.

11  Q.      I'm sure he was at one point.

12          Now, you were the first officer on the

13  scene?

14  A.      Yes.

15  Q.      Now, if you could just tell us, did there come

16  a point when a medic arrived?

17  A.      Yes.

18  Q.      Did the medics then take over, retrieve the

19  victim, and take him to the hospital?

20  A.      Yes.

21  Q.      And as the primary officer, did you receive

22  notification when the body or Mr. Guest had been

23  declared deceased at the hospital?

24  A.      Yes.

25  Q.      And when did that occur?

1    A.      I was advised that at 2236 hours which is

2    10:36 p.m., he was pronounced deceased.

3    Q.      I see you have your report there.  In your

4    report do you indicate the time the call came out?

5    A.      The call was dispatched at approximately 10:05

6    p.m.

7    Q.      And how long do you think it took you to get

8    there?

9    A.      Maximum, maybe three minutes.

10   Q.      All right.  Now, as the primary responding

11   person -- when I say, "primary," I don't mean the

12   lead, I mean the first person there.  Was it from

13   your call that the CC number for the case was issued?

14   A.      Yes.

15   Q.      And can you just tell the jury what a CC

16   number is?

17   A.      A CC number is actually the complaint number

18   under which any incident is filed.

19   Q.      So does this particular case have a CC number?

20   A.      Yes, it does.

21   Q.      Could you read it into the record, please?

22   A.      099, "I" as in Ida, 10277.

23   Q.      Okay.  I'm going to borrow your report for a

24   second.  We have a copy of this that's been marked as

25   356.  Would you put that up, please?

1          MR. PROCTOR:  Judge, is this for

2     identification only?

3          THE COURT:  Just take that down, please,

4     for one second.  I assume -- under the local rules I

5     assumed you've seen it.  Approach the bench, please.

6          MR. PURCELL:  Your Honor, I just want it

7     for identification, put it on the record for what the

8     CC number is.

9          MR. PROCTOR:  I have no problem with

10    that.  I just don't want him to admit it.

11         THE COURT:  That's fine.

12   BY MR. PURCELL:

13   Q.     Can you take a look at the screen next to you.

14         Can you see the CC number located on the

15   report?

16   A.     Top right corner.

17   Q.     Just push there and it will turn a different

18   color.

19         All right.  The top right-hand corner?

20   A.     Yes, sir.

21   Q.     Now, just tell us -- we have other officers

22   testifying, as well.  But is it correct that once a

23   case, an incident, has a CC number, any evidence

24   recovered, any reports done under that particular or

25   relating to that matter follow the CC number; is that

EMMANUEL CABRERA - DIRECT

215

1      right?

2      A.      Yes.

3      Q.      So we can -- if there are any casings

4      recovered by anybody at he scene that night, things

5      like that, they'll be under the same CC number?

6      A.      Yes.

7      Q.      That's for the purpose of collecting the

8      evidence under one heading?

9      A.      Yes.

10     Q.      All right.  Now, just one or two pictures I

11     want to show you before we go on; before we finish, I

12     should say.

13             This is government Exhibit No. 10.  And

14     you said before that where you located the body you

15     couldn't see on the other exhibit because the house

16     blocked it.  If you take a look I'm going to hand

17     Exhibit 10 as well.  Do you recognize Exhibit No. 10?

18     A.      Yes.

19     Q.      What is it, please?

20     A.      That's the area where --

21     Q.      Mr. Guest.

22     A.      -- Mr. Guest was located.

23     Q.      Now, you didn't take any pictures of Mr. Guest

24     while he was at the scene; is that right?

25     A.      No.

EMMANUEL LABREDA - DIRECT

216

```
1     Q.      And when the medics appear at the scene to
2     treat a person and rush him to the hospital, they
3     don't stop and take photographs for the crime lab; is
4     that right?
5     A.      No.  Only crime lab does that.
6     Q.      Only crime lab does that.  And were you there
7     when crime lab arrived?
8     A.      Yes.
9     Q.      By the time crime lab arrived, where was Mr.
10    Guest?  Was he any longer at the scene?
11    A.      No, he was not.
12    Q.      Now, as you take a look at that photograph,
13    can you locate for the jury, though, on the screen
14    where the body was in relation to the image depicted?
15            And if you would tell us whether, as you
16    walk, do you know the name of the street as you walk
17    towards the interior of the picture, the next lane,
18    the next sidewalk?
19    A.      I don't remember.
20    Q.      Wilgrey?
21    A.      Maybe, yes.
22    Q.      If you're walking that direction -- I don't
23    really care what the name of the street is -- but as
24    you walk along that sidewalk, can you tell us where
25    in terms of that sidewalk, where Mr. -- as he lay
```

1    there, Mr. Guest's head was.  Was it Wilgrey or

2    towards Maisel Court?

3    A.     Towards Wilgrey.

4    Q.     Okay.  And the feet were towards Maisel Court?

5    A.     Yes.

6    Q.     Just one moment, please.

7                  Now, how long were you there, sir?  At

8    the scene, that is.

9    A.     I believe more than an hour.

10   Q.     An hour.  Were you there when Detective

11   Kershaw from homicide arrived?

12   A.     Yes.

13   Q.     Okay.  And you didn't undertake any

14   investigation yourself, did you?

15   A.     The only investigation I did was basically get

16   to the scene, locate the body, and --

17   Q.     You need to protect the scene?

18   A.     Yes.

19   Q.     When you were there, were you in uniform?

20   A.     Yes.

21   Q.     All right.  During the time that you were

22   there for that hour, did anybody from the

23   neighborhood walk up to you and tell you anything

24   about them being a witness to this murder?

25   A.     No.

218

```
1                    MR. PURCELL:  Thank you.  I have no

2      further questions.

3                    THE COURT:  Thank you.

4      Cross-examination, Mr. Proctor?

5                    MR. PROCTOR:  Thank you, sir.

6                        CROSS-EXAMINATION

7      BY MR. PROCTOR:

8      Q.     Good afternoon.

9      A.     Good afternoon.

10     Q.     You told Mr. Purcell you were there for about

11     an hour.  Do you know what a crime scene log is, sir?

12     A.     Yes, I do.

13     Q.     And I'm happy to show it to you if you like.

14     But the crime scene log is something that's used so

15     that you can document who was there and when they got

16     there and that sort of thing, right?

17     A.     Yes.

18     Q.     And if the crime scene log showed you're the

19     first officer there at ten past 10 p.m. and left at

20     12:30 p.m., 00:30 hours, half past midnight, would

21     you disagree with that?

22     A.     No.

23     Q.     Do you want to see it?  Or do you want to take

24     my word for it?

25     A.     I'll take your word for it.
```

219

```
1    Q.      So you were at the scene for two hours and 20
2    minutes, give or take, right?
3    A.      Yes.
4    Q.      And that sounds right, doesn't it?
5    A.      Say again?
6    Q.      That sounds -- that sounds about right --
7    A.      Yes.
8    Q.      -- two hours and 20 minutes?  So when you
9    got -- and you went to the police academy, right?
10   A.      Yes.
11   Q.      And graduated?
12   A.      Yes.
13   Q.      And one of the things they teach every cadet,
14   I guess they're called at the police academy, is when
15   you get to a crime scene, what do you do, right?
16   A.      Yes.
17   Q.      And obviously if there's some bleeding, you
18   got to take care of that.  But your goal in going to
19   a crime scene is not to disturb the evidence, right?
20   A.      Yes.
21   Q.      So that when Officer Muhangi gets there, it
22   looks the way it's supposed to, right?
23   A.      Yes.
24   Q.      And in the Guest homicide, would you say you
25   followed all the rules and procedures that were laid
```

220

```
1     out to you?

2     A.      Yes.

3     Q.      Were you there when ballistics were recovered?

4     A.      Yes.

5     Q.      Could you see casings with your own two eyes?

6     A.      Yes.

7     Q.      Did you actually find them, or were you just

8     alerted that someone else had found them?

9     A.      I found or observed about one or two.  And

10    later on somebody else pointed some out to me.

11    Q.      Did you see anyone handle them?

12    A.      Just the crime lab -- sorry, the crime lab

13    tech.

14    Q.      Okay.  And he had gloves on when he did that,

15    right?

16    A.      I don't remember.

17    Q.      Okay.  What was the weather like that night?

18    A.      It was a little bit cool.

19    Q.      It wasn't raining, though?

20    A.      No.

21    Q.      Are you -- now, you say Westport's not your

22    primary area.  But certainly you get there often

23    enough, right?

24    A.      I've worked it enough.

25    Q.      At the time, right, I mean, you know the names
```

EMMANUEL LABREDA - CROSS

221

```
1      of the streets and that sort of stuff?

2      A.      Yes.

3      Q.      Do you know what a POD camera is?

4      A.      Yes.

5      Q.      And for the court reporter that's P-O-D-D-S?

6      A.      I'm not sure if it's P-O-D-D-S or P-O-D-S.

7      I'm not a hundred percent sure.

8      Q.      Okay.

9      A.      I've never used one.

10     Q.      It's basically a camera that is always on and

11     monitoring activity in the area?

12     A.      Records for five days.

13     Q.      And sometimes called a blue light camera?

14     A.      Sometimes.

15     Q.      Are you aware of there being POD cameras in

16     the area that Mr. Guest was murdered?

17     A.      I'm aware of one on -- I believe it's Annor

18     Court.  And I'm not sure if there's another one or

19     not.

20     Q.      Okay.  Did you make any attempts to retrieve

21     that camera?

22     A.      Myself?  No.

23     Q.      And to your knowledge, did anyone else?

24     A.      I'm not sure.

25             MR. PROCTOR:  Can I have a second,
```

```
 1          please, Judge?
 2                    THE COURT:  Certainly.
 3                    MR. PROCTOR:  That's all I have.
 4                    THE COURT:  Thank you.  Any redirect, Mr.
 5          Purcell?
 6                    MR. PURCELL:  None.
 7                    THE COURT:  All right.  You may step
 8          down, Officer Cabreja.  You should not discuss your
 9          testimony with anyone before this trial is over.
10          There's a sequestration order in effect.
11                    All right.  Ladies and gentlemen, we'll
12          take just a brief ten-minute recess right now, our
13          afternoon break, and then we'll be going to about 20
14          minutes to 5 today.  We'll take our afternoon recess.
15                    (BRIEF RECESS.)
16                    THE COURT:  Ready for the next witness.
17          Your next witness?
18                    MR. FUCHS:  Your Honor, it's Dr. J. Laron
19          Locke from the Medical Examiner's Office.
20                    Your Honor, any objection if we have Mr.
21          Locke take the stand?
22                    THE COURT:  No, go ahead.  Dr. Locke?
23                    MR. FUCHS:  Dr. Locke.
24                    THE COURT:  Certainly.  Come on forward,
25          Dr. Locke.
```

```
 1                    (JURY IN.)

 2               THE COURT:  Good afternoon, everyone.

 3     The next witness is Dr. J. Laron Locke; is that

 4     correct?

 5               THE WITNESS:  That's correct.

 6     Whereupon:

 7                    JAMES LARON LOCKE,

 8     called as a witness, having been first duly sworn

 9     according to law, testified as follows:

10               THE DEPUTY CLERK:  Please state your full

11     name for the record.

12               THE WITNESS:  James Laron, L-a-r-o-n,

13     Locke, L-o-c-k-e.

14               THE DEPUTY CLERK:  Thank you.

15                    DIRECT EXAMINATION

16     BY MR. FUCHS:

17     Q.    Dr. Locke, where do you work?

18     A.    Office of the Chief Medical Examiners here in

19     the State of Maryland.

20     Q.    What do you do --

21     A.    I'm sorry.  In Baltimore.

22     Q.    And what do you do there?

23     A.    I'm a forensic pathologist, assistant medical

24     examiner.

25     Q.    And how long have you worked there?
```

1    A.    Since 1991.

2    Q.    Where did you go to medical school?

3    A.    Howard University School in Washington, D.C.

4    Q.    Did you complete a residency?

5    A.    Yes.

6    Q.    Where was that and what was it in?

7    A.    It was in pathology at Temple University

8    Hospital in Philadelphia, Pennsylvania.

9    Q.    Did you also complete a fellowship?

10   A.    Yes.

11   Q.    And where was that and what was it in?

12   A.    Also in Philadelphia at the Office of the

13   Medical Examiners.

14   Q.    And what was the nature of that fellowship?

15   A.    It was a forensic pathology fellowship.

16   Q.    And in your time with the Medical Examiner's

17   Office, approximately how many autopsies do you think

18   you have performed?

19   A.    I've performed and/or supervised probably

20   close to 8,000.

21   Q.    Have you ever been qualified as an expert in

22   court?

23   A.    Yes.

24   Q.    State and federal?

25   A.    Yes.

1    Q.     And approximately how many times?

2    A.     Probably a little more than 400.

3           MR. FUCHS:  Your Honor, at this point I

4    would tender Dr. Locke as an expert on pathology.

5           THE COURT:  Any voir dire, Mr. Proctor?

6           MR. PROCTOR:  No.  We stipulate.

7           THE COURT:  All right.  Ladies and

8    gentlemen, generally a witness cannot give his

9    opinion on a matter.  One exception to that is under

10   Rule 702 of the Federal Rules of Evidence if a

11   person's qualified as an expert.  Dr. Locke has been

12   qualified as an expert in forensic pathology and the

13   defense accepts him as an expert in forensic

14   pathology.  Therefore he's permitted to give his

15   opinion in forensic pathology.

16           As to all witnesses it's up to the jury

17   to accept or reject testimony.  But he is permitted

18   to give his opinion, unlike other witnesses, because

19   he's been qualified as an expert in forensic

20   pathology.  So you may proceed, Mr. Fuchs.

21           MR. FUCHS:  Thank you, Your Honor.

22   BY MR. FUCHS:

23   Q.     Dr. Locke, did you conduct an autopsy of

24   Kareem Kelly Guest?

25   A.     Yes.

1    Q.     And when was that?

2    A.     September 21st, 2009.

3    Q.     Did anyone assist you in that autopsy?

4    A.     Yes.  Dr. Michael Johnson.

5    Q.     And did you write a report based on your

6    findings?

7    A.     Yes.

8              MR. FUCHS:  Permission to approach, Your

9    Honor?

10             THE COURT:  Yes.

11             MR. FUCHS:  Dr. Locke, I'm going to show

12   you government Exhibit 371.  Do you recognize that?

13             Your Honor, that's for identification

14   only.

15             THE COURT:  Yes.

16             THE WITNESS:  Yes, I do.

17   BY MR. FUCHS:

18   Q.     And what is it, sir?

19   A.     Well, it consists of a series of documents.

20   The first is a notarized copy of the autopsy report

21   on Mr. Guest.  Then there are a set of photographs,

22   Xerox photographs, that were taken at the autopsy.

23   Also in the packet are some diagrams, body diagrams,

24   an evidence sheet, and our log sheet from Monday,

25   September 21st, 2009.

227

```
1    Q.     Okay, sir.  Thank you.  In the course of your
2    autopsy did you find evidence of injury to Mr. Guest?
3    A.     Yes.
4    Q.     Now, do you have any idea what order those
5    injuries were sustained?
6    A.     No, I don't.
7    Q.     All right.  If you would, following the order
8    of your report, what injuries did you find inflicted
9    to Mr. Guest?
10   A.     I found seven gunshot wounds to Mr. Guest.
11   They were arbitrarily lettered on the body, so
12   there's no particular order.  Do you want me to did
13   through the gunshot wounds now?
14   Q.     Yes, sir.  Please do.  If you would start with
15   gunshot wound A?
16   A.     Okay.  Gunshot wound A was a gunshot wound
17   that we labeled to the head.  This was located on the
18   right side of the head, roughly in the area of the
19   temple.  There was evidence of close-range firing
20   around the entrance wound on the right side of the
21   head.
22   Q.     And sir, if I could stop you for a moment.
23   I'm going to show you government Exhibit 371A.  Do
24   you recognize that, sir?
25   A.     Yes, I do.
```

1    Q.      And what is that?

2    A.      This is a photograph that was taken at the

3    autopsy on Mr. Guest.

4    Q.      Okay.  And are those your notations on the

5    picture?

6    A.      Yes, they are.

7    Q.      And if you would, show the jury where gunshot

8    wound A is?

9    A.      You mean by touching --

10   Q.      Yes, sir.  If you touch it it will leave a

11   mark.

12           Okay.  You can go ahead.

13   A.      This was the gunshot wound located on the

14   right side of the head at the area of the temple.  As

15   I mentioned earlier, there was some evidence of

16   close-range firing around that entrance wound.

17   Close-range firing essentially, to describe what it

18   is, when a weapon is fired, besides the bullet that

19   comes out at the end of the barrel, there are a

20   number of other substances that may come out.  You

21   might have some soot or smoke coming out; you might

22   have a flame discharge; you might have gases coming

23   out.  And you also have gunpowder that's coming out

24   that's both burned and unburned gunpowder.

25           Depending on the distance from the

JAMES LARON LOPER - DIRECT

229

1    barrel, the end of the barrel to the body, some of

2    those particles will impact the body and remain on

3    the body.  In this case it was noted that there was

4    some gunpowder stippling, or some gunpowder had

5    impacted the skin surrounding that wound.  It was

6    sparse, but there was gunpowder noted.

7                And, if I touch it, will another color

8    come up?

9    Q.     It should leave another mark.

10   A.     These little specks that you see around the

11   entrance wound are what we refer to as gunpowder

12   stippling.

13   Q.     And, sir, a question for you.  When you say

14   close-range firing, what do you mean by that?

15   A.     Generally speaking -- and when I refer to

16   saying generally, because there are a number of

17   factors that go into determining how close the weapon

18   was to the body.  But generally speaking we're

19   talking 24 inches or less.

20                Now, some of those factors that may make

21   the determination are the type of weapon, the type of

22   ammunition in the weapon, the type of gunpowder

23   inside the ammunition.  Also some environmental

24   factors play a role.  Clothing that the individual

25   might be wearing or even hair can serve as filters to

1    minimize the amount of stippling or evidence of

2    close-range firing you might find on the skin.

3    Q.    What did you find about the wound itself?

4    A.    The wound entered -- or, the bullet entered

5    the right side of the head.  And in so doing passed

6    through the right side of the skull, hit portions of

7    the brain where a bullet was recovered in the soft

8    tissue overlying the left side of the jaw.

9    Q.    Did you make a determination on the size of

10   that bullet or the caliber?

11   A.    Yes.  We made a determination that it was a

12   large-caliber bullet.

13   Q.    And what do you mean by large caliber?

14   A.    In our office, at the Office of the Chief

15   Medical Examiners, we usually will have three

16   descriptions.  One being small, medium, and large

17   caliber.  The medium caliber we use as a standard as

18   a .32 caliber.  So anything that's below a .32

19   caliber we refer to as small; anything above a .32

20   caliber we refer to as large.

21   Q.    Okay.  So would a nine millimeter be a large

22   caliber?

23   A.    In our description, yes.

24   Q.    You said this wound or the bullet path struck

25   his brain; is that correct?

1   A.      Yes.

2   Q.      All right.  Would this wound by itself, could

3   that have been potentially fatal?

4   A.      Yes.

5   Q.      If you would, sir, let's move on to gunshot

6   wound B.

7   A.      Gunshot wound B was also a gunshot wound to

8   the right side of the head located there at the

9   arrow.  There was no evidence of close-range firing

10  on the skin surrounding that wound.

11  Q.      Let me stop you there.  Has Mr. Guest's head

12  been shaved?

13  A.      Yes, it has.

14  Q.      So is the area or would the area around entry

15  point B have had hair over it?

16  A.      Yes.

17  Q.      Would that have affected whether or not there

18  was stippling?

19  A.      Yes, it could.

20  Q.      Okay.  Go ahead.

21  A.      The bullet entered from this portion or the

22  side of his head, similar to the other bullet that I

23  mentioned, and passed through the right side of the

24  skull; passed through portions of the brain, where

25  the bullet continued to exit the left side of the

JAMES LARON LOCKE - DIRECT

232

1     skull and left side of the scalp.

2     Q.     Dr. Locke, I'm going to show you government's

3     371C.  Do you recognize that?

4     A.     Yes.

5     Q.     And what is that?

6     A.     Again, it's a photograph taken at autopsy

7     depicting the exit wound.

8     Q.     Okay.  If you would point to where the exit

9     wound is.

10          Okay.  Thank you.

11          So you did not recover the bullet in this

12     wound, correct?

13     A.     That's correct.

14     Q.     All right.  And what damage did that bullet

15     cause?

16     A.     Again, it caused damage to his skull and to

17     his brain.

18     Q.     And taken about itself, would this wound have

19     been potentially fatal?

20     A.     Yes.

21     Q.     All right, sir.  Let's move on to gunshot

22     wound C.

23     A.     Gunshot wound C was another gunshot wound to

24     the right side of his head.

25     Q.     Sir, I'm showing you 371B.  Do you recognize

1    that?

2    A.      Yes.

3    Q.      And do you note where gunshot wound C is on

4    this picture?

5    A.      Just to give you some orientation, what we're

6    looking at essentially is the top of his head; we're

7    looking down on the top of his head.  And as you can

8    see gunshot wounds A and B are located on the left

9    side of the photograph.  Gunshot wound C, again, is

10   still on the right side of the head, but it's

11   slightly more towards the top of the head.

12   Q.      And what did you find out about the wound

13   here?

14   A.      There was no evidence of close-range firing on

15   the skin surrounding this entrance wound.  The bullet

16   passed through the skull and passed through, again,

17   portions of the brain.  The bullet then continued to

18   exit from the left side of the head.

19           Oh, I'm sorry.  I'm looking at gunshot

20   wound B.

21           Gunshot wound C was to the right side of

22   the head, passed through the skull and portions of

23   brain.  A fragment of bullet and also a potentially

24   large size portion of the bullet was recovered from

25   the left temporalis muscle, which is a muscle on the

234

1      left side of the head.

2      Q.      Okay.  And, sir, again, what was the caliber

3      of the bullet you recovered?

4      A.      It was a large caliber.

5      Q.      Okay.  So, again, that could be a nine

6      millimeter?

7      A.      Yes.

8      Q.      Again, taken by itself, could this wound have

9      been potentially fatal?

10     A.      Yes.

11     Q.      Let's move to gunshot wound D.

12     A.      Gunshot wound D was a wound to the left side

13     of the back of the head.

14              MR. FUCHS:  Okay.  And for the record,

15     Your Honor, I'm showing Dr. Locke 371D.

16              THE COURT:  Yes.  371D as in "dog".

17              THE WITNESS:  The gunshot wound was

18     located on the left side of the scalp.  There was no

19     evidence of close-range firing on the surrounding

20     skin.  The bullet did not pass through the skull into

21     the brain, but did cause a fracture of the skull.

22     The bullet continued to exit from the left side of

23     the head by a little slit or exit just above the ear.

24     BY MR. FUCHS:

25     Q.      Sir, we're going to go back to 371C.  Do you

1    see the exit wound there for wound number D?

2    A.      Yes.

3    Q.      Okay.  And if you could, just point it out to

4    the jury.

5              Thank you, sir.

6              Now, sir, you said that the bullet in

7    this wound fractured the skull; is that correct?

8    A.      Yes.

9    Q.      Would this wound taken by itself have been

10   potentially fatal?

11   A.      It has potential to be fatal.

12   Q.      Okay.  Let's move on to gunshot wound E.

13   A.      Gunshot wound E was a gunshot wound to the

14   left side of the back.  There was no evidence of

15   close-range firing around the skin of that entrance

16   wound.

17   Q.      Sir, let me ask you this:  Among the factors

18   that affect whether or not stippling is left, would

19   clothing affect whether or not stippling was left?

20   A.      Yes.

21   Q.      All right.  Go ahead.

22   A.      This bullet passed through the skin and

23   underlying tissues.  It fractured the fourth

24   vertebra, thoracic vertebra, or a portion of the

25   backbone in your chest.  In so doing it bruised a

236

```
 1        portion of the thoracic spinal cord, which is a very
 2        large nerve that runs through your backbone.  It
 3        entered into the right side of the chest and also
 4        caused a perforation to the liver and to the right
 5        side of the diaphragm.  The bullet then continued to
 6        exit from the skin of the right side of the chest.
 7        Q.      And, sir, I'm showing you 371E.  Do you see
 8        the exit wound on that picture?
 9        A.      Yes.
10        Q.      And if you could point it out to the jury.
11        A.      (Witness complies.)
12        Q.      Thank you.
13                Sir, you said the bullet in this wound
14        fractured Mr. Guest's back; is that correct?
15        A.      It fractured one of his backbone.
16        Q.      And it also contused his spinal column; is
17        that correct?
18        A.      Spinal cord, yes.
19        Q.      If Mr. Guest had received that wound and had
20        been walking at the time, could he continue to walk
21        after receiving that wound?
22        A.      Probably not.
23        Q.      Okay.  Could he have continued to stand?
24        A.      Probably not.
25        Q.      And taken by itself would this wound have been
```

1      potentially fatal?

2      A.      It has potential to be fatal.

3      Q.      And why is that?

4      A.      Because it struck several tissues that are

5      responsible for survival.  For instance, the liver is

6      a very vascular organ; it means it has a very rich

7      blood supply.  And in so doing, striking the liver,

8      it would cause a significant amount of bleeding.

9              It also struck the diaphragm.  The

10     diaphragm is a muscle that essentially separates your

11     abdominal organs from your chest organs.  But it has

12     a major responsibility in your breathing because it

13     moves up and down as you breathe.  And in so striking

14     the right side of his diaphragm there may be some

15     difficulty in him breathing.

16     Q.      Okay.  Sir, we're going to move on to gunshot

17     wound F.  Explain to the jury what that was.

18     A.      This was a gunshot wound also to the left side

19     of his back.  There was no evidence of close-range

20     firing on the skin surrounding that wound.

21     Q.      And are you noting for the jury where that

22     wound is?

23     A.      Yes.

24     Q.      Thank you, sir.

25     A.      This bullet entered the skin and underlying

1    tissues.  It also fractured the identical vertebra or

2    portion of the backbone in his body, also contusing

3    or bruising the spinal cord.  This bullet continued

4    to enter into the right chest cavity where it struck

5    the right lung.  It then exited from the chest cavity

6    and continued to exit from the right side of the

7    chest.

8    Q.     Sir, I'm showing you government Exhibit 371E

9    (sic).  Do you see the exit wound on that picture?

10   A.     Yes, I do.

11   Q.     And if you could point it out to the jury?

12   A.     (Witness complies.)

13   Q.     And sir, again, taking by itself, could this

14   wound have been potentially fatal?

15   A.     Yes, it could.

16   Q.     Okay.  And why is that?

17   A.     Again, because it struck vital structures in

18   the body.  The main structure that it did strike was

19   the lung.

20   Q.     Okay.  Now, if you would, move to gunshot

21   wound G.

22   A.     Gunshot wound G was a wound to the left

23   forearm.

24        THE COURT:  You touched the lower part of

25   the screen there, Doctor.  There, it's off.  Thank

239

1      you.

2      BY MR. FUCHS:

3      Q.      Sir, I'm showing you 371G.  Do you recognize

4      that?

5      A.      Yes.

6      Q.      And what is that?

7      A.      This is a photograph of Mr. Guest's left

8      forearm.

9      Q.      Okay.

10     A.      This is a gunshot wound to the left forearm.

11     There was no evidence of close-range firing on the

12     skin surrounding that wound.  The bullet essentially

13     passed through the skin and underlying tissues and

14     continued to exit from the back of the right forearm.

15     Q.      Showing you 371H.  What is that?

16     A.      That is the exit.

17     Q.      Okay.  And, sir, in this case, would that

18     wound likely have been fatal?

19     A.      Not immediately fatal, no.

20     Q.      Sir, you testified that you recovered two

21     bullets and a bullet fragment from Mr. Guest; is that

22     correct?

23     A.      That's correct.

24     Q.      What did you do with those bullets and the

25     bullet fragment?

JAMES LARON LOCKE - DIRECT

240

```
1    A.      Each of the bullets along with the fragment

2    were placed in individual evidence envelopes and

3    labeled and given to the investigator, investigating

4    officer at the time.

5              MR. FUCHS:  Permission to approach, Your

6    Honor.

7              THE COURT:  Yes, sir.

8              MR. FUCHS:  Dr. Locke, I'm showing you

9    government's 443A, B and C.

10             THE COURT:  Government Exhibits 433.

11             MR. FUCHS:  443A, B and C, Your Honor.

12   BY MR. FUCHS:

13   Q.      And I ask if you can identify those.

14             433?

15   A.      Yes.  These were the projectiles that were

16   removed from Mr. Guest's body and placed into

17   evidence envelopes and then turned over to the

18   police.

19   Q.      Okay.  Does it say on there what the CC number

20   is of the case?

21   A.      It has two sets of numbers.  I'm not sure

22   which one is the CC number.

23   Q.      If you could, just read that bottom number.

24   A.      The bottom number?

25   Q.      Yes, sir.
```

JAMES AARON LOCKE - DIRECT

241

1    A.      099I10277.

2    Q.      And, sir, based on all the findings that you

3    made, did you have an opinion as to the cause of

4    death of Mr. Guest?

5    A.      Yes.

6    Q.      And what is it?

7    A.      That Mr. Guest died from multiple gunshot

8    wounds.

9    Q.      Okay.  Did you form an opinion as to the

10   manner of his death?

11   A.      Yes.

12   Q.      And what was that?

13   A.      That of homicide.

14           MR. FUCHS:  No further questions, sir.

15           THE COURT:  Any cross-examination, Mr.

16   Proctor?

17           MR. PROCTOR:  Thanks for coming, Doctor.

18           No, sir.

19           THE COURT:  All right.  Thank you very

20   much, Dr. Locke.  You may step down.  You should not

21   discuss your testimony with anyone in the event you

22   were called back to the witness until this trial

23   concludes, sir.  Thank you very much.

24           MR. FUCHS:  Your Honor, the government's

25   next witness is Akil Muhangi from the Baltimore crime

AKIL KASUMBA MUHANGI - DIRECT

242

```
 1      lab.

 2      Whereupon:

 3                      AKIL KASUMBA MUHANGI,

 4      called as a witness, having been first duly sworn

 5      according to law, testified as follows:

 6                 THE DEPUTY CLERK:  Please state your name

 7      for the record.

 8                 THE WITNESS:  My name is Akil Kasumba

 9      Muhangi.

10                 THE DEPUTY CLERK:  Spell your first name,

11      please.

12                 THE WITNESS:  A-k-i-l.

13                 THE COURT:  Spell your last name, please.

14                 THE WITNESS:  Sure.  Both words.

15      K-a-s-u-m-b-a.  The second word is M-u-h-a-n-g-i.

16                 THE COURT:  Thank you very much.

17                 MR. FUCHS:  Permission to proceed, Your

18      Honor?

19                 THE COURT:  Yes.

20                      DIRECT EXAMINATION

21      BY MR. FUCHS:

22      Q.    Mr. Muhangi, where do you work?

23      A.    I work for the Baltimore City Police

24      Department in the mobile crime lab unit.

25      Q.    Okay.  How long have you worked for the crime
```

```
 1    lab?

 2    A.      Six years.

 3    Q.      And what's your position?

 4    A.      Crime laboratory technician.

 5    Q.      Okay.  What does a crime lab technician do?

 6    A.      Basically we respond to the crime scenes for

 7    purposes of documentation and evidence recovery.

 8    Q.      Okay.  Were you working on September 20th of

 9    2009?

10    A.      Yes.

11    Q.      Did you respond to any calls in Westport that

12    night?

13    A.      Yes.

14    Q.      If you remember, what kind of call was it?

15    A.      I was advised that it was a shooting that

16    eventually turned into a homicide.

17    Q.      Okay.  And, sir, did you write a report based

18    on your response to the call that night?

19    A.      Yes.

20            MR. FUCHS:  Permission to approach, Your

21    Honor.

22            THE COURT:  Yes.

23            MR. FUCHS:  Mr. Muhangi, I'm going to

24    show you government Exhibit 426.

25            Your Honor, this is for identification
```

244

```
 1    only.

 2                    Sir, do you recognize that?

 3                    THE COURT:  That's government Exhibit

 4    426?

 5                    MR. FUCHS:  Yes, sir.

 6                    THE COURT:  All right.

 7                    THE WITNESS:  Yes.

 8    BY MR. FUCHS:

 9    Q.      And what is it?

10    A.      It's a copy of the report that I wrote in

11    reference to that incident.

12    Q.      I'm sorry, go ahead.  Okay.

13    A.      It's a copy of the report that I wrote in

14    reference to that incident.

15    Q.      Okay.  And what is the CC number of this

16    incident?

17    A.      It's 099, "I" as in Ida, 10277.

18    Q.      Okay.  And if you would, sir, tell the jury

19    exactly what the address of the crime scene was?

20    A.      The address I was given was 2440 Maisel Court.

21    Q.      Okay.  And what time did you get there?

22    A.      10:36 in the evening.

23    Q.      Okay.  Did anyone else in the crime lab go

24    with you?

25    A.      I believe my supervisor responded to assess
```

1    the scene.  But I did all the duties on the scene

2    that night.

3    Q.    Were you the person that processed the scene?

4    A.    Yes.

5    Q.    Was the victim at the scene when you arrived?

6    A.    No.

7    Q.    All right.  Was anyone at the scene when you

8    arrived?

9    A.    There were police officers present.  And I

10   believe the homicide detectives had gotten there, as

11   well.

12   Q.    Okay.  I'm going to show you what's been

13   labeled as government's 47.  Do you recognize that?

14   A.    Yes.

15   Q.    And what is it?

16   A.    It's an aerial view of Westport and also the

17   location of the crime scene.

18   Q.    And, on that map, do you see Maisel Court?

19   A.    Yes.

20   Q.    And if you would, show the jury where the

21   crime scene was.

22   A.    Approximately in this area next to where the

23   number 3 is.

24   Q.    You can actually -- if you touch the screen,

25   it leaves a mark.  So, if you would, just circle it,

1    circle where the crime scene was.

2              Sir, I'm also going to show you

3    government Exhibit No. 9.  Do you recognize that?

4    A.    Yes.

5    Q.    And what is that?

6    A.    It's one of the photographs I took of the

7    crime scene.

8    Q.    Okay.  And does this -- was this taken the

9    night of the incident?

10   A.    Yes.

11   Q.    Okay.  And is this the way it looked --

12   A.    Yes.

13   Q.    -- roughly speaking?  All right.  What are

14   those numbered and lettered cards that we see?

15   A.    Those are evidence markers that we use to mark

16   each piece of evidence that we're planning to recover

17   from the crime scene.

18   Q.    Did you recover some evidence that night?

19   A.    Yes.

20   Q.    Did you recover any firearms evidence?

21   A.    Yes, I did.

22   Q.    All right.  Does that evidence all appear in

23   the picture?

24   A.    Everything but one.

25   Q.    Okay.  And is the firearms evidence next to

1    the numbered cards or the lettered cards?

2    A.     The numbered cards.

3                 MR. FUCHS:  Permission to approach, Your

4    Honor?

5                 THE COURT:  Yes, certainly.

6    BY MR. FUCHS:

7    Q.     Mr. Muhangi, I'm going to show you government

8    Exhibit 427A.  Do you recognize that?

9    A.     Yes.

10   Q.     What is that?

11   A.     It's the envelope I used to submit the No. 1

12   piece of evidence, which was a projectile.

13   Q.     Okay.  And if you would, show on the screen

14   where No. 1 was recovered from.

15   A.     It's here.

16   Q.     Where that No. 1 card is?

17   A.     Yes.

18   Q.     All right.  I'm going to show you government

19   exhibit 427B.  Do you recognize that?

20   A.     Yes.

21   Q.     And what is it?

22   A.     It's a cartridge casing that was marked as No.

23   2 from the crime scene.

24   Q.     Okay.  And again, if you would show on the

25   picture where No. 2 was.

1                        And the last is government's 427C.  Do

2       you recognize that?

3       A.      Yes.

4       Q.      And what is it?

5       A.      It's a cartridge casing that was marked as No.

6       3 from the crime scene.

7       Q.      Okay.  One last time if you would?

8       A.      (Witness complies.)

9       Q.      And what CC number were all these pieces of

10      evidence submitted under?

11      A.      The same one, 099, "I" as in Ida, 10277.

12      Q.      Okay.  When you're at a crime scene, how did

13      you pick up the evidence?

14      A.      After it's photographed, in this case the

15      firearms evidence, each one goes into a separate

16      envelope individually.  And once any processing that

17      is necessary is done, then it all gets packaged into

18      one larger envelope and is submitted to our evidence

19      unit.

20      Q.      Okay.  Do you wear gloves when you pick up the

21      evidence?

22      A.      Yes.

23      Q.      I'm going to show you government's Exhibit 7.

24      Do you recognize that?

25      A.      Yes.

1    Q.     And what are we looking at?

2    A.     It's a close-up photograph of item No. 1,

3    which is a projectile.

4    Q.     Okay.  And had it been moved at this point?

5    A.     Not from the time I arrived on the crime scene

6    to the time I picked it up; it was in the same place.

7    Q.     So that's where you found it?

8    A.     Yes.

9    Q.     I'm going to show you government Exhibit No.

10   8.  Do you recognize that?

11   A.     Yes.

12   Q.     And what's that?

13   A.     A close-up photograph of item No. 2, which is

14   a cartridge casing.

15   Q.     This is government Exhibit 26.  Do you

16   recognize that?

17   A.     Yes.

18   Q.     And what's that?

19   A.     A close-up photograph of item No. 3, which is

20   also a cartridge casing.

21   Q.     Okay.  Did you do any testing on the casings

22   after you recovered them?

23   A.     Yes.  Both of the casings were checked for

24   fingerprints before they were submitted.

25   Q.     Okay.  And who actually did the fingerprint

1    testing?

2    A.      I did.

3    Q.      And what did you find?

4    A.      I didn't find any fingerprints on the

5    cartridge casing before I submitted it.

6    Q.      Go back to government's Exhibit No. 9.  Did

7    you recover any other evidence at the scene that

8    night?

9    A.      Yes.

10   Q.      And what was that?

11   A.      I'll have to refer to my report.

12   Q.      Sure.

13   A.      There were also a couple pieces of newspaper.

14   Q.      Do we see those on this picture?

15   A.      Yes.  They're in the grass on the side.

16   Q.      Go ahead and point to them.

17           All right.  Anything else?

18   A.      There was a baseball cap that was marked as

19   item B.

20   Q.      Okay.  Do you remember anything specific about

21   that baseball hat?

22   A.      I believe the pattern was a fatigue; and there

23   was also some blood present on it.

24   Q.      Okay.  What else did you find?

25   A.      There was also a cellphone.

1    Q.      Okay.  Is that where the letter A is located?

2    A.      Yes.

3    Q.      And was all this evidence submitted under the

4    same CC number?

5    A.      Yes.

6    Q.      And was all this evidence submitted that

7    night?

8    A.      The cellphone was collected by the primary

9    detective on the scene.  And the baseball cap was

10   placed into a drying cabinet because of the moisture

11   that was present.  But everything else was submitted

12   that night.

13            MR. FUCHS:  Okay.  No further questions,

14   Your Honor.

15            THE COURT:  Any cross-examination on

16   this, Mr. Proctor?

17            MR. PROCTOR:  No, sir.

18            THE COURT:  All right.  Thank you very

19   much, sir.  You may step down.  You shouldn't discuss

20   your testimony with anyone in the event you're called

21   back to the witness stand until this trial concludes.

22   Thank you very much.

23            Next witness, Mr. Fuchs?

24            MR. FUCHS:  Your Honor, the government

25   calls James Wagster from the Baltimore City Police

1       Department firearms department.

2       Whereupon:

3                       JAMES L. WAGSTER,

4       called as a witness, having been first duly sworn

5       according to law, testified as follows:

6                       THE DEPUTY CLERK:  Please have a seat and

7       state your full name for the record.

8                       THE WITNESS:  James L. Wagster,

9       W-a-g-s-t-e-r, Baltimore City police crime lab.

10                      THE DEPUTY CLERK:  Thank you.

11                      MR. PROCTOR:  Judge, I'm sorry.  Could we

12      approach real quick?

13                      THE COURT:  Certainly.

14                      (BENCH CONFERENCE ON THE RECORD.)

15                      THE COURT:  Yes, Mr. Proctor.

16                      MR. PROCTOR:  I'd like to set out a long

17      and eloquent argument, but I won't.  The last time

18      Mr. Wagster testified -- I believe it might have been

19      in a case with you -- I made the objection under the

20      recent National Academy of Sciences that ballistics

21      evidence is not reliable.  The Court denied it.  I

22      expect to shut up and for Your Honor to deny me once

23      more.  I just want to preserve it just in case the

24      law shakes out differently.  So we would object.

25                      THE COURT:  It's definitely within his

1    area of expertise and is so recognized.  So if he is

2    qualified as an expert he may testify with respect to

3    ballistics analysis.

4              MR. PROCTOR:  And I'm not going to object

5    to his credentials, given Your Honor's ruling.  I

6    just wanted to preserve it.

7              THE COURT:  You've preserved it for the

8    record.

9              (END OF BENCH CONFERENCE.)

10                   DIRECT EXAMINATION

11   BY MR. FUCHS:

12   Q.    Mr. Wagster, again, I'm sorry, where do you

13   work?

14   A.    Baltimore City police crime lab.

15   Q.    How long have you worked there?

16   A.    Since September of 1992.

17   Q.    And what's your position there?

18   A.    I'm a firearms examiner.

19   Q.    And what does a firearms examiner do?

20   A.    We examine all the firearms-related evidence

21   that comes through the police department:  The

22   firearms themselves; fired ammunition components,

23   which would be bullets and cartridge cases; and any

24   live ammunition that's submitted.

25   Q.    And if you would tell us, just briefly, sir,

JAMES L. WAGSTER - DIRECT

254

1    what training you've received as a firearms and

2    toolmark identification expert?

3    A.    There's no schools that teach firearms

4    identification.  At the time I was a Baltimore City

5    police detective in their crime lab.  I was assigned

6    to the Maryland State Police and trained under Mr.

7    Don Floor.

8    Q.    And since that time have you also received

9    additional training in firearms identification?

10   A.    Yes, I'm a member of AFTE, which is the

11   Association of Firearm and Toolmark Examiners.  I've

12   attended several of their national training sessions

13   and several East Coast training sessions.

14   Q.    Have you ever been qualified as an expert?

15   A.    Yes.

16   Q.    In which courts and how many times?

17   A.    Approximately 452 previous times.  Baltimore

18   City, Baltimore County, Howard County, Harford

19   County, U.S. District Court in Baltimore and

20   Greenbelt.

21           MR. FUCHS:  All right.  Your Honor, at

22   this time I would offer Mr. Wagster as an expert in

23   firearms identification.

24           THE COURT:  Any voir dire on this?

25           MR. PROCTOR:  Other than as stated at the

255

1       bench, no, sir.

2                    THE COURT:  All right.  So, again, ladies

3       and gentlemen, Mr. Wagster has been qualified as an

4       expert in firearms identification.  Having been so

5       qualified he's permitted to give his opinion with

6       respect to that area of expertise as to firearms

7       identification.  Once again, it's up to the jury to

8       accept or reject any portion of any witness's

9       testimony.

10                    So with that you may proceed, Mr. Fuchs.

11                    MR. FUCHS:  Thank you, sir.

12      BY MR. FUCHS:

13      Q.    Mr. Wagster, did you examine any firearms

14      evidence in this case?

15      A.    Yes, sir.

16      Q.    And did you generate a report based on your

17      findings?

18      A.    Yes, I did.

19                    MR. FUCHS:  Permission to approach, Your

20      Honor?

21                    THE COURT:  Yes.

22      BY MR. FUCHS:

23      Q.    Mr. Wagster, I'm going to show you government

24      Exhibit 44A.  Do you recognize that?

25      A.    It's a copy of the report that myself and

256

1    examiner Faber prepared.

2    Q.     Okay.  And what's the CC number of the report?

3    A.     It's 099I10277.

4              THE COURT:  Is this being offered into

5    evidence, Mr. Fuchs?

6              MR. FUCHS:  No, sir.  I'm sorry.  Just

7    for identification only.

8              THE COURT:  All right.

9    BY MR. FUCHS:

10   Q.     Now, Mr. Wagster, you examined some casings in

11   this case, correct?

12   A.     Yes, sir.

13             MR. FUCHS:  Your Honor, permission to

14   approach again?

15             THE COURT:  Yes.

16   BY MR. FUCHS:

17   Q.     Mr. Wagster, this is 427B and C.  Do you

18   recognize those?

19   A.     Yes, sir.

20   Q.     And what are they?

21   A.     Two fired nine millimeter cartridge casings.

22             THE COURT:  Exhibits again what, Mr.

23   Fuchs?

24             MR. FUCHS:  427B and C, Your Honor.

25             THE COURT:  All right.  Thank you.

BY MR. FUCHS:

Q.      Have you examined them before today, sir?

A.      Yes, I have.

Q.      And how do you know it's the same set of
casings?

A.      The envelope's marked, my initials, CC number,
and the property number on the plastic envelopes I
placed them in, and the cartridge casings themselves
are marked.

Q.      And if you would -- I'm sorry.

A.      Q1, Q2, my initials, and the property number.

Q.      If you would explain just briefly to the jury
what is a cartridge casing?

A.      A cartridge casing would be the part of the
ammunition component that holds the gunpowder and the
bullet.

Q.      Is it designed -- in this particular case, are
those designed for use in a firearm?

A.      Yes, sir.

Q.      What kind of firearm is that kind of casing
commonly designed for?

A.      Most common for a semiautomatic pistol.

Q.      Mr. Wagster, I show you --

        MR. PROCTOR:  Objection, Judge.

        THE COURT:  You can approach the bench.

```
 1              (BENCH CONFERENCE ON THE RECORD.)

 2              THE COURT:  Yes, Mr. Proctor.

 3              MR. PROCTOR:  I'm going to show you a

 4    firearm that is not connected in this case in any way

 5    and may or may not resemble the murder weapon.

 6              THE COURT:  I assume it's a photograph of

 7    the murder weapon.

 8              MR. FUCHS:  No, no.  It's not.  I'm

 9    sorry.  I showed this to Mr. Proctor earlier.  I

10    didn't think we had a problem.  It's just -- I just

11    want to ask Mr. Wagster how a semiautomatic pistol

12    works.  It's essential that -- the direction of this

13    case, I thought it would be helpful if there was a

14    picture.

15              THE COURT:  I don't think you need to put

16    a picture up there.  It's not complicated.  Just ask

17    him how the weapon works.  No reason to put the

18    picture up.

19              MR. FUCHS:  Thank you.

20              (END OF BENCH CONFERENCE.)

21    BY MR. FUCHS:

22    Q.    Mr. Wagster, if you would, could you explain

23    how a semiautomatic pistol works?

24    A.    On a semiautomatic pistol you'd first have to

25    load the cartridges into the magazine.  The magazine
```

1          would have to be inserted usually into the handle of

2          the firearm.  Then you'd have to pull back the slide,

3          led it go forward to chamber the first round.  When

4          you pull the trigger, the firing pin hits the primer,

5          which sets off an ignition into the gunpowder.  That

6          burns at a very high rate, pushes the bullet down the

7          barrel.

8                    At the same time that the bullet is going

9          down the barrel the cartridge case comes back against

10         the rear or the breech face of the gun.  And then the

11         slide moves rearward, pulls that fired cartridge case

12         out, and extracts and ejects it out of the gun.

13         Q.     And when you say the casing is ejected, it's

14         just dropped on the ground?

15         A.     Basically, yes, sir.

16         Q.     Do you -- in a semiautomatic pistol, do you

17         have to pull the trigger each time you want to fire a

18         bullet?

19         A.     Yes, sir.

20         Q.     Now, in this particular case, you said you

21         examined these two casings; is that correct?

22         A.     Correct.

23         Q.     Okay.  Did you compare these two casings?

24         A.     To each other, yes, sir.

25         Q.     Okay.  And how did you do that?

1    A.      With a comparison microscope.  Which is just a

2    low powered microscope.  But it lets you see two

3    objects at the same time.

4    Q.      And what are you looking for?

5    A.      On these I was using the breech face marks to

6    make my identification.

7    Q.      Okay.  And if you would, tell the jury again

8    what breech face marks are?

9    A.      When the cartridge case comes back against the

10   rear of the gun, the machining marks from when that

11   firearm was made are stamped against the head of the

12   cartridge case.  And they're the marks that we use to

13   identify a cartridge case that's being fired in a

14   particular firearm.

15   Q.      Okay.  So if two casings are fired from the

16   same pistol, will they leave similar or identical

17   breech face marks?

18   A.      Yes, sir.

19   Q.      These sometimes are called tool marks; is that

20   right?

21   A.      Yes, sir.

22   Q.      All right.  And in this particular case, what

23   conclusion did you draw about these two casings?

24           MR. PROCTOR:  Same objection, Judge.

25           THE COURT:  Overruled.

1           THE WITNESS:  That they were fired with

2    the same firearm.

3           MR. FUCHS:  All right.  Permission to

4    approach again, Your Honor.

5           THE COURT:  Certainly.

6    BY MR. FUCHS:

7    Q.     Mr. Wagster, I'm going to show you 433A, B and

8    C.  If you would take a look at those.  Do you

9    recognize those?

10   A.     They're three bullets that I examined.

11   Q.     Okay.  And what's the CC number for the case

12   in which they relate?

13   A.     099I10277.

14   Q.     The same case we've been talking about,

15   correct?

16   A.     Yes, sir.

17   Q.     Okay.  How do you know those are the same

18   casings you looked at?

19   A.     Again, the evidence envelopes are marked with

20   my initials, the property number, and the CC number.

21   The envelopes that I put the bullets in, the plastic

22   ones are marked by myself, and also the bullets

23   themselves.

24   Q.     Okay.  Looking at the envelopes for Q3 and Q4,

25   can you tell where they came from?

1    A.      They're in the Office of the Chief Medical

2    Examiner envelopes.

3    Q.      Okay.  And how about Q1?

4    A.      That was marked from the envelope No. 1.

5    Q.      Okay.  And you examined each of these

6    projectiles, correct?

7    A.      Yes, sir.

8    Q.      All right.  And what caliber were each of

9    these rounds, if you could tell?

10   A.      Q1 and Q3 are nine millimeter.  Q4B was

11   undetermined.

12   Q.      And what was the condition of each of those

13   bullets?

14   A.      Q1D was fairly pristine, decent shape.  Q3B

15   has some mutilation.  And, Q4B, the bearing surface

16   was where the jacket material is completely stripped

17   off the bullet.

18   Q.      And by jacket material, is that the exterior

19   of the bullet?

20   A.      Yes, sir.

21   Q.      And did you compare those bullets?

22   A.      Yes, I did.

23   Q.      How did you do that?

24   A.      There again with a comparison microscope, side

25   by side.

263

```
 1      Q.      Okay.  And in this case what were you looking

 2      for?  The bullets?

 3      A.      Looking for the land and groove marks.  Which

 4      is where the bullet comes in contact with the

 5      interior of the barrel.

 6      Q.      Okay.  And what did you find in this case?

 7      A.      Q1B and Q3B were fired with the same firearm.

 8      Q4B, I couldn't tell.

 9                      MR. FUCHS:  With the Court's indulgence.

10                      No further questions, Your Honor.

11                      THE COURT:  Thank you.

12                      Cross-examination, Mr. Proctor, Mr.

13      Sullivan.

14                      MR. PROCTOR:  May I have a second?

15                      (Discussion off the record.)

16                          CROSS-EXAMINATION

17      BY MR. PROCTOR:

18      Q.      Good afternoon, sir.  How are you.  Good to

19      see you again.  Briefly, when a nine millimeter is

20      fired, I believe it's your testimony that the casing

21      ejects out; is that correct?

22      A.      Yes, sir.

23      Q.      And is that different from gun to gun?  Do

24      some eject to the right and some eject to the left?

25      A.      Yes, sir.
```

264

```
 1     Q.      And you've fired nine millimeters, right?
 2     A.      Yes, sir.
 3     Q.      Probably hundreds of them I would guess by
 4     now, right?
 5     A.      Probably, yes, sir.
 6     Q.      How far do the bullets go when they eject --
 7     the casings -- I'm sorry.  How far do the casings go?
 8     A.       It ranges.  There again, depending on the
 9     surface, whether it's grass or asphalt, they can roll
10     further on asphalt.  It depends on how you hold the
11     gun.  If you hold it I call it TV style or you hold
12     it upright, it's going to make a difference in where
13     that cartridge case goes.
14     Q.      Okay.  So what I hear you saying, obviously,
15     if it lands on grass it's unlikely to roll; is that
16     fair to say?
17     A.      Yes, sir.
18     Q.      Whereas if it lands on concrete, it could
19     skedaddle and finish up somewhere completely
20     different, right?
21     A.      Yes, sir.
22     Q.      And it depends on -- does it depend on the
23     make of the bullet?
24     A.       It can depend -- yes, sir.  There again,
25     different powder loads are in different cartridges.
```

265

1    So that can affect how far it goes.

2    Q.    And it depends on the style of the weapon,

3    right?

4    A.    Yes, sir.

5    Q.    And it depends on what height the person is.

6    Because obviously if I'm holding a gun at shoulder

7    level that's different from a short person holding at

8    a shoulder level, right?

9    A.    Yes, sir.

10   Q.    So I guess what I'm trying to get at:  If two

11   casings are -- sit right next to each other; okay,

12   there's two casings sitting right there on the

13   ground.  That doesn't necessarily mean the person was

14   standing in the same place and pulled the trigger

15   twice, does it?

16   A.    Not particularly, no, sir.

17   Q.    I mean, he could have fired; pulled the

18   trigger ten feet apart; and just one rolled next to

19   the other one, right?

20   A.    Could have, yes, sir.

21   Q.    And by the same token, the reverse is true,

22   isn't it?  If I'm standing here and I pop off two

23   shells, one could be over by the court reporter and

24   the other could be sitting next to my client?

25   A.    Different directions, yes, sir.

JAMES L. WAGSTER - CROSS

266

1          MR. PROCTOR:  Okay.  Can I have a second,

2     please, Judge?

3               That's all I have, Judge.

4          THE COURT:  Thank you very much, Mr.

5     Proctor.  Any redirect, Mr. Fuchs?

6          MR. FUCHS:  No, Your Honor.

7          THE COURT:  All right.  Thank you, Mr.

8     Wagster.  You may step down.  You should not discuss

9     your testimony with anyone, sir, in case you're

10    recalled before the trial is concluded.

11              Counsel approach the bench for one

12    second, please.

13              (BENCH CONFERENCE ON THE RECORD.)

14         THE COURT:  How long a witness is this

15    expected to be?

16         MR. PURCELL:  Short.

17         THE COURT:  This is a short witness,

18    correct?

19         MR. FUCHS:  Five minutes, Your Honor.

20         THE COURT:  Fine.  That will be it for

21    the day.

22         MR. PROCTOR:  The cross might be 30

23    seconds if Mr. Sullivan or I stutter.

24         THE COURT:  You two are too eloquent; you

25    never stutter.

1                    (END OF BENCH CONFERENCE.)

2     Whereupon:

3                        DANIEL MICHAEL KERWIN,

4     called as a witness, having been first duly sworn

5     according to law, testified as follows:

6                    THE DEPUTY CLERK:  Please state your full

7     name for the record.

8                    THE WITNESS:  Daniel Michael Kerwin,

9     K-e-r-w-i-n.

10                   THE DEPUTY CLERK:  Thank you.

11                       DIRECT EXAMINATION

12    BY MR. FUCHS:

13    Q.    Mr. Kerwin, where do you work?

14    A.    I am a special agent with the Bureau of

15    Alcohol, Tobacco Firearms and Explosives.  We're an

16    agency within the U.S. Department of Justice.

17    Specifically I work in the violent crimes impact team

18    group within the Baltimore field division.

19    Q.    And how long have you been with the ATF?

20    A.    Three and a half years.

21    Q.    Have you received any specialized training in

22    the movement of ammunition in interstate commerce?

23    A.    I have.

24    Q.    And if you would, briefly explain to the jury

25    what that training has been.

DANIEL MICHAEL KERWIN - DIRECT

268

1    A.      Certainly.  Prior to my employment with ATF I

2    was a state trooper in the Commonwealth of Virginia.

3    That's where I received initial training as to

4    firearms and ammunition, the markings on there and

5    what they signify, as well as nomenclature to

6    firearms and ammunition, which are basically what the

7    parts are named.

8            In ATF training we expanded upon this by

9    exposing me to many different types of firearms

10   manufacturers and ammunition manufacturers.  And from

11   there I was selected to go to interstate expert,

12   interstate nexus expert training, which is a week

13   long session in Martinsburg, West Virginia, where all

14   we do is examine firearms, ammunition, and determine

15   their place of origin as to who manufactured them.

16           Additionally, I attended the advanced

17   ammunition interstate nexus expert training, which

18   was last year, where we toured several ammunition

19   factories and bullet manufacturers.

20   Q.      And have you ever been qualified as an expert

21   witness?

22   A.      Yes, I have.

23   Q.      And in which courts and how many times?

24   A.      Within the U.S. District Court in the District

25   of Maryland.  And I believe nine times previous.

DANIEL MICHAEL KERWIN/DIRECT

269

```
1                    MR. FUCHS:  Okay.  Your Honor, I at this

2       point I would ask that Special Agent Kerwin be

3       admitted as an expert in the movement of ammo --

4       ammunition in interstate commerce.

5                    THE COURT:  Not as to guns; just as to

6       ammunition?

7                    MR. FUCHS:  Just as to ammunition.

8                    THE COURT:  All right.  Any voir dire,

9       Mr. Proctor?

10                   MR. PROCTOR:  No, sir.

11                   THE COURT:  Once again, this witness has

12      been qualified as an expert with respect to the

13      interstate movement of ammunition.  The matter of

14      interstate movement is one of the elements of one of

15      the offenses and that's why he's being offered.  So

16      he's permitted to give his opinion.  And it's up to

17      you again to reject or accept the opinion of any

18      witness.  But he is qualified as an expert in the

19      interstate movement of ammunition and may so testify.

20                   MR. FUCHS:  Permission to approach, Your

21      Honor?

22                   THE COURT:  Yes, certainly.

23      BY MR. FUCHS:

24      Q.    Special Agent Kerwin, I'm showing you

25      government Exhibit 427C and B.  Do you recognize
```

1    those?

2    A.      Yes, I do.

3    Q.      Have you examined them before today?

4    A.      Yes, I have.

5    Q.      And what are they?

6    A.      They are two cartridge casings which are

7    labeled CCI NR 9 MM Luger, L-u-g-e-r.

8    Q.      If you can, what CC number have these casings

9    been submitted under?

10   A.      Both of them are labeled 099I, Ida, 10277.

11   Q.      And are these cartridge casings designed for

12   use in a firearm?

13   A.      Yes, they are.

14   Q.      And are they ammunition as it's defined under

15   federal law?

16              MR. PROCTOR:  Objection.

17              THE COURT:  Overruled.

18              THE WITNESS:  Yes, they are.

19   BY MR. FUCHS:

20   Q.      Were you able to determine who manufactured

21   these two cartridge casings?

22   A.      Yes, I was.

23   Q.      Who was that?

24   A.      CCI, which stands for Cascade Cartridge

25   Incorporated.

1    Q.      Where were they manufactured?

2    A.      In the State of Idaho.

3    Q.      How do you know that?

4    A.      By examining the head stamp on the cartridge

5    casing itself, which is the name I just read allowed,

6    CCI NR 9 millimeter Luger.  Effectively for those of

7    us in this line of work, this is pretty much an

8    address as to who manufactured it.  And if it were

9    manufactured by, let's say, someone else besides CCI,

10   it would bear another mark on the back.

11   Q.      Did you could some research about CCI?

12   A.      I did.

13   Q.      And what did you find?

14   A.      ATF keeps records as to cartridge head stamps,

15   which is what I read off, and their corresponding

16   manufacturer.  And additionally I consulted

17   periodicals.

18   Q.      Is that what led you to believe that CCIs are

19   manufactured in Idaho?

20   A.      Yes.

21   Q.      All right.  Based on your training and

22   experience, were you able to determine whether or not

23   these cartridge casings moved in interstate commerce?

24   A.      Yes.  As they were manufactured in the State

25   of Idaho, they would have had to have moved in

```
 1        interstate commerce prior to their recovery in the
 2        State of Maryland.
 3                    MR. FUCHS:  No further questions, Your
 4        Honor.
 5                    THE COURT:  Any cross-examination, Mr.
 6        Proctor, Mr. Sullivan?
 7                    MR. PROCTOR:  No, sir.
 8                    THE COURT:  All right.  Thank you very
 9        much, Agent Kerwin.  You may step down.
10                    THE WITNESS:  Thank you, sir.
11                    THE COURT:  You shouldn't discuss your
12        testimony with anyone in the event you're called back
13        to the witness stand.
14                    THE WITNESS:  Yes, sir.
15                    THE COURT:  Thank you, sir.
16                    Counsel, do you want to approach the
17        bench for one second, please?
18                    (BENCH CONFERENCE ON THE RECORD.)
19                    THE COURT:  Okay.  Who is the next
20        witness?
21                    MR. PURCELL:  The government will be
22        calling Detective Moody, and then we're going to go
23        into the eyewitnesses.
24                    THE COURT:  So we're going to get to the
25        eyewitnesses tomorrow.  Detective Moody and how many
```

273

1    eyewitnesses?

2              MR. PURCELL:  Six.

3              THE COURT:  They've all testified,

4    they're all testifying tomorrow?  They'll all be

5    available to testify?

6              MR. PURCELL:  They'll all be available.

7              THE COURT:  Make sure they are all

8    available.  I want Moody.  Depending on how long, I

9    want them all to be available.

10             MR. SULLIVAN:  You're calling him again.

11   This is a brief appearance.

12             MR. PURCELL:  I've notified counsel.  I'm

13   going to ask to recall Detective Moody later on for

14   the statement that the defendant made to him.

15             THE COURT:  Then you will have all six

16   eyewitnesses here to testify?

17             We have an issue with alternate number

18   two, who has a court date scheduled for 9 o'clock

19   tomorrow morning in the District Court in Baltimore

20   County in Essex.  My staff has been on the phone.

21   Given that nothing seems to be going easily so far

22   the first day and a half of this case, I've been on

23   the phone with two different judges in the District

24   Court of Baltimore County.  And we've got it so that

25   her case will be heard immediately at 9 o'clock.  I

1    don't want to start any later than 10 or 10:15.  But

2    I don't want to be losing an alternate juror here and

3    only have one alternate left.

4            So I'm going to indicate to her,

5    alternate No. 2, as to having the case start; that

6    we're going to deal with this and her case will start

7    promptly at 9 o'clock in Essex.  Quite frankly, if

8    she's not here by 10:15, we're going to have to

9    forget her and excuse her and go forward.  I'm just

10   not going to wait until 11 o'clock for her to get

11   here.

12           MR. PURCELL:  They won't continue it?

13           THE COURT:  No.  I've tried that.  And

14   they won't continue it.  And the Baltimore County

15   judge has deferred to Harford County for this hearing

16   and has to do deal with a protective order.  I just

17   have not been able to reschedule it.  You know.  And

18   it was not mentioned in voir dire by the juror and I

19   don't know what else to do about it.

20           Does the government have any other

21   suggestions?

22           MR. PURCELL:  Perhaps, I was just

23   thinking maybe I could have called the State's

24   Attorneys Office from their end just to pull it.

25           THE COURT:  It's now late in the day, Mr.

```
 1    Purcell.  I have not had the normal reaction I get
 2    from the district court.  I talked to -- my office
 3    has talked to Judge Sandy Williams, who usually
 4    reacts immediately for me.  And she said ordinarily
 5    she would do so but it's with respect to Judge
 6    Haislip, who is coming in from Harford County and
 7    we've not been able to change it.
 8              And I know.  All I know is we're probably
 9    on the verge of losing an alternate because I have
10    absolutely no intentions -- no disrespect for the
11    District Court of Maryland -- but I have no
12    intentions of having this whole case wait on their
13    docket out in Essex.  So I'm willing to start at 10
14    or quarter after 10 at the latest.  And if the
15    alternate is not here we're going to have to start
16    without her and we'll have to excuse her and have one
17    alternate left.  And Judge Haislip and Judge Williams
18    have not been particularly responsive to us, quite
19    frankly.  I don't have any more comment.  We'll
20    proceed.  It's what it is.
21              MR. PURCELL:  Your Honor, Judge Haislip
22    is a very good friend of a very good friend of mine
23    who is a district judge.  If I were able to get ahold
24    of somebody --
25              THE COURT:  I don't know.  You want to go
```

1    back to my chambers; because my chambers has not been

2    able to get this done.

3              MR. PURCELL:  Counsel doesn't mind if I

4    intercede.

5              MR. PROCTOR:  No problem.

6              MR. SULLIVAN:  We don't have this problem

7    in the Southern Division.

8              THE COURT:  I will tell you it has not

9    gone smoothly with this situation.  With respect to

10   this situation, we have spent a fair amount of time

11   in my chambers on this.  That's the way it is.  We're

12   going to start at 10 o'clock.

13              (END OF BENCH CONFERENCE.)

14              THE COURT:  Ladies and gentlemen, we're

15   going to start at 10 o'clock tomorrow.  Alternate No.

16   2, you have a commitment that we've spent a lot of

17   time trying to deal with.  And you'll need to talk to

18   Miss West immediately after today's case with respect

19   to a scheduling problem that you have.

20              We're going to start tomorrow promptly at

21   10 or quarter after 10, as best we can.  I'm going to

22   ask everyone to get here as best they can by 10

23   o'clock and we're going to do our best to start at 10

24   o'clock.

25              And, with that, we'll take a brief recess

1      so that we can then proceed with the next matter.

2              (TRIAL RECESSED.)

3

4              I certify that the foregoing is a correct

5      transcript from the record of proceedings in the

6      above-entitled matter.

7

8                              *s/ Anthony Rolland*

9                              ANTHONY ROLLAND

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$26,000** - 63:3, 63:7, 65:7
**$35,000** - 63:11, 65:8, 65:14

**'**

**'80s** - 64:12
**'no** - 45:5

**0**

**00:30** - 218:20
**02s** - 167:8
**099** - 213:22, 244:17, 248:11
**099i** - 270:10
**099i10277** - 241:1, 256:3, 261:13

**1**

**1** - 73:14, 88:18, 107:8, 166:25, 172:5, 187:2, 205:22, 207:11, 247:11, 247:14, 247:16, 249:2, 262:4
**10** - 3:3, 21:15, 21:19, 90:5, 205:8, 215:13, 215:17, 218:19, 274:1, 275:13, 275:14, 276:12, 276:15, 276:21, 276:22, 276:23
**10277** - 213:22, 244:17, 248:11, 270:10
**10:05** - 213:5
**10:15** - 274:1, 274:8
**10:36** - 213:2, 244:22
**11** - 274:10
**11-30** - 199:9
**11:30** - 66:7
**12** - 7:6, 16:20, 187:25
**12:30** - 218:20
**13th** - 194:16
**15** - 52:4, 52:5, 52:6, 90:5, 100:4, 139:4
**1513** - 28:10, 119:2
**16** - 106:23, 107:3, 168:1
**18** - 28:10, 56:9, 57:9, 110:9, 196:15
**1800** - 197:24
**1863(b)7** - 146:17
**18th** - 196:3, 196:6, 196:20
**1958** - 68:5
**1991** - 224:1
**1992** - 253:16
**1998** - 148:9
**19th** - 194:20, 195:11
**1:10-cr-0744-rdb** - 1:6
**1st** - 165:8, 173:19

**2**

**2** - 1:11, 191:24, 247:23, 247:25, 249:13, 274:5, 276:16
**2,000** - 68:23

**20** - 10:16, 28:17, 53:2, 56:1, 86:10, 101:10, 219:1, 219:8, 222:13
**20-something** - 79:2
**200** - 208:17
**2002** - 95:1
**2003** - 147:11
**2004** - 19:20, 21:15, 38:20
**2007** - 26:2
**2008** - 12:17, 12:25, 26:2, 33:1, 100:4, 106:25, 128:23, 141:18, 141:19, 141:25, 143:5, 167:23, 187:6, 187:9, 188:2, 188:6, 188:15
**2009** - 10:16, 34:13, 39:20, 41:6, 49:12, 52:1, 72:22, 76:15, 84:5, 84:9, 89:18, 95:6, 101:3, 101:10, 101:24, 102:24, 103:20, 103:21, 107:22, 108:3, 130:22, 134:22, 141:15, 142:7, 146:9, 154:13, 154:19, 157:6, 165:5, 165:8, 165:24, 166:19, 168:17, 172:19, 174:19, 174:25, 175:17, 177:20, 192:3, 192:6, 193:16, 194:1, 194:10, 194:13, 195:1, 195:2, 195:19, 203:11, 208:2, 226:2, 226:25, 243:9
**20096789** - 207:4
**2010** - 41:6, 41:7, 41:22, 50:23, 52:2, 59:20, 59:25, 194:16, 194:20, 199:9, 201:20
**2011** - 1:11, 196:3, 196:15, 199:10, 201:22
**20th** - 31:12, 31:14, 34:13, 52:1, 101:3, 101:24, 102:24, 103:2, 103:3, 103:20, 103:21, 104:25, 105:2, 107:22, 108:3, 130:21, 135:9, 165:24, 166:19, 208:2, 243:8
**21st** - 31:13, 59:20, 226:2, 226:25
**22** - 127:8
**2236** - 213:1
**227** - 36:8
**23** - 207:5, 207:7
**24** - 9:20, 127:12, 229:19
**2400** - 209:4
**243** - 107:19
**2440** - 244:20
**246** - 36:1, 114:19, 133:7
**25** - 56:1, 86:10, 192:6, 192:12
**251** - 107:19
**25th** - 192:3, 193:15
**26** - 65:14, 177:24, 178:1, 249:15
**2600** - 87:14
**26th** - 60:10
**27** - 29:24

**2700** - 87:14
**27th** - 73:4
**28** - 20:24, 146:16, 188:2
**280** - 17:25, 18:6
**28th** - 141:25, 178:8, 187:6
**29** - 67:21
**295** - 20:14
**29th** - 178:8
**2nd** - 52:1, 185:18, 187:9, 188:6

**3**

**3** - 3:3, 185:19, 206:21, 245:23, 248:6, 249:19
**30** - 56:1, 127:10, 196:18, 196:19, 266:22
**302** - 13:6, 13:7, 13:8, 13:9, 34:20, 35:23, 36:1, 81:9, 101:15, 102:5, 102:7, 102:13, 103:5, 105:18, 105:19, 105:22, 106:1, 106:6, 106:12, 106:25, 108:1, 108:2, 108:12, 108:24, 109:6, 109:23, 110:1, 112:6, 112:7, 118:3, 119:1, 119:16, 120:5, 120:18, 122:2, 122:24, 123:10, 123:16, 124:9, 127:24, 128:14, 133:1, 133:8, 167:22, 168:9, 175:3, 175:4, 175:15, 177:5, 189:7, 189:21, 191:8
**302s** - 100:11, 100:16, 102:25, 106:16, 167:7, 170:14, 177:24, 180:5, 181:18, 189:20, 189:25, 190:9, 190:12, 190:20, 190:25, 191:15, 191:21, 193:2, 193:7, 193:19, 194:2, 194:22, 202:18, 203:15
**306** - 81:25, 82:4, 106:18, 109:19, 108:13, 128:1, 128:2, 132:25, 168:8, 168:9, 189:9
**30th** - 194:13
**32** - 230:18, 230:19
**336** - 98:7, 98:9, 125:2, 142:24, 180:25
**337** - 103:12, 103:13, 103:17, 124:22, 166:9, 166:11
**338** - 96:7, 100:8, 125:3, 141:21
**341** - 138:10, 138:11
**342** - 147:10
**356** - 213:25
**371** - 226:2
**371a** - 227:23
**371b** - 232:25
**371c** - 232:3, 234:25
**371d** - 234:15, 234:16
**371e** - 236:7, 238:8
**371g** - 239:3
**371h** - 239:15

**399** - 72:5, 72:7

**4**

**4** - 32:16, 32:17, 41:7, 114:19
**400** - 225:2
**422** - 157:7, 157:8, 157:24
**426** - 243:24, 244:4
**427a** - 247:8
**427b** - 247:19, 256:17, 256:24
**427c** - 248:1, 269:25
**433** - 240:10, 240:14
**433a** - 267:7
**443a** - 240:9, 240:11
**44a** - 255:24
**452** - 254:17
**47** - 29:13, 245:13
**47a** - 87:19
**4:30** - 66:25
**4th** - 39:21, 59:25

**5**

**5** - 56:7, 222:14

**6**

**6** - 56:7
**603** - 146:8
**615** - 4:20, 4:24
**65** - 166:25

**7**

**7** - 206:21, 248:23
**702** - 225:10

**8**

**8** - 249:10
**8,000** - 224:20
**826** - 146:8

**9**

**9** - 128:23, 207:5, 246:3, 250:6, 270:7, 271:6, 273:18, 273:25, 274:7
**90** - 149:20
**922(g)(1** - 110:9
**948** - 147:10
**9th** - 106:25, 194:10, 199:9

**A**

**abdominal** - 237:11
**abilities** - 196:16
**ability** - 145:18
**able** - 7:16, 270:20, 271:22, 274:17, 275:7, 275:23, 276:2
**above-entitled** - 277:6
**absent** - 99:8, 181:15
**absolutely** - 9:13, 275:10
**Absolutely** - 59:21, 126:22, 146:1, 179:14, 199:19
**Academy** - 252:20
**academy** - 32:6, 219:9, 219:14
**accept** - 116:20, 116:22, 117:12,

225:17, 255:8, 269:17
**accepted** - 117:19
**accepts** - 225:13
**access** - 2:21, 145:6, 163:15
**accessible** - 20:14, 25:17
**acclimate** - 28:23
**accolade** - 59:18
**according** - 3:4, 67:8, 94:8, 136:21, 153:7, 164:19, 199:22, 204:8, 223:9, 242:5, 252:5, 267:5
**accounts** - 15:21, 15:22, 15:25, 16:4
**accurately** - 65:12, 91:10
**accused** - 183:6
**act** - 64:7, 117:1
**acting** - 11:11
**actions** - 183:11
**active** - 69:22, 185:11
**activities** - 195:24
**activity** - 126:1, 221:11
**actors** - 117:3
**acts** - 21:16, 26:21, 198:13
**actual** - 32:7, 145:7, 145:24, 205:14
**adamant** - 175:14, 176:7, 193:8
**add** - 144:4
**addition** - 23:2, 167:6, 167:8
**additional** - 254:9
**Additionally** - 268:16
**additionally** - 271:16
**address** - 64:20, 108:24, 109:1, 143:21, 177:15, 244:19, 244:20, 271:8
**addressed** - 146:19
**adhered** - 9:17
**adhering** - 41:4
**adjust** - 136:23
**admissible** - 81:9
**admission** - 63:10
**admit** - 14:6, 64:4, 112:17, 183:15, 200:17, 200:24, 202:17, 214:10
**admits** - 50:1, 50:2
**admitted** - 22:16, 35:22, 44:21, 45:8, 45:15, 49:7, 51:3, 58:14, 61:25, 81:18, 116:11, 125:5, 125:6, 166:9, 201:1, 202:21, 269:3
**adult** - 210:15
**advance** - 54:17
**advanced** - 268:16
**advised** - 213:1, 243:15
**aerial** - 87:15, 87:22, 245:16
**affect** - 202:2, 235:18, 235:19, 265:1
**affected** - 231:17
**affirmed** - 146:8
**afforded** - 148:17
**afraid** - 49:8
**Afte** - 254:10
**afternoon** - 59:16, 66:25, 91:6, 91:7,

2

125:15, 152:15,
153:13, 159:24,
159:25, 204:18,
218:8, 218:9, 222:13,
222:14, 223:2, 263:18
**Afternoon** - 152:1
**afterwards** - 58:2,
176:24
**age** - 145:22
**agency** - 267:16
**agent** - 3:23, 3:25,
4:1, 4:3, 4:5, 4:7,
4:11, 26:24, 27:1,
32:8, 55:19, 60:8,
93:20, 109:10,
193:14, 267:14
**Agent** - 269:2,
269:24, 272:9
**agents** - 4:15, 5:1,
32:3, 100:17, 132:10,
138:14, 140:8,
175:22, 191:6,
195:12, 195:19,
199:13, 200:18,
201:19
**aggressive** - 27:9
**ago** - 57:11, 72:12,
132:15, 154:19,
187:21
**agree** - 44:5, 55:4,
99:13, 149:24, 188:2
**agreed** - 93:1,
138:17
**agreement** - 35:3,
56:23, 97:10, 97:11,
97:15, 97:23, 98:13,
99:15, 100:2, 104:16,
105:13, 125:2,
142:17, 142:18,
143:4, 165:16,
165:19, 180:13,
180:17, 184:6, 203:15
**agreements** -
167:17
**agrees** - 62:1
**ahead** - 5:22, 6:11,
72:19, 125:12, 149:8,
222:22, 228:12,
231:20, 235:21,
244:12, 250:16
**ahold** - 275:23
**Aid** - 211:7
**aided** - 1:24
**ain't** - 75:17
**Aka** - 95:24, 114:4
**Akil** - 241:25, 242:3,
242:8, 242:12
**Al** - 57:12
**Alaska** - 209:9
**Alcohol** - 267:15
**alert** - 200:6
**alerted** - 220:8
**alibi** - 59:10
**alive** - 14:19, 212:7
**allegation** - 117:20
**allegations** - 80:23,
81:10, 81:16, 116:18
**alleged** - 117:11,
122:21, 148:2
**allow** - 29:15, 93:11
**allowed** - 4:11,
18:10, 20:20, 40:8,
40:9, 52:12, 124:3,
149:19, 151:3, 151:4,
151:5, 151:8, 271:5
**Allows** - 107:15
**Almost** - 40:23
**almost** - 8:21, 9:1,
9:2, 33:14, 36:2,
38:11, 49:1, 54:21,

114:15, 143:10,
157:7, 185:19, 195:17
**alone** - 44:11
**alternate** - 3:1, 3:7,
273:17, 274:2, 274:3,
274:5, 275:9, 275:15,
275:17
**Alternate** - 276:15
**Amber** - 77:25,
120:15, 120:16,
120:19
**Amber's** - 120:24,
121:1
**ambulance** - 90:11
**Amendment** -
139:11, 145:12,
145:16, 183:22, 184:2
**amendments** -
145:11
**America** - 1:3
**ammo** - 269:3
**ammunition** -
119:18, 229:22,
229:23, 253:22,
253:24, 257:15,
267:22, 268:4, 268:6,
268:10, 268:14,
268:17, 268:18,
269:4, 269:6, 269:7,
269:13, 269:19,
270:14
**amount** - 17:25,
18:1, 18:3, 230:1,
237:8, 276:10
**analyses** - 100:19
**analysis** - 253:3
**angel** - 54:4, 54:5,
62:23
**Annapolis** - 44:4,
78:3, 84:8, 84:10,
159:10, 159:11,
162:2, 163:3, 196:8
**Anne** - 209:3
**Annor** - 209:9,
209:14, 221:17
**anonymity** - 146:20
**anonymous** - 2:11,
2:17, 2:18, 2:20, 2:25,
144:2, 144:8, 144:16,
145:9, 145:11,
145:14, 145:16,
145:21, 146:17,
146:23, 147:13,
148:14, 149:23,
149:25, 150:10
**answer** - 15:16,
31:25, 40:6, 1:9:11,
131:17, 193:5, 197:8
**answers** - 40:13
**Anthony** - 277:8,
277:9
**Antonio** - 1:7,
36:14, 36:16, 49:9,
54:3, 112:23, 112:24,
118:7
**anyway** - 46:19,
204:21
**apart** - 265:18
**appeal** - 146:7,
149:7
**Appeals** - 196:3,
196:8, 196:12, 198:12
**appear** - 3:2,
166:23, 212:7, 216:1,
246:22
**appearance** - 97:5,
187:7, 187:14, 188:6,
188:13, 211:23,
273:11
**Appearances** - 1:14

**appeared** - 211:20
**appellate** - 196:13
**apples** - 127:1
**applicable** - 4:20
**applies** - 4:22, 4:24,
201:15
**apply** - 65:14,
201:18
**appointed** - 141:16,
142:2, 183:2, 186:7,
186:17, 186:21,
206:25
**appointing** - 200:9
**appointment** -
152:22
**appreciate** - 8:12,
20:8, 64:8, 153:3
**apprised** - 5:20
**Approach** - 116:7,
134:4, 214:5
**approach** - 52:23,
63:15, 65:2, 73:19,
80:15, 166:7, 168:3,
168:5, 191:25, 208:8,
209:1, 209:6, 226:8,
240:5, 243:20, 247:3,
252:12, 255:19,
256:14, 257:25,
261:4, 266:11,
269:20, 272:16
**approached** -
26:23, 46:10, 92:14,
149:15, 155:20,
210:14
**approaching** -
209:21, 210:15
**appropriate** - 80:21,
137:15
**approval** - 99:9,
180:21, 181:9,
181:15, 181:17,
198:1, 198:4
**April** - 41:6
**arbitrarily** - 227:11
**area** - 13:2, 18:16,
18:18, 55:9, 60:1,
69:20, 76:11, 84:7,
95:14, 95:18, 163:1,
205:18, 205:22,
206:4, 207:10,
207:12, 207:13,
207:15, 207:16,
207:18, 207:20,
211:1, 215:20,
220:22, 221:11,
221:16, 227:18,
228:14, 231:14,
245:22, 253:1, 255:6
**areas** - 206:8
**argues** - 145:10,
145:12, 145:15
**arguing** - 145:17
**argument** - 4:2,
150:20, 172:7, 252:17
**arraignment** -
156:14, 185:15
**arranges** - 21:20
**arrest** - 21:10,
130:1, 130:5
**arrested** - 12:17,
12:25, 26:3, 60:10,
118:20, 154:6
**Arrested** - 12:19
**arrive** - 62:18, 90:2
**arrived** - 212:16,
216:7, 216:9, 217:11,
245:5, 245:8, 249:5
**arrow** - 231:9
**Arundel** - 20:13
**aspect** - 93:14

**asphalt** - 264:9,
264:10
**asserted** - 80:25,
81:13, 81:19, 81:21,
116:12, 116:19,
117:13, 184:1
**assertions** - 80:24
**assess** - 244:25
**assessed** - 17:20
**assessing** - 171:13
**assessments** - 46:1
**assigned** - 205:1,
205:2, 205:5, 206:25,
207:2, 254:5
**assist** - 226:3
**assistant** - 34:24,
104:8, 177:14,
177:15, 187:15,
223:23
**Assistant** - 1:16,
165:12, 181:24,
182:12, 191:20,
193:16, 193:17,
195:12
**assistants** - 124:6
**assisting** - 5:1
**Associate** - 184:7
**associate** - 122:13
**associated** -
113:24, 182:7
**Association** -
254:11
**association** - 70:3
**assume** - 214:4,
258:6
**assumed** - 51:19,
214:5
**Atf** - 267:19, 268:1,
268:8, 271:14
**atlantic** - 55:15
**attempts** - 147:17,
147:25, 221:20
**attend** - 143:15
**attended** - 254:12,
268:16
**attention** - 72:22,
80:14, 95:6, 96:23,
101:3, 114:15,
114:16, 120:14,
137:11, 141:13,
144:25, 154:13,
160:15, 165:21,
174:20, 175:16,
191:6, 205:21, 208:1
**Attorney** - 1:16,
58:17, 165:12,
181:25, 182:12,
184:7, 191:20, 193:17
**attorney** - 40:23,
40:24, 94:25, 97:12,
97:13, 97:16, 97:24,
99:15, 100:20,
137:14, 138:24,
140:2, 182:13,
193:10, 193:11,
197:11
**Attorney's** - 32:10,
60:7, 94:4, 94:18,
97:21, 173:4, 179:5,
180:22, 185:12,
192:25, 203:12
**attorneys** - 52:15,
100:25, 107:7,
107:10, 165:15,
165:18, 165:23
**Attorneys** - 94:22,
195:13, 274:24
**attributed** - 133:5,
133:6
**August** - 1:11, 3:3,

7:6, 29:24, 73:3, 73:4,
141:25, 174:24,
185:18, 187:6,
187:23, 188:2, 188:9,
188:12, 188:13
**authorization** -
201:13
**autopsies** - 224:17
**autopsy** - 225:23,
226:3, 226:20,
226:22, 227:2, 228:3,
232:6
**available** - 273:5,
273:6, 273:8, 273:9
**avenue** - 88:20
**Avery** - 61:24
**aware** - 95:17,
126:7, 175:2, 221:15,
221:17

# B

**babies** - 24:11,
41:12, 41:18, 44:14
**baby** - 11:24, 41:19,
73:8
**baby's** - 156:12
**backbone** - 235:25,
236:2, 236:15, 238:2
**background** -
167:12
**bad** - 17:11, 30:9,
55:22, 127:2
**baggy** - 25:19
**bags** - 19:15
**bail** - 60:10
**balance** - 64:11
**ball** - 62:16, 62:17
**ballistics** - 62:5,
220:3, 252:20, 253:3
**Ballistics** - 62:6
**Baltimore** - 9:4,
21:5, 31:21, 44:12,
55:10, 69:20, 94:23,
95:15, 100:18, 156:6,
168:19, 174:23,
182:17, 183:1, 183:2,
197:12, 204:22,
204:23, 205:18,
206:7, 223:21,
241:25, 242:23,
251:25, 252:9,
253:14, 254:4,
254:17, 254:18,
254:19, 267:18,
273:19, 273:24,
274:14
**Bang** - 11:11,
118:14
**bang** - 11:1, 11:11,
12:13, 22:23, 36:18,
118:13, 129:22,
129:23
**bar** - 57:5
**barrel** - 228:19,
229:1, 259:7, 259:9,
263:5
**base** - 71:4, 177:1
**baseball** - 20:11,
250:18, 250:21, 251:9
**Based** - 119:16,
271:21
**based** - 15:11,
38:20, 50:24, 53:1,
70:7, 193:9, 226:5,
241:2, 243:17, 255:16
**basis** - 65:6
**basketball** - 57:4
**Bates** - 36:1,
107:13, 108:20,

114:19, 133:7
**Beale** - 106:1
**bear** - 271:10
**bearing** - 262:15
**became** - 23:20, 141:15
**become** - 147:22
**becomes** - 21:10
**bed** - 75:5
**beers** - 42:5
**began** - 32:11, 32:13, 34:17, 34:18
**begin** - 121:11
**begins** - 181:3
**behalf** - 53:9
**behavior** - 111:12
**behind** - 210:20
**belief** - 140:11
**bell** - 149:24
**below** - 171:22, 230:18
**bench** - 5:4, 5:23, 6:15, 6:25, 65:2, 80:17, 116:7, 134:4, 149:16, 214:5, 255:1, 257:25, 266:11, 272:17
**Bench** - 5:13, 7:19, 52:25, 53:8, 65:4, 66:2, 80:18, 81:6, 116:9, 252:14, 253:9, 258:1, 258:20, 266:13, 267:1, 272:18, 276:13
**Bennett** - 1:13, 53:21
**best** - 19:9, 32:6, 52:15, 132:15, 186:17, 186:19, 276:21, 276:22, 276:23
**better** - 8:24, 44:17, 52:17, 63:1, 63:2
**between** - 15:6, 26:1, 26:2, 97:11
**beyond** - 53:20, 53:24, 54:7, 55:7, 63:25
**beyond-a-reasonable-doubt** - 53:20
**Big** - 85:3, 161:22, 162:16, 162:20, 162:21, 162:23, 163:5
**big** - 5:22, 19:14, 58:22, 68:21, 82:17, 88:13, 127:6, 149:22
**bigger** - 149:17
**biggest** - 23:9
**billed** - 197:19
**birth** - 109:1
**birthday** - 72:9
**bit** - 8:1, 29:4, 29:8, 31:8, 39:25, 86:21, 88:17, 105:11, 157:2, 220:18
**bitten** - 126:25
**Black** - 36:10, 36:16, 36:21, 79:5, 86:21, 86:23, 87:3, 95:24, 95:25, 101:23, 110:24, 112:10, 114:24, 115:1, 115:2, 117:25, 118:11
**black** - 61:3, 61:7, 149:13, 149:22, 190:8, 190:13, 190:15, 210:18
**Black's** - 36:20, 118:10, 133:17

**Blacktop** - 159:6
**blame** - 20:7, 51:17, 60:24, 60:25
**blamed** - 193:7
**bleeding** - 219:17, 237:8
**block** - 74:10, 74:11, 74:12, 76:8, 76:11, 87:14, 208:17, 209:4, 210:1
**blocked** - 211:3, 215:16
**blocks** - 72:18, 72:19
**blood** - 237:7, 250:23
**blue** - 221:13
**blunt** - 30:11
**board** - 70:2
**body** - 209:23, 210:12, 210:14, 212:22, 215:14, 216:14, 217:16, 226:23, 227:11, 229:1, 229:2, 229:3, 229:18, 238:2, 238:18, 240:16
**book** - 57:12, 57:13, 57:14, 124:11, 124:13, 124:15, 128:16, 128:21, 128:22, 128:24
**boot** - 18:24
**born** - 54:10
**borrow** - 213:23
**borrowed** - 20:25
**bottle** - 26:8, 151:5
**bottles** - 151:1
**bottom** - 30:4, 36:3, 74:17, 108:19, 240:23, 240:24
**bought** - 19:19, 20:6, 24:7, 59:10
**box** - 169:9
**boxes** - 51:6, 51:7, 51:9, 169:10
**boy** - 40:15
**boyfriend** - 39:13, 39:15
**Boys** - 70:4
**boys** - 24:2, 77:21, 91:25, 92:1
**brag** - 26:15
**bragged** - 27:4
**bragging** - 27:18
**brain** - 230:7, 230:25, 231:24, 232:17, 233:17, 233:23, 234:21
**brains** - 89:16
**Brandenburg** - 23:19, 106:12
**brazen** - 26:9, 26:10
**break** - 3:8, 3:11, 16:16, 41:24, 48:3, 49:17, 66:5, 66:24, 138:22, 143:13, 143:21, 148:23, 222:13
**breathe** - 237:13
**breathing** - 237:12, 237:15
**breech** - 259:10, 260:5, 260:8, 260:17
**brick** - 24:16
**brief** - 97:5, 152:10, 198:23, 222:12, 273:11, 276:25
**Brief** - 66:8, 222:15
**Briefly** - 3:21,

263:19
**briefly** - 132:22, 152:5, 202:12, 253:25, 257:12, 267:24
**bright** - 26:10
**bring** - 10:8, 14:18, 14:21, 15:22, 18:9, 19:1, 24:18, 25:11, 32:12, 32:13, 46:11, 49:24, 51:10, 60:6, 75:7, 137:10
**bringing** - 13:21, 30:20, 44:19
**brings** - 47:10
**Brings** - 47:12, 47:13, 47:15
**broke** - 11:4, 25:1, 25:2, 44:13, 186:5
**broken** - 206:8
**brother** - 9:24, 27:13, 27:14, 85:2
**brother's** - 27:15
**brought** - 6:10, 22:24, 28:9, 31:3, 38:21, 40:22, 49:11, 51:11, 64:10, 97:4, 144:24, 176:11, 183:20, 199:22
**Brown** - 100:13, 101:9, 101:11, 105:6, 127:10
**Brown's** - 105:4
**bruised** - 235:25
**bruising** - 238:3
**build** - 52:2
**building** - 38:6, 211:3
**buildings** - 51:6
**built** - 17:1
**bulge** - 25:18
**bullet** - 47:16, 47:18, 47:23, 51:12, 228:18, 230:4, 230:7, 230:10, 230:12, 230:24, 231:21, 231:22, 231:25, 232:11, 232:14, 233:15, 233:17, 233:23, 233:24, 234:3, 234:20, 234:22, 235:6, 235:22, 236:5, 236:13, 237:25, 238:3, 239:12, 239:21, 239:25, 257:16, 259:6, 259:8, 259:18, 262:17, 262:19, 263:4, 264:23, 268:19
**bullets** - 62:6, 239:21, 239:24, 240:1, 253:23, 261:10, 261:21, 261:22, 262:13, 262:21, 263:2, 264:6
**bunch** - 9:9, 22:21, 33:2, 55:21, 155:12
**Bureau** - 109:11, 267:14
**burned** - 228:24
**burns** - 259:6
**business** - 24:21, 195:18, 195:20, 195:24
**but** - 60:15, 122:22
**buy** - 20:15, 20:16, 20:18, 24:3, 30:10, 30:11, 30:12, 59:11
**buying** - 19:21, 24:2

**buzz** - 86:3
**Byers** - 146:6, 146:21

**C**

**cabinet** - 251:10
**Cabreja** - 204:4, 204:6, 204:11, 204:14, 222:8
**cadet** - 219:13
**calendar** - 62:14
**caliber** - 230:10, 230:12, 230:13, 230:17, 230:18, 230:19, 230:20, 230:22, 234:2, 234:4, 262:8
**Camden** - 69:9
**camera** - 221:3, 221:10, 221:13, 221:21
**cameras** - 221:15
**cannot** - 4:25, 139:12, 139:15, 139:18, 225:8
**cap** - 250:18, 251:9
**capacity** - 147:16, 182:3
**captioned** - 2:10
**car** - 11:19, 20:20, 20:21, 20:25, 21:1, 21:4, 21:7, 21:9, 21:14, 38:9, 42:22, 43:18, 43:20, 43:21, 43:23, 44:5, 45:1, 45:11, 45:18, 46:25, 47:11, 48:12, 48:13, 48:18, 59:6, 85:21, 89:7, 163:6, 207:24, 209:8
**card** - 247:16
**cards** - 246:14, 247:1, 247:2
**care** - 12:21, 12:22, 19:14, 27:17, 28:25, 157:2, 216:23, 219:18
**cared** - 44:14
**cares** - 12:23, 62:7
**Carithers** - 32:23, 35:7, 35:8, 38:7, 56:19, 56:24, 58:9, 96:22, 98:2, 98:3, 98:14, 99:21, 103:19, 104:2, 108:17, 131:7, 131:8, 131:20, 132:22, 132:9, 134:10, 134:12, 135:3, 136:1, 136:17, 136:19, 136:25, 137:4, 138:1, 139:16, 139:25, 143:12, 143:17, 148:25, 152:11, 152:24, 153:24, 154:1, 155:1, 155:3, 155:6, 156:16, 160:1, 160:5, 160:12, 160:14, 163:18, 164:15, 164:17, 164:21, 164:22, 165:3, 179:22, 181:4, 182:6, 186:19, 186:20, 187:2, 187:10, 187:24, 188:5, 191:24, 193:15, 196:2, 199:3, 203:21
**carries** - 58:13
**carrying** - 110:13, 119:19

**cars** - 85:13, 85:17, 85:18, 85:23, 85:24
**Cartridge** - 270:24
**cartridge** - 247:22, 248:5, 249:14, 249:20, 250:5, 253:23, 256:21, 257:8, 257:13, 257:14, 259:9, 259:11, 260:9, 260:12, 260:13, 264:13, 270:6, 270:11, 270:21, 271:4, 271:14, 271:23
**cartridges** - 258:25, 264:25
**Cascade** - 270:24
**Case** - 1:6
**case** - 2:6, 3:23, 3:25, 4:3, 4:5, 4:7, 4:11, 6:5, 6:19, 6:23, 7:1, 7:5, 8:4, 8:17, 8:21, 9:5, 9:20, 11:8, 13:20, 14:23, 14:24, 16:21, 17:1, 17:8, 17:9, 21:11, 26:13, 26:24, 27:1, 27:2, 28:15, 31:17, 31:18, 31:19, 31:20, 31:21, 32:18, 32:19, 33:6, 33:7, 33:8, 33:13, 33:14, 33:19, 33:20, 33:21, 34:2, 34:5, 34:7, 34:12, 34:13, 34:24, 38:19, 40:19, 41:14, 52:2, 52:13, 53:23, 56:5, 56:14, 57:14, 57:15, 59:17, 60:25, 62:16, 63:4, 64:5, 70:16, 80:24, 81:11, 93:19, 93:20, 95:11, 95:16, 95:17, 95:19, 96:1, 96:13, 97:3, 97:14, 97:24, 98:14, 101:15, 102:14, 102:20, 108:2, 112:1, 119:21, 122:21, 125:21, 126:4, 127:15, 132:7, 135:12, 142:16, 145:5, 146:5, 146:12, 146:22, 147:11, 148:1, 148:3, 150:20, 154:4, 165:6, 165:9, 165:13, 169:17, 169:24, 172:2, 175:3, 179:12, 183:20, 187:3, 190:19, 197:13, 201:14, 201:16, 213:13, 213:19, 214:23, 229:3, 239:17, 240:20, 248:14, 252:19, 252:23, 255:14, 256:11, 257:17, 258:4, 258:13, 259:9, 259:11, 259:20, 260:9, 260:12, 260:13, 260:22, 261:11, 261:14, 263:1, 263:6, 264:13, 266:9, 273:22, 273:25, 274:5, 274:6, 275:12, 276:18
**cases** - 17:9, 147:9, 150:14, 173:7, 182:4, 183:1, 183:2, 197:13, 200:10, 253:23
**casing** - 247:22,

4

248:5, 249:14,
249:20, 250:5,
257:13, 257:14,
257:20, 259:13,
263:20, 271:5
**casings** - 215:3,
220:5, 249:21,
249:23, 256:10,
256:21, 257:5, 257:8,
259:21, 259:23,
260:15, 260:23,
261:18, 264:7,
265:11, 265:12,
270:6, 270:8, 270:11,
270:21, 271:23
**casually** - 22:15,
22:16
**caught** - 26:12,
57:17
**caused** - 178:21,
200:12, 232:16, 236:4
**causing** - 86:3
**caution** - 104:9
**cautionary** - 116:15
**cavity** - 238:4,
238:5
**Cc** - 213:13, 213:15,
213:17, 213:19,
214:8, 214:14,
214:23, 214:25,
215:5, 240:19,
240:22, 244:15,
248:9, 251:4, 256:2,
257:6, 261:11,
261:20, 270:8
**Cci** - 270:7, 270:24,
271:6, 271:9, 271:11
**Ccis** - 271:18
**Cds** - 167:1
**ceiling** - 63:8
**cell** - 134:21
**cellphone** - 40:8,
250:25, 251:8
**center** - 27:23, 74:7
**Center** - 68:25
**century** - 58:25
**Certain** - 115:14
**certain** - 17:12,
54:12, 142:12, 176:10
**Certainly** - 52:24,
73:20, 132:17, 164:6,
182:9, 192:1, 195:14,
208:10, 222:2,
222:24, 252:13,
261:5, 268:1
**certainly** - 54:7,
63:24, 65:17, 65:21,
65:23, 92:14, 93:9,
130:1, 149:17, 151:9,
185:9, 197:16,
220:22, 247:5, 269:22
**certify** - 277:4
**chair** - 19:25, 57:20,
89:13
**challenge** - 59:18
**chamber** - 259:3
**chambers** - 276:1,
276:11
**chance** - 5:20,
64:20
**change** - 275:7
**changed** - 46:21
**charge** - 17:17
**charged** - 54:16,
51:17, 51:22, 58:5,
60:21, 60:23, 61:9
**charges** - 17:22,
54:21, 116:17, 154:15
**Charley** - 207:5
**chasing** - 27:5

**cheap** - 23:23, 24:5
**check** - 62:14,
64:10
**checked** - 249:23
**checks** - 65:19
**Cheers** - 71:11
**Cheese** - 32:25,
33:17, 34:16, 42:14,
55:22, 56:14, 79:7,
80:2, 96:17, 96:20,
97:24, 98:14, 99:16,
100:13, 101:8,
101:11, 102:20,
105:3, 105:6, 122:3,
122:8, 122:11,
122:13, 122:21,
123:4, 125:3, 127:1,
127:12, 140:7,
141:17, 142:2, 142:8,
153:17, 156:11,
156:14, 168:14,
168:16, 170:5,
173:14, 173:24,
177:25, 178:4, 178:7,
179:11, 180:5,
181:18, 185:15,
186:8, 186:22, 187:8,
189:12, 189:17,
190:19, 190:21,
191:8, 191:16,
191:21, 193:2, 193:7,
193:18, 194:2,
194:21, 195:9,
199:18, 200:20,
201:5, 202:18
**Cheese's** - 35:6,
35:19, 38:5, 56:5,
165:6, 169:24,
175:19, 177:1, 187:3
**Cherry** - 47:5, 205:8,
208:17, 208:23
**chest** - 235:25,
236:3, 236:6, 237:11,
238:4, 238:5, 238:7
**Chief** - 223:18,
230:14, 262:1
**child** - 68:5
**children** - 60:13,
68:7, 68:9, 68:13,
71:5, 72:2, 80:1
**chip** - 32:11
**chipping** - 32:15
**chose** - 184:5
**Chris** - 94:3, 165:14
**Christmas** - 192:9
**Christopher** - 94:6,
94:11
**chronology** - 50:17
**church** - 15:6
**cigarettes** - 30:12,
30:13
**circle** - 245:25,
246:1
**circling** - 206:5
**circuit** - 146:21,
147:9, 183:15
**Circuit** - 2:24, 4:4,
4:12, 147:10, 147:11,
148:9
**circulating** - 174:21
**circumstance** -
8:20
**circumstances** -
185:11
**City** - 44:12, 55:10,
68:25, 94:23, 95:15,
100:18, 182:17,
183:2, 197:12,
204:22, 204:24,
206:7, 242:23,

251:25, 252:9,
253:14, 254:4, 254:18
**city** - 25:17, 31:21,
198:2, 205:2, 205:3
**claim** - 55:11
**claimed** - 58:15
**clarify** - 3:9, 83:2
**clean** - 55:18
**clear** - 29:1, 66:1,
124:20, 179:3
**clearly** - 2:17, 4:5,
28:20, 66:16
**Clearly** - 6:1
**clerical** - 144:9
**clerk** - 141:24,
144:10, 144:21,
151:2, 151:11
**Clerk** - 67:9, 94:9,
94:12, 136:22, 137:1,
153:8, 204:9, 204:12,
204:15, 223:10,
223:14, 242:6,
242:10, 252:6,
252:10, 267:6, 267:10
**client** - 97:18,
97:20, 99:8, 99:10,
141:22, 142:14,
168:14, 169:12,
170:18, 170:20,
171:4, 171:18,
171:20, 172:8,
173:15, 175:13,
177:24, 180:21,
181:8, 181:11,
193:12, 203:13,
203:15, 265:24
**clientele** - 197:5
**clients** - 35:1,
140:7, 150:14,
177:19, 195:25,
197:3, 197:17,
197:19, 198:15, 200:7
**Clinton** - 1:16
**clips** - 17:1
**clocks** - 6:18
**Close** - 228:17
**close** - 42:18,
42:23, 62:15, 69:11,
105:8, 107:11,
161:17, 224:20,
227:19, 228:16,
229:14, 229:17,
230:2, 231:9, 233:14,
234:19, 235:15,
237:19, 239:11,
249:2, 249:13, 249:19
**close-range** -
227:19, 228:16,
229:14, 230:2, 231:9,
233:14, 234:19,
235:15, 237:19,
239:11
**Close-range** -
228:17
**close-up** - 249:2,
249:13, 249:19
**closed** - 185:2
**closest** - 9:25
**clothing** - 210:18,
235:19
**Clothing** - 229:24
**clown** - 17:1
**Club** - 70:4
**clue** - 54:16
**co** - 26:16, 36:13,
54:1, 99:24, 108:5
**co-counsel** - 26:16,
54:1, 99:24
**co-defendants** -
36:13, 108:5

**Coast** - 254:13
**Coca** - 151:1, 151:5
**Coca-cola** - 151:1,
151:5
**cocaine** - 18:1,
18:7, 18:8, 18:11,
18:13, 95:14
**cocked** - 51:12
**code** - 44:11,
110:12, 119:2,
145:22, 150:15
**cognizant** - 59:13
**cohorts** - 127:2
**cola** - 151:1, 151:5
**colleagues** - 33:13
**collected** - 215:8
**collecting** - 215:7
**color** - 214:18,
229:7
**column** - 236:16
**comfortable** - 75:6
**coming** - 17:2,
22:14, 33:12, 50:5,
51:24, 55:1, 67:14,
74:5, 75:19, 78:2,
78:4, 89:5, 131:1,
137:24, 153:14,
154:17, 159:14,
163:2, 182:16,
228:21, 228:22,
228:23, 241:17, 275:6
**comment** - 65:21,
275:19
**comments** - 139:18
**commerce** - 267:22,
269:4, 271:23, 272:1
**commission** -
109:21
**commitment** -
276:16
**committed** - 9:8,
17:5, 21:1, 41:7,
60:23, 126:16, 129:7,
129:8, 129:11, 133:9,
198:13
**common** - 14:22,
16:2, 257:22
**commonly** - 168:18,
257:21
**Commonwealth** -
268:2
**community** - 28:2,
30:18, 34:10, 64:17,
69:23, 70:1, 71:7,
79:22, 86:3, 174:21,
175:25
**compare** - 259:23,
262:21
**comparison** -
260:1, 262:24
**compelled** - 139:12
**complaint** - 213:17
**complaints** - 144:8
**complete** - 9:11,
144:12, 224:4, 224:9
**completely** - 10:3,
49:16, 262:16, 264:19
**complicated** -
258:16
**complies** - 236:11,
238:12, 248:8
**component** -
257:15
**components** -
253:22
**compound** - 56:18
**computer** - 1:24
**computer-aided** -
1:24
**concentrating** -

160:15
**concern** - 176:14,
193:6
**concerned** - 83:20,
99:14, 150:22
**concerns** - 171:17,
177:15
**conclude** - 7:6
**concluded** - 96:1,
266:10
**concludes** - 147:3,
164:13, 203:24,
241:23, 251:21
**concluding** -
146:23
**conclusion** - 15:18,
17:2, 17:3, 119:7,
178:24, 260:23
**concrete** - 264:18
**condition** - 99:6,
181:7, 185:10,
211:17, 262:12
**conditions** - 197:22
**conduct** - 17:13,
17:20, 17:22, 145:5,
198:17, 225:23
**conducted** - 36:5,
135:25, 143:24
**conducting** - 145:4
**conference** - 5:11,
6:25
**Conference** - 5:13,
7:19, 52:25, 53:8,
65:4, 66:2, 80:18,
81:6, 116:9, 252:14,
253:9, 258:1, 258:20,
266:13, 267:1,
272:18, 276:13
**conferences** - 6:15
**confession** - 62:9
**confident** - 9:13
**confirm** - 124:13,
168:8
**conflict** - 183:25
**confronted** - 176:14
**confusion** - 192:19,
212:3
**Congress** - 18:2
**Congress's** - 28:11
**connected** - 258:4
**connection** -
190:19
**consciousness** -
11:9
**consequence** -
179:11
**consider** - 11:7
**considerably** -
198:7
**consideration** -
92:6
**consistent** - 25:14
**consists** - 226:19
**conspiracy** - 17:23,
46:16, 46:18, 95:13,
110:17, 119:23
**Constitution** -
183:21
**constitutional** -
145:10
**consulted** - 99:12,
181:12, 271:16
**contact** - 263:4
**contained** - 81:11,
155:10, 177:5, 184:24
**content** - 59:24,
139:15
**contents** - 81:18,
116:11, 117:8, 180:16
**context** - 80:23,

5

81:10, 81:17, 114:23,
115:10, 116:16,
116:17, 116:20,
116:23, 117:9,
117:13, 139:9, 182:17
**continent** - 54:13
**continue** - 81:23,
117:21, 126:11,
139:21, 150:23,
236:20, 274:12,
274:14
**continued** - 148:24,
210:22, 211:1,
231:25, 233:17,
234:22, 236:5,
236:23, 238:3, 238:6,
239:14
**continuing** - 199:24
**contrary** - 59:3
**controlled** - 110:16,
110:18, 119:22,
119:24, 143:6
**contused** - 236:16
**contusing** - 238:2
**conversation** -
44:8, 134:10
**conversations** -
175:22
**convicted** - 111:2,
147:19, 148:5
**conviction** - 146:7
**cook** - 18:8, 18:11,
18:12, 25:12
**cooked** - 19:6
**cooking** - 25:10
**cool** - 42:24, 220:18
**cooperate** - 182:8,
182:9, 182:24, 184:9,
184:10
**cooperated** - 34:10
**cooperating** -
111:7, 112:15,
114:13, 121:15,
167:13, 183:5, 183:7
**cooperation** -
112:18
**cooperator** -
100:22, 111:20,
120:17, 121:10
**cooperators** -
104:4, 120:10, 167:18
**cop** - 32:7
**Copied** - 177:24,
194:2
**copies** - 82:12,
82:14, 82:18, 83:12,
99:7, 99:11, 99:12,
158:17, 158:18,
158:19, 161:24,
161:25, 162:3, 162:6,
169:17, 170:14,
181:7, 181:12,
181:13, 189:13,
189:14, 189:16,
189:20, 189:23,
190:1, 191:3
**cops** - 26:24, 27:8,
32:7, 62:16, 62:17
**copy** - 29:14, 102:9,
103:14, 108:17,
135:6, 139:4, 141:21,
142:25, 166:10,
166:21, 170:6, 189:6,
189:10, 189:11,
190:2, 190:3, 190:4,
190:5, 193:18,
213:24, 226:20,
244:10, 244:13,
255:25
**cord** - 236:1,

236:18, 238:3
**corner** - 47:12,
57:5, 74:16, 74:17,
85:1, 89:1, 214:16,
214:19
**corners** - 107:8
**Correct** - 96:16,
100:3, 100:5, 103:8,
104:17, 106:14,
106:19, 106:24,
107:14, 108:11,
109:17, 114:14,
121:2, 127:4, 167:19,
178:3, 180:3, 180:12,
180:18, 181:22,
182:2, 182:5, 187:13,
187:18, 187:19,
190:10, 191:1, 191:4,
192:22, 194:11,
194:14, 196:1,
196:13, 196:14,
196:25, 197:25,
201:17, 201:21,
209:13, 259:22
**correct** - 65:15,
74:21, 95:25, 97:1,
98:24, 100:2, 101:21,
102:6, 104:10,
105:14, 105:16,
107:1, 107:23,
109:16, 110:19,
111:5, 112:16,
113:14, 114:25,
115:23, 118:14,
120:25, 121:12,
121:25, 122:19,
123:22, 124:12,
126:2, 126:3, 128:13,
129:10, 130:17,
131:6, 133:25,
134:23, 135:2,
135:15, 135:22,
137:12, 138:16,
141:2, 141:6, 141:8,
141:9, 142:21,
142:22, 151:7,
152:20, 157:17,
157:18, 169:4,
169:22, 172:12,
172:13, 178:13,
178:15, 178:19,
179:8, 179:9, 180:2,
180:11, 180:14,
180:17, 181:21,
182:8, 182:19, 183:3,
184:3, 184:14,
187:22, 189:12,
190:9, 190:25,
192:21, 193:8,
194:23, 196:4,
196:13, 196:17,
196:21, 197:2, 197:7,
197:24, 198:10,
199:11, 201:21,
201:23, 201:25,
202:3, 202:7, 202:18,
203:9, 206:1, 207:16,
214:22, 223:4, 223:5,
230:25, 232:12,
232:13, 235:7,
236:14, 236:17,
239:22, 239:23,
256:11, 259:21,
261:15, 262:6,
263:21, 266:18, 277:4
**corrected** - 151:12
**correctly** - 193:23
**correspond** -
108:20
**corresponding** -

271:15
**cost** - 65:24
**costs** - 65:15, 65:18
**Counsel** - 36:2,
53:12, 65:2, 66:15,
80:15, 90:23, 99:9,
116:8, 124:20,
143:20, 144:6,
157:20, 157:21,
166:12, 181:10,
201:3, 266:11,
272:16, 276:3
**counsel** - 4:23,
26:16, 33:25, 54:1,
92:9, 92:25, 99:7,
99:24, 125:19,
137:20, 137:23,
138:18, 138:21,
152:4, 167:21,
178:11, 181:7,
181:13, 194:25,
195:3, 195:5, 197:18,
199:4, 199:5, 273:12
**counsel's** - 99:8,
181:9
**count** - 17:15,
21:16, 25:22, 28:5,
28:6, 28:7, 28:9, 29:2,
52:12, 58:8
**Count** - 17:16,
17:21, 28:6, 28:10
**counted** - 56:7
**country** - 64:9
**counts** - 188:10
**County** - 20:13,
21:5, 254:18, 254:19,
273:20, 273:24,
274:14, 274:15, 275:6
**couple** - 4:15,
10:18, 10:19, 19:24,
45:9, 57:11, 58:10,
85:3, 89:20, 90:9,
91:8, 116:13, 116:24,
124:10, 137:10,
154:18, 155:18,
178:1, 198:24, 250:13
**course** - 14:20,
31:25, 38:18, 47:8,
99:10, 115:4, 116:22,
138:14, 140:12,
149:12, 167:11,
170:4, 181:10, 227:1
**Court** - 1:1, 2:2, 2:5,
3:19, 4:4, 4:10, 4:19,
5:8, 5:17, 5:24, 6:10,
6:22, 7:13, 7:20, 7:24,
11:25, 12:1, 12:2,
17:18, 19:7, 23:5,
23:14, 29:7, 30:17,
36:2, 50:5, 52:21,
52:24, 53:5, 53:9,
53:11, 63:6, 63:14,
63:17, 64:25, 65:5,
65:13, 65:17, 66:3,
66:10, 66:13, 66:15,
66:21, 73:18, 73:20,
74:9, 74:11, 74:17,
80:15, 80:19, 81:5,
81:7, 84:8, 84:14,
84:19, 90:24, 91:2,
92:18, 93:3, 93:7,
93:13, 98:9, 110:5,
115:13, 116:7,
116:10, 117:2, 117:6,
118:23, 119:10,
121:6, 125:4, 125:9,
125:12, 126:11,
128:2, 131:16,
132:17, 132:20,
134:4, 136:7, 136:9,

136:15, 137:11,
138:8, 138:11, 139:4,
139:5, 139:8, 139:21,
140:14, 141:24,
143:8, 143:20, 146:9,
146:19, 147:3, 149:4,
149:8, 149:10,
149:12, 150:1, 150:4,
150:8, 150:14,
150:21, 151:11,
152:7, 152:15,
152:24, 153:3,
153:20, 154:25,
157:20, 157:23,
158:2, 158:5, 159:18,
164:6, 164:8, 164:10,
164:15, 164:22,
179:17, 180:11,
186:7, 186:21, 192:1,
192:5, 192:8, 192:12,
196:3, 196:7, 196:10,
196:12, 197:1,
198:12, 198:22,
202:11, 203:21,
208:10, 208:24,
209:5, 209:9, 209:14,
214:3, 214:11, 217:2,
217:4, 218:3, 221:18,
222:2, 222:4, 222:7,
222:16, 222:22,
222:24, 223:2, 225:5,
225:7, 226:10,
226:15, 234:16,
238:24, 240:7,
240:10, 241:15,
241:19, 242:13,
242:16, 242:19,
243:22, 244:3, 244:6,
244:20, 245:18,
247:5, 251:15,
251:18, 252:13,
252:15, 252:21,
252:25, 253:7,
254:19, 254:24,
255:2, 255:21, 256:4,
256:8, 256:15,
256:22, 256:25,
257:25, 258:2, 258:6,
258:15, 260:25,
261:5, 263:11, 266:4,
266:7, 266:14,
266:17, 266:20,
266:24, 268:24,
269:5, 269:8, 269:11,
269:22, 270:17,
272:5, 272:8, 272:11,
272:15, 272:19,
272:24, 273:3, 273:7,
273:15, 273:19,
273:24, 274:13,
274:25, 275:11,
275:25, 276:8, 276:14
**court** - 3:2, 3:9,
17:12, 44:3, 46:16,
54:22, 57:4, 130:8,
130:16, 143:16,
144:10, 144:21,
146:16, 146:22,
147:9, 149:18,
154:14, 172:6,
182:16, 196:13,
221:5, 224:22,
265:23, 273:18, 275:2
**Court's** - 144:7,
144:25, 147:8, 263:9
**court's** - 2:11,
147:12
**courthouse** - 8:15,
14:11, 69:1, 141:24,
148:3, 154:1, 188:24

**courtroom** - 4:6,
5:1, 14:2, 15:4, 38:6,
41:8, 60:18, 93:2,
93:10, 93:17, 93:18,
93:20, 93:22, 94:2,
149:17, 151:13,
174:9, 174:11
**courts** - 64:13,
254:16, 268:23
**cousin** - 85:3
**cover** - 166:14
**covered** - 104:22
**cozy** - 149:17
**crack** - 12:22,
12:23, 12:24, 17:25,
18:6, 18:15, 18:16,
18:25, 19:6, 19:13,
19:16, 20:22, 23:14,
23:15, 23:23, 24:13,
25:12, 26:4, 26:12,
95:14
**Crack** - 18:7
**cracked** - 38:20
**created** - 59:13
**credentials** - 253:5
**crew** - 126:8
**crime** - 21:1, 21:2,
21:3, 28:11, 28:12,
58:13, 59:8, 60:23,
110:14, 112:4, 114:7,
114:8, 118:17,
119:20, 130:8,
147:15, 216:3, 216:5,
216:6, 216:7, 216:9,
218:11, 218:14,
218:18, 219:15,
219:19, 220:12,
241:25, 242:24,
242:25, 243:5, 243:6,
244:19, 244:23,
245:17, 245:21,
246:1, 246:7, 246:17,
247:23, 248:6,
248:12, 249:5, 252:9,
253:14, 254:5
**Crime** - 243:4
**crimes** - 28:14,
119:5, 119:15,
119:17, 126:1,
126:16, 130:15,
130:17, 130:18,
267:17
**criminal** - 33:20,
141:4, 167:13,
183:20, 198:13, 200:7
**Critically** - 145:4
**cross** - 117:16,
134:11, 159:19,
169:11, 169:13,
169:18, 241:15,
251:15, 266:22, 272:5
**Cross** - 91:4, 125:9,
125:13, 159:22,
179:18, 179:20,
218:4, 218:6, 263:12,
263:16
**cross-examination**
- 117:16, 134:11,
241:15, 251:15, 272:5
**Cross-examination**
- 91:4, 125:9, 125:13,
179:18, 218:4, 218:6,
263:12, 263:16
**cross-examine** -
159:19
**cross-examining** -
169:11
**crying** - 5:21, 6:9
**Cunningham** -
90:20

6

cups - 151:4
curbside - 24:15
cured - 144:25, 145:4
Curtis - 16:12, 25:4, 25:9, 38:15, 38:23, 39:12, 40:4, 41:21, 41:25, 44:7, 59:15, 61:8, 65:7, 65:20, 70:25
custody - 154:10
cut - 6:12, 18:15, 24:5, 30:16, 74:12, 88:21, 211:2

# D

daddy - 75:3
daily - 177:3, 177:18, 195:24, 200:13, 203:11, 203:16
damage - 232:14, 232:16
dangerous - 55:12, 145:15, 146:14
Daniel - 267:3, 267:8
date - 21:19, 29:3, 92:3, 101:5, 101:6, 109:1, 111:1, 129:11, 177:23, 186:2, 187:5, 187:7, 192:5, 273:18
dated - 100:4, 103:20, 192:2
dates - 129:13, 133:4, 199:5
daughter - 75:1, 78:17, 78:18
daughter's - 74:13
daughter-in-law - 78:17, 78:18
days - 19:24, 40:17, 46:23, 57:11, 158:14, 158:15, 163:13, 175:20, 178:2, 187:11, 187:18, 188:9, 196:18, 196:19, 206:22, 221:12
Dc - 172:23, 224:3
dead - 11:5, 12:13, 55:3, 61:20, 76:10, 89:11, 89:21
deadlock - 64:13
deal - 49:23, 65:25, 274:6, 274:16, 276:17
dealer - 9:3, 12:24, 13:14, 19:13, 20:1, 22:17, 24:19, 24:22, 27:15
dealers - 31:19
dealing - 22:24, 22:25, 55:13
deals - 106:17
death - 67:24, 241:4, 241:10
Debbie - 89:8
Deborah - 5:17, 67:4, 67:6, 67:11
debt - 63:8
deceased - 212:23, 213:2
deceitful - 198:16
December - 50:23, 52:1, 192:6, 194:7, 195:1, 195:2, 203:3
decent - 262:14
deceptively - 198:14

decide - 45:7, 182:7
decided - 172:9
decides - 46:12, 55:16, 64:17
decision - 11:10, 147:8, 196:5, 203:16
declared - 212:23
deemed - 125:5
defendant - 3:14, 7:16, 9:9, 9:23, 10:13, 12:22, 13:13, 15:18, 17:17, 17:22, 18:4, 18:9, 19:21, 19:22, 20:5, 21:20, 21:24, 22:17, 23:14, 24:1, 24:10, 25:4, 26:3, 26:20, 27:25, 28:18, 29:21, 31:5, 34:7, 37:9, 38:15, 42:19, 44:15, 50:24, 51:4, 51:5, 53:10, 83:25, 95:9, 98:17, 108:2, 112:25, 114:17, 119:4, 122:4, 122:14, 122:20, 141:16, 144:1, 144:6, 144:13, 144:16, 145:2, 145:6, 145:10, 145:14, 147:1, 147:19, 148:10, 273:14
Defendant - 1:9, 1:18, 2:4, 144:8, 144:21
defendant's - 17:22, 116:23, 144:1, 147:14, 147:15, 147:17, 148:18
defendants - 34:15, 36:13, 96:15, 96:18, 97:4, 100:13, 101:8, 101:10, 101:14, 102:20, 102:25, 108:5, 108:8, 108:9, 120:1
defense - 3:20, 33:17, 33:24, 39:24, 81:3, 97:11, 97:16, 99:12, 99:15, 100:20, 100:25, 107:6, 107:10, 139:6, 159:18, 181:12, 181:13, 182:13, 225:13
Defense - 66:13
deferred - 274:15
defined - 33:24, 270:14
definitely - 180:9, 185:13, 189:1, 199:21, 252:25
Delauder - 106:13
delete - 66:18
deliberately - 28:18
delighted - 53:10
delivered - 24:11
delivery - 166:19
Deluca - 148:8
denied - 2:12, 2:15, 2:23, 3:22, 60:10, 144:3, 148:21, 194:23, 196:22, 201:4, 202:16, 202:20, 202:24, 203:1, 203:8, 252:21
dent - 126:20
deny - 4:3, 185:19, 252:22
department - 252:1, 253:21
Department -

100:18, 181:25, 204:24, 242:24, 252:1, 267:16
depicted - 216:14
depicting - 232:7
deputized - 32:5
Deputy - 67:9, 94:9, 94:12, 136:22, 137:1, 204:9, 204:12, 204:15, 223:10, 223:14, 242:6, 242:10, 252:6, 252:10, 267:6, 267:10
deputy - 151:2
derivative - 137:16
descend - 54:14
describe - 84:24, 106:4, 111:11, 123:4, 166:13, 167:8, 169:7, 211:22, 228:17
described - 31:6, 103:9, 109:25, 110:7, 133:5, 134:11, 171:12, 207:15
describes - 106:25, 124:9
describing - 167:22
description - 166:22, 230:23
descriptions - 230:16
deserved - 55:1
designated - 4:6, 93:21
designed - 257:17, 257:18, 257:21, 270:11
desire - 183:6
desk - 125:21
Desperation - 60:14
despite - 193:23
detained - 168:23
Detective - 4:8, 27:1, 31:15, 32:4, 36:4, 39:20, 39:23, 191:7, 191:12, 217:10, 272:22, 272:25, 273:13
detective - 44:12, 251:9, 254:5
detective's - 135:23
detectives - 12:18, 21:8, 245:10
determination - 229:21, 230:9, 230:11
determine - 10:11, 15:13, 53:16, 53:18, 268:14, 270:20, 271:22
determining - 229:17
Detroit - 172:22, 173:5
diagrams - 226:23
diaphragm - 236:5, 237:9, 237:10, 237:14
died - 54:24, 56:24, 241:7
Diesel - 27:1, 27:3
difference - 264:12
Different - 85:19, 167:14, 265:25
different - 23:8, 26:3, 26:11, 48:4, 50:1, 82:7, 85:23, 120:16, 146:5, 170:16, 179:4, 205:2, 207:15, 214:17, 263:23, 264:20, 264:25, 265:7, 268:9, 273:23

differently - 252:24
difficulty - 237:15
dire - 3:4, 143:23, 145:5, 145:6, 145:8, 146:12, 146:11, 148:14, 225:5, 254:24, 269:8, 274:18
direct - 22:19, 72:21, 80:14, 95:6, 96:23, 101:2, 141:13, 154:12, 165:21, 175:16, 205:21, 208:1
Direct - 67:12, 94:13, 120:14, 137:2, 153:11, 165:1, 204:16, 223:15, 242:20, 253:10, 267:11
directing - 28:25
direction - 10:24, 88:6, 174:10, 210:2, 216:22, 258:12
directions - 265:25
directly - 117:15, 156:1, 193:13
directors - 70:2
disagree - 140:12, 218:21
disappear - 74:18
disbarred - 56:20, 196:2, 197:2
disbarring - 196:15
discharge - 228:22
disclose - 106:19, 107:6, 120:18
disclosed - 111:14, 111:17
disclosure - 104:5, 104:13, 104:22, 111:1, 134:18, 181:14
discoveries - 161:4, 161:9
discovery - 33:23, 34:6, 34:8, 34:19, 35:3, 56:18, 56:23, 56:25, 57:2, 57:5, 76:19, 77:9, 96:24, 97:8, 97:10, 97:12, 97:17, 97:23, 98:13, 99:6, 100:1, 100:9, 100:15, 102:24, 104:1, 104:16, 105:12, 124:21, 124:23, 125:1, 131:4, 131:11, 134:19, 134:20, 140:6, 140:9, 140:21, 140:23, 142:12, 142:18, 143:6, 161:1, 165:16, 165:19, 167:11, 170:9, 171:12, 173:6, 174:20, 175:12, 180:13, 180:17, 180:21, 181:3, 181:6, 184:17, 184:18, 185:5, 185:15, 185:20, 195:20, 203:14
Discovery - 160:24, 160:25
discretion - 147:13
discrimination - 197:13
discuss - 63:17, 92:20, 93:11, 136:11, 143:12, 164:11, 167:7, 194:21, 203:22, 222:8, 241:21, 251:19, 266:8, 272:11

discussed - 7:11, 80:20
Discussion - 91:3, 132:18, 263:15
discussion - 5:23, 116:14
discussions - 190:22, 190:24
dishonest - 198:17
dispatched - 213:5
dispensed - 97:13
dispute - 54:23, 57:2, 139:5, 192:17
disputed - 196:5, 196:7
disrespect - 275:10
disseminated - 100:24, 104:20, 175:4
distance - 22:5, 228:25
distanced - 59:5
distribute - 17:23, 17:24, 19:7, 110:16, 110:17, 110:18, 119:22, 119:23, 119:24, 175:24
distributed - 18:4, 18:6, 100:20, 134:25, 140:21
Distribution - 110:15
District - 1:1, 1:13, 153:20, 182:1, 203:12, 205:6, 205:18, 254:19, 268:24, 273:19, 273:23, 275:11
district - 52:16, 146:16, 147:12, 180:14, 181:21, 182:13, 205:5, 205:10, 205:11, 205:12, 206:24, 207:1, 275:2, 275:23
districts - 205:2, 206:7, 206:15
disturb - 219:19
Division - 276:7
division - 267:18
divulge - 146:10
Dna - 14:24, 62:4
docket - 187:3, 275:13
doctor - 211:11
Doctor - 238:25, 241:17
document - 116:10, 117:3, 117:17, 157:14, 189:14, 190:16, 218:15
documentation - 243:7
documenting - 3:6
documents - 80:24, 81:8, 142:21, 181:15, 189:8, 226:19
dog - 234:16
Don - 254:7
done - 9:10, 16:24, 29:25, 35:9, 49:1, 133:21, 133:24, 195:17, 214:24, 248:17, 276:2
Dorton - 19:7, 23:4, 23:14, 208:24
dot - 87:24, 88:16, 88:18
doubt - 53:20, 53:24, 54:8, 55:7, 64:1, 64:4, 64:22

7

**Down** - 209:9
**down** - 8:15, 11:1, 11:17, 11:18, 11:22, 11:25, 12:3, 14:16, 18:21, 20:5, 21:6, 29:7, 30:2, 30:14, 38:16, 43:3, 48:8, 48:9, 48:10, 50:6, 74:5, 74:11, 74:13, 88:20, 88:21, 91:10, 92:19, 107:7, 121:23, 132:9, 136:10, 164:11, 179:25, 180:1, 194:2, 194:19, 199:4, 203:22, 206:8, 209:9, 214:3, 222:8, 233:7, 237:13, 241:20, 251:19, 259:6, 259:9, 266:8, 272:9
**downtown** - 69:11, 205:14
**Dr** - 222:18, 222:22, 222:23, 222:25, 223:3, 223:17, 225:4, 225:11, 225:23, 226:4, 226:11, 232:2, 234:15, 240:8, 241:20
**dragged** - 6:24
**drastic** - 150:19
**draw** - 114:15, 114:16, 260:23
**dreads** - 211:25
**dress** - 125:18
**dressed** - 210:18
**drink** - 26:9, 151:4
**drinking** - 150:25
**drinks** - 42:6
**drivel** - 52:11
**drives** - 21:21
**dropped** - 45:20, 48:16, 259:14
**drove** - 45:20, 208:24, 209:8
**drug** - 9:3, 13:14, 20:1, 20:4, 22:17, 22:24, 22:25, 23:22, 24:19, 24:22, 25:22, 27:15, 31:19, 49:23, 55:13, 71:19, 79:2, 95:13, 110:14, 112:4, 115:10, 119:20, 126:1, 182:4
**drug-dealing** - 55:13
**drugs** - 13:11, 20:6, 20:8, 23:21, 24:12, 25:5, 36:25, 46:15, 49:21, 55:24, 115:16, 130:10
**drying** - 251:10
**Duckett** - 16:11, 37:7, 37:8, 37:11, 37:18, 37:20, 42:18, 45:14, 45:18, 46:10, 46:11, 48:23, 50:18, 51:13, 58:23, 59:9, 63:9, 64:1, 65:8, 65:20, 123:7, 123:10, 123:15, 123:17, 124:14, 124:16, 161:18, 161:21
**dude** - 47:7
**due** - 2:10, 144:2, 148:19
**dug** - 194:1
**duly** - 67:7, 94:7, 136:20, 153:6, 164:18, 204:7, 223:8, 242:4, 252:4, 267:4

**During** - 170:13, 217:21
**during** - 3:4, 3:8, 3:10, 23:7, 23:10, 38:4, 72:24, 76:15, 110:13, 119:19, 134:22, 145:5, 145:7, 146:1, 146:10, 154:3, 163:12, 169:19, 172:7, 174:19, 176:23, 190:20
**dusk** - 75:14
**duties** - 245:1
**Dvds** - 167:1
**Dwight** - 77:12, 77:13, 111:16, 112:14, 121:10

## E

**ear** - 234:23
**early** - 16:4, 154:13, 204:19
**easier** - 29:16, 107:15
**easily** - 273:21
**East** - 254:13
**Eastern** - 182:1
**easy** - 23:23, 61:4, 107:9
**eat** - 18:20
**eating** - 46:23
**echo** - 64:6
**edge** - 13:8, 69:19
**educate** - 171:4
**effect** - 53:15, 92:20, 136:11, 150:8, 150:10, 203:25, 222:10
**Effective** - 196:18, 196:19
**Effectively** - 271:6
**effects** - 147:1, 148:11
**effort** - 148:6
**eight** - 7:2, 72:11, 96:15
**either** - 63:24, 115:16, 124:16, 128:25, 132:7, 193:11
**eject** - 263:24, 264:6
**ejected** - 259:13
**ejects** - 259:12, 263:21
**electrical** - 51:7, 51:9
**elements** - 269:14
**eleven** - 53:3
**Elliott** - 100:13, 105:4, 127:10
**eloquent** - 252:17, 266:24
**Emmanuel** - 204:4, 204:6, 204:11
**emotion** - 6:2
**empaned** - 146:17, 146:22, 147:13
**empaneling** - 144:2, 144:7, 144:16, 145:11, 147:5, 148:19
**empanelled** - 146:3
**emphasize** - 6:11, 150:25
**employed** - 94:20, 94:22
**employer** - 150:15
**employment** - 197:13, 268:1
**Emt-** 211:13

**encompass** - 205:18
**encouraged** - 40:9
**end** - 8:16, 16:21, 28:1, 52:13, 53:21, 53:22, 61:11, 61:14, 63:23, 64:4, 64:19, 64:20, 64:21, 76:10, 111:25, 146:18, 188:9, 198:5, 228:19, 229:1, 274:24
**End** - 7:19, 53:8, 66:2, 81:6, 253:9, 258:20, 267:1, 276:13
**ended** - 20:12, 154:4, 154:14
**enforcement** - 60:15, 79:1, 81:8
**enforces** - 22:17
**engaged** - 198:16
**enhance** - 147:21
**ensure** - 3:11
**enter** - 142:16, 187:7, 188:13, 238:4
**entered** - 99:15, 141:23, 142:16, 165:16, 172:8, 187:14, 230:4, 231:21, 236:3, 237:25
**entering** - 188:5
**entire** - 49:3, 52:4, 113:15, 147:4
**entirely** - 56:21
**entitled** - 97:20, 119:8, 277:6
**entrance** - 227:20, 228:16, 229:11, 233:15, 235:15
**entry** - 231:14
**envelope** - 155:6, 160:2, 161:9, 174:1, 174:2, 174:3, 184:17, 184:20, 184:22, 185:22, 188:19, 188:23, 247:11, 248:16, 248:18, 262:4
**envelope's** - 257:6
**envelopes** - 240:2, 240:17, 257:7, 261:19, 261:21, 261:24, 262:2
**environmental** - 229:23
**erase** - 73:24
**ergo** - 149:23
**Ergo** - 60:16
**Eric** - 106:21
**error** - 144:10, 144:20, 150:12
**especially** - 33:20
**essential** - 65:14
**Essentially** - 65:14
**essentially** - 29:18, 69:18, 97:3, 97:10, 104:4, 107:8, 115:15, 144:9, 145:17, 200:6, 200:9, 228:17, 233:6, 237:10, 239:12
**Essex** - 273:20, 274:7, 275:13
**establish** - 25:22, 25:23, 116:24
**established** - 2:23, 115:3
**etcetera** - 108:6, 126:2
**etiquette** - 151:13
**evening** - 31:14, 244:22
**event** - 8:18, 8:20,

92:21, 117:19, 136:12, 164:12, 203:23, 241:21, 251:20, 272:12
**events** - 26:2, 117:11, 117:15
**Eventually** - 155:15
**eventually** - 243:16
**everyday** - 8:17, 8:19
**everywhere** - 57:3, 161:25, 210:2
**Evidence** - 225:10
**evidence** - 9:8, 10:8, 10:20, 33:25, 35:18, 40:22, 46:9, 50:24, 52:13, 52:14, 55:8, 58:24, 59:2, 80:22, 81:9, 116:11, 117:17, 158:3, 214:23, 215:8, 219:19, 226:24, 227:2, 227:19, 228:15, 230:1, 231:9, 233:24, 234:19, 235:14, 237:19, 239:11, 240:2, 240:17, 243:7, 246:15, 246:16, 246:18, 246:20, 246:22, 246:25, 247:12, 248:10, 248:13, 248:15, 248:18, 248:21, 250:7, 251:3, 251:6, 252:21, 253:20, 255:14, 256:5, 261:19, 262:17
**exact** - 56:8, 108:17
**exactly** - 8:20, 65:23, 97:12, 210:5, 244:19
**Exactly** - 76:2, 83:20, 88:11, 104:24
**examination** - 91:4, 117:16, 125:9, 125:13, 134:11, 169:14, 179:18, 202:13, 218:4, 218:6, 241:15, 251:15, 263:12, 263:16, 272:5
**Examination** - 67:12, 94:13, 132:23, 137:2, 153:11, 159:22, 165:1, 179:20, 199:1, 204:16, 223:15, 242:20, 253:10, 267:11
**examinations** - 169:18
**examine** - 159:19, 253:20, 255:13, 268:14
**examined** - 256:10, 257:2, 259:21, 261:10, 262:5, 270:3
**Examiner** - 262:2
**examiner** - 12:9, 223:24, 253:18, 253:19, 256:1
**Examiner's** - 222:19, 224:16
**Examiners** - 223:18, 224:13, 230:15, 254:11
**examining** - 169:11, 271:4
**example** - 190:12
**Except** - 33:9
**except** - 33:15,

101:11, 135:6, 145:23, 149:22
**exception** - 93:9, 93:20, 93:22, 225:9
**Excuse** - 72:18, 199:6
**excuse** - 274:9, 275:16
**excused** - 143:17
**exercise** - 145:18
**exhibit** - 29:13, 29:17, 73:13, 81:24, 100:7, 107:3, 127:25, 138:8, 157:21, 199:7, 208:9, 209:17, 215:15, 247:19
**Exhibit** - 72:5, 72:7, 73:14, 82:3, 87:19, 88:18, 96:7, 98:7, 98:9, 100:8, 103:17, 105:19, 108:13, 125:2, 128:2, 132:25, 141:21, 142:24, 157:7, 157:24, 166:9, 166:11, 168:8, 180:25, 189:9, 205:21, 207:11, 215:13, 215:17, 226:12, 227:23, 238:8, 243:24, 244:3, 246:3, 247:8, 248:23, 249:9, 249:15, 250:6, 255:24, 269:25
**Exhibits** - 240:10, 256:22
**exhibits** - 54:19, 168:4, 168:6, 169:16, 190:3
**existence** - 178:20
**exit** - 20:14, 231:25, 232:7, 232:8, 233:18, 234:22, 234:23, 235:1, 236:6, 236:8, 238:6, 238:9, 239:14, 239:16
**exited** - 238:5
**expanded** - 268:8
**expect** - 4:2, 252:22
**expectation** - 169:23
**expected** - 30:22, 266:15
**expecting** - 6:18, 149:2, 165:6
**expenses** - 65:8
**experience** - 14:20, 15:2, 70:7, 149:18, 182:11, 211:13, 271:22
**experienced** - 7:8, 52:16
**expert** - 99:11, 181:12, 181:13, 181:14, 224:21, 225:4, 225:11, 225:12, 225:13, 225:19, 253:2, 254:2, 254:14, 254:22, 255:4, 268:11, 268:12, 268:17, 268:20, 269:3, 269:12, 269:18
**expertise** - 253:12, 255:6
**experts** - 99:14
**Explain** - 237:17
**explain** - 65:23, 139:9, 257:12, 258:22, 267:24
**Explosives** - 267:15

8

**expose** - 147:23
**exposing** - 268:9
**express** - 180:21
**extensive** - 147:21
**extent** - 4:24, 6:23, 19:2, 20:3, 66:16
**exterior** - 262:18
**extracts** - 259:12
**extreme** - 148:6, 150:18
**eyes** - 220:5
**eyewitnesses** - 15:1, 31:24, 44:13, 49:1, 56:12, 56:15, 210:3, 272:23, 272:25, 273:1, 273:16

---

**F**

**F.3d** - 147:10
**F.supp.2d** - 146:8
**Faber** - 256:1
**fabricated** - 19:24
**Face** - 128:7
**face** - 14:2, 45:6, 78:9, 128:7, 212:6, 259:10, 260:5, 260:8, 260:17
**Face-to-face** - 128:7
**faces** - 148:4
**facility** - 39:23, 168:18, 168:20, 170:22, 175:6, 176:8
**facing** - 89:14, 142:8
**fact** - 2:19, 7:14, 20:9, 22:2, 25:15, 33:12, 38:13, 43:17, 50:2, 50:19, 51:12, 81:22, 111:7, 113:21, 115:24, 115:25, 126:25, 127:5, 140:23, 141:19, 163:23, 175:24, 176:15, 198:5, 200:19
**factories** - 268:19
**factors** - 147:12, 147:14, 229:17, 229:20, 229:24, 235:17
**facts** - 5:25, 17:9, 66:17
**fair** - 114:7, 135:20, 151:7, 171:4, 197:8, 264:16, 276:10
**fairly** - 69:22, 262:14
**Fairton** - 175:8, 175:10
**fall** - 14:4, 197:13
**false** - 177:9
**familiar** - 70:15, 95:20, 180:16
**families** - 62:21
**family** - 10:14, 28:3
**family's** - 12:10
**fancy** - 54:18
**far** - 8:24, 37:21, 41:9, 54:1, 68:25, 73:12, 83:20, 92:6, 114:11, 128:17, 150:22, 188:3, 205:14, 264:6, 264:7, 265:1, 273:21
**fashion** - 65:25, 148:20
**fatal** - 231:3, 232:19, 234:9, 235:10, 235:11, 237:1, 237:2, 238:14,

239:18, 239:19
**fate** - 64:17
**father** - 9:23, 79:25
**fathers** - 14:7
**fatigue** - 250:22
**favor** - 5:15
**Fbi** - 4:15, 13:4, 23:12, 32:5, 32:6, 32:7, 32:9, 33:2, 37:3, 55:19, 56:21, 58:12, 60:8, 76:22, 76:24, 81:9, 100:10, 100:16, 100:17, 102:17, 106:6, 106:12, 126:18, 127:17, 167:7, 167:22, 175:3, 193:1, 201:19
**fear** - 148:15
**February** - 21:15, 21:19, 32:16, 32:17, 38:20, 39:20, 39:21, 41:7, 59:25
**Federal** - 87:1, 87:2, 109:11, 225:10
**federal** - 10:6, 10:7, 13:3, 13:7, 13:8, 15:10, 17:12, 28:11, 28:13, 31:17, 31:18, 32:3, 32:18, 32:21, 33:5, 36:11, 40:18, 46:16, 55:16, 62:17, 63:3, 102:1, 109:12, 109:18, 109:19, 109:21, 109:25, 110:21, 112:5, 114:8, 119:5, 126:8, 126:16, 130:8, 130:16, 132:10, 137:15, 148:3, 154:7, 165:9, 168:21, 173:1, 175:22, 177:9, 224:24, 270:15
**feds** - 42:13, 91:18, 91:19
**feeding** - 19:16
**fees** - 197:14, 198:14, 198:16
**feet** - 27:22, 217:4, 265:18
**fellowship** - 224:9, 224:14, 224:15
**felon** - 110:8, 119:17
**female** - 212:3
**Ferl** - 16:5, 31:2, 31:3, 47:10, 48:24, 48:25, 49:9, 49:11, 50:4, 51:5, 61:23
**Ferl's** - 50:8
**few** - 2:6, 31:22, 32:22, 34:14, 38:3, 49:12, 59:17, 60:6, 72:12, 126:25, 143:9, 143:16, 147:5, 163:12, 165:3, 189:13
**field** - 88:10, 88:12, 88:14, 267:18
**Fifth** - 139:10, 145:12, 183:22, 184:1
**fight** - 47:3
**figure** - 18:12
**figured** - 37:24, 38:2
**file** - 2:13, 2:22, 107:15, 126:4, 141:21, 177:1, 177:2, 190:2
**filed** - 143:24, 144:1, 188:11, 196:23, 213:18

**files** - 171:12, 177:17, 200:15
**filled** - 155:7
**filters** - 229:25
**finally** - 10:10, 14:5, 46:6, 49:7, 49:23, 58:14, 203:10
**Finally** - 35:21, 45:11, 46:6, 104:13, 148:10
**financial** - 65:22
**findings** - 226:6, 241:2, 255:17
**Fine** - 266:20
**fine** - 5:2, 6:20, 7:9, 16:20, 53:7, 81:5, 93:3, 106:10, 117:2, 139:8, 214:11
**finger** - 87:24, 88:5
**fingerprint** - 249:25
**fingerprints** - 14:25, 249:24, 250:4
**finish** - 31:9, 32:22, 215:11, 264:19
**finished** - 36:2, 114:16, 154:4, 157:8
**finishes** - 63:18
**fire** - 259:17
**Firearm** - 254:11
**firearm** - 27:20, 28:6, 110:8, 110:13, 119:18, 119:19, 130:13, 257:18, 257:20, 258:4, 259:2, 260:11, 260:14, 261:2, 263:7, 270:12
**Firearms** - 267:15
**firearms** - 27:12, 246:20, 246:25, 248:15, 252:1, 253:18, 253:19, 253:20, 253:22, 254:1, 254:3, 254:9, 254:23, 255:4, 255:6, 255:13, 268:4, 268:6, 268:9, 268:14
**firearms-related** - 253:20
**fired** - 12:6, 62:6, 62:7, 62:8, 228:18, 253:22, 256:21, 259:11, 260:13, 260:15, 261:1, 263:7, 263:20, 264:1, 265:17
**firing** - 227:19, 228:16, 228:17, 229:14, 230:2, 231:9, 233:14, 234:19, 235:15, 237:20, 239:11, 259:4
**firm** - 197:4, 197:6, 197:15, 197:18, 197:20, 197:22, 198:1, 198:15
**firm's** - 197:19, 198:16
**first** - 5:5, 5:15, 8:4, 11:3, 15:24, 21:17, 25:1, 31:22, 32:16, 33:6, 45:9, 45:12, 47:20, 47:21, 50:1, 53:4, 58:9, 58:10, 58:16, 58:17, 64:9, 66:12, 67:2, 67:7, 94:7, 95:16, 97:9, 104:12, 106:2, 117:24, 121:12, 136:20, 144:18, 144:19, 146:20, 147:5, 153:6, 172:5,

175:17, 191:5, 198:3, 199:16, 200:2, 204:7, 208:14, 208:16, 210:25, 212:12, 213:12, 218:19, 223:8, 226:20, 242:4, 242:10, 252:4, 258:24, 259:3, 267:4, 273:22
**First** - 59:19, 60:18, 61:1, 137:12, 144:8, 145:12, 148:9, 150:9, 211:7, 212:2
**fish** - 57:17
**fit** - 17:13, 75:11
**Five** - 266:19
**five** - 12:19, 26:2, 26:11, 28:8, 53:4, 96:15, 117:25, 147:12, 147:14, 147:21, 171:20, 171:23, 171:24, 204:25, 221:12
**fix** - 75:2
**fixed** - 75:8, 75:13
**fixing** - 75:5
**flag** - 10:24
**flame** - 228:22
**flashing** - 61:15
**flip** - 120:9
**floater** - 207:25, 208:1
**floating** - 34:22
**Floor** - 254:7
**focus** - 21:17
**folks** - 32:22, 54:20, 55:22, 60:25, 62:14, 63:10, 64:24, 85:19
**follow** - 10:8, 11:18, 29:16, 106:10, 120:12, 214:25
**followed** - 219:25
**following** - 40:5, 106:8, 118:10, 173:22, 175:21, 227:7
**follows** - 67:8, 94:8, 97:7, 136:21, 153:7, 164:19, 204:8, 223:9, 242:5, 252:5, 267:5
**Fool** - 60:5
**force** - 32:4, 109:9
**forced** - 14:5, 41:5
**forearm** - 238:23, 239:8, 239:10, 239:14
**foregoing** - 277:4
**forensic** - 223:23, 224:15, 225:12, 225:13, 225:15, 225:19
**forget** - 56:8, 127:25, 190:6, 274:9
**forgive** - 35:24
**form** - 13:7, 13:8, 28:16, 86:12, 241:9
**formal** - 184:8
**former** - 173:15, 181:24, 198:15
**forms** - 81:9
**forth** - 139:17
**forthcoming** - 59:1
**forward** - 49:24, 139:13, 153:4, 222:24, 259:3, 274:9
**four** - 10:9, 12:7, 12:19, 28:8, 35:25, 96:15, 121:17, 133:7, 171:20, 172:19, 187:11, 188:9, 193:24, 194:20, 194:22, 201:4, 203:7

**Four** - 68:8, 172:20, 187:18
**Fourth** - 2:24, 4:4, 4:12
**fourth** - 235:23
**fracture** - 234:21
**fractured** - 235:7, 235:23, 236:14, 236:15, 238:1
**fragment** - 233:23, 239:21, 239:25, 240:1
**frame** - 14:4
**framework** - 17:13, 17:19, 17:21, 23:1
**Franken** - 57:12
**frankly** - 274:7, 275:19
**free** - 65:17, 65:23
**Friday** - 7:6
**friend** - 9:24, 20:20, 21:9, 25:7, 42:19, 43:18, 162:20, 162:21, 275:22
**friend's** - 11:17
**friends** - 19:10, 42:11, 68:18
**front** - 9:9, 12:11, 12:12, 25:19, 41:2, 57:18, 61:13, 77:6, 82:2, 106:9, 142:25, 186:13
**Fuchs** - 1:16, 135:21, 222:18, 222:23, 223:16, 225:3, 225:20, 225:21, 225:22, 226:8, 226:11, 226:17, 234:14, 234:24, 239:2, 240:5, 240:8, 240:11, 240:12, 241:14, 241:24, 242:17, 242:21, 243:20, 243:23, 244:5, 244:8, 247:3, 247:6, 251:13, 251:23, 251:24, 253:11, 254:21, 255:10, 255:11, 255:12, 255:19, 255:22, 256:5, 256:6, 256:9, 256:13, 256:16, 256:23, 256:24, 257:1, 258:8, 258:19, 258:21, 261:3, 261:6, 263:9, 266:5, 266:6, 266:19, 267:12, 269:1, 269:7, 269:20, 269:23, 270:19, 272:3
**full** - 82:21, 94:9, 98:24, 136:22, 153:8, 204:9, 223:10, 252:7, 267:6
**fully** - 5:20
**fundamental** - 147:2
**Future** - 93:17
**future** - 93:19

---

**G**

**Gallagher** - 178:14
**Galt** - 61:24
**Gary** - 1:18
**gases** - 228:22
**Gasque** - 106:21
**gather** - 65:6
**general** - 69:18, 71:4, 109:24, 110:2, 115:7, 137:14, 183:4

9

**General** - 184:7
**Generally** - 229:15
**generally** - 109:22, 109:23, 119:25, 172:17, 225:8, 229:16, 229:18
**generate** - 255:16
**gentlemen** - 66:4, 66:21, 81:7, 93:13, 117:6, 139:10, 143:14, 152:16, 183:17, 186:5, 187:20, 188:7, 222:11, 225:8, 255:3, 276:14
**Giggles** - 113:18, 113:20, 113:22, 113:25, 114:4, 121:18
**Giglio** - 106:16
**girl** - 68:6
**girlfriend** - 24:7, 24:8, 24:9, 24:13, 25:3, 35:20
**girlfriend's** - 51:23, 51:24
**Girls** - 70:4
**girls** - 30:5, 42:11, 42:17, 42:22, 45:11, 48:13, 91:20
**given** - 6:15, 56:19, 98:13, 101:17, 102:20, 109:9, 113:12, 113:16, 113:19, 131:11, 131:23, 135:6, 139:14, 144:11, 144:13, 156:2, 170:21, 170:24, 176:7, 177:2, 185:10, 193:2, 195:8, 200:19, 202:4, 240:3, 244:20, 253:5
**Given** - 170:22, 273:21
**glad** - 6:10
**glance** - 123:12
**gloating** - 61:21
**gloves** - 220:14, 248:20
**goal** - 219:18
**God** - 22:10, 23:11, 57:22
**golf** - 57:18
**government** - 3:14, 3:17, 5:5, 8:4, 15:9, 30:20, 33:22, 38:21, 46:6, 53:23, 55:16, 57:2, 58:18, 59:14, 61:8, 61:16, 61:17, 62:1, 62:15, 63:3, 63:11, 65:23, 81:24, 94:3, 96:6, 97:11, 106:18, 111:19, 113:23, 136:16, 140:24, 142:11, 142:17, 144:22, 145:7, 157:7, 157:24, 165:22, 166:9, 167:10, 168:8, 168:10, 180:1, 180:7, 180:24, 182:8, 182:10, 182:24, 183:5, 183:9, 183:11, 184:6, 189:3, 189:9, 191:6, 191:15, 191:18, 191:19, 193:13, 193:23, 194:9, 194:12, 194:15, 194:18, 195:11, 195:12,

**199:5, 201:4, 201:19,** 204:3, 215:13, 226:12, 227:23, 238:8, 243:24, 244:3, 246:3, 247:7, 247:18, 249:9, 249:15, 251:24, 255:23, 269:25, 272:21, 274:20
**Government** - 66:10, 128:2, 141:20, 240:10
**Government's** - 72:5
**government's** - 5:15, 62:13, 67:2, 70:16, 97:7, 145:2, 232:2, 240:9, 241:24, 245:13, 248:1, 248:23, 250:6
**graduated** - 219:11
**grams** - 17:25, 18:5, 18:6
**grand** - 13:22, 13:23, 13:25, 15:10, 15:20, 15:24, 17:17, 38:22, 40:18, 41:2, 42:1, 44:20, 44:24, 45:9, 49:6, 49:15, 50:17, 50:25, 59:19, 59:24, 60:19, 61:1, 67:22, 148:2, 154:17, 157:5, 158:25, 159:2, 159:4, 159:8, 170:15, 189:25
**Grand** - 167:12
**grandchild** - 161:15
**grandchildren** - 70:4, 71:5
**granddaughter** - 90:8
**grandkids** - 90:8
**grant** - 139:14, 139:17, 189:3
**granted** - 137:13, 140:3, 141:10, 184:8, 201:13
**granting** - 137:14, 137:15
**grapevine** - 91:17
**grass** - 47:14, 47:22, 250:15, 264:9, 264:15
**Greenbelt** - 194:19, 254:20
**grew** - 64:11
**grievance** - 197:11
**groove** - 263:3
**ground** - 259:14, 265:13
**grounds** - 121:5
**group** - 34:15, 42:21, 147:16, 267:18
**growing** - 79:24
**Guess** - 16:3
**guess** - 34:13, 46:18, 54:25, 55:11, 69:4, 84:2, 86:10, 92:8, 127:14, 141:14, 154:19, 161:14, 170:7, 182:1, 182:3, 186:17, 186:20, 188:17, 219:14, 264:3, 265:10
**guessing** - 186:9, 186:11, 186:14, 186:15, 188:22
**Guest** - 5:16, 5:17, 9:20, 10:14, 28:19, 35:23, 36:1, 36:6,

**36:9, 36:15, 36:17,** 37:2, 54:7, 54:24, 56:4, 56:17, 63:22, 67:4, 67:6, 67:11, 67:14, 67:17, 73:13, 82:2, 92:18, 92:23, 92:25, 93:7, 93:22, 101:15, 102:5, 102:7, 103:5, 105:18, 106:23, 108:1, 108:12, 109:8, 110:21, 112:2, 113:19, 114:23, 117:25, 118:4, 118:8, 120:1, 120:9, 123:6, 124:10, 128:6, 128:9, 128:18, 129:5, 129:11, 130:21, 133:1, 133:4, 133:5, 133:8, 133:16, 134:15, 135:9, 135:15, 135:19, 167:23, 168:9, 171:16, 171:19, 175:18, 189:7, 190:12, 208:4, 210:13, 210:14, 212:22, 215:21, 215:22, 215:23, 216:10, 219:24, 221:16, 225:24, 226:21, 227:2, 227:9, 227:10, 228:3, 236:19, 239:21, 241:4, 241:7
**Guest's** - 34:21, 108:25, 118:14, 158:9, 217:1, 231:11, 236:14, 239:7, 240:16
**guilt** - 20:7
**guilty** - 33:10, 33:14, 34:8, 34:11, 34:16, 64:23, 101:11, 102:2, 102:4, 111:25, 122:23, 122:25, 154:7, 154:15, 155:2, 156:14, 173:20, 173:22, 178:2
**gun** - 10:25, 12:6, 22:23, 25:15, 25:16, 25:20, 28:6, 31:1, 31:3, 36:18, 37:9, 47:10, 47:11, 47:12, 47:13, 48:17, 48:19, 48:22, 48:24, 50:19, 50:21, 51:4, 51:18, 51:19, 51:22, 55:13, 58:1, 62:5, 62:6, 62:7, 118:13, 118:14, 129:20, 129:22, 129:23, 129:25, 259:10, 259:12, 260:10, 263:23, 264:11, 265:6
**gun-slinging** - 55:13
**gunpowder** - 228:23, 228:24, 229:4, 229:6, 229:11, 229:22, 257:15, 259:5
**guns** - 13:11, 25:13, 27:6, 115:15, 126:2, 269:5
**gunshot** - 211:21, 227:10, 227:13, 227:15, 227:16, 228:7, 228:13, 231:5, 231:7, 232:21, 232:23, 233:3, 233:8, 233:19, 234:11,

**234:17, 235:12,** 235:13, 237:16, 237:18, 238:20, 239:10, 241:7
**Gunshot** - 227:16, 231:7, 232:23, 233:9, 233:21, 234:12, 235:13, 238:22
**gunshots** - 210:20
**guy** - 14:5, 16:5, 19:15, 20:2, 20:10, 20:25, 21:25, 22:22, 26:5, 27:18, 36:9, 39:14, 43:4, 44:10, 48:19, 49:22, 64:2, 123:23, 162:10, 163:6, 210:5
**guys** - 32:6, 33:3, 85:4, 86:11, 91:21, 156:1, 162:10, 206:17

---

## H

**hair** - 211:24, 212:1, 212:3, 229:25, 231:15
**Halslip** - 275:6, 275:17, 275:21
**half** - 187:21, 218:20, 267:20, 273:22
**hall** - 116:15
**Hall** - 1:7, 2:3, 5:10, 8:22, 9:1, 11:14, 13:13, 20:20, 21:9, 28:9, 36:6, 36:14, 36:16, 37:3, 49:9, 52:14, 54:3, 56:2, 56:6, 56:9, 56:10, 57:9, 60:16, 62:9, 63:25, 64:23, 70:11, 84:1, 84:2, 84:22, 92:9, 92:14, 109:22, 112:23, 112:24, 118:4, 118:7, 123:20, 124:14, 124:16, 127:14, 127:19, 127:23, 128:19, 128:20, 129:8, 130:3, 133:6, 146:13, 147:24, 148:4, 148:17, 150:9
**Hall's** - 128:15
**hallucinating** - 83:22
**hallway** - 94:1, 160:10
**Hamlet** - 23:4, 23:13
**hand** - 162:9, 162:11, 162:12, 166:19, 214:19, 215:16
**handed** - 56:25, 65:19, 131:4, 155:24, 162:13, 174:12, 174:13
**handing** - 82:23, 185:22
**handle** - 22:19, 220:11, 259:1
**handled** - 135:13
**handling** - 140:6
**handwriting** - 157:13
**hang** - 30:18, 30:23, 42:5, 42:17, 76:5, 76:7, 161:20
**hanging** - 30:4, 42:6, 42:16, 85:1, 85:11
**hangout** - 76:9

**happy** - 52:19, 218:13
**harassing** - 62:18
**harassment** - 147:23
**harbor** - 69:19, 69:20
**Harford** - 254:18, 274:15, 275:6
**harm** - 147:16
**hat** - 43:1, 43:2, 250:21
**head** - 12:7, 46:18, 77:6, 77:7, 211:21, 217:1, 227:17, 227:18, 227:21, 228:14, 230:5, 231:8, 231:11, 231:22, 232:24, 233:6, 233:7, 233:10, 233:11, 233:18, 233:22, 234:1, 234:13, 234:23, 260:11, 271:4, 271:14
**heading** - 215:8
**headquarters** - 205:9, 205:12, 205:14
**headset** - 5:10
**hear** - 5:11, 8:4, 8:21, 9:4, 9:14, 13:9, 15:21, 18:8, 18:18, 20:9, 21:23, 22:3, 26:16, 30:1, 33:11, 34:18, 34:19, 36:21, 36:22, 37:5, 38:10, 38:14, 40:12, 41:13, 53:10, 58:18, 59:8, 59:15, 60:2, 60:17, 61:17, 61:23, 62:23, 64:2, 67:1, 91:18, 93:12, 175:17, 210:19, 264:14
**heard** - 15:8, 16:9, 39:3, 43:10, 43:13, 45:2, 45:5, 47:4, 49:13, 49:18, 50:24, 51:25, 57:25, 76:3, 91:19, 133:20, 273:25
**hearing** - 8:23, 9:21, 12:2, 274:15
**hears** - 50:10
**hearsay** - 81:20
**heart** - 69:4
**heat** - 202:15
**heaters** - 27:6
**height** - 265:5
**held** - 4:5, 51:20, 51:21, 72:23, 146:22, 154:5, 154:8, 210:21
**hell** - 43:20
**help** - 15:2, 46:3, 57:22, 89:10, 89:23, 89:24, 89:25, 180:10, 180:24, 187:1, 187:10
**helped** - 203:18
**helpful** - 258:13
**helping** - 4:16
**heroin** - 116:19
**heroin** - 12:20, 12:21, 95:13
**Hershel** - 40:4
**Hickman** - 77:12, 77:13, 111:16, 111:20, 112:14, 112:17, 121:10
**Hickman's** - 111:18
**hide** - 109:3
**high** - 82:19, 82:25, 259:6
**highest** - 196:13

**highlight** - 33:16, 36:15, 73:23
**highlighted** - 28:20, 187:4
**highlighter** - 33:16
**Hill** - 47:5, 205:8, 208:17, 208:23
**hill** - 48:8
**himself** - 12:17, 12:25, 24:20, 29:22, 31:5, 31:10, 49:22, 59:5, 59:10, 111:23, 127:12, 131:24, 149:3
**hinders** - 145:18
**hint** - 55:1
**history** - 167:13
**hit** - 27:18, 27:21, 230:6
**hits** - 259:4
**hold** - 160:6, 264:10, 264:11
**holding** - 265:6, 265:7
**holds** - 257:15
**hole** - 20:5
**home** - 20:11, 29:24, 36:20, 36:24, 64:23, 67:25, 73:2, 73:3, 73:4, 74:1, 74:4, 75:1, 75:20, 83:2, 115:7, 115:9, 115:11, 115:21, 116:3, 116:4, 116:25, 118:10, 121:24, 133:9, 134:2, 163:13
**homicide** - 32:11, 44:12, 62:16, 208:3, 217:11, 219:24, 241:13, 243:16, 245:10
**Honor** - 3:18, 3:21, 4:2, 4:9, 4:13, 6:4, 7:12, 7:22, 63:16, 66:12, 92:24, 116:21, 124:17, 125:8, 136:8, 137:18, 138:25, 139:7, 139:23, 149:2, 152:3, 153:2, 158:1, 164:9, 179:19, 191:25, 192:7, 202:12, 204:1, 208:9, 214:6, 222:18, 222:20, 225:3, 225:21, 226:9, 226:13, 234:15, 240:6, 240:11, 241:24, 242:18, 243:21, 243:25, 247:4, 251:14, 251:24, 252:22, 254:21, 255:20, 256:13, 256:24, 261:4, 263:10, 266:6, 266:19, 269:1, 269:21, 272:4, 275:21
**Honor's** - 253:5
**Honorable** - 1:13
**hope** - 15:7
**Hopkins** - 78:7, 91:24
**horrible** - 54:24, 55:5
**horse** - 61:20
**Hospital** - 224:8
**hospital** - 212:19, 212:23, 216:2
**hour** - 53:6, 148:22, 187:21, 217:9, 217:10, 217:22, 218:11

**hours** - 9:20, 31:13, 197:24, 213:1, 218:20, 219:1, 219:8
**house** - 11:16, 11:17, 18:10, 18:15, 21:6, 23:15, 24:10, 25:6, 29:8, 29:22, 30:6, 36:20, 36:24, 51:23, 51:25, 74:13, 74:25, 75:2, 88:6, 88:17, 88:25, 89:6, 89:13, 90:5, 90:6, 115:8, 115:15, 115:17, 115:22, 118:11, 133:10, 133:17, 156:4, 156:21, 156:23, 157:1, 215:15
**housed** - 168:22
**houses** - 49:17
**Howard** - 43:15, 48:25, 49:2, 61:23, 224:3, 254:18
**human** - 17:11
**hunch** - 53:18
**hundred** - 209:25, 221:7
**hundreds** - 19:20, 21:25, 264:3
**hung** - 36:16, 74:10, 76:10, 85:5, 118:11
**husband** - 42:12, 42:13

**I**

**Ida** - 13:22, 244:17, 248:11, 270:10
**Idaho** - 271:2, 271:19, 271:25
**idea** - 2:18, 2:19, 8:14, 47:7, 114:3, 132:3, 174:18, 227:4
**identical** - 238:1, 260:16
**identification** - 191:24, 199:8, 214:2, 214:7, 226:13, 243:25, 254:2, 254:4, 254:9, 254:23, 255:4, 255:7, 256:7, 260:6
**identified** - 110:20, 208:4
**identifies** - 122:13
**identify** - 105:21, 117:3, 128:19, 133:8, 190:12, 240:13, 260:13
**identifying** - 109:1, 121:21, 144:22, 144:23, 145:3
**identity** - 150:13, 150:15
**ignition** - 259:5
**ill** - 55:2, 55:3
**illegal** - 40:10
**illegally** - 203:13
**image** - 48:7, 216:14
**imagination** - 22:18, 83:21
**imaginative** - 22:18
**immediately** - 22:1, 144:25, 185:14, 210:19, 239:19, 273:25, 275:4, 276:18
**Immunity** - 183:19
**immunity** - 137:14, 137:16, 139:14,

139:17, 140:3, 141:8, 178:22, 183:16, 183:18, 183:25, 184:8, 186:14, 189:3, 197:7, 201:12, 201:13, 201:15, 202:2
**impact** - 5:21, 6:3, 6:6, 229:2, 267:17
**impacted** - 229:5
**impaneled** - 148:20
**impaneling** - 2:11, 2:24
**impartial** - 145:17
**Impeachment** - 167:15
**impeachment** - 169:13
**impede** - 182:15
**implicate** - 14:7, 14:8
**important** - 7:15, 16:24, 24:24, 34:6, 60:13, 61:5, 64:10, 64:18, 101:6
**importantly** - 144:15
**impression** - 146:20, 150:12, 177:4
**improperly** - 203:13, 203:14
**incarcerated** - 86:12, 86:13
**incarceration** - 147:20
**incentive** - 62:24, 65:22, 148:5
**inches** - 229:19
**incident** - 209:3, 213:18, 214:23, 244:11, 244:14, 244:16, 246:9
**incidentally** - 60:21
**Incidentally** - 66:15, 150:24
**incidents** - 26:16
**include** - 103:4, 124:14, 124:15, 167:22, 207:8
**included** - 66:17, 104:2, 165:24, 167:18
**including** - 33:25, 34:20, 35:18, 36:13, 102:25, 116:25, 145:21, 191:7, 199:6
**Incorporated** - 270:25
**incorrect** - 144:19, 201:3, 201:7, 201:8, 201:9
**incriminate** - 183:22
**incrimination** - 139:11, 184:2
**incurred** - 65:9
**Indeed** - 148:1
**independently** - 116:24
**index** - 107:15
**indicate** - 65:18, 76:5, 80:21, 99:3, 146:2, 146:13, 213:4, 274:4
**indicated** - 2:12, 2:15, 3:4, 76:1, 99:18, 119:17, 131:23, 133:16, 143:22, 144:4
**indicates** - 147:24
**indicating** - 175:6, 209:14
**indication** - 3:6

**indict** - 33:21, 41:5, 55:21, 56:2, 123:25
**indicted** - 41:6, 50:23, 56:3, 56:11, 56:13, 95:23, 96:3, 97:3, 122:15, 123:20, 123:23, 127:15
**indictment** - 17:10, 17:15, 17:16, 26:1, 29:11, 32:24, 33:4, 33:5, 50:25, 55:23, 95:8, 96:12, 96:21, 100:6, 100:8, 101:7, 125:2, 141:22, 185:24, 186:2, 186:6, 186:21, 186:25, 187:2, 187:5, 188:2
**individual** - 104:5, 113:20, 113:22, 122:3, 208:3, 210:21, 229:24, 240:2
**individually** - 248:16
**individuals** - 8:24, 115:14, 115:17, 120:8
**indulgence** - 263:9
**infamy** - 55:11
**inflicted** - 227:8
**influence** - 148:7
**inform** - 147:12
**information** - 28:13, 38:20, 38:23, 39:10, 100:21, 100:22, 100:24, 103:4, 104:14, 105:21, 106:1, 106:17, 106:20, 107:6, 109:1, 109:16, 109:20, 111:6, 111:14, 111:21, 111:22, 112:3, 112:8, 113:12, 113:19, 116:17, 116:20, 117:8, 117:9, 119:3, 119:4, 119:16, 120:18, 121:21, 122:17, 123:2, 124:1, 124:18, 144:12, 144:13, 144:22, 144:23, 145:3, 145:7, 150:2, 167:12, 169:14, 195:16
**informed** - 147:8
**infringed** - 145:11, 145:13
**infringes** - 145:16
**initial** - 97:5, 176:4, 268:3
**initialed** - 157:16
**initials** - 157:6, 257:11, 261:20
**injuries** - 22:12, 227:5, 227:8
**injury** - 23:20, 209:23, 227:2
**inmates** - 39:19
**Inmates** - 40:8
**inner** - 69:19
**innocence** - 145:13, 148:17
**inquiries** - 140:24, 176:5
**inquiry** - 40:13
**inserted** - 259:1
**Inside** - 89:13
**inside** - 229:23
**instance** - 86:21, 237:5
**instant** - 43:4
**instantaneously** - 11:11

**instead** - 48:7, 48:8, 82:3, 84:21, 173:20
**instruct** - 181:14
**instruction** - 116:16
**insure** - 147:2
**intend** - 179:10
**intended** - 180:5, 180:7
**intent** - 17:24, 28:19, 110:15, 110:17, 119:22, 119:23
**intentionally** - 195:14, 198:14
**intentions** - 275:10, 275:12
**interact** - 85:13
**interaction** - 85:17, 155:1
**intercede** - 276:4
**interest** - 157:2
**interested** - 84:23
**interesting** - 16:1
**interests** - 146:18
**interfere** - 147:17, 147:25
**interior** - 216:17, 263:5
**interrupt** - 81:2
**interstate** - 267:22, 268:11, 268:12, 268:17, 269:4, 269:13, 269:14, 269:19, 271:23, 272:1
**interview** - 36:6, 128:4, 167:23
**interviewed** - 13:1, 22:21, 31:17, 31:18, 33:2, 154:18
**interviews** - 131:19
**intimidated** - 179:13
**intimidation** - 147:23
**Intimidation** - 182:15
**introduce** - 137:19
**introduced** - 73:14, 124:22
**introducing** - 26:17
**invaded** - 36:25
**invasion** - 36:20, 115:7, 115:9, 115:11, 115:21, 116:3, 116:4, 117:1, 118:10, 121:24, 133:9, 134:2
**inverse** - 152:22
**investigate** - 55:21
**investigated** - 35:4, 35:5, 35:6
**investigating** - 13:2, 16:7, 21:2, 33:2, 125:22, 125:24, 126:18, 179:7, 240:3
**Investigation** - 109:11
**investigation** - 13:3, 24:25, 31:9, 32:9, 37:25, 52:5, 56:4, 102:16, 115:24, 123:20, 125:25, 127:17, 127:18, 127:20, 127:22, 135:11, 135:16, 135:18, 135:20, 135:25, 140:6, 140:10, 140:22, 141:4, 177:8, 178:20, 178:25, 179:3, 183:19, 183:24,

11

185:11, 199:24,
200:7, 201:24, 202:6,
203:3, 217:14, 217:15
**investigations** -
126:8, 126:10
**investigator** -
131:25, 135:6, 135:7,
169:16, 170:17,
189:11, 189:17,
191:8, 191:15,
191:21, 193:1, 193:6,
193:12, 200:22, 240:3
**investigator's** -
193:10
**investigators** -
15:9, 38:1, 180:1,
195:19
**invoke** - 138:21
**involved** - 13:10,
13:14, 13:15, 17:23,
36:19, 69:25, 95:7,
112:3, 113:13, 118:9,
129:25, 131:19,
132:6, 133:20, 135:18
**involvement** -
135:11, 147:15
**involving** - 95:13,
110:8
**Ireland** - 64:12
**Irish** - 54:9
**Isaac** - 42:10, 42:16,
45:12, 61:22
**issue** - 3:1, 5:4,
5:15, 47:2, 144:18,
144:24, 145:9,
146:19, 146:20,
273:17
**issued** - 139:2,
213:13
**Issued** - 196:15
**issues** - 71:19,
71:20
**it'll** - 74:18
**It'll** - 5:4
**item** - 80:22, 107:3,
167:25, 249:2,
249:13, 249:19,
250:19
**itemized** - 105:25
**items** - 166:21
**itself** - 81:18,
124:21, 124:23,
135:16, 140:23,
141:4, 205:10,
205:11, 230:3, 231:2,
232:18, 234:8, 235:9,
236:25, 238:13, 271:5

## J

**Jack**- 72:19, 194:25
**jacket** - 262:16,
262:18
**Jackson** - 120:16
**Jai**- 72:8, 72:9,
72:10, 72:17, 75:11,
75:16, 75:23
**jail** - 29:22, 36:11,
36:12, 39:17, 40:7,
41:19, 41:21, 41:22,
42:12, 56:1, 56:17,
60:9, 60:11, 61:13,
72:23, 86:8, 86:9,
86:14, 86:25, 87:1,
87:2, 92:1, 92:3, 92:7,
102:1, 111:2, 112:11,
113:16, 114:10,
118:1, 122:22, 134:21
**jails** - 39:19
**Jamal**- 43:14,

61:23, 96:12, 100:7,
122:14, 122:16,
122:18, 122:20,
123:19, 127:8
**Jamar**- 33:6, 48:25,
49:1, 95:9, 96:13
**James** - 223:7,
223:12, 251:25,
252:3, 252:8
**January**- 33:1,
59:19, 106:25,
128:23, 167:23,
194:16, 199:10
**jaw** - 230:8
**jeans** - 59:11, 59:12
**Jencks**- 160:22,
160:24, 165:25
**jeopardized** -
100:23
**Jersey**- 134:21,
175:6
**Jim**- 165:14
**job** - 15:1, 15:13,
16:18
**Jocelyn**- 23:3
**Joe**- 114:4
**John**- 1:15
**Johnson**- 195:4,
226:4
**Jr**- 1:15, 136:19,
136:25, 164:17
**judge** - 14:16,
28:24, 29:15, 52:10,
64:15, 73:15, 97:4,
165:9, 274:15, 275:23
**Judge**- 1:13, 5:3,
5:14, 6:21, 52:23,
53:1, 53:21, 63:20,
84:13, 84:18, 92:17,
95:8, 110:4, 115:12,
118:21, 118:24,
119:6, 121:4, 125:11,
132:16, 134:3, 134:5,
149:1, 164:5, 164:7,
165:11, 214:1, 222:1,
252:11, 257:24,
260:24, 266:2, 266:3,
275:3, 275:5, 275:17,
275:21
**judges** - 200:9,
273:23
**judicial** - 147:18,
147:25
**July**- 41:22, 139:3,
194:19, 195:11,
196:3, 196:6, 196:15,
199:10
**jump** - 43:17, 43:21
**jumped** - 43:19,
45:18, 48:11, 48:18
**June**- 154:13,
165:8, 172:5, 173:19
**junkie** - 18:14, 20:1,
20:12, 20:17
**junkies** - 18:14,
19:16, 19:18
**juries** - 2:18, 64:12
**jurisdiction** -
172:18, 172:22,
185:13
**juror** - 16:22,
144:14, 146:19,
149:21, 274:2, 274:18
**jurors** - 13:23,
45:25, 145:25,
146:10, 146:13,
147:17, 148:13,
148:15, 149:11,
149:19, 149:24,
150:2, 150:15, 151:1,

151:3, 151:8
**Jurors**- 64:9,
149:15
**jurors'** - 147:22,
148:11, 149:14
**jury** - 2:11, 2:18,
2:25, 7:20, 8:16,
13:22, 13:25, 14:16,
15:10, 15:20, 15:25,
16:21, 17:17, 38:22,
40:18, 41:2, 42:1,
44:20, 44:24, 45:9,
49:6, 49:15, 50:17,
50:25, 54:9, 59:19,
59:24, 60:19, 61:1,
64:7, 66:11, 66:13,
67:16, 67:22, 68:20,
72:7, 73:1, 73:13,
73:16, 74:1, 76:5,
78:25, 80:21, 82:5,
84:1, 84:6, 87:11,
88:2, 94:21, 95:11,
97:2, 98:17, 98:20,
99:2, 99:3, 100:9,
103:17, 107:4, 109:6,
111:18, 115:9,
116:19, 120:13,
122:13, 129:4,
135:10, 135:13,
137:11, 140:1,
142:24, 144:2, 144:8,
144:17, 144:20,
145:10, 145:12,
145:14, 145:16,
145:17, 145:20,
146:3, 146:17,
146:23, 146:24,
147:5, 147:7, 147:13,
148:2, 148:19,
149:14, 153:22,
154:17, 155:10,
157:6, 158:25, 159:2,
159:3, 159:4, 159:8,
167:9, 167:12, 169:7,
170:15, 172:7,
173:23, 176:3,
176:18, 183:17,
186:5, 186:13,
187:21, 188:8,
189:25, 208:13,
209:19, 213:15,
216:13, 225:16,
228:7, 235:4, 236:10,
237:17, 237:21,
238:11, 244:18,
245:20, 255:7,
257:12, 260:7, 267:24
**Jury**- 1:13, 7:23,
66:9, 66:20, 117:5,
143:19, 152:2,
152:14, 223:1
**jury's** - 53:5, 166:12
**Justice**- 181:25,
267:16

## K

**Kareem**- 9:20,
10:14, 10:17, 11:12,
11:15, 12:5, 12:14,
12:25, 22:20, 27:21,
28:19, 29:5, 30:23,
31:4, 33:1, 33:8,
37:10, 40:15, 42:24,
43:6, 45:4, 45:5, 47:6,
47:25, 48:9, 50:7,
50:12, 51:25, 54:7,
54:24, 56:4, 57:7,
63:22, 67:17, 67:19,

67:23, 68:11, 71:16,
72:1, 72:8, 72:23,
73:3, 74:7, 74:20,
74:23, 75:17, 76:21,
82:6, 83:2, 86:6, 86:7,
88:3, 89:20, 91:11,
91:18, 92:2, 106:23,
128:18, 134:12,
134:25, 158:9,
167:23, 171:16,
175:18, 208:4, 225:24
**Kareem's**- 11:4,
38:12, 43:11, 50:8,
72:16
**Kasumba**- 242:3,
242:8, 242:15
**Keep**- 136:24
**keep** - 25:13, 25:18,
26:7, 61:21, 67:10,
176:8, 176:10, 177:5,
190:1, 190:5
**keeping** - 41:16
**keeps** - 271:14
**Kelly** - 225:24
**kept** - 162:14,
195:24, 197:14
**Kept** - 38:8
**Kershaw**- 217:11
**Kerwin** - 267:3,
267:8, 267:9, 267:13,
269:2, 269:24, 272:9
**Kev**- 85:3, 161:22,
162:10, 162:16,
162:24, 163:5
**Kev's** - 162:20,
162:21
**Kevin**- 16:11, 37:7,
42:18, 43:8, 43:22,
45:13, 45:18, 46:10,
46:11, 48:23, 51:13,
58:23, 63:9, 65:8,
85:2, 123:7, 123:10,
123:15, 123:17,
124:16, 161:17,
161:21
**key** - 2:7
**kill** - 28:19, 37:12,
57:8
**killed** - 13:17,
29:23, 32:20, 50:12,
54:6, 63:22, 135:1,
179:13, 180:8
**killing** - 28:16,
37:16
**kills** - 12:24
**kilo** - 18:5
**kilos** - 18:5
**kind** - 8:21, 65:22,
71:13, 89:10, 160:20,
243:14, 257:20
**kingpin** - 19:15
**kissing** - 122:22
**knowing** - 46:6,
80:5, 89:21
**knowledge** -
109:12, 114:1,
127:18, 130:3, 130:5,
149:25, 162:5,
176:15, 191:17,
193:13, 221:23
**known** - 9:10,
36:17, 70:13, 76:6,
81:8, 101:23, 112:9,
112:14, 118:13,
168:18, 178:21,
205:18
**knows** - 24:9,
24:11, 26:24, 43:4,
43:5, 61:9, 70:8, 71:8,
71:12

**Knox**- 38:4, 58:19,
152:6, 153:5, 153:10,
153:13, 159:19,
160:6, 164:11,
164:14, 173:13,
184:16, 185:4,
185:14, 185:20,
188:16, 188:18,
188:22

## L

**la's** - 75:23
**lab** - 100:19, 216:3,
216:5, 216:6, 216:7,
216:9, 220:12, 242:1,
242:24, 243:1, 243:5,
244:23, 252:9,
253:14, 254:5
**labeled** - 227:17,
240:3, 245:13, 270:7,
270:10
**laboratory** - 243:4
**ladies** - 78:5, 82:9,
143:14, 152:15,
183:17, 186:4,
187:20, 188:7, 255:2
**Ladies**- 66:3, 66:21,
81:7, 93:13, 117:6,
139:10, 222:11,
225:7, 276:14
**lady** - 30:8
**laid** - 219:25
**land** - 46:18, 263:3,
264:18
**lane** - 216:17
**large** - 33:24, 174:2,
230:12, 230:13,
230:16, 230:20,
230:21, 233:24,
234:4, 236:2
**large-caliber** -
230:12
**larger** - 248:18
**Laron**- 222:18,
223:3, 223:7, 223:12
**Larry**- 32:24, 33:17,
34:16, 35:6, 35:19,
38:5, 42:14, 55:22,
79:6, 80:2, 96:17,
96:20, 98:14, 122:3,
127:12, 140:7,
141:17, 153:16,
153:19, 154:3,
154:14, 155:2,
156:11, 162:18,
163:7, 188:23
**Larry's**- 156:12
**laser** - 11:18, 54:18
**last** - 7:12, 14:1,
14:3, 27:5, 36:3, 40:7,
40:15, 43:11, 46:4,
48:25, 49:2, 49:4,
49:5, 50:3, 50:10,
57:17, 57:18, 75:21,
75:22, 114:22, 124:9,
133:7, 138:14, 153:9,
194:23, 195:5,
204:12, 242:13,
248:1, 248:7, 252:17,
268:18
**Last**- 43:16
**late** - 8:1, 143:23,
274:25
**latest** - 275:14
**laugh** - 46:3
**launch** - 55:18
**law** - 10:4, 17:11,
17:19, 33:24, 35:2,

35:8, 35:13, 35:15,
41:4, 41:15, 41:17,
54:11, 58:17, 60:13,
60:15, 67:8, 78:17,
78:18, 79:1, 81:8,
94:8, 136:21, 153:7,
164:19, 196:16,
196:20, 198:1,
198:15, 204:8, 223:9,
242:5, 252:5, 252:24,
267:5, 270:15
  **laws** - 4:12, 17:12
  **lawyer** - 32:23,
35:6, 41:23, 46:12,
46:19, 153:23,
181:20, 184:5
  **lawyer's** - 60:18
  **lawyers** - 6:12, 7:1,
7:8, 34:24, 34:25,
101:13, 101:18,
105:16, 108:10,
143:17, 150:25,
159:18
  **lay** - 10:19, 216:25
  **laying** - 12:5, 211:4,
211:19
  **lead** - 21:3, 95:9,
122:20, 148:15,
213:12
  **leads** - 114:22
  **leaked** - 38:2
  **leaning** - 62:18
  **learn** - 41:14,
130:24
  **learned** - 41:14,
60:1, 125:25, 131:1,
131:3
  **learning** - 32:15
  **least** - 10:12, 19:12,
24:17, 45:8, 49:3,
76:22, 79:25, 105:10,
140:3, 168:20, 170:6,
189:18, 189:19,
190:1, 190:2, 190:3
  **leave** - 52:19, 71:14,
75:15, 228:10, 229:9,
260:16
  **leaves** - 245:25
  **leaving** - 174:8,
174:9
  **led** - 27:2, 259:3,
271:18
  **left** - 34:15, 44:5,
45:14, 54:2, 71:16,
74:16, 74:17, 74:25,
90:6, 90:7, 165:3,
211:20, 218:19,
230:8, 231:25, 232:1,
233:8, 233:18,
233:25, 234:1,
234:12, 234:18,
234:22, 235:14,
235:18, 235:19,
237:18, 238:22,
239:7, 239:10,
263:24, 274:3, 275:17
  **Legal** - 119:6
  **legal** - 18:1, 33:20,
160:19, 160:20, 197:6
  **legitimate** - 5:19
  **legs** - 75:18
  **length** - 6:13, 53:1
  **lengthy** - 147:19
  **Leonard** - 90:13,
90:19
  **less** - 5:5, 19:14,
105:11, 158:16,
176:22, 229:19
  **letter** - 103:9,
103:19, 103:25,

104:6, 124:21,
124:23, 137:13,
138:9, 139:3, 139:17,
143:4, 165:22, 166:3,
166:13, 166:14,
171:13, 177:11,
177:12, 178:21,
192:2, 192:5, 192:15,
192:24, 193:9, 194:8,
195:2, 200:5, 201:12,
202:2, 202:17, 203:2,
203:3, 203:4, 251:1
  **lettered** - 227:11,
246:14, 247:1
  **letters** - 66:16
  **level** - 265:7, 265:8
  **Levine** - 138:5,
138:6, 138:13
  **liar** - 58:18, 59:16
  **Liars** - 57:13
  **liars** - 58:8, 62:10
  **lie** - 15:15, 40:21,
58:22, 59:1, 59:4,
59:13, 60:8, 60:20,
62:25, 131:14,
195:13, 195:14
  **Lied** - 60:9
  **lied** - 13:24, 57:15,
57:22, 57:23, 57:24,
58:2, 58:12, 58:16,
58:20, 59:3, 60:3,
61:21, 61:22, 61:23,
61:24, 131:18
  **Lies** - 57:12
  **life** - 6:3, 9:10, 20:4,
44:16, 49:3, 68:4,
68:21, 130:10,
130:12, 148:4
  **life's** - 63:1
  **Life's** - 63:2
  **light** - 7:13, 18:21,
53:3, 61:16, 69:6,
182:11, 221:13
  **likely** - 53:19,
239:18
  **limited** - 117:16
  **limits** - 7:3
  **line** - 18:22, 62:22,
149:22, 190:13,
190:15, 271:7
  **lines** - 150:9
  **linked** - 55:24
  **list** - 58:10, 105:25,
144:11, 144:13,
144:21, 144:23,
145:2, 145:3, 148:12,
157:8
  **listed** - 81:14, 81:17
  **listen** - 15:3, 32:12
  **lists** - 77:6, 144:20,
149:14
  **live** - 68:22, 70:5,
72:17, 87:23, 88:1,
88:23, 88:24, 158:22,
253:24
  **lived** - 19:23, 23:4,
44:10, 68:3, 68:21,
73:11, 79:22, 87:12,
87:13, 87:14
  **livelihood** - 198:9
  **liver** - 236:4, 237:5,
237:7
  **lives** - 14:19, 23:13,
29:7
  **living** - 18:23,
67:23, 89:6
  **load** - 258:25
  **loads** - 264:25
  **loaned** - 21:9
  **local** - 30:18, 57:5,

125:4, 214:4
  **locate** - 216:13,
217:16
  **located** - 214:14,
215:14, 215:22,
227:17, 228:13,
231:8, 233:8, 234:18,
251:1
  **location** - 69:18,
209:7, 245:17
  **locations** - 133:4
  **lock** - 55:25
  **Locke** - 222:19,
222:21, 222:22,
222:23, 222:25,
223:3, 223:7, 223:13,
223:17, 225:4,
225:11, 225:23,
226:11, 232:2,
234:15, 240:8, 241:20
  **locked** - 41:11,
61:10, 92:4
  **log** - 218:11,
218:14, 218:18,
226:24
  **logistically** - 23:10
  **Look** - 98:18, 186:25
  **look** - 15:5, 17:14,
28:7, 36:3, 39:11,
45:23, 72:6, 73:12,
87:19, 88:12, 100:11,
102:7, 102:8, 102:23,
105:24, 107:3,
108:12, 108:19,
123:9, 124:18,
141:19, 147:20,
158:8, 157:1, 157:6,
159:1, 166:11, 188:1,
192:3, 214:13,
215:16, 216:12, 261:8
  **looked** - 45:3,
58:15, 82:4, 91:25,
113:4, 124:11,
142:21, 161:11,
145:7, 118:3, 167:20,
177:20, 194:6,
200:14, 212:5,
246:11, 261:18
  **Looked** - 47:22
  **Looking** - 180:24,
261:24, 263:3
  **looking** - 29:19,
47:17, 47:23, 72:7,
82:3, 88:12, 98:22,
101:7, 103:14,
108:16, 115:16,
117:24, 160:11,
177:3, 177:18,
190:21, 210:2,
210:22, 233:6, 233:7,
233:19, 249:1, 260:4,
263:1
  **looks** - 23:7, 72:9,
117:25, 219:22
  **lose** - 61:4
  **losing** - 274:2,
275:9
  **loss** - 91:8
  **lost** - 10:16, 14:13
  **loud** - 99:4, 181:1,
181:5
  **love** - 10:15, 41:18,
60:12, 150:14
  **loved** - 56:17, 75:3
  **lover** - 19:11
  **low** - 25:18, 260:2
  **lower** - 29:9, 238:24
  **loyal** - 24:1
  **luck** - 10:5
  **lucky** - 10:5

**Luger** - 270:7, 271:6
**Lunch** - 151:15
**lunch** - 18:19,
66:24, 143:9, 143:14,
143:15, 143:18,
143:22, 148:23,
186:5, 186:23
**lung** - 238:5, 238:19
**lying** - 11:12, 42:8,
56:21, 57:16, 58:8,
59:24, 62:10, 125:21
**Lying** - 57:12

---

# M

  **Ma'am** - 90:22
  **ma'am** - 91:6,
153:4, 159:24
  **machine** - 120:12
  **machining** - 260:10
  **Mack** - 8:25, 12:3,
13:17, 16:13, 16:14,
16:15, 19:4, 19:19,
22:2, 22:3, 22:13,
22:21, 22:22, 24:1,
24:14, 25:13, 25:25,
30:21, 30:25, 36:16,
36:17, 36:18, 37:3,
37:4, 37:12, 37:17,
37:18, 38:17, 39:5,
42:25, 43:7, 43:8,
43:12, 43:14, 43:15,
43:23, 44:7, 44:21,
44:23, 45:3, 45:4,
45:5, 45:17, 45:18,
46:15, 47:6, 47:6,
47:15, 47:21, 48:10,
48:12, 48:15, 48:17,
50:3, 50:9, 50:11,
61:18, 62:22, 86:14,
86:17, 113:5, 113:6,
113:12, 113:16,
113:17, 114:11,
114:17, 114:23,
118:7, 118:8, 118:12,
122:23, 124:14,
124:16, 133:20
  **Mack's** - 45:3, 116:2
  **Madison** - 154:9
  **magazine** - 258:25
  **magistrate** - 97:4
  **mailed** - 174:23
  **main** - 238:18
  **Maisel** - 12:1, 29:7,
43:18, 48:1, 50:5,
68:2, 74:6, 74:8, 74:9,
74:11, 76:6, 76:9,
84:8, 87:17, 88:16,
209:4, 217:2, 217:4,
244:20, 245:18
  **major** - 210:15,
212:6
  **male** - 210:15,
212:6
  **maliciously** - 28:18
  **Mama** - 25:6, 25:7,
25:8
  **Mama's** - 25:6,
25:10
  **Man** - 75:10
  **man** - 9:22, 11:3,
47:9, 55:6, 128:11
  **mandatory** - 148:4
  **Manhole** - 55:20
  **Mannequin** -
162:25
  **manner** - 9:11,
54:24, 55:6, 143:23,
241:10
  **manufactured** -
268:15, 270:20,

271:1, 271:8, 271:9,
271:19, 271:24
  **manufacturer** -
271:16
  **manufacturers** -
268:10, 268:19
  **map** - 19:5, 245:18
  **maps** - 29:14
  **March** - 89:18
  **marijuana** - 30:12
  **mark** - 157:10,
190:4, 199:8, 228:11,
229:9, 245:25,
246:15, 271:10
  **marked** - 96:6, 98:6,
137:20, 157:7, 158:8,
166:8, 187:1, 191:23,
213:24, 247:22,
248:5, 250:18, 257:6,
257:9, 261:19,
261:22, 262:4
  **markedly** - 146:5
  **marker** - 149:13
  **markers** - 246:15
  **markings** - 268:4
  **marks** - 260:5,
260:8, 260:10,
260:12, 260:17,
260:19, 263:3
  **marshaled** - 17:9
  **mart** - 47:1
  **Martinsburg** -
268:13
  **Marty** - 59:9, 87:9,
87:11, 88:23, 89:8,
89:9
  **Marvin** - 133:16,
134:1
  **Maryland** - 1:1,
55:14, 172:15, 193:1,
196:3, 196:8, 196:12,
196:17, 196:20,
198:11, 198:13,
203:12, 223:19,
254:6, 268:25, 272:2,
275:11
  **mask** - 11:1, 21:23,
21:24, 43:4, 45:4,
48:10
  **Mason** - 94:4, 94:6,
94:11, 94:15, 125:15,
125:18, 132:25,
136:10, 165:14,
174:24, 175:6,
190:18, 193:16,
193:17
  **mass** - 27:23
  **material** - 57:23,
58:2, 99:7, 99:10,
106:16, 107:10,
107:12, 167:12,
167:15, 181:8,
181:10, 189:22,
200:20, 262:16,
262:18
  **materials** - 34:19,
35:1, 35:10, 35:14,
35:19, 35:23, 76:19,
77:9, 97:17, 97:18,
97:20, 100:10,
103:10, 104:20,
104:23, 105:2,
107:21, 108:1, 121:1,
140:22, 141:3,
142:12, 157:9,
157:17, 165:25,
166:5, 166:18, 167:3,
167:4, 167:9, 167:22,
168:10, 168:12,
169:1, 169:8, 169:10,

169:14, 170:6, 170:7,
170:14, 170:15,
174:20, 175:2,
175:12, 175:13,
175:15, 175:23,
175:25, 176:7,
176:10, 176:25,
177:6, 179:11,
188:19, 189:22,
199:17, 201:5, 203:6
**matter** - 2:19, 2:20,
6:17, 9:15, 16:24,
16:25, 21:2, 33:7,
37:2, 65:13, 80:25,
81:13, 81:19, 116:12,
116:19, 117:13,
141:3, 141:4, 143:16,
143:21, 148:8, 183:4,
191:5, 214:25, 225:9,
269:13, 277:1, 277:6
**matters** - 2:7, 8:2,
137:10, 143:10
**Maurice** - 36:10,
78:23, 78:25, 95:20,
95:24, 101:23, 115:2
**Maximum** - 213:9
**mean** - 38:1, 75:9,
79:11, 80:11, 89:4,
90:6, 92:9, 100:14,
107:5, 126:4, 126:17,
128:17, 130:15,
163:10, 178:10,
181:23, 187:2, 190:8,
195:13, 213:11,
213:12, 220:25,
228:9, 229:14,
230:13, 265:13,
265:17
  **meaning** - 11:9
  **means** - 17:18,
139:14, 184:12, 237:6
  **meant** - 150:25,
188:14, 205:11
  **measure** - 150:19
  **measures** - 148:6
  **mechanical** - 1:23
  **mechanisms** -
139:13
  **medic** - 212:16
  **Medical** - 219:9,
223:18, 224:13,
224:16, 230:15, 262:1
  **medical** - 12:9,
211:6, 223:23, 224:2
  **medics** - 212:18,
216:1
  **medium** - 230:16,
230:17
  **meet** - 9:22, 9:25,
11:16, 16:6, 16:12,
18:23, 19:17, 23:3,
23:18, 24:23, 26:11,
26:25, 29:6, 30:19,
31:1, 31:22, 32:21,
38:3, 64:16, 128:6,
138:24, 184:5
  **meeting** - 21:20,
26:18, 35:17, 35:21,
42:18, 51:3, 176:23,
176:24, 193:23,
194:9, 194:12,
194:15, 194:18,
195:3, 195:4, 195:10,
211:12
  **meetings** - 183:10,
194:3, 194:20,
194:22, 194:23,
194:25, 195:5, 195:7,
202:22, 202:23,
202:24, 203:1, 203:4,

203:7, 203:8
  **member** - 254:10
  **members** - 145:1,
146:3
  **memorandum** -
2:13
  **memory** - 134:14,
159:1, 175:24, 203:19
  **mention** - 47:19,
86:17, 98:15
  **mentioned** - 13:12,
16:3, 16:4, 23:3,
23:16, 35:7, 37:21,
39:11, 57:9, 73:11,
78:11, 83:17, 86:11,
86:18, 86:21, 112:9,
118:25, 128:15,
130:7, 149:10, 152:3,
158:25, 159:8,
161:10, 161:24,
228:15, 231:23,
274:18
  **mentions** - 56:6,
56:8, 56:9, 56:11
  **merely** - 117:13
  **merit** - 148:18,
150:23
  **message** - 8:8
  **met** - 21:25, 46:19,
51:2, 71:1, 79:10,
123:14, 128:7,
128:11, 137:23,
138:13, 138:14,
142:20, 153:25,
154:22, 178:10,
183:8, 199:5, 199:13,
200:1, 200:16, 201:3,
202:17, 205:24
  **meted** - 127:6
  **Michael** - 32:23,
35:7, 96:22, 98:2,
109:10, 133:16,
134:2, 136:17,
136:19, 136:25,
164:17, 188:5, 226:4,
267:3, 267:8
  **Michigan** - 172:22,
173:5, 182:1
  **microanalyze** -
10:21
  **microphone** -
136:23
  **microscope** -
260:1, 260:2, 262:24
  **Mid** - 55:15
  **Mid-atlantic** - 55:15
  **midnight** - 218:20
  **might** - 14:17,
15:11, 38:24, 39:3,
39:12, 49:13, 77:8,
80:21, 102:16, 159:8,
179:12, 189:19,
228:21, 228:22,
229:25, 230:2,
252:18, 266:22
  **Mike** - 36:24, 38:22,
70:21, 78:14
  **miles** - 69:4
  **millimeter** - 51:11,
230:21, 234:6,
256:21, 262:10,
263:19, 271:6
  **millimeters** - 264:1
  **million** - 198:6
  **mind** - 57:14, 113:2,
113:3, 118:5, 125:10,
160:14, 188:12,
188:14, 276:3
  **mindful** - 7:7
  **mine** - 43:19, 89:25,

197:17, 275:22
  **minimize** - 147:1,
230:1
  **minute** - 5:5, 11:17,
25:1, 47:11, 53:4,
53:25, 66:7, 91:9,
98:4, 193:18, 222:12
  **minutes** - 31:22,
32:22, 38:4, 53:2,
53:6, 66:6, 90:5,
143:16, 213:9, 219:2,
219:8, 222:14, 266:19
  **mirror** - 48:7
  **misappropriating** -
198:14
  **misrepresent** - 54:4
  **Miss** - 3:8, 5:16,
23:13, 30:8, 40:4,
43:6, 61:5, 67:14,
82:2, 92:18, 92:25,
93:7, 93:22, 153:13,
160:5, 164:11,
164:14, 173:13,
178:14, 184:16,
185:4, 185:14,
185:19, 188:16,
188:18, 188:22,
276:18
  **misspoke** - 202:15
  **misstating** - 197:2
  **mistake** - 30:24,
145:4
  **mistrial** - 2:9, 2:10,
2:14, 2:22, 144:2,
144:3, 144:7, 148:19
  **Mizer** - 109:10
  **mobile** - 242:24
  **moisture** - 251:10
  **moment** - 30:1,
90:23, 91:1, 132:16,
143:25, 202:15,
217:6, 227:22
  **momentarily** -
210:22
  **moms** - 41:18, 71:6
  **Monday** - 131:1,
226:24
  **monetary** - 147:20
  **money** - 20:19,
36:25, 115:16, 197:4,
197:6
  **monitoring** - 221:11
  **Monster** - 77:11,
77:16, 111:9, 111:15,
112:14, 121:10,
121:14, 121:15
  **monster** - 77:19
  **Monster's** - 111:11,
111:15
  **month** - 142:3,
187:23, 188:10
  **months** - 11:21,
22:11, 34:14, 39:21,
43:5, 45:22, 49:12,
50:13, 52:4, 52:5,
52:6, 60:11, 61:13,
89:20, 142:3, 172:17,
186:6, 186:18,
186:20, 187:22,
187:25, 188:8,
188:12, 188:14
  **Moody** - 4:8, 26:25,
27:1, 31:15, 32:4,
36:5, 39:20, 39:23,
82:7, 109:9, 129:5,
191:7, 191:12,
272:22, 272:25,
273:8, 273:13
  **Moreover** - 148:4
  **morning** - 2:2, 2:3,

2:4, 2:8, 7:24, 8:7,
24:7, 24:12, 66:4,
66:5, 67:14, 67:15,
75:10, 137:4, 173:25,
204:19, 273:19
  **Morning** - 206:21
  **most** - 10:10, 16:24,
22:18, 24:24, 55:12,
59:16, 86:10, 114:8,
126:23, 130:8, 147:9,
149:17, 185:9
  **Most** - 150:14,
180:9, 189:1, 199:21,
257:22
  **mother** - 5:16, 6:1,
29:6, 29:24, 35:20,
38:5, 38:12, 42:15,
67:18, 73:9, 77:18,
79:9, 79:22, 79:23,
153:18, 156:12,
161:14, 173:16,
174:4, 174:11, 175:19
  **mother's** - 11:15,
21:6, 29:22, 30:2
  **mothers** - 14:7
  **motion** - 2:9, 2:10,
2:12, 2:14, 2:22, 4:3,
143:24, 143:25,
144:1, 148:18,
148:20, 172:6,
196:22, 196:23
  **motive** - 32:19,
37:6, 37:23, 38:2,
56:10, 56:16, 57:8,
116:23
  **mouth** - 26:7, 41:16
  **Mouzon** - 36:10,
36:23, 38:22, 42:2,
44:21, 47:19, 51:14,
60:17, 61:5, 70:19,
78:14, 95:21, 95:24,
101:23, 102:1, 108:5,
110:24, 112:9, 115:2,
115:4, 115:6, 118:11,
133:10
  **Mouzon's** - 42:12,
115:8, 115:22
  **move** - 4:1, 6:19,
6:23, 7:7, 10:18,
47:11, 142:23,
154:12, 231:5,
232:21, 234:11,
235:12, 237:16,
238:20
  **moved** - 68:5, 84:9,
144:6, 249:4, 271:23,
271:25
  **movement** - 182:18,
182:20, 182:22,
267:22, 269:3,
269:13, 269:14,
269:19
  **moves** - 237:13,
259:11
  **moving** - 125:1
  **Muhangi** - 219:21,
241:25, 242:3, 242:9,
242:15, 242:22,
243:23, 247:7
  **multiple** - 57:15,
61:22, 183:9, 191:3,
241:7
  **multiples** - 18:4
  **murder** - 8:18, 9:1,
9:6, 9:8, 10:2, 11:8,
13:11, 13:15, 13:16,
14:5, 17:6, 31:7,
31:11, 31:12, 34:14,
34:18, 37:11, 39:21,
40:1, 44:13, 49:12,

49:23, 59:5, 62:17,
63:11, 74:20, 90:17,
112:4, 112:5, 113:18,
114:7, 118:16,
119:21, 130:8, 135:8,
135:9, 135:11,
135:16, 135:18,
175:17, 175:21,
217:24, 258:5, 258:7
  **murdered** - 6:1,
9:23, 31:19, 32:8,
55:5, 73:5, 87:12,
88:4, 88:24, 88:25,
129:18, 130:21,
134:12, 134:16,
135:16, 148:2, 221:16
  **murderer** - 54:6
  **murders** - 9:2,
36:19, 112:18,
113:13, 118:9, 129:6,
129:12, 129:24,
133:20
  **muscle** - 233:25,
237:10
  **must** - 181:14
  **mutilation** - 262:15

### N

  **nailed** - 57:4
  **name** - 8:23, 19:18,
20:10, 23:22, 25:4,
30:8, 31:2, 32:23,
33:6, 33:16, 34:21,
35:6, 36:10, 36:22,
37:19, 40:3, 67:9,
71:12, 94:9, 95:24,
98:1, 99:23, 105:22,
109:3, 111:15,
113:20, 113:23,
114:4, 121:12,
123:10, 128:15,
136:23, 149:22,
150:15, 152:5, 153:8,
153:9, 157:11,
160:20, 162:18,
162:19, 190:13,
204:10, 204:12,
216:16, 216:23,
223:11, 242:6, 242:8,
242:10, 242:13,
252:7, 267:7, 271:5
  **named** - 23:3,
27:14, 37:6, 38:4,
48:19, 64:2, 78:23,
79:6, 95:9, 95:20,
96:17, 106:12,
110:20, 111:9,
114:24, 120:3, 120:8,
120:15, 122:3, 123:6,
123:23, 133:13,
141:16, 268:7
  **names** - 2:21, 4:17,
55:19, 55:21, 57:9,
62:19, 81:22, 144:12,
145:1, 145:24,
145:25, 146:4,
146:10, 147:22,
148:12, 149:14,
155:12, 180:6, 220:25
  **National** - 252:20
  **national** - 254:12
  **natural** - 64:15
  **nature** - 41:17,
148:1, 175:1, 224:14
  **near** - 159:12
  **nearby** - 207:15
  **necessarily** -
117:12, 117:19,
265:13

**necessary** - 248:17
**neck** - 25:16, 194:19
**need** - 3:11, 14:21, 29:11, 50:20, 55:3, 61:21, 63:7, 90:11, 90:12, 123:9, 138:21, 146:14, 200:6, 208:12, 217:17, 258:15, 276:17
**needed** - 33:10, 60:14, 89:22, 104:1, 150:12, 171:7, 203:11, 203:15
**needs** - 28:4, 146:24, 147:7
**negative** - 92:15
**negotiate** - 184:6
**neighbor** - 70:6, 89:6
**neighborhood** - 9:9, 63:2, 70:3, 80:3, 82:8, 85:4, 87:16, 91:15, 217:23
**neighboring** - 185:12
**neighbors** - 90:9
**neon** - 61:15
**nerve** - 236:2
**nervous** - 46:22
**never** - 6:12, 9:22, 16:3, 46:20, 60:21, 64:16, 79:10, 83:19, 91:21, 92:14, 94:15, 118:5, 123:1, 128:7, 128:11, 132:11, 158:18, 170:25, 179:23, 180:4, 180:7, 181:17, 193:19, 195:14, 198:1, 198:4, 221:9, 266:25
**Never** - 24:22, 188:20, 189:5
**New** - 134:21, 175:6
**new** - 78:9, 181:20
**newspaper** - 250:13
**Next** - 145:15, 251:23
**next** - 7:6, 26:22, 45:16, 50:12, 105:2, 105:5, 114:22, 131:2, 133:19, 150:6, 152:12, 157:11, 157:16, 214:13, 216:17, 216:18, 222:16, 222:17, 223:3, 241:25, 245:22, 246:25, 265:11, 265:18, 265:24, 272:19, 277:1
**nexus** - 268:12, 268:17
**Nice** - 25:17
**nice** - 18:22, 71:12
**nicer** - 125:18
**nickname** - 79:4, 113:1, 113:22
**niece** - 47:2, 47:4
**night** - 7:12, 11:20, 15:12, 31:24, 37:10, 38:16, 38:25, 39:2, 40:1, 40:7, 40:15, 42:2, 47:21, 49:16, 59:5, 130:25, 210:10, 210:11, 215:4, 220:17, 243:12, 243:18, 245:2, 246:9, 246:18, 250:8, 251:7, 251:12
**nine** - 13:13, 51:10,

57:18, 95:1, 113:15, 230:21, 234:5, 256:21, 262:10, 263:19, 264:1, 268:25
**nine-page** - 13:13, 113:15
**Ninth** - 147:10, 147:11
**no'** - 45:5
**Nobody** - 32:1
**nobody** - 12:12, 46:13, 71:10, 187:14
**nomenclature** - 268:5
**nonchalance** - 9:11
**none** - 16:13, 54:23
**None** - 23:8, 54:25, 121:22, 222:6
**nonetheless** - 58:22
**Nonsense** - 59:23
**Norfolk** - 74:7, 87:17, 209:9
**normal** - 167:10, 275:1
**normally** - 66:5, 76:1, 93:7
**northern** - 64:11
**northwest** - 156:6
**notably** - 147:9
**notarized** - 226:20
**notation** - 177:25
**notations** - 228:4
**note** - 93:24, 233:3
**noted** - 123:4, 144:20, 229:3, 229:6
**notes** - 3:5, 8:7, 177:3, 177:4
**nothing** - 11:21, 17:19, 40:10, 56:4, 56:21, 57:21, 59:21, 62:10, 63:19, 91:21, 92:2, 146:1, 146:12, 273:21
**Nothing** - 31:25
**noticed** - 151:6
**notification** - 177:7, 212:22
**notified** - 31:16, 177:12, 178:24, 273:12
**noting** - 237:21
**November** - 49:12, 50:22, 194:5, 194:13, 199:23
**nowhere** - 19:5
**Nr** - 270:7, 271:6
**number** - 3:1, 3:7, 4:14, 56:8, 88:13, 99:19, 106:23, 107:3, 109:2, 114:19, 122:8, 127:25, 137:20, 138:8, 147:8, 169:19, 171:25, 172:16, 213:13, 213:16, 213:17, 213:19, 214:8, 214:14, 214:23, 214:25, 215:5, 228:20, 229:16, 235:1, 240:19, 240:22, 240:23, 240:24, 244:15, 245:23, 248:9, 251:4, 256:2, 257:6, 257:7, 257:11, 261:11, 261:20, 273:14
**numbered** - 166:20, 166:21, 166:23, 246:14, 247:1, 247:2
**numbering** - 167:1

**numbers** - 107:2, 107:5, 107:7, 108:20, 144:14, 240:21
**numerous** - 61:22, 61:23

## O

**o'clock** - 31:14, 66:23, 143:10, 143:15, 143:18, 148:24, 273:18, 273:25, 274:7, 274:10, 276:12, 276:15, 276:23, 276:24
**oath** - 39:7, 40:21, 57:19, 164:23, 184:13, 186:12
**object** - 33:17, 252:24, 253:4
**Objection** - 63:5, 63:13, 84:13, 84:18, 110:4, 115:12, 118:21, 119:6, 131:15, 134:3, 140:13, 196:9, 257:24, 270:16
**objection** - 3:22, 65:6, 65:21, 81:3, 93:4, 119:11, 121:5, 143:23, 144:9, 152:7, 152:25, 222:20, 252:19, 260:24
**objections** - 6:14, 144:16, 260:3
**objects** - 144:16, 260:3
**obligation** - 97:8
**obligations** - 142:12
**observed** - 210:15, 211:18, 211:19, 220:9
**obtained** - 100:10, 130:6
**obviously** - 97:18, 121:9, 129:24, 219:17, 264:14, 265:6
**occasion** - 27:11, 76:16, 83:2, 83:5, 168:25, 193:24, 208:3
**occasions** - 193:24, 193:25, 194:6
**occular** - 134:12, 21:2:25
**occurred** - 36:19, 115:8, 115:25, 117:1, 117:11, 117:20, 118:10, 135:8, 135:9, 146:1, 170:12, 209:3, 209:23, 209:24
**occurs** - 31:12
**October** - 188:15, 194:5, 194:10, 199:9
**offenses** - 109:22, 109:25, 110:6, 110:8, 110:22, 269:15
**offer** - 254:22
**offered** - 81:12, 81:16, 116:18, 158:2, 256:4, 269:15
**Office** - 32:10, 60:7, 94:4, 94:18, 94:23, 97:22, 173:4, 179:5, 180:22, 185:12, 192:25, 203:12, 222:19, 223:18, 224:12, 224:17,

230:14, 262:1, 274:24
**office** - 94:20, 95:17, 99:8, 99:9, 104:21, 132:7, 132:8, 173:3, 174:3, 177:14, 178:21, 179:4, 181:9, 181:10, 181:16, 181:18, 230:14, 275:2
**Officer** - 82:7, 129:5, 204:18, 205:17, 219:21, 222:8
**officer** - 31:23, 32:4, 109:9, 180:11, 204:4, 206:11, 206:12, 207:3, 207:17, 212:12, 212:21, 218:19, 240:4
**officers** - 26:12, 26:18, 109:12, 109:18, 109:19, 130:2, 177:9, 206:9, 206:17, 207:2, 214:21, 245:9
**officials** - 201:19
**often** - 24:8, 84:2, 85:6, 168:21, 220:22
**old** - 9:23, 67:19, 67:21, 71:11, 72:10
**older** - 77:21
**once** - 6:5, 7:2, 10:9, 12:15, 44:8, 57:11, 59:25, 60:5, 97:3, 135:8, 214:22, 248:16, 252:22
**Once** - 135:15, 160:13, 208:23, 255:7, 269:11
**one** - 4:6, 5:4, 9:22, 12:7, 12:18, 14:8, 15:4, 16:2, 16:23, 17:15, 17:16, 17:21, 18:21, 19:9, 19:10, 19:11, 20:4, 20:11, 20:18, 21:16, 21:17, 23:6, 24:6, 24:11, 24:12, 25:3, 25:11, 25:22, 25:23, 26:17, 26:19, 26:20, 26:22, 28:7, 30:4, 31:17, 32:13, 33:9, 33:13, 33:16, 34:11, 35:4, 35:5, 40:25, 42:14, 43:3, 49:6, 50:2, 50:10, 51:8, 54:14, 54:16, 54:23, 55:22, 56:7, 58:4, 58:9, 64:6, 64:9, 64:15, 65:3, 66:23, 66:24, 69:13, 69:14, 69:16, 74:12, 78:23, 80:1, 80:15, 80:16, 82:18, 82:20, 83:5, 83:16, 86:16, 87:7, 87:8, 88:13, 90:8, 91:19, 93:14, 93:20, 93:21, 95:9, 96:14, 96:17, 102:10, 102:11, 102:18, 105:25, 106:7, 106:13, 110:24, 114:10, 116:7, 120:6, 122:8, 129:3, 132:12, 139:13, 140:6, 143:10, 143:20, 146:23, 148:22, 161:10, 162:10, 162:16, 167:8, 168:7, 168:9, 170:17, 170:18, 170:19, 177:23, 180:19, 186:6, 186:18, 187:21,

187:23, 188:8, 189:16, 189:17, 193:23, 194:4, 194:5, 194:20, 194:23, 195:3, 198:4, 203:18, 210:15, 212:11, 214:4, 215:8, 215:10, 217:6, 219:13, 220:9, 221:9, 221:17, 221:18, 236:15, 240:22, 246:6, 246:24, 248:11, 248:15, 248:18, 265:18, 265:19, 265:23, 266:11, 269:14, 272:17, 274:3, 275:16
**One** - 13:12, 16:15, 19:9, 19:18, 22:20, 24:23, 26:15, 34:16, 39:3, 39:13, 43:12, 69:10, 139:12, 186:20, 188:13, 189:16, 190:2, 225:9, 230:16, 248:7
**one-hour** - 148:22
**one-time** - 25:3
**ones** - 32:7, 34:23, 56:17, 189:24, 191:2, 261:22
**ongoing** - 126:7
**open** - 127:17, 127:18, 184:25, 185:1
**opened** - 126:4
**opening** - 2:6, 3:15, 4:23, 5:9, 8:3, 28:22, 63:18, 81:2
**operates** - 47:16
**operating** - 119:2
**Operation** - 55:20
**operation** - 55:20
**opinion** - 146:9, 146:21, 147:11, 148:9, 196:15, 197:1, 198:6, 198:18, 198:19, 225:9, 225:15, 225:18, 241:3, 241:9, 255:5, 269:16, 269:17
**opportunities** - 71:14
**opportunity** - 30:25, 159:19, 168:13, 192:23
**opposite** - 54:14, 54:15
**orange** - 88:18
**order** - 92:20, 93:8, 131:3, 136:11, 139:2, 152:5, 152:12, 152:19, 203:25, 222:10, 227:4, 227:7, 227:12, 274:16
**ordinarily** - 275:4
**organ** - 237:6
**organize** - 169:14
**organized** - 104:6, 147:15
**organizing** - 170:13
**organs** - 237:11
**orient** - 74:2, 88:2
**orientation** - 233:5
**origin** - 268:15
**original** - 15:22
**otherwise** - 94:21
**ourselves** - 7:11
**outcome** - 148:7
**outlined** - 166:17
**outlines** - 104:4
**outlining** - 103:25

**outside** - 11:16, 33:12, 38:6, 51:2, 93:25, 99:8, 104:21, 174:12, 181:8
**overall** - 112:2, 119:1
**overlying** - 230:8
**overruled** - 65:20, 116:13, 119:11
**Overruled** - 63:6, 63:14, 110:5, 115:13, 119:10, 121:6, 126:11, 131:16, 140:14, 196:10, 260:25, 270:17
**overt** - 21:16, 26:21
**own** - 19:8, 30:21, 63:10, 103:14, 103:16, 140:1, 183:17, 183:23, 187:14, 190:1, 220:5

# P

**package** - 120:21, 120:23, 167:21
**packaged** - 248:17
**packet** - 189:22, 226:23
**page** - 13:13, 21:18, 28:8, 35:24, 35:25, 36:7, 56:7, 98:21, 98:25, 99:19, 105:25, 106:7, 106:8, 107:2, 107:4, 107:7, 107:8, 113:15, 114:19, 116:6, 117:24, 120:5, 120:14, 121:11, 121:13, 121:17, 121:19, 121:23, 122:8, 122:9, 122:10, 133:7, 133:19, 168:1, 180:25
**Page** - 28:8
**pages** - 107:9, 107:12, 107:19, 166:17, 166:22
**paid** - 63:3, 63:11
**pair** - 59:10, 59:12
**panel** - 144:11, 145:20, 146:3
**panelist** - 145:24, 146:2, 148:12
**panelists** - 148:16
**panoply** - 61:24
**paper** - 17:1, 42:14, 54:20, 80:14, 82:10, 82:17, 83:7, 128:11, 149:15, 167:4, 167:9, 170:7
**papers** - 37:20, 37:21, 37:22, 38:12, 58:20, 76:22, 77:24, 82:6, 82:9, 82:23, 83:6, 83:19, 86:1, 86:8, 86:9, 86:18, 86:23, 155:7, 155:8, 155:12, 155:21, 156:2, 157:3, 159:2, 159:5, 160:7, 160:8, 160:13, 160:16, 160:20, 161:1, 162:11, 163:13, 163:22
**paperwork** - 38:7, 76:17, 76:21, 77:3, 80:8, 80:9, 135:7, 156:17, 156:19, 156:22, 157:2, 158:7, 158:9, 158:12

**paragraph** - 36:4, 98:23, 98:24, 99:3, 99:5, 104:13, 114:22, 133:7, 181:1, 181:4
**paralegal** - 187:15
**parents** - 89:23
**Park** - 126:5, 126:8
**parked** - 11:19, 209:10, 209:13, 209:14
**Parsons** - 19:18, 20:10, 20:19, 21:4, 21:8, 21:9, 21:20, 21:21, 22:9, 23:2
**Parsons'** - 20:25, 21:6
**part** - 22:7, 27:17, 29:9, 64:16, 104:18, 193:5, 207:13, 238:24, 257:14
**Part** - 28:22
**participation** - 147:16
**particles** - 229:2
**particular** - 9:16, 27:11, 28:15, 35:23, 50:16, 83:1, 83:5, 84:23, 116:3, 123:1, 140:21, 168:7, 177:23, 189:14, 189:21, 207:1, 209:6, 213:19, 214:24, 227:12, 257:17, 259:20, 260:14, 260:22
**Particularly** - 7:13, 84:5
**particularly** - 9:11, 16:2, 26:10, 27:8, 37:17, 42:11, 108:1, 174:21, 265:16, 275:18
**parties** - 144:19, 145:21
**Partlow** - 78:7, 78:11, 78:13, 91:23
**partner** - 26:25
**parts** - 268:7
**party** - 62:22, 72:9
**pass** - 174:1, 234:20
**passed** - 67:20, 71:16, 230:5, 231:23, 231:24, 233:16, 233:22, 235:22, 239:13
**passenger** - 43:24, 45:19
**passing** - 50:7, 72:16
**past** - 10:23, 11:19, 11:21, 30:14, 38:16, 147:17, 147:25, 218:19, 218:20
**pasted** - 57:5
**path** - 230:24
**pathologist** - 223:23
**pathology** - 224:7, 224:15, 225:4, 225:12, 225:14, 225:15, 225:20
**pathway** - 211:4
**patrol** - 206:9, 206:12, 207:12, 207:13, 207:20, 209:8
**patrols** - 207:17
**pattern** - 250:22
**Paul** - 106:13
**pay** - 160:14

**peers** - 91:20
**Peggy** - 78:7, 78:8, 82:21, 91:23
**penalties** - 147:20
**penalty** - 60:4, 60:19
**pending** - 183:24, 202:5
**Pennsylvania** - 224:8
**Penny** - 78:7, 82:24, 91:23
**People** - 57:3, 62:19
**people** - 9:10, 9:24, 10:2, 10:14, 12:15, 12:24, 13:1, 13:10, 13:12, 14:13, 15:3, 18:13, 18:22, 22:22, 23:11, 24:23, 25:11, 30:13, 30:18, 30:19, 31:17, 32:13, 32:20, 33:15, 34:9, 34:12, 34:19, 34:21, 35:18, 36:12, 36:17, 37:13, 38:8, 38:10, 38:14, 44:20, 47:8, 47:9, 49:14, 51:15, 56:9, 56:11, 56:13, 57:7, 57:8, 61:11, 61:14, 62:18, 68:22, 68:24, 71:2, 76:4, 76:6, 80:5, 80:9, 81:14, 81:17, 82:8, 85:13, 85:17, 85:19, 85:23, 86:7, 87:8, 91:11, 91:14, 91:22, 102:15, 103:7, 109:23, 110:20, 111:7, 113:16, 114:10, 115:19, 120:3, 123:25, 133:8, 133:23, 135:13, 139:10, 149:20, 155:13, 155:18, 155:20, 155:23, 155:24, 155:25, 161:10, 163:15, 182:7, 182:9, 182:24
**people's** - 77:9, 155:12, 180:6
**per** - 91:16
**percent** - 221:7
**peremptory** - 145:18
**perforation** - 236:4
**performed** - 224:18, 224:19
**Perhaps** - 274:22
**perilous** - 185:10
**period** - 84:6
**periodicals** - 271:17
**perjurers** - 62:1, 62:3, 62:11
**perjury** - 40:19, 40:20, 41:7, 58:5, 60:4, 60:19, 60:21, 61:10
**permeates** - 64:15
**Permission** - 226:8, 240:5, 242:17, 243:20, 247:3, 255:19, 261:3, 269:20
**permission** - 97:21, 256:13
**permitted** - 97:16, 146:16, 225:14, 225:17, 255:5, 269:16
**person** - 9:20, 14:2, 14:4, 14:24, 15:19, 16:11, 16:12, 28:12, 31:1, 31:16, 41:19,

46:4, 48:20, 54:6, 58:20, 79:6, 84:23, 93:21, 95:9, 95:20, 96:17, 101:23, 111:9, 114:24, 118:7, 122:21, 145:15, 146:14, 210:25, 213:11, 213:12, 216:2, 245:3, 265:5, 265:7, 265:13
**Person** - 15:19
**person's** - 225:11
**personal** - 108:25
**pertain** - 109:21
**pertained** - 76:21
**Philadelphia** - 224:8, 224:12
**phone** - 39:14, 39:19, 40:4, 40:6, 40:7, 40:9, 40:14, 131:9, 273:20, 273:23
**photo** - 124:11, 124:13, 124:15, 128:16, 128:20, 128:22, 128:24
**photograph** - 72:6, 74:3, 87:15, 216:12, 228:2, 232:6, 233:9, 239:7, 249:2, 249:13, 249:19, 258:6
**photographed** - 248:14
**photographs** - 69:17, 205:25, 216:3, 226:21, 226:22, 246:6
**photos** - 128:17
**pick** - 40:14, 126:17, 149:9, 172:7, 248:13, 248:20
**picked** - 14:16, 46:25, 126:15, 126:18, 249:6
**picture** - 9:21, 12:8, 29:10, 29:13, 48:4, 61:20, 72:4, 72:14, 88:13, 128:24, 128:25, 129:1, 208:18, 216:17, 228:5, 233:4, 236:8, 238:9, 246:23, 247:25, 250:14, 258:14, 258:16, 258:18
**pictures** - 215:10, 215:23
**piece** - 128:11, 246:16, 247:12
**pieces** - 149:15, 248:9, 250:13
**pile** - 80:13
**pills** - 12:20
**pin** - 259:4
**pistol** - 11:2, 27:21, 47:14, 47:15, 51:11, 257:22, 258:11, 258:23, 258:24, 259:16, 260:16
**place** - 18:20, 38:17, 47:8, 55:13, 78:3, 89:17, 99:11, 100:12, 104:14, 129:16, 181:11, 194:1, 198:3, 249:6, 265:14, 268:15
**placed** - 240:2, 240:16, 251:10, 257:8
**places** - 23:25, 55:10
**placing** - 65:9
**Plaintiff** - 1:4, 1:15

**planner** - 177:3, 177:20, 178:6, 194:1, 194:7, 195:1, 195:6, 195:18, 195:21, 195:24, 200:13, 203:11, 203:16
**planners** - 177:18
**planning** - 3:23, 246:16
**plastic** - 257:7, 261:21
**play** - 39:25, 229:24
**played** - 41:1, 57:18
**plea** - 66:16, 156:14, 167:17, 172:8, 173:20, 173:22, 178:2, 190:22, 190:24
**plead** - 102:4, 172:9
**pleading** - 111:25, 154:14
**pleads** - 34:7
**pleas** - 33:14, 34:11
**pleasure** - 54:2
**pled** - 33:9, 34:16, 101:11, 101:20, 102:2, 122:23, 122:25, 154:6, 155:2
**plenty** - 2:17, 60:24
**Pm** - 31:15, 213:2, 213:6, 218:19, 218:20
**pocketbook** - 82:21
**Pod** - 221:3, 221:15
**Podds** - 221:5, 221:6
**Pods** - 221:6
**point** - 3:14, 3:16, 3:20, 7:17, 8:19, 22:7, 22:8, 30:4, 38:21, 42:3, 42:7, 42:13, 46:9, 49:7, 50:17, 61:3, 68:13, 72:23, 72:24, 74:25, 98:19, 99:20, 101:12, 105:4, 122:12, 127:14, 131:8, 131:20, 134:8, 139:6, 141:15, 142:7, 145:24, 149:2, 149:6, 150:6, 150:7, 165:6, 168:17, 169:3, 169:22, 169:23, 170:5, 172:14, 176:20, 176:22, 178:16, 190:11, 190:23, 193:15, 212:11, 212:16, 225:3, 231:15, 232:8, 235:3, 236:10, 238:11, 249:4, 250:16, 269:2
**pointed** - 140:19, 220:10
**pointer** - 11:19, 206:5, 208:7
**pointers** - 54:18
**pointing** - 12:4, 30:6, 49:18
**pokey** - 60:16
**pole** - 159:9, 159:11, 162:2
**police** - 13:14, 21:2, 21:5, 22:21, 25:24, 25:25, 26:6, 26:8, 26:14, 26:15, 90:2, 90:9, 90:10, 100:17, 101:1, 219:9, 219:14, 240:18, 245:9, 252:9, 253:14, 253:21, 254:5
**Police** - 100:18, 204:22, 204:24,

16

242:23, 251:25, 254:6
**pop** - 44:13, 134:24, 265:22
  **pops** - 47:16
  **portion** - 231:21, 233:24, 235:24, 236:1, 238:2, 255:8
  **portions** - 33:24, 230:6, 231:24, 233:17, 233:22
  **portrayed** - 77:20
  **position** - 243:3, 253:17
  **possess** - 17:24, 110:17, 119:23
  **possessing** - 130:12
  **possession** - 110:8, 110:15, 119:18, 119:21
  **possibility** - 142:9, 147:22
  **possible** - 28:13, 169:13, 177:9, 183:20, 200:15, 210:23
  **possibly** - 133:6
  **post** - 207:1, 207:2, 207:3, 207:6
**Post** - 207:7
  **poster** - 73:15
  **posts** - 206:16
  **potential** - 119:5, 146:10, 147:18, 235:11, 237:2
  **potentiality** - 93:16
  **potentially** - 231:3, 232:19, 233:23, 234:9, 235:10, 237:1, 238:14
  **pound** - 55:12
  **powder** - 264:25
  **powered** - 260:2
  **practice** - 181:21, 196:16, 196:20, 197:17, 197:21, 198:2, 200:8
  **practicing** - 172:15, 172:20
  **practitioner** - 187:11
  **precautions** - 146:25
  **precedent** - 2:17
  **preference** - 5:6
  **prejudice** - 150:17
  **prejudicial** - 147:1, 148:11, 150:8, 150:10
  **preliminary** - 2:7
  **premeditated** - 11:8
  **premeditation** - 11:8, 28:19
  **preparation** - 170:4, 180:2
  **prepare** - 103:9, 169:10, 169:11
  **prepared** - 13:4, 13:5, 170:18, 170:19, 171:11, 256:1
  **preparing** - 169:18, 172:1, 189:23, 190:24
  **prescription** - 23:21
  **presence** - 9:12, 175:22
  **present** - 3:23, 7:16, 128:4, 132:4, 138:18, 156:7, 160:12, 200:18, 245:9, 250:23, 251:11
  **presentation** - 9:7

  **preserve** - 149:7, 150:20, 252:23, 253:6
  **preserved** - 253:7
  **presided** - 146:6
  **presume** - 126:5
  **presumption** - 145:13, 148:17
  **pretty** - 30:9, 40:21, 41:9, 210:1, 210:11, 271:7
  **previous** - 254:17, 268:25
  **previously** - 144:3, 164:18
  **primary** - 207:12, 207:16, 207:17, 207:19, 207:20, 212:21, 213:10, 213:11, 220:22, 251:8
  **primer** - 259:4
  **prison** - 36:11, 41:9, 58:13, 154:7, 174:22, 177:2
  **prisoners** - 168:21, 168:22
  **pristine** - 262:14
  **privilege** - 184:2
  **privileges** - 139:11
  **probing** - 15:10
  **problem** - 23:9, 53:14, 56:18, 152:4, 214:9, 258:10, 276:5, 276:6, 276:19
  **problems** - 19:12
  **procedural** - 8:2
  **procedures** - 219:25
  **proceed** - 2:3, 2:5, 3:15, 7:25, 8:3, 66:22, 138:17, 141:11, 152:17, 225:20, 242:17, 255:10, 275:20, 277:1
  **proceeding** - 3:12, 155:2
  **proceedings** - 50:1, 173:25, 277:5
  **Proceedings** - 1:12, 1:23
  **process** - 33:21, 40:24, 96:24, 142:5, 145:8, 147:18, 148:1, 151:12, 170:13, 172:8, 173:6, 174:8, 245:3
  **processed** - 18:7, 245:3
  **processing** - 248:16
  **Proctor** - 1:18, 2:8, 3:20, 3:21, 4:14, 5:3, 5:14, 5:18, 6:8, 6:20, 7:11, 7:15, 52:22, 52:23, 53:1, 53:9, 53:11, 63:7, 63:19, 65:1, 66:14, 81:4, 84:13, 84:18, 90:25, 91:1, 91:5, 92:17, 93:5, 110:4, 115:12, 118:21, 119:6, 121:4, 125:10, 125:14, 126:12, 126:13, 126:14, 128:3, 131:15, 131:21, 132:19, 132:20, 134:3, 136:7, 136:8, 149:1, 149:5, 149:9, 150:2, 150:3, 150:7, 150:21, 150:24, 151:9, 152:8, 152:9, 153:1, 153:2, 157:22,

159:21, 159:23, 164:4, 164:7, 192:9, 214:1, 214:9, 218:4, 218:5, 218:7, 221:25, 222:3, 225:5, 225:6, 241:16, 241:17, 251:16, 251:17, 252:11, 252:15, 252:16, 253:4, 254:25, 257:24, 258:2, 258:3, 258:9, 260:24, 263:12, 263:14, 263:17, 266:1, 266:5, 266:22, 269:9, 269:10, 270:16, 272:6, 272:7, 276:5
  **produced** - 1:24, 100:17
  **product** - 24:4
  **proffering** - 150:1
  **proficiency** - 27:12
  **proficient** - 27:19
  **prohibited** - 181:15
  **prohibition** - 197:21
  **projectile** - 247:12, 249:3
  **projectiles** - 240:15, 262:6
  **prolific** - 59:16
  **promptly** - 21:10, 274:7, 276:20
  **promulgated** - 147:12
  **pronounced** - 213:2
  **properly** - 91:10
  **property** - 257:7, 257:11, 261:20
  **prosecute** - 113:8
  **prosecuted** - 113:25, 115:19, 139:18, 153:20, 182:4, 184:13
  **prosecution** - 95:7, 144:11
  **prosecutor** - 33:12, 33:13, 172:24, 173:1
  **prosecutor's** - 34:23
  **prosecutors** - 34:4
  **prospective** - 146:13
  **protect** - 24:20, 34:12, 41:20, 217:17
  **protected** - 147:2
  **protecting** - 15:15, 15:17, 15:19
  **protection** - 40:11, 65:10, 65:15, 65:19, 65:24, 146:15, 146:25, 147:7, 202:5
  **protective** - 274:16
  **prove** - 53:14
  **proven** - 53:23
  **provide** - 33:22, 99:11, 102:24, 105:1, 106:15, 111:6, 112:3, 142:12, 166:16, 181:11
  **provided** - 99:6, 99:12, 105:8, 108:21, 109:16, 109:20, 112:8, 117:10, 122:6, 124:24, 145:2, 156:16, 166:18, 167:1, 167:10, 168:10, 170:8, 175:12, 175:14, 181:6, 181:13, 199:17
  **provides** - 148:5

  **providing** - 28:12, 103:10, 111:22, 165:18
  **provision** - 97:15, 119:4, 141:3, 180:20
  **prudent** - 140:2
  **psyche** - 64:15
**Pta** - 70:4
  **public** - 147:22, 175:4, 175:5
  **publicity** - 147:21
  **publish** - 157:19
  **pull** - 10:25, 43:3, 199:7, 259:2, 259:4, 259:17, 274:24
  **pulled** - 48:10, 265:14, 265:17
  **pulling** - 160:10
  **pulls** - 259:11
**Purcell** - 1:15, 3:17, 3:18, 4:7, 4:8, 4:13, 5:18, 6:4, 7:22, 8:5, 8:6, 19:5, 49:15, 52:21, 53:13, 53:15, 55:23, 56:12, 58:23, 60:12, 60:22, 60:22, 62:25, 63:5, 63:9, 63:13, 63:15, 64:7, 65:5, 65:11, 65:16, 66:12, 67:2, 67:4, 67:13, 73:19, 73:21, 74:19, 81:3, 81:23, 81:25, 82:1, 84:15, 84:20, 90:24, 92:24, 93:11, 94:3, 94:14, 98:10, 98:11, 110:10, 115:18, 116:21, 117:4, 117:21, 117:22, 117:23, 118:22, 118:24, 119:8, 119:14, 121:7, 124:17, 124:19, 125:5, 125:7, 126:9, 128:1, 128:8, 130:7, 132:22, 132:24, 134:5, 134:7, 136:5, 136:16, 137:3, 137:18, 137:22, 138:10, 138:12, 139:22, 139:24, 140:17, 143:8, 152:3, 152:10, 152:18, 152:21, 153:12, 157:19, 157:25, 158:1, 158:4, 158:6, 159:16, 164:9, 164:14, 164:20, 165:2, 179:15, 180:4, 182:12, 185:24, 194:4, 194:25, 195:3, 196:9, 198:23, 199:2, 202:9, 204:3, 204:17, 208:11, 214:6, 214:12, 218:1, 218:10, 222:5, 222:6, 266:16, 272:21, 273:2, 273:6, 273:12, 274:12, 274:22, 275:1, 275:21, 276:3
  **Purcell's** - 53:2
  **purport** - 166:16
  **purpose** - 81:13, 117:16, 215:7
  **purposes** - 17:18, 71:5, 150:16, 191:24, 243:7
  **purse** - 82:19
  **pursuant** - 104:15, 105:12, 139:3, 139:16, 165:19

  **push** - 214:17
  **pushed** - 43:22, 48:13
  **pushes** - 259:6
  **pushing** - 43:23
**Put** - 29:12
  **put** - 2:16, 5:11, 6:18, 9:21, 10:7, 12:10, 17:15, 29:10, 32:23, 35:13, 42:9, 42:14, 49:22, 56:17, 72:4, 77:6, 80:25, 82:2, 87:24, 99:1, 100:6, 103:12, 107:7, 124:20, 124:21, 138:3, 149:2, 149:6, 170:15, 176:25, 186:1, 209:18, 213:25, 214:7, 258:15, 258:17, 261:21
  **putting** - 7:2, 19:15, 73:15, 75:5

### Q

  **Q1** - 257:11, 262:3, 262:10
  **Q1b** - 263:7
  **Q1d** - 262:14
  **Q2** - 257:11
  **Q3** - 261:24, 262:10
  **Q3b** - 262:14, 263:7
  **Q4** - 261:24
  **Q4b** - 262:10, 262:15, 263:8
  **qualified** - 224:21, 225:11, 225:12, 225:19, 253:2, 254:14, 255:3, 255:5, 268:20, 269:12, 269:18
  **qualms** - 55:17
  **Quarles** - 95:8, 165:11
  **quarter** - 185:19, 275:14, 276:21
  **questioned** - 175:23, 176:12
  **questioning** - 7:3, 110:21, 137:9
  **questions** - 87:6, 90:22, 91:9, 109:15, 124:10, 133:3, 134:9, 136:6, 140:20, 141:5, 148:14, 159:17, 165:3, 179:16, 198:21, 198:24, 202:10, 218:2, 241:14, 251:13, 263:10, 272:3
  **quick** - 122:7, 123:12, 252:12
  **quickly** - 10:19, 26:7, 142:23
  **quiet** - 10:3, 210:11
  **Quite** - 53:13, 274:7
  **quite** - 59:2, 86:21, 88:3, 180:16, 275:18
  **quote** - 146:18, 146:19
  **quote/unquote** - 118:13

### R

  **rail** - 18:21, 69:6
  **Rain** - 16:12, 25:4, 25:9, 38:14, 38:23, 39:12, 41:21, 41:25,

44:7, 48:14, 59:15,
61:8, 62:25, 65:7,
70:25, 71:1
**Rain's**- 39:15
**Raines**- 133:16,
134:2
**raining** - 220:19
**raise** - 5:15, 5:22,
63:8, 68:9, 68:11
**raised** - 6:17, 77:18,
150:22
**raises** - 145:14
**ramp** - 190:19
**ramp-up** - 190:19
**ran** - 26:20, 43:8,
44:2, 44:3, 133:17
**Randolph**- 106:1
**range** - 27:19,
227:19, 228:16,
228:17, 229:14,
230:2, 231:9, 233:14,
234:19, 235:15,
237:19, 239:11
**ranges** - 264:8
**rank** - 171:17
**ranking** - 171:22
**rat** - 86:6, 91:11,
92:6
**rate** - 51:21, 259:6
**rather** - 5:22, 49:23,
55:6
**ratted** - 91:25
**Ravens**- 69:12,
69:14
**re** - 185:15
**re-arraignment** -
185:15
**reach** - 17:4, 51:9
**reached** - 8:19
**reaction** - 42:25,
275:1
**reacts** - 275:4
**read** - 57:12, 99:4,
181:1, 181:5, 192:23,
198:5, 198:7, 213:21,
240:23, 271:5, 271:15
**reads** - 28:17
**ready** - 2:3, 2:5,
3:15, 7:10, 7:20, 7:25,
8:3, 41:23, 66:10,
66:13, 66:22, 67:1,
75:14, 152:17, 170:1,
172:6
**Ready**- 222:16
**real** - 15:21, 36:10,
111:15, 113:23,
200:8, 252:12
**realized** - 212:5
**Really**- 19:14
**really** - 15:23, 17:7,
18:20, 20:8, 59:1,
64:17, 69:11, 71:1,
78:7, 79:10, 91:21,
131:17, 141:14,
160:14, 166:14,
189:8, 211:2, 216:23
**rear** - 45:19, 259:10,
260:10
**rearward** - 259:11
**reason** - 2:23, 5:19,
18:2, 24:19, 51:21,
54:11, 125:24,
126:15, 134:17,
141:12, 146:24,
147:6, 148:21, 258:17
**reasonable** - 53:20,
53:24, 54:7, 55:7,
64:1, 64:4, 64:22,
146:25
**reasons** - 2:11,

2:15, 2:16, 30:21,
32:20, 34:11, 56:20,
144:4
**recalled** - 266:10
**receive** - 166:3,
166:5, 177:7, 212:21
**received** - 2:8,
58:20, 79:2, 100:16,
101:14, 102:13,
102:17, 144:19,
144:21, 144:22,
165:22, 167:3,
168:12, 170:6,
170:25, 176:25,
208:14, 208:16,
236:19, 254:1, 254:8,
267:21, 268:3
**receiving** - 236:21
**recent** - 252:20
**recently** - 126:5,
138:14
**recess** - 53:4, 66:7,
222:12, 222:14,
276:25
**Recess**- 66:8,
151:15, 222:15
**Recessed**- 277:2
**recognize** - 87:20,
96:8, 102:11, 129:1,
143:1, 143:2, 157:13,
173:9, 205:22,
215:17, 226:12,
227:24, 232:3,
232:25, 239:3, 244:2,
245:13, 246:3, 247:8,
247:19, 248:2,
248:24, 249:10,
249:16, 255:24,
256:18, 261:9, 269:25
**recognized** - 253:1
**recollection** -
192:24, 193:3,
194:24, 195:7, 195:8
**reconsideration** -
196:23
**Record**- 5:13,
52:25, 65:4, 80:18,
116:9, 252:14, 258:1,
266:13, 272:18
**record** - 2:16,
39:19, 67:10, 76:19,
80:19, 91:3, 92:25,
94:10, 98:1, 111:15,
118:5, 132:18,
136:23, 138:3, 139:1,
144:4, 147:4, 147:24,
149:7, 149:11, 153:9,
179:2, 204:10,
205:24, 213:21,
214:7, 223:11,
234:14, 242:7, 252:7,
253:8, 263:15, 267:7,
277:5
**record's** - 65:25
**recorded** - 1:23,
40:10, 183:10,
183:12, 200:18
**records** - 104:4,
271:14
**Records**- 106:17,
221:12
**recover** - 232:11,
246:16, 246:18,
246:20, 250:7
**recovered** - 174:22,
214:24, 215:4, 220:3,
230:7, 233:24, 234:3,
239:20, 247:14,
249:22
**recovery** - 243:7,

272:1
**recross** - 202:11
**Recross**- 202:13
**Recross-**
**examination** - 202:13
**red** - 54:3, 62:16,
62:17, 206:5
**redact** - 150:16
**redacted** - 108:23,
145:1, 149:13,
149:15, 150:9,
190:11, 190:18,
190:20
**redirect** - 132:21,
136:7, 164:8, 198:22,
222:4, 266:5
**Redirect**- 132:23,
199:1
**Redweld**- 176:25,
177:5, 195:8
**Redwelds**- 170:16
**refer** - 8:9, 122:2,
122:3, 148:8, 203:16,
229:11, 229:15,
230:19, 230:20,
250:11
**reference** - 120:16,
121:18, 122:7,
122:11, 122:17,
244:11, 244:14
**references** - 123:15
**referred** - 119:1
**reflect** - 178:6
**refresh** - 159:1,
192:24, 193:3, 203:18
**regard** - 3:5,
144:18, 145:9, 147:8
**regarding** - 100:21,
177:1
**regardless** -
185:17, 200:16
**region** - 55:15
**rehabilitation** -
22:11
**reject** - 225:17,
255:8, 269:17
**relate** - 65:8,
109:21, 119:3, 261:12
**related** - 56:12,
56:14, 65:18, 78:13,
78:16, 113:18, 129:4,
189:8, 253:20
**relating** - 28:13,
110:21, 128:10,
142:13, 214:25
**relation** - 110:14,
112:4, 116:3, 119:19,
134:10, 216:14
**relationship** -
67:17, 153:16,
156:11, 173:14
**relayed** - 130:3
**released** - 36:12,
175:5
**relevance** - 121:5
**relevant** - 102:16
**reliable** - 252:21
**remain** - 125:10,
229:2
**remainder** - 104:1
**remaining** - 102:25
**Remember**- 27:4
**remember** - 16:4,
16:5, 16:6, 21:13,
55:18, 77:5, 77:7,
77:10, 77:24, 83:10,
132:14, 154:17,
154:24, 155:11,
157:17, 158:7, 158:9,
159:3, 161:7, 162:17,

162:19, 163:4, 163:9,
175:5, 176:3, 176:16,
180:23, 184:22,
184:25, 185:1, 185:3,
185:4, 185:6, 185:7,
185:13, 185:16,
185:21, 185:25,
186:4, 186:8, 188:21,
190:14, 190:17,
191:9, 191:14, 194:9,
194:12, 194:15,
194:18, 198:17,
209:2, 216:19,
220:16, 243:14,
250:20
**remembered** -
58:15, 84:7, 157:9,
157:10, 188:24
**remind** - 66:18,
104:15
**reminded** - 148:16
**remove** - 98:8
**removed** - 148:13,
190:8, 240:16
**removing** - 148:11
**repeatedly** - 148:16
**rephrase** - 84:19
**report** - 13:5, 13:13,
36:4, 36:5, 81:14,
81:17, 102:14, 112:2,
113:15, 117:8,
208:13, 213:3, 213:4,
213:23, 214:15,
226:5, 226:20, 227:8,
243:17, 244:10,
244:13, 250:11,
255:16, 255:25, 256:2
**reporter** - 221:5,
265:23
**reports** - 77:8,
100:16, 100:18,
101:1, 142:13,
183:15, 214:24
**represent** - 54:2,
186:7, 186:22, 198:15
**representation** -
190:21
**represented** -
96:20, 109:7, 109:8,
138:1, 138:4, 142:5,
163:19
**representing** -
76:23
**request** - 144:3,
178:22
**require** - 146:18
**required** - 106:19,
151:2
**requirement** -
197:19
**reschedule** - 274:17
**research** - 271:11
**resemble** - 258:5
**residency** - 224:4
**resort** - 148:6
**resources** - 10:7
**respect** - 2:9, 2:13,
2:16, 2:24, 4:21, 5:25,
65:5, 80:23, 81:10,
143:22, 151:13,
253:2, 255:6, 269:12,
275:5, 276:9, 276:18
**Respectfully**- 53:17
**respond** - 208:3,
208:15, 208:16,
243:6, 243:11
**responded** - 31:23,
244:25
**responding** -
213:10

**Response**- 176:21
**response** - 141:5,
176:18, 199:18,
243:18
**responses** - 140:24,
176:4
**responsibility** -
237:12
**responsible** - 237:5
**responsive** - 275:18
**restricted** - 98:16
**result** - 144:7,
177:11
**resulted** - 95:7
**Resumed**- 165:1
**retaliate** - 28:12,
28:20
**retaliation** - 28:16,
32:19, 37:1, 37:2,
133:21, 182:23
**retaliatory** - 13:16
**retrieve** - 212:18,
221:20
**retrospect** - 82:25
**return** - 16:25, 63:4,
143:14
**reveal** - 115:24
**revenues** - 197:20
**reverse** - 149:3,
265:21
**reversing** - 152:12
**review** - 99:10,
168:13, 168:25,
169:5, 169:20, 181:10
**reviewed** - 169:8,
195:1, 195:6, 203:6
**reviewing** - 147:3,
176:8
**rich** - 237:6
**Richard**- 1:13
**rid** - 48:22, 158:13
**right-hand** - 214:19
**rights** - 147:2
**risk** - 41:21, 182:10
**risks** - 182:7,
182:14
**Road**- 44:4, 78:3,
84:9, 84:10, 159:10,
159:11, 162:2, 163:3,
205:8, 208:17, 208:23
**roadmap** - 61:15
**rob** - 115:16
**Robert**- 19:18,
20:10, 20:19
**Roddy**- 48:19, 48:21
**Roland**- 126:5,
126:8
**role** - 116:2, 229:24
**roll** - 27:7, 264:9,
264:15
**Rolland**- 277:8,
277:9
**rolled** - 26:19,
265:18
**rolling** - 5:9, 27:9
**roof** - 211:3
**room** - 61:9, 75:2,
75:3, 75:5, 75:8,
75:10, 75:12, 75:13,
75:16, 149:20
**Rosa**- 38:4, 58:19,
152:6, 153:5, 153:10,
173:13
**Ross**- 42:9, 45:12,
47:2, 61:21, 79:19,
156:9, 161:12,
161:14, 173:17
**Ross's**- 42:13
**roughly** - 227:18,
246:13

**round** - 259:3
**rounds** - 262:9
**route** - 75:25,
208:21
**rule** - 3:24, 4:19,
9:13, 9:16, 12:15,
12:17, 34:4, 34:6,
41:4, 41:15
**Rule**- 4:20, 4:24,
225:10
**Rules**- 225:10
**rules** - 125:4, 214:4,
219:25
**ruling** - 253:5
**run** - 22:6, 43:7,
115:15, 210:4
**running** - 40:14,
50:9, 89:7
**runs** - 30:10, 236:2
**rush** - 216:2

## S

**sacrifice** - 8:12,
64:8
**safe** - 38:13, 44:18
**safety** - 100:23,
148:16
**saint** - 37:11, 58:24
**Sandy** - 275:3
**sat** - 26:18, 41:21,
41:22, 180:1
**satisfied** - 197:22
**savage** - 9:11
**save** - 144:14
**saved** - 22:10
**saw** - 10:2, 12:15,
14:6, 15:7, 15:12,
16:11, 16:12, 21:4,
25:12, 26:22, 30:3,
32:1, 37:8, 38:12,
38:14, 38:15, 39:5,
43:7, 44:22, 44:23,
45:2, 45:16, 47:22,
48:20, 50:2, 50:3,
50:4, 50:6, 51:14,
51:25, 55:22, 57:24,
71:1, 75:21, 75:22,
77:24, 80:9, 82:6,
84:2, 84:22, 89:3,
89:4, 90:7, 90:11,
113:10, 113:18,
119:3, 150:9, 155:18,
161:25, 178:8, 194:1,
210:6
**scalp** - 232:1,
234:18
**scan** - 121:23
**scared** - 14:9
**scene** - 31:23,
45:20, 208:22, 209:1,
209:22, 212:13,
215:4, 215:24, 216:1,
216:10, 217:8,
217:16, 217:17,
218:11, 218:14,
218:18, 219:1,
219:15, 219:19,
244:19, 245:1, 245:3,
245:5, 245:7, 245:17,
245:21, 246:1, 246:7,
246:17, 247:23,
248:6, 248:12, 249:5,
250:7, 251:9
**scenes** - 243:6
**schedule** - 7:17
**scheduled** - 165:10,
273:18
**scheduling** -
276:19

**scholarship** - 20:12
**School** - 224:3
**school** - 54:10,
54:11, 70:5, 79:23,
224:2
**schools** - 254:3
**Sciences** - 252:20
**scrap** - 54:20
**screen** - 28:23,
82:3, 98:18, 106:10,
106:11, 186:1, 199:7,
214:13, 216:13,
238:25, 245:24,
247:13
**se** - 91:16
**Sealed** - 188:1
**sealed** - 160:2,
184:21
**seat** - 43:24, 211:5,
252:6
**seated** - 7:25, 54:3,
90:23, 125:11, 143:25
**Seattle** - 64:3
**Second** - 61:2,
144:15, 150:11
**second** - 21:18,
61:6, 65:3, 78:10,
80:16, 88:25, 95:17,
95:19, 96:5, 98:21,
98:24, 98:25, 100:12,
101:6, 102:23, 106:8,
116:8, 150:7, 162:19,
164:4, 167:7, 176:12,
176:23, 188:17,
193:5, 200:1, 200:4,
213:24, 214:4,
221:25, 242:15,
263:14, 266:1,
266:12, 272:17
**secondary** - 207:3
**Secondly** - 5:3
**seconds** - 124:18,
266:23
**sections** - 110:12
**Security** - 109:2
**see** - 9:14, 10:4,
10:23, 11:24, 12:8,
13:23, 16:10, 16:13,
16:14, 19:4, 19:6,
23:6, 28:20, 28:24,
29:3, 29:9, 30:15,
30:22, 33:3, 33:4,
35:25, 36:14, 39:4,
39:5, 39:22, 42:24,
44:6, 45:7, 47:4,
47:21, 48:4, 48:9,
49:18, 50:9, 52:6,
59:22, 60:2, 60:20,
61:2, 61:6, 61:7,
73:16, 74:4, 74:20,
74:23, 75:8, 75:12,
75:16, 76:16, 76:20,
77:1, 77:3, 78:1,
79:13, 79:15, 83:1,
83:6, 83:17, 84:25,
85:13, 85:16, 85:18,
85:22, 86:19, 89:12,
90:15, 90:17, 93:15,
96:14, 99:2, 99:23,
103:13, 105:25,
106:11, 106:13,
106:21, 108:23,
120:8, 121:12,
121:25, 123:10,
141:21, 143:18,
155:19, 155:22,
156:19, 156:21,
158:9, 159:1, 159:7,
159:10, 166:22,
169:12, 178:4, 178:6,

204:21, 209:19,
211:2, 213:3, 214:14,
215:15, 218:23,
220:5, 220:11,
229:10, 233:8, 235:1,
236:7, 238:9, 245:18,
246:14, 250:14,
260:2, 263:19
**See** - 51:5
**seeing** - 11:13,
12:18, 16:5, 16:6,
28:23, 83:10, 83:22,
84:7, 96:8, 157:9,
157:10, 157:17,
158:8, 159:2, 159:8,
161:24, 198:17
**seek** - 130:1, 140:3
**seem** - 211:23
**sees** - 42:24,
149:20, 149:21
**selected** - 268:11
**self** - 139:11, 184:2
**self-incrimination** -
139:11, 184:2
**sell** - 18:16, 19:4,
19:6, 23:25
**selling** - 12:20,
12:23, 20:8, 24:2,
26:3, 26:12, 49:21
**sells** - 46:15
**semiautomatic** -
11:2, 47:14, 257:22,
258:11, 258:23,
258:24, 259:16
**send** - 64:23, 97:9,
105:15
**Sends** - 47:10
**sense** - 6:13, 6:24,
14:20, 14:22
**sensitive** - 100:22
**sent** - 41:9, 51:7,
86:8, 103:19, 103:21,
103:22, 103:23,
107:21, 107:24,
108:2, 108:17, 111:4,
134:20, 139:4, 200:5
**sentence** - 56:7,
117:24
**sentences** - 127:6,
130:19, 148:4
**separate** - 112:1,
127:22, 166:25,
197:5, 248:15
**separates** - 237:10
**September** - 10:16,
28:17, 31:12, 31:13,
52:1, 100:4, 130:21,
135:9, 143:5, 175:16,
187:9, 187:23, 188:6,
188:14, 192:3,
192:11, 192:12,
193:15, 207:4, 208:2,
226:2, 226:25, 243:8,
253:16
**sequestered** - 93:1
**sequestration** - 4:1,
4:20, 92:20, 93:8,
136:10, 203:25,
222:10
**sergeant** - 210:21
**seriatim** - 116:14
**series** - 226:19
**serious** - 54:21,
54:22, 114:8, 118:17,
130:8, 130:15,
130:18, 130:19
**Serious** - 130:17
**seriously** - 56:23
**serve** - 229:25
**served** - 58:6

**serves** - 134:14
**session** - 50:16,
268:13
**Session** - 152:1
**sessions** - 254:12,
254:13
**set** - 14:4, 25:23,
63:11, 119:1, 139:17,
226:21, 252:16, 257:4
**sets** - 170:16,
240:21, 259:5
**seven** - 19:22,
21:22, 22:8, 96:15,
227:10
**several** - 110:20,
166:17, 166:22,
189:23, 237:4,
254:12, 254:13,
268:18
**sex** - 30:22
**shakes** - 252:24
**shame** - 60:5
**Shameka** - 42:9,
42:13, 43:18, 45:12,
46:24, 61:21, 79:19,
156:9, 161:12,
161:14, 163:5, 173:17
**shape** - 30:10, 45:3,
262:14
**Shaquanda** - 42:10,
42:16, 45:12, 61:22
**shaved** - 231:12
**sheet** - 187:3,
226:24
**sheets** - 58:16
**shells** - 265:23
**shift** - 27:10,
206:20, 206:21,
207:24
**shifts** - 206:18
**shirt** - 25:19, 54:3
**shock** - 22:10
**shoot** - 11:1, 22:19,
24:17, 56:10
**shooter** - 46:11,
46:14, 61:3, 61:6
**shooting** - 9:3,
22:5, 24:20, 27:23,
37:7, 39:2, 39:6,
43:25, 44:22, 45:4,
45:14, 45:15, 45:17,
45:19, 46:17, 50:9,
51:16, 51:25, 55:13,
57:25, 59:9, 60:1,
126:2, 129:25,
209:24, 210:23,
243:15
**shootings** - 13:15,
13:16, 21:25, 36:19,
118:9, 129:24, 133:21
**shootout** - 27:13
**shoots** - 14:25,
21:22
**Short** - 266:16
**short** - 131:3,
183:15, 211:24,
265:7, 266:17
**short-circuit** -
183:15
**shortage** - 130:16
**Shot** - 22:15
**shot** - 11:3, 11:5,
11:6, 19:22, 19:23,
20:9, 22:8, 22:14,
27:13, 27:14, 27:15,
27:17, 27:18, 31:6,
40:15, 43:9, 43:10,
48:11, 57:18, 89:8,
89:9, 89:22
**shots** - 11:4, 11:6,

12:7, 39:4, 45:2,
49:18
**shoulder** - 265:6,
265:8
**Show** - 74:1
**show** - 6:2, 11:13,
12:8, 24:19, 25:18,
48:5, 51:8, 52:13,
52:14, 55:8, 58:24,
59:2, 69:17, 71:11,
80:13, 88:2, 88:3,
88:4, 88:5, 96:6,
97:18, 98:6, 98:17,
158:8, 168:4, 168:6,
180:19, 191:23,
191:25, 192:2, 206:3,
208:6, 215:11,
218:13, 226:11,
227:23, 228:7, 232:2,
243:24, 245:12,
245:20, 246:2, 247:7,
247:13, 247:18,
247:24, 248:23,
249:9, 255:23,
257:23, 258:3, 261:7
**showed** - 31:4,
38:8, 55:23, 83:19,
155:22, 155:23,
162:23, 186:1,
218:18, 258:9
**showing** - 88:16,
127:25, 150:17,
150:18, 156:1, 163:4,
163:9, 168:5, 168:7,
207:10, 232:25,
234:15, 236:7, 238:8,
239:3, 240:8, 269:24
**Showing** - 166:8,
239:15
**shown** - 83:8,
128:18, 128:22,
148:10, 201:10,
208:18
**shows** - 42:7,
87:16, 87:23
**Shryock** - 147:10
**shut** - 41:16, 252:22
**sic** - 238:9
**side** - 12:5, 30:7,
43:24, 43:25, 44:25,
45:18, 45:19, 48:2,
48:12, 49:16, 103:13,
163:2, 197:17,
197:21, 198:2,
211:20, 227:18,
227:20, 228:14,
230:5, 230:6, 230:8,
231:8, 231:22,
231:23, 231:25,
232:1, 232:24, 233:9,
233:10, 233:18,
233:21, 234:1,
234:12, 234:18,
234:22, 235:14,
236:3, 236:5, 236:6,
237:14, 237:18,
238:6, 250:15,
262:24, 262:25
**sides** - 51:6, 107:16
**sidewalk** - 11:12,
11:18, 11:22, 216:18,
216:24, 216:25
**sight** - 61:4, 162:8
**sign** - 61:15
**signature** - 192:21
**signed** - 56:22,
99:21, 104:16, 143:4,
180:13
**significant** - 6:17,
169:9, 171:25, 237:8

19

**signify** - 268:5
**similar** - 83:6, 231:22, 260:16
**simply** - 130:12
**single** - 14:8, 57:15
**singular** - 3:25
**sister** - 77:17
**sisters** - 77:18
**Sit** - 48:8
**sit** - 15:2, 19:25, 93:1, 93:17, 93:18, 132:1, 132:9, 179:25, 185:18, 188:21, 265:11
**sits** - 60:10
**sitting** - 14:3, 14:6, 15:3, 53:6, 54:1, 66:25, 89:13, 93:19, 94:1, 179:7, 189:2, 265:12, 265:24
**situation** - 137:12, 276:9, 276:10
**six** - 96:15, 122:9, 122:10, 273:15
**Six** - 243:2, 273:2
**Sixth** - 145:16
**size** - 57:16, 230:9, 233:24
**skedaddle** - 264:19
**skimming** - 157:3
**skin** - 229:5, 230:2, 231:10, 233:15, 234:20, 235:15, 235:22, 236:6, 237:25, 237:25, 239:12, 239:13
**skull** - 230:6, 231:24, 232:1, 232:16, 233:16, 233:22, 234:20, 234:21, 235:7
**slept** - 43:4
**slew** - 130:15
**slide** - 47:16, 259:2, 259:11
**slightly** - 233:11
**slinging** - 55:13
**slip** - 8:16, 197:12
**slit** - 234:23
**slow** - 6:16
**small** - 230:16, 230:19
**smaller** - 29:19
**smart** - 18:11, 38:17
**smash** - 37:10, 47:7
**smile** - 26:9
**Smith** - 114:4
**smoke** - 228:21
**smoothly** - 276:9
**snitch** - 17:7, 44:10
**snitches** - 182:19
**snitching** - 19:23, 22:15, 44:9, 57:8
**Snitching** - 28:14
**Social** - 109:2
**soft** - 230:7
**sold** - 12:21, 12:22, 18:25
**solo** - 187:11
**someone** - 6:1, 31:1, 36:17, 56:24, 59:11, 61:12, 89:24, 118:13, 149:13, 149:20, 180:7, 220:8, 271:9
**sometime** - 134:13, 134:24, 165:23, 199:23
**Sometimes** - 20:16, 26:5, 221:14

**sometimes** - 10:9, 34:8, 221:13, 260:19
**somewhere** - 8:10, 20:12, 38:4, 44:4, 44:18, 45:21, 51:7, 98:15, 102:1, 159:6, 264:19
**son** - 9:24, 14:13, 38:13, 72:1, 78:19, 89:5, 91:24, 92:15, 161:6, 163:19
**son's** - 21:7, 91:20
**sons** - 78:21, 78:23
**soon** - 59:12, 90:2, 163:10
**sooner** - 107:21
**soot** - 228:21
**Sorry** - 209:13
**sorry** - 8:1, 14:12, 14:13, 28:8, 29:12, 38:15, 41:6, 64:19, 67:19, 77:13, 91:8, 98:8, 100:7, 103:25, 104:14, 112:6, 134:9, 176:21, 184:18, 184:20, 207:1, 209:10, 211:18, 220:12, 223:21, 233:19, 244:12, 252:11, 253:12, 256:6, 257:10, 258:9, 264:7
**sort** - 8:17, 8:20, 15:5, 28:22, 58:12, 105:25, 167:15, 177:18, 206:5, 218:16, 221:1
**sorts** - 84:16, 166:1, 167:9
**sought** - 141:8
**sound** - 130:22
**sounds** - 115:4, 127:9, 130:23, 169:2, 219:4, 219:6
**source** - 35:22, 105:21
**south** - 69:3
**Southern** - 205:6, 205:17, 276:7
**space** - 35:25
**span** - 10:20, 10:21
**sparse** - 229:6
**speaking** - 79:12, 132:8, 229:15, 229:18, 246:13
**special** - 109:10, 267:14
**Special** - 269:2, 269:24
**specialized** - 267:21
**specific** - 140:18, 166:17, 172:18, 250:20
**specifically** - 39:5, 126:6, 146:9, 175:3, 175:5, 177:23
**Specifically** - 267:17
**specified** - 17:25, 18:1, 21:16, 26:2
**specks** - 229:10
**specter** - 61:12
**spectre** - 145:14
**speculative** - 150:5
**Spell** - 204:12, 242:10, 242:13
**spell** - 153:9
**spent** - 276:10, 276:16

**spinal** - 236:1, 236:16, 238:3
**Spinal** - 236:18
**spine** - 11:4, 27:23
**splattered** - 89:16
**spoken** - 86:2
**spouse's** - 145:22, 145:23
**stack** - 82:17, 82:25
**stacks** - 107:11
**stadium** - 69:12
**staff** - 273:20
**stage** - 15:5, 15:6
**stairs** - 54:15
**stamp** - 108:20, 271:4
**stamped** - 260:11
**stamping** - 107:13
**stamps** - 271:14
**stand** - 6:9, 10:23, 54:4, 59:4, 92:22, 93:24, 125:19, 136:13, 152:25, 164:13, 164:16, 203:24, 222:21, 236:23, 251:21, 272:13
**standard** - 53:20, 230:17
**standing** - 11:14, 12:3, 40:16, 42:21, 44:25, 59:4, 59:7, 61:13, 63:21, 149:16, 265:14, 265:22
**stands** - 270:24
**start** - 6:16, 8:1, 8:10, 8:11, 13:21, 22:4, 47:17, 66:6, 148:23, 227:14, 274:1, 274:5, 274:6, 275:13, 275:15, 276:12, 276:15, 276:20, 276:23
**started** - 7:2, 23:24, 30:15, 210:1
**starting** - 4:21, 134:24
**starts** - 36:6, 40:5, 47:17
**state** - 3:12, 56:20, 136:22, 138:25, 149:18, 153:8, 196:13, 204:9, 223:10, 242:6, 252:7, 267:6, 268:2
**State** - 67:9, 94:9, 196:16, 223:19, 224:24, 254:6, 271:2, 271:24, 272:2
**State's** - 94:22, 274:23
**state's** - 94:25
**statement** - 5:9, 37:18, 63:18, 66:17, 81:2, 109:8, 121:9, 175:4, 197:9, 200:19, 273:14
**statements** - 2:6, 3:15, 4:23, 8:3, 76:22, 76:23, 104:3, 160:17, 160:19, 166:1, 177:9, 177:16, 183:23, 190:18, 191:8, 201:18
**states** - 97:15
**States** - 1:1, 1:3, 1:13, 97:21, 139:2, 146:6, 146:21, 147:9, 148:8, 153:20, 173:4, 180:22, 181:24, 182:12, 184:7,

191:20, 195:12, 203:11
**status** - 101:7, 111:18, 186:14
**statute** - 18:3, 28:11, 137:15
**stay** - 7:17, 90:23, 93:9, 93:21, 163:13
**stayed** - 19:13, 32:1, 73:6
**steal** - 115:16
**stenography** - 1:23
**Step** - 53:25
**step** - 41:20, 92:19, 136:10, 164:10, 203:21, 222:7, 241:20, 251:19, 266:8, 272:9
**steps** - 48:3, 48:6, 48:7
**Steve** - 138:5
**Stewart** - 32:25, 33:6, 33:7, 95:9, 96:12, 96:13, 100:8, 122:14, 122:16, 122:20, 122:25, 123:1, 123:19, 125:3, 127:8, 185:24
**stick** - 54:19
**stick-on** - 54:19
**still** - 17:2, 22:12, 32:15, 34:14, 42:3, 44:22, 47:25, 71:24, 71:25, 73:16, 141:14, 159:20, 164:22, 177:4, 199:24, 233:10
**stippling** - 229:4, 229:12, 230:1, 231:18, 235:18, 235:19
**stipulate** - 126:9, 225:6
**stitching** - 12:6
**stop** - 18:21, 69:10, 69:14, 69:15, 69:16, 78:10, 99:13, 143:9, 143:11, 183:7, 216:3, 227:22, 231:11
**stopped** - 19:21, 78:5, 78:6, 210:25
**stops** - 69:8, 69:12, 69:13
**storage** - 177:17, 193:25
**store** - 30:10, 59:10, 59:11, 78:2, 78:4, 78:5, 89:5
**story** - 9:6, 20:3, 46:21, 53:13, 60:15
**stranger** - 71:9, 71:10
**Street** - 68:2, 74:6, 74:7, 74:8, 87:18, 154:9, 162:25, 209:5
**street** - 9:13, 13:19, 29:8, 30:4, 30:24, 37:4, 38:3, 38:16, 41:5, 41:11, 41:15, 45:1, 48:1, 48:2, 51:18, 74:5, 86:1, 87:13, 111:12, 118:19, 163:2, 206:11, 210:8, 216:16, 216:23
**streets** - 10:4, 29:18, 57:4, 60:14, 221:1
**stretch** - 8:17, 75:18
**strictly** - 145:20
**strike** - 118:5,

191:13, 238:18
**strikes** - 145:19
**striking** - 237:7, 237:13
**string** - 25:16, 174:3, 184:23
**stripped** - 262:16
**strong** - 146:24, 147:6, 182:18, 182:20, 182:22
**struck** - 230:24, 237:4, 237:9, 238:4, 238:17
**structural** - 150:11
**structure** - 17:10, 238:18
**structures** - 238:17
**stuff** - 22:6, 30:10, 120:24, 134:24, 155:13, 190:8, 221:1
**stutter** - 266:23, 266:25
**style** - 264:11, 265:2
**subdivided** - 206:14
**subject** - 93:5, 117:15
**submit** - 53:22, 59:3, 64:21, 247:11
**submitted** - 248:10, 248:18, 249:24, 250:5, 251:3, 251:6, 251:11, 253:24, 270:9
**subsequent** - 195:5
**substances** - 110:16, 110:18, 119:22, 119:24, 228:20
**substantial** - 147:20
**successful** - 127:5
**suffer** - 147:19
**suffering** - 22:12
**sufficiently** - 61:20
**suggestions** - 274:21
**suggests** - 46:9
**Sullivan** - 1:18, 52:22, 54:1, 56:22, 57:17, 139:6, 139:7, 140:13, 152:8, 153:1, 179:18, 179:19, 179:21, 192:2, 192:7, 192:10, 192:14, 196:11, 198:20, 202:11, 202:12, 202:14, 203:20, 263:13, 266:23, 272:6, 273:10, 276:6
**summer** - 20:11, 26:21, 26:22, 72:22, 72:24, 76:15, 84:5, 134:22, 174:19, 201:22
**Sunday** - 74:21, 130:24
**Supermax** - 168:19
**supervised** - 224:19
**supervisor** - 244:25
**supervisory** - 177:14
**supplied** - 104:2
**supply** - 237:7
**suppose** - 141:16
**Suppose** - 61:25
**supposed** - 35:2, 47:1, 219:22
**surface** - 262:15, 264:9
**surprise** - 75:7
**surprised** - 64:14

**surrounding** -
229:5, 231:10,
233:15, 234:19,
237:20, 239:12
**survival** - 237:5
**survived** - 68:14
**suspect** - 91:10
**suspected** - 133:9
**suspects** - 46:13
**sustained** - 227:5
**Sustained** - 84:14,
118:23
**Suv** - 42:8
**Suvs** - 54:19
**swear** - 59:20
**swearing** - 57:20
**switch** - 50:3, 50:4
**swore** - 39:7, 50:20
**sworn** - 67:7, 94:7,
136:20, 153:6,
164:19, 204:7, 223:8,
242:4, 252:4, 267:4
**sympathetic** - 37:18
**system** - 64:11

**T**

**table** - 125:19,
151:1, 151:6
**tag** - 21:5
**Taglin** - 77:24
**Taglin's** - 77:24
**talks** - 60:12, 63:9
**Tamica** - 36:22,
36:23, 38:22, 42:2,
42:12, 43:21, 44:3,
44:20, 47:19, 48:14,
51:14, 60:17, 70:19,
78:14
**tape** - 40:12, 200:18
**tapes** - 39:24
**target** - 56:3
**task** - 32:4, 109:9
**Tatum** - 27:14
**taunted** - 26:5
**teach** - 219:13,
254:3
**team** - 12:19,
267:17
**tech** - 220:13
**technical** - 14:23
**technician** - 243:4,
243:5
**telephone** - 3:10,
39:11, 40:1
**television** - 93:15
**temple** - 227:19,
228:14
**Temple**- 224:7
**temporalis** - 233:25
**ten** - 31:14, 57:11,
58:13, 60:9, 66:6,
66:7, 70:14, 190:17,
218:19, 222:12,
265:18
**ten-minute** - 66:7,
222:12
**tender** - 225:4
**terms** - 6:12, 37:6,
65:9, 69:25, 79:1,
81:11, 81:16, 85:16,
97:7, 100:10, 105:3,
114:7, 135:10, 140:7,
155:1, 169:13,
169:15, 169:16,
169:18, 173:23,
184:24, 202:4, 202:5,
206:8, 211:23, 216:25
**terrified** - 50:15
**testified** - 67:8,

92:11, 94:8, 136:21,
153:7, 164:19, 184:3,
185:23, 195:23,
197:12, 200:12,
204:8, 223:9, 239:20,
242:5, 252:5, 252:18,
267:5, 273:3
**testifies** - 12:9, 58:5
**testify** - 3:24, 5:25,
18:10, 23:5, 26:19,
49:2, 58:19, 93:18,
117:15, 139:12,
183:24, 186:12,
189:15, 253:2,
269:19, 273:5, 273:16
**testifying** - 31:2,
98:4, 137:13, 139:16,
140:4, 214:22, 273:4
**testimonies** -
155:13
**testimony** - 4:22,
16:1, 63:4, 66:7, 67:1,
76:4, 92:21, 136:12,
139:3, 139:15,
143:13, 148:24,
164:12, 180:2,
181:23, 186:22,
188:6, 188:11,
189:25, 193:22,
199:23, 201:14,
201:16, 203:22,
222:9, 225:17,
241:21, 251:20,
255:9, 263:20, 266:9,
272:12
**testing** - 249:21,
250:1
**thankfully** - 8:18
**theft** - 150:13,
150:16
**themself** - 149:22
**themselves** - 15:17,
145:25, 148:13,
253:22, 257:8, 261:23
**Thereby**- 139:18
**Therefore** - 225:14
**therein** - 81:1,
81:11, 81:13, 81:16,
81:19, 117:13
**they've** - 10:17,
18:23
**They've**- 273:3
**thick** - 212:1
**thinking** - 14:18,
57:10, 89:9, 188:12,
274:23
**third** - 35:21, 58:11,
58:14, 98:22, 150:13,
178:11, 181:1, 181:4,
200:17, 202:21
**Thirty**- 9:22
**Thirty-one**- 9:22
**thoracic** - 235:24,
236:1
**thousand** - 18:5,
107:11
**threat** - 200:8
**threatening** - 62:20,
62:21
**three** - 10:9, 12:7,
20:16, 28:6, 28:7,
28:10, 69:4, 72:9,
72:18, 72:19, 73:5,
75:20, 78:5, 82:18,
86:13, 92:4, 96:14,
99:19, 113:16,
121:11, 121:13,
158:14, 189:16,
189:18, 189:19,
193:24, 194:20,

194:22, 199:14,
202:16, 213:9,
230:15, 261:10
**Three**- 158:15,
267:20
**threw** - 24:16,
155:15, 155:16
**throughout** -
175:25
**Throw**- 188:22
**throw** - 163:22,
164:1, 188:18, 188:24
**thrown** - 163:24
**tied** - 133:17
**timeframe** - 169:19
**Timothy**- 1:18, 54:1
**tiny** - 13:8, 18:18
**tips** - 15:11
**tissue** - 230:8
**tissues** - 235:23,
237:4, 238:1, 239:13
**title** - 57:13
**Tobacco**- 267:15
**Today**- 184:4
**today** - 2:13, 2:22,
12:9, 13:21, 14:9,
22:24, 27:25, 28:9,
50:25, 62:14, 64:18,
66:23, 69:1, 79:13,
79:14, 79:15, 95:3,
108:14, 114:2, 119:3,
132:1, 137:10,
137:13, 137:24,
138:6, 140:4, 141:8,
147:6, 178:22, 180:2,
184:12, 185:18,
189:2, 201:12,
206:22, 222:14,
257:2, 270:3
**today's** - 276:18
**Todd**- 109:9
**toes** - 62:21
**together** - 75:5,
75:12, 79:24, 85:5,
141:20, 169:18
**tomorrow** - 3:2,
272:25, 273:4,
273:19, 276:15,
276:20
**took** - 10:22, 23:20,
28:16, 30:25, 32:3,
38:7, 44:1, 45:22,
48:14, 48:15, 50:13,
52:2, 52:5, 57:19,
75:25, 76:1, 83:17,
149:13, 156:4,
184:13, 186:12,
208:21, 208:23,
213:7, 246:6
**tool** - 260:19
**toolmark** - 254:2
**Toolmark**- 254:11
**tools** - 16:18, 16:20
**Top**- 214:16
**top** - 21:18, 77:5,
77:7, 121:19, 171:19,
171:22, 214:19,
233:6, 233:7, 233:11
**topic** - 63:20
**totally** - 112:7,
116:22, 117:4
**Touch**- 74:17
**touch** - 73:22,
98:18, 228:10, 229:7,
245:24
**touched** - 71:4,
238:24
**touching** - 73:23,
228:9

**touchscreen** -
73:17
**toured** - 268:18
**towards** - 50:5,
88:9, 210:16, 216:17,
217:2, 217:4, 233:11
**Towards**- 217:3
**town** - 27:17,
145:22
**track** - 177:18
**Tracy**- 23:18, 23:19,
106:12
**traffic** - 84:9, 84:11,
84:17
**trafficking** - 25:22,
79:3, 110:14, 112:5,
119:20
**tragedy** - 55:2
**tragic** - 20:3
**trail** - 74:9, 74:12
**trained** - 254:6
**training** - 211:6,
211:7, 254:1, 254:9,
254:12, 254:13,
267:21, 267:25,
268:3, 268:8, 268:12,
268:17, 271:21
**Transcript** - 1:12
**transcript** - 1:24,
277:5
**transcription** - 1:24
**transcripts** - 197:11
**transportation** -
4:16, 5:2
**trauma** - 22:10
**treat** - 216:2
**Trial**- 1:12, 277:2
**trial** - 23:7, 23:8,
23:10, 38:5, 41:10,
53:21, 53:22, 63:23,
64:20, 64:21, 93:25,
105:4, 105:7, 105:9,
105:11, 122:4, 142:9,
142:11, 148:7, 151:5,
164:13, 165:7, 166:2,
168:23, 169:3,
169:15, 169:25,
170:1, 171:11, 172:2,
172:5, 173:20,
189:23, 190:3,
190:25, 203:24,
205:25, 206:1, 222:9,
241:22, 251:21,
266:10
**trials** - 64:13
**tried** - 43:17, 43:20,
43:21, 48:13, 50:22,
150:13, 173:7, 274:13
**trigger** - 259:4,
259:17, 265:14,
265:18
**Trina**- 30:8
**Trina's**- 43:6
**trip** - 59:19
**trooper** - 268:2
**truck** - 155:20,
155:21, 162:11,
163:14, 163:16
**true** - 37:20, 56:6,
59:23, 132:2, 180:9,
195:16, 265:21
**trundled** - 21:6,
21:7
**trundles** - 39:23
**truth** - 10:10, 10:11,
10:12, 15:14, 46:2,
57:21, 57:22, 59:2,
59:20, 59:21, 80:25,
81:13, 81:19, 116:12,
116:19, 117:12,

184:15
**truthful** - 35:16,
140:8, 140:11
**truthfully** - 186:12
**truthfulness** -
177:16
**try** - 3:9, 6:5, 7:1,
7:9, 95:5, 183:6
**trying** - 41:20,
126:20, 171:4,
186:16, 265:10,
276:17
**Tuesday**- 62:14
**turf** - 22:18, 26:6
**turn** - 10:24, 35:25,
36:7, 82:23, 180:25,
214:17
**turned** - 11:21,
38:18, 67:21, 131:4,
240:17, 243:16
**turning** - 11:18
**Tv**- 71:11, 264:11
**Twenty**- 53:6
**twenty** - 27:22
**Twice**- 58:12
**twice** - 10:9, 11:1,
11:4, 27:22, 60:3,
199:10, 265:15
**Two**- 114:10,
202:20, 202:25,
203:1, 256:21
**two** - 3:2, 3:7, 9:2,
11:4, 11:6, 12:7,
20:16, 21:18, 27:6,
28:6, 29:23, 33:15,
34:14, 34:24, 40:17,
42:17, 43:3, 45:11,
50:1, 58:16, 60:11,
61:13, 66:24, 69:3,
69:12, 69:13, 78:5,
86:13, 92:4, 96:14,
102:25, 103:7,
105:15, 105:17,
108:8, 108:9, 113:16,
120:14, 124:18,
129:3, 133:24, 142:3,
143:15, 143:18,
144:8, 145:10,
146:25, 148:4,
148:23, 155:20,
155:23, 155:24,
156:1, 162:9, 168:1,
180:25, 186:6,
186:18, 186:20,
187:22, 188:8,
188:13, 190:1,
193:24, 194:3,
194:20, 194:24,
195:5, 195:7, 202:24,
203:4, 203:8, 215:10,
219:1, 219:8, 220:5,
220:9, 239:20,
240:21, 259:21,
259:23, 260:2,
260:15, 260:23,
265:10, 265:12,
265:22, 266:24,
270:6, 270:21,
273:18, 273:23
**type** - 83:7, 98:17,
100:21, 100:22,
112:8, 129:20,
131:19, 229:21,
229:22
**types** - 268:9
**typically** - 206:25,
207:23, 207:24

**U**

**Ultimately** - 44:19
**ultimately** - 44:20,
49:25, 179:12
**unburned** - 228:24
**uncommon** - 25:17
**under** - 4:20, 18:23,
40:21, 60:4, 60:19,
95:23, 119:2, 137:13,
137:14, 146:16,
150:11, 164:23,
177:4, 177:8, 183:16,
183:19, 183:21,
183:22, 185:11,
189:2, 200:7, 201:24,
213:18, 214:4,
214:24, 215:5, 215:8,
225:9, 248:10, 251:3,
252:19, 254:6, 270:9,
270:14
**Under** - 39:6, 125:4
**undercurrent** -
91:16
**underground** -
83:14
**underlying** -
235:23, 237:25,
239:13
**understatement** -
58:25
**understood** - 180:8
**undertake** - 102:24,
217:13
**undertaken** - 179:3
**undetermined** -
262:11
**Unfortunately** - 55:9
**unfortunately** - 21:3
**uniform** - 204:21,
217:19
**unit** - 242:24,
248:19
**Unit** - 207:5
**United** - 1:1, 1:3,
1:13, 97:21, 139:1,
146:6, 146:21, 147:9,
148:8, 153:20, 173:4,
180:22, 181:24,
182:12, 184:7,
191:20, 195:12,
203:11
**University** - 224:3,
224:7
**Unless** - 110:11
**unless** - 3:13,
183:25
**unlike** - 225:18
**unlikely** - 92:21,
136:12, 264:15
**unprofessional** -
199:6
**unredacted** - 190:7,
190:8, 190:25
**unring** - 149:24
**unsealed** - 184:21
**unusual** - 172:11
**up** - 5:4, 5:11, 6:11,
8:15, 8:16, 9:22, 14:4,
14:10, 14:15, 14:25,
17:15, 18:8, 18:15,
19:7, 20:12, 21:21,
22:7, 24:14, 26:8,
26:19, 26:23, 27:7,
29:7, 29:8, 29:10,
29:12, 29:17, 29:18,
30:5, 30:6, 30:8,
32:24, 40:14, 41:17,
41:20, 42:7, 42:24,
43:6, 44:3, 44:4,
44:13, 46:4, 46:8,
46:9, 46:14, 46:25,

47:25, 48:1, 48:2,
48:3, 48:7, 53:15,
53:16, 53:17, 54:14,
54:16, 55:18, 55:19,
55:25, 61:10, 61:11,
61:14, 63:11, 64:11,
67:10, 68:13, 72:4,
74:8, 75:8, 75:10,
76:9, 77:18, 79:24,
87:13, 88:8, 92:4,
99:1, 100:6, 103:12,
111:25, 126:4,
127:17, 127:18,
133:17, 134:24,
136:24, 154:4,
154:14, 159:8,
159:10, 160:6,
172:14, 186:1, 190:4,
190:19, 194:1, 199:7,
202:20, 208:12,
209:8, 209:18,
209:22, 210:4, 211:1,
213:25, 217:23,
225:16, 229:8,
237:13, 248:13,
248:20, 249:2, 249:6,
249:13, 249:19,
252:22, 255:7,
258:16, 258:18,
264:19, 269:16
**Up** - 201:22
**upright** - 264:12
**uprooted** - 177:17
**uptown** - 48:15
**Usc** - 28:10, 110:9,
146:17
**users** - 20:4


**V**

**Van** - 27:3
**various** - 102:15
**vascular** - 237:6
**vehicle** - 210:1
**venire** - 144:11,
144:20, 145:1, 145:3,
148:12
**verdict** - 16:25
**verge** - 275:9
**verifying** - 66:18
**vernacular** - 13:19
**version** - 29:19,
98:8, 190:15
**vertebra** - 235:24,
238:1
**vials** - 26:7
**victim** - 5:21, 6:6,
38:16, 43:14, 116:25,
210:23, 211:4,
211:18, 211:19,
211:22, 212:7,
212:19, 245:5
**victim's** - 5:16
**view** - 3:14, 3:16,
3:20, 32:6, 139:6,
245:16
**Vin** - 26:25, 27:3
**violate** - 12:16, 34:4
**violated** - 12:15
**violation** - 28:10,
203:14
**violations** - 34:5
**violence** - 55:24,
71:20, 110:15, 119:20
**violent** - 55:9,
55:12, 126:1, 267:17
**Virginia** - 268:2,
268:13
**visible** - 160:8
**visiting** - 29:6

**vital** - 238:17
**voice** - 67:10,
136:24
**void** - 144:13
**voir** - 3:4, 143:23,
145:5, 145:6, 145:8,
146:2, 146:11,
148:14, 225:5,
254:24, 269:8, 274:18
**volume** - 169:9
**vs** - 1:6


**W**

**Wagster** - 251:25,
252:3, 252:8, 252:9,
252:18, 253:12,
254:22, 255:3,
255:13, 255:23,
256:10, 256:17,
257:23, 258:11,
258:22, 261:7, 266:8
**Wait** - 193:18
**wait** - 159:20,
274:10, 275:12
**waited** - 41:10
**waiting** - 10:15,
10:17, 137:5, 152:24,
164:20, 204:19
**wake** - 14:10
**Wal** - 47:1
**Wal-mart** - 47:1
**walk** - 10:25, 18:19,
26:23, 27:7, 27:10,
42:24, 48:6, 50:7,
69:1, 216:16, 216:24,
217:23, 236:20
**walked** - 11:22,
12:4, 30:5, 30:14,
43:6, 43:9, 88:5, 88:7,
88:20, 88:21, 160:13,
174:11, 209:10,
209:22
**Walked** - 29:7
**walking** - 10:23,
11:12, 11:17, 11:25,
30:15, 30:24, 31:5,
38:16, 50:5, 50:6,
50:7, 160:10, 173:10,
210:15, 211:1,
216:22, 236:20
**Walking** - 12:3,
48:9, 75:16
**walks** - 14:24, 47:6
**walkway** - 209:4
**wall** - 57:6, 89:14,
89:15
**walled** - 135:17
**Wallner** - 132:6,
132:13, 165:14,
193:17
**Wallner's** - 99:23
**Wanda** - 78:6,
78:11, 78:13, 82:22,
82:23, 91:23
**wandered** - 30:2
**wants** - 28:2, 28:3,
49:2, 61:16, 61:17
**warrant** - 130:2
**warrants** - 130:5
**Washington** - 224:3
**water** - 26:8, 151:4
**Waterview** - 208:23,
208:24
**ways** - 171:6
**weapon** - 228:18,
229:17, 229:21,
229:22, 258:5, 258:7,
258:17, 265:2
**wear** - 25:16, 25:19,

248:20
**wearing** - 21:23,
229:25
**wears** - 21:24
**weather** - 220:17
**Wednesday** - 3:2
**week** - 105:10,
105:11, 138:14,
158:16, 166:2, 169:2,
268:12
**weekend** - 57:17
**weeks** - 10:18,
10:19, 29:23, 60:6,
73:5, 75:20
**welcome** - 197:16
**well-established** -
2:23
**West** - 3:8, 268:13,
276:18
**western** - 69:19
**Westport** - 9:3,
12:1, 13:2, 13:10,
18:16, 20:13, 20:14,
23:24, 23:25, 25:25,
29:10, 29:25, 31:19,
34:22, 35:11, 38:8,
42:4, 55:9, 55:11,
68:2, 68:3, 68:5,
68:16, 69:5, 69:18,
70:3, 70:8, 71:7, 71:9,
71:10, 71:13, 74:3,
78:9, 83:7, 83:8,
87:18, 95:14, 95:18,
102:15, 125:22,
125:24, 126:15,
126:17, 126:18,
126:19, 127:3,
127:20, 158:23,
159:3, 159:6, 159:12,
162:1, 163:2, 205:19,
206:4, 207:8, 207:10,
243:11, 245:16
**Westport's** - 126:23,
220:21
**wheelchair** - 16:5
**wheeled** - 61:8
**Whereas** - 264:18
**whereby** - 139:13,
144:10
**wherefores** -
117:18
**white** - 77:10
**whites** - 77:10
**whole** - 55:14,
57:21, 59:20, 76:8,
155:12, 189:22,
275:12
**whys** - 117:18
**wife** - 36:22
**Wilgrey** - 11:25,
12:2, 51:8, 74:14,
216:20, 217:1, 217:3
**willfully** - 28:18
**Williams** - 59:9,
87:9, 87:11, 88:23,
275:3, 275:17
**willing** - 275:13
**window** - 24:17
**withdraw** - 134:5
**Withdrawn** - 118:22
**withheld** - 146:1,
146:4
**Witness** - 67:11,
94:11, 110:6, 115:14,
119:13, 131:17,
136:14, 136:25,
139:20, 140:15,
153:10, 164:24,
192:13, 204:1,
204:11, 204:14,

223:5, 223:12,
226:16, 234:17,
236:11, 238:12,
242:8, 242:12,
242:14, 244:7, 248:8,
252:8, 261:1, 267:8,
270:18, 272:10,
272:14
**witness** - 4:22,
4:25, 5:6, 5:15, 8:18,
10:6, 15:20, 16:6,
18:9, 19:1, 21:11,
22:2, 22:3, 22:13,
23:6, 24:24, 24:25,
32:8, 33:9, 37:5,
38:11, 39:9, 40:23,
43:11, 43:13, 46:20,
56:5, 57:15, 59:14,
62:13, 62:17, 62:24,
65:9, 65:15, 65:18,
65:24, 66:6, 66:6, 66:22,
67:1, 67:3, 67:7,
73:19, 92:22, 93:24,
94:7, 106:13, 124:10,
130:13, 134:6,
135:12, 136:13,
136:20, 148:3, 152:5,
152:10, 152:13,
152:19, 152:22,
152:25, 153:6,
160:17, 164:13,
164:16, 164:18,
166:1, 182:16,
190:18, 191:25,
203:23, 204:7, 208:8,
211:18, 217:24,
222:16, 222:17,
223:3, 223:8, 225:8,
241:22, 241:25,
242:4, 251:21,
251:23, 252:4,
266:14, 266:17,
267:4, 268:21,
269:11, 269:18,
272:13, 272:20
**witness's** - 255:8
**Witnesses** - 93:15
**witnesses** - 4:16,
4:17, 4:21, 7:3, 7:14,
7:16, 9:12, 10:8,
11:20, 11:21, 13:20,
15:25, 17:4, 19:8,
19:9, 19:10, 23:16,
24:18, 25:21, 25:23,
26:14, 26:17, 29:16,
30:3, 30:20, 31:21,
32:21, 39:13, 43:13,
48:20, 49:24, 57:1,
59:6, 70:15, 93:8,
93:17, 93:25, 100:24,
102:14, 104:3,
116:25, 117:7,
117:14, 147:6,
167:13, 169:11,
169:13, 169:19,
171:10, 171:14,
171:18, 179:12,
183:4, 225:16, 225:18
**woke** - 8:15, 14:15
**woman** - 18:14,
19:10, 23:3, 23:4,
23:18, 23:19, 38:3,
38:22, 39:21, 41:11,
42:7, 43:18, 106:12,
120:15, 173:9
**women** - 78:6
**wonder** - 13:6,
16:19, 63:7
**woods** - 194:19
**word** - 54:15, 55:11,

62:2, 84:22, 110:12,
190:7, 218:24,
218:25, 242:15
  **words** - 43:11,
43:16, 50:10, 53:15,
54:12, 118:14, 129:6,
140:1, 183:18, 242:14
  **wore** - 43:2, 43:3
  **works** - 258:12,
258:17, 258:23
  **worried** - 49:5, 53:2
  **worry** - 16:18,
81:15, 81:21
  **wound** - 211:21,
227:15, 227:16,
227:20, 228:8,
228:13, 228:16,
229:5, 229:11, 230:3,
230:4, 230:24, 231:2,
231:6, 231:7, 231:10,
232:7, 232:9, 232:12,
232:18, 232:22,
232:23, 233:3, 233:9,
233:12, 233:15,
233:20, 233:21,
234:8, 234:11,
234:12, 234:17,
235:1, 235:7, 235:9,
235:12, 235:13,
235:16, 236:8,
236:13, 236:19,
236:21, 236:25,
237:17, 237:18,
237:20, 237:22,
238:9, 238:14,
238:21, 238:22,
239:10, 239:12,
239:18
  **wounds** - 227:10,
227:13, 233:8, 241:8
  **wrapped** - 46:14,
184:24
  **write** - 91:9, 226:5,
243:17
  **written** - 26:18,
170:7, 170:13, 194:2
  **wrote** - 18:3, 36:5,
192:15, 199:4,
244:10, 244:13

## X

**Xerox** - 226:22

## Y

**Y'all** - 44:9
  **Yards** - 69:9
  **year** - 63:3, 63:12,
187:25, 268:18
  **years** - 7:2, 9:22,
18:24, 20:24, 56:1,
57:11, 58:13, 60:9,
67:21, 70:14, 72:12,
79:2, 86:13, 92:4,
95:1, 127:8, 127:10,
154:19, 172:19,
172:20, 204:25,
243:2, 267:20
  **yell** - 45:5, 51:25
  **yelling** - 22:9, 40:5
  **yellow** - 155:6,
160:1
  **yesterday** - 2:12,
8:14, 14:10, 14:15,
143:22, 147:4
  **young** - 104:8
  **younger** - 71:2
  **yourself** - 45:24,
74:2, 76:13, 77:1,

140:9, 169:20,
171:13, 177:8,
183:22, 187:16,
188:5, 189:10,
189:16, 206:9,
206:17, 217:14

## Z

**zeal** - 62:15
  **zip** - 145:22, 150:15
  **zoom** - 99:1