UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,


                    Plaintiff,

vs.                      Case No. 1:10-CR-0744-RDB

ANTONIO HALL,


                    Defendant.

-----------------------------------------------------

**AUGUST 3, 2011**

**Transcript of Trial Proceedings**

**Before the Honorable RICHARD D. BENNETT**
**United States District Judge, and a Jury**

APPEARANCES:

For the Plaintiff:     John F. Purcell, Jr.
                       Clinton J. Fuchs
                       Assistant U.S. Attorney

For the Defendant:     Gary E. Proctor
                       Timothy J. Sullivan




Proceedings recorded by mechanical stenography,
transcript produced with computer-aided
transcription.

TONY ROLLAND, RMR-CRR
focr.mdd@gmail.com

```
1                    P R O C E E D I N G S
2              (JURY OUT.)
3              THE COURT:  Good morning.  We're ready to
4     proceed and bring the jury in.  Let me go over some
5     scheduling matters.  Today we'll go until 4:30 and
6     have the normal hour.  Tomorrow we'll go from 9:30 to
7     1:30.  And then we'll just break.  I have a hearing
8     in another, so I've got to handle another hearing at
9     2 o'clock.  Then Friday, I've spoken with Judge
10    Titus.  Mr. Proctor, I've arranged we will not sit
11    here on Friday for you to have your appearance with
12    Judge Titus on Friday morning.  And we'll start like
13    at 12 o'clock.  What time is your appearance before
14    him?
15             MR. PROCTOR:  I have a sentencing at 9.
16    I'm hoping it will last two hours.
17             THE COURT:  So if we, say, start at
18    noon --
19             MR. PROCTOR:  It's a good bet.  If I'm
20    running late, I'll have Judge Titus --
21             THE COURT:  I think that allows you
22    enough time if we schedule it at noon.
23             MR. PROCTOR:  I think so.
24             MR. PURCELL:  Your Honor, I haven't given
25    you a list of witnesses, but we are I think in a
```

1   pretty good place.  We were talking about it

2   yesterday where we are on your sort of calendar.  I

3   think today we'll hit the cooperators and that's

4   really the bulk of the case.  After that it's all

5   downhill.

6                THE COURT:  We did nine witnesses

7   yesterday.  I apologize for the thing tomorrow

8   afternoon.  And then obviously we knew about Mr.

9   Proctor on Friday morning.

10               MR. PURCELL:  You told us before of so we

11  knew.

12               THE COURT:  Anything further from the

13  point of view of the government?

14               MR. PURCELL:  No.

15               THE COURT:  From the defense?

16               MR. PROCTOR:  No, Your Honor.

17               THE COURT:  All right.

18               (JURY IN.)

19               THE COURT:  Good morning, everyone.

20  Juror No. 2, I'm glad we were able to get you on

21  schedule this morning.

22               The schedule today is we're going to go

23  to 4:30 today.  We'll take an hour at lunch at 1

24  o'clock.  And tomorrow I have a matter in the

25  afternoon.  So tomorrow we're going to do our best to

1    start promptly at 9:30 and we'll go until 1:30 and we

2    will not be sitting tomorrow afternoon.  And I will

3    not call your employers and tell them that.  So you

4    all do what you want to do.

5                 With that, we are ready to proceed with

6    the next government witness.  Mr. Purcell?

7                 MR. PURCELL:  Thank you.  The government

8    calls Detective Moody.  And I've notified Detective

9    Moody may be called and recalled and I'll defer to

10   counsel whether they wish to cross-examine him now in

11   total, or --

12                THE COURT:  Yes.  It's up to the defense

13   counsel.

14   Whereupon:

15                         TODD MOODY,

16   called as a witness, having been first duly sworn

17   according to law, testified as follows:

18                THE DEPUTY CLERK:  Please state your full

19   name for the record.

20                THE WITNESS:  Detective Todd Moody.

21                THE DEPUTY CLERK:  Thank you.

22                     DIRECT EXAMINATION

23   BY MR. PURCELL:

24   Q.    Detective, a couple of questions today.  I'm

25   going to be introducing some exhibits for later

1     witnesses that you were involved in through you so

2     the jury can see what we're doing.  But first, we've

3     heard a lot about Westport, and I just want to nail

4     down for the benefit of the jury where this area is

5     in relation to basically where we are right now.

6     Because it is in the Baltimore area, is that right?

7     A.     That's correct.

8     Q.     Can you just indicate, using the touch screen,

9     where --

10              THE COURT:  What exhibit is on the screen

11    right now?

12              MR. PURCELL:  I was about to say, it's

13    Exhibit 6B.

14    BY MR. PURCELL:

15    Q.     If you can locate Westport, just put a circle

16    around it, I suppose would work, for the jury's

17    benefit.

18              Now, within that circle, if you can

19    locate the area we've been talking most about today

20    and we'll be talking a lot more about today, the area

21    of the 2400 block of Maisel Street and -- I'm sorry,

22    Maisel Court.

23    A.     It would be about right there.

24    Q.     Okay.  And yesterday when Debbie Guest was

25    testifying she indicated where she lived.  As a point

```
1     of reference, can you show essentially where Maisel
2     Street is on this map?
3     A.      Maisel Street is right here.  And Miss Guest
4     lives approximately about right there.
5     Q.      Okay.  And that's just on the other side of
6     Nevada?
7     A.      It's at the very end of Westport Street where
8     it intersects with Maisel Street.
9     Q.      I'm sorry.  With Maisel, I'm sorry, Westport.
10              And the ball field that we've heard
11    about -- we can see in our larger exhibit is -- can
12    you indicate that, as well?
13    A.      It would be right here.
14    Q.      Okay.  Thank you.  Now, if you were -- we
15    mentioned I think -- one of the witnesses did,
16    perhaps Miss Guest -- that there was a light rail
17    line.  Could you show us where the light rail she was
18    referring to is?
19    A.      The light rail line runs -- you can barely see
20    the tracks, but it runs along the water here.
21    Q.      And as the direction you're going, is it the
22    direction towards Baltimore City or away?
23    A.      That -- this is -- Baltimore City is there.
24    Q.      Okay.  And if you were to come in -- for
25    instance, if you go to the very top right-hand corner
```

7

```
 1    of your screen, is that essentially where you would
 2    just about be at Ravens Stadium?
 3    A.     That's correct.
 4    Q.     Okay.  So that's the location of Westport?
 5    A.     Correct.
 6    Q.     Thank you very much.  And that's Exhibit 6B.
 7    And you can clear that screen and we'll move on.
 8              THE COURT:  It's the bottom left-hand
 9    corner.  Detective Moody, if you just hit it and
10    touch it it will clear.
11    BY MR. PURCELL:
12    Q.     Now, Detective, one of the things I want to
13    get through with you today is the actual taking of
14    the -- what we are calling -- I'll continue to call,
15    I suppose, the Guest 302, which is Exhibit No. 306.
16    Now, can you tell us what your role was in creating
17    this 302 that we heard about yesterday being
18    disclosed?
19    A.     Myself and Agent Mizer at the time, following
20    Mr. Guest's arrest in the Southern District,
21    responded over to the Southern District and basically
22    interviewed Mr. Guest regarding any information that
23    he may have had.
24    Q.     I'm sorry, what was the date of Mr. Guest's
25    arrest?
```

8

```
 1    A.      It was January 9th, 2008.

 2    Q.      I just want to give a second between my

 3    question and your answers; okay?

 4    A.      Sorry.

 5    Q.      Thank you.

 6                   Was what date?

 7    A.      January 9th, 2008.

 8    Q.      And what date did you prepare the 302

 9    following that interview?

10    A.      I prepared the 302 on January 10th, 2008.

11    Q.      Is that indicated on the 302?

12    A.      It is.

13    Q.      What had Mr. Guest been arrested for?

14    A.      He was arrested for possession of heroin.

15    Q.      How much heroin?

16    A.      I believe it was five gelatin capsules of

17    heroin.

18    Q.      Thank you.  Now, we've actually reviewed this

19    at some length so it will make it a little bit more

20    quick on your review today.  But in the course of the

21    interview of Mr. Guest, what were you investigating?

22    A.      During that time we were investigating a

23    heroin organization that was ran out of the Westport

24    area.  It was operated by a gentleman by the name of

25    Jamal Stewart.  He had several associates that were
```

1    involved in his organization.

2    Q.    And is that what led to the indictment that we

3    saw yesterday including Mr. Stewart and Mr. Cheese in

4    which Mr. Carithers was counsel?

5    A.    That's correct.

6    Q.    And is that the case in which the discovery

7    that was provided to Mr. Cheese's attorney, Mr.

8    Carithers, was disclosed?

9    A.    That's correct.

10   Q.    Now, was the Guest 302 disclosed prior to May

11   20, 2009?

12   A.    No, it was not.

13   Q.    Okay.  And that was more than a year after it

14   was written; is that correct?

15   A.    That's correct.

16   Q.    And it was disclosed -- if you can confirm for

17   the Court or for the jury -- it was only disclosed to

18   the two defendants in the Stewart case; is that

19   correct?

20   A.    That's correct.  Mr. Cheese and Mr. Brown.

21   Q.    And then we followed its path from there

22   yesterday.

23   A.    Yes.

24   Q.    Thank you.  Just for the record, if it wasn't

25   up, what we're referring to is government Exhibit

1    338.

2                        Now, can you also confirm whether you

3    were the case agent in that case as well?  Is that

4    correct?

5    A.      That's correct.

6    Q.      Now, at the time, that is of May 20 of 2009

7    when this 302 was disclosed, of the defendants on

8    this particular indictment, which ones had already

9    entered guilty pleas without receiving this

10   particular 302?

11   A.      Jamal Stewart had received it.  I'm sorry.  He

12   had pled guilty and not received it.

13   Q.      How about with Mr. Williams?

14   A.      Jahvin Williams had pled guilty; Walter Taylor

15   had pled guilty; Damien Gary had pled guilty; Eric

16   Gasque had pled guilty; and Timothy McBride had pled

17   guilty.

18   Q.      Okay.  So all of those individuals never

19   received the 302 and pled without it?

20   A.      That's correct.

21   Q.      Okay.  Thank you.  Now, in the 302 there were

22   some other individuals mentioned.  In fact, in the

23   context of Mr. Guest's statement about Mr. Hall or of

24   this person, Antonio Hall, Mack, it seemed to be in

25   the context of a person named Black, or Maurice

1    Mouzon.  Did you know who he was?

2    A.      I did.  He was another gentleman that I was

3    the case agent in his prosecution, as well.

4    Q.      And could you tell the Court the status of Mr.

5    Mouzon at the time his particular 302 was disclosed

6    in May 2009?

7    A.      He had pled guilty and had been sentenced and

8    he was in federal prison.

9    Q.      He was a substantial target of your

10   investigation; is that right?  The lead target?

11   A.      Yes, he was.

12   Q.      At that time, in that investigation.

13           Was he a Westport person?

14   A.      He was.

15   Q.      In fact, his wife is one of the witnesses in

16   this case; is that right?

17   A.      That's correct.

18   Q.      She'll be testifying later today, I believe.

19           Now, there's an individual named Hickman

20   who a lot of times seems to be dedicated by Mr. Guest

21   talking about Monster that we heard about?

22   A.      That's correct.

23   Q.      What was the status of Monster at the time of

24   this particular disclosure in May 2009?

25   A.      He had pled guilty.  He had also been

1    sentenced and he was a cooperating witness with the

2    government.

3    Q.      Okay.  So he was sentenced as a cooperator; is

4    that right?

5    A.      That's correct.

6    Q.      Now, did Mr. Guest give information about the

7    crime of murder as to any other individuals in that

8    302 other than Mr. Hall or Mr. Hickman or Mr. Mouzon?

9    A.      He mentioned a gentleman by the name of -- who

10   he knew as Giggles.

11   Q.      And has that person ever been identified?

12   A.      I think at the time, no.  But we have had

13   since identified him after that.  It was a while

14   after that.

15   Q.      At the time, however, no?

16   A.      At the time, no.

17   Q.      You didn't know who he was and his name is not

18   in there?

19   A.      His name is not in there.

20   Q.      Okay.  So the only person whose name -- or can

21   you tell the Court how the people who were named as

22   to being suspects in the crime of murder,

23   drug-related murder, which of those individuals had

24   already not been convicted and was on -- still on the

25   street?

1      A.      Mr. Hall.

2      Q.      The only one?

3      A.      Correct.

4      Q.      Okay.  Now, if you look at -- I think it's --

5      do you have the 302 in front of you?

6      A.      I do.

7      Q.      Okay.  Turn to page -- and if you would help

8      me back there, Andy.  Turn to page -- I think it's

9      the bottom of page four.  All right.  Can you put

10     that up, please?

11             There's a reference to a home invasion,

12     the home of Black; is that correct?

13     A.      That's correct.

14             MR. PROCTOR:  Judge, objection.  We would

15     ask for the same instruction.

16             THE COURT:  Yes, certainly.

17             Ladies and gentlemen, this document is

18     introduced into evidence with respect to the context

19     of the allegations in this case.  With respect to

20     other statement of facts or allegations as to other

21     matters, it would be hearsay.  It's not being offered

22     for the truth of the matter asserted therein, it's

23     merely being offered with respect to information that

24     was in the 302 that was later apparently divulged in

25     some fashion.  But the matter of the context and the

14

1    contents of what's in the 302 is not to be accepted

2    by you as fact one way or the other.  It's extraneous

3    to this.  Definitely we're not getting into all the

4    other facts and allegations as to other matters

5    that's in the 302 itself.

6                Is that satisfactory to you, Mr. Proctor?

7                MR. PROCTOR:  Yes, sir.

8                THE COURT:  Okay.  Fine.

9                MR. PURCELL:  Thank you, Your Honor.

10   BY MR. PURCELL:

11   Q.     Now, did Mr. Guest in his statement to you

12   that day, did he link this person, Hall, Antonio

13   Hall, Mack, to the home invasion?

14   A.     He did.

15   Q.     How did he do that?

16   A.     He, one, by indicating he was an associate of

17   Maurice Mouzon.  And Maurice Mouzon was a known drug

18   dealer, crack dealer in the neighborhood.

19   Q.     Okay.

20   A.     He described that he was aware of the home

21   invasion that had occurred at Maurice Mouzon's house.

22   And that based on his conversations with Maurice

23   Mouzon's wife, he had learned that Marvin and Michael

24   Raines were suspected of being involved in that home

25   invasion.  Following the home invasion --

15

 1    Q.      Did he say anything about -- did Mr. Guest say

 2    anything about Mr. Hall specifically being involved

 3    in any retaliation for that home invasion?

 4                   MR. PROCTOR:  Objection, Judge.  Can we

 5    approach?

 6                   THE COURT:  Yes.  Certainly.

 7                   (BENCH CONFERENCE ON THE RECORD.)

 8                   THE COURT:  Yes, Mr. Proctor.

 9                   MR. PROCTOR:  Judge, the objection I

10    have, the 302 comes in because Mr. Hall is allegedly

11    aware of it and that's his motivation.  But when

12    we're getting into things that Mr. Guest told Officer

13    Moody that aren't even in the 302, that's pure

14    hearsay and there's no basis to get it in.

15                   MR. PURCELL:  It is in the 302.

16                   THE COURT:  It's in the 302.

17                   MR. PROCTOR:  I'd rather he'd let him

18    read it.  And ask --

19                   THE COURT:  I understand the objection.

20    The comment that was -- the answer to the last

21    question was, in fact, material that's in the 302 if

22    you read through the 302.

23                   Mr. Purcell, the best way to do this is

24    that he can look at the 302 and just sort of

25    summarize the context of the information and we'll

1      move on from there.  I don't want to spend a lot of

2      time going into the context.

3                  MR. PURCELL:  Well, Your Honor, as I

4      mentioned yesterday, we're alleging that this 302 was

5      the motive.  What adds to the motive is the fact that

6      things that Mr. Guest were saying, in fact, there is

7      evidence that they occurred.  So that the defendant

8      would have an increased motive if, in fact, these

9      things occurred.

10                 THE COURT:  I understand.  You can

11     certainly go into all those topic areas.  I think the

12     way to handle it is to say:  What topic areas were in

13     this 302 in addition to drug dealing or whatever --

14                 MR. PURCELL:  I haven't gone beyond that,

15     Your Honor.

16                 THE COURT:  We're not going to go into

17     the specifics on what the allegations are.  I've

18     given the jury a cautionary instruction that Mr.

19     Proctor said was satisfactory to him.  But we've got

20     to be careful to stay within the parameters of the

21     302 in the context whether Mr. Hall was involved in

22     the home invasion, other matters, essentially the

23     context of the amount of information that related to

24     Mr. Hall.

25                 MR. PURCELL:  We're going to prove two

17

```
1     things today, Your Honor.  And right now I'm

2     establishing, one, there was a home invasion; and,

3     two, there was retaliation of the people that are

4     mentioned in the 302.

5               THE COURT:  I understand.  My point is

6     that Mr. Proctor's objection is to make sure you stay

7     within the confines of the 302.  And to the extent --

8     as opposed to questions that go beyond it.

9               MR. PURCELL:  But I haven't.  So it's an

10    early objection.

11              THE COURT:  I think we don't need to go

12    into the great details.

13              MR. PROCTOR:  And we don't want a mini

14    trial on the home invasion.  It's not part of 404B;

15    it's not part of the overt acts.  And I would

16    rather --

17              THE COURT:  I've given the jury the

18    cautionary instruction several times.  The bottom

19    line is that, with respect to the topic areas, just

20    address the topic areas and move on.  The 302 is what

21    it is and they've been told --

22              MR. PURCELL:  We would have been done by

23    now.

24              MR. PROCTOR:  I'd rather the questioning

25    was:  Does the 302 reflect.  Because if you ask the
```

1   question:  Did he say anything else about, who knows

2   what else he recalls that never made it into the 302.

3                   THE COURT:  That's fine.  Just be careful

4   with it.

5                   (END OF BENCH CONFERENCE.)

6   BY MR. PURCELL:

7   Q.      Okay.  Let me repeat my question.  Did Mr.

8   Guest say anything in this 302 connecting Mr. Hall to

9   any retaliation for the Mouzon home invasion?

10  A.      Yes.

11  Q.      What did he say?

12  A.      He believed he could have been involved in the

13  homicides and shootings that followed that home

14  invasion.

15  Q.      That's in your 302; is that correct?

16  A.      That's on page five.

17  Q.      And I don't want you to say anything about

18  what he says; it's in the 302?

19  A.      It's in the 302.

20  Q.      You took good notes?

21  A.      I did.

22  Q.      All right.  Now, did there -- did you confirm

23  that, in fact, there was a home invasion of the home

24  of Tamica Mouzon?

25  A.      I did.

1    Q.    I'm just showing you for identification

2    government Exhibit No. 162.  And you obtained this in

3    the course of your investigation; is that right?

4    A.    I did.

5    Q.    And what does it reflect?

6    A.    It just reflects the incident that occurred on

7    2723 Hollins Ferry Road on May 2nd, 2005.  The report

8    of a robbery.  And the victim and the reporting

9    person being Tamica Mouzon.

10   Q.    Thank you.  Now, there are some individuals

11   named by Mr. Guest --

12            THE COURT:  That's just being for

13   identification only.  It's not in evidence.

14            MR. PURCELL:  Exactly.  Thank you.

15   BY MR. PURCELL:

16   Q.    There were some individuals named by Mr. Guest

17   in your 302 as to who he said were the people against

18   whom retaliation might be sought because they were

19   the people supposed to have been threatened.  What

20   were their names?

21   A.    Marvin Raines and Michael Raines.

22   Q.    And did you investigate whether there was, in

23   fact, any such retaliation against either of those

24   individuals?

25   A.    I did.

1  Q.      And I direct your attention to 161 -- for

2  identification only.  And I just want you to give us

3  the date, the nature of the crime, and the victim

4  reflected in that police document.

5  A.      This is a report of an incident of a shooting

6  that occurred May 5th in the 2600 block of Huron

7  Street.  And the victim of the shooting was a Michael

8  Raines.

9  Q.      And is Michael Raines one of the people

10  mentioned to you by Mr. Guest as to whom Mr. Hall

11  might be taking retaliation?

12  A.      That's correct.

13  Q.      Or he told you, in fact, he believed he had

14  heard; is that correct?

15  A.      Correct.

16  Q.      And how long after the home invasion did this

17  retaliation occur?  And tell us the day and the year,

18  please.

19  A.      The day of the home invasion was May 2nd,

20  2005.  The day of that shooting was May 5, 2005.

21  Q.      And this is what was connected to Mr. Hall in

22  the 302?

23  A.      Correct.

24  Q.      Thank you.

25          THE COURT:  That's for identification

21

1        only, as well.

2                      MR. PURCELL:  Yes.

3        BY MR. PURCELL:

4        Q.      Now, I don't know if I mentioned this, but as

5        an element the of the offense -- and this will get to

6        it, it's sort of self-evident -- but at the time that

7        you took this information from Mr. Guest, were you a

8        federal agent, a federal law enforcement officer?

9        A.      Correct.  A deputized special agent with the

10       FBI.

11       Q.      And who were you with when, in fact, as a

12       deputized federal agent, you had -- you are a federal

13       law enforcement officer yourself under the law; is

14       that right?

15       A.      Correct.

16       Q.      So you can do search warrants, testify before

17       the grand jury, all the things that federal agents

18       do?

19       A.      Yes, correct.

20       Q.      And you were with an actual federal agent as

21       well during that period, as well?

22       A.      I was.

23       Q.      And who was that?

24       A.      Special Agent Michael Mizer.

25       Q.      Thank you.  And is the information that was

TODD MOODY - DIRECT - 2/14/12

22

1    provided summarized in the 302?

2    A.      It is.

3    Q.      Now, there's just one other thing I want to

4    talk about the 302 for a second, and that is there

5    was a question yesterday.  I don't think it was clear

6    whether when Mr. Guest was presented with the -- I'm

7    sorry -- when he interviewed with you, whether or not

8    when he viewed this photo book whether or not Mr.

9    Hall's photograph was in it.  Could you clarify that,

10   please?

11   A.      No, Mr. Hall's photograph was not in the book

12   at the time.

13   Q.      Okay.  So he did not have an opportunity to

14   identify or not identify Mr. Hall by photograph that

15   day; is that right?

16   A.      That's correct.

17   Q.      Now, briefly I want to talk to you about or

18   ask you some questions, if I may, about the

19   investigation itself.  Now, just for the record

20   again, tell us what the date of the murder of Mr.

21   Kareem Guest was.

22   A.      September 20th, 2009.

23   Q.      When did you get involved in the

24   investigation?

25   A.      Within several days of the investigation, once

1    I learned of the homicide.

2    Q.      And just tell the jury, please, how this

3    investigation was conducted in terms of whether it

4    was solely Baltimore City Homicide -- was there a

5    city homicide?

6    A.      There was a city homicide investigation.

7    Q.      Assigned?

8    A.      There was.

9    Q.      And who was it?

10   A.      Detective Brian Kershaw.

11   Q.      And did you work with Detective Kershaw in

12   the -- in the -- during the investigation?

13   A.      On and off I did have the opportunity to work

14   with him, yes.

15   Q.      Is he still assigned as the homicide detective

16   on this case?

17   A.      He is.

18   Q.      Okay.  Now, did the investigation essentially

19   become a federal grand jury investigation?

20   A.      It did.

21   Q.      And tell the jury how that -- basically how

22   that occurred.

23   A.      We started issuing grand jury subpoenas to

24   anyone we had heard through various sources or based

25   on my knowledge of the neighborhood who could have

1    been in the area at the time of the murder.

2    Q.      Now, as this -- this was now in the fall of

3    2009; is that right?

4    A.      That's correct.

5    Q.      At the outset of the investigation, were there

6    any eyewitnesses to this -- or any known

7    eyewitnesses; we know that there were -- but were

8    there any known eyewitnesses to the murder of Mr.

9    Guest?

10   A.      No, none.

11   Q.      And in fact, the investigation began

12   essentially right after the murder.  Can you tell the

13   jury, please, when did the grand jury investigation

14   and the homicide investigation itself uncover its

15   first eyewitness to this murder who came forward and

16   said:  It was X Y or Z who did it?

17   A.      Once we brought in Ms. Rain Curtis, which was

18   in July, I believe, of 2010.

19   Q.      July 2010?

20   A.      Correct.

21   Q.      For a murder that happened in September 2009?

22   A.      That's correct.

23   Q.      In the interval, was the grand jury -- were

24   witnesses -- that is just generally, people being

25   brought before the grand jury and asked questions

TODD MOODY - DIRECT - DURKIN

25

1      about what they knew?

2      A.      They were.

3      Q.      And up to that point of July 2010, did any of

4      those witnesses say, yes, they saw what happened and

5      can tell us who was there and who did it?

6      A.      No.

7      Q.      And did those witnesses include people, for

8      instance, as Shameka Ross?

9      A.      That's correct.

10     Q.      Jamal Howard, also known as Ferl?

11     A.      Correct.

12     Q.      Rain Curtis?

13     A.      Correct.

14     Q.      Shaquanda Isaac?

15     A.      Yes.

16     Q.      Tamica Mouzon, Mika Mouzon?

17     A.      Correct.

18     Q.      And up to July 2010, whatever they said, they

19     didn't say they were there or saw it happen; is that

20     correct?

21     A.      That's correct.

22     Q.      Now, what occurred in February, in grand jury

23     proceedings in February 2009 -- I'm sorry -- 2010, in

24     the early part of 2010, that led to the disclosure by

25     Miss Curtis in July of 2010?

26

```
 1                    I'm going to ask you to just sort of --

 2       without getting into everybody's testimony, unless

 3       counsel wishes to get into it; answer any question

 4       they have -- but just tell the jury in February of

 5       2010 did you receive information that you believed

 6       might lead you to be able to show that some of these

 7       witnesses weren't telling the truth about being there

 8       or not?

 9       A.      That's correct.

10       Q.      And what was that?  Just summarize it, please.

11       A.      We had learned that there was a telephone call

12       placed from a gentleman who was incarcerated at the

13       time by the name of Brandon Hall, named Hershel.  He

14       was incarcerated in the Maryland correctional

15       facility out in Hagerstown.  And we had learned that

16       he had placed a call to someone at the scene that

17       night and several people had gotten on the phone and

18       had conversations with him.

19       Q.      Now, up to that point had Rain Curtis admitted

20       being present at the scene of this murder?

21       A.      No.

22       Q.      Had she been asked in the grand jury if she

23       had been present at the scene of the murder?

24       A.      That's correct, she had.

25       Q.      What about Tamica Mouzon?  Had she been asked
```

1    about being present at the scene of the murder?

2    A.    Yes.

3    Q.    Had she denied being present at the scene of

4    the murder?

5    A.    Correct.

6    Q.    Others, as well?

7    A.    Correct.

8    Q.    Now, when you heard about this phone call that

9    might have occurred between a boyfriend of Miss

10   Curtis and Miss Curtis or others, did you undertake

11   to locate where this person was?

12   A.    We did.

13   Q.    And where was he?

14   A.    He was in Hagerstown.

15   Q.    Was he just living in Hagerstown?

16   A.    He was in prison.

17   Q.    You're talking like a police officer.  I know.

18         He was in prison in Hagerstown?

19   A.    Correct.

20   Q.    The state prison?

21   A.    Yes.

22   Q.    Now, did you determine whether or not that

23   particular state prison is one of those prisons that

24   maintains calls, that is, records call of inmates as

25   they -- as they make them?

```
 1      A.      We did.

 2      Q.      Now, inmates can't receive calls on those

 3      phones; is that correct?

 4      A.      Correct.

 5      Q.      They can just make them?

 6      A.      Correct.

 7      Q.      And you've listened to many of these; is that

 8      right?

 9      A.      I have.

10      Q.      Can you tell the jury what sort of notice is

11      given the inmates as to the call being recorded.

12      A.      There's a prerecorded automated recording that

13      says -- I'm not exactly to quote it -- but it says

14      that all telephone calls are subject to recording and

15      monitoring.

16      Q.      And this is fairly prominent on the call, is

17      it not?

18      A.      It actually -- it plays that prerecorded

19      statement prior to connecting the call.

20      Q.      All right.  Now, did you obtain telephone

21      calls from that person -- did you state what his name

22      was?

23      A.      I did.  Brandon Hall.

24      Q.      Thank you.  I'm always think of the next

25      question.
```

```
 1                    Now, when Mr. Hall's records were

 2      obtained, did you go back; were you able to retrieve

 3      the records going back as far as September 21st of

 4      2009, the day after the murder?

 5      A.     We did.

 6      Q.     And you got other calls, as well?

 7      A.     Yes.

 8      Q.     Okay.  And these calls, for the record, have

 9      all been provided to counsel?

10      A.     They have.

11      Q.     And they have them.  In fact, while we're

12      talking about it, the defense has been given the

13      entire homicide file; is that correct?

14      A.     That's correct.

15      Q.     And the entire investigative file of the FBI?

16      A.     Correct.

17      Q.     And the grand jury materials of all the people

18      we're talking about?

19      A.     Yes, correct.

20      Q.     Including, by the way, the blue-light cameras?

21      A.     That's correct.

22      Q.     Were blue-light cameras -- we heard a

23      question; I think I'm just going to digress; this is

24      what I do -- but yesterday we heard a question of

25      Officer Cabreja, I think by Mr. Proctor, as to
```

```
 1    whether or not he obtained the local blue-light
 2    protective cameras from the Maisel Street area?
 3    A.      Correct.
 4    Q.      You heard that?
 5    A.      I did.
 6    Q.      He didn't seem to know, did he?
 7    A.      He wouldn't know.
 8    Q.      He wouldn't know.  Why wouldn't he know?
 9    A.      Because it wouldn't be within his realm of
10    duty as a patrol officer responding to a homicide
11    scene.  Once homicide detectives arrive, they assume
12    responsibility for any other investigative things
13    that need to be obtained.
14    Q.      Okay.  And was that done in this case?
15    A.      It was.
16    Q.      And were those tapes viewed?
17    A.      They were.
18    Q.      And we have them and the defense has them?
19    A.      Yes, they do.
20    Q.      And we have them as well.  And we'll admit
21    them if anybody wants them.  They are government
22    Exhibit No. 468.  And just tell the jury what these
23    are.
24    A.      That's a CD disc containing the video footage
25    from the POD camera that was located near the
```

1    intersection of Annor and Alaska Street.

2    Q.    And is it correct that, of the discovery that

3    we gave to defense, which consists of several

4    thousands of pages, that page 27 of that discovery

5    states that there was nothing found of value on those

6    tapes?

7    A.    That's correct.

8    Q.    But they were given to the defense, anyway?

9    A.    They were.

10   Q.    Okay.  Thank you.  I just want to be clear

11   that those tapes had been recovered despite the fact

12   that the witness didn't have a clue about them?

13   A.    Correct.

14   Q.    And they're there for anybody to watch.

15         Now, going back to the homicide, you

16   obtained all of these calls from Mr. Howard.  And of

17   particular interest was -- or you found -- was a call

18   on September 21st, 2009, the day after the murder; is

19   that right?

20   A.    That's correct.

21   Q.    And do we have a copy of that call here?

22   A.    We do.

23   Q.    And that is government exhibit.  And again

24   correct me if I'm incorrect.  That is government

25   Exhibit No. 188 is the entire bank of calls.  And

```
 1      then we've got a segment of the call rather than --

 2      it's a fairly long call, isn't it?

 3      A.      That's correct.  Most of the calls from the

 4      state facilities are about 20 minutes.  Some

 5      facilities allow the calls to be 30 minutes.

 6      Q.      Then what happens?

 7      A.      It disconnects.

 8      Q.      Just automatically disconnects?

 9      A.      Correct.

10      Q.      Now, is it correct to say that -- and counsel

11      can play the whole thing if they wish.  But most of

12      this is personal conversation?

13      A.      That's correct.

14      Q.      But did there come a point in the conversation

15      where it seems to relate to events that happened the

16      prior night?

17      A.      Yes, it did.

18      Q.      Now, we'll play this in a minute, but let's

19      continue for a second.  After you obtained the

20      information and listened to this particular call, did

21      you come to believe or come to an opinion, at least,

22      as to whether Miss Curtis had been, up to this point,

23      truthful with the grand jury investigation as to

24      whether or not she was at the scene that night?

25      A.      I did.  It was clear that she was being
```

1    dishonest.

2    Q.      Previously she had said she wasn't there?

3    A.      Correct.

4    Q.      And the tape indicated otherwise?

5    A.      That's true.

6    Q.      Now, after the tape was obtained, can you tell

7    the jury, please, what steps were made to sort of

8    re-confront Miss Curtis about this particular tape.

9    And she had been to the grand jury.

10             By the way, was she represented through

11   all of this?

12   A.      Yes, she was.

13   Q.      Were you present at meetings with Miss Curtis

14   and her attorney after you found this recorded call

15   to her?

16   A.      I was.

17   Q.      And just tell her -- the jury, I'm sorry --

18   how she was confronted; that is, presented with this

19   contrary evidence?

20   A.      We advised her that we had recordings.  We

21   didn't specify that they were jail calls because we

22   didn't want to divulge the fact that we were

23   recovering jail calls and risk losing any further

24   ones that may occur.  But we advised her that we had

25   a recording from her explaining to someone else that

1    she was right there when Kareem was killed.

2    Q.    Now, that's what was told to her?

3    A.    Correct.

4    Q.    Do you remember any further disclosure that

5    was made to her attorney under the agreement that he

6    not disclose the actual source of the information?

7    A.    Correct.

8    Q.    What was done in that regard?

9    A.    We played the actual recordings for her

10    attorney.

11    Q.    Did he meet with her after we did that?

12    A.    He did.

13    Q.    And what was her response in terms of

14    admitting or making any admissions that she had

15    previously been untruthful?

16    A.    She said she wasn't there and she didn't know

17    what we were talking about.

18    Q.    Was she presented with the possibility, that

19    as a result of this new evidence, that she could face

20    indictment for perjury?

21    A.    She was.

22    Q.    And that was with her attorney present?

23    A.    Correct.

24    Q.    And ultimately, let me direct your attention

25    now to I believe it's April of 2010 -- and the docket

```
1        sheets are here; we can confirm that if counsel wants
2        a precise date -- did you present evidence before the
3        grand jury in furtherance of an indictment of Miss
4        Curtis for perjury?
5     A.    We did.
6     Q.    And was she indicted?
7     A.    She was indicted.
8     Q.    Was she arrested?
9     A.    She was arrested.
10    Q.    That's a federal charge; is that right?
11    A.    Correct.
12    Q.    Can you tell the jury what occurred in terms
13       of whether -- when she was presented to a magistrate
14       judge, as to whether she was released pending trial
15       on that perjury charge or whether she was detained;
16       that is, held in custody until her trial?
17    A.    She was detained pending her trial.
18    Q.    And was she detained without -- unless counsel
19       requires that it be known -- was she detained in
20       Baltimore?
21    A.    No, she was not.
22    Q.    Was she detained in some other city?
23    A.    Correct.
24    Q.    She was out of contact with her family?
25    A.    That's true.
```

```
1    Q.      Now, at what point did you receive information

2    that Miss Curtis, who now was incarcerated pending

3    her trial -- that was actually before Judge Bennett,

4    I understand?

5    A.      It was.

6    Q.      That she was pending trial for perjury, that

7    she, through her attorney, now wished to come forward

8    and recant her prior testimony?

9    A.      I believe that was in July, several months

10   later, we had received notification from her

11   attorney.

12   Q.      And what occurred as a result of that?

13   A.      We brought her back in with her attorney and

14   interviewed her.

15   Q.      And did her story change?

16   A.      Yes, it did.

17   Q.      Now, was she then presented to the grand

18   jury -- I think it was on July -- the transcripts

19   that we have are on July 21, I believe.

20   A.      Yeah, July 21st she went back into the grand

21   jury.

22   Q.      Just for the record, I've prepared a summary

23   that you've reviewed and confirmed to be correct,

24   government Exhibit 311; is that right?

25   A.      Correct.
```

1    Q.    Just tell the jury what it is.  I'm going to

2    move it into evidence.

3    A.    It's a list of the witnesses and the dates

4    that they went into the grand juries.  Because there

5    were so many, we needed to make a list.

6    Q.    Okay.  And that shows the dates of the various

7    grand jury appearances of the eyewitnesses in this

8    case and I believe Mr. Parsons; is that right?

9    A.    Correct.

10   Q.    Not every witness?

11   A.    No, not every witness.

12          MR. PURCELL:  Okay.  So we'll move that

13   in.  So you can refer to that if the Court has no

14   objection to that, and counsel.

15          THE COURT:  Any objection to this

16   exhibit, Mr. Proctor?

17          MR. PROCTOR:  No, sir.

18          THE COURT:  So admitted.

19          MR. PURCELL:  That's 311.  Thank you.

20   BY MR. PURCELL:

21   Q.    Now, in her proffer and in her grand jury

22   testimony, did Miss Curtis identify a person as the

23   person she now said she was an eyewitness to the

24   murder of Mr. Guest?

25   A.    She did.

1   Q.      And who did she identify?

2   A.      Mr. Hall sitting here in the blue shirt.

3   Q.      So up to that point, July 2010, was she the

4   first eyewitness to come forward and point to

5   somebody?

6   A.      She was the very first witness to identify the

7   shooter of Mr. Guest.

8   Q.      Now, did you tell her to identify Mr. Hall?

9   A.      No, I did not.

10  Q.      Did you tell her to identify Mr. Hall?

11  A.      Absolutely not.

12  Q.      Did you know she was going to identify Mr.

13  Hall at the time when she came in for a proffer with

14  her attorney?

15  A.      No, I did not.

16  Q.      As far as you know, had I been told by her

17  attorney who she was going to identify?

18  A.      No.

19  Q.      Do you remember what the first question was to

20  her -- probably had to be the first question -- she

21  was asked in that proffer session?

22  A.      She was.

23  Q.      And what was -- she was asked, "Who did it,"

24  was the first question?

25  A.      Correct.

39

```
 1       Q.       And what did she say?

 2       A.       She said, "Mack did it".

 3       Q.       Now, did she also describe who else was there

 4       and what their position was at the time of the

 5       shooting?

 6       A.       She did.

 7       Q.       Now, did that cause you to believe other

 8       people who said they weren't there were, in fact, not

 9       there?

10       A.       Correct.

11       Q.       Now, using the grand jury, what was done in

12       relation to those individuals?  I'm talking about now

13       Ross, Isaac, Jamal Howard in particular?

14       A.       We --

15       Q.       Tamica Mouzon?

16       A.       Correct.  We re-served all the witnesses who

17       Miss Rain placed at the time of the scene of the

18       murder who previously told us they were not there and

19       didn't know anything.  We re-served them with new

20       grand jury subpoenas, mostly through their attorneys

21       because almost everyone was represented.

22       Q.       Now, did -- in the grand jury -- you've

23       reviewed the transcripts, as well?

24       A.       I have.

25       Q.       Were those witnesses told that Miss Curtis had
```

1    reported to the government exactly what happened?

2    That is, did they know what she told us?

3    A.      No.

4    Q.      Did we tell them that she told us what she

5    said?

6    A.      No, we didn't.

7    Q.      I didn't tell them; you didn't tell them; none

8    of the agents or my co-counsel didn't tell them?

9    A.      No.

10   Q.      So they were just asked and told -- basically,

11   what were they told?  Essentially that we didn't

12   believe them?

13   A.      We basically told them we didn't believe them

14   and we asked a little more pointed questions, which I

15   think indicated to the witnesses that we knew

16   something.

17                   MR. SULLIVAN:  Objection.

18                   THE COURT:  Sustained.

19   BY MR. PURCELL:

20   Q.      Did we have better information to use to ask

21   questions?

22   A.      Yes.

23   Q.      Now we knew?

24   A.      Correct.

25   Q.      Or believed we knew?

41

```
 1      A.      Correct.

 2      Q.      It's for the jury to determine whether we were

 3      right or not.

 4              Now, that investigation then continued.

 5      Let me ask you:  Why didn't you just go and arrest

 6      Mr. Hall in July of 2010 once you had information

 7      from Miss Curtis that he was the person who did it?

 8      Did you believe her?  Did you believe her?

 9      A.      I believed her, yes.

10      Q.      Did you have probable cause, you believe, to

11      arrest Mr. Hall?

12      A.      Very weak probable cause, one witness, yes.

13      Q.      But you didn't arrest him?

14      A.      No.

15      Q.      Wasn't that the end of your investigation?

16      You had the person who did it?

17      A.      That was basically the beginning of the

18      investigation.  Because now we knew -- we had

19      identified the shooter, so now we could develop

20      evidence and start focusing on obtaining evidence

21      based on what we knew.  Because up until then we

22      didn't know.

23      Q.      Up until then, what did you do when you had

24      information that maybe this person or that person

25      that was there may have done it or had a motive to do
```

1    it?  Did you just ignore it?  What did you do in your

2    investigation with your other leads, if you had any?

3    A.      We followed up on every lead that we could.

4    We -- you know, we tapped into sources that we had in

5    the neighborhood, informants.  I had frequent contact

6    with the family.  Because Miss Guest is very

7    connected with the community and she would hear a lot

8    of things in passing.  So she would pass that

9    information on to me.

10   Q.      Let me ask you:  Who was the source of

11   information that led us to even subpoena Miss Mouzon

12   and Miss Curtis in the first place?

13   A.      It was Miss Guest.

14   Q.      Who is the mother-in-law of Tamica Mouzon?

15   A.      Wanda Partlow.

16   Q.      And is it based on a conversation between Miss

17   Guest -- without telling us what it was -- Miss Guest

18   and Miss Partlow, that she disclosed to you that

19   caused us to subpoena or the investigation to

20   subpoena those two individuals?

21   A.      That's correct.

22   Q.      Who initially denied they weren't there?

23   A.      Yes.

24   Q.      Or that they were there.

25            All right.  Now, at some point in the

43

```
1        investigation, did you learn that Kevin Duckett was
2        at the scene?
3        A.      We did.
4        Q.      Or believed that he was at the scene; had
5        information to that effect?
6        A.      We did.
7        Q.      Did anybody ever refuse to or not identify him
8        in the course of their testimony?
9        A.      No.  I mean they -- people said he was there.
10       Q.      Up to the point that Miss Ross identified Mr.
11       Hall -- and she'll be a witness here -- as being
12       there, had she ever not told you that she was with
13       Kevin Duckett?
14       A.      No.  She told us from the very beginning that
15       she was with Mr. Duckett.
16       Q.      Up to the time that Miss Curtis told you that
17       information she gave you about being an eyewitness to
18       Mr. Hall, had she ever denied seeing Kevin Duckett?
19       A.      I don't think she did, no.
20       Q.      How about Shaquanda Isaac?
21       A.      No.
22       Q.      So these people all readily admitted that
23       Kevin Duckett was there; is that right?
24       A.      That's correct.
25       Q.      And others, as well?
```

```
1    A.      Yes.

2    Q.      How about Jamal Howard?  Up to the point that

3    he admitted seeing Mr. Hall there, had he initially

4    denied it?

5    A.      He did.

6    Q.      Did he deny seeing Mr. Duckett?

7    A.      No.

8    Q.      Or another person named Seattle?

9            Do you know Seattle's real name?

10   A.      Robert Jones.

11   Q.      Did any of those witnesses, at least who had

12   an opportunity to see him, deny seeing Robert Jones?

13   A.      No.

14   Q.      How about Miss Mouzon or Miss Curtis?

15   A.      No.  They saw him.  They admitted -- the only

16   people that didn't acknowledge seeing Mr. Jones at

17   the scene that night was Shameka Ross and Shaquanda

18   Isaac.  And they were sitting in the vehicle that

19   night.  I don't know if they would have seen him.

20   Q.      Because the witnesses told us specifically

21   where Mr. Jones was; is that right?

22   A.      That's correct.

23   Q.      And it wasn't on the street?

24   A.      Correct.

25   Q.      But nobody ever, in their earlier testimonies,
```

TODD MOODY - DIRECT - 2/13/12

45

1     withheld seeing Mr. Jones?

2     A.      No.

3     Q.      Mr. Hall?

4     A.      Everyone denied seeing Mr. Hall.

5     Q.      Now, did there come a point in the

6     investigation when it was decided, based on the

7     information that we had, to approach Mr. Duckett?

8     A.      We did.

9     Q.      Did people say he was there?

10    A.      People say he was there.

11    Q.      Had anybody identified him as the shooter?

12    A.      No.

13    Q.      Did you have information that he was an

14    associate of Mr. Hall?

15    A.      Yes.

16    Q.      Did you have information that he was involved

17    in drug trafficking with Mr. Hall?

18    A.      Yes.

19    Q.      Was that information used as leverage in

20    speaking to him with his attorney?

21    A.      Yes, it was.

22    Q.      And can you tell the jury whether, in a

23    meeting between the investigators, prosecutors, Mr.

24    Duckett, and his attorney, whether he decided now to

25    come forward and cooperate?

46

1   A.      He actually had two attorneys with him.  But

2   he did, yes.

3   Q.      Did he ever deny Mr. Hall was there?

4   A.      No, he did not.

5   Q.      Did he ever deny he was there?

6   A.      No, he did not.

7   Q.      But did he describe what he saw?

8   A.      He did.

9   Q.      And did he go to the grand jury and do the

10  same thing?

11  A.      Yes, he did.

12  Q.      He's going to be testifying here today or

13  tomorrow, whenever we get to him.

14  A.      Correct.

15  Q.      But the break that led to all of this was just

16  somebody mentioning that they were talking to Rain's

17  boyfriend on the phone in the grand jury on February

18  4th, 2010; is that right?

19  A.      That's correct.

20  Q.      Now, let me ask you, without this break, up to

21  that point, this was just another cold Baltimore City

22  Homicide case?

23  A.      Yes, it was.

24  Q.      With no eyewitnesses?

25  A.      No eyewitnesses.  And every witness we spoke

1    to in the grand jury not seeing anything and not

2    hearing anything.  I think maybe -- some people may

3    have acknowledged hearing shots that night, but that

4    was the extent of it.

5    Q.    But they all talked to somebody, didn't they,

6    and then Miss Guest heard about it?

7    A.    Correct.

8    Q.    And she told you?

9    A.    Correct.

10   Q.    Did we say more than once that we got lucky?

11              MR. SULLIVAN:  Objection.

12              THE COURT:  Sustained.

13              MR. PURCELL:  Thank you.

14   BY MR. PURCELL:

15   Q.    Now, as to Miss Curtis -- and she'll be our

16   next witness -- but can you tell the -- tell the

17   jury, when she came forward in July of 2010, was she

18   still being held in a detention center?

19   A.    She was.  She was in prison.

20   Q.    When she came forward, did we unlock the door

21   and she walked out?

22   A.    No, she did not.

23   Q.    Was she still under indictment for perjury?

24   A.    She was still under indictment for perjury,

25   correct.

1    Q.      Did there come a time where she came before --

2    into this courtroom where Mr. Hall is sitting right

3    now and entered a plea of guilty?

4    A.      She did.

5    Q.      Now, how did we prevent the community of

6    people she was with from knowing that she entered a

7    guilty plea to the perjury and was now basically a

8    government cooperator?

9               MR. PROCTOR:  Objection, Judge.

10              THE COURT:  Approach the bench.

11              (BENCH CONFERENCE ON THE RECORD.)

12              MR. PROCTOR:  This whole line of

13    questioning is:  How did we do this, how did we do

14    that.  I object.  It's not relevant.  It's hearsay.

15    She's going to testify.  The jury can listen to

16    her --

17              THE COURT:  What is the proffered answer?

18              MR. PURCELL:  It was a sealed proceeding.

19    That's the answer.

20              THE COURT:  You can testify what was the

21    nature of the proceeding with Miss Curtis; she can

22    testify it was a sealed proceeding.  You don't need

23    to get into the dialogue in terms of strategy and

24    what you all decided to do.  So the objection is

25    sustained as to that.

TODD MOODY - DIRECT - PURCELL

49

```
1              MR. PURCELL:  Thank you.
2              (JURY IN.)
3    BY MR. PURCELL:
4    Q.     Let me narrow that question a little bit,
5    Detective.
6              Were you at the guilty plea for Miss
7    Curtis?
8    A.     I was.
9    Q.     Was it a sealed proceeding?
10   A.     It was.
11   Q.     That is, the public was not invited or
12   permitted?
13   A.     Correct.
14   Q.     And that the docket sheets were sealed.  If
15   anybody were to look at it, they would never know
16   that she had even entered a guilty plea?
17   A.     Correct.
18   Q.     And that plea, you remember, it might be on
19   your sheet, 311, does it note there what month it was
20   she came in and took a guilty plea?
21   A.     She pled guilty in October of 2010.
22   Q.     Now, did there come a time when she was
23   released to supervision?  And when did that occur?
24   A.     That was in December of 2010.
25   Q.     And that basically coincided with the arrest
```

1      of Mr. Hall?

2      A.      Very close, correct.

3      Q.      He was indicted in December?

4      A.      Correct.

5      Q.      Now, we heard a question yesterday -- actually

6      it wasn't a question.  It was -- I noted that

7      counsel -- something Mr. Proctor said in opening

8      statement.  I just wanted to address that.  And the

9      Court may recall I objected.  But it had to do with

10     comments that counsel made about that we gave, that

11     is, the government gave Mr. Duckett, I think it was,

12     and Miss Curtis something like $36,000 in one case

13     and $25,000 in another.

14             Did either of witnesses -- did you give

15     those witnesses that kind of money?

16     A.      No, we did not.

17     Q.      Were there witness protection expenses

18     incurred on behalf of those two witnesses and

19     others -- all of which, by the way, have been

20     disclosed to counsel -- is that right?

21     A.      That's correct.

22     Q.      As they must be.  Can you describe what the

23     expenses for these witnesses have been and why they

24     were incurred?

25     A.      Well, they were incurred to relocate people.

TODD MOODY - DIRECT - PURCELL

51

```
 1        For example --
 2        Q.     Why didn't you just let Miss Curtis go back to
 3   Westport?
 4               MR. PROCTOR:  Objection, Judge.
 5               THE COURT:  Overruled.
 6               THE WITNESS:  We didn't think it was
 7   safe, and neither did she, for her well-being.  If
 8   she would have been released, there would have been
 9   some suspicion as to why she would have been
10   released.  And that would have put her in great
11   danger.
12   BY MR. PURCELL:
13        Q.     Once Mr. Hall was indicted, it was no longer a
14   secret that she was a cooperator, was it?
15        A.     No, it wasn't.
16        Q.     Couldn't be.  You can't deep those secrets?
17               MR. SULLIVAN:  Objection.  That's not a
18   question.
19               THE COURT:  Sustained.
20               MR. PURCELL:  Can we keep those kind of
21   secrets from the defense?
22               MR. SULLIVAN:  Objection.
23               THE COURT:  Overruled.
24               THE WITNESS:  No, we cannot.
25               MR. PURCELL:  So when she got out, when
```

52

```
 1        she was finally released by Judge Bennett, at what
 2        point -- what condition did she find herself in or
 3        did you find her in in terms of what she needed now
 4        to survive on the outside?  What had happened to her
 5        home; where were her children; did she have any
 6        assets or money?
 7                    MR. PROCTOR:  Objection, Judge.
 8                    THE COURT:  Approach the bench, please.
 9                    (BENCH CONFERENCE ON THE RECORD.)
10                    THE COURT:  First, just procedurally,
11        under the local rules, only one lawyer can note an
12        objection.  Who is going to cross-examine?
13                    MR. PROCTOR:  That would be me.
14                    THE COURT:  That's all right.  I mean,
15        I've let it go.  You both can't be objecting.
16                    MR. PROCTOR:  He can't help himself.
17        He's got objection Tourette's syndrome.
18                    THE COURT:  That's fine.  As long as you
19        don't start objecting as to each other, that will be
20        fine.
21                    What is the proffered answer here?
22                    MR. PURCELL:  She was destitute.  And she
23        had to be taken care of.
24                    THE COURT:  Basically you've covered the
25        matter of witness protection and cost and she was
```

53

```
1    destitute.  Do we need to go any further on her

2    getting back into the community --

3                MR. PURCELL:  We didn't mention it at

4    all.  I didn't think they'd get into it because they

5    are inviting me to do exactly what I'm doing.

6                THE COURT:  I understand.  You objected

7    to Mr. Proctor's comment in his opening statement

8    with respect to money to -- others and I.  And I

9    ruled -- I overruled your objection but noted at the

10   time that you could follow up on that issue and you

11   are now with respect to the matter of the cost of

12   witness protection.  I think we have covered it

13   enough.  I don't think we need to go into any further

14   into it.  It speaks for itself.  So the objection is

15   sustained to that extent.  We'll move on.  You've

16   directed the inquiry --

17               MR. PURCELL:  Your Honor, may I just

18   bring out that we've done the same for other

19   witnesses, as to those other witnesses?

20               THE COURT:  You can indicate basically

21   that there have been witness protection.  You can ask

22   a question with respect to whether or not there have

23   been witness protection costs associated with other

24   witnesses.  And that will be the end of that inquiry.

25               (END OF BENCH CONFERENCE.)
```

TODD MOODY - DIRECT - PURCELL

54

BY MR. PURCELL:

1

2    Q.     So were there and are there continuing to be

3    witness protection extensions for witnesses such as

4    Miss Curtis and Mr. Duckett, Mr. Howard, other

5    witnesses we've assisted move; is that correct?

6    A.     Correct.

7    Q.     And these are witness protection expenses?

8    A.     Correct.

9    Q.     Do these witnesses receive checks or cash from

10   you for their rent or their expenses that are

11   necessary?

12   A.     No.

13   Q.     Who pays them?

14   A.     No one pays them.  We pay the actual bills.

15   Q.     I'm saying:  Who pays those bills?

16   A.     We pay the bills.

17   Q.     You actually pay the bill, don't you?

18   A.     We personally pay the bills.  We have

19   government undercover credit cards that we have to

20   use.

21   Q.     Is it fun and easy to do?

22   A.     No, it's not.  It's an administrative

23   nightmare, to say the least.

24   Q.     We don't have buckets of money laying around

25   for this, do we?

1    A.    We don't.

2    Q.    All right.  I wanted to clear that point up.

3    Thank you.

4         Now, just about Mr. Duckett for a second

5    or two.  When Mr. Duckett came forward in October of

6    2010, was he then presented to the grand jury?

7    A.    He was.

8    Q.    Okay.  We'll hear what he has to say later.

9         Now, in addition to his grand jury

10   testimony, did you undertake to use him -- let me ask

11   you, first -- did you disclose to the world that he

12   was now cooperating, as well?

13   A.    No, we did not.

14   Q.    So did you undertake to use him in a

15   controlled capacity, that is, maybe put -- put a body

16   wire on him; send him in and have him do what are

17   called controlled meetings with Mr. Hall?

18   A.    We did, correct.

19   Q.    On how many occasions?

20   A.    Two occasions.

21   Q.    And what were the dates of those occasions?

22   A.    November 18th and then November 20th, 2010.

23   Q.    And we'll be admitting the particular exhibits

24   that were obtained.

25         Did you obtain recorded conversations

56

```
 1         between Mr. Hall and Mr. Duckett on those two

 2         occasions?

 3    A.        And others, yes.

 4    Q.        And have those or at least the pertinent parts

 5         of them been actually transcribed?

 6    A.        They have.

 7    Q.        And these materials -- you can confirm that

 8         all have been provided to counsel as well; is that

 9         right?

10    A.        The recordings in their entirety, yes.

11    Q.        Okay.  In their entirety?

12    A.        Correct.

13    Q.        Now, in addition to that, are you familiar

14         with the -- excuse me -- another aspect of our case

15         which we'll be getting to a little bit later; but

16         that is the murder of an individual named Martie

17         Williams?

18    A.        I am familiar with that.

19    Q.        And we heard Miss Guest speak of knowing him

20         and actually seeing him yesterday; that's the person

21         I'm talking about.

22    A.        Yes.

23    Q.        Are you familiar with that investigation?

24    A.        I am.

25    Q.        Okay.  Or that murder.
```

TODD MOODY - DIRECT - 02/14/12

57

```
 1      A.      Correct.

 2      Q.      What date did that occur, if you remember?

 3      A.      I don't recall the date.

 4      Q.      Was it March of 2010?  If I may lead you on

 5   that?

 6      A.      I believe it was March of 2010.  I'm sorry.

 7   2009.

 8      Q.      I'm sorry.  You're right.  2009.  A couple of

 9   months before this murder?

10      A.      Correct.

11      Q.      That is, the Kareem Guest murder.

12              Now, what I'm getting to in this is in

13   the course of that investigation, were detectives

14   from homicide able to obtain a local -- a film from a

15   local camera that looked down on that part of Maisel

16   Street?

17      A.      They were.

18      Q.      Where the house is located where Mr. Williams

19   was murdered?

20      A.      Correct.

21      Q.      What was that camera on?

22      A.      The camera was on the playground and the

23   dumpster area of Maisel Street.  But beyond that you

24   can see the row houses in the video as well.

25      Q.      And have you had an opportunity to review
```

```
 1     that?

 2     A.      I have.

 3     Q.      Have you obtained it from detective Dohoney,

 4     who I understand was the lead homicide detective?

 5     A.      I have.

 6     Q.      And who will be testifying here later if

 7     necessary to authenticate this tape.

 8              And has that been provided to counsel?

 9     A.      Correct.  The video in its entirety.

10     Q.      And I asked you to pull a segment of that that

11     coincides with the time of the murder; is that right?

12     A.      Correct.

13     Q.      Now, did you interview Mr. Duckett about his

14     role in that murder?

15     A.      We did.

16     Q.      And did he admit to a role in that murder?

17     A.      He did.

18              MR. PURCELL:  Now, we'll be introducing

19     that and we'll be playing that tape, then, with Mr.

20     Duckett a bit later.  But if I may just move into

21     evidence, Your Honor, as to that particular event,

22     the tape itself which is -- actually, it's

23     Exhibits -- 134 is the overall tape which has been

24     provided.  And then the excerpts that we've done are

25     exhibits 135 and 136, which are just narrow portions
```

```
 1      that can be played in court without the entire thing
 2      being played.
 3                  THE COURT:  Any objection to those?
 4                  MR. PROCTOR:  No, sir.
 5                  THE COURT:  So Exhibit 134 will be
 6      admitted.  This is of March 2009; is that correct?
 7                  MR. PURCELL:  Yes.
 8                  THE COURT:  A tape from the blue-light
 9      camera.  And Exhibits 135 and 136 are excerpts from
10      that tape; is that correct, Mr. Purcell?
11                  MR. PURCELL:  Exactly.  Actually 136 is
12      the entire tape, if I'm -- we've changed the numbers
13      a bit.  136 is the entire tape.  134 and 135 are the
14      two extracts or segments.
15                  THE COURT:  All right.
16                  MR. PURCELL:  And as to the two
17      controlled meetings you did with Mr. Duckett, who
18      we'll ask about in more detail, just to introduce
19      those, they are Exhibits 313, and the transcript is
20      314.  That's for the 11-18 event.  And the 11-20
21      is -- are Exhibits 181 and 183; is that right?  Okay.
22                  THE COURT:  Counsel, approach the bench
23      for one second, please.
24                  (BENCH CONFERENCE ON THE RECORD.)
25                  THE COURT:  With respect to the
```

1    transcripts, transcripts ordinarily don't come into

2    evidence.  Essentially as to the transcripts they're

3    marked for identification at the time if you decide

4    to play the tapes.  I will explain to the jury

5    they're merely given to the jury for their

6    edification as to what the government believes is on

7    the tapes and it's up to the jury's recollection that

8    controls.

9              MR. PROCTOR:  Judge, just so I we don't

10   have to come back up.  I thought I heard Detective

11   Moody say he testified at the grand jury.  I have no

12   grand jury transcript from him.

13             THE COURT:  I'm sorry?

14             MR. PROCTOR:  I heard he testified before

15   the grand jury in Rain Curtis' case, is what he said.

16   I don't have that transcript.  I've never seen it.

17             MR. PURCELL:  If I have it, I'll find it.

18             THE COURT:  He's entitled to it.  It's

19   *Jencks* material.

20             MR. PURCELL:  I know.  I just --

21             THE COURT:  In terms of the Rain Curtis

22   case, I mean, the reality is, as to the testimony of

23   any police officers, as to any of these people in

24   this investigation, *Jencks* material has to be turned

25   over.

1          MR. PURCELL:  He did 302s on all of this

2      stuff.  So it's not going to be any different; it's

3      the same thing.  But I will find it.

4          THE COURT:  Defense counsel has the 302s?

5          MR. PURCELL:  Yes.

6          THE COURT:  So your point is, is that --

7          MR. PURCELL:  It's nothing different.

8      The material testimony has been provided.

9          THE COURT:  It seems to me that we can do

10     that pretty quickly in terms of -- Detective Moody is

11     obviously here.  He may be called back to the witness

12     stand, Mr. Proctor.  So we'll make sure that the U.S.

13     Attorney's Office immediately looks for that grand

14     jury transcript this morning.  So you're not limited

15     just to cross this morning.  If you want to come back

16     to it, you certainly can.

17         MR. PROCTOR:  And the last thing is,

18     Judge, I haven't seen the excerpts of the camera that

19     he's talking about.  We'll look at it at a break.  I

20     just haven't seen them.

21         (END OF BENCH CONFERENCE.)

22         MR. PURCELL:  As the Court will indicate,

23     the transcripts are not admitted other than for

24     identification purposes.

25         THE COURT:  Let me explain that to you,

 1        ladies and gentlemen.  If you listen to any tapes

 2        during this trial and you're given transcripts, the

 3        transcripts are not introduced into evidence.

 4        They're provided to the jury to assist the jury with

 5        the proponent of the tape, in this case the

 6        government, believes is on the tape.  But it's up to

 7        the jury to determine what they hear in terms of what

 8        they believe is on the tape.  So that's how that

 9        works.  The transcripts themselves are not introduced

10        into evidence.

11                  MR. PURCELL:  That will be the last thing

12        we wish to do with you this morning, Detective.

13        You'll be called back later on in the case, probably

14        towards the very end.

15                  What I'd like to do is if I may present

16        these transcripts, Your Honor, for the Rain Curtis

17        segment.  And as I've said, we have segments of some

18        of these tapes were produced because they're very

19        long.  Counsel has the complete, and can play the

20        complete, but I'd like to play just Exhibit 188A.

21        And the transcript for that which is 188B.  And it's

22        going to be just the segment that the witness

23        testified about.

24                  THE COURT:  All right.

25                  MR. PURCELL:  I'll just get those out.

TODD MOODY - DIRECT - 2/13/12

63

1                    THE COURT:  All right.  Government

2     Exhibit 188 is the tape itself.  And 188A is an

3     excerpt and 188B are the proposed transcripts; is

4     that right?

5                    MR. PURCELL:  That's correct, Your Honor.

6                    THE COURT:  So 188 will be admitted into

7     evidence.  188A will be admitted into evidence.  188B

8     will not be.  It's just for purposes -- Mr. Fuchs, do

9     you have a copy of what you're giving the jury so I

10    can see it, perhaps?

11                   MR. FUCHS:  Certainly, Your Honor.

12                   THE COURT:  Do you have a copy there, Mr.

13    Proctor and Mr. Sullivan?

14                   MR. PROCTOR:  I think I have one.

15                   THE COURT:  Thank you, Mr. Fuchs.

16                   Hold on one second.  Wait minute.

17                   MR. PURCELL:  All right.

18    BY MR. PURCELL:

19    Q.     Just play that.

20                   You helped make this segment; is that

21    right?

22    A.     That's correct.

23    Q.     And what segment is this?  Is this the part

24    where we talked about Miss Curtis admitting she was

25    actually present?

64

```
 1    A.      Correct.  This is the section from the 9-21

 2    call.

 3    Q.      And this became the break in the investigation

 4    where you were led to your first eyewitness?

 5    A.      Correct.

 6    Q.      Months later?

 7    A.      Months later.

 8    Q.      This is the day after the murder?

 9    A.      Correct.

10               MR. PURCELL:  Play it, please.

11               (Audio playing.)

12    BY MR. PURCELL:

13    Q.      Okay.  There's another segment beginning at

14    16:49.  And this is the time of the call; is that

15    right?

16    A.      That's the time on the counter of the call,

17    correct.

18    Q.      The counter of the call.

19    A.      The counter of the call.

20    Q.      It's not 16:14 hours?

21    A.      Correct.

22    Q.      Could you proceed with that, please?

23               (Audio playing.)

24    BY MR. PURCELL:

25    Q.      Who's Little Mike?
```

TODD MOODY - CROSS - PROCTOR

65

```
 1      A.      Tamica Mouzon.
 2              MR. PURCELL:  Thank you.  Now, Detective,
 3      as I noted, you may be recalled, and certainly
 4      counsel can ask you whatever they wish on
 5      cross-examination now.  I have no further questions.
 6              THE COURT:  Thank you, Mr. Purcell.
 7              Mr. Proctor, cross examination?
 8                  CROSS EXAMINATION
 9      BY MR. PROCTOR:
10      Q.      Good morning, Detective Moody.  How are you?
11      A.      Good.
12      Q.      I always get it wrong.  Is it Detective,
13      Agent, Officer?
14      A.      It's Detective.  If I can get the pay raise of
15      an agent, you can refer to me as Agent.
16      Q.      You testified -- Mr. Purcell asked you a few
17      questions about this was our lucky break, questions
18      like that, right?
19      A.      Correct.
20      Q.      This wasn't just another homicide, was it?
21      A.      In terms of --
22      Q.      Is there a more -- you know what a term of
23      "red ball" is?
24      A.      I've never heard that term until you used it
25      the other day.
```

TODD MOORE - CROSS - PROCTOR

66

```
1     Q.      Homicide detectives use it; a prominent
2   murder?
3                   MR. PURCELL:  Objection.
4                   THE COURT:  Sustained.
5   BY MR. PROCTOR:
6     Q.      Okay.  I guess what I'm asking is:  Not all
7   murders are created equal, are they?
8     A.      I don't know if I can answer that.  I don't
9   even understand that question.
10    Q.      Certainly when a federal witness is murdered
11  significant resources are poured into that
12  investigation, aren't they?
13    A.      I can't speak for other people's murders.
14  I've never been involved in the murder of any other
15  federal witness other than this one.
16    Q.      Okay.  Well, let's talk about this one.  You
17  put 20 people in the grand -- different people -- 20
18  people in the grand jury; does that sound about
19  right?
20    A.      We grand juried a lot of people.  I can't tell
21  you if it was 20.  It could have been over 20.  It
22  could have been closer to 30.  I mean, people came
23  in; a lot of people came in and then a lot of people
24  came back in.
25    Q.      Right.
```

```
 1    A.      We were in the grand jury quite a bit.

 2    Q.      And some of them went through three and four

 3    times like you said, right?

 4    A.      That's right.

 5    Q.      And the grand jury is -- it's an investigative

 6    tool for an officer, right?

 7    A.      It's an investigative tool, correct.

 8    Q.      And when people go in there, they swear under

 9    penalty of perjury, right?

10    A.      They do.

11    Q.      And so if they don't tell the truth, they've

12    committed perjury?

13    A.      That's correct.

14    Q.      So certainly you would hope that their answers

15    would be ore truthful and that's why it's a such good

16    investigative tool, right?

17    A.       I would hope that anyone going into the grand

18    jury would be truthful, correct.

19    Q.      And to step back for a minute, you talked a

20    bit about Kareem's 302.  And he was arrested with

21    five jell caps, correct?

22    A.       Right.

23    Q.      And I guess I just want to make it clear to

24    the jury:  Five jell caps is a tiny amount of heroin,

25    isn't it?
```

68

```
1    A.      I would say that's a matter of opinion.  I

2    mean, it could be tiny to one person and a lot to

3    another.  If you're a drug user, that's a pretty good

4    amount to have with you.

5    Q.      In terms of quantity, it's probably less than

6    a gram, right?

7    A.      It's probably less than a gram combined.

8    Q.      And you mentioned Kareem mentioned a guy named

9    Giggles; is that correct?

10   A.      He did.

11   Q.      And he said Giggles is a contract killer,

12   right?

13   A.      Correct.

14   Q.      And as far as you know, Giggles wasn't locked

15   up?  Still on the street?

16   A.      At the time of when?

17   Q.      At the time of Kareem's murder.

18   A.      I have no idea where he was.  He wasn't a

19   predominant face in the Westport neighborhood.

20   Q.      Okay.  Mr. Purcell asked you about the POD

21   camera; do you remember that?

22   A.      Correct.

23   Q.      I believe you testified you got it and you

24   looked at it and there was nothing of evidentiary

25   value on it?
```

```
 1    A.      No.  I testified that Detective Kershaw

 2    obtained it and looked at it.

 3    Q.      And there was nothing of evidentiary value on

 4    it, right?

 5    A.      Correct.

 6    Q.      I guess, maybe I didn't speak coherently in

 7    opening.  It happens a lot.  My point I was trying to

 8    make is if you discount the eyewitnesses, do you have

 9    a gun in this case, sir?

10    A.      No, there's no gun.

11    Q.      Do you have any video footage in this case,

12    sir?

13    A.      There's no video footage.

14    Q.      Do you have any fingerprints in this case,

15    sir?

16    A.      No, there's no fingerprints.

17    Q.      Do you have any ballistics in this case, sir?

18    A.      Just the analysis of the actual rounds that

19    were recovered.

20    Q.      Do you have any DNA in this case, sir?

21    A.      No, we do not.

22    Q.      How long have you been an officer?

23    A.      Since 1997 I've been a police officer.

24    Q.      14 years?

25    A.      About that.
```

```
 1    Q.      Have you ever threatened a suspect?

 2    A.      Threatened a suspect?

 3    Q.      Yes.

 4    A.      In what way?

 5    Q.      With bodily harm.

 6    A.      No.

 7    Q.      Did you ever threaten their family?

 8    A.      No.

 9    Q.      Did you ever put them in a difficult position?

10    A.      Who, the suspect?

11    Q.      Yeah.

12    A.      Well, we've put suspects in difficult

13    positions all the time by arresting them.  So, I

14    mean, if you look at that, sure.

15    Q.      Right.  Well, have you ever put them in a

16    position where people in the neighborhood might want

17    to do harm to them?

18    A.      I like to think we've taken every measure to

19    not let anyone get harmed.

20    Q.      Did you ever tell anybody that got shot you

21    wish the shooter had a better aim so they would have

22    ended up dead?

23    A.      No.  I don't recall saying anything like that

24    to anyone.

25            MR. PROCTOR:  Can I have a second,
```

1      please, Judge?

2                  THE COURT:  Certainly.

3                  MR. PROCTOR:  That's all we have.

4                  THE COURT:  Thank you.  You may step

5      down.

6                  Redirect, Mr. Purcell?

7                  MR. PURCELL:  No.

8                  THE COURT:  Detective Moody, you may step

9      down, return to the table.

10                 Again, ladies and gentlemen, Detective

11     Moody has been designated as the case agent.  So he's

12     an exception to the rule with respect to the

13     witnesses having to leave the courtroom.

14                 MR. PURCELL:  Your Honor, it's been

15     suggested, we're bringing Rain Curtis down, she'll be

16     a very lengthy witness.  If the Court --

17                 THE COURT:  All right.  This probably is

18     a good time to take our break; a ten-minute break.

19     It's ten minutes after 11.  And then we'll be going

20     until five minutes to 1 for lunch.

21                 (BRIEF RECESS.)

22                 (JURY OUT.)

23                 THE COURT:  Counsel, are we ready to

24     proceed with the next witness?

25                 MR. PURCELL:  Yes.

RAIN CURTIS 107 - DIRECT - PURCELL

72

```
 1                    THE COURT:  Bring the jury in.

 2                    (JURY IN.)

 3                    MR. PURCELL:  The government calls Rain

 4   Curtis.

 5   Whereupon:

 6                         RAIN CURTIS,

 7   called as a witness, having been first duly sworn

 8   according to law, testified as follows:

 9                    THE DEPUTY CLERK:  State your full name

10   for the record.  And spell your last name.

11                    THE WITNESS:  Rain Curtis.  C U R T I S.

12                    DIRECT EXAMINATION

13   BY MR. PURCELL:

14   Q.     Good morning, Miss Curtis.

15   A.     Good morning.

16   Q.     How are you?

17   A.     All right.

18   Q.     I know you've been waiting since yesterday to

19   come in, so I appreciate your waiting.  Now, you know

20   why you're here?

21   A.     Yes.

22   Q.     Miss Curtis, you and I have met prior to

23   today, would that be fair to say?

24   A.     Yes.

25   Q.     Have you been questioned by me in the federal
```

1    grand jury prior to today?  That is, under oath in

2    the grand jury?

3    A.      Yes.

4    Q.      Do you remember on how many occasions?

5    A.      One.

6    Q.      One?

7    A.      Yes.

8    Q.      You've only been to the grand jury one time?

9    A.      No.  Twice.

10   Q.      Do you remember the very first time you came

11   in and basically] didn't tell us anything; you wanted

12   a lawyer?

13   A.      Yes.

14   Q.      So would it be three times?

15   A.      Yes.  No.

16   Q.      Well, let's take a look at the grand jury

17   transcripts.  Remember, we met the other day and a

18   couple weeks ago whenever it was.  And we went

19   through your transcripts?

20   A.      Yes.

21   Q.      If I may approach the witness.

22           THE COURT:  Yes.

23   BY MR. PURCELL:

24   Q.      Showing you what's been marked Exhibit No.

25   195.  At this point only for identification, Your

74

1    Honor, unless counsel wishes them in.

2              When we first brought you in, and you

3    didn't have a lawyer?

4    A.     Yes.

5    Q.     Do you remember that?

6    A.     Yes.

7    Q.     Then we stopped?

8    A.     If you show me the dates, I can remember.

9    Q.     And the second time was February 4, which is

10   the one I think you'll never forget.

11   A.     Yes.

12   Q.     And the third time was?

13   A.     Yes.  July 20th, when I gave my true

14   statement.

15   Q.     All right.  And that's what you said is your

16   true statement?

17   A.     Yes.

18   Q.     And that's really what the jury is here to

19   find out.  Is that your true statement?

20   A.     Yes.

21              THE COURT:  What is Exhibit No. 195, Mr.

22   Purcell?

23              MR. PURCELL:  195 is the grand jury

24   transcript of the date January 21, 2010.  And the

25   second exhibit I showed her, Your Honor, is a

```
 1        transcript for February 4th, 2010.

 2                    THE COURT:  And that's 196?

 3                    MR. PURCELL:  That's 187.

 4                    THE COURT:  187.

 5                    MR. PURCELL:  Then the third exhibit,

 6        grand jury of July 20th, 2010, is Exhibit No. 194.

 7        BY MR. PURCELL:

 8        Q.     That was all of your appearances, correct?

 9        A.     Yes.

10        Q.     Two of which where you were really questioned?

11                    THE COURT:  All of which have been marked

12        for identification only, correct, Mr. Purcell?

13                    MR. PURCELL:  Yes.

14        BY MR. PURCELL:

15        Q.     The first one was really why you were here and

16        you wanted to not talk and get a lawyer, correct?

17        A.     Correct.

18        Q.     And on the other two occasions when you came

19        in, were you represented?

20        A.     Yes.

21        Q.     And you're represented now, are you not?

22        A.     Yes.

23        Q.     What's your attorney's name?

24        A.     Joe Murtha.

25        Q.     And he knows you're here today?
```

1     A.      Yes.

2     Q.      Miss Curtis, probably a lot of questions, I'm

3     not really sure where to start.  I guess I should be.

4             But let me ask you this:  Do you know the

5     defendant, Mr. Hall?

6     A.      I do.

7     Q.      Do you need to look at him to see who he is?

8     A.      No.  I know.

9     Q.      How long have you known him?

10    A.      Twelve years maybe.

11    Q.      Speak up a little bit.

12    A.      Twelve, ten years maybe.

13    Q.      And where do you know him from?

14    A.      Westport.

15    Q.      And tell the jury, please, do you live in

16    Westport?

17            What's your association with Westport?

18    A.      I do not live in Westport.  I socialize in

19    Westport.  I'm from West Baltimore.

20    Q.      West Baltimore?

21    A.      Uh-huh.

22    Q.      You're not living in Westport or West

23    Baltimore at this point; is that right?

24    A.      Correct.

25    Q.      Now, do you have any children?

RAON CURTIS 107 - DIRECT - PURCELL

77

```
1      A.      Yes.  Two.

2      Q.      How many?

3      A.      Two.

4      Q.      Are they with you today?

5      A.      Yes.

6      Q.      In the back room with the agents?

7      A.      Correct.

8      Q.      Do you know Tamica Mouzon?

9      A.      Yes.

10     Q.      Do you know Shameka Ross?

11     A.      Yes.

12     Q.      Do you know Jamal Howard, also known as Ferl?

13     A.      Yes.

14     Q.      Do you know Robert Jones, also known as

15     Seattle?

16     A.      Yes.

17     Q.      Do you know a guy named Avery, Avery Walding?

18     A.      Yes.

19     Q.      Do you know Shaquanda Isaac?

20     A.      Yes.

21     Q.      And did you know Kareem Guest?

22     A.      Yes.

23     Q.      And how did you know Kareem?

24     A.      He was a friend that I knew from Westport, as

25     well.
```

RAON CURTIS 10 - DIRECT - PURCELL

78

1    Q.      Now, I want to direct your attention to the

2    summer of 2009, Miss Curtis.  Did there come a time

3    when you saw or became aware of sort of government

4    discovery materials that were circulating around

5    Westport?

6    A.      Yes.

7    Q.      Did you ever see any of those materials?

8    A.      Yes.

9    Q.      Do you remember whose materials you might have

10   seen?

11   A.      Taglin's, Taglin.  I don't know Taglin's last

12   name.  And Kareem's.

13   Q.      And Kareem's?

14   A.      Uh-huh.

15   Q.      Did you see Kareem's before he came home from

16   jail in August, or just during the summer?

17   A.      Whatever the summer was.  I don't know whether

18   he was home or not, but it was that summer.

19   Q.      Well, let me ask you this:  Before the day he

20   was killed you saw --

21   A.      Say that again.

22   Q.      Before the day he was murdered, you saw him

23   the day he was murdered; is that correct?

24   A.      Yes.

25   Q.      Before the day he was murdered, do you

1    remember seeing him at all in Westport prior to that

2    day?

3    A.      No.

4    Q.      Now, when you saw this paperwork, can you tell

5    us how it is you came to see it?  Did somebody have

6    it or did you see it somewhere?

7    A.      Yes.

8    Q.      Where did you see it?

9    A.      A group of us had gathered around on, in the

10   neighborhood.  And I believe Mika had the papers,

11   Shameka had the papers, but all of us were passing

12   them around.

13   Q.      Would that be Shameka Ross?

14   A.      Yes.

15   Q.      I'm not trying to get anybody in trouble.  I'm

16   just asking if you remember anybody else who was

17   there.

18   A.      I can only remember my girlfriend, maybe me,

19   Shanay Smith, Chaneque Adams, Mika, is all I can

20   remember.

21   Q.      Okay.  Shameka Ross?

22   A.      Uh-huh.

23   Q.      Was Tamica there?

24   A.      I don't remember.

25   Q.      But a bunch of people?

80

1    A.      Yes.

2    Q.      Were you surprised to see these documents?

3    A.      I knew that, I knew that they were supposed to

4    gave information.  But, yeah, I was surprised to see

5    the documents, yeah.

6    Q.      It's one thing to hear about it, it's another

7    thing to see about it in black and white?

8    A.      Exactly.  Exactly.

9    Q.      Is that the way you felt?

10   A.      Yes.

11   Q.      Did you ever talk to Kareem about it?

12   A.      No.

13   Q.      Never had the chance to ask him about it?

14   A.      No.

15   Q.      Aside from the ones you remember seeing, did

16   there seem to be more materials in the pile of papers

17   that were being circled around other -- in other than

18   the ones you remember?

19   A.      Yes.

20   Q.      Do you know Kareem's mom, Miss Guest?

21   A.      Yes.

22   Q.      And his brother?

23   A.      Yes.

24   Q.      Father?

25   A.      Yes.

1    Q.     Did he have a lot of family over there?

2    A.     Yes.

3    Q.     Did you have family there?

4    A.     No.  My family ain't moved years ago.

5    Q.     What was your connection?  How did you become

6    a person that socialized over there?

7    A.     My grandmother initially lived in Maisbury

8    Court.  And she moved many years ago, maybe seven,

9    eight years ago.  She moved a long time ago.  But I

10   had grown to have friends there and I always came

11   there to socialize.

12   Q.     Now, you've looked at some of these exhibits

13   before, but -- I'm sorry, Your Honor.  I thought I

14   had a exhibit here.

15          I'm showing the witness and the Court

16   Exhibit No. 3, which is a blow-up poster.  And if you

17   need to you can come over here, Miss Curtis, and look

18   at it.  But do you recognize what's shown in that

19   photograph?

20   A.     I do.

21   Q.     Now, is this one of the areas on Maisel Court

22   where you would -- when you go over there -- hang out

23   with people?

24   A.     Yes.

25   Q.     Now, I direct your attention -- do you

82

1    recognize this as being Maisel Court?

2    A.      Yes.

3    Q.      I direct your attention to these.  There's

4    some -- is there some steps up there?

5    A.      Yes.

6    Q.      And where if you were to walk up those steps

7    and keep going, tell the jury where you would be

8    going.

9    A.      To the blacktop.

10   Q.      Okay.  Do you remember what the name of the

11   street is over there?

12   A.      Kermit Court.

13   Q.      Kermit.  Did you have any friends on Kermit

14   Court back in September of 2009?

15   A.      I did.

16   Q.      And who in particular do you remember were

17   your friends over there?

18   A.      Chaneque Adams.

19   Q.      Now, this second photograph I have here, this

20   second poster, which is Exhibit No. 4 -- which I know

21   you've seen before, maybe not quite so large.  Do you

22   recognize that picture?

23   A.      I do.

24   Q.      And do you recognize that in connection with

25   the events that we're here to ask you questions

83

1     about?

2     A.      I do.

3     Q.      Now, when I was showing you these transcripts,

4     when we got to the one where you said, July 20th,

5     yes, this is my truthful testimony, does that mean

6     your February 4th testimony was not truthful?

7     A.      Yes.

8     Q.      Can you tell the jury, please, why, when we

9     brought you to the grand jury on February 4th, 2010

10    and asked you if you were present at the murder of

11    Kareem Guest, you told us you weren't there and

12    didn't see anything?

13    A.      Because I would have rather protect my family

14    and the person who was a suspect.

15    Q.      You were trying to protect Mr. Hall?

16    A.      Yes.

17    Q.      Well, at that time he wasn't even a suspect,

18    was he?

19            We don't know who did it until you told

20    us?

21    A.      That's correct.

22            MR. PROCTOR:  Objection.

23            THE COURT:  Overruled.

24    BY MR. PURCELL:

25    Q.      But you knew -- I guess I can put it this

1    way -- on February 4, 2009 -- I'm sorry, 2010 -- Miss

2    Curtis, when you came to the grand jury, did you know

3    who killed Kareem Guest?

4    A.      I did.

5    Q.      Did you tell us?

6    A.      No.

7    Q.      Did you tell the grand jury?

8    A.      No.

9    Q.      I say "us" but it was I; was I the person that

10   questioned you in the grand jury that day?

11   A.      Yes.

12   Q.      Now, let's talk about that day.  How did you

13   come to be -- excuse me.  How did you come to be in

14   Westport that day?

15   A.      Me and Tamica had came.  I came out Westport

16   to meet Tamica.  And her and I had walked over to

17   that side of Westport to socialize or buy drugs or do

18   whatever we was doing.

19   Q.      Did you say, "buy drugs"?

20   A.      Uh-huh.

21   Q.      What kind of drugs?

22   A.      Marijuana.

23   Q.      Well, do you remember where you parked when

24   you picked her up?  Or met with her, I should say?

25   A.      I parked on Annapolis Road.

85

```
1    Q.      Annapolis Road.  Now, I don't think these
2    photographs actually show Annapolis Road.  But can
3    you orient the jury as to where it was you would be
4    parked if we use the ball field as a reference?
5              If you need to get up -- actually, I'll
6    come over to you with this.
7              THE COURT:  Mr. Purcell, it would be
8    helpful.  These posters are fine.  But you if you
9    have photographs back there -- that's why we have the
10   TV monitors -- that would be very helpful.  Thank you
11   very much.
12   BY MR. PURCELL:
13   Q.      Looking at the ball field picture, Exhibit No.
14   1, I believe, where -- just basically where would the
15   place you parked be in relation to Maisel Court?
16   A.      It's not shown on the map.
17   Q.      Would it be in this direction?
18   A.      Yes.
19   Q.      Okay.  Across the field?
20   A.      Yes.
21   Q.      So you parked there and walked across the
22   field?
23   A.      Yes.
24   Q.      Where did you go?
25   A.      I came -- where did I go when I came into
```

```
 1          Westport?

 2          Q.      Uh-huh.  When you met with Tamica, where did

 3          you guys go to now when you were on foot?

 4          A.      We came in across the park where the

 5          basketball field is shown, where the diamond is.

 6          Q.      Is that it?

 7          A.      Yes.

 8          Q.      Go ahead.

 9          A.      And we entered into Maisel Court.

10          Q.      Go ahead.

11          A.      We entered in through Maisel Court.

12          Q.      Did you come down Maisel?

13          A.      Yes.

14          Q.      Did you go anywhere before you went to Maisel?

15          A.      No.

16          Q.      Did you go to Chaneque's at all that evening?

17          A.      Yes.

18          Q.      Did you go there first?

19          A.      I came in through Maisel.

20          Q.      All right.  Go ahead.

21          A.      I walked up through that split where you see

22          it says "G" right there; I walked up through that

23          split to Kermit Court, to Chaneque's.  She wasn't

24          home.

25          Q.      Okay.  Now, was Tamica still with you?
```

1  A.     I believe.  I can't really remember.  She was,

2  if we wasn't with me, she was walking right behind

3  me.  Or, in other words, once we realized Chaneque

4  wasn't home, we walked back down.

5  Q.     Okay.  When you walked back down, you were

6  walking back towards Maisel Court?

7  A.     Right.

8  Q.     And were you doing that with her?

9  A.     Right.

10 Q.     Now, on your way back over to Maisel, did you

11 encounter anybody -- I show you this picture of the

12 steps over here, Exhibit No. 3.

13         As you walked back -- come on over here

14 for a second.

15         If the witness may, Your Honor?

16         THE COURT:  Yes.  Certainly.

17 BY MR. PURCELL:

18 Q.     So when you're walking back you came back to

19 Maisel down these steps?

20 A.     Correct.

21 Q.     When you got to the steps, did you see anybody

22 there?

23 A.     Yes.

24 Q.     Who did you see?

25 A.     Seattle and Avery.

RAON CURTIS - DIRECT - PURCELL

88

```
 1    Q.      You have to speak up.

 2    A.      Seattle and Avery.

 3    Q.      Seattle is Robert Jones.

 4    A.      Yes.

 5    Q.      And Avery is Avery Walding?

 6    A.      Yes.

 7    Q.      And where did you go after that?

 8    A.      Where did I go?

 9    Q.      Uh-huh.

10    A.      I came back into the street area.

11    Q.      Now, if you can take the seat, please.

12            Can you tell us, please, who was there?

13            Who do you remember seeing?

14    A.      When I came back into the street area it was

15    myself, Tamica, Shameka, Shaquanda, Ferl, Kevin,

16    Mack.

17    Q.      Is Kevin Kevin Duckett?

18    A.      Yes.

19    Q.      And Ferl is Jamal Howard?

20    A.      Yes.

21    Q.      Did you see a guy named Keyburn?

22    A.      Keyburn.

23    Q.      Did you see a person named Roddy that evening?

24    A.      Yes.

25    Q.      Who is Roddy?
```

1     A.      I don't know Roddy real name.

2     Q.      You don't know him?

3     A.      I don't know his real name.

4     Q.      Okay.  Does he have a car?

5     A.      Yes.

6     Q.      Now, so you came across.  And you've mentioned

7     a lot of people.  I just want to place them, if you

8     don't mind.  So where were Shameka and is Shaquanda?

9             Would a picture make a difference?

10            I'm going to put up on the poster a very

11    similar one, this is Exhibit 4, and this is Exhibit

12    No. 2.

13    A.      Shameka's car was parked by the fire hydrant.

14    Q.      By the hydrant?

15    A.      Yes.

16    Q.      What kind of car does she have?

17    A.      An Acura truck.

18    Q.      Okay.  And you can tell me where to put the

19    truck.

20    A.      Back a little.

21    Q.      Right there?

22    A.      Uh-huh.

23    Q.      And who was in the truck?

24    A.      Shameka and Shaquanda.

25    Q.      And they were there when you walked across the

1      first time.  When you walked across from Kermit; is

2      that right?

3      A.      You mean, when I initially -- when I first

4      came into Westport?

5      Q.      Actually, you're right.  When you first came

6      down the street, down Maisel, did you see them there?

7      A.      I can't really remember.  I just know when I

8      came back down they were there.

9      Q.      They were there?

10     A.      Yes.

11     Q.      And did you see Kevin Duckett?

12     A.      Yes.

13     Q.      Where was he?

14     A.      He was standing around outside.

15     Q.      Where was Mack?

16     A.      Standing around outside right there by the

17     truck.

18     Q.      And was it -- when you say standing around,

19     you mean this area here?

20     A.      Yes.

21     Q.      Down by the street?

22     A.      Yes.

23     Q.      As opposed to, say, back up on the steps where

24     Seattle was?

25     A.      Yes.

```
 1    Q.      And had you expected to see Mack there; is
 2    that why you went there that evening?
 3    A.      No.
 4    Q.      Why did you go there?
 5    A.      With Tamica to buy drugs.
 6    Q.      Okay.  Buy marijuana?
 7    A.      Yes.
 8    Q.      So at any point while you were there before
 9    the shooting, did you see Kareem?
10    A.      Yes.
11    Q.      Can you tell the jury where you saw him and
12    what he was doing when you saw him?
13    A.      When I first came into Westport -- I'm trying
14    to remember when I seen Kareem.  After I was talking
15    to Avery and Seattle on the steps area, I was walking
16    back towards the street area where the truck is.  And
17    me and Little Mike, seeing Kareem, he asked for a
18    cigarette, I think.
19    Q.      Which direction was he headed on Maisel?
20    A.      When he asked her for the cigarette, I don't
21    know what direction he was heading in.
22    Q.      Do you know Miss Trina?
23    A.      Yes.
24    Q.      Can you get cigarettes at Miss Trina?
25    A.      Yes.
```

1    Q.      Does that help refresh your memory as to which

2    direction he was going?

3    A.      Yes.  I mean, I don't actually remember how we

4    saw him or however.  But I know we was in the court

5    and we saw him.  And he went back up to Miss Trina's,

6    of course probably to get a cigarette.

7    Q.      Okay.  So when you saw him -- I'm just going

8    to point to the exhibit with the car on it, which is

9    Exhibit No. 2.  When you saw him, would it be correct

10   to say you were somewhere in this area?

11   A.      Yes.

12   Q.      On this side of the steps?

13   A.      Yes.

14   Q.      Okay.  And you saw him and he was heading up

15   towards the ball field up towards Miss Trina's?

16   A.      I can't specifically say which direction he

17   came from.  Because I probably didn't pay attention.

18   I just know I looked up and he was there then.

19   Q.      When he asked for a cigarette?

20   A.      Yes.

21   Q.      After that where did he go?  Is that when he

22   went towards Miss Trina's?

23   A.      He went toward Miss Trina's.

24   Q.      Okay.  And to use our larger exhibit, No. 1,

25   just to orient you; you see where I am?

RAON CURTIS - DIRECT - PURCELL

93

1    A.       Uh-huh.

2    Q.       You would have been somewhere here between

3    Kermit and Maisel and on the steps?

4    A.       Right.

5    Q.       And when you went to get a cigarette you would

6    have gone towards Miss Trina, which is --

7                  MR. PROCTOR:  Objection, Judge.

8                  THE COURT:  Sustained.

9    BY MR. PURCELL:

10   Q.       Where is Miss Trina's?

11   A.       Miss Trina's is --

12   Q.       Here's my dot.  Go up or down?

13                 MR. PROCTOR:  Judge, objection.  It's

14   leading.

15                 THE COURT:  Overruled.

16                 MR. PROCTOR:  The witness has to point it

17   out.

18                 THE COURT:  Overruled.  You may continue,

19   Mr. Purcell.  Go ahead.

20                 MR. PURCELL:  All right.  Just forget the

21   interruptions.  Go ahead.

22                 THE COURT:  That will be stricken, Mr.

23   Purcell.  It's not inappropriate to make an

24   objection.  Just move forward.  The objection was

25   overruled.

1    BY MR. PURCELL:

2    Q.      Which direction did he go?

3    A.      When I came -- if -- okay.  He would have

4    walked up the court.

5    Q.      That way?

6    A.      Yes.

7    Q.      Okay.  And where is Miss Trina's?

8    A.      To the right of the arrow.

9    Q.      Right there?

10   A.      Yes.

11   Q.      Now, you saw him then.  And what did you do?

12           I mean I know you weren't paying

13   attention necessarily to him at that point, were you?

14   A.      No.

15   Q.      So who were you talking to?

16   A.      I don't know what I was doing when he was up

17   there.  Probably talking to Shameka and Shaquanda at

18   the truck.

19   Q.      And where was Mack -- where were Mack and

20   Kevin, if you remember?

21   A.      In front of us by the truck.  Or on the

22   curbside somewhere.

23   Q.      On this side?

24   A.      Yeah.  We were all in that, right there in

25   that court.

95

```
 1       Q.      So on the opposite street of the car, on the
 2   side of the street of the car?
 3       A.      It could have been in the street, walking
 4   around.  Somewhere in that neighborhood right there.
 5   I mean, we always standing right there.
 6       Q.      Thank you.  Now, during that evening, did you
 7   have occasion to take a call from Ferl -- I'm sorry,
 8   not Ferl -- but from Hershel?
 9       A.      Yes.
10       Q.      And did anybody else speak to Hershel on the
11   phone while you were there?
12       A.      Yes.
13       Q.      Who else?
14       A.      Seattle.
15       Q.      Do you remember if anybody else was take
16   talking to him?
17       A.      Avery.
18       Q.      Avery.  And you spoke to him as well?
19       A.      Yes.
20       Q.      Okay.  After you spoke to him, is that --
21   where did you go after you spoke to him?
22       A.      Back down to the area where the truck is.
23       Q.      And when you did speak to him, where were you
24   and Seattle and Avery having that conversation with
25   Hershel?
```

1      A.      On the steps.

2      Q.      And we've seen where the steps are.  In this

3      picture, exhibit number -- Exhibit No. 2, the steps

4      would have been off the picture towards the low end?

5      A.      That's correct.

6      Q.      All right.  So, walking up those steps.

7              We've all seen these pictures too many

8      times.

9              The steps would have been over here?

10     A.      Correct.

11     Q.      Now, after some time passed, did you have

12     occasion to see Kareem come back down the court?

13     A.      Yes.

14     Q.      Tell the jury what you saw, please.

15     A.      After I got off the phone with Hershel, I gave

16     the phone back to Avery.  And I walked back down to

17     the area, probably talked to Tamica and Shaquanda and

18     Little Mike; Tamica some more.

19     Q.      Now, where were they when you were talking to

20     them?

21     A.      At the truck.

22     Q.      Okay.  At the truck?

23     A.      Uh-huh.  Yes.

24     Q.      In the truck?

25     A.      The doors were open.  We were all in and out

1      of the truck.

2      Q.      Go ahead, please.

3      A.      While we were socializing in the truck, Kareem

4      walked back down to the area where the truck was.

5      When he walked down, he walked past the fire hydrant

6      in the direction of the lower court.

7      Q.      In that direction I'm going from the street to

8      the --

9      A.      That's correct.

10     Q.      This way, follow the dot, would it be fair to

11     say he came down this way and then turned -- is that

12     Wilgrey back there?

13     A.      That's correct.

14     Q.      What happened then?

15     A.      Once he started to walk in that direction,

16     Mack and Kevin started following him.  And Mack shot

17     him.

18     Q.      Who shot him?

19     A.      Mack.

20     Q.      Mack shot him?

21     A.      Yes.

22     Q.      I thought you said they shot him?

23     A.      No.

24     Q.      Okay.  I'm sorry.

25     A.      Mack.

RAON CURTIS 10 DIRECT - PURCELL

1    Q.      Now, when you saw Mack going after him, about

2    how far away was Mack from Kareem when he first shot

3    him?

4    A.      Can you repeat the question?

5    Q.      About how far away was Mack from Kareem when

6    Mack first shot him?

7    A.      A foot, maybe.

8    Q.      And describe what you saw in terms of Mack

9    shooting Kareem.  Physically, what did you see Mack

10   do?

11   A.      When he walked towards -- when he started

12   walking towards him, he had a hat or a mask or

13   something on his head.  And he pulled the mask down

14   and shot him.

15   Q.      Did he shoot him just once?

16   A.      He shot him once.  And he fell.  And he shot

17   him a couple more times.

18   Q.      Did you see where he was shooting when he shot

19   him a couple more times?

20   A.      I knew Kareem had his back turned, so I would

21   have -- I would say that he shot him in his back.

22   The first time --

23   Q.      I'm sorry.  Go ahead.

24   A.      The first time.

25   Q.      All right.

1    A.      And when he fell, he was on the ground and I

2    was at standing level.  So I can't specifically say

3    where he shot him at the other times.

4    Q.      How close to him was he when he shot him the

5    other times?

6    A.      Standing over the top of him.

7    Q.      Standing over him?

8    A.      Yes.

9    Q.      Now, when you say it was Mack who shot him and

10   followed him and stood over him and shot him, can you

11   show the jury, tell the jury, who it is you're

12   talking about, please?

13   A.      He's sitting right there.

14   Q.      The person in the blue shirt?

15   A.      Yes.

16           THE COURT:  The record will reflect the

17   witness has identified the defendant Antonio Hall.

18   BY MR. PURCELL:

19   Q.      What happened after the shooting?

20   A.      Mack and Kevin walked back to the truck and

21   got in the truck.  By this time me and Shameka and

22   Tamica and Shaquanda, we were all sitting in the

23   truck.  And they came and Shameka was in the front in

24   the driver's side, Shaquanda was in the passenger

25   side, Tamica and I were in the back.  And Mack and

1      Kevin got in and scooted us over and we got out.

2      Q.     Where did you go?

3      A.     Once they got in, I motioned to Mika to get

4      out.  And once we got out -- well, while we were

5      getting out they told her to pull off.  And we got

6      out and proceeded to go back in the direction that we

7      entered Westport in and they pulled off.

8      Q.     Which direction did you go when you left the

9      scene?

10     A.     To the rear of the vehicle.

11     Q.     Did you go back towards the ballpark?

12     A.     That's correct.

13     Q.     Where did you go to?

14     A.     We went back to my vehicle on the other side

15     of Westport.

16     Q.     Where did you go after that?

17     A.     We -- once we went back to my vehicle, Tamica

18     stopped and talked to her mother-in-law on the

19     Memphis Road side.  And we got in my car and I took

20     her home.

21     Q.     What's the name of the mother-in-law that you

22     spoke to?

23     A.     Wanda Partlow.

24     Q.     What did you tell her?

25     A.     I didn't tell her anything.

1    Q.      What did Tamika tell her?

2    A.      I didn't hear what she said.  But she told me

3    that she told her what happened.  I was standing on

4    the cement and she went up on the porch to talk to

5    her.

6    Q.      Now, I've asked you this before, so just

7    remember the answer.  You stated to the jury that

8    when Mack went after Kevin -- I'm sorry -- went after

9    Kareem, he pulled a mask on?

10   A.      Yes.

11   Q.      Now, at any point while you were watching the

12   shooting, did Mack pull the mask off?

13   A.      Yes.

14   Q.      Tell the jury what you were able to see when

15   he pulled the mask off.

16   A.      I saw his face.

17   Q.      And did he pull the mask off while he was

18   shooting or after he was shooting?

19   A.      It was happening so fast, I don't remember

20   specifically.

21   Q.      Is there any doubt in your mind as to who

22   committed this murder?

23   A.      None.

24   Q.      Now, you don't really want to be here, do you?

25   A.      I do not.

1    Q.    All right.  The first time you were questioned

2    about this, why don't you tell the jury what you told

3    them your story was.

4    A.    I told them I wasn't there.  I told them I was

5    there; I didn't see it.

6    Q.    Why did you do that?

7    A.    Because I would have rather protected Mack and

8    my children.

9    Q.    And what was your relationship with Mack at

10   that time in 2009, September of 2009?

11   A.    An intimate relationship.

12   Q.    Did he also have another girlfriend?

13   A.    Correct.

14   Q.    And who was that?

15   A.    Caprese.

16   Q.    As far as you know, is that still his

17   girlfriend?

18   A.    Yes.

19   Q.    What is her last name, if you know.

20   A.    Diggs.

21   Q.    And do you know where she lives?  If I were to

22   just put the dot at Maisel at the break, tell me

23   where to go.  Forgive my hand.

24   A.    Down.  I mean, yeah -- no.  To the left of

25   your arrow and up.  But you're on the wrong side of

RYAN CHRISTIE - DIRECT - PURCELL

103

1    the court.

2    Q.    She lived on Wilgrey?

3    A.    Yes.

4    Q.    But you had a relationship with Mack at that

5    time, as well?

6    A.    I did.

7              MR. PROCTOR:  Objection.  Asked and

8    answered.

9              THE COURT:  Overruled.

10   BY MR. PURCELL:

11   Q.    Did you care for him at that time?

12   A.    I did.

13   Q.    How long had you -- you've told us how long

14   you've known him.  How long had you and he had a

15   relationship at this point?  And that's back in

16   September of 2009.

17   A.    Four years.

18   Q.    Now, can you tell the jury:  What did Mack do

19   to make money during the four years you knew him?

20   A.    Sold drugs.

21   Q.    What particular type of drug do you remember

22   him being involved in?

23   A.    Cocaine.

24   Q.    Any particular type of cocaine?

25   A.    Crack.

1    Q.     Crack?

2    A.     Yes.

3    Q.     Do you know a woman named Mama?

4    A.     Yes.

5    Q.     Who is that?

6    A.     A lady -- a drug addict who used to let people

7    do things in her house.

8    Q.     And where did she live?

9    A.     On Annor Court.

10   Q.     Annor Court is -- tell me if I'm correct.

11   Just point to the jury.  It's marked on the map, is

12   it not, Annor Court?

13   A.     Yes.

14   Q.     Okay.  Can you just tell us where -- do you

15   remember where she lived?

16   A.     To where the arrow's point up.

17   Q.     Okay.  In this direction?

18   A.     Yes.

19   Q.     Okay.  Did you ever go to Mama's house with

20   Mack and see him do anything there, or conduct any

21   drug business there?

22   A.     I did.

23   Q.     What do you remember seeing him do?

24   A.     Package cocaine.

25   Q.     Crack cocaine?

```
1    A.       Yes.

2    Q.       On how many different occasions do you think

3    you saw him do that there?

4    A.       I can't count.  Several.

5    Q.       Several.  It was during the four years you

6    knew him prior to the murder?

7    A.       It wasn't during the whole four years.  It was

8    probably within the last two years.

9    Q.       So in the two years before the murder?

10   A.       Yes.

11   Q.       Now, did you ever see Mack conduct any other

12   drug traffic activity:  Give out, serve people, or

13   pick up money from people?

14   A.       Serve.  But I never really seen him pick up

15   money from anybody.

16   Q.       When you say, "serve," tell the jury what that

17   means.

18   A.       Exchange money and drugs with drug addicts.

19   Q.       Do you know Kevin Duckett?

20   A.       I did do.

21   Q.       Did Kevin Duckett kill Kareem?

22   A.       No.

23   Q.       Do you know Robert Jones, Seattle?

24   A.       I do.

25   Q.       Did Robert Jones kill Kareem?
```

```
 1    A.      No.
 2    Q.      Did someone force you to come in and say it
 3    was Mack?
 4    A.      No.
 5    Q.      Is there some agreement between you and other
 6    witnesses in this case that Mack's just the fall guy;
 7    you're really protecting somebody else?
 8    A.      No.
 9    Q.      Are you sure?
10    A.      I'm positive.
11    Q.      You know what happens when you are untruthful
12    before a jury or grand jury under oath, don't you?
13    A.      I do.
14    Q.      Do you regret that you have to come in here
15    today and testify about Mack?
16    A.      I do.
17    Q.      Particularly in front of him?
18    A.      I do.
19    Q.      During the time that you were in an intimate
20    relationship with Mack, did you ever know him to have
21    guns on his person or in the vicinity?
22    A.      I do.
23    Q.      Tell the jury, please, what you know about
24    that.
25    A.      I know that he carried guns.
```

```
 1     Q.      How do you know that?

 2     A.      Because I saw them.

 3     Q.      Now, when you were watching this shooting and

 4     you saw Kareem go down after he was shot, did you

 5     hear Kareem say anything?

 6     A.      I did.

 7     Q.      What did you hear Kareem say?

 8     A.      "No, Mack".

 9     Q.      Is that the name he said, "No, Mack"?

10     A.      Yes.

11     Q.      And was it Mack who was shooting him?

12     A.      It was.

13     Q.      And I'm going to ask you this before the

14     defense asks you.  This is your time to tell us if

15     anybody anywhere has made you come in here -- Moody,

16     me, Mrs. Guest, anybody -- has made you say that Mack

17     committed this murder?

18     A.      No.

19     Q.      Do you remember when you first told the

20     government that it was Mack?

21     A.      I do.

22     Q.      Was your attorney there?

23     A.      He was.

24     Q.      Had you talked to him before you told us about

25     what happened?
```

RDA CURTIS - DIRECT - PROCTOR

108

1    A.    I did.

2    Q.    Now, let's talk about what happened to you,

3    Miss Curtis, in terms of your appearance in grand

4    jury of February 4th, 2009 when you said you weren't

5    there and didn't see anything.

6          Did there come a time after that

7    testimony that you were brought back to the U.S.

8    Attorney's Office and confronted by myself and the

9    investigators in the case, the FBI, and told that we

10   didn't believe you because we had records; we had

11   evidence of a taped conversation where you said you

12   were there?  Do you remember that?

13   A.    I do.

14   Q.    And do you remember that we actually played

15   it, not for you, but for your attorney?

16   A.    Yes.

17   Q.    And you still -- well, what did you tell us

18   after that meeting?  Did you tell us Mack did it?

19   A.    I did not.

20   Q.    Why didn't you?

21   A.    Because I still insisted on not giving up the

22   correct information.

23   Q.    What happens to people who give information

24   about drug dealers?

25              MR. PROCTOR:  Objection.

1           MR. PURCELL:  -- in your experience?

2           THE COURT:  Sustained.  Sustained.

3    BY MR. PURCELL:

4    Q.     In the community, in Westport, before Kareem

5    was killed, did you hear that he was a snitch?

6    A.     Kareem?

7    Q.     Kareem.

8    A.     Yes.

9    Q.     All right.  I direct your attention back to

10   some conversations in the grand jury, some questions

11   that you had previous to the grand jury about a

12   conversation you had with Mack in the past about what

13   happens to snitches.  What did Mack tell you --

14           MR. PROCTOR:  Objection.

15           MR. PURCELL:  What did Mack tell you

16   happens to snitches?

17           MR. PROCTOR:  Objection.

18           THE COURT:  Approach the bench, please.

19           (BENCH CONFERENCE ON THE RECORD.)

20           THE COURT:  Basis of the objection?

21           MR. PROCTOR:  It's several-fold.

22   Firstly, directing your attention to something you

23   said at the grand jury, she hasn't said she doesn't

24   remember.  It's incorrect to refer her.

25           THE COURT:  I understand your objection

1    to be that -- the pending question is any prior

2    discussion that she has had with the defendant with

3    respect to his view as to those who cooperate with

4    government authorities.  That's the basis of the

5    objection.  That's the pending question right now.

6    What the defendant said to her with respect to people

7    who, quote, "snitches," end of quote.  What is the

8    basis of the objection?

9                  MR. PROCTOR:  The question was:

10   Directing your attention to what you told the grand

11   jury, what did Mack tell you?

12                 THE COURT:  Well, then, you can rephrase

13   it.  The question can be:  Have you had any previous

14   discussions with Mack with respect to his position as

15   to people who, quote, "snitches," end quote.  She

16   either does or doesn't recollect such prior

17   conversation.

18                 MR. PURCELL:  It's a crucial form of the

19   question objection.  Yes.

20                 THE COURT:  You may rephrase the

21   question.  It's admissible.  You have to rephrase the

22   question.

23                 MR. PURCELL:  It's not an objection to

24   the --

25                 THE COURT:  The point is, if you have an

RIAL CURTIS - DIRECT - PURCELL

111

1    objection to the substance, it's clearly under Rule

2    801 in terms of declarations against interest.  It's

3    not hearsay.  If she has knowledge as to prior

4    conversations, it doesn't need to be put in the

5    context of what she did or didn't say.  The question

6    is precisely did she have prior conversations with

7    the defendant.  And it's yes or no.  "What's his

8    position as to snitches," end quote, end of quote.

9    And she can answer.  You need to put the timeframe in

10    terms of when the conversation was.  You know, as to

11    that extent, the objection is overruled.

12                    (END OF BENCH CONFERENCE.)

13    BY MR. PURCELL:

14    Q.     Miss Curtis, do you recall any conversations

15    you had with Mack while you were in a relationship

16    with him?

17    A.     I do.

18    Q.     About what happens to snitches?

19    A.     No.  I mean we had several conversations.

20    Q.     Did he ever say anything to you about what

21    happens if you snitch?

22                    MR. PROCTOR:  Objection, Judge.  Asked

23    and answered.

24                    THE COURT:  He may follow up if there's a

25    basis for an inconsistent statement.  So he may

1    follow up.

2            MR. PURCELL:  I'm about to.  I just want

3    to make sure I've asked the question sufficiently for

4    the witness to answer.

5    BY MR. PURCELL:

6    Q.    Do you remember any conversations with Mack

7    about snitching?

8            Did you say you had several conversations

9    about that or, you had several conversations with

10   him?

11   A.    We had several conversations about that.

12   Q.    About snitching?

13   A.    Yes.

14   Q.    What sort of things -- what did Mack say to

15   you when you had these conversations about snitching?

16           Did he recommend it?

17   A.    No, he did not.

18   Q.    Did he approve of it?

19   A.    He felt it was a bad thing.

20   Q.    Did he ever say to you what would happen or

21   what would happen to you in his view of you if you

22   were ever a snitch?

23   A.    Yes.

24   Q.    What did he say?

25   A.    He said that -- I can't remember him promising

113

```
 1     that he would kill me or anything, but it was known.

 2     Q.     It was known?

 3     A.     Yes.

 4     Q.     That you would be killed?

 5     A.     Yes.

 6     Q.     And he said that to you?

 7     A.     He didn't say it, but it was expressed.

 8     Q.     That's what you understood his conversation to

 9     be?

10     A.     Yes.

11     Q.     This is a person you're in an intimate

12     relationship with?

13     A.     That's correct.

14     Q.     And you stayed with him for four years?

15     A.     I did.

16     Q.     Now, you mentioned that when you saw Mack go

17     after Kareem that he pulled down a mask.

18     A.     Yes.

19     Q.     Now, can you tell the jury whether that

20     mask -- Mack having a mask was something you had seen

21     before or knew of before?

22     A.     It was normal all the time.

23     Q.     It was what?

24     A.     Normal.  It was something he always wore.

25     Q.     Let's go back to your presentation to the
```

1     grand jury in February of 2004.  As a result of your

2     presentation --

3                   MR. SULLIVAN:  Not 2004.

4                   MR. PURCELL:  I'm sorry.  2009.  It was

5     February 4th, 2009 -- 2010.  Excuse me.

6     BY MR. PURCELL:

7     Q.     Were you indicted as a result of that

8     testimony?

9     A.     I was.

10    Q.     And I just want to introduce, if you recognize

11    it, a copy of the indictment in your case.  And this

12    is Exhibit No. 191; counsel has it.  And is that your

13    indictment?

14    A.     It is.

15    Q.     Now, did you -- when you were indicted, were

16    you arrested?

17    A.     I was.

18    Q.     And were you held in jail after you were

19    arrested?

20    A.     I was.

21    Q.     And were you held in jail in Balt -- you don't

22    have to say where you were unless counsel asks you.

23    But were you held in jail in Baltimore?

24    A.     I was not.

25    Q.     Were you in contact with your family or

1      friends while you were away?

2      A.      My children.

3      Q.      Your children.  Now, during the time you were

4      confined, did you have any conversation with -- I'm

5      sorry -- conversation with Ferl or Duckett or Tamica

6      or Shameka Ross as to what they should say to the

7      grand jury when they were called in?

8      A.      I did not.

9      Q.      And did there could am a time when you

10     actually decided to come forward with the truth?

11              MR. PROCTOR:  Objection, Judge.

12              THE COURT:  Rephrase the question,

13     please.  Objection sustained.

14     BY MR. PURCELL:

15     Q.      Did there come a time when you came forward

16     with different responses than you had given on

17     February 4th, 2010 to the grand jury?

18     A.      Yes.

19     Q.      And you characterized them as the truth; is

20     that right?

21     A.      Yes.

22     Q.      What made you decide to do that, Miss Curtis?

23     A.      My children.

24     Q.      What do you mean?

25     A.      I felt as though the importance of being with

116

1        my children outweighed the importance of protecting

2        someone.

3        Q.      Are you with your children now?

4        A.      I am.

5        Q.      Would you do anything to jeopardize being

6        taken away from your children again?

7                        MR. PROCTOR:  Objection, Judge.

8                        THE COURT:  Sustained.

9        BY MR. PURCELL:

10       Q.      Do you want to be taken away from your

11       children again?

12       A.      I do not.

13       Q.      Would you risk that again?

14                       MR. PROCTOR:  Objection.

15                       THE COURT:  Sustained.

16       BY MR. PURCELL:

17       Q.      Okay.  How long were you away from your

18       children?

19       A.      Six months.

20       Q.      Now, did there come a time when you entered a

21       guilty plea in this case?  Or, that is, in your

22       perjury charge case?

23       A.      I did.

24       Q.      Did that cause you to be released immediately?

25       A.      It did not.

1    Q.      When you came to the grand jury -- I think

2    your date of that last grand jury, what you

3    characterized as the truth, of being July 20th of

4    2010 -- were you released that day and allowed to go

5    back home with your children in July?

6    A.      No.

7    Q.      How long, Miss Curtis, did you remain in jail?

8    A.      After I gave my statement?  Can you rephrase

9    --

10   Q.      Just tell us when you were released.

11   A.      December.

12   Q.      December.  So you gave your statement in July

13   and were released in December?

14   A.      That's correct.

15   Q.      Now, when you were released, did the

16   government give you a bucket of cash and say, "Thanks

17   a lot for your help; and go on your way"?

18   A.      No.

19   Q.      Has the government paid expenses for you and

20   your children to live somewhere other than Westport

21   in Baltimore; is that correct?

22   A.      That's correct.

23   Q.      And do they pay the rent?

24   A.      Yes.

25   Q.      They pay the bills?

1    A.      Yes.

2    Q.      Are you testifying here in exchange for free

3    housing from the government?

4    A.      No.

5    Q.      When you came forward in July of 2010, did you

6    do that because you wanted to get out and get some

7    free housing from the government?

8    A.      No.

9    Q.      I don't think I've introduced it, but you said

10   you had a plea agreement.

11            And Your Honor, the government has

12   confirmed with counsel that the plea agreement's been

13   redacted as the Court wishes.

14            THE COURT:  Yes.  What government exhibit

15   is that?

16            MR. PURCELL:  This is 192, Your Honor.

17   And counsel have seen that and we removed the

18   statement of facts and other non-relevant portions.

19   BY MR. PURCELL:

20   Q.      But is this 192 your plea agreement?

21   A.      It is.

22   Q.      Now, the crime you were charged with were

23   perjury and false statements; is that right?

24   A.      That's correct.

25   Q.      Do you understand -- or, can you tell the jury

1    what the maximum punishment is for each of those

2    various counts you were charged with in the

3    indictment, if you know?

4    A.    20 or 30 years.

5    Q.    That's your understanding of it?

6    A.    Yeah.

7    Q.    Okay.  Totally you were looking at that

8    amount?

9    A.    Yes.

10   Q.    And you served from April until December?

11   A.    That's correct.

12   Q.    Have you been sentenced yet?

13   A.    No, I have not.

14   Q.    Do you know what you'll get as a sentence?

15   A.    I do not.

16   Q.    Now, do you have an expectation or has your

17   attorney or I told you what you should expect or is

18   likely to occur in your case?

19   A.    No.

20   Q.    Has your attorney told you that you'll

21   probably just get time served; or is that what you

22   hope will happen?

23   A.    I hope.

24   Q.    And you and your attorney have had

25   conversations about that hope?

```
 1    A.      That's correct.

 2    Q.      But you understand that may not happen?

 3    A.      I do.

 4    Q.      All that being said, this is your opportunity

 5    to tell this jury that what you're saying to them

 6    today is not true.

 7                 MR. PROCTOR:  Objection, Judge.

 8                 THE COURT:  Overruled.

 9    BY MR. PURCELL:

10    Q.      Is what you said here today true?

11    A.      Yes.

12    Q.      Have you enjoyed implicating your former lover

13    in a murder?

14                 MR. PROCTOR:  Same objection.

15                 THE COURT:  Overruled.

16                 THE WITNESS:  Repeat the question.

17    BY MR. PURCELL:

18    Q.      I've asked a stupid question, actually.

19                 Have you enjoyed -- one of many, I'm

20    sure.

21                 Have you enjoyed implicating your former

22    lover in a murder?

23    A.      No.

24    Q.      You wish you didn't have to do it?

25    A.      I do.
```

MIN CURTIS - CROSS - PROCTOR

121

```
 1                    MR. PURCELL:  I have no further

 2      questions.  Thank you.

 3                    THE COURT:  Thank you.

 4      Cross-examination.  Mr. Proctor.

 5                    MR. PROCTOR:  Thank you, sir.

 6                         CROSS-EXAMINATION

 7      BY MR. PROCTOR:

 8      Q.      Good afternoon, Miss Curtis.

 9      A.      Good afternoon.

10      Q.      Before we start getting into the meat of it, I

11      wanted to ask one quick question.  The case agent in

12      this case is Detective Moody, who's seated over

13      there, right?

14      A.      Yes.

15      Q.      Do you know him?

16      A.      Yes.

17      Q.      You've interacted with him?

18      A.      Yes.

19      Q.      Did he ever threaten you?

20      A.      No.

21      Q.      Did he ever threaten your family?

22      A.      No.

23      Q.      Was he rude?

24      A.      Yes.

25      Q.      Tell me about that.
```

1    A.      What do you want to know?

2    Q.      Give me examples of how he was rude.

3    A.      Before I was arrested he came on my job,

4    embarrassed me.  He's rude.

5    Q.      How did he embarrass you?

6    A.      I was at work; he's a police officer.  It is

7    obvious I don't want the police at work asking me

8    questions.  I felt as though he could have went about

9    his job in a better way.

10   Q.      What about your kids; did he ever do anything

11   that made you worry about them?

12   A.      He advised me that if I didn't tell the truth,

13   that I would be taken away from my children.

14   Q.      Thank you.  I'll move on.

15           And Mr. Purcell talked about this

16   briefly.  But the federal government pays your bills,

17   right?

18   A.      Correct.

19   Q.      And, so, they pay your rent, right?

20   A.      Yes.

21   Q.      And they pay, what, your utilities?

22   A.      Yes.

23   Q.      Pay your phone bill?

24   A.      Yes.

25   Q.      Pay for cable TV?

RAIN CURTIS - CROSS - PROCTOR

123

```
 1     A.      Yes.

 2     Q.      They pay -- do they give you pocket money?

 3     A.      No.

 4     Q.      Do they pay gas for your car?

 5     A.      I don't have a car.

 6     Q.      Well, what other -- let me ask a better

 7     question.

 8                  What other things do they pay?

 9     A.      You just stated them.  They don't pay for

10     anything else.

11     Q.      Okay.  And so far that's added up to 26,545

12     bucks?

13     A.      Okay.

14     Q.      And they've been paying that since you got out

15     on December 8th, right?

16     A.      Correct.

17     Q.      So you're living rent free at government

18     expense?

19     A.      Correct.

20     Q.      Before you were released from jail, when was

21     the last time you legally earned $3,600 a month?

22     A.      When I was working.

23     Q.      Okay.  And that's how much it was?

24     A.      I made a considerable amount.  I worked for

25     Verizon for several years.
```

124

1    Q.      Okay.  So -- which gets me to the phone call

2    with Hershel.  You've heard it, right?

3    A.      I have.

4    Q.      Several times, I'm guessing?

5    A.      Yes.

6    Q.      And is it your testimony here today that,

7    granted you lied the first time you went into the

8    grand jury, and granted you lied the second time you

9    went to the grand jury, right?

10   A.      The first time I went to the grand jury I

11   didn't give a statement.

12   Q.      Well, you basically said:  I didn't know

13   nothing and I want a lawyer?

14   A.      The first time I went to the grand jury, I

15   wanted a lawyer.

16   Q.      Right.  But before that you basically said:  I

17   don't know anything and I feel intimidated?

18   A.      Yes.

19   Q.      And the, "I don't know anything," at least

20   that part you're not saying is not true, right (sic)?

21   A.      Say that again.

22           MR. PROCTOR:  If I may approach the

23   witness, Judge?

24           THE COURT:  Certainly.

25

JOHN CURTIS  CROSS - PROCTOR

125

```
1     BY MR. PROCTOR:

2     Q.      Your first grand jury transcript is --

3     A.      In January.

4     Q.      -- January.  And if we go to page nine?

5              THE COURT:  For the record, that's

6     government Exhibit 195.

7              MR. PROCTOR:  It's not marked, but I'll

8     take your word for it.

9              MR. PURCELL:  It is marked.

10             THE COURT:  I'm sorry.  Approach the

11    bench, please.

12             (BENCH CONFERENCE ON THE RECORD.)

13             MR. PROCTOR:  I'm sorry, Judge.  It is

14    marked.

15             THE COURT:  Did you just say -- did you

16    just say to me, Mr. Proctor, "I don't know but I'll

17    take your word for it"?

18             MR. PROCTOR:  I was talking to Mr.

19    Purcell.  I'm sorry if the Court interpreted that --

20             THE COURT:  I thought you were addressing

21    me, sir.

22             MR. PROCTOR:  No.  Mr. Purcell chirped

23    in --

24             THE COURT:  I'm going to stop all the

25    chirping from everybody here.  Do you understand?
```

1     Enough conversation from both of you.  Do you

2     understand that?  Both of you.

3               Don't ever look at me in my courtroom and

4     say, "I'll take your word for it," Mr. Proctor.

5               MR. PROCTOR:  I'm sorry.  I was

6     addressing Mr. Purcell.

7               THE COURT:  You were looking at me when

8     you said it.

9               MR. PROCTOR:  I thought I was actually

10    addressing the grand jury transcript.  But I'd never

11    address the Court that way.

12              THE COURT:  I hope not, Mr. Proctor.

13    Enough chirping back and forth in front of everybody.

14    I'm not going to admonish people in front of the

15    jury.  But that's enough from both of you.  Do you

16    understand that?  Both of you.

17              MR. PROCTOR:  Yes, sir.

18              THE COURT:  Understand, Mr. Purcell?

19              MR. PURCELL:  I do.

20              THE COURT:  Too many casual comments.

21              Mr. Proctor, do you understand that?

22              MR. PROCTOR:  I do.

23              THE COURT:  All right.  Let's just

24    proceed professionally, then.

25              (END OF BENCH CONFERENCE.)

ROLLA CURTIS 107   CROSS - PROCTOR

1              MR. PROCTOR:  All right, Judge.  I'm

2    sorry.  I also forget to ask to approach the witness.

3              THE COURT:  That's quite all right.

4    That's quite all right.

5    MR. PROCTOR:

6    Q.     So this is the grand jury transcript the first

7    time you testified, Exhibit 195, January 21st,

8    correct?

9    A.     Uh-huh.

10   Q.     And you were asked -- you said -- and I'll

11   quote -- "I don't know what I am or I'm not doing

12   anything wrong," correct?

13   A.     Correct.

14   Q.     So what you meant by that is:  I don't know

15   what happened, right?

16   A.     Yes.

17   Q.     And that's not true, correct?

18   A.     What's -- what's the question?

19   Q.     I guess -- let me put it a different way.  The

20   first time you went to the grand jury you weren't

21   exactly forthcoming with what you called the truth --

22   A.     Correct.

23   Q.     -- correct?

24   A.     Correct.

25   Q.     But is it your testimony today that when you

1     talked to Hershel you did tell him the truth on the

2     phone the next day?

3     A.      I vaguely told him what happened.

4     Q.      Right.  But what you told him was true, right?

5     A.      Yes.

6     Q.      Okay.  Which gets me to that call with

7     Hershel.

8             And, Judge, I don't know what number the

9     defense is on, but this would be for identification

10    purposes.

11            THE COURT:  I think it would be

12    defendant's Exhibit No. 3, I believe, for

13    identification, Mr. Proctor.

14            MR. PROCTOR:  Right.  Actually, the

15    government's probably ready to introduce that.  I'll

16    just use theirs if that's acceptable with the Court.

17            THE COURT:  Which exhibit is it for the

18    government?

19            MR. PURCELL:  That is 188B.

20            THE COURT:  188 -- I thought 188B was the

21    transcript.

22            MR. PROCTOR:  It is.

23            THE COURT:  All right.  Fine.

24            MR. PROCTOR:  Have you seen this

25    transcript, Miss Curtis.

```
 1                    THE COURT:  For the record, 188 and 188A
 2      are in evidence.  And 188B is just for identification
 3      only; is the transcript that the jury used the to
 4      listen to the tape.
 5                    MR. PROCTOR:  Yes, sir.
 6      BY MR. PROCTOR:
 7      Q.     Have you seen this transcript, Miss Curtis?
 8      A.     No.
 9      Q.     Okay.  Well, maybe, would it be a pain to play
10      it?  Since she hasn't seen it?
11                    THE COURT:  We can play it again, if you
12      like.  If the government would tee that up.
13                    Thank you very much, Mr. Purcell.
14                    MR. PROCTOR:  I apologize, Judge.  I
15      thought she had seen it.
16                    THE COURT:  That's all right.  That's all
17      right.  Take it easy.
18                    MR. PROCTOR:  If you just want to follow
19      along so you can make sure the transcript is
20      accurate, that would be great.
21                    (Audio playing.)
22      BY MR. PROCTOR:
23      Q.     Did you follow that transcript?
24      A.     I did.
25      Q.     Did it look accurate?
```

RUJA CURTIS - CROSS - PURCELL

1    A.    It did.

2    Q.    The transcript -- and that's your voice,

3    right, and Brandon Hall is the person on the other

4    line?

5    A.    Yes.

6    Q.    Who you call Hershel?

7    A.    Yes.

8    Q.    So I guess my question is this:  You say Mack

9    followed Kareem and shot him a bunch of times, right?

10   A.    Yes.

11   Q.    And essentially it was a one-man show, right?

12   A.    Yes.

13   Q.    So why, when you're talking on the phone with

14   Hershel -- which you've already said is the truth and

15   you've already said you told Hershel not everything

16   that happened, but most of it -- why do you use the

17   word, "they," not once, but twice in that call?

18   "They killed that boy"?  Who's the, "they"?

19   A.    I was being evasive because I didn't really

20   want him to know what happened.

21   Q.    Okay.  So you're being evasive.  And didn't

22   you say on direct when Mr. Purcell asked you, you

23   used the word, "they," again?

24   A.    When?

25   Q.    "They killed him"?

RAIN CURTIS - CROSS - PURCELL

131

```
 1      A.      When did I say that?

 2      Q.      Mr. Purcell was asking you questions not a

 3      half hour ago.

 4      A.      I did?

 5      Q.      Yes.

 6              So let's cut to the chase.  So if you

 7      said, "they," earlier, you were incorrect because

 8      only one person killed him, right?

 9      A.      That's correct.

10      Q.      And if you said, "they," on the phone to

11      Hershel, again, you were incorrect because they

12      didn't kill him; your testimony is Mack did, right?

13      A.      As I stated:  On the phone with Hershel, I

14      would have not given him the correct information.  I

15      do realize it's a recorded call.

16      Q.      Okay.  The second time you went to the grand

17      jury you said -- and I don't want to go through it

18      line by line.  Let's just hit the highlights.  You

19      said you learned about the shooting when you got

20      home; is that correct?

21      A.      Yes.

22      Q.      That's not true, is it?

23      A.      That's not true.

24      Q.      You said -- and let me back up for a little.

25      When you go into the grand jury, you took an oath
```

```
 1      exactly the same as the oath you took this morning,

 2      right?

 3      A.      I did.

 4      Q.      You swore under penalty of perjury to tell the

 5      whole truth and nothing but the truth?

 6      A.      I did.

 7      Q.      And it's no secret that you didn't uphold that

 8      oath, did you?

 9      A.      I did not.

10      Q.      You lied.  You were charged with perjury, in

11      fact, you pled guilty to perjury, right?

12      A.      That's correct.

13      Q.      Okay.  And it's fair to say -- we don't need

14      to count them -- but you didn't just lie once; you

15      lied many, many times in that grand jury, didn't you?

16      A.      On that day?

17      Q.      Yes.

18      A.      Yes.

19      Q.      Okay.  You said you weren't -- you only

20      learned of the shooting when you got home.  That was

21      perjury, right?

22      A.      Yes.

23      Q.      You said you didn't hear any shots that night.

24      That was perjury, right?

25      A.      Yes.  Yes.
```

JOHN CURTIS - CROSS - PROCTOR

133

```
1    Q.      And then on -- can you even guess how many

2    times you lied in the grand jury that day?

3                   MR. PURCELL:  Objection.

4                   THE COURT:  Overruled.

5                   THE WITNESS:  No.

6    BY MR. PROCTOR:

7    Q.      More than ten?

8    A.      I don't remember.

9    Q.      And then you were interviewed at the U.S.

10   Attorney's Office a few weeks after that, February

11   24th, right?

12   A.      Yes.

13   Q.      And you're aware, are you not, that it's a

14   crime to lie to a federal agent?

15   A.      I am.

16   Q.      And federal agents were present with your

17   lawyer, Mr. Owens, right?

18   A.      Yes.

19   Q.      And you lied again, right?

20   A.      Yes.

21   Q.      A whole bunch?

22           Said you weren't in the area at the time,

23   right?

24   A.      Yes.

25   Q.      You said you didn't hear or witness what had
```

1    occurred, right?

2    A.      Yes.

3    Q.      And they played your lawyer the tape.  And you

4    still -- even though your lawyer, I assume, came out

5    and said to you, "I heard the tape, you're on it,"

6    you still maintained your story that you didn't see

7    and didn't hear anything, didn't you?

8    A.      I knew the tape didn't play anything.

9    Q.      I'm sorry.  Could you repeat that?

10   A.      I knew the information that I gave on the tape

11   didn't really say much about the incident.

12   Q.      "I was there when they killed that boy,"

13   doesn't say much about it?

14   A.      Just because I was there don't mean I seen it.

15   Q.      "I was right there when they killed that boy,"

16   doesn't mean you've seen it?

17   A.      Regardless of what the phone call said, I knew

18   I saw it.

19   Q.      Okay.  You said you didn't know Hershel's real

20   name.  That wasn't true, was it?

21   A.      Right.

22   Q.      In fact, you've him written a letter with

23   Brandon Hall in your handwriting, right?

24   A.      Yes.

25   Q.      So then you get arrested, May 26th, 2010?

1      A.      Yes.

2      Q.      Bad day in the Curtis household?

3      A.      Yes.

4      Q.      And when you got arrested, you had ten

5      Percocets in your purse; does that sound right?

6      A.      I did.

7      Q.      Did you have a prescription for those?

8      A.      I did not.

9      Q.      And as you sit here today, are you still using

10     drugs?

11     A.      I am not.

12     Q.      And the reason you got arrested is the grand

13     jury indicted you with lying on that meeting on

14     February 24th and obstructing justice, right?

15     A.      Yes.

16     Q.      And you were denied bail?

17     A.      Yes.

18     Q.      Twice?

19     A.      Yes.

20     Q.      So you're sitting in jail with no bail, no

21     trial date, hiding somewhere else, away from your

22     kids, looking for a way out, right?

23     A.      Not necessarily.

24     Q.      Well, the reason you talked to the government

25     was not because you wanted to be a good citizen.  The

RAJ CURTIS - CROSS - 02/02/12

1    reason you talked to the government is to get a

2    better deal and hopefully to get home, right?

3    A.      No, that's not true.

4    Q.      So you woke up one morning and you thought:

5    You know what, my conscience is killing me.  Today a

6    year later is the day I'm going to tell them about

7    it.  Is that your testimony?

8    A.      My testimony is what I gave.

9    Q.      I'm not asking what your testimony is; I'm

10   asking why you gave it.  You hoped to get out of

11   jail?

12   A.      I gave my testimony because it was the right

13   thing to do.

14   Q.      Wasn't it the right thing to do the first time

15   you went to the grand jury, the second time you went

16   to the grand jury, the time you met with them in the

17   FBI or in the U.S. Attorney's Office; it was the

18   right thing to do then too, right?

19   A.      Yes.

20   Q.      But all of a sudden, one time, this time, the

21   fourth, fifth, sixth time you met with them, then

22   it's the right thing to do?

23   A.      Yes.

24   Q.      So it didn't play into your mind at all:

25   Geez, if I talk to them and tell them what they want

1       to hear -- and you know what they want to hear,

2       right?  They want to hear who killed Kareem, right?

3       That's what they want to know?

4       A.      They want to know the truth.

5       Q.      They don't want to know the truth about what

6       you had for dinner last night; they want to know who

7       killed Kareem, don't they?

8       A.      Of course.

9       Q.      And it doesn't enter into your psyche at all

10      that:  Hey, maybe if I tell them what they want to

11      know, they're going to let me out of jail?

12      A.      I knew what they wanted to know.  It was the

13      truth.

14      Q.      Maybe I'm not making myself very clear.  I'm

15      not asking what they wanted to know; I'm asking why

16      did you want to give it to them.  Did you want to

17      give it to them in the hopes you'd get out of jail?

18      A.      From my experience, telling someone doesn't

19      always mean that you come home.  I've seen that

20      happen.

21      Q.      Agreed.  But it can't hurt, can it?

22      A.      It can't hurt.

23      Q.      And so when you talked to Mr. Purcell and the

24      officers, your intent was:  That it certainly can't

25      hurt my case; is that fair to say?

RYAN CURTIS - CROSS - PROCTOR

138

```
1    A.       Correct.

2    Q.       And it took a while, but, in fact, it did help

3    your case, right?

4    A.       I wouldn't know.

5    Q.       You got released?

6    A.       I did?

7    Q.       December.

8    A.       Exactly.

9    Q.       And you had no expectation of being released

10   before you talked to them, did you?

11   A.       No.

12   Q.       And you hope and expect that when you're

13   sentenced you'll get time served, right?

14   A.       I know the guidelines.

15   Q.       I'm sorry?

16   A.       I know the guidelines for my charge.

17   Q.       Yeah.  And I have your plea agreement right

18   here.  And let's talk a little bit about the

19   guidelines, since you brought it up.

20            The guidelines -- do you know what a 5(k)

21   is?

22   A.       I do not.

23   Q.       Have you ever heard the term, "substantial

24   assistance"?

25   A.       No.
```

1    Q.      Let me ask:  Do your guidelines go down --

2    do -- the amount of prison sentence you expect to

3    receive, does that diminish if the government says

4    you helped them?

5    A.      It does.

6    Q.      It goes down by a lot, right?

7    A.      Two or three points or something like that.

8    Q.      Right.  Depending on -- and it's the

9    government that makes that decision about whether you

10   helped them or not, right?

11   A.      Say that again?

12   Q.      Who decides whether to move for cooperation in

13   your case?

14   A.      I don't really understand that question.

15          MR. PROCTOR:  Can I approach, Judge?

16          THE COURT:  Yes, sir.

17   BY MR. PROCTOR:

18   Q.      You may have your plea agreement right here,

19   which is marked as government's Exhibit 492.  Have

20   you seen this before, ma'am?

21   A.      I have.

22   Q.      We don't have a signed version.  But you've

23   looked through this and this appears to be your plea

24   agreement?

25   A.      Uh-huh.  Yes.

1    Q.    And as you mentioned, there are guidelines?

2    A.    Yes.

3    Q.    They're right here.  And you've waived your

4    appeal, right?

5    A.    Yes.

6    Q.    And those guidelines start off at one number

7    and get adjusted because you pled guilty and

8    etcetera, etcetera, right?

9    A.    Yes.

10   Q.    And then at the back there's a sealed

11   supplement?

12   A.    Uh-huh.

13   Q.    And you read this, and you went through it

14   with Mr. Murtha, and you signed it?

15   A.    Right.

16   Q.    And that sealed supplement is the part that

17   would reduce any recommended sentence if you

18   cooperated, right?

19   A.    Yes.

20   Q.    And this is a plea agreement between you and

21   the United States Attorney's Office; which is this

22   office, correct?

23   A.    Correct.

24   Q.    And that plea agreement says, "This office has

25   the sole discretion in determining whether the

1    defendant" -- that's you, right?

2    A.    Yes.

3    Q.    "Has provided substantial assistance, and

4    whether to make any motion pursuant to 3553 and

5    5(k)1.1".

6          So if I am I summarizing this

7    correctly -- and tell me if I ain't -- the United

8    States Attorney's Office has the sole discretion in

9    deciding whether you've provided substantial

10   assistance, true?

11   A.    You mean, whether I gave them the information

12   that they wanted to know?

13   Q.    Whether you helped them out.  Substantial

14   assistance means to help them out, right?

15   A.    Right.

16   Q.    And it's their call whether you helped them

17   out or not, isn't it?

18   A.    Yes.

19   Q.    And if they make that call, your recommended

20   sentence goes down, doesn't it?

21   A.    Yes.

22   Q.    The second time you went -- when you went to

23   the U.S. Attorney's Office on February 24th, another

24   lawyer named Flynn Owens was right with you, wasn't

25   he?

TONY CURTIS - CROSS - PROCTOR

142

1    A.      Yes.

2    Q.      And at that time you said you weren't in the

3    area, didn't you?

4    A.      Yes.

5    Q.      That wasn't true, was it?

6    A.      Right.

7    Q.      You said you didn't hear or witness the murder

8    of Kareem occur.  That wasn't true, was it?

9    A.      Correct.

10   Q.      You said you didn't know Avery.  That wasn't

11   true, was it?

12   A.      Correct.

13   Q.      Let me ask you this, if I may digress a

14   minute.

15           You said you didn't put Mr. Hall's name

16   in it because you didn't want to get him this

17   trouble, words to that effect, right?  You're scared

18   of him, whatever.  Why don't you put Avery's name in

19   it?

20   A.      What do you mean?

21   Q.      You said you didn't know Avery.  I'm assuming

22   you said that because you didn't want to drag Avery

23   into it?

24   A.      Uh-huh.

25   Q.      Why are you protecting Avery?

1    A.      I don't -- what do you mean, why am I

2    protecting him?  What am I protecting him from?

3    Q.      Let me ask you a better question.  Why did you

4    say you didn't know Avery when that wasn't true?

5    A.      Because I wanted to disassociate myself from

6    the whole incident.

7    Q.      And then you got indicted, right?

8    A.      Yes.

9    Q.      Let's go, if I may, through the -- through

10   your testimony.

11              THE COURT:  Why don't you all approach

12   the bench for one second, please?

13              (BENCH CONFERENCE ON THE RECORD.)

14              THE COURT:  Okay.  This is going to be a

15   good time to break for lunch.  It's a little bit

16   before 1.  I've got a bench meeting with the other

17   judges.  How much longer do you think you'll be on

18   cross?

19              MR. PROCTOR:  Ten, fifteen minutes.

20              THE COURT:  How much on redirect?

21              THE WITNESS:  Ten minutes.

22              THE COURT:  Who's the next witness?

23              MR. PURCELL:  Tamica Mouzon.

24              THE COURT:  Who's after?

25              THE WITNESS:  Kevin Duckett.

RAIN CURTIS CROSS- PROCTOR

```
 1                  THE COURT:  All right.  We'll take a

 2       break for lunch.

 3                  The point I was just making to you

 4       earlier, I'm definitely a firm believer in letting

 5       people try this case, but there's a lot of

 6       familiarity going on down here in the well of the

 7       courtroom.  I've let it go on.  You shouldn't make a

 8       comment.  Everybody take their foot off the gas

 9       pedal.

10                  MR. PROCTOR:  I've never had a trial

11       where the judge didn't shout at me.  Don't worry.

12                  THE COURT:  That's all right.  I think

13       the conversation was a little bit colloquial, the

14       conversation back and forth.  We just need to cool

15       it, that's all.

16                  We'll take a break for lunch.

17                  (END OF BENCH CONFERENCE.)

18                  THE COURT:  All right.  Ladies and

19       gentlemen, we're going to take a break for lunch now.

20       And we'll start again at 2 o'clock, maybe a little

21       bit thereafter.  But we'll take a break for lunch.

22                  (LUNCH RECESS.)

23

24

25
```

1                    AFTERNOON SESSION

2              (JURY IN.)

3              THE COURT:  Good afternoon, everyone.

4         Miss Curtis, if you'll return to the

5    witness stand, please.  You're still under oath.

6              Ladies and gentlemen, I'm sorry for the

7    delay.  On Wednesdays all the judges meet together.

8    So if you think sometimes lawyers talk a lot, wait

9    until you see a bunch of judges talking.  I try to

10   cut them off.  I tried to get back as quickly as I

11   could and I do apologize.

12             With that we're ready to continue.  And

13   you may continue with your cross-examination, Mr.

14   Proctor.

15             MR. PROCTOR:  Thank you.

16   BY MR. PROCTOR:

17   Q.    Miss Curtis, if it's okay with you, could you

18   come down from the stand; and if Miss West would be

19   kind enough to hand you the microphone?  If you would

20   just come over here, ma'am.

21             When you first got to Westport, do you

22   recall what time of the evening it was?

23   A.    In the evening.

24   Q.    Was it dark?

25   A.    No.

1    Q.    Okay.  And you go to whose house?

2    A.    Tamica's.

3    Q.    And where is Tamica's house on this?

4    A.    On the other side of the map.

5    Q.    So, up here?

6    A.    It's on the other side of Westport.

7    Q.    And you -- and she's home.  Do you go in?

8    A.    Not normally.

9    Q.    So she comes outside?

10   A.    Yes.

11   Q.    And you two decide to go where?

12   A.    Over here to the public outside.

13   Q.    Why don't you drive?

14   A.    I don't want to.

15   Q.    Okay.  It's only a few minute walk?

16   A.    Uh-huh.

17   Q.    So you just want to walk?

18   A.    Yes.

19   Q.    So you walk over here.  And can you just show

20   the jury the route you took, please, ma'am?

21              Maybe I will borrow Mr. Purcell's laser

22   pointer.

23              MR. PURCELL:  You're not really trained

24   in this, but I'll let you borrow it.

25

1       BY MR. PROCTOR:

2       Q.      I'll try not to put it in anyone's eye.   In

3       fact, why don't I give it to you.   If something

4       happens it's your fault.

5                       So can you point to the direction you

6       came in?

7       A.      We came in here, walked down here, through

8       here.

9       Q.      Okay.   And your purpose for coming down there

10      was what?

11      A.      To buy marijuana.

12      Q.      Had you been drinking earlier that day?

13      A.      No.

14      Q.      Had you been using marijuana earlier that day?

15      A.      Not that I recall.

16      Q.      Had you been using pain killers?

17      A.      No.

18      Q.      Percocets.

19      A.      No.

20      Q.      Or anything like that?

21      A.      No.

22      Q.      So as best you can recall when you got to

23      Tamica -- is it TAM/MIKE/KA or TAM/MEEK/KA?

24      A.      TAM/MIKE/KA.

25      Q.      When you got to her house, as best you recall

1    you were sober?

2    A.    Yes.

3    Q.    Okay.  And you come down here.  And where is

4    it you're seeking to buy marijuana?

5    A.    I don't know.  We went -- there's several

6    places.  I don't actually remember who we were aiming

7    to buy it from.  But several people have it.

8    Q.    Okay.  And did you actually purchase some?

9    A.    Yes.

10   Q.    Who did you purchase it from?

11   A.    I don't remember.

12   Q.    Did you buy it or did Tamica buy it?

13   A.    We probably bought it together.

14   Q.    Okay.  Because if you put your money

15   together --

16   A.    Exactly.

17   Q.    -- you get more?

18   A.    Exactly.

19   Q.    Okay.  So you buy marijuana.  And you don't

20   recall where you bought it.  Actually, if you want to

21   go back to the witness stand; if I need you back I'll

22   ask you to step over again.  Thank you, ma'am.

23            So you buy marijuana, somewhere, you

24   don't recall where exactly.  Do you smoke it?

25   A.    Not right there, no.

1    Q.    Do you put it in a blunt or do you roll it

2    yourself, splits?  How do you do it?

3    A.    We didn't do anything with it until we were on

4    our way home.

5    Q.    Okay.  So you had marijuana.  Do you remember

6    how much you spent?

7    A.    No.

8    Q.    Typically you would buy what, 20 bucks' worth,

9    something like that?

10   A.    Yeah, something like that.

11   Q.    Okay.  So you got your marijuana.  And at that

12   point you go, I think you said, socializing; is that

13   fair to say?

14   A.    Right there in the court, yes.

15   Q.    What does socializing mean to you?

16   A.    Talking.

17   Q.    Okay.  So you're talking where Mr. Purcell put

18   the sticker of the --

19   A.    Yes.  At the car.

20   Q.    And all these people are friends of yours,

21   right?

22   A.    Yes.

23   Q.    Kevin's a friend of yours, isn't he?

24   A.    Yes.

25   Q.    Kareem, before that day, would you call him a

RAIN CURTIS CROSS - PROCTOR

150

```
 1    friend?

 2    A.      Yes.

 3    Q.      Shameka's a friend?

 4    A.      Yes.

 5    Q.      Tamica's certainly a friend, right?

 6    A.      Yes.

 7    Q.      Shaquanda is a friend?

 8    A.      Yes.

 9    Q.      Ferl, is he a friend --

10    A.      Yes.

11    Q.      -- or someone you know?

12    A.      Yes.

13    Q.      He's a friend?

14    A.      Yes.

15    Q.      Seattle?

16    A.      Yes.

17    Q.      Are they friends like people you bump into; or

18    like buddies, you've known them for a long time?

19    A.      Some are and some aren't.

20    Q.      All right.  What about Kareem, which one is

21    he?

22    A.      Kareem is somebody I probably was closer to

23    when I was younger.  As the years grew on, he

24    wasn't -- I wasn't around, he wasn't around, whatever

25    the case might have been.
```

TONYA CURTIS - CROSS - PRONTTB

151

1    Q.      Okay.  So you're talking to your friends.  And

2    that's when your testimony is the shooting happened,

3    right?

4    A.      I'm sorry?

5    Q.      Your testimony was you were talking to your

6    friends and that's when the shooting happened?

7    A.      Yes.

8    Q.      Okay.  And if I can step back a minute.

9            What age are your children, ma'am?

10   A.      What age are they?

11   Q.      Yes.

12   A.      They are nine and seven.

13   Q.      So back then they were approximately seven and

14   five, something like that?

15   A.      Actually, my children are ten and eight.

16   Their birthdays are this month.  I'm sorry.

17   Q.      Okay.  So back then they were eight and six,

18   something like that?

19   A.      Yes, yes.

20   Q.      And let me get this right.  You were out with

21   your friend, buying marijuana at 10 o'clock on a

22   Sunday night while your kids are at home?

23   A.      Was it a Sunday?

24   Q.      Yeah.

25   A.      Oh.  Yes.

RAIN CURTIS CROSS-PROCTOR

```
 1     Q.      Did you have to go to work the next day?
 2     A.      No.  And my kids weren't at home; they were
 3   with my mother.
 4     Q.      Okay.  Were you working at that time?
 5     A.      No.
 6     Q.      So when the shooting happened -- and maybe
 7   I'll hold it up if that's okay with you.  Do you see
 8   on this picture where the shooting occurred?  Do you
 9   see on this picture where the shooting occurred?
10     A.      I do.
11             MR. PURCELL:  What exhibit?
12             MR. PROCTOR:  Oh, yes.  Exhibit No. 4,
13   government Exhibit No. 4.  And I'll just hold it up
14   like that.
15             Mr. Purcell, can you see?
16             MR. PURCELL:  Yes, I can.  Thank you.
17   BY MR. PROCTOR:
18     Q.      If you could just step up, please, ma'am.
19   When the shooting happened, where was -- the first
20   shot, I should say -- where was Kareem, roughly?
21     A.      Probably by the bush.
22     Q.      Right here?
23     A.      In that area, yes.
24             MR. PROCTOR:  And, Judge, so the record's
25   clear, this is the right-hand side, picture of a
```

HALL CURTIS - CROSS - PROCTOR

1    green bush in government Exhibit No. 4.

2              THE COURT:  Yes.  The record will so

3    reflect.

4    BY MR. PROCTOR:

5    Q.     And where is it your testimony that Mr. Hall

6    was?

7    A.     When -- at what point?

8    Q.     When the first shot was fired.

9    A.     To the left of that cement.

10   Q.     To the left of -- like --

11   A.     Over there.

12   Q.     That's a better idea.  I'll move it that way.

13   Why don't you point it out.

14   A.     Over here.

15   Q.     Okay.  So roughly here?

16   A.     Yeah.  And Kareem is on the cement walking

17   here.

18   Q.     Okay.  I thought you said by the bush.  You

19   mean by where the cement meets the bush?

20   A.     Of course, he wasn't in the grass.  He was

21   walking on the cement.

22   Q.     Okay.  So he was on the cement.  Mr. Hall,

23   it's your testimony, was around here?

24   A.     Yes.

25   Q.     Where was Big Kev?

DUJA CURTIS 107 CROSS - PROCTOR

1    A.      Right here.  Maybe five steps back in the

2    grass.

3    Q.      Okay.  Thank you.  So it's your testimony that

4    -- I'm sorry.  The grass, one more question.  The

5    grass on which side of the walk, where is Mr.

6    Duckett?

7    A.      The same side, on the left side, on this side

8    of the walkway.

9    Q.      So if you're Mr. Hall -- okay?  If you're Mr.

10   Hall, when the shots are fired, if I'm Kevin, am I

11   this far away?

12   A.      Yeah.

13           MR. PROCTOR:  So, Judge, five feet?

14           THE COURT:  Your estimate is as good as

15   mine, Mr. Proctor.  I'm not sure.  Three feet, four

16   feet.  I think the witness has indicated three or

17   four feet.

18   BY MR. PROCTOR:

19   Q.      Okay.  So Mr. Duckett is three or four feet

20   away behind and to the right of Mr. Hall at the time

21   the shots were fired?

22   A.      He would have been behind Mr. Hall to the

23   left.

24   Q.      To the left.  So --

25   A.      Yes.

155

1    Q.      Okay.  I got it.

2            And you are by the vehicle, right?

3    A.      Uh-huh, that's correct.

4    Q.      Who is -- let's take them one by one.

5    Shameka, where was she standing when the shots were

6    fired, or sitting?

7    A.      So far as I can remember, she was either

8    sitting in the truck or standing right at the pass --

9    at the driver door of the truck.

10   Q.      Okay.  Let me find that one, if I can have a

11   moment, Judge.

12           THE COURT:  All right.  Take your time.

13   BY MR. PROCTOR:

14   Q.      So this is government Exhibit No. 2 with Mr.

15   Purcell's high tech vehicle insertion.  Can you see

16   that, ma'am?

17   A.      I can.

18   Q.      And if you need to come down, feel free.

19           So are you -- where are you when the

20   shots are fired?

21   A.      Right where your pointing at the rear driver

22   door.

23   Q.      The rear -- so right here?

24   A.      Yes.

25   Q.      And are you on this side of the vehicle?

RAIN CURTIS - CROSS - PROCTOR

156

```
1     A.      Yes.
2     Q.      Yes.  And as best you can recall, where was
3     Shameka?
4     A.      At the driver.
5     Q.      So right here?
6     A.      Yes.
7     Q.      And the shooting was approximately over here?
8     A.      That's correct.
9     Q.      So it's fair to say Shameka was closer than
10    you?
11    A.      Correct.
12    Q.      Okay.  Where is Little Mike; where's Tamica?
13    A.      Standing outside the vehicle right by the gas
14    tank, where the gas tank would, by the wheel, the
15    rear wheel.
16    Q.      Right here?
17    A.      Yeah.
18    Q.      So she's within a foot or so of you?
19    A.      Yes.
20    Q.      Where's Shaquanda?
21    A.      Driver -- passenger.  I'm sorry.  Passenger
22    side.
23    Q.      Front passenger side?
24    A.      Uh-huh.
25    Q.      So she's closer to the shooting than you are?
```

MAIN CURTIS - CROSS - PROCTOR

157

```
 1    A.       That's correct.
 2    Q.       Where's -- and think Big Kev you say is two
 3    feet; he's obviously a lot closer to the shooting --
 4    A.       Yes.
 5    Q.       -- than you were?
 6             Where's Ferl, do you remember?
 7    A.       I don't.  I wasn't looking in the direction
 8    where Ferl was standing before the shooting occurred,
 9    so I don't know where he was.
10    Q.       Have I missed anyone, or is that everybody?
11    A.       No.  It was other people outside.  But as I
12    stated, I really wasn't looking around.  I was
13    looking in the direction that there was something
14    going on at.
15    Q.       Okay.  So is there anyone else that I haven't
16    mentioned that you recall being there at the time of
17    the shooting?
18    A.       When the shots first rang out, Roddy was
19    standing there.  But as soon as the shots fired, he
20    ran.
21    Q.       Where was Roddy?
22    A.       He was over towards the closed -- like on the
23    T.  You know, the clothes hangar thing.
24    Q.       Right --
25    A.       Yeah.
```

1      Q.      -- here?

2      A.      Yeah.

3      Q.      Okay.  So he's standing approximately where

4      this trash can is?

5      A.      He was approximately right there, right.

6      Q.      Okay.  I got you.  And what did you say

7      Kareem's last words were?

8      A.      "No, Mack".

9      Q.      And here's my question.  It sounds like at

10     least three people were standing closer to the shots

11     than you were, right?

12     A.      Yes.

13     Q.      So they ought to have heard that too, right?

14     A.      They heard the shots, yes.

15     Q.      They ought to have heard Kareem's last words?

16     A.      That's correct.

17     Q.      Did you -- did there come a time when you got

18     in the vehicle?

19     A.      Yes.

20     Q.      And was that after the shots, the first shots,

21     were fired?

22     A.      During at some point.

23     Q.      And you got in the rear passenger side?

24     A.      Correct.

25     Q.      Or the rear driver's side?

```
 1     A.      Yes.

 2     Q.      And Tamica also got in, right?

 3     A.      Yes.

 4     Q.      And then you got out?

 5     A.      Once Mack and Kevin got in.

 6     Q.      Okay.  What side did Mack get in, do you

 7     remember?

 8     A.      Passenger rear.

 9     Q.      Okay.  And what side did Kevin get in?

10     A.      The same.

11     Q.      And why did you get out?

12     A.      Why would I stay in?  I got out because I

13     wanted to.

14     Q.      Okay.  I think I heard you say you took off,

15     right?

16     A.      Uh-huh.  Yes.

17     Q.      And you ran -- I don't need to show you -- up

18     Maisel Court, back towards where your car was?

19     A.      That's correct.

20     Q.      And I think I heard you say that Kev -- Kareem

21     was a pretty good friend of yours, right?

22     A.      Yes.

23     Q.      So you left him there bleeding dying and took

24     off, right?

25     A.      I did.
```

1    Q.    You didn't call 911?

2    A.    I did not.

3    Q.    A couple more things.  I'm almost done, you'll

4    be pleased to know.

5              Do you recall a time when you saw Tamica

6    again?

7    A.    I do.

8    Q.    It was a couple of days after you were

9    released from jail; does that sound right?

10   A.    Yes.

11   Q.    And you saw her -- was it the U.S. Attorney's

12   Office or the courthouse?

13   A.    Yes.

14   Q.    Which one?

15   A.    Wherever I got released at.  The courthouse, I

16   guess.  Yeah.

17   Q.    Okay.  And you saw Tamica in a room?

18   A.    I guess.

19   Q.    And you were brought in by an agent, right?

20   A.    I was already there.

21   Q.    You were already --

22   A.    I was being released.

23   Q.    Right.  And you went in and you told her,

24   "Don't end up like me"; isn't that correct?

25   A.    Correct.

```
 1     Q.      Who told you to say that?

 2     A.      No one.

 3     Q.      Well, if I haven't seen my friend for four

 4     months and I walk into her room, the first thing I

 5     say to them is not, "Don't end up like me"; I say,

 6     "Hey, how you doing, what's up?"

 7     A.      Of course.  That was the first thing I said.

 8     Q.      Okay.  So what did you understand was your

 9     purpose in going in to talk to Tamica?

10     A.      That I was seeing her because I probably

11     wasn't going to see her again.

12     Q.      No one told you:  Hey, you got to tell her to

13     talk to us, or something like that?

14     A.      No, not necessarily, no.  I knew why she was

15     down there and I knew that she wasn't cooperating.

16     Put it like that.

17     Q.      Okay.  And who told you that?

18     A.      I was -- it was Mr. Purcell.

19     Q.      Okay.  So you knew she wasn't cooperating.

20     And she's your friend, so you didn't want her to end

21     up like you, right?

22     A.      Correct.

23     Q.      You didn't want her charged with perjury; you

24     didn't want her in an orange jump suit?

25     A.      That's correct.
```

RAIN CURTIS - CROSS - PROATER

162

```
1    Q.      Or is it blue?  I can never remember.
2            So one more thing before I forget.
3    Before the night Kareem got killed, had Detective
4    Moody ever pulled you over?
5    A.      Yes.
6    Q.      Tell me about that.
7    A.      I was -- I remember I was moving that day and
8    I had Tay in the car with me, Taglin.  And we had
9    just come from buying some marijuana.  And when we
10   turned the corner he pulled us over.
11   Q.      And what happened?
12   A.      And he told me that did I know who Tay was.
13   And I said:  Yeah.  And he said:  She wasn't a nice
14   person to be hanging around with, why was I with her.
15   Q.      What did you say?
16   A.      And I said she was my girlfriend and she was
17   helping me move.
18   Q.      And that's it?
19   A.      That was it.
20   Q.      Did --
21   A.      I think he might have asked her what was she
22   doing out there or something like what was she up to,
23   something like that.  He asked her a few questions,
24   but he didn't really have many questions for me.
25   They were on the passenger side talking to her.
```

1    Q.    Okay.  Did he write you a ticket?

2    A.    No.  I wasn't doing anything wrong.

3    Q.    But you had marijuana, right?

4    A.    I don't know if he knew that.

5    Q.    That's true.  It isn't a crime if they don't

6    know, right?

7    A.    Right.

8    Q.    So let me ask you this:  I'm not suggesting

9    you've been locked up a bunch, because you haven't.

10   But you've ran into cops quite a few times over the

11   years, right?

12   A.    I have ran into --

13   Q.    Ran into police officers, talked to police

14   officers, seen them on the street --

15   A.    Correct.

16   Q.    -- and said, "Hi"?

17   A.    I have.

18   Q.    Has anyone talked to you as disrespectfully as

19   Detective Moody?

20   A.    No.

21            MR. PROCTOR:  Thank you.  Can I have one

22   second, please?

23            THE COURT:  Sure.

24            MR. PROCTOR:  That's all we have.  Thank

25   you, Judge.

```
 1                    THE COURT:  Redirect.  Mr. Purcell?
 2                    REDIRECT EXAMINATION
 3       BY MR. PURCELL:
 4       Q.     It seems to be important to the defense that
 5       Detective Moody is disrespectful.
 6                    MR. PROCTOR:  Objection.
 7                    THE COURT:  Sustained.  Just rephrase the
 8       question.
 9                    MR. PURCELL:  Thank you.
10       BY MR. PURCELL:
11       Q.     Have any of your encounters with Detective
12       Moody caused you to come in here and implicate Mack,
13       probably your -- your lover at the time, as the
14       person who killed Kareem Guest?
15       A.     No.
16       Q.     That would be pretty silly, wouldn't it?
17                    MR. PROCTOR:  Objection.
18                    THE COURT:  Overruled.
19       BY MR. PURCELL:
20       Q.     What did you say?
21       A.     It would.
22       Q.     It would be, wouldn't it?
23       A.     Yes.
24       Q.     Let me ask you:  Who, of all the people that
25       were there that night, who was the last person that
```

165

1     you'd really want to implicate in this murder?

2                MR. PROCTOR:  Objection, Judge.

3                THE COURT:  I'm sorry.  What is the

4     question again?

5                MR. PURCELL:  Of all the people there

6     that night, who was the last person you'd want to

7     implicate in the murder if they didn't do it?

8                MR. PROCTOR:  Objection.

9                THE COURT:  Overruled.

10               THE WITNESS:  I don't understand the

11    question.

12    BY MR. PURCELL:

13    Q.     Of all the people who were there that night --

14    A.     Uh-huh.

15    Q.     -- is it correct there was only one with

16    whom -- with which you were having or with whom you

17    were having a relationship?

18    A.     That's correct.

19    Q.     And who was that?

20    A.     Mack.

21    Q.     Is there some reason about your relationship

22    that you decided to testify against him and possibly

23    put him in jail for the rest of his life?

24    A.     No.

25    Q.     Is there anything he could do to you that

1 would make you do that to him?

2     MR. PROCTOR:  Objection, Judge.

3     THE COURT:  Overruled.

4     THE WITNESS:  No.

5 BY MR. PURCELL:

6 Q. Is that what's happening here?  You're lying

7 about him to get back at him for something?

8 A. No.

9 Q. You were asked some questions about where Mr.

10 Duckett was that evening, Big Kev.

11 A. Yes.

12 Q. You know who I mean by Big Kev?

13 A. Yes.

14 Q. Do you know why they call him Big Kev or why

15 you call him Big Kev?

16 A. Because of his stature.

17 Q. How is his stature compared to Mr. Hall's

18 stature?

19 A. The opposite.

20 Q. What do you mean?

21 A. He is big and he's small.

22 Q. Could you ever mistake the two of them?

23 A. No.

24 Q. Kevin's really pretty big, isn't he?

25 A. Yes.

167

```
 1      Q.      And is there any doubt in your mind as to who
 2   was pulling the trigger when you saw Kareem being
 3   killed?
 4      A.      No.
 5                   MR. PROCTOR:  Objection.
 6                   THE COURT:  Overruled.
 7   BY MR. PURCELL:
 8      Q.      You may answer that question.
 9      A.      No.
10      Q.      Who was it?
11      A.      Mack.
12      Q.      Now, you were asked another question -- just
13   to direct your attention to it -- about the
14   confrontation that you had with Tamica.  And when I
15   say, "confrontation," I don't mean you had a
16   confrontation; I mean you were presented to her.  Do
17   you remember that?
18      A.      Yes.
19      Q.      Okay.  And if you remember, did it actually
20   happen in the U.S. Attorney's Office?
21      A.      I do.
22      Q.      Okay.  Not the -- you're in the courthouse
23   now.  Do you know the difference between where we
24   are?
25      A.      Something like that.  They all seem the same
```

RAIN CURTIS - REDIRECT / PURCELLI

168

1    to me.

2    Q.    It's all the same to you.  I understand.

3          It was in a government office --

4    A.    Yes.

5    Q.    -- right?

6    A.    Yes.

7    Q.    All right.  And you were in one of the

8    attorney offices and she was in a meeting room; is

9    that right?

10   A.    That's correct.

11   Q.    Okay.  With her attorney?

12   A.    That's correct.

13   Q.    About how long was it that you stood in front

14   of her and said whatever you said?

15   A.    Three minutes, if that.

16   Q.    Three minutes?

17   A.    Three to five minutes, yeah.

18   Q.    That long?

19   A.    Maybe.

20   Q.    Do you want to sit here for three to five

21   minutes and see if it was that long?

22             MR. PROCTOR:  Objection, Judge.

23             THE COURT:  Overruled.

24             THE WITNESS:  It wasn't very long.

25

BY MR. PURCELL:

Q.      Okay.  And during that period of time did you

have an opportunity to tell her:  Hey, Tamica, make

sure you tell them that it was Mack.  Did you have an

opportunity to tell her anything about your

testimony?

A.      No.

Q.      Or about anything about what you told us, that

is, told the government about who committed this

murder?

A.      I did not.

Q.      Were you ever alone with her in the room?

A.      I was not.

Q.      You know what I'm asking you.  I'm asking you:

Did you tell Tamica what to say?

A.      I did not.

Q.      What did you tell her to do?

A.      Look out for her kids; worry about herself.

Q.      Did you tell her to tell the truth?

A.      Yes.

Q.      Counsel asked you something about the use of

the term, "they," in the transcript.  And when you

were talking to Hershel, "They killed that boy out

there; they killed Kareem".  Whatever it was.  I'm

paraphrasing but I'm not paraphrasing the use of the

```
1      word, 'they,' as was pointed out.
2                  Did you mean it to say that there was
3      more than one person that killed Kareem?
4      A.      No.
5      Q.      How many people killed Kareem?
6      A.      One.
7      Q.      And who was it?
8      A.      Mack.
9      Q.      So you don't want to tell us it was somebody
10     else and you're just in here --
11                 MR. PROCTOR:  Objection, Judge.
12                 THE COURT:  Sustained.
13                 MR. PURCELL:  Are you sure it was Mack?
14                 MR. PROCTOR:  Objection.
15                 THE COURT:  Overruled.
16     BY MR. PURCELL:
17     Q.      You may answer that question.  The question
18     is:  Are you sure it was Mack?
19     A.      I am.
20                 MR. PURCELL:  Thank you.  I have no
21     further questions.
22                 MR. PROCTOR:  Can I have a couple of
23     follow-up?
24                 THE COURT:  Sure.  Just on the topic of
25     redirect.
```

1          MR. PROCTOR:  Of course.

2                    RECROSS-EXAMINATION

3     BY MR. PROCTOR:

4     Q.     Mr. Purcell asked you:  Did you tell Tamica

5     what you said that day in the U.S. Attorney's Office.

6     Do you recall that?

7     A.     Ask the question again?

8     Q.     Do you recall Mr. Purcell just a minute or two

9     ago asking you did you tell Tamica what you said or

10    anything like that?

11    A.     Yes.

12    Q.     But isn't it true that before you were

13    incarcerated you and Tamica regularly discussed the

14    stories you had given?

15    A.     Not regularly, no.

16    Q.     Okay.  How many times?

17    A.     Once.

18    Q.     And you said, "This is what I said," and she

19    said, "I said the same thing"?

20    A.     Exactly.

21                    MR. PROCTOR:  That's all I have.

22                    THE COURT:  Thank you very much, Miss

23    Curtis.  You may step down.  You should not discuss

24    your testimony with anyone until this trial concludes

25    in the event that you're called back to the witness

172

```
1     stand.  Thank you very much.
2                 MR. PURCELL:  The government calls Kevin
3     Duckett.  We're calling this witness out of order,
4     Your Honor, for logistical reasons.  Just trying to
5     get the witness finished today.
6                 THE COURT:  That's fine.
7     Whereupon:
8                      KEVIN DUCKETT,
9     called as a witness, having been first duly sworn
10    according to law, testified as follows:
11                THE DEPUTY CLERK:  State your full name
12    for the record.  Keep your voice up, please.
13                THE WITNESS:  Kevin Duckett.
14                THE DEPUTY CLERK:  Spell your last name,
15    please.
16                THE WITNESS:  D-u-c-k-e-t-t.
17                THE DEPUTY CLERK:  Thank you.  Move up to
18    the microphone please, Mr. Duckett.  Thank you.
19                     DIRECT EXAMINATION
20    BY MR. PURCELL:
21    Q.    Please state your name again, please.
22    A.    Kevin Duckett.
23    Q.    And do you have a nickname, Mr. Duckett?
24    A.    Yes.
25    Q.    What is it?
```

1    A.    Big Kev.

2    Q.    How tall are you, sir?

3    A.    Six-three.

4    Q.    Would you step out of the witness box for a

5    second and just let the jury see you standing up.

6    Okay.

7              Thank you very much, sir.

8              How old are you, Mr. Duckett?

9    A.    28.

10   Q.    Do you have any children?

11   A.    Yes.

12             THE COURT:  You'll need to lean forward,

13   sir, so we can hear you on the microphone.  Thank

14   you.

15             THE WITNESS:  Three.

16   BY MR. PURCELL:

17   Q.    And I understand you recently had the third?

18   A.    Yes.

19   Q.    You and your girlfriend?

20   A.    Yes.

21   Q.    And how old is your oldest child?

22   A.    Five.

23   Q.    And the middle child?  I might as well ask

24   while I'm asking.

25   A.    Three.

1  Q.    Three.  Now, where were you living back in

2  September of 2009?

3         Let me direct your attention.  Do you

4  remember when Kareem was killed?

5  A.    Yeah.

6  Q.    At that time -- for the record, I think we've

7  shown it was September 20th, 2009 -- where were you

8  living at that time?

9  A.    Brooklyn.

10  Q.    Where?

11  A.    Brooklyn.

12  Q.    Brooklyn.  In Anne Arundel County or

13  Baltimore?  Still in Baltimore?

14  A.    Still in Baltimore.

15  Q.    Would you say south Baltimore?

16  A.    Yeah.

17  Q.    Now, do you know the defendant in this case,

18  Mr. Hall --

19  A.    Yes.

20  Q.    -- also known as Mack?  Would you point to

21  him, please, if you see him?

22         THE COURT:  The record will reflect the

23  witness has pointed out the defendant, Antonio Hall.

24  BY MR. PURCELL:

25  Q.    And how long have you known Mr. Hall?

KEVIN PICKETT - DIRECT - PURCELL

175

```
1    A.      All my life.

2    Q.      All your life.  And you're 28.  Where do you

3    know him from?

4    A.      The neighborhood.

5    Q.      What neighborhood is that?

6    A.      Westport.

7    Q.      Do you hang out in Westport?

8    A.      Yes.

9    Q.      Now, you and I have talked, I guess, on a

10   couple of occasions.  And you've been to the grand

11   jury, the federal grand jury, and testified before

12   the grand jury; is that right?

13   A.      Yes.

14   Q.      And you did that on two occasions; is that

15   right?

16   A.      Yes.

17   Q.      I'm going to present you the copies of that.

18   And this is just for identification at this point,

19   government's 178 and -- actually 177.

20           And do you remember coming to the grand

21   jury?

22   A.      Yes.

23   Q.      Okay.  And would it be correct to say, look at

24   this if you need to review that, but the first time

25   was October 28th, 2010; is that right?
```

1    A.      I guess.  I ain't sure of the dates.

2    Q.      And -- but the transcript shows that to be the

3    date; is that right?

4    A.      Yes.

5    Q.      Okay.  And the second time was in February

6    2011 earlier this year?  Do you remember I asked you

7    about the Martie Williams case?

8    A.      Yeah.

9    Q.      Is that a, "Yes"?

10   A.      Yes.

11   Q.      I'll just leave those there in case we need

12   them.

13           Now, can you tell the jury, while you

14   were living in Westport back in 2009 and probably

15   back in 2008 and 2007, 2006, if you weren't in jail,

16   how was it that you made a living, made money?

17   A.      Selling drugs.

18   Q.      What drugs did you sell?

19   A.      Crack.

20   Q.      What else?

21   A.      Heroin.

22   Q.      Now, do you know from your own personal

23   experience and from your observation what Mr. Hall

24   did for a living back in those years?  That is,

25   before the murder of Mr. Guest?  And I guess even

KEVIN DUCKETT - DIRECT - PURCELL

177

```
1    after that for a couple months.  What did he do for a
2    living?
3    A.      Selling drugs.
4    Q.      What drugs did he sell?
5    A.      Crack.
6    Q.      Now, Mr. Duckett, were there ever any times
7    that you and Mr. Hall were selling crack in the same
8    places or the same parts of Westport?
9    A.      Yeah.
10   Q.      So you saw him conducting sales?
11   A.      Yes.
12   Q.      Were there ever any times when you and Mr.
13   Hall put your money together to buy drugs?
14   A.      Yes.
15   Q.      And can you tell the jury how often that would
16   happen?  How often would you guys combine to buy
17   drugs; that is, cocaine particularly?
18   A.      I guess like once a week, give or take.
19   Q.      And did you have a person you went to to get
20   the cocaine from?
21   A.      I mean, I just give him my money.  I don't
22   know who he was going to.
23   Q.      Okay.  Who would you give the money to to get
24   the supply that you needed or the amount that you
25   wanted?
```

1    A.      Mack.

2    Q.      You mean the defendant?

3    A.      Uh-huh.

4    Q.      And can you tell the jury -- I know we've

5    talked about this.  But can you tell the jury,

6    please, it wasn't the same amount all the time, was

7    it?

8    A.      No.

9    Q.      What amounts of drugs would you typically buy

10   maybe once a week when you were buying cocaine?

11   A.      Man, it just varied.  Whatever we could get

12   our hands on.

13   Q.      Okay.  Well, I'm going to ask you to be a bit

14   more precise and give us some examples of amounts

15   that you would buy.  Did you ever, for instance, put

16   your money together and buy a kilo, a thousand grams,

17   a brick?

18   A.      Yeah, I guess.

19   Q.      Is that a, "Yes"?

20   A.      Uh-huh.

21   Q.      Is that more than once?

22   A.      I don't remember.  I don't remember.

23   Q.      Are you sure you don't remember?

24           MR. PROCTOR:  Objection.

25           THE COURT:  Overrule -- sustained.

```
 1          Sustained.

 2     BY MR. PURCELL:

 3     Q.      Do you remember buying kilos more than once?

 4     A.      Yes.

 5     Q.      With Mack?

 6     A.      Yes.

 7     Q.      When you bought kilos of cocaine, can you tell

 8     the jury, did you sell it as cocaine or was it sold

 9     as crack cocaine?

10     A.      Crack.

11     Q.      Where did you cook it?  Or give us some

12     examples of places that you and he would cook crack

13     cocaine.

14               MR. PROCTOR:  Objection.

15               THE COURT:  Overruled.

16     BY MR. PURCELL:

17     Q.      Thank you.  Go ahead.

18     A.      At Mama house.

19     Q.      As whose house?

20     A.      Mama.

21     Q.      Mama.  Is that one of the places you'd do it?

22     And you've seen Mr. Hall cook or --

23               MR. PROCTOR:  Objection.

24               THE COURT:  Overruled.

25               MR. PROCTOR:  602, Your Honor.
```

1          THE COURT:  Approach the bench, please.

2          (BENCH CONFERENCE ON THE RECORD.)

3          THE COURT:  602; did someone say 602?

4   You mean lack of personal knowledge?

5          MR. PROCTOR:  Assumes facts not in

6   evidence.  He just said, "Where did you see Mr. Hall

7   cook it".  He never said he saw Mr. Hall cook it.

8          THE COURT:  Clearly he's established that

9   Mr. Duckett has knowledge.  Duckett has said he dealt

10  in drugs with Mr. Hall.  And if the basis of it is

11  under Rule 602, lack of personal knowledge, it's

12  overruled -- I mean, it's overruled.  You can

13  certainly lay the foundation, if you will, Mr.

14  Purcell, in terms of what he did or didn't do with

15  Mr. Hall.

16          MR. PROCTOR:  Judge, the whole tenor of

17  this direct so far has been two- or three-sentence

18  questions with "Yes" replies.  I'm just asking

19  that --

20          THE COURT:  Well, I think, generally when

21  you have a witness that's going:  Yes, no, yes, no.

22  It's a pretty good indication they're leading

23  questions.  So why don't you just rephrase the

24  questions and ask what the relationship was to

25  whatever extent and what he did and didn't do.

1          MR. PURCELL:  I just want to note for the

2    record -- and I think it's obvious to all of us

3    here -- that he's very conflicted.

4          THE COURT:  Under Rule 607 you're allowed

5    to challenge him and impeach him, if necessary.

6    You're welcome to challenge him on it.  But the

7    bottom line is that, Mr. Proctor, he's clearly

8    testified as to a relationship of dealing in drugs

9    with Mr. Hall, and that's perfectly clear.  So it's

10   not a 602 objection in terms of lack of personal

11   knowledge.  But you can rephrase the question, Mr.

12   Purcell.

13         MR. PURCELL:  Because of that point, just

14   to clarify, I don't want to lead him, but to that

15   point to the extent that the Court's observed that he

16   is such a difficult witness that -- and I may have to

17   go after him that as I just did.

18         THE COURT:  In terms of trying to get

19   specificity of drug amount, though, I don't really

20   expect him to have great knowledge and recollection

21   as to drug amounts.  So you can't put words in his

22   mouth.  We'll see if he does or doesn't recall.

23         MR. PURCELL:  I know that he knows about

24   what a brick is.

25         THE COURT:  Well, if there's grand jury

1    testimony that you want to confront him with under

2    612, you can do that.

3              MR. PROCTOR:  I understand.

4              (JURY IN.)

5              THE COURT:  I'm sorry, I meant, 613, not

6    612.

7              Go ahead, Mr. Purcell.

8    BY MR. PURCELL:

9    Q.    Just to clarify something, sir.  A brick is

10    how much cocaine?

11    A.    36 ounces.

12    Q.    How many grams, do you know?

13    A.    A thousand grams.

14    Q.    36 ounces, did you say?

15    A.    Yes.

16    Q.    Now, Mr. Duckett, it is important that you

17    speak so that the jury can hear you; okay?  I'm

18    asking you to do that.

19              Now, I asked you:  Do you know places --

20    and maybe I asked it incorrectly.  Let me ask you --

21    sort of backtrack a little bit.

22              To your knowledge, does Mr. Hall know how

23    to cook crack?

24    A.    I don't know if he know how to do it.

25    Q.    Did you ever see him cook crack?

```
1    A.      No.

2    Q.      Have you seen him at Mama's that you've

3    mentioned, where somebody else cooked it for him?

4    A.      Yeah.

5    Q.      And can you tell the jury some of the people

6    that you know cooked crack for Mr. Hall?

7    A.      Linnard.

8    Q.      Is that Linnard, you said?

9    A.      Yeah.

10   Q.      Did you ever cook crack for Mr. Hall; that is,

11   get the brick or whatever it was, the amount you were

12   buying, and cook it and split it up that way?

13   A.      Not that I can remember.

14   Q.      You'd cook your own?

15   A.      No.  I mean, sometimes.  But --

16   Q.      You knew how to, right?

17   A.      Yeah.

18   Q.      If you didn't, could you get somebody -- is it

19   hard to find somebody who can do it for you if don't

20   know how to do it?

21   A.      Is it hard?

22   Q.      Yeah.  Is it hard to find somebody to do it

23   for you; that is, to cook?

24   A.      Yeah.

25   Q.      Are there people out there, for instance, in
```

KEVIN DICKETTS - DIRECT - PURCELL

184

```
1    Westport, though, that you can go to and give them an
2    amount of cocaine and ask them to cook it for you?
3    A.      Yeah.
4    Q.      Now, when you sold -- and I'm asking you about
5    the time that you know about Mr. Hall.  When the
6    cocaine was sold, how did you observe Mr. Hall was
7    selling it?
8            And what I mean is:  Did he sell it on
9    the corners himself; did he have other people sell it
10   with him or for him?  How would that go down?
11   A.      Both.
12   Q.      Both.  So you saw him do sales?
13           And could you describe to the jury how
14   sales that you saw Mr. Hall conduct went down in
15   Westport.  How would it happen?  If I'm a person who
16   wants crack, how would I approach Mr. Hall?  Based on
17   your observations.
18   A.      A car would pull up and say what they want.
19   Q.      A call?
20   A.      A car.
21   Q.      A car would pull up.  And would these
22   transactions take very long?
23   A.      No.
24   Q.      And could you tell the jury, please, what
25   amounts that -- you know, I'm not interested in your
```

1    sales at this moment, maybe never.  But Mr. Hall's

2    sales, what quantities would he sell to these people

3    who wanted crack cocaine?

4    A.    I don't know.

5    Q.    Well, how was it packaged, were they dimes,

6    nickels, quarters?

7                 MR. PROCTOR:  Objection, Judge.

8                 THE COURT:  Sustained.

9                 MR. PURCELL:  What was the amount of

10   price per a unit of sale?

11                MR. PROCTOR:  Objection.

12                THE COURT:  Sustained.

13   BY MR. PURCELL:

14   Q.    Do you know, when these street sales are being

15   conducted -- sometimes these are hard questions to

16   ask.  When these street sales are being conducted,

17   how much money was being taken from the customer if

18   they wanted just one pill or vial, or whatever it was

19   that was being used?

20   A.    I guess it depends on how many they wanted.

21   Q.    On how many they want.  What if they just

22   wanted one?

23   A.    Ten dollars.

24   Q.    Ten dollars.  Can you tell us, based on your

25   observation, just how did the drugs that Mr. Hall

1      typically sell (sic), how were they packaged?  Are we

2      talking about jell caps or bags or what?  You tell

3      us.

4                   MR. PROCTOR:  Objection.

5                   THE COURT:  Overruled.

6                   THE WITNESS:  Bags.

7      BY MR. PURCELL:

8      Q.     Bags.  Little tiny bags?

9             I'm not going to state the obvious.  But

10     Mr. Duckett, you're not really happy being here

11     today, are you?

12     A.     No.

13     Q.     And you understand your obligation to tell the

14     truth, do you not?

15     A.     I understand.

16                  MR. PURCELL:  I'm sorry, Your Honor.  I'm

17     just going to check my notes as I go along.

18                  THE COURT:  Take your time.

19     BY MR. PURCELL:

20     Q.     Did you know Kareem Guest?

21     A.     Yes.

22     Q.     How well did you know him?

23     A.     I knew him well.

24     Q.     Do you know his family?

25     A.     Yes.

187

```
 1     Q.      Do you know his mom?

 2     A.      Yes.

 3     Q.      Do you know where he lived when he was home?

 4     A.      Yeah.

 5     Q.      Where did he live?

 6     A.      With his mom.

 7     Q.      Do you know where that was?

 8     A.      Yeah.

 9     Q.      Where was it?

10     A.      By the school.

11     Q.      What street, do you remember?

12     A.      I don't know.

13     Q.      Do you know Martie Williams?

14     A.      Yeah.

15     Q.      Was it anywhere near Martie Williams, the

16     place where he hung out?

17     A.      Yeah.

18     Q.      Was it anywhere near the place where Martie

19     Williams was killed?

20     A.      Yeah.

21     Q.      We'll talk about that in a few minutes.  I

22     know you're looking forward to that.

23             Now, Mr. Duckett, you understand you're

24     here to answer some questions about the murder of

25     Kareem Guest.  Do you understand that?
```

KEVIN PICKETT - DIRECT - PURCELL

188

```
 1    A.      Yeah.

 2    Q.      Do you know who killed Kareem Guest?

 3    A.      Yeah.

 4    Q.      Who was it that killed Kareem Guest?

 5    A.      Mack.

 6    Q.      Were you there?

 7    A.      Yeah.

 8    Q.      Did you kill him?

 9    A.      No.

10    Q.      Do you know why Mr. Hall killed Mr. Guest?

11    A.      Because he mentioned his name.

12    Q.      Where?

13    A.      It was in some papers.

14    Q.      Did you see those papers?

15    A.      Yeah.

16    Q.      When did you first see them?

17    A.      I don't remember.

18    Q.      Was it -- obviously before Kareem was killed.

19    But was it sometime that summer?

20    A.      I don't remember when I seen them.

21    Q.      All right.  Do you remember where you were

22    when you first saw them?

23    A.      No.

24    Q.      Do you remember who had them when you first

25    saw them?
```

KEVIN PICKETT - DIRECT - PURCELL

189

```
 1        A.      No.

 2        Q.      In addition to Kareem's papers, did you see

 3   them?

 4        A.      Yeah.

 5        Q.      You did?  That is the report that he talked

 6   about Mack in it?  Did you see where he spoke about

 7   Mack?

 8        A.      Yeah.

 9        Q.      Or they wrote about Mack.  Did he name you?

10        A.      No.

11        Q.      He didn't, did he?

12                Did he name Black?

13        A.      Yeah.

14        Q.      And who is Black?

15        A.      Somebody from the neighborhood.

16        Q.      Did he name Monster?

17        A.      I ain't sure.

18        Q.      Do you know who Monster is?

19        A.      Yeah.

20        Q.      Neighborhood guy?

21        A.      (Nodding.)

22        Q.      Do you know where he is now?

23        A.      No.

24        Q.      Do you know he's in prison?  Where he's at,

25   right?
```

```
1              I'm going to ask you to tell us how it is

2    that you came to be in a position to see what

3    happened to Kareem Guest on the night of his death.

4    How did you end up being on Maisel Court that night,

5    Mr. Duckett?

6    A.    Rode with Meka over there.

7    Q.    And who is Meka?

8    A.    Somebody from the neighborhood.

9    Q.    Is that Shameka Ross; is that correct?

10   A.    Yeah.

11   Q.    Now, why don't you tell this jury -- you've

12   already told the grand jury this; is that correct?

13   A.    Yes.

14   Q.    All right.  But this jury doesn't know, so you

15   have to tell them; understand?

16             All right.  How did it come that you were

17   with Shameka that night and went over there?  Just

18   tell the jury why you were together and what you were

19   doing.

20   A.    We was about to take a ride up to Walmart or

21   something.  And she got a phone call to meet somebody

22   over there.

23   Q.    Did you remember what it was about the phone

24   call that she received?  Was it about a family member

25   or do you know what it was about at all?
```

1    A.    Something about her niece was fighting or

2    something.

3    Q.    And so where did you go or where did she drive

4    as a result of that phone call?

5    A.    Maisel Court.

6    Q.    To where?

7    A.    Maisel Court.

8    Q.    Did you have any idea before you got into that

9    car that this evening was going to end with the death

10    of Kareem Guest?

11    A.    No.

12    Q.    Are you sure?

13    A.    Positive.

14    Q.    So when you got to Maisel Court, tell the jury

15    where she parked or what she did with that car.

16    A.    She parked right there where the truck got on

17    the board.

18    Q.    Okay.  And you're looking at Exhibit No. 2.

19    And do you see the car that's already pinned up to

20    Exhibit No. 2?

21    A.    Yeah.

22    Q.    By the way, what kind of car does Shameka

23    have?

24    A.    An Acura.

25    Q.    Is that little stick on there accurate to

1    depict the sort of car she had, an Acura SUV?

2    A.    Yes.

3    Q.    Now, when you were in her car going over

4    there, where were you seated?

5    A.    In the passenger seat.

6    Q.    Front passenger?  And can you tell the jury

7    what happened when you got there?  What did you do

8    when you arrived there?

9    A.    Got out the car and talked to Mack.

10   Q.    Mack was there already?

11   A.    Yeah.

12   Q.    You mean the defendant.  Now, as you were

13   arriving at Maisel, did you have occasion to see

14   Kareem Guest at that point?

15   A.    Yes.

16   Q.    Where did you see him?

17   A.    At the beginning of Maisel.

18   Q.    At the beginning of Maisel.  And if you would

19   put up the aerial, please, that we've been using,

20   which is the smaller version of Exhibit 1.

21          When we say the beginning of the Maisel,

22   I'm just going to -- do you see the red dot?  Do you

23   see the "G"?  Do you recognize that area there?

24          What area is that?

25   A.    That's where the car was parked at.

KEVIN PICKETT - DIRECT - PURCELL

```
 1      Q.      Okay.  Now, take a look at the exhibit that's

 2      just in front of you, which is Exhibit No. 4.  And

 3      does that exhibit show also where the car was parked?

 4      A.      Yes.

 5      Q.      And is the car -- was it pointed nose down,

 6      that is, driver's or front pointed towards Annor

 7      Court?

 8      A.      Yes.

 9      Q.      As it is on the picture below the poster?

10      Okay.

11              So where did you see Kareem when you

12      first arrived on Maisel?

13              How did you get there?  Did you come from

14      Annor?  Did you come from Norfolk?  How did you

15      arrive?

16      A.      Annor.

17      Q.      I'm going -- did you go up?

18      A.      Yes.

19      Q.      I'm going to start going up.  Just tell me

20      where to stop when you first saw Kareem.

21      A.      Right there.

22      Q.      What was he doing?

23      A.      Talking to somebody.

24      Q.      Were they male or female, if you can remember?

25      A.      I think both.
```

194

```
1    Q.      Okay.  Do you remember Donnell; do you know
2    Donnell?
3                  MR. PROCTOR:  Objection, Judge.
4                  THE COURT:  Sustained.
5    BY MR. PURCELL:
6    Q.      Okay.  Do you know -- can you tell us if you
7    know who the male was that he was with?
8    A.      Donnell.
9    Q.      Do you know Donnell, as well?
10   A.      Yeah.
11   Q.      Okay.  Now, the jury's heard something about
12   his mother.  Who is Donnell's mother?
13   A.      Trina.
14   Q.      And just to -- you mean, Miss Trina?
15   A.      Yeah.
16   Q.      Okay.  And you was telling us he was going up
17   Maisel.  Did she live on Maisel?
18   A.      Yeah.
19   Q.      Can you tell me when to stop when I'm pretty
20   much there?
21   A.      Right there.
22   Q.      Right about here.  When you saw Kareem, it was
23   at the bottom, for the record, near -- closer to
24   Annor Court?
25   A.      Yeah.
```

1    Q.    Is that right?

2    A.    Yeah.

3    Q.    And you guys parked pretty much near to the

4    fire hydrant at that point as you got out?

5    A.    Yeah.

6    Q.    When you got out, did you see Mack there?

7    A.    Yeah.

8    Q.    Now, did you stay there?  Or what did you do

9    when you get out of the car?  Did you go anywhere

10   else?

11   A.    Who, me?

12   Q.    Yeah.

13   A.    I went and used the bathroom.

14   Q.    Now, before you went to use the bathroom and

15   you were talking to Mack, do you know whether Mack

16   had spotted Kareem at the end of the street?

17   A.    Yeah.

18   Q.    How do you know?

19   A.    Because he said -- he asked me did I see

20   Kareem standing right there.

21   Q.    And what did he say about that?

22   A.    He about to smash him.

23   Q.    Mack said he was going to smash him?

24   A.    Yeah.

25   Q.    Now, what did you understand that to mean?  He

1    was going to go and start a fistfight with him?

2    A.    No.

3    Q.    What did you understand that to mean?

4    A.    He going to kill him.

5    Q.    You've heard Mack say that before?

6    A.    Yeah.

7    Q.    Use the word, "smash"?

8    A.    Yeah.

9    Q.    Now, after he told you this, do you have any

10   conversation with him about whether it was a good

11   thing to do or a bad thing to do in terms of smashing

12   Kareem?

13   A.    I told him, "Don't do it".

14   Q.    Why?

15   A.    Because it was too many people out there.

16   Q.    Now, did you suggest anything else about maybe

17   have somebody else doing it?

18   A.    Yeah.

19   Q.    What did you say?

20   A.    "Let somebody else do it".

21   Q.    Did you use a term, a street term for carrying

22   out some sort of mission?

23   A.    I said, "Let somebody else put some work in".

24   Q.    "Put some work in".

25   A.    Yeah.

```
 1    Q.      What was Mr. Hall's response to that?

 2    A.      "I'm about to kill him".

 3    Q.      I'm sorry.  What?

 4    A.      "I'm about to kill him".

 5            "I'm about to kill him".

 6    Q.      "I'm about to kill him"?  "I'm about to kill

 7    him".

 8            So how much longer, then, did you say

 9    there talking to Mack before you went to the

10    bathroom?

11    A.      I ain't sure.

12    Q.      Did you at some point leave and go to the

13    bathroom?

14    A.      Yeah.

15    Q.      Now, when you left and went to the bathroom,

16    do you know if the girls -- let me ask you to step

17    back for a second.

18            While you were there, did you see another

19    young woman that you know from the neighborhood

20    arrive and talk to Shameka?

21    A.      I don't know.

22    Q.      Do you know a woman named Shaquanda?

23    A.      Yeah.

24    Q.      Did you see her that night?

25    A.      Yeah.
```

```
 1      Q.      Where was she?

 2      A.      In the car with me.

 3      Q.      Okay.  Did she go over there with you?

 4      A.      No.

 5      Q.      Okay.  Where did you meet with her?  Did you

 6      pick her up somewhere along the way?

 7      A.      No.

 8      Q.      So where did she first arrive in this car?

 9      A.      She just popped up over there.

10      Q.      On Maisel?

11      A.      Yeah.

12      Q.      Now, let me ask you this, I should have been a

13      bit more precise.  But Mack was saying to you,

14      "There's Kareem and I'm about to kill him," can you

15      show us on Exhibit No. 4 or Exhibit No. 3 -- I'll

16      just present this one to you first.  I'm going to use

17      counsel's method.

18              Can you see -- if this picture shows the

19      place where that conversation occurred, point to it,

20      please.

21              In this grassy area?

22      A.      Uh-huh.

23      Q.      Now, while we're looking at this government

24      Exhibit 3 -- counsel, I'm sorry.

25              MR. PROCTOR:  That's fine; that's fine.
```

1    BY MR. PURCELL:

2    Q.    While we're looking at this, when you went you

3    off to use the bathroom, could you just show the jury

4    where -- what direction you went and where you went?

5    A.    Up there.

6    Q.    Up the steps?

7    A.    Yeah.

8    Q.    Did you go to a particular woman's house?

9    Because they may know who you're talking about;

10   they've heard other testimony.

11   A.    Yeah.

12   Q.    Whose house was it?

13   A.    Shameka.

14   Q.    Shameka.  And she lives on what street or

15   court?

16   A.    Kermit.

17   Q.    Does she still live there?

18   A.    I don't know.

19   Q.    So about how long were you gone?

20   A.    Not too long.

21   Q.    Now, when you came back, can you tell us if

22   you ran into anybody you know that was on the steps

23   up there?

24   A.    Seattle.

25   Q.    Who else?  Anybody else you remember?

```
 1     A.      And Avery.

 2     Q.      Avery.  Do you know a guy named Keyburn?

 3     A.      Yeah.

 4     Q.      Now, can you tell the jury -- they don't know

 5     him.  Can you tell the jury what condition Keyburn

 6     was in the night of this murder in terms of his

 7     physical abilities?

 8     A.      Paralyzed.

 9     Q.      Was he in a wheelchair?

10     A.      Yeah.

11     Q.      And do you remember seeing him on Maisel Court

12     in the same area that evening?

13     A.      Yeah.

14     Q.      Where was he?

15     A.      I don't remember exactly where he was at.

16     Q.      Would it be correct to say he was somewhere in

17     this general -- between the two curbs?

18     A.      Yes.

19     Q.      Did you see Ferl?

20     A.      Yes.

21     Q.      Do you know who I'm talking about?

22     A.      Yes.

23     Q.      Is that Jamal Howard?

24     A.      Yeah.

25     Q.      I'll talk about him in a minute.
```

1            Now, when you came back from the
2    bathroom, were Shameka -- was the car still there?
3    A.      It was gone.
4    Q.      It was gone.  Did there come a point when it
5    came back?
6    A.      Yeah.
7    Q.      And when they came back, did anybody in the
8    car give you anything?
9    A.      No.
10   Q.      Did they have anything?
11   A.      No.  They had food.
12   Q.      Pardon?
13   A.      They had food.
14   Q.      Food.  For or drinks?  Food?
15   A.      Yeah.
16   Q.      Where did they park in relation to where they
17   had been before?
18   A.      The same spot.
19   Q.      You say the same spot?
20   A.      Yeah.
21   Q.      I should be over there so they can hear.
22           Now, when you came back to the bathroom,
23   where was Mack?  Did you join him again?
24   A.      Yes.
25   Q.      Where did you join up with him again?

1    A.      Basically the same spot.

2    Q.      The same spot.  Now, did there come a point --

3    you say the car came back, right?  Did there come a

4    point -- and the car was -- for the record, let's use

5    Exhibit No. 4.  Just point for the jury where you saw

6    the car when it came back; that is, Shameka's car.

7                A little bit above the fire hydrant?

8                Now, can you tell the jury if at any

9    point that evening you observed Mack with a gun?

10   A.      Yeah.

11   Q.      And when did you see -- when did you first see

12   Mack obtain or have a gun in his possession?

13   A.      When he got it.

14   Q.      When he got it?

15   A.      Yeah.

16   Q.      Who gave it to him?

17   A.      Ferl.

18   Q.      Ferl.  Can you tell the jury -- can you step

19   down for a second, please, and approach the exhibit?

20   It might be easier for the jury.  Can you come over

21   here, please?

22                Is that all right, Your Honor?

23                THE COURT:  That's fine.

24   BY MR. PURCELL:

25   Q.      Do you know how to use a laser pointer?

```
1    A.     No.

2    Q.     Is it correct that the car was basically here?

3    A.     Yeah.

4    Q.     Just tell the jury where it was that you

5    observed Ferl give Mack a gun.

6    A.     Over there in that area.

7    Q.     Over here?

8    A.     Yeah.

9    Q.     And tell the jury what happened, please.  What

10   did you observe?

11   A.     Mack got the gun.

12   Q.     Where did Ferl come with the gun?  Did he come

13   up Maisel?  Where did you see him approach Mack from?

14   A.     From this side.

15   Q.     Okay.  Somewhere on Wilgrey, that area?

16   Around the back of Maisel?

17   A.     Yeah.

18   Q.     And where were you in relation to Mack and

19   Ferl when Ferl gave Mack the gun?

20   A.     Right there beside him.

21   Q.     So you were there and you saw the gun being

22   handed --

23   A.     Yeah.

24   Q.     -- to him?  Can you describe the type of gun

25   it is?  What I mean is:  Was it a revolver or like a
```

1     nine Glock semiautomatic type of gun?

2     A.     An automatic.

3     Q.     An automatic?

4     A.     Yes.

5     Q.     That is with the bullets that go into the

6     handle?

7     A.     Yeah.

8     Q.     And what did Mack do with the gun after Ferl

9     gave it to him?

10    A.     Cocked it back.

11    Q.     What happened when he cocked it?

12    A.     A bullet fell out.

13    Q.     What did you guys do after the bullet fell

14    out?

15    A.     Tried to find it.

16    Q.     Can you describe to the jury how you and Mack

17    and Ferl went about trying to find this bullet.

18    A.     Just looking for it in the grass.

19    Q.     Did anybody crouch down or get on their knees

20    or anything like that?

21    A.     No.

22    Q.     What did you do?

23    A.     I just was bending down.

24    Q.     And did you find it?

25    A.     No.

```
 1    Q.      And did Mack keep the gun after it was given

 2    to him by Ferl?

 3    A.      Yeah.

 4    Q.      Did you ever touch the gun?

 5    A.      No.

 6    Q.      You can take the seat, please, sir.  Thank

 7    you.

 8                 After Mr. Hall obtained the gun from

 9    Ferl, where did you and he -- where did you and he go

10    or where were you after that?

11    A.      Right back where we started off at.

12    Q.      That would be basically on the step side of

13    the street; is that right?

14    A.      Yes.

15    Q.      What were you doing?

16    A.      Just standing there.

17    Q.      Standing around.  What are the girls doing

18    that were there?

19    A.      Just standing around.

20    Q.      Do you remember seeing Rain there that

21    evening?

22    A.      Yes.

23    Q.      Now, you mentioned you remember seeing Shameka

24    and Shaquanda.  Do you recall seeing Little Mike?

25    A.      Yeah.
```

KEVIN PICKETT - DIRECT - PURCELL

206

```
 1    Q.      Do you know who I'm talking about?

 2    A.      Yeah.

 3    Q.      You mentioned some others you saw.  Now, while

 4    you were there standing with Mack and he had the gun

 5    and were standing there, did you see Kareem again?

 6    A.      Yeah.

 7    Q.      Now, tell us where it was you saw him, what

 8    direction he was going.

 9    A.      Towards Trina's house.

10    Q.      So he was going to go up towards Trina's.  So

11    it was up the street.  So if you go to Exhibit 1, is

12    it correct to say that now he was moving from where

13    he had been up the street towards Trina's?

14    A.      Yeah.

15    Q.      Did he walk past of you?

16    A.      Yeah.

17    Q.      Did you say anything to him?

18    A.      No.

19    Q.      Did Mack?

20    A.      No.

21    Q.      Did Mack say anything to you about him when he

22    walked by?

23    A.      He just said about smash.

24    Q.      Did he see -- do you know, did Mack see Kareem

25    go by?
```

1    A.     Yeah.

2    Q.     Was he looking at him?

3    A.     Yeah.

4    Q.     Was he?

5    A.     Yeah.

6    Q.     Were you?

7    A.     Yeah.

8    Q.     Now, you knew at this point that Mack was

9    about to kill Kareem.  You told him what you told

10   him.  You didn't warn Kareem, did you?

11   A.     No.

12   Q.     Why not?

13   A.     Because then it would have been showing that I

14   was being disloyal to him.

15   Q.     Did you say being disloyal to Mack?

16   A.     Yeah.

17   Q.     That's quite a test of loyalty, isn't it?

18            MR. PROCTOR:  Objection.

19            THE COURT:  Sustained.

20   BY MR. PURCELL:

21   Q.     Now, after Kareem walked by you and went to

22   Trina's, was he gone very long?

23            How long was he gone?

24   A.     About five minutes.

25   Q.     Did you see him return?

1    A.      Yeah.

2    Q.      Now, when he returned, can you tell the jury,

3    is this where Mack was killed -- or, Mack killed

4    Kareem?

5    A.      Yeah.

6    Q.      Would you tell the jury what happened; what

7    did you see Mack do and what did you do?

8    A.      He ran over there towards him.

9    Q.      When?

10   A.      When he -- in that little gap.

11   Q.      So let's use Exhibit No. 44.  Can you put this

12   one up, please, the first side?

13           THE COURT:  Government Exhibit 44 is up

14   on the screen.

15   BY MR. PURCELL:

16   Q.      Does this show where the shooting happened?

17   A.      Yeah.

18   Q.      Is that a, "Yes"?

19   A.      Yeah.

20   Q.      And Mack and you guys were still -- I'm

21   pointing over towards the other side of the street,

22   that poster.

23           MR. PROCTOR:  If it's all right with the

24   Court --

25           THE COURT:  Go right ahead.

1    BY MR. PURCELL:

2    Q.    I'm pointing also at 3, which is what you've

3    been indicating where you were standing on the step

4    side of the street; is that right?

5    A.    Yeah.

6    Q.    So Kareem came down from Trina's, correct?

7    From your right to left?

8    A.    Yeah.

9    Q.    As I'm indicating here.

10          Was he on the sidewalk or on the street?

11   A.    Yeah.

12   Q.    There is actually no sidewalk over there, is

13   there, on Maisel.

14          And tell the jury what Mack did first.

15   We'll ask about what you did.  What did Mack do when

16   Kareem turned that corner heading towards the fire

17   hydrant?

18   A.    Ran towards him.

19   Q.    Was Mack wearing anything on his head?

20   A.    Yeah.

21   Q.    What was he wearing?

22   A.    A hat.

23   Q.    What did he do with the hat?

24   A.    Pulled it down.

25   Q.    What did he do with the gun?

KEVIN PICKETT - DIRECT - PURCELL

210

```
1     A.      He shot him.

2     Q.      How many times did he shoot him?

3     A.      I don't remember.

4     Q.      Was it more than once?

5     A.      Yeah.

6     Q.      Now, where did you -- where were you when Mack

7     went across the street?  Did you follow him; did you

8     stay with him; what did you do?  When he ran across

9     by you.

10    A.      Went and got in the car.

11    Q.      Now, did you follow Mack across on the grass

12    on the other side?

13    A.      No.

14    Q.      Are you sure?

15    A.      Positive.

16    Q.      And I've asked you that before, haven't I?

17    A.      Yeah.

18    Q.      And what is your recollection of what you did

19    when Mack went after Kareem?

20    A.      I went and got in the car.

21    Q.      Why did you do that?

22    A.      Because I was trying to leave.

23    Q.      Did you know what was going to happen?

24    A.      Yeah.

25    Q.      Now, before Mack shot Kareem, did you have any
```

KEVIN PICKETT - DIRECT PURCELL

211

```
1      conversation with him where he made any remarks to

2      you about the paperwork?

3      A.      Yeah.

4      Q.      What did he say?  That is, I'm talking about

5      that evening at that time.  What did he say?

6      A.      That he mentioned his name.

7      Q.      Did he say anything to you about whether your

8      name was in there?

9      A.      He's saying, I'm just saying that, 'cause he

10     said my name and he mentioned his name.

11     Q.      But your name was not in there?

12     A.      Yeah.

13     Q.      But his was.  And had you actually seen Mack's

14     name in the Guest paperwork?

15     A.      Yeah.

16     Q.      Mack was angry about that?

17     A.      I guess.

18     Q.      Do you know of any other reason he would want

19     to kill Kareem?

20     A.      No.

21     Q.      Now, as Kareem was being shot -- after this,

22     before as well -- did you hear Kareem say anything

23     just before or during the time he was being shot?

24     A.      Yeah.

25     Q.      What did he say?
```

1    A.      "Don't do this to me, Mack".

2    Q.      When was that?  Before the shooting or during

3    the shooting?

4    A.      During.

5    Q.      During.  Was he already down?

6    A.      I don't know.

7    Q.      Now, when you got into the car, sir, who was

8    in it already?

9    A.      Meka and Kwana.

10   Q.      They were already in it.  And did they stay in

11   the car?

12   A.      Yes.

13   Q.      Now, what about the girls?  I'm going to ask

14   you to draw your attention to Rain and Mike, Little

15   Mike.  Did they make any effort to get into the car?

16   Or what did they do when the shooting was going on or

17   just after it happened?

18   A.      Try and get in the car.

19   Q.      They did.  Now, who tried to get in the car

20   first, if you remember?

21   A.      I don't remember.

22   Q.      You don't remember if it was them or you?

23   A.      No, I got in first.

24   Q.      You were in first.  And tell the jury -- so

25   you're getting in first on which side?

1    A.      The driver's side.

2    Q.      So I'm going to show the witness government

3    Exhibit No. 2 with the SUV attached.  Was that the

4    way the car was pointed?

5    A.      Yeah.

6    Q.      Okay.  Show the jury, please, or just tell me

7    where to point, as to where Mack was when he began to

8    run, at the point he began to run after Kareem?

9    A.      Right there.

10   Q.      In here?

11           And where were you in relation to him?

12   A.      Right there.

13   Q.      Now, where did you go when he started across

14   after Kareem?

15   A.      The truck.

16   Q.      Passenger side?

17   A.      The driver's side.

18   Q.      I'm sorry.  The driver's side.  And as to the

19   two girls, Rain and Tamica, who was in first?  That

20   is, as to you or they, who got in first?

21   A.      I don't know.  I got in first.

22   Q.      You were in before they were?

23   A.      Yeah.

24   Q.      Now, can you tell the jury, if you recall,

25   Mack getting into that car at all?

1    A.      Yeah.

2    Q.      What side did he get in on?

3    A.      The passenger.

4    Q.      And is the passenger side the side closer to

5    the shooting?

6    A.      Yeah.

7    Q.      Now, when he got in, could you tell the jury

8    what happened to the girls?

9    A.      They got out.

10   Q.      What was happening as Mack was getting in?

11   What were you doing; staying inside?  Or what were

12   you doing?

13   A.      I was just moving back.

14   Q.      You're sliding over to toward the driver's

15   side?

16   A.      Yeah.

17   Q.      You're a big buy.  Was there room for

18   everybody back there?

19   A.      No.

20   Q.      Do you know what the girls did or where they

21   went?

22   A.      No.

23   Q.      Now, after Mack got into the car, what

24   happened?

25   A.      We pulled out.

KEVIN PICKETT - DIRECT - PURCELL

215

1    Q.      Where did you go?

2    A.      Over to east Baltimore.

3    Q.      And did there come a time when Mack got out of

4    the car?

5    A.      Yeah.

6    Q.      And what was -- was it a -- can you tell us

7    where was it, if you remember, what it was that

8    caused the car to stop that allowed him to get out.

9    A.      A red light.

10   Q.      A red light.  Do you know where that was?

11   A.      Washington Boulevard.

12   Q.      And did he get back in after that?

13   A.      Yeah.

14   Q.      Okay.  Where did he go after he got back into

15   the car?

16   A.      Over to east Baltimore.

17   Q.      What happened there?  Who got out?  Who left?

18   A.      Mack.

19   Q.      And what about the other people.  You've got

20   three people in the car, correct?

21   A.      Yeah.

22   Q.      Where did you all go after that?

23   A.      Back to Westport.

24   Q.      You went back to Westport.  But Mack didn't go

25   back to Westport?

```
 1    A.      No.

 2    Q.      Now, before you got out, did Mack tell you

 3    anything, or do you know what happened to that gun?

 4    A.      I mean, I assume he just passed it off.

 5    Q.      What did he tell you?

 6                    MR. PROCTOR:  Objection.

 7                    MR. PURCELL:  What did he --

 8                    THE COURT:  Overruled.

 9    BY MR. PURCELL:

10    Q.      What did he tell you -- what did Mack tell

11    you, if anything -- what, if anything, did Mack tell

12    you happened to the gun?

13    A.      He said he gave that to Roddy.

14    Q.      He said that?

15    A.      Yes.

16    Q.      You're not guessing about that, are you?

17    A.      No.

18    Q.      But he got rid of it?

19    A.      He said he gave it to Roddy.

20    Q.      And who was Roddy?

21    A.      Somebody from the neighborhood.

22    Q.      Now, was Roddy there that evening?

23    A.      Yeah.

24    Q.      Did you see him?

25    A.      Yeah.
```

```
1    Q.      Now, you went back to the scene; is that
2    right?
3                 What was going on there when you got
4    back?
5    A.      It was just a crime scene.
6    Q.      Did you go over and observe it?
7    A.      No.
8    Q.      And, obviously, but let me ask, were there
9    police there?
10   A.      Yeah.
11   Q.      Did you walk over to the police and tell them
12   that you were an eyewitness?
13   A.      No.
14   Q.      And that you had prior knowledge this was
15   going to happen and you knew exactly who did it?
16   A.      No.  Because I would have been disloyal to
17   him.
18   Q.      I don't think I heard you.  I'm sorry.  What?
19   A.      Because I would have been being disloyal to
20   him.
21   Q.      You would have banned, did you say?
22   A.      They would have been being disloyal to him.
23   Q.      This isn't something you ever would have even
24   done, is it?
25   A.      No.
```

```
1    Q.      And that's how you feel today, isn't it?

2    A.      Yes.

3    Q.      Disloyal?

4    A.      Yeah.

5    Q.      Now, after the murder occurred, you knew that

6    there was an investigation undertaken.  People are

7    trying to find out, the government was trying to find

8    out who killed Kareem; is that right?

9    A.      Yeah.

10   Q.      As far as you know, can you tell the jury

11   whether Mack was aware of that investigation?

12   A.      Yeah.

13   Q.      Are you aware of the grand jury investigation

14   that was being conducted and witnesses being brought

15   in from Westport?

16   A.      Yeah.

17   Q.      How did you know about it?

18   A.      Just it was the word around the neighborhood.

19   Q.      Did you have occasion to talk to any of the

20   government witnesses after or before they went to the

21   grand jury?

22   A.      Yes.

23   Q.      Can you tell the jury what witnesses you spoke

24   to.  And was it -- these witnesses -- after or

25   before?
```

KEVIN PICKETT - DIRECT - PURCELL

219

```
 1      A.      After.

 2      Q.      After.  Why were you talking to the witnesses

 3      afterwards?

 4      A.      Trying to see what the what they were saying.

 5      Q.      What they were saying?  Is that what you were

 6      asking?

 7      A.      Yeah.

 8      Q.      Did Mack participate in this inquiry or asking

 9      witnesses what was being asked?

10      A.      Yeah.

11      Q.      He did?  Do you remember talking to Tamika

12      Mouzon?

13      A.      Yeah.

14      Q.      Where did you go to meet -- to talk to her?

15      A.      Her house.

16      Q.      Did Mack go with you?

17      A.      Yeah.

18      Q.      What about his brother, Tatum; was he ever

19      involved in talking to any of these witnesses?

20      A.      No.

21      Q.      Are you sure?

22      A.      Not that I can remember.

23      Q.      Did you talk to any other witnesses besides

24      Tamika Mouzon?

25      A.      Yeah.
```

1   Q.     Who?

2   A.     I think all of them.

3   Q.     Did you talk to Shaquanda?

4   A.     I don't remember.

5   Q.     How about Mr. Tamica, Miss Ross?

6   A.     Yeah.

7   Q.     Did you talk to her?

8          And what about Rain?

9   A.     Yes.

10  Q.     What did Rain tell you about what she said in

11  the grand jury?  That is, Rain Curtis.

12  A.     That she ain't all bad.

13  Q.     That she's not going to know what happened?

14  A.     Yeah.

15  Q.     Is that what she's going to say?

16         Did she tell you after she came to the

17  grand jury what she said?  Did she ever tell you

18  after any of her trips to the grand jury what she

19  said?

20  A.     That she ain't told you all anything.

21  Q.     That she what?

22  A.     That she didn't tell you all anything.

23  Q.     That she didn't tell us anything?

24  A.     Yeah.

25  Q.     Did anybody else that you remember tell you

1    that they didn't tell us anything?

2    A.    Everybody said that.

3    Q.    And they were telling you guys about this, you

4    and Mack?

5    A.    Yeah.

6    Q.    Now, directing your attention now to -- I

7    guess it's October of 2010.  And do you remember

8    being asked, I guess by your lawyer, about coming in

9    and talking to the government about what you

10   observed --

11   A.    Yeah.

12   Q.    -- that night?  And did you talk to your

13   lawyer about that?

14   A.    Yes.

15   Q.    And, in fact, when you came to that meeting,

16   did you have two lawyers present?

17   A.    Yeah.

18   Q.    One appointed by the court and one who you had

19   used in the state?

20   A.    Yes.

21   Q.    And what did you -- for the record, who did

22   you meet with when you had that meeting?

23   A.    You.

24   Q.    And was I by myself?

25   A.    No.

```
1     Q.      Was I with agents and, I guess, other

2     attorneys as well?

3     A.      Yeah.

4     Q.      And did we discuss with you and your attorneys

5     your possibility of your coming forward?

6     A.      Yeah.

7     Q.      And did you later meet with your attorneys and

8     make a decision as to what to do?

9     A.      Yes.

10    Q.      And what did you decide to do?

11    A.      Come forward.

12    Q.      Now, I believe we gave you has what's called a

13    proffer letter; do you remember that?

14    A.      No.

15    Q.      A letter that told you we would not use

16    anything you said against you.

17    A.      Yeah.

18    Q.      And you remember that when you came to the

19    grand jury I also told you that on the record in the

20    transcripts; that what you were saying would not be

21    used against you, as long as you were truthful?

22    A.      Yes.

23    Q.      Have you been truthful?

24    A.      Yeah.

25    Q.      Were you truthful with the grand jury?
```

KEVIN PICKETT - DIRECT - PURCELL

223

1    A.      Yes.

2    Q.      And is the truthful account, according to your

3    recollection, the account you gave to the jury here

4    today?

5    A.      Yeah.

6    Q.      I'm going to jump to a different subject for a

7    second.  And I want to ask you about the murder of

8    Martie Williams.

9            Do you know Martie?

10   A.      Yeah.

11   Q.      Could I have that photograph, please?

12           I'm going to show you what's been marked

13   government Exhibit 469.  It's a photograph.  Can you

14   tell the jury if you recognize that person, who it

15   is?

16   A.      Martie.

17   Q.      Is that Martie Williams?

18   A.      Yeah.

19   Q.      If you can just put this photograph on the

20   display, please.

21           Now, in your grand jury testimony and in

22   your meetings with me and the government agents that

23   were part of the case, you never met with me alone,

24   did you?

25   A.      No.

KEVIN PICKETT - DIRECT - PURCELL

224

1    Q.     Did you describe to the grand jury and us what

2    your role in that murder was?

3    A.     Yeah.

4    Q.     And do you know who killed Martie Williams?

5    A.     Yeah.

6    Q.     Who killed him?

7    A.     Mack.

8    Q.     Was he alone?

9    A.     I don't know.  I ain't never seen nobody else

10   with him.

11   Q.     Well, do you remember telling the grand jury

12   that Eastwood -- there was another person with him,

13   or that he told you there was somebody else with him?

14   A.     No.  I ain't ever tell anybody that I ever

15   seen Eastwood, because I didn't see them.

16   Q.     You didn't see him.

17   A.     No.

18   Q.     Well, to be clear, when the murder happened --

19   and we'll go back and rewind this a bit in a second.

20   But when the murder happened, where were you?

21   A.     In Westport.

22   Q.     You actually had left the house before the

23   murder that night.

24   A.     Yeah.

25   Q.     Okay.  So you didn't see it.

225

1    A.      Right.

2    Q.      And I'll be back to what Mack may have said

3    about that shooting.  I understand your precision in

4    hearing and my precision in asking questions on that

5    point.

6            But I want to ask you first about that

7    murder.  For the record, I think, this was before the

8    Kareem Guest murder; is that right?

9    A.      Yes.

10   Q.      Was it the same year?

11   A.      I don't remember.

12   Q.      I think it's on the record that it was March

13   21st, 2009, two months before the Kareem Guest

14   murder.

15           And is this at the house just a few doors

16   down from Ms. Debby's?

17   A.      Yes.

18   Q.      Now, can you describe to the jury what was the

19   cause of this murder?  What was Mack -- I'm assuming

20   he doesn't kill people for no reason.  There must

21   have been a reason.  What was the reason?

22   A.      He was mad with Martin.

23   Q.      Okay.  I get that.  About what?

24   A.      Because Martie, like, said something when Mack

25   was fussing to somebody.

226

```
1    Q.      Okay.  Did this involve -- well, let me ask

2    you this:  At that time in March of 2009 when this

3    murder happened, where was Mack selling his crack

4    primarily?

5            That is, in the Westport area where?

6    A.      All over there.

7    Q.      On Annapolis Road; is that one of the places?

8    A.      Yeah.

9    Q.      Now, you were selling as well; is that right?

10   A.      Yeah.

11   Q.      Did you have a relationship with Martie as to

12   you selling to him?

13   A.      Yeah.

14   Q.      What did you sell to Martie?

15   A.      I would just give him packs.

16   Q.      What's a pack?

17   A.      Drugs.

18   Q.      Now, were you giving him heroin or crack or

19   both?

20   A.      Both.

21   Q.      So you had a relationship with Martie; is that

22   right?

23   A.      Yes.

24   Q.      Now, did there come some dispute about Martie

25   maybe having a relationship with somebody else and
```

KEVIN PICKETT - DIRECT - PURCELL

227

1    selling somebody else's drugs?

2    A.    Yeah.

3    Q.    Okay.  And did that make Mack mad?

4    A.    Yeah.

5    Q.    Because, if you're loyal, his loyalty to

6    you --

7              MR. PROCTOR:  Objection.

8              THE COURT:  Sustained.  Rephrase the

9    question.

10             MR. PURCELL:  Thank you.

11   BY MR. PURCELL:

12   Q.    You talked about your loyalty to Mack.  Was he

13   also loyal to you?

14   A.    No.

15   Q.    No?  What about this issue of Martie getting

16   drugs from somebody else; was that a problem for

17   Mack?

18   A.    I don't know if it was a problem for him or

19   what.

20   Q.    Well, what was the beef about between Mack and

21   Martie?  You told us in the grand jury.

22   A.    Because Mack was fussing with somebody else

23   and Martie had said something.  And Mack had words

24   with Martin and Martie came back later like he was

25   looking for Mack.  And that's what the beef was

1      about.

2      Q.      So Mack was messing with -- what's that guy's

3      name?  Was it Shorty?

4      A.      Yeah.

5      Q.      And in that there was a confrontation; is that

6      right?

7      A.      Yeah.

8      Q.      And were you there?

9      A.      Yeah.

10     Q.      And how did Martie -- when that happened,

11     whose side was Martie taking in that confrontation

12     between Mack and Shorty?

13     A.      Shorty.

14     Q.      And did that cause some words, then, between

15     Mack and Martie?

16     A.      Yeah.

17     Q.      And some anger?

18             And after that, what occurred?

19     A.      Somebody saw Martie came, acting like he was

20     looking for Mack or something.

21     Q.      Okay.  When you say looking for him, you don't

22     mean just:  Hey, let's, you know, go somewhere

23     together?  What did you understand that to mean and

24     what did Mack understand that to mean when he told

25     you that, when someone was looking for him, what that

KEVIN PICKETT - DIRECT - PURCELL

229

```
 1      means?

 2      A.      Well, he was looking for him to do something

 3      to him.

 4      Q.      Like kill him?

 5      A.      I guess.

 6      Q.      And that information that you received Martie

 7      was looking for Mack, when was that received in

 8      relation to the date that Martie was killed?  Was it

 9      the same day?  A different day?

10      A.      The same day.

11      Q.      The same day.  And after Mack received that

12      information that Martie was looking for him or maybe

13      looking for him, he got this not from Martie, but

14      from somebody else?

15      A.      I don't know.

16      Q.      Some of the kids out there, I think you said?

17      A.      Yeah.

18      Q.      What did Mack tell to you do?  Did you all

19      know where Martie hung out?

20      A.      Yeah.

21      Q.      Were you welcome in that place?

22      A.      Yeah.

23      Q.      And just tell the jury, is that the house on

24      Maisel?

25      A.      Yes.
```

230

```
1    Q.      What did you do?  That is, you admitted you
2    had a role in that murder.  What did you do to help
3    set that murder up?
4    A.      Went and asked was Martie in.
5    Q.      Who told you to go there and see if Martie's
6    in?
7    A.      Mack.
8    Q.      What did he tell you to do?
9    A.      Go see if he's there.
10   Q.      All right.  How did he arrange with you to --
11   for you to relate back to him whether or not -- or,
12   to confirm whether or not Mack was in there.
13   A.      That he was going to call my phone and asks me
14   if I got a scale.
15   Q.      A scale?
16   A.      Yeah.
17   Q.      Okay.  So did you go to the house?
18   A.      Yeah.
19   Q.      Was Martie there?
20   A.      Yeah.
21   Q.      Who else was there?
22   A.      Linnard.
23   Q.      For the record, is that Linnard Cunningham?
24   A.      Yeah.
25   Q.      So when you went in -- and we've now been to
```

```
 1     this house; we'll see some pictures of it later.
 2     When you went into the house, just tell us, was it a
 3     row house --
 4     A.    Yeah.
 5     Q.    -- on Maisel?
 6              Where was -- where was Martie?
 7     A.    In there playing a game in the living room.
 8     Q.    Where was he in relation to the front door?
 9     A.    In the living room.
10     Q.    Excuse me one moment, Your Honor.  I'm sorry.
11              (Counsel confer.)
12     BY MR. PURCELL:
13     Q.    What were they doing?  When you went into the
14     house, they were doing what?
15     A.    Playing a game.
16     Q.    Okay.  I'm going to approach the witness, if I
17     may, and show government's Exhibit 123, a picture.
18              This is government Exhibit No. 123.  Do
19     you recognize that?
20     A.    Yeah.
21     Q.    What is it?
22     A.    House.
23     Q.    Let's give the jury an idea of what type of
24     house this is.  Could you put this up, please?  Thank
25     you.  Take that picture off.
```

KEVIN PICKETT - DIRECT - PURCELL

```
 1                      I'm going to show you an exhibit as well,
 2      No. 124.  Do you recognize what that picture depicts?
 3      A.      Yeah.  Where they was playing a game at.
 4      Q.      Okay.  Is that the inside of the house?
 5      A.      Yeah.
 6      Q.      And could you put 124 up, please?
 7                      Now, does 124 show the TV on which these
 8      guys were playing the game and does it show the
 9      chairs they were sitting in?
10      A.      Yeah.
11      Q.      Can you put this up for a minute?  Okay.
12                      Now, if you touch this screen -- if I ask
13      you to point to a certain place -- it will light up
14      so we can see where you're pointing.
15                      Can you tell us, if you remember, when
16      you went in, when Mack asked to go in, where -- where
17      Martie was in the house.
18      A.      (Witness complies.)
19      Q.      Okay.  So he's sitting in that chair.  And
20      where was Linnard?
21      A.      (Witness complies.)
22      Q.      Now, was anybody else in the house or
23      downstairs in the house that you remember?
24      A.      No.
25      Q.      Did you have your cellphone with you?
```

233

```
 1      A.      Yeah.

 2      Q.      Did you have your phone with you?

 3              Now, I'm not going to go upstairs with

 4      these pictures yet.  But did you discover there were

 5      other people in the house?

 6      A.      Yeah.

 7      Q.      Who were they?

 8      A.      Boo Boo.

 9      Q.      Anybody else?

10      A.      Ducky.

11      Q.      Who?

12      A.      Ducky.

13      Q.      And you know their nicknames, Boo Boo and

14      Ducky; is that right?

15      A.      Yeah.

16      Q.      Okay.  Now, when you observed that Martie was

17      there, what did you do in terms of getting a call to

18      or making a -- getting a call from or making a call

19      to Mack?

20      A.      I didn't make no call to Mack.

21      Q.      Did he call you?

22      A.      Yeah.

23      Q.      Is that, "Yes"?

24      A.      (Nodding.)

25      Q.      Okay.  What did you tell him?
```

1    A.      He asked me did I have a scale.  I said,

2    "Yeah".

3    Q.      You knew what that meant, didn't you?

4    A.      Yeah.

5    Q.      What did it mean?

6    A.      That Martie was in there.

7    Q.      What did it mean to you in terms of what was

8    going to happen to Martie very, very soon?

9    A.      That he was going to get killed.

10   Q.      How old was Martie when he was killed, do you

11   know?

12   A.      I don't know.

13   Q.      You're 28.  Was he younger or older?

14   A.      Younger.

15   Q.      Do you know he's 19?

16   A.      I don't know.

17   Q.      So after you passed this information on to

18   Mack, what did you do?

19   A.      Left out the house.

20   Q.      Where did you go?

21   A.      To the mall.

22   Q.      Now, when this case first happened, when the

23   murder first happened, you were actually questioned

24   by Baltimore City Homicide, weren't you?

25   A.      Yeah.

KEVIN PICKETT - DIRECT - PURCELL

235

```
 1     Q.      Was it Detective Dohoney?

 2     A.      I mean, yeah, they tried to question me.

 3     Q.      Okay.  Did you talk to them?

 4     A.      No.

 5     Q.      Did they ever show you a video that they had

 6     obtained from a store across -- I'm sorry -- a

 7     school, the little southwest school -- what's the

 8     name of that?  Westport Academy, across the street?

 9     A.      No.

10     Q.      Did you see that?

11     A.      No.

12     Q.      Have you ever seen it?

13     A.      No.

14     Q.      Now, when you walked out of the house, if you

15     remember -- just tell us, when you walked out of the

16     house -- can you put these up again -- and you walked

17     down the sidewalk, which direction did you turn as

18     you look at that?

19     A.      This way.

20     Q.      Okay.  Thank you.  And you've marked that.

21     And then you walked up the street that way?

22             THE COURT:  You have to answer yes or no.

23     You can't just nod your head, sir.  Yes, you walked

24     up the street that way?

25             THE WITNESS:  Yes.
```

1             MR. PURCELL:  May I approach?  This is an

2       exhibit already admitted.  47A.

3             THE COURT:  Okay.

4       BY MR. PURCELL:

5       Q.     Okay.  Thank you.  I don't know if I've shown

6       you this, so take your time.  It's another aerial.

7       And just see if on this aerial you can spot the house

8       was Martie was murdered.

9       A.     I do.

10      Q.     Do you?  Okay.  I'm going to put this up on

11      the screen.  And could you touch the lower left-hand

12      corner of the screen there, Mr. Duckett?  It will

13      make those dots go away.  There you go.

14             Now, could you just put a finger dot on

15      Martie's house?

16      A.     (Witness complies.)

17      Q.     Now, when you left the house, just drag your

18      finger if you need to, show the jury which way you

19      went when you left the house.

20             That's the edge of the ball field, there,

21      isn't it?  That's heading back toward the project of

22      Westport?

23      A.     Yeah.

24      Q.     All right.  I don't think I've asked anybody

25      this before.  But in Westport when we talk about the

1    project, projects, is it correct we're talking about

2    these groups of row houses; is that right?

3    A.      Yes.

4    Q.      For instance, where Kareem was killed would be

5    referred to as in the project?

6    A.      Yeah.

7    Q.      Now, you left, walked out.  Did you -- were

8    you close enough to hear the shooting?

9    A.      Yeah.

10   Q.      You were still on the -- in the area and heard

11   the shots?

12   A.      Yeah.

13   Q.      Did you hear any -- anybody else speak before

14   the shots occurred; a woman, perhaps?

15   A.      Yeah.

16   Q.      What did you hear said?

17   A.      Something, "You all scared me," or something

18   like that.

19   Q.      And how long after that did you hear the

20   shots?

21   A.      Like a minute or two.

22   Q.      So you didn't see the shooting itself?

23   A.      No.

24   Q.      Now, where did you go?

25   A.      To the mall.

```
1    Q.      And did you get yourself an alibi while you
2    were at the mall?
3    A.      Yeah.
4    Q.      What did you do to get an alibi?  You know
5    what I mean by an alibi; something to show that you
6    weren't down there?
7    A.      Yeah.
8    Q.      What did you do?
9    A.      Just kept the receipts.
10   Q.      So you bought something?
11   A.      Yeah.
12   Q.      What mall did you go to?
13   A.      Mondawmin.
14   Q.      Did somebody drive you out there?
15   A.      Yeah.
16           THE COURT:  If you could keep your voice
17   up, sir, and speak into the microphone, please.
18   BY MR. PURCELL:
19   Q.      Did someone drive you out there?
20   A.      Yeah.
21   Q.      When did you -- well, I guess you knew.  But
22   when did you actually get confirmation that Martie
23   was dead?
24   A.      Later on that night.
25   Q.      From who?
```

1    A.      I don't remember from who.

2    Q.      Now, did you have occasion after that to talk

3    to Mack about the shooting, itself?

4    A.      I don't know.

5    Q.      Did he ever make any comment to you -- and I

6    think you corrected me earlier.  When you spoke to

7    Mack after this, did he ever state something that

8    occurred and, in the context of that, describe

9    somebody who was with him?

10   A.      I don't understand what you're saying.

11   Q.      Yeah, neither do I.

12           Did he ever state to you that somebody

13   dropped something that was evidence at the shooting?

14   A.      He just said dumb-ass.

15   Q.      What did he say?

16   A.      "Dumb-ass dropped a clip".

17   Q.      Dropped a clip.  What's a clip?

18   A.      That hold the bullets.

19   Q.      Now, who did you understand dumb-ass to be a

20   reference to at that point?

21   A.      I was assuming -- I thought that he was just

22   talking about Eastwood.

23   Q.      Because he referred to Eastwood before that

24   way?

25   A.      Yeah, I guess.  I think so.

```
1    Q.      Did you ever see Martie dead in place in the
2    house?
3    A.      No.
4    Q.      Pictures of it, even?
5    A.      No.
6    Q.      We'll save that for a different time.  The
7    jury will see them in a day or so or a couple of
8    days.
9            Now, after this shooting happened, were
10   you aware -- and apparently you were aware -- when
11   Martie was there, that there was somebody else in the
12   house; is that right?
13   A.      Yeah.
14   Q.      And that was Linnard?
15   A.      Yeah.
16   Q.      Was there ever a time that you were with Mack
17   that Mack talked to Linnard about anything the police
18   may have asked him about the shooting?
19   A.      Yeah.
20   Q.      Tell us about that, please.
21   A.      We went down there.
22   Q.      Lean up, please.
23   A.      We went down there to pick Linnard up.
24   Q.      Went down where?
25   A.      Homicide.
```

```
 1    Q.     So Linnard was at homicide being questioned?

 2    A.     Yeah.

 3    Q.     And how do you and Mack get down there?

 4           Mack doesn't drive, does he?

 5    A.     I don't know.

 6    Q.     Okay.  Well, just forget that.  So how did he

 7    get down there?

 8    A.     Linnard girlfriend.

 9    Q.     And how is it he came to be with his

10    girlfriend?  Did she invite you to go?  Or how did

11    you run into her?

12    A.     I don't remember how we ran into her.

13    Q.     So tell us what happened.

14    A.     We just went down there and picked him up.

15    And we went somewhere else and just talked.

16    Q.     Where did you take him?  Or where did you go?

17    A.     Back out to Westport.

18    Q.     Can you tell us where in Westport you had this

19    conversation with him?

20    A.     Mount Winans.

21    Q.     Mount Winans?  Is that on our picture?  No?

22           It's south?  Lower?

23           So Mount Winans would be, am I correct,

24    somewhere in this area?

25    A.     Yes.
```

1    Q.    We'll have a picture of that later.  It's not

2    right up there on the screen.

3              Now, when you arrived at wherever you got

4    to at Mount Winans with Linnard Cunningham, did you

5    have a conversation with him in the car?  Or where

6    did it take place?

7    A.    Outside the car.

8    Q.    Tell us about it, please.

9    A.    He was just mad and was like:  You all should

10   have shot me or something.

11   Q.    Linnard said you should have shot him?

12   A.    Yeah.

13   Q.    Why did he say that?  Why would he say to Mack

14   and you that you should have shot him?

15   A.    Because it was looking like he had something

16   to do with it.

17   Q.    Was he basically being accused of having set

18   up the way you did it?

19   A.    I guess.

20   Q.    Or knew who did it?

21   A.    I guess.

22   Q.    Did you ask him or did Mack ask him while you

23   were there what the police were asking him about who

24   did it?

25   A.    He didn't tell him.

KEVIN DUCKETT - DIRECT - PURCELL

243

1    Q.      He didn't say anything.

2    A.      No.

3    Q.      Now, when Linnard said to you and Mack, "You

4    all should have shot me," do you remember what Mack

5    said in response?

6    A.      Said, "I'd shoot you".

7    Q.      He said he would shoot him.  Did he say

8    something like:  We can arrange that?

9    A.      Yeah.

10   Q.      Did he shoot him?

11   A.      No.

12   Q.      Was it fair to say that Linnard was scared to

13   death?

14   A.      I don't know.

15   Q.      Did he seem scared to you?

16   A.      Yeah.  In my opinion, yeah.

17   Q.      All right.  There's one other area, Your

18   Honor, I want to get, into and it won't take very

19   long.  I appreciate the Court's patience with this

20   witness -- with me conducting this interrogation.

21               We need the aerial that shows Huron.

22               Do you know where Huron Street is, Mr.

23   Duckett?

24   A.      Yeah.

25   Q.      Now, on Exhibit 1, it's just sort of out of

```
 1    range.  So while they're getting that exhibit up,

 2    it's correct to say that it's --

 3                    MR. PROCTOR:  Judge, if I could just have

 4    one second, please.

 5                    THE COURT:  Certainly.

 6                    MR. PURCELL:  Thank you.

 7                    THE COURT:  Thank you, Mr. Proctor.

 8                    MR. PURCELL:  Thank you, sir.

 9    BY MR. PURCELL:

10    Q.    Now, I don't know if you've seen this before,

11    but can you take a look at the exhibit, which is

12    Exhibit No. 6, thank you, and tell us whether on

13    Exhibit No. 6 you see Huron Street.

14                    I'm sorry.  We just put this down and we

15    should have put it up.  Look to your left.  Do you

16    see it?

17                    Now, I want to direct your attention --

18    this will be back a bit.  But did you ever have a

19    conversation with Mack as you were walking along

20    Huron Street or in that area where he told you about

21    anything that he had done there?

22    A.    Yeah.

23    Q.    All right.  Lean forward, if you would, and

24    tell the jury what you were doing with Mack or what

25    you were doing and what he told you.
```

KEVIN DICKENS - DIRECT - PURCELL

245

```
 1    A.      We was just walking up the street.  And he was

 2    just saying something about this is where he shot a

 3    white guy or something.

 4    Q.      Did he tell you why he shot the white guy?

 5    A.      Because he was a snitch.

 6    Q.      Do you know who he was snitching on?

 7    A.      No.

 8    Q.      Did he say when it was that he shot this white

 9    guy?

10    A.      No.

11    Q.      Were there any other white guys that you know

12    of that Mack ever told you he had shot?

13    A.      No.

14    Q.      Did he tell you whether or not this white guy

15    lived or died when he was shot?

16    A.      I don't remember.

17    Q.      But he said he did it.  Where is it?  If you

18    can see it on that map, can you tell us where it was

19    that Mack told you -- where he was talking to you

20    about having done this shooting.  If it's on there.

21                In that area?  He was walking on the

22    street?

23                Your Honor, may I just address the Court

24    with counsel?

25                There is another area of questioning I
```

KEVIN PICKETT - DIRECT - PURCELL

246

```
 1   want to get into, but it's going to involve playing a
 2   couple of tapes.  And if you want to, I'm going to
 3   continue, but I'm just letting you know.  I can't see
 4   the clock.
 5                 THE COURT:  It's ten of 4, we're going to
 6   be stopping for the day at 4:30.  And I don't know if
 7   it makes any sense to take a break and then take ten,
 8   fifteen minutes to come back.
 9                 Is everybody doing okay over there?
10   Okay.  Miss West will give me the high sign if
11   someone needs to stop.  Why don't we keep moving
12   forward, Mr. Purcell.
13                 Everyone ready to go until, say, 25 after
14   4, another half an hour and we'll stop for the day?
15   Is that agreeable to everyone?  Okay.  All right.
16                 MR. PURCELL:  That's what I was hoping
17   you would say, Your Honor.  Thank you.
18                 THE COURT:  Just keep going.  Okay.
19                 MR. PURCELL:  I'm getting paid, I know.
20   BY MR. PURCELL:
21   Q.     Let's go back to your decision in October of
22   2010 to come forward with -- after you talked to your
23   attorneys and come forward.  Let me ask you, first:
24   When we met with your counsel, did the government,
25   myself, describe to you what crimes you might
```

1    potentially be facing?

2    A.    Yeah.

3    Q.    Did the government, myself, advise you that we

4    didn't have any information that you did this

5    particular shooting; that is, the shooting of Kareem

6    Guest?

7    A.    Yeah.

8    Q.    Were you told that, even if you didn't do it,

9    if you were part of a drug conspiracy with Mr. Hall,

10   that you could still be held liable for it under the

11   law?

12   A.    Yeah.

13   Q.    And is that part of your calculation as to why

14   to come forward?

15   A.    Yeah.

16   Q.    And as a result of that, you are not being in

17   any way charged for the Kareem Guest murder; is that

18   right?

19   A.    Right.

20   Q.    And you gave us information under immunity in

21   the grand jury about the Martie Williams murder and

22   your role in that; is that right?

23   A.    Yeah.

24   Q.    And you got immunity for that?

25   A.    Yeah.

KEVIN DICKERSON - DIRECT - PURCELL

248

```
 1     Q.      Now, in, I guess it's early November --

 2             THE COURT:  Counsel, do you want to

 3     approach the bench just one second, please?

 4             (BENCH CONFERENCE ON THE RECORD.)

 5             THE COURT:  Mr. Proctor, just looking at

 6     my notes, the issues that were previously raised at a

 7     motions hearing, the matter of the shooting of Martie

 8     Williams as well as the issue of the shooting of

 9     Kareem Guest were both listed as overt acts in the

10     superseding indictment and were referenced in Count

11     1, the conspiracy count, correct?

12             Is it your wish -- I think at the time I

13     indicated to you I would give a cautionary

14     instruction noting that Mr. Hall is not charged with

15     the Martie Williams murder in this case.  These were

16     acts alleged to have occurred in furtherance of the

17     drug conspiracy, Count 1 listed in the indictment.

18     Do you want me to give a cautionary instruction?

19             MR. PROCTOR:  Yes.  And, Judge, the white

20     boy he shot is Robert Parsons, who is also in our

21     overt acts.  So, you might as well -- the shooting of

22     the white person --

23             THE COURT:  Yes, I was about to ask.  Is

24     it A?

25             Yes, in A.  And I gather there's going to
```

1        be a follow-up listing in connection with --

2                    MR. PURCELL:  He'll be testifying.

3                    THE COURT:  Okay.  Can we pull this back

4        just a little bit so I can see the jury irrelevant?

5        I always indicate to them, as to those two other

6        shootings, he's not charged with those.  They're just

7        overt acts in furtherance of the drug conspiracy.  I

8        still can't see -- I see fewer jurors now.

9                    MR. PROCTOR:  If they find the drug

10       conspiracy --

11                   THE COURT:  That's right.  I said, these

12       are just charges.  And I'll just explain that he's

13       not charged with those murders in this case, murder

14       and attempted murder in this case.  Is that

15       satisfactory?  I remember we mentioned it at the

16       motions hearing.  You preserved your earlier motion

17       with respect to that it and I indicated at the time I

18       would deal with it in that fashion.

19                   MR. PROCTOR:  Thank you.

20                   MR. PURCELL:  Offered as evidence of the

21       drug conspiracy, as opposed to 404 --

22                   THE COURT:  That's right.  I've ruled

23       they were listed in the indictment.

24                   (END OF BENCH CONFERENCE.)

25                   THE COURT:  Ladies and gentlemen, with

1    respect to the shooting of Martie Williams, as well

2    as apparently they'll be linking up Mr. RP, Mr.

3    Parsons, as to the individual who was white who was

4    shot, Mr. Hall is not charged in this case with that

5    murder and those attempted murders.  He's charged

6    with those acts in connection with the drug

7    conspiracy charged in Count 1.  So they're actually

8    listed in the indictment as overt acts in furtherance

9    of the drug conspiracy, but he's not charged in this

10   case with that.

11            And so it's admissible in evidence

12   because it's part of the charged conspiracy of acts

13   in furtherance of the drug conspiracy.  Unlike Count

14   3 where he's clearly charged as to the murder of Mr.

15   Guest.

16            Is that satisfactory to you, Mr. Proctor?

17            MR. PROCTOR:  Yes, Your Honor.

18            THE COURT:  Thank you very much.  I just

19   wanted to clarify that.  So we may continue.  Go

20   ahead, Mr. Purcell.

21   BY MR. PURCELL:

22   Q.    We talked about -- we just asked you about

23   what you had at stake, possibly yourself, if you had

24   not cooperated.  You had a lot at stake, didn't you?

25   A.    Yeah.

1     Q.      For potential --

2     A.      Yeah.

3     Q.      -- is that right?  And you decided to do what

4     you're doing today; is that right?

5     A.      Yeah.

6     Q.      Now, in November, once you came into the grand

7     jury -- I think you went to the grand jury -- if you

8     can just refresh our memory for the record.  Your

9     first appearance in the grand jury was on October

10    28th, 2010; is that right?

11    A.      Yes.

12    Q.      Do you remember -- was your testimony, as far

13    as you recall, about the same subject we have asked

14    you today?

15    A.      Yeah.

16    Q.      And your second we primarily asked you about

17    the Martie Williams murder; is that right?

18    A.      Yeah.

19    Q.      Now, before Mack was arrested in December, did

20    you undertake -- or at the direction of the agents in

21    this case, were you -- I guess what the term is --

22    were you wired up and asked to go into Westport and

23    have communications with Mack?

24    A.      Yeah.

25    Q.      And did you do that?

1    A.      Yeah.

2    Q.      And on how many occasions, if you remember,

3    did you do that?

4    A.      Two.

5    Q.      Two?  And do you remember these meetings?

6    A.      Yes.

7    Q.      Now, before we get to those particular calls,

8    at this time -- that is, at that time, around October

9    and November of 2010 -- strike that.

10             In your meetings with us in October when

11   we first met with you, do you remember telling us

12   what you testified about today, about what happened

13   to the gun; that is, the gun being given to Roddy?

14   A.      Yeah.

15   Q.      Do you remember telling us that?

16   A.      Yeah.

17             THE COURT:  If you'll lean forward,

18   please, sir, and speak into the microphone.

19   BY MR. PURCELL:

20   Q.      Now, when you were on the street, did any

21   of -- do you remember any of the grand jury witnesses

22   reporting to you or Mack, telling you that they

23   reported to him, that we were now questioning about

24   Roddy?

25   A.      Yeah.

KEVIN PICKETT - DIRECT - PURCELL

253

```
 1      Q.      Let's get right to it as to an aspect of that.
 2   How did that make you feel personally in terms of
 3   your safety, that we were now asking about Roddy
 4   after we met you?
 5      A.      That somebody in the car that was in the car
 6   had said something to you all.
 7      Q.      So if the people are reporting back to Mack
 8   about Roddy, that means we knew.  And only how many
 9   people knew about Roddy?  People in the car?
10      A.      Yeah.
11      Q.      And Roddy?
12      A.      Yeah.
13      Q.      And nobody else?
14      A.      Right.
15      Q.      So in one of these taped conversations, if you
16   remember, when you went in, did Mack mention to
17   you -- did you have a conversation with him where he
18   was talking to you about he had talked to witnesses
19   and that we were asking about Roddy?
20      A.      Yeah.
21      Q.      What did he say about that?
22      A.      That why did he asking about me supposedly
23   giving Roddy a gun.
24      Q.      And what was his reaction to that?  How did
25   he -- was he -- I mean, did he question you as to how
```

254

1    they knew that?

2    A.      Yeah.

3    Q.      What did he say, if you remember?

4    A.      It was like it's just crazy they know that.

5    Q.      And did he talk about who he suspected at that

6    point?

7    A.      No.

8    Q.      But he said it was crazy that we knew that?

9    A.      Yeah.

10   Q.      Was he trying to figure out how we knew it?

11   A.      Yeah.

12   Q.      Did you tell him that you told them?

13   A.      No.

14   Q.      Or that you told us?

15   A.      No.

16   Q.      Do you remember what witnesses it was that had

17   reported to him that we had asked them if they knew

18   about Roddy?

19   A.      Tamica.

20   Q.      Tamica.  And so he told you that they had

21   asked Meka about it?

22   A.      Yeah.

23   Q.      All right.  Did he mention anybody else who --

24   whether -- who -- if anybody else who had reported or

25   he had heard also had been asked about it besides

1          Shameka?

2          A.      Kwana.

3          Q.      Did he say that he spoke to Kwana or that

4     Shameka told him that Kwana was asked too.

5          A.      He didn't really say.

6          Q.      He didn't say.  But he named two witnesses

7     that had asked about Roddy and he couldn't figure out

8     how we knew?

9          A.      Right.

10          Q.      Now, I'm going to ask you to -- Your Honor,

11     the tapes have been already introduced through

12     Detective Moody --

13                 THE COURT:  Yes.  They were Exhibit 174;

14     is that right?  Let me see here.

15                 MR. PURCELL:  Yes.  It would have been --

16     actually, for the November 18 event, I believe it was

17     313 and 314, 313 being the tape and 314 --

18                 THE COURT:  Yes.  Exhibits 181 and 313.

19     And the transcript are 314 and 182, correct?

20                 MR. PURCELL:  I think it might be 183.

21     183B.

22                 THE COURT:  All right.  So we have two

23     tapes as to each incident.  And then we have

24     transcripts --

25                 MR. PURCELL:  Yeah.  We have one tape for

KEVIN DICKETD - DIRECT - PURCELL

256

1    two incidents and two transcripts for each -- I'm

2    sorry, one transcript for each incident, as well.

3    And now that they're in, I would just to ask that

4    they be played.  Before I do, I'm going to ask this

5    question.

6    BY MR. PURCELL:

7    Q.      You knew that you had a body wire on or

8    something; is that right?

9    A.      Uh-huh.

10   Q.      And when -- on these two occasions that you

11   were wearing a body wire, did you have conversations

12   with Mack?

13   A.      Yeah.

14   Q.      And were -- your monitoring -- was it being

15   supervised?

16   A.      I don't know.

17   Q.      Well, when you went out there, were there

18   agents around who were able to talk to on your

19   microphone, as well?

20   A.      No.

21   Q.      Were there agents out there with you?

22   A.      No.

23   Q.      I don't mean, like, standing next to you; I

24   mean in the area.

25   A.      Yeah.

KEVIN PICKETT - DIRECT - PURCELL

257

```
1     Q.      Was Moody and his team of agents out there?

2     A.      Yeah.

3     Q.      Okay.  They didn't send you into Westport or

4     that area by yourself is what I'm saying.

5     A.      I don't know.  I don't know where they was at.

6     Q.      You don't know where they were.  They put you

7     in motion that night?

8     A.      Yeah.

9     Q.      I'm over-complicating.  I'm sorry.

10            All right.  I'd like to play, first --

11     and I think it's been introduced already as a

12     recording that was taken on November 18, 2010.  And

13     before we do that, we really have --

14            THE COURT:  And this is exhibit number,

15     again, Mr. Purcell?

16            MR. PURCELL:  This is No. 313.  And the

17     transcript now being given out is 314.

18            THE COURT:  All right.  Again, the tape

19     is in evidence.  The transcript, 314, is not in

20     evidence.  It's merely to assist you in listening to

21     the tape.  It's your recollection that controls as to

22     what you believe you hear on the tape, ladies and

23     gentlemen.

24            So the tape itself, 313, will be in

25     evidence and 314 is for identification only.
```

KEVIN PICKETT - DIRECT - PURCELL

```
 1                    MR. PURCELL:  This is a fairly long

 2      conversation, so these are excerpts; is that correct?

 3      And we're going to stop and go from place to place.

 4      The transcript tracks --

 5                    THE COURT:  The transcript tracks the

 6      portion of the tape that you're going to play --

 7                    MR. PURCELL:  Yes.

 8                    THE COURT:  -- is that correct?

 9                    MR. PURCELL:  Yes.  So it will take a

10      minute or so as we go from each section.

11                    THE COURT:  Thank you, Mr. Purcell.

12                    Any objection to that, Mr. Proctor, Mr.

13      Sullivan?

14                    MR. PROCTOR:  No, sir.

15                    MR. PURCELL:  If everybody at the defense

16      table is ready and the jurors have their transcripts,

17      we'll just go ahead.

18      BY MR. PURCELL:

19      Q.      Now, this is basically out on the street and

20      at one point in a car; is that correct?

21                    Listen as well because I'm going to ask

22      you some questions about the conversation, all right.

23                    Will you play that, please?

24                    I'm told that the part that we're

25      beginning with begins on page 2 at, "Smoky".  All
```

KEVIN DUCKETT - DIRECT - PURCELL

259

```
1        right.  Go ahead, please.

2                     (Audio playing.)

3                     While you're advancing that, before you

4        start it again, in this next section you see where

5        that begins with, "Moody" -- by the way, you're the

6        source; is that right?  Where it says, "Source"?

7        A.     Yeah.

8        Q.     Do you have a copy of the transcript?  This is

9        where we are right about here?  Do you recognize your

10       voice so far?

11       A.     Yeah.

12       Q.     Now, get yourself oriented.  But when you went

13       out there to -- with the idea of trying to talk to

14       Mack and see what information you could get from him,

15       did Detective Moody and you -- did he tell you that

16       he was going to try to sort of get talk going by

17       showing up and being his obnoxious self?

18       A.     Yeah.

19       Q.     Okay.  Is that what happened?

20       A.     Yeah.

21       Q.     All right.  Go ahead.

22                     (Audio playing.)

23                     Begin at 010200; is that correct?

24                     Do you see where we are, Mr. Duckett?

25       Counsel.
```

KEVIN PICKETT - DIRECT - PURCELL

1               (Audio playing.)

2               THE COURT:   Stop the tape for one second,

3      please.   Stop the tape.   If there's any

4      demonstrative -- whoever is laughing or having a

5      demonstration will leave the courtroom right now.

6      Out.   Out.   There's no demonstrations in this

7      courtroom.   People sit in the courtroom and they are

8      quiet and it's a public proceeding.   There are no

9      demonstrations of any kind.   Those two people remain

10     outside of the courtroom.

11              People quietly listen to the evidence in

12     this case.   This is a courtroom.   Anybody that makes

13     any noise in this courtroom will be out and they will

14     not come back in.

15              Court security officers are advised to

16     immediately advise me with their hands raised if they

17     see any of that kind of nonsense again.

18              Continue with the tape, Mr. Purcell.

19     BY MR. PURCELL:

20     Q.      Before we begin, we heard in the transcript a

21     person attributed to being Hall.   Can you tell the

22     jury who it is that person is yelling about Roddy and

23     be independent.   Is that Mr. Hall?

24     A.      Yeah.

25     Q.      Is that, "Yes"?

1    A.    Yeah.

2    Q.    Does the transcript accurately reflect the

3    statements that are being made by Hall during the

4    conversation?

5    A.    Yeah.

6    Q.    Thank you.  Please continue.

7              (Audio playing.)

8              Stop for a second.

9              Mr. Duckett, what was your understanding

10   about what the meaning of the word, "stack," is in

11   that conversation?

12   A.    A thousand dollars.

13   Q.    "Stack," is a thousand dollars?

14   A.    Yeah.

15   Q.    And when Mr. Hall was saying, "Check this out,

16   yo, here the 700.  Bring me some sales, yo, and I

17   will give you 300 more dollars," what did you

18   understand that to mean?  What is he talking about

19   sales?

20   A.    Clientele.

21   Q.    I'm sorry.  What?

22   A.    Wants him to sell, some people to buy some

23   drugs from.

24   Q.    He wasn't selling anything else?  He wasn't in

25   the business of selling anything legitimate, was he?

1    A.    No.

2    Q.    All right.  Thank you.  Go ahead.

3              (Audio playing.)

4              Now, when he's talking about Roddy, is

5    that the same Roddy that was at the scene and to whom

6    he told you he gave the gun?

7    A.    Yeah.

8    Q.    Is that the same person he talked about?

9    A.    Yeah.

10   Q.    And this person Tatum that he was complaining

11   about, having to take care of these boys, who is

12   Tatum in relation to Mr. Hall?

13   A.    His brother.

14   Q.    Are you ready?  Thank you.

15             (Audio playing.)

16             What's that mean, "He ain't seen shit"?

17   Didn't see guys doing anything wrong?

18   A.    Yeah.

19   Q.    The Moody he's talking about is Detective

20   Moody sitting right here?

21   A.    Yeah.

22   Q.    Okay.  Go ahead, please.

23             (Audio playing.)

24             Now, Mr. Duckett, when Mr. Hall said --

25   is that what he said, "You want to take me a hit of

1        sale, yo?"

2        A.      Yeah.

3        Q.      What does that mean?

4        A.      Sell amounts.

5        Q.      Okay.  Sell drugs?

6        A.      Yeah.

7        Q.      Okay.  Go ahead, please.

8                        (Audio playing.)

9                        Stop, please.

10                       Now, can you describe -- or tell the

11       jury, please, what it was Mr. Smith was complaining

12       about when he says, "Cutting was dead wrong, giving

13       him something and ain't let me know".  What's he

14       saying there?

15       A.      I don't know.

16       Q.      Do you know what he was talking about in terms

17       of cutting?

18                       THE COURT:  You have to lean forward,

19       sir, and speak into the microphone.

20                       THE WITNESS:  I guess smack.

21       BY MR. PURCELL:

22       Q.      Is that what you understood him to be talking

23       about?

24       A.      Yeah.

25       Q.      Go ahead, please.

1                    (Audio played.)

2                    Stop that, please.  Thank you.

3                    Now, Mr. Duckett, if you go to the bottom

4     of the preceding page where Smith -- last -- it says

5     Smith, Hall, Smith.  It's the second-to-last Smith on

6     the page.  And he says, "Hey, cuz, hey cuz," it's

7     Hall who says, "Yes"; is that right?

8     A.      I don't see what you're talking about.

9     Q.      Go to the bottom of the preceding page.

10                    If I may approach?

11                    THE COURT:  Yes, you may.

12    BY MR. PURCELL:

13    Q.      Thank you.  Okay.  Where it says, "Hey, cuz,"

14    it's Hall who says, "Yeah".  You heard that; he

15    responded to him?

16    A.      I don't know.

17    Q.      A moment ago?  Said, "Yeah".

18    A.      Yeah.

19    Q.      Now, did you hear the part where it says, "He

20    was dead wrong," and you hearing something, "without

21    letting me know"?

22    A.      Yeah.

23    Q.      Now go to the next page.  This is what I want

24    to ask you about.  Mr. Hall says, "I mean, I gave him

25    a couple of stones, yo.  I be giving him like a

1    hundred dollars worth of nickels, yo, and let him

2    dime them and he just give me my money straight

3    back".

4                Now, I don't think the jury -- well,

5    strike that.

6                Could you tell the jury what that meant

7    in terms of -- if anything -- in terms of drugs?

8    A.     He was giving him --

9                THE COURT:  Lean forward, sir, please,

10   and speak into the microphone.

11               THE WITNESS:  He was giving him ready.

12   BY MR. PURCELL:

13   Q.     Giving him ready?  Is that what stones are?

14   A.     Yeah.

15   Q.     And when he says, "I gave him a hundred

16   dollars worth of nickels," what does that mean?

17   A.     He gave him a hundred dollars worth of five

18   dollar bills.

19   Q.     And says, "And let him dime them".  What does

20   that mean?

21   A.     He sold them for ten.

22   Q.     So he was fronting him straight back.  So, he

23   was fronting him the money, itself; that's twice what

24   he gave him in terms of value; is that right?

25   A.     Yeah.

1    Q.      Okay.  But they're talking about drugs there,

2    correct?

3    A.      Yeah.

4    Q.      And they're not talking nickels and dimes, but

5    five dollars and ten dollars; is that right?

6    A.      Yeah.

7    Q.      You don't buy a bag of crack for a nickel, do

8    you?

9    A.      No.

10   Q.      Not yet, anyway.

11           Go ahead.

12           (Audio playing.)

13           Mr. Duckett, when this particular part of

14   the conversation was going on, were you in a car?

15   A.      Yeah.

16   Q.      Okay.  Just going on to 21840.  Thank you.

17           All right.  And that was it for that

18   particular conversation.

19           Now, in the next -- I guess two days

20   later you went back; is that right?

21   A.      Yeah.

22   Q.      And is that the conversation that you

23   described where Mr. Hall -- I'm sorry, Mr. Hall was

24   talking to you about the questions we were asking

25   about Roddy?

1    A.      Yeah.

2                 MR. PURCELL:  Now, Your Honor, if you

3    give me an idea of how much time we have?

4                 THE COURT:  Yes.  Why don't you all

5    approach the bench and we'll get some time estimates?

6                 (BENCH CONFERENCE ON THE RECORD.)

7                 MR. PURCELL:  These are, no doubt, the

8    two longest witnesses.

9                 THE COURT:  How much longer do you have

10   with this witness?

11                MR. PURCELL:  I'm almost finished.

12                THE COURT:  Can you finish in a matter of

13   a few minutes?

14                MR. PURCELL:  Yes.

15                THE COURT:  All right.  And then we'll

16   have cross- examination start in the morning.

17                MR. PROCTOR:  That will be fine with me.

18                MR. PURCELL:  Just reserve in case I find

19   something in my notes.

20                (JURY IN.)

21                THE COURT:  Ladies and gentlemen, we just

22   have a few more minutes and we'll conclude the direct

23   examination with Mr. Proctor or Mr. Sullivan to start

24   their cross-examination in the morning.  And I'll go

25   over the schedule tomorrow with you in a second.  So,

1          just bear with us.

2                      Go ahead, Mr. Purcell.

3                      MR. PURCELL:  We're going to get in the

4          second tape --

5                      THE COURT:  What exhibit number?

6                      MR. PURCELL:  This will be Exhibit No.

7          181; and a transcript, 181B.  Make sure the Court has

8          one.

9                      THE COURT:  181B as in Boy?

10                     MR. PURCELL:  Yes.

11                     THE COURT:  That will not be in evidence.

12         It will be marked for identification.  You may refer

13         to it as you listen to the tape.  And then government

14         Exhibit 181 is admitted into evidence and has already

15         been admitted into evidence.  And again, Mr. Purcell,

16         you just have a matter of a few minutes.  If you

17         think we can do this in a few minutes.

18                     MR. PURCELL:  Yes, Your Honor.  If we

19         don't, we can stop and finish it tomorrow.  There

20         will be fewer questions on this one.  Go ahead.

21                     THE COURT:  What is the date of this, Mr.

22         Purcell?

23                     MR. PURCELL:  This is November 20th,

24         2010.

25                     THE COURT:  All right.  Go ahead.

1              (Audio playing.)

2    BY MR. PURCELL:

3    Q.      Okay.  We can stop there.  Let's go back to

4    the beginning of this conversation, though.  You've

5    described this conversation earlier.  You said you

6    went in and talked to Mack.  Is this the conversation

7    where he told you that Kwana and Ron and Shameka had

8    been asked about Roddy in the grand jury?

9    A.      Yes.

10   Q.      And did I hear correctly that Mack was saying

11   that this was just in the past couple of weeks?

12   A.      Yeah.

13   Q.      Was he wondering how we knew?

14   A.      Yeah.

15   Q.      And on -- I guess, I apologize to all for not

16   having these pages numbered.  But on the top of the

17   third page, about the third reference to Mr. Hall, it

18   was very faint.  But you've listened to this with

19   earphones and were present at the scene; is that

20   right?

21   A.      Yeah.

22   Q.      Did he say, "Right, but how they know I got

23   out?"

24   A.      Yeah.

25   Q.      And he did get out, according to your

270

1    testimony; is that right?

2    A.      Yeah.

3              MR. PURCELL:  Thank you.  Your Honor,

4    with that I have no further questions for today.

5              THE COURT:  All right.  That concludes

6    the direct examination of Mr. Duckett.

7              Mr. Duckett, you will remain under oath.

8    You're not to discuss your testimony with anyone.

9    You'll come back to the witness stand tomorrow and

10   we'll begin with the cross-examination by defense

11   counsel.

12             Ladies and gentlemen, tomorrow afternoon

13   I have another previously scheduled matter in this

14   courtroom that cannot be rescheduled so that we're

15   going to start tomorrow promptly at 9:30 and we're

16   going to go until 1:30 and take a break at 11:30.  We

17   won't take a break for lunch.  But you'll be excused

18   for the day at 1:30.  So, that will be the day

19   tomorrow, from 9:30 to 1:30, with a break around

20   11:15, 11:20 for a break.  And then we'll go until

21   1:30.  And that will be it.  And then we'll be

22   finished for the day and you can have lunch.

23             And then on Friday we're going to be

24   starting at noon because of another conflict in the

25   Court's schedule.  So we basically have two fairly

1    substantial half days tomorrow and Friday.

2              And so with that, this Court -- I have

3    another matter at 4:30, I believe, Miss West.  So

4    this Court will stand in recess for about five

5    minutes.

6              (TRIAL RECESSED.)

7

8              I certify that the foregoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12                        *s/ Anthony Rolland*

13                        ANTHONY ROLLAND

14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$25,000** - 50:13
**$3,600** - 123:21
**$36,000** - 50:12

**'**

**'they** - 170:1

**0**

**010200** - 259:23

**1**

**1** - 3:23, 71:20,
85:14, 92:24, 143:16,
192:20, 206:11,
243:25, 248:11,
248:17, 250:7
**10** - 151:21
**10th** - 8:10
**11** - 71:19
**11-18** - 59:20
**11-20** - 59:20
**11:15** - 270:20
**11:20** - 270:20
**11:30** - 270:16
**12** - 2:13
**123** - 231:17, 231:18
**124** - 232:2, 232:6,
232:7
**134** - 58:23, 59:5,
59:13
**135** - 58:25, 59:9,
59:13
**136** - 58:25, 59:9,
59:11, 59:13
**14** - 69:24
**161** - 20:1
**162** - 19:2
**16:14** - 64:20
**16:49** - 64:14
**174** - 255:13
**177** - 175:19
**178** - 175:19
**18** - 255:16, 257:12
**181** - 59:21, 255:18,
268:7, 268:14
**181b** - 268:7, 268:9
**182** - 255:19
**183** - 59:21, 255:20
**183b** - 255:21
**187** - 75:3, 75:4
**188** - 31:25, 63:2,
63:6, 128:20, 129:1
**188a** - 62:20, 63:2,
63:7, 129:1
**188b** - 62:21, 63:3,
63:7, 128:19, 128:20,
129:2
**18th** - 55:22
**19** - 234:15
**191** - 114:12
**192** - 118:16, 118:20
**194** - 75:6
**195** - 73:25, 74:21,
74:23, 125:6, 127:7
**196** - 75:2
**1997** - 69:23
**1:10-cr-0744-rdb** -
1:5
**1:30** - 2:7, 4:1,
270:16, 270:18,
270:19, 270:21

**2**

**2** - 2:9, 3:20, 89:12,
92:9, 96:3, 144:20,
155:14, 191:18,
191:20, 213:3, 258:25
**20** - 9:11, 10:6, 32:4,
66:17, 66:21, 119:4,
149:8
**2004** - 114:1, 114:3
**2005** - 19:7, 20:20
**2006** - 176:15
**2007** - 176:15
**2008** - 8:1, 8:7, 8:10,
176:15
**2009** - 9:11, 10:6,
11:6, 11:24, 22:22,
24:3, 24:21, 25:23,
29:4, 31:18, 57:7,
57:8, 59:6, 78:2,
82:14, 84:1, 102:10,
103:16, 108:4, 114:4,
114:5, 174:2, 174:7,
176:14, 225:13, 226:2
**2010** - 24:18, 24:19,
25:3, 25:18, 25:23,
25:24, 25:25, 26:5,
34:25, 38:3, 41:6,
46:18, 47:17, 49:21,
49:24, 55:6, 55:22,
57:4, 57:6, 74:24,
75:1, 75:6, 83:9, 84:1,
114:5, 115:17, 117:4,
118:5, 134:25,
175:25, 221:7,
246:22, 251:10,
252:9, 257:12, 268:24
**2011** - 1:10, 176:6
**20th** - 32:22, 55:22,
74:13, 75:6, 83:4,
117:3, 174:7, 268:23
**21** - 36:19, 74:24
**21840** - 266:16
**21st** - 29:3, 31:18,
36:20, 127:7, 225:13
**2400** - 5:21
**24th** - 133:11,
135:14, 141:23
**25** - 246:13
**26,545** - 123:11
**2600** - 20:6
**26th** - 134:25
**27** - 31:4
**2723** - 19:7
**28** - 173:9, 175:2,
234:13
**28th** - 175:25,
251:10
**2nd** - 19:7, 20:19

**3**

**3** - 1:10, 81:16,
87:12, 128:12,
198:15, 198:24,
209:2, 250:14
**30** - 32:5, 66:22,
119:4
**300** - 261:17
**302** - 7:15, 7:17, 8:8,
8:10, 8:11, 9:10, 10:7,
10:10, 10:19, 10:21,
11:5, 12:8, 13:5,
13:24, 14:1, 14:5,
15:10, 15:13, 15:15,
15:16, 15:21, 15:22,
15:24, 16:4, 16:13,
16:21, 17:4, 17:7,
17:20, 17:25, 18:2,
18:8, 18:15, 18:18,
18:19, 19:17, 20:22,
22:1, 22:4, 67:20

**302s** - 61:1, 61:4
**306** - 7:15
**311** - 36:24, 37:19,
49:19
**313** - 59:19, 255:17,
255:18, 257:16,
257:24
**314** - 59:20, 255:17,
255:19, 257:17,
257:19, 257:25
**338** - 10:1
**3553** - 141:4
**36** - 182:11, 182:14

**4**

**4** - 74:9, 82:20, 84:1,
89:11, 152:12,
152:13, 153:1, 193:2,
198:15, 202:5, 246:5,
246:14
**404** - 249:21
**404b** - 17:14
**44** - 208:11, 208:13
**468** - 30:22
**469** - 223:13
**47a** - 236:2
**492** - 139:19
**4:30** - 2:5, 3:23,
246:6, 271:3
**4th** - 46:18, 75:1,
83:6, 83:9, 108:4,
114:5, 115:17

**5**

**5** - 20:20
**5(k** - 138:20
**5(k)1.1** - 141:5
**5th** - 20:6

**6**

**6** - 244:12, 244:13
**602** - 179:25, 180:3,
180:11, 191:10
**607** - 181:4
**612** - 182:2, 182:6
**613** - 182:5
**6b** - 5:13, 7:6

**7**

**700** - 261:16

**8**

**801** - 111:2
**8th** - 123:15

**9**

**9** - 2:15
**9-21** - 64:1
**911** - 160:1
**9:30** - 2:6, 4:1,
270:15, 270:19
**9th** - 8:1, 8:7

**A**

**abilities** - 200:7
**able** - 3:20, 26:6,
29:2, 57:14, 101:14,
256:18
**above-entitled** -
271:10
**Absolutely** - 38:11
**Academy** - 235:8
**acceptable** - 128:16

**accepted** - 14:1
**according** - 4:17,
72:8, 172:10, 223:2,
269:25
**account** - 223:2,
223:3
**accurate** - 129:20,
129:25, 191:25
**accurately** - 261:2
**accused** - 242:17
**acknowledge** -
44:16
**acknowledged** -
47:3
**acting** - 228:19
**activity** - 105:12
**acts** - 17:15, 248:9,
248:16, 248:21,
249:7, 250:6, 250:8,
250:12
**actual** - 7:13, 21:20,
34:6, 34:9, 54:14,
69:18
**Acura** - 89:17,
191:24, 192:1
**Adams** - 79:19,
82:18
**added** - 123:11
**addict** - 104:6
**addicts** - 105:18
**addition** - 16:13,
55:9, 56:13, 189:2
**address** - 17:20,
50:8, 126:11, 245:23
**addressing** -
125:20, 126:6, 126:10
**adds** - 16:5
**adjusted** - 140:7
**administrative** -
54:22
**admissible** -
110:21, 250:11
**admissions** - 34:14
**admit** - 30:20, 58:16
**admitted** - 26:19,
37:18, 43:22, 44:3,
44:15, 59:6, 61:23,
63:6, 63:7, 230:1,
236:2, 268:14, 268:15
**admitting** - 34:14,
55:23, 63:24
**admonish** - 126:14
**advancing** - 259:3
**advise** - 247:3,
260:16
**advised** - 33:20,
33:24, 122:12, 260:15
**aerial** - 192:19,
236:6, 236:7, 243:21
**afternoon** - 3:8,
3:25, 4:2, 121:8,
121:9, 145:3, 270:12
**Afternoon** - 145:1
**afterwards** - 219:3
**age** - 151:9, 151:10
**Agent** - 7:19, 21:24,
65:13, 65:15
**agent** - 10:3, 11:3,
21:8, 21:9, 21:12,
21:20, 65:15, 71:11,
121:11, 133:14,
160:19
**agents** - 21:17,
40:8, 77:6, 133:16,
222:1, 223:22,
251:20, 256:18,
256:21, 257:1
**ago** - 73:18, 81:4,
81:8, 81:9, 131:3,
171:9, 264:17

**agreeable** - 246:15
**Agreed** - 137:21
**agreement** - 34:5,
106:5, 118:10,
118:20, 138:17,
139:18, 139:24,
140:20, 140:24
**agreement's** -
118:12
**ahead** - 86:8, 86:10,
86:20, 93:19, 93:21,
97:2, 98:23, 179:17,
182:7, 208:25,
250:20, 258:17,
259:1, 259:21, 262:2,
262:22, 263:7,
263:25, 266:11,
268:2, 268:20, 268:25
**aided** - 1:24
**aim** - 70:21
**aiming** - 148:6
**ain't** - 81:4, 141:7,
176:1, 189:17,
197:11, 220:12,
220:20, 224:9,
224:14, 262:16,
263:13
**Alaska** - 31:1
**alibi** - 238:1, 238:4,
238:5
**allegations** - 13:19,
13:20, 14:4, 16:17
**alleged** - 248:16
**allegedly** - 15:10
**alleging** - 16:4
**allow** - 32:5
**allowed** - 117:4,
181:4, 215:8
**allows** - 2:21
**almost** - 39:21,
160:3, 267:11
**alone** - 169:12,
223:23, 224:8
**America** - 1:3
**amount** - 16:23,
67:24, 68:4, 119:8,
123:24, 139:2,
177:24, 178:6,
181:19, 183:11,
184:2, 185:9
**amounts** - 178:9,
178:14, 181:21,
184:25, 263:4
**analysis** - 69:18
**Andy** - 13:8
**anger** - 228:17
**angry** - 211:16
**Annapolis** - 84:25,
85:1, 85:2, 226:7
**Anne** - 174:12
**Annor** - 31:1, 104:9,
104:10, 104:12,
193:6, 193:14,
193:16, 194:24
**answer** - 15:20,
26:3, 48:17, 48:19,
52:21, 66:8, 101:7,
111:9, 112:4, 167:8,
170:17, 187:24,
235:22
**answered** - 103:8,
111:23
**answers** - 8:3,
67:14
**Anthony** - 271:12,
271:13
**Antonio** - 1:6,
10:24, 14:12, 99:17,
174:23
**anyway** - 31:8,

266:10
**apologize** - 3:7, 129:14, 145:11, 269:15
**appeal** - 140:4
**appearance** - 2:11, 2:13, 108:3, 251:9
**appearances** - 37:7, 75:8
**Appearances** - 1:13
**appointed** - 221:18
**appreciate** - 72:19, 243:19
**approach** - 15:5, 45:7, 59:22, 73:21, 124:22, 127:2, 139:15, 143:11, 184:16, 202:19, 203:13, 231:16, 236:1, 248:3, 264:10, 267:5
**Approach** - 48:10, 52:8, 109:18, 125:10, 180:1
**approve** - 112:18
**April** - 34:25, 119:10
**area** - 5:4, 5:6, 5:19, 5:20, 8:24, 24:1, 30:2, 57:23, 88:10, 88:14, 90:19, 91:15, 91:16, 92:10, 95:22, 96:17, 97:4, 133:22, 142:3, 152:23, 192:23, 192:24, 198:21, 200:12, 203:6, 203:15, 226:5, 237:10, 241:24, 243:17, 244:20, 245:21, 245:25, 256:24, 257:4
**areas** - 16:11, 16:12, 17:19, 17:20, 81:21
**arrange** - 230:10, 243:8
**arranged** - 2:10
**arrest** - 7:20, 7:25, 41:5, 41:11, 41:13, 49:25
**arrested** - 8:13, 8:14, 35:8, 35:9, 67:20, 114:16, 114:19, 122:3, 134:25, 135:4, 135:12, 251:19
**arresting** - 70:13
**arrive** - 30:11, 193:15, 197:20, 198:8
**arrived** - 192:8, 193:12, 242:3
**arriving** - 192:13
**arrow** - 94:8, 102:25
**arrow's** - 104:16
**Arundel** - 174:12
**Aside** - 80:15
**aspect** - 56:14, 253:1
**ass** - 239:14, 239:16, 239:19
**asserted** - 13:22
**assets** - 52:6
**Assigned** - 23:7
**assigned** - 23:15
**assist** - 62:4, 257:20
**assistance** - 138:24, 141:13, 141:10, 141:14
**Assistant** - 1:15
**assisted** - 54:5

**associate** - 14:16, 45:14
**associated** - 53:23
**associates** - 8:25
**association** - 76:17
**assume** - 30:11, 134:4, 216:4
**Assumes** - 180:5
**assuming** - 142:21, 225:19, 239:21
**attached** - 213:3
**attempted** - 249:14, 250:5
**attention** - 20:1, 34:24, 78:1, 81:25, 82:3, 92:17, 94:13, 109:9, 109:22, 110:10, 167:13, 174:3, 212:14, 221:6, 244:17
**Attorney** - 1:15
**attorney** - 9:7, 33:14, 34:5, 34:10, 34:22, 36:7, 36:11, 36:13, 38:14, 38:17, 45:20, 45:24, 107:22, 108:15, 119:17, 119:20, 119:24, 168:8, 168:11
**attorney's** - 75:23
**Attorney's** - 61:13, 108:8, 133:10, 136:17, 140:21, 141:8, 141:23, 160:11, 167:20, 171:5
**attorneys** - 39:20, 46:1, 222:2, 222:4, 222:7, 246:23
**attributed** - 260:21
**Audio** - 64:11, 64:23, 129:21, 259:2, 259:22, 260:1, 261:7, 262:3, 262:15, 262:23, 263:8, 264:1, 266:12, 269:1
**August** - 1:10, 78:16
**authenticate** - 58:7
**authorities** - 110:4
**automated** - 28:12
**automatic** - 204:2, 204:3
**automatically** - 32:8
**Avery** - 77:17, 87:25, 88:2, 88:5, 91:15, 95:17, 95:18, 95:24, 96:16, 142:10, 142:21, 142:22, 142:25, 143:4, 200:1, 200:2
**Avery's** - 142:18
**aware** - 14:20, 15:11, 78:3, 133:13, 218:11, 218:13, 240:10

**B**

**backtrack** - 182:21
**Bad** - 135:2
**bad** - 112:19, 196:11, 220:12
**bag** - 266:7
**bags** - 186:2, 186:8
**Bags** - 186:6, 186:8
**bail** - 135:16, 135:20
**ball** - 6:10, 65:23, 85:4, 85:13, 92:15, 236:20
**ballistics** - 69:17

**ballpark** - 100:11
**Balt** - 114:21
**Baltimore** - 5:6, 6:22, 6:23, 23:4, 35:20, 46:21, 76:19, 76:20, 76:23, 114:23, 117:21, 174:13, 174:14, 174:15, 215:2, 215:16, 234:24
**bank** - 31:25
**banned** - 217:21
**barely** - 6:19
**based** - 14:22, 23:24, 41:21, 42:16, 45:6, 185:24
**Based** - 184:16
**Basis** - 109:20
**basis** - 15:14, 110:4, 110:8, 111:25, 180:10
**basketball** - 86:5
**bathroom** - 195:13, 195:14, 197:10, 197:13, 197:15, 199:3, 201:2, 201:22
**bear** - 268:1
**became** - 64:3, 78:3, 81:5
**beef** - 227:20, 227:25
**began** - 24:11, 213:7, 213:8
**Begin** - 259:23
**begin** - 260:20, 270:10
**beginning** - 41:17, 43:14, 64:13, 192:17, 192:18, 192:21, 258:25, 269:4
**begins** - 258:25, 259:5
**behalf** - 50:18
**behind** - 87:2, 154:20, 154:22
**believer** - 144:4
**believes** - 60:6, 62:6
**below** - 193:9
**Bench** - 15:7, 18:5, 48:11, 52:9, 53:25, 59:24, 61:21, 109:19, 111:12, 125:12, 126:25, 143:13, 144:17, 180:2, 248:4, 249:24, 267:6
**bench** - 48:10, 52:8, 59:22, 109:18, 125:11, 143:12, 143:16, 180:1, 248:3, 267:5
**bending** - 204:23
**benefit** - 5:4, 5:17
**Bennett** - 1:12, 36:3, 52:1
**beside** - 203:20
**best** - 3:25, 15:23, 147:22, 147:25, 156:2
**bet** - 2:19
**better** - 40:20, 70:21, 122:9, 123:6, 136:2, 143:3, 153:12
**between** - 8:2, 27:9, 42:16, 45:23, 56:1, 93:2, 106:5, 140:20, 167:23, 200:17, 227:20, 228:12, 228:14
**beyond** - 16:14, 17:8, 57:23

**Big** - 153:25, 157:2, 166:10, 166:12, 166:14, 166:15, 173:1
**big** - 166:21, 166:24, 214:17
**bill** - 54:17, 122:23
**bills** - 54:14, 54:15, 54:16, 54:18, 117:25, 122:16, 265:18
**birthdays** - 151:16
**bit** - 8:19, 49:4, 56:15, 58:20, 59:13, 67:1, 67:20, 76:11, 138:18, 143:15, 144:13, 144:21, 178:13, 182:21, 198:13, 202:7, 224:19, 244:18, 249:4
**Black** - 10:25, 13:12, 189:12, 189:14
**black** - 80:7
**blacktop** - 82:9
**bleeding** - 159:23
**block** - 5:21, 20:6
**blow** - 81:16
**blow-up** - 81:14
**blue** - 29:20, 29:22, 30:1, 38:2, 59:8, 99:14, 162:1
**blue-light** - 29:20, 29:22, 30:1, 59:8
**blunt** - 149:1
**board** - 191:17
**bodily** - 70:5
**body** - 55:15, 256:7, 256:11
**Boo** - 233:8, 233:13
**book** - 22:8, 22:11
**borrow** - 146:21, 146:24
**bottom** - 7:8, 13:9, 17:18, 181:7, 194:23, 264:3, 264:9
**bought** - 148:13, 148:20, 179:7, 238:10
**Boulevard** - 215:11
**box** - 173:4
**boy** - 130:18, 134:12, 134:15, 169:23, 248:20
**Boy** - 268:9
**boyfriend** - 27:9, 46:17
**boys** - 262:11
**Brandon** - 26:13, 28:23, 130:3, 134:23
**break** - 2:7, 46:15, 46:20, 61:19, 64:3, 65:17, 71:18, 102:22, 143:15, 144:2, 144:16, 144:19, 144:21, 246:7, 270:16, 270:17, 270:19, 270:20
**Brian** - 23:10
**brick** - 178:17, 181:24, 182:9, 183:11
**Brief** - 71:21
**briefly** - 22:17, 122:16
**bring** - 2:4, 53:18
**Bring** - 72:1, 261:16
**bringing** - 71:15
**Brooklyn** - 174:9, 174:11, 174:12
**brother** - 80:22, 219:18, 262:13
**brought** - 24:17, 24:25, 36:13, 74:2, 83:9, 108:7, 138:19,

160:19, 218:14
**Brown** - 9:20
**bucket** - 117:16
**buckets** - 54:24
**bucks** - 123:12
**bucks'** - 149:8
**buddies** - 150:18
**bulk** - 3:4
**bullet** - 204:12, 204:13, 204:17
**bullets** - 204:5, 239:18
**bump** - 150:17
**bunch** - 79:25, 130:9, 133:21, 145:9, 163:9
**bush** - 152:21, 153:1, 153:18, 153:19
**business** - 104:21, 261:25
**Buy** - 91:6
**buy** - 84:17, 84:19, 91:5, 147:11, 148:4, 148:7, 148:12, 148:9, 148:23, 149:8, 177:13, 177:16, 178:9, 178:15, 178:16, 214:17, 261:22, 266:7
**buying** - 151:21, 162:9, 178:10, 179:3, 183:12

**C**

**cable** - 122:25
**Cabreja** - 29:25
**calculation** - 247:13
**calendar** - 3:2
**camera** - 30:25, 57:15, 57:21, 57:22, 59:9, 61:18, 68:21
**cameras** - 29:20, 29:22, 30:2
**cannot** - 51:24, 270:14
**capacity** - 55:15
**Caprese** - 102:15
**caps** - 67:21, 67:24, 186:2
**capsules** - 8:16
**car** - 89:4, 89:13, 89:16, 92:8, 95:1, 95:2, 100:19, 123:4, 123:5, 149:19, 159:18, 162:8, 184:18, 184:20, 184:21, 191:9, 191:15, 191:19, 191:22, 192:1, 192:3, 192:9, 192:25, 193:3, 193:5, 195:9, 198:2, 198:8, 201:2, 201:8, 202:3, 202:4, 202:6, 203:2, 210:10, 210:20, 212:7, 212:11, 212:15, 212:18, 212:19, 213:4, 213:25, 214:23, 215:4, 215:8, 215:15, 215:20, 242:5, 242:7, 253:5, 253:9, 258:20, 266:14
**cards** - 54:19
**care** - 52:23, 103:11, 262:11
**careful** - 16:20, 18:3
**Carithers** - 9:4, 9:8
**carried** - 106:25
**carrying** - 196:21

3

**case** - 3:4, 9:6, 9:18, 10:3, 11:3, 11:16, 13:19, 23:16, 30:14, 37:8, 46:22, 50:12, 56:14, 60:15, 60:22, 62:5, 62:13, 69:9, 69:11, 69:14, 69:17, 69:20, 71:11, 106:6, 108:9, 114:11, 116:21, 116:22, 119:18, 121:11, 121:12, 137:25, 138:3, 139:13, 144:5, 150:25, 174:17, 176:7, 176:11, 223:23, 234:22, 248:15, 249:13, 249:14, 250:4, 250:10, 251:21, 260:12, 267:18
**Case** - 1:5
**cash** - 54:9, 117:16
**casual** - 126:20
**caused** - 42:19, 164:12, 215:8
**cautionary** - 16:18, 17:18, 248:13, 248:18
**Cd** - 30:24
**cellphone** - 232:25
**cement** - 101:4, 153:9, 153:16, 153:19, 153:21, 153:22
**center** - 47:18
**certain** - 232:13
**Certainly** - 15:6, 63:11, 66:10, 71:2, 87:16, 124:24, 244:5
**certainly** - 13:16, 16:11, 61:16, 65:3, 67:14, 137:24, 150:5, 180:13
**certify** - 271:8
**chair** - 232:19
**chairs** - 232:9
**challenge** - 181:5, 181:6
**chance** - 80:13
**Chaneque** - 79:19, 82:18, 87:3
**Chaneque's** - 86:16, 86:23
**change** - 36:15
**changed** - 59:12
**characterized** - 115:19, 117:3
**charge** - 35:10, 35:15, 116:22, 138:16
**charged** - 118:22, 119:2, 132:10, 161:23, 247:17, 248:14, 249:6, 249:13, 250:4, 250:5, 250:7, 250:9, 250:12, 250:14
**charges** - 249:12
**chase** - 131:6
**Check** - 261:15
**check** - 186:17
**checks** - 54:9
**Cheese** - 9:3, 9:20
**Cheese's** - 9:7
**child** - 173:21, 173:23
**children** - 52:5, 76:25, 102:8, 115:2, 115:3, 115:23, 116:1, 116:3, 116:6, 116:11, 116:18, 117:5, 117:20, 122:13,

151:9, 151:15, 173:10
**chirped** - 125:22
**chirping** - 125:25, 126:13
**cigarette** - 91:18, 91:20, 92:6, 92:19, 93:5
**cigarettes** - 91:24
**circle** - 5:15, 5:18
**circled** - 80:17
**circulating** - 78:4
**citizen** - 135:25
**city** - 23:5, 23:6, 35:22
**City** - 6:22, 6:23, 23:4, 46:21, 234:24
**clarify** - 22:9, 181:14, 182:9, 250:19
**clear** - 7:7, 7:10, 22:5, 31:10, 32:25, 55:2, 67:23, 137:14, 152:25, 181:9, 224:18
**clearly** - 111:1, 181:7, 250:14
**Clearly** - 180:8
**Clerk** - 4:18, 4:21, 72:9, 172:11, 172:14, 172:17
**Clientele** - 261:20
**Clinton** - 1:15
**clip** - 239:16, 239:17
**clock** - 246:4
**close** - 50:2, 99:4, 237:8
**closed** - 157:22
**closer** - 66:22, 150:22, 156:9, 156:25, 157:3, 158:10, 194:23, 214:4
**clothes** - 157:23
**clue** - 31:12
**co** - 40:8
**co-counsel** - 40:8
**Cocaine** - 103:23
**cocaine** - 103:24, 104:24, 104:25, 177:17, 177:20, 178:10, 179:7, 179:8, 179:9, 179:13, 182:10, 184:2, 184:6, 185:3
**Cocked** - 204:10
**cocked** - 204:11
**coherently** - 69:6
**coincided** - 49:25
**coincides** - 58:11
**cold** - 46:21
**colloquial** - 144:13
**combine** - 177:16
**combined** - 68:7
**coming** - 147:9, 175:20, 221:8, 222:5
**comment** - 15:20, 53:7, 144:8, 239:5
**comments** - 50:10, 126:20
**committed** - 67:12, 101:22, 107:17, 169:9
**communications** - 251:23
**community** - 42:7, 48:5, 53:2, 109:4
**compared** - 166:17
**complaining** - 262:10, 263:11
**complete** - 62:19, 62:20
**complicating** - 257:9

**complies** - 232:18, 232:21, 236:16
**computer** - 1:24
**computer-aided** - 1:24
**conclude** - 267:22
**concludes** - 171:24, 270:5
**condition** - 52:2, 200:5
**conduct** - 104:20, 105:11, 184:14
**conducted** - 23:3, 185:15, 185:16, 218:14
**conducting** - 177:10, 243:20
**confer** - 231:11
**Conference** - 15:7, 18:5, 48:11, 52:9, 53:25, 59:24, 61:21, 109:19, 111:12, 125:12, 126:25, 143:13, 144:17, 180:2, 248:4, 249:24, 267:6
**confined** - 115:4
**confines** - 17:7
**confirm** - 9:16, 10:2, 18:22, 35:1, 56:7, 230:12
**confirmation** - 238:22
**confirmed** - 36:23, 118:12
**conflict** - 270:24
**conflicted** - 181:3
**confront** - 33:8, 182:1
**confrontation** - 167:14, 167:15, 167:16, 228:5, 228:11
**confronted** - 33:18, 108:8
**connected** - 20:21, 42:7
**connecting** - 18:8, 28:19
**connection** - 81:5, 82:24, 249:1, 250:6
**conscience** - 136:5
**considerable** - 123:24
**consists** - 31:3
**conspiracy** - 247:9, 248:11, 248:17, 249:7, 249:19, 249:21, 250:7, 250:9, 250:12, 250:13
**contact** - 35:24, 42:5, 114:25
**containing** - 30:24
**contents** - 14:1
**context** - 10:23, 10:25, 13:18, 13:25, 15:20, 16:2, 16:21, 16:23, 111:5, 239:8
**Continue** - 260:18
**continue** - 7:14, 32:19, 93:18, 145:12, 145:13, 246:3, 250:19, 261:6
**continued** - 41:4
**continuing** - 54:2
**contract** - 68:11
**contrary** - 33:19
**controlled** - 55:15, 55:17, 59:17
**controls** - 60:8, 257:21

**conversation** - 32:12, 32:14, 42:16, 95:24, 108:11, 109:12, 110:17, 111:10, 113:8, 115:4, 115:15, 126:1, 144:13, 144:14, 196:10, 198:19, 211:1, 241:19, 242:5, 244:19, 253:17, 258:2, 258:22, 261:4, 261:11, 266:14, 266:18, 266:22, 269:4, 269:5, 269:6
**conversations** - 14:22, 26:18, 55:25, 109:10, 111:4, 111:6, 111:14, 111:19, 112:6, 112:8, 112:9, 112:11, 112:15, 119:25, 253:15, 256:11
**convicted** - 12:24
**cook** - 179:11, 179:12, 179:22, 180:7, 182:23, 182:25, 183:10, 183:12, 183:14, 183:23, 184:2
**cooked** - 183:3, 183:6
**cool** - 144:14
**cooperate** - 45:25, 110:3
**cooperated** - 140:18, 250:24
**cooperating** - 12:1, 55:12, 161:15, 161:19
**cooperation** - 139:12
**cooperator** - 12:3, 48:8, 51:14
**cooperators** - 3:3
**copies** - 175:17
**cops** - 163:10
**copy** - 31:21, 63:9, 63:12, 114:11, 259:8
**corner** - 6:25, 7:9, 162:10, 209:16, 236:12
**corners** - 184:9
**correct** - 5:7, 7:3, 9:5, 9:9, 9:14, 9:15, 9:19, 9:20, 10:4, 10:5, 10:20, 11:17, 11:22, 12:5, 13:12, 13:13, 18:15, 20:12, 20:14, 21:19, 22:16, 24:4, 24:22, 25:9, 25:20, 25:21, 26:9, 26:24, 28:3, 29:13, 29:14, 29:19, 29:21, 31:2, 31:7, 31:20, 31:24, 32:3, 32:10, 32:13, 36:23, 42:21, 43:24, 44:22, 46:19, 47:25, 50:2, 50:21, 54:5, 55:18, 59:6, 59:10, 63:5, 63:22, 64:17, 67:7, 67:13, 67:18, 67:21, 68:9, 75:8, 75:12, 75:16, 78:23, 83:21, 92:9, 96:5, 97:9, 97:13, 100:12, 104:10, 108:22, 113:13, 117:14, 117:21, 117:22, 118:24, 119:11, 120:1, 127:8, 127:12, 127:17, 127:23,

131:9, 131:14, 131:20, 132:12, 140:22, 155:3, 156:8, 157:1, 158:16, 159:19, 160:24, 161:25, 165:15, 165:18, 168:10, 168:12, 175:23, 190:9, 190:12, 200:16, 203:2, 206:12, 209:6, 215:20, 237:1, 241:23, 244:2, 248:11, 255:19, 258:2, 258:8, 258:20, 259:23, 266:2, 271:8
**Correct** - 7:5, 13:3, 20:15, 20:23, 21:9, 21:15, 24:20, 25:11, 25:13, 25:17, 27:5, 27:7, 27:19, 28:4, 28:6, 29:16, 30:3, 31:13, 32:9, 33:3, 34:3, 34:7, 34:23, 35:11, 35:23, 36:25, 37:9, 38:25, 39:10, 39:16, 40:24, 41:1, 44:24, 46:14, 47:7, 47:9, 49:13, 49:17, 50:4, 54:6, 54:8, 56:12, 57:1, 57:10, 57:20, 58:9, 58:12, 64:1, 64:5, 64:9, 64:21, 65:19, 68:13, 68:22, 69:5, 75:17, 76:24, 77:7, 87:20, 96:10, 102:13, 122:18, 123:16, 123:19, 127:13, 127:22, 127:24, 138:1, 140:23, 142:9, 142:12, 156:11, 158:24, 160:25, 161:22, 163:15
**corrected** - 239:6
**correctional** - 26:14
**correctly** - 141:7, 269:10
**cost** - 52:25, 53:11
**costs** - 53:23
**Counsel** - 59:22, 62:19, 71:23, 169:21, 231:11, 248:2, 259:25
**counsel** - 4:10, 4:13, 9:4, 26:3, 29:9, 32:10, 35:1, 35:18, 37:14, 40:8, 50:7, 50:10, 50:20, 56:8, 58:8, 61:4, 65:4, 74:1, 114:12, 114:22, 118:12, 118:17, 198:24, 245:24, 246:24, 270:11
**counsel's** - 198:17
**count** - 105:4, 132:14, 248:11
**Count** - 248:10, 248:17, 250:7, 250:13
**counter** - 64:16, 64:18, 64:19
**counts** - 119:2
**County** - 174:12
**couple** - 4:24, 57:8, 73:18, 98:17, 98:19, 160:3, 160:8, 170:22, 175:10, 177:1, 240:7, 246:2, 264:25, 269:11
**course** - 8:20, 19:3, 43:8, 57:13, 92:6, 137:8, 153:20, 161:7,

4

171:1

**Court** - 1:1, 2:3,
2:17, 2:21, 3:6, 3:12,
3:15, 3:17, 3:19, 4:12,
5:10, 5:22, 7:8, 9:17,
11:4, 12:21, 13:16,
14:8, 15:6, 15:8,
15:16, 15:19, 16:10,
16:16, 17:5, 17:11,
17:17, 18:3, 19:12,
20:25, 37:13, 37:15,
37:18, 40:18, 47:12,
48:10, 48:17, 48:20,
50:9, 51:5, 51:19,
51:23, 52:8, 52:10,
52:14, 52:18, 52:24,
53:6, 53:20, 59:3,
59:5, 59:8, 59:15,
59:22, 59:25, 60:13,
60:18, 60:21, 61:4,
61:6, 61:9, 61:22,
61:25, 62:24, 63:1,
63:6, 63:12, 63:15,
65:6, 66:4, 71:2, 71:4,
71:8, 71:16, 71:17,
71:23, 72:1, 73:22,
74:21, 75:2, 75:4,
75:11, 81:8, 81:15,
81:21, 82:1, 82:12,
82:14, 83:23, 85:7,
85:15, 86:9, 86:11,
86:23, 87:6, 87:16,
93:8, 93:15, 93:18,
93:22, 99:16, 103:9,
104:9, 104:10,
104:12, 109:2,
109:18, 109:20,
109:25, 110:12,
110:20, 110:25,
111:24, 115:12,
116:8, 116:15,
118:13, 118:14,
120:8, 120:15, 121:3,
124:24, 125:5,
125:10, 125:15,
125:19, 125:20,
125:24, 126:7,
126:11, 126:12,
126:18, 126:20,
126:23, 127:3,
128:11, 128:16,
128:17, 128:20,
128:23, 129:1,
129:11, 129:16,
133:4, 139:16,
143:11, 143:14,
143:20, 143:22,
143:24, 144:1,
144:12, 144:18,
145:3, 153:2, 154:14,
155:12, 159:18,
163:23, 164:1, 164:7,
164:18, 165:3, 165:9,
166:3, 167:6, 168:23,
170:12, 170:15,
170:24, 171:22,
172:6, 173:12,
174:22, 178:25,
179:15, 179:24,
180:1, 180:3, 180:8,
180:20, 181:4,
181:18, 181:25,
182:5, 185:8, 185:12,
186:5, 186:18, 190:4,
191:5, 191:7, 191:14,
193:7, 194:4, 194:24,
200:11, 202:23,
207:19, 208:13,
208:24, 208:25,
216:8, 227:8, 235:22,

236:3, 238:16, 244:5,
244:7, 245:23, 246:5,
246:18, 248:2, 248:5,
248:23, 249:3,
249:11, 249:22,
249:25, 250:18,
252:17, 255:13,
255:18, 255:22,
257:14, 257:18,
258:5, 258:8, 258:11,
260:2, 260:15,
263:18, 264:11,
265:9, 267:4, 267:9,
267:12, 267:15,
267:21, 268:5, 268:7,
268:9, 268:11,
268:21, 268:25,
270:5, 271:2, 271:4

**court** - 59:1, 92:4,
94:4, 94:25, 96:12,
97:6, 103:1, 149:14,
199:15, 221:18

**Court's** - 181:15,
243:19, 270:25

**courthouse** -
160:12, 160:15,
167:22

**courtroom** - 48:2,
71:13, 126:3, 144:7,
260:5, 260:7, 260:10,
260:12, 260:13,
270:14

**covered** - 52:24,
53:12

**crack** - 14:18,
177:7, 179:9, 179:12,
182:23, 182:25,
183:6, 183:10,
184:16, 185:3, 226:3,
226:18, 266:7

**Crack** - 103:25,
104:1, 104:25,
176:19, 177:5, 179:10

**crazy** - 254:4, 254:8

**created** - 66:7

**creating** - 7:16

**credit** - 54:19

**crime** - 12:7, 12:22,
20:3, 118:22, 133:14,
163:5, 217:5

**crimes** - 246:25

**cross** - 4:10, 52:12,
61:15, 65:5, 65:7,
143:18, 145:13,
267:16, 267:24,
270:10

**Cross** - 65:8, 121:4,
121:6

**Cross-examination**
- 121:4, 121:6

**cross-examination**
- 65:5, 145:13,
267:24, 270:10

**cross-examine** -
4:10, 52:12

**crouch** - 204:19

**crucial** - 110:18

**Cunningham** -
230:23, 242:4

**curbs** - 200:17

**curbside** - 94:22

**Curtis** - 24:17,
25:12, 25:25, 26:19,
27:10, 32:22, 33:8,
33:13, 35:4, 36:2,
37:22, 39:25, 41:7,
42:12, 43:16, 44:14,
47:15, 48:21, 49:7,
50:12, 51:2, 54:4,
60:21, 62:16, 63:24,

71:15, 72:4, 72:6,
72:11, 72:14, 72:22,
76:2, 78:2, 81:17,
84:2, 108:3, 111:14,
115:22, 117:7, 121:8,
128:25, 129:7, 135:2,
145:4, 145:17,
171:23, 220:11

**Curtis'** - 60:15

**custody** - 35:16

**customer** - 185:17

**cut** - 131:6, 145:10

**Cutting** - 263:12

**cutting** - 263:17

**cuz** - 264:6, 264:13

---

# D

**Damien** - 10:15

**danger** - 51:11

**dark** - 145:24

**date** - 7:24, 8:6, 8:8,
20:3, 22:20, 35:2,
57:2, 57:3, 74:24,
117:2, 135:21, 176:3,
229:8, 268:21

**dates** - 37:3, 37:6,
55:21, 74:8, 176:1

**days** - 22:25, 160:8,
240:8, 266:19, 271:1

**dead** - 70:22,
238:23, 240:1,
263:12, 264:20

**deal** - 136:2, 249:18

**dealer** - 14:18

**dealers** - 108:24

**dealing** - 16:13,
181:8

**dealt** - 180:9

**death** - 190:3,
191:9, 243:13

**Debbie** - 5:24

**Debby's** - 225:16

**December** - 49:24,
50:3, 117:11, 117:12,
117:13, 119:10,
123:15, 138:7, 251:19

**decide** - 60:3,
115:22, 146:11,
222:10

**decided** - 45:6,
45:24, 48:24, 115:10,
165:22, 251:3

**decides** - 139:12

**deciding** - 141:9

**decision** - 139:9,
222:8, 246:21

**declarations** -
111:2

**dedicated** - 11:20

**deep** - 51:16

**Defendant** - 1:8,
1:16

**defendant** - 16:7,
76:5, 99:17, 110:2,
110:6, 111:7, 141:1,
174:17, 174:23,
178:2, 192:12

**defendant's** -
128:12

**defendants** - 9:18,
10:7

**defense** - 3:15,
4:12, 29:12, 30:18,
31:3, 31:8, 51:21,
117:14, 128:9, 164:4,
258:15, 270:10

**Defense** - 61:4

**defer** - 4:9

**Definitely** - 14:3

**definitely** - 144:4

**delay** - 145:7

**demonstration** -
260:5

**demonstrations** -
260:6, 260:9

**demonstrative** -
260:4

**denied** - 27:3,
42:22, 43:18, 44:4,
45:4, 135:16

**deny** - 44:6, 44:12,
46:3, 46:5

**depict** - 192:1

**depicts** - 232:2

**deputized** - 21:9,
21:12

**Deputy** - 4:18, 4:21,
72:9, 172:11, 172:14,
172:17

**describe** - 39:3,
46:7, 50:22, 98:8,
184:13, 203:24,
204:16, 224:1,
225:18, 239:8,
246:25, 263:10

**described** - 14:20,
266:23, 269:5

**designated** - 71:11

**despite** - 31:11

**destitute** - 52:22,
53:1

**detail** - 59:18

**details** - 17:12

**detained** - 35:15,
35:17, 35:18, 35:19,
35:22

**Detective** - 4:8,
4:20, 4:24, 7:9, 7:12,
23:10, 23:11, 49:5,
60:10, 61:10, 62:12,
65:2, 65:10, 65:12,
65:14, 69:1, 71:8,
71:10, 121:12, 162:3,
163:19, 164:5,
164:11, 235:1,
255:12, 259:15,
262:19

**detective** - 23:15,
58:3, 58:4

**detectives** - 30:11,
57:13, 66:1

**detention** - 47:18

**determine** - 27:22,
41:2, 62:7

**determining** -
140:25

**develop** - 41:19

**dialogue** - 48:23

**diamond** - 86:5

**died** - 245:15

**difference** - 89:9,
167:23

**different** - 61:2,
61:7, 66:17, 105:2,
115:16, 127:19,
223:6, 229:9, 240:6

**difficult** - 70:9,
70:12, 181:16

**Diggs** - 102:20

**digress** - 29:23,
142:13

**dime** - 265:2,
265:19

**dimes** - 185:5,
266:4

**diminish** - 139:3

**dinner** - 137:6

**direct** - 20:1, 34:24,
78:1, 81:25, 82:3,

109:9, 130:22,
167:13, 174:3,
180:17, 244:17,
267:22, 270:6

**Direct** - 4:22, 72:12,
172:19

**directed** - 53:16

**directing** - 109:22,
221:6

**Directing** - 110:10

**direction** - 6:21,
6:22, 85:17, 91:19,
91:21, 92:2, 92:16,
94:2, 97:6, 97:7,
97:15, 100:6, 100:8,
104:17, 147:5, 157:7,
157:13, 199:4, 206:8,
235:17, 251:20

**disassociate** -
143:5

**disc** - 30:24

**disclose** - 34:6,
55:11

**disclosed** - 7:18,
9:8, 9:10, 9:16, 9:17,
10:7, 11:5, 42:18,
50:20

**disclosure** - 11:24,
25:24, 34:4

**disconnects** - 32:7,
32:8

**discount** - 69:8

**discover** - 233:4

**discovery** - 9:6,
31:2, 31:4, 78:4

**discretion** - 140:25,
141:8

**discuss** - 171:23,
222:4, 270:8

**discussed** - 171:13

**discussion** - 110:2

**discussions** -
110:14

**dishonest** - 33:1

**disloyal** - 207:14,
207:15, 217:16,
217:19, 217:22

**Disloyal** - 218:3

**display** - 223:20

**dispute** - 226:24

**disrespectful** -
164:5

**disrespectfully** -
163:18

**District** - 1:1, 1:12,
7:20, 7:21

**divulge** - 33:22

**divulged** - 13:24

**Dna** - 69:20

**docket** - 34:25,
49:14

**document** - 13:17,
20:4

**documents** - 80:2,
80:5

**Dohoney** - 58:3,
235:1

**dollar** - 265:18

**dollars** - 185:23,
185:24, 261:12,
261:13, 261:17,
265:1, 265:16,
265:17, 266:5

**done** - 17:22, 30:14,
34:8, 39:11, 41:25,
53:18, 58:24, 160:3,
217:24, 244:21,
245:20

**Donnell** - 194:1,
194:2, 194:8, 194:9

---

5

**Donnell's** - 194:12
**door** - 47:20, 155:9, 155:22, 231:8
**doors** - 96:25, 225:15
**dot** - 93:12, 97:10, 102:22, 192:22, 236:14
**dots** - 236:13
**doubt** - 101:21, 167:1, 267:7
**down** - 5:4, 57:15, 71:5, 71:9, 71:15, 86:12, 87:4, 87:5, 87:19, 90:6, 90:8, 93:12, 95:22, 96:12, 96:16, 97:4, 97:5, 97:11, 98:13, 107:4, 113:17, 139:1, 139:6, 141:20, 144:6, 145:18, 147:7, 147:9, 148:3, 155:18, 161:15, 171:23, 184:10, 184:14, 193:5, 202:19, 204:19, 204:23, 209:6, 209:24, 212:5, 225:16, 235:17, 238:6, 240:21, 240:23, 240:24, 241:3, 241:7, 241:14, 244:14
**Down** - 90:21, 102:24
**downhill** - 3:5
**downstairs** - 232:23
**drag** - 142:22, 236:17
**draw** - 212:14
**drinking** - 147:12
**drinks** - 201:14
**drive** - 146:13, 191:3, 238:14, 238:19, 241:4
**driver** - 155:9, 155:21, 156:4
**Driver** - 156:21
**driver's** - 99:24, 158:25, 193:6, 213:1, 213:17, 213:18, 214:14
**dropped** - 239:13, 239:16
**Dropped** - 239:17
**drug** - 12:23, 14:17, 16:13, 45:17, 68:3, 103:21, 104:6, 104:21, 105:12, 105:18, 108:24, 181:19, 181:21, 247:9, 248:17, 249:7, 249:9, 249:21, 250:6, 250:9, 250:13
**drug-related** - 12:23
**drugs** - 84:17, 84:19, 84:21, 91:5, 103:20, 105:18, 135:10, 176:17, 176:18, 177:3, 177:4, 177:13, 177:17, 178:9, 180:10, 181:8, 185:25, 227:1, 227:16, 261:23, 263:5, 265:7, 266:1
**Drugs** - 226:17
**Duckett** - 43:1, 43:13, 43:15, 43:18, 43:23, 44:6, 45:7, 45:24, 50:11, 54:4, 55:4, 55:5, 56:1,

58:13, 58:20, 59:17, 88:17, 90:11, 105:19, 105:21, 115:5, 143:25, 154:6, 154:19, 166:10, 172:3, 172:8, 172:13, 172:16, 172:18, 172:22, 172:23, 173:8, 177:6, 180:9, 182:16, 186:10, 187:23, 190:5, 236:12, 243:23, 259:24, 261:9, 262:24, 264:3, 266:13, 270:6, 270:7
**Ducky** - 233:10, 233:12, 233:14
**duly** - 4:16, 72:7, 172:9
**dumb** - 239:14, 239:19
**Dumb** - 239:16
**dumb-ass** - 239:14, 239:19
**Dumb-ass** - 239:16
**During** - 8:22, 106:19, 158:22, 212:4, 212:5
**during** - 21:21, 23:12, 62:2, 78:16, 95:6, 103:19, 105:5, 105:7, 115:3, 169:2, 211:23, 212:2, 261:3
**duty** - 30:10
**dying** - 159:23

## E

**early** - 17:10, 25:24, 248:1
**earned** - 123:21
**earphones** - 269:19
**easier** - 202:20
**east** - 215:2, 215:16
**Eastwood** - 224:12, 224:15, 239:22, 239:23
**easy** - 54:21, 129:17
**edge** - 236:20
**edification** - 60:6
**effect** - 43:5, 142:17
**effort** - 212:15
**eight** - 81:9, 151:15, 151:17
**either** - 19:23, 50:14, 110:16, 155:7
**element** - 21:5
**embarrass** - 122:5
**embarrassed** - 122:4
**employers** - 4:3
**encounter** - 87:11
**encounters** - 164:11
**end** - 6:7, 41:15, 53:24, 62:14, 96:4, 110:7, 110:15, 111:8, 160:24, 161:5, 161:20, 190:4, 191:9, 195:16
**End** - 18:5, 53:25, 61:21, 111:12, 126:25, 144:17, 249:24
**ended** - 70:22
**enforcement** - 21:8, 21:13
**enjoyed** - 120:12, 120:19, 120:21

**enter** - 137:9
**entered** - 10:9, 48:3, 48:6, 49:16, 86:9, 86:11, 100:7, 116:20
**entire** - 29:13, 29:15, 31:25, 59:1, 59:12, 59:13
**entirety** - 56:10, 56:11, 58:9
**entitled** - 60:18, 271:10
**equal** - 66:7
**Eric** - 10:15
**essentially** - 6:1, 7:1, 16:22, 23:18, 24:12, 130:11
**Essentially** - 40:11, 60:2
**established** - 180:8
**establishing** - 17:2
**estimate** - 154:14
**estimates** - 267:5
**etcetera** - 140:8
**evasive** - 130:19, 130:21
**evening** - 86:16, 88:23, 91:2, 95:6, 145:22, 145:23, 166:10, 191:9, 200:12, 202:9, 205:21, 211:5, 216:22
**event** - 58:21, 59:20, 171:25, 255:16
**events** - 32:15, 82:25
**evidence** - 13:18, 16:7, 19:13, 33:19, 34:19, 35:2, 37:2, 41:20, 58:21, 60:2, 62:3, 62:10, 63:7, 108:11, 129:2, 180:6, 239:13, 249:20, 250:11, 257:19, 257:20, 257:25, 260:11, 268:11, 268:14, 268:15
**evident** - 21:6
**evidentiary** - 68:24, 69:3
**exactly** - 28:13, 40:1, 53:5, 127:21, 132:1, 148:24, 200:15, 217:15
**Exactly** - 19:14, 59:11, 80:8, 138:8, 148:16, 148:18, 171:20
**examination** - 65:5, 65:7, 121:4, 121:6, 145:13, 171:2, 267:16, 267:23, 267:24, 270:6, 270:10
**Examination** - 4:22, 65:8, 72:12, 164:2, 172:19
**examine** - 4:10, 52:12
**example** - 51:1
**examples** - 122:2, 178:14, 179:12
**exception** - 71:12
**excerpt** - 63:3
**excerpts** - 58:24, 59:9, 61:18, 258:2
**exchange** - 118:2
**Exchange** - 105:18
**excuse** - 56:14, 84:13
**Excuse** - 114:5, 231:10

**excused** - 270:17
**exhibit** - 5:10, 6:11, 31:23, 37:16, 74:25, 75:5, 81:14, 92:8, 92:24, 96:3, 118:14, 128:17, 152:11, 193:1, 193:3, 202:19, 232:1, 236:2, 244:1, 244:11, 257:14, 268:5
**Exhibit** - 5:13, 7:6, 7:15, 9:25, 19:2, 30:22, 31:25, 36:24, 59:5, 62:20, 63:2, 73:24, 74:21, 75:6, 81:18, 82:20, 85:13, 87:12, 89:11, 92:9, 96:3, 114:12, 125:6, 127:7, 128:12, 139:19, 152:12, 152:13, 153:1, 155:14, 191:18, 191:20, 192:20, 193:2, 198:15, 198:24, 202:5, 206:11, 208:11, 208:13, 213:3, 223:13, 231:17, 231:18, 243:25, 244:12, 244:13, 255:13, 268:6, 268:14
**Exhibits** - 58:23, 59:9, 59:19, 59:21, 255:18
**exhibits** - 4:25, 55:23, 58:25, 81:12
**expect** - 119:17, 138:12, 139:2, 181:20
**expectation** - 119:16, 138:9
**expected** - 91:1
**expense** - 123:18
**expenses** - 50:17, 50:23, 54:7, 54:10, 117:19
**experience** - 109:1, 137:18, 176:23
**explain** - 60:4, 61:25, 249:12
**explaining** - 33:25
**expressed** - 113:7
**extensions** - 54:3
**extent** - 17:7, 47:4, 53:15, 111:11, 180:25, 181:15
**extracts** - 59:14
**extraneous** - 14:2
**eye** - 147:22
**eyewitness** - 24:15, 37:23, 38:4, 43:17, 64:4, 217:12
**eyewitnesses** - 24:6, 24:7, 24:8, 37:7, 46:24, 46:25, 69:8

## F

**face** - 34:19, 68:19, 101:16
**facilities** - 32:4, 32:5
**facility** - 26:15
**facing** - 247:1
**fact** - 10:22, 11:15, 14:2, 15:21, 16:5, 16:6, 16:8, 18:23, 19:23, 20:13, 21:11, 24:11, 29:11, 31:11, 33:22, 39:8, 132:11, 134:22, 138:2, 147:3, 221:15

**facts** - 13:20, 14:4, 118:18, 180:5
**faint** - 269:18
**fair** - 72:23, 97:10, 132:13, 137:25, 149:13, 156:9, 243:12
**fairly** - 28:16, 32:2, 258:1, 270:25
**fall** - 24:2, 106:6
**false** - 118:23
**familiar** - 56:13, 56:18, 56:23
**familiarity** - 144:6
**family** - 35:24, 42:6, 70:7, 81:1, 81:3, 81:4, 83:13, 114:25, 121:21, 186:24, 190:24
**far** - 29:3, 38:16, 68:14, 98:2, 98:5, 102:16, 123:11, 154:11, 155:7, 180:17, 218:10, 251:12, 259:10
**fashion** - 13:25, 249:18
**fast** - 101:19
**Father-** 80:24
**fault** - 147:4
**Fbi-** 21:10, 29:15, 108:9, 136:17
**February-** 25:22, 25:23, 26:4, 46:17, 74:9, 75:1, 83:6, 83:9, 84:1, 108:4, 114:1, 114:15, 115:17, 133:10, 135:14, 141:23, 176:5
**federal** - 11:8, 21:8, 21:12, 21:17, 21:20, 23:19, 35:10, 66:10, 66:15, 72:25, 122:16, 133:14, 133:16, 175:11
**feet** - 154:13, 154:15, 154:16, 154:17, 154:19, 157:3
**fell** - 98:16, 99:1, 204:12, 204:13
**felt** - 80:9, 112:19, 115:25, 122:8
**female** - 193:24
**Ferl-** 25:10, 77:12, 88:15, 88:19, 95:7, 95:8, 115:5, 150:9, 157:6, 157:8, 200:19, 202:17, 202:18, 203:5, 203:12, 203:19, 204:8, 204:17, 205:2, 205:9
**Ferry-** 19:7
**few** - 65:16, 133:10, 146:15, 162:23, 163:10, 187:21, 225:15, 267:13, 267:22, 268:16, 268:17
**fewer** - 249:8, 268:20
**field** - 6:10, 85:4, 85:13, 85:19, 85:22, 86:5, 92:15, 236:20
**fifteen** - 143:19, 246:8
**fifth** - 136:21
**fighting** - 191:1
**figure** - 254:10, 255:7
**file** - 29:13, 29:15
**film** - 57:14

6

**finally** - 52:1
**Fine** - 14:8, 128:23
**fine** - 18:3, 52:18, 52:20, 85:8, 172:6, 198:25, 202:23, 267:17
**finger** - 236:14, 236:18
**fingerprints** - 69:14, 69:16
**finish** - 267:12, 268:19
**finished** - 172:5, 267:11, 270:22
**fire** - 89:13, 97:5, 195:4, 202:7, 209:16
**fired** - 153:8, 154:10, 154:21, 155:6, 155:20, 157:19, 158:21
**firm** - 144:4
**first** - 4:16, 5:2, 24:15, 38:4, 38:6, 38:19, 38:20, 38:24, 42:12, 55:11, 64:4, 72:7, 73:10, 74:2, 75:15, 86:18, 90:1, 90:3, 90:5, 91:13, 98:2, 98:6, 98:22, 98:24, 102:1, 107:19, 124:7, 124:10, 124:14, 125:2, 127:6, 127:20, 136:14, 145:21, 152:19, 153:8, 157:18, 158:20, 161:4, 161:7, 172:9, 175:24, 188:16, 188:22, 188:24, 193:12, 193:20, 198:8, 198:16, 202:11, 208:12, 209:14, 212:20, 212:23, 212:24, 212:25, 213:19, 213:20, 213:21, 225:6, 234:22, 234:23, 246:23, 251:9, 252:11, 257:10
**First**- 52:10
**Firstly**- 109:22
**fistfight** - 196:1
**five** - 8:16, 18:16, 67:21, 71:20, 151:14, 154:1, 154:13, 168:17, 168:20, 207:24, 265:17, 266:5, 271:4
**Five**- 67:24, 173:22
**Flynn**- 141:24
**focusing** - 41:20
**fold** - 109:21
**follow** - 53:10, 97:10, 111:24, 112:1, 129:18, 129:23, 170:23, 210:7, 210:11, 249:1
**follow-up** - 170:23, 249:1
**followed** - 9:21, 18:13, 42:3, 99:10, 130:9
**Following**- 14:25
**following** - 7:19, 8:9, 97:16
**follows** - 4:17, 72:8, 172:10
**food** - 201:11, 201:13
**Food**- 201:14

**foot** - 86:3, 98:7, 144:8, 156:18
**footage** - 30:24, 69:11, 69:13
**force** - 106:2
**foregoing** - 271:8
**forget** - 74:10, 93:20, 127:2, 162:2, 241:6
**Forgive**- 102:23
**form** - 110:18
**former** - 120:12, 120:21
**forth** - 126:13, 144:14
**forthcoming** - 127:21
**forward** - 24:15, 36:7, 38:4, 45:25, 47:17, 47:20, 55:5, 93:24, 115:10, 115:15, 118:5, 173:12, 187:22, 222:5, 222:11, 244:23, 246:12, 246:22, 246:23, 247:14, 252:17, 263:18, 265:9
**foundation** - 180:13
**Four**- 103:17
**four** - 13:9, 67:2, 103:19, 105:5, 105:7, 113:14, 154:15, 154:17, 154:19, 161:3
**fourth** - 136:21
**free** - 118:2, 118:7, 123:17, 155:18
**frequent** - 42:5
**Friday**- 2:9, 2:11, 2:12, 3:9, 270:23, 271:1
**friend** - 77:24, 149:23, 150:1, 150:3, 150:5, 150:7, 150:9, 150:13, 151:21, 159:21, 161:3, 161:20
**friends** - 81:10, 82:13, 82:17, 115:1, 149:20, 150:17, 151:1, 151:6
**front** - 13:5, 94:21, 99:23, 106:17, 126:13, 126:14, 168:13, 193:2, 193:6, 231:8
**Front**- 156:23, 192:6
**fronting** - 265:22, 265:23
**Fuchs**- 1:15, 63:8, 63:11, 63:15
**full** - 4:18, 72:9, 172:11
**fun** - 54:21
**furtherance** - 35:3, 248:16, 249:7, 250:8, 250:13
**fussing** - 225:25, 227:22

**G**

**game** - 231:7, 231:15, 232:3, 232:8
**gap** - 208:10
**Gary** - 1:16, 10:15
**gas** - 123:4, 144:8, 156:13, 156:14
**Gasque** - 10:16
**gather** - 248:25

**gathered** - 79:9
**Geez** - 136:25
**gelatin** - 8:16
**general** - 200:17
**generally** - 24:24, 180:20
**gentleman** - 8:24, 11:2, 12:9, 26:12
**gentlemen** - 13:17, 62:1, 71:10, 144:19, 145:6, 249:25, 257:23, 267:21, 270:12
**Giggles**- 12:10, 68:9, 68:11, 68:14
**girlfriend** - 79:18, 102:12, 102:17, 162:16, 173:19, 241:8, 241:10
**girls** - 197:16, 205:17, 212:13, 213:19, 214:8, 214:20
**given** - 16:18, 17:17, 28:11, 29:12, 31:8, 60:5, 62:2, 115:16, 131:14, 171:14, 205:1, 252:13, 257:17
**glad** - 3:20
**Glock**- 204:1
**Government** - 63:1, 208:13
**government** - 3:13, 4:6, 4:7, 9:25, 12:2, 19:2, 30:21, 31:23, 31:24, 36:24, 40:1, 48:8, 50:11, 54:19, 60:6, 62:6, 72:3, 78:3, 107:20, 110:4, 117:16, 117:19, 118:3, 118:7, 118:11, 118:14, 122:16, 123:17, 125:6, 128:18, 129:12, 133:24, 136:1, 139:3, 139:9, 152:13, 153:1, 155:14, 168:3, 169:9, 172:2, 198:23, 213:2, 218:7, 218:20, 221:9, 223:13, 223:22, 231:18, 246:24, 247:3, 268:13
**government's** - 128:15, 139:19, 175:19, 231:17
**grams** - 68:6, 68:7
**grams** - 178:16, 182:12, 182:13
**grand** - 21:17, 23:19, 23:23, 24:13, 24:23, 24:25, 25:22, 26:22, 29:17, 32:23, 33:9, 35:3, 36:17, 36:20, 37:4, 37:7, 37:21, 39:11, 39:20, 39:22, 46:9, 46:17, 47:1, 55:6, 55:9, 60:11, 60:12, 60:15, 61:13, 66:17, 66:18, 66:20, 67:1, 67:5, 67:17, 73:1, 73:2, 73:8, 73:16, 74:23, 75:6, 83:9, 84:2, 84:7, 84:10, 106:12, 108:3, 109:10, 109:11, 109:23, 110:10, 114:1, 115:7, 115:17, 117:1, 117:2, 124:8, 124:9, 124:10, 124:14, 125:2,

126:10, 127:6, 127:20, 131:16, 131:25, 132:15, 133:2, 135:12, 136:15, 136:16, 175:10, 175:11, 175:12, 175:20, 181:25, 190:12, 218:13, 218:21, 220:11, 220:17, 220:18, 222:19, 222:25, 223:21, 224:1, 224:11, 227:21, 247:21, 251:6, 251:7, 251:9, 252:21, 269:8
**grandmother** - 81:7
**granted** - 124:7, 124:8
**grass** - 153:20, 154:2, 154:4, 154:5, 204:18, 210:11
**grassy** - 188:21
**great** - 17:12, 51:10, 129:20, 181:20
**green** - 153:1
**grew** - 150:23
**ground** - 99:1
**group** - 79:9
**groups** - 237:2
**grown** - 81:10
**guess** - 66:6, 67:23, 69:6, 76:3, 83:25, 127:19, 130:8, 133:1, 160:16, 160:18, 175:9, 176:1, 176:25, 177:18, 178:18, 185:20, 211:17, 221:7, 221:8, 222:1, 229:5, 238:21, 239:25, 242:19, 242:21, 248:1, 251:21, 263:20, 266:19, 269:15
**guessing** - 124:4, 216:16
**Guest**- 5:24, 6:3, 6:16, 7:15, 7:22, 8:13, 8:21, 9:10, 11:20, 12:6, 14:11, 15:1, 15:12, 16:6, 18:8, 19:11, 19:16, 20:10, 21:7, 22:6, 22:21, 24:9, 37:24, 38:7, 42:6, 42:13, 42:17, 47:6, 56:19, 57:11, 77:21, 80:20, 83:11, 84:3, 107:16, 164:14, 176:25, 186:20, 187:25, 188:2, 188:4, 188:10, 190:3, 191:10, 192:14, 211:14, 225:8, 225:13, 247:6, 247:17, 248:9, 250:15
**Guest's** - 7:20, 7:24, 10:23
**guidelines** - 138:14, 138:16, 138:19, 138:20, 139:1, 140:1, 140:6
**guilty** - 10:9, 10:12, 10:14, 10:15, 10:16, 10:17, 11:7, 11:25, 48:3, 48:7, 49:18, 49:20, 49:21, 116:21, 132:11, 140:17
**gun** - 69:9, 69:10, 202:9, 202:12, 203:5, 203:11, 203:12,

203:19, 203:21, 203:24, 204:1, 204:8, 205:1, 205:4, 205:8, 206:4, 209:25, 216:3, 216:12, 252:13, 252:23, 262:6
**guns** - 106:21, 106:25
**guy** - 68:8, 77:17, 88:21, 106:6, 189:20, 200:2, 245:3, 245:4, 245:9, 245:14
**guys** - 86:3, 177:16, 195:3, 204:13, 208:20, 221:3, 232:8, 245:11, 262:17

**H**

**Hagerstown** - 26:15, 27:14, 27:15, 27:18
**half** - 131:3, 246:14, 271:1
**Hall** - 1:6, 10:23, 10:24, 12:8, 13:1, 14:12, 14:13, 15:2, 15:10, 16:21, 16:24, 18:8, 20:10, 20:21, 22:14, 26:13, 28:23, 38:2, 38:8, 38:10, 38:13, 41:6, 41:11, 43:11, 43:18, 44:3, 45:3, 45:4, 45:14, 45:17, 46:3, 48:2, 50:1, 51:13, 55:17, 56:1, 76:5, 83:15, 99:17, 130:3, 134:23, 153:5, 153:22, 154:9, 154:10, 154:20, 154:22, 174:18, 174:23, 174:25, 176:23, 177:7, 177:13, 179:22, 180:6, 180:7, 180:10, 180:15, 181:9, 182:22, 183:6, 183:10, 184:5, 184:6, 184:14, 184:16, 185:25, 188:10, 205:8, 247:9, 248:14, 250:4, 260:21, 260:23, 261:3, 261:15, 262:12, 262:24, 264:5, 264:7, 264:14, 264:24, 266:23, 269:17
**Hall's** - 22:9, 22:11, 29:1, 142:15, 166:17, 185:1, 197:1
**hand** - 6:25, 7:8, 102:23, 145:19, 152:25, 236:11
**handed** - 203:22
**handle** - 2:8, 16:12, 204:6
**hands** - 178:12, 260:16
**handwriting** - 134:23
**hang** - 81:22, 175:7
**hangar** - 157:23
**hanging** - 162:14
**happy** - 186:10
**hard** - 183:19, 183:21, 183:22, 185:15
**harm** - 70:5, 70:17
**harmed** - 70:19
**hat** - 98:12, 209:22,

7

209:23
**head** - 98:13,
209:19, 235:23
**headed** - 91:19
**heading** - 91:21,
92:14, 209:16, 236:21
**hear** - 42:7, 55:8,
62:7, 80:6, 101:2,
107:5, 107:7, 109:5,
132:23, 133:25,
134:7, 137:1, 137:2,
142:7, 173:13,
182:17, 201:21,
211:22, 237:8,
237:13, 237:16,
237:19, 257:22,
264:19, 269:10
**heard** - 5:3, 6:10,
7:17, 11:21, 20:14,
23:24, 27:8, 29:22,
29:24, 30:4, 47:6,
50:5, 56:19, 60:10,
60:14, 65:24, 124:2,
134:5, 138:23,
158:13, 158:14,
158:15, 159:14,
159:20, 194:11,
196:5, 199:10,
217:18, 237:10,
254:25, 260:20,
264:14
**hearing** - 2:7, 2:8,
47:2, 47:3, 225:4,
248:7, 249:16, 264:20
**hearsay** - 13:21,
15:14, 48:14, 111:3
**held** - 35:16, 47:18,
114:18, 114:21,
114:23, 247:10
**help** - 13:7, 52:16,
92:1, 117:17, 138:2,
141:14, 230:2
**helped** - 63:20,
139:4, 139:10,
141:13, 141:16
**helpful** - 85:8, 85:10
**helping** - 162:17
**heroin** - 8:14, 8:15,
8:17, 8:23, 67:24,
226:18
**Heroin** - 176:21
**herself** - 52:2,
169:18
**Hershel** - 26:13,
95:8, 95:10, 95:25,
96:15, 124:2, 128:1,
128:7, 130:6, 130:14,
130:15, 131:11,
131:13, 169:23
**Hershel's** - 134:19
**Hi** - 163:16
**Hickman** - 11:19,
12:8
**hiding** - 135:21
**high** - 155:15,
246:10
**highlights** - 131:18
**himself** - 52:16,
184:9
**hit** - 3:3, 7:9,
131:18, 262:25
**Hold** - 63:16
**hold** - 152:7,
152:13, 239:18
**Hollins** - 19:7
**home** - 13:11,
13:12, 14:13, 14:20,
14:24, 14:25, 15:3,
16:22, 17:2, 17:14,
18:9, 18:13, 18:23,

20:16, 20:19, 52:5,
78:15, 78:18, 86:24,
87:4, 100:20, 117:5,
131:20, 132:20,
136:2, 137:19, 146:7,
149:4, 151:22, 152:2,
187:3
**homicide** - 23:1,
23:5, 23:6, 23:15,
24:14, 29:13, 30:10,
30:11, 31:15, 57:14,
58:4, 65:20, 241:1
**Homicide** - 23:4,
46:22, 66:1, 234:24,
240:25
**homicides** - 18:13
**Honor** - 2:24, 3:16,
14:9, 16:3, 16:15,
17:1, 53:17, 58:21,
62:16, 63:5, 63:11,
71:14, 74:1, 74:25,
81:13, 87:15, 118:11,
118:16, 172:4,
179:25, 186:16,
202:22, 231:10,
243:18, 245:23,
246:17, 250:17,
255:10, 267:2,
268:18, 270:3
**Honorable** - 1:12
**hope** - 67:14, 67:17,
119:22, 119:23,
119:25, 126:12,
138:12
**hoped** - 136:10
**hopefully** - 136:2
**hopes** - 137:17
**hoping** - 2:16,
246:16
**hour** - 2:6, 3:23,
131:3, 246:14
**hours** - 2:16, 64:20
**House** - 231:22
**house** - 14:21,
57:18, 104:7, 104:19,
146:1, 146:3, 147:25,
179:18, 179:19,
199:8, 199:12, 206:9,
219:15, 224:22,
225:15, 229:23,
230:17, 231:1, 231:2,
231:3, 231:14,
231:24, 232:4,
232:17, 232:22,
232:23, 233:5,
234:19, 235:14,
235:16, 236:7,
236:15, 236:17,
236:19, 240:2, 240:12
**household** - 135:2
**houses** - 57:24,
237:2
**housing** - 118:3,
118:7
**Howard** - 25:10,
31:16, 39:13, 44:2,
54:4, 77:12, 88:19,
200:23
**hundred** - 265:1,
265:15, 265:17
**hung** - 187:16,
229:19
**Huron** - 20:6,
243:21, 243:22,
244:13, 244:20
**hurt** - 137:21,
137:22, 137:25
**hydrant** - 89:13,
89:14, 97:5, 195:4,
202:7, 209:17

**I**

**idea** - 68:18,
153:12, 191:8,
231:23, 259:13, 267:3
**identification** -
19:1, 19:13, 20:2,
20:25, 60:3, 61:24,
73:25, 75:12, 128:9,
128:13, 129:2,
175:18, 257:25,
268:12
**identified** - 12:11,
12:13, 41:19, 43:10,
45:11, 99:17
**identify** - 22:14,
37:22, 38:1, 38:6,
38:8, 38:10, 38:12,
38:17, 43:7
**ignore** - 42:1
**immediately** -
61:13, 116:24, 260:16
**immunity** - 247:20,
247:24
**impeach** - 181:5
**implicate** - 164:12,
165:1, 165:7
**implicating** -
120:12, 120:21
**importance** -
115:25, 116:1
**important** - 164:4,
182:16
**inappropriate** -
93:23
**incarcerated** -
26:12, 26:14, 36:2,
171:13
**incident** - 19:6,
20:5, 134:11, 143:6,
255:23, 256:2
**incidents** - 25:7
**include** - 25:7
**including** - 9:3
**Including** - 29:20
**inconsistent** -
111:25
**incorrect** - 31:24,
109:24, 131:7, 131:11
**incorrectly** - 182:20
**increased** - 16:8
**incurred** - 50:18,
50:24, 50:25
**independent** -
260:23
**indicate** - 5:8, 6:12,
53:20, 61:22, 249:5
**indicated** - 5:25,
8:11, 33:4, 40:15,
154:16, 248:13,
249:17
**indicating** - 14:16,
209:3, 209:9
**indication** - 180:22
**indicted** - 35:6,
35:7, 50:3, 51:13,
114:7, 114:15,
135:13, 143:7
**indictment** - 9:2,
10:8, 34:20, 35:3,
47:23, 47:24, 114:11,
114:13, 119:3,
248:10, 248:17,
249:23, 250:8
**individual** - 11:19,
56:16, 250:3
**individuals** - 10:18,
10:22, 12:7, 12:23,
19:10, 19:16, 19:24,

39:12, 42:20
**informants** - 42:5
**information** - 7:22,
12:6, 13:23, 15:25,
16:23, 21:7, 21:25,
26:5, 32:20, 34:6,
36:1, 40:20, 41:6,
41:24, 42:9, 42:11,
43:5, 43:17, 45:7,
45:13, 45:16, 45:19,
80:4, 108:22, 108:23,
131:14, 134:10,
141:11, 229:6,
229:12, 234:17,
247:4, 247:20, 259:14
**inmates** - 27:24,
28:2, 28:11
**inquiry** - 53:16,
53:24, 219:8
**insertion** - 155:15
**inside** - 214:11,
232:4
**insisted** - 108:21
**instance** - 6:25,
25:8, 178:15, 183:25,
237:4
**instruction** - 13:15,
16:18, 17:18, 248:14,
248:18
**intent** - 137:24
**interacted** - 121:17
**interest** - 31:17,
111:2
**interested** - 184:25
**interpreted** - 125:19
**interrogation** -
243:20
**interruptions** -
93:21
**intersection** - 31:1
**intersects** - 6:8
**interval** - 24:23
**interview** - 8:9,
8:21, 58:13
**interviewed** - 7:22,
22:7, 36:14, 133:9
**intimate** - 102:11,
106:19, 113:11
**intimidated** -
124:17
**introduce** - 59:18,
114:10, 128:15
**introduced** - 13:18,
62:3, 62:9, 118:9,
255:11, 257:11
**introducing** - 4:25,
58:18
**invasion** - 13:11,
14:13, 14:21, 14:25,
15:3, 16:22, 17:2,
17:14, 18:9, 18:14,
18:23, 20:16, 20:19
**investigate** - 19:22
**investigating** -
8:21, 8:22
**investigation** -
11:10, 11:12, 19:3,
22:19, 22:24, 22:25,
23:3, 23:6, 23:12,
23:18, 23:19, 24:5,
24:11, 24:13, 24:14,
32:23, 41:4, 41:15,
41:18, 42:2, 42:19,
43:1, 45:6, 56:23,
57:13, 60:24, 64:3,
66:12, 218:6, 218:11,
218:13
**investigative** -
29:15, 30:12, 67:5,
67:7, 67:16

**investigators** -
45:23, 108:9
**invite** - 241:10
**invited** - 49:11
**inviting** - 53:5
**involve** - 226:1,
246:1
**involved** - 5:1, 9:1,
14:24, 15:2, 16:21,
18:12, 22:23, 45:16,
66:14, 103:22, 219:19
**irrelevant** - 249:4
**Isaac** - 25:14, 39:13,
43:20, 44:18, 77:19
**issue** - 53:10,
227:15, 248:8
**issues** - 248:6
**issuing** - 23:23
**itself** - 14:5, 22:19,
24:14, 53:14, 58:22,
63:2, 237:22, 239:3,
257:24, 265:23

**J**

**Jahvin**- 10:14
**jail** - 33:21, 33:23,
78:16, 114:18,
114:21, 114:23,
117:7, 123:20,
135:20, 136:11,
137:11, 137:17,
160:9, 165:23, 176:15
**Jamal**- 8:25, 10:11,
25:10, 39:13, 44:2,
77:12, 88:19, 200:23
**January** - 8:1, 8:7,
8:10, 74:24, 125:3,
125:4, 127:7
**jell** - 67:21, 67:24,
186:2
**Jencks**- 60:19,
60:24
**jeopardize** - 116:5
**job** - 122:3, 122:9
**Joe**- 75:24
**John**- 1:14
**join** - 201:23,
201:25
**Jones**- 44:10,
44:12, 44:16, 44:21,
45:1, 77:14, 88:3,
105:23, 105:25
**Jr**- 1:14
**judge** - 35:14,
144:11
**Judge**- 1:12, 2:9,
2:12, 2:20, 13:14,
15:4, 15:9, 36:3, 48:9,
51:4, 52:1, 52:7, 60:9,
61:18, 71:1, 93:7,
93:13, 111:22,
115:11, 116:7, 120:7,
124:23, 125:13,
127:1, 128:8, 129:14,
139:15, 152:24,
154:13, 155:11,
163:25, 165:2, 166:2,
168:22, 170:11,
180:16, 185:7, 194:3,
244:3, 248:19
**judges** - 143:17,
145:7, 145:9
**July**- 24:18, 24:19,
25:3, 25:18, 25:25,
36:9, 36:18, 36:19,
36:20, 38:3, 41:6,
47:17, 74:13, 75:6,
83:4, 117:3, 117:5,
117:12, 118:5

8

**jump** - 161:24, 223:6
**juried** - 66:20
**juries** - 37:4
**Juror**- 3:20
**jurors** - 249:8, 258:16
**Jury**- 1:12, 2:2, 3:18, 49:2, 71:22, 72:2, 145:2, 182:4, 267:20
**jury** - 2:4, 5:2, 5:4, 9:17, 16:18, 17:17, 21:17, 23:2, 23:19, 23:21, 23:23, 24:13, 24:23, 24:25, 25:22, 26:4, 26:22, 28:10, 29:17, 30:22, 32:23, 33:7, 33:9, 33:17, 35:3, 35:12, 36:18, 36:21, 37:1, 37:7, 37:21, 39:11, 39:20, 39:22, 41:2, 45:22, 46:9, 46:17, 47:1, 47:17, 48:15, 55:6, 55:9, 60:4, 60:5, 60:11, 60:12, 60:15, 61:14, 62:4, 62:7, 63:9, 66:18, 67:1, 67:5, 67:18, 67:24, 72:1, 73:1, 73:2, 73:8, 73:16, 74:18, 74:23, 75:6, 76:15, 82:7, 83:8, 83:9, 84:2, 84:7, 84:10, 85:3, 91:11, 96:14, 99:11, 101:7, 101:14, 102:2, 103:18, 104:11, 105:16, 106:12, 106:23, 108:4, 109:10, 109:11, 109:23, 110:11, 113:19, 114:1, 115:7, 115:17, 117:1, 117:2, 118:25, 120:5, 124:8, 124:9, 124:10, 124:14, 125:2, 126:10, 126:15, 127:6, 127:20, 129:3, 131:17, 131:25, 132:15, 133:2, 135:13, 136:15, 136:16, 146:20, 173:5, 175:11, 175:12, 175:21, 176:13, 177:15, 178:4, 178:5, 179:8, 181:25, 182:17, 183:5, 184:13, 184:24, 190:11, 190:12, 190:14, 190:18, 191:14, 192:6, 199:3, 200:4, 200:5, 202:5, 202:8, 202:18, 202:20, 203:4, 203:9, 204:16, 208:2, 208:6, 209:14, 212:24, 213:6, 213:24, 214:7, 218:10, 218:13, 218:21, 218:23, 220:11, 220:17, 220:18, 222:19, 222:25, 223:3, 223:14, 223:21, 224:1, 224:11, 225:18, 227:21, 229:23, 231:23, 236:18, 240:7, 244:24, 247:21,

249:4, 251:7, 251:9, 252:21, 260:22, 263:11, 265:4, 265:6, 269:8
**jury's** - 5:16, 60:7, 194:11
**justice** - 135:14

## K

**Kareem**- 22:21, 34:1, 57:11, 68:8, 77:21, 77:23, 80:11, 83:11, 84:3, 91:9, 91:14, 91:17, 96:12, 97:3, 98:2, 98:5, 98:9, 98:20, 101:9, 105:21, 105:25, 107:4, 107:5, 107:7, 109:4, 109:6, 109:7, 113:17, 130:9, 137:2, 137:7, 142:8, 149:25, 150:20, 150:22, 152:20, 153:16, 159:20, 162:3, 164:14, 167:2, 169:24, 170:3, 170:5, 174:4, 186:20, 187:25, 188:2, 188:4, 188:18, 190:3, 191:10, 192:14, 193:11, 193:20, 194:22, 195:16, 195:20, 196:12, 198:14, 206:5, 206:24, 207:9, 207:10, 207:21, 208:4, 209:6, 209:16, 210:19, 210:25, 211:19, 211:21, 211:22, 213:8, 213:14, 218:8, 225:8, 225:13, 237:4, 247:5, 247:17, 248:9
**Kareem's**- 67:20, 68:17, 78:12, 78:13, 78:15, 80:20, 158:7, 158:15, 189:2
**Keep**- 172:12
**keep** - 51:20, 82:7, 205:1, 238:16, 246:11, 246:18
**kept** - 238:9
**Kermit** - 82:12, 82:13, 86:23, 90:1, 93:3, 199:16
**Kershaw**- 23:10, 23:11, 69:1
**Kev**- 153:25, 157:2, 159:20, 166:10, 166:12, 166:14, 166:15, 173:1
**Kevin**- 43:1, 43:13, 43:18, 43:23, 88:15, 88:17, 90:11, 94:20, 97:16, 99:20, 100:1, 101:8, 105:19, 105:21, 143:25, 154:10, 159:5, 159:9, 172:2, 172:8, 172:13, 172:22
**Kevin's**- 149:23, 166:24
**Keyburn**- 88:21, 88:22, 200:2, 200:5
**kids** - 122:10, 135:22, 151:22, 152:2, 169:18, 229:16
**kill** - 105:21, 105:25, 113:1, 131:12, 188:8, 196:4, 197:2, 197:4,

197:5, 197:6, 198:14, 207:9, 211:19, 225:20, 229:4
**killed** - 34:1, 78:20, 84:3, 109:5, 113:4, 130:18, 130:25, 131:8, 134:12, 134:15, 137:2, 137:7, 162:3, 164:14, 167:3, 169:23, 169:24, 170:3, 170:5, 174:4, 187:19, 188:2, 188:4, 188:10, 188:18, 208:3, 218:8, 224:4, 224:6, 229:8, 234:9, 234:10, 237:4
**killer** - 68:11
**killers** - 147:16
**killing** - 136:5
**kilo** - 178:16
**kilos** - 179:3, 179:7
**kind** - 50:15, 51:20, 84:21, 89:16, 145:19, 191:22, 260:9, 260:17
**knees** - 204:19
**knowing** - 48:6, 56:19
**knowledge** - 23:25, 111:3, 180:4, 180:9, 180:11, 181:11, 181:20, 182:22, 217:14
**known** - 14:17, 24:6, 24:8, 25:10, 35:19, 76:9, 77:12, 77:14, 103:14, 113:1, 113:2, 150:18, 174:20, 174:25
**knows** - 18:1, 75:25, 181:23
**Kwana**- 212:9, 255:2, 255:3, 255:4, 269:7

## L

**lack** - 180:4, 180:11, 181:10
**ladies** - 62:1, 71:10, 257:22
**Ladies**- 13:17, 144:18, 145:6, 249:25, 267:21, 270:12
**lady** - 104:6
**large** - 82:21
**larger** - 6:11, 92:24
**laser** - 146:21, 202:25
**last** - 2:16, 15:20, 61:17, 62:11, 72:10, 78:11, 102:19, 105:8, 117:2, 123:21, 137:6, 158:7, 158:15, 164:25, 165:6, 172:14, 264:4, 264:5
**late** - 2:20
**laughing** - 260:4
**law** - 4:17, 21:8, 21:13, 42:14, 72:8, 100:18, 100:21, 172:10, 247:11
**lawyer** - 52:11, 73:12, 74:3, 75:16, 72:13, 124:15, 133:17, 134:3, 134:4, 141:24, 221:8, 221:13
**lawyers** - 145:8, 221:16
**lay** - 180:13

**laying** - 54:24
**lead** - 11:10, 26:6, 42:3, 57:4, 58:4, 181:14
**leading** - 93:14, 180:22
**leads** - 42:2
**Lean**- 240:22, 244:23, 265:9
**lean** - 173:12, 252:17, 263:18
**learn** - 43:1
**learned** - 14:23, 23:1, 26:11, 26:15, 131:19, 132:20
**least** - 32:21, 44:11, 54:23, 56:4, 124:19, 158:10
**leave** - 71:13, 176:11, 197:12, 210:22, 260:5
**led** - 9:2, 25:24, 42:11, 46:15, 64:4
**Left**- 234:19
**Left** - 7:8, 100:8, 102:24, 153:9, 153:10, 154:7, 154:23, 154:24, 159:23, 197:15, 209:7, 215:17, 224:22, 236:11, 236:17, 236:19, 237:7, 244:15
**left-hand** - 7:8, 236:11
**legally** - 123:21
**legitimate** - 261:25
**length** - 8:19
**lengthy** - 71:16
**less** - 68:5, 68:7
**letter** - 134:22, 222:13, 222:15
**letting** - 144:4, 246:3, 264:21
**level** - 99:2
**leverage** - 45:19
**liable** - 247:10
**lie** - 132:14, 133:14
**lied** - 124:7, 124:8, 132:10, 132:15, 133:2, 133:19
**life** - 165:23, 175:1, 175:2
**light** - 6:16, 6:17, 6:19, 29:20, 29:22, 30:1, 59:8, 215:9, 215:10, 232:13
**likely** - 119:18
**limited** - 61:14
**line** - 6:17, 6:19, 17:19, 48:12, 130:4, 131:18, 181:7
**link** - 14:12
**linking** - 250:2
**Linnard**- 183:7, 183:8, 230:22, 230:23, 232:20, 240:14, 240:17, 240:23, 241:1, 241:8, 242:4, 242:11, 243:3, 243:12
**list** - 2:25, 37:3, 37:5
**listed** - 248:9, 248:17, 249:23, 250:8
**listen** - 48:15, 62:1, 129:4, 260:11, 268:13
**Listen**- 258:21
**listened** - 28:7, 32:20, 269:18

**listening** - 257:20
**listing** - 249:1
**live** - 76:15, 76:18, 104:8, 117:20, 187:5, 194:17, 199:17
**lived** - 5:25, 81:7, 103:2, 104:15, 187:3, 245:15
**lives** - 6:4, 102:21, 199:14
**living** - 27:15, 76:22, 123:17, 174:1, 174:8, 176:14, 176:16, 176:24, 177:2, 231:7, 231:9
**local** - 30:1, 52:11, 57:14, 57:15
**locate** - 5:15, 5:19, 27:11
**located** - 30:25, 57:18
**location** - 7:4
**locked** - 68:14, 163:9
**logistical** - 172:4
**longest** - 267:8
**look** - 13:4, 15:24, 49:15, 61:19, 70:14, 73:16, 76:7, 81:17, 126:3, 129:25, 175:23, 193:1, 235:18, 244:11
**Look**- 169:18, 244:15
**looked** - 31:15, 68:24, 69:2, 81:12, 92:18, 139:23
**looking** - 119:7, 126:7, 135:22, 157:7, 157:12, 157:13, 187:22, 191:18, 198:23, 199:2, 204:18, 207:2, 227:25, 228:20, 228:21, 228:25, 229:2, 229:7, 229:12, 229:13, 242:15, 248:5
**Looking**- 85:13
**looks** - 61:13
**losing** - 33:23
**lover** - 120:12, 120:22, 164:13
**low** - 96:4
**Lower**- 241:22
**lower** - 97:6, 236:11
**loyal** - 227:5, 227:13
**loyalty** - 207:17, 227:5, 227:12
**lucky** - 47:10, 65:17
**Lunch**- 144:22
**lunch** - 3:23, 71:20, 143:15, 144:2, 144:16, 144:19, 144:21, 270:17, 270:22
**lying** - 135:13, 166:6

## M

**ma'am** - 139:20, 145:20, 146:20, 148:22, 151:9, 152:18, 155:16
**Mack** - 10:24, 14:13, 39:2, 88:16, 90:15, 91:1, 94:19, 97:16, 97:19, 97:20, 97:25, 98:1, 98:2,

9

98:5, 98:6, 98:8, 98:9, 99:9, 99:20, 99:25, 101:8, 101:12, 102:7, 102:9, 103:4, 103:18, 104:20, 105:11, 106:3, 106:15, 106:20, 107:8, 107:9, 107:11, 107:16, 107:20, 108:18, 109:12, 109:13, 109:15, 110:11, 110:14, 111:15, 112:6, 112:14, 113:16, 113:20, 130:8, 131:12, 158:8, 159:5, 159:6, 164:12, 165:20, 167:11, 169:4, 170:8, 170:13, 170:18, 174:20, 178:1, 179:5, 188:5, 189:6, 189:7, 189:9, 192:9, 192:10, 195:6, 195:15, 195:23, 196:5, 197:9, 198:13, 201:23, 202:9, 202:12, 203:3, 203:11, 203:13, 203:18, 203:19, 204:8, 204:16, 205:1, 206:4, 206:19, 206:21, 206:24, 207:8, 207:15, 208:3, 208:7, 208:20, 209:14, 209:15, 209:19, 210:6, 210:11, 210:19, 210:25, 211:16, 212:1, 213:7, 213:25, 214:10, 214:23, 215:3, 215:18, 215:24, 216:2, 216:10, 216:11, 218:11, 219:8, 219:16, 221:4, 224:7, 225:2, 225:19, 225:24, 226:3, 227:3, 227:12, 227:17, 227:20, 227:22, 227:23, 227:25, 228:2, 228:12, 228:15, 228:20, 228:24, 229:7, 229:11, 229:18, 230:7, 230:12, 232:16, 233:19, 233:20, 234:18, 239:3, 239:7, 240:16, 240:17, 241:3, 241:4, 242:13, 242:22, 243:3, 243:4, 244:19, 244:24, 245:12, 245:19, 251:19, 251:23, 252:22, 253:7, 253:16, 256:12, 259:14, 269:6, 269:10
  **Mack's** - 106:6, 211:13
  **mad** - 225:22, 227:3, 242:9
  **magistrate** - 35:13
  **maintained** - 134:6
  **maintains** - 27:24
  **Maisbury** - 81:7
  **Maisel** - 5:21, 5:22, 6:1, 6:3, 6:8, 6:9, 30:2, 57:15, 57:23, 81:21, 82:1, 85:15, 86:9, 86:11, 86:12, 86:14, 86:19, 87:6,

87:10, 87:19, 90:6, 91:19, 93:3, 102:22, 159:18, 190:4, 191:5, 191:7, 191:14, 192:13, 192:21, 192:18, 192:21, 193:12, 194:17, 198:10, 200:11, 203:13, 203:16, 209:13, 229:24, 231:5
  **male** - 193:24, 194:7
  **mall** - 234:21, 237:25, 238:2, 238:12
  **Mama** - 104:3, 179:18, 179:20, 179:21
  **Mama's** - 104:19, 183:2
  **man** - 130:11
  **Man** - 178:11
  **map** - 6:2, 85:16, 104:11, 146:4, 245:18
  **March** - 57:4, 57:6, 59:6, 225:12, 226:2
  **Marijuana** - 84:22
  **marijuana** - 91:6, 147:11, 147:14, 148:4, 148:19, 148:23, 149:5, 149:11, 151:21, 162:9, 163:3
  **marked** - 60:3, 73:24, 75:11, 104:11, 125:7, 125:9, 125:14, 139:19, 223:12, 235:20, 268:12
  **Martie** - 56:16, 176:7, 187:13, 187:15, 187:18, 223:8, 223:9, 223:16, 223:17, 224:4, 225:24, 226:11, 226:14, 226:21, 226:24, 227:15, 227:21, 227:23, 227:24, 228:10, 228:11, 228:15, 228:19, 229:6, 229:8, 229:12, 229:13, 229:19, 230:4, 230:19, 231:6, 232:17, 233:16, 234:6, 234:8, 234:10, 236:8, 238:22, 240:1, 240:11, 247:21, 248:7, 248:15, 250:1, 251:17
  **Martie's** - 230:5, 236:15
  **Martin** - 225:22, 227:24
  **Marvin** - 14:23, 19:21
  **Maryland** - 1:1, 26:14
  **mask** - 98:12, 98:13, 101:9, 101:12, 101:15, 101:17, 113:17, 113:20
  **material** - 15:21, 60:19, 60:24, 61:8
  **materials** - 29:17, 56:7, 78:4, 78:7, 78:9, 80:16
  **matter** - 3:24, 13:22, 13:25, 52:25, 53:11, 68:1, 248:7, 267:12, 268:16, 270:13, 271:3, 271:10

**matters** - 2:5, 13:21, 14:4, 16:22
  **Maurice** - 10:25, 14:17, 14:21, 14:22
  **maximum** - 119:1
  **Mcbride** - 10:16
  **mean** - 43:9, 52:14, 60:22, 66:22, 68:2, 70:14, 83:5, 90:3, 90:19, 92:3, 94:12, 95:5, 102:24, 111:19, 115:24, 134:14, 134:16, 137:19, 141:11, 142:20, 143:1, 149:15, 153:19, 166:12, 166:20, 167:15, 167:16, 170:2, 177:21, 178:2, 180:4, 180:12, 183:15, 184:8, 192:12, 194:14, 195:25, 196:3, 203:25, 216:4, 228:22, 228:23, 228:24, 234:5, 234:7, 235:2, 238:5, 253:25, 256:23, 256:24, 261:18, 262:16, 263:3, 264:24, 265:16, 265:20
  **meaning** - 261:10
  **means** - 105:17, 141:14, 229:1, 253:8
  **meant** - 127:14, 182:5, 234:3, 265:6
  **measure** - 70:18
  **meat** - 121:10
  **mechanical** - 1:24
  **meet** - 34:11, 84:16, 145:7, 190:21, 198:5, 219:14, 221:22, 222:7
  **meeting** - 45:23, 108:18, 135:13, 143:16, 168:8, 221:15, 221:22
  **meetings** - 33:13, 55:17, 59:17, 223:22, 252:5, 252:10
  **meets** - 153:19
  **Meka** - 190:6, 190:7, 212:9, 254:21
  **member** - 190:24
  **memory** - 92:1, 251:8
  **Memphis** - 100:19
  **mention** - 53:3, 253:16, 254:23
  **mentioned** - 6:15, 10:22, 12:9, 16:4, 17:4, 20:10, 21:4, 68:8, 89:6, 113:16, 140:1, 157:16, 183:3, 188:11, 205:23, 206:3, 211:6, 211:10, 249:15
  **mentioning** - 46:16
  **merely** - 13:23, 60:5, 257:20
  **messing** - 228:2
  **met** - 72:22, 73:17, 84:24, 86:2, 136:16, 136:21, 223:23, 246:24, 252:11, 253:4
  **method** - 198:17
  **Michael** - 14:23, 19:21, 20:7, 20:9, 21:24
  **microphone** - 145:19, 172:18, 173:13, 238:17,

252:18, 256:19, 263:19, 265:10
  **middle** - 173:23
  **might** - 19:18, 20:11, 26:6, 27:9, 49:18, 70:16, 78:9, 150:25, 162:21, 173:23, 202:20, 246:25, 248:21, 255:20
  **Mika** - 25:16, 79:10, 79:19, 100:3
  **Mike** - 64:25, 91:17, 96:18, 156:12, 205:24, 212:14, 212:15
  **mind** - 89:8, 101:21, 136:24, 167:1
  **mine** - 154:15
  **mini** - 17:13
  **minute** - 32:18, 63:16, 67:19, 71:18, 142:14, 146:15, 151:8, 171:8, 200:25, 232:11, 237:21, 258:10
  **minutes** - 32:4, 32:5, 71:19, 71:20, 143:19, 143:21, 168:15, 168:16, 168:17, 168:21, 187:21, 207:24, 246:8, 267:13, 267:22, 268:16, 268:17, 271:5
  **Miss** - 6:3, 6:16, 25:25, 27:9, 27:10, 32:22, 33:8, 33:13, 35:3, 36:2, 37:22, 39:17, 39:25, 41:7, 42:6, 42:11, 42:12, 42:13, 42:16, 42:17, 42:18, 43:10, 43:16, 44:14, 47:6, 47:15, 48:21, 49:6, 50:19, 63:24, 72:14, 72:22, 76:2, 78:2, 80:20, 81:17, 84:1, 91:22, 91:24, 92:5, 92:15, 92:22, 92:23, 93:6, 93:10, 93:11, 94:7, 108:3, 111:14, 115:22, 117:7, 121:8, 128:25, 129:7, 145:4, 145:17, 145:18, 171:22, 194:14, 220:5, 246:10, 271:3
  **missed** - 157:10
  **mission** - 196:22
  **mistake** - 166:22
  **Mizer** - 7:19, 21:24
  **mom** - 80:20, 187:1, 187:6
  **moment** - 155:11, 185:1, 231:10, 264:17
  **Mondawmin** - 238:13
  **money** - 50:15, 52:6, 53:8, 54:24, 103:19, 105:13, 105:15, 105:18, 123:2, 148:14, 176:16, 177:13, 177:21, 177:23, 178:16, 185:17, 265:2, 265:23
  **monitoring** - 28:15, 256:14
  **monitors** - 85:10

**Monster** - 11:21, 11:23, 189:16, 189:18
  **month** - 49:19, 123:21, 151:16
  **months** - 36:9, 57:9, 116:19, 161:4, 177:1, 225:13
  **Months** - 64:6, 64:7
  **Moody** - 4:8, 4:9, 4:15, 4:20, 7:9, 15:13, 60:11, 61:10, 65:10, 71:8, 71:11, 107:15, 121:12, 162:4, 163:19, 164:5, 164:12, 255:12, 257:1, 259:5, 259:15, 262:19, 262:20
  **morning** - 2:3, 2:12, 3:9, 3:19, 3:21, 61:14, 61:15, 62:12, 65:10, 72:14, 72:15, 132:1, 136:4, 267:16, 267:24
  **Most** - 32:3
  **most** - 5:19, 32:11, 130:16
  **mostly** - 39:20
  **mother** - 42:14, 100:18, 100:21, 152:3, 194:12
  **mother-in-law** - 42:14, 100:18, 100:21
  **motion** - 141:4, 249:16, 257:7
  **motioned** - 100:3
  **motions** - 248:7, 249:16
  **motivation** - 15:11
  **motive** - 16:5, 16:8, 41:25
  **Mount** - 241:20, 241:21, 241:23, 242:4
  **mouth** - 181:22
  **Mouzon** - 11:1, 11:5, 12:8, 14:17, 18:9, 18:24, 19:9, 25:16, 26:25, 39:15, 42:11, 42:14, 44:14, 65:1, 77:8, 143:23, 219:12, 219:24
  **Mouzon's** - 14:21, 14:23
  **move** - 7:7, 16:1, 17:20, 37:2, 37:12, 53:15, 54:5, 58:20, 93:24, 122:14, 139:12, 153:12, 162:17
  **Move** - 172:17
  **moved** - 81:4, 81:8, 81:9
  **moving** - 162:7, 206:12, 214:13, 246:11
  **murder** - 12:7, 12:22, 12:23, 22:20, 24:1, 24:8, 24:12, 24:15, 24:21, 26:20, 26:23, 27:1, 27:4, 29:4, 31:18, 37:24, 39:18, 56:16, 56:25, 57:9, 57:11, 58:11, 58:14, 58:16, 64:8, 66:2, 66:14, 68:17, 83:10, 101:22, 105:6, 105:9, 107:17, 120:13, 120:22, 142:7, 165:1, 165:7, 169:10, 176:25, 187:24, 200:6, 218:5, 223:7, 224:2, 224:18,

10

224:20, 224:23,
225:7, 225:8, 225:14,
225:19, 226:3, 230:2,
230:3, 234:23,
247:17, 247:21,
248:15, 249:13,
249:14, 250:5,
250:14, 251:17
  **murdered** - 57:19,
66:10, 78:22, 78:23,
78:25, 236:8
  **murders** - 66:7,
66:13, 249:13, 250:5
  **Murtha** - 75:24,
140:14
  **must** - 50:22,
225:20

**N**

**nail** - 5:3
  **name** - 4:19, 8:24,
12:9, 12:17, 12:19,
12:20, 26:13, 28:21,
44:9, 72:9, 72:10,
75:23, 78:12, 82:10,
89:1, 89:3, 100:21,
102:19, 107:9,
134:20, 142:15,
142:18, 172:11,
172:14, 172:21,
188:11, 189:9,
189:12, 189:16,
211:6, 211:8, 211:10,
211:11, 211:14,
228:3, 235:8
  **named** - 10:25,
11:19, 12:21, 19:11,
19:16, 26:13, 44:8,
56:16, 68:8, 77:17,
88:21, 88:23, 104:3,
141:24, 197:22,
200:2, 255:6
  **names** - 19:20
  **narrow** - 49:4, 58:25
  **nature** - 20:3, 48:21
  **near** - 30:25,
187:15, 187:18,
194:23, 195:3
  **necessarily** - 94:13,
135:23, 161:14
  **necessary** - 54:11,
58:7, 181:5
  **need** - 17:11, 30:13,
48:22, 53:1, 53:13,
76:7, 81:17, 85:5,
111:4, 111:9, 132:13,
144:14, 148:21,
155:18, 159:17,
173:12, 175:24,
176:11, 236:18,
243:21
  **needed** - 37:5, 52:3,
177:24
  **needs** - 246:11
  **Neighborhood** -
189:20
  **neighborhood** -
14:18, 23:25, 42:5,
68:19, 70:16, 79:10,
95:4, 175:4, 175:5,
189:15, 190:8,
197:19, 216:21,
218:18
  **Nevada** - 6:6
  **never** - 10:18, 18:2,
49:15, 60:16, 65:24,
66:14, 74:10, 105:14,
126:10, 144:10,
162:1, 180:7, 185:1,

223:23, 224:9
  **Never** - 80:13
  **new** - 34:19, 39:19
  **next** - 4:6, 28:24,
47:16, 71:24, 128:2,
143:22, 152:1,
256:23, 259:4,
264:23, 266:19
  **nice** - 162:13
  **nickel** - 266:7
  **nickels** - 185:6,
265:1, 265:16, 266:4
  **nickname** - 172:23
  **nicknames** - 233:13
  **niece** - 191:1
  **night** - 26:17, 32:16,
32:24, 44:17, 44:19,
47:3, 132:23, 137:6,
151:22, 162:3,
164:25, 165:6,
165:13, 190:3, 190:4,
190:17, 197:24,
200:6, 221:12,
224:23, 238:24, 257:7
  **nightmare** - 54:23
  **nine** - 3:6, 125:4,
151:12, 204:1
  **nobody** - 44:25,
224:9, 253:13
  **noise** - 260:13
  **non** - 118:18
  **non-relevant** -
118:18
  **none** - 24:10, 40:7
  **None** - 101:23
  **nonsense** - 260:17
  **noon** - 2:18, 2:22,
270:24
  **Norfolk** - 193:14
  **normal** - 2:6, 113:22
  **Normal** - 113:24
  **normally** - 146:8
  **nose** - 193:5
  **note** - 49:19, 52:11,
181:1
  **noted** - 50:6, 53:9,
65:5
  **notes** - 18:20,
186:17, 248:6, 267:19
  **nothing** - 31:5,
61:7, 68:24, 69:3,
124:13, 132:5
  **notice** - 28:10
  **notification** - 36:10
  **notified** - 4:8
  **noting** - 248:14
  **November** - 55:22,
248:1, 251:6, 252:9,
255:16, 257:12,
268:23
  **number** - 96:3,
128:8, 140:6, 257:14,
268:5
  **numbered** - 269:16
  **numbers** - 59:12

**O**

**o'clock** - 2:9, 2:13,
3:24, 144:20, 151:21
  **oath** - 73:1, 106:12,
131:25, 132:1, 132:8,
145:5, 270:7
  **object** - 48:14
  **objected** - 50:9,
53:6
  **objecting** - 52:15,
52:19
  **objection** - 13:14,
15:9, 15:19, 17:6,

17:10, 37:14, 37:15,
48:24, 52:12, 52:17,
53:9, 53:14, 59:3,
93:13, 93:24, 109:20,
109:25, 110:5, 110:8,
101:19, 110:23,
111:1, 111:11,
120:14, 181:10,
258:12
  **Objection** - 15:4,
40:17, 47:11, 48:9,
51:4, 51:17, 51:22,
52:7, 66:3, 83:22,
93:7, 103:7, 108:25,
109:14, 109:17,
112:22, 115:11,
115:13, 116:7,
116:14, 120:7, 133:3,
164:6, 164:17, 165:2,
165:8, 166:2, 167:5,
168:22, 170:11,
170:14, 178:24,
179:14, 179:23,
185:7, 185:11, 186:4,
186:17, 207:18, 216:6,
227:7
  **obligation** - 186:13
  **obnoxious** - 259:17
  **observation** -
176:23, 185:25
  **observations** -
184:17
  **observe** - 184:6,
203:10, 217:6
  **observed** - 181:15,
202:9, 203:5, 221:10,
233:16
  **obstructing** -
135:14
  **obtain** - 28:20,
55:25, 57:14, 202:12
  **obtained** - 19:2,
29:2, 30:1, 30:13,
31:16, 32:19, 33:6,
55:24, 58:3, 69:2,
205:8, 235:6
  **obtaining** - 41:20
  **obvious** - 122:7,
181:2, 186:9
  **obviously** - 3:8,
61:11, 157:3, 188:18,
217:8
  **occasion** - 95:7,
96:12, 192:13,
218:19, 239:2
  **occasions** - 55:19,
55:20, 55:21, 56:2,
73:4, 75:18, 105:2,
175:10, 175:14,
252:2, 256:10
  **occur** - 20:17,
33:24, 49:23, 57:2,
119:18, 142:8
  **occurred** - 14:21,
16:7, 16:9, 19:6, 20:6,
23:22, 25:22, 27:9,
35:12, 36:12, 134:1,
152:8, 152:9, 157:8,
198:19, 218:5,
228:18, 237:14,
239:8, 248:16
  **October** - 49:21,
55:5, 175:25, 221:7,
246:21, 251:9, 252:8,
252:10
  **offense** - 21:5
  **Offered** - 249:20
  **offered** - 13:21,
13:23
  **Office** - 61:13,

108:8, 133:10,
136:17, 140:21,
141:8, 141:23,
160:12, 167:20, 171:5
  **office** - 140:22,
140:24, 168:3
  **Officer** - 15:12,
29:25, 65:13
  **officer** - 21:8, 21:13,
27:17, 30:10, 67:6,
69:22, 69:23, 122:6
  **officers** - 60:23,
137:24, 163:13,
163:14, 260:15
  **offices** - 168:8
  **often** - 177:15,
177:16
  **old** - 173:8, 173:21,
234:10
  **older** - 234:13
  **oldest** - 173:21
  **Once** - 24:17, 30:11,
51:13, 97:15, 100:3,
159:5, 171:17
  **once** - 22:25, 41:6,
47:10, 87:3, 98:15,
98:16, 100:4, 100:17,
130:17, 132:14,
177:18, 178:10,
178:21, 179:3, 210:4,
251:6
  **One** - 73:5, 73:6,
170:6, 221:18
  **one** - 6:15, 7:12,
11:15, 13:2, 14:2,
14:16, 17:2, 20:9,
22:3, 27:23, 41:12,
50:12, 52:11, 54:14,
59:23, 63:14, 63:16,
66:15, 66:16, 68:2,
73:8, 74:10, 75:15,
80:6, 81:21, 83:4,
89:11, 120:19,
121:11, 130:11,
131:8, 136:4, 136:20,
140:6, 143:12,
150:20, 154:4, 155:4,
155:10, 160:14,
161:2, 161:12, 162:2,
163:21, 165:15,
168:7, 170:3, 179:21,
185:18, 185:22,
198:16, 208:12,
221:18, 226:7,
231:10, 243:17,
244:4, 248:3, 253:15,
255:25, 256:2,
258:20, 260:2, 268:8,
268:20
  **one-man** - 130:11
  **ones** - 10:8, 33:24,
80:15, 80:18
  **open** - 96:25
  **opening** - 50:7,
53:7, 69:7
  **operated** - 8:24
  **opinion** - 32:21,
68:1, 243:16
  **opportunity** - 22:13,
23:13, 44:12, 57:25,
120:4, 169:3, 169:5
  **opposed** - 17:8,
90:23, 249:21
  **opposite** - 95:1,
166:19
  **orange** - 161:24
  **order** - 172:3
  **ordinarily** - 60:1
  **ore** - 67:15
  **organization** - 8:23,

9:1
  **orient** - 85:3, 92:25
  **oriented** - 259:12
  **otherwise** - 33:4
  **ought** - 158:13,
158:15
  **ounces** - 182:11,
182:14
  **outset** - 24:5
  **Outside** - 242:7
  **outside** - 52:4,
90:14, 90:16, 146:9,
146:12, 156:13,
157:11, 260:10
  **outweighed** - 116:1
  **over-complicating** -
257:9
  **overall** - 58:23
  **Overrule** - 178:25
  **Overruled** - 51:5,
51:23, 83:23, 93:15,
93:18, 103:9, 120:8,
120:15, 133:4,
164:18, 165:9, 166:3,
167:6, 168:23,
170:15, 179:15,
179:24, 186:5, 216:8
  **overruled** - 53:9,
93:25, 111:11, 180:12
  **overt** - 17:15, 248:9,
248:21, 249:7, 250:8
  **Owens** - 133:17,
141:24
  **own** - 176:22,
183:14

**P**

**pack** - 226:16
  **Package** - 104:24
  **packaged** - 185:5,
186:1
  **packs** - 226:15
  **page** - 13:7, 13:8,
13:9, 18:16, 31:4,
125:4, 258:25, 264:4,
264:6, 264:9, 264:23,
269:17
  **pages** - 31:4,
269:16
  **paid** - 117:19,
246:19
  **pain** - 129:9, 147:16
  **papers** - 79:10,
79:11, 80:16, 188:13,
188:14, 189:2
  **paperwork** - 79:4,
211:2, 211:14
  **Paralyzed** - 200:8
  **parameters** - 16:20
  **paraphrasing** -
169:25
  **Pardon** - 201:12
  **park** - 86:4, 201:16
  **parked** - 84:23,
84:25, 85:4, 85:15,
85:21, 89:13, 191:15,
191:16, 192:25,
193:3, 195:3
  **Parsons** - 37:8,
248:20, 250:3
  **part** - 17:14, 17:15,
25:24, 57:15, 63:23,
124:20, 140:16,
223:23, 247:9,
247:13, 250:12,
258:24, 264:19,
266:13
  **participate** - 219:8
  **particular** - 10:8,

10:10, 11:5, 11:24,
27:23, 31:17, 32:20,
33:8, 39:13, 55:23,
58:21, 82:16, 103:21,
103:24, 199:8, 247:5,
252:7, 266:13, 266:18
 **Particularly** -
106:17
 **particularly** -
177:17
 **Partlow** - 42:15,
42:18, 100:23
 **parts** - 56:4, 177:8
 **pass** - 42:8, 155:8
 **passed** - 96:11,
216:4, 234:17
 **Passenger** - 156:21,
159:8, 213:16
 **passenger** - 99:24,
156:21, 156:23,
158:23, 162:25,
192:5, 192:6, 214:3,
214:4
 **passing** - 42:8,
79:11
 **past** - 97:5, 109:12,
206:15, 269:11
 **path** - 9:21
 **patience** - 243:19
 **patrol** - 30:10
 **pay** - 54:14, 54:16,
54:17, 54:18, 65:14,
92:17, 117:23,
117:25, 122:19,
122:21, 123:2, 123:4,
123:8, 123:9
 **Pay** - 122:23,
122:25
 **paying** - 94:12,
123:14
 **pays** - 54:13, 54:14,
54:15, 122:16
 **pedal** - 144:9
 **penalty** - 67:9,
132:4
 **pending** - 35:14,
35:17, 36:2, 36:6,
110:1, 110:5
 **People** - 45:10,
218:6, 253:9, 260:7,
260:11
 **people** - 12:21,
17:3, 19:17, 19:19,
20:9, 24:24, 25:7,
26:17, 29:17, 39:8,
43:9, 43:22, 44:16,
45:9, 47:2, 48:6,
50:25, 60:23, 66:17,
66:18, 66:20, 66:22,
66:23, 67:8, 70:16,
79:25, 81:23, 89:7,
104:6, 105:12,
105:13, 108:23,
110:6, 110:15,
126:14, 144:5, 148:7,
149:20, 150:17,
157:11, 158:10,
164:24, 165:5,
165:13, 170:5, 183:5,
183:25, 184:9, 185:2,
196:15, 215:19,
215:20, 225:20,
233:5, 253:7, 253:9,
260:9, 261:22
 **people's** - 66:13
 **per** - 185:10
 **Percocets** - 135:5,
147:18
 **perfectly** - 181:9
 **perhaps** - 6:16,

63:10, 237:14
 **period** - 21:21,
169:2
 **perjury** - 34:20,
45:13, 45:16, 36:6,
47:23, 47:24, 48:7,
67:9, 67:12, 116:22,
118:23, 132:4,
132:10, 132:11,
132:21, 132:24,
161:23
 **permitted** - 49:12
 **person** - 10:24,
10:25, 11:13, 12:11,
12:20, 14:12, 19:9,
27:11, 28:21, 37:22,
37:23, 41:7, 41:16,
41:24, 44:8, 56:20,
68:2, 81:6, 83:14,
84:9, 88:23, 99:14,
106:21, 113:11,
130:3, 131:8, 162:14,
164:14, 164:25,
165:6, 170:3, 177:19,
184:15, 223:14,
224:12, 248:22,
260:21, 260:22,
262:8, 262:10
 **personal** - 32:12,
176:22, 180:4,
180:11, 181:10
 **personally** - 54:18,
253:2
 **pertinent** - 56:4
 **phone** - 26:17, 27:8,
46:17, 95:11, 96:15,
96:16, 122:23, 124:1,
128:2, 130:13,
131:10, 131:13,
134:17, 190:21,
190:23, 191:4,
230:13, 233:2
 **phones** - 28:3
 **photo** - 22:8
 **photograph** - 22:9,
22:11, 22:14, 81:19,
82:19, 223:11,
223:13, 223:19
 **photographs** -
85:2, 85:9
 **physical** - 200:7
 **Physically** - 98:9
 **pick** - 105:13,
105:14, 198:6, 240:23
 **picked** - 84:24,
241:14
 **picture** - 82:22,
85:13, 87:11, 89:9,
96:3, 96:4, 152:8,
152:9, 152:25, 193:9,
198:18, 231:17,
231:25, 232:2,
241:21, 242:1
 **Pictures** - 240:4
 **pictures** - 96:7,
231:1, 233:4
 **pile** - 80:16
 **pill** - 185:18
 **pinned** - 191:19
 **place** - 3:1, 42:12,
85:15, 89:7, 187:16,
187:18, 198:19,
229:21, 232:13,
240:1, 242:6, 258:3
 **placed** - 26:12,
26:16, 39:17
 **places** - 148:6,
177:8, 179:12,
179:21, 182:19, 226:7
 **Plaintiff** - 1:4, 1:14

 **play** - 32:11, 32:18,
60:4, 62:19, 62:20,
63:19, 129:9, 129:11,
134:8, 136:24,
257:10, 258:6, 258:23
 **Play** - 64:10
 **played** - 34:9, 59:1,
59:2, 108:14, 134:3,
256:4, 264:1
 **playground** - 57:22
 **Playing** - 231:15
 **playing** - 58:19,
64:11, 64:23, 129:21,
231:7, 232:3, 232:8,
246:1, 259:2, 259:22,
260:1, 261:7, 262:3,
262:15, 262:23,
263:8, 266:12, 269:1
 **plays** - 28:18
 **plea** - 48:3, 48:7,
49:6, 49:16, 49:18,
49:20, 116:21,
118:10, 118:12,
118:20, 138:17,
139:18, 139:23,
140:20, 140:24
 **pleas** - 10:9
 **pleased** - 160:4
 **pled** - 10:12, 10:14,
10:15, 10:16, 10:19,
11:7, 11:25, 49:21,
132:11, 140:7
 **pocket** - 123:2
 **Pod** - 30:25, 68:20
 **point** - 3:13, 5:25,
17:5, 25:3, 26:19,
32:14, 32:22, 36:1,
38:3, 38:4, 42:25,
43:10, 44:2, 45:5,
46:21, 52:2, 55:2,
61:6, 69:7, 73:25,
76:23, 91:8, 92:8,
93:16, 94:13, 101:11,
103:15, 104:11,
104:16, 110:25,
144:3, 147:5, 149:12,
153:7, 153:13,
158:22, 174:20,
175:18, 181:13,
181:15, 192:14,
195:4, 197:12,
198:19, 201:4, 202:2,
202:4, 202:5, 202:9,
207:8, 213:7, 213:8,
225:5, 232:13,
229:20, 254:6, 258:20
 **pointed** - 40:14,
170:1, 174:23, 193:5,
193:6, 213:4
 **pointer** - 146:22,
202:25
 **pointing** - 155:21,
208:21, 209:2, 232:14
 **points** - 139:7
 **police** - 20:4, 27:17,
60:23, 69:23, 122:6,
122:7, 163:13, 217:9,
217:11, 240:17,
242:23
 **popped** - 198:9
 **porch** - 101:4
 **portion** - 258:6
 **portions** - 58:25,
118:18
 **position** - 39:4,
70:9, 70:16, 110:14,
111:8, 190:2
 **positions** - 70:13
 **Positive** - 191:13,
210:15

 **positive** - 106:10
 **possession** - 8:14,
202:12
 **possibility** - 34:18,
222:5
 **possibly** - 165:22,
250:23
 **poster** - 81:16,
82:20, 89:10, 193:9,
208:22
 **posters** - 85:8
 **potential** - 251:1
 **potentially** - 247:1
 **poured** - 66:11
 **preceding** - 264:4,
264:9
 **precise** - 35:2,
178:14, 198:13
 **precisely** - 111:6
 **precision** - 225:3,
225:4
 **predominant** -
68:19
 **prepare** - 8:8
 **prepared** - 8:10,
36:22
 **prerecorded** -
28:12, 28:18
 **prescription** - 135:7
 **present** - 26:20,
26:23, 27:1, 27:3,
33:13, 34:22, 35:2,
62:15, 63:25, 83:10,
133:16, 175:17,
198:16, 221:16,
269:19
 **presentation** -
113:25, 114:2
 **presented** - 22:6,
33:18, 34:18, 35:13,
36:17, 55:6, 167:16
 **preserved** - 249:16
 **pretty** - 3:1, 61:10,
68:3, 159:21, 164:16,
166:24, 180:22,
194:19, 195:3
 **prevent** - 48:5
 **previous** - 109:11,
110:13
 **Previously** - 33:2
 **previously** - 34:15,
39:18, 248:6, 270:13
 **price** - 185:10
 **primarily** - 226:4,
251:16
 **prison** - 11:8,
27:16, 27:18, 27:20,
27:23, 47:19, 139:2,
189:24
 **prisons** - 27:23
 **probable** - 41:10,
41:12
 **problem** - 227:16,
227:18
 **procedurally** -
52:10
 **proceed** - 2:4, 4:5,
64:22, 71:24, 126:24
 **proceeded** - 100:6
 **proceeding** - 48:18,
48:21, 48:22, 49:9,
260:8
 **Proceedings** - 1:11,
1:24
 **proceedings** -
25:23, 271:9
 **Procter** - 1:16, 2:10,
2:15, 2:19, 2:23, 3:9,
3:16, 13:14, 14:6,
14:7, 15:4, 15:8, 15:9,

15:17, 16:19, 17:13,
17:24, 29:25, 37:16,
37:17, 48:9, 48:12,
50:7, 51:4, 52:7,
52:13, 52:16, 59:4,
60:9, 60:14, 61:12,
61:17, 63:13, 63:14,
65:7, 65:9, 66:5,
70:25, 71:3, 83:22,
93:7, 93:13, 93:16,
103:7, 108:25,
109:14, 109:17,
109:21, 110:9,
111:22, 115:11,
116:7, 116:14, 120:7,
120:14, 121:4, 121:5,
121:7, 124:22, 125:1,
125:7, 125:13,
125:16, 125:18,
125:22, 126:4, 126:5,
126:9, 126:12,
126:17, 126:21,
126:22, 127:1, 127:5,
128:13, 128:14,
128:22, 128:24,
129:5, 129:6, 129:14,
129:18, 129:22,
133:6, 139:15,
139:17, 143:19,
144:10, 145:14,
145:15, 145:16,
147:1, 152:12,
152:17, 152:24,
153:4, 154:13,
154:15, 154:18,
155:13, 163:21,
163:24, 164:6,
164:17, 165:2, 165:8,
166:2, 167:5, 168:22,
170:11, 170:14,
170:22, 171:1, 171:3,
171:21, 178:24,
179:14, 179:23,
179:25, 180:5,
180:16, 181:7, 182:3,
185:7, 185:11, 186:4,
194:3, 198:25,
207:18, 208:23,
216:6, 227:7, 244:3,
244:7, 248:5, 248:19,
249:9, 249:19,
250:16, 250:17,
258:12, 258:14,
267:17, 267:23
 **Proctor's** - 17:6,
53:7
 **produced** - 1:24,
62:18
 **professionally** -
126:24
 **proffer** - 37:21,
38:13, 38:21, 222:13
 **proffered** - 48:17,
52:21
 **project** - 236:21,
237:1, 237:5
 **projects** - 237:1
 **prominent** - 28:16,
66:1
 **promising** - 112:25
 **promptly** - 4:1,
270:15
 **proponent** - 62:5
 **proposed** - 63:3
 **prosecution** - 11:3
 **prosecutors** - 45:23
 **protect** - 83:13,
83:15
 **protected** - 102:7
 **protecting** - 106:7,

116:1, 142:25, 143:2
  **protection** - 50:17,
52:25, 53:12, 53:21,
53:23, 54:3, 54:7
  **protective** - 30:2
  **prove** - 16:25
  **provided** - 9:7,
22:1, 29:9, 56:8, 58:8,
58:24, 61:8, 62:4,
141:3, 141:9
  **psyche** - 137:9
  **public** - 49:11,
146:12, 260:8
  **pull** - 58:10, 100:5,
101:12, 101:17,
184:18, 184:21, 249:3
  **pulled** - 98:13,
100:7, 101:9, 101:15,
113:17, 162:4,
162:10, 214:25
  **Pulled** - 209:24
  **pulling** - 167:2
  **punishment** - 119:1
  **Purcell** - 1:14, 2:24,
3:10, 3:14, 4:6, 4:7,
4:23, 5:12, 5:14, 7:11,
14:9, 14:10, 15:15,
15:23, 16:3, 16:14,
16:25, 17:9, 17:22,
18:6, 19:14, 19:15,
21:2, 21:3, 37:12,
37:19, 37:20, 40:19,
47:13, 47:14, 48:18,
49:1, 49:3, 51:12,
51:20, 51:25, 52:22,
53:3, 53:17, 54:1,
58:18, 59:7, 59:10,
59:11, 59:16, 60:17,
60:20, 61:1, 61:5,
61:7, 61:22, 62:11,
62:25, 63:5, 63:17,
63:18, 64:10, 64:12,
64:24, 65:2, 65:6,
65:16, 66:3, 68:20,
71:6, 71:7, 71:14,
71:25, 72:3, 72:13,
73:23, 74:22, 74:23,
75:3, 75:5, 75:7,
75:12, 75:13, 75:14,
83:24, 85:7, 85:12,
87:17, 93:9, 93:19,
93:20, 93:23, 94:1,
99:18, 103:10, 109:1,
109:3, 109:15,
110:18, 110:23,
111:13, 112:2, 112:5,
114:4, 114:6, 115:14,
116:9, 116:16,
118:16, 118:19,
120:9, 120:17, 121:1,
122:15, 125:9,
125:19, 125:22,
126:6, 126:18,
126:19, 128:19,
129:13, 130:22,
131:2, 133:3, 137:23,
143:23, 146:23,
149:17, 152:11,
152:15, 152:16,
161:18, 164:1, 164:3,
164:9, 164:10,
164:19, 165:5,
165:12, 166:5, 167:7,
169:1, 170:13,
170:16, 170:20,
171:4, 171:8, 172:2,
172:20, 173:16,
174:24, 179:2,
179:16, 180:14,
181:1, 181:12,

181:13, 181:23,
182:7, 182:8, 185:9,
185:13, 186:7,
186:16, 186:19,
194:5, 199:1, 202:24,
207:20, 208:15,
209:1, 216:7, 216:9,
227:10, 227:11,
231:12, 236:1, 236:4,
238:18, 244:6, 244:8,
244:9, 246:12,
246:16, 246:19,
246:20, 249:2,
249:20, 250:20,
250:21, 252:19,
255:15, 255:20,
255:25, 256:6,
257:15, 257:16,
258:1, 258:7, 258:9,
258:11, 258:15,
258:18, 260:18,
260:19, 263:21,
264:12, 265:12,
267:2, 267:7, 267:11,
267:14, 267:18,
268:2, 268:3, 268:6,
268:10, 268:15,
268:18, 268:22,
268:23, 269:2, 270:3
  **Purcell's** - 146:21,
155:15
  **purchase** - 148:8,
148:10
  **pure** - 15:13
  **purpose** - 147:9,
161:9
  **purposes** - 61:24,
63:8, 128:10
  **purse** - 135:5
  **pursuant** - 141:4
  **Put** - 161:16, 196:24
  **put** - 5:15, 13:9,
51:10, 55:15, 66:17,
70:9, 70:12, 70:15,
83:25, 89:10, 89:18,
102:22, 111:4, 111:9,
127:19, 142:15,
142:18, 147:2,
148:14, 149:1,
149:17, 165:23,
177:13, 178:15,
181:21, 192:19,
196:23, 208:11,
223:19, 231:24,
232:6, 232:11,
235:16, 236:10,
236:14, 244:14,
244:15, 257:6

---

**Q**

  **quantities** - 185:2
  **quantity** - 68:5
  **quarters** - 185:6
  **questioned** - 72:25,
75:10, 84:10, 102:1,
234:23, 241:1
  **questioning** -
17:24, 48:13, 245:25,
252:23
  **questions** - 4:24,
17:8, 22:18, 24:25,
40:14, 40:21, 65:5,
65:17, 76:2, 82:25,
109:10, 121:2, 122:8,
131:2, 162:23,
162:24, 166:9,
170:21, 180:18,
180:23, 180:24,
185:15, 187:24,

225:4, 258:22,
266:24, 268:20, 270:4
  **quick** - 8:20, 121:11
  **quickly** - 61:10,
145:10
  **quiet** - 260:8
  **quietly** - 260:11
  **quite** - 67:1, 82:21,
127:3, 127:4, 163:10,
207:17
  **quote** - 28:13,
110:7, 110:15, 111:8,
127:11

---

**R**

  **rail** - 6:16, 6:17,
6:19
  **Rain** - 24:17, 25:12,
26:19, 39:17, 60:15,
60:21, 62:16, 71:15,
72:3, 72:6, 72:11,
205:20, 212:14,
213:19, 220:8,
220:10, 220:11
  **Rain's** - 46:16
  **Raines** - 14:24,
19:21, 20:8, 20:9
  **raise** - 65:14
  **raised** - 248:6,
260:16
  **ran** - 8:23, 157:20,
159:17, 163:10,
163:12, 199:22,
208:8, 210:8, 241:12
  **Ran** - 163:13, 209:18
  **rang** - 157:18
  **range** - 244:1
  **rather** - 15:17,
17:16, 17:24, 32:1,
83:13, 102:7
  **Ravens** - 7:2
  **re** - 33:8, 39:16,
39:19
  **re-confront** - 33:8
  **re-served** - 39:16,
39:19
  **reaction** - 253:24
  **read** - 15:18, 15:22,
140:13
  **readily** - 43:22
  **ready** - 2:3, 4:5,
71:23, 128:15,
145:12, 246:13,
258:16, 262:14,
265:11, 265:13
  **real** - 44:9, 89:1,
89:3, 134:19
  **reality** - 60:22
  **realize** - 131:15
  **realized** - 87:3
  **really** - 3:4, 74:18,
75:10, 75:15, 76:3,
87:1, 90:7, 101:24,
105:14, 106:7,
130:19, 134:11,
139:14, 146:23,
157:12, 162:24,
165:1, 166:24,
181:19, 186:10,
255:5, 257:13
  **realm** - 3:7
  **rear** - 100:10,
155:21, 155:23,
156:15, 158:23,
158:25, 159:8
  **reason** - 135:12,
135:24, 136:1,
165:21, 211:18,
225:20, 225:21

  **reasons** - 172:4
  **recalled** - 4:9, 65:3
  **recant** - 36:8
  **receipts** - 238:9
  **receive** - 26:5, 28:2,
36:1, 54:9, 139:3
  **received** - 10:11,
10:12, 10:19, 36:10,
190:24, 229:6, 229:7,
229:11
  **receiving** - 10:9
  **recently** - 173:17
  **Recess** - 71:21,
144:22
  **recess** - 271:4
  **Recessed** - 271:6
  **recognize** - 81:18,
82:1, 82:22, 82:24,
114:10, 192:23,
223:14, 231:19,
232:2, 255:9
  **recollect** - 110:16
  **recollection** - 60:7,
181:20, 210:18,
223:3, 257:21
  **recommend** -
112:16
  **recommended** -
140:17, 141:19
  **record** - 4:19, 9:24,
22:19, 29:8, 36:22,
72:10, 99:16, 125:5,
129:1, 153:2, 172:12,
174:6, 174:22, 181:2,
194:23, 202:4,
221:21, 222:19,
225:7, 225:12,
230:23, 251:8, 271:9
  **Record** - 15:7,
48:11, 52:9, 59:24,
109:19, 125:12,
143:13, 180:2, 248:4,
267:6
  **record's** - 152:24
  **recorded** - 1:24,
28:11, 33:14, 55:25,
131:15
  **recording** - 28:12,
28:14, 33:25, 257:12
  **recordings** - 33:20,
34:9, 56:10
  **records** - 27:24,
29:1, 29:3, 108:10
  **recovered** - 31:11,
69:19
  **recovering** - 33:23
  **Recross** - 171:2
  **Recross-
examination** - 171:4
  **red** - 65:23, 192:22,
215:9, 215:10
  **redacted** - 118:13
  **Redirect** - 71:6,
164:1, 164:2
  **redirect** - 143:20,
170:25
  **reduce** - 140:17
  **refer** - 37:13, 65:15,
109:24, 268:12
  **reference** - 6:1,
13:11, 85:4, 239:20,
269:17
  **referenced** - 248:10
  **referred** - 237:5,
239:23
  **referring** - 6:18,
9:25
  **reflect** - 17:25, 19:5,
99:16, 153:3, 174:22,
261:2

  **reflected** - 20:4
  **reflects** - 19:6
  **refresh** - 92:1,
251:8
  **refuse** - 43:7
  **regard** - 34:8
  **regarding** - 7:22
  **Regardless** - 134:17
  **regret** - 106:14
  **regularly** - 171:13,
171:15
  **relate** - 32:15,
230:11
  **related** - 12:23,
16:23
  **relation** - 5:5,
39:12, 85:15, 201:16,
203:18, 213:11,
229:8, 231:8, 262:12
  **relationship** -
102:9, 102:11, 103:4,
103:15, 106:20,
111:15, 113:12,
165:17, 165:21,
226:11, 226:21,
226:25
  **released** - 35:14,
49:23, 51:8, 51:10,
52:1, 116:24, 117:4,
117:10, 117:13,
117:15, 123:20,
138:5, 138:9, 160:9,
160:15, 160:22
  **relevant** - 48:14,
118:18
  **relocate** - 50:25
  **remain** - 117:7,
260:9, 270:7
  **remarks** - 211:1
  **remember** - 34:4,
38:19, 49:18, 57:2,
68:21, 73:4, 73:10,
74:5, 74:8, 78:9, 79:1,
79:16, 79:18, 79:20,
79:24, 80:15, 80:18,
82:10, 82:16, 84:23,
87:1, 88:13, 90:7,
91:14, 92:3, 94:20,
95:15, 101:7, 101:19,
103:21, 104:15,
104:23, 107:19,
108:12, 108:14,
109:24, 112:6,
112:25, 133:8, 148:6,
148:11, 149:5, 155:7,
157:6, 159:7, 162:1,
162:7, 167:17,
167:19, 174:4,
175:20, 176:6,
178:22, 178:23,
179:3, 183:13,
187:11, 188:17,
188:20, 188:21,
188:24, 190:23,
193:24, 194:1,
199:25, 200:11,
200:15, 205:20,
205:23, 210:3,
212:20, 212:21,
212:22, 215:7,
219:11, 219:22,
220:4, 220:25, 221:7,
222:13, 222:18,
224:11, 225:11,
232:15, 232:23,
235:15, 239:1,
241:12, 243:4,
245:16, 249:15,
251:12, 252:2, 252:5,

252:11, 252:15,
252:21, 253:16,
254:3, 254:16
  **Remember**- 73:17
  **removed** - 118:17
  **rent** - 54:10, 117:23,
122:19, 123:17
  **repeat** - 18:7, 98:4,
134:9
  **Repeat**- 120:16
  **rephrase** - 110:12,
110:20, 110:21,
117:8, 164:7, 180:23,
181:11
  **Rephrase**- 115:12,
227:8
  **replies** - 180:18
  **report** - 19:7, 20:5,
189:5
  **reported** - 40:1,
252:23, 254:17,
254:24
  **reporting** - 19:8,
252:22, 253:7
  **represented** -
33:10, 39:21, 75:19,
75:21
  **requires** - 35:19
  **rescheduled** -
270:14
  **reserve** - 267:18
  **resources** - 66:11
  **respect** - 13:18,
13:19, 13:23, 17:19,
53:8, 53:11, 53:22,
59:25, 71:12, 110:3,
110:6, 110:14,
249:17, 250:1
  **responded** - 7:21,
264:15
  **responding** - 30:10
  **response** - 34:13,
197:1, 243:5
  **responses** - 115:16
  **responsibility** -
30:12
  **rest** - 165:23
  **result** - 34:19,
36:12, 114:1, 114:7,
191:4, 247:16
  **retaliation** - 15:3,
17:3, 18:9, 19:18,
19:23, 20:11, 20:17
  **retrieve** - 29:2
  **return** - 71:9, 145:4,
207:25
  **returned** - 208:2
  **review** - 8:20,
57:25, 175:24
  **reviewed** - 8:18,
36:23, 39:23
  **revolver** - 203:25
  **rewind** - 224:19
  **Richard**- 1:12
  **rid** - 216:18
  **ride** - 190:20
  **right-hand** - 6:25,
152:25
  **risk** - 33:23, 116:13
  **Road**- 19:7, 84:25,
85:1, 85:2, 100:19,
226:7
  **robbery** - 19:8
  **Robert**- 44:10,
44:12, 77:14, 88:3,
105:23, 105:25,
248:20
  **Roddy**- 88:23,
88:25, 89:1, 157:18,
157:21, 216:13,

216:19, 216:20,
216:22, 252:13,
252:24, 253:3, 253:8,
253:9, 253:11,
253:19, 253:23,
254:18, 255:7,
260:22, 262:4, 262:5,
266:25, 269:8
  **Rode**- 190:6
  **role** - 7:16, 58:14,
58:16, 224:2, 230:2,
247:22
  **roll** - 149:1
  **Rolland**- 271:12,
271:13
  **Ron**- 269:7
  **room** - 77:6, 160:17,
161:4, 168:8, 169:12,
214:17, 231:7, 231:9
  **Ross**- 25:8, 39:13,
43:10, 44:17, 77:10,
79:13, 79:21, 115:6,
190:9, 220:5
  **roughly** - 152:20,
153:15
  **rounds** - 69:18
  **route** - 146:20
  **row** - 57:24, 231:3,
237:2
  **Rp**- 250:2
  **rude** - 121:23,
122:2, 122:4
  **Rule**- 111:1, 180:11,
181:4
  **rule** - 71:12
  **ruled** - 53:9, 249:22
  **rules** - 52:11
  **run** - 213:8, 241:11
  **running** - 2:20
  **runs** - 6:19, 6:20

---

# S

  **safe** - 51:7
  **safety** - 253:3
  **sale** - 185:10, 263:1
  **sales** - 177:10,
184:12, 184:14,
185:1, 185:2, 185:14,
185:16, 261:16,
261:19
  **satisfactory** - 14:6,
16:19, 249:15, 250:16
  **save** - 240:6
  **saw** - 9:3, 25:4,
25:19, 44:15, 46:7,
78:3, 78:20, 78:22,
79:4, 91:11, 91:12,
92:4, 92:5, 92:7, 92:9,
92:14, 94:11, 96:14,
98:1, 98:8, 101:16,
105:3, 107:2, 107:4,
113:16, 134:18,
160:5, 160:11,
160:17, 167:2,
177:10, 180:7,
184:12, 184:14,
188:22, 188:25,
193:20, 194:22,
202:5, 203:21, 206:3,
206:7, 228:19
  **scale** - 230:14,
230:15, 234:1
  **scared** - 142:17,
237:17, 243:12,
243:15
  **scene** - 26:16,
26:20, 26:23, 27:1,
27:3, 30:11, 32:24,
39:17, 43:2, 43:4,

44:17, 100:9, 217:1,
217:5, 262:5, 269:19
  **schedule** - 2:22,
3:21, 3:22, 267:25,
270:25
  **scheduled** - 270:13
  **scheduling** - 2:5
  **school** - 187:10,
235:7
  **scooted** - 100:1
  **screen** - 5:8, 5:10,
7:1, 7:7, 208:14,
232:12, 236:11,
236:12, 242:2
  **sealed** - 48:18,
48:22, 49:9, 49:14,
140:10, 140:16
  **search** - 21:16
  **seat** - 88:11, 192:5,
205:6
  **seated** - 121:12,
192:4
  **Seattle** - 44:8,
77:15, 87:25, 88:2,
88:3, 90:24, 91:15,
95:14, 95:24, 105:23,
150:15, 199:24
  **Seattle's** - 44:9
  **second** - 8:2, 22:4,
32:19, 55:4, 59:23,
63:16, 70:25, 74:9,
74:25, 82:19, 82:20,
87:14, 124:8, 131:16,
136:15, 141:22,
143:12, 163:22,
173:5, 176:5, 197:17,
202:19, 223:7,
224:19, 244:4, 248:3,
251:16, 260:2, 261:8,
264:5, 267:25, 268:4
  **second-to-last** -
264:5
  **secret** - 51:14,
132:7
  **secrets** - 51:16,
51:21
  **section** - 64:1,
258:10, 259:4
  **security** - 260:15
  **see** - 5:2, 6:11, 6:19,
44:12, 57:24, 63:10,
76:7, 78:7, 78:15,
79:5, 79:6, 79:8, 80:2,
80:4, 80:7, 83:12,
86:21, 87:21, 87:24,
88:21, 88:23, 90:6,
90:11, 91:1, 91:9,
92:25, 96:12, 98:9,
98:18, 101:14, 102:5,
104:20, 105:11,
108:5, 134:6, 145:9,
152:7, 152:9, 152:15,
155:15, 161:11,
168:21, 173:5,
174:21, 180:6,
181:22, 182:25,
188:14, 188:16,
189:2, 189:6, 190:2,
191:19, 192:13,
192:16, 192:22,
192:23, 193:11,
195:6, 195:19,
197:18, 197:24,
198:18, 200:19,
202:11, 203:13,
206:5, 206:24,
207:25, 208:7,
216:24, 219:4,
224:15, 224:16,
224:25, 230:5, 230:9,

231:1, 232:14,
235:10, 236:7,
237:22, 240:1, 240:7,
244:13, 244:16,
245:18, 246:3, 249:4,
249:8, 255:14, 259:4,
259:14, 259:24,
260:17, 262:17, 264:8
  **seeing** - 43:18,
44:3, 44:6, 44:12,
44:16, 45:1, 45:4,
47:1, 56:20, 79:1,
80:15, 88:13, 91:17,
104:23, 161:10,
200:11, 205:20,
205:23, 205:24
  **seeking** - 148:4
  **seem** - 30:6, 80:16,
167:25, 243:15
  **segment** - 32:1,
58:10, 62:17, 62:22,
63:20, 63:23, 64:13
  **segments** - 59:14,
62:17
  **self** - 21:6, 259:17
  **self-evident** - 21:6
  **Sell** - 263:4, 263:5
  **sell** - 176:18, 177:4,
179:8, 184:8, 184:9,
185:2, 186:1, 226:14,
261:22
  **Selling** - 176:17,
177:3
  **selling** - 177:7,
184:7, 226:3, 226:9,
226:12, 227:1,
261:24, 261:25
  **semiautomatic** -
204:1
  **send** - 55:16, 257:3
  **sense** - 246:7
  **sentence** - 119:14,
139:2, 140:17,
141:20, 180:17
  **sentenced** - 11:7,
12:1, 12:3, 119:12,
138:13
  **sentencing** - 2:15
  **September** - 22:22,
24:21, 29:3, 31:18,
82:14, 102:10,
103:16, 174:2, 174:7
  **serve** - 105:12,
105:16
  **Serve** - 105:14
  **served** - 39:16,
39:19, 119:10,
119:21, 138:13
  **Session** - 145:1
  **session** - 38:21
  **set** - 230:3, 242:17
  **seven** - 81:8,
151:12, 151:13
  **several** - 8:25,
17:18, 22:25, 26:17,
31:3, 36:9, 109:21,
111:19, 112:8, 112:9,
112:11, 123:25,
148:5, 148:7
  **Several** - 105:4,
105:5, 124:4
  **several-fold** -
109:21
  **Shameka** - 25:8,
44:17, 77:10, 79:11,
79:13, 79:21, 88:15,
89:8, 89:24, 94:17,
99:21, 99:23, 115:6,
155:5, 156:3, 156:9,
190:9, 190:17,

191:22, 197:20,
199:13, 199:14,
201:2, 205:23, 255:1,
255:4, 269:7
  **Shameka's** - 89:13,
150:3, 202:6
  **Shanay** - 79:19
  **Shaquanda** - 25:14,
43:20, 44:17, 77:19,
88:15, 89:8, 89:24,
94:17, 96:17, 99:22,
99:24, 150:7, 156:20,
197:22, 205:24, 220:3
  **sheet** - 49:19
  **sheets** - 35:1, 49:14
  **shirt** - 38:2, 99:14
  **shit** - 262:16
  **shoot** - 98:15,
210:2, 243:6, 243:7,
243:10
  **shooter** - 38:7,
41:19, 45:11, 70:21
  **shooting** - 20:5,
20:7, 20:20, 39:5,
91:9, 98:9, 98:18,
99:19, 101:12,
101:18, 107:3,
107:11, 131:19,
132:20, 151:2, 151:6,
152:6, 152:8, 152:9,
152:19, 156:7,
156:25, 157:3, 157:8,
157:17, 208:16,
212:2, 212:3, 212:16,
214:5, 225:3, 237:8,
237:22, 239:3,
239:13, 240:9,
240:18, 245:20,
247:5, 248:7, 248:8,
248:21, 250:1
  **shootings** - 18:13,
249:6
  **Shorty** - 228:3,
228:12, 228:13
  **shot** - 70:20, 97:16,
97:18, 97:20, 97:22,
98:2, 98:6, 98:14,
98:16, 98:18, 98:21,
99:3, 99:4, 99:9,
99:10, 107:4, 130:9,
152:20, 153:8, 210:1,
210:25, 211:21,
211:23, 242:10,
242:11, 242:14,
243:4, 245:2, 245:4,
245:8, 245:12,
245:15, 248:20, 250:4
  **shots** - 47:3,
132:23, 154:10,
154:21, 155:5,
155:20, 157:18,
157:19, 158:10,
158:14, 158:20,
237:11, 237:14,
237:20
  **shout** - 144:11
  **Show** - 213:6
  **show** - 6:1, 6:17,
26:6, 74:8, 85:2,
87:11, 99:11, 130:11,
146:19, 159:17,
193:3, 198:15, 199:3,
208:16, 213:2,
223:12, 231:17,
232:1, 232:7, 232:8,
235:5, 236:18, 238:5
  **showed** - 74:25
  **showing** - 19:1,
81:15, 83:3, 207:13,
259:17

14

**Showing** - 73:24
**shown** - 81:18,
85:16, 86:5, 174:7,
236:5
**shows** - 37:6,
176:2, 198:18, 243:21
**sic** - 124:20, 186:1
**side** - 6:5, 84:17,
92:12, 94:23, 95:2,
99:24, 99:25, 100:14,
100:19, 102:25,
146:4, 146:6, 152:25,
154:5, 154:7, 155:25,
156:22, 156:23,
158:23, 158:25,
159:6, 159:9, 162:25,
203:14, 205:12,
208:12, 208:21,
209:4, 210:12,
212:25, 213:1,
213:16, 213:17,
213:18, 214:2, 214:4,
214:15, 228:11
**sidewalk** - 209:10,
209:12, 235:17
**sign** - 246:10
**signed** - 139:22,
140:14
**significant** - 66:11
**silly** - 164:16
**similar** - 89:11
**sit** - 2:10, 135:9,
168:20, 260:7
**sitting** - 4:2, 38:2,
44:18, 48:2, 99:13,
99:22, 135:20, 155:6,
155:8, 232:9, 232:19,
262:20
**six** - 151:17
**Six** - 116:19, 173:3
**Six-three** - 173:3
**sixth** - 136:21
**sliding** - 214:14
**smack** - 263:20
**small** - 166:21
**smaller** - 192:20
**smash** - 195:22,
195:23, 196:7, 206:23
**smashing** - 196:11
**Smith** - 79:19,
263:11, 264:4, 264:5
**smoke** - 148:24
**Smoky** - 258:25
**snitch** - 109:5,
111:21, 112:22, 245:5
**snitches** - 109:13,
109:16, 110:7,
110:15, 111:8, 111:18
**snitching** - 112:7,
112:12, 112:15, 245:6
**sober** - 148:1
**socialize** - 76:18,
81:11, 84:17
**socialized** - 81:6
**socializing** - 97:3,
149:12, 149:15
**sold** - 179:8, 184:4,
184:6, 265:21
**Sold** - 103:20
**sole** - 140:25, 141:8
**solely** - 23:4
**someone** - 26:16,
33:25, 106:2, 116:2,
137:18, 150:11,
180:3, 228:25,
238:19, 246:11
**sometime** - 188:19
**sometimes** - 145:8,
183:15, 185:15
**somewhere** - 79:6,

92:10, 93:2, 94:22,
117:20, 135:21,
148:23, 198:6,
200:16, 228:22,
241:15, 241:24
**Somewhere** - 95:4,
203:15
**soon** - 157:19,
234:8
**Sorry** - 8:4
**sorry** - 5:21, 6:9,
7:24, 10:11, 22:7,
25:23, 33:17, 57:6,
57:8, 60:13, 81:13,
84:1, 95:7, 97:24,
98:23, 101:8, 114:4,
115:5, 125:10,
125:13, 125:19,
126:5, 127:2, 134:9,
138:15, 145:6, 151:4,
151:16, 154:4,
156:21, 165:3, 182:5,
186:16, 197:3,
198:24, 213:18,
217:18, 231:10,
235:6, 244:14, 256:2,
257:9, 261:21, 266:23
**sort** - 3:2, 15:24,
21:6, 26:1, 28:10,
33:7, 78:3, 112:14,
182:21, 192:1,
196:22, 243:25,
259:16
**sought** - 19:18
**sound** - 66:18,
135:5, 160:9
**sounds** - 158:9
**source** - 34:6,
42:10, 259:6
**Source** - 259:6
**sources** - 23:24,
42:4
**south** - 174:15,
241:22
**Southern** - 7:20,
7:21
**southwest** - 235:7
**speaking** - 45:20
**speaks** - 53:14
**special** - 21:9
**Special** - 21:24
**specifically** - 15:2,
44:20, 92:16, 99:2,
101:20
**specificity** - 181:19
**specifics** - 16:17
**specify** - 33:21
**spell** - 72:10
**Spell** - 172:14
**spend** - 16:1
**spent** - 149:6
**split** - 86:21, 86:23,
183:12
**splits** - 149:2
**spoken** - 2:9
**spot** - 201:18,
201:19, 202:1, 202:2,
236:7
**spotted** - 195:16
**stack** - 261:10
**Stack** - 261:13
**Stadium** - 7:2
**stake** - 250:23,
250:24
**stand** - 61:12,
145:5, 145:18,
148:21, 172:1, 270:9,
271:4
**standing** - 90:14,
90:18, 95:5, 99:2,

101:3, 155:5, 155:8,
157:8, 157:19, 158:3,
158:10, 173:5,
195:20, 205:16,
205:24, 206:4, 206:5,
209:3, 256:23
**Standing** - 90:16,
99:6, 99:7, 156:13,
205:17
**start** - 2:12, 2:17,
4:1, 41:20, 52:19,
76:3, 121:10, 140:6,
144:20, 193:19,
196:1, 259:4, 267:16,
267:23, 270:15
**started** - 23:23,
97:15, 97:16, 98:11,
205:11, 213:13
**starting** - 270:24
**state** - 4:18, 27:20,
27:23, 28:21, 32:4,
172:21, 186:9,
221:19, 239:7, 239:12
**State** - 72:9, 172:11
**statement** - 10:23,
13:20, 14:11, 28:19,
50:8, 53:7, 74:14,
74:16, 74:19, 111:25,
117:8, 117:12,
118:18, 124:11
**statements** -
118:23, 261:3
**States** - 1:1, 1:3,
1:12, 140:21, 141:8
**states** - 31:5
**stature** - 186:16,
166:17, 166:18
**status** - 11:4, 11:23
**stay** - 16:20, 17:6,
159:12, 195:8, 210:8,
212:10
**stayed** - 113:14
**staying** - 214:11
**stenography** - 1:24
**step** - 61:9, 71:4,
71:8, 148:22, 151:8,
152:18, 171:23,
173:4, 197:16,
202:18, 205:12, 209:3
**steps** - 33:7, 82:4,
82:6, 87:12, 87:19,
87:21, 90:23, 91:15,
92:12, 93:3, 96:1,
96:2, 96:3, 96:6, 96:9,
154:1, 199:6, 199:22
**Stewart** - 8:25, 9:3,
9:18, 10:11
**stick** - 191:25
**sticker** - 149:18
**still** - 12:24, 23:15,
47:18, 47:23, 47:24,
86:25, 102:16,
108:17, 108:21,
134:4, 134:6, 135:9,
145:15, 199:17, 201:2,
208:20, 237:10,
247:10, 249:8
**Still** - 68:15, 174:13,
174:14
**stones** - 264:25,
265:13
**stood** - 99:10,
168:13
**stop** - 125:24,
193:20, 194:19,
215:8, 246:11,
246:14, 258:3,
268:19, 269:3
**Stop** - 260:2, 260:3,
261:8, 263:9, 264:2

**stopped** - 74:7,
100:18
**stopping** - 246:6
**store** - 235:6
**stories** - 171:14
**story** - 36:15, 102:3,
134:6
**straight** - 265:2,
265:22
**strategy** - 48:23
**street** - 12:25,
44:23, 68:15, 82:11,
88:10, 88:14, 90:6,
90:21, 91:16, 95:1,
95:2, 95:3, 97:7,
163:14, 185:14,
185:16, 187:11,
195:16, 196:21,
199:14, 205:13,
206:11, 206:13,
208:21, 209:4,
209:10, 210:7, 235:8,
235:21, 235:24,
245:1, 245:22,
252:20, 258:19
**Street** - 5:21, 6:2,
6:3, 6:7, 6:8, 20:7,
30:2, 31:1, 57:16,
57:23, 243:22,
244:13, 244:20
**stricken** - 93:22
**strike** - 252:9, 265:5
**stuff** - 61:2
**stupid** - 120:18
**subject** - 28:14,
223:6, 251:13
**subpoena** - 42:11,
42:19, 42:20
**subpoenas** - 23:23,
39:20
**substance** - 111:1
**Substantial** - 141:13
**substantial** - 11:9,
138:23, 141:3, 141:9,
271:1
**sudden** - 136:20
**sufficiently** - 112:3
**suggest** - 196:16
**suggested** - 71:15
**suggesting** - 163:8
**suit** - 161:24
**Sullivan** - 1:17,
40:17, 47:11, 51:17,
51:22, 63:13, 114:3,
258:13, 267:23
**summarize** - 15:25,
26:10
**summarized** - 22:1
**summarizing** -
141:6
**summary** - 36:22
**summer** - 78:2,
78:16, 78:17, 78:18,
188:19
**Sunday** - 151:22,
151:23
**superseding** -
248:10
**supervised** - 256:15
**supervision** - 49:23
**supplement** -
140:11, 140:16
**supply** - 177:24
**suppose** - 5:16,
7:15
**supposed** - 19:19,
80:3
**supposedly** -
253:22
**surprised** - 80:2,

80:4
**survive** - 52:4
**suspect** - 70:1,
70:2, 70:10, 83:14,
83:17
**suspected** - 14:24,
254:5
**suspects** - 12:22,
70:12
**suspicion** - 51:9
**Sustained** - 40:18,
47:12, 51:19, 66:4,
93:8, 109:2, 116:8,
116:15, 164:7,
170:12, 179:1, 185:8,
185:12, 194:4,
207:19, 227:8
**sustained** - 48:25,
53:15, 115:13, 178:25
**Suv** - 192:1, 213:3
**swear** - 67:8
**swore** - 132:4
**sworn** - 4:16, 72:7,
172:9
**syndrome** - 52:17

**T**

**table** - 71:9, 258:16
**Taglin** - 78:11, 162:8
**Taglin's** - 78:11
**tall** - 173:2
**Tam/meek/ka-**
147:23
**Tam/mike/ka-**
147:23, 147:24
**Tamica** - 18:24,
19:9, 25:16, 26:25,
39:15, 42:14, 65:1,
77:8, 79:23, 84:15,
84:16, 86:2, 86:25,
88:15, 91:5, 96:17,
96:18, 99:22, 99:25,
100:17, 115:5,
143:23, 147:23,
148:12, 156:12,
159:2, 160:5, 160:17,
161:9, 167:14, 169:3,
169:15, 171:4, 171:9,
171:13, 213:19,
220:5, 254:19, 254:20
**Tamica's** - 146:2,
146:3, 150:5
**Tamika** - 101:1,
219:11, 219:24
**tank** - 156:14
**tape** - 33:4, 33:6,
33:8, 58:7, 58:19,
58:22, 58:23, 59:8,
59:10, 59:12, 59:13,
62:5, 62:6, 62:8, 63:2,
129:4, 134:3, 134:5,
134:8, 134:10,
255:17, 255:25,
257:18, 257:21,
257:22, 257:24,
258:6, 260:2, 260:3,
260:18, 268:4, 268:13
**taped** - 108:11,
253:15
**tapes** - 30:16, 31:6,
31:11, 60:4, 60:7,
62:1, 62:18, 246:2,
255:11, 255:23
**tapped** - 42:4
**target** - 11:9, 11:10
**Tatum** - 219:18,
262:10, 262:12
**Tay** - 162:8, 162:12
**Taylor** - 10:14

team - 257:1
tech - 155:15
tee - 129:12
telephone - 26:11,
28:14, 28:20
Ten- 143:19,
143:21, 185:23,
185:24
ten - 71:18, 71:19,
76:12, 133:7, 135:4,
151:15, 246:5, 246:7,
265:21, 266:5
ten-minute - 71:18
tenor - 180:16
term - 65:22, 65:24,
138:23, 169:22,
196:21, 251:21
terms - 23:3, 34:13,
35:12, 48:23, 52:3,
60:21, 61:10, 62:7,
65:21, 68:5, 98:8,
108:3, 111:2, 111:10,
180:14, 181:10,
181:18, 196:11,
200:6, 233:17, 234:7,
253:2, 263:16, 265:7,
265:24
test - 207:17
testified - 4:17,
60:11, 60:14, 62:23,
65:16, 68:23, 69:1,
72:8, 127:7, 172:10,
175:11, 181:8, 252:12
testify - 21:16,
48:15, 48:20, 48:22,
106:15, 165:22
testifying - 5:25,
11:18, 46:12, 58:6,
118:2, 249:2
testimonies - 44:25
testimony - 26:2,
36:8, 37:22, 43:8,
55:10, 60:22, 61:8,
83:5, 83:6, 108:7,
114:8, 124:6, 127:25,
131:12, 136:7, 136:8,
136:9, 136:12,
143:10, 151:2, 151:5,
153:5, 153:23, 154:3,
169:6, 171:24, 182:1,
199:10, 223:21,
251:12, 270:1, 270:8
theirs - 128:16
themselves - 62:9
thereafter - 144:21
therein - 13:22
they've - 17:21,
67:11, 123:14, 199:10
third - 74:12, 75:5,
173:17, 269:17
thousand - 178:16,
182:13, 261:12,
261:13
thousands - 31:4
threaten - 70:7,
121:19, 121:21
threatened - 19:19,
70:1
Threatened - 70:2
Three- 154:15,
168:15, 168:16,
168:17, 173:15,
173:25, 174:1
three - 67:2, 73:14,
139:7, 154:16,
154:19, 158:10,
168:20, 173:3,
180:17, 215:20
three-sentence -
180:17

ticket - 163:1
timeframe - 111:9
Timothy- 1:17,
10:16
tiny - 67:24, 68:2,
186:8
Titus- 2:10, 2:12,
2:20
Today- 2:5, 136:5
today - 3:3, 3:22,
3:23, 4:24, 5:19, 5:20,
7:13, 8:20, 11:18,
17:1, 46:12, 72:23,
73:1, 75:25, 77:4,
106:15, 120:6,
120:10, 124:6,
127:25, 135:9, 172:5,
186:11, 218:1, 223:4,
251:4, 251:14,
252:12, 270:4
Todd- 4:15, 4:20
together - 145:7,
148:13, 148:15,
177:13, 178:16,
190:18, 228:23
Tomorrow- 2:6
tomorrow - 3:7,
3:24, 3:25, 4:2, 46:13,
267:25, 268:19,
270:9, 270:12,
270:15, 270:19, 271:1
took - 18:20, 21:7,
49:20, 100:19,
131:25, 132:1, 138:2,
146:20, 159:14,
159:23
tool - 67:6, 67:7,
67:16
top - 6:25, 99:6,
269:16
topic - 16:11, 16:12,
17:19, 17:20, 170:24
total - 4:11
Totally- 119:7
touch - 5:8, 7:10,
205:4, 232:12, 236:11
Tourette's- 52:17
toward - 92:23,
214:14, 236:21
Towards- 206:9
towards - 6:22,
62:14, 87:6, 91:16,
92:15, 92:22, 93:6,
96:4, 98:11, 98:12,
100:11, 157:22,
159:19, 193:6,
206:10, 206:13,
208:8, 208:21,
209:16, 209:18
tracks - 6:20, 258:4,
258:5
traffic - 105:12
trafficking - 45:17
trained - 146:23
transactions -
184:22
transcribed - 56:5
Transcript- 1:11
transcript - 1:24,
59:19, 60:12, 60:16,
61:14, 62:21, 74:24,
75:1, 125:2, 126:10,
127:6, 128:21,
128:25, 129:3, 129:7,
129:19, 129:23,
130:2, 169:22, 176:2,
255:19, 256:2,
257:17, 257:19,
258:4, 258:5, 259:8,
260:20, 261:2, 268:7,

271:9
transcription - 1:25
transcripts - 36:18,
39:23, 60:1, 60:2,
61:23, 62:2, 62:3,
62:9, 62:16, 63:3,
73:17, 73:19, 83:3,
222:20, 255:24,
256:1, 258:16
trash - 158:4
Trial - 1:11, 271:6
trial - 17:14, 35:14,
35:16, 35:17, 36:3,
36:6, 62:2, 135:21,
144:10, 171:24
Tried- 204:15
tried - 145:10,
212:19, 235:2
trigger - 167:2
Trina- 91:22, 91:24,
93:6, 194:13, 194:14
Trina's- 92:5, 92:15,
92:22, 92:23, 93:10,
93:11, 94:7, 206:9,
206:10, 206:13,
207:22, 209:6
trips - 220:18
trouble - 79:15,
142:17
truck - 89:17, 89:19,
89:23, 90:17, 91:16,
94:18, 94:21, 95:22,
96:21, 96:22, 96:24,
97:1, 97:3, 97:4,
99:20, 99:21, 99:23,
155:8, 155:9, 191:16,
213:15
true - 33:5, 35:25,
74:13, 74:16, 74:19,
120:6, 120:10,
124:20, 127:17,
128:4, 131:22,
131:23, 134:20,
136:3, 141:10, 142:5,
142:8, 142:11, 143:4,
163:5, 171:12
truth - 13:22, 26:7,
67:11, 115:10,
115:19, 117:3,
122:12, 127:21,
128:1, 130:14, 132:5,
137:4, 137:5, 137:13,
169:19, 186:14
truthful - 32:23,
67:15, 67:18, 83:5,
83:6, 222:21, 222:23,
222:25, 223:2
try - 144:5, 145:9,
147:2, 259:16
Try- 212:18
Trying- 219:4
trying - 69:7, 79:15,
83:15, 91:13, 172:4,
181:18, 204:17,
210:22, 218:7,
254:10, 259:13
Turn- 13:7, 13:8
turn - 235:17
turned - 60:24,
97:11, 98:20, 162:10,
209:16
Tv- 85:10, 122:25,
232:7
Twelve- 76:10,
76:12
twice - 130:17,
265:23
Twice- 73:9, 135:18
two - 2:16, 9:18,
16:25, 17:3, 42:20,

46:1, 50:18, 55:5,
56:1, 59:14, 59:16,
75:18, 105:8, 105:9,
146:11, 157:2,
166:22, 171:8,
175:14, 180:17,
200:17, 213:19,
221:16, 225:13,
237:21, 249:5, 255:6,
255:22, 256:1,
256:10, 260:9,
266:19, 267:8, 270:25
Two- 55:20, 75:10,
77:1, 77:3, 139:7,
252:4, 252:5
uphold - 132:7
type - 103:21,
103:24, 203:24,
204:1, 231:23
Typically- 149:8
typically - 178:9,
186:1

## U

ultimately - 34:24
uncover - 24:14
Under - 181:4
under - 21:13, 34:5,
47:23, 47:24, 52:11,
67:8, 73:1, 106:12,
111:1, 132:4, 145:5,
180:11, 182:1,
247:10, 247:20, 270:7
undercover - 54:19
understood - 113:8,
263:22
undertake - 27:10,
55:10, 55:14, 251:20
undertaken - 218:6
unit - 185:10
United - 1:1, 1:3,
1:12, 140:21, 141:7
unless - 26:2,
35:18, 74:1, 114:22
Unlike - 250:13
unlock - 47:20
untruthful - 34:15,
106:11
Up - 41:23, 43:10,
43:16, 44:2, 199:5,
199:6
up - 4:12, 9:25,
13:10, 25:3, 25:18,
26:19, 32:22, 38:3,
41:21, 42:3, 46:20,
53:10, 55:2, 60:7,
60:10, 62:6, 68:15,
70:22, 76:11, 81:16,
82:4, 82:6, 84:24,
85:5, 86:21, 86:22,
88:1, 89:10, 90:23,
92:5, 92:14, 92:15,
92:18, 93:12, 94:4,
94:16, 96:6, 101:4,
102:25, 104:16,
105:13, 105:14,
108:21, 111:24,
112:1, 123:11,
129:12, 131:24,
136:4, 138:19, 146:5,
152:7, 152:13,
152:18, 159:17,
160:24, 161:5, 161:6,
161:21, 162:22,
163:9, 170:23,
172:12, 172:17,
173:5, 183:12,
184:18, 184:21,
190:4, 190:20,
191:19, 192:19,

193:17, 193:19,
194:16, 198:6, 198:9,
199:23, 201:25,
203:13, 206:10,
206:11, 206:13,
208:12, 208:13,
230:3, 231:24, 232:6,
232:11, 232:13,
235:16, 235:21,
235:24, 236:10,
238:17, 240:22,
240:23, 241:14,
242:2, 242:18, 244:1,
244:15, 245:1, 249:1,
250:2, 251:22, 259:17
uphold - 132:7
upstairs - 233:3
user - 68:3
utilities - 122:21

## V

vaguely - 128:3
value - 31:5, 68:25,
69:3, 265:24
varied - 178:11
various - 23:24,
37:6, 119:2
vehicle - 44:18,
100:10, 100:14,
100:17, 155:2,
155:15, 155:25,
156:13, 158:18
Verizon - 123:25
version - 139:22,
192:20
vial - 185:18
vicinity - 106:21
victim - 19:8, 20:3,
20:7
video - 30:24,
57:24, 58:9, 69:11,
69:13, 235:5
view - 3:13, 110:3,
112:21
viewed - 22:8, 30:16
voice - 130:2,
172:12, 238:16,
259:10
vs - 1:5

## W

Wait - 63:16
wait - 145:8
waiting - 72:18,
72:19
waived - 140:3
Walding- 77:17,
88:5
walk - 82:6, 97:15,
146:15, 146:17,
146:19, 154:5, 161:4,
206:15, 217:11
walked - 47:21,
84:16, 85:21, 86:21,
86:22, 87:4, 87:5,
87:13, 89:25, 90:1,
94:4, 96:16, 97:4,
97:5, 98:11, 99:20,
147:7, 206:22,
207:21, 235:14,
235:15, 235:16,
235:21, 235:23, 237:7
walking - 87:2,
87:6, 87:18, 91:15,
95:3, 96:6, 98:12,
153:16, 153:21,
244:19, 245:1, 245:21
walkway - 154:8

16

**Walmart** - 190:20
**Walter** - 10:14
**Wanda** - 42:15, 100:23
**wants** - 30:21, 35:1, 184:16
**Wants** - 261:22
**warn** - 207:10
**warrants** - 21:16
**Washington** - 215:11
**watch** - 31:14
**watching** - 101:11, 107:3
**water** - 6:20
**weak** - 41:12
**wearing** - 209:19, 209:21, 256:11
**Wednesdays** - 145:7
**week** - 177:18, 178:10
**weeks** - 73:18, 133:10, 269:11
**welcome** - 181:6, 229:21
**well-being** - 51:7
**West** - 76:19, 76:20, 76:22, 145:18, 246:10, 271:3
**Westport** - 5:3, 5:15, 6:7, 6:9, 7:4, 8:23, 11:13, 51:3, 68:19, 76:14, 76:16, 76:17, 76:18, 76:19, 76:22, 77:24, 78:5, 79:1, 84:14, 84:15, 84:17, 86:1, 90:4, 91:13, 100:7, 100:15, 109:4, 117:20, 145:21, 146:6, 175:6, 175:7, 176:14, 177:8, 184:1, 184:15, 215:23, 215:24, 215:25, 218:15, 224:21, 226:5, 235:8, 236:22, 236:25, 241:17, 241:18, 251:22, 257:3
**wheel** - 156:14, 156:15
**wheelchair** - 200:9
**white** - 80:7, 245:3, 245:4, 245:8, 245:11, 245:14, 248:19, 248:22, 250:3
**whole** - 32:11, 48:12, 105:7, 132:5, 133:21, 143:6, 180:16
**wife** - 11:15, 14:23
**Wilgrey** - 97:12, 103:2, 203:15
**Williams** - 10:13, 10:14, 56:17, 57:18, 176:7, 187:13, 187:15, 187:19, 223:8, 223:17, 224:4, 247:21, 248:8, 248:15, 250:1, 251:17
**Winans** - 241:20, 241:21, 241:23, 242:4
**wire** - 55:16, 256:7, 256:11
**wired** - 251:22
**wish** - 4:10, 32:11, 62:12, 65:4, 70:21, 120:24, 248:12
**wished** - 36:7
**wishes** - 26:3, 74:1, 118:13

**withheld** - 45:1
**Witness** - 4:20, 51:6, 51:24, 72:11, 120:16, 133:5, 143:21, 143:25, 165:10, 166:4, 168:24, 172:13, 172:16, 173:15, 186:6, 232:18, 232:21, 235:25, 236:16, 263:20, 265:11
**witness** - 4:6, 4:16, 12:1, 31:12, 37:10, 37:11, 38:6, 41:12, 43:11, 46:25, 47:16, 50:17, 52:25, 53:12, 53:21, 53:23, 54:3, 54:7, 61:11, 62:22, 66:10, 66:15, 71:16, 71:24, 72:7, 73:21, 81:15, 87:15, 93:16, 99:17, 112:4, 124:23, 127:2, 133:25, 142:7, 143:22, 145:5, 148:21, 154:16, 171:25, 172:3, 172:5, 172:9, 173:4, 174:23, 180:21, 181:16, 213:2, 231:16, 243:20, 267:10, 270:9
**witnesses** - 2:25, 3:6, 5:1, 6:15, 11:15, 24:24, 25:4, 25:7, 26:7, 37:3, 39:16, 39:25, 40:15, 44:11, 44:20, 50:14, 50:15, 50:18, 50:23, 53:19, 53:24, 54:3, 54:5, 54:9, 71:13, 106:6, 218:14, 218:20, 218:23, 218:24, 219:2, 219:9, 219:19, 219:23, 252:21, 253:18, 254:16, 255:6, 267:8
**woke** - 136:4
**woman** - 104:3, 197:19, 197:22, 237:14
**woman's** - 199:8
**wondering** - 269:13
**word** - 125:8, 125:17, 126:4, 130:17, 130:23, 170:1, 196:7, 218:18, 261:10
**words** - 87:3, 142:17, 158:7, 158:15, 181:21, 227:23, 228:14
**wore** - 113:24
**works** - 62:9
**world** - 55:11
**worry** - 122:11, 144:11, 169:18
**worth** - 149:8, 265:1, 265:16, 265:17
**write** - 163:1
**written** - 9:14, 134:22
**wrote** - 189:9

## Y

**year** - 9:13, 20:17, 136:6, 176:6, 225:10
**years** - 69:24, 76:10, 76:12, 81:4, 81:8, 81:9, 103:17,

103:19, 105:5, 105:7, 105:8, 105:9, 113:14, 119:4, 123:25, 150:23, 163:11, 176:24
**yelling** - 260:22
**yesterday** - 3:2, 3:7, 5:24, 7:17, 9:3, 9:22, 16:4, 22:5, 29:24, 50:5, 56:20, 72:18
**yo** - 261:16, 263:1, 264:25, 265:1
**young** - 197:19
**Younger** - 234:14
**younger** - 150:23, 234:13
**yourself** - 21:13, 149:2, 238:1, 250:23, 257:4, 259:12