UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,


Plaintiff,


vs.                    Case No.  1:10-CR-0744-RDB


ANTONIO HALL,


Defendant.

------------------------------------------------------

**AUGUST 8, 2011**
**Transcript of Trial Proceedings**

**Before The Honorable RICHARD D. BENNETT**
**United States District Judge, and a Jury**

APPEARANCES:              John F. Purcell, Jr.
                          Clinton J. Fuchs
                          Assistant U.S. Attorneys

FOR THE DEFENDANT:        Gary E. Proctor
                          Timothy J. Sullivan


Proceedings recorded by mechanical stenography,
transcript produced with computer-aided
transcription.

```
 1                     P R O C E E D I N G S

 2              (JURY IN.)

 3              THE COURT:  Counsel, before we get

 4     started, a few matters.  Juror No. 1 has advised the

 5     deputy clerk of court that she remembers the witness

 6     Jocelyn Hamlet, who is known as Mama, from elementary

 7     school.  That she didn't recognize the name at the

 8     time, but she's brought to the attention of the

 9     deputy clerk that apparently she knew Miss Hamlet

10     back in elementary school.  Which would -- given the

11     fact that Juror No. 1 is 54 years of age -- would

12     place it back some 40 years ago.

13              Now, we certainly can ask Juror No. 1 if

14     that would affect her judgment in this case one way

15     or the other.  I'm certain it would not, but I'll

16     handle this whichever way counsel desires.

17              And then Juror No. 8 has indicated that

18     she knows somebody by the name of Avery Galtney who

19     lives in the county.  Is that Anne Arundel County?

20     She said the county.  And she recognized the name

21     Avery Galtney because it's been mentioned a few

22     times.  So what is the pleasure of the government and

23     then I'll hear from the defense as to how they would

24     like this to be handled.

25              MR. PURCELL:  The government's position
```

1    is, Your Honor, I would bring each to the bench; note

2    their question; and ask them and if would affect

3    their ability to be fair and impartial.  It's very

4    unlikely that the Galtney will be a government

5    witness in the direct -- in it's case in chief.

6              THE COURT:  Okay.  Mr. Proctor, Mr.

7    Sullivan, how would you like to handle it?

8              MR. PROCTOR:  The same way.

9              THE COURT:  Okay.  Well, as opposed to

10   bringing the juror up to the bench, I think what

11   we'll do as a matter of record we'll just Juror No.

12   1 -- in light of their notes, just say if Juror No. 1

13   would first come into the courtroom, the judge has a

14   few questions.  And we'll just have her come, be

15   seated, and we'll just talk -- we'll have her stand

16   right here in the well of the courtroom.  Is that

17   agreeable to the government?  To the defense?  And

18   then we'll do the same with No. 8.

19              (JUROR NO. 1 IN.)

20              THE COURT:  Good morning, Juror No. 1,

21   you may stand right there.  Nice to see you.  I see

22   that you gave us a note that you remember the witness

23   Jocelyn Hamlet, whose nickname apparently is Mama,

24   from elementary school.  Is that correct?

25              JUROR NO. 1:  Yes.

1          THE COURT:  But I gather it's been many,

2   many years.

3          JUROR NO. 1:  I haven't seen her since.

4   I haven't seen her since.

5          THE COURT:  Okay.  I've noted that given

6   you are 54 years of age, correct?

7          JUROR NO. 1:  Yes.

8          THE COURT:  You don't look it.  You look

9   much younger.  But it's been quite a -- it's been 40

10   years, probably, since you've --

11          JUROR NO. 1:  Right.  I haven't seen her.

12          THE COURT:  Would that affect your

13   judgment in any way in this case?

14          JUROR NO. 1:  Oh, no.

15          THE COURT:  Mr. Purcell, any questions?

16          MR. PURCELL:  No.

17          THE COURT:  Mr. Proctor, any questions?

18          MR. PROCTOR:  No.

19          THE COURT:  Mr. Sullivan?

20          MR. SULLIVAN:  No.

21          THE COURT:  Thank you very much, Juror

22   No. 1.  You can go back into the jury room.  And then

23   we'll bring out Juror No. 8.

24          (JUROR NO. 8 IN.)

25          THE COURT:  Good morning, Juror No. 8.

1    That's right.  Just stand right there.  You gave the

2    deputy clerk of court a note that you may know

3    someone by the name of Avery Galtney; is that right?

4                    JUROR NO. 8:  Galtney.

5                    THE COURT:  Galtney.  Okay.  And that you

6    believe lives in the county.  Is that Anne Arundel

7    County?

8                    JUROR NO. 8:  Out Reistertown somewhere.

9                    THE COURT:  Out Reistertown.  Okay.  How

10   well do you know this person?

11                   JUROR NO. 8:  I really don't know him.  I

12   know his father.

13                   THE COURT:  You know his father.  Would

14   that cause -- if it turns out to be the same

15   person -- we're not even sure that person is going to

16   testify here in court.  There's been some reference

17   to him.  Would the fact that you may or may not know

18   the father of an person who may or may not prove to

19   be that witness cause you to have any difficulty in

20   being a fair and impartial juror in this case?

21                   JUROR NO. 8:  No.

22                   THE COURT:  Any questions from the

23   government?

24                   MR. PURCELL:  No.

25                   THE COURT:  From the defense?  Mr.

6

1       Proctor or Mr. Sullivan?

2                   MR. PROCTOR:  No, Your Honor.

3                   THE COURT:  Thank you, Juror No. 8.  You

4       may return to the jury room as well.

5                   All right.  As far as I'm concerned both

6       may continue to serve as jurors.  Is there any

7       objection from the government?

8                   MR. PURCELL:  No, Your Honor.

9                   THE COURT:  From the defense?

10                  MR. PROCTOR:  No, sir.

11                  THE COURT:  Okay.  With that, we're ready

12      to bring the jury in.

13                  (JURY IN.)

14                  THE COURT:  Good morning, everyone.  Hope

15      everyone had a nice weekend.  A nice breezy, balmy

16      weekend.  I think the heat will break eventually.

17      With that, we are ready for the next government

18      witness.  Mr. Purcell.

19                  MR. PURCELL:  Good morning, Your Honor.

20      Yes.  The government is ready to proceed with Robert

21      Parsons, who is outside.

22      Whereupon:

23                  ROBERT MICHAEL PARSONS,

24      called as a witness, having been first duly sworn

25      according to law, testified as follows:

ROBERT MICHAEL PARSONS - DIRECT/PURCELL

7

```
 1                 THE DEPUTY CLERK:  State your full name

 2      for the record and spell your first and last name.

 3                 THE WITNESS:  Robert Michael Parsons.

 4      R-o-b-e-r-t, P-a-r-s-o-n-s.

 5                       DIRECT EXAMINATION

 6      BY MR. PURCELL:

 7      Q.     Good morning, Mr. Parsons.  Sir, how old are

 8      you?

 9      A.     35.

10      Q.     And don't give us your address, but what part

11      of Maryland are you from?

12      A.     West Baltimore.

13      Q.     West Baltimore?

14      A.     Uh-huh.

15      Q.     And where were you living back in, I guess,

16      2003, 2004?

17      A.      In Halethorpe.

18      Q.     Halethorpe.  And that is part of Baltimore

19      City?

20      A.     Baltimore County.  It's on the Baltimore

21      City/Baltimore County line.

22      Q.     Okay.  On the line.  Now, I understand that at

23      some point prior to that you had been in college?

24      A.     Yes.

25      Q.     And where were you in college?
```

ROBERT MICHAEL PARSONS - DIRECT/PURCELL

8

1    A.      I'm sorry?

2    Q.      Where were you in college?

3    A.      It was the University of Rio Grande in

4    southeast Ohio.  And then I transferred to a school

5    in Tennessee.

6    Q.      And was your transfer related to any athletic

7    scholarship you had at the time?

8    A.      Yes.  I was on a baseball scholarship.

9    Q.      What position did you play?

10   A.      I was a catcher.

11   Q.      Catcher.  Did there come a time when you left

12   college and returned to Baltimore?

13   A.      Yes.

14   Q.      Now, when you returned to Baltimore -- let me

15   strike that.

16           Before you returned to Baltimore, did you

17   have any prior history of drug abuse; that is, use of

18   cocaine or heroin or anything like that?

19   A.      No.  I did smoke a little marijuana on

20   occasion, you know, like the year before I left for

21   college.  My senior year in high school I think was

22   the first time I tried it.

23   Q.      Other than that, I'm talking about.

24   A.      Other than that, no.

25   Q.      Can you tell the jury -- it's important to

1    your testimony -- what is it that occurred in terms

2    of your drug use when you returned home from college

3    and came back into the community?

4    A.    How did --

5    Q.    In terms of your drug use?  What happened when

6    you came home?

7    A.    I got together with some -- like, the friends

8    that I had before I left.  And they were getting

9    high; you know, using cocaine, crack, Ecstasy, stuff

10   like that, on a regular basis.

11   Q.    Did you start using drugs?

12   A.    Yeah, I fell into it.  Mainly smoking crack.

13   Q.    Smoking crack.  Now, did there come a time

14   when you met the defendant, Mr. Hall, seated here in

15   court?

16   A.    Yes.

17   Q.    Do you know who I'm talking about?

18   A.    Yes.

19   Q.    If you do know who I'm talking to, please

20   point to him for the record?

21         THE COURT:  The record will indicated

22   that the witness has identified and pointed to the

23   defendant, Antonio Hall.

24   BY MR. PURCELL:

25   Q.    Tell the jury, please, how is it that you met

1    Mr. Hall.  In what context?

2    A.    I was purchasing crack from him.  The first

3    time that I met him, i was with a friend of mine that

4    was supposed to go meet someone else in Westport.

5    And Mack came up to the car instead and sold to us.

6    And then from then -- from then on, you know,

7    whenever I would go in the neighborhood, I was buying

8    from him.  Or -- I mean, there was other people that

9    I would buy from, also.

10   Q.    Who was your primary source of crack during

11   the period you were buying crack in Westport?

12   A.    It was Mack and usually another guy, Freddy.

13   Q.    Freddy?

14   A.    Yeah.

15   Q.    Is Freddy a person that you later loaned your

16   car to?

17   A.    Yes.

18   Q.    We'll talk about that in a few minutes, later

19   in your testimony.

20          Now, in terms of -- if you can, I'm going

21   to put up government No. Exhibit 6A.  Do you see

22   there's a monitor there to your left?

23   A.    Uh-huh.

24   Q.    And from time to time -- okay.  I'll do this

25   one, if you don't mind.  Because I have some

11

1    questions for him here.  Thank you.

2              Now, this is an aerial shot, government's

3    Exhibit 6A.  But do you recognize the area shown in

4    this aerial photograph?

5    A.    Yes.

6    Q.    Okay.  Can you look -- and, actually, you had

7    have an opportunity to look at this aerial photograph

8    before; is that correct?

9    A.    Yes.

10   Q.    Now, when you said you first began to buy from

11   Mack, if you see it on this particular aerial, can

12   you tell us -- and if you just point and touch that

13   screen, it will turn -- it will, like, illuminate

14   where you're pointing to.

15   A.    Okay.

16   Q.    So if you remember the first time you met

17   Mack, can you show us where it was and point to it,

18   please?

19   A.    The first time that I met him was right here

20   at the top of Norfolk Street.

21   Q.    Okay.  Are you familiar with Maisel Court?

22   A.    Yes.

23   Q.    During the time you knew Mack, did you ever

24   buy drugs from him on Maisel Court?

25   A.    Yes.

12

1    Q.    And we'll get into the time lines more in a

2    minute.  But for how long a period would you say you

3    bought cocaine, crack cocaine, from Mr. Hall?

4    A.    It was at least a year.

5    Q.    A year?

6    A.    At least.

7    Q.    And during that -- during that year that you

8    bought from Mr. Hall, can you tell the jury, please,

9    how frequently you would buy drugs from him.

10   A.    Some days I would go -- I mean, it would be

11   pretty much an everyday thing.  Some days I would go

12   two, three times a day; some days I would go five,

13   six times a day.

14   Q.    Okay.  Now, did Mr. Hall wear a mask when you

15   bought drugs from him during these transactions?

16   A.    No.

17   Q.    So you would buy sometimes two, three times a

18   day?

19   A.    Yes.

20   Q.    Now, would you tell the jury, please, what it

21   was, that is, describe the sort of items you were

22   buying from Mr. Hall.  How was the crack packaged,

23   for instance?

24   A.    They were packaged in small, like zip-top

25   bags.

ROBERT MICHAEL PARSONS - DIRECT - BURGEE

13

1    Q.      And --

2    A.      Ten-dollar bags.

3    Q.      Thank you.  And how much would you pay for

4    those, or for each of those, typically in your

5    transactions with Mr. Hall?

6    A.      Ten dollars apiece.

7    Q.      Ten dollars apiece.  And in your typical

8    transactions, how many of those would you buy at a

9    time?

10   A.      Started out, I would buy anywhere between five

11   and ten at a time.

12   Q.      So that would cost you between 50 and a

13   hundred dollars?

14   A.      50 and a hundred bucks.

15   Q.      How would you pay, cash?

16   A.      Right.

17   Q.      When -- you pay cash right at the time of the

18   transaction?

19   A.      Yes.

20   Q.      Now, to your observation, just based on what

21   you saw, were you Mr. Hall's only crack customer?

22   A.      No.

23   Q.      You're laughing when I say that.  Why?

24   A.      It was -- that neighborhood was a hotspot.

25   You know, there was a lot of traffic going in and out

14

1     of there.

2     Q.      Did you see Mr. Hall serve other people the

3     way he served you?

4     A.      Yes.

5     Q.      And I'm using the word, "serve," because

6     that's the word that's used on the street, isn't it?

7     A person serves you?

8     A.      Yes.

9     Q.      Could you tell the jury, please, how a typical

10    transaction occurs when you go to Maisel Street or

11    wherever it would be that you go to see Mr. Hall in

12    Westport to buy crack from him.

13    A.      Well, can I show you on the map?

14    Q.      Yes, you may.

15    A.      Is that what you want me to do?

16    Q.      Sure, please.

17    A.      I would pull in off of Hollins Ferry Road,

18    which is right here.

19    Q.      Why don't we do this.  Why don't we get rid of

20    the other -- press the lower left-hand --

21              THE COURT:  Hit the left-hand part of the

22    screen, Mr. Parsons.  And it will clear up.  And then

23    you can redirect, if you want.

24              THE WITNESS:  Okay.

25

1    BY MR. PURCELL:

2    Q.      Thank you.  And I'll back up a little bit to

3    give the jury -- go ahead, please.

4    A.      Usually I would pull in off of Hollins Ferry

5    Road and then come up into Annor Court.  And a lot of

6    times I would just get -- my car would get rushed by

7    a couple guys.  You know what I mean?  But if that

8    wasn't the case, if nobody would rush the car, I

9    would turn on to Maisel Court.  And a lot of times I

10   would put my order in right here where the break is

11   in between the buildings and go up and turn around

12   and then I would come back down.  That's when, you

13   know, I would do the transaction.

14   Q.      Now, tell the jury, please, in terms of those

15   times when you put an order in, would that be to Mr.

16   Hall they would put the order in?

17   A.      If he was out there at the time, yes.

18   Q.      Okay.  And let's just talk about -- all we're

19   interested in, really, at this point in my

20   questioning are your deals with Mr. Hall.

21   A.      Okay.

22   Q.      So were there times when you, for instance,

23   pulled up on Maisel and put an order in with Mr.

24   Hall?

25   A.      Yeah.

1    Q.      And would he serve you immediately?

2    A.      Most of the time he would serve me.

3    Q.      Okay.  Now -- I mean, at that point when you

4    put the order in?

5    A.      No, no.  He would -- you know, he would take

6    your order; he would go over to wherever he was

7    hiding his stash at while I was turning around; and

8    when I would come back he'd have it and, you know,

9    make the transaction then.

10   Q.      I'm asking you because I know that you did it;

11   you did it routinely.  But the jury has not done it.

12   So I want them to get an idea from your experience;

13   okay?

14   A.      Okay.

15   Q.      Now, were there times when you would give an

16   order to Mr. Hall, pull away, and then he would have

17   someone else serve you?

18   A.      Yes.

19   Q.      Okay.  Tell the jury how that worked, please.

20   A.      If I would -- like I said, I would let him

21   know what I wanted.  And sometimes he would just

22   stand back in the cut and send somebody else to me.

23   Q.      You saw that happen?

24   A.      Yes.

25   Q.      And you would tell him how much you wanted?

ROBERT MICHAEL PARSONS - DIRECT - BURGEE

17

```
 1      A.      Yes.

 2      Q.      And that person would then bring it to you?

 3      A.      Yes.  Somebody else would bring it to me.

 4      Q.      At his direction?

 5      A.      Yes.

 6      Q.      Did you give that person the money?

 7      A.      Yes.

 8      Q.      Or had you already given Mr. Hall the money?

 9      A.      No.  I would give the person that came to the

10      car the money.

11      Q.      Okay.  But he took the order?

12      A.      Yes.

13      Q.      I may have asked this.  But while you were out

14      there doing these transactions, did you observe Mr.

15      Hall conduct transactions with other customers

16      similar to the way that he conducted transactions

17      with you?

18      A.      Yes.

19      Q.      And your testimony is that you believe you did

20      transactions with Hall?  I'm not talking just about

21      Westport, but with Hall basically every day for a

22      year?

23      A.      Give or take a day or two.

24      Q.      Okay.  A couple of days you didn't?

25      A.      Right.
```

ROBERT MICHAEL PARSONS - DIRECT - BURGEL

18

```
 1    Q.      Now, that ended in February of 2004 when you
 2    were shot; is that right?
 3    A.      Right.
 4    Q.      Let's talk about that.  Just one second,
 5    please.
 6            Let me ask you:  While we're still
 7    talking about the drug transactions you did with Mr.
 8    Hall, did you ever have transactions with him where
 9    you didn't pay him at the immediate -- that is, at
10    the time you actually obtained the drugs?
11    A.      I mean --
12            MR. PROCTOR:  Judge, I'm sorry, I have an
13    objection.  Could we approach, please?
14            THE COURT:  Yes.  Certainly.
15            (BENCH CONFERENCE ON THE RECORD.)
16            MR. PROCTOR:  Two things.  Thing No. 1, I
17    can hear the metal detector and so can the jury.
18            THE COURT:  I'm sorry.  What?
19            MR. PROCTOR:  I can hear the courtroom
20    security officer swiping people, before they -- you
21    can hear the beep, beep, beep, and so can the jury.
22    I've seen a couple of them look around.  That's
23    sending a message that my client is somehow violent;
24    that people needed to be wanded a second time.  If
25    you can get word to get the CSOs to do it down the
```

1    hall or by the elevators or whatever.

2              THE COURT:  First of all, I don't

3    necessarily agree with your characterization that the

4    jury has or hasn't noticed.  You put that on as your

5    opinion and the record will reflect I haven't noticed

6    any jurors looking over at the door.  And I've been

7    watching.  So your summary of the what you believe

8    the facts to be is definitely in contravention with

9    what the Court has noticed.  And the Court will put

10   on the record that I have absolutely not noticed the

11   jurors being distracted.  So the record will not

12   reflect that your summary is accurate because it is

13   not accurate.

14              Secondarily, I will certainly ask the

15   security officers to do that outside of the doors out

16   of an abundance of caution.

17              What is the other one.

18              MR. SULLIVAN:  The second thing, Judge,

19   is just before we get into Mr. Hall shooting him, I'm

20   requesting a limiting instruction.  The fact that Mr.

21   Hall may have shot this man is -- in retaliation for

22   testifying --

23              THE COURT:  I would think that the facts

24   of this relate totally to the matter of the drug

25   charge in Count 1 and acts in connection with the

1    drug charge.  There is no charge against Mr. Hall

2    with respect to the facts here.  When would you like

3    me to --

4              MR. PROCTOR:  When Mr. Purcell goes to,

5    "Did there come a time Mr. Hall shot you".

6              THE COURT:  That's consistent with --

7    you've preserved your earlier objection with respect

8    to this and I previously ruled upon it.  And the

9    record will reflect you've preserved your objection

10   as to this topic.

11             But it is an overt act, correct, that's

12   charged with respect to the conspiracy.  So he's

13   permitted to testify to it.  Because it is an overt

14   act listed in the conspiracy charge returned by the

15   grand jury.  But I'll give that limiting instruction

16   once there's testimony as to a shooting.  I'll be

17   glad to do that, Mr. Proctor.

18             MR. PROCTOR:  Thank you.

19             THE COURT:  All right.

20             (END OF BENCH CONFERENCE.)

21             THE COURT:  If the court security officer

22   could just come up to the bench one second, please.

23             (BENCH CONFERENCE ON THE RECORD.)

24             THE COURT:  With respect to any wanding

25   of people that come into the courtroom, do it outside

1      the door, not inside the door.

2                    THE COURT SECURITY OFFICER:  They are.

3      They're right outside the door.

4                    THE COURT:  I don't want to hear the

5      wanding of people coming in the courtroom.  I want it

6      done outside of the doorway.

7                    THE COURT SECURITY OFFICER:  In the

8      hallway, or --

9                    THE COURT:  Yeah.  Just outside of the

10     door, in the hall outside the door.

11                   THE COURT SECURITY OFFICER:  Very good.

12                   (JURY IN.)

13                   THE COURT:  All right.  With that, I've

14     attended to that other matter.  Mr. Proctor.  And

15     with that, you may continue, Mr. Purcell.

16     BY MR. PURCELL:

17     Q.    Okay.  Yes.  My question -- I think the last

18     question I asked was whether there were ever

19     occasions when you were buying, doing these

20     transactions with Mr. Hall, and, instead of paying at

21     the time, you were given drugs and agreed to pay

22     later?

23     A.    Every now and then if I didn't have any money,

24     he would front me maybe one or two, you know, but

25     that was about it.  And it didn't happen too often.

```
 1      Q.      What does that mean, front you?
 2      A.      He would give me the drugs without me giving
 3      him the money, intending on me to pay him back, you
 4      know, some other time.  Usually later that day or the
 5      next day.
 6      Q.      All right.  Now, in the course of your
 7      transactions, if you're going back multiple times a
 8      day, when you went back -- just tell the jury,
 9      please -- typically how many of these zips -- let's
10      just call them zip bags or whatever -- that you would
11      buy at a time?
12      A.      At one time?  The most would be 15.  The least
13      would be, you know, one or two.  But, on average, it
14      was at least five every time.
15      Q.      And what would you do with them, with the
16      crack that was in these vials, or I'm sorry, in these
17      ziplocks?
18      A.      Well, when I first started out, I would end up
19      using half of them and getting rid of half of them.
20      Q.      What does that mean, getting rid of them?
21      What does that mean?
22      A.      I would sell them to someone else for a couple
23      dollars more and make my money back so I could buy
24      more.  And -- but after a while it just got to a
25      point where I wasn't selling any of them and I was
```

23

1    just using them all myself.

2    Q.    Spend a lot of money on crack, did you?

3    A.    A little bit.

4    Q.    A lot?

5    A.    A lot, yeah.

6    Q.    Now, were you able to work at all during this

7    time when you were using crack all the time?

8    A.    When I started out I was working.

9    Q.    What happened to that?

10   A.    Just the drugs.  Stopped going to work on a

11   regular -- so, the boss didn't like that too much.

12   Q.    No.  Now, in your personal experience, were

13   there occasions when, instead of paying cash for

14   drugs, you were able to, for instance, use your car

15   or something else as collateral or loan it out to

16   some extent?  Just tell the jury what you did.

17   A.    Yeah.  If I didn't have any money and I wanted

18   to use, I could loan my vehicle out to somebody in

19   trade for crack.

20   Q.    And how much might you get for that?

21   A.    Sometimes four bags.

22   Q.    Now, do you know a person named Freddy

23   Jackson?

24   A.    Yes.

25   Q.    How do you know him?

1    A.      I lent my car out to him and it was used in a

2    homicide.

3    Q.      Now, in your experience in going over to

4    Westport, where did you used to -- or, how did you

5    come to know him?  How did you come to know Mr.

6    Jackson?

7    A.      I was also buying crack from him, as well.

8    Q.      Okay.  And when you bought from him, were

9    there times when you saw him selling in proximity to

10   Mr. Hall?

11   A.      Usually when you've seen one, you've seen the

12   other.

13   Q.      Did they appear to know each other and be

14   friendly with each other?

15   A.      Yes.

16   Q.      Now, tell the jury, please, you mentioned you

17   loaned your car out to Mr. Jackson.  And it you

18   mentioned that it was used in a crime in Baltimore

19   County; is that correct?

20   A.      Correct.

21   Q.      Now, after that car was used in a crime --

22   while Mr. Jackson had it, I take it?

23   A.      Yeah.  Yes.

24   Q.      Okay.  Were you questioned by the police?

25   A.      Yes, I was.

```
 1     Q.      And was it Baltimore County police?

 2     A.      It was Baltimore County police.

 3     Q.      And the car that you used, was that registered

 4   to somebody else?

 5     A.      It was registered to my mother.

 6     Q.      To your mother?

 7     A.      Uh-huh.

 8     Q.      Ultimately the police tracked through to you?

 9     A.      Yes.

10     Q.      Now, when the police tracked the car through

11   to you, did you -- did they ask you who had the car

12   at a particular time?

13     A.      They wanted me to verify who had the car.  But

14   they had pretty much already had an idea who it was.

15     Q.      Okay.  Did you verify for them that Mr.

16   Jackson had the car?

17     A.      Yes.

18     Q.      You did?

19     A.      Yes.

20     Q.      And did there later come a time when you were

21   actually subpoenaed as a witness in Mr. Jackson's

22   case in Baltimore County?

23     A.      Yes.

24     Q.      Because of your identification of him?

25     A.      Uh-huh.
```

1    Q.      Now, I direct your attention, please,

2    to February -- I believe it's February 10th of 2004;

3    is that right?

4    A.      Right.

5    Q.      Now, let me ask you:  After you made this

6    identification of Mr. Jackson, once that occurred,

7    did you have occasion to see Mr. Jackson around

8    anymore?

9    A.      I seen him one other time.

10   Q.      Did you have any other transactions with him?

11   A.      No.

12   Q.      How did Mr. Hall relate to you -- or, did his

13   relationship with you change after you identified Mr.

14   Jackson?

15   A.      It changed because I didn't frequent that

16   neighborhood too much anymore.  I did see him one

17   other time after that, but he just -- you know, he

18   ignored me.

19   Q.      He ignored you?

20   A.      Right.

21   Q.      Now, do you know a person named Larry Cheese?

22   A.      Yes, I do.

23   Q.      How do you know Larry Cheese?

24   A.      I would buy drugs from Larry Cheese, also.

25   Q.      Another person you came to know?

ROBERT MICHAEL PARSONS - DIRECT - BURGEE

27

1    A.      Uh-huh.

2    Q.      Now, after you did this sale -- I'm sorry --

3    after you did the swap, car swap and your

4    identification of Mr. Jackson with the police, did

5    you continue to see Mr. Cheese?

6    A.      Yes.

7    Q.      And based on your observations of these

8    individuals, did you know whether Mr. Cheese knew Mr.

9    Byers?  I'm sorry, Mr. Hall?

10   A.      I knew that -- yes, I knew they knew each

11   other.

12   Q.      You could tell?

13   A.      Yes.

14   Q.      All right.  Now, direct your attention back to

15   February 10th, 2004.  For the record, you remember

16   this because that's the day you were shot; is that

17   right?

18   A.      That's right.  It was at night.

19   Q.      At night.  Now, could you tell the jury,

20   please, how you came to be in -- how you came to be

21   in Westport that evening.

22   A.      I was using over at someone's house.

23   Q.      Okay.  And why were you in Westport?  You were

24   using at a house in Westport?

25   A.      Yes.

```
1    Q.      Okay.  That wasn't clear.  Let me just ask you

2    before we get into the actual shooting:  In the --

3    would it be fair to say in the many hundreds of

4    times -- would that be right, that you bought from

5    Mr. Hall?

6    A.      I would.  That's accurate.

7    Q.      You would have an opportunity to see him

8    without a mask on, walk up to your car, walk back

9    you; you got to see how he looked, what his build

10   was, his gait, his manner of walking; is that right?

11   A.      Absolutely.

12   Q.      Was his walk, gait, and manner like that of

13   anyone else you knew?

14   A.      No.  He had his own -- you know, each person

15   carries themself their own particular way.

16   Q.      And you had become familiar with the way Mr.

17   Hall carried himself?

18   A.      Yes.

19   Q.      And you had seen him hundreds of times?

20   A.      Yes.

21   Q.      In transactions with him?

22   A.      Yes.

23   Q.      Where your attention was on him?

24   A.      Absolutely.

25   Q.      Because when you're there, you want to get the
```

1    drugs?

2    A.      Right.

3    Q.      And he has the drugs?

4    A.      Right.

5    Q.      Now, you'll be asked this, so I'll ask you

6    now.  When you would go and conduct these

7    transactions, were there times that you were already

8    high?

9    A.      Yes.

10   Q.      Did that affect your ability to tell who it

11   was you were buying drugs from?

12   A.      No.

13   Q.      You'd know Mack whether you were high or not;

14   is that right?

15   A.      Yes.

16   Q.      Now, on the night of the shooting, were you

17   using drugs that evening?

18   A.      Earlier that evening.

19   Q.      Were you high?

20   A.      Not at the time, no.

21   Q.      Now, tell us, please, how it came to be -- or

22   how you came to be in the area where you were shot.

23           I'm going to begin that line of

24   questioning with basically tell the jury -- I'm not

25   sure it's on government Exhibit No. 1 or on 6A, which

1    is up on the screen, or 6, whatever it may be, if

2    it's shown there.

3                THE COURT:  Why don't you hit the lower

4    left-hand corner, Mr. Parsons?  It will clear that

5    off.  Government Exhibit 6A is still up on the TV

6    monitors for the jury.

7    BY MR. PURCELL:

8    Q.      I'll slide this up.  I've got another visual

9    we can use if we have to.  In fact, let's just go to

10   visual.  What we just had up is 6.A, and I would --

11   let's go now to Exhibit No. 6, also an aerial, and

12   just get yourself oriented.  This is another picture

13   I believe you may have seen.  But just take your time

14   and orient yourself.

15               Do you see what's shown here?

16   A.      Yes.

17   Q.      Is that an area that's familiar to you?

18   A.      Yes, it is.

19   Q.      Now, if you would, once you get yourself

20   oriented, could you tell the jury, please, where it

21   was that the shooting occurred.  And we'll get into

22   how you came to be there in a second.

23   A.      It was right here at the corner of Huron and

24   Hollins Ferry Road.

25   Q.      And that's really just right across from where

1     you described you had done your deals on Maisel

2     Court?

3     A.     Yes.

4     Q.     If the jury wants to follow my pen.  Still in

5     Westport; is that right?

6     A.     Correct.

7     Q.     Okay.  Hollins Ferry Road is here.  Now, how

8     was it that you happened to be at that particular

9     location when the shooting occurred?

10    A.     I was supposed to meet Larry Cheese and do a

11    transaction.  And he had called and asked where I was

12    at.  And I told him, you know, that I was waiting for

13    him at Hollins Ferry Road and Huron Street.

14    Q.     Now, I'm going to replace the 6 we have with a

15    6 that you -- the same picture that you actually had

16    an opportunity to view today and mark; is that right?

17    A.     Yes.

18    Q.     Do you see your initials up there?

19    A.     Yes.

20    Q.     Okay.  That's exactly the same exhibit we just

21    looked at except for the difference of your initials.

22           And could you just point again on this

23    exhibit where your -- where the shooting occurred.

24    And that's what you indicated when you viewed this

25    photograph; is that correct?

1    A.      Yeah.  I was standing on the right-hand side

2    of the street.

3    Q.      Now, when you were shot, were you in your car

4    or not in your car?  Where were you?

5    A.      No.  I was standing on the sidewalk.

6    Q.      Okay.  Now, tell the jury, please, what it is

7    you observed, if anything, that grabbed your

8    attention while you were waiting there for Mr. Cheese

9    to show up.

10   A.      It actually grabbed my attention before I was

11   waiting for him to show up.  Because I was with my

12   girlfriend earlier that eve -- probably an hour or

13   two before the actual shooting.  And she had a flat.

14   And I was changing a flat; I believe it was right

15   here in this alley.

16   Q.      Okay.

17   A.      And as we were pulling into the alley --

18   Q.      I'm just going to read into the record what

19   street you're indicating, because it won't otherwise

20   know.  You're indicating off of Puget Street; between

21   Puget and Huron Street; is that right?

22   A.      Right.

23   Q.      Go ahead, please.

24   A.      I was changing the flat tire.  And I noticed

25   it was a white -- I believe it was an Infiniti that

ROBERT MICHAEL PARSONS - DIRECT - BURRELL

33

1    passed which me like two or three times while I was

2    out there.

3    Q.     Were you able to see who was in it?

4    A.     No.

5    Q.     Go ahead.

6    A.     The windows were tinted.  So, you know, after

7    we got that situation taken care of, she left.  And I

8    went to meet up with Larry Cheese right here, the

9    spot that I already indicated.  And the same car had

10   passed me while I was standing on the corner talking

11   to Larry Cheese on the phone.

12   Q.     Okay.  In that conversation, did he ask you

13   where you were?

14   A.     Yeah.  He asked where I was at --

15   Q.     Did you tell him?

16   A.     -- and I told him that I was standing on the

17   corner of Hollins Ferry and Huron Street.

18   Q.     Did you tell him -- okay.  Go ahead.

19   A.     I kept my eye on the car because I thought

20   that it might have been the car that he was in.  So

21   the car was on Hollins Ferry Road and it proceeded to

22   go farther past me down Hollins Ferry Road.  And I

23   can't really show you on this picture, but there's a

24   spot where it turned in and came up the alley toward

25   me.

1    Q.     All right.  Show the jury -- let's clear the

2    screen.  Can you indicate where you were?

3    A.     I was here.

4    Q.     And then show us from which direction you saw

5    the Infiniti coming back from your direction.

6    A.     Up this alley right here.

7    Q.     Okay.  And what did you notice as you noticed

8    the car come back?

9    A.     Well, I got blocked out by this house.  But,

10   you know, I seen it was it was coming up.  And then a

11   couple minutes later, probably two, three minutes

12   later, is when I seen Mack come up between the two

13   houses.

14   Q.     Okay.  And I show you what's been marked

15   government Exhibit No. 52.  Before we get to 52,

16   let's take 6 off.  And let's just go through this

17   exhibit first so we know what car we're talking

18   about.

19          Do you recognize Exhibit No. 60?

20   A.     Yes.

21   Q.     All right.  And whose car is that?

22   A.     That was mine.

23   Q.     Is that the car you loaned to Mr. Jackson,

24   Freddy Jackson?

25   A.     Yes.

ROBERT MICHAEL PARSONS - DIRECT - BURGEL

35

1    Q.    All right.  And did you have your car there
2    that evening?
3    A.    No.
4    Q.    The evening of the shooting?
5    A.    No.
6    Q.    Okay.  Now I'm showing you government's
7    Exhibit No. 61.  And, if you can, just take a look at
8    that and tell the jury what that depicts in relation
9    to your shooting, the scene of your shooting.
10   A.    This is where I was standing at.
11   Q.    Okay.  And do you see where the stop sign is
12   there, sir?
13   A.    Yes.
14   Q.    Would that be Hollins Ferry Road?
15   A.    Yes.
16   Q.    Okay.  So you were facing --
17   A.    Going east/west would be Hollins Ferry Road.
18   Q.    Okay.  Well, you're fancier than I am.  But
19   facing Hollins Ferry Road and the stop sign, you were
20   on the right-hand side; is that right?
21   A.    Yes.
22   Q.    Okay.  And you indicated on this photograph
23   where you were just waiting there, right?
24   A.    Correct.
25   Q.    Now, using this photograph -- this photograph

1 for perspective, when you were standing there, just

2 indicate to the jury which direction it is that you

3 saw Mack approach you from.

4 A.     He would have been coming from this side.  You

5 can't really see exactly where, but it's over on the

6 far left side of the page.

7 Q.     From left to right, then; is that right?  From

8 left to right?

9 A.     He was -- if I'm facing Hollins Ferry Road, he

10 would be coming from my left.

11 Q.     Let's look at a different photograph.  That

12 shows where you were, though, in this picture; is

13 that correct?

14 A.     Right.

15 Q.     And that's Exhibit No. 61.  Put that aside for

16 a second.

17            Now, do you recognize Exhibit No. 52?

18 These numbers don't have any particular significance,

19 Jurors.  They're just numbers we stuck on these

20 exhibits.

21 A.     Yes.

22 Q.     Now, you said you saw the defendant come from

23 between some houses; is that right?

24 A.     Correct.

25 Q.     And does this photograph show the houses from

ROBERT MICHAEL PARSONS - DIRECT - BURGEL

1    which you saw Mack emerge to shoot you?

2    A.    Yes.

3    Q.    Okay.  Now, indicate to the jury by pointing

4    on the photograph where it was you saw Mack emerge

5    from.

6    A.    I believe it was this driveway right here.

7    Q.    And would it be correct to say you were in the

8    foreground?

9    A.    Yeah.  I would be basically the one taking the

10   picture.

11   Q.    Okay.  I understand.  So at what point did you

12   observe this person emerge from the between the

13   house?  That is, where did you first see that person

14   between these houses, who you've described him as

15   Mack, when you saw him coming at you, was he by where

16   the car is now, or was he on the street?  Just give

17   us an idea.

18   A.    I actually seen him as he came around the

19   corner of the house.  Because I was already focused

20   in that direction because of the white car that I

21   seen.

22   Q.    So the white car you saw would have been back

23   behind that house that I'm pointing to here?

24   A.    It would have been -- I don't know exactly

25   where back there.  But it would have been back there

38

1    somewhere.

2    Q.      Somewhere back there --

3    A.      Right.

4    Q.      -- between -- as you say, the house blocked

5    you?

6    A.      Correct.

7    Q.      So use your -- let's clear the screen.  And

8    show us where it was -- I know the truck's in the

9    way, but we can't fix that.  Show us where it was in

10   relation to the houses that you first saw Mack emerge

11   towards you.

12   A.      (Witness complies.)

13   Q.      All right.  Now, when you saw him, how was he

14   dressed?

15   A.      All in black.

16   Q.      Now, you had occasion to see Mack on hundreds

17   of occasions during your relationship with him.

18           By the way, did you ever become friends?

19   A.      Associates.

20   Q.      Okay.  How would he typically dress?

21   A.      Usually in baggie jeans, T-shirt, hat,

22   skullcap.

23   Q.      Skullcap.  Okay.

24           Now, as he came out that night he was

25   dressed in what way.  How would you describe --

1    describe him to the jury, please.  You were there; we

2    weren't.

3    A.     He was just dressed in solid black, head to

4    toe.

5    Q.     Head to toe?

6    A.     Head to toe.

7    Q.     What about his face; were you able to see his

8    face?

9    A.     He had a mask on.

10   Q.     Okay.  What kind of mask?

11   A.     A ski mask.

12   Q.     When you say, "ski," do you mean an actual --

13   like a fabric mask, or a thin sheer mask like a

14   stocking cap?

15   A.     No.  It was like a wool -- a wool cap.

16   Q.     Okay.  Pulled down over his face?

17   A.     Pulled down over his face.

18   Q.     Now, you couldn't see his face then?

19   A.     No.

20   Q.     So as this person approached, who did you

21   think it was as he approached?

22   A.     Mack.

23   Q.     Is that your testimony today; that you believe

24   it was Mack even now?

25   A.     Absolutely.

40

```
 1        Q.       Tell the jury, please, why you believed it was
 2    Mack then and why you believe it was Mack now.
 3        A.       There's -- there's nobody that's ever going to
 4    change my mind.  It's -- you know what I mean?  I
 5    know how he carries himself.  I seen him every day
 6    for over a year.  There just wasn't any doubt in my
 7    mind.
 8        Q.       Now, what did you observe about Mack as he was
 9    approaching you?  Was he saying, "Hey, nice to see
10    you again.  Do you want to buy some crack from me?"
11        A.       No.  He pulled a gun out from his waistband.
12        Q.       At what point, as he came out from behind the
13    house, did you first see the firearm?
14        A.       He didn't pull it out right away.  That's why
15    I actually seen him for -- you know, he had a couple
16    steps around the corner.  And I tried -- I tried to
17    run --
18        Q.       Uh-huh.
19        A.       -- when I seen him pull the gun.
20        Q.       Okay.  So was he still alongside the house?
21    Or see this little --
22        A.       He's probably in front of the house a little
23    bit in the grass right there.
24        Q.       Okay.  And you're across the street?
25        A.       Yes.
```

ROBERT MICHAEL PARSONS - DIRECT - BURGEE

41

```
 1      Q.      And you said you tried to run, Mr. Parsons.
 2   Let me put the photograph back up on -- of 60 --
 3   excuse me, 61.  This is Bates 1340.
 4              As you saw him now, is it correct to say
 5   he's coming from the left side where this house is
 6   over here somewhere coming towards you?
 7      A.      Right.  Well, he stayed on the other side of
 8   the street, though.  He didn't come across the
 9   street.
10      Q.      Okay.  But he was heading in your direction?
11      A.      He was heading in my direction.
12      Q.      Thank you for correcting me.  Now, when you
13   first came out, can you show the jury where it was
14   you were when you first saw him.
15      A.      I was right here.
16      Q.      All right.  And when you said you began to
17   run, where is it that you began to move?
18      A.      I started to run towards the stop sign.
19      Q.      Towards the stop sign?
20      A.      Correct.
21      Q.      All right.  Now, let's just show the jury the
22   general direction in which you began to move.  You
23   were going towards Hollins Ferry.
24              At what point did the shooting start?
25      A.      I took two steps.  And, like, the second step
```

42

1    he hit me in my right leg and broke my leg.

2    Q.      Okay.  Which leg?

3    A.      Right leg.

4            MR. PROCTOR:  Judge, I believe now would

5    be an appropriate time.

6            THE COURT:  Yes.  Ladies and gentlemen,

7    in Count 1, the conspiracy charge, there are overt

8    acts that are listed.  And specifically in Paragraph

9    3A of Count 1 of the conspiracy charge there is an

10   overt act listed, which is done by the initials of

11   persons in terms of an allegation of a shooting in

12   furtherance of the conspiracy.

13           This testimony relates strictly to that

14   charge and allegation that there was this shooting

15   committed by the defendant in furtherance of the drug

16   conspiracy.  That is the only basis upon which this

17   evidence is being admitted; for that purpose and that

18   purpose alone, as an act in furtherance of the

19   alleged drug conspiracy, and not in connection with

20   any other charge of the shooting of Mr. Parsons.

21           Is that satisfactory, Mr. Proctor?

22           MR. PROCTOR:  Yes, sir.

23           THE COURT:  Okay.

24           MR. PURCELL:  Thank you, Your Honor.

25

BY MR. PURCELL:

Q.      Now, I was beginning to ask you, when the
Court instructed the jury, just tell us, please,
where you were hit first.

A.      The first shot hit me in my right leg.

Q.      And what did that do in terms of your ability
to run away?

A.      It broke my femur and severed my femoral
artery.

Q.      And why are you not dead?

A.      I believe that when I rolled back over I must
have pinched the artery off.

Q.      So was that the only shot that was fired at
you?

A.      No.

Q.      Tell the jury, please, how many times you were
shot and where you were shot.

A.      I was shot -- the doctors say I was shot a
total of at least six times.  The majority in my
right leg and my left leg.  I had another one go
through my left shoulder; through my left lung and
out my back; and I also had one in my back.

Q.      I take it you still bear the scars from these
injuries; is that right?

A.      Absolutely.

1    Q.     And how long -- well, you were obviously taken

2    from the scene that night?

3    A.     Yes.

4    Q.     Do you remember any of that?

5    A.     Yes.

6    Q.     How did you get out of there?  Do you

7    remember?

8    A.     Ambulance.

9    Q.     Were you still conscious when the ambulance

10   picked you up?

11   A.     Yes.

12   Q.     At what time -- if you remember, at what point

13   do you recall that you no longer were conscious?

14   Were you still in the --

15   A.     I was at the hospital.

16   Q.     When your memory stopped.

17   A.     I was still at the hospital -- I was at the

18   hospital.  And I remember them pulling on my leg.

19   And then that's all I remember.

20   Q.     All right.  And how long were you -- where did

21   you go?

22   A.     Shock Trauma.

23   Q.     Shock Trauma.  Just a couple blocks from where

24   we are right now?

25   A.     Yes, sir.

ROBERT MICHAEL PARSONS - DIRECT - BURRELL

45

```
1     Q.      Do you remember how long you were in the

2     hospital?

3     A.      Four weeks.

4     Q.      Were you four weeks in Shock Trauma?

5     A.      Yes.

6     Q.      At University of Maryland?

7     A.      Yes.

8     Q.      And how long after that were you -- did you

9     undergo any therapy or rehabilitation?

10    A.       I did therapy basically with what they sent me

11    home with.  Besides the therapy that I did at the

12    hospital.

13    Q.      Not to pry, but did you have medical

14    insurance?

15    A.      No.

16    Q.      Now, did there come a time when the

17    detectives -- I think Detectives Grear and Jones --

18    sought to interview you at Shock Trauma?

19    A.      Yes.

20    Q.      And did you -- do you remember what your

21    condition was at that time when you first met those

22    detectives?

23    A.      When I first met them, I had just woken up.

24    When I woke up, they were there.

25    Q.      And were you still under medication at that
```

ROBERT MICHAEL PARSONS - DIRECT - BURSEL

46

1    time?

2    A.      Heavily.

3    Q.      And did there come a time when you actually

4    did a photo array and picked Mack's picture out as

5    the person who shot you?

6    A.      Yes.

7    Q.      The photo array -- I have it around here

8    somewhere -- just shows photographs of a face; is

9    that right?

10   A.      Correct.

11   Q.      And at any time did you see Mack's face?

12   A.      Yes.

13   Q.      During the shooting?

14   A.      No.

15   Q.      I'm sorry.  During the shooting.

16   A.      No, not during the shooting.

17   Q.      Okay.  But you picked him out because you

18   recognized that as -- you were telling them:  That's

19   the person that shot me?

20   A.      Yes.

21   Q.      Not that you saw his face?

22   A.      Correct.

23   Q.      Now, I was going through these notes of an

24   interview with you last night and I saw one of the

25   detectives noted that you said that the assailant was

```
1      six feet tall.
2               Do you know how tall Mr. Hall is?
3      A.     No.
4      Q.     Describing a person is different from
5      recognizing him, isn't it?
6      A.     Yes.
7      Q.     Did you recognize the person who approached
8      you and shot you that night?
9      A.     Yes.
10     Q.     Who was it?
11     A.     Mack.
12     Q.     The defendant, Mr. Hall?
13     A.     Yes.
14     Q.     Did he say anything to you?
15     A.     Not a thing.
16     Q.     Did you say anything to him?
17     A.     Yes.
18     Q.     What did you say?
19     A.     I told him -- well, after, I was laying on the
20     ground and he just kept shooting me.  So I yelled,
21     "All right, that's enough".  I used --
22     Q.     Profanity?
23     A.     Profanity.  But, yeah, basically that's what I
24     said.
25     Q.     Showing you what's been marked -- this is just
```

ROBERT MICHAEL PARSONS - DIRECT - BURGEE

48

1          a photocopy -- Exhibit 477.  And is this the -- I

2          direct your attention to to -- again, a photocopy -- but

3          take a look at that.

4                      Is that a photocopy of the photo array

5          that you showed --

6          A.      Yes.

7          Q.      -- Detective Grear or Jones, whoever was there

8          that day?

9          A.      Yes.

10         Q.      And did you write your name above the

11         photograph that you identified?

12         A.      Yes.

13         Q.      Now, how long after the shooting did you make

14         that identification; is the date on there?

15         A.      That says 2-15-04.

16         Q.      2-15-04.  Okay.  Now, I'm going to put this up

17         on the screen.  And on the reverse side of this photo

18         array did you -- thanks.  On the reverse side did you

19         make a statement as to who shot you?  This is Bates

20         2121.  Look at that and tell me if you recognize that

21         as the statement that you made.

22         A.      Yes.

23         Q.      And what does it say?

24         A.      "I, Robert Parsons, know this person to be

25         known as Mack.  I'm also sure that this is the person

1    who got out of the car and shot me numerous times".

2    Q.    Now, did you write this, or did the detectives

3    write it?  Do you know?

4    A.    I wrote that.

5              MR. PURCELL:  All right.  That's Exhibit

6    477, Your Honor.

7              THE COURT:  So noted.  So admitted.

8              MR. PURCELL:  Thank you.

9    BY MR. PURCELL:

10   Q.    Just a couple other photographs just for the

11   scene.  I will show this to Detective Grear or Jones,

12   whichever is here today.  This is Exhibit No. 58, as

13   well.

14             Do you recognize that scene?

15   A.    Yes.

16   Q.    Just tell us where we are here.

17   A.    This is where I would have been standing when

18   I got shot.

19   Q.    And where the individual was standing?

20   A.    No.  Across the street from me.

21   Q.    Across the street.  Okay.

22             Showing you government Exhibit 48, this

23   is a bit more down-the-block shot.

24   A.    Uh-huh.

25   Q.    Do you recognize that?

1    A.     Yes.

2    Q.     And could you just show the jury, please, on

3    this photograph where in relation to the stop sign

4    you were when you were shot.

5    A.     I would have been up here by the van.

6    Q.     Okay.  And does this show the -- what we're

7    just looking at from a slightly different

8    perspective -- the gap through which Mack emerged and

9    shot at you?

10   A.     Yes.

11   Q.     Okay.  Would it be correct to say --

12   A.     Right here.

13   Q.     Right here?

14   A.     Yes.

15   Q.     Now, as he came out -- and this shows both

16   sides of the street, which is why I wanted to show it

17   to you.  Can you tell the jury, please, on this

18   photograph, to the best of your memory, how close you

19   recall seeing Mack approach to you.

20              That is, how is as far as he got, as far

21   as you remember?

22   A.     Right here.

23   Q.     And the shooting would have happened from

24   there?

25   A.     Uh-huh.

```
 1      Q.      Okay.  Were you able to see what kind of gun
 2  it was?
 3      A.      I knew it was a semiautomatic.
 4      Q.      How did you know that?
 5      A.      Just by the looks of it.  It wasn't a
 6  revolver.
 7      Q.      When you stay a semiautomatic, you mean the
 8  kind that has a magazine that goes into the handle?
 9      A.      Right.  Like a nine millimeter.
10      Q.      And how quickly -- I know I'm asking you a
11  question you may not remember.  But could you tell
12  how quickly the shots followed each other?
13      A.      They were one after the other.
14      Q.      Pop, pop, pop, pop, pop?
15      A.      Uh-huh.
16      Q.      And you were getting hit?
17      A.      Most of the time.
18      Q.      Now, other than lending a car to Freddy
19  Jackson, did you owe Mack any money?
20      A.      No.
21      Q.      Had you done anything that would anger him, as
22  far as you know?
23      A.      Maybe verifying that Freddy was --
24              THE COURT:  Keep your voice up and speak
25  into the microphone, please.
```

52

```
 1              THE WITNESS:  Maybe verifying that Freddy
 2    was the one that, you know, I identified to the
 3    police.
 4              MR. PURCELL:  Okay.  And that's Exhibit
 5    No. 48.
 6              Let's keep track of these as I'm marking
 7    them.  Thank you.
 8              Now, I have a couple of shots, and we're
 9    almost finished.
10              THE COURT:  You mean a couple more
11    photographs, Mr. Purcell?
12              MR. PURCELL:  A couple more photographs,
13    yes, Your Honor, thank you.  We are just finished,
14    with direct, at least.
15    BY MR. PURCELL:
16    Q.    Showing you government'S Exhibit No. 70.  And
17    I don't know if you've seen that today or in another
18    meeting with me.
19    A.    Yes.
20    Q.    But does that look to be the scene of the
21    shooting?
22    A.    Right.
23    Q.    Is that basically how you recall it, where you
24    were that evening?
25    A.    Yep.
```

ROBERT MICHAEL PARSONS - DIRECT - BURSEL

53

1    Q.      Between those cars?

2    A.      Yeah.

3    Q.      Is that your shoe there in the middle there

4    with an "E" next to it?

5    A.      Yes.

6    Q.      Take another look at some of these.  Exhibit

7    No. 69.  Do you recognize that scene -- or those

8    clothing -- that clothing there?

9    A.      Yes.

10   Q.      Whose clothing is that?

11   A.      Mine.

12   Q.      Okay.  Do you remember where the medics

13   basically ripped your clothes off or cut your clothes

14   off of you at the scene?

15   A.      Yes.

16   Q.      Showing you what's been marked No. 64 -- I'm

17   sorry, 68.  Does that also accurately reflect where

18   it was you were shot?

19   A.      Yes.

20   Q.      Okay.  And that looks to be looking up from

21   Hollins Ferry?

22   A.      Correct.

23   Q.      So Hollins Ferry would have been in the

24   foreground?

25   A.      Yeah, foreground.

ROBERT MICHAEL PARSONS - CROSS - PROCTOR

54

```
1    Q.      And just one more, which is Exhibit 71.
2    Again, do you recognize that scene?
3    A.      Yes.
4    Q.      Your clothes, your shoes?
5    A.      Yes.
6    Q.      All right.  Now, in 2004 you told the police
7    it was Mack; is that right?
8    A.      Yes.
9    Q.      Had some time to think about it, think it
10   over?
11   A.      Yeah.
12   Q.      Today in front of a jury, in front of the
13   defendant, to the best of your knowledge, who is the
14   person who shot you on February 10th, 2004?
15   A.      It was Mack.
16            MR. PURCELL:  Thank you.  I have no
17   further questions.
18            THE COURT:  Thank you, Mr. Purcell.  Mr.
19   Proctor, cross-examination.
20            MR. PROCTOR:  Thank you, Your Honor.
21                  CROSS-EXAMINATION
22   BY MR. PROCTOR:
23   Q.    Good morning.  How are you?
24   A.    Good.  How are you?
25   Q.    Not bad, all things considered.
```

1          While Mr. Purcell is gathering up.

2          Freddy Jackson, he committed a murder

3    with your vehicle, right, as best you know?

4    A.     As best I know.

5    Q.     He took your vehicle and he drove over to

6    Baltimore County and he shot someone and killed him,

7    right?

8    A.     That's what I was told.

9    Q.     Okay.  Do you remember when that was?

10   A.     No, I don't.  I know it was -- it was still

11   cold out; it was still snowing out.  So it had to

12   have been from Thanksgiving up until, I would say,

13   January.

14   Q.     Okay.

15   A.     Somewhere around there, give or take a month.

16   Q.     So December, give or take a month.  It might

17   have been late November, it might have been early

18   January?

19   A.     Yes.

20   Q.     Okay.  And it's your testimony that after the

21   Freddy Jackson thing went down, you only saw Mack one

22   time, right?

23   A.     Right.

24   Q.     And you didn't buy drugs from him that time,

25   did you?

1    A.      No.

2    Q.      So all of your drug buying from Mack was, I

3    thought I heard you say, roughly a one-year period;

4    does that sound right?

5    A.      Correct.

6    Q.      And so all that drug buying would have been in

7    2003, right?

8    A.      Late 2003 -- late 2002, 2003.

9    Q.      Okay.  And I heard you say multiple times a

10   day?

11   A.      Yes.

12   Q.      Every day?

13   A.      Almost every day.

14   Q.      Do you recall that Mack was locked up for

15   three months in 2003?

16   A.      It's possible.

17   Q.      So if he was around, it was almost every day.

18   But there may have been a time when he disappeared

19   for a while?

20   A.      When he was out there, I would buy drugs

21   mainly from him.

22   Q.      Right.  But you also bought from Larry Cheese.

23   In fact, that's what you were doing there that night,

24   right?

25   A.      I was actually supposed to get money from

```
 1    Larry Cheese.  He was supposed to lend me money.
 2    Q.    I thought I heard you say you were getting
 3    drugs from him?
 4    A.    We were making a transaction.
 5    Q.    What was the transaction?
 6    A.    He was supposed to lend me money.
 7    Q.    And in return you were supposed to?  What was
 8    your side of the bargain?
 9    A.    I was going to use the money to purchase
10    drugs.
11    Q.    Okay.  So you're going to use the money to
12    purchase drugs and then he'll get more back or
13    something like that?
14    A.    No.  He didn't have the drugs that I needed.
15    But he said he would lend me the money to get some.
16    Q.    Okay.  Got it.  So he was fronting you money,
17    basically?
18    A.    That's what he said.
19    Q.    Okay.  So -- and you also bought drugs from
20    Seattle, didn't you?
21    A.    Yes.
22    Q.    And Big Kev?
23    A.    I don't recall Big Kev.
24    Q.    Okay.  Let me ask you this:  Mr. Purcell asked
25    you, and I remember you chuckling, was Mack the only
```

58

```
 1    person -- were you the only person Mack sold drugs

 2    to?

 3    A.      Right.

 4    Q.      Right.  But it's also true that Mack wasn't

 5    the only person you bought drugs from, right?

 6    A.      No.

 7    Q.      I mean you drive up Maisel at 10 o'clock on a

 8    Saturday night, it's kicking, right?

 9    A.      If he was out there, like I said, mainly I

10    would buy drugs from him.

11    Q.      Right.  I guess my point is --

12    A.      But I would buy drugs from other people.

13    Q.      And even if he is out there, there's no

14    shortage of people selling.  You might buy from Mack;

15    but it's an open-air drug market, right?

16    A.      Yes.

17    Q.      So as far as you know -- let me think of how I

18    want to put this.  When you handed Mack drug money,

19    that was Mack's drug money, right?

20    A.      Yes.

21    Q.      You never saw him split it with Seattle?

22    A.      No.

23    Q.      You never saw him give Larry Cheese his cut?

24    A.      No.

25    Q.      And the reverse is also true, isn't it?  If
```

1    you bought drugs from Cheese, that was Larry Cheese's

2    money, right?

3    A.      Well, I never really bought the drugs directly

4    from Larry Cheese.  They were his drugs, but he was

5    in a different part of the neighborhood.

6    Q.      Okay.  Got you.  So I guess what I'm trying to

7    get at is:  There wasn't one seller in the

8    neighborhood, right?

9    A.      No.

10   Q.      There were a bunch of entrepreneurs, for want

11   of a better word; and everybody's trying to make

12   their little bit hustling drugs?

13   A.      Right.

14             MR. PROCTOR:  So -- Mr. Purcell, can I

15   have those photos you just showed?

16             MR. PURCELL:  Yes.  Some are marked and

17   some are not.

18   BY MR. PROCTOR:

19   Q.      Thanks.  So I wanted to go through a few of

20   these photos with you.  First of all -- I'll try and

21   keep it short.  This is government Exhibit 69.  Do

22   you see that on the screen, sir?

23   A.      Yes.

24   Q.      And then we're going to swap it out for

25   government Exhibit 70.  Do you see that?

1    A.      Yes.

2    Q.      I guess what I'm trying to get at is:  When

3    you say Mack was shooting at you --

4    A.      Uh-huh.

5    Q.      -- were those vehicles right there?

6    A.      Yeah.

7    Q.      So it's 1 a.m., right?

8    A.      Uh-huh.

9    Q.      He's standing from across the street?

10   A.      Uh-huh.

11   Q.      He's dressed all in black?

12   A.      Yes.

13   Q.      There's two vehicles obscuring your view

14   somewhat?

15   A.      I was standing between the two vehicles.

16   Q.      Okay.  Granted.  But, I mean, the vehicles

17   were -- as you started running, presumably the

18   vehicles obscured your view at some point?

19   A.      I had already seen him once I started running.

20   I was running away from him after I seen him pull the

21   gun.

22   Q.      Right.  And you were running, in this picture

23   at least, away from where the photographer is?

24   A.      Yeah.  And I only got -- you know, if I'm

25   standing there facing and I see him and I turned to

ROBERT MICHAEL PARSONS - CROSS - PROCTOR

61

```
1    run, I'm only really picking up my left leg and
2    starting to go.  That left my right leg exposed and
3    that's how he shot me in my right leg.
4    Q.      Okay.  So you took a couple steps and then you
5    fell?
6    A.      Yes.
7    Q.      And you're high on cocaine at the time?
8    A.      I wasn't high on cocaine at the time.
9    Q.      You had been using cocaine that night, right?
10   A.      Earlier that night.
11   Q.      I think you said around 11 o'clock?  Do you
12   recall testifying in Baltimore City Circuit Court in
13   November 16th, 2004?
14   A.      Yes.
15   Q.      In front of Judge Schwait?
16   A.      I don't remember what the judge's name was,
17   but, yes.
18   Q.      Is that -- an old retired judge?  And do you
19   recall saying before the shooting you'd had been at a
20   friend's house getting high?
21   A.      Right.
22   Q.      But it's your testimony that that was many
23   hours earlier, rather than a few?
24   A.      It was a couple hours earlier.
25   Q.      Okay.  Well, if the shooting happened at 1
```

```
 1      a.m., a couple hours before that is 11 p.m., right?

 2      A.      You could say that.  But the high on the crack

 3      cocaine only lasts 15 minutes.

 4      Q.      And then you need more, right?

 5      A.      Right.

 6      Q.      And just -- just so there's no mistake, the

 7      shooting Freddy Jackson did, the murder he did, I

 8      just don't want the jury to think -- Mr. Hall was

 9      never charged in that crime, was he?

10      A.      I don't believe so.

11      Q.      So as far as you know that's something Freddy

12      did; it didn't involve Mack at all?

13      A.      Right.

14      Q.      And I just want to make sure I got this right.

15      I wrote down you said when the police interviewed you

16      about the Freddy Jackson murder --

17      A.      Uh-huh.

18      Q.      -- you said, "They already knew who did it,

19      but they wanted me to verify"?

20      A.      They showed me a lineup.

21      Q.      Okay.

22      A.      They asked who was using my vehicle that

23      night.  They didn't -- you know what I mean?  They

24      had an idea who was driving my car.  How they had

25      that idea, I don't know.  But, you know, they showed
```

1    me a lineup and I pointed him out.

2    Q.      Okay.  So let me -- when you were meeting with

3    them, did they tell you Freddy Jackson used your car

4    before you told them?

5    A.      No.  They said that they knew that it wasn't a

6    white guy that was driving my vehicle that night, so

7    they knew it wasn't me.  They asked me who it was

8    that was driving my vehicle.  And I told them who it

9    was.  And then they showed me a lineup and I picked

10   him out of the lineup, you know, on a piece of paper.

11   Q.      Right.  So they must have known before, right?

12   A.      That's the only thing that I could think of.

13   Q.      They didn't go away and create a lineup after

14   you told them who was using it?

15   A.      They did go away and -- after I told them who

16   was using my vehicle, then they left and came out and

17   brought a lineup.

18   Q.      So they left, created one, and then came back;

19   is that your testimony?

20   A.      Yes.

21              MR. PROCTOR:  Can I have a second,

22   please?

23              Nothing further.

24              THE COURT:  Thank you.  Any redirect, Mr.

25   Purcell?

1           MR. PURCELL:  No.  Thank you very much,

2     Your Honor.

3           THE COURT:  All right.  You may step

4     down, Mr. Parsons.  You should not discuss your

5     testimony with anybody until this trial concludes

6     later in the week.

7           MR. PROCTOR:  Oh, I'm sorry, Judge.  Can

8     I ask one more question?

9           THE COURT:  Sure.

10    BY MR. PROCTOR:

11    Q.    Just one more question, sir.  Cross my heart.

12          The indictment in this case, the first

13    charge on the indictment is that Mr. Hall sold drugs

14    from January 1st, 2004.

15    A.    Okay.

16    Q.    Is it your testimony that, if he sold drugs

17    from January 1, 2004, it wasn't to you?

18    A.    Yes.

19          MR. PROCTOR:  Nothing further.

20          MR. PURCELL:  I still have nothing

21    further.  Thank you.

22          THE COURT:  Thank you.  You may step

23    down, Mr. Parsons.  Again, you should not discuss

24    your testimony with anyone in the event you're called

25    back to the witness stand.  Thank you very much.

Case 1:10-cr-00744-RDB Document 110 Filed 02/14/12 Page 65 of 241

 1                    THE WITNESS:  Thank you, sir.

 2                    MR. PURCELL:  The government calls

 3      officer Christopher Kazmarek.

 4      Whereupon:

 5                    CHRISTOPHER KAZMAREK,

 6      called as a witness, having been first duly sworn

 7      according to law, testified as follows:

 8                    THE DEPUTY CLERK:  Please state your full

 9      name for the record.

10                    THE WITNESS:  Detective Chris Kazmarek.

11                    THE DEPUTY CLERK:  Thank you.

12                    THE COURT:  Spell your last name for the

13      record, please, sir.

14                    THE WITNESS:  K-a-z-m-a-r-e-k.

15                    THE COURT:  Thank you.

16                    MR. PURCELL:  I'll give counsel a moment

17      to get his binders out.

18                    DIRECT EXAMINATION

19      BY MR. PURCELL:

20      Q.      Detective, good morning.

21      A.      Good morning, sir.

22      Q.      Tell us where you're employed, please.

23      A.      I work for the Baltimore City Police

24      Department.  I'm assigned to the homicide unit.

25      Q.      How long have you been there?

CHRISTOPHER KAZMARK - DIRECT - PURDIE

66

1    A.      I've been working for the police department

2    for eleven years.  I've been at homicide almost

3    three.

4    Q.      Now, before your stint in homicide, let me

5    direct your attention back to -- I guess it's March,

6    early March of 2004.

7            Where were you working then?

8    A.      I was assigned to the patrol division of the

9    Southern District.

10   Q.      Does the Southern District include the area

11   known as Westport?

12   A.      Yes.

13   Q.      And did your patrol area include Westport?

14   A.      Part of it, yes.

15   Q.      Are you familiar with Dorton Court?

16   A.      Yes.

17   Q.      And is Dorton Court part of Westport?

18   A.      Yes.

19   Q.      You know you're here today to be asked some

20   questions about a particular event on Dorton Court in

21   2004?

22   A.      Yes, sir.

23   Q.      Now, before we get to that, let me just ask

24   you:  In your year of -- let me ask you:  How many

25   years did you patrol in Westport?

CHRISTOPHER KAZMAREK - DIRECT - PYROBELL

67

```
1      A.      I'd say, off and on, I worked patrol and
2      plains clothes there for probably about six years.
3      Q.      And when did that period of work over there
4      end?
5      A.      From about 2002 to 2008.
6      Q.      2008?
7      A.      Yes.
8      Q.      During that period of time and up to 2008, did
9      you come to know a person named Antonio Hall?
10     A.      Yes.
11     Q.      Known as Mack?
12     A.      Yes.
13     Q.      Do you see that person in the courtroom today?
14     A.      Yes.
15     Q.      Now, during the course of time that you knew
16     Mack, did you see him -- or did you ever see him
17     around the neighborhood?
18     A.      Yes.  In Westport.
19     Q.      And how often -- when you say you saw him,
20     with what frequency when you went into Westport would
21     you expect to see him?
22     A.      I mean, it wasn't every day.  But on a regular
23     basis when I was in patrol.
24     Q.      What was he doing?
25     A.      He was hanging out in the area.
```

CHRISTOPHER KAZMAREK - DIRECT - PURCELL

68

1    Q.      Hanging out?

2    A.      Yes.

3    Q.      And do you see the person you saw hanging out

4    there between 2000-whatever and 2008 in the courtroom

5    today?

6    A.      Yes.

7    Q.      Where is he, please?

8    A.      Seated at the defense table.

9            THE COURT:  The record will reflect the

10   witness has pointed to and pointed out the defendant,

11   Antonio Hall.

12   BY MR. PURCELL:

13   Q.      Now, if I may put up Exhibit 6A.  The reliable

14   aerial that we've used.  It's been admitted.  And

15   just direct your attention.  Is this what you know as

16   Westport?

17   A.      Yes, that's part of it.

18   Q.      6A.  And you talked about -- why you're here

19   is my question will be an event that occurred on

20   Dorton Court.  Could you just locate Dorton Court on

21   the -- on this visual and point to it, please?

22   A.      Dorton Court is right here.

23   Q.      All right.  Now, I direct your attention,

24   please, back to March 7th, 2004.  Did you have an

25   occasion to receive a call for service or a call that

1      led you to the 2400 block of Dorton Court?

2      A.      Yes.

3      Q.      Tell the jury, please, what the nature of the

4      call was.

5      A.      I received a call for --

6                  MR. PROCTOR:  Objection, Judge.

7                  THE COURT:  Rephrase the question,

8      please.

9                  THE WITNESS:  I responded to --

10                 MR. PURCELL:  I can ask a better

11     question.

12                 THE COURT:  Rephrase the question.  The

13     objection was sustained.  Rephrase the question.

14     BY MR. PURCELL:

15     Q.      First of all, did the caller -- were you given

16     by dispatch the name of a person who called?

17     A.      No.

18     Q.      And just tell us what you did when you

19     responded to the call.  Was there a particular

20     address that you were directed to?

21     A.      Yes.  2412 Dorton Court.

22     Q.      All right.  And was it the front, the back,

23     the driveway that you were directed to?

24     A.      It was the rear.

25     Q.      What part of the rear?

CHRISTOPHER KAZMARK - DIRECT - PURDIE

70

1    A.      The back door, the alley area.  It's actually

2    the road that goes through there, it's actually --

3    you know, it's the road, but I would consider it an

4    alley.

5    Q.      Okay.  And was your direction -- I'm sorry.

6    Was your attention specifically directed to a trash

7    can or garbage can?

8    A.      Yes.

9    Q.      All right.  Tell the jury what you were

10   directed to.

11   A.      The call was for to recover property in a

12   trash can behind 2412 Dorton Court.

13   Q.      So the police were there to recover this

14   property, whatever it was?

15   A.      Yes.

16   Q.      Were you told what the property was in the

17   dispatch call?

18   A.      I don't believe it said what was in the trash

19   can.  We didn't find out till we got there.

20   Q.      So the anonymous caller says basically calls

21   the police and says, "Come and recover what's in this

22   trash can at 2412 Dorton Court"?

23   A.      Correct.

24   Q.      All right.  Did you go there?

25   A.      Yes.

CHRISTOPHER KAZMARIK - DIRECT - PURCELL

71

```
1     Q.      And what did you find in the trash can behind
2     2412 Dorton Court?
3     A.      I found a clear plastic bag with 28 small blue
4     ziplock bags with rock substance; Taurus .357 magnum
5     revolver with six rounds; and a Taurus nine
6     millimeter PT-99 Para handgun with a magazine with 13
7     rounds.
8     Q.      Let's talk about the bags, first.  What did
9     they look like?
10    A.      Just small ziplock bags, commonly used to
11    package CDS.
12    Q.      Crack?
13    A.      Yes.
14    Q.      BY CDS you mean controlled substances?
15    A.      I've also seen heroin packaged in it before,
16    too.
17    Q.      Have you also seen crack packaged in it --
18    A.      Yes.
19    Q.      -- as well?
20    A.      Yes.
21    Q.      Now, the caller was not identified?
22    A.      No.
23    Q.      And there was no owner attributed to this
24    particular cache of drugs and guns, sort of?
25    A.      No.
```

CHRISTOPHER KAZMAREK - DIRECT - PIROLLI

72

1    Q.      Did you recover the items?

2    A.      Yes.

3    Q.      Now, when you did this, did your event -- and

4    the jury's heard this term before -- but did your

5    response to this particular call generate a report on

6    your part?

7    A.      Yes, it did.

8    Q.      And tell the jury, please, whether that report

9    was given its own specified control number or CC

10   number as used in the police department.

11   A.      Yes.  It is issued a unique complaint number,

12   CC number.  And that was issued one for that case.

13   Q.      Okay.  And would it be correct to say that the

14   items that were recovered on this event were given --

15   were entered into evidence; you took them back and

16   they were given to ECU; is that right?

17   A.      Yes.  They're issued property numbers through

18   ECU.

19   Q.      Okay.  And ECU is evidence control?

20   A.      Yes.

21   Q.      Okay.  And they would be all categorized under

22   the same CC number?

23   A.      Correct.

24   Q.      And you say they're also given specific

25   property numbers; is that right?

73

```
1     A.     Yes.

2     Q.     And the property numbers, is it correct to

3     say, are also listed under the CC number?

4     A.     Yes.

5     Q.     All right.  Now, just for the record, please,

6     let's go back to the -- they call this an ELMO,

7     Jurors.  That's why we refer to it this way, this

8     machine.

9            Did this particular -- it doesn't seem to

10    be working.  Did something happen here?

11            THE COURT:  Is there any objection, to

12    this particular document, Mr. Proctor?

13            MR. PROCTOR:  No, sir.

14            MR. PURCELL:  If they just wish it for

15    identification or not, it doesn't matter to the

16    government.

17            THE COURT:  Well, it's on the screen,

18    it's now in evidence, Mr. Purcell.  What exhibit

19    number is this?

20            MR. PURCELL:  Okay.  This is Exhibit No.

21    472, Your Honor.

22            THE COURT:  All right.  Exhibit 472.

23    BY MR. PURCELL:

24    Q.     Can you hit the bottom left-hand corner of

25    your screen?  And I'm just going to ask you to just
```

CHRISTOPHER KAZMAREK - DIRECT - PURDIE

74

1    identify -- for reasons that will become evident

2    later, just identify the CC number for this

3    particular recovered property.

4    A.      Right there.

5    Q.      All right.  Could you read into the record

6    what that CC number is?

7    A.      049, C as in Charles, 4279.

8    Q.      All right.  So the guns and drugs that were

9    recovered here were recovered under this CC number?

10   A.      Yes, sir.

11   Q.      And does this report also show the date of the

12   recovery?

13   A.      Yes.  The date would be right there.

14   Q.      And that was -- for the record, just read it

15   in, please?

16   A.      3-7, 2004 at 21:55 hours, for March 7, 2004 at

17   9:55 p.m.

18   Q.      So 21:55 is military time for about 9:55 p.m.;

19   is that right?

20   A.      Yes, sir.

21   Q.      Okay.  And you also categorized on the report

22   the items that were recovered; is that right?  On the

23   lower right of it, where it says, "property

24   recovered"?

25   A.      Yes, sir.

1    Q.    Could you read what you recovered, please?

2    A.    One clear ziplock bag; 28 small blue ziplock

3    bags with rock; one Taurus .357 magnum revolver,

4    serial number JJ 366602 with six rounds; and one

5    Taurus nine millimeter PT-99 Para, serial number T1A

6    64078 with a magazine and 13 rounds.

7    Q.    So these were loaded?

8    A.    Yes.

9    Q.    It looks like a nine millimeter can hold as

10   many as 13 rounds of nine millimeter ammunition; is

11   that right?

12   A.    Yes.

13   Q.    Semiautomatic is what you guys carry?

14   A.    Yes.

15   Q.    It's a firearm in which you put the ammunition

16   into the handle of the gun, correct?

17   A.    Correct.

18   Q.    Now, the .357 and the nine millimeter were

19   both then submitted to ECU; is that right?

20   A.    Yes.

21   Q.    Now, I've shown you these earlier today I

22   think to -- prior to your coming in.  So let's just

23   take a look at them.  I direct your attention -- that

24   was 472, Counsel.

25              THE COURT:  Hit the lower left button if

CHRISTOPHER KAZMARK - DIRECT - PURCELL

76

```
 1     you please, Detective.  Thank you.
 2     BY MR. PURCELL:
 3     Q.      Now, of particular interest for our case here
 4     is the nine millimeter pistol.  And was that
 5     submitted and given a unique property number?
 6     A.      Yes.
 7     Q.      And again, just take a look at --
 8              THE COURT:  Is that the same exhibit, Mr.
 9     Purcell, 472?
10              MR. PURCELL:  No.  This is now 471, Your
11     Honor.  We've moved on, or back, I should say.
12              THE COURT:  Thank you.
13     BY MR. PURCELL:
14     Q.      Let's now -- let's take a look, first.  This
15     is a request to the lab; is it not?  Let's go back to
16     the form.
17     A.      Yes.
18     Q.      And does this -- does this reflect the nine
19     millimeter pistol as opposed to the .357 that was
20     recovered at 2412 Dorton Court in the trash can?
21     A.      Yes.  That is the examination request for the
22     nine millimeter.
23     Q.      And that's your CC number up there?
24     A.      Yes.
25     Q.      Ending 4279?
```

77

1    A.      Yeah.  Right there.

2    Q.      All right.  Right here?

3    A.      Yes, sir.

4    Q.      Now, this particular item was given a property

5    number.  And just read into the record, please, what

6    that property number is.

7    A.      04013008.

8    Q.      Okay.  So if this particular firearm would

9    have been, say, for instance, compared to any casings

10   or any other evidence recovered from another scene,

11   it would be identified by this particular property

12   number; is that right?

13   A.      Yes, sir.

14   Q.      3008 are the last four digits.

15   A.      Correct.

16   Q.      And I think I asked you to confirm whether any

17   fingerprints were found on this gun or the other gun.

18   A.      No, they weren't.

19   Q.      Negative?

20   A.      Correct.  They were negative.

21   Q.      Did you do that yourself?

22   A.      Yes.

23   Q.      You're able to process -- I'm sorry, Your

24   Honor.  You're able to process firearm -- or some

25   evidence yourself for fingerprints?

78

1    A.      Yes.

2    Q.      Now, did you do the same thing; that is,

3    submit the .357 that we're less interested in, but

4    just as a bit of evidence.  This was recovered as

5    well, and given a number -- well, read it into the

6    record, please.  This is exhibit 480, Your Honor?

7    A.      That property number is 04013007.

8    Q.      So this is the specific, now another lab

9    request for the .357?

10   A.      Correct.

11   Q.      And you can tell this is the same .357 that

12   you recovered by the same paperwork trail; is that

13   right?

14   A.      Correct.

15   Q.      Okay.  And no prints on this, I take it?

16   A.      No prints.

17   Q.      In fact, it's recorded on the bottom.  Just

18   point to where that is recorded on these documents.

19           Okay.  No prints found.  Thank you.

20           Was this -- by the way, was this gun

21   loaded?

22   A.      Yes, it was.

23   Q.      How many .357 rounds were in it?

24   A.      Six.

25   Q.      All right.  And just tell the jury quickly, if

1    they don't know, what's the difference between a

2    semiautomatic and a revolver.  Where do the bullets

3    go in a revolver?

4    A.      Revolver bullets go in the cylinder, like a

5    cowboy-type gun, and it revolves in a circle.  And in

6    a semiauto it's loaded into the handle.

7    Q.      Okay.  And that's why it's sometimes called a

8    six-shooter, because typically they have six rounds

9    in them; is that right?

10   A.      Correct.

11   Q.      Okay.  All right.  This was submitted, as

12   well.

13            Now, did you -- at the point of recovery

14   of this particular item, did you interview anybody in

15   the home, yourself, on March 7, 2004?

16   A.      No, I didn't speak with anyone.

17   Q.      Now, you were not in homicide at that time,

18   were you?

19   A.      No, sir.

20   Q.      What were you in?

21   A.      Patrol.

22   Q.      What do patrolmen wear?

23   A.      A uniform.

24   Q.      What do they drive?

25   A.      A marked patrol car.

1    Q.      Marked patrol cars?

2    A.      Yes.

3    Q.      So you went to the house, you were in uniform

4    in a patrol car; is that right?

5    A.      Correct.

6    Q.      Were you by yourself?

7    A.      No.  Sergeant Gerzack was with me.

8    Q.      All right.  So there are at least two police

9    officers at the house or at the back of the house

10   rummaging into the trash can and recovering evidence;

11   is that right?

12   A.      Correct.

13   Q.      Okay.  And I've asked you just -- let's go

14   back for a second to Exhibit No. 6, straight-up 6.

15   If on this photograph you can just indicate to the

16   jury where, again, Dorton Court is and where, if you

17   remember, 2412 would be, and which side, if you

18   remember.

19   A.      Dorton Court is right in here.  And I believe

20   it's -- I'm not sure if it's the first set of

21   houses -- I think it's the big group in the middle.

22   Q.      Okay.  And what are these trash cans -- this

23   is an aerial; it's really far up.  But you've been on

24   the street there.  Tell us how the -- is there a

25   section in the back of the houses for the -- a

CHRISTOPHER KAZMAREK - DIRECT - PURCELL

81

1    receptacle or something for trash cans to be placed?

2    A.    Usually people have them out behind the houses

3    there.  And there's a little bump-out that comes out.

4    It's like a little storage area that has a door on

5    it.  But this is behind the house.  And that's --

6    actually, right there, that would be where the trash

7    trucks and all would come through.  So it wouldn't be

8    uncommon for a trash can to be there.

9            But this wasn't like a normal sized trash

10   can, like a metal, you know, garbage can you would

11   have in your back yard.  It was, like, a white

12   smaller plastic can.

13   Q.    Now, you also worked drugs over there as well,

14   correct?

15   A.    Correct.

16   Q.    It's not unusual for drug dealers to stash

17   guns and drugs in places like that, is it?

18   A.    No.

19   Q.    Accessible, but not on your person?

20   A.    Correct.

21   Q.    And you didn't interview anybody in the house?

22   A.    No.

23   Q.    So do you even know today who lives there?

24   A.    No.

25   Q.    What their relationship is to the defendant?

1    A.      No.

2    Q.      All right.  Now, just to conclude this

3    particular evidence, particularly the nine millimeter

4    firearm that was submitted to ECU; and then there

5    available for examination and comparison against

6    evidence that might have occurred in a shooting that

7    happened a month before?

8    A.      Correct.

9                MR. PURCELL:  All right.  Thank you.  I

10   believe I have no further questions.  Thank you.

11               THE COURT:  Any cross-examination, Mr.

12   Proctor?

13               MR. PROCTOR:  No, sir.

14               THE COURT:  All right.  Thank you,

15   Detective Kazmarek.  You may step down.  You should

16   not discuss your testimony with anyone in the event

17   you're called back to testify before the trial is

18   concluded.  Thank you very much, sir.

19               THE WITNESS:  Thank you.

20               THE COURT:  With that, we'll take a late

21   morning recess.  We'll take a ten-minute recess and

22   we will reconvene until 1 o'clock and have lunch at 1

23   o'clock.

24               (BRIEF RECESS.)

25               (JURY IN.)

1              THE COURT:  All right.  Ladies and

2    gentlemen, we're ready to continue.  We'll break for

3    lunch much around 1 o'clock.  With that, Mr. Purcell,

4    the next government witness.

5              MR. PURCELL:  The next government witness

6    is Ann Marie Peters.

7    Whereupon:

8                   ANN MARIE PETERS,

9    called as a witness, having been first duly sworn

10   according to law, testified as follows:

11             THE DEPUTY CLERK:  Please state your full

12   name for the record.

13             THE WITNESS:  Ann Marie Peters.

14             THE DEPUTY CLERK:  Spell your last name,

15   please?

16             THE WITNESS:  P-e-t-e-r-s.

17             THE COURT:  Pull the microphone toward

18   you there.  The microphone.  Right in front of you.

19   Thank you very much.

20             THE WITNESS:  P-e-t-e-r-s.

21             THE COURT:  Thank you very much.

22                  DIRECT EXAMINATION

23   BY MR. PURCELL:

24   Q.    Good afternoon -- or, good morning, Miss

25   Peters.

```
 1       A.      Good morning.

 2       Q.      Now, you may recall meeting me on one occasion

 3    here in this building?

 4       A.      Yes.

 5       Q.      Okay.  And at that time you had been asked to

 6    come down here with your daughter, correct?

 7       A.      Yes.

 8       Q.      Could you state the name of your daughter on

 9    the record, please?

10       A.      Tia Rouse.

11       Q.      And could you spell it for the reporter,

12    please?

13       A.      T-i-a, R-o-u-s-e.

14       Q.      And how old is your daughter now?

15       A.      30.  30.  30.

16       Q.      Okay.  Thanks.

17               THE COURT:  You've got to keep your voice

18    up, ma'am.  I'm sorry.  Keep your voice up.

19               THE WITNESS:  30.

20               THE COURT:  Thank you very much.

21    BY MR. PURCELL:

22       Q.      Could you describe to the jury or explain to

23    the jury what your daughter's relationship is with

24    the defendant, Mr. Hall?  Do you know him?

25       A.      Yes.
```

85

```
 1      Q.      How do you know him?
 2      A.      He's my grandchildren's father.
 3      Q.      And is he the father of one grandchild or more
 4   than one grandchild?
 5      A.      More than one.
 6      Q.      And where do those children live?
 7      A.      With their mother.
 8      Q.      And with you?
 9      A.      And with me.
10      Q.      Is that correct?
11      A.      Yes.
12      Q.      And what's the name of those children and
13   their ages now, please?
14      A.      Abrea, she's 15; and Simone is 10.
15      Q.      Hall?  Hall is their last name?
16      A.      Yes.
17      Q.      Okay.  15 now and 10 now?
18      A.      Yes.
19      Q.      Is that correct?  And they live with you?
20      A.      I live with my daughter, yes.  We live
21   together.
22      Q.      And does Mr. Hall have access to those
23   children from time to time?
24      A.      Yes.
25      Q.      And you know where he was living, where he
```

1    hung out, at least prior to his arrest back in

2    December of 2009?

3    A.      No.

4    Q.      Do you know the area of Westport?

5    A.      Yes.

6    Q.      Is that an area that you know him to frequent

7    or to be found in from time to time?

8    A.      Sometimes.

9    Q.      Did you ever go this there and see him there?

10   A.      Where, in Westport?

11   Q.      Uh-huh.

12   A.      Well, I lived out there.  So --

13   Q.      You did?

14   A.      Yeah.

15   Q.      Okay.  We're going to get to that in a second.

16              Now -- and it's actually that you lived

17   there is why you're here today.  Just a couple of

18   questions; all right?

19   A.      Uh-huh.

20   Q.      Now, you remember, I guess it's March 7, 2004,

21   some firearms and drugs were found in a particular

22   trash can; we just heard some evidence.  I guess I

23   should ask you where you with were living.  Forget

24   that.

25              Let me ask you:  Back in March of 2004

ANN MARIE PETERS - DIRECT - BYRFIELD

87

```
 1        where were you living?

 2        A.      2412 Dorton Court.

 3        Q.      Could you say that address again, please?

 4        A.      2412 Dorton Court.

 5        Q.      Okay.  And you lived there in February of

 6        2004?

 7        A.      Yes.

 8        Q.      You lived there in March of 2004?

 9        A.      Yes.

10        Q.      And that's 2412 Dorton Court?

11        A.      Yes.

12        Q.      For the record, there's been testimony --

13        we've just had a witness talk about that location.

14                        Now, ma'am, on the evening of March 7,

15        2004, did you make an anonymous call to the police

16        reporting something you had observed in the trash can

17        behind your house?

18        A.      No.

19        Q.      Do you know who did make a call to the police?

20        A.      I called them, but I didn't call them

21        anonymously.  I called them and told them who I was.

22        Q.      Okay.  I'm sorry.  You did?

23        A.      Yes.

24        Q.      Okay.  And what did you call the police about,

25        ma'am?
```

ANN MARIE PETERS - DIRECT - WINFIELD

1    A.      My granddaughter found some guns in my trash

2    can.

3    Q.      And this granddaughter would be Mr. Hall's

4    daughter?

5    A.      Abrea, yes.

6    Q.      And you called the police?

7    A.      Yes.

8    Q.      Now, do you remember whether the police showed

9    up?

10   A.      Yes.

11   Q.      And when they showed up were they in uniform?

12   A.      Yes.

13   Q.      Did the police who showed up to recover that

14   particular item or those items, do you remember

15   having any conversation with them?

16   A.      No.

17   Q.      They just came and left?

18   A.      And said "booyah".

19   Q.      Booyah.  When they found the drugs?

20   A.      I didn't know anything, this is the first I'm

21   hearing about drugs.

22   Q.      Okay.  You knew about the guns, you had seen

23   them?

24   A.      Yes.  I saw one.  I didn't know until later

25   that it was two, but that was enough.

1    Q.      That was enough?

2    A.      Yeah.

3    Q.      Now, after you found or after the police came

4    and recovered that property, did a person named

5    G-Rock call you and ask you what the police were

6    doing there?

7    A.      He might have.  I don't remember.

8    Q.      What's his relationship to the defendant?

9    A.      I think they're cousins.

10   Q.      Do you know who I'm talking about, G-Rock?

11   A.      Yeah, I know who you're talking about.

12   Q.      Do you know his real name?

13   A.      Gum.  I don't know his real name.

14   Q.      Okay.  Did the defendant, Mr. Hall, call you

15   after that occurred and ask you what uniformed police

16   were doing at your house?

17   A.      I can't remember.

18   Q.      Pardon me?

19   A.      I really can't remember.

20   Q.      You don't remember?

21   A.      No.

22   Q.      Now, do you remember meeting some detectives,

23   who I think would just be wearing suits, on or about

24   April 26, 2004 and telling them that both G-Rock and

25   Antonio Hall called and asked why police were at your

1    house?

2    A.     No, I don't.

3    Q.     Do you remember that?

4    A.     No.

5    Q.     You just don't remember?

6    A.     I just really don't.  2004; I can't even

7    remember yesterday.

8    Q.     That's your testimony, you don't remember.

9    Not that it didn't happen?

10   A.     I really don't remember.  If they did, I mean,

11   2004?  I cannot remember who called.  But I do

12   remember the detectives, you know, coming to my

13   house.

14   Q.     Okay.  We'll talk about that in a second.

15   A.     All right.

16   Q.     That was about a month later, I guess, right?

17   A.     I guess.

18   Q.     Let me ask you:  I'm going to show you what's

19   been marked as government's 487.  And at this

20   juncture, Your Honor, this is just for identification

21   to present to the witness.  487.  And that is one of

22   the, that's a Bates from the Grear notes or Lotus

23   Notes.

24              I'm showing you -- just -- I'm going to

25   ask you to read -- do you see the highlighted

1    portions here?

2    A.      Uh-huh.

3    Q.      Just take your time and read the highlighted

4    portions.  And I'm going to ask you those same

5    questions back.  Just asking to see if this refreshes

6    your memory about any conversations you had with the

7    police.  Take your time.

8    A.      That didn't happen.

9    Q.      Didn't happen?

10   A.      No, it did not.

11   Q.      Well, what you're saying didn't happen is what

12   the police wrote in their report?

13   A.      Exactly.

14   Q.      Well, the police wrote in their report --

15          MR. PROCTOR:  Objection.

16          THE COURT:  Sustained.

17   BY MR. PURCELL:

18   Q.      Let me ask you:  After this occurred, that is,

19   police in uniform came to your house, did any people

20   in the neighborhood refer to you as a snitch or talk

21   to you about being a snitch?

22   A.      No.

23   Q.      Did you at any time tell any detectives that

24   if you -- let me ask you this -- strike that.

25          THE COURT:  Approach the bench, please,

1       for one second.

2                   (BENCH CONFERENCE ON THE RECORD.)

3                   THE COURT:  Mr. Purcell, with respect to

4       this witness's response, the police report, if she

5       says it didn't happen, that's her testimony, and you

6       cannot go into the contents of the police report.

7       She said the police report's inaccurate.  So if

8       you're about to question her about the contents of

9       the report, you cannot have a scenario:  Did you say

10      such and such; no, I did not; did you say such and

11      such; no, I did not.  That would not be appropriate.

12      And an objection's been noted and it's sustained and

13      it is a warning objection.  What is the answer to the

14      question you're about to ask?

15                  MR. PURCELL:  I'll show the Court the

16      report.  And actually there's one more -- more than

17      one point of questioning her.  The detectives that I

18      expect to call after this, and then to impeach her as

19      to whether, in fact, she was asked those particular

20      questions or that she made those statements.

21                  THE COURT:  Under Rule 801 you're

22      permitted to do so.  You can do that with respect to

23      consistency or lack of consistency.

24                  MR. PURCELL:  But I have to ask her first

25      if she said those things.  That's my point.

ANN MARIE PETERS - DIRECT - WRGFIELD

93

```
 1                    THE COURT:  And you're talking about the
 2       portion you have highlighted in yellow?
 3                    MR. PURCELL:  Yes.
 4                    THE COURT:  All right.  And you have seen
 5       this, obviously, Mr. Proctor?
 6                    MR. PROCTOR:  Some time ago.  I can't put
 7       my finger on it.
 8                    MR. PURCELL:  It's right here.
 9                    THE COURT:  What you can do is, without
10       getting into the specifics, you can ask her if she
11       made any comments to the police about feeling
12       threatened and leave it at that.  And then the police
13       officer can come up on the witness stand.  Under
14       801(d) he's permitted to then testify in terms of
15       comments that are inconsistent with what she has said
16       here.
17                    MR. PURCELL:  I understand.
18                    MR. PROCTOR:  Well, Judge, I almost want
19       to withdraw my objection.  Because the way Your
20       Honor -- which is the correct way, I 100 percent
21       agree to it -- then I've got to call her back as a
22       defense witness to say it didn't happen.  If the
23       police officer said that --
24                    THE COURT:  You can cross-examine that
25       way, if you want.
```

1          MR. PROCTOR:  It just seems more

2     efficient, though --

3          THE COURT:  But I guess, Mr. Proctor, in

4     terms of the way I've ruled, in terms of the

5     correctness of the ruling, the way it works under the

6     rules of evidence is that he can confront the witness

7     with the contents or the general comments, and the

8     police officer can then testify under Rule 801(d) in

9     terms of a -- under prior 801(d)(1) prior statements

10    of a witness that are inconsistent.

11         Actually, Mr. Purcell, under Rule

12    801(d)(1) -- go ahead.  I think that the way it's to

13    be broached out is that you can ask her if she said

14    that; ask her if she made a comment about feeling

15    threatened.  She can deny it.

16         MR. PURCELL:  Just a general comment.

17         THE COURT:  Just a general comment.  The

18    police officer can testify that she did make comments

19    about being threatened.  But under 801(d)(1) with

20    respect to a prior statement of a witness, the

21    defendant testifies at trial, at a hearing, subject

22    to cross-examination concerning the statement, the

23    statement is inconsistent with the declarant's

24    testimony and was given under oath subject to penalty

25    of perjury at trial or hearing.  This statement given

1    to the police officer was not given under oath.  So

2    you can't even get into the details of it.

3                 MR. SULLIVAN:  Sorry, sir.  Could you

4    tell the gallery to quiet down?

5                 (END OF BENCH CONFERENCE.)

6                 THE COURT:  Ladies and gentlemen, when

7    we're up here having a conference.  And we hear

8    people talking in the back.  It's disturbing and

9    slows the process down.

10                The court security officer is advised,

11   again, anybody who talks out loud and makes noise in

12   this gallery is to be taken out of the courtroom.

13   It's not complicated.  People are talking out loud;

14   out they go.

15                (BENCH CONFERENCE ON THE RECORD.)

16                MR. SULLIVAN:  Sorry, Your Honor, I

17   couldn't hear.

18                THE COURT:  I couldn't, either.

19                MR. PURCELL:  It's the same woman that

20   you threw out of court the other day.

21                THE COURT:  Is it the same person?  We

22   can identify the person.  If it's the same person I

23   excused last time, she's out.

24                MR. PROCTOR:  The woman with her head

25   down, with a brown shirt on.  She's between the woman

```
 1      in white and purple.  She's looking away.

 2                  (END OF BENCH CONFERENCE.)

 3                  THE COURT:  The two women that were

 4      making noise again before, just please stand up.  If

 5      they were the same people who were there -- the same

 6      person who was asked to leave the courtroom last

 7      week, now she's escorted out of the courtroom.  Out

 8      she goes.  Not to return.  Not to return.

 9                  Two bites at the apple.  The second time

10      you're out for good.  She's not to return.

11                  (BENCH CONFERENCE ON THE RECORD.)

12                  THE COURT:  All right.  Now, under the

13      rules, you can confront her as to whether or not she

14      made a statement, she felt threatened.  She can admit

15      it or deny it.  If she denies it, you cannot go into

16      the direct contents of the document.  The police

17      officer can then be called.  He can be questioned as

18      to whether or not she made general comments about

19      feeling threatened.  He can say yes or no, she made

20      comments about being threatened.  You can't go into

21      the specifics of the comments.  She's denied anything

22      as to G-Rock, for example.  Because under

23      801(d)(1)(A) it has to be a prior inconsistent

24      statement made under oath.

25                  MR. PURCELL:  I'm not going to -- I'm
```

1    just going more under 600 rules than the 800 rules.

2         THE COURT:  I'm sorry?

3         MR. PURCELL:  I'm making this under the

4    600 rules and not the 800 rules in terms of

5    impeachment.  But our point is --

6         THE COURT:  But the point is it isn't

7    just under the 600 rules in terms of the prior

8    statements of witnesses, you can cross-examine on a

9    prior statement, but essentially you get into the 800

10   series in terms of the content of the statement.  And

11   in certain context it may or may not be hearsay.

12         And particularly, for example, if it's a

13   statement that's consistent with a prior statement

14   after someone has sought to impeach a witness, you're

15   then permitted to present consistent testimony.  And

16   that does not have to be under oath, and under

17   801(d)(1) it comes in and it's not hearsay.  But with

18   respect to an inconsistent statement, it has to be

19   under oath.

20         MR. PURCELL:  Thank you.  I understand

21   the ruling.

22         (END OF BENCH CONFERENCE.)

23   BY MR. PURCELL:

24   Q.    Just go back to the setting.  On March 7,

25   2004, you did call the police; they responded in

ANN MARIE PETERS10 - DIRECT - BYRFIELD

98

```
1       uniform and recovered at least the one gun and more

2       than that, no doubt about that.

3       A.      No.

4       Q.      Now, let me ask you:  Do you recall that -- at

5       least, I showed you a report and asked you if it

6       refreshes your memory.  You say it doesn't.  And that

7       what's in the report did not occur; is that what

8       you're saying?

9       A.      I don't remember it happening that way.

10      Q.      Do you remember saying those things?

11      A.      No, I didn't.

12      Q.      And would it be correct you at least agree

13      that the date that is indicated, it was about a month

14      later?

15      A.      It probably was.

16      Q.      Okay.

17      A.      But they were calling more; they were calling.

18      But they came past the house.

19      Q.      That's when they finally came by?

20      A.      Yes.

21      Q.      And for the record, that would be, at least

22      according to the report, 26 April 2004?

23      A.      I guess.

24      Q.      And how many detectives came to the house?

25      A.      I think there was one time.  The first time I
```

```
 1        think it was one.  And then I think two came.  And
 2        agents came like every day to --
 3        Q.      In 2004?
 4        A.      Yes.
 5        Q.      And these gentlemen, I'm trying to get that
 6        they were not in uniform --
 7        A.      Right.
 8        Q.      -- they were detectives?
 9        A.      Right.  Right.
10        Q.      Okay.  Thank you.
11                Now, what I've asked you if you have
12        recollection of is:  Do you remember telling,
13        particularly on April 26, 2004, if they asked you to
14        go downtown and do a tape-recorded statement?
15        A.      I don't remember.
16        Q.      You don't remember?
17        A.      I do not.
18        Q.      Do you remember not wanting to do that or
19        saying you would not do that?
20        A.      I probably didn't go.  I probably didn't.
21        Q.      Probably didn't?
22        A.      No.
23        Q.      In fact, you never did go downtown or give a
24        tape- recorded statement; is that right?
25        A.      Oh, I didn't know anything.  I just called the
```

ANN MARIE PETERS - DIRECT / MARCUS

100

1    guns in.  So --

2    Q.    Okay.  But my question is:  Did you ever

3    provide a tape- recorded statement?

4    A.    I don't remember if I did.

5    Q.    And you do remember you never went downtown to

6    be questioned; is that right?

7    A.    I don't think I did go downtown.

8    Q.    Now, my final question:  Do you -- about this

9    aspect -- do you remember telling the officers, the

10   detectives that is, on 26 April that you really felt

11   threatened if you were to tell them anything more?

12   A.    No, I don't remember.  I don't remember saying

13   that.  Because what did I know?  All I knew was guns

14   in the trash can.  I never saw who put them there.  I

15   just knew they were there.  But I did it for my

16   granddaughter.

17   Q.    Yes.  In the course of the detectives coming

18   to your home, did they begin to turn their

19   questioning back in 2004 to whether you had any

20   knowledge as to whether your daughter's baby's father

21   was involved in a shooting in February of 2004?

22   A.    Did they ask me?  They might have.  But I

23   don't know.  I don't remember.  I really don't

24   remember if they specific -- I remember one of the

25   detectives saying to me he finds it rather ironic

1    that guns would be in my trash can belonging to my

2    grandchildren's father.

3    Q.      Okay.  Did they make you aware that that --

4    did they at any time when they were talking to you

5    tell you that one of the guns, that is the nine

6    millimeter, had actually been linked to, matched to,

7    some ammunition found from a shooting scene that

8    happened in February?  Did they tell you that's why

9    they're interested in asking you these questions?

10   A.      Probably.  They may have.  I really -- it's

11   not clicking; none of this is really clicking.

12               MR. PURCELL:  All right.  Thank you.

13   Your Honor, I have no further questions.

14               THE COURT:  Any cross-examination, Mr.

15   Proctor?

16               MR. PROCTOR:  Briefly.

17                   CROSS EXAMINATION

18   BY MR. PROCTOR:

19   Q.      As you sit here today, do you know how the

20   guns got in the trash can?

21   A.      No.

22   Q.      Do you know if they had been in there a week,

23   a month, a year?

24   A.      No.

25   Q.      Do you know who put them in there?

1    A.      No.

2    Q.      Mr. Hall, you and him are cool, right?

3    A.      Yes.

4    Q.      Have you ever felt threatened by him?

5    A.      No.

6    Q.      Has he ever told you he was going to do

7    something to you?

8    A.      No.

9    Q.      Would you come into court and lie for him

10   today?

11   A.      No.

12              MR. PROCTOR:  Can I have a second,

13   please?

14              THE COURT:  Certainly.

15              MR. PROCTOR:  That's all I have.

16              THE COURT:  Thank you, Mr. Proctor.

17              Ms. Peters, you may step down -- yes, I'm

18   sorry, Mr. Purcell.

19              MR. PURCELL:  Your Honor, before I ask

20   this question, may we approach the Court with

21   counsel?

22              THE COURT:  Right.

23              (BENCH CONFERENCE ON THE RECORD.)

24              MR. PURCELL:  Your Honor, Mr. Proctor

25   just asked the witness does -- did she know who put

 1    the guns there.  And in her statement she said, "Mack

 2    put the guns there".  I'd like to be able to ask her

 3    if she told the police that specifically; then ask

 4    the officer if that's what he told her.

 5                   THE COURT:  Well, Mr. Purcell, it still

 6    doesn't get around 801(d)(1)(A) with respect to an

 7    inconsistent statement because it's not made under

 8    oath to the police officer.  And the rules are very

 9    specific as to that.  It's not a statement made under

10    oath.

11                   MR. PURCELL:  I understand.

12                   THE COURT:  That's the rule.

13                   (END OF BENCH CONFERENCE.)

14                   REDIRECT EXAMINATION

15    BY MR. PURCELL:

16    Q.     Ma'am, you were just asked if you knew who put

17    the guns in the trash can.

18    A.     Right.

19    Q.     You actually do know who put the guns in the

20    trash can, don't you?

21    A.     No, not even to this -- I never saw who put

22    them in there.  I'm just going by what you guys say.

23    But -- all I know is I went out after Abrea came in

24    and told me, "Grandma, there's something in the trash

25    can," I went out.  I looked in the trash can.  I saw

1   a guns.  I called the police.  That was it.

2   Q.     So you deny that you ever stated that Mack put

3   the guns in the trash can?

4   A.     Oh, no.

5                 MR. PURCELL:  I have no further

6   questions.  Thank you.

7                 THE COURT:  You may step down, Miss

8   Peters.  You shouldn't discuss your testimony with

9   anyone in the event you're called back to the witness

10  stand before the trial is over.  Thank you very much.

11                Next witness, Mr. Purcell?

12                MR. PURCELL:  The next witness is

13  Detective Grear.  I think it's Clinton?

14                THE COURT:  Clarence Grear?

15                MR. PURCELL:  Clarence, yes.

16                Your Honor, I just want to tell you we're

17  making very good progress in the case.

18                THE COURT:  Okay.

19  Whereupon:

20                     CLARENCE GREAR,

21  called as a witness, having been first duly sworn

22  according to law, testified as follows:

23                THE DEPUTY CLERK:  Please state your full

24  name for the record and spell your last name, please.

25                THE WITNESS:  Detective Clarence Grear.

1    Last name is G-r-e-a-r.

2                    THE DEPUTY CLERK:  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. PURCELL:

5    Q.     Good morning, Detective Grear.  Thank you for

6    coming in this morning.  First of all, tell us where

7    you're employed.

8    A.     I'm employed -- I'm a detective with the

9    Baltimore City Police Department.

10   Q.     And how long have you been with the Baltimore

11   City Police Department?

12   A.     I'm in my sixteenth year.

13   Q.     And what is your current assignment?

14   A.     I'm a detective intel analyst with the

15   criminal intelligence division.

16   Q.     Now, I direct your attention, please, back to

17   2004.  What was your assignment in detectives at that

18   time?

19   A.     I was an investigator in the non-fatal

20   shooting division.

21   Q.     Did you say non-fatal?

22   A.     Non-fatal.

23   Q.     So is it correct you guys do the

24   investigations that don't go to homicide?

25   A.     Correct.

CLARENCE GREAR - DIRECT - PURCELL

106

```
1      Q.      Now, I want to direct your attention,
2      please -- and you know why you're here.  You've been
3      briefed on the case that we're interested in; is that
4      right?
5      A.      Yes.
6      Q.      Is it fair to say you've handled several
7      shootings in your career?
8      A.      Quite a number, yes.
9      Q.      And this particular shooting we're interested
10     in is a shooting of an individual named Robert
11     Parsons.  Are you familiar with that case?
12     A.      Yes, I am.
13     Q.      Did you actually have occasion to see Mr.
14     Parsons this morning?
15     A.      Yes.
16     Q.      Okay.  And was Mr. Parsons a victim in a
17     particular case that you investigated?
18     A.      Yes, he was.
19     Q.      And it's that case I want to ask you some
20     questions about.
21             Now, before we go any further, I just
22     want to for a future witness establish on the record
23     what the criminal complaint number or CC number was
24     for that particular case and under which evidence
25     that was recovered in that case would have been
```

CLARENCE GREAR - DIRECT - PURCELL

107

1    logged; okay?

2    A.      Okay.

3    Q.      And I direct your attention, please, to

4    Exhibit No. 476, Your Honor.

5              THE COURT:  This is an item that's

6    already in evidence, correct?

7              MR. PURCELL:  Not.  Not yet.

8              THE COURT:  Any objection, Mr. Proctor?

9              MR. PROCTOR:  Mr. Purcell has showed me

10   his exhibits and I have objection to any of them.

11             THE COURT:  All right.

12             MR. PURCELL:  Thank you.

13   BY MR. PURCELL:

14   Q.      This is Exhibit 476.  And do you recognize

15   this as being one of the reports prepared in relation

16   to the Parsons shooting?

17   A.      Correct, yes.

18   Q.      Can you read into the record what the CC

19   number is that collects all of the evidence and

20   reports in that case?

21   A.      The central complaint number is 049, B as in

22   boy, 04792.

23   Q.      Okay.  And that is a distinct number for this

24   particular case and the evidence recovered under it;

25   is that right?

1    A.     Yes, it is.

2    Q.     Okay.  A simple point, but it needs to be

3    made.

4            Now, did you have occasion to go to the

5    shooting scene on the evening that it occurred?

6    A.     Yes, we did.

7    Q.     And a couple of photographs, if I may show

8    you.

9            Was the victim still there when you got

10   there?

11   A.     No.  He had been taken away.

12   Q.     He had been taken away.  Okay.  Showing you

13   what's been marked government's 83.  Is this actually

14   one of the crime scene photos taken that evening by

15   the crime lab?

16   A.     Yes, it is.

17   Q.     And they were all, in fact, turned over to you

18   because you and Detective Jones were the case agents;

19   is that right?

20   A.     That's correct.

21   Q.     And is that a Baltimore City police vehicle I

22   see way in the background there?

23   A.     Yes, it is.

24   Q.     And can you tell us what the cross street is?

25            I'm going to point to a stop sign --

1          THE COURT:  What exhibit number is this,

2    again, Mr. Purcell?  I'm sorry.

3          MR. PURCELL:  This is 83.

4          THE COURT:  Thank you.

5    BY MR. PURCELL:

6    Q.    Showing you again just the stop sign.  Can you

7    just tell us what cross street that is where -- the

8    police car has to its rear?

9    A.    Huron Street is perpendicular to Hollins

10   Ferry.

11   Q.    Okay.  That's Hollins Ferry at the end?

12   A.    Yes.

13   Q.    And we're looking down -- thank you.  We're

14   looking down Huron Street; is that right?

15   A.    Correct.

16   Q.    And I see -- this looks to be crime scene

17   tape?

18   A.    Yes.  It's blocking off the area, yes.

19   Q.    And can you tell us where in there within that

20   tape the shooting scene was, generally?

21   A.    It would be right there in the center area.

22   Q.    Now, I'm going to show you some of the -- just

23   a couple other pictures of the scene, if you

24   recognize them.  Exhibit No. 82.  Is that evidence

25   that was recovered at the shooting scene that

110

1    evening?

2    A.      Correct.

3    Q.      All right.  That's 82.  I don't need these

4    glossies.  I think I'll just do without them, unless

5    counsel wishes them.

6            And we've seen 83.  Now, in addition to

7    whatever was recovered that evening, my request in

8    having you come in today was to direct your attention

9    to some investigation you did the following day in

10   the daylight.

11   A.      Correct.

12   Q.      And did you go back to the scene of this

13   shooting the following day?

14   A.      Yes, I did.

15   Q.      And did you just do a walk-around and look for

16   any evidence you might find regarding the shooting?

17   A.      Our purpose there was for a canvass of the

18   area to find additional evidence.

19   Q.      All right.  And in the course of that, did you

20   find what is known as a casing, that is, a bullet

21   casing, a shell?

22   A.      Yes, we did.

23   Q.      And did you -- can you tell us where it was

24   you found that?

25   A.      It was in the middle of the street.

1    Q.      Okay.

2    A.      On Huron.

3    Q.      Okay.  I'm going to show you a couple of

4    photographs.  This is 63, government Exhibit 63.  And

5    do you recognize the fellow in the photograph?

6    A.      That would be me.

7    Q.      All right.  And is that a picture you had

8    taken after you had observed the location of the

9    casing that we're talking about?

10   A.      Correct.

11   Q.      And if I'm correct that you're looking -- I

12   would be -- if you were looking up Hollins Ferry on

13   Huron, Hollins Ferry would be in the foreground; is

14   that right?

15   A.      Hollins Ferry would be forward of me, yes,

16   sir, that's correct.

17   Q.      Okay.  At the end of the street.  Thank you.

18          Now, we took a -- there were a couple of

19   pictures taken.  Let's sort of move up on the actual

20   location of the casing.  And this is Exhibit 96, and

21   it's marked with a 1.  And there's a little tiny -- I

22   can just barely see it -- something next to the 1.

23   Is that the location in which you found the casing?

24   A.      Correct.

25   Q.      All right.  Now, when you go to a scene and a

1    nine millimeter or any other semiautomatic is found

2    on a surface like a street, is there any rule of

3    physics as to where the casing's going to end up?

4    You just never know where they're going to be; is

5    that right?

6    A.    No.

7    Q.    Okay.  That's why you walk all over the area?

8    A.    Correct.

9    Q.    Hit the ground, they take off?

10   A.    Correct.

11   Q.    So you found this one or observed it on that

12   particular spot in the street; is that right?

13   A.    That's right.

14   Q.    Okay.  I think I have one more that shows it a

15   bit more closely.  Showing you Exhibit No. 90.  And

16   do you recognize or can you tell the jury what this

17   photograph depicts?

18   A.    That's a picture of the casing.

19   Q.    Okay.  And the casing, just to -- can you just

20   point to it, please?  If you touch that screen it

21   will indicate where the casing is by you touching it.

22         All right.  And you can just barely see

23   it.  I'll zoom in for a second.  Zoom in.

24         And is that the casing in place as you

25   found it?

CLARENCE GREAR - DIRECT - PURCELL

113

```
1      A.      Correct.

2      Q.      And that would be -- let's go back to 96.  If

3      we have a -- if we were to say which side of the

4      street that's on, that's on the -- if you were

5      facing -- put it this way:  Hollins Ferry would be

6      again in the foreground; is that right?

7      A.      Correct.

8      Q.      The front of the van would be facing towards

9      Hollins Ferry?

10     A.      Exactly.

11     Q.      Okay.  And you're still on Huron, correct?

12     A.      That's right.

13     Q.      You found that casing.  Did you recover it?

14     Was it recovered, the casing?

15     A.      Yes, it was.

16     Q.      And showing the witness what's been marked

17     government's 481.  And just confirm by looking at the

18     numbers we've just been talking about the CC number

19     and whatnot and other documentation that confirm that

20     nine millimeter casing is a nine millimeter casing

21     you recovered on the day after the Parsons shooting

22     at this location.

23     A.      Yes.

24     Q.      All right.  And was that particular item then

25     taken into evidence under your CC number?
```

CLARENCE GREAR - DIRECT - PURCELL

114

```
1    A.      Yes, it was.

2    Q.      Okay.  And was it given its own property

3    number?

4    A.      Yes, it was.

5    Q.      All right.  And showing you now what's

6    going -- back to No. 476, if you would, you've

7    already identified this item, but just read into the

8    record, please, what the property number given to

9    this shell was.

10   A.      04007588.

11   Q.      Okay.  And does it say it's recovered from

12   2400 Huron one nine millimeter Luger shell casing; is

13   that right?

14   A.      Correct.

15   Q.      So just that one shell casing is under that

16   number.  Now, is that number -- and under this CC

17   number, does that allow you, then to submit this to

18   firearms for further comparison?

19   A.      Yes, it is.

20   Q.      For instance, to a firearm that might have

21   been recovered out of a trash can in March 2004?

22   A.      Correct.

23   Q.      At 2412 Dorton Court?

24   A.      Correct.

25   Q.      Did you make a request for such an analysis
```

CLARENCE GREAR - DIRECT - PURCELL

115

1    later on in your investigation?

2    A.     I did.

3    Q.     Okay.  We'll have another witness testify as

4    to that.

5              Now, just one other documentary exhibit

6    as to the shell casing.  Again, you read into the

7    record what the shell casing property number was.

8    This is Exhibit 475.  I'm going to back up there a

9    little bit, Detective.  And if you can confirm what

10   this particular document is.  Is this an evidence

11   control inventory sheet for evidence under your case,

12   CC ending 4792?

13   A.     Correct.  Yes, it is.

14   Q.     And does this, again, relate to the property

15   of the shell casing with property number ending in

16   digits 7588?

17   A.     Yes, it is.

18   Q.     All right.  This is Exhibit 475.

19              Now, in the course of your investigation,

20   just tell us, please, what did you find the condition

21   of the victim to be when you were able to finally

22   talk to him?

23   A.     Well, he was pretty seriously injured.

24   Q.     Okay.  Were you able to talk to him the day

25   after the shooting?

1    A.      Yes, we did.

2    Q.      Were you able to talk to him in a substantial

3    way the day after the shooting?

4    A.      Yes, pretty much.

5    Q.      Okay.  And at some point in the course of your

6    investigation did he identify a person as Mack, that

7    is, Antonio Hall as the person who shot him?

8    A.      Yes.

9              MR. PROCTOR:  Objection.

10             THE COURT:  Overruled.  Rephrase the

11   question, Mr. Purcell.  I think the question would be

12   that he indicated that he thought that an individual

13   named Mack had shot him.

14             MR. PURCELL:  Okay.  I understand.

15   BY MR. PURCELL:

16   Q.      At some point was Mr. Hall a suspect in the

17   shooting?

18   A.      Yes, he was.

19   Q.      And was that suspicion based on statements

20   made by the victim?

21   A.      Yes, it was.

22   Q.      In fact, the victim also made an array

23   identification of the victim?

24   A.      He identified him in a photo array, yes, he

25   did.

—117—

1    Q.    But he also told you that at the time of the

2    shooting he was wearing a mask; is that right?

3    A.    Correct.

4    Q.    Now, moving on from that, however, did there

5    come a time that you learned from the crime lab that

6    this particular casing had been matched to a firearm

7    recovered by Detective Kazmarek on March 7, 2004?

8    A.    Yes.

9    Q.    Okay.  And did he tell you where that had been

10   recovered?  Or did you learn where that had been

11   recovered?

12   A.    It was recovered from a trash can -- actually,

13   two weapons and some cocaine recovered from a trash

14   can next to 2412 Dorton Court.

15   Q.    And did your investigation reveal that there

16   might be some relationship between that location and

17   the defendant, Mr. Hall?

18   A.    Yes.

19   Q.    So did you undertake, I think in April of

20   2009, to conduct an interview of a woman who owned

21   that home?

22   A.    Yes.

23   Q.    Or lived there with their daughter and

24   grandchildren; is that correct?

25   A.    Right.  Miss Peters.

1    Q.      And did you see Miss Peters leaving today?

2    Did you see her leaving today?  Did you see her

3    today?

4    A.      I did see her.

5    Q.      Okay.  Is that the person you're talking about

6    that you had occasion to interview?

7    A.      Yes.

8    Q.      Now, I see you don't have your report with

9    you.  But let me just show you what's been previously

10   marked 487.  And it's a page from -- counsel has this

11   entire report, for the record.  It's been marked 487

12   for identification, having been previously shown to

13   Miss Peters.  I see you have a copy of that.

14           When did you undertake to actually ask

15   Miss Peters about the recovery of that or the

16   observations, if any, of that firearm at her home?

17   A.      That was on the 26th of April.

18   Q.      Okay.  And at that time did she make

19   statements as to whether or not -- without telling us

20   who she identified -- did she identify someone as

21   having put that stuff in the trash can at that time?

22   A.      Correct.

23   Q.      And did you make notes of that in your report?

24   A.      Yes, I did.

25   Q.      Now, did you make that stuff up in your

1    report?

2    A.      Oh, no, no.

3    Q.      Did she also -- did you also ask her to come

4    down to homicide or to make a tape-recorded

5    statement?

6    A.      We asked her to come to the Southern District.

7    Q.      Not homicide.  I'm sorry.  Go ahead.

8    A.      And at that time she spoke with us.  But she

9    refused to give a statement, a recorded statement.

10   Q.      And in her statements, without telling us the

11   specifics of it at this time, did she indicate

12   whether she felt threatened if she gave you any more

13   information?

14   A.      She did.  She said she would have her head

15   blown had --

16             THE COURT:  Don't go into the contents,

17   Detective Grear.  The question is:  Did she indicate

18   she felt threatened.  Just yes or no.

19   BY MR. PURCELL:

20   Q.      In general terms, yes or no.

21   A.      Yes, she did.

22   Q.      And did she indicate to you whether she had

23   been referred to as a snitch in the neighborhood?

24   A.      Yes, she did.

25   Q.      What did she say?

CLARENCE GREAR - DIRECT/PURCELL

120

1     A.     She said folks in the neighborhood have been

2     calling her and calling her a snitch.

3     Q.     Did she explain to you what her relationship

4     was to Mr. Hall at that time, or did you know what

5     her relationship was to Mr. Hall?

6     A.     Well, she did explain.  And we knew that --

7     Q.     Just the familial relationship, please, that's

8     all.

9               MR. PROCTOR:  Objection.

10             THE COURT:  Sustained.  Rephrase the

11     question.

12             MR. PURCELL:  Thank you.  Did you

13     determine or did you ascertain -- strike that.

14             Did she confirm that she had, through her

15     daughter, a relationship with Mr. Hall?

16             MR. PROCTOR:  Objection.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.

19     BY MR. PURCELL:

20     Q.     And that her grandchildren -- that he was the

21     father of her two grandchildren?

22     A.     Correct.

23     Q.     All right.  Just one second, if I may, Your

24     Honor, please.

25             Detective Jones, I'm only asking

1      this because counsel has --

2      A.      Grear.

3      Q.      I'm sorry.  Detective Grear.  Has a right to

4      ask you these questions.  Let me ask you:  If a

5      citizen has a complaint against a particular officer

6      for their conduct on the street, what is the course

7      of action that they -- that is available to them, at

8      least through the police department?

9      A.      They can make a complaint either through the

10     individual's supervisor or through the internal

11     affairs division.

12     Q.      Okay.  Is internal affairs sometimes called

13     IAD?

14     A.      Correct.

15     Q.      So you're saying that if a particular citizen

16     has a complaint against the way a particular

17     detective or officer or anybody in the police

18     department treats them on the street or conducts the

19     investigation, they can present that complaint to

20     IAD?

21     A.      Correct.

22     Q.      Is that right?

23     A.      That's correct.

24     Q.      Now -- and there's no control over that.

25     Anybody can walk in and say whatever they want; is

CLARENCE GREAR - DIRECT - PURCELL

122

1      that right?

2      A.      There's no control.  They can walk right off

3      the street; they don't know you; they can make a

4      complaint.

5      Q.      Now, I'm asking you this because there's been

6      a complaint made against you not related to this

7      case; is that right?

8      A.      Not related to this case, no.

9      Q.      No, not related to this case.

10     A.      Some other cases, yes.

11     Q.      Other cases.  You have more than one -- you

12     have many other cases?

13     A.      That's correct.

14     Q.      This is an old case for you; is that right?

15     A.      Right.

16     Q.      2004.  But I want you to just to explain to

17     the jury a particular complaint that was made in your

18     case that I think -- in an unrelated matter in 2004;

19     is that right?

20     A.      Exactly.

21     Q.      And was that made by a citizen?  Or a

22     defendant?  Or on behalf of a defendant?

23     A.      It was made by a citizen that we later found

24     out was related to --

25                     MR. PROCTOR:  Objection.

```
 1               THE COURT:  Sustained at this time.  He
 2   can respond to any questions on cross.  If he's asked
 3   on cross- examination, he can respond into specifics.
 4   But that objection is sustained at this time in terms
 5   of conclusion.
 6   BY MR. PURCELL:
 7   Q.      The particular complaint, I've spoken to you
 8   about, so you know what complaint I'm talking about
 9   as opposed to any other complaint.  But this is one
10   that you recall that was sustained to some extent; is
11   that right?
12   A.      Correct.
13   Q.      Tell the jury what the nature of that
14   complaint was as to conduct in your part.  I believe
15   it was regarding an arrest and search.
16   A.      The original allegation was that I did a
17   search warrant on a car.  That I searched the car
18   then later obtained the search warrant.
19   Q.      That you searched it first and then --
20   A.      Then later obtained a search warrant.
21   Q.      Okay.  And the person, the so-called
22   independent person who was a witness to this
23   pre-warrant search, was who?
24               MR. PROCTOR:  Objection.
25               MR. PURCELL:  Do you remember?  If you
```

124

```
 1          don't know their name --
 2                    MR. PROCTOR:  Objection.
 3                    MR. PURCELL:  -- just tell us their
 4          role --
 5                    THE COURT:  Sustained, sustained.  We
 6          need not get into the specifics.
 7                    MR. PURCELL:  Your Honor, the
 8          specifics -- if I may approach?
 9                    THE COURT:  Sure.
10                    (BENCH CONFERENCE ON THE RECORD.)
11                    THE COURT:  Where are you going, Mr.
12          Purcell?
13                    MR. PURCELL:  There's a car in question
14          that was allegedly searched prior to the warrant.
15          The witness who had so-called confirmed this was a
16          tow truck operator who was interviewed by the
17          defendant's lawyers.  He was presented as an
18          independent witness, a tow truck driver, with just no
19          axe to grind.  It turned out to be the defendant's
20          cousin.  And there was a sustained allegation, but I
21          wanted the source of that to be clear.
22                    THE COURT:  Well, you don't need to go
23          into his name, just his relationship of Antonio Hall?
24          How do we know he was the cousin of Antonio Hall?
25                    THE WITNESS:  They found that out during
```

CLARENCE GREAR - DIRECT - PURCELL

125

```
1     the course of the investigation.

2                  MR. PROCTOR:  Judge, I'm not going there.

3     I'm going to ask him with it.  My client's not

4     charged with generating a false police report.

5                  THE COURT:  All right.  It's very simple.

6     If there's any question at on this topic at all by

7     you, he's going to be permitted to answer that.

8                  MR. PROCTOR:  Absolutely.

9                  THE COURT:  We're fine with it, Mr.

10    Purcell.  It's done.  If there's any

11    cross-examination of any kind on this matter, he's

12    free to go into it.  Otherwise we're done with it.

13                 MR. PURCELL:  Your Honor, I'd like to

14    bring out the conclusion; that he that he got a mild

15    reprimand.

16                 THE COURT:  That's fine, that's fine,

17    that's fine.  Thank you.

18                 (END OF BENCH CONFERENCE.)

19    BY MR. PURCELL:

20    Q.     Detective, we'll just go right to the end of

21    this story.  After investigation by IAD, did you

22    receive a reprimand of any sort?

23    A.     A letter.

24    Q.     A low-level reprimand?

25    A.     Low-level.
```

CLARENCE GREAR - DIRECT - PURCELL

126

```
 1     Q.      Did you lose any time?

 2     A.      No time.

 3     Q.      Seniority, transfer?

 4     A.      Nothing.

 5     Q.      Nothing.  You weren't, like, off the street

 6     for a while, demoted, fined?

 7     A.      No.

 8     Q.      Okay.  And this was based on an allegation; is

 9     that right?

10     A.      Correct.

11     Q.      And what did the letter of reprimand say you

12     should have done in terms of -- did they conclude, in

13     fact, that you had done a search before a warrant?

14     A.      No, they didn't.

15     Q.      What did they find you had done or not done?

16     A.      The finding was that I should have had a

17     supervisor review the search warrant.

18     Q.      Before you got it?

19     A.      Correct.

20     Q.      So there's no sustained finding as to this

21     conduct that was alleged?

22     A.      Correct.

23     Q.      Okay.  I only bring it up because it's fair

24     game and I wanted to get there and have you explain

25     your side of the story.
```

1     A.     Fine.

2               MR. PURCELL:  Thank you.  May I have one

3     more moment, Your Honor?  I think I'm finished.

4               No.  Thank you, Your Honor.

5               THE COURT:  Thank you, Mr. Purcell.

6               Cross-examination, Mr. Proctor.

7               MR. PROCTOR:  Just a few questions, if I

8     may.

9               (Counsel confer.)

10                   CROSS EXAMINATION

11    BY MR. PROCTOR:

12    Q.     How are you this afternoon, sir?

13    A.     Fine.

14    Q.     Is this overtime at least?  No?

15               I just want to make sure I understand one

16    thing.  What time did you get to the scene that

17    evening, sir?

18    A.     We arrived in the morning.

19    Q.     Okay.  The shooting happened --

20    A.     The shooting happened early in the morning.

21    Q.     1 a.m. or so?

22    A.     Thereabouts.  And then we arrived sometime

23    afterwards.

24    Q.     After what, sorry?

25    A.     Actually, the shooting happened in the morning

1    and then we came to the scene to do the -- canvass

2    the scene.

3    Q.      Okay.  What time did you get to the scene?

4    A.      Sometime in the morning.

5    Q.      Okay.  Was it daylight when you got there?

6    A.      It was daylight, yes.

7    Q.      And this is February, right?

8    A.      Correct.

9    Q.      So it's probably not getting daylight until

10   seven-is?

11   A.      I don't know.

12           THE COURT:  I believe this was March 7,

13   was it not?

14           MR. PROCTOR:  No.  The shooting was

15   February 12th?

16           MR. PURCELL:  February 10th is the

17   shooting.  March 7 is the date that Detective

18   Kazmarek went to the house.

19           THE COURT:  Okay.  February 10, 2004 was

20   the shooting.  All right.

21   BY MR. PROCTOR:

22   Q.      So you got there on February 11th sometime in

23   the morning.  It was daylight, right?

24   A.      Correct.

25   Q.      When you got there --

CLARENCE GREAR - CROSS - PROCTOR

129

1    A.      I want to make it clear because -- that we

2    came to the scene to canvass the scene for evidence

3    only.

4    Q.      Right.  Which is what I was getting to.  So

5    Mr. Parsons had long since gone, right?

6    A.      He had long left the scene.  The scene had

7    been processed, taken care of.  Our purpose to come

8    to the scene was only for the canvass.

9    Q.      Okay.  So I guess that's my question; that's

10   my point to the extent I ever have one.  This is the

11   picture of the scene.  Now, you weren't there when

12   this was taken, right?

13   A.      Correct.

14   Q.      But Mr. Purcell showed it to you, it's

15   government Exhibit 83?  Yeah?  Do you see that?

16   A.      Correct, yes.

17   Q.      And you see it's taped off and there's a

18   police cruiser at the top of the street?

19   A.      Correct.

20   Q.      And this is government Exhibit 63; your

21   smiling face that day when you found the shell

22   casing?

23   A.      Correct.

24   Q.      And if we go back to government 83, all those

25   cars on the right-hand side, they've all gone by the

1    time you've gotten there, haven't they?

2    A.    Yes.

3    Q.    So it's several hours later, cars have been

4    and gone, the crime tape's been removed, the medics

5    have been there.  And at that point there's a shell

6    casing lying in the middle of the street?

7    A.    Correct.

8            MR. PROCTOR:  Can I have a second,

9    please, Judge?

10           THE COURT:  Certainly.

11           MR. PROCTOR:  That's all I have.  Thank

12   you.

13           THE COURT:  Thank you, Mr. Proctor.

14           Any redirect, Mr. Purcell?

15           MR. PURCELL:  Yes, I do.  Just one we

16   question.

17               REDIRECT EXAMINATION

18   BY MR. PURCELL:

19   Q.    Were there reports of any other shootings on

20   that block between the time of the shooting of Mr.

21   Parsons and the time you got there that day?

22   A.    No, I wasn't.

23   Q.    You were just basically lucky to find one

24   casing, weren't you?

25   A.    Very lucky.

```
 1                    MR. PURCELL:  Thank you.  No further
 2       questions.
 3                    THE COURT:  Thank you very much,
 4       Detective Grear.  You may step down.  You shouldn't
 5       discuss your testimony with anyone in the event
 6       you're called back to the witness stand before this
 7       trial conclude this week.  Thank you very much.
 8                    THE WITNESS:  Thank you.
 9                    MR. FUCHS:  Your Honor, the government
10       calls Sandra Bohlen from the Baltimore police
11       department firearms examination.
12       Whereupon:
13                         SANDRA BOHLEN,
14       called as a witness, having been first duly sworn
15       according to law, testified as follows:
16                    THE DEPUTY CLERK:  Please state your full
17       name for the record.
18                    THE WITNESS:  My name is Sandra Bohlen.
19       The last name is spelled B-o-h-l-e-n.  I'm a firearms
20       examiner with the Baltimore police department.
21                         DIRECT EXAMINATION
22       BY MR. FUCHS:
23       Q.     Miss Bohlen, how long have you been a firearms
24       examiner?
25       A.     I went to the firearms unit in 1994, so just
```

1        about 17 years.

2        Q.      What does a firearms examiner do?

3        A.      Basically we analyze any firearms evidence

4        that may come into the laboratory.  That could

5        actually be a firearm itself or it may be fired

6        ammunition, components, be it cartridge cases or

7        bullets.  We can microscopically compare those to

8        tell whether they were fired from the same firearm or

9        not.

10       Q.      Okay.  And what training have you received?

11       A.      Very extensive training to become a firearms

12       examiner.  I could go over all of that with you.

13       Q.      Just briefly.  Just briefly.  The highlights.

14       A.      Okay.  Numerous armorer's courses for various

15       firearms.  Typically I list all of those, but I won't

16       do that here.  The FBI shooting crime scene

17       reconstruction course; ATF serial number restoration

18       course; training for the IBIS, Integrated Ballistic

19       Identification System, a computer system that we have

20       within the laboratory.

21              Additionally I've toured the factories of

22       various firearms manufacturers.  I would typically

23       list all of those here, as well.

24       Q.      Okay.

25       A.      Also the Winchester/Olin ammunition

1    manufacturing facility.  I'm a member of a

2    professional organization, the Association of Firearm

3    and Toolmark Examiners.  And I've been qualified as

4    an expert in firearms identification over a hundred

5    times, district and circuit level, as well as at the

6    federal level in Baltimore City.

7                THE FUCHS:  Your Honor, at this point I

8    would offer Miss Bohlen as an expert in firearm and

9    toolmark identification.

10                THE COURT:  Any voir dire on this point?

11                MR. PROCTOR:  Judge, if you'll recall I

12    would just make the same objection that I may made to

13    Mr. Wagster, who previously testified.

14                THE COURT:  Yes.  And that will be

15    overruled.  But you've preserved that for the record,

16    Mr. Proctor.

17                Ladies and gentlemen, as I've said

18    before, usually a witness cannot give an opinion.

19    But under Rule 702 of the Federal Rules of Evidence,

20    one who is qualified as an expert can give his or her

21    opinion.  Miss Bohlen has been qualified as an expert

22    in firearms and toolmark identification with respect

23    to firearms, so she is permitted to give her opinion.

24                As with all witnesses, it's up to you to

25    determine whether you accept or reject any portions

1    of the testimony of a witness.

2              So, with that, you may proceed, Mr.

3    Fuchs.

4              MR. FUCHS:  Thank you, sir.

5    BY MR. FUCHS:

6    Q.    Miss Bohlen, I'm going to show you

7    government's Exhibit No. 71.  Do you recognize that,

8    ma'am?

9    A.    Yes, I do.

10   Q.    And what is it?

11   A.    It's a request for examination for a firearm.

12   Q.    Okay.  And is that your name at the bottom?

13   A.    Yes, it is.

14   Q.    And if you would tell the ladies and gentlemen

15   of the jury, what is the CC number that this report

16   relates to?

17   A.    049C04279.

18   Q.    Okay.  And what is the property number of this

19   particular piece of evidence?

20   A.    04013008.

21   Q.    And what is the place of occurrence that this

22   piece of evidence was recovered from?

23   A.    2412 -- I'm not sure.  Is that Dorton Court?

24   Q.    Okay.  And who is the evidence submitted by?

25   A.    Officer Kazmarek.

135

```
1    Q.     And if you would, tell the ladies and
2    gentlemen of the jury the make, model, and serial
3    number of the firearm?
4    A.     Yes.  It is was a Taurus manufactured firearm.
5    The model was PT-99AF.  And the serial number is
6    actually TIA6407A.
7    Q.     Now, as part of your duties, did you check to
8    see if this pistol was working?
9    A.     Yes.
10   Q.     What did you do?
11   A.     It was test fired for operability.  We have a
12   range that we can test fire pistols into a water tank
13   and retrieve the bullets and cartridge casings.
14   Q.     And what did you find in this case?
15   A.     That the firearm was operable.
16   Q.     I'm going to show you government'S Exhibit
17   483.
18              THE COURT:  I'm sorry.  Government
19   exhibit?
20              MR. FUCHS:  483, Your Honor.
21              THE COURT:  483.  Thank you.
22   BY MR. FUCHS:
23   Q.     And, Miss Bohlen, do you recognize that?
24   A.     Yes, I do.
25   Q.     And what is that?
```

1    A.    That is a copy of the operability for the

2    pistol we were just talking about.

3    Q.    Okay.  And is that a document that the pistol

4    was test fired and found to be working?

5    A.    Yes.

6    Q.    Miss Bohlen, I'm now going to show you what's

7    been marked as government's Exhibit 481.  Do you

8    recognize that?

9    A.    Yes.

10   Q.    And what is it?

11   A.    It's a cartridge case that I received for

12   analysis under CC number 049B04792.

13   Q.    Okay.  And how do you know you've examined

14   this particular casing?

15   A.    All of the packaging bears my markings.

16   Q.    Okay.  And, in fact, those are your initials

17   right there, correct?

18   A.    That's correct.

19   Q.    Okay.  And at some point did you get a request

20   to compare this casing with a particular firearm?

21   A.    Yes, I did.

22   Q.    Let me show you government's Exhibit 484.  Do

23   you recognize that?

24   A.    Yes, I do.

25   Q.    And what is that?

```
 1    A.      That is the request for comparison to compare

 2    the cartridge case to the Taurus pistol.

 3    Q.      Okay.  And that's the Taurus pistol we were

 4    just talking about?

 5    A.      That's correct.

 6    Q.      And that was the one recovered on Dorton

 7    Court, correct?

 8    A.      Yes.

 9    Q.      Okay.  And what did you do?

10    A.      Basically the test-fired cartridge cases from

11    the Taurus pistol are microscopically compared

12    against -- in this case that cartridge case is Q1.

13    And it was found to have been fired with that pistol.

14    Q.      Okay.  And let's just back up.  What did you

15    do to compare these two?  You said a microscopic

16    analysis.

17    A.      Yes.

18    Q.      What is that?

19    A.      We have a large stereo microscope that allows

20    us to put, side by side, two pieces of evidence.  So

21    we look at two cartridge cases side by side.  And

22    we're looking for markings that are imparted from the

23    firearm.

24            That's the whole basis of firearms

25    identification.  That, during the manufacture of the
```

1    firearm, there are markings placed onto the metal of

2    the firearm.  So that once the firearm is finished

3    and later on fired, the softer metal of the

4    ammunition components actually pick up those markings

5    during the firing.  And that's what we're looking at

6    under the microscope.

7    Q.      Okay.  So is it fair to say you're comparing

8    those two casings, one that you're matching and then

9    one fired from the target handgun; and you check so

10   see if she have the same breech face markings?

11   A.      Correct.  It would be one, the evidence, in

12   this case the Q1 from the one case, to the one of the

13   test-fired cases from the Taurus.

14   Q.      And having locked at both of those, what was

15   your expert opinion?

16   A.      Yes.  The Q1 -- the test-fired -- the evidence

17   cartridge case was, in fact, fired with the Taurus

18   pistol.

19              MR. FUCHS:  Okay.  Thank you.

20              No further questions, Your Honor.

21              THE COURT:  Thank you.

22              Any cross-examination, Mr. Proctor?

23              MR. PROCTOR:  Briefly.

24

25

SANDRA BOHLEN - CROSS - PROCTOR

139

1                    CROSS EXAMINATION

2    BY MR. PROCTOR:

3    Q.     Where's the gun today?

4    A.     I don't know.  It's not currently in the

5    evidence room.  I believe it's been returned to

6    someone.

7    Q.     Did you retest it?  Or, I'm sorry.  You

8    couldn't retest it, then, because it's not in the

9    evidence room, right?

10   A.     Retest for what?

11   Q.     In preparation for your testimony.  You could

12   have again compared the results, right, to the

13   evidence you were just shown?

14   A.     This is from '04, and these are the

15   conclusions.  There would be no need to retest the

16   firearm at this point.

17   Q.     Okay.  And since '04 you haven't looked at the

18   casings and you haven't seen the gun?

19   A.     No.  Not to my knowledge, no.

20            MR. PROCTOR:  Nothing further.

21            THE COURT:  Thank you.  You may step

22   down, Miss Bohlen.  You should not discuss your

23   testimony with anybody in the event you're called

24   back to the witness stand before this trial

25   concludes.

1          THE WITNESS:  Yes, Your Honor.  Thank

2     you.

3          THE COURT:  Thank you very much.

4          Mr. Purcell, why don't you wait for Miss

5     Bohlen to leave.

6          Thank you.  Counsel, approach the bench

7     one second, please.

8          (BENCH CONFERENCE ON THE RECORD.)

9          THE COURT:  It's about, not quite, maybe

10     seven or eight minutes of 1.  Who is the next

11     witness?

12          MR. PURCELL:  The next witness will take

13     some time, it's Detective Dohony from the Martie

14     Williams murder.  And he's going to introduce --

15          THE COURT:  It's Detective Robert Dohony?

16          MR. PURCELL:  Yes, sir.

17          THE COURT:  Okay.  He'll be the next

18     witness?

19          MR. PURCELL:  Yes.

20          THE COURT:  It seems to me this might be

21     the appropriate time to stop for lunch.

22          MR. PROCTOR:  Works for me.

23          THE COURT:  Okay.  We'll stop and we'll

24     start with Detective Dohony after lunch.

25          MR. PURCELL:  Can I give the court a idea

141

1      of what's coming?

2                      THE COURT:  Certainly.

3                      MR. PURCELL:  Thank you.  I've told

4      counsel, Your Honor, I will take the brunt of your

5      displeasure, but we have three witnesses this

6      afternoon.  And we pretty much have to break because

7      of schedules after that.  And then we will finish

8      tomorrow.

9                      THE COURT:  Okay.  Hold on just one

10     second.

11                     MR. PURCELL:  There will be Dohony.

12                     THE COURT:  Detective Robert Dohony,

13     D-o-h-o-n-y.  And, after -- you have three witnesses

14     after him?

15                     MR. PURCELL:  I think it's three.  Three

16     or four.  After Dohony will be --

17                     THE COURT:  Anyway, the bottom line is

18     you think we may not be going until --

19                     MR. PURCELL:  We may not.

20                     THE COURT:  Until what time do you

21     project?  You can't tell how long cross is going to

22     be.  But you think we'll be able to finish before 4

23     o'clock; is that right?

24                     MR. PURCELL:  We may, yes.

25                     MR. PROCTOR:  Judge, most likely, we know

1    who's coming up and I don't think we have ten minutes

2    of cross for any one of them.

3                THE COURT:  All right.  We'll just wait

4    and see where we are.  We might finish earlier.

5                And then how are we doing tomorrow?  You

6    have a full day lineup for tomorrow?

7                MR. PURCELL:  We do.  We're finishing

8    tomorrow.

9                THE COURT:  Okay.  So we'll just tell the

10   jury we're right on schedule and take a break for

11   lunch.  And we're working on instructions back in my

12   chambers now.

13               MR. SULLIVAN:  The only potential

14   roadblock, Your Honor, is that you ordered -- you

15   signed a writ for a Bureau of Prisons prisoner to

16   come here and testify for us.  The marshal's service

17   hasn't got him here yet.  I think that they

18   anticipate.

19               MR. PROCTOR:  I thought he was getting in

20   tonight, I believe is what they said.

21               THE COURT:  You give the name of that

22   person to Miss West.  Miss West will give it to Ted

23   Stoller.  And, Miss West, make sure Ted Stoller lets

24   me know by this afternoon if there's any problem

25   having that witness here tomorrow.

1              MR. PROCTOR:  Your Honor, he has a

2      lawyer, Mr. Ruter, and I've called Mr. Ruter and

3      asked him to meet me in the cellblock.

4              THE COURT:  If there's any difficulty,

5      you let me know.  We way put Mr. Ruter under custody,

6      but --

7              MR. PROCTOR:  I wouldn't oppose such a

8      motion.  In the event he makes it to the district

9      tonight, I would ask request that Mr. Stoller come up

10     for tomorrow, in case Mr. Purcell's case goes --

11             THE COURT:  Whatever we need to do to

12     cross T's and dot I's to deal with issues that come

13     up.  Wherever you witness is, Miss West is going to

14     confirm from Mr. Stoller that he'll be here tomorrow.

15             MR. PROCTOR:  Mr. Purcell knows, I'm

16     happy to say the name.  Robert Jones.

17             THE COURT:  Robert Jones.  We have to

18     make sure he's there.  We have to cross T's and dot

19     I's to make sure he's here.

20             MR. PURCELL:  Is there any responsibility

21     on me for this?

22             THE COURT:  You've issued a subpoena.

23     I've signed the subpoena.  And the marshals should

24     have him here.  So there's nothing for the government

25     to do.

1           MR. PURCELL:  No, no --

2           THE COURT:  Thank you very much.  We'll

3    take a break for lunch.

4               (END OF BENCH CONFERENCE.)

5           THE COURT:  Ladies and gentlemen, we're

6    going to break for lunch now and we'll start again at

7    2 o'clock.  And it's anticipated that perhaps --

8    perhaps we may finish a little early this afternoon,

9    and then we'll pick up again tomorrow morning.  We'll

10   wait and see.

11              With that you, have an hour for lunch.

12              (LUNCH RECESS.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          AFTERNOON SESSION
2               THE COURT:  We're ready to bring the jury
3     in and proceed with the next witness.
4               MR. PURCELL:  Yes, Your Honor.
5               (JURY IN.)
6               THE COURT:  Good afternoon, everyone.
7     We're ready to continue.
8               All right.  Mr. Purcell, next witness?
9               MR. PURCELL:  Thank you, Your Honor.  The
10    government calls Detective Robert Dohony here in the
11    courtroom.
12    Whereupon:
13                      ROBERT DOHONY,
14    called as a witness, having been first duly sworn
15    according to law, testified as follows:
16              THE DEPUTY CLERK:  Please state you full
17    name for the record.
18              THE WITNESS:  Detective Robert Dohony.
19              THE DEPUTY CLERK:  Spell your last name,
20    please.
21              THE WITNESS:  D as in David, o-h-o, N as
22    in Nancy, y.
23              THE DEPUTY CLERK:  Thank you.
24
25
```

146

```
1                     DIRECT EXAMINATION

2    BY MR. PURCELL:

3    Q.      Good afternoon, Detective Dohony.

4    A.      Good afternoon.

5    Q.      Tell the jury, please, where you're employed.

6    A.      For 18 years I've been employed with the

7    Baltimore City Police Department.  And the last 11

8    years I've been assigned to the homicide unit.

9    Q.      All right.  And I direct your attention,

10   please, to March 21st, 2009.  Did you have occasion

11   to respond to a call about a homicide on the I guess

12   it's the 2400 block of Maisel Street?

13   A.      I received a call to 2635 Maisel Street.  It's

14   a row house in the Westport area of Baltimore.

15   Q.      Okay.  2635 Maisel Street.  And can you tell

16   us, please, the name of the victim of that homicide?

17   A.      Martie Williams.

18   Q.      And how old was Mr. Williams at the time of

19   his death?

20   A.      Martie Williams had just turned 20 at the time

21   of his death.

22   Q.      Now, you have in front of you -- it looks like

23   a copy of a homicide folder?

24   A.      Yes.  This is my case folder from that

25   investigation.
```

1    Q.     All right.  Can you just read into the

2    record -- we may need it purposes later in terms of

3    evidence identification, what the CC number is under

4    which your reports were filed and under which any

5    evidence recovered from that case was filed, as well.

6    A.     The CC number for this case is 099, C as in

7    Charles, 09932.

8    Q.     Okay.  Now, homicide, I understand, like some

9    shootings are also given their own homicide number or

10   shooting number; is that right?

11   A.     That's correct.

12   Q.     We don't need that; but that's the CC number?

13   A.     Correct.

14   Q.     All right.  About what time was it that you

15   were called to the scene?

16   A.     Approximately 8:30 that evening.

17   Q.     Were you able to determine, based on the 911

18   call, approximately what time the homicide occurred?

19   A.     The homicide occurred about ten after 8.  So

20   it was about 20 minutes before we got the call.

21   Q.     All right.  And when you arrived at the scene,

22   was the body of Mr. Williams still present?

23   A.     It was.

24   Q.     We're going to look at some photographs in a

25   minute.

ROBERT DOHONY - DIRECT/PURCELL

148

```
 1              Now, were you able to ascertain from the
 2      evidence collection done while you were still at the
 3      scene, I think, if I read your report correctly, what
 4      was the -- what did appear to be at least the manner
 5      of death of Mr. Williams?
 6      A.      He was shot multiple times.
 7      Q.      And were you able to determine from evidence
 8      collection how many handguns were involved?  At
 9      least, how many -- evidence of how many handguns was
10      found at the scene?
11      A.      Evidence of two handguns were found at the
12      scene.
13      Q.      And could you tell us how you were able to
14      tell us two?  Were their distinctive cartridge
15      casings found?
16      A.      Yes.  There were .40 caliber cartridge casings
17      and .32 caliber cartridge casings, indicating two
18      different handguns.
19      Q.      Now, on that evening of that murder when you
20      arrived, did any members of the citizenry in that
21      area come forward and declare themselves eyewitnesses
22      to this murder?
23      A.      No, sir.
24      Q.      Did anybody come into the house and say they
25      saw it, or they saw anybody running from the seen saw
```

1    anybody go into the house, or anything like that?

2    A.    No, sir.

3    Q.    Is that unusual in Baltimore City?

4    A.    That is not unusual.

5    Q.    Okay.  So there were no eyewitnesses, at least

6    at that point; is that right?

7    A.    That's correct.

8    Q.    Okay.  Let's take a look at a couple of

9    photographs I have set aside here from -- if I may

10   just come around this way, counsel.  Thank you.

11             Showing you what's been marked government

12   Exhibit 47A -- it's already in, Your Honor.  And it

13   is an aerial photograph.  I'm just going to ask you

14   to take your time and orient yourself on that and

15   tell us if you're able to find the house in which

16   Martie Williams was murdered.

17   A.    Yes.  It's in the bottom right-hand corner of

18   the screen.  You would move the photo a little pit.

19             If you see Maisel Street and Westport

20   Street, we're looking at the second house in from the

21   corner.

22   Q.    Okay.

23   A.    That's 2635.

24   Q.    And you have a -- if you -- that's a touch

25   screen that will indicate for the jury --

1    A.       Okay.

2    Q.       -- what you're looking at.

3             All right.  That's the murder scene.

4             Now, if you would just further orient us

5    a bit for purposes of some prior testimony?

6             THE COURT:  On the bottom left-hand

7    corner of that, Detective, that will clear that off.

8    Just at the bottom left-hand corner.

9    BY MR. PURCELL:

10   Q.       Very good.  Now, if you were to walk out of

11   this house, in which direction would you turn -- and

12   then just indicate for us which direction you would

13   go if you were heading towards the ball field that is

14   between Maisel Street and Maisel Court, what they

15   sometimes call the Projects of Westport, if you know.

16   A.       I'm not exactly sure, but I believe you would

17   travel up Maisel Street this direction.

18   Q.       Okay.  And you can see the field here at the

19   top of the screen?

20   A.       Yes.

21   Q.       What I'm talking to is right here.

22            Now, is there a elementary school or any

23   other schools in that area adjacent to the house?

24   A.       Yes.  The large building here is the Westport

25   Elementary School.

ROBERT DOHONY - DIRECT/PURCELLI

1    Q.    All right.  Thank you.  And at some point

2    we'll be getting into some evidence you recovered

3    from that school.

4              Can you tell the jury what that was?

5    A.    Two video cameras that were located just right

6    here on the loading dock area.  And they pointed

7    right into the block and directly right at 2635

8    Maisel Street.

9    Q.    Okay.  Thank you.

10             That was Exhibit No. 47A, already

11   admitted.

12             Now, showing you what's been marked as

13   government's Exhibit 123 -- at least this version

14   hasn't been marked -- can you tell the jury what

15   they're looking at here?

16   A.    That is the front porch and front door of 2635

17   Maisel Street.

18   Q.    Now, directing your attention to going into

19   the house, Exhibit No. 124, can you tell the jury

20   what you see in this photograph and if, indeed, the

21   victim is depicted in this photograph.

22   A.    Yes.  This is the living room, which is the

23   first room you enter when you walk through the front

24   door, going into the kitchen.  Mr. Williams is right

25   here slumped in the chair.  The TV screen right here,

```
1    which at the time he was playing a video game.

2    Q.     Okay.  Now, I see there's a second chair next

3    to him to his right.  Is that basically where it was

4    that evening, as well?

5    A.     Yes, it is.

6    Q.     And is this a fair and accurate representation

7    of the scene as one would enter into this location of

8    the murder scene?

9    A.     It is.

10   Q.     Okay.  And you said that there was evidence

11   that Mr. Williams had been shot.  I'm showing you

12   what's been marked government's 116.  116.  Is

13   this -- just tell us what we're looking at here,

14   please.  I'm sorry.

15   A.     This is Martie sitting in the chair as he was.

16   He was playing the video game.  He was shot four

17   times in the back of the head, four times in the

18   back.  He's leaning over to his left.  You can see

19   evidence of spatter on the wall and a large quantity

20   of blood on the floor below him and below the chair.

21   Q.     Now, since this case have you met members of

22   Mr. Williams' family?

23   A.     Yes, I have.

24   Q.     And his father has actually been here

25   throughout this case?
```

ROBERT DOHONY - DIRECT/PURCELLI

153

1    A.      Correct.

2    Q.      I show you what's been marked government's

3    Exhibit No. 118.  Do you recognize that?  Tell us

4    what it is, please.

5    A.      This is a photograph coming from the dining

6    room area looking back out towards the living room.

7    It just shows the large quantity of blood on the

8    floor below the chair.

9    Q.      All right.  I'm showing you what's been marked

10   government's Exhibit 132.  132.  And I don't think

11   this has been admitted before.  I'm told no.

12               Now, tell us, please, what we're looking

13   at, what perspective we're looking at the street

14   here.  I guess that's Maisel Street; is that right?

15   A.      This is a shot from -- it looks like it would

16   be the next door neighbor's yard.  Just looking at

17   Maisel Street up towards Westport Street.  With the

18   number of people standing on the sidewalk.

19   Q.      Now, that evening, was there any evidence of

20   firearms recovered on the street in that location?

21   A.      Yes, there was.

22   Q.      What was found?

23   A.      What was found was the magazine and what's

24   called the heel of a gun and the spring of a gun.

25   That magazine itself contained four .32 caliber

1    rounds.  So we found parts of a gun right next to the

2    house.

3    Q.    All right.  So it looks like somebody dropped

4    the magazine on the way out?

5    A.    It would look like that the gun fell apart and

6    just fell to the ground.

7    Q.    And was that recovered?

8    A.    That was recovered.

9    Q.    Now, we're not going to get into it in great

10   detail.  But I know that you've had that processed

11   for fingerprints in whatever way it could be

12   processed; is that correct?

13   A.    That is correct.

14   Q.    Was there any forensic evidence recovered from

15   that magazine?

16   A.    Unfortunately not.

17   Q.    Now, I show you what has been marked -- and

18   forensic evidence would include fingerprints; and you

19   do swab it for DNA?

20   A.    Fingerprints.  It was processed for

21   fingerprints and DNA.

22   Q.    All right.  Without any success?

23   A.    With negative success.

24   Q.    Okay.  I direct your attention now to that

25   magazine.  Let's first look at the -- Exhibit No.

ROBERT DOHONY - DIRECT - PURCELLI

155

1    128.   Does that photograph show the vicinity where

2    the magazine was found?

3    A.      Yes, it does.

4    Q.      And what -- and I see a couple of the evidence

5    markers there in the street.  Could you tell the jury

6    to which evidence marker they should be looking?

7    A.      No. 1, 2, and 3 are the three parts of the

8    handgun.

9    Q.      Okay.  Are you basically saying the gun fell

10   apart?

11   A.      Yes.

12   Q.      And where's the magazine we're talking about?

13   A.      That's indicated with No. 2.

14   Q.      All right.  If you just clear the screen,

15   please.  And I'll show you what's been marked

16   government's Exhibit No. 122.  I take it this

17   magazine is still over in property somewhere?

18   A.      Yes, it is.

19   Q.      Okay.  It was submitted by yourself.  Do you

20   recognize Exhibit No. 122?

21   A.      I do.

22   Q.      What is it?

23   A.      This is the close-up of the magazine and the

24   evidence marker.

25   Q.      Now, does the magazine -- can you still see

1    any ammunition in the magazine?

2    A.    In that picture you can see two of the four

3    rounds that were in the magazine.

4    Q.    And so this would be representative of the .32

5    caliber ammunition found at the scene; is that right?

6    A.    Correct.

7    Q.    Okay.  So were casings for the .32 found

8    inside?

9    A.    Casings for the .32 were found inside.

10   Q.    As well as an another firearm?

11   A.    As well as another firearm.

12   Q.    Okay.  Thank you.

13         Now, in the course of your investigation,

14   did you undertake to interrogate a person named Kevin

15   Duckett as to his knowledge of this crime?

16   A.    Yes, I did.

17   Q.    And did you conduct an interview of Mr.

18   Duckett in homicide or wherever it may have occurred?

19   A.    I interviewed him in my office, at the

20   homicide office.

21   Q.    And was he alone or with an attorney when that

22   occurred?

23   A.    He came in alone.  But at the time he

24   requested his attorney.  So I called his attorney.

25   And she responded down to the office.  And the three

1    of us had a conversation.

2    Q.      Okay.  Did Mr. Duckett admit being at the

3    scene?

4    A.      He admitted being at the scene prior to the

5    incident.

6    Q.      Did he in the course of your investigation of

7    this murder of Martie Williams ever identify himself

8    as the person who set the murder up; that is, call

9    Mr. Hall, the person who committed the murder?

10   A.      At the time that we had our interview or

11   conversation he denied any knowledge or involvement

12   in the incident.

13   Q.      He did not implicate himself?

14   A.      Not at all.

15   Q.      Did he implicate anybody else?

16   A.      No, not at all.

17   Q.      Now, did you have occasion to interview an

18   individual named Linnard Cunningham?

19   A.      Several times, yes.

20   Q.      Did you determine that Mr. Cunningham had been

21   there at the time of the shooting?

22   A.      He admitted that he was sitting in that chair

23   as you saw; the empty chair.

24   Q.      The blue chair?

25   A.      The blue chair.

ROBERT DOHONY - DIRECT/PURCELL

158

1    Q.    For the record, I believe Mr. Cunningham will

2    be testifying tomorrow.  And I'll finish my

3    questioning as to him.  And he indicated he was

4    there?

5    A.    Yes.

6    Q.    All right.  Now, going back to Mr. Duckett for

7    a second, did Mr. Duckett in your interview with him

8    produce any documentation or any documentary evidence

9    which he represented to you was something to show

10   that he wasn't at the scene at the time of the actual

11   murder?

12   A.    He on his person produced to me a receipt from

13   Mondawin Mall in which he had purchased a pair of

14   jeans.

15   Q.    And he had that with him when he came into

16   homicide?

17   A.    Yes.

18   Q.    All right.  Now, I asked you a moment

19   ago about the -- this is partially -- maybe the main

20   reason why you're here today.  But you recovered a

21   police videotape from -- what's the name of the

22   school, Westport Elementary?

23   A.    Westport Elementary.

24   Q.    All right.  And when you examined that -- this

25   is something you guys do, you look around and see if

1        there are any cameras around that might have

2        captured --

3        A.      We do.

4        Q.      Okay.  And this time you learned that there

5        was a camera on Westport Elementary?

6        A.      Correct.

7        Q.      And when you viewed that, did you find that

8        the camera or the view of the camera included the

9        address where the murder had happened?

10       A.      It did.

11              MR. PURCELL:  Okay.  Now, that has been

12       already, Your Honor, introduced in evidence as

13       Exhibit 136 through Detective Moody.

14              THE COURT:  Government Exhibit 136 is the

15       blue-light camera tape; is that right?

16              MR. PURCELL:  It's the camera from

17       Westport Elementary, yes.  It's not the blue-light.

18              THE COURT:  Government's 136?

19              THE WITNESS:  Yes.

20       BY MR. PURCELL:

21       Q.      Blue-lights are normally referred to, I guess,

22       as the city-installed cameras that you see.

23       A.      Yes, the pole cameras throughout the city that

24       you may see.  This is the camera that's attached to

25       the elementary school and run by the elementary

 1    school.

 2    Q.      Okay.  Public school?

 3    A.      Public school.

 4    Q.      And you got it?

 5    A.      And we got it.

 6    Q.      I'm going to show you -- this is government's

 7    136, already admitted, and counsel has seen it.

 8              Just to confirm what we are looking at

 9    here is what you've described it to be.  I see it's

10    very well documented.

11    A.      This DVD is what was recovered by our cyber

12    crime crimes unit.  I was there when it was

13    recovered.  The cyber crimes unit will process it and

14    then place it on a DVD, mark it, and then I get a

15    copy of it.

16    Q.      Okay.  Now, does the camera have a time

17    function on it?

18    A.      It does have a time function.

19    Q.      And in this particular case was it an hour

20    ahead?

21    A.      It was an hour -- I believe it was an hour

22    ahead, which is a problem we run into a lot with

23    Daylight Savings Time and such.

24    Q.      But you'll be able to tell when you look at

25    it?

ROBERT DOHONY - DIRECT - PURCELL

161

```
 1    A.      Yes.

 2                MR. PURCELL:  Now, we have also

 3    introduced, Your Honor, Exhibit No. 135 through

 4    Detective Moody, which is a narrow segment of this.

 5                THE COURT:  Yes.  It's a redacted version

 6    of 136, correct?

 7                MR. PURCELL:  Yes.

 8                THE COURT:  Counsel for defense has seen

 9    these tapes, correct?

10                MR. PURCELL:  Yes, Your Honor.  They have

11    them.

12    BY MR. PURCELL:

13    Q.      We've actually loaded into the computer

14    Exhibit 135, already admitted, as I said, which is

15    the portion just about the time of the murder.

16                Before we play that, this is just a

17    video, as opposed to an audio.

18    A.      Correct.

19    Q.      In terms of what the jury's about to see, why

20    don't you tell us -- you've seen this tape, of

21    course.  We're going to go right down to the time

22    where a person exits right before the murder, right

23    before the time of the murder, and then I think you

24    can see two people entering after that person has

25    gone down the street a bit.
```

ROBERT DOHONY - DIRECT / PURCELL

162

```
 1      A.      Correct.

 2      Q.      Okay.  Is that basically what we'll be seeing?

 3      A.      Yes.

 4      Q.      Now, I think it will be evident, but am I

 5      correct that you really can't see the faces of these

 6      individuals?

 7      A.      No, you cannot.

 8      Q.      But you're able to see the entry and exit of

 9      people from the house?

10      A.      Correct.

11      Q.      And at least the general size and appearance

12      of the person who we'll notice leaving the house

13      before two people enter; is that right?

14      A.      That's correct.

15      Q.      With that, could we turn that tape on?  Pay

16      attention to the monitors, folks.

17              Now, if you want to ask for a freeze.  So

18      this is from the perspective of the school.  Looking

19      in the foreground is the school building itself; is

20      that right?

21      A.      That is the loading dock area of the school.

22      Q.      All right.  Can if you see where the house is?

23      If you do, tell the jury where it is.

24      A.      Well, the actual porch of the house is just

25      off screen.  But you can see the sidewalk and the
```

1     gate entrance coming out on to Maisel Street.

2     Q.     Okay.  Now, we're seeing an individual that's

3     walked out of that house; is that right?

4     A.     I believe that person was walking up the

5     street.

6     Q.     Can you restart it, please?  Thank you.

7                I want to focus on that individual and

8     see where he comes from, Detective; all right?

9     A.     Okay.

10    Q.     Yes.

11    A.     Okay.  As you can see, he's coming off the

12    porch.

13    Q.     All right?  And now heading towards Westport?

14    A.     Heading up Maisel Street toward the ball

15    fields, if you will.  And it would appear he's

16    talking on a cellphone.

17    Q.     Let's just watch for a second, please.

18                Now, while we're watching, did Duckett

19    tell you that that's what he did; he left before the

20    shooting, walked up the street?

21    A.     Yes.

22    Q.     Go ahead.

23                Now, when you see the first appearance of

24    the people who are -- as I noted, I've seen this --

25    that are going to go into the house, just say so the

ROBERT DOHONY - DIRECT/PURCELL

164

1    jury can see them.

2    A.      All right.  The young lady is getting out of

3    the car in front?

4    Q.      You've interviewed her?

5    A.      She moved shortly thereafter.

6            Now, if you watch in the corner you're

7    going to see two individual come around.  Here they

8    come right now.

9    Q.      From the left?

10   A.      From the left.

11   Q.      Now, we're going to continue playing until I

12   tell you to stop; okay?  Please.

13           When you see those two people again,

14   Detective, let us know.

15   A.      Here they come, exiting the house.

16   Q.      Okay.  That's two.  And there's a third person

17   that follows them out but doesn't continue with them;

18   is that right?

19   A.      That's correct.

20   Q.      Have you talked to Mr. Cunningham as to

21   whether that was him?

22   A.      That is Mr. Cunningham.

23   Q.      Okay.  To this point, Mr. Cunningham has never

24   identified who those people are; is that right?

25   A.      No, he has not.

165

1    Q.      Okay.  Thank you.  I think that's about the

2    extent of it, unless counsel wishes to see more, in

3    which case they can play it.

4              Thank you.

5              Just one moment, Your Honor.  I think I'm

6    finished.

7              Thank you very much, Detective.  Counsel

8    will have some questions.

9              THE COURT:  Mr. Proctor, Mr. Sullivan?

10              MR. SULLIVAN:  Thank you, Your Honor.

11                   CROSS EXAMINATION

12   BY MR. SULLIVAN:

13   Q.      Good afternoon, Detective.

14   A.      Good afternoon.

15   Q.      Detective, tell the ladies and gentlemen of

16   the jury what BGF is.

17   A.      BGF is an acronym for Black Guerilla Family.

18   Q.      And is that a gang that is both in prisons in

19   the Maryland Department of Corrections and in

20   Baltimore City?

21   A.      Correct.

22   Q.      And in light of your investigation into Martie

23   Williams, were you able to ascertain whether Martie

24   Williams was a member of BGF?

25   A.      There were indications during the

166

1     investigation that Martie was a member of BGF.

2     Q.     So the answer -- do you have just indications,

3     or were you convinced that he was a BGF member?

4     A.     I wasn't convinced.  But there were strong

5     indications that he was involved.

6     Q.     And what were those strong indicutions to you,

7     in light of your investigation?

8     A.     There were documentation.  We had some photos

9     that were obtained by our intel -- one of our intel

10    gangs.  And Martie's pictures was one of those

11    indicated that -- it actually gave the name of the

12    sponsor that got him into BGF.  And I think a length

13    of time that he had been involved.

14    Q.     And, although you're in the homicide unit, is

15    it uncommon for you to see turf battles or wars

16    between rival gangs such at BGF and the Crips for

17    example, or the Bloods?

18    A.     That's not uncommon, right.

19    Q.     And that's something that you have pretty good

20    familiarity with, correct?

21    A.     Somewhat.

22    Q.     That rival gangs, whether they're BGF or the

23    Bloods, they fight over drug territories, do they

24    not?

25    A.     They fight over drug territories; they fight

1    over personal fights or beefs, if you will.

2    Q.     They do home invasions to try to steal rival

3    gangs' drugs or money?

4    A.     I'm sure that's happened in the past.

5    Q.     Okay.  I'm just asking in light of your

6    training and experience.

7    A.     Yes, that's been known to happen.

8    Q.     Okay.  Now, Mr. Purcell asked you -- you

9    recovered two different types of shell casings at the

10   crime scene, correct?

11   A.     Correct.

12   Q.     Now, were any of those shell casings, would

13   they in light of your experience come from a nine

14   millimeter handgun?

15   A.     No.

16   Q.     Okay.  Would they come from a .357 revolver?

17   A.     No.

18   Q.     And the reason it wouldn't come from a

19   revolver is what?

20   A.     The projectiles or bullets don't fit those

21   weapons.

22   Q.     Okay.  And also revolvers don't eject; they

23   don't have an ejection port, correct?

24   A.     Correct.

25   Q.     Okay.  Now, also Mr. Purcell asked you, the

ROBERT DOHONY - CROSS - SULLIVAN

168

```
 1    items that you found out on the street -- and let me

 2    just direct your attention to -- particularly to

 3    government's Exhibit 122.  Now, according to your

 4    testimony, Detective, this was a magazine that was

 5    found in the road, correct?

 6    A.      Correct.

 7    Q.      Now, tell the ladies and gentlemen of the

 8    jury, what is this magazine made of?  Is it plastic

 9    or is it metal?

10    A.      It's metal.

11    Q.      And is it flat?  And is the reason it's shiny

12    is because it's flat?

13    A.      Correct.

14    Q.      Okay.  Now, in light -- now, you didn't

15    process this yourself, did you?

16    A.      No, I did not.

17    Q.      You sent it to the evidence lab or whatever

18    you guys call it up here?

19    A.      It was collected by our crime lab and then

20    submitted to trace units.

21    Q.      Okay.  And based on being the lead

22    investigator, they examined this magazine using all

23    the tools of the trade and were unable to get any

24    fingerprints from that, correct?

25    A.      Correct.
```

1    Q.      And also they swabbed it.  And tell the ladies

2    and gentlemen of the jury what's that mean when they

3    swabbed it; what does that mean for DNA?

4    A.      Basically it's as simple as taking a Q-tip and

5    running the Q-tip along the item to collect possible

6    DNA.  And then that Q-tip, itself, is processed.

7    Q.      Okay.  And, again, they did that and were

8    unable to develop any person's DNA off of that

9    magazine?

10   A.      Correct.

11   Q.      Now, you also testified about interviewing at

12   your homicide office, unit office, this Mr. Kevin

13   Duckett.  Do you remember that?

14   A.      I do.

15   Q.      And when did you first -- what was the date of

16   the meeting that you had with him?

17   A.      April 2nd, 2009.

18   Q.      And the homicide was on March 21st, 2009,

19   correct?

20   A.      Correct.

21   Q.      Now, up to this point in the course of your

22   investigation, had you had any leads or knowledge

23   that Mr. Duckett was involved in Mr. Williams'

24   murder?

25   A.      He was a person of interest.

ROBERT DOHONY CROSS/ SULLIVAN

170

1    Q.      And how did Mr. Duckett develop in April of

2    2009 as a person of interest?

3    A.      Almost immediately three names popped up in

4    the investigation.  It was probably just a day or two

5    after the incident.

6    Q.      Do you remember interviewing on June 2, 2009

7    Thomas Henry Young?

8    A.      I do recall interviewing a Thomas Henry Young.

9    Q.      And do you recall Mr. Young telling you that

10   Mr. Williams was involved in a drug territory dispute

11   with Big Kev?

12              MR. PURCELL:  Objection, Your Honor.

13              THE COURT:  Sustained.  Sustained.

14   Approach the bench much, please.

15              (BENCH CONFERENCE ON THE RECORD.)

16              MR. PURCELL:  Absolute hearsay, Your

17   Honor.

18              MR. SULLIVAN:  He can deny it.

19              THE COURT:  You can ask general topic

20   areas.  The same objection that you and Mr. Proctor

21   raised as to Mr. Purcell for the same reasons.  You

22   cannot go into the contents of an interview and start

23   reading out what the report says.

24              MR. SULLIVAN:  I understand.  I'll

25   rephrase it.

ROBERT DOHONY - CROSS - SULLIVAN

171

```
1                THE COURT:  You have to go to just
2      general topic areas.  But you cannot put in facts
3      through your questions.  So the objection is
4      sustained.
5                MR. SULLIVAN:  I understand.
6                (END OF BENCH CONFERENCE.)
7      BY MR. SULLIVAN:
8      Q.     Based on your investigation, why was Mr.
9      Duckett identified as somebody who had something to
10     do with Mr. Williams' murder?
11     A.     Mr. Duckett was well-known in the area,
12     well-known as a drug dealer.
13     Q.     Did he have a reputation for being part of a
14     gang or affiliated?
15                MR. PURCELL:  Objection, hearsay.
16                MR. SULLIVAN:  If you know.
17                THE COURT:  Overruled.
18                THE WITNESS:  Affiliated, yes.  Do I know
19     if he was involved in any gang?  No.
20     BY MR. SULLIVAN:
21     Q.     Okay.  Now, the video that Mr. Purcell just
22     showed you, both the long version and the edited
23     version, has that been scrutinized to try to
24     ascertain the identities of the two people who went
25     into that house that night?
```

```
1     A.       We tried to enhance it, but it didn't help.

2     Q.       Did you send it to the FBI lab in Quantico to

3     get it enhanced?

4     A.       No, we did not.

5     Q.       Just did it here in the city?

6     A.       Just here in the city.

7     Q.       And as a result of any ability to computer

8     enhance it, were you able to identify any of those

9     people?

10    A.       No.  The quality of the equipment just didn't

11    allow us to sharpen the image, if you will.

12    Q.       Now, back to your April meeting with Mr.

13    Duckett.  Did Mr. Duckett tell you why he was there

14    moments before Mr. Williams was murdered?

15    A.       No, he didn't.

16    Q.       The Court's indulgence.

17             Detective, when you looked at the video

18    of the two individuals, based on their manner of

19    walking, their manner of leaving, how they out, how

20    they ran down the street, were you able to identify

21    any particular person based on the manner that they

22    moved?

23    A.       I was not able to.  But one person did

24    identify -- make an identification that it could be

25    one of these individuals.
```

ROBERT DOHONY - RECROSS/SULLIVAN

173

```
1                    MR. SULLIVAN:  The court's indulgence.

2                    Thank you, Detective.  No further

3       questions.

4                         REDIRECT EXAMINATION

5       BY MR. PURCELL

6       Q.     Who were the other two people of interest

7       besides Mr. Duckett that came up immediately in this

8       case?

9       A.     Antonio Hall and Clive Brown.

10      Q.     Is he also known as Eastwood?

11      A.     Mr. Brown is known as Eastwood.  Mr. Hall is

12      known as Mack.

13      Q.     Okay.  And you found that neither, Hall,

14      Eastwood, or Mr. Duckett were a part of BGF; is that

15      right?

16      A.     I never had any indication of that.

17      Q.     In fact, you found that Westport is not BGF

18      territory, it's Westport territory; is that right?

19      A.     That's correct.

20                   MR. PURCELL:  No further questions.

21                   THE COURT:  Recross, Mr. Sullivan.

22                   MR. SULLIVAN:  Thank you, Your Honor.

23                        RECROSS EXAMINATION

24      BY MR. SULLIVAN:

25      Q.     Detective, there's portions of Annapolis Road
```

174

```
 1      that are BGF, correct?
 2      A.      I'm not knowledgeable enough on territory.
 3      Q.      So how do you know that there's no BGF in
 4      Westport?
 5      A.      There could be BGF anywhere.
 6      Q.      So when you just told Mr. Purcell that there's
 7      no BGF in Westport, you really don't know that, do
 8      you?
 9      A.      I don't know that it's their territory.
10      Q.      And, also, BGF, Martie Williams was BGF.  BGF
11      members would not necessarily go in and kill another
12      BGF member, would they?
13      A.      That's been known to happen, also.
14      Q.      But more likely than not it would be another
15      gang killing another gang member, not intra-gang
16      killings, correct?
17              MR. PURCELL:  Objection, pure
18      speculation.
19              THE COURT:  Overruled.
20      BY MR. SULLIVAN:
21      Q.      In light of -- you're a homicide detective.
22      A.      Gang members kill gang members; and rival gang
23      members kill rival gang members.
24              MR. SULLIVAN:  Thank you.
25              THE COURT:  Thank you.  You may step
```

```
1     down, Detective Dohony.  You should not discuss your

2     testimony with anyone in case you're called back to

3     the witness stand.

4              Counsel, do you want to approach the

5     bench for one second?

6              (BENCH CONFERENCE ON THE RECORD.)

7              THE COURT:  Again, Counsel, at this stage

8     do you want me to give the same cautionary

9     instruction?  This relates to charged overt acts.

10             MR. SULLIVAN:  The same as you gave --

11             THE COURT:  Thank you.

12             (JURY IN.)

13             THE COURT:  This is the same instruction

14    that I gave with respect to the matter of the

15    shooting of Robert Parsons that relates here to the

16    murder of Martie Williams on March 21st, 2009.  It's

17    an overt act that's charged in Paragraph 3(f) of

18    Count 1 of the indictment.  There's no specific

19    charge against Mr. Hall as this defendant in this

20    case with respect to the murder of Martie Williams,

21    but it is a charged overt act.  So it's admitted for

22    that purpose and that purpose only with respect to it

23    being an overt act in furtherance of the drug

24    conspiracy.  So I provide that cautionary instruction

25    to you, as well.
```

HENRY TINKLER 110 - DIRECT / PURCELL

1              Is that satisfactory to you, Mr.

2    Sullivan.

3              MR. SULLIVAN:  Yes, Your Honor.  Thank

4    you.

5              THE COURT:  Mr. Purcell, next witness.

6              MR. PURCELL:  The next witness is Henry

7    Tinkler, T-i-n-k-l-e-r.

8    Whereupon:

9                    HENRY TINKLER III,

10   called as a witness, having been first duly sworn

11   according to law, testified as follows:

12             THE DEPUTY CLERK:  State your full name

13   for the record.

14             THE WITNESS:  Henry Tinkler III.

15             THE COURT:  Spell your name, please.

16             THE WITNESS:  The last name?

17             THE COURT:  Yes, sir.  Speak in the

18   microphone.  If you'll spell your last name, please.

19             THE WITNESS:  T-i-n-k-l-e-r.

20             THE COURT:  All right.  Thank you.

21                  DIRECT EXAMINATION

22   BY MR. PURCELL:

23   Q.    Good afternoon, Mr. Tinkler.

24             Mr. Tinkler, how old are you?

25   A.    35.

HENRY TINKLER 110 - DIRECT / PURCELL

1    Q.    Okay.  Are you a married man, have children?

2    A.    I have children.

3    Q.    How many children?

4    A.    Six.

5    Q.    Six children.  Are they all yours?

6    A.    Yes.

7    Q.    Now, Mr. Tinkler, I'm going to first direct

8    your attention to the defendant, Mr. Hall.  Do you

9    know him?

10   A.    Yes.

11   Q.    How do you know him?

12   A.    Live in the same neighborhood.

13   Q.    How long have you lived in the same

14   neighborhood?

15   A.    I've lived there for 19 years.

16   Q.    What neighborhood are you talking about?

17   A.    Westport.

18   Q.    Westport.  And by what nickname do you know

19   him?

20   A.    Mack.

21   Q.    Mack.  And during that period of time that

22   you've known him, how often was it that you would say

23   you ran into him and saw him?

24   A.    Almost every day.

25   Q.    Almost every day.  And you're not living in

178

```
1    Westport now, are you?

2    A.     No.

3    Q.     Did there come a time when you did?  Or, if

4    you did, until when did you live there?

5    A.     I moved away about three years ago.

6    Q.     Now, did you know Martie Williams?

7    A.     Yes.

8    Q.     Do you know Linnard Cunningham?

9    A.     Yes.

10   Q.     Mr. Williams, of course, was a man who was

11   murdered in March of 2009 over there.

12   A.     Correct.

13   Q.     Did you know the home in which -- are you

14   familiar with the home in which he was killed?

15   A.     Yes.

16   Q.     Is that a home in which you had been yourself

17   on numerous occasions?

18   A.     Yes.

19   Q.     What about Mr. Cunningham?  Is he a person you

20   know to be familiar with that house, as well?

21   A.     Yes.

22   Q.     Do you know Kevin Duckett?

23   A.     Yes.

24   Q.     Now, what is your opinion of Mr. Duckett's --

25   you know him personally, right?  Mr. Duckett?
```

179

1    A.      From the neighborhood, yes.

2            MR. SULLIVAN:  Your Honor, could you

3    please ask Mr. Tinkler to move.

4            THE COURT:  Just put that screen down a

5    little bit, Mr. Tinkler.  Just push the screen up;

6    push it down.

7            MR. PURCELL:  It's going to be used in

8    all my --

9            THE COURT:  Okay.  Well, leave it up

10   there.  So Mr. Sullivan can see you, as well.  Thank

11   you.

12   BY MR. PURCELL:

13   Q.      Do you have an opinion as to Mr. Duckett's

14   reputation for peacefulness or un-peacefulness?

15   A.      I never known him to do nothing wrong.

16   Q.      What's your opinion personally of him?

17   A.      A peaceful dude.

18   Q.      In fact, in the grand jury you described him

19   as a Teddy bear, did you not?

20   A.      Yes.

21   Q.      What's that based upon?  Your experience with

22   him?

23   A.      Yes.

24   Q.      Now, Mr. Duckett is or was drug dealer; is

25   that right?

180

```
 1      A.      Correct.

 2      Q.      Were you involved in the drug business?

 3      A.      Yes.

 4      Q.      When I say, "drug business," I mean in selling

 5      drugs --

 6      A.      Yes.

 7      Q.      -- in Westport?

 8      A.      Yeah.

 9      Q.      Do you have personal knowledge that Mr. Hall

10      was involved in the drug business in Westport?

11      A.      Yes.

12      Q.      What about Mr. Cunningham?

13      A.      Yes.

14      Q.      You mentioned Mr. Duckett.  What about a guy

15      named Eastwood?

16      A.      Yes.

17      Q.      And who do you know him to be associated with

18      or friends with?

19      A.      Mack, Kev, Linnard, myself.

20      Q.      Now, did you know Kareem Guest?

21      A.      Yes.

22      Q.      How well did you know him?

23      A.      Known him the whole time I lived out there.

24      We was very close.

25      Q.      Very close?
```

HENRY TINKLER 110 - DIRECT / PURCELL

181

```
 1    A.      Yeah.

 2    Q.      You see some of his family members here today.

 3    You know them as well, I take it?

 4    A.      By Face.

 5    Q.      Miss Debbie?

 6    A.      Yes.

 7    Q.      Now, did there come a time -- let me direct

 8    your attention now not just about the Williams case

 9    or that murder.  We'll get to that in a second.  But

10    in that summer before Kareem was killed, did you have

11    occasion to see any of the paperwork that we've heard

12    is circulating or was circulating around Westport

13    that described different people being interviewed by

14    the FBI?

15    A.      I heard about it, but I never seen it.

16    Q.      You never saw it?

17    A.      No.

18    Q.      Did you ever see anybody with it?

19    A.      No.

20    Q.      Okay.  You didn't see it yourself?

21    A.      No.

22    Q.      What did you hear about it?

23    A.      That Kareem was a snitch.  And that he was

24    supposed to have been snitching on Mack about

25    something.  But that was about it.
```

1    Q.    Is that what people were saying in the

2    neighborhood?

3    A.    Right.

4    Q.    Snitching on who?

5    A.    Mack.

6    Q.    Now, a lot of people we talked about were

7    already in jail, weren't they?

8    A.    Correct.

9    Q.    You knew that, as well?

10            Now, Mr. Tinkler, were you present at the

11    time of Mr. Williams' murder on March 21st, 2009?

12    Jumping back to that event?

13    A.    No.

14    Q.    Okay.  Had you seen him that day?

15    A.    No.

16    Q.    When was the last time you had been to that

17    house that you recall?

18    A.    The night before.  Well, no, actually earlier

19    that morning.

20    Q.    Earlier that day?

21    A.    Yeah.

22    Q.    Now, tell the jury:  How were you guys using

23    that house?  What was going on there?

24    A.    Playing dice for money; video games; selling

25    crack.

HENRY JENKINS 110 - DIRECT / PURCELL

183

```
 1        Q.      Okay.  So you actually sold crack out of the
 2   house from time to time?
 3        A.      Uh-huh.
 4        Q.      Who did that?
 5        A.      Me and Mr. Cunningham.
 6        Q.      Do you know who Mr. Williams was buying at
 7   least some of his drugs from?
 8        A.      No.
 9        Q.      Now, you've heard the term -- in fact, we've
10   heard the term a moment ago for the first time in the
11   trial -- the term BGF.  Do you know what that means?
12        A.      Yes.
13        Q.      What does that mean?
14        A.      Black Guerilla Family.  It's a gang.
15        Q.      All right?  Were you in that gang?
16        A.      No.
17        Q.      Was Mr. Cunningham?
18        A.      No.
19        Q.      Was Kev?
20        A.      No.
21        Q.      Was Mack.
22        A.      No.
23        Q.      Was Martie?
24        A.      Yeah.
25        Q.      Now, directing your attention to that period
```

1    of time before the murder -- it's a day or two

2    before -- were you a witness personally to any

3    dispute on the street between Martie and Mack?

4    A.    Yeah.

5    Q.    Tell the jury about that, please.  First tell

6    us where it occurred.

7    A.    Right outside the house that he got killed in

8    front of.  It was an argument over selling dope.

9    Martie was selling dope over on Mack's row.  They

10   didn't want him to, if it wasn't for Mack.  So the

11   article was basically over who was going to sell what

12   dope on the other side of the bridge.

13   Q.    Now, just to clarify, you said they weren't

14   going to let him unless the stuff he was selling was

15   Mack's?

16   A.    Correct.

17   Q.    And this was dope; this was heroin at that

18   point?

19   A.    Yes.

20   Q.    Okay.  That's what dope is referred to --

21   A.    Yes.

22   Q.    -- as heroin on the street?

23             So, Annapolis Road, at least the block

24   we're talking about, can you tell us with more

25   specificity -- I know it's sort of a long street --

185

1    what part of Annapolis Road you're talking about?

2    A.      Down on Annapolis Road in Kent Street.

3    Q.      Annapolis and Kent?

4    A.      Yes.

5    Q.      Now, that's just sort of off our picture, if

6    you look at Exhibit No. 1 up on the wall.  I think we

7    have it on a different photograph, but it's not

8    really shown on Exhibit No. 6A, is it?

9    A.      No.

10   Q.      All right.  But if you would, just show us in

11   which direction you would be going to if you wanted

12   to get to Annapolis and Kent.  All right.  Go ahead.

13              THE COURT:  He's touched the screen

14   there, sir.

15              THE WITNESS:  I can't really see on this

16   screen.

17   BY MR. PURCELL:

18   Q.      Okay.  But it would be further up Maisel

19   Street, you're saying?

20   A.      Yes.

21   Q.      Okay.  Let's take a look at this exhibit;

22   maybe we'll see it.  This is Exhibit No. 6B, Your

23   Honor, which has already been admitted.  I'm going to

24   zoom in a little bit.

25              And just take your time.  I don't know if

1    I've ever this to you before.  We can see Westport

2    and, if you can, show us where you're talking about.

3    A.    Right here.  Near Kent Street.

4    Q.    And that's an area where there was a dispute

5    about that, if you want to sell there, you've got to

6    sell Mack's stuff?

7    A.    Right.  That is the area.

8    Q.    Okay.  Now, how do you know that's what the

9    dispute about -- was about that day between Mack and

10   the late Mr. Williams?

11   A.    I heard it.

12   Q.    You heard it, yourself?

13   A.    Yes.

14   Q.    Now, where were you when you heard that?

15   A.    Standing on the front porch.

16   Q.    Now, how far away was the dispute -- you

17   thought there was going to be a fight, didn't you?

18   A.    Correct.

19   Q.    Where was Mr. Cunningham; where was he?

20   A.    Right beside me.

21   Q.    Did at some point your or he or both of you go

22   towards the action, so to speak?

23   A.    Yes.  He ended up walking over here first, and

24   I ended up following behind him.

25   Q.    Okay.  Does that mean that you were able to

1    hear what was being said?

2    A.     You can actually hear from the front pour.

3    Q.     Mack can get pretty loud, can't he, when he's

4    excited?

5    A.     Yeah.

6    Q.     Was he excited that day?

7    A.     Yeah.

8    Q.     And what was Martie doing?  I mean, I'm not

9    saying it's true or not, but how did Martie respond

10    to this accusation that he was selling somebody's

11    else's stuff there on Annapolis Road and Kent?

12    A.     He didn't like it.  He basically put up a fuss

13    about it.

14    Q.     Did he deny it or admit it?  Did he Mack, "No,

15    it's not true, or anything like that?

16    A.     He said it wasn't true.

17    Q.     You heard that?

18    A.     Yes.

19    Q.     Was it true?  That is, was he selling other

20    there?

21    A.     For his self?

22    Q.     Yes.

23    A.     Yeah.

24    Q.     Okay.  Now, is this dispute a dispute between

25    Mack and Martie or a dispute between Mack and BGF?

HENRY TINKLER 110 - DIRECT / PURCELL

188

```
1    A.      As far as I know, Mack and Martie.

2    Q.      He didn't seem to care that it was BGF, did

3    he?

4    A.      No.

5    Q.      That was his area; he didn't care about BGF or

6    not?

7    A.      Correct.

8    Q.      Okay.  Now, Martie was in BGF; is that right?

9    A.      Yes.

10   Q.      We'll talk a little bit about what their

11   reaction was later.

12           When did you first hear about the murder?

13   A.      8 o'clock that night.

14   Q.      And who did you hear it from?

15   A.      Mr. Cunningham.

16   Q.      Did you see any of the other kids who might

17   have been upstairs in the house prior to seeing Mr.

18   Cunningham that evening?

19   A.      Yes.

20   Q.      Where did you see them?

21   A.      On Annapolis Road.

22   Q.      All right.  Now, you don't live over -- at

23   that time you weren't living in Westport, were you?

24   A.      No.

25   Q.      You were living in western Baltimore, or, East
```

189

1      Baltimore, right?

2      A.      Correct.

3      Q.      So when you heard about it, did you come down

4      to Westport from East Baltimore?

5      A.      Yes.

6      Q.      And who did you encounter first, if I may ask?

7      A.      Boo Boo and Gucci.

8      Q.      Boo Boo and Gucci?

9      A.      Yes.

10     Q.      Okay.  These are guys who were ostensibly

11     upstairs?

12     A.      Right.

13     Q.      Did they tell you what happened to Mack -- or,

14     to Martie?

15     A.      Yeah.

16     Q.      And then did you go -- by the way -- strike

17     that.

18             Did you then have occasion to see Mr.

19     Cunningham?

20     A.      Yes.

21     Q.      Now, you were with Mr. Cunningham from -- did

22     he get rid of any of his clothes that he was wearing

23     that evening?

24     A.      Yes.

25     Q.      What did he do with them?

190

```
 1      A.      He burned them.

 2      Q.      Do you know why?

 3              MR. PROCTOR:  Objection.

 4              THE COURT:  Sustained.  Sustained.

 5   BY MR. PURCELL:

 6      Q.      It wouldn't be good to have blood on your

 7   clothes if the police came to see you, would it?

 8      A.      No.

 9      Q.      Why not?

10      A.      Look suspicious.

11      Q.      Might make you the defendant?

12      A.      Right.

13      Q.      They don't care in you're next to the guy or

14   know who did?

15      A.      Right.

16      Q.      Okay.  Did you understand then why he was

17   getting rid of this clothes.

18      A.      Uh-huh.

19      Q.      Now, later that evening, can you tell the jury

20   whether you were present when BGF guys -- so I guess

21   Cherry Hill, a nearby neighborhood?

22      A.      Correct.

23      Q.      Approached Mr. Cunningham in your presence?

24      A.      Yeah.  We both was there.  They approached us

25   both in front of his school, saying we knew what
```

1    happened.

2                    MR. PROCTOR:  Objection.

3                    MR. PURCELL:  I'm not offering it for the

4    truth of the matter.

5                    THE COURT:  Just step back.  Rephrase the

6    question.  Objection sustained.  Rephrase the

7    question.

8                    MR. PURCELL:  Thank you.

9    BY MR. PURCELL:

10   Q.     Were you present when this happened?

11   A.     Yes.

12   Q.     Was he accused -- that is, was Linnard being

13   accused of being a person that might know who did it?

14   A.     Yes.

15   Q.     Why would they say that?

16   A.     It was the house that we hung in.

17   Q.     Is that what BGF guys with saying?

18   A.     Yes.

19   Q.     They didn't accuse him of doing it, did they?

20   A.     No.

21   Q.     Or you?

22   A.     No.

23   Q.     Did he tell anybody who did it?  At that

24   point, Mr. Cunningham, did he tell the BGF guys who

25   did it?

```
1    A.      No.

2    Q.      Now, I direct your attention it to a couple of

3    days, I guess, after the murder.  Were you present at

4    any point where Mr. Hall was talking about a guy

5    named Relly?

6    A.      Yes.

7    Q.      Do you know who Relly is?

8    A.      Yes.

9    Q.      Who is he?

10   A.      He's one of Martie's best friends.

11   Q.      Whose best friend?

12   A.      Martie.

13   Q.      Martie's best friend?

14   A.      Yes.

15   Q.      And his real name is Jerrell Taylor?

16   A.      Correct.

17   Q.      Okay.  Jerrell Taylor.  What is it that you

18   heard Mack say, if anything, about what he would do

19   or might have to do against the best friend of Martie

20   Williams?

21           MR. PROCTOR:  Objection.  Ask to

22   approach, please.

23           THE COURT:  Approach the bench, please.

24           (BENCH CONFERENCE ON THE RECORD.)

25           THE COURT:  Yes.  What is the proffered
```

1    answer?

2              MR. PURCELL:  He's going to say that

3    Mack, the defendant, said that he may have to kill

4    Jerrell Taylor before he retaliates against him.

5              THE COURT:  He made a comment -- the

6    proffered answer is that Mr. Tinkler will say that

7    Mr. Hall, the defendant, made a comment to him that

8    he might have to kill Jerrell Taylor before Jerrell

9    Taylor killed him.

10             MR. PURCELL:  Retaliated against him.

11             THE COURT:  Retaliated against him with

12   respect to the death of Martie Williams.

13             MR. PURCELL:  Yes.

14             THE COURT:  Okay.  Mr. Proctor?

15             MR. PROCTOR:  It's not noticed.  It's not

16   relevant.  Is it 404(b)?

17             THE COURT:  It's not 404(b).  We've

18   already gone through that.  The whole matter of the

19   Martie Williams' murder is an overt act charged in

20   furtherance of the conspiracy, and your previous

21   objections have been noted as to that.  So it's not

22   an offer --

23             MR. PROCTOR:  I'm now getting to power of

24   3, 404(b) extrapolated?

25             THE COURT:  I've made a comment to you,

1    Mr. Proctor. The Court's ruled. I've ruled that

2    it's not 404(b), similar crimes not in evidence.

3    This is offered with respect to Paragraph 3(f) of the

4    indictment. Count 1 relates to the murder of Martie

5    Williams in the furtherance of the drug conspiracy.

6    That's how it's charged in the indictment, as charged

7    by the grand jury.

8            So, with respect to the matter of Martie

9    Williams' murder, it is allegedly a comment in

10   connection with that. As to Mr. Tinkler, in

11   connection with the murder of Martie Williams, your

12   client made the comment, allegedly, that he would

13   have to respond as to Jerrell Taylor because of the

14   possibility of Jerrell Taylor acting in retaliation

15   as to the murder of Martie Williams.

16           MR. PURCELL: That just seems too

17   attenuated, Judge.

18           THE COURT: I don't see how it's

19   attenuated. It goes to show -- it goes to show,

20   arguably, again, it's a matter of inference and

21   argument, it goes to show concern on the part of Mr.

22   Hall with respect to someone wanted to retaliate

23   against him for an act that he's alleged to have

24   committed in order to show his state of mind with

25   respect to his involvement or lack thereof with

1    respect to the murder of Martie Williams.  So unless

2    there's a further basis, the objection is overruled.

3              MR. PROCTOR:  No, sir.

4              MR. PURCELL:  Thank you, Your Honor.

5              (JURY IN.)

6              THE COURT:  The objection's overruled.

7    You may repeat the question.

8    BY MR. PURCELL:

9    Q.    Thank you.  Relly was Martie's best friend?

10   A.    Correct.

11   Q.    On the street, if someone kills your best

12   friend, what is very likely to occur?

13   A.    Retaliation.

14   Q.    Now, I asked you if in the day after the

15   murder you were present when Mr. Hall made statements

16   about what he might have to do to Relly?

17   A.    Correct.

18   Q.    What did he say?  Just so the jury can hear

19   you, just move your hand from the microphone.

20   A.    He said he might have to kill him.

21   Q.    Why?

22   A.    Because he was afraid that Relly might

23   retaliate back against him.

24   Q.    You were present and heard that?

25   A.    Yes.

HENRY TINKLER 115 - CROSS - PROCTOR

196

1    Q.    Who was the person who said that?

2    A.    Mack.

3    Q.    The gentleman seated right here in the yellow

4    shirt?

5    A.    Yes.

6              THE COURT:  The record will reflect the

7    witness has identified the defendant, Antonio Hall.

8              MR. PURCELL:  Thank you.  I have no

9    further questions.

10             THE COURT:  Mr. Proctor?

11             MR. PROCTOR:  Can I have a second,

12   please, Judge?

13             THE COURT:  Sure.

14                  CROSS-EXAMINATION

15   BY MR. PROCTOR:

16   Q.    Just a couple questions, sir, if I may.

17             I believe the words you used for Big Kev

18   are, "Teddy bear," something like that?

19   A.    Yes.

20   Q.    And, by the way, when was the last time you

21   spoke to him?

22   A.    Probably three days after the murder.

23   Q.    The murder of Mr. Guest or the murder of

24   Martie?

25   A.    Martie.

```
 1      Q.      So this big Teddy bear you haven't spoken to

 2    since March 2009?

 3      A.      Correct.

 4      Q.      And I wrote down your opinion of his character

 5    is that he's a peaceful dude?

 6      A.      Yes.

 7      Q.      Would it change your opinion if you knew he

 8    smacked a woman in the mouth?

 9      A.      No.

10      Q.      Would it change your opinion if you knew he

11    dragged a lady out of a car and assaulted her?

12      A.      No.  Because I don't know about none of that.

13      Q.      I'm not asking that.  Your opinion is he's a

14    peaceful dude.  If you learned these things to be

15    true, would you still think he was a peaceful dude?

16      A.      No.

17              MR. PROCTOR:  Thank you.

18              THE COURT:  Any other questions, Mr.

19    Proctor?

20              MR. PROCTOR:  No, sir.

21              THE COURT:  All right.  Thank you, Mr.

22    Tinkler, you may step down.  You should not discuss

23    your testimony with anyone in the event you are

24    called back to the witness stand until this trial

25    concludes.  Thank you very much, sir.
```

```
1                    MR. PURCELL:  It will just be a moment

2      for our next witness, Your Honor.  Thank you, Mr.

3      Taylor.

4                    THE COURT:  And the next witness is whom?

5                    MR. PURCELL:  David McClinton.  This will

6      conclude our witnesses for today, Your Honor.

7      Whereupon:

8                         DAVID McCLINTON,

9      called as a witness, having been first duly sworn

10     according to law, testified as follows:

11                   THE DEPUTY CLERK:  State your full name

12     for the record.  Keep your voice up, sir, and slide

13     up to the table.

14                   THE WITNESS:  McClinton, David.

15                   THE COURT:  Keep your voice, up, please,

16     sir.

17                   THE WITNESS:  David McClinton.

18                      DIRECT EXAMINATION

19     BY MR. PURCELL:

20     Q.     Mr. McClinton, I'm going to ask you a few

21     questions.  You and I have met on one occasion, and I

22     saw you today; is that right?  Is that, "Yes"?

23     A.     Yes, sir.

24     Q.     Mr. McClinton, where are you from?

25     A.     Westport.
```

DAVID McCLINTON - DIRECT / PURCELL

199

```
 1    Q.      How old are you?

 2    A.      34.

 3            THE COURT:  Lean forward a little,

 4    please, sir, and speak into that microphone.  You can

 5    pull the microphone down close to you.  That's the

 6    point.  I'm not criticizing, but if you have that

 7    level of voice, then, just speak closely into the

 8    microphone.

 9            THE WITNESS:  Fine.  Can you hear?

10            THE COURT:  Yes.  Thank you.

11    BY MR. PURCELL:

12    Q.      Mr. McClinton, if you were not asked to move

13    up, you would be the very first witness who was not

14    asked not to move up.  So everybody's been asked the

15    same thing.

16            Now, let me ask you a couple of

17    questions.  Do you know the defendant, Mr. Hall?

18    A.      (Nodding.)

19    Q.      Is that a, "Yes"?

20    A.      Yes, sir.

21    Q.      How long have you known him?

22    A.      For years.

23    Q.      Did you say for years?

24    A.      Yes.

25    Q.      How long have you lived in Westport, sir?
```

1    A.      I don't know.  I came in the Eighties.

2    Q.      Pardon me, the Eighties?

3    A.      Yeah.

4    Q.      If you remember, can you tell us some of the

5    places you lived in Westport?  Just the streets;

6    don't tell us the addresses, just the streets.

7    A.      Dorton, Annor, and Norfolk.

8    Q.      Okay.  Now, did you know Kareem Guest?

9    A.      Yes.

10   Q.      How would you describe your relationship with

11   Mr. Guest?

12   A.      It's a good relationship.  He's a good dude.

13          THE DEPUTY CLERK:  Mr. McClinton, sorry,

14   the jury is having a hard time --

15          THE COURT:  Yeah, I'm having a hard time

16   hearing you, Mr. McClinton.  You're not the first

17   one, but you're going to really have to move your

18   chair up, sir, and put the microphone right next to

19   your lips, if necessary.

20   BY MR. PURCELL:

21   Q.      Mr. McClinton, it may help you if you have to

22   get your voice over to me.  Okay.  Can you hear me

23   from there?

24   A.      Yeah.

25   Q.      Now, I asked you if you knew Kareem Guest,

1     what did you say?

2     A.      He was a good dude.  I never had any problems

3     with him.

4     Q.      You never had any problems with him?

5     A.      (Nodding.)

6     Q.      Do you know his family?

7     A.      Yes.

8     Q.      Do you know Miss Debbie?

9     A.      Yes.

10    Q.      Now, you've also known the defendant for

11    years; is that right?

12    A.      Yes.

13    Q.      Now, let me direct your attention.  Do you

14    remember the summer before Kareem was killed?  Do you

15    remember that summer?

16    A.      Yes.

17    Q.      During the course of that summer, Mr.

18    McClinton, did you have occasion to see any of these

19    discovery papers that we've heard were through, were

20    circulating through Westport?

21    A.      I seen when I came home.

22    Q.      You were in jail for a while?

23    A.      Yes.

24    Q.      When did you come home?

25    A.      April 29th, 2009.

1    Q.    So after you came home you saw them?

2    A.    (Nodding.)

3    Q.    That summer.  Did you see Kareem's?

4    A.    (Nodding.)

5    Q.    Is that a, "Yes"?

6    A.    Yes.

7    Q.    Did you see other people's, as well?

8    A.    Yes.

9    Q.    All right.  Now, do you have any personal

10   knowledge that the defendant, Mr. Hall, saw those

11   papers?

12   A.    Probably, maybe.

13   Q.    I'm sorry.  What?

14   A.    Maybe he did.

15   Q.    Were you ever present when those papers were

16   being circulated and he was present?

17   A.    No.

18   Q.    Pardon me?

19   A.    No.  When I seen them, I seen the papers, when

20   I seen them, it was like in April.

21   Q.    Do you know that for a fact, or are you just

22   guessing?

23   A.    No.  It was in April.  I came home the 29th of

24   '09 and I seen them like the 30th.

25   Q.    Oh, really?  Okay.

1              Did you ever see them when Mr. Hall was

2    present?

3    A.      No.

4    Q.      Do you remember telling me about three weeks

5    ago that you were present when he saw them and that

6    you knew that he saw them?

7    A.      Yes.

8    Q.      Now, was that true when you told me that?

9    A.      Yes.

10   Q.      You don't want to be here testifying in a case

11   with Mr. Hall, do you?

12   A.      No.

13   Q.      It's important, though, that you tell the

14   truth; all right?  Do you understand that?

15   A.      Yes.

16   Q.      So you were present when Mr. Hall saw these

17   papers; is that right?

18   A.      Yes.

19   Q.      And he wasn't happy about them, was he?

20   A.      No.

21   Q.      Tell the jury how he reacted.

22   A.      Mad.

23   Q.      Did you say what?

24   A.      Mad.

25   Q.      He was mad.

```
1                    Now, I direct your attention to the day
2       before the murder.  I think the murder was on a
3       Sunday.  You were around that day, weren't you?
4       A.      Yes, I was in the house.  I couldn't come out.
5       Q.      Pardon me?
6       A.      I couldn't come out.  I was on the box, on the
7       GPS box.
8       Q.      Okay.  You were on a box.  Are you on anything
9       how now?
10      A.      No.
11      Q.      All right.
12      A.      No.
13      Q.      Now, were you present the day before when you
14      saw Mack being shown the papers by anyone?
15      A.      Yes.
16      Q.      Is that a, "Yes"?
17      A.      (Nodding.)
18      Q.      Who was showing Mack the papers the day before
19      the murder?
20      A.      A couple of people.  Some people I don't know.
21      Q.      Did you see that happen?
22      A.      (Nodding.)
23      Q.      Was Mack happy that time?
24      A.      No.
25      Q.      You're nodding your head, "No"; is that right?
```

1    A.      No.

2    Q.      Now, the night of the murder, where were you

3    living?  I've forgotten?

4    A.      Dorton Court.

5    Q.      Did you have occasion to go over to the scene

6    after the shooting?

7    A.      I walked down there.  I mean, I went to go

8    out; that's about it.  I seen all the police.

9    Q.      Did you see Kareem?  Was he still there?

10   A.      No.  He was in the ambulance.

11   Q.      He was in the ambulance.  Did you see him in

12   the ambulance?

13   A.      I looked in there.

14   Q.      Was he in there?

15   A.      Yeah.

16   Q.      All right.  Now, we're almost finished.

17           About three months after the murder you

18   were arrested, yourself, were you not?  That was

19   December 6, 2009.  Do you remember that?

20   A.      Yes.

21           THE COURT:  I can't hear you, sir.  Is

22   that a, "Yes"?

23           THE WITNESS:  Yes.

24   BY MR. PURCELL:

25   Q.      Could you tell the jury where it was you were

```
1    arrested?

2    A.      On Annapolis Road.

3    Q.      Okay.  And when you were, can you tell what

4    you were doing when you were arrested?  Were you

5    walking away from some place?

6    A.      I was coming; I was walking across the street.

7    Q.      Okay.  There's some abandoned buildings or

8    something you were walking away from and the police

9    spotted you?  Okay.  Is that a, "Yes"?

10   A.      Yes.

11   Q.      Now, did they accuse you of being a drug

12   dealer at that time?

13   A.      Yeah.  I was -- I went over there to go piss,

14   actually.

15   Q.      Okay.  And you had to take a leak in the

16   alley?

17   A.      Yeah.

18   Q.      Did they walk behind the building with you and

19   find some drugs?

20   A.      No.  They set me on the steps.

21   Q.      Pardon me?

22   A.      They set me on the steps where the bus stop's

23   add.

24   Q.      Did they go and find some drugs?

25   A.      And they walked around the corner.
```

DAVID MCCLINTON - DIRECT / HURSEIL

207

```
 1      Q.      Did you go with them?

 2      A.      (Nodding.)

 3      Q.      Did they bring them out?

 4      A.      Yeah.

 5      Q.      And did you tell the police that night where

 6   you got those drugs?

 7      A.      Not that night.  I told them when I got down

 8   at the police station.

 9      Q.      They took you downtown, didn't they?

10      A.      Yes.

11      Q.      And do you remember meeting Detective Kershaw

12   from homicide and Detective Moody from this

13   investigation.

14      A.      Yes.

15      Q.      And did you tell them where you got these

16   drugs?

17      A.      Yes.

18      Q.      Tell the jury where you got them.

19      A.      From Mr. Hall.

20      Q.      From Mr. Hall?

21      A.      (Nodding.)

22      Q.      And, for the record, do you remember how much

23   or what kind of drugs you had with you that day?

24      A.      Yes.

25      Q.      What was it?
```

```
1     A.       Heroin.

2     Q.       Was there any crack there, too?

3     A.       Yes.

4     Q.       I'm going to show you what's been marked

5     government's 381.  This is just for identification.

6     Do you recognize this as being the date of your

7     arrest?  It says 12-6-09, right there.

8     A.       Yes, sir.

9     Q.       And looking down here, do remember Officer

10    Pinto as one of the guys that locked you up?

11    A.       I don't remember.

12    Q.       Did you have some 33 gelatin capsules of

13    heroin and some little red ziplock bags of cocaine,

14    crack cocaine?

15    A.       Yeah.

16    Q.       And where did you say you got them?

17    A.       Mr. Hall.

18    Q.       Mr. Hall?  Now, did you get them from Mr. Hall

19    in a house or on the street or where?

20    A.       The streets.

21    Q.       Pardon me?

22    A.       The streets.

23    Q.       Do you know a woman named Caprese?

24    A.       Yes.

25    Q.       Do you remember telling me that you went to
```

1    Caprese's house to get those drugs for Mr. Hall and
2    that's where he gave them to you?
3    A.      Yes.
4    Q.      Is that the truth?
5    A.      Yes.
6    Q.      Difficult, isn't it?  And, Mr. McClinton --
7                MR. PROCTOR:  Objection.
8                THE COURT:  Sustained.
9    BY MR. PURCELL:
10   Q.      Mr. McClinton, thank you.
11              Is the person from whom you got those
12   drugs here in the courtroom?
13   A.      Yes.
14   Q.      Now, were they fronted, or you had to paid for
15   them?
16              I didn't hear you.
17   A.      I had to pay for it.
18   Q.      I can't hear you over the rattle there.
19   A.      I had to pay for it.
20   Q.      Okay.  Now, you've been convicted yourself of
21   some crimes?
22   A.      Yes.
23   Q.      All right.  Now, when I spoke to you last you
24   told me that you had been in jail for failure to
25   register as a sex offender; is that right?  Tell the

```
 1    jury what your offense was in terms of that, and how

 2    much time you went to jail.

 3    A.    Sex with a minor.  I got seven years.

 4    Q.    And how old were you?

 5    A.    19.

 6    Q.    19?  And this was a woman who was under 16, I

 7    guess?

 8    A.    15.

 9    Q.    Under 15?

10    A.    She's 15.

11    Q.    She was 15.  And you got seven years for that?

12    A.    (Nodding.)

13    Q.    Who reported the crime, do you know?

14    A.    (Nodding.)

15    Q.    Who?

16    A.    Her father.

17    Q.    Her father?

18    A.    But her mother didn't want to press charges.

19    Q.    You got seven years?

20    A.    (Nodding.)

21    Q.    So now you have to register as a sex offender?

22    A.    (Nodding.)

23    Q.    Did you fail to do that recently?

24    A.    I did it.

25    Q.    What happened to your charge?  What happened
```

211

1    to your failure charge?  Is that what you had been in

2    jail more recently for?

3    A.      (Nodding.)

4    Q.      What happened to that charge?

5    A.      Time served.

6    Q.      Time served.  Now, just a final thing.  My

7    understanding is that you've asked the government for

8    some help in getting out of Baltimore; is that right?

9    A.      Yes.

10   Q.      And has the government agreed to provide you

11   with a bus ticket, and I understand something like

12   $200 in cash, to help you to leave Baltimore; is that

13   correct?

14   A.      Yes.

15   Q.      And I think to write a letter to your

16   probation officer for the purpose of your leaving; is

17   that correct?

18   A.      Yes.

19          MR. PURCELL:  All right.  Mr. McClinton,

20   I have no further questions.  Thank you.

21          THE COURT:  Mr. Proctor, Mr. Sullivan?

22   Mr. Proctor?

23                    CROSS-EXAMINATION

24   BY MR. PROCTOR:

25   Q.      Good afternoon, sir.  How are you?

DAVID McCLINTON - CROSS / PROCTOR

212

```
1                    Sir, my watch may not be the official
2      timekeeper, but I make it you committed perjury eight
3      minutes ago, at 3:09 p.m.  You said Mr. Hall wasn't
4      there when you were looking at the papers.  Was that
5      true?
6      A.     3:09?
7      Q.     If my watch is correct.  Eight minutes ago
8      when you said Mr. Hall wasn't there when you were
9      looking at the papers, was that true?
10                   You need to answer yes or no for the
11     court reporter.
12     A.     I don't want to answer no more questions.
13     Q.     I'm sorry, sir?
14     A.     I don't want to answer no more questions.
15                   MR. PROCTOR:  Judge, if you could
16     instruct the witness.
17                   THE COURT:  I'm sorry.  The question is
18     with respect to your prior statement.  The question
19     is, Mr. McClinton, that you originally said that Mr.
20     Hall was not there when you looked at the papers.
21     And now Mr. Proctor is now cross-examining you on the
22     fact that you a few minutes later said that he was
23     there when you were looking at the papers.  That's
24     the thrust of the question.  If you'll answer his
25     question, please sir.  Answer Mr. Proctor's question.
```

DAVID McCLINTON - CROSS - PROCTOR

213

```
 1    BY MR. PROCTOR:

 2    Q.      Let me ask the question again.

 3    A.      Come on.

 4    Q.      When I asked you at 3:09 -- when Mr. Purcell

 5    asked you at 3:09 p.m., you said Mr. Hall wasn't

 6    present when you looked at the papers.  Was that

 7    true?

 8    A.      That was true.

 9    Q.      Do you have any expectation that the

10    government's going to charge you with perjury for

11    giving a false answer ten minutes ago?

12    A.      Ah --

13    Q.      In fact, not only are they not going to charge

14    you with perjury, they're going to give you a bus

15    ticket, a couple of hundred bucks, and a ticket to

16    ride, right?

17              THE COURT:  You have to answer the

18    question yes or no, Mr. McClinton.

19              THE WITNESS:  Yes.

20              MR. PROCTOR:  Can I have a second,

21    please, Judge?

22    BY MR. PROCTOR:

23    Q.      When you were arrested on December 6th,

24    2009 -- let me ask you this:  You remember meeting

25    with Detective -- Officer Moody, right?
```

DAVID McCLINTON - CROSS - PROCTOR

214

```
 1      A.      Yes.

 2      Q.      Who said Mack's name first, you or Officer

 3      Moody?  And please don't read that, sir.  If I need

 4      you to, I'll point you to the correct section.

 5                      Can I retrieve the exhibit, please, sir?

 6                      THE COURT:  Certainly can.  Certainly.

 7      BY MR. PROCTOR:

 8      Q.      When you were interviewed at homicide -- and

 9      you had just been arrested for a little bit of drugs,

10      right?

11      A.      Yes.

12      Q.      In fact, you probably haven't seen the

13      chemical analysis.  But if I told you it was 10.3

14      grams, does that sound about right?  You don't

15      dispute --

16      A.      I don't know.

17      Q.      And 10.3 grams is not much bigger than the lid

18      of my pen, is it?

19      A.      I don't know.

20      Q.      Well, they're your drugs, right?  Can you

21      answer yes or no, please?

22      A.      Yes.

23      Q.      So when you got arrested for this tiny little

24      amount of drugs, you were taken to homicide, right?

25      A.      No.
```

1      Q.      No?  Where were you interviewed, sir?

2      A.      I went down to the police station.

3      Q.      Okay.

4      A.      Cherry Hill.

5      Q.      Okay.  So you were interviewed at Cherry Hill.

6      And Officer Moody was one of them.  And I think

7      Detective Kershaw was the other one of them; does

8      that sound right?  And they talked to you.  Did you

9      say Mack's name or did they say Mack's name to you?

10     A.      I did.

11     Q.      I'm sorry?

12     A.      I did.

13             MR. PROCTOR:  Judge, I --

14             THE COURT:  What was the answer to the

15     question?  You did or they did, sir?

16             THE WITNESS:  I did.

17             THE COURT:  You did.  The answer is that

18     he did.

19     BY MR. PROCTOR:

20     Q.      And do you recall them telling you --

21     actually, I don't think I want to go there.  Nothing

22     further.

23             THE COURT:  Any redirect, Mr. Purcell?

24             MR. PURCELL:  No, thank you very much.

25             THE COURT:  Thank you very much.  Thank

1    you, Mr. McClinton.  You can step down.  You

2    shouldn't discuss your testimony with anyone in the

3    event you're called back to the witness stand before

4    this trial concludes.  Thank you, sir.

5                 MR. PURCELL:  Your Honor, I apologize,

6    but that concludes the government's presentation of

7    ready witnesses for today.

8                 THE COURT:  Today.  You don't have any

9    further witnesses to present today and we're ready to

10   go tomorrow at 10 o'clock?  Is that correct?

11                MR. PURCELL:  We will finish tomorrow,

12   yes, Your Honor.

13                THE COURT:  All right.  Okay.  Why don't

14   you all approach the bench for one second.  Just wait

15   one second please, ladies and gentlemen.

16                (BENCH CONFERENCE ON THE RECORD.)

17                THE COURT:  Have you been able to

18   ascertain that the witness Jones -- that Robert Jones

19   is en route and is ready to be here tomorrow?

20                MR. PROCTOR:  He'll be here tonight.  Mr.

21   Stoller will have him available tomorrow afternoon.

22   The only problem is--

23                THE COURT:  He can have him here tomorrow

24   morning.

25                MR. PROCTOR:  Mr. Stoller said he's not

1     bringing him until the defense intends to call him.

2              The only problem, Judge, is Mr. Ruter

3     e-mailed me at lunch time and Mr. Purcell

4     independently, we had the same idea.  Mr. Ruter

5     represented him during his plea.  And for reasons

6     known only to him, despite it being a C plea, he's

7     filed a 2255 alleging Mr. Ruter's incompetence.  So I

8     think we need to get --

9              MR. PURCELL:  Yes.  I was about to say,

10    it was a case out of Westport, your case with Jerrell

11    Taylor and another defendant.

12             THE COURT:  A year or two ago.

13             MR. PROCTOR:   Not even that long, I

14    don't think.

15             MR. PURCELL:  It was late last year.

16    He's the guy that pled on the day of the trial.

17             THE COURT:  Yes.

18             MR. PROCTOR:  So Mr. Ruter feels

19    conflicted because he has this pending ineffective of

20    counsel claim so I think we need to call Miss Shearer

21    and Mr. Purcell and/or I should --

22             THE COURT:  Since it's 3:30 you all

23    should be able to do that.  Is Miss Shearer here this

24    week --

25             MR. PROCTOR:  She's off today.  She's

218

1    working from home today, but she's in in the morning

2    bright and early.

3              THE COURT:  So you probably have to get

4    someone.  I don't know that if he needs an attorney

5    or not.

6              MR. PURCELL:  Well, Your Honor, this is

7    my thinking of it --

8              THE COURT:  I guess he probably ought to

9    have.  Are you calling him as a witness and -- you're

10   calling him as a witness and are you asking questions

11   that may or may not cause him to assert his privilege

12   against self-incrimination?

13             MR. PROCTOR:  I have no expectation he

14   would assert his privilege.  I'll be asking him about

15   what several witnesses said.  He was at the scene

16   when Mr. Guest was killed.  Now, I guess it's

17   conceive that the government could deem his answers

18   to be perjurious.  That's conceivable.  So I think we

19   ought to, out of an abundance of caution, get him a

20   lawyer.

21             THE COURT:  All right.  That's fine.  So

22   we have Robert Jones.  How many more government

23   witnesses do we have?

24             MR. PURCELL:  We have Linnard Cunningham,

25   who we heard about a moment ago.  Then we just have

1       five cops who arrested Mr. Hall as various times, a

2       chemist, and probably Detective Moody.

3                   THE COURT:  What are the police officers

4       going to talk about with respect to arresting him

5       several times?

6                   MR. PURCELL:  They arrested Mr. Hall,

7       these are the individuals -- remember when we had the

8       hearing in May where different statements had been

9       made at different points of arrest?

10                  THE COURT:  Yes.

11                  MR. PURCELL:  That's going to be very

12      supportive -- the circumstances of those contacts,

13      which were arrests.  So he -- they were all in 2007

14      and 2008, if I am correct.

15                  THE COURT:  As I recall my ruling was we

16      were going to have to certain prophylactic approaches

17      taken with respect to the various charges.  And these

18      go to the fact that certain statements were made on

19      certain dates, correct?

20                  MR. PURCELL:  Well, these are actually

21      substantive overt acts that were charged.  They are

22      going to be arrests with drugs.  They're charged as

23      overt acts --

24                  THE COURT:  Overt acts in furtherance of

25      the conspiracy.  All right.  Same rulings apply.  So

1      you have five police officers and you have Mr.

2      Cunningham.  How long will Mr. Cunningham be?

3                  MR. PURCELL:  Shorter than Mr. Tinkler.

4      Briefer than Mr. Tinkler.  And then, Moody, I'm just

5      basically going to call him so they can cross-examine

6      him.

7                  THE COURT:  I gather these other

8      witnesses will be more verbal than Mr. McClinton was.

9                  MR. PURCELL:  I don't pick my witnesses,

10     Judge.

11                 THE COURT:  And then the defense is going

12     to call Robert Jones and what other witnesses?

13                 MR. PROCTOR:  We may or may not call

14     Robert Jones.  The problem is he's been represented

15     throughout.  We haven't had a chance to talk to him.

16     So I'm hoping we can conclude --

17                 THE COURT:  Who are you definitely going

18     to call?

19                 MR. PROCTOR:  I don't know that there's

20     any definite person we would hang our hat on at this

21     moment.

22                 THE COURT:  Have you had any chance to

23     continue to discuss with Mr. Hall whether or not he

24     is going to testify?

25                 MR. PROCTOR:  We would anticipate him not

```
 1          testifying.  If that changes --
 2                    THE COURT:  The defendant has indicated
 3          he can still hear me, the defendant.  We're getting
 4          to the stage where he has got to make a decision
 5          tomorrow afternoon that he's comfortable with the
 6          fact that he has had plenty of time to think about
 7          it.  So then with that we conceivably could finish
 8          with witness testimony tomorrow; is that right?
 9                    MR. PURCELL:  I know we'll finish
10          tomorrow.
11                    THE COURT:  All right.  And then we may
12          or may not have defense witnesses.  We may or may not
13          go to the jury some time Wednesday and closing
14          arguments perhaps; is that fair?
15                    MR. PROCTOR:  That sounds conceivable.
16                    THE COURT:  Do you mind my giving the
17          jury that possible schedule?
18                    MR. PROCTOR:  No.
19                    THE COURT:  Any problems from either of
20          you?
21                    MR. PROCTOR:  No, sir.  The only problem,
22          just logistically, if Mr. Jones' lawyer could be here
23          at lunchtime, we could just meet with him.
24                    THE COURT:  That's fine.  That's fine.
25          I'm counting on you all to talk to Miss Shearer and
```

1    get that lined up because I agree that Mr. Ruter's in

2    the position of having a 2255 asserted against him.

3                   MR. PROCTOR:  You could always go back to

4    your desk and deny it, Judge.  And then he wouldn't

5    have it.

6                   THE COURT:  Certainly I give those a

7    great deal of deep thought and review.  So I

8    certainly couldn't do it that quickly, Mr. Proctor.

9                   Okay.  I'll advise the jury of the

10   schedule and see you all tomorrow at 10 o'clock.

11                   (END OF BENCH CONFERENCE.)

12                   THE COURT:  All right.  Ladies and

13   gentlemen, as the government has indicated, that will

14   conclude the case for today.  We're going to start

15   tomorrow at 10 o'clock with witness testimony.  There

16   is a strong possibility that this case could be --

17   could be submitted to you by Wednesday in terms of

18   closing argument.  We'll have to wait and see.  It's

19   a possibility.  So we're on schedule here and the

20   trains are all running on time.  And, again, thank

21   you for your prompt attendance each morning.

22                   So we're going to start tomorrow at 10

23   o'clock.  And is there anything further from the

24   point of view of the government before we recess for

25   the day?

1          MR. PURCELL:  No.  Thank you, Your Honor.

2     I'm sorry we ran out of witnesses --

3          THE COURT:  That's all right.

4          Mr. Proctor, Mr. Sullivan, anything

5     further from the point of view of the defense today?

6          MR. PROCTOR:  Yes.  Nothing we need to

7     detain the jury.  If we can talk with you for one

8     minute.

9          THE COURT:  That's fine.  If everybody

10    will stay here for a minute and the jury will be

11    excused and we'll see you all tomorrow.

12          (JURY OUT.)

13          THE COURT:  All right.  We just have the

14    verify the jury has gone.

15          Yes, Mr. Proctor, be glad to hear from

16    you.  Yes, sir.

17          MR. PROCTOR:  Two things, sir.  Thing

18    number one, I looked at the Court's calendar this

19    morning and you had a sentencing on the calendar

20    tomorrow on the 3 o'clock.  Has that been moved?

21          THE COURT:  It can be moved to later in

22    the day if necessary.

23          MR. PROCTOR:  I'm just wondering in terms

24    of if the government is wrapping up at 2:30, should

25    we plan on presenting --

1          THE COURT:  No.  Just plan on it.  I'll

2     deal with the matter of sentencing.  I'll just delay

3     it if necessary.

4          MR. PROCTOR:  Okay.  And the second

5     thing, I believe it's an appropriate ex parte

6     discussion at the bench with Mr. Sullivan and I, if

7     that's acceptable to the Court.

8          THE COURT:  Out of the presence of --

9     your client can hear what's being said?

10         MR. PROCTOR:  Correct.  He should.  He

11    can and should.

12         THE COURT:  Okay.  Any problem with that

13    from the government?

14         MR. PURCELL:  No, Your Honor.

15         THE COURT:  All right.  Defense counsel

16    can approach the bench just on a matter that involves

17    representation of their client.

18         (BENCH CONFERENCE ON THE RECORD.)

19         MR. PROCTOR:  It doesn't even involve

20    that, Judge.

21         THE COURT:  Can you hear, Mr. Hall?

22    Okay.  Mr. Hall has verified he can hear.

23         MR. PROCTOR:  We would like to order Mr.

24    Purcell's opening statement, the transcript of it, to

25    use in closing.  With the theme of the government

1    hasn't lived up to what they promised.  We talked to

2    your court reporter, who is hearing us, and we need

3    you to approve a daily transcript.  If I get you a

4    CJA 31 --

5                THE COURT:  That's fine.

6                MR. PROCTOR:  -- just for that small

7    portion.

8                THE COURT:  If he can do that.

9                Any problem?  That's fine.

10               MR. PROCTOR:  That's all.  Thank you.

11               THE COURT:  Sure that's fine.

12               (END OF BENCH CONFERENCE.)

13               THE COURT:  With that, then, we are

14   concluded for the day and this Court is adjourned for

15   the day and we'll reconvene tomorrow at 10 o'clock to

16   continue the trial.

17               (TRIAL RECESSED.)

18

19               I certify that the foregoing is a correct

20   transcript from the record of proceedings in the

21   above-entitled matter.

22

23                        *s/ Anthony Rolland*

24                        ANTHONY ROLLAND

25

1

## $

**$200** - 211:12

## '

**'04** - 139:14, 139:17
**'09** - 202:24

## 0

**04007588** - 114:10
**04013007** - 78:7
**04013008** - 77:7,
134:20
**04792** - 107:22
**049** - 74:7, 107:21
**049b04792** - 136:12
**049c04279** - 134:17
**099** - 147:6
**09932** - 147:7

## 1

**1** - 2:4, 2:11, 2:13,
3:12, 3:19, 3:20, 3:25,
4:3, 4:7, 4:11, 4:14,
4:22, 18:16, 19:25,
29:25, 42:7, 42:9,
60:7, 61:25, 64:17,
82:22, 83:3, 111:21,
111:22, 127:21,
140:10, 155:7,
175:18, 185:6, 194:4
**10** - 58:7, 85:14,
85:17, 128:19,
216:10, 222:10,
222:15, 222:22,
225:15
**10.3** - 214:13,
214:17
**100** - 93:20
**10th** - 26:2, 27:15,
54:14, 128:16
**11** - 61:11, 62:1,
146:7
**116** - 152:12
**118** - 153:3
**11th** - 128:22
**12-6-09** - 208:7
**122** - 155:16,
155:20, 168:3
**123** - 151:13
**124** - 151:19
**128** - 155:1
**12th** - 128:15
**13** - 71:6, 75:6,
75:10
**132** - 153:10
**1340** - 41:3
**135** - 161:3, 161:14
**136** - 159:13,
159:14, 159:18,
160:7, 161:6
**15** - 22:12, 62:3,
85:14, 85:17, 210:8,
210:9, 210:10, 210:11
**16** - 210:6
**16th** - 61:13
**17** - 132:1
**18** - 146:6
**19** - 177:15, 210:5,
210:6
**1994** - 131:25
**1:10-cr-0744-rdb** -
1:6
**1st** - 64:14

## 2

**2** - 144:7, 155:7,
155:13, 170:6
**2-15-04** - 48:15,
48:16
**20** - 146:20, 147:20
**2000-whatever** -
68:4
**2002** - 56:8, 67:5
**2003** - 7:16, 56:7,
56:8, 56:15
**2004** - 7:16, 18:1,
26:2, 27:15, 54:6,
54:14, 61:13, 64:14,
64:17, 66:6, 66:21,
68:24, 74:16, 79:15,
86:20, 86:25, 87:6,
87:8, 87:15, 89:24,
90:6, 90:11, 97:25,
98:22, 99:3, 99:13,
100:19, 100:21,
105:17, 114:21,
117:7, 122:16,
122:18, 128:19
**2007** - 219:13
**2008** - 67:5, 67:6,
67:8, 68:4, 219:14
**2009** - 86:2, 117:20,
146:10, 169:17,
169:18, 170:2, 170:6,
175:16, 178:11,
182:11, 197:2,
201:25, 205:19,
213:24
**2011** - 1:10
**2121** - 48:20
**21:55** - 74:16, 74:18
**21st** - 146:10,
169:18, 175:16,
182:11
**2255** - 217:7, 222:2
**2400** - 69:1, 114:12,
146:12
**2412** - 69:21, 70:12,
70:22, 71:2, 76:20,
80:17, 87:2, 87:4,
87:10, 114:23,
117:14, 134:23
**26** - 89:24, 98:22,
99:13, 100:10
**2635** - 146:13,
146:15, 149:23,
151:7, 151:16
**26th** - 118:17
**28** - 71:3, 75:2
**29th** - 201:25,
202:23
**2:30** - 223:24
**2nd** - 169:17

## 3

**3** - 155:7, 193:24,
223:20
**3(f** - 175:17, 194:3
**3-7** - 74:16
**30** - 84:15, 84:19
**3008** - 77:14
**30th** - 202:24
**31** - 225:4
**32** - 148:17, 153:25,
156:4, 156:7, 156:9
**33** - 208:12
**34** - 199:2
**35** - 7:9, 176:25
**357** - 71:4, 75:3,
75:18, 76:19, 78:3,
78:9, 78:11, 78:23,

## 4

167:16
**366602** - 75:4
**381** - 208:5
**3:09** - 212:3, 212:6,
213:4, 213:5
**3:30** - 217:22
**3a** - 42:9

## 4

**4** - 141:22
**40** - 2:12, 4:9,
148:16
**404(b** - 193:16,
193:17, 193:24, 194:2
**4279** - 74:7, 76:25
**471** - 76:10
**472** - 73:21, 73:22,
75:24, 76:9
**475** - 115:8, 115:18
**476** - 107:4, 107:14,
114:6
**477** - 48:1, 49:6
**4792** - 115:12
**47a** - 149:12, 151:10
**48** - 49:22, 52:5
**480** - 78:6
**481** - 113:17, 136:7
**483** - 135:17,
135:20, 135:21
**484** - 136:22
**487** - 90:19, 90:21,
118:10, 118:11

## 5

**50** - 13:12, 13:14
**52** - 34:15, 36:17
**54** - 2:11, 4:6
**58** - 49:12

## 6

**6** - 30:1, 30:11,
31:14, 31:15, 34:16,
80:14, 205:19
**6.a** - 30:10
**60** - 34:19, 41:2
**600** - 97:1, 97:4,
97:7
**61** - 35:7, 36:15,
41:3
**63** - 111:4, 129:20
**64** - 53:16
**64078** - 75:6
**68** - 53:17
**69** - 53:7, 59:21
**6a** - 10:21, 11:3,
29:25, 30:5, 68:13,
68:18, 185:8
**6b** - 185:22
**6th** - 213:23

## 7

**7** - 74:16, 79:15,
86:20, 87:14, 97:24,
117:7, 128:12, 128:17
**70** - 52:16, 59:25
**702** - 133:19
**71** - 54:1, 134:7
**7588** - 115:16
**7th** - 68:24

## 8

**8** - 1:10, 2:17, 3:18,
4:23, 4:24, 4:25, 5:4,
5:8, 5:11, 5:21, 6:3,
147:19, 188:13

## 8

**800** - 97:1, 97:4,
97:9
**801** - 92:21
**801(d** - 93:14, 94:8
**801(d)(1** - 94:9,
94:12, 94:19, 97:17
**801(d)(1)(a** - 96:23,
103:6
**82** - 109:24, 110:3
**83** - 108:13, 109:3,
110:6, 129:15, 129:24
**8:30** - 147:16

## 9

**90** - 112:15
**911** - 147:17
**96** - 111:20, 113:2
**9:55** - 74:17, 74:18

## A

**abandoned** - 206:7
**ability** - 3:3, 29:10,
43:6, 172:7
**able** - 23:6, 23:14,
33:3, 39:7, 51:1,
77:23, 77:24, 103:2,
115:21, 115:24,
116:2, 141:22,
147:17, 148:1, 148:7,
148:13, 149:15,
160:24, 162:8,
165:23, 172:8,
172:20, 172:23,
186:25, 216:17,
217:23
**above-entitled** -
225:21
**Abrea** - 85:14, 88:5,
103:23
**Absolute** - 170:16
**absolutely** - 19:10
**Absolutely** - 28:11,
28:24, 39:25, 43:25,
125:8
**abundance** - 19:16,
218:19
**abuse** - 8:17
**accept** - 133:25
**acceptable** - 224:7
**access** - 85:22
**Accessible** - 81:19
**according** - 6:25,
65:7, 83:10, 98:22,
104:22, 131:15,
145:15, 168:3,
176:11, 198:10
**accurate** - 19:12,
19:13, 28:6, 152:6
**accurately** - 53:17
**accusation** - 187:10
**accuse** - 191:19,
206:11
**accused** - 191:12,
191:13
**acronym** - 165:17
**act** - 20:11, 20:14,
42:10, 42:18, 175:17,
175:21, 175:23,
193:19, 194:23
**acting** - 194:14
**action** - 121:7,
186:22
**acts** - 19:25, 42:8,
175:9, 219:21,
219:23, 219:24
**actual** - 28:2, 32:13,
39:12, 111:19,
158:10, 162:24

## A

**add** - 206:23
**addition** - 110:6
**additional** - 110:18
**Additionally** -
132:21
**address** - 7:10,
69:20, 87:3, 159:9
**addresses** - 200:6
**adjacent** - 150:23
**adjourned** - 225:14
**admit** - 96:14,
157:2, 187:14
**admitted** - 42:17,
49:7, 68:14, 151:11,
153:11, 157:4,
157:22, 160:7,
161:14, 175:21,
185:23
**advise** - 222:9
**advised** - 2:4, 95:10
**aerial** - 11:2, 11:4,
11:7, 11:11, 30:11,
68:14, 80:23, 149:13
**affairs** - 121:11,
153:7
**affect** - 2:14, 3:2,
4:12, 29:10
**affiliated** - 171:14
**Affiliated** - 171:18
**afraid** - 195:22
**Afternoon** - 145:1
**afternoon** - 83:24,
127:12, 141:6,
142:24, 144:8, 145:6,
146:3, 146:4, 165:13,
165:14, 176:23,
211:25, 216:21, 221:5
**afterwards** - 127:23
**age** - 2:11, 4:6
**agents** - 99:2,
108:18
**ages** - 85:13
**ago** - 2:12, 93:6,
158:19, 178:5,
183:10, 203:5, 212:3,
212:7, 213:11,
217:12, 218:25
**agree** - 19:3, 93:21,
98:12, 222:1
**agreeable** - 3:17
**agreed** - 21:21,
211:10
**ahead** - 15:3, 32:23,
33:5, 33:18, 94:12,
119:7, 160:20,
160:22, 163:22,
185:12
**aided** - 1:24
**air** - 58:15
**allegation** - 42:11,
42:14, 123:16,
124:20, 126:8
**alleged** - 42:19,
126:21, 194:23
**allegedly** - 124:14,
194:9, 194:12
**alleging** - 217:7
**alley** - 32:15, 32:17,
33:24, 34:6, 70:1,
70:4, 206:16
**allow** - 114:17,
172:11
**allows** - 137:19
**almost** - 52:9,
59:17, 66:2, 93:18,
205:16
**Almost** - 56:13,
170:3, 177:24, 177:25
**alone** - 42:18,
156:21, 156:23

2

**alongside** - 40:20
**Ambulance** - 44:8
**ambulance** - 44:9,
205:10, 205:11,
205:12
**America** - 1:3
**ammunition** -
75:10, 75:15, 101:7,
132:6, 132:25, 138:4,
156:1, 156:5
**amount** - 214:24
**analysis** - 114:25,
136:12, 137:16,
214:13
**analyst** - 105:14
**analyze** - 132:3
**anger** - 51:21
**Ann** - 83:6, 83:8,
83:13
**Annapolis** - 173:25,
184:23, 185:1, 185:2,
185:3, 185:12,
187:11, 188:21, 206:2
**Anne** - 2:19, 5:6
**Annor** - 15:5, 200:7
**anonymous** -
70:20, 87:15
**anonymously** -
87:21
**Answer** - 212:25
**answer** - 92:13,
125:7, 166:2, 193:1,
193:6, 212:10,
212:12, 212:14,
212:24, 213:11,
213:17, 214:21,
215:14, 215:17
**answers** - 218:17
**Anthony** - 225:23,
225:24
**anticipate** - 142:18,
220:25
**anticipated** - 144:7
**Antonio** - 1:7, 9:23,
67:9, 68:11, 89:25,
116:7, 124:23,
124:24, 173:9, 196:7
**Anyway** - 141:17
**apart** - 154:5,
155:10
**apiece** - 13:6, 13:7
**apologize** - 216:5
**appear** - 24:13,
148:4, 163:15
**appearance** -
162:11, 163:23
**Appearances** - 1:13
**apple** - 96:9
**apply** - 219:25
**approach** - 18:13,
36:3, 50:19, 102:20,
124:8, 140:6, 175:4,
192:22, 216:14,
224:16
**Approach** - 91:25,
170:14, 192:23
**approached** -
39:20, 39:21, 47:7,
190:24
**Approached** -
190:23
**approaches** -
219:16
**approaching** - 40:9
**appropriate** - 42:5,
92:11, 140:21, 224:5
**approve** - 225:3
**April** - 89:24, 98:22,
99:13, 100:10,
117:19, 118:17,

169:17, 170:1,
172:12, 201:25,
202:20, 202:23
**area** - 11:3, 29:22,
30:17, 66:10, 66:13,
67:25, 70:1, 81:4,
86:4, 86:6, 109:18,
109:21, 110:18,
112:7, 146:14,
148:21, 150:23,
151:6, 153:6, 162:21,
171:11, 186:4, 186:7,
188:5
**areas** - 170:20,
171:2
**arguably** - 194:20
**argument** - 184:8,
194:21, 222:18
**arguments** - 221:14
**armorer's** - 132:14
**array** - 46:4, 46:7,
48:4, 48:18, 116:22,
116:24
**arrest** - 86:1,
123:15, 208:7, 219:9
**arrested** - 205:18,
206:1, 206:4, 213:23,
214:9, 214:23, 219:1,
219:6
**arresting** - 219:4
**arrests** - 219:13,
219:22
**arrived** - 127:18,
127:22, 147:21,
148:20
**artery** - 43:9, 43:12
**article** - 184:11
**Arundel** - 2:19, 5:6
**ascertain** - 120:13,
148:1, 165:23,
171:24, 216:18
**aside** - 36:15, 149:9
**aspect** - 100:9
**assailant** - 46:25
**assaulted** - 197:11
**assert** - 218:11,
218:14
**asserted** - 222:2
**assigned** - 65:24,
66:8, 146:8
**assignment** -
105:13, 105:17
**Assistant** - 1:14
**associated** - 180:17
**Associates** - 38:19
**Association** - 133:2
**Atf** - 132:17
**athletic** - 8:6
**attached** - 159:24
**attendance** - 222:21
**attended** - 21:14
**attention** - 2:8,
26:1, 27:14, 28:23,
32:8, 32:10, 48:2,
66:5, 68:15, 68:23,
70:6, 75:23, 105:16,
106:1, 107:3, 110:8,
146:9, 151:18,
154:24, 162:16,
168:2, 177:8, 181:8,
183:25, 192:2,
201:13, 204:1
**attenuated** -
194:17, 194:19
**attorney** - 156:21,
156:24, 218:4
**Attorneys** - 1:14
**attributed** - 71:23
**audio** - 161:17
**August** - 1:10

**available** - 82:5,
121:7, 216:21
**average** - 22:13
**Avery** - 2:18, 2:21,
5:3
**aware** - 101:3
**axe** - 124:19

# B

**baby's** - 100:20
**background** -
108:22
**bad** - 54:25
**bag** - 71:3, 75:2
**baggie** - 38:21
**bags** - 12:25, 13:2,
22:10, 23:21, 71:4,
71:8, 71:10, 75:3,
208:13
**ball** - 150:13,
163:14
**Ballistic** - 132:18
**balmy** - 6:15
**Baltimore** - 7:12,
7:13, 7:18, 7:20, 8:12,
8:14, 8:16, 24:18,
25:1, 25:2, 25:22,
55:6, 61:12, 65:23,
105:9, 105:10,
108:21, 131:10,
131:20, 133:6, 146:7,
146:14, 149:3,
165:20, 188:25,
189:1, 189:4, 211:8,
211:12
**barely** - 111:22,
112:22
**bargain** - 57:8
**baseball** - 8:8
**Based** - 171:8
**based** - 13:20, 27:7,
116:19, 126:8,
147:17, 168:21,
172:18, 172:21,
179:21
**basis** - 9:10, 42:16,
67:23, 137:24, 195:2
**Bates** - 41:3, 48:19,
90:22
**battles** - 166:15
**bear** - 43:23,
179:19, 196:18, 197:1
**bears** - 136:15
**become** - 28:16,
38:18, 74:1, 130:11
**beefs** - 167:1
**beep** - 18:21
**began** - 11:10,
41:16, 41:17, 41:22
**begin** - 29:23,
100:18
**beginning** - 43:2
**behalf** - 122:22
**behind** - 37:23,
40:12, 70:12, 71:1,
81:2, 81:5, 87:17,
186:24, 206:18
**belonging** - 101:1
**below** - 152:20,
153:8
**bench** - 3:1, 3:10,
20:22, 91:25, 140:6,
170:14, 175:5,
192:23, 216:14,
224:6, 224:16
**Bench** - 18:15,
20:20, 20:23, 92:2,
95:5, 95:15, 96:2,
96:11, 97:22, 102:23,

103:13, 124:10,
125:18, 140:8, 144:4,
170:15, 171:6, 175:6,
192:24, 216:16,
222:11, 224:18,
225:12
**Bennett** - 1:12
**beside** - 186:20
**best** - 50:18, 54:13,
55:3, 55:4, 192:10,
192:11, 192:13,
192:19, 195:9, 195:11
**better** - 59:11, 69:10
**between** - 13:10,
13:12, 15:11, 33:20,
34:12, 36:23, 37:12,
37:14, 38:4, 60:15,
68:4, 79:1, 95:25,
117:16, 130:20,
150:14, 166:16,
184:3, 186:9, 187:24,
187:25
**Between** - 53:1
**Bgf** - 165:16,
165:17, 165:24,
166:1, 166:3, 166:12,
166:16, 166:22,
173:14, 173:17,
174:1, 174:3, 174:5,
174:7, 174:10,
174:12, 183:11,
187:25, 188:2, 188:5,
188:8, 190:20,
191:17, 191:24
**Big** - 57:22, 57:23,
170:11, 196:17
**big** - 80:21, 197:1
**bigger** - 214:17
**binders** - 65:17
**bit** - 15:2, 23:3,
40:23, 49:23, 59:12,
78:4, 112:15, 115:9,
150:5, 161:25, 179:5,
185:24, 188:10, 214:9
**bites** - 96:9
**black** - 38:15, 39:3,
60:11
**Black** - 165:17,
183:14
**block** - 49:23, 69:1,
130:20, 146:12,
151:7, 184:23
**blocked** - 34:9, 38:4
**blocking** - 109:18
**blocks** - 44:23
**blood** - 132:20,
153:7, 190:6
**Bloods** - 166:17,
166:23
**blown** - 119:15
**Blue** - 159:21
**blue** - 71:3, 75:2,
157:24, 157:25,
159:15, 159:17
**blue-light** - 159:15,
159:17
**Blue-lights** - 159:21
**body** - 147:22
**Bohlen** - 131:10,
131:13, 131:18,
131:19, 131:23,
133:8, 133:21, 134:6,
135:23, 136:6,
139:22, 140:5
**Boo** - 189:7, 189:8
**booyah** - 88:18
**Booyah** - 88:19
**boss** - 23:11
**bottom** - 73:24,
78:17, 134:12,

141:17, 149:17,
150:6, 150:8
**bought** - 12:3, 12:8,
12:15, 24:8, 28:4,
56:22, 57:19, 58:5,
59:1, 59:3
**box** - 204:6, 204:7,
204:8
**boy** - 107:22
**break** - 6:16, 15:10,
83:2, 141:6, 142:10,
144:3, 144:6
**breech** - 138:10
**breezy** - 6:15
**bridge** - 184:12
**Brief** - 82:24
**briefed** - 106:3
**Briefer** - 220:4
**Briefly** - 101:16,
138:23
**briefly** - 132:13
**bright** - 218:2
**bring** - 3:1, 4:23,
6:12, 17:2, 17:3,
125:14, 126:23,
145:2, 207:3
**bringing** - 3:10,
217:1
**broached** - 94:13
**broke** - 42:1, 43:8
**brought** - 2:8, 63:17
**Brown** - 173:9,
173:11
**brown** - 95:25
**brunt** - 141:4
**bucks** - 13:14,
213:15
**build** - 28:9
**building** - 84:3,
150:24, 162:19,
206:18
**buildings** - 15:11,
206:7
**bullet** - 110:20
**bullets** - 79:2, 79:4,
132:7, 135:13, 167:20
**bump** - 81:3
**bump-out** - 81:3
**bunch** - 59:10
**Bureau** - 142:15
**burned** - 190:1
**bus** - 206:22,
211:11, 213:14
**business** - 180:2,
180:4, 180:10
**button** - 75:25
**buy** - 10:9, 11:10,
11:24, 12:9, 12:17,
13:8, 13:10, 14:12,
22:11, 22:23, 26:24,
40:10, 55:24, 56:20,
58:10, 58:12, 58:14
**buying** - 10:7,
10:11, 12:22, 21:19,
24:7, 29:11, 56:2,
56:6, 183:6
**Byers** - 27:9

# C

**cache** - 71:24
**calendar** - 223:18,
223:19
**caliber** - 148:16,
148:17, 153:25, 156:5
**caller** - 69:15,
70:20, 71:21
**camera** - 159:5,
159:8, 159:15,
159:16, 159:24,

3

160:16
**cameras** - 151:5,
159:1, 159:22, 159:23
**cannot** - 90:11,
92:6, 92:9, 96:15,
133:18, 162:7,
170:22, 171:2
**cans** - 80:22, 81:1
**canvass** - 110:17,
128:1, 129:2, 129:8
**cap** - 39:14, 39:15
**Caprese** - 208:23
**Caprese's** - 209:1
**capsules** - 208:12
**captured** - 159:2
**car** - 10:5, 10:16,
15:6, 15:8, 17:10,
23:14, 24:1, 24:17,
24:21, 25:3, 25:10,
25:11, 25:13, 25:16,
27:3, 28:8, 32:3, 32:4,
33:9, 33:19, 33:20,
33:21, 34:8, 34:17,
34:21, 34:23, 35:1,
37:16, 37:20, 37:22,
49:1, 51:18, 62:24,
63:3, 79:25, 80:4,
109:8, 123:17,
124:13, 164:3, 197:11
**care** - 33:7, 129:7,
188:2, 188:5, 190:13
**career** - 106:7
**carried** - 28:17
**carries** - 28:15, 40:5
**carry** - 75:13
**cars** - 53:1, 80:1,
129:25, 130:3
**cartridge** - 132:6,
135:13, 136:11,
137:2, 137:10,
137:12, 137:21,
138:17, 148:14,
148:16, 148:17
**Case** - 1:6
**case** - 2:14, 3:5,
4:13, 5:20, 15:8,
25:22, 64:12, 72:12,
76:3, 104:17, 106:3,
106:11, 106:17,
106:19, 106:24,
106:25, 107:20,
107:24, 108:18,
115:11, 122:7, 122:8,
122:9, 122:14,
122:18, 135:14,
136:11, 137:2,
137:12, 138:12,
138:17, 143:10,
146:24, 147:5, 147:6,
152:21, 152:25,
160:19, 165:3, 173:8,
175:2, 175:20, 181:8,
203:10, 217:10,
222:14, 222:16
**cases** - 122:10,
122:11, 122:12,
132:6, 137:10,
137:21, 138:13
**cash** - 13:15, 13:17,
23:13, 211:12
**casing** - 110:20,
110:21, 111:9,
111:20, 111:23,
112:18, 112:19,
112:21, 112:24,
113:13, 113:14,
113:20, 114:12,
114:15, 115:6, 115:7,
115:15, 117:6,
129:22, 130:6,

130:24, 136:14,
136:20
**casing's** - 112:3
**Casings** - 156:9
**casings** - 77:9,
135:13, 138:8,
139:18, 148:15,
148:16, 148:17,
156:7, 167:9, 167:12
**catcher** - 8:10
**Catcher** - 8:11
**categorized** - 72:21,
74:21
**caution** - 19:16,
218:19
**cautionary** - 175:8,
175:24
**Cc-** 72:9, 72:12,
72:22, 73:3, 74:2,
74:6, 74:9, 76:23,
106:23, 107:18,
113:18, 113:25,
114:16, 115:12,
134:15, 136:12,
147:3, 147:6, 147:12
**Cds** - 71:11, 71:14
**cellblock** - 143:3
**cellphone** - 163:16
**center** - 109:21
**central** - 107:21
**certain** - 2:15,
97:11, 219:16,
219:18, 219:19
**Certainly** - 18:14,
102:14, 130:10,
141:2, 214:6, 222:6
**certainty** - 2:13,
19:14, 222:8
**certify** - 225:19
**chair** - 151:25,
152:2, 152:15,
152:20, 153:8,
157:22, 157:23,
157:24, 157:25,
200:18
**chambers** - 142:12
**chance** - 220:15,
220:22
**change** - 26:13,
40:4, 197:7, 197:10
**changed** - 26:15
**changes** - 221:1
**changing** - 32:14,
32:24
**character** - 197:4
**characterization** -
19:3
**charge** - 19:25,
20:1, 20:14, 42:7,
42:9, 42:14, 42:20,
64:13, 175:19,
210:25, 211:1, 211:4,
213:10, 213:13
**charged** - 20:12,
62:9, 125:4, 175:9,
175:17, 175:21,
193:19, 194:6,
219:21, 219:22
**charges** - 210:18,
219:17
**Charles** - 74:7,
147:7
**check** - 135:7,
138:9
**Cheese** - 26:21,
26:23, 26:24, 27:5,
27:8, 31:10, 32:8,
33:8, 33:11, 56:22,
57:1, 58:23, 59:1,
59:4

**Cheese's** - 59:1
**chemical** - 214:13
**chemist** - 219:2
**Cherry** - 190:21,
215:4, 215:5
**chief** - 3:5
**children** - 85:6,
85:12, 85:23, 177:1,
177:2, 177:3, 177:5
**Chris** - 65:10
**Christopher** - 65:3,
65:5
**chuckling** - 57:25
**circle** - 79:5
**circuit** - 133:5
**Circuit** - 61:12
**circulated** - 202:16
**circulating** -
181:12, 201:20
**circumstances** -
219:12
**citizen** - 121:5,
121:15, 122:21,
122:23
**citizenry** - 148:20
**City** - 71:9, 61:12,
65:23, 105:9, 105:11,
108:21, 133:6, 146:7,
149:3, 165:20
**city** - 159:22,
159:23, 172:5, 172:6
**city-installed** -
159:22
**City/baltimore** -
7:21
**Cja** - 225:4
**claim** - 217:20
**Clarence** - 104:14,
104:15, 104:20,
104:25
**clarify** - 184:13
**clear** - 14:22, 28:1,
30:4, 34:1, 38:7, 71:3,
75:2, 124:21, 129:1,
150:7, 155:14
**Clerk** - 7:1, 65:8,
65:11, 83:11, 83:14,
104:23, 105:2,
131:16, 145:16,
145:19, 145:23,
176:12, 198:11,
200:13
**clerk** - 2:5, 2:9, 5:2
**clicking** - 101:11
**client** - 18:23,
194:12, 224:9, 224:17
**client's** - 125:3
**Clinton** - 1:14,
104:13
**Clive** - 173:9
**close** - 50:18,
155:23, 180:24,
180:25, 199:5
**close-up** - 155:23
**closely** - 112:15,
199:7
**closing** - 221:13,
222:18, 224:25
**clothes** - 53:13,
54:4, 67:2, 189:22,
190:7, 190:17
**clothing** - 53:8,
53:10
**cocaine** - 8:18, 9:9,
12:3, 61:7, 61:8, 61:9,
62:3, 117:13, 208:13,
208:14
**cold** - 55:11
**collateral** - 23:15
**collect** - 169:5

**collected** - 168:19
**collection** - 148:2,
148:8
**collects** - 107:19
**college** - 7:23, 7:25,
8:2, 8:12, 8:21, 9:2
**comfortable** - 221:5
**coming** - 21:5, 34:5,
34:10, 36:4, 36:10,
37:15, 41:5, 41:6,
75:22, 90:12, 100:17,
105:6, 141:1, 142:1,
153:5, 163:1, 163:11,
206:6
**comment** - 94:14,
94:16, 94:17, 193:5,
193:7, 193:25, 194:9,
194:12
**comments** - 93:11,
93:15, 94:7, 94:18,
96:18, 96:20, 96:21
**committed** - 42:15,
55:2, 157:9, 194:24,
212:2
**commonly** - 71:10
**community** - 9:3
**compare** - 132:7,
136:20, 137:1, 137:15
**compared** - 77:9,
137:11, 139:12
**comparing** - 138:7
**comparison** - 82:5,
114:18, 137:1
**complaint** - 72:11,
106:23, 107:21,
121:5, 121:9, 121:16,
121:19, 122:4, 122:6,
122:17, 123:7, 123:8,
123:9, 123:14
**complicated** - 95:13
**complies** - 38:12
**components** -
132:6, 138:4
**computer** - 1:24,
132:19, 161:13, 172:7
**computer-aided** -
1:24
**conceivable** -
218:18, 221:15
**conceivably** - 221:7
**conceive** - 218:17
**concern** - 194:21
**concerned** - 6:5
**concerning** - 94:22
**conclude** - 82:2,
126:12, 131:7, 198:6,
220:16, 222:14
**concluded** - 82:18,
225:14
**concludes** - 64:5,
139:25, 197:25,
216:4, 216:6
**conclusion** - 123:5,
125:14
**conclusions** -
139:15
**condition** - 45:21,
115:20
**conduct** - 17:15,
29:6, 117:20, 121:6,
123:14, 126:21,
156:17
**conducted** - 17:16
**conducts** - 121:18
**confer** - 127:9
**Conference** - 18:15,
20:20, 20:23, 92:2,
95:5, 95:15, 96:2,
96:11, 97:22, 102:23,

103:13, 124:10,
125:18, 140:8, 144:4,
170:15, 171:6, 175:6,
192:24, 216:16,
222:11, 224:18,
225:12
**confirm** - 77:16,
113:17, 113:19,
115:9, 120:14,
143:14, 160:8
**confirmed** - 124:15
**conflicted** - 217:19
**confront** - 94:6,
96:13
**connection** - 19:25,
42:19, 194:10, 194:11
**conscious** - 44:9,
44:13
**consider** - 70:3
**considered** - 54:25
**consistency** - 92:23
**consistent** - 20:6,
97:13, 97:15
**conspiracy** - 20:12,
20:14, 42:7, 42:9,
42:12, 42:16, 42:19,
175:24, 193:20,
194:5, 219:25
**contacts** - 219:12
**contained** - 153:25
**content** - 97:10
**contents** - 92:6,
92:8, 94:7, 96:16,
119:16, 170:22
**context** - 10:1,
97:11
**continue** - 6:6,
21:15, 27:5, 83:2,
145:7, 164:11,
164:17, 220:23,
225:16
**contravention** -
19:8
**control** - 72:9,
72:19, 115:11,
121:24, 122:2
**controlled** - 71:14
**conversation** -
33:12, 88:15, 157:1,
157:11
**conversations** -
91:6
**convicted** - 209:20
**convinced** - 166:3,
166:4
**cool** - 102:2
**cops** - 219:1
**copy** - 118:13,
136:1, 146:23, 160:15
**corner** - 30:4,
30:23, 33:10, 33:17,
37:19, 40:16, 73:24,
149:17, 149:21,
150:7, 150:8, 164:6,
206:25
**correct** - 3:24, 4:6,
11:8, 20:11, 24:19,
31:25, 36:13, 37:7,
41:4, 50:11, 72:13,
73:2, 75:16, 81:14,
84:6, 85:10, 85:19,
93:20, 98:12, 105:23,
107:6, 108:20,
111:11, 111:16,
113:11, 117:24,
121:23, 122:3,
136:17, 136:18,
137:5, 137:7, 147:11,
149:7, 154:12,
154:13, 161:6, 161:9,

162:5, 162:14,
164:19, 166:20,
167:10, 167:23,
168:5, 168:24,
169:19, 173:19,
174:1, 174:16,
211:13, 211:17,
212:7, 214:4, 216:10,
219:14, 219:19,
225:19
  **Correct** - 24:20,
31:6, 35:24, 36:24,
38:6, 41:20, 46:10,
46:22, 53:22, 56:5,
70:23, 72:23, 75:17,
77:15, 77:20, 78:10,
78:14, 79:10, 80:5,
80:12, 81:15, 81:20,
82:8, 105:25, 107:17,
109:15, 110:2,
110:11, 111:10,
111:24, 112:8,
112:10, 113:1, 113:7,
114:14, 114:22,
114:24, 115:13,
117:3, 118:22,
120:22, 121:14,
121:21, 123:12,
126:10, 126:19,
126:22, 128:8,
128:24, 129:13,
129:16, 129:19,
129:23, 130:7,
138:11, 147:13,
153:1, 156:6, 159:6,
161:18, 162:1,
162:10, 165:21,
167:11, 167:24,
168:6, 168:13,
168:25, 169:10,
169:20, 178:12,
180:1, 182:8, 184:16,
186:18, 188:7, 189:2,
190:22, 192:16,
195:10, 195:17,
197:3, 224:10
  **correcting** - 41:12
  **Corrections** -
165:19
  **correctly** - 148:3
  **correctness** - 94:5
  **cost** - 13:12
  **Counsel** - 2:3,
75:24, 127:9, 140:6,
161:8, 165:7, 175:4,
175:7
  **counsel** - 2:16,
65:16, 102:21, 110:5,
118:10, 121:1, 141:4,
149:10, 160:7, 165:2,
217:20, 224:15
  **Count** - 19:25, 42:7,
42:9, 175:18, 194:4
  **counting** - 221:25
  **county** - 2:19, 2:20,
5:6
  **County** - 2:19, 5:7,
7:20, 7:21, 24:19,
25:1, 25:2, 25:22,
55:6
  **couple** - 15:7,
17:24, 18:22, 22:22,
34:11, 40:15, 44:23,
49:10, 52:8, 52:10,
52:12, 61:4, 61:24,
62:1, 86:17, 108:7,
109:23, 111:3,
111:18, 149:8, 155:4,
192:2, 196:16,
199:16, 204:20,

213:15
  **course** - 22:6,
67:15, 100:17,
110:19, 115:19,
116:5, 121:6, 125:1,
132:17, 132:18,
156:13, 157:6,
161:21, 169:21,
178:10, 201:17
  **courses** - 132:14
  **Court** - 1:1, 2:3, 3:6,
3:9, 3:20, 4:1, 4:5,
4:8, 4:12, 4:15, 4:17,
4:19, 4:21, 4:25, 5:5,
5:9, 5:13, 5:22, 5:25,
6:3, 6:9, 6:11, 6:14,
9:21, 11:21, 11:24,
14:21, 15:5, 15:9,
18:14, 18:18, 19:2,
19:9, 19:23, 20:6,
20:19, 20:21, 20:24,
21:2, 21:4, 21:7, 21:9,
21:11, 21:13, 30:3,
31:2, 42:6, 42:23,
43:3, 49:7, 51:24,
52:10, 54:18, 61:12,
63:24, 64:3, 64:9,
64:22, 65:12, 65:15,
66:15, 66:17, 66:20,
68:9, 68:20, 68:22,
69:1, 69:7, 69:12,
69:21, 70:12, 70:22,
71:2, 73:11, 73:17,
73:22, 75:25, 76:8,
76:12, 76:20, 80:16,
80:19, 82:11, 82:14,
82:20, 83:1, 83:17,
83:21, 84:17, 84:20,
87:2, 87:4, 87:10,
91:16, 91:25, 92:3,
92:15, 92:21, 93:1,
93:4, 93:9, 93:24,
94:3, 94:17, 95:6,
95:18, 95:21, 96:3,
96:12, 97:2, 97:6,
101:14, 102:14,
102:16, 102:20,
102:22, 103:5,
103:12, 104:7,
104:14, 104:18,
107:5, 107:8, 107:11,
109:1, 109:4, 114:23,
116:10, 117:14,
119:16, 120:10,
120:17, 123:1, 124:5,
124:9, 124:11,
124:22, 125:5, 125:9,
125:16, 127:5,
128:12, 128:19,
130:10, 130:13,
131:3, 133:10,
133:14, 134:23,
135:18, 135:21,
137:7, 138:21,
139:21, 140:3, 140:9,
140:15, 140:17,
140:20, 140:23,
141:2, 141:9, 141:12,
141:17, 141:20,
142:3, 142:9, 142:21,
143:4, 143:11,
143:17, 143:22,
144:2, 144:5, 145:2,
145:6, 150:6, 150:14,
159:14, 159:18,
161:5, 161:8, 165:9,
170:13, 170:19,
171:1, 171:17,
173:21, 174:19,
174:25, 175:7,

175:11, 175:13,
176:5, 176:15,
176:17, 176:20,
179:4, 179:9, 185:13,
190:4, 191:5, 192:23,
192:25, 193:5,
193:11, 193:14,
193:17, 193:25,
194:18, 195:6, 196:6,
196:10, 196:13,
197:18, 197:21,
198:4, 198:15, 199:3,
199:10, 200:15,
205:4, 205:21, 209:8,
211:21, 212:17,
213:17, 214:6,
215:14, 215:17,
215:23, 215:25,
216:8, 216:13,
216:17, 216:23,
217:12, 217:17,
217:22, 218:3, 218:8,
218:21, 219:3,
219:10, 219:15,
219:24, 220:7,
220:11, 220:17,
220:22, 221:2,
221:11, 221:16,
221:19, 221:24,
222:6, 222:12, 223:3,
223:9, 223:13,
223:21, 224:1, 224:7,
224:8, 224:12,
224:15, 224:21,
225:5, 225:8, 225:11,
225:13, 225:14
  **court** - 2:5, 5:2,
5:16, 9:15, 20:21,
95:10, 95:20, 102:9,
140:25, 212:11, 225:2
  **Court's** - 172:16,
194:1, 223:18
  **court's** - 173:1
  **courtroom** - 3:13,
3:16, 18:19, 20:25,
21:5, 67:13, 68:4,
95:12, 96:6, 96:7,
145:11, 209:12
  **cousin** - 124:20,
124:24
  **cousins** - 89:9
  **cowboy** - 79:5
  **cowboy-type** - 79:5
  **Crack** - 71:12
  **crack** - 9:9, 9:12,
9:13, 10:2, 10:10,
10:11, 12:3, 12:22,
13:21, 14:12, 22:16,
23:2, 23:7, 23:19,
24:7, 40:10, 62:2,
71:17, 182:25, 183:1,
208:2, 208:14
  **create** - 63:13
  **created** - 63:18
  **crime** - 24:18,
24:21, 62:9, 108:14,
108:15, 109:16,
117:5, 130:4, 132:16,
156:15, 160:12,
167:10, 168:19,
210:13
  **crimes** - 160:12,
160:13, 194:2, 209:21
  **criminal** - 105:15,
106:23
  **Crips**- 166:16
  **criticizing** - 199:6
  **cross** - 54:19,
82:11, 93:24, 94:22,
97:8, 101:14, 108:24,

109:7, 123:2, 123:3,
125:11, 138:22,
141:21, 142:2,
143:12, 143:18,
212:21, 220:5
  **Cross** - 54:21,
64:11, 101:17, 127:6,
127:10, 139:1,
165:11, 196:14,
211:23
  **cross-examination**
- 54:19, 82:11, 94:22,
101:14, 125:11,
138:22
  **Cross-examination**
- 54:21, 127:6,
196:14, 211:23
  **cross-examine** -
93:24, 97:8, 220:5
  **cross-examining** -
212:21
  **cruiser** - 129:18
  **Csos** - 18:25
  **Cunningham** -
157:18, 157:20,
158:1, 164:20,
164:22, 164:23,
178:8, 178:19,
180:12, 183:5,
183:17, 186:19,
188:15, 188:18,
189:19, 189:21,
190:23, 191:24,
218:24, 220:2
  **current** - 105:13
  **custody** - 143:5
  **customer** - 13:21
  **customers** - 17:15
  **cut** - 16:22, 53:13,
58:23
  **cyber** - 160:11,
160:13
  **cylinder** - 79:4

# D

  **daily** - 225:3
  **date** - 48:14, 74:11,
74:13, 98:13, 128:17,
169:15, 208:6
  **dates** - 219:19
  **daughter** - 84:6,
84:8, 84:14, 85:20,
88:4, 117:23, 120:9
  **daughter's** - 84:23,
100:20
  **David** - 145:21,
198:5, 198:8, 198:14,
198:17
  **daylight** - 110:10,
128:5, 128:6, 128:9,
128:23
  **Daylight** - 160:23
  **days** - 12:10, 12:11,
12:12, 17:24, 192:3,
196:22
  **dead** - 43:10
  **deal** - 143:12,
222:7, 224:2
  **dealer** - 171:12,
179:24, 206:12
  **dealers** - 81:16
  **deals** - 15:20, 31:1
  **death** - 146:19,
146:21, 148:5, 193:12
  **Debbie** - 181:5,
201:8
  **December** - 55:16,
86:2, 205:19, 213:23
  **decision** - 221:4

  **declarant's** - 94:23
  **declare** - 148:21
  **deem** - 218:17
  **deep** - 222:7
  **Defendant** - 1:8,
1:15
  **defendant** - 9:14,
9:23, 36:22, 42:15,
47:12, 54:13, 68:10,
81:25, 84:24, 89:8,
89:14, 94:21, 117:17,
122:22, 175:19,
177:8, 190:11, 193:3,
193:7, 196:7, 199:17,
201:10, 202:10,
217:11, 221:2, 221:3
  **defendant's** -
124:17, 124:19
  **Defense** - 224:15
  **defense** - 2:23,
3:17, 5:25, 6:9, 68:8,
93:22, 161:8, 217:1,
220:11, 221:12, 223:5
  **definite** - 220:20
  **definitely** - 19:8,
220:17
  **delay** - 224:2
  **demoted** - 126:6
  **denied** - 96:21,
157:11
  **denies** - 96:15
  **deny** - 94:15, 96:15,
104:2, 170:18,
187:14, 222:4
  **Department** - 65:24,
105:9, 105:11, 146:7,
165:19
  **department** - 66:1,
72:10, 121:8, 121:18,
131:11, 131:20
  **depicted** - 151:21
  **depicts** - 35:8,
112:17
  **Deputy** - 7:1, 65:8,
65:11, 83:11, 83:14,
104:23, 105:2,
131:16, 145:16,
145:19, 145:23,
176:12, 198:11,
200:13
  **deputy** - 2:5, 2:9,
5:2
  **describe** - 12:21,
38:25, 39:1, 84:22,
200:10
  **described** - 31:1,
37:14, 160:9, 179:18,
181:13
  **Describing** - 47:4
  **desires** - 2:16
  **desk** - 222:4
  **despite** - 217:6
  **detail** - 154:10
  **details** - 95:2
  **detain** - 223:7
  **detective** - 105:8,
105:14, 121:17,
174:21
  **Detective** - 48:7,
49:11, 65:10, 65:20,
76:1, 82:15, 104:13,
104:25, 105:5,
108:18, 115:9, 117:7,
119:17, 120:25,
121:3, 125:20,
128:17, 131:4,
140:13, 140:15,
140:24, 141:12,
145:14, 145:18,
146:3, 150:7, 159:13,

161:4, 163:8, 164:14,
165:7, 165:13,
165:15, 168:4,
172:17, 173:2,
173:25, 175:1,
207:11, 207:12,
213:25, 215:7, 219:2
**detectives** - 45:17,
45:22, 46:25, 49:2,
89:22, 90:12, 91:23,
92:17, 98:24, 99:8,
100:10, 100:17,
100:25, 105:17
**Detectives** - 45:17
**detector** - 18:17
**determine** - 120:13,
133:25, 147:17,
148:7, 157:20
**develop** - 169:8,
170:1
**dice** - 182:24
**difference** - 31:21,
79:1
**different** - 36:11,
47:4, 50:7, 59:5,
148:18, 167:9,
181:13, 185:7, 219:8,
219:9
**Difficult** - 209:6
**difficulty** - 5:19,
143:4
**digits** - 77:14,
115:16
**dining** - 153:5
**dire** - 133:10
**direct** - 3:5, 26:1,
27:14, 48:2, 52:14,
66:5, 68:15, 68:23,
75:23, 96:16, 105:16,
106:1, 107:3, 110:8,
146:9, 154:24, 168:2,
177:7, 181:7, 192:2,
201:13, 204:1
**Direct** - 7:5, 65:18,
83:22, 105:3, 131:21,
146:1, 176:21, 198:18
**directed** - 69:20,
69:23, 70:6, 70:10
**directing** - 151:18,
183:25
**direction** - 17:4,
34:4, 34:5, 36:2,
37:20, 41:10, 41:11,
41:22, 70:5, 150:11,
150:12, 150:17,
185:11
**directly** - 59:3,
151:7
**disappeared** -
56:18
**discovery** - 201:19
**discuss** - 64:4,
64:23, 82:16, 104:8,
131:5, 139:22, 175:1,
197:22, 216:2, 220:23
**discussion** - 224:6
**dispatch** - 69:16,
70:17
**displeasure** - 141:5
**dispute** - 170:10,
184:3, 186:4, 186:9,
186:16, 187:24,
187:25, 214:15
**distinct** - 107:23
**distinctive** - 148:14
**distracted** - 19:11
**district** - 133:5,
143:8
**District** - 1:1, 1:12,
66:9, 66:10, 119:6

**disturbing** - 95:8
**division** - 66:8,
105:15, 105:20,
121:11
**Dna** - 154:19,
154:21, 169:3, 169:6,
169:8
**dock** - 151:6,
162:21
**doctors** - 43:18
**document** - 73:12,
96:16, 115:10, 136:3
**documentary** -
115:5, 158:8
**documentation** -
113:19, 158:8, 166:8
**documented** -
160:10
**documents** - 78:18
**Dohony** - 140:13,
140:15, 140:24,
141:11, 141:12,
141:13, 141:16,
145:10, 145:13,
145:18, 146:3, 175:1
**dollar** - 13:2
**dollars** - 13:6, 13:7,
13:13, 22:23
**done** - 16:11, 21:6,
31:1, 42:10, 51:21,
125:10, 125:12,
126:12, 126:13,
126:15, 148:2
**door** - 19:6, 21:1,
21:3, 21:10, 70:1,
81:4, 151:16, 151:24,
153:16
**doors** - 19:15
**doorway** - 21:6
**dope** - 184:8, 184:9,
184:12, 184:17,
184:20
**Dorton** - 66:15,
66:17, 66:20, 68:20,
68:22, 69:1, 69:21,
70:12, 70:22, 71:2,
76:20, 80:16, 80:19,
87:2, 87:4, 87:10,
114:23, 117:14,
134:23, 137:6, 200:7,
205:4
**dot** - 143:12, 143:18
**doubt** - 40:6, 98:2
**Down** - 185:2
**down** - 15:12,
18:25, 33:22, 39:16,
39:17, 49:23, 55:21,
62:15, 64:4, 64:23,
82:15, 84:6, 95:4,
95:9, 95:25, 102:17,
104:7, 109:13,
109:14, 119:4, 131:4,
139:22, 156:25,
161:21, 161:25,
172:20, 175:1, 179:4,
179:6, 189:3, 197:4,
197:22, 199:5, 205:7,
207:7, 208:9, 215:2,
216:1
**down-the-block** -
49:23
**downtown** - 99:14,
99:23, 100:5, 100:7,
207:9
**dragged** - 197:11
**dress** - 38:20
**dressed** - 38:14,
38:25, 39:3, 60:11
**drive** - 58:7, 79:24
**driver** - 124:18

**driveway** - 37:6,
69:23
**driving** - 62:24,
63:6, 63:8
**dropped** - 154:3
**drove** - 55:5
**drug** - 8:17, 9:2,
9:5, 18:7, 19:24, 20:1,
42:15, 42:19, 56:2,
56:6, 58:15, 58:18,
58:19, 81:16, 166:23,
166:25, 170:10,
171:12, 175:23,
179:24, 180:2, 180:4,
180:10, 194:5, 206:11
**drugs** - 9:11, 11:24,
12:9, 12:15, 18:10,
21:21, 22:2, 23:10,
23:14, 26:24, 29:1,
29:3, 29:11, 29:17,
55:24, 56:20, 57:3,
57:10, 57:12, 57:14,
57:19, 58:1, 58:5,
58:10, 58:12, 59:1,
59:3, 59:4, 59:12,
64:13, 64:16, 71:24,
74:8, 81:13, 81:17,
86:21, 88:19, 88:21,
167:3, 180:5, 183:7,
206:19, 206:24,
207:6, 207:16,
207:23, 209:1,
209:12, 214:9,
214:20, 214:24,
219:22
**Duckett** - 156:15,
156:18, 157:2, 158:6,
158:7, 163:18,
169:13, 169:23,
170:1, 171:9, 171:11,
172:13, 173:7,
173:14, 178:22,
178:25, 179:24,
180:14
**Duckett's** - 178:24,
179:13
**dude** - 179:17,
197:5, 197:14,
197:15, 200:12, 201:2
**duly** - 6:24, 65:6,
83:9, 104:21, 131:14,
145:14, 176:10, 198:9
**during** - 10:10,
12:7, 12:15, 23:6,
124:25, 137:25,
138:5, 165:25,
177:21, 217:5
**During** - 11:23,
46:13, 46:15, 67:8,
201:17
**duties** - 135:7
**Dvd** - 160:11,
160:14

## E

**e-mailed** - 217:3
**early** - 55:17, 66:6,
127:20, 144:8, 218:2
**East** - 188:25, 189:4
**east/west** - 35:17
**Eastwood** - 173:10,
173:11, 173:14,
180:15
**Ecstasy** - 9:9
**Ecu** - 72:16, 72:18,
72:19, 75:19, 82:4
**edited** - 171:22
**efficient** - 94:2

**Eight** - 212:7
**eight** - 140:10,
212:2
**Eighties** - 200:1,
200:2
**either** - 95:18,
121:9, 221:19
**eject** - 167:22
**ejection** - 167:23
**elementary** - 2:6,
2:10, 3:24, 150:22,
159:25
**Elementary** -
150:25, 158:22,
158:23, 159:5, 159:17
**elevators** - 19:1
**eleven** - 66:2
**Elmo** - 73:6
**emerge** - 37:1, 37:4,
37:12, 38:10
**emerged** - 50:8
**employed** - 65:22,
105:7, 105:8, 146:5,
146:6
**empty** - 157:23
**en** - 216:19
**encounter** - 189:6
**End** - 20:20, 95:5,
96:2, 97:22, 103:13,
125:18, 144:4, 171:6,
222:11, 225:12
**end** - 22:18, 67:4,
109:11, 111:17,
112:3, 125:20
**ended** - 18:1,
186:23, 186:24
**Ending** - 76:25
**ending** - 115:12,
115:15
**enhance** - 172:1,
172:8
**enhanced** - 172:3
**enter** - 151:23,
152:7, 162:13
**entered** - 72:15
**entering** - 161:24
**entire** - 118:11
**entitled** - 225:21
**entrance** - 163:1
**entrepreneurs** -
59:10
**entry** - 162:8
**equipment** - 172:10
**escorted** - 96:7
**essentially** - 97:9
**establish** - 106:22
**eve** - 32:12
**evening** - 27:21,
29:17, 29:18, 35:2,
35:4, 52:24, 87:14,
108:5, 108:14, 110:1,
110:7, 127:17,
147:16, 148:19,
152:4, 153:19,
188:18, 189:23,
190:19
**event** - 64:24,
66:20, 68:19, 72:3,
72:14, 82:16, 104:9,
131:5, 139:23, 143:8,
182:12, 197:23, 216:3
**eventually** - 6:16
**everyday** - 12:11
**evidence** - 42:17,
72:15, 72:19, 73:18,
77:10, 77:25, 78:4,
80:10, 82:3, 82:6,
86:22, 94:6, 106:24,
107:6, 107:19,
107:24, 109:24,

110:16, 110:18,
113:25, 115:10,
115:11, 129:2, 132:3,
134:19, 134:22,
134:24, 137:20,
138:11, 138:16,
139:5, 139:9, 139:13,
147:3, 147:5, 148:2,
148:7, 148:9, 151:2,
152:10, 152:19,
153:19, 154:14,
154:18, 155:4, 155:6,
155:24, 158:8,
159:12, 168:17, 194:2
**Evidence** - 133:19,
148:11
**evident** - 74:1,
162:4
**ex** - 224:5
**exactly** - 31:20,
36:5, 37:24, 150:16
**Exactly** - 91:13,
113:10, 122:20
**examination** -
54:19, 54:21, 76:21,
82:5, 82:11, 94:22,
101:14, 123:3,
125:11, 127:6,
131:11, 134:11,
138:22, 196:14,
211:23
**Examination** - 7:5,
65:18, 83:22, 101:17,
103:14, 105:3,
127:10, 130:17,
131:21, 139:1, 146:1,
165:11, 173:4,
173:23, 176:21,
198:18
**examine** - 93:24,
97:8, 220:5
**examined** - 136:13,
158:24, 168:22
**examiner** - 131:20,
131:24, 132:2, 132:12
**Examiners** - 133:3
**examining** - 212:21
**example** - 96:22,
97:12, 166:17
**except** - 31:21
**excited** - 187:4,
187:6
**excuse** - 41:3
**excused** - 95:23,
223:11
**Exhibit** - 10:21,
11:3, 29:25, 30:5,
30:11, 34:15, 34:19,
35:7, 36:15, 36:17,
48:1, 49:5, 49:12,
49:22, 52:4, 52:16,
53:6, 54:1, 59:21,
59:25, 68:13, 73:20,
73:22, 80:14, 107:4,
107:14, 109:24,
111:4, 111:20,
112:15, 115:8,
115:18, 129:15,
129:20, 134:7,
135:16, 136:7,
136:22, 149:12,
151:10, 151:13,
151:19, 153:3,
153:10, 154:25,
155:16, 155:20,
159:13, 159:14,
161:3, 161:14, 168:3,
185:6, 185:8, 185:22
**exhibit** - 31:20,
31:23, 34:17, 73:18,

6

76:8, 78:6, 109:1,
115:5, 135:19,
185:21, 214:5
**exhibits** - 36:20,
107:10
**exit** - 162:8
**exiting** - 164:15
**exits** - 161:22
**expect** - 67:21,
92:18
**expectation** - 213:9,
218:13
**experience** - 16:12,
23:12, 24:3, 167:6,
167:13, 179:21
**expert** - 133:4,
133:8, 133:20,
133:21, 138:15
**explain** - 84:22,
120:3, 120:6, 122:16,
126:24
**exposed** - 61:2
**extensive** - 132:11
**extent** - 23:16,
123:10, 129:10, 165:2
**extrapolated** -
193:24
**eye** - 33:19
**eyewitnesses** -
148:21, 149:5

## F

**fabric** - 39:13
**Face** - 181:4
**face** - 39:7, 39:8,
39:16, 39:17, 39:18,
46:8, 46:11, 46:21,
129:21, 138:10
**faces** - 162:5
**facility** - 143:11
**facing** - 35:16,
35:19, 36:9, 60:25,
113:5, 113:8
**fact** - 2:11, 5:17,
19:20, 30:9, 56:23,
78:17, 92:19, 99:23,
108:17, 116:22,
126:13, 136:16,
138:17, 173:17,
179:18, 183:9,
202:21, 212:22,
213:13, 214:12,
219:18, 221:6
**factories** - 132:21
**facts** - 19:8, 19:23,
20:2, 171:2
**fail** - 210:23
**failure** - 209:24,
211:1
**fair** - 3:3, 5:20, 28:3,
106:6, 126:23, 138:7,
152:6, 221:14
**false** - 125:4,
213:11
**familial** - 120:7
**familiar** - 11:21,
28:16, 30:17, 66:15,
106:11, 178:14,
178:20
**familiarity** - 166:20
**family** - 152:22,
181:2, 201:6
**Family**- 165:17,
183:14
**fancier** - 35:18
**far** - 6:5, 36:6,
50:20, 51:22, 58:17,
62:11, 80:23, 186:16,
188:1

**fatal** - 105:19,
105:21, 105:22
**father** - 5:12, 5:13,
5:18, 85:2, 85:3,
100:20, 101:2,
120:21, 152:24,
210:16, 210:17
**Fbi**- 132:16, 172:2,
181:14
**February**- 18:1,
26:2, 27:15, 54:14,
87:5, 100:21, 101:8,
128:7, 128:15,
128:16, 128:19,
128:22
**federal** - 133:6
**Federal**- 133:19
**feet** - 47:1
**fell** - 9:12, 61:5,
154:5, 154:6, 155:9
**fellow** - 111:5
**felt** - 96:14, 100:10,
102:4, 119:12, 119:18
**femoral** - 43:8
**femur** - 43:8
**Ferry**- 14:17, 15:4,
30:24, 31:7, 31:13,
33:17, 33:21, 33:22,
35:14, 35:17, 35:19,
36:9, 41:23, 53:21,
53:23, 109:10,
109:11, 111:12,
111:13, 111:15,
113:5, 113:9
**few** - 2:4, 2:21,
3:14, 10:18, 59:19,
61:23, 127:7, 198:20,
212:22
**field** - 150:13,
150:18
**fields** - 163:15
**fight** - 166:23,
166:25, 186:17
**fights** - 167:1
**filed** - 147:4, 147:5,
217:7
**final** - 100:8, 211:6
**finally** - 98:19,
115:21
**fine** - 125:9, 125:16,
125:17, 218:21,
221:24, 223:9, 225:5,
225:9, 225:11
**Fine**- 127:1, 127:13,
199:9
**fined** - 126:6
**finger** - 93:7
**fingerprints** - 77:17,
77:25, 154:11,
154:18, 154:21,
168:24
**Fingerprints**-
154:20
**finish** - 141:7,
141:22, 142:4, 144:8,
158:2, 216:11, 221:7,
221:9
**finished** - 52:9,
52:13, 127:3, 138:2,
156:6, 205:16
**finishing** - 142:7
**fire** - 135:12
**firearm** - 40:13,
75:15, 77:8, 77:24,
82:4, 114:20, 117:6,
118:16, 132:5, 132:8,
133:8, 134:11, 135:3,
135:4, 135:15,
136:20, 137:23,
138:1, 138:2, 139:16,

156:10, 156:11
**Firearm**- 133:2
**firearms** - 86:21,
114:18, 131:11,
131:19, 131:23,
131:25, 132:2, 132:3,
132:11, 132:15,
132:22, 133:4,
133:22, 133:23,
137:24, 153:20
**fired** - 43:13, 132:5,
132:8, 135:11, 136:4,
137:10, 137:13,
138:3, 138:9, 138:13,
138:16, 138:17
**firing** - 138:5
**first** - 3:13, 6:24,
7:2, 8:22, 10:2, 11:10,
11:16, 11:19, 22:18,
34:17, 37:13, 38:10,
40:13, 41:13, 41:14,
43:4, 43:5, 45:21,
45:23, 64:12, 65:6,
71:8, 76:14, 80:20,
83:9, 88:20, 92:24,
98:25, 104:21,
123:19, 131:14,
145:14, 151:23,
154:25, 163:23,
169:15, 176:10,
177:7, 183:10,
186:23, 188:12,
189:6, 198:9, 199:13,
200:16, 214:2
**First**- 19:2, 59:20,
69:15, 105:6, 184:5
**fit** - 167:20
**five** - 12:12, 13:10,
22:14, 219:1, 220:1
**fix** - 38:9
**flat** - 32:13, 32:14,
32:24, 168:11, 168:12
**floor** - 152:20, 153:8
**focus** - 163:7
**focused** - 37:19
**folder** - 146:23,
146:24
**folks** - 120:1,
162:16
**follow** - 31:4
**followed** - 51:12
**following** - 110:9,
110:13, 186:24
**follows** - 6:25, 65:7,
83:10, 104:22,
131:15, 145:15,
164:17, 176:11,
198:10
**foregoing** - 225:19
**foreground** - 37:8,
53:24, 53:25, 111:13,
113:6, 162:19
**forensic** - 154:14,
154:18
**Forget**- 86:23
**forgotten** - 205:3
**form** - 76:16
**forward** - 111:15,
148:21, 199:3
**four** - 23:21, 45:4,
77:14, 141:16,
152:16, 152:17,
153:25, 156:2
**Four**- 45:3
**Freddy**- 10:12,
10:13, 10:15, 23:22,
34:24, 51:18, 51:23,
52:1, 55:2, 55:21,
62:7, 62:11, 62:16,
63:3

**free** - 125:12
**freeze** - 162:17
**frequency** - 67:20
**frequent** - 26:15,
86:6
**frequently** - 12:9
**friend** - 10:3,
192:11, 192:13,
192:19, 195:9, 195:12
**friend's** - 61:20
**friendly** - 24:14
**friends** - 9:7, 38:18,
180:18, 192:10
**front** - 21:24, 22:1,
40:22, 54:12, 61:15,
69:22, 83:18, 113:8,
146:22, 151:16,
151:23, 164:3, 184:8,
186:15, 187:2, 190:25
**fronted** - 209:14
**fronting** - 57:16
**Fuchs**- 1:14, 131:9,
131:22, 133:7, 134:3,
134:4, 134:5, 135:20,
135:22, 138:19
**full** - 7:1, 65:8,
83:11, 104:23,
131:16, 142:6,
145:16, 176:12,
198:11
**function** - 160:17,
160:18
**furtherance** - 42:12,
42:15, 42:18, 175:23,
193:20, 194:5, 219:24
**fuss** - 187:12
**future** - 106:22

## G

**G-rock** - 89:5, 89:10,
89:24, 96:22
**gait** - 28:10, 28:12
**gallery** - 95:4, 95:12
**Galtney** - 2:18, 2:21,
3:4, 5:3, 5:4, 5:5
**game** - 126:24,
152:1, 152:16
**games** - 182:24
**gang** - 165:18,
171:14, 171:19,
174:15, 174:22,
174:23, 183:14,
183:15
**Gang**- 174:22
**gangs** - 166:10,
166:16, 166:22
**gangs'**- 167:3
**gap** - 50:8
**garbage** - 70:7,
81:10
**Gary** - 1:15
**gate** - 163:1
**gather** - 4:1, 220:7
**gathering** - 55:1
**gelatin** - 208:12
**general** - 41:22,
94:7, 94:16, 94:17,
96:18, 119:20,
162:11, 170:19, 171:2
**generally** - 109:20
**generate** - 72:5
**generating** - 125:4
**gentleman** - 196:3
**gentlemen** - 42:6,
83:2, 95:6, 99:5,
133:17, 134:14,
135:2, 144:5, 165:15,
168:7, 169:2, 216:15,
222:13

**Gerzack** - 80:7
**girlfriend** - 32:12
**given** - 2:10, 4:5,
17:8, 21:21, 69:15,
72:9, 72:14, 72:16,
72:24, 76:5, 77:4,
78:5, 94:24, 94:25,
95:1, 114:2, 114:8,
147:9
**glad** - 20:17, 223:15
**glossies** - 110:4
**Government** - 30:5,
135:18, 159:14
**government** - 2:22,
3:4, 3:17, 5:23, 6:7,
6:17, 6:20, 10:21,
29:25, 34:15, 49:22,
59:21, 59:25, 65:2,
73:16, 83:4, 83:5,
111:4, 129:15,
129:20, 129:24,
131:9, 143:24,
145:10, 149:11,
211:7, 211:10,
218:17, 218:22,
222:13, 222:24,
223:24, 224:13,
224:25
**Government's**-
159:18
**government's** -
2:25, 11:2, 35:6,
52:16, 90:19, 108:13,
113:17, 134:7,
135:16, 136:7,
136:22, 151:13,
152:12, 153:2,
153:10, 155:16,
160:6, 168:3, 208:5,
213:10, 216:6
**Gps**- 204:7
**grabbed** - 32:7,
32:10
**grams** - 214:14,
214:17
**grand** - 20:15,
179:18, 194:7
**grandchild** - 85:3,
85:4
**grandchildren** -
117:24, 120:20,
120:21
**grandchildren's** -
85:2, 101:2
**granddaughter** -
88:1, 88:3, 100:16
**Grande**- 8:3
**Grandma** - 103:24
**Granted**- 60:16
**grass** - 40:23
**Grear**- 45:17, 48:7,
49:11, 90:22, 104:13,
104:14, 104:20,
104:25, 105:1, 105:5,
119:17, 121:2, 121:3,
131:4
**great** - 154:9, 222:7
**grind** - 121:9
**ground** - 47:20,
112:9, 154:6
**group** - 80:21
**Gucci** - 189:7, 189:8
**Guerilla** - 165:17,
183:14
**guess** - 7:15, 58:11,
59:6, 60:2, 66:5,
86:20, 86:22, 90:16,
90:17, 94:3, 98:23,
129:9, 146:11,
153:14, 159:21,

7

190:20, 192:3, 210:7,
218:8, 218:16
**guessing** - 202:22
**Guest** - 180:20,
196:23, 200:8,
200:11, 200:25,
218:16
**Gum** - 89:13
**gun** - 40:11, 40:19,
51:1, 60:21, 75:16,
77:17, 78:20, 79:5,
98:1, 139:3, 139:18,
153:24, 154:1, 154:5,
155:9
**guns** - 71:24, 74:8,
81:17, 88:1, 88:22,
100:1, 100:13, 101:1,
101:5, 101:20, 103:1,
103:2, 103:17,
103:19, 104:1, 104:3
**guy** - 10:12, 63:6,
180:14, 190:13,
192:4, 217:16
**guys** - 15:7, 75:13,
103:22, 105:23,
158:25, 168:18,
182:22, 189:10,
190:20, 191:17,
191:24, 208:10

---

## H

**Halethorpe** - 7:17,
7:18
**half** - 22:19
**hall** - 19:1, 21:10
**Hall** - 1:7, 9:14,
9:23, 10:1, 12:3, 12:8,
12:14, 12:22, 13:5,
14:2, 14:11, 15:16,
15:20, 15:24, 16:16,
17:8, 17:15, 17:20,
17:21, 18:8, 19:19,
19:21, 20:1, 20:5,
21:20, 24:10, 26:12,
27:9, 28:5, 28:17,
47:2, 47:12, 62:8,
64:13, 67:9, 68:11,
84:24, 85:15, 85:22,
89:14, 89:25, 102:2,
116:7, 116:16,
117:17, 120:4, 120:5,
120:15, 124:23,
124:24, 157:9, 173:9,
173:11, 173:13,
175:19, 177:8, 180:9,
192:4, 193:7, 194:22,
195:15, 196:7,
199:17, 202:10,
203:1, 203:11,
203:16, 207:19,
207:20, 208:17,
208:18, 209:1, 212:3,
212:8, 212:20, 213:5,
219:1, 219:6, 220:23,
224:21, 224:22
**Hall's** - 13:21, 88:3
**hallway** - 21:8
**Hamlet** - 2:6, 2:9,
3:23
**hand** - 14:20, 14:21,
30:4, 32:1, 35:20,
73:24, 129:25,
149:17, 150:6, 150:8,
195:19
**handed** - 58:18
**handgun** - 71:6,
138:9, 155:8, 167:14
**handguns** - 148:8,
148:9, 148:11, 148:18

**handle** - 2:16, 3:7,
51:8, 75:16, 79:6
**handled** - 2:24,
106:6
**hang** - 220:20
**hanging** - 67:25,
68:3
**Hanging** - 68:1
**happy** - 143:16,
203:19, 204:23
**hard** - 200:14,
200:15
**hat** - 38:21, 220:20
**head** - 39:3, 95:24,
119:14, 152:17,
204:25
**Head** - 39:5, 39:6
**heading** - 41:10,
41:11, 150:13, 163:13
**Heading** - 163:14
**hear** - 2:23, 18:17,
18:19, 18:21, 21:4,
95:7, 95:17, 181:22,
187:1, 187:2, 188:12,
188:14, 195:18,
199:9, 200:22,
205:21, 209:16,
209:18, 221:3,
223:15, 224:9,
224:21, 224:22
**heard** - 56:3, 56:9,
57:2, 72:4, 86:22,
181:11, 181:15,
183:9, 183:10,
186:11, 186:12,
186:14, 187:17,
189:3, 192:18,
195:24, 201:19,
218:25
**hearing** - 88:21,
94:21, 94:25, 200:16,
219:8, 225:2
**hearsay** - 97:11,
97:17, 170:16, 171:15
**heart** - 64:11
**heat** - 6:16
**Heavily** - 46:2
**heel** - 153:24
**help** - 172:1,
200:21, 211:8, 211:12
**Henry** - 170:7,
170:8, 176:6, 176:9,
176:14
**Heroin** - 208:1
**heroin** - 8:18,
71:15, 184:17,
184:22, 208:13
**hiding** - 16:7
**high** - 8:21, 9:9,
29:8, 29:13, 29:19,
61:7, 61:8, 61:20,
62:2
**highlighted** - 90:25,
91:3, 93:2
**highlights** - 132:13
**Hill** - 190:21, 215:4,
215:5
**himself** - 28:17,
40:5, 157:7, 157:13
**history** - 8:17
**Hit** - 14:21, 75:25,
112:9
**hit** - 30:3, 42:1,
43:4, 43:5, 51:16,
73:24
**Hold** - 141:9
**hold** - 75:9
**Hollins** - 14:17,
15:4, 30:24, 31:7,
31:13, 33:17, 33:21,

33:22, 35:14, 35:17,
35:19, 36:9, 41:23,
53:21, 53:23, 109:9,
109:11, 111:12,
111:13, 111:15,
113:5, 113:9
**home** - 9:2, 9:6,
45:11, 79:15, 100:18,
117:21, 118:16,
167:2, 178:13,
178:14, 178:16,
201:21, 201:24,
202:1, 202:23, 218:1
**homicide** - 24:2,
65:24, 66:2, 66:4,
79:17, 105:24, 119:4,
119:7, 146:8, 146:11,
146:16, 146:23,
147:8, 147:9, 147:18,
147:19, 156:18,
156:20, 158:16,
166:14, 169:12,
169:18, 174:21,
207:12, 214:8, 214:24
**Honor** - 3:1, 6:2,
6:8, 6:19, 42:24, 49:6,
52:13, 54:20, 64:2,
73:21, 76:11, 77:24,
78:6, 90:20, 93:20,
95:16, 101:13,
102:19, 102:24,
104:16, 107:4,
120:24, 124:7,
125:13, 127:3, 127:4,
131:9, 133:7, 135:20,
138:20, 140:1, 141:4,
142:14, 143:1, 145:4,
145:9, 149:12,
159:12, 161:3,
161:10, 165:5,
165:10, 170:12,
170:17, 173:22,
176:3, 179:2, 185:23,
195:4, 198:2, 198:6,
216:5, 216:12, 218:6,
223:1, 224:14
**Honorable** - 1:12
**Hope** - 6:14
**hoping** - 220:16
**hospital** - 44:15,
44:17, 44:18, 45:2,
45:12
**hotspot** - 13:24
**hour** - 3:2, 5:22,
144:11, 160:19,
160:23
**hours** - 61:23,
61:24, 62:1, 74:16,
130:3
**house** - 27:22,
27:24, 34:9, 37:13,
37:19, 37:23, 38:4,
40:13, 40:20, 40:22,
41:5, 61:20, 80:3,
80:9, 81:5, 81:21,
87:17, 89:16, 90:1,
90:13, 91:19, 98:18,
98:24, 128:18,
146:14, 148:24,
149:1, 149:15,
149:20, 150:11,
150:23, 151:19,
154:2, 162:9, 162:12,
162:22, 162:24,
163:3, 163:25,
164:15, 171:25,
178:20, 182:17,
182:23, 183:2, 184:7,
188:17, 191:16,
204:4, 208:19, 209:1

**houses** - 34:13,
36:23, 36:25, 37:14,
38:10, 80:21, 80:25,
81:2
**hundred** - 13:13,
13:14, 133:4, 213:15
**hundreds** - 28:3,
28:19, 38:16
**hung** - 86:1, 191:16
**Huron** - 30:23,
31:13, 32:21, 33:17,
109:9, 109:14, 111:2,
111:13, 113:11,
114:12
**hustling** - 59:12

---

## I

**I's** - 143:12, 143:19
**Iad** - 121:13,
121:20, 125:21
**Ibis** - 132:18
**idea** - 16:12, 25:14,
37:17, 62:24, 62:25,
140:25, 217:4
**identification** -
25:24, 26:6, 27:4,
48:14, 73:15, 90:20,
116:23, 118:12,
133:4, 133:9, 133:22,
137:25, 147:3,
172:24, 208:5
**Identification** -
132:19
**identified** - 9:22,
26:13, 48:11, 52:2,
71:21, 77:11, 114:7,
116:24, 118:20,
164:24, 171:9, 196:7
**identify** - 74:1, 74:2,
95:22, 116:6, 118:20,
157:7, 172:8, 172:20,
172:24
**identities** - 171:24
**ignored** - 26:18,
26:19
**Iii** - 176:9, 176:14
**illuminate** - 11:13
**image** - 172:11
**immediate** - 18:9
**immediately** - 16:1,
170:3, 173:7
**imparted** - 137:22
**impartial** - 3:3, 5:20
**impeach** - 92:18,
97:14
**impeachment** -
97:5
**implicate** - 157:13,
157:15
**important** - 8:25,
203:13
**inaccurate** - 92:7
**incident** - 157:5,
157:12, 170:5
**include** - 66:10,
66:13, 154:18
**included** - 159:8
**incompetence** -
217:7
**inconsistent** -
93:15, 94:10, 94:23,
96:23, 97:18, 103:7
**incrimination** -
218:12
**indeed** - 151:20
**independent** -
123:22, 124:18
**independently** -
217:4

**indicate** - 34:2,
36:2, 37:3, 80:15,
112:21, 119:11,
119:17, 119:22,
149:25, 150:12
**indicated** - 2:17,
9:21, 31:24, 33:9,
35:22, 98:13, 116:12,
155:13, 158:3,
166:11, 221:2, 222:13
**indicating** - 32:19,
32:20, 148:17
**indication** - 173:16
**indications** -
165:25, 166:2, 166:5,
166:6
**indictment** - 64:12,
64:13, 175:18, 194:4,
194:6
**individual** - 49:19,
106:10, 116:12,
157:18, 163:2, 163:7,
164:7
**individual's** -
121:10
**individuals** - 27:8,
162:6, 172:18,
172:25, 219:7
**indulgence** -
172:16, 173:1
**ineffective** - 217:19
**inference** - 194:20
**Infiniti** - 32:25, 34:5
**information** -
119:13
**initials** - 31:18,
31:21, 42:10, 136:16
**injured** - 115:23
**injuries** - 43:24
**inside** - 21:1, 156:8,
156:9
**installed** - 159:22
**instance** - 12:23,
15:22, 23:14, 77:9,
114:20
**instead** - 10:5,
21:20, 23:13
**instruct** - 212:16
**instructed** - 43:3
**instruction** - 19:20,
20:15, 175:9, 175:13,
175:24
**instructions** -
142:11
**insurance** - 45:14
**Integrated** - 132:18
**intel** - 105:14, 166:9
**intelligence** -
105:15
**intending** - 22:3
**intends** - 217:1
**interest** - 76:3,
169:25, 170:2, 173:6
**interested** - 15:19,
78:3, 101:9, 106:3,
106:9
**internal** - 121:10,
121:12
**interrogate** - 156:14
**interview** - 45:18,
46:24, 79:14, 81:21,
117:20, 118:6,
156:17, 157:10,
157:17, 158:7, 170:22
**interviewed** - 62:15,
124:16, 156:19,
164:4, 181:13, 214:8,
215:1, 215:5
**interviewing** -
169:11, 170:6, 170:8

8

**intra** - 174:15
**intra-gang** - 174:15
**introduce** - 140:14
**introduced** -
159:12, 161:3
**invasions** - 167:2
**inventory** - 115:11
**investigated** -
106:17
**investigation** -
110:9, 115:1, 115:19,
116:6, 117:15,
121:19, 125:1,
125:21, 146:25,
156:13, 157:6,
165:22, 166:1, 166:7,
169:22, 170:4, 171:8,
207:13
**investigations** -
105:24
**investigator** -
105:19, 168:22
**involve** - 62:12,
224:19
**involved** - 100:21,
148:8, 166:5, 166:13,
169:23, 170:10,
171:19, 180:2, 180:10
**involvement** -
157:11, 194:25
**involves** - 224:16
**ironic** - 100:25
**issued** - 72:11,
72:12, 72:17, 143:22
**issues** - 143:12
**item** - 77:4, 79:14,
88:14, 107:5, 113:24,
114:7, 169:5
**items** - 12:21, 72:1,
72:14, 74:22, 88:14,
168:1
**itself** - 132:5,
153:25, 162:19, 169:6

## J

**Jackson** - 23:23,
24:6, 24:17, 24:22,
25:16, 26:6, 26:7,
26:14, 27:4, 34:23,
34:24, 51:19, 55:2,
55:21, 62:7, 62:16,
63:3
**Jackson's** - 25:21
**jail** - 182:7, 201:22,
209:24, 210:2, 211:2
**January** - 55:13,
55:18, 64:14, 64:17
**jeans** - 38:21,
158:14
**Jerrell** - 192:15,
192:17, 193:4, 193:8,
194:13, 194:14,
217:10
**Jj** - 75:4
**Jocelyn** - 2:6, 3:23
**John** - 1:13
**Jones** - 45:17, 48:7,
49:11, 108:18,
120:25, 143:16,
143:17, 216:18,
218:22, 220:12,
220:14
**Jones'** - 221:22
**Jr** - 1:13
**judge** - 3:13, 61:18
**Judge** - 1:12, 18:12,
19:18, 42:4, 61:15,
64:7, 69:6, 93:18,
125:2, 130:9, 133:11,

141:25, 194:17,
196:12, 212:15,
213:21, 215:13,
217:2, 220:10, 222:4,
224:20
**judge's** - 61:16
**judgment** - 2:14,
4:13
**Jumping** - 182:12
**juncture** - 90:20
**June** - 170:6
**Juror** - 2:4, 2:11,
2:13, 2:17, 3:11, 3:12,
3:19, 3:20, 3:25, 4:3,
4:7, 4:11, 4:14, 4:21,
4:23, 4:24, 4:25, 5:4,
5:8, 5:11, 5:21, 6:3
**juror** - 3:10, 5:20
**Jurors** - 36:19, 73:7
**jurors** - 6:6, 19:6,
19:11
**Jury** - 1:12, 2:2,
6:13, 21:12, 82:25,
145:5, 175:12, 195:5,
223:12
**jury** - 4:22, 6:4,
6:12, 8:25, 9:25, 12:8,
12:20, 14:9, 15:3,
15:14, 16:11, 16:19,
18:17, 18:21, 19:4,
20:15, 22:8, 23:16,
24:16, 27:19, 29:24,
30:6, 30:20, 31:4,
32:6, 34:1, 35:8, 36:2,
37:3, 39:1, 40:1,
41:13, 41:21, 43:3,
43:16, 50:2, 50:17,
54:12, 62:8, 69:3,
70:9, 72:8, 78:25,
80:16, 84:22, 84:23,
112:16, 122:17,
123:13, 134:15,
135:2, 142:10, 145:2,
146:5, 149:25, 151:4,
151:14, 151:19,
155:5, 162:23, 164:1,
165:16, 168:8, 169:2,
179:18, 182:22,
184:5, 190:19, 194:7,
195:18, 200:14,
203:21, 205:25,
207:18, 210:1,
221:13, 221:17,
222:9, 223:7, 223:10,
223:14
**jury's** - 72:4, 161:19

## K

**Kareem** - 180:20,
181:10, 181:23,
200:8, 200:25,
201:14, 205:9
**Kareem's** - 202:3
**Kazmarek** - 65:3,
65:5, 65:10, 65:14,
82:15, 117:7, 128:18,
134:25
**Keep** - 51:24, 84:18,
198:12, 198:15
**keep** - 52:6, 59:21,
84:17
**Kent** - 185:2, 185:3,
185:12, 186:3, 187:11
**kept** - 33:19, 47:20
**Kershaw** - 207:11,
215:7
**Kev** - 57:22, 57:23,
170:11, 180:19,
183:19, 196:17

**Kevin** - 156:14,
169:12, 178:22
**kicking** - 58:8
**kids** - 188:16
**kill** - 174:11, 174:22,
174:23, 193:3, 193:8,
195:20
**killed** - 55:6,
178:14, 181:10,
184:7, 193:9, 201:14,
218:16
**killing** - 174:15
**killings** - 174:16
**kills** - 195:11
**kind** - 39:10, 51:1,
51:8, 125:11, 207:23
**kitchen** - 151:24
**knowledge** - 54:13,
100:20, 139:19,
156:15, 157:11,
169:22, 180:9, 202:10
**knowledgeable** -
174:2
**Known** - 67:11,
180:23
**known** - 2:6, 48:25,
63:11, 66:11, 110:20,
167:7, 171:11,
171:12, 173:10,
173:11, 173:12,
174:13, 177:22,
179:15, 199:21,
201:10, 217:6
**knows** - 2:18,
143:15

## L

**lab** - 76:15, 78:8,
108:15, 117:5,
168:17, 168:19, 172:2
**laboratory** - 132:4,
132:20
**lack** - 92:23, 194:25
**ladies** - 134:14,
135:1, 165:15, 168:7,
169:1, 216:15
**Ladies** - 42:6, 83:1,
95:6, 133:17, 144:5,
222:12
**lady** - 164:2, 197:11
**large** - 137:19,
150:24, 152:19, 153:7
**Larry** - 26:21, 26:23,
26:24, 31:10, 33:8,
33:11, 56:22, 57:1,
58:23, 59:1, 59:4
**Last** - 105:1
**last** - 7:2, 21:17,
46:24, 65:12, 77:14,
83:14, 85:15, 95:23,
96:6, 104:24, 131:19,
145:19, 146:7,
176:16, 176:18,
176:22, 196:20,
209:23, 217:15
**lasts** - 62:3
**late** - 55:17, 56:8,
82:20, 186:10, 217:15
**Late** - 56:8
**laughing** - 13:23
**law** - 6:25, 65:7,
83:10, 104:22,
131:15, 145:15,
176:11, 198:10
**lawyer** - 143:2,
218:20, 221:22
**lawyers** - 124:17
**laying** - 47:19
**lead** - 168:21

**leads** - 169:22
**leak** - 206:15
**Lean** - 199:3
**leaning** - 152:18
**learn** - 117:10
**learned** - 117:5,
159:4, 197:14
**least** - 12:4, 12:6,
22:12, 22:14, 43:19,
52:14, 60:23, 80:8,
86:1, 98:1, 98:5,
98:12, 98:21, 121:8,
127:14, 148:4, 148:9,
149:5, 151:13,
162:11, 183:7, 184:23
**leave** - 93:12, 96:6,
140:5, 179:9, 211:12
**leaving** - 118:1,
118:2, 162:12,
172:19, 211:16
**led** - 69:1
**left** - 8:11, 8:20, 9:8,
10:22, 14:20, 14:21,
30:4, 33:7, 36:6, 36:7,
36:8, 36:10, 41:5,
43:20, 43:21, 61:11,
61:2, 63:16, 63:18,
73:24, 75:25, 88:17,
129:6, 150:6, 150:8,
152:18, 163:19,
164:9, 164:10
**left-hand** - 14:20,
14:21, 30:4, 73:24,
150:6, 150:8
**leg** - 42:1, 42:2,
42:3, 43:5, 43:20,
44:18, 61:1, 61:2,
61:3
**lend** - 57:1, 57:6,
57:15
**lending** - 51:18
**length** - 166:12
**lent** - 24:1
**less** - 78:3
**Letter** - 125:23,
126:11, 211:15
**level** - 125:24,
125:25, 133:5, 133:6,
199:7
**lid** - 214:17
**lie** - 102:9
**light** - 3:12, 159:15,
159:17, 165:22,
166:7, 167:5, 167:13,
168:14, 174:21
**lights** - 159:21
**likely** - 141:25,
174:14, 195:12
**limiting** - 19:20,
20:15
**line** - 7:21, 7:22,
29:23, 141:17
**lined** - 222:1
**lines** - 12:1
**lineup** - 62:20, 63:1,
63:9, 63:10, 63:13,
63:17, 142:6
**linked** - 101:6
**Linnard** - 157:18,
178:8, 180:19,
191:12, 218:24
**lips** - 200:19
**list** - 132:15, 132:23
**listed** - 20:14, 42:8,
42:10, 73:3
**live** - 85:6, 85:19,
85:20, 178:4, 188:22
**Live** - 177:12
**lived** - 86:12, 86:16,
87:5, 87:8, 117:23,

177:13, 177:15,
180:23, 199:25,
200:5, 225:1
**lives** - 2:19, 5:6,
81:23
**living** - 7:15, 85:25,
86:23, 87:1, 151:22,
153:6, 177:25,
188:23, 188:25, 205:3
**loaded** - 75:7,
78:21, 79:6, 161:13
**loading** - 151:6,
162:21
**loan** - 23:15, 23:18
**loaned** - 10:15,
24:17, 34:23
**locate** - 68:20
**located** - 151:5
**location** - 31:9,
87:13, 111:8, 111:20,
111:23, 113:22,
117:16, 152:7, 153:20
**locked** - 56:14,
138:14, 208:10
**logged** - 107:1
**logistically** - 221:22
**Look** - 48:20, 190:10
**look** - 4:8, 11:6,
11:7, 18:22, 35:7,
36:11, 48:3, 52:20,
53:6, 71:9, 75:23,
76:7, 76:14, 110:15,
137:21, 147:24,
149:8, 154:5, 154:25,
158:25, 160:24,
163:6, 165:8
**looked** - 28:9,
31:21, 103:25,
139:17, 172:17,
205:13, 212:20,
213:6, 223:18
**looking** - 19:6, 50:7,
53:20, 96:1, 109:13,
109:14, 111:11,
112:14, 113:17,
137:22, 138:5,
149:20, 150:2,
151:15, 152:13,
153:6, 153:12,
153:13, 153:16,
155:6, 160:8, 208:9,
212:4, 212:9, 212:23
**Looking** - 162:18
**looks** - 51:5, 53:20,
75:9, 109:16, 146:22,
153:15, 154:3
**lose** - 126:1
**Lotus** - 90:22
**loud** - 95:11, 95:13,
187:3
**low** - 125:24
**Low** - 125:25
**low-level** - 125:24
**Low-level** - 125:25
**Kazwer** - 14:20, 30:3,
74:23, 75:25
**lucky** - 130:23,
130:25
**Luger** - 114:12
**lunch** - 82:22, 83:3,
140:21, 140:24,
142:11, 144:3, 144:6,
144:11, 217:3
**Lunch** - 144:12
**lunchtime** - 221:23
**lung** - 43:21
**lying** - 130:6

## M

9

**Ma'am** - 103:16
**ma'am** - 84:18, 87:14, 87:25, 134:8
**machine** - 73:8
**Mack** - 10:5, 10:12, 11:11, 11:17, 11:23, 29:13, 34:12, 36:3, 37:1, 37:4, 37:15, 38:10, 38:16, 39:22, 39:24, 40:2, 40:8, 47:11, 48:25, 50:8, 50:19, 51:19, 54:7, 54:15, 55:21, 56:2, 56:14, 57:25, 58:1, 58:4, 58:14, 58:18, 60:3, 62:12, 67:11, 67:16, 103:1, 104:2, 116:6, 116:13, 173:12, 177:20, 177:21, 180:19, 181:24, 182:5, 183:21, 184:3, 184:10, 186:9, 187:3, 187:14, 187:25, 188:1, 189:13, 192:18, 193:3, 196:2, 204:14, 204:18, 204:23
**Mack's** - 46:4, 46:11, 58:19, 184:9, 184:15, 186:6, 214:2, 215:9
**Mad** - 203:22, 203:24
**mad** - 203:25
**magazine** - 51:8, 71:6, 75:6, 153:23, 153:25, 154:4, 154:15, 154:25, 155:2, 155:12, 155:17, 155:23, 155:25, 156:1, 156:3, 168:4, 168:8, 168:22, 169:9
**magnum** - 71:4, 75:3
**mailed** - 217:3
**main** - 158:19
**Maisel** - 11:21, 11:24, 14:10, 15:9, 15:23, 31:1, 58:7, 146:12, 146:13, 146:15, 149:19, 150:14, 150:17, 151:8, 151:17, 153:14, 153:17, 163:1, 163:14, 185:18
**majority** - 43:19
**Mall** - 158:13
**Mama** - 2:6, 3:23
**man** - 19:21, 177:1, 178:10
**manner** - 28:10, 28:12, 148:4, 172:18, 172:19, 172:21
**manufacture** - 137:25
**manufactured** - 135:4
**manufacturers** - 132:22
**manufacturing** - 133:1
**map** - 14:13
**March** - 66:5, 66:6, 68:24, 74:16, 79:15, 86:20, 86:25, 87:8, 87:14, 97:24, 114:21, 117:7, 128:12, 128:17, 146:10,

169:18, 175:16, 178:11, 182:11, 197:2
**Marie** - 83:6, 83:8, 83:13
**marijuana** - 8:19
**mark** - 31:16, 160:14
**marked** - 34:14, 47:25, 53:16, 59:16, 79:25, 90:19, 108:13, 111:21, 113:16, 118:10, 118:11, 136:7, 149:11, 151:12, 151:14, 152:12, 153:2, 153:9, 154:17, 155:15, 208:4
**Marked** - 80:1
**marker** - 155:6, 155:24
**markers** - 155:5
**market** - 58:15
**marking** - 52:6
**markings** - 136:15, 137:22, 138:1, 138:4, 138:10
**marriott** - 177:1
**marshal's** - 142:16
**marshals** - 143:23
**Martie** - 140:13, 146:17, 146:20, 149:16, 152:15, 157:7, 165:22, 165:23, 166:1, 174:10, 175:16, 175:20, 178:6, 183:23, 184:3, 184:9, 187:8, 187:9, 187:25, 188:1, 188:8, 189:14, 192:12, 192:19, 193:12, 193:19, 194:4, 194:8, 194:11, 194:15, 195:1, 196:24, 196:25
**Martie's** - 166:10, 192:10, 192:13, 195:9
**Maryland** - 1:1, 7:11, 45:6, 165:19
**mask** - 12:14, 28:8, 39:9, 39:10, 39:11, 39:13, 117:2
**matched** - 101:6, 117:6
**matching** - 138:8
**matter** - 3:11, 19:24, 21:14, 73:15, 122:18, 125:11, 175:14, 191:4, 193:18, 194:8, 194:20, 224:2, 224:16, 225:21
**matters** - 2:4
**Mcclinton** - 198:5, 198:8, 198:14, 198:17, 198:20, 198:24, 199:12, 200:13, 200:16, 200:21, 201:18, 209:6, 209:10, 211:19, 212:19, 213:18, 216:1, 220:8
**mean** - 10:8, 12:10, 15:7, 16:3, 18:11, 22:1, 22:20, 22:21, 39:12, 40:4, 51:7, 52:10, 58:7, 60:16, 62:23, 67:22, 71:14, 90:10, 169:2, 169:3, 180:4, 183:13, 186:25, 187:8, 205:7
**means** - 183:11
**mechanical** - 1:24

**medical** - 45:13
**medication** - 45:25
**medics** - 53:12, 130:4
**meet** - 10:4, 31:10, 33:8, 143:3, 221:23
**meeting** - 52:18, 63:2, 84:2, 89:22, 169:16, 172:12, 207:11, 213:24
**member** - 133:1, 165:24, 166:1, 166:3, 174:12, 174:15
**members** - 148:20, 152:21, 174:11, 174:22, 174:23, 181:2
**memory** - 44:16, 50:18, 91:6, 98:6
**mentioned** - 2:21, 24:16, 24:18, 180:14
**message** - 18:23
**met** - 9:14, 9:25, 10:3, 11:16, 11:19, 45:21, 45:23, 152:21, 198:21
**metal** - 18:17, 81:10, 138:1, 138:3, 168:9, 168:10
**Michael** - 6:23, 7:3
**microphone** - 51:25, 83:17, 83:18, 176:18, 195:19, 199:4, 199:5, 199:8, 200:18
**microscope** - 137:19, 138:6
**microscopic** - 137:15
**microscopically** - 132:7, 137:11
**middle** - 53:3, 80:21, 110:25, 130:6
**might** - 23:20, 33:20, 55:16, 55:17, 58:14, 82:6, 89:7, 100:22, 110:16, 114:20, 117:16, 140:20, 142:4, 159:1, 188:16, 191:13, 192:19, 193:8, 195:16, 195:20, 195:22
**Might** - 190:11
**mild** - 125:14
**military** - 74:18
**millimeter** - 51:9, 71:6, 75:5, 75:9, 75:10, 75:18, 76:4, 76:19, 76:22, 82:3, 101:6, 112:1, 113:20, 114:12, 167:14
**mind** - 10:25, 40:4, 40:7, 194:24, 221:16
**Mine** - 53:11
**mine** - 10:3, 34:22
**minor** - 210:3
**minute** - 12:2, 82:21, 147:25, 223:8, 223:10
**minutes** - 10:18, 34:11, 62:3, 140:10, 142:1, 147:20, 212:3, 212:7, 212:22, 213:11
**Miss** - 2:9, 83:24, 104:7, 117:25, 118:1, 118:13, 118:15, 131:23, 133:8, 133:21, 134:6, 135:23, 136:6, 139:22, 140:4,

142:22, 142:23, 143:13, 181:5, 201:8, 217:20, 217:23, 221:25
**mistake** - 62:6
**model** - 135:2, 135:5
**moment** - 65:16, 127:3, 158:18, 165:5, 183:10, 198:1, 218:25, 220:21
**moments** - 172:14
**Mondawin** - 158:13
**money** - 17:6, 17:8, 17:10, 21:23, 22:3, 22:23, 23:2, 23:17, 51:19, 56:25, 57:1, 57:6, 57:9, 57:11, 57:15, 57:16, 58:18, 58:19, 59:2, 167:3, 182:24
**monitor** - 10:22
**monitors** - 30:6, 162:16
**month** - 55:15, 55:16, 82:7, 90:16, 98:13, 101:23
**months** - 56:15, 205:17
**Moody** - 159:13, 161:4, 207:12, 213:25, 214:3, 215:6, 219:2, 220:4
**morning** - 3:20, 4:25, 6:14, 6:19, 7:7, 54:23, 65:20, 65:21, 82:21, 83:24, 84:1, 105:5, 105:6, 106:14, 127:18, 127:20, 127:25, 128:4, 128:23, 144:9, 182:19, 216:24, 218:1, 222:21, 223:19
**most** - 22:12, 141:25
**Most** - 16:2, 51:17
**mother** - 25:5, 25:6, 85:7, 210:18
**motion** - 143:8
**mouth** - 197:8
**move** - 41:17, 41:22, 111:19, 149:18, 179:3, 195:19, 199:12, 199:14, 200:17
**moved** - 76:11, 164:5, 172:22, 178:5, 223:20, 223:21
**moving** - 117:4
**multiple** - 22:7, 56:9, 148:6
**murder** - 55:2, 62:7, 62:16, 140:14, 148:19, 148:22, 150:3, 152:8, 157:7, 157:8, 157:9, 158:11, 159:9, 161:15, 161:22, 161:23, 169:24, 171:10, 175:16, 175:20, 181:9, 182:11, 184:1, 188:12, 192:3, 193:19, 194:4, 194:9, 194:11, 194:15, 195:1, 195:15, 196:22, 196:23, 204:2, 204:19, 205:2, 205:17
**murdered** - 149:16, 172:14, 178:11

**must** - 43:11, 63:11

## N

**name** - 2:7, 2:18, 2:20, 5:3, 7:1, 7:2, 48:10, 61:16, 65:9, 65:12, 69:16, 83:12, 83:14, 84:8, 85:12, 85:15, 89:12, 89:13, 104:24, 105:1, 124:1, 124:23, 131:17, 131:18, 131:19, 134:12, 142:21, 143:16, 145:7, 145:19, 146:16, 158:21, 166:11, 176:12, 176:15, 176:16, 176:18, 192:15, 198:11, 214:2, 215:9
**named** - 23:22, 26:21, 67:9, 89:4, 106:10, 116:13, 156:14, 157:18, 180:15, 192:5, 208:23
**names** - 170:3
**Nancy** - 145:22
**narrow** - 161:4
**nature** - 69:3, 123:13
**Near** - 186:3
**nearby** - 190:21
**necessarily** - 19:3, 174:11
**necessary** - 200:19, 223:22, 224:3
**need** - 62:4, 110:3, 124:6, 124:22, 139:15, 143:11, 147:2, 147:12, 212:10, 214:3, 217:8, 217:20, 223:6, 225:2
**needed** - 18:24, 57:14
**needs** - 108:2, 218:4
**Negative** - 77:19
**negative** - 77:20, 154:23
**neighbor's** - 153:16
**neighborhood** - 10:7, 13:24, 26:16, 59:5, 59:8, 67:7, 91:20, 119:23, 120:1, 177:12, 177:14, 177:16, 179:1, 182:2, 190:21
**never** - 58:21, 58:23, 59:3, 62:9, 99:23, 100:5, 100:14, 103:21, 112:4, 164:23, 173:16, 179:15, 181:15, 181:16, 201:2, 201:4
**next** - 6:17, 22:5, 53:4, 83:4, 83:5, 104:12, 111:22, 117:14, 140:10, 140:12, 140:17, 145:3, 145:8, 152:2, 153:16, 154:1, 176:5, 176:6, 190:13, 198:2, 198:4, 200:18
**Next** - 104:11
**Nice** - 3:21
**nice** - 6:15, 40:9
**nickname** - 3:23, 177:18
**night** - 27:18, 27:19,

29:16, 38:24, 44:2,
46:24, 47:8, 56:23,
58:8, 61:9, 61:10,
62:23, 63:6, 171:25,
182:18, 188:13,
205:2, 207:5, 207:7
  **nine** - 51:9, 71:5,
75:5, 75:9, 75:10,
75:18, 76:4, 76:18,
76:22, 82:3, 101:5,
112:1, 113:20,
114:12, 167:13
  **nobody** - 15:8, 40:3
  **noise** - 95:11, 96:4
  **non** - 105:19,
105:21
  **Non** - 105:22
  **non-fatal** - 105:19,
105:21
  **Non-fatal** - 105:22
  **none** - 101:11,
197:12
  **Norfolk** - 11:20,
200:7
  **normal** - 81:9
  **normally** - 159:21
  **note** - 3:1, 3:22, 5:2
  **noted** - 4:5, 46:25,
49:7, 92:12, 163:24,
193:21
  **notes** - 3:12, 46:23,
90:22, 118:23
  **Notes** - 90:23
  **Nothing** - 63:23,
64:19, 126:4, 126:5,
139:20, 215:21, 223:6
  **nothing** - 64:20,
143:24, 179:15
  **notice** - 34:7,
162:12
  **noticed** - 19:4, 19:5,
19:9, 19:10, 32:24,
34:7, 193:15
  **November** - 55:17,
61:13
  **number** - 72:9,
72:10, 72:11, 72:12,
72:22, 73:3, 73:19,
74:2, 74:6, 74:9, 75:4,
75:5, 76:5, 76:23,
77:5, 77:6, 77:12,
78:5, 78:7, 106:8,
106:23, 107:19,
107:21, 107:23,
109:1, 113:18,
113:25, 114:3, 114:8,
114:16, 114:17,
115:7, 115:15,
132:17, 134:15,
134:18, 135:3, 135:5,
136:12, 147:3, 147:6,
147:9, 147:10,
147:12, 153:18,
223:18
  **numbers** - 36:18,
36:19, 72:17, 72:25,
73:2, 113:18
  **Numerous** - 132:14
  **numerous** - 49:1,
178:17

**O**

  **o'clock** - 58:7,
61:11, 82:22, 82:23,
83:3, 141:23, 144:7,
188:13, 216:10,
222:10, 222:15,
222:23, 223:20,
225:15

  **oath** - 94:24, 95:1,
96:24, 97:16, 97:19,
103:8, 103:10
  **objection** - 6:7,
18:13, 20:7, 20:9,
69:13, 73:11, 92:13,
93:19, 107:8, 107:10,
123:4, 133:12,
170:20, 171:3, 195:2
  **Objection** - 69:6,
91:15, 116:9, 120:9,
120:16, 122:25,
123:24, 124:2,
170:12, 171:15,
174:17, 190:3, 191:2,
191:6, 192:21, 209:7
  **objection's** - 92:12,
195:6
  **objections** - 193:21
  **obscured** - 60:18
  **obscuring** - 60:13
  **observation** - 13:20
  **observations** -
27:7, 118:16
  **observe** - 17:14,
37:12, 40:8
  **observed** - 32:7,
87:16, 111:8, 112:11
  **obtained** - 18:10,
123:18, 123:20, 166:9
  **obviously** - 44:1,
93:5
  **occasion** - 8:20,
26:7, 38:16, 68:25,
84:2, 106:13, 108:4,
118:6, 146:10,
157:17, 181:11,
189:18, 198:21,
201:18, 205:5
  **occasions** - 21:19,
23:13, 38:17, 178:17
  **occur** - 98:7, 195:12
  **occurred** - 9:1,
26:6, 30:21, 31:9,
31:23, 68:19, 82:6,
89:15, 91:18, 108:5,
147:18, 147:19,
156:18, 156:22, 184:6
  **occurrence** -
134:21
  **occurs** - 14:10
  **offender** - 209:25,
210:21
  **offense** - 210:1
  **offer** - 133:8, 193:22
  **offered** - 194:3
  **offering** - 191:3
  **office** - 156:19,
156:20, 156:25,
169:12
  **officer** - 18:20,
20:21, 65:3, 93:13,
93:23, 94:8, 94:18,
95:1, 95:10, 96:17,
103:4, 103:8, 121:5,
121:17, 211:16
  **Officer** - 21:2, 21:7,
21:11, 134:25, 208:9,
213:25, 214:2, 215:6
  **officers** - 19:15,
80:9, 100:9, 219:3,
220:1
  **official** - 212:1
  **often** - 21:25, 67:19,
177:22
  **Ohio** - 8:4
  **Oho** - 145:21
  **old** - 7:7, 61:18,
84:14, 122:14,
146:18, 176:24,

199:1, 210:4
  **once** - 20:16, 26:6,
30:19, 60:19, 138:2
  **One** - 75:2
  **one** - 2:14, 10:25,
18:4, 19:17, 20:22,
21:24, 22:12, 22:13,
24:11, 26:9, 26:16,
37:9, 43:20, 43:22,
46:24, 51:13, 52:2,
54:1, 55:21, 56:3,
59:7, 63:18, 64:8,
64:11, 72:12, 75:3,
75:4, 84:2, 85:3, 85:4,
85:5, 88:24, 90:21,
92:1, 92:16, 92:17,
98:1, 98:25, 99:1,
100:24, 101:5,
107:15, 108:14,
112:11, 112:14,
114:12, 114:15,
115:5, 120:23,
122:11, 123:9, 127:2,
127:15, 129:10,
130:15, 130:23,
133:20, 137:6, 138:8,
138:9, 138:11,
138:12, 140:7, 141:9,
142:2, 152:7, 165:5,
166:9, 166:10,
172:23, 172:25,
175:5, 192:10,
198:21, 200:17,
208:10, 215:6, 215:7,
216:14, 216:15,
223:7, 223:18
  **one-year** - 56:3
  **open** - 58:15
  **open-air** - 58:15
  **opening** - 224:24
  **operability** -
135:11, 136:1
  **operable** - 135:15
  **operator** - 124:16
  **opinion** - 19:5,
133:18, 133:21,
133:23, 138:15,
178:24, 179:13,
179:16, 197:4, 197:7,
197:10, 197:13
  **opportunity** - 11:7,
28:7, 31:16
  **oppose** - 143:7
  **opposed** - 3:9,
76:19, 123:9, 161:17
  **order** - 15:10,
15:15, 15:16, 15:23,
16:4, 16:6, 16:16,
17:11, 194:24, 224:23
  **ordered** - 142:14
  **organization** -
133:2
  **orient** - 30:14,
149:14, 150:4
  **oriented** - 30:12,
30:20
  **original** - 123:16
  **originally** - 212:19
  **ostensibly** - 189:10
  **otherwise** - 32:19
  **Otherwise** - 125:12
  **ought** - 218:8,
218:19
  **outside** - 6:21,
19:15, 20:25, 21:3,
21:6, 21:9, 21:10,
184:7
  **overruled** - 133:15,
195:2, 195:6
  **Overruled** - 116:10,

120:17, 171:17,
174:19
  **Overt** - 219:24
  **overt** - 20:11, 20:13,
42:7, 42:10, 175:9,
175:17, 175:21,
175:23, 193:19,
219:21, 219:23
  **overtime** - 127:14
  **owe** - 51:19
  **own** - 28:14, 28:15,
72:9, 114:2, 147:9
  **owned** - 117:20
  **owner** - 71:23

**P**

  **package** - 71:11
  **packaged** - 12:22,
12:24, 71:15, 71:17
  **packaging** - 136:15
  **page** - 36:6, 118:10
  **paid** - 209:14
  **pair** - 158:13
  **paper** - 63:10
  **papers** - 201:19,
202:11, 202:15,
202:19, 203:17,
204:14, 204:18,
212:4, 212:9, 212:20,
212:23, 213:6
  **paperwork** - 78:12,
181:11
  **Para** - 71:6, 75:5
  **Paragraph** - 42:8,
175:17, 194:3
  **Pardon** - 89:18,
200:2, 202:18, 204:5,
206:21, 208:21
  **Parsons** - 6:21,
6:23, 7:3, 7:4, 7:7,
14:22, 30:4, 41:1,
42:20, 48:24, 64:4,
64:23, 106:11,
106:14, 106:16,
107:16, 113:21,
129:5, 130:21, 175:15
  **part** - 7:10, 7:18,
14:21, 59:5, 66:17,
68:17, 69:25, 72:6,
123:14, 135:7,
171:13, 173:14,
185:1, 194:21
  **Part** - 66:14
  **parte** - 224:5
  **partially** - 158:19
  **particular** - 11:11,
25:12, 28:15, 31:8,
36:18, 66:20, 69:19,
71:24, 72:5, 73:9,
73:12, 74:3, 76:3,
77:4, 77:8, 77:11,
79:14, 82:3, 86:21,
88:14, 92:19, 106:9,
106:17, 106:24,
107:24, 112:12,
113:24, 115:10,
117:6, 121:5, 121:15,
121:16, 122:17,
123:7, 134:19,
136:14, 136:20,
160:19, 172:21
  **particularly** - 82:3,
97:12, 99:13, 168:2
  **parts** - 154:1, 155:7
  **passed** - 33:1,
33:10
  **past** - 33:22, 98:18,
167:4
  **patrol** - 66:8, 66:13,

66:25, 67:1, 67:23,
79:25, 80:1, 80:4
  **Patrol** - 79:21
  **patrolmen** - 79:22
  **Pay** - 162:15
  **pay** - 13:3, 13:15,
13:17, 18:9, 21:21,
22:3, 209:17, 209:19
  **paying** - 21:20,
23:13
  **peaceful** - 179:17,
197:5, 197:14, 197:15
  **peacefulness** -
179:14
  **pen** - 31:4, 214:18
  **penalty** - 94:24
  **pending** - 217:19
  **People** - 95:13
  **people** - 10:8, 14:2,
18:20, 18:24, 20:25,
21:5, 58:12, 58:14,
81:2, 91:19, 95:8,
96:5, 153:18, 161:24,
162:9, 162:13,
163:24, 164:13,
164:24, 171:24,
172:9, 173:6, 181:13,
182:1, 182:6, 204:20
  **people's** - 202:7
  **percent** - 93:20
  **perhaps** - 144:7,
144:8, 221:14
  **period** - 10:11,
12:2, 56:3, 67:3, 67:8,
177:21, 183:25
  **perjurious** - 218:18
  **perjury** - 94:25,
212:2, 213:10, 213:14
  **permitted** - 20:13,
92:22, 93:14, 97:15,
125:7, 133:23
  **perpendicular** -
109:9
  **person** - 5:10, 5:15,
5:18, 10:15, 14:7,
17:2, 17:6, 17:9,
23:22, 26:21, 26:25,
28:14, 37:12, 37:13,
39:20, 46:5, 46:19,
47:4, 47:7, 48:24,
48:25, 54:14, 58:1,
58:5, 67:9, 67:13,
68:3, 69:16, 81:19,
89:4, 95:21, 95:22,
96:6, 116:6, 116:7,
118:5, 123:21,
123:22, 142:22,
156:14, 157:8, 157:9,
158:12, 161:22,
161:24, 162:12,
163:4, 164:16,
169:25, 170:2,
172:21, 172:23,
178:19, 191:13,
196:1, 209:11, 220:20
  **person's** - 169:8
  **personal** - 23:12,
167:1, 180:9, 202:9
  **personally** - 178:25,
179:16, 184:2
  **persons** - 42:11
  **perspective** - 36:1,
50:8, 153:13, 162:18
  **Peters** - 83:6, 83:8,
83:13, 83:16, 83:20,
83:25, 102:17, 104:8,
117:25, 118:1,
118:13, 118:15
  **phone** - 33:11
  **photo** - 46:4, 46:7,

48:4, 48:17, 116:24,
149:18
  **photocopy** - 48:1,
48:2, 48:4
  **photograph** - 11:4,
11:7, 31:25, 35:22,
35:25, 36:11, 36:25,
37:4, 41:2, 48:11,
50:3, 50:18, 80:15,
111:5, 112:17,
149:13, 151:20,
151:21, 153:5, 155:1,
185:7
  **photographer** -
60:23
  **photographs** -
46:8, 49:10, 52:11,
52:12, 108:7, 111:4,
147:24, 149:9
  **photos** - 59:15,
59:20, 108:14, 166:8
  **physics** - 112:3
  **pick** - 138:4, 144:9,
220:9
  **picked** - 44:10,
46:4, 46:17, 63:9
  **picking** - 61:1
  **picture** - 30:12,
31:15, 33:23, 36:12,
37:10, 46:4, 60:22,
111:7, 112:18,
129:11, 156:2, 185:5
  **pictures** - 109:23,
111:19, 166:10
  **piece** - 63:10,
134:19, 134:22
  **pieces** - 137:20
  **pinched** - 43:12
  **Pinto** - 208:10
  **piss** - 206:13
  **pistol** - 76:4, 76:19,
135:8, 136:2, 136:3,
137:2, 137:3, 137:11,
137:13, 138:18
  **pistols** - 135:12
  **pit** - 149:18
  **place** - 2:12,
112:24, 134:21,
160:14, 206:5
  **placed** - 81:1, 138:1
  **places** - 81:17,
200:5
  **plains** - 67:2
  **Plaintiff** - 1:4
  **plan** - 223:25, 224:1
  **plastic** - 71:3,
81:12, 168:8
  **play** - 8:9, 161:16,
165:3
  **playing** - 152:1,
152:16, 164:11
  **Playing** - 182:24
  **plea** - 217:5, 217:6
  **pleasure** - 2:22
  **pled** - 217:16
  **plenty** - 221:6
  **Pm** - 62:1, 74:17,
74:18, 212:3, 213:5
  **point** - 7:23, 9:20,
11:12, 11:17, 15:19,
16:3, 22:25, 31:22,
37:11, 40:12, 41:24,
44:12, 58:11, 60:18,
68:21, 78:18, 79:13,
92:17, 92:25, 97:5,
97:6, 108:2, 108:25,
112:20, 116:5,
116:16, 129:10,
130:5, 133:7, 133:10,
136:19, 139:16,

149:6, 151:1, 164:23,
169:21, 184:18,
186:21, 191:24,
192:4, 199:6, 214:4,
222:24, 223:5
  **pointed** - 9:22,
63:1, 68:10, 151:6
  **pointing** - 11:14,
37:3, 37:23
  **points** - 219:9
  **pole** - 159:23
  **police** - 24:24, 25:1,
25:2, 25:8, 25:10,
27:4, 52:3, 54:6,
62:15, 66:1, 70:13,
70:21, 72:10, 80:8,
87:15, 87:19, 87:24,
88:6, 88:8, 88:13,
89:3, 89:5, 89:15,
89:25, 91:7, 91:12,
91:14, 91:19, 92:4,
92:6, 92:7, 93:11,
93:12, 93:23, 94:8,
94:18, 95:1, 96:16,
97:25, 103:3, 103:8,
104:1, 108:21, 109:8,
121:8, 121:17, 125:4,
129:18, 131:10,
131:20, 158:21,
190:7, 205:8, 206:8,
207:5, 207:8, 215:2,
219:3, 220:1
  **Police** - 65:23,
105:9, 105:11, 146:7
  **Pop** - 51:14
  **pop** - 51:14
  **popped** - 170:3
  **porch** - 151:16,
162:24, 163:12,
186:15
  **port** - 167:23
  **portion** - 93:2,
161:15, 225:7
  **portions** - 91:1,
91:4, 133:25, 173:25
  **position** - 2:25, 8:9,
222:2
  **possibility** - 194:14,
222:16, 222:19
  **possible** - 56:16,
169:5, 221:17
  **potential** - 142:13
  **pour** - 187:2
  **power** - 193:23
  **pre** - 123:23
  **pre-warrant** -
123:23
  **preparation** -
139:11
  **prepared** - 107:15
  **presence** - 190:23,
224:8
  **present** - 90:21,
97:15, 121:19,
147:22, 182:10,
190:20, 191:10,
192:3, 195:15,
195:24, 202:15,
202:16, 203:2, 203:5,
203:16, 204:13,
213:6, 216:9
  **presentation** -
216:6
  **presented** - 124:17
  **presenting** - 223:25
  **preserved** - 20:7,
20:9, 133:15
  **press** - 14:20,
210:18
  **presumably** - 60:17

**pretty** - 12:11,
25:14, 115:23, 116:4,
141:6, 166:19, 187:3
  **previous** - 193:20
  **previously** - 20:8,
118:9, 118:12, 133:13
  **primary** - 10:10
  **prints** - 78:15,
78:16, 78:19
  **prisoner** - 142:15
  **prisons** - 165:18
  **Prisons** - 147:12
  **privilege** - 218:11,
218:14
  **probation** - 211:16
  **problem** - 142:24,
160:22, 216:22,
217:2, 220:14,
221:21, 224:12, 225:9
  **problems** - 201:2,
201:4, 221:19
  **proceed** - 6:20,
134:2, 145:3
  **proceeded** - 33:21
  **proceedings** -
225:20
  **Proceedings** - 1:11,
1:24
  **process** - 77:23,
77:24, 95:9, 160:13,
168:15
  **processed** - 129:7,
154:10, 154:12,
154:20, 169:6
  **Proctor** - 1:15, 3:6,
3:8, 4:17, 4:18, 6:1,
6:2, 6:10, 18:12,
18:16, 18:19, 20:4,
20:17, 20:18, 21:14,
42:4, 42:21, 42:22,
54:19, 54:20, 54:22,
59:14, 59:18, 63:21,
64:7, 64:10, 64:19,
69:6, 73:12, 73:13,
82:12, 82:13, 91:15,
93:5, 93:6, 93:18,
94:1, 94:3, 95:24,
101:15, 101:16,
101:18, 102:12,
102:15, 102:16,
102:24, 107:8, 107:9,
116:9, 120:9, 120:16,
122:25, 123:24,
124:2, 125:2, 125:8,
127:6, 127:7, 127:11,
128:14, 128:21,
130:8, 130:11,
130:13, 133:11,
133:16, 138:22,
138:23, 139:2,
139:20, 140:22,
141:25, 142:19,
143:1, 143:7, 143:15,
165:9, 170:20, 190:3,
191:2, 192:21,
193:14, 193:15,
193:23, 194:1, 195:3,
196:10, 196:11,
196:15, 197:17,
197:19, 197:20,
209:7, 211:21,
211:22, 211:24,
212:15, 212:21,
213:1, 213:20,
213:22, 214:7,
215:13, 215:19,
216:20, 216:25,
217:13, 217:18,
217:25, 218:13,
220:13, 220:19,

220:25, 221:15,
221:18, 221:21,
222:3, 222:8, 223:4,
223:6, 223:15,
223:17, 223:23,
224:4, 224:10,
224:19, 224:23,
225:6, 225:10
  **Proctor's** - 212:25
  **produce** - 158:8
  **produced** - 1:24,
158:12
  **Profanity** - 47:22,
47:23
  **professional** -
133:2
  **proffered** - 192:25,
193:6
  **progress** - 104:17
  **project** - 141:21
  **projectiles** - 167:20
  **Projects** - 150:15
  **promised** - 225:1
  **prompt** - 222:21
  **property** - 70:11,
70:14, 70:16, 72:17,
72:25, 73:2, 74:3,
74:23, 76:5, 77:4,
77:6, 77:11, 78:7,
89:4, 114:2, 114:8,
115:7, 115:14,
115:15, 134:18,
155:17
  **prophylactic** -
219:16
  **prove** - 5:18
  **provide** - 100:3,
175:24, 211:10
  **proximity** - 24:9
  **pry** - 45:13
  **Pt-99** - 76:4, 75:5
  **Pt-99af** - 135:5
  **Public** - 160:2,
160:3
  **Puget** - 32:20, 32:21
  **pull** - 14:17, 15:4,
16:16, 40:14, 40:19,
60:20, 199:5
  **Pull** - 83:17
  **pulled** - 15:23,
40:11
  **Pulled** - 39:16,
39:17
  **pulling** - 32:17,
44:18
  **Purcell** - 1:13, 2:25,
4:15, 4:16, 5:24, 6:8,
6:18, 6:19, 7:6, 9:24,
15:1, 20:4, 21:15,
21:16, 30:7, 42:24,
43:1, 49:5, 49:8, 49:9,
52:4, 52:11, 52:12,
52:15, 54:16, 54:18,
55:1, 57:24, 59:14,
59:16, 63:25, 64:1,
64:20, 65:2, 65:16,
65:19, 68:12, 69:10,
69:14, 73:14, 73:18,
73:20, 73:23, 76:2,
76:9, 76:10, 76:13,
82:9, 83:3, 83:5,
83:23, 84:21, 91:17,
92:3, 92:15, 92:24,
93:3, 93:8, 93:17,
94:11, 94:16, 95:19,
96:25, 97:3, 97:20,
97:23, 101:12,
102:18, 102:19,
102:24, 103:5,
103:11, 103:15,

104:5, 104:11,
104:12, 104:15,
105:4, 107:7, 107:9,
107:12, 107:13,
109:2, 109:3, 109:5,
116:11, 116:14,
116:15, 119:19,
120:12, 120:19,
123:6, 123:25, 124:3,
124:7, 124:12,
124:13, 125:10,
125:13, 125:19,
127:2, 127:5, 128:16,
129:14, 130:14,
130:15, 130:18,
131:1, 140:4, 140:12,
140:16, 140:19,
140:25, 141:3,
141:11, 141:15,
141:19, 141:24,
142:7, 143:15,
143:20, 144:1, 145:4,
145:8, 145:9, 146:2,
150:9, 159:11,
159:16, 159:20,
161:2, 161:7, 161:10,
161:12, 167:8,
167:25, 170:12,
170:16, 170:21,
171:15, 171:21,
173:5, 173:20, 174:6,
174:17, 176:5, 176:6,
176:22, 179:7,
179:12, 185:17,
190:5, 191:3, 191:8,
191:9, 193:2, 193:10,
193:13, 194:16,
195:4, 195:8, 196:8,
198:1, 198:5, 198:19,
199:11, 200:20,
205:24, 209:9,
211:19, 213:4,
215:23, 215:24,
216:5, 216:11, 217:3,
217:9, 217:15,
217:21, 218:6,
218:24, 219:6,
219:11, 219:20,
220:3, 220:9, 221:9,
223:1, 224:14
  **Purcell's** - 143:10,
224:24
  **purchase** - 57:9,
57:12
  **purchased** - 158:13
  **purchasing** - 10:2
  **pure** - 174:17
  **purple** - 96:1
  **purpose** - 42:17,
42:18, 110:17, 129:7,
175:22, 211:16
  **purposes** - 147:2,
150:5
  **push** - 179:5, 179:6
  **Put** - 36:15
  **put** - 10:21, 15:10,
15:15, 15:16, 15:23,
16:4, 19:4, 19:9, 41:2,
48:16, 58:18, 68:13,
75:15, 93:6, 100:14,
101:25, 102:25,
103:2, 103:16,
103:19, 103:21,
104:2, 113:5, 118:21,
137:20, 143:5, 171:2,
179:4, 187:12, 200:18

**Q**

**Q-tip** - 169:4, 169:5,

169:6
**Q1-** 137:12, 138:12, 138:16
**qualified** - 133:3, 133:20, 133:21
**quality** - 172:10
**Quantico** - 172:2
**quantity** - 152:19, 153:7
**questioned** - 24:24, 96:17, 100:6
**questioning** - 15:20, 29:24, 92:17, 100:19, 158:3
**questions** - 3:14, 4:15, 4:17, 5:22, 11:1, 54:17, 66:20, 82:10, 86:18, 91:5, 92:20, 101:9, 101:13, 104:6, 106:20, 121:4, 123:2, 127:7, 131:2, 138:20, 165:8, 171:3, 173:3, 173:20, 196:9, 196:16, 197:18, 198:21, 199:17, 211:20, 212:12, 212:14, 218:10
**quickly** - 51:10, 51:12, 78:25, 222:8
**quiet** - 95:4
**Quite** - 106:8
**quite** - 4:9, 140:9

---

**R**

**raised** - 170:21
**ran** - 172:20, 177:23, 223:2
**range** - 135:12
**rather** - 61:23, 100:25
**rattle** - 209:18
**reacted** - 203:21
**reaction** - 188:11
**read** - 32:18, 74:5, 74:14, 75:1, 77:5, 78:5, 90:25, 91:3, 107:18, 114:7, 115:6, 147:1, 148:3, 214:3
**reading** - 170:23
**ready** - 6:11, 6:17, 6:20, 83:2, 145:2, 145:7, 216:7, 216:9, 216:19
**real** - 89:12, 89:13, 192:15
**really** - 5:11, 15:19, 30:25, 33:23, 36:5, 59:3, 61:1, 80:23, 89:19, 90:6, 90:10, 100:10, 100:23, 101:10, 101:11, 162:5, 174:7, 185:8, 185:15, 200:17, 202:25
**rear** - 69:24, 69:25, 109:8
**reason** - 158:20, 167:18, 168:11
**reasons** - 74:1, 170:21, 217:5
**receipt** - 158:12
**receive** - 68:25, 125:22
**received** - 69:5, 132:10, 136:11, 146:13
**recently** - 210:23, 211:2
**receptacle** - 81:1

---

**recess** - 82:21, 222:24
**Recess** - 82:24, 144:12
**Recessed** - 225:17
**recognize** - 2:7, 11:3, 34:19, 36:17, 47:7, 48:20, 49:14, 49:25, 53:7, 54:2, 107:14, 109:24, 111:5, 112:16, 134:7, 135:23, 136:8, 136:23, 153:3, 155:20, 208:6
**recognized** - 2:20, 46:18
**recognizing** - 47:5
**recollection** - 99:12
**reconstruction** - 132:17
**reconvene** - 82:22, 225:15
**Record** - 18:15, 20:23, 92:2, 95:15, 96:11, 102:23, 124:10, 140:8, 170:15, 175:6, 192:24, 216:16, 224:18
**record** - 3:11, 7:2, 9:20, 9:21, 19:5, 19:10, 19:11, 20:9, 27:15, 32:18, 65:9, 65:13, 68:9, 73:5, 74:5, 74:14, 77:5, 78:6, 83:12, 84:9, 87:12, 98:21, 104:24, 106:22, 107:18, 114:8, 115:7, 118:11, 131:17, 133:15, 145:17, 147:2, 158:1, 176:13, 196:6, 198:12, 207:22, 225:20
**recorded** - 1:24, 78:17, 78:18, 99:14, 99:24, 100:3, 119:4, 119:9
**recover** - 70:11, 70:13, 70:21, 72:1, 88:13, 113:13
**recovered** - 72:14, 74:3, 74:9, 74:22, 74:24, 75:1, 76:20, 77:10, 78:4, 78:12, 89:4, 98:1, 106:25, 107:24, 109:25, 110:7, 113:14, 113:21, 114:11, 114:21, 117:7, 117:10, 117:11, 117:12, 117:13, 134:22, 137:6, 147:5, 151:2, 153:20, 154:7, 154:14, 158:20, 160:11, 160:13, 167:9
**recovering** - 80:10
**recovery** - 74:12, 79:13, 118:15
**Recross-** 173:21, 173:23
**red** - 208:13
**redacted** - 161:5
**redirect** - 14:23, 63:24, 130:14, 215:23
**Redirect-** 103:14, 130:17, 173:4
**refer** - 73:7, 91:20
**reference** - 5:16

---

**referred** - 119:23, 159:21, 184:20
**reflect** - 19:5, 19:12, 20:9, 53:17, 68:9, 76:18, 196:6
**refreshes** - 91:5, 98:6
**refused** - 119:9
**regarding** - 110:16, 123:15
**register** - 209:25, 210:21
**registered** - 25:3, 25:5
**regular** - 9:10, 23:11, 67:22
**rehabilitation** - 45:9
**Reisterstown-** 5:8, 5:9
**reject** - 133:25
**relate** - 19:24, 26:12, 115:14
**related** - 8:6, 122:6, 122:8, 122:9, 122:24
**relates** - 42:13, 134:16, 175:9, 175:15, 194:4
**relation** - 35:8, 38:10, 50:3, 107:15
**relationship** - 26:13, 38:17, 81:25, 84:23, 89:8, 117:16, 120:3, 120:5, 120:7, 120:15, 124:23, 200:10, 200:12
**relevant** - 193:16
**reliable** - 68:13
**Relly-** 192:5, 192:7, 195:9, 195:16, 195:22
**remember** - 3:22, 11:16, 27:15, 44:4, 44:7, 44:12, 44:18, 44:19, 45:1, 45:20, 50:21, 51:11, 53:12, 55:9, 57:25, 61:16, 80:17, 80:18, 86:20, 88:8, 88:14, 89:7, 89:17, 89:19, 89:20, 89:22, 90:3, 90:5, 90:7, 90:8, 90:10, 90:11, 90:12, 98:9, 98:10, 99:12, 99:15, 99:16, 99:18, 100:4, 100:5, 100:9, 100:12, 100:23, 100:24, 123:25, 169:13, 170:6, 200:4, 201:14, 201:15, 203:4, 205:19, 207:11, 207:22, 208:9, 208:11, 208:25, 213:24, 219:7
**remembers** - 2:5
**removed** - 130:4
**repeat** - 195:7
**Rephrase-** 69:7, 69:12, 69:13, 116:10, 120:10, 191:5, 191:6
**rephrase** - 170:25
**replace** - 31:14
**report** - 72:5, 72:8, 74:11, 74:21, 91:12, 91:14, 92:4, 92:6, 92:9, 92:16, 98:5, 98:7, 98:22, 118:8, 118:11, 118:23, 119:1, 125:4, 134:15, 148:3, 170:23
**report's** - 92:7
**reported** - 210:13

---

**reporter** - 84:11, 212:11, 225:2
**reporting** - 87:16
**reports** - 107:15, 107:20, 130:19, 147:4
**representation** - 152:6, 224:17
**representative** - 156:4
**represented** - 158:9, 217:5, 220:14
**reprimand** - 125:15, 125:22, 125:24, 126:11
**reputation** - 171:13, 179:14
**request** - 76:15, 76:21, 78:9, 110:7, 114:25, 134:11, 136:19, 137:1, 143:9
**requested** - 156:24
**requesting** - 19:20
**respect** - 20:2, 20:7, 20:12, 20:24, 92:3, 92:22, 94:20, 97:18, 103:8, 133:22, 175:14, 175:20, 175:22, 193:12, 194:3, 194:8, 194:22, 194:25, 195:1, 212:18, 219:4, 219:17
**respond** - 123:2, 123:3, 146:11, 187:9, 194:13
**responded** - 69:9, 69:19, 97:25, 156:25
**response** - 72:5, 92:4
**responsibility** - 143:20
**restart** - 163:6
**restoration** - 132:17
**result** - 172:7
**results** - 139:12
**retaliate** - 194:22, 195:23
**Retaliated-** 193:10, 193:11
**retaliates** - 193:4
**retaliation** - 19:21, 194:14
**Retaliation-** 195:13
**retest** - 139:7, 139:8, 139:15
**Retest-** 139:10
**retired** - 61:18
**retrieve** - 135:13, 214:5
**return** - 6:4, 57:7, 96:8, 96:10
**returned** - 8:12, 8:14, 8:16, 9:2, 20:14, 139:5
**reveal** - 117:15
**reverse** - 48:17, 48:18, 58:25
**review** - 126:17, 222:7
**revolver** - 51:6, 71:5, 75:3, 79:2, 79:3, 167:16, 167:19
**Revolver-** 79:4
**revolvers** - 167:22
**revolves** - 79:5
**Richard-** 1:12
**rid** - 14:19, 22:19, 22:20, 189:22, 190:17
**ride** - 213:16
**right-hand** - 32:1, 35:20, 129:25, 149:17

---

**Rio-** 8:3
**ripped** - 53:13
**rival** - 166:16, 166:22, 167:2, 174:22, 174:23
**road** - 70:2, 70:3, 168:5
**Road-** 14:17, 15:5, 30:24, 31:7, 31:13, 33:21, 33:22, 35:14, 35:17, 35:19, 36:9, 173:25, 184:23, 185:1, 185:2, 187:11, 188:21, 206:2
**roadblock** - 142:14
**Robert-** 6:20, 6:23, 7:3, 7:4, 48:24, 106:10, 140:15, 141:12, 143:16, 143:17, 145:10, 145:13, 145:18, 175:15, 216:18, 218:22, 220:12, 220:14
**rock** - 71:4, 75:3, 89:5, 89:10, 89:24, 96:22
**role** - 124:4
**Rolland-** 225:23, 225:24
**rolled** - 43:11
**room** - 4:22, 6:4, 139:5, 139:9, 151:22, 151:23, 153:6
**roughly** - 56:3
**rounds** - 71:5, 71:7, 75:4, 75:6, 75:10, 78:23, 79:8, 154:1, 156:3
**Rouse-** 84:10, 84:13
**route** - 216:19
**routinely** - 16:11
**row** - 146:14, 184:9
**rule** - 103:12, 112:2
**Rule-** 92:21, 94:8, 94:11, 133:19
**ruled** - 20:8, 94:4, 194:1
**rules** - 94:6, 96:13, 97:1, 97:4, 97:7, 103:8
**Rules-** 133:19
**ruling** - 94:5, 97:21, 219:15
**rulings** - 219:25
**rummaging** - 80:10
**run** - 40:17, 41:1, 41:17, 41:18, 43:7, 61:1, 159:25, 160:22
**running** - 60:17, 60:19, 60:20, 60:22, 148:25, 169:5, 222:20
**rush** - 15:8
**rushed** - 15:6
**Ruter-** 143:2, 143:5, 217:2, 217:4, 217:18
**Ruter's-** 217:7, 222:1

---

**S**

**sale** - 27:2
**Sandra** - 131:10, 131:13, 131:18
**satisfactory** - 42:21, 176:1
**Saturday** - 58:8
**Savings** - 160:23
**saw** - 13:21, 16:23, 24:9, 34:4, 36:3,

13

36:22, 37:1, 37:4, 37:15, 37:22, 38:10, 38:13, 41:4, 41:14, 46:21, 46:24, 55:21, 58:21, 58:23, 67:19, 68:3, 88:24, 100:14, 103:21, 103:25, 148:25, 157:23, 177:23, 181:16, 198:22, 202:1, 202:10, 203:5, 203:6, 203:16, 204:14

**scars** - 43:23

**scenario** - 92:9

**scene** - 35:9, 44:2, 49:11, 49:14, 52:20, 53:7, 53:14, 54:2, 77:10, 101:7, 108:5, 108:14, 109:16, 109:20, 109:23, 109:25, 110:12, 111:25, 127:16, 128:1, 128:2, 128:3, 129:2, 129:6, 129:8, 129:11, 132:16, 147:15, 147:21, 148:3, 148:10, 148:12, 150:3, 152:7, 152:8, 156:5, 157:3, 157:4, 158:10, 167:10, 205:5, 218:15

**schedule** - 142:10, 221:17, 222:10, 222:19

**schedules** - 141:7

**scholarship** - 8:7, 8:8

**School** - 150:25

**school** - 2:7, 2:10, 3:24, 8:4, 8:21, 150:22, 151:3, 158:22, 159:25, 160:1, 160:2, 160:3, 162:18, 162:19, 162:21, 190:25

**schools** - 150:23

**Schwait** - 61:15

**screen** - 11:13, 14:22, 30:1, 34:2, 38:7, 48:17, 59:22, 73:17, 73:25, 112:20, 149:18, 149:25, 150:19, 151:25, 155:14, 162:25, 179:4, 179:5, 185:13, 185:16

**scrutinized** - 171:23

**search** - 123:15, 123:17, 123:18, 123:20, 123:23, 126:13, 126:17

**searched** - 123:17, 123:19, 124:14

**seated** - 3:15, 9:14, 196:3

**Seated** - 68:8

**Seattle** - 57:20, 58:21

**second** - 18:4, 18:24, 19:18, 20:22, 30:22, 36:16, 41:25, 63:21, 80:14, 86:15, 90:14, 92:1, 96:9, 102:12, 112:23, 120:23, 130:8, 140:7, 141:10, 149:20, 152:2, 158:7, 163:17, 175:5, 181:9, 196:11, 213:20, 216:14, 216:15, 224:4

**Secondarily** - 19:14

**section** - 80:25, 214:4

**security** - 18:20, 19:15, 20:21, 95:10

**Security** - 21:2, 21:7, 21:11

**see** - 3:21, 10:21, 11:11, 14:2, 14:11, 26:7, 26:16, 27:5, 28:7, 28:9, 30:15, 31:18, 33:3, 35:11, 36:5, 37:13, 38:16, 39:7, 39:18, 40:9, 40:13, 40:21, 46:11, 51:1, 59:22, 59:25, 60:25, 67:13, 67:16, 67:21, 68:3, 86:9, 90:25, 91:5, 106:13, 108:22, 109:16, 111:22, 112:22, 118:1, 118:2, 118:4, 118:8, 118:13, 129:15, 129:17, 135:8, 138:10, 142:4, 144:10, 149:19, 150:18, 151:20, 152:2, 152:18, 155:4, 155:25, 156:2, 158:25, 159:22, 159:24, 160:9, 161:19, 161:24, 162:5, 162:8, 162:22, 162:25, 163:8, 163:11, 163:23, 164:1, 164:7, 164:13, 165:2, 166:15, 179:10, 181:2, 181:11, 181:18, 181:20, 185:15, 185:22, 186:1, 188:16, 188:20, 189:18, 190:7, 194:18, 201:18, 202:3, 202:7, 203:1, 204:21, 205:9, 205:11, 222:10, 222:18, 223:11

**seeing** - 50:19, 162:2, 163:2, 188:17

**seem** - 73:9, 188:2

**segment** - 161:4

**self** - 187:21, 218:12

**self-incrimination** - 218:12

**sell** - 22:22, 184:11, 186:5, 186:6

**seller** - 59:7

**selling** - 22:25, 24:9, 58:14, 180:4, 182:24, 184:8, 184:9, 184:14, 187:10, 187:19

**semiauto** - 79:6

**semiautomatic** - 51:3, 51:7, 79:2, 112:1

**Semiautomatic** - 75:13

**send** - 16:22, 172:2

**sending** - 18:23

**senior** - 8:21

**Seniority** - 126:3

**sent** - 45:10, 168:17

**sentencing** - 223:19, 224:2

**Sergeant** - 80:7

**serial** - 75:4, 75:5, 132:17, 135:2, 135:5

**series** - 97:10

**seriously** - 115:23

**serve** - 6:6, 14:2, 14:5, 16:1, 16:2, 16:17

**served** - 14:3, 21:5, 211:6

**serves** - 14:7

**service** - 68:25, 142:16

**Session** - 145:1

**set** - 80:20, 149:9, 157:8, 206:20, 206:22

**setting** - 97:24

**seven** - 128:10, 140:10, 210:3, 210:11, 210:19

**seven-is** - 128:10

**several** - 106:6, 130:3, 218:15, 219:5

**Several** - 157:19

**severed** - 43:8

**sex** - 209:25, 210:21

**Sex** - 210:3

**sharpen** - 172:11

**Shearer** - 217:20, 217:23, 221:25

**sheer** - 39:13

**sheet** - 115:11

**shell** - 110:21, 114:9, 114:12, 114:15, 115:6, 115:7, 115:15, 129:21, 130:5, 167:9, 167:12

**shiny** - 168:11

**shirt** - 38:21, 95:25, 196:4

**Shock** - 44:22, 44:23, 45:4, 45:18

**shoe** - 53:3

**shoes** - 54:4

**shoot** - 37:1

**shooter** - 79:8

**shooting** - 19:19, 20:16, 28:2, 29:16, 30:21, 31:9, 31:23, 32:13, 35:4, 35:9, 41:24, 42:11, 42:14, 42:20, 46:13, 46:15, 46:16, 47:20, 48:13, 50:23, 52:21, 60:3, 61:19, 61:25, 62:7, 82:6, 100:21, 101:7, 105:20, 106:9, 107:16, 108:5, 109:20, 109:25, 110:13, 110:16, 113:21, 115:25, 116:3, 116:17, 117:2, 127:19, 127:20, 127:25, 128:14, 128:17, 128:20, 130:20, 132:16, 147:10, 157:21, 163:20, 175:15, 205:6

**shootings** - 106:7, 130:19, 147:9

**short** - 59:21

**shortage** - 58:14

**Shorter** - 220:3

**shortly** - 164:5

**shot** - 11:2, 18:2, 19:21, 20:5, 27:16, 29:22, 32:3, 43:5, 43:13, 43:17, 43:18, 46:5, 46:19, 47:8, 48:19, 49:1, 49:18, 49:23, 50:4, 50:9, 53:18, 54:14, 55:6,

61:3, 116:7, 116:13, 148:6, 152:11, 152:16, 153:15

**shots** - 51:12, 52:8

**shoulder** - 43:21

**show** - 11:17, 14:13, 32:9, 32:11, 33:23, 34:4, 34:14, 36:25, 38:8, 41:13, 41:21, 49:11, 50:2, 50:6, 50:16, 74:11, 90:18, 92:15, 108:7, 109:22, 111:3, 118:9, 134:6, 135:16, 136:6, 136:22, 153:2, 154:17, 155:1, 155:15, 158:9, 160:6, 185:10, 186:2, 194:19, 194:21, 194:24, 208:4

**Show** - 34:1, 38:9

**showed** - 48:5, 59:15, 62:20, 62:25, 63:9, 88:8, 88:11, 88:13, 98:5, 107:9, 129:14, 171:22

**showing** - 35:6, 90:24, 113:16, 114:5, 151:12, 152:11, 153:9, 204:18

**Showing** - 47:25, 49:22, 52:16, 53:16, 108:12, 109:6, 112:15, 149:11

**shown** - 11:3, 30:2, 30:15, 75:21, 118:12, 139:13, 185:8, 204:14

**shows** - 36:12, 46:8, 50:15, 112:14, 153:7

**side** - 32:1, 35:20, 36:4, 36:6, 41:5, 41:7, 48:17, 48:18, 57:8, 80:17, 113:3, 126:25, 129:25, 137:20, 184:12, 237:21, 184:12

**sides** - 50:16

**sidewalk** - 32:5, 153:18, 162:25

**sign** - 35:11, 35:19, 41:18, 41:19, 50:3, 108:25, 109:6

**signed** - 142:15, 143:23

**significance** - 36:18

**similar** - 17:16, 194:2

**Simone** - 85:14

**simple** - 108:2, 125:5, 169:4

**sit** - 101:19

**sitting** - 152:15, 157:22

**situation** - 33:7

**Six** - 78:24, 177:4, 177:5

**six** - 12:13, 43:19, 47:1, 67:2, 71:5, 75:4, 79:8

**six-shooter** - 79:8

**sixteenth** - 105:12

**size** - 162:11

**sized** - 81:9

**ski** - 39:11, 39:12

**skullcap** - 38:22

**Skullcap** - 38:23

**slide** - 30:8, 198:12

**slightly** - 50:7

**slows** - 95:9

**slumped** - 151:25

**smacked** - 197:8

**small** - 12:24, 71:3, 71:10, 75:2, 225:6

**smaller** - 81:12

**smiling** - 129:21

**smoke** - 8:19

**smoking** - 9:12

**Smoking** - 9:13

**snitch** - 91:20, 91:21, 119:23, 120:2, 181:23

**snitching** - 181:24

**Snitching** - 182:4

**snowing** - 55:11

**so-called** - 123:21, 124:15

**softer** - 138:3

**sold** - 10:5, 58:1, 64:13, 64:16, 183:1

**solid** - 39:3

**someone** - 5:3, 10:4, 16:17, 22:22, 55:6, 97:14, 118:20, 139:6, 194:22, 195:11, 218:4

**sometime** - 127:22, 128:22

**Sometime** - 128:4

**sometimes** - 12:17, 16:21, 79:7, 121:12, 150:15

**Sometimes** - 23:21, 86:8

**somewhat** - 60:14

**Somewhat** - 166:21

**somewhere** - 5:8, 38:1, 41:6, 46:8, 155:17

**Somewhere** - 38:2, 55:15

**Sorry** - 95:3, 95:16

**sorry** - 8:1, 18:12, 18:18, 22:16, 27:2, 27:9, 46:15, 53:17, 64:7, 70:5, 77:23, 84:18, 87:22, 97:2, 102:18, 109:2, 119:7, 121:3, 127:24, 135:18, 139:7, 152:14, 200:13, 202:13, 212:13, 212:17, 215:11, 223:2

**sort** - 12:21, 71:24, 111:19, 125:22, 184:25, 185:5

**sought** - 45:18, 97:14

**sound** - 56:4, 214:14, 215:8

**sounds** - 221:15

**source** - 10:10, 124:21

**southeast** - 8:4

**Southern** - 66:9, 66:10, 119:6

**spatter** - 152:19

**specific** - 72:24, 78:8, 100:24, 103:9, 175:18

**specifically** - 42:8, 70:6, 103:3

**specificity** - 184:25

**specifics** - 93:10, 96:21, 119:11, 123:3, 124:6, 124:8

**speculated** - 72:9

**speculation** - 174:18

**spell** - 7:2, 84:11, 204:24, 176:18

**Spell** - 65:12, 83:14,
145:19, 176:15
**spelled** - 131:19
**Spend** - 23:2
**split** - 58:21
**spoken** - 123:7,
197:1
**sponsor** - 166:12
**spot** - 33:9, 33:24,
112:12
**spotted** - 206:9
**spring** - 153:24
**stage** - 175:7, 221:4
**stand** - 3:15, 3:21,
5:1, 16:22, 64:25,
93:13, 96:4, 104:10,
131:6, 139:24, 175:3,
197:24, 216:3
**Standing** - 186:15
**standing** - 32:1,
32:5, 33:10, 33:16,
35:10, 36:1, 49:17,
49:19, 60:9, 60:15,
60:25, 153:18
**start** - 9:11, 41:24,
140:24, 144:6,
170:22, 222:14,
222:22
**started** - 2:4, 22:18,
23:8, 41:18, 60:17,
60:19
**Started** - 13:10
**starting** - 61:2
**stash** - 16:7, 81:16
**state** - 65:8, 83:11,
84:8, 104:23, 131:16,
145:16, 194:24
**State** - 7:1, 176:12,
198:11
**statement** - 48:19,
48:21, 94:20, 94:22,
94:23, 94:25, 96:14,
96:24, 97:9, 97:10,
97:13, 97:18, 99:14,
99:24, 100:3, 103:1,
103:7, 103:9, 119:5,
119:9, 212:18, 224:24
**statements** - 92:20,
94:9, 97:8, 116:19,
118:19, 119:10,
195:15, 219:8, 219:18
**States** - 1:1, 1:3,
1:12
**station** - 207:8,
215:2
**stay** - 51:7, 223:10
**stayed** - 41:7
**steal** - 167:2
**stenography** - 1:24
**step** - 41:25, 64:3,
64:22, 82:15, 102:17,
104:7, 131:4, 139:21,
174:25, 191:5,
197:22, 216:1
**steps** - 40:16,
41:25, 61:4, 206:20,
206:22
**stereo** - 137:19
**still** - 18:6, 30:5,
40:20, 43:23, 44:9,
44:14, 44:17, 45:25,
55:10, 55:11, 64:20,
103:5, 108:9, 113:11,
147:22, 148:2,
155:17, 155:25,
197:15, 205:9, 221:3
**Still**- 31:4
**stint** - 66:4
**stocking** - 39:14
**Stoller**- 142:23,

143:9, 143:14,
216:21, 216:25
**stop** - 35:11, 35:19,
41:18, 41:19, 50:3,
108:25, 109:6,
140:21, 140:23,
164:12
**stop's** - 206:22
**Stopped** - 23:10
**stopped** - 44:16
**storage** - 81:4
**story** - 125:21,
126:25
**straight** - 80:14
**straight-up** - 80:14
**Street** - 11:20,
14:10, 31:13, 32:20,
32:21, 33:17, 109:9,
109:14, 146:12,
146:13, 146:15,
149:19, 149:20,
150:14, 150:17,
151:8, 151:17,
153:14, 153:17,
163:1, 163:14, 185:2,
185:19, 186:3
**street** - 14:6, 32:2,
32:19, 37:16, 40:24,
41:8, 41:9, 49:20,
49:21, 50:16, 60:9,
80:24, 108:24, 109:7,
110:25, 111:17,
112:2, 112:12, 113:4,
121:6, 121:18, 122:3,
126:5, 129:18, 130:6,
153:13, 153:20,
155:5, 161:25, 163:5,
163:20, 168:1,
172:20, 184:3,
184:22, 184:25,
195:11, 206:6, 208:19
**streets** - 200:5,
200:6, 208:20, 208:22
**strictly** - 42:13
**strike** - 8:15, 91:24,
120:13, 189:16
**strong** - 166:4,
166:6, 222:16
**stuck** - 36:19
**stuff** - 9:9, 118:21,
118:25, 184:14,
186:6, 187:11
**subject** - 94:21,
94:24
**submit** - 78:3,
114:17
**submitted** - 75:19,
76:5, 79:11, 82:4,
134:24, 155:19,
168:20, 222:17
**subpoena** - 143:22,
143:23
**subpoenaed** -
25:21
**substance** - 71:4
**substances** - 71:14
**substantial** - 116:2
**substantive** -
219:21
**success** - 154:22,
154:23
**suits** - 89:23
**Sullivan** - 1:16, 3:7,
4:19, 4:20, 6:1, 19:18,
95:3, 95:16, 142:13,
165:9, 165:10,
165:12, 170:18,
170:24, 171:5, 171:7,
171:16, 171:20,
173:1, 173:21,

173:22, 173:24,
174:20, 174:24,
175:10, 176:2, 176:3,
179:2, 179:10,
211:21, 223:4, 224:6
**summary** - 19:7,
19:12
**summer** - 181:10,
201:14, 201:15,
201:17, 202:3
**Sunday** - 204:3
**supervisor** -
121:10, 126:17
**supportive** - 219:12
**supposed** - 10:4,
31:10, 56:25, 57:1,
57:6, 57:7, 181:24
**surface** - 112:2
**suspect** - 116:16
**suspicion** - 116:19
**suspicious** - 190:10
**sustained** - 69:13,
92:12, 123:4, 123:10,
124:5, 124:20,
126:20, 171:4, 191:6
**Sustained** - 91:16,
120:10, 123:1, 124:5,
170:13, 190:4, 209:8
**swab** - 154:19
**swabbed** - 169:1,
169:3
**swap** - 27:3, 59:24
**swiping** - 18:20
**sworn** - 6:24, 65:6,
83:9, 104:21, 131:14,
145:14, 176:10, 198:9
**System** - 132:19
**system** - 132:19

**T**

**T's** - 143:12, 143:18
**T-shirt** - 38:21
**T1a**- 75:5
**table** - 68:8, 198:13
**talks** - 95:11
**tall** - 47:1, 47:2
**tank** - 135:12
**tape** - 99:14, 99:24,
100:3, 109:17,
109:20, 119:4,
159:15, 161:20,
162:15
**tape's** - 130:4
**tape-recorded** -
99:14, 119:4
**taped** - 129:17
**tapes** - 161:9
**target** - 138:9
**Taurus** - 71:4, 71:5,
75:3, 75:5, 135:4,
137:2, 137:3, 137:11,
138:13, 138:17
**Taylor**- 192:15,
192:17, 193:4, 193:8,
193:9, 194:13,
194:14, 198:3, 217:11
**Ted**- 142:22, 142:23
**Teddy**- 179:19,
196:18, 197:1
**Ten**- 13:2, 13:6,
13:7
**ten** - 13:11, 82:21,
142:1, 147:19, 213:11
**Ten-dollar**- 13:2
**ten-minute** - 82:21
**Tennessee**- 8:5
**term** - 72:4, 183:9,
183:10, 183:11
**terms** - 9:1, 9:5,

10:20, 15:14, 42:11,
43:6, 93:14, 94:4,
94:9, 97:4, 97:7,
97:10, 119:20, 123:4,
126:12, 147:2,
161:19, 210:1,
222:17, 223:23
**territories** - 166:23,
166:25
**territory** - 170:10,
173:18, 174:2, 174:9
**test** - 135:11,
135:12, 136:4,
137:10, 138:13,
138:16
**test-fired** - 137:10,
138:13, 138:16
**testified** - 6:25,
65:7, 83:10, 104:22,
131:15, 133:13,
145:15, 169:11,
176:11, 198:10
**testifies** - 94:21
**testify** - 5:16, 20:13,
82:17, 93:14, 94:8,
94:18, 115:3, 142:16,
220:24
**testifying** - 19:22,
61:12, 158:2, 203:10,
221:1
**testimony** - 9:1,
10:19, 17:19, 20:16,
39:23, 42:13, 55:20,
61:22, 63:19, 64:5,
64:16, 64:24, 82:16,
87:12, 90:8, 92:5,
94:24, 97:15, 104:8,
131:5, 134:1, 139:11,
139:23, 150:5, 168:4,
175:2, 197:23, 216:2,
221:8, 222:15
**Thanksgiving**-
55:12
**theme** - 224:25
**themself** - 28:15
**themselves** -
148:21
**therapy** - 45:9,
45:10, 45:11
**Thereabouts**-
127:22
**thereafter** - 164:5
**thereof** - 194:25
**they've** - 129:25
**thin** - 39:13
**thinking** - 218:7
**third** - 164:16
**Thomas**- 170:7,
170:8
**threatened** - 93:12,
94:15, 94:19, 96:14,
96:19, 96:20, 100:11,
102:4, 119:12, 119:18
**three** - 12:12, 12:17,
33:1, 34:11, 56:15,
63:3, 141:5, 141:13,
141:15, 155:7,
156:25, 170:3, 178:5,
196:22, 203:4, 205:17
**Three**- 141:15
**threw** - 95:20
**throughout** -
152:25, 159:23,
220:15
**thrust** - 212:24
**Tia**- 84:10, 84:13
**Tia6407a**- 135:6
**ticket** - 211:11,
213:15
**timekeeper** - 212:2

**Timothy**- 1:16
**Tinkler**- 176:7,
176:9, 176:14,
176:19, 176:23,
176:24, 177:7, 179:3,
179:5, 182:10, 193:6,
194:10, 197:22,
220:3, 220:4
**tinted** - 33:6
**tiny** - 111:21,
214:23
**tip** - 169:4, 169:5,
169:6
**tire** - 32:24
**Today**- 54:12, 216:8
**today** - 31:16,
39:23, 49:12, 52:17,
66:19, 67:13, 68:5,
75:21, 81:23, 86:17,
101:19, 102:10,
110:8, 118:1, 118:2,
118:3, 139:3, 158:20,
181:2, 198:6, 198:22,
216:7, 216:9, 217:25,
218:1, 222:14, 223:5
**toe** - 39:4, 39:5,
39:6
**together** - 9:7,
85:21
**tomorrow** - 141:8,
142:5, 142:6, 142:8,
142:25, 143:10,
143:14, 144:9, 158:2,
216:10, 216:11,
216:19, 216:21,
216:23, 221:5, 221:8,
221:10, 222:10,
222:15, 222:22,
223:11, 223:20,
225:15
**tonight** - 142:20,
143:9, 216:20
**took** - 17:11, 41:25,
55:5, 61:4, 72:15,
111:18, 207:9
**Toolmark**- 133:3
**toolmark** - 133:9,
133:22
**tools** - 168:23
**top** - 11:20, 12:24,
129:18, 150:19
**topic** - 20:10, 125:6,
170:19, 171:2
**total** - 43:19
**totally** - 19:24
**touch** - 11:12,
112:20, 149:24
**touched** - 185:13
**touching** - 112:21
**toured** - 132:21
**tow** - 124:16,
124:18
**toward** - 33:24,
83:17, 163:14
**Towards**- 41:19
**towards** - 38:11,
41:6, 41:18, 41:23,
113:8, 150:13, 153:6,
153:17, 163:13,
186:22
**trace** - 168:20
**track** - 52:6
**tracked** - 25:8,
25:10
**trade** - 23:19,
168:23
**traffic** - 13:25
**trail** - 78:12
**training** - 132:10,
132:11, 132:18, 167:6

trains - 222:20
transaction - 13:18, 14:10, 15:13, 16:9, 31:11, 57:4, 57:5
transactions - 12:15, 13:5, 13:8, 17:14, 17:15, 17:16, 17:20, 18:7, 18:8, 21:20, 22:7, 26:10, 28:21, 29:7
Transcript- 1:11
transcript - 1:24, 224:24, 225:3, 225:20
transcription - 1:25
transfer - 8:6, 126:3
transferred - 8:4
trash - 70:6, 70:12, 70:18, 70:22, 71:1, 76:20, 80:10, 80:22, 81:1, 81:6, 81:8, 81:9, 86:22, 87:16, 88:1, 100:14, 101:1, 101:20, 103:17, 103:20, 103:24, 103:25, 104:3, 114:21, 117:12, 117:13, 118:21
Trauma- 44:22, 44:23, 45:4, 45:18
travel - 150:17
treats - 121:18
Trial- 1:11, 225:17
trial - 64:5, 82:17, 94:21, 94:25, 104:10, 131:7, 139:24, 183:11, 197:24, 216:4, 217:16, 225:16
tried - 8:22, 40:16, 41:1, 172:1
truck - 124:16, 124:18
truck's - 38:8
trucks - 81:7
true - 58:4, 58:25, 187:9, 187:15, 187:16, 187:19, 197:15, 203:8, 212:5, 212:9, 213:7, 213:8
truth - 191:4, 203:14, 209:4
try - 59:20, 167:2, 171:23
trying - 59:6, 59:11, 60:2, 99:5
turf - 166:15
turn - 11:13, 15:9, 15:11, 100:18, 150:11, 162:15
turned - 33:24, 60:25, 108:17, 124:19, 146:20
turning - 16:7
turns - 5:14
Tv- 30:5, 151:25
two - 12:12, 12:17, 17:23, 21:24, 22:13, 32:13, 33:1, 34:11, 34:12, 41:25, 60:13, 60:15, 80:8, 88:25, 96:3, 99:1, 117:13, 120:21, 137:15, 137:20, 137:21, 138:8, 148:11, 148:14, 148:17, 156:2, 161:24, 162:13, 164:7, 164:13, 164:16, 167:9, 170:4, 171:24, 172:18, 173:6, 184:1, 217:12

Two- 18:16, 96:9, 151:5, 223:17
type - 79:5
types - 167:9
typical - 13:7, 14:9
Typically- 132:15
typically - 13:4, 22:9, 38:20, 79:8, 132:22

**U**

Ultimately - 25:8
un-peacefulness - 179:14
unable - 168:23, 169:8
uncommon - 81:8, 166:15, 166:18
under - 45:25, 72:21, 73:3, 74:9, 94:5, 94:8, 94:9, 94:11, 94:19, 94:24, 95:1, 96:12, 96:22, 96:24, 97:1, 97:3, 97:7, 97:16, 97:19, 103:7, 103:9, 106:24, 107:24, 113:25, 114:15, 114:16, 115:11, 133:19, 136:12, 138:6, 143:5, 147:3, 147:4, 210:6
Under - 92:21, 93:13, 210:9
undergo - 45:9
undertake - 117:19, 118:14, 156:14
Unfortunately - 154:16
uniform - 79:23, 80:3, 88:11, 91:19, 98:1, 99:6
uniformed - 89:15
unique - 72:11, 76:5
unit - 65:24, 131:25, 146:8, 160:12, 160:13, 166:14, 169:12
United - 1:1, 1:3, 1:12
units - 168:20
University - 8:3, 45:6
unless - 110:4, 165:2, 184:14, 195:1
unlikely - 3:4
unrelated - 122:18
unusual - 81:16, 149:3, 149:4
up - 3:10, 10:5, 10:21, 14:22, 15:2, 15:5, 15:11, 15:23, 20:22, 22:18, 28:8, 30:1, 30:5, 30:8, 30:10, 31:18, 32:9, 32:11, 33:8, 33:24, 34:10, 34:12, 41:2, 44:10, 45:23, 45:24, 48:16, 50:5, 51:24, 53:20, 55:1, 55:12, 56:14, 58:7, 61:1, 67:8, 68:13, 76:23, 80:14, 80:23, 84:18, 88:9, 88:11, 88:13, 93:13, 95:7, 96:4, 111:12, 111:19, 112:3, 115:8, 118:25, 126:23, 133:24, 137:14, 138:4, 142:1, 143:9, 143:13, 144:9,

150:17, 153:17, 155:23, 157:8, 163:4, 163:14, 163:20, 168:18, 169:21, 170:3, 173:7, 179:5, 179:9, 185:6, 185:18, 186:23, 186:24, 187:12, 198:12, 198:13, 198:15, 199:13, 199:14, 200:18, 208:10, 222:1, 223:24, 225:1
Up - 34:6
upstairs - 188:17, 189:11

**V**

van - 50:5, 113:8
various - 132:14, 132:22, 219:1, 219:17
vehicle - 23:18, 55:3, 55:5, 62:22, 63:6, 63:8, 63:16, 108:21
vehicles - 60:5, 60:13, 60:15, 60:16, 60:18
verbal - 220:8
verified - 224:22
verify - 25:13, 25:15, 62:19, 223:14
verifying - 51:23, 52:1
version - 151:13, 161:5, 171:22, 171:23
vials - 22:16
vicinity - 155:1
victim - 106:16, 108:9, 115:21, 116:20, 116:22, 116:23, 146:16, 151:21
video - 151:5, 152:16, 161:6, 161:17, 171:21, 172:17, 182:24
videotape - 158:21
view - 31:16, 60:13, 60:18, 159:8, 222:24, 223:5
viewed - 31:24, 159:7
violent - 18:23
visual - 30:8, 30:10, 68:21
voice - 51:24, 84:17, 84:18, 198:12, 198:15, 199:7, 200:22
voir - 133:10
vs - 1:6

**W**

Wagster - 133:13
waistband - 40:11
wait - 140:4, 142:3, 144:10, 216:14, 222:18
waiting - 31:12, 32:8, 32:11, 35:23
walk - 28:8, 28:12, 110:15, 112:7, 121:25, 122:2, 150:10, 151:23, 206:18
walk-around - 110:15
walked - 163:3, 163:20, 205:7, 206:25

walking - 28:10, 163:4, 172:19, 186:23, 206:5, 206:6, 206:8
wall - 152:19, 185:6
wanded - 18:24
wanding - 20:24, 21:5
wants - 31:4
warning - 94:17
warrant - 123:17, 123:18, 123:20, 123:23, 124:14, 126:13, 126:17
wars - 166:15
watch - 163:17, 164:6, 212:1, 212:7
watching - 19:7, 163:18
water - 135:12
weapons - 117:13, 167:21
wear - 12:14, 79:22
wearing - 89:23, 117:2, 189:22
Wednesday - 221:13, 222:17
week - 64:6, 96:7, 101:22, 131:7, 217:24
weekend - 6:15, 6:16
weeks - 45:3, 45:4, 203:4
well-known - 171:11, 171:12
West - 7:12, 7:13, 142:22, 142:23, 143:13
western - 188:25
Westport - 10:4, 10:11, 14:12, 17:21, 24:4, 27:21, 27:23, 27:24, 31:5, 66:11, 66:13, 66:17, 66:25, 67:18, 67:20, 68:16, 86:4, 86:10, 146:14, 149:19, 150:15, 150:24, 153:17, 158:22, 158:23, 159:5, 159:17, 163:13, 173:17, 173:18, 174:4, 174:7, 177:17, 177:18, 178:1, 180:7, 180:10, 181:12, 186:1, 188:23, 189:4, 198:25, 199:25, 200:5, 201:20, 217:10
whatnot - 113:19
whichever - 2:16, 49:12
white - 32:25, 37:20, 37:22, 63:6, 81:11, 96:1
whole - 137:24, 180:23, 193:18
Williams - 140:14, 146:17, 146:18, 146:20, 147:22, 148:5, 149:16, 151:24, 152:11, 157:7, 165:23, 165:24, 170:10, 172:14, 174:10, 175:16, 175:20, 176:18, 178:10, 181:8, 183:6, 186:10, 192:20, 193:12, 194:5, 194:11, 194:15, 195:1

Williams' - 152:22, 169:23, 171:10, 182:11, 193:19, 194:9
Winchester/olin - 132:25
windows - 33:6
wish - 73:14
wishes - 110:5, 165:2
withdraw - 93:19
witness - 2:5, 3:5, 3:22, 5:19, 6:18, 6:24, 9:22, 25:21, 64:25, 65:6, 68:10, 83:4, 83:5, 83:9, 87:13, 90:21, 93:13, 93:22, 94:6, 94:10, 94:20, 97:14, 102:25, 104:9, 104:11, 104:12, 104:21, 106:22, 113:16, 115:3, 123:22, 124:15, 124:18, 131:6, 131:14, 133:18, 134:1, 139:24, 140:11, 140:12, 140:18, 142:25, 143:13, 145:3, 145:8, 145:14, 175:3, 176:5, 176:6, 176:10, 184:2, 196:7, 197:24, 198:2, 198:4, 198:9, 199:13, 212:16, 216:3, 216:18, 218:9, 218:10, 221:8, 222:15
Witness - 7:3, 14:24, 38:12, 52:1, 65:1, 65:10, 65:14, 69:9, 82:19, 83:13, 83:16, 83:20, 84:19, 104:25, 120:18, 124:25, 131:8, 131:18, 140:1, 145:18, 145:21, 159:19, 171:18, 176:14, 176:16, 176:19, 185:15, 198:14, 198:17, 199:9, 205:23, 213:19, 215:16
witness's - 92:4
witnesses - 97:8, 133:24, 141:5, 141:13, 198:6, 216:7, 216:9, 218:15, 218:23, 220:8, 220:9, 220:12, 221:12, 223:2
woke - 45:24
woken - 45:23
woman - 95:19, 95:24, 95:25, 117:20, 197:8, 208:23, 210:6
women - 96:3
wondering - 223:23
wool - 39:15
word - 14:5, 14:6, 18:25, 59:11
words - 196:17
works - 94:5
Works - 140:22
wrapping - 223:24
writ - 142:15
write - 48:10, 49:2, 49:3, 211:15
wrote - 49:4, 62:15, 91:12, 91:14, 197:4

**Y**

yard - 81:11, 153:16

**year** - 8:20, 8:21, 12:4, 12:5, 12:7, 17:22, 40:6, 56:3, 66:24, 101:23, 105:12, 217:12, 217:15

**years** - 2:11, 2:12, 4:2, 4:6, 4:10, 66:2, 66:25, 67:2, 132:1, 146:6, 146:8, 177:15, 178:5, 199:22, 199:23, 201:11, 210:3, 210:11, 210:19

**yelled** - 47:20

**yellow** - 93:2, 196:3

**yesterday** - 90:7

**Young** - 170:7, 170:8, 170:9

**young** - 164:2

**younger** - 4:9

**yourself** - 30:12, 30:14, 30:19, 77:21, 77:25, 79:15, 80:6, 149:14, 155:19, 168:15, 178:16, 181:20, 186:12, 205:18, 209:20

## Z

**zip** - 12:24, 22:10

**zip-top** - 12:24

**ziplock** - 71:4, 71:10, 75:2, 208:13

**ziplocks** - 22:17

**zips** - 22:9

**zoom** - 112:23, 185:24

**Zoom** - 112:23