UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,


                    Plaintiff,


vs.                          Case No.  1:10-CR0744-RDB


Antonio Hall,


                    Defendant.

------------------------------------------------------

**AUGUST 9, 2011**
**Transcript of Trial Proceedings**

**Before the Honorable RICHARD D. BENNETT**
**United States District Judge, and a Jury**

APPEARANCES:

For the Plaintiff:      John F. Purcell, Jr.
                        Clinton J. Fuchs
                        Assistant U.S. Attorney


For the Defendant:      Gary E. Proctor
                        Timothy J. Sullivan

Proceedings recorded by mechanical stenography,
transcript produced with computer-aided
transcription.

2

```
1                    P R O C E E D I N G S
2               THE COURT:  We're ready to bring the jury
3      in and have the next government witness; is that
4      correct?
5               MR. PURCELL:  Yes.
6               THE COURT:  Correct from the point of
7      view of the defense?
8               MR. PROCTOR:  Yes, sir.
9               THE COURT:  We're ready to go here.
10              (JURY IN.)
11              THE COURT:  Good morning, everyone.
12     We're ready to proceed here.
13              With that, the next witness, Mr. Purcell.
14              MR. PURCELL:  Thank you.  Good morning,
15     Your Honor, and jurors.
16              The next witness is Linnard Cunningham.
17     Whereupon:
18               LINNARD GEORGE CUNNINGHAM,
19     called as a witness, having been first duly sworn
20     according to law, testified as follows:
21              THE DEPUTY CLERK:  Please state your full
22     name for the record.  Slide up to the table, please,
23     and keep your voice up.
24              THE WITNESS:  Linnard George Cunningham.
25              THE DEPUTY CLERK:  Spell your first name,
```

1    please?

2          THE WITNESS:  L-i-n-n-a-r-d.

3          THE DEPUTY CLERK:  Thank you.

4            DIRECT EXAMINATION

5    BY MR. PURCELL:

6    Q.    Good morning, Mr. Cunningham.

7    A.    Good morning.

8    Q.    Mr. Cunningham, how old are you?

9    A.    I'm 38.

10    Q.    Now, you're going to need to sit up and just

11    sort of lean into the mike so the jury can hear you;

12    okay?

13    A.    Yes.

14    Q.    Voices get lost in this large room.

15         Now, Mr. Cunningham, you know why you're

16    here.  You and I have met before; is that correct?

17    A.    Yes.

18    Q.    You've been to the federal grand jury on one

19    occasion, I think; is that correct?

20    A.    Yes.

21    Q.    All right.  And you're here with your

22    attorney, who you see sitting in the courtroom; is

23    that right?

24    A.    Yes.

25    Q.    Okay.  Now, Mr. Cunningham, just a couple of

```
 1     questions.  First of all, you were present, is it
 2     correct, for the murder or at the scene of the murder
 3     of Martie Williams?
 4     A.      Yes.
 5     Q.      Where were you seated -- where were you in the
 6     room when Mr. Williams was killed?
 7     A.      Mr. Williams was to my left; I was on the
 8     right side.
 9     Q.      What were you guys doing at the time of the
10     murder?
11     A.      Playing a game, video game.
12     Q.      All right.  And how long are had you known Mr.
13     Williams?
14     A.      I known him since he was a young kid.
15     Q.      You're 38, right?
16     A.      Yes.
17     Q.      Now, what is your connection to Westport, Mr.
18     Cunningham?
19     A.      Back then?
20     Q.      Yeah, uh-huh.
21     A.      I hung out there.
22     Q.      Had you ever lived there?
23     A.      Yeah, I've lived there.
24     Q.      How long had you lived there?
25     A.      For, like, 15 years.
```

LANARD GEORGE CUNNINGHAM - DIRECT - PURCELL

5

1    Q.      So -- and if you look over at Exhibit No. 1 --
2    and we'll put another exhibit up on the monitor in a
3    minute.  But if you look over at that big poster
4    there between the judge and the jury, you recognize
5    that to be an aerial of Westport?
6    A.      Yes.
7    Q.      Is that the area you recognize and know as
8    Westport?
9    A.      Yes.
10   Q.      Now, the home in which Mr. Williams was
11   murdered was a little bit further up on Maisel
12   Street; is that right?
13   A.      Yes.
14   Q.      Do you know Miss Debbie, Mr. Kareem Guest's
15   mother?
16   A.      Yes, I know Miss Debbie.
17   Q.      And do you know where Miss Debbie lives in
18   relation to where Mr. Williams lived?
19   A.      Yeah, a couple houses down.
20   Q.      A couple houses further up.  Okay.
21           Now, did you know Kareem Guest?
22   A.      Yes, I knew Kareem.
23   Q.      And how well did you know him?
24   A.      I knew him since he was coming up, too.
25   Q.      Were you guys friends, or --

LANDAR GEORGE CUNNINGHAM - DIRECT - PURCELL

6

1    A.    Yeah, he was.

2    Q.    Good buy.  I'm sorry.  Go ahead.

3    A.    Yeah, he was a good guy.

4    Q.    Do you know his daughter?

5    A.    Yes, I know his daughter.

6    Q.    Now, do you know a person by the name of

7    Antonio Hall, also known as Mack?

8    A.    Yes.

9    Q.    And do you see him in the courtroom today?

10   A.    Yes, I see him.  He's towards my left.

11         THE COURT:  The record will reflect that

12   the witness has identified the defendant, Antonio

13   Hall.

14   BY MR. PURCELL:

15   Q.    You're talking about the gentleman in the blue

16   shirt at the defense table?

17   A.    Yes.

18   Q.    And how long have you known Mr. Hall?

19   A.    All my life.

20   Q.    All your life, as well?

21   A.    All his life.  I'm older than him.

22   Q.    You're a little bit older than him?

23   A.    Yes.

24   Q.    Seven years older than him?

25   A.    Uh-huh.  Yes.

LANARD GEORGE CUNNINGHAM - DIRECT - PURCELL

7

```
1    Q.      Now, back in 2009, about how often would you
2    see Mr. Hall?
3    A.      Once -- I mean, he in there, not everyday
4    occasion, like he in there.
5    Q.      Now, do you know Kevin Duckett?
6    A.      Yes, I know Kevin.
7    Q.      What's his nickname?
8    A.      Kev.
9    Q.      You knew a guy named Eastwood?
10   A.      Yes.
11   Q.      Now, I want to direct your attention, please,
12   to the -- I think the record already reflects that
13   the date of the murder of Mr. Williams was March 21,
14   2009.
15           Does that sound about right to you?
16   A.      Yes.
17   Q.      Now, I'm going to direct your attention to the
18   day or days just before then, before that murder, and
19   ask you if you recollect any particular -- or if you
20   observed or saw a dispute between Mr. Williams and
21   Mr. Hall?
22   A.      It was a dispute.  I don't know exactly who
23   was saying what, whatever.  It was a lot of argument
24   going on.
25   Q.      An argument going on?
```

1   A.      Yeah.

2   Q.      And where was this argument?  Just so the jury

3   knows what you're talking about, where did you see

4   this going on?

5   A.      Right on Maisel Street, right across the

6   street from where the murder took place.

7   Q.      Okay.  So in that vicinity?

8   A.      Yes.

9   Q.      Was it a dispute?  You could tell that?

10  A.      Yeah, I could tell there was a dispute.  There

11  was a lot of people out there.

12  Q.      Okay.  Who was with Mr. Hall?

13  A.      I can't remember who was with him, exactly.

14  Q.      Was Big Kev there?

15  A.      I can't remember if he was there.  But I was

16  there.

17  Q.      Okay.  Do you remember -- well, do you

18  remember Mr. Eastwood being there?

19  A.      Yeah, I remember Eastwood being there.

20  Q.      Actually, his name is Clive Brown; is that

21  correct?

22  A.      Clive Brown.

23  Q.      His last name is not Eastwood; but having

24  referred to him as Eastwood, that was in error, his

25  nickname is Eastwood; is that right?

9

```
 1    A.       Yes.

 2    Q.       Now, was Relly there?

 3    A.       Yes, I remember Relly there.

 4    Q.       Now, tell the jury, what was Relly's

 5    relationship with Martie Williams at the time Martie

 6    was killed, Martie Williams?

 7    A.       I guess he was his friend.

 8    Q.       Were they, in fact, friends?

 9    A.       Yes.

10    Q.       And what was your relationship with Martie at

11    the time he was killed.

12    A.       He was like a nephew.

13    Q.       A nephew to you?

14    A.       Yes.

15    Q.       Okay.  Now, was Martie in the drug business at

16    the time he was killed?

17    A.       I never seen him personally dealing or doing

18    drugs, nothing like that.

19    Q.       But you knew he was in drugs?

20    A.       Yeah.  I mean, yeah, if you want to say.  I

21    never seen it, personally.

22    Q.       Okay.  You don't have to see something to know

23    it, though, do you?

24    A.       I mean -- I guess not.  I guess not.

25    Q.       Was Mr. Hall in the drug business at the time
```

1    of Martie's murder?

2    A.    The same way.  I never seen him.  But, like,

3    for me, myself, you could say I dealt drugs.  So I

4    guess if somebody say you dealt drugs, you dealt

5    drugs.

6    Q.    Mr. Cunningham, at the time of Martie

7    Williams' murder, where was Mr. Hall selling drugs?

8    I direct your attention -- you told the grand jury

9    this a couple of months ago.  So if you need to

10   refresh your memory, I certainly will.

11   A.    I mean, I hung down that part --

12             THE COURT:  Mr. Purcell, we have the --

13   if you put it up on the television screen so the

14   jurors have the screen there, and that would be

15   helpful.

16             Thank you.

17             MR. PURCELL:  Thank you.  That is Exhibit

18   6A being shown now.

19             THE COURT:  If you look to your left

20   there, Mr. Cunningham, you can see a blow-up there of

21   the aerial photo, and that might help you to some

22   extent.

23   BY MR. PURCELL:

24   Q.    Now, this does not show Annapolis Road, but it

25   does show the projects; is that right?

LANNIER GEORGE CUNNINGHAM - DIRECT - PURCELL
11

```
 1      A.      Yes.

 2      Q.      Now, my question is:  Where at the time of Mr.

 3   Williams' murder was Mr. Hall selling drugs?

 4      A.      Like I said, I didn't hang around them to know

 5   if he sold drugs or not.  But they hung out in --

 6   Westport at the top.

 7      Q.      You can touch it.

 8      A.      Around up here, in this area.

 9      Q.      Touch it.  Touch the screen and show the jury

10   where you have your hand and it will light up.

11              THE COURT:  Just touch the screen, sir.

12   Just touch it.  There you go.

13   BY MR. PURCELL:

14      Q.      Okay.  Any place else?  See, if you touch the

15   screen it will light up and the jury can see where

16   you're pointing.  Here, I'll show you.  If I may

17   approach.

18              So as an example, if you were saying

19   here, do you see how it lights up?

20      A.      Okay.  I didn't know that.

21      Q.      So I'm going to clear it.  That's how you

22   clear it.  Just push that down here on the left.  Do

23   you see that it's all clear?

24              Okay.  My question is:  Where was Mr.

25   Hall selling drugs?
```

```
 1       A.       They hung up in this part right here.

 2       Q.       Okay.  And did you know them to be selling on

 3   Annapolis Road, as well?

 4       A.       No, I didn't go over there.  I ain't hang over

 5   there.

 6       Q.       Do you remember being in the grand jury back

 7   in February 24, 2011?

 8       A.       Yes.

 9       Q.       I asked you the same question?

10       A.       Yeah, I remember telling you.  I ain't hang

11   over.  That was wrong.  I just hung in the projects.

12       Q.       Okay.  Just bear with me for a moment, Your

13   Honor.  I'm trying to find the reference.

14                I direct your attention, Counsel, to Page

15   28, Line 23 and 22.  I'm just going to show this to

16   you and ask you if that refreshes your memory as to

17   what your response was and your knowledge was as to

18   where Mr. Hall was selling.

19                My question is at Line 22.  "Do you know

20   where Mack was selling at the same time?"  I just

21   asked you about where -- I think where Martie was

22   selling.  What was your answer?

23       A.       It's saying here I say, "I said I'm not sure".

24       Q.       What?

25       A.       "I'm not sure.  I know Mack, he be over
```

LANNIE GEORGE CUNNINGHAM - DIRECT - PURCELL

13

1    Annapolis Road".

2    Q.    And what else does it say?  Continue.  That's

3    not the end.

4    A.    Okay.  "He did, he had, he were".

5    Q.    Right here?

6    A.    I read that.  I said, "Okay".

7            THE COURT:  Keep your voice up, please,

8    sir.

9            THE WITNESS:  Over Annapolis Road and

10   over the projects.

11   BY MR. PURCELL:

12   Q.    So, "Over Annapolis Road and over in the

13   projects"; is that right?  That's what it says?

14   A.    Yes, that's what it says.

15   Q.    That's what you said to the grand jury?

16   A.    Yes.

17   Q.    Please leave that there, I may need it again.

18   I hope not.

19            And you're telling the grand jury -- I'm

20   sorry.  You're telling the jury today that you don't

21   know what the dispute was about that was between

22   Martie and the defendant; is that right?

23   A.    Yes.

24   Q.    Didn't you hear it?

25   A.    I don't know to this day what it was about.

1    Q.      Okay.  Now, let's talk about the murder of Mr.

2    Williams.  What were you guys doing in the house at

3    the time just before the murder?

4    A.      Just playing the game.

5    Q.      What do you mean by, "the game"?

6    A.      The video game.

7    Q.      Now, did there come a time that evening that

8    you saw Mr. Duckett?

9    A.      Yes.

10   Q.      And tell the jury, please, what you remember

11   about that.

12   A.      I remember him coming in.  It was a lot of

13   little kids in there waiting to play the game also.

14   I mean, he came in and he was like, "Um, he got

15   winners.  That's me, next".  I was so focused on the

16   game, we was playing a game, so he left.

17   Q.      All right.  Now, you said that -- did he come

18   back at some point?

19   A.      Yeah, I think so.  I think he did come back.

20   I'm not certainly sure, but I think so.

21   Q.      Now, you said there were a bunch of little

22   kids in there.  Let me go back and ask you now:  At

23   the time of the murder, if you remember, who was in

24   the house?  You and Martie.  Who else?

25   A.      It was two other people upstairs on the second

LINNER GEORGE CUNNINGHAM - DIRECT - PURCELL

15

```
1     floor.
2     Q.      Just two?
3     A.      Yeah, just two.
4     Q.      Okay.  So anybody else who had been there
5     earlier had already left; is that right?
6     A.      Right.  Yes.
7     Q.      And if you remember, about how long before the
8     murder had Mr. Duckett left the scene?
9     A.      I'm not sure.  I mean, like 20 minutes, a
10    half, 15 minutes.  In that rate of time.
11    Q.      You're not sure?
12    A.      I'm not exactly sure of the time, but it
13    wasn't long.
14    Q.      Okay.  It wasn't long?
15    A.      No.
16    Q.      And he left?
17    A.      Yes.
18    Q.      Now, how many -- let me ask you:  When did you
19    first become aware that someone had come into the
20    house prior to the shooting?
21    A.      Well, when I heard the pop.
22    Q.      So up to that point you weren't aware if
23    somebody had come into the house?
24    A.      The door is facing the back of us.
25    Q.      Okay.
```

LINNEA GEORGE CUNNINGHAM - DIRECT - PURCELL

16

```
 1      A.      And we are sitting directly towards the jury,
 2      as that was the TV.
 3      Q.      Okay.  I have a couple pictures I'm going to
 4      show you.  And you can explain better, I think.
 5              Let's take a look.  I'm going to take 6A
 6      off the screen for a second and put up Bates 3425,
 7      which is Exhibit 123.
 8              Do you recognize that house?
 9      A.      Yes.
10      Q.      Okay.  And whose house is that?  Or what house
11      is that?
12      A.      That's the house where Martie was murdered.
13      Q.      Now, how often -- may I ask -- how often did
14      you guys, you know, hang out there?
15      A.      All the time.  Every day.
16      Q.      Okay.  Now, let's take a look at the inside.
17      If you walk through that front door -- I direct your
18      attention to 124 -- is this what you see?
19      A.      Yes.
20      Q.      This is Exhibit 124.
21      A.      Yes.
22      Q.      Okay.  Now, using your touch screen, you can
23      just touch the lower left-hand corner there, Mr.
24      Cunningham, and all these yellow marks will be gone.
25              There you go.  Now, show us where -- with
```

17

```
 1      your finger, find point -- where were you sitting at

 2      the time of the shooting?

 3      A.      Okay.  (Complies.)

 4      Q.      Now, is that chair, that blue chair, in the

 5      same position or has it been moved?  Were you closer

 6      to the TV or further from the TV?

 7      A.      Yeah, it wasn't like that.  We was exactly in

 8      front of the TV.

 9      Q.      A little bit further ahead?

10      A.      Yes.

11      Q.      Okay.  Now, do you recognize the individual

12      slumped in the other chair?  If you look carefully,

13      you can see a person in that chair.

14      A.      Yes.  That's Little Martie.

15      Q.      You haven't seen these pictures before, have

16      you?

17      A.      No.

18      Q.      All right.  I don't mean to upset you.  But I

19      do have questions I have to ask you about it; okay?

20      A.      Uh-huh.

21      Q.      Now, looking at this exhibit -- so that's the

22      TV that you were talking about you were watching?

23      A.      Yes.

24      Q.      Now, tell the jury, please, just show us or

25      tell us, where it was that you became aware of
```

LINWER GEORGE CUNNINGHAM - DIRECT - PURCELL

18

```
1    people -- where were these people when you became

2    aware of their being in the room with you?

3    A.      In back of the chairs.

4    Q.      Okay.  Now, at the time of the murder, Mr.

5    Cunningham, could you tell the jury whether the

6    chairs were closer together or further apart?

7    A.      It was more closer together.

8    Q.      All right.  And when -- did you -- so you're

9    telling the jury you didn't -- you weren't aware of

10   these guys coming into the house?

11   A.      No.  The TV was up.  And also, the music was

12   up upstairs.

13   Q.      All right.  You said the music was on?

14   A.      Yes.

15   Q.      So you didn't hear them come in or turn and

16   look at them?

17   A.      No.  I turned when I heard the first pop

18   sound.

19   Q.      All right.  And when you turned, how many

20   people did you see?

21   A.      I seen two.

22   Q.      And how many -- how many guns were there, if

23   you can tell us, if you saw them?

24   A.      I don't remember seeing them.  I seen two

25   people.  And you could tell because the flashes from
```

19

```
1     the -- like, the gun and the noise.  I really didn't

2     turn exactly around.  I just, like, glanced over with

3     my shoulder.

4     Q.     It would have been your left shoulder as

5     you're looking now?

6     A.     Yes.

7     Q.     Now, we've asked you this before, but the jury

8     wasn't there, so I'm asking you now.  In terms of --

9     let's just start with beginning with how these guys

10    compared to each other in terms of height.  Was there

11    the same height, a difference between them that you

12    could notice?  Tell the jury, please.

13    A.     One was big, like a big guy, tall, and bigger

14    than me.  And I'm a little big.  He was bigger than

15    me, and tall.  Another guy was shorter than him and

16    slimmer.

17    Q.     Okay.  And in the grand jury, at least, you

18    were able to observe that person -- well, tell the

19    jury how particularly the shorter guy was dressed?

20    A.     All black, black mask.  And I can see his

21    eyes, just his eyes.

22    Q.     Okay.  And were you able to see, were they

23    African-American males?

24    A.     Excuse me.

25    Q.     Were they African-American males?
```

1    A.      Yes, yes.

2    Q.      Now, I don't particularly do this, but I know

3    African-Americans sometimes distinguish themselves as

4    to the complexion, the hue of their complexion.  How

5    would you -- if you remember, how did you describe

6    the complexion of the shorter male?

7    A.      Like a brown-skinned, lighter person.  Like a

8    brown- skinned.

9    Q.      Lighter?

10   A.      Yeah, lighter.

11   Q.      Lighter than yourself?

12   A.      Yeah.

13   Q.      Thank you.  And neither of these individuals

14   shot at you; is that right?

15   A.      No.  But at the time I braced myself because I

16   thought I was next.  And I'm not.  I mean, I could

17   see, like, the other guy tilting the gun over towards

18   me.  So I'm, like, just shut my eyes.

19   Q.      You thought that was it, huh?

20   A.      Yeah.

21   Q.      But it wasn't?

22   A.      Yeah.  But it wasn't.

23   Q.      So describe how the taller guy looked, please.

24   Or how he was dressed.

25   A.      Same thing.  Excuse me, same thing.  Black,

LINWEB GEORGE CUNNINGHAM - DIRECT / PURCEL

21

```
1    black mask.  You could see his eyes, too.
2    Q.      Now, after the shooting -- which I guess
3    didn't last that long.  How long did it last?
4    A.      It was, like, for me, everything was slow
5    motion.  It was like bang, bang, bang, in and out.
6    Q.      You don't know how many times Martie was shot,
7    do you?
8    A.      No.  I just kept hearing it.  I was just,
9    like, anticipating, my turn, that's what I was doing.
10   I was sitting there like:  When is it going to stop.
11   Q.      That's understandable.  Now, these individuals
12   didn't stay there, did they?
13   A.      No, they didn't stay.
14   Q.      Did they leave?
15   A.      Yes, they left.
16   Q.      Tell the jury what you remember about their
17   leaving.
18   A.      I remember after the shots completely stopped,
19   I opened my eyes and looked and I could see them
20   leaving out the front door.
21   Q.      And were you able to tell when they got to the
22   end of the -- let's go back to the front of the
23   house.  Were you able to tell when they got to the
24   end of the sidewalk -- that goes onto Maisel; is that
25   right?
```

                                                                    22

1        A.      Yes.

2        Q.      Hit the bottom left.  There you go.

3                Which direction they turned, if you're

4    able to tell us?

5        A.      If you come out and you make a left, you'll go

6    this way.

7        Q.      So they went -- if you're facing the picture

8    as I am -- I'm sorry -- they went to the left?

9        A.      Yes.

10       Q.      Just leave it that.  As you look at it.

11               Now, how many were there?

12       A.      Two.

13       Q.      Only two?

14       A.      Yes.

15       Q.      Now, what did you do?

16       A.      I came out right out.  I came out to the gate.

17   I mean, I was just, like, I didn't even know what

18   that do.  But then I thought there's two more people

19   in the house and I went back and I looked at Little

20   Martie.  He was gone.  So we all just came back out

21   to the front yard.  Then we went back in and, like,

22   cleaned up our mess in there.

23       Q.      Now, at that point you're sitting next to a

24   man who had just been shot?

25       A.      Yeah.

23

```
1    Q.      Did you have concern that you might be
2    believed by the police to be involved because there
3    might be actual forensic evidence there?
4    A.      Yeah.  After the fact when we left and tried
5    to figure out what's going on and everything, then
6    that's the type of stuff start running through your
7    head.
8    Q.      Okay.  And tell the jury please, you what you
9    did, in terms of -- if you did -- in terms of getting
10   rid of any clothes or anything like that.
11   A.      I had a green and -- a light green type
12   sweatshirt -- I mean, sweat jacket.  And I took it
13   and I threw it in the water.
14   Q.      Okay.  You also had a firearm stashed
15   somewhere, didn't you?
16   A.      Yes.
17   Q.      What kind?
18   A.      A .357.
19   Q.      This is 2009 we're talking about, right?
20   A.      Yes.
21   Q.      Okay.  What did you do with the .357?
22   A.      Also through it in the water, too.
23   Q.      Do you know whether Martie had a gun on him
24   that night?
25   A.      I wasn't aware of that until the detectives
```

1    told me.

2    Q.    And where was it?

3    A.    I don't know.  They told me he had a gun on

4    him.

5    Q.    You didn't see it, you're saying?

6    A.    No.  That house you come in, you can't bring

7    no guns.  No drugs or stuff inside the house because

8    of the kids.

9    Q.    I guess they forgot to tell Martie that.

10   A.    Yeah.

11   Q.    But regardless, it didn't do him any good, did

12   it?

13   A.    No, it didn't.

14   Q.    I'm showing you government's 489.

15             Do you recognize that man?

16   A.    Yes.

17   Q.    Is that how Martie looked after he was shot?

18   A.    I really didn't get to see him like this

19   because he was slumped over to the wall and I could

20   see blood just dripping from his face.

21   Q.    Did he have any last words?

22   A.    No.  Nothing.

23   Q.    Now, you got out of there.  Do you know a

24   person named Mr. Tinkler, Henry Tinkler?

25   A.    Yes.

25

```
 1      Q.      And did you have occasion to meet with him
 2   later that evening?
 3      A.      Yes.  Like right after the shooting.
 4      Q.      Now, at the time of Martie's murder, were you
 5   aware that he was BGF?  Do you know what BGF is?  The
 6   gang?
 7      A.      Yeah, I know BGF.
 8      Q.      Did you know Martie -- did you know prior to
 9   that evening he was killed that he was associated
10   with BGF?
11      A.      Yes, I heard that he was with BGF.
12      Q.      Now, did you encounter any people that evening
13   from BGF who wanted to know what happened and who did
14   it because they knew you were in the house?
15      A.      Yeah.  It was a couple people.
16      Q.      What happened?  Just tell the jury, please.
17      A.      They say, "You be in the house.  And what's
18   going on?  What the man did?"  And I'm like, "That's
19   what I'm trying to find out, too".
20                  Words exchanged.  A whole lot of
21   argument, fussing going on.  And we left, me and Mr.
22   Tinkler.
23      Q.      Now, were they fussing with you because they
24   were telling you that you must have known because you
25   were in there?
```

LANNER GEORGE CUNNINGHAM - DIRECT - PURCELL

1    A.      Yeah.  They said, "You was in there so you

2    know what's going on".

3    Q.      Did you explain to them why you couldn't tell

4    them who did it?

5    A.      I ain't explain to them.  I just said, "I

6    don't know.  I'm trying to find out the same thing".

7    Q.      Did you tell them about the masks, that type

8    of thing?

9    A.      I mean, I said "Two people came in with masks

10   and shot Little Martie up".

11   Q.      Okay.  Now, was -- did you encounter a Relly

12   that evening?

13   A.      Yeah.

14   Q.      How was Relly?

15   A.      He was disturbed.  He was like I was and

16   anybody else, I mean.

17   Q.      Did you say disturbed?

18   A.      Hysterical.

19   Q.      He wanted to know who did it, didn't he?

20   A.      Yeah.

21   Q.      He wanted to go get him, didn't he?

22   A.      Yeah.

23   Q.      Now, to this day you haven't identified in the

24   grand jury.  Let me ask you here.  Can you tell us:

25   Did you see the faces, know who did this?

```
 1    A.      No.

 2    Q.      Now -- and you have not identified anybody as

 3    a shooter; is that right?  Or the shooters?

 4    A.      No.

 5    Q.      Right.  And I've asked you several times,

 6    haven't I?

 7    A.      Yes.

 8    Q.      Now, after this murder occurred, did you have

 9    occasion to meet and be interviewed by Detective

10    Dohony down at homicide, which is downtown here?

11    A.      Yes.  Like, I guess, like three or four

12    occasions.

13    Q.      Now, on one of those occasions when you went

14    to see Detective Dohony when you left, did your

15    girlfriend pick you up?

16    A.      Yeah.  My daughter's mother at the time.  She

17    was my girlfriend back then.  Yeah, she picked me up.

18    Q.      And we know her name, don't we?

19    A.      Yes.

20    Q.      You've told it to us and I think we've

21    interviewed her.  Can you tell us if on one of those

22    occasion you got in the car and were surprised to

23    find some people there?

24    A.      Yes.

25    Q.      Who were some people that were in the car
```

LANKER GEORGE CUNNINGHAM - DIRECT - PURCELL

28

1    after you went to homicide?

2    A.      Kev, Mack, Eastwood, and Keyburn.

3    Q.      And Keyburn?

4    A.      Yes.

5    Q.      Before Keyburn had been shot and put in a

6    wheelchair, right?

7    A.      Yes.

8    Q.      And was that surprising to you?

9    A.      Yeah, it was surprising.

10   Q.      Now, where did you go?

11   A.      We went back out Westport area.

12   Q.      And where did you go when you got to Westport?

13   A.      I don't know the street name, but off of

14   Hollins Ferry Road.

15   Q.      Where?

16   A.      Off of Hollins Ferry Road.

17   Q.      You were worried, weren't you?

18   A.      Yeah.  I just wasn't feeling it out there.  I

19   ain't trust nobody.

20   Q.      So tell the jury, please, when you got to

21   wherever it was you said you went?  Did you say

22   Puget?

23   A.      I didn't know the street, but that could be

24   it.  It's off of Hollins Ferry Road.

25   Q.      Okay.  Off of Hollins Ferry Road.  I thought

29

```
 1      maybe you said that in the grand jury.  We can look
 2      at it if you we have to.
 3                   Now, when you got there, what happened?
 4      A.      When we got there, I mean, I was still mad
 5      because --
 6      Q.      I asked you what happened.
 7      A.      Well, I got out and --
 8      Q.      Who told you to get out?
 9      A.      I got out and Mr. Hall got out with me.
10      Q.      Did anybody tell you to get out of the car?
11      A.      No, I don't think anybody told me.  I got out.
12      Q.      Are you sure?
13      A.      Well, I asked to got out.  I mean, it was so
14      long ago.
15      Q.      Okay.  Excuse me one moment, Your Honor.
16                   I just asked you who asked you to get
17      out.  And you said you got out.  But I asked you that
18      in the grand jury at Page 31 --
19      A.      Oh, yeah, I see it.
20      Q.      Did someone ask you to get out?
21      A.      Yeah, Mack asked me to get out.
22      Q.      Okay.  Now, when you get out of the car after
23      Mack asked you to get out of the car, did Mack ask
24      you any questions?
25      A.      Yeah.  He asked me.
```

LANDER GEORGE CUNNINGHAM - DIRECT - PURCELL                        30

```
1     Q.      What was he asking you questions about?

2     A.      Like, what was going on down on, like,

3     homicide; what they got you for; that thing happened

4     over there to Little Martie?

5     Q.      So he was asking you about the Little Martie

6     murder; is that right?

7     A.      Yes.

8     Q.      What the police knew?

9     A.      Yes.

10    Q.      And what did you tell him -- did you tell him

11    what you told the police?

12    A.      Yeah, I told him.  They showed me a picture of

13    you and Eastwood.

14    Q.      And did you tell him that you didn't identify

15    anybody as a shooter?

16    A.      I just -- like I was telling the detectives, I

17    don't know who it was to this day.

18    Q.      And you told him you told the police that; is

19    that right?

20    A.      Yeah, I told him that.

21    Q.      Okay.  But he wasn't asking you about the

22    Ravens' latest acquisition; he was asking you about

23    the Martie Williams murder; is that right?

24    A.      Yes.

25                MR. PURCELL:  Thank you.  I have no
```

LINNIE GEORGE CUNNINGHAM - CROSS/SULLIVAN

1    further questions.

2            THE COURT:  Cross-examination, Mr.

3    Sullivan?

4            MR. SULLIVAN:  Thank you, Your Honor.

5                  CROSS-EXAMINATION

6    BY MR. SULLIVAN:

7    Q.    Mr. Cunningham, good morning.

8    A.    Good morning.

9    Q.    Do you have any idea who I am?

10   A.    I guess you're the defense attorney.

11   Q.    Right.  We've never met before?

12   A.    No.

13   Q.    And isn't it a fact that we asked to meet

14   before by asking your attorney, Mr. Saunders ^ CHECK,

15   and you didn't want to meet with the defense.  Do you

16   remember that?

17   A.    No.

18   Q.    Okay.  Mr. Saunders never talked to you about

19   that?

20   A.    No.

21   Q.    Okay.  Now, Mr. Cunningham, let me understand

22   a couple things.  Immediately after these two people

23   left the house, did you call 911?

24   A.    No, I didn't.

25   Q.    Did you have a cellphone?

LINNER GEORGE CUNNINGHAM CROSS / SULLIVAN

32

1    A.    Yeah, I did.

2    Q.    So you could have called 911, but you did not?

3    A.    Yes, I could have called.

4    Q.    Okay.  The first thing you did is you walk

5    outside?

6    A.    Yes.

7    Q.    And I guess it would be a fair statement,

8    based on your testimony, that you were a little dazed

9    and confused as to what just occurred?

10   A.    Yeah.  I was in total shock of it, all of it.

11   Q.    Okay.  And being in total shock, is it a fair

12   statement that you went back into the house and

13   interfered with the crime scene by making sure all

14   your fingerprints and things that you had touched

15   were gone?

16   A.    Yeah, I did that.

17   Q.    Okay.  Now, you would know, wouldn't you, that

18   the police would want the crime scene exactly like it

19   was at the time that the murder occurred, right?

20   A.    Right.

21   Q.    But you were -- at this point, even moments

22   after Mr. Williams was killed, you were taking care

23   of yourself by removing any evidence that you were

24   even there, correct?

25   A.    Yes.

```
 1      Q.      And -- because you didn't want anything to do
 2      with this?
 3      A.      Not at all.
 4      Q.      And because you knew that, if you had a jacket
 5      that was covered with blood, the police and the
 6      homicide would be asking you a lot of questions,
 7      correct?
 8      A.      Right.
 9      Q.      And isn't that why you took that green jacket
10      you had on and you dug a hole and you buried it
11      somewhere?
12      A.      No.  Actually, my jacket didn't have no blood
13      on it.
14      Q.      Oh, what did you bury?
15      A.      I buried the jacket that I had on.  But it
16      didn't have blood on it.
17      Q.      Okay.  Now, where did you bury the jacket?
18      A.      I didn't bury it.  I took it and threw in it
19      the water over in -- what's that, the Patapsco.
20      Q.      Okay.  So you didn't bury it?
21      A.      No.
22      Q.      Was Mr. Tinkler with you?
23      A.      Yes.
24      Q.      Okay.  And was he with you when you threw it
25      into the river?
```

LINNER GEORGE CUNNINGHAM - CROSS / SULLIVAN

34

1    A.    Uh-huh.

2    Q.    Where did you throw it into the river?

3    A.    It was like a little creek that leads down to

4    the water.

5    Q.    Was it deep?

6    A.    No, it wasn't deep.  It wasn't deep.  But the

7    current take it to the Patapsco water.

8    Q.    Because all you wanted to do at that point,

9    Mr. Cunningham, was just get rid of any and all

10   pieces of evidence that linked you to the murder of

11   Mr. Williams, right?

12   A.    Yes.  I didn't want to have nothing to do with

13   none of that stuff.

14   Q.    I'm sorry?

15   A.    I didn't want to have nothing to do with none

16   of that.

17   Q.    Right.  And that's why you said you broke up

18   the gun and threw that into the water too, right?

19   A.    Yes.

20   Q.    Now, immediately after the two people left the

21   house, did you use your cellphone and call Mr.

22   Tinkler?

23   A.    No.  I didn't call no one.

24   Q.    At any point before you left the house, did

25   you call Mr. Tinkler?

LINWER GEORGE CUNNINGHAM CROSS / SULLIVAN

35

1    A.      No.

2    Q.      Did you ever tell Mr. Tinkler that somebody or

3    some people have killed Martie Williams?

4    A.      Yeah.  When he came and picked me up on, by

5    the fire station of Waterview and Annapolis Road.  I

6    walked from the house to there.

7    Q.      Okay.  And when you -- why did you call him?

8    A.      I called him to pick me up.

9    Q.      Did you call so he could drive you somewhere

10   so you could get rid of the evidence?

11   A.      No.  I called him to take some time to find

12   out what's going on.

13   Q.      Now, it seems to me -- and correct me if I'm

14   wrong, sir -- but it seems to me that the video game

15   was playing and the music was really loud, correct?

16   A.      Yes.  I think the video game was probably more

17   louder than the music.

18   Q.      What kind of video game was it?

19   A.      A basketball game.

20   Q.      Okay.  And Mr. Duckett had been there earlier?

21   A.      Yes.

22   Q.      Now, I think you testified 15 to 20 minutes.

23   So that was the time, according to you, that Mr.

24   Duckett left before the shooters came in?

25   A.      Yes, something like that.

1    Q.      Well, are you guessing, or are you kind of

2    confident with that response?

3    A.      Like I said, I can't tell you the exact time.

4    But that's just using that timeframe.

5    Q.      Okay.  Now, and according to your testimony,

6    you knew two people were upstairs, correct?

7    A.      Yes.

8    Q.      And you were playing the game with Mr.

9    Williams.  And, before I forget, is it your testimony

10   today, sir, that you did not know that Martie

11   Williams was a drug dealer?

12   A.      I mean, I put it like this.  Everybody assume

13   to be a drug dealer or gunslinger, whatever you want

14   to say.  But that's just, like -- that's his say on

15   the streets.  Personally, I never seen him deal no

16   drugs.  I never did no drugs activities with him,

17   nothing like that.  I could tell you about what I

18   did.

19   Q.      Well, you're a drug dealer, too, right?

20   A.      Yeah, I used to be.

21   Q.      Right.  You're not anymore?

22   A.      No.

23   Q.      Okay.  How did you think Mr. Williams got his

24   money?

25   A.      I never turned to ask.  I mean, a lot of us

```
 1      gambled; we did a lot of stuff to get money.  It
 2      wasn't just about drugs.  However it take to feed
 3      your family and support yourself, you're going to go
 4      ahead and do it.
 5      Q.      Right.  But didn't you tell the grand jury
 6      that Martie's area of selling drugs was on Annapolis
 7      Road?
 8      A.      Yeah, I said that.
 9      Q.      Right.  So back when you were in front of the
10      grand jury, you told the grand jury that Mr. Williams
11      was a drug dealer, right?
12      A.      Yes.
13      Q.      And you also knew that Mr. Williams carried
14      firearms, right?
15      A.      I never seen the guns.  I said that to the
16      grand jury, too.
17      Q.      But you knew he did?
18      A.      No, I didn't know.  I heard of him carrying
19      guns.
20      Q.      Well, no doubt you carried firearms, correct?
21      A.      Yep.
22      Q.      Because that kind of goes with being a drug
23      dealer, doesn't it?
24      A.      No.  Protection, whatever.
25      Q.      So the .357 that you had -- and that's a
```

LINNER GEORGE CUNNINGHAM - CROSS / SULLIVAN

38

1      pretty big gun, isn't it?

2      A.     Yep.

3      Q.     So that .357 you had was for protection?

4      A.     Yeah.

5      Q.     From what?

6      A.     From whoever probably going to try to do

7      something to me.

8      Q.     Why would somebody want to do something to

9      you, Mr. Cunningham?

10     A.     Why not?

11     Q.     Why not?

12     A.     Yeah.

13     Q.     Maybe because you're a drug dealer?

14     A.     Yeah.  So.

15     Q.     And is it your testimony to this grand jury

16     that up till the time that -- after Mr. Williams'

17     death you never knew he was in BGF?

18     A.     I never said that.

19     Q.     Did you know that Mr. Williams was a member of

20     BGF?

21     A.     Yeah, I heard it.  I heard that.

22     Q.     And what's BGF mean, again.  What does that

23     stand for?

24     A.     I don't know what it stands for.

25     Q.     Black Guerilla Family?

```
1    A.      Uh-huh.

2    Q.      Well, you knew who Cochise was, right?

3    A.      Yeah, I knew Cochise.

4    Q.      Who is he?

5    A.      He's a good friend.

6    Q.      He's a friend of yours?

7    A.      Yeah.

8    Q.      And Cochise was BGF, wasn't he?

9    A.      Uh-huh.

10   Q.      You have to answer yes or no, sir.

11   A.      Yes.

12   Q.      And it was Cochise who was in charge of BGF in

13   that neighborhood and came to talk to you about what

14   happened to Martie Williams, right?

15   A.      Yeah, he talked to me.

16   Q.      Yeah.  Because you're the only living person

17   that was there, right?

18   A.      Yes.  Well, two, well, three.  I mean, two

19   other guys that was upstairs.

20   Q.      Yeah, the two upstairs.  But actually in the

21   room when their fellow gang member got shot, you were

22   the only person there, right?

23   A.      Yes.

24   Q.      Now, is it a fair statement, sir, that when

25   you heard the first -- you're playing a video game;
```

1    you hear a pop; wasn't that your testimony?

2    A.    Yes.

3    Q.    And then you kind of glanced over to the left

4    and you saw two people in black shooting Mr.

5    Williams; is that correct?

6    A.    Yes.

7    Q.    And is it your testimony that you shut your

8    eyes immediately at that point in anticipation of --

9    A.    No.  My first reaction, I looked over.  I shut

10   my eyes when I thought it was my turn.

11   Q.    Did the shooters have gloves on?

12   A.    All black.

13   Q.    So just -- I'm trying to understand this.  So

14   from head to toe, all black?

15   A.    Yeah.  The reason why I can tell that they had

16   on all black because when they was leaving up I could

17   see they were all black.

18   Q.    So according to your recollection of what you

19   saw that night in those couple of seconds, the only

20   skin that you could see was in the slits of both of

21   their masks?

22   A.    Yes.  I said that from day one.

23   Q.    And in this slit, could you show the ladies

24   and gentlemen of the jury how big the slits were?

25            So, Your Honor, can I approach?

```
1              THE COURT:  Certainly.

2    BY MR. SULLIVAN:

3    Q.      So let me help you out here.  So are you

4    saying about a half an inch?

5    A.      I don't know.  Like a mask.  Like this.  You

6    can see this.

7    Q.      Okay.  So that is what you answered Mr.

8    Purcell with when you said the complexion of these

9    individuals was based on what you could see for those

10   few seconds through the slits?

11   A.      Yes.

12   Q.      While you were getting ready to be killed

13   yourself, or you thought?

14   A.      Yeah.  I mean, you hear a popping sound and

15   then you look over and you see, what would you do?

16   Q.      I'm not quite sure.

17   A.      All right.

18   Q.      The Court's indulgence.

19           Sir, let me ask you a question about --

20   let me show you what's been marked and admitted as

21   government's 124.  Now, this is a picture that you

22   hadn't seen before today, correct?

23   A.      Yes.

24   Q.      Was the room -- you know what I mean by,

25   "illuminated"?  Was the room lit up like this when
```

```
1     you were playing the video game, or were the lights

2     out and you were playing the video game in the dark?

3     A.     Actually, the only lights was out was the ones

4     in this room behind the TV.

5     Q.     So I'm sorry, could you clear the screen

6     again?

7     A.     In the back of here, the lights was out.  This

8     lamp right here was on.  And then there's another

9     light and that was on.

10    Q.     Okay.  Clear the screen for one second.

11                 Do you see the light hanging from the

12    ceiling?

13    A.     Yes.

14    Q.     Was that on or off?

15    A.     I can't remember.  But it was another light on

16    in the house in this room.

17    Q.     Right.  Then that would be the lamp on the

18    table to your right where you were sitting?

19    A.     Yes.

20    Q.     Now, the dispute between Mack -- between Mr.

21    Hall and Martie, do you know what that dispute was

22    about?

23    A.     No.

24    Q.     Were you ever present with Mr. Tinkler when

25    Martie and Mr. Hall got into it?
```

43

```
1        A.      Yes.  I mean, I think he was dead.  I'm not
2        sure, like, was he dead or not.
3        Q.      And to the best of your knowledge, as you sit
4        here today under oath, do you know what the nature of
5        that dispute was about?
6        A.      No.  Not to this day I still don't know.
7        Q.      And Mr. Williams was like a nephew to you and
8        you still don't know, correct?
9        A.      No.  How am I going to ask him?  He's
10       deceased.
11       Q.      Okay.  And you also don't know, sir, whether
12       or not Mr. Hall was the shooter that night or one of
13       the shooters?
14       A.      I said that from day one.  I don't know.  Till
15       now, I still don't know.  There's two shooters in
16       here.
17       Q.      And that's all you know?
18       A.      Yes.
19               MR. SULLIVAN:  Okay.  Thank you, sir.  No
20       further questions.
21               THE COURT:  Any redirect, Mr. Purcell?
22               MR. PURCELL:  Just one moment, Your
23       Honor.  Please.
24               No, Your Honor.  Thank you.
25               Thank you, Mr. Cunningham.
```

44

```
1              THE COURT:  Thank you very much, Mr.
2    Cunningham.  You may step down.  You should not
3    discuss your testimony with anyone until this trial
4    concludes, sir, this week.
5              Thank you very much.
6              MR. PURCELL:  Thank you, Mr. Cunningham.
7              THE COURT:  Next witness, Mr. Purcell?
8              MR. PURCELL:  Your Honor, the government
9    is going to recall Detective Moody very briefly, and
10   to allow cross- examination which we cut off earlier.
11             THE COURT:  We were in the midst of
12   cross- examination; is that right?
13             MR. PURCELL:  Your Honor, I had asked
14   that he be recalled for certain questions and counsel
15   had reserved the right to cross.
16             THE COURT:  But I thought we concluded
17   with him before that began, but you have more.
18             MR. PURCELL:  That was our agreement.
19             MR. SULLIVAN:  That's fine, Judge.
20             MR. PROCTOR:  I'm sorry, Judge.  I'm
21   having trouble locating one file.
22             THE COURT:  All right.  All right.  Mr.
23   Purcell, do you want to proceed now?
24             MR. PURCELL:  Yes, sir.
25
```

1                        TODD MOODY,

2        called as a witness, having been previously duly

3        sworn according to law, testified as follows:

4                     DIRECT EXAMINATION

5        BY MR. PURCELL:

6        Q.      A couple questions, Detective Moody.

7                     In this investigation, up to what point

8        was it until you had an eyewitness who confirmed that

9        they were there and saw the murder?

10       A.      It was July of 2010.

11       Q.      Now, up to that point, had witnesses come to

12       the grand jury and confirmed that that evening, at

13       least, they saw Robert Jones, also known as Seattle?

14       A.      Yes, they did.  Many witnesses, actually.

15       Q.      So from the outset no one was not mentioning

16       Mr. Jones; is that right?

17       A.      Every witness that came into the grand jury

18       who admitted to being there that night at this scene

19       admitted to seeing Mr. Jones, with the exception of

20       Shameka Ross.

21                     THE COURT:  I think you need to clarify,

22       Mr. Purcell.  We just finished with the matter of Mr.

23       Williams.  Clarify that you're talking about the

24       murder of Kareem Guest.

25                     MR. PURCELL:  I am now speaking about the

TODD MOODY - DIRECT - PURCELL

46

1    Guest investigation.  Very good point.  Thank you,

2    Your Honor.  And these questions, at least at this

3    point unless I say otherwise, are about the

4    investigation of Mr. Guest.

5            Thank you, Your Honor.

6    BY MR. PURCELL:

7    Q.    Now, in that same interval, from September '08

8    to July '09 -- September 20th is the date of the

9    murder, to July of 2010, did witnesses who were

10   interviewed or come to the grand jury and admit that

11   they were there describe Kevin Duckett being at the

12   scene?

13   A.    Yes, they did.  Every witness who admittedly

14   was at the scene of the murder admitted that they saw

15   Kevin Duckett there that night.

16   Q.    How about Jamar Howard?

17   A.    Yes, they did.

18   Q.    How about Avery Galtney?

19   A.    Avery, as well.

20   Q.    How about the defendant, Mr. Hall?

21   A.    No one.

22   Q.    So up to that point in that interval, not one

23   person who was later an eyewitness described Mr. Hall

24   as being present that evening?

25   A.    That's correct; not one witness.

```
 1    Q.      Not one person?

 2    A.      Not one.

 3    Q.      Now, that changed, didn't it?

 4    A.      That did change.

 5    Q.      Now, was Mr. -- was Robert Jones, Seattle,

 6    brought to the grand jury?

 7    A.      He was not.

 8    Q.      Did you attempt to interview him after you

 9    learned that he had been there or he has been

10    described as being there -- is that correct?  He was

11    on that tape with Rain Curtis, wasn't he?

12    A.      He was.

13    Q.      On the night of the murder, talking to

14    Hershel?

15    A.      Correct.

16    Q.      Okay.  So you knew he was there?

17    A.      We knew he was there.

18    Q.      And did you undertake to try to interview him

19    about what he saw that evening?

20    A.      Prior to even obtaining the tape, we made two

21    attempts in speaking with Mr. Jones regarding the

22    murder of Kareem Guest.  And on both occasions he

23    said he doesn't have a statement.

24    Q.      Now, there came a time when Mr. Jones was

25    actually arrested for a home invasion and federally
```

1  prosecuted; is that right?

2  A.    That's correct.

3  Q.    Where is he now?

4  A.    He's serving a -- I believe a 15-year

5  sentence.

6  Q.    Okay.  Imposed by Judge Bennett?

7  A.    It was in this court, yes.

8  Q.    And up to the time that he was being -- that

9  is, from the point that he was indicted by a federal

10  grand jury up to the time that his case was resolved,

11  was he offered an opportunity to come in and

12  cooperate and describe what he saw that evening?

13  A.    He was.  Through his counsel, he was.

14  Q.    And did he agree to do that?

15  A.    He declined.

16  Q.    What about after he was sentenced; was he

17  given an opportunity to come forward and describe

18  what he saw that evening?

19  A.    He was.

20  Q.    And did he do that?

21  A.    He did not.

22  Q.    So up to this point, he's never come forward

23  and described anything about what he saw that

24  evening; is that right?

25  A.    That's correct, never.

49

```
 1    Q.      Okay.  Do you know where he is today?

 2    A.      He's in this building.

 3    Q.      Did we bring him here?

 4            MR. PROCTOR:  Objection.

 5            THE COURT:  Overruled.

 6            MR. PROCTOR:  Judge, can we approach on

 7    that before he answers the question?

 8            THE COURT:  Sure.

 9            (BENCH CONFERENCE ON THE RECORD.)

10            MR. PROCTOR:  Judge, he just got a

11    lawyer, Michael Lawler was appointed to represent

12    him.  Again, we haven't spoken with him.  Mr. Lawler

13    is on his way, I believe, from Greenbelt.  I don't

14    want the inference that somehow -- if we don't call

15    him, because I don't know what he's going to say and

16    I haven't had a chance to speak to him -- we had that

17    witness but we didn't call him because we didn't like

18    what he was going to say.

19            Who brought him here is irrelevant.  If

20    he's testified, the government's welcome to impeach

21    him with all these chances he had to answer.  But we

22    shouldn't go into it through this witness --

23            THE COURT:  The point is, as to saying in

24    context the fact that he's serving a 15-year prison

25    sentence, I permitted the question as to is he here
```

```
1        now.  He is serving a 15-year prison sentence.  I
2        don't think we need to go into this any further.
3                    Are you going to call Jones as a witness?
4                    MR. PURCELL:  No.
5                    THE COURT:  Are you?
6                    MR. PROCTOR:  I don't know.  So I don't
7        want the inference --
8                    THE COURT:  How much farther are we going
9        to go on Mr. Jones?
10                   MR. PURCELL:  I'm done.
11                   THE COURT:  All right.  There's no
12       question about it.  He's somewhere here in the
13       building and he's serving a 15-year sentence.  Move
14       on.
15                   (END OF BENCH CONFERENCE.)
16       BY MR. PURCELL:
17       Q.    So it would be correct to say from September
18       20, 2009 to the present Mr. Jones has never taken
19       advantage of an opportunity to talk with the
20       government about what he saw that that night?
21       A.    That's correct.
22       Q.    Now, I'm just about finished.
23                   I direct your attention to the recording
24       that you obtained by using Mr. Duckett.  Now we're
25       talking about November.  And these exhibits are in
```

1    evidence.  The November 2010 use of Mr. Duckett after

2    he had come in and went to the grand jury; told the

3    grand jury and you and the government what he saw.

4    Did you try to use him in an undercover capacity?

5    A.     We did.

6    Q.     And I think we heard the first tape.  That was

7    the sort of loud street recording; is that right?

8    A.     That's correct.

9    Q.     And that was on the 18th?

10   A.     That was on the 18th.

11   Q.     Now, prior to your using Mr. Duckett, had he

12   made a request about what not to ask certain

13   witnesses?

14   A.     He did.

15   Q.     And was that based on information that he had

16   provided?

17   A.     That's correct, it was.

18   Q.     And what was the information he provided that

19   he did not want certain witnesses to be asked in the

20   grand jury?

21   A.     It was regarding the -- after the murder of

22   Kareem Guest when he departed from the vehicle driven

23   by Shameka Ross with the defendant Mr. Hall in the

24   back street and Shaquanda Isaac as the passenger.  He

25   didn't want us to ask Miss Isaac or Miss Ross about

TONY MOODY - DIRECT - 2/14/12

52

1    whether or not Mr. Hall had gotten out of the vehicle
2    at any point to give the gun to Roddy, who at some
3    point they realized was following them.  And he was
4    very --
5    Q.    Up to the point that Mr. Duckett came forward,
6    had any other witness described Mr. Hall getting out
7    and giving the gun to Roddy?
8    A.    No.  He was the only witness who provided that
9    information.
10   Q.    And what did he tell you would result if he --
11   if suddenly witnesses started being asked about
12   Roddy?
13   A.    He stated he was aware that the witnesses were
14   coming back.  And that Mr. Hall had been questioning
15   the witnesses after their grand jury.  And that if
16   Mr. Hall got wind that we were asking questions about
17   him getting out of the vehicle and giving Roddy the
18   gun, it would bring a lot of suspicion on either him
19   himself or potentially Roddy, who is Gerald Horton.
20   Q.    Did he ever ask you to specifically not ask,
21   or ask the government in the grand jury not to ask
22   particular witnesses about Roddy?
23   A.    He did.
24   Q.    What witnesses?
25   A.    Shameka Ross and Shaquanda Isaac.

53

```
 1    Q.      Now, directing your attention to the tape, and
 2    we can play it again if need be, of 11-20.
 3            In that conversation, is the name Roddy
 4    brought up and questions being -- or, statements
 5    being made about Roddy?
 6    A.      On the 20th it is.
 7    Q.      Who was the first person to use the name Roddy
 8    and in what context?
 9    A.      Mr. Hall brought it up.
10    Q.      You were listening to this as it was going on?
11    A.      No, actually we weren't.
12    Q.      Oh, you weren't.  I'm sorry.  You were just
13    recording it?
14    A.      It's recorded.
15    Q.      And in the tape Mr. Hall brought it up.  And
16    what did he say?
17    A.      He said he had spoken to Meka, who is Shameka
18    Ross.  And she had informed him that those peoples,
19    referring to the government, were asking questions
20    about whether did somebody get out of the vehicle and
21    give Roddy the gun.
22    Q.      And is this the conversation in which he
23    stated, "How they know I got out of the car"?
24    A.      I don't believe he stated it like, "How they
25    know I got out".  He said, "They know I got too?
```

```
1      That's crazy".  Almost in an accusatory type of way

2      towards Mr. Duckett.

3      Q.      Now, in this conversation -- we played it, and

4      we're going to play it again perhaps if the jury

5      wishes to hear it later.  But after this meeting is

6      my focus.

7               What was Mr. Duckett's demeanor, I guess

8      I should say, when he returned to your meeting place

9      with him after that undercover or controlled

10     conversation?

11     A.      He was very angry in that he felt as though we

12     had put him in a position to where that jeopardized

13     his harm.  And, more than that, he was scared; he was

14     very scared.  He felt as though Mr. Hall was

15     basically accusing him.  Because he repeated to me,

16     "He said, 'They know that too?  That's crazy".  And

17     he took that as an accusatory statement towards

18     himself and possibly Mr. Horton, who was Roddy.

19     Q.      In fact, did he tell you to tell Roddy to

20     protect him?

21     A.      He did.

22     Q.      Okay.

23     A.      He did.

24     Q.      Now, did he want to do any more undercover

25     meetings?
```

TODD MOODY - DIRECT - 2/14/12

55

1    A.    No, he did not.

2    Q.    What happened to him that night in terms of

3    his --

4    A.    That was.

5    Q.    -- let me finish, please.  What happened in

6    terms of Mr. Duckett's housing occurred that evening?

7    A.    That's the night that we relocated Mr. Duckett

8    and housed him away from Baltimore.

9    Q.    So fair to say that from September -- I'm

10   sorry -- November 20th, 2010 to the present Mr.

11   Duckett has been housed someplace else?

12   A.    That's correct.

13   Q.    At government expense?

14   A.    I'm sorry?

15   Q.    At government expense?

16   A.    Correct.

17   Q.    Now, what other witnesses that have been

18   presented to this grand jury are being housed or have

19   been moved or relocated or assisted by the government

20   in terms of getting out of Westport?

21   A.    We assisted Miss Rain Curtis upon her release

22   from prison in being relocated.  Mr. Duckett.  We've

23   assisted Jocelyn Hamlet in seeking new housing.

24   We've relocated just recently Jamar Howard, as well.

25   And I believe that may be it.

56

1    Q.      How about Mr. McClinton?  We saw him

2    yesterday.

3    A.      Yes, Mr. McClinton requested yesterday to be

4    relocated.

5    Q.      Now, you were present -- because you were the

6    case agent, you were present for the testimony of

7    Tamica Mouzon, Little Mike, last week?

8    A.      I was.

9    Q.      Now, prior to the date that she testified, did

10   she make a request to you?

11   A.      She did.

12   Q.      Was her attorney present?

13   A.      He was.

14   Q.      In fact, is he the one that brought you into

15   the room to make the request?

16   A.      That's correct.

17   Q.      What was the request?

18   A.      That she be relocated.

19   Q.      Has that been done yet?

20   A.      Not yet.

21   Q.      And that's something you will have to attend

22   tend to?

23   A.      Correct.

24   Q.      And that's the first time she asked for it,

25   was the day before she was coming in to testify

57

```
 1        against the defendant; is that right?
 2        A.      That's correct.  We had -- we had made it
 3        known to her months ago that that was available and
 4        that was an option and she declined.
 5        Q.      Now she wants to be moved?
 6        A.      Correct.
 7                     MR. PURCELL:  Nothing further.  Thank you
 8        very much.
 9                     THE COURT:  Thank you, Mr. Purcell.  Mr.
10        Proctor?
11                     MR. PROCTOR:  Before I begin cross, can
12        we approach, please, sir?
13                     THE COURT:  Sure.
14                     (BENCH CONFERENCE ON THE RECORD.)
15                     MR. PROCTOR:  Judge, I promised Mr.
16        Purcell weeks ago that if I was going to go into an
17        area I would raise it with the Court and let you rule
18        on it first.  So I'm abiding by that promise.
19                     Officer Moody shot a Lamont Dorsey and
20        there is a civil rights complaint pending with Judge
21        Quarles.  I checked last night and the city solicitor
22        just answered the reply, so it's still sitting out
23        there.
24                     I'm not asking him about that.  I
25        couldn't care less if there's a civil rights
```

```
1      complaint pending.  I couldn't care less that there's
2      an IAD complaint pending.
3                    MR. PURCELL:  There's not.  It's a
4      cleared shoot; and you knew that all along.
5                    MR. PROCTOR:  I'm going to ask him:  Did
6      he shoot an unarmed man.  He'll say -- I'm asking to
7      ask if he shot an unarmed man.  He'll say:  No, he
8      was armed at the time, I assume.  And I'm going to
9      ask him:  Did he lie on the police report and say he
10     only shot him twice, when the medical record -- which
11     I have and will impeach him -- with shows that the
12     man was shot three times.  And that's it.
13                   THE COURT:  I'm sorry.  No reason.  No
14     reason.  You're saying that he has made a statement
15     that he shot him twice and there is a medical report
16     that indicates that the man was shot three times?
17                   MR. PROCTOR:  Correct.  And that's it.
18     I'm not even going to mention that there's a pending
19     civil rights complaint.  I couldn't care less about
20     it.
21                   THE COURT:  So you're seeking to impeach
22     him.  What is the basis of the impeachment; in terms
23     of his not being truthful as to the number of times
24     he shot the man?
25                   MR. PROCTOR:  In writing a police report
```

1      to the head of homicide, which is Mr. McLarney, which

2      is what I've seen.  But it will violate the discovery

3      agreement of the person that has it to give me a

4      copy.  So I don't have a copy because I'm not allowed

5      to see it.

6                  THE COURT:  My point is you're not going

7      to go into the fact that Mr. Dorsey filed a civil

8      rights complaint?

9                  MR. PROCTOR:  Correct.

10                 THE COURT:  And there is no internal

11     investigation.

12                 MR. PROCTOR:  Right.

13                 THE COURT:  So exactly what are you going

14     to cross-examine him on?  That there was an incident

15     and he just shot a man.  And he knew -- that he said

16     the man was unarmed, and really he said he thought he

17     was armed.  And the report says that he was shot --

18     the report says the man was shot three times.  And

19     you're going to confront Detective Moody with the

20     fact that he says he shot him twice?

21                 MR. PROCTOR:  He wrote a police report,

22     and so he lied on a police report.

23                 THE COURT:  Well, he lied on the police

24     report because he believed he shot him twice and the

25     report says he shot him three times?

1              MR. PROCTOR:  The medical report.  The

2    University the Maryland Medical Center says he has

3    three bullet holes.

4              THE COURT:  So the police officer says he

5    believes he shot him twice and the medical report

6    says three times?

7              MR. PROCTOR:  He can explain it as an

8    innocent recollection, or it happened so fast that

9    he --

10             THE COURT:  Mr. Purcell.

11             MR. PURCELL:  Your Honor, they're going

12   way around the barn to get in the fact that he shot

13   somebody and the inconsistency, such as it is, about

14   two or three shots.  This is a complete sandbagging,

15   by the way, because this has been completely

16   discussed between counsel, around this issue.  This

17   is not an IAD complaint.  It's a clean shooting --

18             THE COURT:  I've reviewed this for *Giglio*

19   purposes.  And I recall and the record will reflect

20   there is no IAD.  There's no internal --

21             MR. PURCELL:  Well they're well aware all

22   along.  And to try to bring that up a the last minute

23   and try to -- for that miniscule, insignificant

24   inconsistency between two people -- to bring in the

25   fact that he shot somebody, which is the object here,

1    is completely the classic far more prejudicial than

2    it is probative.  And Your Honor, it would be a gross

3    error to admit this evidence.

4                THE COURT:  What is the inconsistency?

5    That there was an incident and the man said he

6    thought he shot twice and the report says he shot

7    three times.  So your argument is, because he said he

8    shot twice and the report says he shot three times,

9    therefore he's lying?

10               MR. PURCELL:  There is no

11   inconsistency --

12               THE COURT:  Wasn't that the whole

13   inference of it?

14               MR. PROCTOR:  He wrote a report two weeks

15   later to the head of homicide wherein he said, "I

16   shot him twice," and the man has three bullet holes

17   in him.  He downplayed his role; he downplayed the

18   amount of times he pulled the trigger; he

19   minimized -- and, you know, even aside from that, I

20   get to ask him, I believe, if he shot an unarmed man.

21   And if he says, "No" --

22               THE COURT:  Well, what is the basis of

23   your saying he shot an unarmed man?

24               MR. PROCTOR:  Mr. Dorsey.  The person

25   shot.

1          THE COURT:  Detective Moody will probably

2     say he believed he was armed.

3          MR. PROCTOR:  They never recovered a gun.

4          THE COURT:  What is the evidence that he

5     was not armed?

6          MR. PROCTOR:  The witnesses in part,

7     people we've spoken to, people we've asked about

8     Detective Moody will tell us they believe he was

9     unarmed.

10          MR. PURCELL:  Let's try that case here,

11     then.

12          THE COURT:  But my point is, but for your

13     saying in a question he was unarmed, Detective Moody

14     contends that he was armed.

15          MR. PROCTOR:  And I agree I'm not

16     entitled to bring Mr. Dorsey in to impeach him with

17     it.  It's a collateral issue.  But I get to ask.

18          THE COURT:  What basis is there for you

19     to say in his question, "You shot an unarmed man?"

20          MR. PROCTOR:  Because I have a good faith

21     basis from witnesses --

22          THE COURT:  That's not sufficient.

23          MR. PROCTOR:  I think it is.

24          THE COURT:  Well, the Court rules it's

25     not.  No lawyer, either prosecution or defense, can

```
1        just proffer a fact in a question.  It's true, even
2        as I instruct the jury, your questions are not
3        evidence, the answers of are.  What is the basis of
4        your saying he was unarmed.  Apparently somebody
5        contends he was unarmed.  Right?
6                    MR. PURCELL:  Right.
7                    THE COURT:  Well, then, bring him in.
8                    MR. PROCTOR:  That's a collateral issue.
9                    THE COURT:  I'm not going to have you
10       stand up in a courtroom and say somebody was unarmed.
11       For all I know, the man was armed.  For all I know,
12       the man deserved to be shot.  It was self-defense
13       from the police officer.  How am I supposed to judge
14       this?
15                   MR. PURCELL:  It's already been judged.
16                   MR. PROCTOR:  That's a question of
17       credibility for the jury.
18                   THE COURT:  Wait a minute, Mr. Purcell.
19       The bottom line is, is that, first, one thing's going
20       to happen, Mr. Proctor.  On a few occasions I've had
21       to admonish you about putting facts in your
22       questions.  Which is all right; that's strategy.  You
23       are absolutely not going to be permitted to stand up
24       in this courtroom and accuse a police officer of
25       shooting an unarmed man just because that's what you
```

1        believe the facts are.  You're not a witness.

2                    MR. PROCTOR:  Which is why I wanted to

3        run it by the Court first.

4                    THE COURT:  Well, that's exactly right.

5        You're not going to be permitted to do so.

6                    MR. PROCTOR:  Okay.

7                    THE COURT:  Whether it's a collateral

8        issue or not, it's a separate matter.  If there's

9        some contention that this police officer is lying and

10       he shot an unarmed man, then it has to be teed up

11       properly in terms of seeking to impeach the police

12       officer with what you contend is blatantly lying

13       about shooting an unarmed man.  It may or may not go

14       off into collateral issues, and that would require

15       another ruling by the Court.  And if you're prepared

16       to seek to go down that road, then I'll address that.

17       But what's not going to happen is for you to stand up

18       and accuse him are shooting an unarmed man --

19                    MR. PURCELL:  Your Honor --

20                    THE COURT:  -- based upon what your

21       personal belief is, Mr. Proctor.  I wouldn't permit

22       the government to do the same thing.  You can't just

23       stand up and offer facts; there has to be some basis

24       for it.

25                    Now, as I recall, I reviewed *Giglio*

65

1    material, all these civil files, and as I recall

2    there's absolutely no internal investigation on this

3    matter.  And apparently there is a lawsuit brought by

4    Mr. Dorsey, defended by the City Solicitor's Office

5    as to this detective, and it has to do with a matter

6    that occurred in which -- I don't know what the facts

7    are.  I don't know whether Mr. Dorsey was or

8    wasn't -- was or was not armed; whether there was a

9    gun that was or was not found; or what happened at

10   the scene.

11              So this is really going off in a

12   conjectural area.  And if the whole thrust -- the

13   whole thrust of your purported discussion of this,

14   Mr. Proctor, is that, because Detective Moody

15   apparently said -- indicated on a police report that

16   he shot the man twice and the medical records reflect

17   that the man was, in fact, shot three times, I don't

18   find that to be in any way impeachment of anybody's

19   credibility.  Any more than it would be if Mr. Dorsey

20   said he shot twice and an it appeared, in fact, he

21   shot three times.

22              In the heat of the moment whether you

23   shoot two or three times, that inconsistency is not

24   impeaching or showing untruthfulness on the side of

25   either party at the shootout.

1           Now, if the proffer was that Detective

2    Moody said he shot twice and the man was shot 27

3    times, then there's a big difference between 2 and

4    27.  There's a markedly different situation in terms

5    of the police report.  But for there to be a variance

6    of one between two shots and three shots, is not

7    impeaching.  To the extent it's impeaching, it

8    essentially is an end-run around, I guess, or seeking

9    to get in the fact that there was a shooting that he

10   was involved in.

11          So I'm trying to give you latitude here

12   in terms of trying to attack Detective Moody.  But

13   that's really not -- I don't find that to be a

14   particularly significant inconsistency.

15          So, I mean, what else do you propose to

16   impeach him with other than that?

17             MR. PROCTOR:  That's it.

18             MR. PURCELL:  That's it.  Your Honor, the

19   point is that's all they want.  They want this little

20   infinitesimally small inconsistency drives the

21   gigantic fact, which we will hear endlessly for the

22   rest of the case, that he shot somebody.  He's

23   Officer Moody who yells at people, shoots people.

24   That's where they're going.  And this is, as I've

25   said -- and they know it.  They know it.  It's a

```
 1    stunt.  And it's a very harmful stunt.  It's gross.
 2               THE COURT:  I'm not going to permit this,
 3    Mr. Proctor.  You are certainly free -- you are
 4    certainly free to call witnesses who would seek to
 5    attack the credibility of Detective Moody.  If there
 6    are people who would come forward and say that he's
 7    overreacted on the streets of Westport, that this is
 8    some kind of rogue police officer who acts as a
 9    cowboy on the streets of Westport, you are certainly
10    free to do that and I would permit that.  In terms of
11    his overreaction, alleged misconduct, mistreatment of
12    people in the streets of Westport.  If there are
13    people who would be inclined to come forward and so
14    testify, you certainly are permitted to bring them
15    forward.  And I will deal with them seriatim on an
16    individual basis.
17               But to seek to bring in this one incident
18    over the difference between whether or not he fired
19    twice or three times is of really no great moment.
20    It's gone really far afield.  And certainly,
21    certainly to contend that he shot an unarmed man when
22    there's absolutely not a scintilla that he shot an
23    unarmed man.  I gather that Detective Moody really
24    contends that the man was armed, correct?
25               MR. PURCELL:  He was shooting somebody.
```

1          THE COURT:  I mean, from what I can

2   gather from this is that he contends that somebody

3   drew a gun on him and he fired and he was in

4   self-defense.

5          MR. PURCELL:  He was shooting somebody

6   else.

7          THE COURT:  Mr. Dorsey is contending that

8   he was not armed.  And that's a separate fact.  But

9   to just ask him in the question, "You shot an unarmed

10  man"; "No, I didn't"; "Yes, I did"; I mean, you're

11  putting your own credibility at issue, Mr. Proctor,

12  because of your posing that question.  So because of

13  that, that line of cross-examination will not be

14  permitted and your exception to my ruling is noted

15  for the record.

16          But, again, you are certainly free to

17  seek to attack the credibility of Detective Moody in

18  other ways.  And if this individual made a pattern of

19  abusing citizens in the community and if he

20  overreacted and if you believe he's a rogue police

21  officer, you are certainly free to address the Court

22  with respect to witnesses you want to call in that

23  regard.  But not in this fashion.  So, with that, the

24  objection by the government is sustained.

25          MR. PROCTOR:  Thank you, sir.

1          (END OF BENCH CONFERENCE.)

2                    CROSS-EXAMINATION

3    BY MR. PROCTOR:

4    Q.     Just a couple questions, sir.

5              Mr. Purcell asked you where Seattle is.

6    Do you remember that question?

7    A.     I do.

8    Q.     Where's Roddy?

9    A.     I don't know where Roddy is.

10   Q.     Did you serve him with a subpoena for court?

11   A.     I did serve him with a subpoena.

12   Q.     Okay.  But you don't -- as you sit here today,

13   you don't know where he is?

14   A.     Well, we would have to call his attorney.  He

15   has an attorney appointed to him.

16   Q.     And Mr. Purcell also asked you about the

17   witnesses you had to relocate?

18   A.     Correct.

19   Q.     Did all of them get a nice pool?

20   A.     I don't know what you mean.

21   Q.     Well, you heard Mr. Duckett; you were here for

22   his testimony, right?

23   A.     I was.

24   Q.     And did you see his Facebook photos?

25   A.     I haven't.  I'm not a friend of his on

1      Facebook.

2      Q.     He's sitting by the pool in the sun.

3             So I guess, without telling us where they

4      are, my question is:  Did all of the witnesses get a

5      nice place with a swimming pool?

6      A.     No, they did not.

7             MR. PROCTOR:  That's all I have.

8             THE COURT:  Thank you.  Any redirect, Mr.

9      Purcell?

10            MR. PURCELL:  No, thank you.

11            THE COURT:  Detective Moody, you may step

12     down and return to the witness table, as you are the

13     case agent.

14            Yes, Mr. Fuchs?

15            MR. FUCHS:  Your Honor, the government

16     calls Detective Antonio Green.

17                     ANTONIO GREEN,

18     called as a witness, having been first duly sworn

19     according to law, testified as follows:

20            THE DEPUTY CLERK:  Please state your full

21     name.

22            THE WITNESS:  Detective Antonio Green.

23            THE DEPUTY CLERK:  Thank you.

24

25

71

```
 1                      DIRECT EXAMINATION

 2    BY MR. FUCHS:

 3    Q.     Detective Green, where do you work?

 4    A.     Baltimore City Police Department.

 5    Q.     How long have you been a police officer?

 6    A.     Ten years.

 7    Q.     Where were you working in July of 2005?

 8    A.     Public housing section.

 9    Q.     And that's part of the Baltimore Police

10    Department?

11    A.     Yes.

12    Q.     All right.  Did you work in a particular part

13    of the city when you were with the housing section?

14    A.     The Southern District.

15    Q.     Are you familiar with the Westport

16    neighborhood?

17    A.     Yes.

18    Q.     How often would you say you were in the

19    Westport neighborhood?

20    A.     When I was in the housing section, I was going

21    through there every day.

22    Q.     Okay.  Let me show you government's Exhibit

23    47.

24           Do you recognize that?

25    A.     Yes.
```

72

1    Q.    Okay.  And what is that?

2    A.    That's Westport.

3    Q.    Okay.  And you're familiar with that area?

4    A.    Yes, sir.

5    Q.    All right.  Turn your attention to July 29th

6    of 2005.  Were you working that day?

7    A.    Yes.

8    Q.    Were you in Westport that day?

9    A.    Yes.

10   Q.    Were you in plainclothes?

11   A.    Yes.

12   Q.    Were you in an unmarked car?

13   A.    I believe it was a gold Cavalier, yes.

14   Q.    All right.  And who was with you that day?

15   A.    Detective Fletcher Jackson and Detective Shawn

16   Yates.

17   Q.    And Detective, I'm sorry, if you move up a

18   little closer to the mike, the jury probably can hear

19   you a little better.

20         And so you were with Detective Jackson

21   and Yates?

22   A.    Yes.

23   Q.    And what was your assignment that day?

24   A.    We were assigned to a flex unit.  We basically

25   rode around the projects looking for narcotics

1     violations, violent crimes.

2     Q.     Okay.  Did you make any arrests that day?

3     A.     Yes.

4     Q.     All right.  Did you write a report about that

5     arrest?

6     A.     Yes.

7               MR. FUCHS:  Permission to approach, Your

8     Honor?

9               THE COURT:  Yes.  Permission granted.

10    BY MR. FUCHS:

11    Q.     Detective, I'm going to show you what's been

12    marked as Exhibit 405.  It's for identification only,

13    Your Honor.

14               Do you recognize that?

15    A.     Yes.

16    Q.     And what is it?

17    A.     It's a statement of probable cause that I

18    wrote up for Mr. Antonio Hall.

19    Q.     Okay.  And you said you made an arrest that

20    day; is that correct?

21    A.     Yes.

22    Q.     All right.  Would you explain to the jury what

23    happened?

24    A.     We were patrolling in the Westport area.  Saw

25    a red pickup truck turn on to Annor Court.

ANTONIO GREEN - DIRECT - FUGHS

74

```
1    Q.      Detective Green, I'm sorry to interrupt.  The
2    screen in front of you, actually, if you touch it
3    will leave a mark.  So, if you would, show the jury
4    on the map what you saw.
5    A.      Okay.  I can't see the words on here.
6    Q.      Does that work?
7    A.      Yeah.
8    Q.      And if you would hit the bottom left-hand
9    corner, that will take away the mark you made.  All
10   right.  Go ahead.
11   A.      We were patrolling; seen a red pickup truck
12   turn on to Annor Court.
13   Q.      And Annor Court is that road we see running up
14   and down the middle, correct?
15   A.      Yes, Annor Court.
16   Q.      Okay.
17   A.      We saw a red pickup truck turn on to Annor
18   Court; a white male driving the truck.  Pulled into
19   the court.  We come in behind the truck.  The truck
20   was approached by a black male.  The driver of the
21   truck gave the male U.S. currency.  The black male
22   reached down into his -- the seam of his zipper.  He
23   turned and looked and saw our gold car, and took off
24   running.
25            I believed it was a narcotics transaction
```

ANTONIO GREEN - DIRECT FUGHS

1    about to take place.  The black male, who was Mr.

2    Hall, fled on foot.  I gave chase.  Placed him --

3    cuffed him, placed him under arrest, and recovered

4    two ziplocks of cocaine from the inseam of his

5    zipper.

6    Q.     Okay.  Detective, let me back up and take this

7    one piece as a time.  You said the red truck drove up

8    Annor Court; is that correct?

9    A.     Yes, sir.

10   Q.     And you were following that truck?

11   A.     We were.  A couple -- we were a couple car

12   lengths behind the truck.

13   Q.     Okay.  Approximately how far away in feet?

14   A.     Maybe 50 feet.

15   Q.     Could you see the car clearly?

16   A.     Yes, sir.

17   Q.     And could you see the area of Annor Court

18   clearly?

19   A.     Yes, sir.

20   Q.     All right.  And then the car stopped?

21   A.     Yes, sir.

22   Q.     And you saw someone approach; is that correct?

23   A.     Yes, sir.

24   Q.     And who did you see approach?

25   A.     Mr. Hall.

76

```
1    Q.      Okay.  And had you ever seen Mr. Hall before?

2    A.      Yes.

3    Q.      Okay.  Were you familiar with him?

4    A.      Yes, sir.

5    Q.      And had you spoken to him before?

6    A.      Yes, sir.

7    Q.      Okay.  So you were clear that that was Mr.

8    Hall, correct?

9    A.      Not when -- when I first saw him, I wasn't a

10   hundred percent sure who it was.  But I saw him from

11   the side view.

12   Q.      Okay.  But you then later arrested him and

13   knew that you knew this person?

14   A.      Yes.

15   Q.      All right.  So then you saw -- if you would,

16   tell us again, you saw Mr. Hall reach into his pants?

17   A.      He reached down to the inseam of his pants

18   area --

19   Q.      Okay.

20   A.      -- like he was going to get something out;

21   turned around; saw the gold bar car; took off

22   running.

23   Q.      Okay.  Now, he saw the gold car.  Is that car

24   well-known in Westport?

25   A.      Yes.
```

ANTONIO GREEN - DIRECT - FUCHS

77

```
1    Q.      Do you drive it frequently?

2    A.      Yes, sir.

3    Q.      And do people in Westport know that you are a

4    police officer?

5    A.      Yes, sir.

6    Q.      All right.  So it's an unmarked car, but is it

7    fair to say everybody knows what it is?

8    A.      The gold Cavalier.  Most police officers who

9    were plainclothes drive Cavaliers.  It's a pretty

10   well-known car.

11   Q.      All right.  And so you said Mr. Hall took off

12   running?

13   A.      Yes.

14   Q.      Now, who chased him?

15   A.      I did.

16   Q.      Okay.  And where did you -- if you would,

17   first show us where the car -- that red truck --

18   stopped.  Hit the left-hand corner and take away that

19   mark.  If you would show us where the red truck

20   stopped.

21   A.      Right here.

22   Q.      That's just about at the intersection of Annor

23   and the 2400 block of Maisel, correct?

24   A.      Right.

25   Q.      Okay.  And where were you in relation to that?
```

78

1    A.      (Marks.)

2    Q.      Okay.  And so you said Mr. Hall took off

3    running.  And you chased him.  Where did you catch

4    him?

5    A.      Right here.

6    Q.      Did you tackle him to the ground?

7    A.      Uh-huh.  Yes, sir.

8    Q.      Okay.  And then you searched him?

9    A.      Yes, sir.

10   Q.      Okay.  And tell us again what you found.

11   A.      It was two ziplocks of cocaine.

12   Q.      Okay.  And was Mr. Hall placed under arrest?

13   A.      Yes, sir.

14   Q.      And were the drugs submitted?

15   A.      Yes, sir.

16   Q.      All right.  I'm going to show you what's been

17   marked government's 407.  Do you recognize that?

18             If you would, hit the left-hand part of

19   the screen.

20             Do you recognize that?

21   A.      Yes, sir.

22   Q.      And what is that?

23   A.      This is what I recovered, two ziplocks, yellow

24   ziplocks of cocaine I recovered from Mr. Hall.

25   Q.      Okay.  How do you know that this is the

79

```
 1    cocaine that you recovered from Mr. Hall that day?
 2    A.      The CC number here, here, and on the picture
 3    is what I took to mark the evidence and this is what
 4    I submitted.
 5    Q.      Okay.  And, also, is this the date of the
 6    arrest reflected in the report you have?
 7    A.      Yes, sir.
 8    Q.      And that's your handwriting, correct?
 9    A.      Yes, sir.
10    Q.      And that's your name.  All right.
11              Permission to approach, Your Honor?
12              THE COURT:  Yes.  Go ahead.
13    BY MR. FUCHS:
14    Q.      This is government's Exhibit 490.  Do you
15    recognize that?
16    A.      Yes, sir.
17    Q.      And what is it?
18    A.      This is my submission.
19    Q.      Okay.  That's the drugs we just saw the
20    picture of, correct?
21    A.      Correct.
22              THE COURT:  What exhibit number was that?
23              MR. FUCHS:  It's 490, Your Honor.
24              THE COURT:  Okay.
25
```

BY MR. FUCHS:

Q.      And again, Detective, if you would, clear off
all the marks.  Those right there, those are the
ziplock bags of crack; is that correct?

A.      Correct.

        MR. FUCHS:  All right.  Your Honor,
permission to publish this to the jury.

        THE COURT:  I don't think we need to do
that.  It speaks for itself.  It doesn't need to be
published to the jury.

        MR. FUCHS:  Thank you.

BY MR. FUCHS:

Q.      All right, Detective.  You said that you had
seen Mr. Hall before that day; is that correct?

A.      Yes.

Q.      All right.  How often would you see Mr. Hall
in Westport?

A.      At least twice a week.

Q.      Okay.  So you said you were there every day;
is that correct?

A.      Yes, sir.

Q.      And you saw Mr. Hall twice a week?

A.      Yes, sir.

Q.      Where would you see him when you went to
Westport?

1    A.    Up along that Annor Court corridor.

2    Q.    By the Annor Court corridor, you're talking

3    about this area right here; is that right?

4    A.    Yes, Annor Court up along Maisel.

5    Q.    Okay.  Who would you see him with those days

6    you saw him?

7    A.    He used to hang out with just a group of guys.

8    Q.    Okay.  Do you know Kevin Duckett?

9    A.    Yes, sir.

10   Q.    Did you ever see him hanging out with Kevin

11   Duckett?

12   A.    He's been there a couple times.

13   Q.    Okay.  What did you see Mr. Hall doing those

14   times you saw him twice a week?

15   A.    Hanging out with other guys that -- who were

16   arrested for selling narcotics.

17   Q.    Okay.  Did you ever see him walking up to cars

18   that were pulling through the neighborhood?

19   A.    The first time I actually saw him doing that

20   was the -- when he approached the red truck.

21   Q.    Was the day you arrested him?

22   A.    Yes, sir.

23   Q.    Did you see Mr. Hall after July of '05?

24   A.    Yes, sir.

25   Q.    Did you see him in Westport?

1    A.    Yes, sir.

2    Q.    What did you see him doing then?

3    A.    Still hanging in the same area.

4    Q.    All right.  Did you keep an eye on Mr. Hall

5    when you were in the neighborhood?

6    A.    Yes, sir.

7    Q.    Why did you do that?

8    A.    Because I arrested him for narcotics.  I

9    thought he was a drug dealer.

10   Q.    Okay.  Detective, did you in any way

11   participate in the investigation of Kareem Guest's

12   murder?

13   A.    No.

14   Q.    Do you know anything about the investigation?

15   A.    No.

16             MR. FUCHS:  No further questions, Your

17   Honor.

18             THE COURT:  Thank you, Mr. Fuchs.

19             Cross-examination, Mr. Proctor or Mr.

20   Sullivan?

21             MR. PROCTOR:  Briefly, Judge.

22                  CROSS EXAMINATION

23   BY MR. PROCTOR:

24   Q.    How are you, sir?

25   A.    I'm all right.

ANTONIO GREEN - CROSS - PROCTOR

83

```
 1     Q.      This is five years ago, right?
 2     A.      Yes, sir.
 3             MR. PROCTOR:  And can I have 490 for a
 4     second, please?
 5             Judge, I heard your ruling about not
 6     publishing it to the jury, but can I at least hold it
 7     up?
 8             THE COURT:  Sure, sure.
 9             MR. PROCTOR:  Or ask the officer, maybe?
10             THE COURT:  Just go right ahead.  Is
11     there any dispute what the contents are there?
12             MR. PROCTOR:  No.  It's drugs.  It's hard
13     on the screen to see how tiny it is, I guess is my
14     point.
15     BY MR. PROCTOR:
16     Q.      Officer, these are the two ziplocks you
17     recovered; is that correct?
18     A.      Correct.
19     Q.      And they are, I mean, what, maybe three
20     quarters of an inch by a half an inch?
21     A.      I guess.
22     Q.      And they're not even -- those ziplocks aren't
23     even full, are they?
24     A.      It's a powder cocaine.  It's usually sold on
25     the street for about ten bucks.  That's probably
```

ANTONIO GREEN - CROSS - PROCTOR

84

```
 1            about ten bucks' worth.
 2            Q.    Okay.  And I guess -- if you just stay there,
 3            I'll be right back.  I guess my point is that's half
 4            a postage stamp full of cocaine, correct?
 5            A.    Say that again?
 6            Q.    It's about the size of half of a stamp, half
 7            of a mail stamp, something like that?
 8            A.    Right.
 9            Q.    And if we could wander over here.  Miss West,
10            do you have a black marker?  I want to write on
11            there.
12                        Over here.  And you just correct me if
13            I'm wrong.
14                        Did you see the indictment in this case?
15            A.    No.
16            Q.    Well, the first charge of the indictment is
17            narcotics conspiracy and overt acts, date, quantity.
18            Okay.  So would you believe me if the 7-29-05 arrest
19            that you made was overt act number B?
20                        You have to say yes or no.
21            A.    You said would I believe you if you say that?
22            Q.    Yeah.  Do you think I'm misleading you on
23            that?
24                        And the date of your arrest was 7-29-05;
25            is that correct?
```

A.      Yes, my arrest was 7-29-05.

Q.      Okay.  And those drugs were 0.34 grams; is
that correct?

A.      I didn't measure them.

Q.      Would it refresh -- if you could go back to
the stand.  Would it refresh your recollection to see
the chemist report?

A.      Yes, sir.

Q.      Okay.  Let me just retrieve it.  This is a,
what appears to be a chemist report.  And we should
mark it defense -- what are we on?

THE DEPUTY CLERK:  4.

THE COURT:  Defendant's Exhibit 4.  Do
you want to introduce this at this time, Mr. Proctor?

MR. PROCTOR:  The chemist is testifying
later.

THE COURT:  We'll do it for
identification right now.

MR. PROCTOR:  At some point I will be
moving it in, Judge.

MR. FUCHS:  No objection.

THE COURT:  Let's just move it in now.
That's fine.  It's the chemist's report and it will
come into evidence.  And this relates to the July 29,
2005?

86

```
1               MR. PROCTOR:  That's correct.

2    BY MR. PROCTOR:

3    Q.     And, Officer, the date is 7-29-05; is that

4    correct?

5    A.     Correct.

6    Q.     And if you look at the complaint number, which

7    the jury has heard about, it's the same one, isn't

8    it?

9    A.     Correct.

10   Q.     And the gross weight of the drugs that you

11   seized that day was .34 grams of cocaine base,

12   commonly known as crack; is that correct?

13   A.     Correct.

14               MR. PROCTOR:  That's all I have, Your

15   Honor.

16               THE COURT:  Any redirect, Mr. Purcell or

17   Mr. Fuchs?

18                    REDIRECT EXAMINATION

19   BY MR. FUCHS

20   Q.     Detective Green, when would you see Mr. Hall

21   in Westport?  Was it just during the morning?

22   A.     No.  I worked on two different shifts.

23   Q.     Okay.  Would you see him all day long?

24   A.     If I was in Westport, more than likely I saw

25   him.
```

```
1     Q.      Okay.  And did you see him at all different
2     times of the day?
3     A.      Yes.
4     Q.      Okay.  And did you see him after July of 2005?
5     A.      Yes.
6     Q.      Did you see him all over Westport?
7     A.      Yes.
8     Q.      Did you see him hanging out, just standing on
9     the corner?
10    A.      Yes.
11    Q.      What did you think he was doing?
12                 MR. PROCTOR:  Objection.
13                 THE COURT:  Sustained.
14                 MR. FUCHS:  No further questions.
15                 THE COURT:  Thank you.  You may step
16    down, Detective Green.  You shouldn't discuss your
17    testimony with anyone until this trial concludes this
18    week, perhaps tomorrow.
19                 So, thank you very much, sir.  And, with
20    that, we'll take our late morning -- not mid-morning,
21    but our late morning recess for about ten minutes or
22    so.
23                 (BRIEF RECESS.)
24
25
```

LARRY DURAN WILLIAMS, JR. - DIRECT - FUCHS 88

1    Whereupon:

2                    LARRY DURAN WILLIAMS, JR.,

3    called as a witness, having been first duly sworn

4    according to law, testified as follows:

5                    THE DEPUTY CLERK:  Please state your fall

6    name for the record.

7                    THE WITNESS:  Larry Duran Williams, Jr.

8                    THE DEPUTY CLERK:  Spell your first name,

9    please?

10                    THE WITNESS:  L-a-r-r-y.

11                    DIRECT EXAMINATION

12   BY MR. FUCHS:

13   Q.     Sergeant Williams, where do you work?

14   A.     Baltimore City Police Department.

15   Q.     How long have you been a police officer?

16   A.     18 years.

17   Q.     And what's your current assignment?

18   A.     Southern District drug unit.

19   Q.     Okay.  How long have you been in the southern?

20   A.     It will be ten years this year.

21   Q.     Are you familiar with the Westport

22   neighborhood?

23   A.     Yes.

24   Q.     I show you government's 6A.  Are you familiar

25   with that?

```
1    A.      Yes.

2    Q.      And what is it?

3    A.      Westport homes.

4    Q.      How often would you say you visit Westport?

5    A.      Every day that I worked.

6    Q.      And are you actually in the project side, what

7    we're looking at here?

8    A.      Yes.

9    Q.      Okay.  I'd like to turn your attention to

10   January 26 of 2007.  Were you working that day?

11   A.      Yes.

12   Q.      What shift were you working?

13   A.      10 a.m. to 6 p.m.

14   Q.      Were you in plainclothes?

15   A.      Yes.

16   Q.      Unmarked car?

17   A.      Yes.

18   Q.      Did you go to Westport that day?

19   A.      Yes.

20   Q.      Did you make any arrests?

21   A.      Yes.

22   Q.      Okay.  If you would, tell the jury what

23   happened.

24   A.      It was myself and Detective Ryce.  We were

25   observing the 2400 block of Kermit Court.
```

LARRY DUFFY, DUFFY WILLIAMS,  JR. 02/13/12 - FUCHS

1    Q.      And, if you would, show the jury on the map
2    where that is.
3    A.      It's right here.
4    Q.      Thank you.
5    A.      We were parked on Dorton Court.  At which time
6    we observed a white male come around on Annor Court.
7    Q.      Let me stop you there.  I'm sorry.  If you
8    would, point on the map where you were parked on
9    Dorton.  And then go ahead.
10   A.      A white male proceeded around Annor Court,
11   walking up Alaska Court.
12   Q.      That's commonly known as the blacktop,
13   correct?
14   A.      Yes.
15   Q.      All right.
16   A.      He approached a black female.  They had a
17   brief conversation.  And she raised a hand and
18   pointed to the end of Kermit Court.
19   Q.      What did you think was happening?
20   A.      A CDS sale was about to happen.
21   Q.      Okay.  What happened next?
22   A.      We observed the black male that was wearing
23   like a green Army coat; black, like long -- well,
24   black T-shirt; jeans that was rolled up to his
25   ankles; was standing at the end of Kermit Court.

1    Q.    Did you recognize that man?

2    A.    Yes.

3    Q.    Who was it?

4    A.    Antonio Hall.

5    Q.    Do you see him here today?

6    A.    Yes.

7    Q.    If you would point him out for us.

8    A.    Here.

9            THE COURT:  The record will reflect the

10   witness has identified the defendant, Antonio Hall.

11   BY MR. FUCHS:

12   Q.    Prior to that day, had you seen Mr. Hall

13   before?

14   A.    Yes.

15   Q.    Had you seen him often?

16   A.    Yes.

17   Q.    Okay.  So you were familiar with what he

18   looked like?

19   A.    Yes.

20   Q.    All right.  Go ahead.

21   A.    At which time the white male walked over to

22   Mr. Hall.  They proceeded to have a brief

23   conversation.  At which time the male removed

24   currency from his pocket, gave it to Mr. Hall.  Mr.

25   Hall proceeded to take an object that was the shape

1    and size of CDS out of his mouth, proceeded to give

2    it to the male.

3    Q.    Okay.  When you say it was the shape and size

4    of CDS, what did it look like?

5    A.    Just a small like zip.

6    Q.    Is that how narcotics is commonly packaged?

7    A.    Yes.

8    Q.    All right.  And so he handed that ziplock to

9    the white male?

10   A.    Yes.

11   Q.    And what happened?

12   A.    At that time the white male proceeded to leave

13   the area walking across the field.  Mr. Hall

14   proceeded to walk around the rear of Kermit Court.

15   Q.    And let me stop you there.  You said that Mr.

16   Hall had taken the CDS from his mouth; is that right?

17   A.    Correct.

18   Q.    Had you ever seen that before?

19   A.    Yes.

20   Q.    Is that a common way to store narcotics?

21   A.    Yes.

22   Q.    Why?

23   A.    It's easy to get rid of them.

24   Q.    What do you mean by that?

25   A.    You can swallow it.

```
1    Q.      Okay.
2    A.      Spit it out.  Stomp on it real quick.
3    Q.      Okay.  So go ahead.  You have the white male
4    walking away?
5    A.      Yes.
6    Q.      Where did he go?
7    A.      And he walked across.  Mr. Hall walked back
8    here.  And at which time we proceeded to try to cut
9    the white male off to arrest him.
10   Q.      Just so I'm clear, the white male walked
11   across that ball field towards the top of the screen,
12   right?
13   A.      Yes.
14   Q.      Okay.  And did you go pursue him?
15   A.      Yes.
16   Q.      Did you catch up to him?
17   A.      Yes.
18   Q.      Where did you find him?
19   A.      2300 block of Annapolis Road.
20   Q.      Did you have any doubt in your mind that the
21   person you stopped on Annapolis Road was the same
22   person you had seen conducting that transaction?
23   A.      No doubt.
24   Q.      Okay.  How far away from the transaction were
25   you from where you were sitting on Dorton?
```

94

```
 1    A.      A hundred feet.

 2    Q.      Okay.  So could you see everything clearly?

 3    A.      Yes.

 4    Q.      What time of day was this?

 5    A.      One o'clock in the afternoon.

 6    Q.      Okay.  So you caught up to the person on

 7    Annapolis?

 8    A.      Yes.

 9    Q.      What happened?

10    A.      As he saw us exiting the vehicle, he was

11    attempting to place the CDS into his rear pocket.  At

12    which time we placed him under arrest, recovered the

13    CDS, which was a yellow small ziplock.

14    Q.      Okay.  I'm going to show you government's 409.

15    Do you recognize that?

16    A.      Yes.

17    Q.      And what is it?

18    A.      The CDS that we recovered.

19    Q.      And if you would, just point to where the

20    narcotics is.

21    A.      (Complies.)

22    Q.      All right.  What did you suspect it to be?

23    A.      Cocaine.

24    Q.      And how do you know that's the same cocaine

25    that you pulled off that gentleman that day?
```

95

1    A.     It has the same CC number.  Detective Ryce

2    submitted it.  The same property number.

3    Q.     Okay.  So after you recovered the CDS, what

4    happened?

5    A.     We placed the white male in our vehicle and

6    proceeded back to Westport homes to look for Mr.

7    Hall.

8    Q.     Did you find him?

9    A.     Yes.

10   Q.     Where did you find him?

11   A.     He was in between the cut of Annor Court; like

12   right here, there's a cut right there.

13   Q.     And what happened?

14   A.     We placed him under arrest.

15   Q.     Was the person you found in the cut on Annor

16   the same person you saw conducting that transaction

17   at the end of Kermit Court?

18   A.     Yes.  Still had the green jacket, the black

19   shirt, and the pants were rolled up to his ankles.

20   Q.     And you knew Mr. Hall well at this point,

21   correct?

22   A.     Yes.

23   Q.     All right.  So was there any question in your

24   mind that Mr. Hall had been the person conducting

25   that sale?

1    A.     No doubt.

2    Q.     Were the drugs submitted for testing?

3    A.     Yes.

4           MR. FUCHS:  Permission to approach, Your

5    Honor.

6           THE COURT:  Yes.

7    BY MR. FUCHS:

8    Q.     Sergeant, I'm going to show you government's

9    491.  Do you recognize that?

10   A.     Yes.

11   Q.     And what is it?

12   A.     The CDS from the arrest.

13   Q.     And that's the drugs that we just saw in that

14   picture on the screen, correct?

15   A.     Correct.

16   Q.     And you said these were submitted for testing,

17   correct?

18   A.     Correct.

19   Q.     Were they submitted to the Baltimore Police

20   Department's drug analysis unit?

21   A.     Yes.

22   Q.     All right.  I'm going to show you government

23   Exhibit 462.

24           Do you know what that is?

25   A.     Yes.

LARRY DURAN WILLIAMS, JR. - DIRECT - FUCHS

97

1    Q.    And what is it?

2    A.    A drug analysis report.

3    Q.    Okay.  And does this report correspond to the

4    case we've been talking about?

5    A.    Yes.

6    Q.    And how do you know?

7    A.    Same complaint number and same property

8    number.

9    Q.    Okay.  And the complaint number is here,

10   correct?

11   A.    Correct.

12   Q.    And this is also the same date of the arrest?

13   A.    Correct.

14   Q.    And is that the location?

15   A.    Yes.

16   Q.    All right.  It was submitted by this gentleman

17   here.  Do you know him?

18   A.    Yes.  Detective Ryce.

19   Q.    Was he with you that day?

20   A.    Yes.

21   Q.    All right.  What were the results?

22   A.    Tested positive for cocaine, Schedule II.

23   Q.    All right.  Now, before this arrest, you

24   already testified you had met Mr. Hall, correct?

25   A.    Correct.

1    Q.      And where had you met him?

2    A.      In the Westport neighborhood.

3    Q.      Okay.  How often would you see Mr. Hall in

4    Westport?

5    A.      Every day.

6    Q.      All right.  So you were there every day,

7    correct?

8    A.      Correct.

9    Q.      And every day you were there you saw Mr. Hall?

10   A.      Correct.

11   Q.      All right.  What times of day would you see

12   him?

13   A.      All day, morning, evening.

14   Q.      Okay.  Where would you see him?

15   A.      Most of the time he would be in the 2400 block

16   of Norfolk.

17   Q.      Okay.  And, if you could, just show us where

18   that is.

19   A.      Right here.

20   Q.      Okay.  Where else did you see him?

21   A.      We would see him down on, like, Maisel right

22   here; sometimes on Annor; and you would see him also

23   over on the 2300 block, 2200 block of Annapolis Road.

24   Q.      Is that near the intersection of Annapolis

25   Road and Kent Street?

```
1    A.      Yes.

2    Q.      All right.  When you saw him all those times

3    in Westport, either on this side or on the Annapolis

4    Road side, what did you see him doing?

5    A.      Walking up to individuals; what we perceived

6    to be conducting CDS sales.

7    Q.      Did you ever see him walking up to cars?

8    A.      Yes.

9    Q.      All right.  When you saw him all those times,

10   was he with other people, or was he by himself?

11   A.      Other people, mostly.

12   Q.      Who were some of the people you saw him with?

13   A.      Kevin Duckett, Martie Williams, Kareem Guest,

14   Timothy McClinton, Gerald Horton.

15   Q.      Is Gerald Horton also nobody as Roddy?

16   A.      Yes.

17   Q.      Do you know someone named Eastwood?

18   A.      Yes.

19   Q.      Did you ever see Mr. Hall with Eastwood?

20   A.      Yes.

21   Q.      All right.  When you saw Mr. Hall in Westport,

22   did you keep an eye on him?

23   A.      Always.

24   Q.      And why him in particular?

25           MR. SULLIVAN:  Objection.
```

```
 1                THE COURT:  Sustained.  You need to --
 2      the basis of the question.
 3                MR. FUCHS:  Your Honor --
 4                THE COURT:  Why don't you approach, Mr.
 5      Fuchs?
 6                (BENCH CONFERENCE ON THE RECORD.)
 7                THE COURT:  The question as phrased is
 8      improper.  And just have him say:  Someone told me X,
 9      Y, and Z.  You certainly can explore how long he
10      worked in the neighborhood; he has intelligence
11      gathering sources that they monitor activity, that
12      they gain information on people who engage in drug
13      trafficking; and if he's done all of that.  And then
14      basically he's identified the defendant as a drug
15      trafficker; and the objection is overruled.  You need
16      to lay the foundation.
17                MR. PROCTOR:  Judge, just while we're
18      here, it will only take a second.  I just saw in the
19      elevator Robert Jones' lawyer.
20                THE COURT:  And that is Michael Lawler?
21                MR. PROCTOR:  He's saying, you know, he
22      needs to explore with his client his rights over
23      lunch.  And it requires you or Miss West to make a
24      call to the marshals to give him access to his
25      client.  Normally the lock up the cellblock from 12
```

1       to 1:30.

2                     THE COURT:  Miss West, call and make sure

3       that Mr. Lawler has access to Mr. Jones.  He'll be

4       his lawyer, it's fine.  Miss West will see that

5       that's done.

6                     MR. PROCTOR:  Okay.  Thank you.

7                     (END OF BENCH CONFERENCE.)

8       BY MR. FUCHS:

9       Q.      Sergeant, you said you saw Mr. Hall in your

10      time in Westport walking up to cars; is that correct?

11      A.      Correct.

12      Q.      Meeting individuals on the street?

13      A.      Correct.

14      Q.      Did you suspect him to be a drug dealer?

15      A.      Yes.

16      Q.      Did you also talk to people in the

17      neighborhood about Mr. Hall?

18      A.      Yes.

19      Q.      Did you gather intelligence on him?

20      A.      Yes.

21      Q.      Based on that --

22                    MR. PROCTOR:  Objection.

23                    THE COURT:  Overruled.

24      BY MR. FUCHS:

25      Q.      Based on that information, those observations

102

```
 1        and that intelligence you gathered, did you pay

 2        particular attention to Mr. Hall?

 3        A.      Yes.

 4        Q.      Okay.  And why?

 5                    MR. PROCTOR:  Same objection.

 6                    THE COURT:  Overruled.

 7                    THE WITNESS:  For CDS sales.  And also

 8        that he was a violent individual.

 9        BY MR. FUCHS:

10        Q.      All right.  Now, other than the time you

11        arrested Mr. Hall which we've been speaking about,

12        did you ever speak to Mr. Hall?

13        A.      Yes.

14        Q.      All right.  How often do you think you spoke

15        to him?

16        A.      Around three or four days a week he would come

17        up and talk to us.

18        Q.      Now, you've been in the southern for quite

19        some time, correct?

20        A.      Correct.

21        Q.      How many years have you been encountering Mr.

22        Hall in Westport?

23        A.      Since at least 2004.

24        Q.      Okay.  So from 2004 to 2009 you saw him pretty

25        regularly?
```

LARRY DURAN WILLIAMS, JR. - 02/14/12 - PUGHS

103

```
1    A.      Yes.

2    Q.      All right.  And you said you spoke to him

3    three or four times a week?

4    A.      Yes.

5    Q.      Did you ever talk to him alone?

6    A.      No.  Other than I saw him when we were off --

7    when I was off duty.  Other than that.

8    Q.      In the times you spoke with him, who was

9    usually with you?

10   A.      Detective John Ryce and detective Troy Taylor.

11   Q.      Okay.  Did you usually patrol with those

12   officers?

13   A.      Yes.

14   Q.      Did Mr. Hall know you were a police officer?

15   A.      Yes.

16   Q.      How do you know he knew?

17   A.      He would always me, "Sarge".

18   Q.      All right.  Now, we met and discussed several

19   of these conversations you had with Mr. Hall,

20   correct?

21   A.      Correct.

22   Q.      And you, in fact, have a summary based on your

23   recollections of those, correct?

24   A.      Correct.

25   Q.      And the summary accurately reflects your
```

```
1    recollections of those conversations, correct?

2    A.      Correct.

3    Q.      All right.  I'd like to turn your attention to

4    the summer of 2009.  Do you remember encountering Mr.

5    Hall that summer outside of Westport?

6    A.      Yes.

7    Q.      Tell us what happened.

8    A.      He was in the Lakeland community, which is

9    adjacent to Westport.  We were patrolling the area.

10   At which time we observed Mr. Hall, he was standing

11   on the property of the Lakeland Elementary Middle

12   School, which was unfamiliar that he would be there.

13   At which time we pulled up.  We were just going to

14   get out and talk to him, see what he was in the area

15   for.  As we pulled up he proceeded to run on foot.

16   Q.      Did you chase him?

17   A.      Yes, Detective Ryce gave pursuit on foot.

18   Q.      Did you catch up to him?

19   A.      Yes.

20   Q.      And did you search him?

21   A.      Yes.

22   Q.      Did you find any contraband on him?

23   A.      No.

24   Q.      Any reason to arrest him that day?

25   A.      No.
```

1    Q.      What happened?

2    A.      He was free to go.

3    Q.      Now, let me turn your attention to July of

4    2010.  In that month, did you have a conversation

5    with Mr. Hall about the incident the previous summer?

6    A.      Yes.

7    Q.      If you would, tell the jury what happened.

8    A.      We were in the 2400 block of Norfolk.  Mr.

9    Hall came up to our vehicle; it was myself, Detective

10   Ryce, Detective Taylor.  He just said, "You remember

11   when you all were chasing me last summer?"  He said,

12   "I had two ratchets on me".  Which was -- ratchets

13   are the street terminology for handguns.  "And I

14   threw them as I was running".

15   Q.      And that's what Mr. Hall told you?

16   A.      Yes.

17   Q.      That he threw two guns from you when you

18   chased him the previous summer?

19   A.      Correct.

20   Q.      All right.  Now, who started this

21   conversation?

22   A.      Mr. Hall.

23   Q.      Was that unusual?

24   A.      That he was telling us that, yes.

25   Q.      No, I don't mean that he told you.  The fact

106

```
 1    that he started a conversation with you.
 2    A.      No.
 3    Q.      Would you talk with you most days you were
 4    there?
 5    A.      Yes.
 6    Q.      He would just wander up to you and start a
 7    conversation?
 8    A.      Yes.
 9    Q.      Okay.  And most of these conversations were
10    innocuous; is that right?
11    A.      Correct.
12    Q.      Now, this particular conversation where he
13    told you about the two ratchets, was he under arrest
14    when he was talking to you?
15    A.      No.
16    Q.      Did you put him in handcuffs?
17    A.      No.
18    Q.      Did you point your weapons at him?
19    A.      No.
20    Q.      Did you detain him in any way?
21    A.      No.
22    Q.      Did you threaten him?
23    A.      No.
24    Q.      Did you make any promises to get him to come
25    and talk to you and tell you about the two ratchets?
```

1    A.    No.

2    Q.    Did you offer him inducement of any kind for

3    him to give you that statement?

4    A.    No.

5    Q.    Did you write that statement up in a report?

6    A.    No.

7    Q.    Why not?

8    A.    Nothing would have been done.

9    Q.    Is it fair to say there's no charges you could

10   bring for that?

11   A.    No.

12   Q.    Let me turn your attention to August of 2010.

13   In that month did you have a conversation with Mr.

14   Hall about how he would commit a shooting?

15   A.    Yes.

16   Q.    If you would, describe the conversation.

17   A.    We were on the 2400 block of Dorton Court -- I

18   mean, 2400 block of Norfolk.  Mr. Hall comes up to

19   us, general conversation.  He says, "Sarge, if I go

20   through this cut and put a mask on and come back

21   around with two guns, you won't know it's me".

22   Q.    He said he'd put on mask on; is that right?

23   A.    Correct.

24   Q.    And he'd have two guns?

25   A.    Yes.

LARRY DEAN WILLIAMS, JR. - CROSS

108

```
 1    Q.      And he thought you wouldn't be able to
 2    recognize him?
 3    A.      Correct.
 4    Q.      What did you say to that?
 5    A.      I would say I would be able to recognize.
 6    Q.      And how would you be able to recognize him?
 7    A.      Based on height, weight, the way he walked or
 8    ran.
 9    Q.      All right.  How did that conversation start?
10    A.      Mr. Hall walked over to our vehicle.
11    Q.      Not unlike the conversation we were just
12    talking about?
13    A.      Not unlike.
14    Q.      Was Mr. Hall under arrest during this
15    conversation?
16    A.      No.
17    Q.      Was he in handcuffs?
18    A.      No.
19    Q.      Was he free to leave at any time?
20    A.      Yes.
21    Q.      All right.  Did you threaten him?
22    A.      No.
23    Q.      Point your weapon at him?
24    A.      No.
25    Q.      Did you assault him?
```

1      A.      No.

2      Q.      Did you make him any promises; tell him you'd

3      take care of any charges?

4      A.      No.

5      Q.      Did you offer him any inducements to make that

6      statement to you?

7      A.      No.

8      Q.      All right.  Let me turn your attention to late

9      August of 2010; so, last August.  And I'll ask you:

10     Do you know someone named Gary Hall?

11     A.      Yes.

12     Q.      Who is that?

13     A.      Mr. Hall's brother.

14     Q.      And what's his nickname?

15     A.      Tatum.

16     Q.      All right.  Did you ever have a conversation

17     with Mr. Antonio Hall about Tatum, Gary Hall?

18     A.      Yes.

19     Q.      All right.  Tell us what that conversation was

20     about.

21     A.      2400 block of Norfolk Street, again.  Mr. Hall

22     comes up to us, and his brother's also there, Gary

23     Hall.  And he said, "I'm proficient with my

24     weaponry".  We were like, "What are you talking

25     about?"  He said, "The guys that shot my brother over

```
1      on the west side, just I went back over there; I put

2      my mask on; and I got them from a half a block away".

3      Q.      Okay.  So he was telling you he shot the

4      people who shot his brother?

5      A.      Yes.

6      Q.      And Mr. Gary Hall, Tatum, was there as well,

7      right?

8      A.      Correct.

9      Q.      Did he confirm that he had been shot?

10     A.      Yes.

11     Q.      And Mr. Hall said he wore a mask in that

12     shooting; is that correct?

13     A.      Correct.

14     Q.      And he shot him from how far away?

15     A.      He said half a block.

16     Q.      Let me ask you again:  Who started this

17     conversation?

18     A.      Mr. Hall.

19     Q.      All right.  And who else was there?

20     A.      Detective Ryce and Detective Taylor.

21     Q.      Okay.  Was Mr. Hall under arrest during this

22     conversation?

23     A.      No.

24     Q.      Handcuffs on him?

25     A.      No.
```

1    Q.    Weapons pointed at him?

2    A.    No.

3    Q.    Did you threaten him?

4    A.    No.

5    Q.    Did you assault him?

6    A.    No.

7    Q.    Did you make him any promises?

8    A.    No.

9    Q.    Did you tell him you would take care of any

10   charges?

11   A.    No.

12   Q.    Did you offer him any inducements to come talk

13   to you and make that statement to you?

14   A.    No.

15   Q.    All right.  Did you write that up in a report?

16   A.    No.

17   Q.    And why not?

18   A.    We knew there was an investigation going on,

19   so we didn't want anything to be involved with the

20   investigation.

21   Q.    All right.  Now, I'll turn your attention to

22   October of 2010.  Did you have a conversation with

23   Mr. Hall in that time?

24   A.    Yes.

25   Q.    All right.  And did he talk to you about the

1    federal investigation of him?

2    A.     Yes.

3    Q.     All right.  And, if you would, explain the

4    conversation.

5    A.     Came up to us again in the 2400 block of

6    Norfolk.  He said he knew the feds were investigating

7    him.

8              MR. PROCTOR:  Judge, I have a quick

9    objection.  Can we approach the bench?

10             THE COURT:  Sure.

11             (BENCH CONFERENCE ON THE RECORD.)

12             THE COURT:  This is the conversation of

13   November 2010 which was the subject of the previous

14   testimony on July 22 at the suppression hearing.

15             MR. PROCTOR:  Yes.  And you sustained the

16   objection as to my next killer; so I just want to

17   make sure --

18             THE COURT:  No, no, no.  That was

19   September of 2010.  I'm looking at my notes.  In

20   September of 2010 there was a discussion with the

21   defendant with respect to his son, in which the

22   defendant said, "Whenever I go away, my son will be

23   the next killer out there," and I ruled that is not

24   admissible.  The government cannot go into that.

25   It's highly prejudicial and it's just bravado.

LARRY DURAN WILLIAMS - FILED 02/14/12 - FUCHS

113

```
1                     So that this November 2010 conversation,
2       I believe, according to my notes, has some inquiry by
3       the defendant, "To put a drug case on me so the feds
4       will not come and get me".  That's the topic.  But
5       other than that, there's not going to be discussed --
6                     MR. PROCTOR:  I just want to be sure that
7       the witness has been directed.
8                     MR. FUCHS:  He has.  We're not going to
9       be talking about -- this is the last conversation and
10      we're done.
11                    THE COURT:  And he knows not to get into
12      anything about, "My son is going to be the next
13      whatever".
14                    MR. FUCHS:  That's correct.
15                    THE COURT:  All right.
16                    (END OF BENCH CONFERENCE.)
17      BY MR. FUCHS:
18      Q.     Sergeant Williams, did you and Mr. Hall have a
19      conversation about the federal investigation of him?
20      A.     Yes.
21      Q.     Okay.  And this was in October of 2010?
22      A.     Yes.
23      Q.     All right.  And what was the conversation
24      about?
25      A.     He approached us in the 2400 block of Norfolk.
```

114

1    He was just asking if we could put a felony drug case

2    on him because the feds were after him.

3    Q.      All right.  During this conversation -- I'll

4    ask you all the same questions.  Was Mr. Hall under

5    arrest?

6    A.      No.

7    Q.      Was he being detained?

8    A.      No.

9    Q.      Okay.  Did you threaten him?

10   A.      No.

11   Q.      Did you make him any promises?

12   A.      No.

13   Q.      Did you over him any inducement to get him to

14   make that statement to you?

15   A.      No.

16   Q.      And, again, did he start this conversation?

17   A.      Yes.

18   Q.      All right.  Other than your testimony here

19   today, have you personally been involved in the

20   federal investigation of Mr. Hall?

21   A.      No.

22              MR. FUCHS:  No further questions, Your

23   Honor.

24              THE COURT:  Thank you, Mr. Fuchs.

25              Mr. Proctor, cross-examination.

```
 1              MR. PROCTOR:  Briefly.
 2                  CROSS-EXAMINATION
 3    BY MR. PROCTOR:
 4    Q.    Sergeant, if you can come down from the stand
 5    and wander over here with me.  I won't bite.
 6              So this July 29 -- I'm sorry, the January
 7    26, 2007, this is the subject of your testimony, you
 8    arrested Mr. Hall, right?
 9    A.    Right.
10    Q.    Have you seen the indictment in this case?
11    A.    No.
12    Q.    This is overt act C.  And the arrest date was
13    1-26-07, correct?
14    A.    Correct.
15    Q.    And we were shown the chemist report while you
16    were over there testifying, weren't we?
17    A.    Yes.
18    Q.    And the quantity in grams of what you arrested
19    was 0.18.  Does that ring any bells?
20    A.    Yes.
21    Q.    Okay.  You can go back to the stand.  Thank
22    you, sir.
23              Now, let's talk about these -- I don't
24    want to say confessions -- blurts, whatever the term
25    may be, of Mr. Hall.
```

```
 1    A.      Uh-huh.

 2    Q.      The first one is summer of 2009.  And he ran

 3    away, right?

 4    A.      Yes.

 5    Q.      And that was at Lakeland Elementary and

 6    Middle?

 7    A.      Yes.

 8    Q.      You didn't arrest him, right?

 9    A.      Correct.

10    Q.      Is it a crime to run away from the police?

11    A.      No.

12    Q.      So you didn't have a basis to arrest him?

13    A.      No.

14    Q.      Did you go back to your desk and write a

15    report?

16    A.      No.

17    Q.      Did you tell anyone about it?

18    A.      It was myself, Detective Taylor, and Detective

19    Ryce; and then, the rest of my crew, they knew.

20    Q.      You said the summer of 2009.  Can you give me

21    a month?

22    A.      Maybe August.

23    Q.      Maybe August, maybe July, maybe September?

24    A.      Maybe August.

25    Q.      Okay.  Can you give me the day of the week?
```

```
 1     A.      No.

 2     Q.      Was it hot or cold out?

 3     A.      It was hot.

 4     Q.      Well, summer, right.  Was it early morning,

 5     late afternoon?

 6     A.      Mid-afternoon.

 7     Q.      Okay.  And so the second one is July 2010.

 8     And he tells you, "I had two ratchets on me"?

 9     A.      Yes.

10     Q.      Now, it is against the law to -- you know Mr.

11     Hall's a prohibited person, right?

12     A.      Correct.

13     Q.      It is against the law for a prohibited person

14     to possess a gun, isn't it?

15     A.      Yes.

16     Q.      And certainly against the law for a prohibited

17     person to possess two guns, right?

18     A.      Correct.

19     Q.      And he confessed, if I'm listening to you

20     properly, "I had two guns," right?

21     A.      Correct.

22     Q.      And Maryland doesn't have a statute of

23     limitations for that kind of thing, does it?

24     A.      No.

25     Q.      So he's saying, "I confess to having two guns
```

1    that I'm not allowed to have a year ago," and not

2    only do you not charge him with a crime, you don't

3    even write a report, do you?

4    A.    Correct.  We had no property recovered.

5    Q.    Did you go over there and look?

6    A.    The year before we did.

7    Q.    Okay.  But you didn't know if anything had

8    been thrown away a year ago, right?

9    A.    Well, we backtracked and we didn't find

10   anything a year before.

11   Q.    You didn't find anything a year ago; you

12   didn't go back and relook; you didn't pull records to

13   see if anyone else had stumbled upon a gun in the

14   area, did you?

15   A.    No.

16   Q.    In fact, you didn't do anything?

17   A.    No.

18   Q.    And then we get to August 2010.  He says, "If

19   I have a mask and two guns you won't know it's me,"

20   right?  Words to that effect?

21   A.    Uh-huh.

22   Q.    Again, same -- Mr. Fuchs was clear to saying:

23   Was he under arrest, who approached who.  Again,

24   let's go through the same thing.  You didn't write a

25   report, did you?

```
 1    A.     No.

 2    Q.     You don't know whether it was the beginning of

 3    August or the end of August, do you?

 4    A.     No.

 5    Q.     You just remember him saying that?

 6    A.     Correct.

 7    Q.     Incidentally, you testified before in front of

 8    Judge Bennett, didn't you?

 9    A.     Yes.

10    Q.     And that was three weeks ago, ballpark?

11    A.     Around that.

12    Q.     What color was my tie that day?

13    A.     I don't remember.

14    Q.     So you don't remember three weeks ago what

15    color my tie was, but you remember what Mr. Hall said

16    a year ago?

17    A.     Your tie was irrelevant to me that day.

18    Q.     How many people do you speak to every week?

19    A.     Depends on the week.

20    Q.     How many arrests do you make in an average

21    week?

22    A.     10 to 15.

23    Q.     And yet this undocumented thing that Mr. Hall

24    said a year ago just sticks in your mind?

25    A.     Yes.  Because we talked to him on numerous
```

```
 1    occasions.
 2    Q.      Right.  So then late August, the same month --
 3    and, again, you don't know what day of the week, do
 4    you?
 5    A.      Correct.
 6    Q.      You don't know if it's the last week in August
 7    or the third week in August.  He tells you about
 8    Tatum being shot and how he got the person from a
 9    half a block away, right?
10    A.      Uh-huh.
11    Q.      Did you investigate if there were any
12    shootings?
13    A.      No.  Because Gary Hall -- I already knew Gary
14    Hall was shot and Gary Hall stated that day that he
15    had been shot.
16    Q.      Okay.  And Mr. Hall's telling you he shot two
17    other people; is that right?  "I got them".  Is that
18    the words you said?
19    A.      "Got them".
20    Q.      Right.  So them's more than one, right?
21    A.      No.  That's just terminology.
22    Q.      I got one --
23    A.      I got them.
24    Q.      Okay.  So Mr. Hall again is confessing to what
25    sure sounds like an attempted murder, right?
```

1    A.    It's not a confession; it's just making

2    statements.

3    Q.    "I got them"?  What do you think he meant?  "I

4    got them a Christmas card"?

5    A.    Nope.

6    Q.    "I got them a birthday present"?

7    A.    Nope.

8    Q.    You think he meant, "I shot the people that

9    shot my brother," right?

10   A.    Correct.

11   Q.    And it's your testimony you didn't write a

12   report and you didn't call to see if anyone had been

13   shot from half a block away?

14   A.    Correct.

15   Q.    So he just happens to tell you about this

16   attempted murder and presumably possessing a firearm

17   by a convicted felon.  And you do a big fat nothing

18   about it until Mr. Fuchs asks you about it nine

19   months later?

20   A.    Nope.  Detective Moody didn't.

21   Q.    All right.  Detective Moody.  Do you know if

22   he wrote a report?

23   A.    No.

24   Q.    Then the last one -- I'm not too concerned

25   about the last one.  Can I have a second, please,

1        Judge?

2                      THE COURT:  Sure.

3                      MR. PROCTOR:  Mr. Sullivan, do you recall

4        Mr. Hall saying -- and I think --

5                      THE COURT:  I think you meant Sergeant

6        Williams, not Mr. Sullivan.

7        BY MR. PROCTOR:

8        Q.     Right.  Mr. Sullivan reminded me, is what I

9        meant.

10                     I want to make sure I had this quote

11       exact.  Did you say Mr. Hall said "I'm not" -- "I'm

12       very proficient with my weaponry"; does that sound

13       right?

14       A.     Yep.

15       Q.     Is that as best you can recall verbatim what

16       he said?

17       A.     Yep.

18                     MR. PROCTOR:  Okay.  Can I have a second,

19       please?

20                     THE COURT:  Sure.

21                     MR. PROCTOR:  Nothing further.

22                     THE COURT:  Any redirect, Mr. Fuchs?

23                     MR. FUCHS:  No, Your Honor.

24                     THE COURT:  All right.  Thank you very

25       much, Sergeant Williams.  You may step down, sir.

WILLIAM CHRISTOPHER JANU III - DIRECT - FUCHS

123

```
 1        You shouldn't discuss your testimony with anyone

 2        until this trial concludes, I think by tomorrow or

 3        Thursday.  Thank you very much.

 4                    Next witness, Mr. Fuchs?

 5                    MR. FUCHS:  Your Honor, it will be

 6        detective William Janu.

 7        Whereupon:

 8                    WILLIAM CHRISTOPHER JANU III,

 9        called as a witness, having been first duly sworn

10        according to law, testified as follows:

11                    THE DEPUTY CLERK:  Please have a seat.

12        And please state your full name for the record.

13                    THE WITNESS:  My name is Detective

14        William Christopher Janu III.

15                    THE DEPUTY CLERK:  Spell your last name,

16        please.

17                    THE WITNESS:  J-a-n-u.

18        BY MR. FUCHS:

19        Q.      Detective Janu, where do you work?

20        A.      I work for the Baltimore City violent crime

21        impact section.

22        Q.      How long have you been a police officer?

23        A.      Five and a half years.

24        Q.      And you said your current assignment is the

25        violent crime impact section?
```

1    A.      Yes, sir.

2    Q.      Where were you working in March of 2008?

3    A.      I was working in Southern District operations.

4    Q.      Okay.  How long had you been working in the

5    Southern District?

6    A.      Two years.

7    Q.      In March of 2008?

8    A.      Yes.

9    Q.      All right.  Were you familiar with the

10   Westport neighborhood?

11   A.      Yes, I am.

12   Q.      I'm going to show you government's Exhibit 6.

13   Do you recognize that?

14   A.      Yes, I do.

15   Q.      And what is that?

16   A.      It's the Westport area.

17   Q.      How often, when you were working in the

18   southern, did you visit Westport?

19   A.      Pretty much on a daily basis.

20   Q.      Let me turn your attention to March 24th of

21   2008.  Were you working that day?

22   A.      Yes, I was.

23   Q.      What shift were you working?

24   A.      I believe I was working 6 p.m. to 2 a.m.

25   Q.      Were you in plainclothes?

1    A.      Yes, sir.

2    Q.      All right.  Were you in an unmarked car?

3    A.      Yes, sir.

4    Q.      Anyone in the car with you?

5    A.      Myself and Officer Broderick.

6    Q.      All right.  What was your assignment that day?

7    A.      It's crime suppression, which is basically

8    just trying to find illegal activity in the

9    neighborhoods.

10   Q.      Okay.  So were you just driving around

11   Westport?

12   A.      Yes.

13   Q.      All right.  Did you make any arrests that day?

14   A.      Yes, I did.

15   Q.      All right.  Tell the jury what happened.

16   A.      We were traveling in an unmarked car south on

17   Hollins Ferry Road, where we came upon a red minivan

18   with dark-tinted windows that made a left on to

19   Harmon Avenue.  And I initiated a traffic stop on the

20   corner of Harmon Avenue and Pierpont Street.

21   Q.      Okay.  Let me clear this off.  Can you point

22   to the where intersection of Harmon and Pierpont is?

23   A.      Right there.  Slightly north of that.

24   Q.      Now, why did you make the traffic stop?

25   A.      The minivan was heavily tinted, which is a

WILLIAM CHRISTOPHER JANUSZEWSKI - DIRECT - FUGHS

126

```
 1     repair order violation in the State of Maryland.
 2     Q.      Okay.  And did you approach the minivan?
 3     A.      Yes, I did.  I approached on the driver's
 4     side.
 5     Q.      Okay.  And what did the other officer with you
 6     do?
 7     A.      He approached on the passenger side.
 8     Q.      What happened next?
 9     A.      I, after initiating the traffic stop,
10     approached the driver's side, where I then asked the
11     driver who I stopped for registration and his
12     license.  During the time where he was recovering
13     that, I did a cursory scan of the inside of the
14     vehicle for any type of weapons that may be within
15     reach.
16     Q.      And, Detective, why do you do that?
17     A.      It's a safety thing just so that hopefully I
18     can spot a weapon before he has a chance to use it on
19     me.
20     Q.      Okay.  And were there streetlights out?
21     A.      Yes, there were streetlights out.  And I was
22     using my flashlight.
23     Q.      Okay.  So could you see inside the vehicle
24     pretty well?
25     A.      Clearly.
```

1    Q.    All right.  So what did you see?

2    A.    As I was looking around the driver's side I

3    saw a rock- like cocaine substance scattered around

4    the driver's side floorboard.

5    Q.    Okay.  And tell us again who the driver was.

6    A.    Donald Wise.

7    Q.    All right.  Was there anybody else in the car?

8    A.    Yes.  The passenger, Antonio Hall.

9    Q.    Okay.  You're pointing over to this table

10   here.  Do you recognize this gentleman?

11   A.    Yes, sir.

12         THE COURT:  The record will reflect that

13   the witness has identified the defendant, Antonio

14   Hall.

15   BY MR. FUCHS:

16   Q.    Okay.  Was there anyone else in the van?

17   A.    No, sir.

18   Q.    All right.  So you said you saw some -- what

19   looked like rock cocaine on the floor of the driver's

20   seat?

21   A.    Yes, sir.

22   Q.    All right.  What did you do next?

23   A.    I removed Mr. Weiss from the car; placed him

24   under arrest for the suspected cocaine.  At which

25   time Officer Broderick also removed Mr. Hall from the

1    vehicle, placing him under arrest for the cocaine, as

2    well.

3    Q.    All right.  Did you all search the van?

4    A.    Yes.

5    Q.    Did you find any other contraband?

6    A.    Just the cocaine in the van.

7    Q.    Did you search Mr. Weiss?

8    A.    Yes.

9    Q.    Any more contraband on him?

10    A.    No, sir.

11    Q.    Okay.  Did you search Mr. Hall?

12    A.    Yes.

13    Q.    And did you personally search Mr. Hall?

14    A.    Yes.

15    Q.    And what did you find?

16    A.    $2700 in $100 bills in his -- I believe left

17    front pocket.

18    Q.    Okay.  What happened after that?

19    A.    Yeah, left front pocket.

20          At that point the wagon was called.  Mr.

21    Weiss and Mr. Hall were placed under arrest and

22    transported to central booking; the recovered money

23    and the recovered cocaine from the van.  And a repair

24    order was issued for the tint on the van.

25    Q.    Now, you didn't find any cocaine on Mr. Hall,

```
 1      correct?
 2      A.      No.
 3      Q.      Why was Mr. Hall arrested?
 4      A.      Just due to my training, knowledge and
 5      experience --
 6                      MR. PROCTOR:  Objection.
 7                      THE COURT:  Overruled.
 8      BY MR. FUCHS:
 9      Q.      If you would, Detective, just why did you make
10      that decision that day?
11      A.      I suspected that the money that Mr. Hall had
12      on him, accompanied with the cocaine that was in the
13      truck -- or, excuse me, in the van -- would be from a
14      drug transaction.
15      Q.      Were the drugs that you found, those rock
16      cocaine -- the rock cocaine on the driver's floor,
17      was it submitted for testing?
18      A.      Yes, it was.
19      Q.      All right.  I'm going to show you government's
20      Exhibit 420.  Do you recognize that?
21      A.      Yes, I do.  That's our standard Baltimore City
22      submission with there's a matching complaint number
23      to the arrest.
24      Q.      Okay.  So this is the cocaine that was
25      recovered that day that we've been speaking about?
```

```
 1    A.      Yes, sir.
 2    Q.      And, if you would, point on the document where
 3    the cocaine is.
 4    A.      Right there.
 5    Q.      All right.  You said the drugs were submitted
 6    for testing, correct?
 7    A.      Yes, sir.
 8    Q.      And that is to the Baltimore Police
 9    Department's drug analysis?
10    A.      Their evidence control unit.
11    Q.      I'm sorry.
12    A.      Their evidence control unit.
13    Q.      Okay.  And would they have been tested by the
14    drug analysis unit?
15    A.      Yes, they have.
16    Q.      All right.  I'm going to show you government's
17    Exhibit 463.  Do you recognize that?
18    A.      Yes, I do.
19    Q.      And what is it?
20    A.      It's an analysis for drugs.
21    Q.      Now, does the complaint number for this drug
22    analysis match the complaint number for the complaint
23    we've been talking about?
24    A.      Yes, it does.
25    Q.      All right.  And is that the same date?
```

1    A.      Yes, it is.

2    Q.      And is that the same location?

3    A.      Yes, the intersection.

4    Q.      Okay.  And so these are the drugs -- this is

5    the analysis of the drugs that we were just looking

6    at, correct?

7    A.      Correct.

8    Q.      All right.  And what was the results?

9    A.      It came back positive for a Schedule II

10   narcotic, cocaine.

11   Q.      All right.  Prior to the day you arrested him

12   in March, had you ever met Mr. Hall.

13   A.      No.

14   Q.      Did you know Mr. Hall?

15   A.      No.

16   Q.      Have you ever seen him since then?

17   A.      No.

18   Q.      Did you in any way participate in the federal

19   investigation of Mr. Hall?

20   A.      No.

21           MR. FUCHS:  No further questions, Your

22   Honor.

23           THE COURT:  Thank you.  Mr. Proctor?

24           MR. PROCTOR:  Briefly.

25

```
 1                     CROSS-EXAMINATION

 2   BY MR. PROCTOR:

 3   Q.      How are you, sir?

 4   A.      Well.

 5   Q.      If you could just come for a little walk with

 6   me.

 7                   Have you seen the indictment in this

 8   case?

 9   A.      I'm sorry, sir?

10   Q.      Have you seen the indictment in this case?

11   A.      No.

12   Q.      Overt act D concerns an arrest of 3-24-08.

13   And that would be your arrest, wouldn't it, sir?

14   A.      Yes, sir.

15   Q.      And the quantity of the drugs is actually two

16   lines, .20 and then .12?

17   A.      Yes, sir.

18   Q.      Because presumably they were submitted

19   separately or something like that?

20   A.      Sure.

21   Q.      So if my math is correct, .20 plus .12 is .32

22   grams of crack; is that correct?

23   A.      Correct.

24   Q.      Okay.  You can go back to your seat, please.

25                   And I just want to make sure I have this
```

1    right.  You pull the car over for a window tint,

2    right?

3    A.     Yes, sir.

4    Q.     And it's dark, right?

5    A.     Yes, sir.

6    Q.     And yet, on a dark street through a window

7    tint, you see a third of a gram of cocaine?

8    A.     No.  The window was down.

9    Q.     Okay.  So you see a third of a gram -- do we

10   have those drugs, Mr. Fuchs?

11              MR. FUCHS:  I'm sorry?

12              MR. PROCTOR:  Do we have those drugs?

13              Can I approach the witness, please,

14   Judge?

15              THE COURT:  Certainly.

16              MR. PROCTOR:  So -- I'm sorry, Judge.

17   Just give me a second.

18              THE COURT:  Government Exhibit 463.

19              (Counsel confer.)

20              MR. PROCTOR:  Can you open it up, or do

21   you --

22              THE COURT:  No, you can't open it up, Mr.

23   Proctor.

24              MR. PROCTOR:  Judge, I can't see the

25   drugs in the exhibit.

```
 1                    THE COURT:  Show the witness the exhibit.
 2      We're not going to open up these exhibits with
 3      these items.
 4      BY MR. PROCTOR:
 5      Q.     So this is government's Exhibit 420.
 6             Do you see that up on your screen?
 7      A.     Yes, sir.
 8      Q.     And the drugs are what I'm pointing to, are
 9      they not?
10      A.     Yes, sir.
11      Q.     And they're sandwiched internally in the
12      exhibit.  But you agree with me that they're maybe
13      the size of the top of my pen?
14      A.     Yes.
15      Q.     Yes.  And that's what you saw scattered on the
16      driver's side floorboard on a dark night?
17      A.     With -- under a street light using my
18      flashlight, yes.
19      Q.     Okay.  When you testified on direct, did you
20      say you shined your flashlight in there?
21      A.     Yes.
22      Q.     When you wrote your police report, did you say
23      you shined your flashlight in there?
24      A.     No, I did not.
25      Q.     And just so we're a hundred percent clear, it
```

HALL-BY-CHRISTOPHER JANU-FILL-02/14/12-REDIRECT-FUCHS

135

```
 1       was on the driver's side and Mr. Hall was on the

 2       passenger side?

 3       A.      Yes.

 4       Q.      And it's a minivan, so it's not like they're

 5       all sandwiched in close together?

 6       A.      Yes.

 7               MR. PROCTOR:  Can I have a second?

 8               Nothing further.  Thank you.

 9               THE COURT:  Any redirect, Mr. Fuchs?

10               MR. FUCHS:  Just briefly, Your Honor.

11                       REDIRECT EXAMINATION

12       BY MR. FUCHS:

13       Q.      Detective, where was the money found?

14       A.      In Mr. Hall's -- yeah, Mr. Hall's left front

15       pocket.

16               MR. FUCHS:  No further questions, Your

17       Honor.

18               THE COURT:  Thank you, you may step down,

19       Detective Janu.  You should not discuss your

20       testimony with anyone in the event you're called back

21       to the witness stand before this trial conclude this

22       week.

23               THE WITNESS:  Yes, sir.

24               THE COURT:  Thank you very much.

25               MR. FUCHS:  Your Honor, the government's
```

1       next witness is Special Agent Gabriel Brooks.

2       Whereupon:

3                       GABRIEL BROOKS,

4       called as a witness, having been first duly sworn

5       according to law, testified as follows:

6                       THE DEPUTY CLERK:  State your full name

7       for the record.

8                       THE WITNESS:  It's Gabriel Brooks.

9                       THE DEPUTY CLERK:  Thank you.

10                      DIRECT EXAMINATION

11      BY MR. FUCHS:

12      Q.      Special Agent Brooks, where do you currently

13      work?

14      A.      I work in Alcohol, Tobacco Firearms and

15      Explosives out of Atlanta, Georgia.

16      Q.      Okay.  How long have you worked there?

17      A.      I've worked for the ATF for two and a half

18      years now.

19      Q.      Before you worked for the ATF, who did you

20      work for?

21      A.      I worked for Baltimore City Police Department.

22      Q.      And when did you work for the BPD?

23      A.      I started in January of 1999 up until late

24      December 2008.

25      Q.      Okay.  Now, where were you assigned in August

1     of 2008?

2     A.     At the time I was assigned to the Southern

3     District operations.

4     Q.     And what does the operations section do?

5     A.     Actually, I was a sergeant there.  And

6     basically that's the drug unit and the flex units;

7     the units that were to be plainclothes, basically.

8     And we did a lot of drug work.

9     Q.     Okay.  Now, how long did you work in the

10    southern in total?

11    A.     Approximately six months.

12    Q.     Okay.  When you worked in the southern, did

13    you go to Westport?

14    A.     Yes, I did.

15    Q.     Okay.  Is that part of the southern?

16    A.     Yes, it is.

17    Q.     All right.  You're familiar with that

18    neighborhood, correct?

19    A.     Yes, I am.

20    Q.     I'm going to show you government's Exhibit 6.

21    Do you recognize that?

22    A.     Yes, I do.

23    Q.     All right.  What is it?

24    A.     It's a map of the Westport area.

25    Q.     Okay.  Now, were you working on August 7 of

GABRIEL BROOKS - DIRECT - IVACHS

138

1    2008?

2    A.    I was.

3    Q.    What was your assignment that day?

4    A.    I was -- at that time I was a sergeant in the

5    Southern District.  And I was purchasing narcotics;

6    we were doing buy/ bust operations.

7    Q.    Were you personally doing the purchasing?

8    A.    Yes, I was.

9    Q.    You were working undercover; is that right?

10   A.    Yes, I was.

11   Q.    All right?  How were you dressed that day?

12   A.    I was dressed plainclothes; just normal

13   dress-down in order to purchase narcotics.

14   Q.    You were trying to blend in, correct?

15   A.    Yes.

16   Q.    Trying to pose as your average drug buyer?

17   A.    Correct.

18   Q.    What were you driving?

19   A.    I was driving a -- just a normal beat-up

20   vehicle.  It was -- I had a couple vehicles that I

21   would use.

22   Q.    Okay.  Was anyone with you when you went on

23   the buy/bust?

24   A.    No.

25   Q.    Where did you go?

1    A.    Well, I drove around the Westport area.  And

2    then I went on to Waterview and I saw some

3    individuals on Dorton Court.

4    Q.    Okay.  And, if you would, you can touch the

5    screen and leave a mark.  Just show the jury what

6    you're talking about.

7    A.    This is Waterview.  This is Dorton.

8    Q.    Okay.  So you said you drove down Waterview;

9    is that right?

10   A.    Yeah.  I drove down Waterview.  And then I

11   ended up turning back around and coming up.  And then

12   I went on to Dorton Court.

13   Q.    Had you seen people on Dorton?

14   A.    Yeah.  That's why I went up there.

15   Q.    Okay.  Did you know Dorton to be a place you

16   might be able to buy drugs?

17   A.    Yes.

18   Q.    All right.  What happened when you drove up

19   Dorton?

20   A.    When I drove up Dorton, I saw individuals

21   there.  And I saw a black male standing sort of

22   towards the driver's side of my vehicle up Dorton.

23   Who I made eye contact with him and he waved me to

24   pull over.  At which time he asked me, "How many?"

25   Q.    All right.  The person who waved you and said,

1      "How many," do you see him here in the courtroom?

2      A.      Yes, I do.

3      Q.      Who is it?

4      A.      It's Mr. Hall.

5                 THE COURT:  The record will reflect the

6      witness has identified the defendant, Antonio Hall.

7      BY MR. FUCHS:

8      Q.      And there was no one else in the car with you,

9      correct?

10     A.      No.

11     Q.      All right.  But you heard him say, "How many?"

12     A.      Yes.

13     Q.      All right.  What did you take this to mean?

14     A.      I took that to mean:  How many packages; how

15     many pills or packages of controlled dangerous

16     substance, drugs.

17     Q.      Had you done buy/busts before?

18     A.      Yes.

19     Q.      Are you familiar with how street-level sales

20     operate?

21     A.      Yes, I am.

22     Q.      All right.  Was this typical?

23     A.      Very typical.

24     Q.      What happened after he asked you, "How many?"

25     A.      At that point I had pulled over.  And he had

GABRIEL, BROOKS - DIRECT - HUGHS

141

1      motioned and said something to some other individuals
2      that were to his right.  And they came over; they
3      rushed over to my vehicle.
4      Q.     Was there anyone else on Dorton while you were
5      there who seemed to be directing your traffic?
6      A.     No.
7      Q.     What happened when these two individuals came
8      to your window?
9      A.     They came to my vehicle.  I didn't know what
10     he had exactly said to them, so I again said, "I want
11     four".  And then one individual produced two packages
12     of cocaine out of his mouth and handed them to me.
13     And then he pulled a 20 out of my hand.  And then at
14     the same time another guy had gotten in my window,
15     and he also gave me two, which I took from him.  And
16     then I gave him 20.
17     Q.     Okay.  Was there any doubt in your mind that
18     Mr. Hall was directing these two to your car?
19     A.     No, not at all.  I mean, that's exactly what
20     happened.
21     Q.     Did you see Mr. Hall do anything?  Did he wave
22     to them?
23     A.     Just in the beginning, like when I pulled up,
24     he motioned to them, like:  Go to the car.  And I
25     couldn't tell what he said.  And then they just

1     rushed over to the car.

2     Q.     Before he made that motion or directed them,

3     did anybody else approach your car?

4     A.     No.

5              MR. FUCHS:  All right.  Permission to

6     approach, Your Honor?

7              THE COURT:  Yes.  Go right ahead.

8     BY MR. FUCHS:

9     Q.     Special Agent, I'm going to show you

10    government's Exhibit 492.  Looking at the CC number,

11    do you recognize that?

12    A.     This is the drugs that were purchased on that

13    day on Dorton Court.

14    Q.     Okay.  Does the CC number match up to the CC

15    number of this particular incident?

16    A.     No.  Actually this one's different.  And I

17    can't really see the photo on this one.  This one is

18    11852.  My complaint number was different.

19    Q.     I'm sorry.  Let me show you this.  This is

20    government's Exhibit 417.  Do you recognize that?

21    A.     Yes.  Those are the packages that I purchased.

22    Q.     I apologize, Special Agent.  Let's take a look

23    at it, government's Exhibit 493.  Just see if those

24    CC numbers match up.

25    A.     Yes, that's it.

GABRIEL BROOKS - DIRECT - HUGHS

143

```
1    Q.      And I know it's packed pretty tightly there,
2    but this picture, 417, is what that looks like
3    unfolded, correct?
4              All right.  If you would, show the jury
5    where the narcotics are.
6    A.      It's -- these are two, I'll call them pills.
7    They're packages, they're small ziplocks.  And then
8    these are two.  So --
9    Q.      Now, after you handed the money off to these
10   two gentlemen that came to your window, where did
11   they go?
12   A.      I didn't really pay attention to exactly where
13   they went.  I left.
14   Q.      All right.  Did you see them hand the money
15   off to Mr. Hall?
16   A.      No.
17   Q.      Okay.  So what did you do?
18   A.      I continued up Dorton Court and got out of the
19   area.  As I left, I told the arrest team the
20   descriptions of the individuals that I had come in
21   contact with.
22   Q.      Okay.  And what happened after that?
23   A.      I left the area.  The arrest team, they
24   responded.  And then I met Detective White up at the
25   road club.
```

1    Q.    Okay.  And what did he show you?

2    A.    He showed me some photos that were taken on

3    the scene and I identified who took place in the

4    transaction.

5    Q.    And based on your identification of the

6    pictures, were those people then arrested?

7    A.    Yes.

8    Q.    I'm going to show you government's 499.

9          Do you recognize that picture?

10   A.    Yes.

11   Q.    And what is that picture?

12   A.    That's the picture of the individual who I

13   first had contact with who directed the two

14   individuals over to me.

15   Q.    Okay.  Again, do you see him in the courtroom

16   here?

17   A.    Yes, I do.

18   Q.    All right.  And that's how he looked that day,

19   correct?

20   A.    Yes.

21   Q.    All right.  Now, the drugs that were recovered

22   that we just saw that are sitting up there with you,

23   were they submitted for testing?

24   A.    Yes.  I gave the drugs after I purchased them

25   I gave them to Detective White and he submitted them.

1    Q.    And those were submitted to Baltimore Police

2    Department's drug analysis unit, correct?

3    A.    Yes.

4    Q.    Okay.  I'm showing you government Exhibit 464.

5          Do you recognize that?

6    A.    Yes.  That's the lab sheet submittal report

7    from Baltimore City's crime lab.

8    Q.    All right.  Is that the same CC number?

9    A.    It is.

10   Q.    And the same date of arrest?

11   A.    It is.

12   Q.    And the same location, correct, 2400 Dorton?

13   A.    Yes.

14   Q.    All right.  And what was the result of the

15   test?

16   A.    It came back for being cocaine base, Schedule

17   II.

18   Q.    Now, prior to this day, had you ever seen Mr.

19   Hall?

20   A.    No.

21   Q.    Had you ever met Mr. Hall?

22   A.    No.

23   Q.    Had you ever arrested him?

24   A.    Not that I'm aware of, no.

25   Q.    All right.  And after this arrest, did you

```
 1     take any part in the federal investigation of Mr.

 2     Hall?

 3     A.      No.

 4              MR. FUCHS:  All right.  No further

 5     questions, Your Honor.

 6              THE COURT:  Thank you.

 7     Cross-examination, Mr. Proctor?

 8              MR. PROCTOR:  Briefly.

 9                    CROSS-EXAMINATION

10     BY MR. PROCTOR:

11     Q.      Sir, did you review -- did you write a police

12     report?

13     A.      Yes.

14     Q.      And, if I could show you, I guess what I'll

15     mark as defense 5 for identification purposes.

16              Have you seen this before?

17     A.      Yes.

18     Q.      And did you write that?

19     A.      No.

20     Q.      But your name's down on the bottom left as

21     approving it?

22     A.      Yes.

23     Q.      Which means you looked over the police report;

24     made sure it was accurate; and then gave your

25     approval, right?
```

147

```
1    A.      Yes.
2    Q.      And it's your testimony you bought --
3    basically two different people gave you drugs, right?
4    A.      Yes.
5    Q.      And the first time you talk about the drugs,
6    you write two peoples came up to you, do you not?
7    A.      I did.
8    Q.      And the second time you talk about the drugs,
9    you write someone else gave you two pink ziplocks,
10   right?
11   A.      Based on this, that's what it says.  And I
12   didn't -- if I could look at the statement of
13   probable cause, which I actually did write.
14   Q.      Okay.  Go ahead.
15   A.      Yeah, I wrote two pinks on both.
16   Q.      Okay.  And you would agree with me, would you
17   not, that's what on the screen are not four pink
18   ziplocks?
19   A.      Well, the one looks like it's probably clear.
20   Q.      Yellow is what I would guess.
21   A.      Well, that's -- no, that's a clear sip.
22   Q.      Okay.
23   A.      That's actually clear.  The substance inside
24   of it is cocaine.  When it's cocaine base, it turns a
25   yellowy color, which is what that is.
```

1    Q.     But it's not pink, right?

2    A.     No.  I guess it's probably not pink.  It looks

3    more clear.

4    Q.     The arrest in this case was 8-7-08; is that

5    correct?

6    A.     Yes.

7    Q.     And we just saw the chemist report.  But the

8    amount of drugs is .45 of a gram; is that correct?

9           Would you like to see it again?

10   A.     I believe you.

11   Q.     Thousands wouldn't.

12          And did you in that case use prerecorded

13   buy money?

14   A.     I did.

15   Q.     Tell the jury what prerecorded buy money is.

16   A.     It's -- prerecorded buy money is money that is

17   used to make the drug purchases.  And we record the

18   serial numbers.  And then that helps us in the

19   identification of the money after the arrests are

20   made.

21   Q.     Okay.  And in this case Mr. Hall wasn't the

22   only person arrested, was he?

23   A.     No.

24   Q.     And the prerecorded buy money, $20 of it was

25   recovered, wasn't it?

1    A.      I believe there was some money recovered, yes.

2    Q.      But it wasn't recovered from Mr. Hall's

3    person, was it?

4    A.      No.

5    Q.      It was recovered from, I think, Brandon

6    Carter?  Does that sound right?

7    A.      Correct.

8    Q.      So it's your testimony that Mr. Hall was

9    directing operations, or words to that effect, right?

10   A.      Yes.

11   Q.      But what you're saying is afterwards, when the

12   police came and they rounded up Mr. Carter and Mr.

13   Hall and arrested them, Mr. Carter still got the

14   money in his pocket?

15   A.      I'm not sure where it was seized from, but it

16   was seized from Mr. Carter.

17   Q.      Okay.  So whether it was his pocket, wherever,

18   it wasn't seized from Mr. Hall?

19   A.      Correct.

20           MR. PROCTOR:  Can I have a second,

21   please, Judge?

22           THE COURT:  Sure.

23           MR. PROCTOR:  Nothing further.

24           THE COURT:  Thank you.  Any redirect, Mr.

25   Fuchs?

1        MR. FUCHS:  Very briefly.

2                    REDIRECT EXAMINATION

3    BY MR. FUCHS:

4    Q.    Special Agent, did anyone else as you drove up

5    Dorton ask you, "How many?"

6    A.    No.

7    Q.    Did anybody else, as near as you could tell,

8    motion the two men to your car?

9    A.    No.

10                   MR. FUCHS:  No further questions, Your

11   Honor.

12                   THE COURT:  Thank you.  You may step

13   down, Special Agent Brooks.  You should not discuss

14   your testimony with anybody in the event you're

15   called back to the witness stand before this trial

16   concludes this week.

17                   Thank you very much, sir.

18                   Next witness, Mr. Fuchs?

19                   MR. FUCHS:  Your Honor, the next witness

20   is Detective Paul Thompson.

21

22

23

24

25

1    Whereupon:

2                        PAUL THOMPSON,

3    called as a witness, having been first duly sworn

4    according to law, testified as follows:

5                    THE DEPUTY CLERK:  Please state your

6    name.

7                    THE WITNESS:  Detective Paul Thompson.

8                    THE DEPUTY CLERK:  Thank you.

9                        DIRECT EXAMINATION

10   BY MR. FUCHS:

11   Q.     Detective Thompson, where do you work?

12   A.     Southern District.

13   Q.     And is that part of the Baltimore City Police

14   Department?

15   A.     Yes, it is.

16   Q.     All right.  How long have you worked in the

17   southern?

18   A.     Approximately 12 years.

19   Q.     Okay.  And are you familiar with the Westport

20   neighborhood?

21   A.     Yes, I am.

22   Q.     That's part of your district, correct?

23   A.     Yes, it is.

24   Q.     All right.  How often are you in Westport?

25   A.     Daily.

PAUL THOMPSON - DIRECT EXAMINATION

152

```
1    Q.      Okay.  I'm going to show you government's
2    Exhibit 488.  Do you recognize that?
3    A.      Yes, I do.
4    Q.      What are we looking at?
5    A.      Looking at the Westport residential, Annapolis
6    Road area.
7    Q.      Okay.  Now, this is just one part of Westport,
8    correct?
9    A.      Yes, it is.
10   Q.      Now, where on this map -- if you could just
11   point us -- where is what's been called the project
12   side of Maisel Court?
13   A.      The project side would be farther over this
14   area.
15   Q.      Okay.  It's to the left of the screen,
16   correct?
17   A.      Yes, sir.
18   Q.      All right.  And if you would, just point out
19   on the map, where is Annapolis Road?
20   A.      Annapolis Road is this road that runs through
21   the middle of the map.
22   Q.      Okay.  You can -- is this Annapolis Road?
23   A.      Yes, it is.
24   Q.      All right.
25   A.      This area.
```

```
1    Q.      There you go.  All right.  I'd like to turn
2    your attention to March 27 of 2009.  Were you working
3    that day?
4    A.      Yes, I was.
5    Q.      All right.  Did you go to Westport that day?
6    A.      Yes, I did.
7    Q.      Were you in plainclothes?
8    A.      Yes.
9    Q.      All right.  Were you in an unmarked car?
10   A.      Yes, I was.
11   Q.      Who was with you that day?
12   A.      Detective Martin was working with me that day.
13   Q.      And what was your assignment?
14   A.      I was observing any crimes or illegal
15   activities.
16   Q.      All right.  And do you know of the area of
17   Annapolis and Kent to be an area of high crime?
18   A.      Yes.
19   Q.      All right.  What kind of crimes have you seen
20   there?
21   A.      Open area narcotics sales.
22   Q.      All right.  Now, turning your attention back
23   to March 27.  Did you make any arrests that day?
24   A.      Yes, I did.
25   Q.      All right.  If you would, tell the jury what
```

```
 1     happened.
 2     A.      On that date I was working in an unmarked car.
 3     I was driving down northbound on Annapolis Road,
 4     which is this road right here.  At that time I saw a
 5     group of black males and females standing on a corner
 6     on the 2800 block of Kent and Annapolis Road.
 7     Q.      Detective, I'm sorry, if you would point out
 8     on the map where there that is.
 9     A.      It's right here.
10     Q.      Okay.  It's where that black "X" mark is; is
11     that correct?
12     A.      That's correct.
13     Q.      And you and I actually reviewed this aerial
14     earlier today, correct?
15     A.      Yes, we did.
16     Q.      And that's your "X" that you put there; is
17     that right?
18     A.      That's my "X".
19     Q.      Okay.  All right.  Go ahead.
20     A.      At that time I saw Mr. Hall approaching the
21     group with his left hand clenched, holding a water
22     bottle in his right hand.  At the same time while
23     this is going on the people had, the people had --
24     the group of people all had U.S. currency in their
25     hands.
```

1    Q.    All right.  So you saw Mr. Hall approaching a
2    group of people on the street corner; is that right?
3    A.    That's correct.
4    Q.    And these people are holding money in their
5    hands?
6    A.    Yes.
7    Q.    All right.  And what did you see happen next?
8    A.    At that time another individual came from the
9    south side of the street to the north side holding
10   money in his left hand; U.S. currency in his left
11   hand.  At that time I believed that drugs were being
12   sold or about to be sold.
13   Q.    And what happened next?
14   A.    So I exited.  I got out of my vehicle and I
15   approached Mr. Hall.  I grabbed him in an attempt to
16   place him under arrest.
17   Q.    All right.  And, just so we're clear, you're
18   talking about Mr. Hall now, that's the person you saw
19   approaching this group of people with the money in
20   their hand; is that right?
21   A.    That's correct.
22   Q.    Had you seen Mr. Hall before that day?
23   A.    Yes, many times.
24   Q.    Okay.  So you knew who he was; is that right?
25   A.    Yes, I did.

1    Q.      Okay.  And you'd had contact with him?

2    A.      Yes.

3    Q.      And had conversations with him, correct?

4    A.      Correct.

5    Q.      All right.  So you knew who this gentleman was

6    as he approached?

7    A.      Yes.

8    Q.      All right.  So you said you went and you

9    approached Mr. Hall?

10   A.      Yes.

11   Q.      And what happened?

12   A.      At the time he put his left hand to his mouth

13   and took a drink from a water bottle he had in his

14   right hand.  Then he grabbed my arm and we both fell

15   to the ground against the side of a house that was on

16   the corner of Kent Street and Annapolis Road.  And my

17   partner ordered one of the gentleman who was running

18   across the street with the money in his hand, Mr.

19   Spam, to sit down.  He then helped me place Mr. Hall

20   under arrest.

21   Q.      When Mr. Hall put something on his mouth and

22   then followed with a water bottle, what did you think

23   he was doing?

24   A.      I believe he was trying to swallow illegal

25   drugs.

1    Q.      Okay.  Had you ever seen someone do that

2    before?

3    A.      Many times.

4    Q.      Okay.  Did you try to recover any drugs out of

5    Mr. Hall's mouth?

6    A.      He's already swallowed it.  It was impossible.

7    Q.      All right.  Was Mr. Hall arrested that day?

8    A.      Yes, he was.

9    Q.      Now, prior to that you said you had met Mr.

10   Hall?

11   A.      Yes.

12   Q.      All right.  And you had spoken to him?

13   A.      Yes.

14   Q.      All right.  In your interactions with him, how

15   was he with you?

16   A.      He was friendly; normal conversations.

17   Q.      Okay.  Did he have any hesitation about coming

18   to talk to you?

19   A.      None.

20   Q.      Did you at any point in time take part in the

21   federal investigation of Mr. Hall?

22   A.      No, I didn't.

23           MR. FUCHS:  All right.  No further

24   questions, Your Honor.

25           THE COURT:  Cross-examination, Mr.

1    Proctor.

2              MR. PROCTOR:  Thank you, sir.

3                    CROSS-EXAMINATION

4    BY MR. PROCTOR:

5    Q.    So Mr. Hall was friendly and talked to you

6    often; is that right?

7    A.    Correct.

8    Q.    Did he ever tell you he was proficient with

9    his weaponry?

10   A.    No.

11   Q.    Does it sound like something Mr. Hall might

12   say?

13   A.    Sounds like something he would say.

14   Q.    He used the word, "weaponry," a lot?

15   A.    Not to me.

16   Q.    Did he use the word, "proficiency," a lot?

17   A.    I can't recall.

18   Q.    And whereas you believe Mr. Hall had some

19   drugs, actually you didn't get any, did you?

20   A.    I didn't recover any, no.

21   Q.    Right.  So on -- the date of it was 3-27-09,

22   sir?

23   A.    Yes, 3-27-09.

24   Q.    And the amount of grams you recovered is zero,

25   right?

```
1    A.      Correct.

2    Q.      And are you any good at math?

3    A.      I have some basic math, yes, sir.

4    Q.      34 plus 18 plus 32 plus 45 is 1.29.  Does that

5    sound right?

6    A.      That sounds right.

7    Q.      Let me ask you this:  How many narcotics

8    arrests have you made?

9    A.      Made or participated in, a thousand or more.

10   Q.      A boatload, right?

11   A.      Right.

12   Q.      Is 1.29 grams a lot of crack or a little bit?

13   A.      It's a little bit.

14           MR. PROCTOR:  Nothing further.

15           THE COURT:  All right.  Thank you,

16   Detective Thompson.  You may step down.

17           MR. FUCHS:  Your Honor, if I may just

18   very briefly.

19           THE COURT:  Sure, sure.

20                    REDIRECT EXAMINATION

21   BY MR. FUCHS:

22   Q.      Detective, a question for you.  You said

23   you've participated in thousands of narcotics

24   arrests; is that correct?

25   A.      That's correct.
```

1    Q.    And have you participated in making narcotics

2    arrests in Westport?

3    A.    Yes.

4    Q.    All right.  And have you arrested people in

5    the middle of drug transactions in Westport?

6    A.    Yes.

7    Q.    Is it typical to find street-level drug

8    dealers in Westport carrying kilograms of crack

9    cocaine?

10   A.    No, it's not.

11   Q.    Is it typical to find them carrying ounces at

12   a time?

13   A.    No.

14   Q.    On their person I mean.

15   A.    Not ounces on their person, no.

16   Q.    Where do they put it?

17   A.    In either houses or in locations in alleys,

18   or -- it's not going to be on their person.

19   Q.    Why do they carry so little on here person?

20         MR. PROCTOR:  Objection.

21         THE COURT:  Overruled.

22         THE WITNESS:  Well, it's less of a

23   penalty and it's easier transport.

24   BY MR. FUCHS:

25   Q.    Do you know what an ounce of crack cocaine

1    looks like?

2    A.      Yes.

3    Q.      Would that be easy to swallow?

4    A.      It would be impossible to swallow.

5              MR. FUCHS:  No further questions, Your

6    Honor.

7              THE COURT:  Thank you, Detective

8    Thompson.  You may step down.  You should not discuss

9    your testimony with anyone until this trial concludes

10   this week.  Thank you very much, sir.

11             All right.  With that, it is 1 o'clock --

12             MR. PROCTOR:  Judge, could we approach

13   before you dismiss the jury?

14             THE COURT:  Sure, sure.

15             (BENCH CONFERENCE ON THE RECORD.)

16             MR. PROCTOR:  Is that it?  Are you done?

17             MR. PURCELL:  We're finished with

18   witnesses, yes.  We have a stipulation, I think, to

19   read into the record.

20             THE COURT:  We have a stipulation?  You

21   do under *Old Chief*.

22             MR. PROCTOR:  Yes.

23             THE COURT:  That's the only stipulation I

24   know of thus far, right?

25             MR. PROCTOR:  Yes.  Judge, given the

1    government's done and to give Mr. Jones' lawyer a

2    chance to consult with me and the government, should

3    he choose to do either, I would just ask to take a

4    little longer for lunch.

5                 THE COURT:  Sure.

6                 MR. PROCTOR:  That's all.  Before you

7    told the jury to come back at 2.  I want to ask you

8    if you could make it 2:30, maybe?

9                 THE COURT:  We'll take an hour and a half

10   for lunch.

11                So the government is going to enter into

12   a stipulation as to a prior conviction.  And then I

13   will indicate that it's just for purposes of an

14   element under 922(g), without mentioning *Old Chief*;

15   I'll just explain that that's the only reason is for

16   the element, nothing more and nothing else.  And then

17   the government is going to rest and then the defense

18   is prepared to call -- if Mr. Jones is not called as

19   a witness and Mr. Hall decides not to testify, are

20   there any other witnesses?

21                MR. PROCTOR:  Yes.  There's one more.

22                THE COURT:  There's definitely a witness

23   you're going to be calling?

24                MR. PROCTOR:  Well, we haven't met with

25   him.  There's that's another reason.  Mr. Sullivan's

```
1    going to meet with him during lunch and I'll tell the

2    government who it is.

3                   THE COURT:  That's fine.  We'll take an

4    hour and a half for lunch.  We'll tell them to return

5    at 2:30.

6                   (END OF BENCH CONFERENCE.)

7                   THE COURT:  All right.  Ladies and

8    gentlemen, you're going to have a little bit longer

9    for lunch today.  So we're going to reconvene at

10   2:30.  And, Miss West, you can be back here in ten

11   minutes?  We have other assignments.  I saw your face

12   light up.

13                  (Laughter.)

14                  THE COURT:  I'm just teasing.  I'm just

15   teasing.  All right.  Does a great job.

16                  Okay.  We'll take an hour and a half for

17   lunch and we'll see you all at 2:30.

18                  (RECESS FOR LUNCH.)

19

20

21

22

23

24

25
```

```
 1                       AFTERNOON SESSION

 2                  (JURY OUT.)

 3                  THE COURT:  We're ready to bring the jury

 4      in.  Mr. Purcell, you have a few other matters and

 5      then the government rests; is that correct?

 6                  MR. PURCELL:  Just a stipulation that Mr.

 7      Fuchs will be reading.

 8                  THE COURT:  All right.  What is referred

 9      to generally as an Old Chief stipulation pursuant to

10      the Old Chief case, pursuant to which the defendant

11      is stipulating to a prior conviction, which is one of

12      the predicate elements for the charge under 18 U.S.

13      Code section 922(g), right?

14                  MR. PURCELL:  Yes, Your Honor.  Count 5.

15                  THE COURT:  I'm sorry?

16                  MR. PURCELL:  Which is Count 5.

17                  THE COURT:  Count 5.  Is that correct,

18      Mr. Proctor, Mr. Sullivan, there's a stipulation as

19      to that?

20                  THE DEFENDANT:  Hold up.

21                  THE COURT:  And has it been signed?

22                  THE DEFENDANT:  No.  I'm not admitting to

23      that.  You ain't tell me that.

24                  MR. PURCELL:  Well, you signed it.

25                  THE DEFENDANT:  But can I tell him -- I
```

1          ain't admitting to no 922(g).

2                    THE COURT:  Mr. Hall, let me just explain

3          to you something, sir.  You're not admitting a 922(g)

4          violation.  Any defendant in his right mind

5          stipulates to this.  And if you don't want to

6          stipulate to it then the government is entitled to

7          come in and introduce your prior conviction.

8                    Mr. Hall, when I'm talking to you, listen

9          to me.  What I'm trying to explain to you, sir, that

10         under the case called *Old Chief* of the Supreme Court,

11         the Supreme Court of the United States found -- held

12         that a defendant has a right to stipulate to the fact

13         that there is an underlying conviction, without the

14         conviction itself being given to the jury.  Thereby

15         the prosecutor is not permitted to introduce the fact

16         of a prior conviction and I instruct the jury that

17         they don't need to worry what the prior conviction

18         was for; merely that there was a prior conviction.

19                   It is essentially in the interest of any

20         criminal defendant who is charged with a 922(g)

21         violation to stipulate to that fact.  You're not

22         stipulating to the 922(g) violation.  You're not

23         acknowledging your guilt as to the 922(g) violation

24         or acknowledging that you're a felon in possession of

25         a firearm.  It's just you're stipulating to a prior

1    criminal conviction.

2              And that is what your lawyers, your

3    court-appointed lawyers, have worked out with the

4    government.  I can assure you, sir, that in all these

5    cases almost overwhelmingly defendants almost always

6    provide that stipulation because they don't want the

7    government to get into the details of a prior

8    conviction.  Do you understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  All right.  So that's the

11   basis of it and that's why I'm permitting the

12   government -- I don't have to permit the stipulation.

13   They can just go ahead and prove it.  But it's in

14   your interest that there be that stipulation.

15             So, has Mr. Hall signed that?

16             MR. PROCTOR:  Yes, sir.

17             THE COURT:  All right.  It has been

18   signed.  With that, then the government will rest.

19   Then you can approach the bench on the Rule 29

20   motion, we'll deal with fairly quickly, Mr. Proctor,

21   and then we can proceed.

22             Yes, Mr. Purcell.

23             MR. PURCELL:  For the sake of the record,

24   as I've notified counsel well in advance and again

25   reminded them, and Mr. Hall, we have -- the

1     government has certified records of three prior drug

2     trafficking convictions which would in the

3     alternative of the stipulation be admitted next.

4              THE COURT:  Absolutely.  If there's not a

5     stipulation, all three prior drug convictions will be

6     introduced into evidence and I would give the jury

7     the cautionary instruction that it just relates to

8     the elements of the charge under 922(g).  But those

9     convictions would be admissible.  With the

10    stipulation they are not admissible because there's

11    no reason to have them be introduce because there's a

12    stipulation of prior conviction.

13             Correct, Mr. Proctor?

14             MR. PROCTOR:  Yes, sir.

15             THE COURT:  Mr. Sullivan?

16             MR. SULLIVAN:  Yes.

17             THE COURT:  All right.  That's where

18    we're going.

19             MR. PROCTOR:  Mr. Michael Lawler is here.

20    He was in the city jail when he got the call from

21    Miss Shearer.

22             THE COURT:  He was visiting a client over

23    at city jail.

24             MR. PROCTOR:  Well, we're unclear, Your

25    Honor.  But we'll give him the benefit of the doubt.

1           THE COURT:  We're laughing here.  Mr.

2    Lawler is a respected member of the Bar of this Court

3    and he was obviously visiting a client who perhaps

4    maybe resided in the city jail.  Correct, Mr.

5    Proctor?

6           MR. PROCTOR:  That's conceivable, yeah.

7    So, he's not in court clothes, but he is appointed

8    for Robert Jones and he's present.

9           THE COURT:  That's fine.  Okay.  And

10   Robert Jones is an individual who was previously

11   before me and sentenced by me.

12          MR. PROCTOR:  Correct.

13          THE COURT:  And he's now being called as

14   a witness for the defense.

15          MR. PROCTOR:  Correct.

16          THE COURT:  All right.  So, with that, I

17   think we are ready now to bring the jury pack in,

18   correct?  From the point of view of the government?

19          MR. PURCELL:  Yes.

20          THE COURT:  From the defense?

21          MR. PROCTOR:  Yes, sir.

22          THE COURT:  All right.  We'll bring the

23   jury back in.

24          (JURY IN.)

25          THE COURT:  Good afternoon, everyone.

```
1    Had a nice long lunch.  And, with that, we're ready
2    to proceed.
3                MR. Purcell?
4                MR. PURCELL:  The government's about to
5    rest.  We have one stipulation between the parties
6    that we'll admit, and that will be the government's
7    case.
8                THE COURT:  Ladies and gentlemen, as I'll
9    instruct you, the stipulation is the one time, the
10   only time, where what lawyers say is actually
11   evidence in the case, and that's when there is a
12   stipulation.  There is a stipulation that has been
13   reached between the government and the defendant
14   which is going to be summarized by Mr. Fuchs.
15               And that has been marked as an exhibit as
16   well?
17               MR. FUCHS:  That's correct, Your Honor.
18   It's government's Exhibit 486.
19               THE COURT:  All right.  Government's
20   Exhibit 486.
21               Mr. Fuchs, we'll be glad to hear from
22   you.
23               MR. FUCHS:  Thank you, Your Honor.
24               Your Honor, it's agreed and stipulated
25   between the parties that prior to September 20th,
```

1    2009, the defendant Antonio Hall had been convicted

2    of a crime punishable by imprisonment for a term

3    exceeding one year, as defined in 18 U.S.C. Section

4    921, and his civil rights had not been restored, and

5    therefore the defendant is a prohibited person for

6    purposes of prosecution pursuant to 18 U.S.C. Section

7    922(g)(1).

8                    THE COURT:  All right.  And the

9    government's Exhibit 486 has -- if you will put that

10   up on the screen for a moment there.  That has not

11   only been signed by counsel for the government and

12   counsel for Mr. Hall, but also been signed by Mr.

13   Hall, correct?

14                   MR. FUCHS:  That's right, Your Honor.

15                   THE COURT:  All right.  And that is, in

16   fact, the signature of both counsel as well as Mr.

17   Hall; is that correct, Mr. Proctor?

18                   MR. PROCTOR:  Yes, sir.

19                   THE COURT:  All right.  And that will be

20   used as government Exhibit 486.  And if you'll bring

21   that up to the clerk's desk right now, Mr. Fuchs.

22                   Ladies and gentlemen, as to the

23   stipulation, it's very important for me to advise

24   that you are not to worry what the conviction was

25   for.  One of the elements of Count 5 of the

1      five-count indictment returned against the defendant

2      by the grand jury, the particular charge there is in

3      Count 5 that the defendant, having been previously

4      convicted of a crime punishable by imprisonment for a

5      term exceeding one year, did knowingly possess two

6      rounds of nine millimeter Luger ammunition, in or

7      affecting commerce.

8              One of the elements of that offense is

9      that there is a prior criminal conviction of a crime

10     punishable by imprisonment for a term exceeding one

11     year.  It is an element of the offense that the

12     government has to prove.  The defendant has

13     stipulated with the government that there is that

14     prior conviction.  That's the only thing you need to

15     consider it for.  You don't need to speculate as to

16     what it's for.  There is a prior conviction.  So that

17     element does not have to be proven nor is there any

18     need to introduce what the conviction is for because

19     there's a stipulation that there's a prior

20     conviction.

21             So that is the reason for the

22     stipulation.  I think that's the only stipulation in

23     the case.  But this is the one time what the lawyers

24     have said is, in fact, evidence.  So that element has

25     been satisfied.  And for that purpose alone I give

172

```
 1        you that cautionary instruction.
 2                   Now, as to that, Mr. Purcell, are there
 3        any further witnesses or any further evidence?
 4                   MR. PURCELL:  No, Your Honor.  Just
 5        subject to whatever housekeeping may be needed, the
 6        government rests its case.  Thank you.
 7                   THE COURT:  Okay.  The government rests.
 8        Counsel, if you'll approach the bench, please.
 9                   (BENCH CONFERENCE ON THE RECORD.)
10                   THE COURT:  All right.  The defense now
11        files a Rule 29 motion; is that correct?
12                   MR. SULLIVAN:  Correct.
13                   THE COURT:  All right.  Now, with respect
14        to the standard obviously to be applied on the Rule
15        29 motion for judgment of acquittal as to the five
16        counts against the defendant is that, if upon viewing
17        the evidence in the light most favorable to the
18        government any rational trier of fact could have
19        found the defendant guilty beyond a reasonable doubt.
20        And that's United States v. Tresvant, 677 F.2d 1018,
21        a Fourth Circuit opinion, 1982; United States v.
22        Romer, 148 F.3d 359, a Fourth Circuit opinion in 1998
23        in which certiorari was denied.
24                   And the government is allowed the benefit
25        of all reasonable inferences from the facts proven
```

1       from those sought to be established.  And indeed, in

2       *United States v. Wilson*, 115 F.3d 1185, the Fourth

3       Circuit in 1997 held that the uncorroborated

4       testimony of a single witness, even when that witness

5       is an accomplice, co-defendant, or informant, is

6       enough to deny a Rule 29 standard.

7                   Under that standard the Rule 29 motion

8       will be denied.  With respect to the evidence in this

9       case under those standards there is more than

10      sufficient evidence to allow the case to go to the

11      jury with respect to allegations of conspiracy.

12                  As to Count 1, I will note there is the

13      issue we'll address at some point in time as to the

14      drug quantity, however that's stated in the

15      conspiracy.  Because I note that the drug quantity is

16      stated 280 grams or more.  And the fact that 280

17      grams or more has not been proven does not in any way

18      invalidate Count 1 of the indictment.  But we are

19      going to address on a verdict sheet the matter of

20      finding a drug quantity in this case.

21                  As Count 2, based upon the evidence

22      there's more than sufficient evidence for it to go to

23      the jury as to the allegation that the defendant, in

24      violation of 924(o) of Title 18, used and carried a

25      firearm -- I'm sorry.  That's a sign my eyesight.

1           MR. PURCELL:  924(o), conspiracy.

2           THE COURT:  Conspiracy with respect to

3    conspiring, confederating to use and carry firearms

4    in connection with a drug trafficking crime.

5           And then Count 3, the actual charge of

6    the murder of Kareem Guest in retaliation, in

7    violation of 18 U.S. Code 1111 and 1513.  And aiding

8    and abetting that charge in Count 4, the 924(c)

9    charge, essentially deliberately and maliciously and

10   with premeditation killing Kareem Kelly Guest with

11   the intent of retaliating against Mr. Guest for

12   providing information to law enforcement officers, as

13   set forth in Count 4.

14          And as to Count 5, 922(g), the felon in

15   possession charge, there's more than sufficient

16   evidence under the standards that I just outlined to

17   survive any motion of acquittal at this stage.

18          The motion has been made and you

19   preserved that for the record, Mr. Proctor and Mr.

20   Sullivan, and the motion will be denied.  And we're

21   now ready to proceed with the defense case.

22          You have how many witnesses that you want

23   to call?

24          MR. PROCTOR:  At this point I anticipate

25   Robert Jones as our only witness.

```
 1                    THE DEPUTY CLERK:  The marshal just asked
 2       could they leave the leg irons on Mr. Jones because
 3       he's in custody.
 4                    THE COURT:  That's fine.  You can keep
 5       the leg irons on.  Obviously he's a felon; he's got
 6       15-year sentence.
 7                    MR. PROCTOR:  He's in a jump suit.
 8                    THE COURT:  All right.  So with that --
 9                    MR. PROCTOR:  Judge, it is possible we
10       call one more witness.  But he's been running
11       interference.  He keeps saying he's on his way but
12       won't tell us where he is.
13                    THE COURT:  All right.  We'll see what
14       happens here.  We'll now proceed with the defense
15       case.  And the first witness will be Robert Jones.
16       So, with that, we are ready to proceed.
17                    Anything further from the point of view
18       of the government?
19                    MR. PURCELL:  No, sir.
20                    THE COURT:  From the defense?
21                    MR. PROCTOR:  No, sir.
22                    (END OF BENCH CONFERENCE.)
23                    THE COURT:  We are now ready to proceed
24       with the defense case.  And the defendant will call
25       as his first witness, Mr. Robert Jones; is that
```

1    correct, Mr. Proctor?

2                    MR. PROCTOR:  Yes, sir.

3                    THE COURT:  All right.  The marshals will

4    bring Mr. Jones in.

5    Whereupon:

6                        ROBERT JONES,

7    called as a witness, having been first duly sworn

8    according to law, testified as follows:

9                    THE DEPUTY CLERK:  Please state your full

10   name for the record.

11                   THE WITNESS:  Robert Jones.

12                   THE DEPUTY CLERK:  Sit up and speak in

13   the microphone.

14                   THE WITNESS:  Robert Jones.

15                   MR. PROCTOR:  May I proceed, Your Honor?

16                   THE COURT:  Yes, you certainly can, Mr.

17   Proctor.

18                   DIRECT EXAMINATION

19   BY MR. PROCTOR:

20   Q.    Good afternoon, Mr. Jones.  How old are you?

21   A.    24.

22   Q.    And I see you're in a maroon, I guess, purple

23   jump suit?

24   A.    Yeah.

25   Q.    Are you currently incarcerated?

```
 1    A.      Yes.

 2    Q.      Where?

 3    A.      MCAC.

 4    Q.      When did you get to MCAC?

 5    A.      Yesterday.

 6    Q.      Where were you before that?

 7    A.      Pine Knot, Kentucky.

 8    Q.      And is that a United States prison?

 9    A.      Yep.

10    Q.      And what are you doing there?

11    A.      Serving 15 years for Hobbs Act.

12    Q.      Hobbs Act is a robbery?

13    A.      Yeah.

14    Q.      And you were tried by Mr. Purcell, right?

15            I'm sorry, you pled guilty and Mr.

16    Purcell was the prosecutor?

17    A.      Uh-huh.

18    Q.      And you received 15 years.  And when was that?

19    A.      February 3.

20    Q.      Okay.  So six months ago more or less?  Yeah?

21            And before -- when did you get

22    incarcerated?

23    A.      May 2010.

24    Q.      Okay.  So before May 2010 where did you live?

25    A.      Baltimore.
```

178

```
 1    Q.      Any particular area?

 2    A.      305 Bigley.

 3    Q.      Which is which area of the city?

 4    A.      That's Baltimore County.

 5    Q.      Okay.  Did you frequent the Westport area?

 6    A.      Yes.

 7    Q.      Why would you go there?

 8    A.      That's where I grew up at.

 9    Q.      Would you go there a lot?

10    A.      That's where I hung out at.

11    Q.      Do you know this gentleman seated right there?

12    A.      Yeah.

13    Q.      Who's that?

14    A.      Antonio.

15    Q.      What do you know him by?

16    A.      Mack.

17    Q.      How long have you known Mack?

18    A.      Almost all my life.

19    Q.      Okay.  Are you and him friends?

20    A.      Yes.

21    Q.      Acquaintances, good friends?  How would you

22    describe it?

23    A.      Good friends.

24    Q.      And you know other people in the courtroom

25    too, right?
```

ROBERT JONES - DIRECT - PROCTOR

179

```
1     A.     Uh-huh.

2     Q.     Did you know a man named Kareem Guest?

3     A.     Yes, I knew him.

4     Q.     Were you good friends with him?

5     A.     Yeah, good friends.

6     Q.     Do you know his family?

7     A.     A couple of them.

8     Q.     Do you know Miss Debbie?

9     A.     Yeah.

10    Q.     Were you present the night Kareem was killed?

11    A.     Yeah.

12    Q.     Okay.  I'm going to show you some pictures.

13    And if you have a -- I'm sorry, I'm talking to the

14    government.  If you would put these up on the screen

15    at the same time.

16                 This first one would be government

17    Exhibit 1.  Could you put that on the screen, please,

18    sir?  And just so you don't have to -- 1, 2, 3, 4 is

19    what we're going to be talking about.

20                 Do you see that, sir?

21    A.     Uh-huh.

22    Q.     Can you point on this map to where Kareem

23    Guest was murdered?

24    A.     In this gap.

25    Q.     Okay.  And you've never seen this before, have
```

ROBERT JONES - DIRECT - PROCTOR

180

1      you?

2      A.      No.

3      Q.      And, in fact, before an hour ago you had never

4      seen me before, had you?

5      A.      Right.

6      Q.      Okay.  Where were you standing when -- well,

7      let me step back.

8              Had you seen Kareem earlier that day?

9      A.      No.

10     Q.      And let me step back a little further.  Have

11     you ever seen papers that said Kareem was

12     cooperating?

13     A.      Yeah.

14     Q.      Where did you see them, as best you can

15     recall?

16     A.      Around the neighborhood, everywhere.

17     Q.      Had everyone seen them?

18     A.      Everywhere.

19     Q.      Had you seen Mack seen read them?

20     A.      No, I ain't seen him read.

21     Q.      But it was well known that he had cooperated?

22     A.      Uh-huh.

23     Q.      Had you read his 302?

24     A.      No.

25     Q.      You just heard that it existed?

ROBERT JONES - DIRECT - PROCTOR

181

1    A.      Yeah.

2    Q.      Had you ever talked to Kareem about it?

3    A.      Yeah, I talked to him before.

4    Q.      About his cooperating?

5    A.      Uh-huh.

6    Q.      What did he say?

7              MR. PURCELL:  Objection.  He's not

8    entitled to that exception, Your Honor.

9              THE COURT:  Approach the bench, please.

10             (BENCH CONFERENCE ON THE RECORD.)

11             THE COURT:  Yes.  The question was of

12   this witness was what did Kareem Guest say to him.

13   And the government's objection is that it's hearsay

14   and it's not subject to the wrongdoer exception?

15             MR. PURCELL:  It's not for the defendant,

16   no, Your Honor.

17             THE COURT:  I'm sorry?

18             MR. PURCELL:  It's not for the defendant,

19   no, Your Honor.  Just for the government.

20             THE COURT:  That's right.

21             MR. PROCTOR:  I believe he's going to say

22   Kareem said, you know, "They made it up, it wasn't

23   me".  It's not for the truth of the matter asserted.

24   By definition they didn't make it up.

25             THE COURT:  Rephrase the question by

ROBERT JONES - DIRECT - PROCTOR

182

1    asking was --

2              MR. PROCTOR:  I really was just laying a

3    foundation.  I don't need to pursue it any further.

4    I'll withdraw the question.

5              MR. PURCELL:  Thank you.

6              THE COURT:  All right.

7              (END OF BENCH CONFERENCE.)

8    BY MR. PROCTOR:

9    Q.    So do you remember what night of the week it

10   was when Kareem was killed?

11   A.    No.

12   Q.    Do you remember the date?

13   A.    No.

14   Q.    Do you know what month?

15   A.    September.

16   Q.    Okay.  September of what year?

17   A.    2009.

18   Q.    So September of 2009.  Do you remember what

19   time he was killed at?

20   A.    About 10 o'clock.

21   Q.    In the morning?

22   A.    At night.

23   Q.    So he was killed at 10 o'clock at night.  Do

24   you remember what you were doing earlier that day?

25   A.    No.

ROBERT JONES - DIRECT - PROCTOR

183

```
1    Q.    Do you remember where you were hanging out?

2    A.    Yeah.

3    Q.    Where?

4    A.    In the gap up.

5    Q.    Do you see government's Exhibit 3?  If you

6    could put it up, please.

7                Does this show where you were when Kareem

8    was shot?

9    A.    Uh-huh.

10   Q.    Could you point for the members of the jury

11   where you were?

12   A.    Over here.

13   Q.    Okay.  I got it.  So maybe 15 feet from the

14   steps?  Does that sound about right?

15   A.    Yeah.

16   Q.    Okay.  Who were you with, if anyone?

17   A.    Avery.

18   Q.    Avery's last name?  Do you know his last name?

19   A.    No.

20   Q.    Who else did you see out there that night?

21   A.    Rain, Little Mike.

22   Q.    Do you know a lady named Shameka?

23   A.    Yeah, I know her.

24   Q.    Did you see her out that night?

25   A.    I don't remember.
```

184

```
1    Q.    So she may or may not have been there?

2    A.    I don't know.

3    Q.    Do you know a lady named Shaquanda Isaac?

4    A.    Yeah.

5    Q.    Did you see her out there that night?

6    A.    No.

7    Q.    Do you know a gentleman named Keyburn?

8    A.    Keyburn, yeah.

9    Q.    Did you see him out there that night?

10   A.    I seen him earlier.

11   Q.    Okay.  And Keyburn's the guy in the

12   wheelchair, right?

13   A.    Yeah.

14   Q.    Well, at the time the shooting occurred, he

15   was there or you just don't remember?

16   A.    I think he was there.

17   Q.    Okay.  Let me ask you to step back a little.

18   Was Ferl there?

19   A.    Ferl?

20   Q.    Yeah.

21   A.    I don't remember seeing Ferl.

22   Q.    You don't remember whether he wasn't there; or

23   he could have been there and you don't know one way

24   or the other?

25   A.    I don't remember.  I don't know.
```

```
 1   Q.      Let me step back.  You have a lawyer, right,
 2   sir?
 3   A.      Yeah.
 4   Q.      And he's in the courtroom, right?
 5   A.      Yeah.
 6   Q.      Do you want to be here today?
 7   A.      No, not for real.
 8   Q.      Why not?
 9   A.      Because they're talking about something about
10   my 2255 might -- I don't know, it's a whole bunch of
11   stuff about a motion that I filled (sic) about my
12   case about being some problems about it because I'm
13   headed there.
14   Q.      I think I understand you.  Is what you're
15   saying that you're worried there may be some adverse
16   legal ramifications for you?
17   A.      Uh-huh.
18   Q.      Your appeal may get denied?
19   A.      Yeah, my 2255.
20   Q.      Okay.  I understand that.  So to get back to
21   it a little.  When you first saw Kareem that night,
22   first of all, tell me where he was.
23   A.      In the gap, the gap down.
24   Q.      The gap?
25   A.      Down from the gap I was at.
```

ROBERT JONES - DIRECT - PROCTOR

186

```
1    Q.      Okay.  Did you see a vehicle there that night?
2    A.      No.
3    Q.      Do you see what's previously been marked and
4    admitted as government's Exhibit 2 right here?
5    A.      Uh-huh.
6    Q.      Does that show where Kareem was when he got
7    shot?
8    A.      Yeah.
9    Q.      Can you point to it?
10   A.      (Complies.)
11   Q.      Right about here?
12   A.      Uh-huh.
13   Q.      Okay.  And where you were standing, it's about
14   where this picture was taken from, right?
15   A.      Yeah, a little bit back.
16   Q.      A little bit back.  So the guy taking this
17   picture, you would have been standing a few feet
18   behind him?
19   A.      Uh-huh.
20   Q.      Okay.  And, in your own words, what happened?
21   A.      I was standing in the gap.  I seen somebody
22   come from this way in all black with a mask.  I heard
23   the shots.  I was backing up; he ran; then came on
24   around; came back around this-away; jumped in the car
25   and backed out.
```

ROBERT JONES - DIRECT - PROCTOR

187

```
 1        Q.      Whose car?

 2        A.      Georgie.

 3        Q.      Okay.  And let's just walk through that kind

 4     of step by step.  When you first saw Kareem, he was

 5     walking this way down the street?

 6        A.      No, he was walking this-away.

 7        Q.      This way?

 8        A.      Yeah.  On the other side.

 9        Q.      Okay.  And he turned into the gap right here

10     by the fire hydrant?

11        A.      Uh-huh.

12        Q.      Did you say anything to him?

13        A.      No.

14        Q.      Did he say anything?

15        A.      No.

16        Q.      Did you hear anyone else say anything to him?

17        A.      No.

18        Q.      So Kareem walks into the gap.  And how far

19     along has Kareem got before you see this person in

20     all black?

21        A.      As soon as he got by the gap I seen the

22     person.

23        Q.      Where did that person come from?

24        A.      It come from that-away, by you.

25        Q.      This way?
```

1    A.      Yeah.

2    Q.      So Kareem walks past; there's a vehicle here.

3    Now, you don't remember seeing a vehicle, do you?

4    A.      There was something black.  I don't know

5    exactly.  It was a vehicle there.

6    Q.      Okay.  So there was something there, but you

7    don't recall exactly what.  So Kareem walks this way

8    and turns into what you call the gap?

9    A.      Uh-huh.

10   Q.      What's this street back here, do you know?

11   A.      That's a court.  I don't know what street it

12   is, what court it is.

13   Q.      Dorton?

14   A.      No.

15   Q.      Alaska?  It will come to me.

16          MR. PURCELL:  Wilgrey.

17   BY MR. PROCTOR:

18   Q.      Wilgrey?

19   A.      Wilgrey.

20   Q.      Okay.  So Kareem comes past; theres a vehicle

21   on Exhibit 2; and turns on to what you call the gap?

22   A.      He was on the other side of the street.

23   Q.      He was on the far side?

24   A.      Yeah.

25   Q.      So he walks this way and he turns on to the

```
 1      gap.  And you say you see a shooter come from --
 2      someone in all black come this direction?
 3      A.      Uh-huh.
 4      Q.      Was this person alone?
 5      A.      Yeah.
 6      Q.      Were they talk walking or were they running?
 7      A.      Walking fast.
 8      Q.      Okay.  And you said they were in all black.
 9      Can you describe it, from head to toe, what did they
10      look like?
11      A.      Black mask, black shirt, black pants.
12      Q.      Did they have gloves on?
13      A.      I don't know.
14      Q.      Did they at that time have a gun out?
15      A.      The gun was by their side.
16      Q.      Okay.  In their right hand or their left; or
17      you don't remember?
18      A.      Right.
19      Q.      Right hand.  Okay.  So this person comes back.
20      And you got a good view of this; nothing was in your
21      way?
22      A.      No.
23      Q.      How's your eyesight?
24      A.      Good.
25      Q.      So this person comes by, and they're walking
```

```
1       fast, and they turn behind Kareem; is that your

2       testimony?

3       A.      Uh-huh.

4       Q.      Then what happens?

5       A.      Shots.

6       Q.      Do you see the flash?

7       A.      No.

8       Q.      Do you hear them?

9       A.      I hear it.

10      Q.      Did you look over when you heard them?

11      A.      I was backing up.

12      Q.      Backing up towards the steps?

13      A.      Yeah.

14      Q.      Okay.  So you're backing up towards the steps

15      and you hear the shots.  Did you see Kareem fall?

16      A.      No.

17      Q.      Do you know how many shots there were?

18      A.      A couple.  I don't know exactly how many.

19      Q.      More than two?

20      A.      More than two.

21      Q.      More than five?

22      A.      About five.

23      Q.      Okay.  And did you ever see Kareem's body on

24      the ground?

25      A.      No.
```

ROBERT JONES - DIRECT - PROCTOR

191

```
 1     Q.      So, as soon as the shots happened, you take

 2     off?

 3     A.      Uh-huh.

 4     Q.      And you take off which direction?

 5     A.      Towards the way the cameraman is.

 6     Q.      Okay.  So, again, if we go back to government

 7     Exhibit 3.

 8             Did you see that, sir?

 9     A.      Yep.

10     Q.      So do you go up the steps?

11     A.      Uh-huh.

12     Q.      And then which way?

13     A.      I ran up the steps to the -- the shots

14     stopped.  Then I ran all the way around the front

15     side of the court around that-away.

16     Q.      Okay.  So direct my pencil or my pen, which

17     direction?  Left?

18     A.      Uh-huh.

19     Q.      So you run behind this building?

20     A.      Yeah.  All the way around.  And then I came

21     back on this street right there.

22     Q.      Okay.  And then you came back up Maisel?

23     A.      Uh-huh.

24     Q.      Let's get right to it.  Do you know who fired

25     the shots?
```

192

```
 1      A.      No.

 2      Q.      You know Mack well, right?

 3      A.      Uh-huh.

 4      Q.      Was the shooter -- the first thing you saw was

 5      the person walking, right?

 6      A.      Yeah.

 7      Q.      Do you know who Mack walks?

 8      A.      Yeah.

 9      Q.      Do you think that shooter walked like Mack?

10      A.      No.

11      Q.      Do you know about what height Mack is?

12      A.      Yeah.

13      Q.      Was the shooter the same height, taller, or

14      shorter?

15      A.      Taller.

16      Q.      A few inches taller or a whole lot taller?

17      A.      Just taller.

18      Q.      Okay.  Could you see anything about the

19      shooter's skin color?

20      A.      No.

21      Q.      Because they had on all black?

22      A.      Uh-huh.

23      Q.      Could you see the shooter's hair or did they

24      have a --

25      A.      Mask.
```

ROBERT JONES - DIRECT - PROCTOR

193

```
 1        Q.      Mask.  So was the shooter fatter or thinner
 2    than Mack?
 3        A.      A little bigger.
 4        Q.      A little bigger.  And I forgot to ask.  Was
 5    Mack out there that night?
 6        A.      I seen him the early part.
 7        Q.      Okay.  Like, about how long before the
 8    shooting?
 9        A.      Probably like two hours.
10        Q.      Is it -- was he there when the shots occurred,
11    to the best of your recollection?
12        A.      No.
13        Q.      Do you know where he went?
14        A.      No.
15        Q.      So what about Big Kev; did you see him out
16    there that night?
17        A.      Yeah, he was out there.
18        Q.      Was the shooter -- was he big enough to be Big
19    Kev?
20        A.      No.
21        Q.      Because he's a big guy, right?
22        A.      Yeah.
23        Q.      So I don't want to put words in your mouth,
24    but it's fair to say the shooter's taller than Mack
25    but not at tall as Big Kev?
```

```
 1      A.      Right.

 2      Q.      And how certain are you about that?

 3      A.      Real certain.

 4      Q.      Would you come to court and lie for Mack?

 5      A.      No.

 6      Q.      Did I give you an immunity agreement?

 7      A.      Nope.

 8      Q.      Did I put any money in your commissary?

 9      A.      No.

10      Q.      Have you signed a cooperation agreement with

11      me?

12      A.      Nope.

13      Q.      In fact, have I done anything for you?

14      A.      No.

15      Q.      So why are you here?

16      A.      Just here to tell the truth.

17      Q.      Well, let's talk about that a little.

18              Do you know Officer Moody?

19      A.      Yeah.

20      Q.      Do you see him in the courtroom today?

21      A.      Uh-huh.

22      Q.      Did he ever pull a gun on you?

23      A.      Yeah.

24      Q.      Tell the jury about that.

25      A.      I went to go see my probation officer.  I was
```

ROBERT JONES - DIRECT - PROCTOR

195

```
1    coming out.  He said, "What's up?"  I said, "What's
2    up?"  I ain't know who he was.  He grabbed my arm.  I
3    ran.  He chased me; caught me like 20 minutes later;
4    put a gun on my head.
5    Q.    Put a gun to your head?
6    A.    Uh-huh.
7    Q.    Like where did he press it against?
8    A.    Right here.
9    Q.    And what, if anything, did he say?
10   A.    "I should fucking kill you for running".
11   Q.    Were you scared?
12   A.    Yeah.
13   Q.    Did he identify himself as a police officer?
14   A.    No.  He said, "You know who I am".
15   Q.    And did you?
16   A.    No.
17   Q.    Was anyone else there?
18   A.    Yeah.  I was at the probation spot; my
19   girlfriend took me.
20   Q.    Okay.  And his exact words were, "I should
21   fucking kill you for running"?
22   A.    "For making me run".
23   Q.    "For making me run".
24         Did you file an internal affair
25   complaint?
```

196

```
 1      A.      No.

 2      Q.      Did you tell -- do anything about it?

 3      A.      No.

 4      Q.      Why not?

 5      A.      I never seen nothing get done from people

 6    filing internal affair blanks.

 7      Q.      Did you see him around the neighborhood after

 8    that?

 9      A.      Yeah.

10      Q.      Did there ever come a time when you met with

11    Mr. Purcell and others in regards to who killed

12    Kareem?

13      A.      Yeah.

14      Q.      What did the government tell you about Mack

15    shooting Kareem?

16      A.      Everybody know he did it.

17      Q.      Okay.  Everybody knows he did it, and so -- so

18    what?  What does that mean to you?

19      A.      He's basically saying maybe if he tell me

20    who's testifying, I be inclined to testify.  And just

21    ain't nobody out there but him and his brother and

22    nobody like them.

23      Q.      Now, you're serving a 15-year sentence?

24      A.      Yes.

25      Q.      Did the government tell you how much time
```

ROBERT JONES - CROSS - PURCELL

197

```
 1       they'd cut off your sentence if you testified against

 2       Mack?

 3       A.      Yeah.  Less than 10 years.

 4       Q.      Your sentence would go from 15 to less than

 5       10?

 6       A.      Uh-huh.

 7       Q.      And do you remember who told you that?

 8       A.      My lawyer told me that.

 9       Q.      Okay.  Did you ever tell the government that

10       Mack shot Kareem?

11       A.      I ain't know who shot Mack -- I mean, who shot

12       Kareem.  I couldn't tell them that.

13       Q.      As you sit here today, who shot Kareem?

14       A.      Don't ask me.

15               MR. PROCTOR:  Can I have a second,

16       please, sir?

17               THE COURT:  Sure.

18               MR. PROCTOR:  Nothing further, thank you.

19               THE COURT:  Cross-examination, Mr.

20       Purcell.

21               MR. PURCELL:  Thank you.

22                      CROSS-EXAMINATION

23       BY MR. PURCELL:

24       Q.      Mr. Jones, your nickname is Seattle; is that

25       right?
```

ROBERT JONES - CROSS - PURCEL

198

```
 1      A.      Yes.

 2      Q.      Is that right?

 3      A.      Uh-huh.

 4      Q.      And you're saying that the closest you were

 5   when the shooting occurred -- were you at the top of

 6   the steps, bottom of the steps, where were you?

 7      A.      I was in the gap when the shooting occurred.

 8      Q.      In the gap.  Now, you had just gotten off the

 9   phone with Hershel; is that right?

10      A.      That was like 30 minutes before.

11      Q.      30 minutes before?

12      A.      Probably so.

13      Q.      And who was on the phone after you?

14      A.      Rain.

15      Q.      And, after Rain, do you know?

16      A.      No.

17      Q.      Do you know who was on the phone with Hershel

18   when the shooting occurred?

19      A.      No.

20      Q.      Okay.  Where was Avery when the shooting

21   occurred?

22      A.      On the steps.

23      Q.      Where were you in relation to him?

24      A.      Avery?

25      Q.      Uh-huh.  Avery Galtney.
```

ROBERT JONES - CROSS - PURCEL

199

```
 1    A.      Friends.
 2    Q.      I didn't ask you whether you were friends.  I
 3    asked you where -- I'm sorry, I used the word,
 4    "relation".  What I'm saying is:  Where was he in
 5    relation to you when the shooting happened?
 6    A.      He was on the steps; I was in the gap.
 7    Q.      Okay.  So you were a little bit away from him?
 8    A.      Yeah.
 9    Q.      Okay.  You guys had just been to McDonalds a
10    little bit earlier that evening in George's car?
11    A.      Yeah.
12    Q.      Okay.  Now, this is the first time you've come
13    in and made any kind of statement about this
14    shooting; is that right?
15    A.      Yes.
16    Q.      And you're not implicating the defendant; is
17    that right?
18    A.      Yes.
19    Q.      In fact, you're telling the jury that the last
20    time you saw Mack was, A, he wasn't there at the time
21    of the shooting; and he was there maybe two hours
22    before; is that correct?
23    A.      Uh-huh.
24    Q.      Okay.  So you're not implicating him?
25    A.      No.
```

```
 1    Q.      All right.  Now, you said that you've talked
 2    to your attorney.  You had a couple opportunities
 3    both before you were arrested, after you were
 4    arrested, and then again after you were convicted to
 5    tell the government your view or what you saw of the
 6    shooting that night and you refused on every
 7    occasion; is that right?
 8    A.      That's correct.
 9    Q.      In fact, do you remember when you left here,
10    when the judge had just -- it was Judge Bennett who
11    sentenced you; is that right?
12    A.      Uh-huh.
13    Q.      This very courtroom.  You were sitting
14    basically right where Mack is sitting right now.
15    A.      Yep.
16    Q.      Now, he's sitting there now.  But you left the
17    courtroom and you looked at Moody and you said,
18    "Moody" -- he was in the back.  And you yelled, "No
19    statement".  You were quite proud of yourself.  Do
20    you remember that?
21    A.      Yes.
22    Q.      You were quite proud because you didn't tell?
23    A.      I was proud because Moody threatened me and he
24    was trying to make me to tell him something I didn't
25    know.  So I was telling him no statements; like,
```

201

```
1      whatever he done couldn't make me say nothing.
2      Q.      Okay.  So this is the Moody who put a gun to
3      your head?
4      A.      Todd Moody.
5      Q.      Okay.  And your girlfriend was there?
6      A.      No.  She was on the phone with me.
7      Q.      I see.  All right.  She's in the courtroom,
8      isn't she?
9      A.      Yes, she here.
10     Q.      All right.  So you're here to tell us that you
11     weren't there -- I'm sorry, that you were there; the
12     defendant wasn't or hadn't been there for two hours;
13     Moody put a gun to your head.  And this is the first
14     time you're here to talk about it; is that right?
15     A.      That's correct.
16     Q.      All right.  Now, you mentioned that you saw
17     Keyburn out there that night.  Was he on Maisel?
18     A.      Yeah, he was in the gap.
19     Q.      Okay.  Was he there when the shooting
20     happened?
21     A.      I think.
22     Q.      Yeah.  He was, wasn't he?
23     A.      I said, "I think so".
24     Q.      Yeah.  And you saw Ferl.  Or do you not
25     remember seeing Ferl?
```

1    A.      I don't remember seeing Ferl.

2    Q.      Okay.  And you saw Kev?

3    A.      Yeah.

4    Q.      But the shooter wasn't Kev; you're sure of

5    that?

6    A.      Uh-huh.

7    Q.      And it wasn't the defendant, because he wasn't

8    there?

9    A.      Uh-uh.

10   Q.      Now, you are in a federal penitentiary now for

11   15 years for sticking a gun in the face of a woman

12   and her baby in her home; isn't that right?

13   A.      I didn't stick no gun.

14   Q.      Okay.  You were there?

15   A.      I was there.

16   Q.      Did you do the home invasion?

17   A.      No, I was there.

18   Q.      Did you commit the home invasion with two

19   other people?

20   A.      I was with two other people that committed a

21   home invasion.

22   Q.      Well, you admitted -- do you want to see your

23   plea agreement?

24   A.      Yeah.  Because there was nothing else to admit

25   to.  That's what you made me admit to too.

1    Q.    I made you admit to it?

2          I'm a pretty bad person, aren't I?

3    A.    You ain't bad.  Just a little aggressive.  Try

4    to take make people do what you want them to do.

5    Q.    Okay.  But I made you plead guilty?

6    A.    Basically.

7    Q.    Well, you pled guilty the morning of your jury

8    trial, didn't you?

9    A.    Yeah.  I had no options.

10   Q.    Well, you had no options because we had

11   evidence that you broke into a house with two other

12   people; that a gun was stuck in the face of a woman

13   named Sandrea, Sandrea Fulton and her one-year-old

14   baby; that you ransacked the house for drugs and

15   money; then you left, left your two friends behind.

16   And they both cooperated against you, didn't they?

17   A.    Yes.

18   Q.    They did.  What are their names, tell the

19   jury?

20   A.    Brandon and Jerrell.

21   Q.    All right.  Jerrell Taylor is Relly, isn't it?

22   A.    Uh-huh.

23   Q.    And the other guy is Ferbie; is that right?

24   A.    Yep.

25   Q.    You left them behind.  Or you went to get a

```
1      car.  And you went in that house for the purpose of
2      committing a robbery; is that correct?
3      A.      Nope.
4      Q.      So you're denying -- you're trying to deny
5      your guilt before this Court?
6      A.      No.  I went in the house with my
7      co-defendants.
8      Q.      Through a broken window; is that right?
9      A.      No.
10     Q.      No?  Wow.  Did you read your plea agreement?
11     A.      Not for real.
12     Q.      Not for real.  Well, you should read it next
13     time.  Because you admitted to all those facts.
14     A.      Yeah, I know what I admitted to.  I had no
15     choice.  I had no other options.
16     Q.      Because I wouldn't give you a choice?
17     A.      Yeah, you said 30 to life or cop to that.  So
18     I signed a plea agreement.  What else you wanted?
19     Q.      You could have just done what over people do:
20     Put your case before a jury and make your case.
21     A.      I didn't think my chances were that good.
22     Q.      What; because you were in that house with
23     people that were sticking a gun into that woman's --
24     A.      Because two co-defendants was saying one
25     thing, and I'm saying I --
```

ROBERT JONES - CROSS - PURCELL

205

```
1    Q.      So you didn't commit that crime.  Is that what
2    you're saying?  Tell us.  Did you commit that crime
3    or not?
4    A.      I was there.
5    Q.      What were you doing there?
6    A.      I was with my co-defendants.
7    Q.      Okay.  Well, what were they doing there?
8    A.      What you charged them for, man.
9    Q.      But not you.  You didn't do what I charged.
10   What I did to them was fine; what the government did
11   to them was fine, but not to you?
12   A.      Yeah.
13   Q.      Yeah.  You just happened to be there?
14   A.      I was just there.
15   Q.      Yeah.  It's funny.  Because in your statement
16   of facts, you agree, you signed a letter, a
17   statement, saying it was your idea.  Do you want me
18   to read that out to the record?
19   A.      I just said I agreed to the statement of
20   facts.
21   Q.      Well, let's just let the jury know what you
22   agreed to what you didn't do.
23              MR. PROCTOR:  Objection.
24              THE COURT:  Overruled.
25              MR. PURCELL:  Let's see how badly you
```

ROBERT JONES - CROSS - PURCELL

206

1    were.  Let me show you what's been marked government

2    Exhibit No. 501.

3             Do you recognize this?

4             THE COURT:  Are you looking at Attachment

5    A of the stipulated facts, Mr. Purcell?

6             MR. PURCELL:  I will be, Your Honor.

7             THE COURT:  That's part of the record.

8    That's part of the record, any guilty plea that I

9    take, and I'm looking at it right here.  Its a matter

10   of court record.

11            MR. PURCELL:  Thank you, Your Honor.  I

12   have it right here.

13            MR. PROCTOR:  Judge, this would be for

14   identification purposes?

15            THE COURT:  Absolutely not.  Approach the

16   bench.

17            (BENCH CONFERENCE ON THE RECORD.)

18            THE COURT:  Any guilty plea I take, the

19   defendant is put under oath and the statement of

20   facts is read in the record.  I'm looking at it right

21   here.  This is the testimony under oath as to which

22   this witness can be cross-examined on.

23            MR. PROCTOR:  Miss Curtis' statement of

24   facts did not come into the record.

25            THE COURT:  Certainly if you wanted it to

1    come in.  We do with that with respect to the

2    defendant, Mr. Proctor, so we don't have stipulated

3    facts with hearsay facts inferences coming in.  Under

4    Fourth Circuit law, to the extent that someone takes

5    the witness stand and wants to challenge, you're

6    certainly free to challenge anybody who's pled guilty

7    with a statement of facts that they acknowledge.

8              Mr. Purcell, I assume you're referring to

9    Attachment A, stipulated facts; is that correct?

10             MR. PURCELL:  Yes, Your Honor.

11             THE COURT:  It's a matter of court

12   record.  It's government Exhibit 1, attached to the

13   plea agreement at the time of the guilty plea.  So

14   it's a matter of court record.  So he's free to ask

15   this witness whether or not those facts are true or

16   not.

17             MR. PROCTOR:  He already has, Judge.  I

18   think that's the point.

19             THE COURT:  The objection's overruled.

20   Go ahead, Mr. Purcell.

21             (END OF BENCH CONFERENCE.)

22   BY MR. PURCELL:

23   Q.     Before I start reading from this, I'm going to

24   introduce the whole thing so the jury can read it at

25   their leisure.

208

```
 1                      This is your signature at the end of this
 2         where it says, "I have read this agreement and
 3         carefully reviewed every part of it with my attorney.
 4         I understand it.  I voluntarily agree to it.  And
 5         specifically I reviewed the factual advisory ^ CHECK,
 6         with my attorney.  I do not wish to change any part
 7         of it.  I am completely satisfied with the
 8         representation of my attorney".  Dated 11-5-10.  And
 9         that's your signature, right?
10         A.      Yep.
11         Q.      And part of this letter says -- the exhibit
12         number is 501.  In Paragraph 1, when it states what
13         you're charged with, what's called a Hobbs Act
14         robbery, breaking into somebody's house to steal
15         drugs and money, "The defendant admits that he is, in
16         fact, guilty of this offense and will so advise the
17         Court".
18                      And did you, didn't you?
19         A.      Uh-huh.
20         Q.      In fact, the judge -- I didn't -- I didn't sit
21         up there at the guilty plea, did I?
22         A.      No.
23         Q.      I sat over here where I always sit.  And the
24         judge asked you on the record -- we can get the
25         record if you want -- "Are you guilty?  Did you
```

1          commit this offense?"

2                    Under oath, just like the oath you took a

3          moment ago.  And you said, "Yes, I committed it".

4          You didn't say, "No, I didn't, but they're making me

5          do it," did you?

6          A.     No.

7          Q.     Why not?

8          A.     Because I was getting 15 years.

9          Q.     Why didn't you just try your case?

10         A.     Because I didn't think I could win.

11         Q.     Because you were guilty?

12         A.     No.  Because I had two co-defendants that was

13         saying I did something.

14         Q.     And they led you into this house?

15                    Tell us.  You know, now's your chance.

16         Tell us what really happened.  What really happened

17         out there?  How did you and Jerrell and Brandon

18         happen to be in Miss Fulton's house with her baby

19         with a gun stuck in her face; you upstairs ransacking

20         it looking for drugs and money?  What part do we have

21         wrong?

22         A.     Who found me upstairs ransacking --

23         Q.     I'm asking you the questions, sir.  Answer

24         them.  Or not.  But don't ask me any questions.

25                    What were you doing there?

1    A.      I was in the house with her.

2    Q.      Oh.  So you were there first?

3    A.      I was in the house with them.

4    Q.      I asked you a question.  You're saying you

5    were there first?

6    A.      No.

7    Q.      So you went in with those guys and they

8    suddenly decided to rob her?

9    A.      I don't know what they decided to do.

10   Q.      Well, you know, she said you're the one she

11   recognized when they broke in the house.

12                THE COURT:  Hold on.  Approach the bench

13   for one second.

14                (BENCH CONFERENCE ON THE RECORD.)

15                THE COURT:  Mr. Purcell, we're not going

16   to have a summary of what witnesses said.  This is a

17   very simple process.  Any guilty plea that I take,

18   the plea agreement is introduced as government

19   Exhibit 1; the Attachment A is part of government

20   Exhibit 1; and it's verbatim.  There's no reason to

21   be summarizing the case or asking who said what to

22   whom.  All you need to do is refer to Attachment A,

23   the stipulated facts.  That's a matter of the court

24   record and it's a matter of the exhibit, the plea

25   agreement, and it's part of the record.  That's the

1    limitation on the cross-examination.

2             We do not need to have you try to

3    summarize who had said what to whom.  Whatever you

4    want to address is in Attachment A, the stipulated

5    facts.  And you're certainly free to cross-examine

6    him on that document, which is a matter of court

7    record and is in the court file.

8             MR. PURCELL:  Thank you, Your Honor.

9             (END OF BENCH CONFERENCE.)

10   BY MR. PURCELL:

11   Q.    Let me direct your attention to the stipulated

12   facts.  You signed an agreement that this was true.

13   "That while Taylor held the gun on Miss Fulton, the

14   defendant," which is you, "demanded that she tell

15   them where the drugs and money were.  She responded

16   she didn't know".

17             Is that not true?

18   A.    That's what I agreed to.

19   Q.    I'm not asking you if it's agreed to.  I know

20   you agreed to.  We have it right here in the letter.

21   You're saying that's not what happened?

22   A.    That's what I agreed to.

23   Q.    I'm asking you what happened.

24   A.    I feel like you're trying to intimidate me or

25   something.

212

1              THE COURT:  Just answer the question, Mr.

2    Jones.

3              MR. PURCELL:  I don't think I can

4    intimidate you, Mr. Jones.

5              THE COURT:  The Assistant U.S. Attorney

6    is reading from a court record that I made part of

7    the record when you pled guilty.  That's what he's

8    asking you.  You just answer the question.

9              THE WITNESS:  I just answered the

10   question.  I said I agreed to it.

11             THE COURT:  The witness here has said

12   that's what he agreed to.  He's indicated that he no

13   longer accepts that fact.

14   BY MR. PURCELL:

15   Q.    You're denying that now.  You want to come

16   back and have a new trial, don't you?

17             Did you file a motion for a new trial?

18   A.    Yes, I did.

19   Q.    And you've actually filed a motion called a

20   2255 seeking an appeal so you can get a reversal?

21   A.    Yes, I did.

22   Q.    You're never going to admit any facts, are

23   you, under those circumstances?

24   A.    That ain't the case.

25   Q.    So you're saying now what you couldn't say

ROBERT JONES - CROSS - PURCELL

213

1    then for some reason.  The evidence hasn't changed,

2    has it?

3    A.      No.

4    Q.      But now you want to come back and do this

5    again.  What's going to be better this time?

6    A.      I don't know what's going to be better.

7    Q.      Don't let me intimidate you.

8            What would you do to me on the street,

9    Mr. Jones, if I talked to you the way I'm talking to

10   you?

11               MR. PROCTOR:  Objection.

12               THE COURT:  Sustained.

13               MR. PURCELL:  You won't get the chance

14   for a while.

15               MR. PROCTOR:  Was that a question, Your

16   Honor?

17               THE COURT:  Move to be stricken.  The

18   comment will be stricken.

19   BY MR. PURCELL:

20   Q.      All right, Mr. Jones.  Let's go through your

21   record.  I guess these are all just things you pled

22   to because you had to.  When you were 15, what did

23   you plead guilty to?

24   A.      Armed robbery.

25   Q.      What's that?

ROBERT JONES - CROSS - PURCEL

214

1      A.      Armed robbery.

2      Q.      Okay.  You were -- I'm sorry, you were 16.

3    Armed robbery, Count 1.  That means robbery with a

4    gun, right?

5      A.      Yeah.

6      Q.      Okay.  Just like the one you're denying right

7    here that you didn't do?

8      A.      Just like that one.

9      Q.      Okay.  Now, did you do that one?

10     A.      I just said I didn't.

11     Q.      You didn't?  Did you do the one you were

12   convicted of at the age of 16?

13             Is that a, "No," you didn't do it?

14     A.      I answered the question, man.

15     Q.      I'm asking you again because I didn't hear it.

16   Answer the question, please.

17     A.      Did I do it?

18     Q.      Yes.

19     A.      I was there.  I participated in it.

20     Q.      The one when you were 16?

21     A.      Yes, I did.

22     Q.      You committed that crime?

23     A.      I participated in the crime.

24     Q.      All right.  So you pled guilty.  Did you plead

25   guilty because you're guilty or you pled guilty

ROBERT JONES - CROSS - PURCELL

215

```
1     because you just happened to be there?

2     A.      No, I pled guilty because I was getting

3     probation and going home that day.  That's why I pled

4     guilty.

5     Q.      Okay.  So you just plead guilty not based on

6     what the facts are, just based on what you think

7     might happen to you; is that right?

8     A.      Yes, I do.

9     Q.      Okay.  So you didn't commit that offense?

10    A.      I did.  I participated with it.

11    Q.      So you're guilty of robbery?

12    A.      Yeah.

13    Q.      All right.  Now, the next one when you're

14    18 -- how old are you now?

15    A.      24.

16    Q.      When you're 18 you were convicted of

17    possession with intent to distribute a controlled

18    substance.  What substance was that, crack?

19    A.      Crack.

20    Q.      That's what Mr. Hall sells, isn't it, crack?

21    A.      I don't know what he sells.

22    Q.      You don't know what he sells?

23    A.      I just said I don't know what he sells.

24    Q.      Huh.  He's in the drug business in, isn't it

25    he?
```

1    A.      I don't know what business that man is in.

2    Q.      What business were you in back in September of

3    2009?

4            MR. PROCTOR:  Judge, I have an objection.

5    Can we approach?

6            THE COURT:  Approach the bench.

7            (BENCH CONFERENCE ON THE RECORD.)

8            MR. PROCTOR:  Judge, I guess this is all

9    fair game, but Mr. Purcell's walking up and Mr.

10   Sullivan was simply leaning on the witness's shoulder

11   when he used the ELMO.  If he could stay behind

12   counsel table or behind the podium, instead of -- you

13   know, it seems like it's escalating because he keeps

14   getting within inches of the witness.

15           THE COURT:  Once again, Mr. Proctor, we

16   have a problem of you summarizing for the record.

17   It's absolutely not accurate for you to say that he's

18   getting within inches of the witness, to the extent

19   you feel he's approached the witness box too closely.

20   Mr. Purcell, exercise more restraint.  He's not the

21   gotten that close to the witness.

22           MR. PROCTOR:  Thank you, sir.

23           (END OF BENCH CONFERENCE.)

24   BY MR. PURCELL:

25   Q.      Mr. Jones, going back to your first

ROBERT JONES - CROSS - PRICE-AL

217

```
 1      conviction.  Not only were you convicted and

 2      sentenced to a period of jail, after you were

 3      released -- you served the entire period of the

 4      sentence that the law requires of Maryland.  It's

 5      called mandatory release.  But even after that you

 6      violated conditions and your mandatory release was

 7      withdrawn; isn't that right?

 8      A.      Uh-huh.

 9      Q.      Well, what did you do?  What didn't you do and

10      they said you did?

11      A.      I had a bag of weed.  That's what I admitted

12      to.

13      Q.      You admit that?

14      A.      Yes, I did.

15      Q.      You'll admit to a bag of weed any day of the

16      week?

17      A.      A bag of weed and some OxyContins.

18      Q.      Now, in your age 18 conviction you said you

19      had crack.  And, once again, you were held until your

20      mandatory release; is that right?

21      A.      That's the same charge, same time.

22      Q.      The possession with intent?

23      A.      Uh-huh.

24      Q.      Yeah.  You were sentenced to 20 years

25      incarceration; suspended all but 14; is that right?
```

ROBERT JONES - CROSS - PURCELL

218

```
1     A.     Uh-huh.

2     Q.     And three years probation?

3     A.     Yeah.

4     Q.     Now, when you got out, did you start selling

5     drugs again?

6     A.     Was I selling drugs again?

7     Q.     Uh-huh.

8     A.     No.

9     Q.     No.  So since 2004 you haven't sold any drugs?

10    A.     No, I don't think so.

11    Q.     Well, actually on the night of the murder,

12    didn't you meet with somebody -- you talked to Avery

13    before coming in here today?

14    A.     I don't recall.

15    Q.     Okay.  Well, didn't you go to the bus station

16    over here off of -- what is it 295 -- come into the

17    city and do a drug deal right after this murder

18    occurred?

19    A.     I don't recall.

20    Q.     You don't remember that?

21    A.     No.

22    Q.     Huh.  Are you sure?

23    A.     Positive.

24    Q.     Okay.  Did you talk to your girlfriend about

25    that?
```

1    A.    Talk to her about what?

2    Q.    About the drug deal?

3    A.    No.

4    Q.    Now, you had somebody's car, didn't you?

5    A.    Yeah.

6    Q.    You had Georgie's car?

7    A.    Uh-huh.

8    Q.    A Mercedes?

9    A.    Yep.

10   Q.    And where did you go to meet Georgie to give

11   the car back?

12   A.    Back at the motel.

13   Q.    And what's the name of the motel?

14   A.    I don't know.

15   Q.    Tim's Motel.  Do you remember that?

16   A.    Yeah.

17   Q.    And do you remember seeing Georgie there?  He

18   was there doing drugs he got from you, wasn't he?

19   A.    No.

20   Q.    You didn't tell him any drugs that day?

21   A.    No.

22   Q.    Are you sure?  Or you just don't remember?

23   A.    No, I didn't sell him nothing.

24   Q.    Okay.  Have you seen Georgie's grand jury?

25   A.    No.

```
 1    Q.      Okay.  Anyway, didn't you tell Georgie that
 2    Kareem had just been killed and that's what happens
 3    to snitches?
 4    A.      I don't know.  No.
 5    Q.      You didn't say that?
 6    A.      No.
 7    Q.      You're sure?  You don't remember?
 8    A.      I'm positive I didn't say it.
 9    Q.      You wouldn't say that.
10            Now, you have another conviction.  And
11    you admit to this 2004 conviction at age 18; is that
12    right?  Did you do that crime, too?
13    A.      Uh-huh.
14    Q.      Okay.  So that's two prior drug trafficking
15    crimes of violence; is that right?
16    A.      Two prior drug trafficking.
17    Q.      Yeah, one prior crime of violence and one
18    prior drug trafficking conviction; is that correct?
19    A.      Yeah.
20    Q.      And you admit those and don't contest that you
21    did those crimes; is that right?
22    A.      Uh-huh.
23    Q.      Okay.  You know that makes you a career
24    offender under the guidelines, right?
25    A.      That's that you sentenced me under.
```

1     Q.      I dont sentence --

2     A.      You forced me to get sentenced.

3     Q.      Who sentenced you?

4     A.      Judge Bennett.

5     Q.      Okay.  Does Judge Bennett do whatever I tell

6     him to do?

7     A.      No.

8     Q.      Now, you have another conviction.  This one

9     also at age 18.  And you were convicted of assault,

10    second degree.  This is when you punched out a cop.

11    Do you remember that?

12    A.      Uh-huh.

13    Q.      You do remember punching out a cop?

14    A.      I didn't punch him out.

15    Q.      Well, what do you call when you punch a person

16    in the face with a closed fist?

17    A.      I didn't punch him.  I pushed him.

18    Q.      Well, I didn't create this document.  But the

19    document I'm looking at, which is your presentence

20    agreement which you've also agreed to --

21            MR. PROCTOR:  Objection.

22            THE COURT:  Sustained.

23    BY MR. PURCELL:

24    Q.      Let's see if the witness knows what it is.  Do

25    you recognize this document?  It hasn't been marked

222

1     yet.

2              Do you recognize your presentence report,

3     don't you?

4     A.      Uh-huh.

5     Q.      You read it, didn't you?

6     A.      Yeah.

7     Q.      And remember when you were sentenced Judge

8     Bennett asked you -- didn't ask me, he asked you?

9     "Have you read this?  Do you agree with it?  Do you

10    want to make any changes to it?"  And you didn't

11    change that part of the presentence agreement, did

12    you?

13    A.      I said that I read the agreement.  My lawyer

14    just seen me the day before sentencing.  And I didn't

15    get a chance to go over it with my lawyer.

16    Q.      Oh, man.  You have some bad luck.

17              All right.  So you just pushed him.  But

18    you got convicted of second degree assault; is that

19    right?

20    A.      Yes.

21    Q.      But you're guilty of that second degree

22    assault?

23    A.      Yes, I am.

24    Q.      All right.  So now you have three prior

25    qualifying convictions to be a career offender; is

```
1      that right?

2      A.      Uh-huh.

3      Q.      Okay.  And Mack wasn't there that night?

4      A.      What night?

5      Q.      The night of the murder.

6      A.      I ain't see him.

7      Q.      Keyburn was?

8      A.      Yeah.

9      Q.      And you mentioned what ladies you saw there?

10     A.      Uh-huh.

11             MR. PURCELL:  Okay.  Thanks.  I have no

12     further questions.

13             THE COURT:  Any redirect, Mr. Proctor?

14             MR. PROCTOR:  Briefly.

15                    REDIRECT EXAMINATION

16     BY MR. PROCTOR:

17     Q.      With your own two eyes, did you ever see

18     Officer Moody ever do anything else to anyone in

19     Westport?

20     A.      No.  I ain't seen him with my own two eyes.

21     Q.      So without telling us what the word on the

22     street is, you've heard other things, right?

23     A.      Yeah.

24     Q.      And those aren't good, are they?

25             MR. PURCELL:  Objection, Your Honor.
```

1          THE COURT:  Sustained.  Move to strike.

2    That will not be considered.

3    BY MR. PROCTOR:

4    Q.     Do you remember what date you pled guilty?

5    A.     No.

6          MR. PROCTOR:  If I could have that

7    exhibit, Mr. Purcell.

8          (Counsel confer.)

9    BY MR. PROCTOR:

10   Q.     If I said November 8th, 2010, does that sound

11   about right?

12   A.     Yes.

13   Q.     So that was -- you pled guilty more than a

14   year after Kareem was shot, right?

15   A.     Yes.

16          MR. PROCTOR:  Can I have a second,

17   please, Judge?

18          Nothing further.

19          THE COURT:  Any recross, Mr. Purcell?

20          MR. PURCELL:  No.  Thank you.

21          THE COURT:  All right.  Mr. Jones, you're

22   excused, sir.  You shouldn't discuss your testimony

23   with anyone until this trial concludes in the event

24   you're called back to the witness stand before this

25   trial concludes, tomorrow probably.

1           MR. SULLIVAN:  Your Honor, can we

2    approach?

3           THE COURT:  Certainly.

4           (BENCH CONFERENCE ON THE RECORD.)

5           MR. SULLIVAN:  Your Honor, we have one

6    witness under subpoena, Keyburn, whose real name is

7    Ritonio Maes (ph).  We served him with a subpoena

8    Sunday night at 10 o'clock directing him to be here.

9           THE COURT:  Is this the individual in a

10   wheelchair?

11          MR. SULLIVAN:  Yes.  He's supposedly

12   making his way here, making his way here.  He's not

13   here.  Although I know it's not convenient, can we

14   ask the Court to recess for about ten minutes so we

15   can make a final call?  Because we have to make a

16   decision as to whether or not we're going to ask for

17   a writ of attachment for this person.

18          THE COURT:  Why don't we -- while we're

19   waiting, I'll excuse the jury and I'll make sure at

20   this point in time Mr. Hall is not going to testify;

21   is that correct?

22          MR. SULLIVAN:  Yes, sir.

23          THE COURT:  It might be a good time for

24   me to go over that while we're waiting for Mr.

25   Keyburn.  What is Mr. Keyburn's real name?

1          MR. PURCELL:  His real name is Ritonio

2     Maze.

3          THE COURT:  Ritonio Maze.  Okay.

4          Just parenthetically, I would note that,

5     in connection with the guilty plea -- that's why the

6     U.S. Attorney's Office teases me sometimes and says

7     it's not a Rule 11, it's a Rule 33 because I take so

8     much -- I'm careful with them.  But you've got to be

9     careful with them.

10          MR. PURCELL:  I've never heard that said,

11     Your Honor.

12          THE COURT:  Somebody once referred to it

13     as Rule 33, not a Rule 11.

14          Okay.  With that, we'll excuse the jury.

15     I'll attend the matter here and I'll advise Mr. Hall

16     of his rights.  And there's a little bit of a delay

17     for a witness to appear, take a break and I need to

18     attend to something.  Is satisfactory?

19          MR. PROCTOR:  Yes, sir.

20          (END OF BENCH CONFERENCE.)

21          THE COURT:  All right.  Ladies and

22     gentlemen, there's a little bit of a delay in a

23     defense witness arriving.  And so I've got to tend to

24     a matter up here at the bench, anyway, with the

25     lawyers.  So we might as well let you take a break

1    now.  We're waiting for another witness who is late

2    arriving.  We're trying to find out what the witness'

3    status is.  So you all are excused for a few minutes.

4    We'll wait here for a minute.

5                    (JURY OUT.)

6                    THE COURT:  All right.  Mr. Lawler, nice

7    to see you again.  Thank you for taking that court

8    appointment very quickly.  I appreciate it.  Thank

9    you very much.

10                    Mr. Hall, if you'll stand for a moment,

11   please.  Let me just explain something to you, sir.

12                    Your lawyers have indicated that they

13   intend to call one more witness, Mr. Ritonio Maes,

14   also known as Keyburn.  And we're delaying the

15   proceedings now; they're trying to see where he is.

16   Do you understand that, sir?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  And then your lawyers have

19   indicated that at that point in time that you've made

20   an election not to testify and that the defense will

21   be resting.

22                    Is that correct, Mr. Proctor and Mr.

23   Sullivan?

24                    MR. SULLIVAN:  That's my understanding,

25   Your Honor.

1           MR. PROCTOR:  Yes, sir.

2           THE COURT:  Okay.  Now, Mr. Hall, I want

3    to make sure that you have had an opportunity now.

4    We addressed this I think -- if not yesterday, we

5    addressed it Friday.  I can't remember whether it was

6    yesterday or Friday that I addressed the matter of

7    the -- your privilege under the Fifth Amendment to

8    not be called as a witness against yourself in this

9    case.  And under the Fifth Amendment to the United

10   States Constitution it specifically provides that no

11   person shall be compelled in any criminal case to be

12   a witness against himself.  And that's a Fifth

13   Amendment privilege against self-incrimination.

14           Do you understand that, sir?

15           THE DEFENDANT:  Yes.

16           THE COURT:  All right.  And you have the

17   right to testify.  And if you do testify, you can be

18   subject to cross- examination by government counsel.

19   Do you understand that?

20           THE DEFENDANT:  Yes.

21           THE COURT:  And you can be questioned

22   about any prior criminal history that you have.  Do

23   you understand that?

24           THE DEFENDANT:  Yes.

25           THE COURT:  All right.  Do you understand

1        that you also have a right not to testify and that no

2        adverse inference can be drawn against you for not

3        testifying?  Do you understand that?

4                    THE DEFENDANT:  Yes.

5                    THE COURT:  And, in fact, there is an

6        instruction that I will give, the effect of which

7        will essentially be, "Mr. Hall did not testify in

8        this case".  And I will tell the jury, "That under

9        our Constitution there is no requirement that he

10       testify and that you should not consider it in any

11       way".  And I will tell the jury, "That the burden is

12       always upon the government and never shifts to the

13       defendant; and there's never any burden upon a

14       defendant to testify or to put on any evidence".  And

15       I will tell them specifically that they should not

16       consider in any way that you did not testify.

17                    Do you understand that, sir?

18                    THE DEFENDANT:  Yes.

19                    THE COURT:  All right.  And you've had an

20       opportunity to discuss this matter with your

21       attorneys, Mr. Proctor and Mr. Sullivan; is that

22       correct?

23                    THE DEFENDANT:  Yes.

24                    THE COURT:  All right.  And,

25       understanding your rights in that regard and having

1          discussed it with them -- are you under the influence
2          of any medication or any alcoholic beverage of any
3          kind today, sir?
4                    THE DEFENDANT:  No.
5                    THE COURT:  All right.  And are you --
6          having had a chance to talk with them about this, it
7          is your election not to testify in this case; is that
8          correct?
9                    THE DEFENDANT:  Yes.
10                   THE COURT:  All right.  Okay.  Is there
11         anything further that the government wants me to
12         address on this point?
13                   MR. PURCELL:  No, thank you, Your Honor.
14                   THE COURT:  Mr. Proctor, Mr. Sullivan,
15         anything further the defense wants me to address?
16                   MR. PROCTOR:  No, thank you, sir.
17                   THE COURT:  All right.  Mr. Hall, while
18         I'm having this colloquy with you, let me also
19         verify, sir, that, with respect to the matter of
20         witnesses being called, your attorneys have
21         subpoenaed Mr. Jones, who just testified.  And they
22         have subpoenaed Mr. Maes.  And that's the issue now
23         as to where Mr. Maes is.  He's apparently received a
24         subpoena.  And it's been represented to me that he
25         was served Sunday night at 10 o'clock.

1                    MR. PROCTOR:  I think it was a little

2      earlier than that.

3                    THE COURT:  Sunday evening, August the

4      7th.

5                    MR. SULLIVAN:  And the subpoena was for

6      10 a.m. this morning, Your Honor.

7                    THE COURT:  All right.  Thank you, Mr.

8      Proctor.

9                    Are there any other witnesses whom you

10     wanted to call that whom your lawyers have not

11     planned to call as witnesses, Mr. Hall?

12                   THE DEFENDANT:  Yes.

13                   THE COURT:  And who is that?

14                   THE DEFENDANT:  Lamont Dorsey.

15                   THE COURT:  Lamont Dorsey?

16                   THE DEFENDANT:  Yes.

17                   THE COURT:  Okay.  And the proffers as to

18     Lamont Dorsey's testimony would be with respect to

19     Detective Moody; is that right?

20                   MR. PROCTOR:  Yes.

21                   THE COURT:  All right.  They have sought

22     to do that, and I have denied that for evidentiary

23     reasons.  But they have sought to try to do that with

24     respect to what I believe is a collateral matter.

25                   But are there any other witnesses besides

1    Mr. Dorsey whom you would want your lawyers to call

2    as witnesses who they have not called.

3               THE DEFENDANT:  No.

4               THE COURT:  Is there anything that you've

5    asked your lawyers to do which they have not done?

6               THE DEFENDANT:  I ain't asked them to do

7    nothing but that.

8               THE COURT:  Okay.  Then the Court finds

9    that they've done everything that you've asked them

10   to do and very thoroughly represented you and that

11   you're aware of your rights with respect to

12   testifying or not testifying; that you've made a

13   knowing and intelligent decision, and waiver of any

14   right to testify and that you will not testify.

15              So we will go in recess for a few moments

16   waiting for a determination as to the location of

17   Ritonio Maes.  And, with that, why don't you put your

18   headset back in, Mr. Hall, and be seated.

19              And I just want to hear from counsel in

20   terms if there can be a proffer here; if we try to

21   work this out if there's some difficulty with Mr.

22   Maes if we can't find him, if he doesn't appear.

23              Counsel, approach the bench.

24              (BENCH CONFERENCE ON THE RECORD.)

25              THE COURT:  One, you're not compelled to

1       make a proffer.  I'm just trying to figure out if

2       there's a way we can deal with this issue, it there's

3       some reason we can't find Ritonio Maes.  Do you want

4       to make a proffer as to what you believe his

5       testimony will be?

6                   MR. PROCTOR:  He's Mr. Sullivan's

7       witness.

8                   THE COURT:  Okay.  Your witness.  Okay.

9       Mr. Sullivan?

10                  MR. SULLIVAN:  Your Honor, I think Mr.

11      Maes would testify that he was not on Maisel Court at

12      the time Mr. Guest was shot, which is consistent with

13      what he told the grand jury.

14                  THE COURT:  And the thrust of it will be

15      that that would be inconsistent with what perhaps

16      other witnesses have said?

17                  MR. SULLIVAN:  That's correct.

18                  THE COURT:  Is there any other purpose to

19      his testimony?

20                  MR. SULLIVAN:  No.

21                  THE COURT:  All right.  Well, then, it

22      seems to me that, if that's consistent with his grand

23      jury testimony and that's what he would say here, and

24      if the government wants to check and see if that's

25      what he said before the grand jury -- we'll have to

1        wait and see if he can be located -- we may or may

2        not want to consider a stipulation.  Why don't we

3        first --

4                        MR. PURCELL:  We won't stipulate.  He

5        needs to be cross-examined.

6                        THE COURT:  That's fine.  I'm not going

7        to make anybody stipulate to anything.  So that's

8        fine.  So we'll just wait on Ritonio Maes.  I have a

9        sentencing scheduled at 4 and we might have to just

10       break for the day and wait until tomorrow.

11                       MR. PROCTOR:  If you'll give us a minute.

12       I'm not sure Mr. Hall wants us to even call him.

13                       THE COURT:  Mr. Hall, can you hear me?

14                       Do you want to have a chance to discuss

15       this with your lawyers?

16                       THE DEFENDANT:  Yes.

17                       THE COURT:  Okay.  That's fine.  Why

18       don't we go --

19                       (END OF BENCH CONFERENCE.)

20                       THE COURT:  All right.  With that, this

21       Court will stand in recess for about ten minutes.

22       We're going to be stopping for the day in this case

23       at 4 o'clock because we have a sentencing in another

24       matter that I must attend to and then we'll start

25       again tomorrow morning.  With that, I'll take a

1      recess.

2              (BRIEF RECESS.)

3              THE COURT:  I've been advised,

4      apparently, Mr. Proctor and Mr. Sullivan, that the

5      defendant does not want Mr. Ritonio Maze to be

6      called; is that correct?  Is that correct, Mr.

7      Sullivan?

8              MR. SULLIVAN:  We have discussed it with

9      Mr. Hall that, although Mr. Maze is under subpoena

10     and we could ask the Court to order the marshal's

11     service to bring him here --

12             THE COURT:  And I would certainly do so.

13             MR. SULLIVAN:  After further consultation

14     with Mr. Hall, Mr. Hall has made the decision that he

15     does not require Mr. Maes to be called in the defense

16     case.

17             THE COURT:  That's fine.  Is that

18     correct, Mr. Hall?

19             THE DEFENDANT:  Yes.

20             THE COURT:  All right.  Okay.  With that,

21     then, are there any other defense witnesses, Mr.

22     Proctor?

23             MR. PROCTOR:  There are not.

24             THE COURT:  All right.  And Mr. Hall has

25     been advised of his right to testify and has decided

1    to exercise his right not to testify.  So the defense

2    rests.

3                    Is there any rebuttal, Mr. Purcell?

4                    MR. PURCELL:  No, Your Honor.

5                    THE COURT:  I've got a sentencing here at

6    4 o'clock.  It seems to me what we can do is we can

7    tell the jury that we will reconvene for closing

8    argument tomorrow.  And we will have the charge

9    conference tomorrow morning.  I think we can probably

10   try to get started with the charge conference

11   tomorrow morning at, between 9 and 9:30.

12                   And I'm just trying to gauge the time it

13   will take.  I don't think there's a heavy dispute.

14   We don't have a lot of instructions yet from the

15   defense.  The instructions seem to be fairly

16   boilerplate.  But I don't -- how long do you think

17   it's going to take for a charge conference, Mr.

18   Purcell, from the point of the government?  Two

19   hours?

20                   MR. PURCELL:  Have I seen any defense

21   instructions yet?

22                   MR. PROCTOR:  Judge, rather than submit

23   rival instructions, I just went through the

24   government and noted the objections I had to theirs.

25                   THE COURT:  Yeah.  I heard of some of

1    those you objected to.  I question now is we're not

2    going to address that now.  Is it realistic to

3    believe that the charge conference would not take

4    more than two hours?

5                    MR. PROCTOR:  I think it takes one, would

6    be my guess.

7                    THE COURT:  What do you think, Mr.

8    Purcell?

9                    MR. PURCELL:  Fine.  I just don't

10   remember seeing the correspondence to the Court with

11   any objections to our instructions.

12                   THE COURT:  I don't, either.  But I

13   believe Mr. Proctor has e-mailed them or something.

14                   MR. PROCTOR:  I have not.  But I went

15   through and I made notes as I was reading them.

16                   THE COURT:  That's fine.  We can deal

17   with it tomorrow.  That's okay.  That's fine.  Fine.

18                   MR. PROCTOR:  If the Court wants a

19   heads-up, I'll turn it into a letter.

20                   THE COURT:  Oh, no, no, no.  We'll deal

21   with it tomorrow.  It seems to me what we can try to

22   do is maybe we can get started at around a quarter of

23   9?

24                   THE DEPUTY CLERK:  A quarter after 9.

25                   THE COURT:  Why don't we -- we'll start

238

```
1    at quarter after 9 and I will tell the jury that I
2    anticipate that we will have closing arguments
3    starting around 11 and maybe if it's 1:30 they'll
4    have to wait.  But I'll tell them we anticipate
5    having closing arguments starting around 11.  And
6    maybe it's 11:30.  I'll tell them we anticipate
7    having closing arguments starting around 11.  And
8    then we'll have arguments before lunch and then after
9    lunch and then we'll go from there.  Does that sound
10   workable to everyone?
11              MR. PURCELL:  Yes, Your Honor.
12              THE COURT:  The only alternative is I
13   have a sentencing at 4 and there are numerous issues
14   that have been raised that I have to address.  The
15   sentencing is going to take at least an hour and then
16   it will be 5 o'clock and court staff have to go home.
17   So it seems to me that's the way to do it.
18              Now, Mr. Hall, generally defendants don't
19   need to be sitting here for the charge conference.
20   It's just lawyers discussing the law and my
21   instructions to the jury as a matter of law.
22              Is it your desire to have Mr. Hall here,
23   Mr. Proctor and Mr. Sullivan, or not?
24              MR. SULLIVAN:  He'd like to be here.
25              THE COURT:  That will be fine.  Mr. Hall,
```

1    you'll be here.  We'll have you here in court at

2    quarter after 9.  We discuss legal issues and

3    instructions on the law to the jury.

4              So, with that, unless there's anything

5    further from the point of view of the government,

6    we'll have the defense rest; we'll have the

7    government indicate no rebuttal; and we'll tell the

8    jury what the schedule is.

9              MR. PROCTOR:  Judge, I always forget.

10   Halfway through closing arguments, I always remember

11   to renew my Rule 29 motions.

12             THE COURT:  It will be renewed at this

13   time and denied for the same reasons that I have

14   previously indicated.  So you've done so and that has

15   been denied for the same reasons that I've indicated

16   before.

17             So, with that, we are ready to bring the

18   jury in, explain the schedule to them.

19             (JURY IN.)

20             THE COURT:  Ladies and gentlemen, thank

21   you very much.  And with that, any further defense

22   witnesses, Mr. Proctor?

23             MR. PROCTOR:  No, sir.  At this time the

24   defense rests.

25             THE COURT:  All right.  The defense

1     rests.  Any rebuttal, Mr. Purcell?

2               MR. PURCELL:  No, Your Honor.  Thank you.

3               THE COURT:  No rebuttal by the

4     government.  That concludes the evidence in the case,

5     ladies and gentlemen.  And we're going to have

6     closing argument tomorrow.  I have some legal matters

7     that I need to go over with the lawyers tomorrow.

8     And I think the earliest we could anticipate going to

9     the jury for closing argument would be 11 o'clock.

10    So I want you all to be here by quarter of 11 so

11    we're ready to get started promptly at 11.

12              If we get started a little afterward, I

13    apologize, but we have legal matters to deal with and

14    you don't need to come in here and listen to that

15    white noise.  I know you all love listening to it.

16              (Laughter.)

17              THE COURT:  We're laughing here.  But the

18    point is if you can be here at a quarter of 11, we'll

19    try out best to get started with closing arguments by

20    11 o'clock.

21              Miss West, they can have lunch ready for

22    them by 1, I would think, could they not?  And this

23    is the one time -- sometimes we tell the jurors that

24    we buy you lunch.  But we don't buy you anything here

25    because everything that's done is with your tax

1        dollars.  So this is the one day where you get some

2        of your tax dollars back because the courthouse

3        provides lunch for all of you.  So the plan is you'll

4        be here by no later than quarter of 11.  Be ready to

5        come into the courtroom at 11 o'clock.  You will have

6        closing argument; we'll break around 1; and then

7        we'll have either further argument or my instructions

8        on the law after 1 o'clock.  And lunch will be

9        provided to you.  So you will just meet with Miss

10       West when you arrive; that's the first thing that

11       will happen tomorrow morning at a quarter of 11, if

12       you get here at 10:45.  And that's what we'll do.

13                  So, with that, I'll take a brief recess.

14       I see Mr. Outlaw and others in connection with this

15       next case.  We'll take a brief recess and I'll be

16       back on the bench in a few minutes with respect to

17       the other matter.

18                  MR. PURCELL:  Before you leave the bench,

19       can we come up with counsel for a second.

20                  THE COURT:  We don't need to talk to the

21       jury any more.

22                  MR. PURCELL:  No, not at all.

23                  THE COURT:  Everyone wait here.  The jury

24       can be excused and be gone for the day.  And I'll see

25       you all tomorrow.  If you all want to approach the

1     bench here.

2                    (BENCH CONFERENCE ON THE RECORD.)

3                    MR. PURCELL:   The reason I wanted to

4     speak to you for a second is you might want to tell

5     your clerk who is doing these that I'm going to

6     dismiss Count 2, because we don't need it.   It makes

7     the instructions a bit more cumbersome than I think

8     they need to be.

9                    THE COURT:   That's fine.   I will tell you

10    that tomorrow -- that's fine.   Are you definitely

11    going to dismiss Count 2?

12                   MR. PURCELL:   Yes.

13                   THE COURT:   All right.   I'll make sure

14    that Mr. Sales, my law clerk working on this, knows.

15    And basically it's just the drug conspiracy count,

16    Count 1, and then Counts 3, 4, and 5.

17                   MR. PURCELL:   Yes.

18                   THE COURT:   I don't think we don't have

19    time to renumber them.   It will be too cumbersome.

20    We'll just say Count 2 no longer before you for

21    consideration; it is no longer an issue.   Basically

22    it will be submitted on Counts 1, 3, 4, and 5.

23                   And, Madam Clerk, we'll reflect that

24    government 2 -- Count 2 is now dismissed on

25    government motion.

1                MR. PURCELL:  We so move, yes.

2                I would just, I'm sure there will be no

3        aggressive or affirmative use of that against the

4        government in closing argument.

5                MR. PROCTOR:  Never.

6                THE COURT:  So then it will just be on

7        Counts 1, 3, 4, and 5.  And, in that regard, some of

8        these boilerplate Sand and Siffert instructions, I've

9        narrowed them down.  Sometimes they might say

10       redacted.  I will tell you, as you know, I talk to

11       the jurors -- because you all have had jury trials

12       with me -- I talk to the jurors after every trial.

13       And they all said it's overwhelming.  So I'm making a

14       strong effort now to whittle these down.  So some of

15       the boilerplate that's just this verbiage that just

16       repeats the process, it doesn't serve any purpose,

17       and it actually is better so that when they come to

18       the subject of the instructions and the counts and

19       the elements, we can't recount it down to paying more

20       attention, otherwise they just get flooded with way

21       too much information.

22               So you'll see tomorrow with the draft

23       instructions you'll see a reference to a Sand and

24       Siffert, you might see, "Redacted".  That means I

25       might have given two of the paragraphs of Sand and

1    Siffert but I think we get to the point that they're

2    balanced and we move on to the next one.

3                 MR. PROCTOR:  Judge, I can't recall.  Do

4    you send your written instructions back to the jury?

5                 THE COURT:  Yes, I do.  They get

6    verbatim.  I summarize the indictment in the

7    instructions, so they don't get the indictment, but I

8    summarize the indictment in the instructions.  Some

9    of the instructions I actually will read verbatim.

10   For instance, I tend to read verbatim the conspiracy

11   count, Count 1.  I read it, read the overt acts that

12   are charged.  And take a while.  Which is why I'm

13   trying to whittle down the others.  It doesn't serve

14   anybody's purpose because they're brain dead after a

15   while because they get so much information thrown at

16   them.

17                 MR. SULLIVAN:  Has the government -- do

18   we have a draft verdict sheet?

19                 MR. PURCELL:  I'll do one.

20                 MR. SULLIVAN:  Because does the jury make

21   the decision as to the drug quantities?

22                 MR. PURCELL:  Yes, I do a special verdict

23   for 280.

24                 THE COURT:  Let me ask you something.

25   With respect to the drug quantity of 280, is it going

245

1    to be 280 or not 280?  I mean, are you going to

2    specify what the drug quantity is.

3                 MR. PURCELL:  280 is the ten-year minimum

4    mandatory.  28 grams is the five-year minimum

5    mandatory, now ten.  But I'm planning --

6                 THE COURT:  Well, I would think that you

7    need to put drug quantity of 280, 28, or even zero to

8    28.  Because the defense is obviously arguing that

9    you have 1.9 grams or whatever.  I know the

10   government is going to take -- you have to have a

11   category of zero to 28.

12                MR. PURCELL:  Actually, I agree with what

13   the Court is saying.  But we don't need a category

14   for below that.  If they find guilty, and they don't

15   mark "Yes" for 280 or 28, it's inferentially less

16   than 28.

17                THE COURT:  Okay.  Then the verdict sheet

18   will be say less than 28 grams.  There has to be some

19   place for them to know that they think, if they were

20   to find Mr. Hall guilty, fine, it's less than 28

21   grams.  I need to have some affirmation -- so it's an

22   affirmative finding on it.

23                MR. PROCTOR:  Pick guilty and leave the

24   rest blank?

25                THE COURT:  I don't want to have to deal

1       with if he were found guilty as to the charge.  I

2       don't want to have to deal if whether the did or did

3       not find as to quantity.  We need to have it

4       specified.  If he's guilty but less than 28 grams --

5                   MR. PURCELL:  This is my point, though.

6       The first count that says:  Guilty, not guilty,

7       possession with intent to distribute crack cocaine.

8       Then, if the person -- if you find that he is guilty,

9       please determine the amount.  Is it 280 grams or

10      more.  Yes/no.  If it is no, consider B, is it 28

11      grams or more.  Then if they do no, then it has to be

12      less than 28 grams.  That's the way they're usually

13      set up.

14                  THE COURT:  Again, I would prefer, and I

15      think defense would prefer and everyone would prefer,

16      if they want to find less than 28 grams I want them

17      to say we're finding less than 28 grams.

18                  MR. PROCTOR:  Only have a "Yes" box

19      and --

20                  THE COURT:  You'll figure out how to do

21      it.  The point is, if they would find him guilty but

22      they find it's less than 28 grams, I want there to be

23      an affirmative statement so the verdict sheet can be

24      read.  You need to have that just for purposes of

25      clarity.

1          I'm not sure it has any legal

2     significance in the guidelines, but I want to have it

3     be in terms of the findings here so we couldn't don't

4     have to deal with that down the road.

5               MR. PROCTOR:  Thank you, sir.

6               THE COURT:  Okay.  Good luck.

7               (END OF BENCH CONFERENCE.)

8

9          I certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12

13                         *s/ Anthony Rolland*

14                         ANTHONY ROLLAND

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$100** - 128:16
**$20** - 148:24
**$2700** - 128:16

**'**

**'05** - 81:23
**'08** - 46:7
**'09** - 46:8
**'they** - 54:16

**0**

**0.18** - 115:19
**0.34** - 85:2

**1**

**1** - 5:1, 161:11, 173:12, 173:18, 179:17, 179:18, 207:12, 208:12, 210:19, 210:20, 214:3, 240:22, 241:6, 241:8, 242:16, 242:22, 243:7, 244:11
**1-26-07** - 115:13
**1.29** - 159:4, 159:12
**1.9** - 245:9
**10** - 89:13, 119:22, 182:20, 182:23, 197:3, 197:5, 225:8, 230:25, 231:6
**1018** - 172:20
**10:45** - 241:12
**11** - 226:7, 226:13, 238:3, 238:5, 238:7, 240:9, 240:10, 240:11, 240:18, 240:20, 241:4, 241:5, 241:11
**11-20** - 53:2
**11-5-10** - 208:8
**1111** - 174:7
**115** - 173:2
**1185** - 173:2
**11852** - 142:18
**11:30** - 238:6
**12** - 100:25, 132:16, 132:21, 151:18
**123** - 16:7
**124** - 16:18, 16:20, 41:21
**14** - 217:25
**148** - 172:22
**15** - 4:25, 15:10, 35:22, 119:22, 177:11, 177:18, 183:13, 197:4, 202:11, 209:8, 213:22
**15-year** - 48:4, 49:24, 50:1, 50:13, 175:6, 196:23
**1513** - 174:7
**16** - 214:2, 214:12, 214:20
**18** - 88:16, 159:4, 164:12, 170:3, 170:6, 173:24, 174:7, 215:14, 215:16, 217:18, 220:11, 221:9
**18th** - 51:9, 51:10
**1982** - 172:21
**1997** - 173:3
**1998** - 172:22
**1999** - 136:23
**1:10-cr0744-rdb** -

**1:6**
**1:30** - 101:1, 238:3

**2**

**2** - 66:3, 124:24, 162:7, 173:21, 179:18, 186:4, 188:21, 242:6, 242:11, 242:20, 242:24
**20** - 15:9, 35:22, 50:18, 132:16, 132:21, 141:13, 141:16, 195:3, 217:24
**2004** - 102:23, 102:24, 218:9, 220:11
**2005** - 71:7, 72:6, 85:25, 87:4
**2007** - 89:10, 115:7
**2008** - 124:2, 124:7, 124:21, 136:24, 137:1, 138:1
**2009** - 7:1, 7:14, 23:19, 50:18, 102:24, 104:4, 116:2, 116:20, 153:2, 170:1, 182:17, 182:18, 216:3
**2010** - 45:10, 46:9, 51:1, 55:10, 105:4, 107:12, 109:9, 111:22, 112:13, 112:19, 112:20, 113:1, 113:21, 117:7, 118:18, 177:23, 177:24, 224:10
**2011** - 1:11, 12:7
**20th** - 46:8, 53:6, 55:10, 169:25
**21** - 7:13
**22** - 12:15, 12:19, 112:14
**2200** - 98:23
**2255** - 185:10, 185:19, 212:20
**23** - 12:15
**2300** - 93:19, 98:23
**24** - 12:7, 176:21, 215:15
**2400** - 77:23, 89:25, 98:15, 105:8, 107:17, 107:18, 109:21, 112:5, 113:25, 145:12
**24th** - 124:20
**26** - 89:10, 115:7
**27** - 66:2, 66:4, 153:2, 153:23
**28** - 12:15, 245:4, 245:7, 245:8, 245:11, 245:15, 245:16, 245:18, 245:20, 246:4, 246:10, 246:12, 246:16, 246:17, 246:22
**280** - 173:16, 244:23, 244:25, 245:1, 245:3, 245:7, 245:15, 246:9
**2800** - 154:6
**29** - 85:24, 115:6, 166:19, 172:11, 172:15, 173:6, 173:7, 239:11
**295** - 218:16
**29th** - 72:5
**2:30** - 162:8, 163:5, 163:10, 163:17

**3**

**3** - 174:5, 177:19, 179:18, 183:5, 191:7, 242:16, 242:22, 243:7
**3-24-08** - 132:12
**3-27-09** - 158:21, 158:23
**30** - 198:10, 198:11, 204:17
**302** - 180:23
**305** - 178:2
**31** - 29:18
**32** - 132:21, 159:4
**33** - 226:7, 226:13
**34** - 86:11, 159:4
**3425** - 16:6
**357** - 23:18, 23:21, 37:25, 38:3
**359** - 172:22
**38** - 3:9, 4:15

**4**

**4** - 85:12, 85:13, 174:8, 174:13, 179:18, 234:9, 234:23, 236:6, 238:13, 242:16, 242:22, 243:7
**405** - 73:12
**407** - 78:17
**409** - 94:14
**417** - 142:20, 143:2
**420** - 129:20, 134:5
**45** - 148:8, 159:4
**462** - 96:23
**463** - 130:17, 133:18
**464** - 145:4
**47** - 71:23
**486** - 169:18, 169:20, 170:9, 170:20
**488** - 152:2
**489** - 24:14
**490** - 79:14, 79:23, 83:3
**491** - 96:9
**492** - 142:10
**493** - 142:23
**499** - 144:8

**5**

**5** - 146:15, 164:14, 164:16, 164:17, 170:25, 171:3, 174:14, 238:16, 242:16, 242:22, 243:7
**50** - 75:14
**501** - 206:2, 208:12

**6**

**6** - 89:13, 124:12, 124:24, 137:20
**677** - 172:20
**6a** - 10:18, 16:5, 88:24

**7**

**7** - 137:25
**7-29-05** - 84:18, 84:24, 85:1, 86:3
**7th** - 231:4

**8**

**8-7-08** - 148:4
**8th** - 224:10

**9**

**9** - 1:11, 236:11, 237:23, 237:24, 238:1, 239:2
**911** - 31:23, 32:2
**921** - 170:4
**922(g** - 162:14, 164:13, 165:1, 165:3, 165:20, 165:22, 165:23, 167:8, 174:14
**922(g)(1** - 170:7
**924(c** - 174:8
**924(o** - 173:24, 174:1
**9:30** - 236:11

**A**

**abetting** - 174:8
**abiding** - 57:18
**able** - 19:18, 19:22, 21:21, 21:23, 22:4, 108:1, 108:5, 108:6, 139:16
**above-entitled** - 247:11
**absolutely** - 63:23, 65:2, 67:22, 216:17
**Absolutely** - 167:4, 206:15
**abusing** - 68:19
**accepts** - 212:13
**access** - 100:24, 101:3
**accompanied** - 129:12
**accomplice** - 173:5
**according** - 2:20, 35:23, 36:5, 40:18, 45:3, 70:19, 88:4, 113:2, 123:10, 136:5, 151:4, 176:8
**accurate** - 146:24, 216:17
**accurately** - 103:25
**accusatory** - 54:1, 54:17
**accuse** - 63:24, 64:18
**accusing** - 54:15
**acknowledge** - 207:7
**acknowledging** - 165:23, 165:24
**Acquaintances** - 178:21
**acquisition** - 30:22
**acquittal** - 172:15, 174:17
**act** - 84:19, 115:12, 132:12
**Act** - 177:11, 177:12, 208:13
**activities** - 36:16, 153:15
**activity** - 100:11, 125:8
**acts** - 67:8, 84:17, 244:11
**actual** - 23:3, 174:5
**address** - 64:16, 68:21, 173:13, 173:19, 211:4, 230:12, 230:15, 237:2, 238:14
**addressed** - 228:4, 228:5, 228:6
**adjacent** - 104:9

**admissible** - 112:24, 167:9, 167:10
**admit** - 46:10, 61:3, 169:6, 202:24, 202:25, 203:1, 212:22, 217:13, 217:15, 220:11, 220:20
**admits** - 208:15
**admitted** - 41:20, 45:18, 45:19, 46:14, 167:3, 186:4, 202:22, 204:13, 204:14, 217:11
**admittedly** - 46:13
**admitting** - 164:22, 165:1, 165:3
**admonish** - 63:21
**advance** - 166:24
**advantage** - 50:19
**adverse** - 185:15, 229:2
**advise** - 170:23, 208:16, 226:15
**advised** - 235:3, 235:25
**advisory** - 208:5
**aerial** - 5:5, 10:21, 154:13
**affair** - 195:24, 196:6
**affecting** - 171:7
**affirmation** - 245:21
**afield** - 67:20
**African** - 19:23, 19:25, 20:3
**African-american** - 19:23, 19:25
**African-americans** - 20:3
**Afternoon** - 164:1
**afternoon** - 94:5, 117:5, 117:6, 168:25, 176:20
**afterwards** - 149:11
**age** - 214:12, 217:18, 220:11, 221:9
**Agent** - 136:1, 136:12, 142:9, 142:22, 150:4, 150:13
**agent** - 56:6, 70:13
**aggressive** - 203:3, 243:3
**ago** - 10:9, 29:14, 57:3, 57:16, 83:1, 118:1, 118:8, 118:11, 119:10, 119:14, 119:16, 119:24, 177:20, 180:3, 209:3
**agree** - 48:14, 62:15, 134:12, 147:16, 205:16, 208:4, 222:9, 245:12
**agreed** - 169:24, 205:19, 205:22, 211:18, 211:19, 211:20, 211:22, 212:10, 212:12, 221:20
**agreement** - 44:18, 59:3, 194:6, 194:10, 202:23, 204:10, 204:18, 207:13, 208:2, 210:18, 210:25, 211:12, 221:20, 222:11, 222:13
**ahead** - 6:2, 17:9, 37:4, 74:10, 79:12, 83:10, 90:9, 91:20,

2

93:3, 142:7, 147:14,
154:19, 166:13,
207:20
**aided** - 1:24
**aiding** - 174:7
**ain't** - 12:4, 12:10,
26:5, 28:19, 164:23,
165:1, 180:20, 195:2,
196:21, 197:11,
203:3, 212:24, 223:6,
223:20, 232:6
**Alaska** - 90:11,
188:15
**Alcohol** - 136:14
**alcoholic** - 230:2
**allegation** - 173:23
**allegations** - 173:11
**alleged** - 67:11
**alleys** - 160:17
**allow** - 44:10,
173:10
**allowed** - 59:4,
118:1, 172:24
**Almost** - 54:1,
178:18
**almost** - 166:5
**alone** - 103:5,
171:25, 189:4
**alternative** - 167:3,
238:12
**Amendment** -
228:7, 228:9, 228:13
**America** - 1:3
**american** - 19:23,
19:25
**americans** - 20:3
**ammunition** - 171:6
**amount** - 61:18,
148:8, 158:24, 246:9
**analysis** - 96:20,
97:2, 130:9, 130:14,
130:20, 130:22,
131:5, 145:2
**angry** - 54:11
**ankles** - 90:25,
95:19
**Annapolis** - 10:24,
12:3, 13:1, 13:9,
13:12, 35:5, 37:6,
93:19, 93:21, 94:7,
98:23, 98:24, 99:3,
152:5, 152:19,
152:20, 152:22,
153:17, 154:3, 154:6,
156:16
**Annor** - 73:25,
74:12, 74:13, 74:15,
74:17, 75:8, 75:17,
77:22, 81:1, 81:2,
81:4, 90:6, 90:10,
95:11, 95:15, 98:22
**answer** - 12:22,
39:10, 49:21, 212:1,
212:8
**Answer** - 209:23,
214:16
**answered** - 41:7,
57:22, 212:9, 214:14
**answers** - 49:7,
63:3
**Anthony** - 247:13,
247:14
**anticipate** - 174:24,
238:2, 238:4, 238:6,
240:8
**anticipating** - 21:9
**anticipation** - 40:8
**Antonio** - 1:7, 6:7,
6:12, 70:16, 70:17,
70:22, 73:18, 91:4,

91:10, 109:17, 127:8,
127:13, 140:6, 170:1,
178:14
**anyway** - 226:24
**Anyway** - 220:1
**apart** - 18:6
**apologize** - 142:22,
240:13
**appeal** - 185:18,
212:20
**appear** - 226:17,
232:22
**Appearances** - 1:14
**appeared** - 65:20
**applied** - 172:14
**appointed** - 49:11,
69:15, 166:3, 168:7
**appointment** -
227:8
**appreciate** - 227:8
**Approach** - 181:9,
206:15, 210:12, 216:6
**approach** - 11:17,
40:25, 49:6, 57:12,
73:7, 75:22, 75:24,
79:11, 96:4, 100:4,
112:9, 126:2, 133:13,
142:3, 142:6, 161:12,
166:19, 172:8, 216:5,
225:2, 232:23, 241:25
**approached** -
74:20, 81:20, 90:16,
113:25, 118:23,
126:3, 126:7, 126:10,
155:15, 156:6, 156:9,
216:19
**approaching** -
154:20, 155:1, 155:19
**approval** - 146:25
**approving** - 146:21
**area** - 5:7, 11:8,
28:11, 37:6, 57:17,
65:12, 72:3, 73:24,
75:17, 76:18, 81:3,
82:3, 92:13, 104:9,
104:14, 118:14,
124:16, 137:24,
139:1, 143:19,
143:23, 152:6,
152:14, 152:25,
153:16, 153:17,
153:21, 178:1, 178:3,
178:5
**arguing** - 245:8
**argument** - 7:23,
7:25, 8:2, 25:21, 61:7,
238:8, 240:6, 240:9,
241:6, 241:7, 243:4
**arguments** - 238:2,
238:5, 238:7, 238:8,
239:10, 240:19
**arm** - 156:14, 195:2
**armed** - 58:8, 59:17,
62:2, 62:5, 62:14,
63:11, 65:8, 67:24,
68:8
**Armed** - 213:24,
214:1, 214:3
**Army** - 90:23
**arrest** - 73:5, 73:19,
75:3, 78:12, 79:6,
84:18, 84:24, 85:1,
93:9, 94:12, 95:14,
96:12, 97:12, 97:23,
104:24, 106:13,
108:14, 110:21,
114:5, 115:12, 116:8,
116:12, 118:23,
127:24, 128:1,
128:21, 129:23,

132:12, 132:13,
143:19, 143:23,
145:10, 145:25,
148:4, 155:16, 156:20
**arrested** - 47:25,
76:12, 81:16, 81:21,
82:8, 102:11, 115:8,
115:18, 129:3,
131:11, 144:6,
145:23, 148:22,
149:13, 157:7, 160:4,
200:3, 200:4
**arrests** - 73:2,
89:20, 119:20,
125:13, 148:19,
153:23, 159:8,
159:24, 160:2
**arrive** - 241:10
**arriving** - 226:23,
227:2
**aside** - 61:19
**assault** - 108:25,
111:5, 221:9, 222:18,
222:22
**asserted** - 181:23
**assigned** - 72:24,
136:25, 137:2
**assignment** - 72:23,
88:17, 123:24, 125:6,
138:3, 153:13
**assignments** -
163:11
**Assistant** - 1:16,
212:5
**assisted** - 55:19,
55:21, 55:23
**associated** - 25:9
**assume** - 36:12,
58:8, 207:8
**assure** - 166:4
**Atf** - 136:17, 136:19
**Atlanta** - 136:15
**attached** - 207:12
**attachment** -
225:17
**Attachment** - 206:4,
207:9, 210:19,
210:22, 211:4
**attack** - 66:12, 67:5,
68:17
**attempt** - 47:8,
155:15
**attempted** - 120:25,
121:16
**attempting** - 94:11
**attempts** - 47:21
**attend** - 56:21,
226:15, 226:18,
234:24
**attention** - 7:11,
7:17, 10:8, 12:14,
16:18, 50:23, 53:1,
72:5, 89:9, 102:2,
104:3, 105:3, 107:12,
109:8, 111:21,
124:20, 143:12,
153:2, 153:22,
211:11, 243:20
**attorney** - 3:22,
31:10, 31:14, 56:12,
69:14, 69:15, 200:2,
208:3, 208:6, 208:8
**Attorney** - 1:16,
212:5
**Attorney's** - 226:6
**attorneys** - 229:21,
230:20
**August** - 1:11,
107:12, 109:9,
116:22, 116:23,

116:24, 118:18,
119:3, 120:2, 120:6,
120:7, 136:25,
137:25, 231:3
**available** - 57:3
**Avenue** - 125:19,
125:20
**average** - 119:20,
138:16
**Avery** - 46:18,
46:19, 183:17,
198:20, 198:24,
198:25, 218:12
**Avery's** - 183:18
**aware** - 15:19,
15:22, 17:25, 18:2,
18:9, 23:25, 25:5,
52:13, 60:21, 145:24,
232:11

---

**B**

**baby** - 202:12,
203:14, 209:18
**backed** - 186:25
**Backing** - 190:12
**backing** - 186:23,
190:11, 190:14
**backtracked** - 118:9
**bad** - 203:2, 203:3,
222:16
**badly** - 205:25
**bag** - 217:11,
217:15, 217:17
**bags** - 80:4
**balanced** - 244:2
**ball** - 93:11
**ballpark** - 119:10
**Baltimore** - 55:8,
71:4, 71:9, 88:14,
96:19, 123:20,
129:21, 130:8,
136:21, 145:1, 145:7,
151:13, 177:25, 178:4
**bang** - 21:5
**bar** - 76:21
**Bar** - 168:2
**barn** - 60:12
**base** - 86:11,
145:16, 147:24
**based** - 32:8, 41:9,
51:15, 64:20, 103:22,
144:5, 173:21, 215:5,
215:6
**Based** - 101:21,
101:25, 108:7, 147:11
**basic** - 159:3
**basis** - 58:22,
61:22, 62:18, 62:21,
63:3, 64:23, 67:16,
100:2, 116:12,
124:19, 166:11
**basketball** - 35:19
**Bates** - 16:6
**bear** - 12:12
**beat** - 138:19
**beat-up** - 138:19
**became** - 17:25,
18:1
**become** - 15:19
**began** - 44:17
**begin** - 57:11
**beginning** - 19:9,
119:2, 141:23
**behind** - 42:4,
74:19, 75:12, 186:18,
190:1, 191:19,
203:15, 203:25,
216:11, 216:12
**belief** - 64:21

**believes** - 60:5
**bells** - 115:19
**below** - 245:14
**Bench** - 49:9, 50:15,
57:14, 69:1, 100:6,
101:7, 112:11,
113:16, 161:15,
163:6, 172:9, 175:22,
181:10, 182:7,
206:17, 207:21,
210:14, 211:9, 216:7,
216:23, 225:4,
226:20, 232:24,
234:19, 242:2, 247:7
**bench** - 112:9,
166:19, 172:8, 181:9,
206:16, 210:12,
216:6, 226:24,
232:23, 241:16,
241:18, 242:1
**benefit** - 167:25,
172:24
**Bennett** - 1:12,
48:6, 119:8, 200:10,
221:4, 221:5, 222:8
**best** - 43:3, 122:15,
180:14, 193:11,
240:19
**better** - 16:4, 72:19,
213:5, 213:6, 243:17
**between** - 5:4, 7:20,
13:21, 19:11, 42:20,
60:16, 60:24, 66:3,
66:6, 67:18, 95:11,
169:5, 169:13,
169:25, 236:11
**beverage** - 230:2
**beyond** - 172:19
**Bgf** - 25:5, 25:7,
25:10, 25:11, 25:13,
38:17, 38:20, 38:22,
39:8, 39:12
**big** - 5:3, 19:13,
19:14, 38:1, 40:24,
66:3, 121:17, 193:18,
193:21
**Big** - 8:14, 193:15,
193:18, 193:25
**bigger** - 19:13,
19:14, 193:3, 193:4
**Bigley** - 178:2
**bills** - 128:16
**birthday** - 121:6
**bit** - 5:11, 6:22,
17:9, 159:12, 159:13,
163:8, 186:15,
186:16, 199:7,
199:10, 226:16,
226:22, 242:7
**bite** - 115:5
**black** - 19:20, 21:1,
40:4, 40:12, 40:14,
40:16, 40:17, 74:20,
74:21, 75:1, 84:10,
90:16, 90:22, 90:23,
90:24, 95:18, 139:21,
154:5, 154:10,
186:22, 187:20,
188:4, 189:2, 189:8,
189:11, 192:21
**Black** - 20:25,
38:25, 189:11
**blacktop** - 90:12
**blank** - 245:24
**blanks** - 196:6
**blatantly** - 64:12
**blend** - 138:14
**block** - 77:23,
89:25, 93:19, 98:15,
98:23, 105:8, 107:17,

107:18, 109:21,
110:2, 110:15, 112:5,
113:25, 120:9,
121:13, 154:6
**blood** - 24:20, 33:5,
33:12, 33:16
**blow** - 10:20
**blow-up** - 11:9
**blue** - 6:15, 17:4
**blurts** - 115:24
**boatload** - 159:10
**body** - 190:23
**boilerplate** -
236:16, 243:8, 243:15
**booking** - 128:22
**bottle** - 154:22,
156:13, 156:22
**bottom** - 22:2,
63:19, 74:8, 146:20,
198:6
**bought** - 147:2
**box** - 216:19,
246:18
**Bpd** - 136:22
**braced** - 20:15
**brain** - 244:14
**Brandon** - 149:5,
203:20, 209:17
**bravado** - 112:25
**break** - 226:17,
226:25, 234:10, 241:6
**breaking** - 208:14
**Brief** - 87:23, 235:2
**brief** - 90:17, 91:22,
241:13, 241:15
**Briefly** - 82:21,
115:1, 131:24, 146:8,
223:14
**briefly** - 44:9,
135:10, 150:1, 159:18
**bring** - 2:2, 24:6,
49:3, 52:18, 60:22,
60:24, 62:16, 63:7,
67:14, 67:17, 107:10,
164:3, 168:17,
168:22, 170:20,
176:4, 235:11, 239:17
**Broderick** - 125:5,
127:25
**broke** - 34:17,
203:11, 210:11
**broken** - 204:8
**Brooks** - 136:1,
136:3, 136:8, 136:12,
150:13
**brother** - 109:13,
109:25, 110:4, 121:9,
196:21
**brother's** - 109:22
**brought** - 47:6,
49:19, 53:4, 53:9,
53:15, 56:14, 65:3
**Brown** - 8:20, 8:22
**brown** - 20:7, 20:8
**brown-skinned** -
20:7
**bucks** - 83:25
**bucks'** - 84:1
**building** - 49:2,
50:13, 191:19
**bullet** - 60:3, 61:16
**bunch** - 14:21,
185:10
**burden** - 229:11,
229:13
**buried** - 33:10,
33:15
**bury** - 33:14, 33:17,
33:18, 33:20
**bus** - 218:15

**business** - 9:15,
9:25, 215:24, 216:1,
216:2
**bust** - 138:6
**buy** - 6:2, 138:6,
139:16, 148:13,
148:15, 148:16,
148:24, 240:24
**buy/bust** - 138:23
**buy/busts** - 140:17
**buyer** - 138:16

## C

**cameraman** - 191:5
**cannot** - 112:24
**capacity** - 51:4
**car** - 27:22, 27:25,
29:10, 29:22, 29:23,
53:23, 72:12, 74:23,
75:11, 75:15, 75:20,
76:21, 76:23, 77:6,
77:10, 77:17, 89:16,
125:2, 125:4, 125:16,
127:7, 127:23, 133:1,
140:8, 141:18,
141:24, 142:1, 142:3,
150:8, 153:9, 154:2,
186:24, 187:1,
199:10, 204:1, 219:4,
219:6, 219:11
**card** - 121:4
**care** - 32:22, 57:25,
58:1, 58:19, 109:3,
111:9
**career** - 220:23,
222:25
**careful** - 226:8,
226:9
**carefully** - 17:12,
208:3
**carried** - 37:13,
37:20, 173:24
**carry** - 160:19,
174:3
**carrying** - 37:18,
160:8, 160:11
**cars** - 81:17, 99:7,
101:10
**Carter** - 149:6,
149:12, 149:13,
149:16
**Case** - 1:6
**case** - 48:10, 56:6,
62:10, 66:22, 70:13,
84:14, 97:4, 113:3,
114:1, 115:10, 132:8,
132:10, 148:4,
148:12, 148:21,
164:10, 165:10,
169:7, 169:11,
171:23, 172:6, 173:9,
173:10, 173:20,
174:21, 175:15,
175:24, 185:12,
204:20, 209:9,
210:21, 212:24,
228:9, 228:11, 229:8,
230:7, 234:22,
235:16, 240:4, 241:15
**cases** - 166:5
**catch** - 78:3, 93:16,
104:18
**category** - 245:11,
245:13
**caught** - 94:6, 195:3
**cautionary** - 167:7,
172:1
**Cavalier** - 72:13,
77:8

**Cavaliers** - 77:9
**Cc** - 79:2, 95:1,
142:10, 142:14,
142:24, 145:8
**Cds** - 90:20, 92:1,
92:4, 92:16, 94:11,
94:13, 94:18, 95:3,
96:12, 99:6, 102:7
**ceiling** - 42:12
**cellblock** - 100:25
**cellphone** - 31:25,
34:21
**Center** - 60:2
**central** - 128:22
**certain** - 44:14,
51:12, 51:19, 194:2,
194:3
**Certainly** - 41:1,
133:15, 206:25, 225:3
**certainly** - 10:10,
14:20, 67:3, 67:4,
67:9, 67:14, 67:20,
67:21, 68:16, 68:21,
100:9, 117:16,
117:16, 207:6, 211:5,
235:12
**certified** - 167:1
**certify** - 247:9
**certiorari** - 172:23
**chair** - 17:4, 17:12,
17:13
**chairs** - 18:3, 18:6
**challenge** - 207:5,
207:6
**chance** - 49:16,
126:18, 162:2,
209:15, 213:13,
222:15, 230:6, 234:14
**chances** - 49:21,
204:21
**change** - 47:4,
208:6, 222:11
**changed** - 47:3,
213:1
**changes** - 222:10
**charge** - 39:12,
84:16, 118:2, 164:12,
167:8, 171:2, 174:5,
174:8, 174:9, 174:15,
217:21, 236:8,
236:10, 236:17,
237:3, 238:19, 246:1
**charged** - 165:20,
205:8, 205:9, 208:13,
244:12
**charges** - 107:9,
109:3, 111:10
**chase** - 75:2,
104:16
**chased** - 77:14,
78:3, 105:18, 195:3
**chasing** - 105:11
**check** - 233:24
**Check** - 31:14,
208:5
**checked** - 57:21
**chemist** - 85:7,
85:10, 85:15, 115:15,
148:7
**chemist's** - 85:23
**Chief** - 161:21,
162:14, 164:9,
164:10, 165:10
**choice** - 204:15,
204:16
**choose** - 162:3
**Christmas** - 121:4
**Christopher** - 123:8,
123:14
**Circuit** - 172:21,

172:22, 173:3, 207:4
**circumstances** -
212:23
**citizens** - 68:19
**City** - 65:4, 71:4,
88:14, 123:20,
129:21, 136:21,
151:13
**city** - 57:21, 71:13,
167:20, 167:23,
168:4, 178:3, 218:17
**City's** - 145:7
**civil** - 57:20, 57:25,
58:19, 59:7, 65:1,
170:4
**clarify** - 45:21
**Clarify** - 45:23
**clarity** - 246:25
**classic** - 61:1
**clean** - 60:17
**cleaned** - 22:21
**Clear** - 42:10
**clear** - 11:21, 11:22,
11:23, 42:5, 76:7,
80:2, 93:10, 118:22,
125:21, 134:25,
147:19, 147:21,
147:23, 148:3, 155:17
**cleared** - 58:4
**clearly** - 75:15,
75:18, 94:2
**Clearly** - 126:25
**clenched** - 154:21
**clerk** - 242:5,
242:14
**Clerk** - 2:21, 2:25,
3:3, 70:20, 70:23,
85:12, 88:5, 88:8,
123:11, 123:15,
136:6, 136:9, 151:5,
151:8, 175:1, 176:9,
176:12, 237:24,
242:23
**clerk's** - 170:21
**client** - 100:22,
100:25, 167:22, 168:3
**Clinton** - 1:15
**Clive** - 8:20, 8:22
**close** - 135:5,
216:21
**closed** - 221:16
**closely** - 216:19
**closer** - 17:5, 18:6,
18:7, 72:18
**closest** - 198:4
**closing** - 236:7,
238:2, 238:5, 238:7,
239:10, 240:6, 240:9,
240:19, 241:6, 243:4
**clothes** - 23:10,
168:7
**club** - 143:25
**co** - 173:5, 204:7,
204:24, 205:6, 209:12
**co-defendant** -
173:5
**co-defendants** -
204:7, 204:24, 205:6,
209:12
**coat** - 90:23
**cocaine** - 75:4,
78:11, 78:24, 79:1,
83:24, 84:4, 86:11,
94:24, 97:22, 127:3,
127:19, 127:24,
128:1, 128:6, 128:23,
128:25, 129:12,
129:16, 129:24,
130:3, 131:10, 133:7,
141:12, 145:16,

147:24, 160:9,
160:25, 246:7
**Cocaine** - 94:23
**Cochise** - 39:2,
39:3, 39:8, 39:12
**Code** - 164:13,
174:7
**cold** - 117:2
**collateral** - 62:17,
63:8, 64:7, 64:14,
231:24
**colloquy** - 230:18
**color** - 119:12,
119:15, 147:25,
192:19
**coming** - 5:24,
14:12, 18:10, 52:14,
56:25, 139:11,
157:17, 195:1, 207:3,
218:13
**comment** - 213:18
**commerce** - 171:7
**commissary** - 194:8
**commit** - 107:14,
202:18, 205:1, 205:2,
209:1, 215:9
**committed** -
202:20, 209:3, 214:22
**committing** - 204:2
**common** - 92:20
**commonly** - 86:12,
90:12, 92:6
**community** - 68:19,
104:8
**compared** - 19:10
**compelled** - 228:11,
232:25
**complaint** - 57:20,
58:1, 58:2, 58:19,
59:8, 60:17, 86:6,
97:7, 97:9, 129:22,
130:21, 130:22,
142:18, 195:25
**complete** - 60:14
**completely** - 21:18,
60:15, 61:1, 208:7
**complexion** - 20:4,
20:6, 41:8
**Complies** - 17:3,
94:21, 186:10
**computer** - 1:24
**computer-aided** -
1:24
**conceivable** - 168:6
**concern** - 23:1
**concerned** - 121:24
**concerns** - 132:12
**conclude** - 135:21
**concluded** - 44:16
**concludes** - 44:4,
87:17, 123:2, 150:16,
161:9, 224:23,
224:25, 240:4
**conditions** - 217:6
**conducting** - 93:22,
95:16, 95:24, 99:6
**confederating** -
174:3
**confer** - 133:19,
224:8
**Conference** - 49:9,
50:15, 57:14, 69:1,
100:6, 101:7, 112:11,
113:16, 161:15,
163:6, 172:9, 175:22,
181:10, 182:7,
206:17, 207:21,
210:14, 211:9, 216:7,
216:23, 225:4,
226:20, 232:24,

4

234:19, 242:2, 247:7
  **conference** - 236:9,
236:10, 236:17,
237:3, 238:19
  **confess** - 117:25
  **confessed** - 117:19
  **confessing** - 120:24
  **confession** - 121:1
  **confessions** -
115:24
  **confident** - 36:2
  **confirm** - 110:9
  **confirmed** - 45:8,
45:12
  **confront** - 59:19
  **confused** - 32:9
  **conjectural** - 65:12
  **connection** - 4:17,
174:4, 226:5, 241:14
  **consider** - 171:15,
229:10, 229:16,
234:2, 246:10
  **consideration** -
242:21
  **considered** - 224:2
  **consistent** - 233:12,
233:22
  **conspiracy** - 84:17,
173:11, 173:15,
174:1, 242:15, 244:10
  **Conspiracy** - 174:2
  **conspiring** - 174:3
  **Constitution** -
228:10, 229:9
  **consult** - 162:2
  **consultation** -
235:13
  **contact** - 139:23,
143:21, 144:13, 156:1
  **contend** - 64:12,
67:21
  **contending** - 68:7
  **contends** - 62:14,
63:5, 67:24, 68:2
  **contention** - 64:9
  **contents** - 83:11
  **contest** - 220:20
  **context** - 49:24,
53:8
  **Continue** - 13:2
  **continued** - 143:18
  **contraband** -
104:22, 128:5, 128:9
  **control** - 130:10,
130:12
  **controlled** - 54:9,
140:15, 215:17
  **convenient** - 225:13
  **conversation** -
53:3, 53:22, 54:3,
54:10, 90:17, 91:23,
105:4, 105:21, 106:1,
106:7, 106:12,
107:13, 107:16,
107:19, 108:9,
108:11, 108:15,
109:16, 109:19,
110:17, 110:22,
111:22, 112:4,
112:12, 113:1, 113:9,
113:19, 113:23,
114:3, 114:16
  **conversations** -
103:19, 104:1, 106:9,
156:3, 157:16
  **convicted** - 121:17,
170:1, 171:4, 200:4,
214:12, 215:16,
217:1, 221:9, 222:18
  **conviction** - 162:12,

164:11, 165:7,
165:13, 165:14,
165:16, 165:17,
165:18, 166:1, 166:8,
167:12, 170:24,
171:9, 171:14,
171:16, 171:18,
171:20, 217:1,
217:18, 220:10,
220:11, 220:18, 221:8
  **convictions** - 167:2,
167:5, 167:9, 222:25
  **cooperate** - 48:12
  **cooperated** -
180:21, 203:16
  **cooperating** -
180:12, 181:4
  **cooperation** -
194:10
  **cop** - 204:17,
221:10, 221:13
  **copy** - 59:4
  **corner** - 16:23,
74:9, 77:18, 87:9,
125:20, 154:5, 155:2,
156:16
  **correct** - 2:4, 3:16,
3:19, 4:2, 8:21, 32:24,
33:7, 35:13, 35:15,
36:6, 37:20, 40:5,
41:22, 43:8, 46:25,
47:10, 48:2, 48:25,
50:17, 50:21, 51:8,
51:17, 55:12, 56:16,
57:2, 67:24, 73:20,
74:14, 75:8, 75:22,
76:8, 77:23, 79:8,
79:20, 80:4, 80:14,
80:20, 83:17, 84:4,
84:12, 84:25, 85:3,
86:1, 86:4, 86:12,
90:13, 95:21, 96:14,
96:17, 97:10, 97:24,
98:7, 101:10, 102:19,
103:20, 103:23,
104:1, 110:12,
113:14, 115:13,
129:1, 130:6, 131:6,
132:21, 132:22,
137:18, 138:14,
140:9, 143:3, 144:19,
145:2, 145:12, 148:5,
148:8, 151:22, 152:8,
152:16, 154:11,
154:12, 154:14,
155:3, 155:21, 156:3,
159:24, 159:25,
164:5, 164:17,
168:18, 169:17,
170:13, 170:17,
172:11, 176:1,
199:22, 200:8,
201:15, 204:2, 207:9,
220:18, 225:21,
227:22, 229:22,
230:8, 233:17, 235:6,
235:18, 247:9
  **Correct** - 2:6, 47:15,
55:16, 56:23, 57:6,
58:17, 59:9, 69:18,
79:21, 80:5, 83:18,
86:5, 86:9, 86:13,
92:17, 96:15, 96:18,
97:11, 97:13, 97:25,
98:8, 98:10, 101:11,
101:13, 102:20,
103:21, 103:24,
104:2, 105:19,
106:11, 107:23,
108:3, 110:8, 110:13,

115:14, 116:9,
117:12, 117:18,
117:21, 118:4, 119:6,
120:5, 121:10,
121:14, 131:7,
132:23, 138:17,
149:7, 149:19, 156:4,
158:7, 159:1, 167:13,
168:4, 168:12,
168:15, 172:12
  **correspond** - 97:3
  **correspondence** -
237:10
  **corridor** - 81:1, 81:2
  **Counsel** - 12:14,
133:19, 172:8, 224:8,
232:23
  **counsel** - 44:14,
48:13, 60:16, 166:24,
170:11, 170:12,
170:16, 216:12,
228:18, 232:19,
241:19
  **Count** - 164:14,
164:16, 164:17,
170:25, 171:3,
173:12, 173:18,
173:21, 174:5, 174:8,
174:13, 174:14,
214:3, 242:6, 242:11,
242:16, 242:20,
242:24, 244:11
  **count** - 171:1,
242:15, 244:11, 246:6
  **Counts** - 242:16,
242:22, 243:7
  **counts** - 172:16,
243:18
  **County** - 178:4
  **couple** - 3:25, 5:19,
5:20, 10:9, 16:3,
25:15, 31:22, 40:19,
45:6, 69:4, 75:11,
81:12, 138:20, 179:7,
190:18, 200:2
  **Court** - 1:1, 2:2, 2:6,
2:9, 2:11, 6:11, 10:12,
10:19, 11:11, 13:7,
31:2, 41:1, 43:21,
44:1, 44:7, 44:11,
44:16, 44:22, 45:21,
49:5, 49:8, 49:23,
50:5, 50:8, 50:11,
57:9, 57:13, 57:17,
58:13, 58:21, 59:6,
59:10, 59:13, 59:23,
60:4, 60:10, 60:18,
61:4, 61:12, 61:22,
62:1, 62:4, 62:12,
62:18, 62:22, 62:24,
63:7, 63:9, 63:18,
64:3, 64:4, 64:7,
64:15, 64:20, 67:2,
68:1, 68:7, 68:21,
70:8, 70:11, 73:9,
73:25, 74:12, 74:13,
74:15, 74:18, 75:8,
75:17, 79:12, 79:22,
79:24, 80:8, 81:1,
81:2, 81:4, 82:18,
83:8, 83:10, 85:13,
85:17, 85:22, 86:16,
87:13, 87:15, 89:25,
90:5, 90:6, 90:10,
90:11, 90:18, 90:25,
91:9, 92:14, 95:11,
95:17, 96:6, 100:1,
100:4, 100:7, 100:20,
101:2, 101:23, 102:6,
107:17, 112:10,

112:12, 112:18,
113:11, 113:15,
114:24, 122:2, 122:5,
122:20, 122:22,
122:24, 122:12
129:7, 131:23,
133:15, 133:18,
133:22, 134:1, 135:9,
135:18, 135:24,
139:3, 139:12, 140:5,
142:7, 142:13,
143:18, 146:6,
149:22, 149:24,
150:12, 152:12,
157:25, 159:15,
159:19, 160:21,
161:7, 161:14,
161:20, 161:23,
162:5, 162:9, 162:22,
163:3, 163:7, 163:14,
164:3, 164:8, 164:15,
164:17, 164:21,
165:2, 165:10,
165:11, 166:10,
166:17, 167:4,
167:15, 167:17,
167:22, 168:1, 168:2,
168:9, 168:13,
168:16, 168:20,
168:22, 168:25,
169:8, 169:19, 170:8,
170:15, 170:19,
172:7, 172:10,
172:13, 174:2, 175:4,
175:8, 175:13,
175:20, 175:23,
176:3, 176:16, 181:9,
181:11, 181:17,
181:20, 181:25,
182:6, 197:17,
197:19, 204:5,
205:24, 206:4, 206:7,
206:15, 206:18,
206:25, 207:11,
207:19, 208:17,
210:12, 210:15,
212:1, 212:5, 212:11,
213:12, 213:17,
216:6, 216:15,
221:22, 223:13,
224:1, 224:19,
224:21, 225:3, 225:9,
225:14, 225:18,
225:23, 226:3,
226:12, 226:21,
227:6, 227:18, 228:2,
228:16, 228:21,
228:25, 229:5,
229:19, 229:24,
230:5, 230:10,
230:14, 230:17,
231:3, 231:7, 231:13,
231:15, 231:17,
231:21, 232:4, 232:8,
232:25, 233:8,
233:11, 233:14,
233:18, 233:21,
234:6, 234:13,
234:17, 234:20,
234:21, 235:3,
235:10, 235:12,
235:17, 235:20,
235:24, 236:5,
236:25, 237:7,
237:10, 237:12,
237:16, 237:18,
237:20, 237:25,
238:12, 238:25,
239:12, 239:20,
239:25, 240:3,

240:17, 241:20,
241:23, 242:9,
242:13, 242:18,
243:6, 244:5, 244:24,
245:6, 245:13,
245:17, 245:25,
246:14, 246:20, 247:6
  **court** - 48:7, 69:10,
74:19, 166:3, 168:7,
188:11, 188:12,
191:15, 194:4,
206:10, 207:11,
207:14, 210:23,
211:6, 211:7, 212:6,
227:7, 238:16, 239:1
  **Court's** - 41:18
  **court-appointed** -
166:3
  **courthouse** - 241:2
  **courtroom** - 3:22,
6:9, 63:10, 63:24,
140:1, 144:15,
178:24, 185:4,
194:20, 200:13,
200:17, 201:7, 241:5
  **covered** - 33:5
  **cowboy** - 67:9
  **Crack** - 215:19
  **crack** - 80:4, 86:12,
132:22, 159:12,
160:8, 160:25,
215:18, 215:20,
217:19, 246:7
  **crazy** - 54:1, 54:16
  **create** - 221:18
  **credibility** - 63:17,
65:19, 67:5, 68:11,
68:17
  **creek** - 34:3
  **crew** - 116:19
  **crime** - 32:13,
32:18, 116:10, 118:2,
123:20, 123:25,
125:7, 145:7, 153:17,
170:2, 171:4, 171:9,
174:4, 205:1, 205:2,
214:22, 214:23,
220:12, 220:17
  **crimes** - 73:1,
153:14, 153:19,
220:15, 220:21
  **criminal** - 165:20,
166:1, 171:9, 228:11,
228:22
  **cross** - 44:10,
44:12, 44:15, 57:11,
59:14, 68:13, 114:25,
206:22, 211:1, 211:5,
228:18, 234:5
  **Cross** - 31:2, 31:5,
69:2, 82:19, 82:22,
115:2, 132:1, 146:7,
146:9, 157:25, 158:3,
197:19, 197:22
  **cross-examination**
- 68:13, 114:25, 211:1
  **Cross-examination** -
31:2, 31:5, 69:2,
82:19, 115:2, 132:1,
146:7, 146:9, 157:25,
158:3, 197:19, 197:22
  **cross-examine** -
59:14, 211:5
  **cross-examined** -
206:22, 234:5
  **cuffed** - 75:3
  **cumbersome** -
242:7, 242:19
  **Cunningham** - 2:16,
2:18, 2:24, 3:6, 3:8,

5

3:15, 3:25, 4:18, 10:6, 10:20, 16:24, 18:5, 31:7, 31:21, 34:9, 38:9, 43:25, 44:2, 44:6
**currency** - 74:21, 91:24, 154:24, 155:10
**current** - 34:7, 88:17, 123:24
**cursory** - 126:13
**Curtis** - 47:11, 55:21
**Curtis'** - 206:23
**custody** - 175:3
**cut** - 44:10, 93:8, 95:11, 95:12, 95:15, 107:20, 197:1

# D

**daily** - 124:19
**Daily** - 151:25
**dangerous** - 140:15
**dark** - 42:2, 125:18, 133:4, 133:6, 134:16
**dark-tinted** - 125:18
**date** - 7:13, 46:8, 56:9, 79:5, 84:17, 84:24, 86:3, 97:12, 115:12, 130:25, 145:10, 154:2, 158:21, 182:12, 224:4
**Dated** - 208:8
**daughter** - 6:4, 6:5
**daughter's** - 27:16
**days** - 7:18, 81:5, 102:16, 106:3
**dazed** - 32:8
**dead** - 43:1, 43:2, 244:14
**deal** - 36:15, 67:15, 166:20, 218:17, 219:2, 233:2, 237:16, 237:20, 240:13, 245:25, 246:2, 247:4
**dealer** - 36:11, 36:13, 36:19, 37:11, 37:23, 38:13, 82:9, 101:14
**dealers** - 160:8
**dealing** - 9:17
**dealt** - 10:3, 10:4
**death** - 38:17
**Debbie** - 5:14, 5:16, 5:17, 179:8
**deceased** - 43:10
**December** - 136:24
**decided** - 210:8, 210:9, 235:25
**decides** - 162:19
**decision** - 129:10, 225:16, 232:13, 235:14, 244:21
**declined** - 48:15, 57:4
**deep** - 34:5, 34:6
**Defendant** - 1:9, 1:17, 164:20, 164:22, 164:25, 166:9, 227:17, 228:15, 228:20, 228:24, 229:4, 229:18, 229:23, 230:4, 230:9, 231:12, 231:14, 231:16, 232:3, 232:6, 234:16, 235:19
**defendant** - 6:12, 13:22, 46:20, 51:23, 57:1, 91:10, 100:14, 112:21, 112:22, 113:3, 127:13, 140:6,

164:10, 165:4, 165:12, 165:20, 169:13, 170:1, 170:5, 171:1, 171:3, 171:12, 172:16, 172:19, 173:5, 173:23, 175:24, 181:15, 181:18, 199:16, 201:12, 202:7, 206:19, 207:2, 208:15, 211:14, 229:13, 229:14, 235:5
**Defendant's** - 85:13
**defendants** - 166:5, 204:7, 204:24, 205:6, 209:12, 238:18
**defended** - 65:4
**defense** - 2:7, 6:16, 31:10, 31:15, 62:25, 63:12, 68:4, 85:11, 146:15, 162:17, 168:14, 168:20, 172:10, 174:21, 175:14, 175:20, 175:24, 226:23, 227:20, 230:15, 235:15, 235:21, 236:1, 236:15, 236:20, 239:6, 239:21, 239:24, 239:25, 245:8, 246:15
**defined** - 170:3
**definitely** - 162:22, 242:10
**definition** - 181:24
**degree** - 221:10, 222:18, 222:21
**delay** - 226:16, 226:22
**delaying** - 227:14
**deliberately** - 174:9
**demanded** - 211:14
**demeanor** - 54:7
**denied** - 172:23, 173:8, 174:20, 185:18, 231:22, 239:13, 239:15
**deny** - 173:6, 204:4
**denying** - 204:4, 212:15, 214:6
**departed** - 51:22
**Department** - 71:4, 71:10, 88:14, 136:21, 151:14
**Department's** - 96:20, 130:9, 145:2
**Deputy** - 2:21, 2:25, 3:3, 70:20, 70:23, 85:12, 88:5, 88:8, 123:11, 123:15, 136:6, 136:9, 151:5, 151:8, 175:1, 176:9, 176:12, 237:24
**describe** - 20:5, 20:23, 46:11, 48:12, 48:17, 107:16, 178:22, 189:9
**described** - 46:23, 47:10, 48:23, 52:6
**descriptions** - 143:20
**deserved** - 63:12
**desire** - 238:22
**desk** - 116:14, 170:21
**details** - 166:7
**detain** - 106:20
**detained** - 114:7
**Detective** - 27:9, 27:14, 44:9, 45:6,

59:19, 62:1, 62:8, 62:13, 65:14, 66:1, 66:12, 67:5, 67:23, 68:17, 70:11, 70:16, 70:22, 71:3, 72:15, 72:17, 72:20, 73:11, 74:1, 75:6, 80:2, 80:13, 82:10, 86:20, 87:16, 89:24, 95:1, 97:18, 103:10, 104:17, 105:9, 105:10, 110:20, 116:18, 121:20, 121:21, 123:13, 123:19, 126:16, 129:9, 135:13, 135:19, 143:24, 144:25, 150:20, 151:7, 151:11, 153:12, 154:7, 159:16, 159:22, 161:7, 231:19
**detective** - 65:5, 103:10, 123:6
**detectives** - 23:25, 30:16
**determination** - 232:16
**determine** - 246:9
**difference** - 19:11, 66:3, 67:18
**different** - 66:4, 86:22, 87:1, 142:16, 142:18, 147:3
**difficulty** - 232:21
**Direct** - 3:4, 45:4, 71:1, 88:11, 136:10, 151:9, 176:18
**direct** - 7:11, 7:17, 10:8, 12:14, 16:17, 50:23, 134:19, 191:16, 211:11
**directed** - 113:7, 142:2, 144:13
**directing** - 53:1, 141:5, 141:18, 149:9, 225:8
**direction** - 22:3, 189:2, 191:4, 191:17
**directly** - 16:17
**discovery** - 59:2
**discuss** - 44:3, 87:16, 123:1, 135:19, 150:13, 161:8, 224:22, 229:20, 234:4, 239:2
**discussed** - 60:16, 103:18, 113:5, 230:1, 235:8
**discussing** - 238:20
**discussion** - 65:13, 112:20
**dismiss** - 161:13, 242:6, 242:11
**dismissed** - 242:24
**dispute** - 7:20, 7:22, 8:9, 8:10, 13:21, 42:20, 42:21, 43:5, 83:11, 236:13
**distinguish** - 20:7
**distribute** - 215:17, 246:7
**District** - 1:1, 1:13, 71:14, 88:18, 124:3, 124:5, 137:3, 138:5, 151:12
**district** - 151:22
**disturbed** - 26:15, 26:17
**document** - 130:2,

211:6, 221:18, 221:19, 221:25
**Dohony** - 27:10, 27:14
**dollars** - 241:1, 241:2
**Donald** - 127:6
**done** - 50:10, 56:19, 100:13, 101:5, 107:8, 113:10, 140:17, 161:16, 162:1, 194:13, 196:5, 201:1, 204:19, 232:5, 232:9, 239:14, 240:25
**door** - 15:24, 16:17, 21:20
**Dorsey** - 57:19, 59:7, 61:24, 62:16, 65:4, 65:7, 65:19, 68:7, 231:14, 231:15, 232:1
**Dorsey's** - 231:18
**Dorton** - 90:5, 90:9, 93:25, 107:17, 139:3, 139:7, 139:12, 139:13, 139:15, 139:19, 139:20, 139:22, 141:4, 142:13, 143:18, 145:12, 150:5, 188:13
**doubt** - 37:20, 93:20, 93:23, 96:1, 141:17, 167:25, 172:19
**down** - 5:19, 10:11, 11:22, 27:10, 30:2, 34:3, 44:2, 64:16, 70:12, 74:14, 74:22, 76:17, 87:16, 98:21, 115:4, 122:25, 133:8, 135:18, 138:13, 139:8, 139:10, 146:20, 150:13, 154:3, 156:19, 156:19, 161:8, 185:23, 187:5, 243:9, 243:14, 243:19, 244:13, 247:4
**Down** - 185:25
**downplayed** - 61:17
**downtown** - 27:10
**draft** - 243:22, 244:18
**drawn** - 229:2
**dress** - 138:13
**dress-down** - 138:13
**dressed** - 19:19, 20:24, 138:11, 138:12
**drew** - 68:3
**drink** - 156:13
**dripping** - 24:20
**drive** - 35:9, 77:1, 77:9
**driven** - 51:22
**driver** - 74:20, 126:11, 127:5
**driver's** - 126:3, 126:10, 127:2, 127:4, 127:19, 129:16, 134:16, 135:1, 139:22
**drives** - 66:20
**driving** - 74:18, 125:10, 138:18, 138:19, 154:3
**drove** - 75:7, 139:1, 139:8, 139:10, 139:18, 139:20, 150:4
**drug** - 9:15, 9:25, 36:11, 36:13, 36:19,

37:11, 37:22, 38:13, 82:9, 88:18, 96:20, 97:2, 100:12, 100:14, 101:14, 113:3, 114:1, 129:14, 130:9, 130:14, 130:21, 137:6, 137:8, 138:16, 145:2, 148:17, 160:5, 160:7, 167:1, 167:5, 173:14, 173:15, 173:20, 174:4, 215:24, 218:17, 219:2, 220:14, 220:16, 220:18, 242:15, 244:21, 244:25, 245:2, 245:7
**drugs** - 9:18, 9:19, 10:3, 10:4, 10:5, 10:7, 11:3, 11:5, 11:25, 24:7, 36:16, 37:2, 37:6, 78:14, 79:19, 83:12, 85:2, 86:10, 96:2, 96:13, 129:15, 130:5, 130:20, 131:4, 133:12, 133:15, 133:10, 133:12, 133:25, 134:8, 139:16, 140:16, 142:12, 144:21, 144:24, 147:3, 147:5, 147:8, 148:8, 155:11, 156:25, 157:4, 158:19, 203:14, 208:15, 209:20, 211:15, 218:5, 218:6, 218:9, 219:18, 219:20
**Duckett** - 7:5, 14:8, 15:8, 35:20, 35:24, 46:11, 46:15, 50:24, 51:1, 51:11, 52:5, 54:2, 55:7, 55:11, 55:22, 69:21, 81:8, 81:11, 99:13
**Duckett's** - 54:7, 55:6
**due** - 129:4
**dug** - 33:10
**duly** - 2:19, 45:2, 70:18, 88:3, 123:9, 136:4, 151:3, 176:7
**Duran** - 88:2, 88:7
**During** - 114:3, 126:12
**during** - 86:21, 108:14, 110:21, 163:1
**duty** - 103:7

# E

**e-mailed** - 237:13
**earliest** - 240:8
**early** - 117:4, 193:6
**easier** - 160:23
**Eastwood** - 7:9, 8:18, 8:19, 8:23, 8:24, 8:25, 28:2, 30:13, 99:17, 99:19
**easy** - 92:23, 161:3
**effect** - 118:20, 149:9, 229:6
**effort** - 243:14
**either** - 52:18, 62:25, 65:25, 99:3, 160:17, 162:3, 237:12, 241:7
**election** - 227:20, 230:7
**element** - 162:14, 162:16, 171:11, 171:17, 171:24

6

Elementary - 104:11, 116:5
elements - 164:12, 167:8, 170:25, 171:8, 243:19
elevator - 100:19
Elmo - 216:11
encounter - 25:12, 26:11
encountering - 102:21, 104:4
End - 50:15, 69:1, 101:7, 113:16, 163:6, 175:22, 182:7, 207:21, 211:9, 216:23, 226:20, 234:19, 247:7
end - 13:3, 21:22, 21:24, 66:8, 90:18, 90:25, 95:17, 119:3, 208:1
end-run - 66:8
ended - 139:11
endlessly - 66:21
enforcement - 174:12
engage - 100:12
enter - 162:11
entire - 217:3
entitled - 62:16, 165:6, 181:8, 247:11
error - 8:24, 61:3
escalating - 216:13
essentially - 66:8, 165:19, 174:9, 229:7
established - 173:1
evening - 14:7, 25:2, 25:9, 25:12, 26:12, 45:12, 46:24, 47:19, 48:12, 48:18, 48:24, 55:6, 98:13, 199:10, 231:3
event - 135:20, 150:14, 224:23
everyday - 7:3
everywhere - 180:16
Everywhere - 180:18
evidence - 23:3, 32:23, 34:10, 35:10, 51:1, 61:3, 62:4, 63:3, 79:3, 85:24, 130:10, 130:12, 167:6, 169:11, 171:24, 172:3, 172:17, 173:8, 173:10, 173:21, 173:22, 174:16, 203:11, 213:1, 229:14, 240:4
evidentiary - 231:22
exact - 36:3, 122:11, 195:20
exactly - 7:22, 8:13, 15:12, 17:7, 19:2, 32:18, 59:13, 64:4, 141:10, 141:19, 143:12, 188:5, 188:7, 190:18
examination - 31:2, 31:5, 44:10, 44:12, 68:13, 69:2, 82:19, 114:25, 115:2, 132:1, 146:7, 146:9, 157:25, 158:3, 197:19, 197:22, 211:1, 228:18
Examination - 3:4, 45:4, 71:1, 82:22, 86:18, 88:11, 135:11, 136:10, 150:2, 151:9,

159:20, 176:18, 223:15
examine - 59:14, 211:5
examined - 206:22, 234:5
example - 11:18
exceeding - 170:3, 171:5, 171:10
exception - 45:19, 68:14, 181:8, 181:14
exchanged - 25:20
excuse - 129:13, 225:19, 226:14
Excuse - 19:24, 20:25, 29:15
excused - 224:22, 227:3, 241:24
exercise - 216:20, 236:1
Exhibit - 5:1, 10:17, 16:7, 16:20, 71:22, 73:12, 79:14, 85:13, 96:23, 124:12, 129:20, 130:17, 133:18, 134:5, 137:20, 142:10, 142:20, 142:23, 145:4, 152:2, 169:18, 169:20, 170:9, 170:20, 179:17, 183:5, 186:4, 188:21, 191:7, 206:2, 207:12, 210:19, 210:20
exhibit - 5:2, 17:21, 79:22, 133:25, 134:1, 134:12, 169:15, 208:11, 210:24, 224:7
exhibits - 50:25, 134:2
existed - 180:25
exited - 155:14
exiting - 94:10
expense - 55:13, 55:15
experience - 129:5
explain - 16:4, 26:3, 26:5, 60:7, 73:22, 112:3, 162:15, 165:2, 165:9, 227:11, 239:18
explore - 100:9, 100:22
Explosives - 136:15
extent - 10:22, 66:7, 207:4, 216:18
eye - 82:4, 99:22, 139:23
eyes - 19:21, 20:18, 21:1, 21:19, 40:8, 40:10, 223:17, 223:20
eyesight - 173:25, 189:23
eyewitness - 45:8, 46:23

**F**

F.2d- 172:20
F.3d- 172:22, 173:2
face - 24:20, 163:11, 202:11, 203:12, 209:19, 221:16
Facebook- 69:24, 70:1
faces - 26:25
facing - 15:24, 22:7
fact - 9:8, 23:4, 31:13, 49:24, 54:19, 56:14, 59:7, 59:20,

60:12, 60:25, 63:1, 65:17, 65:20, 66:9, 66:21, 68:8, 103:22, 105:25, 118:16, 165:12, 165:15, 165:21, 170:16, 171:24, 172:18, 173:16, 180:3, 194:13, 199:19, 200:9, 208:16, 208:20, 212:13, 229:5
facts - 63:21, 64:1, 64:23, 65:6, 172:25, 204:13, 205:16, 205:20, 206:5, 206:20, 206:24, 207:3, 207:7, 207:9, 207:15, 210:23, 211:5, 211:12, 212:22, 215:6
factual - 164:5
fair - 32:7, 32:11, 39:24, 55:9, 77:7, 107:9, 193:24, 216:9
fairly - 166:20, 236:15
faith - 62:20
fall - 88:5, 190:15
familiar - 71:15, 72:3, 76:3, 88:21, 88:24, 91:17, 124:9, 137:17, 140:19, 151:19
family - 37:3, 179:6
Family- 38:25
far - 61:1, 67:20, 75:13, 93:24, 110:14, 161:24, 187:18, 188:23
fashion - 68:23
fast - 60:8, 189:7, 190:1
fat - 121:17
fatter - 193:1
favorable - 172:17
February- 12:7, 177:19
federal - 3:18, 48:9, 112:1, 113:19, 114:20, 131:18, 146:1, 157:21, 202:10
federally - 47:25
feds - 112:6, 113:3, 114:2
feed - 37:2
feet - 75:13, 75:14, 94:1, 183:13, 186:17
fell - 156:14
fellow - 39:21
felon - 121:17, 165:24, 174:14, 175:5
felony - 114:1
felt - 54:11, 54:14
female - 90:16
females - 154:5
Ferbie- 203:23
Ferl- 184:18, 184:19, 184:21, 201:24, 201:25, 202:1
Ferry- 28:14, 28:16, 28:24, 28:25, 125:17
few - 41:10, 63:20, 164:4, 186:17, 192:16, 227:3, 232:15, 241:16
field- 92:13, 93:11
Fifth- 228:7, 228:9, 228:12
figure - 23:5, 233:1, 246:20

file - 44:21, 195:24, 211:7, 212:17
filed - 59:7, 212:19
files - 65:1, 172:11
filing - 196:6
filled - 185:11
final - 225:15
findings - 247:3
Fine- 237:9, 237:17
fine - 44:19, 85:23, 101:4, 163:3, 168:9, 175:4, 205:10, 205:11, 234:6, 234:8, 234:17, 235:17, 237:16, 237:17, 238:25, 242:9, 242:10, 245:20
finger - 17:1
fingerprints - 32:14
finish - 55:5
finished - 45:22, 50:22, 161:17
fire - 35:5, 187:10
firearm - 23:14, 121:16, 165:25, 173:25
Firearms- 136:14
firearms - 37:14, 37:20, 174:3
fired - 67:18, 68:3, 191:24
first - 2:19, 2:25, 15:19, 18:17, 32:4, 39:25, 40:9, 51:6, 53:7, 56:24, 57:18, 63:19, 64:3, 70:18, 76:9, 77:17, 81:19, 84:16, 88:3, 88:8, 116:2, 123:9, 136:4, 144:13, 147:5, 151:3, 175:15, 175:25, 176:7, 179:16, 185:21, 185:22, 187:4, 192:4, 199:12, 201:13, 210:2, 210:5, 216:25, 234:3, 241:10, 246:6
First- 4:1
fist - 221:16
five - 83:1, 171:1, 172:15, 190:21, 190:22, 245:4
Five- 123:23
five-count - 171:1
five-year - 245:4
flash - 190:8
flashes - 18:25
flashlight - 126:22, 134:18, 134:20, 134:23
fled - 75:2
Fletcher- 72:15
flex - 72:24, 137:6
flooded - 243:20
floor - 15:1, 127:19, 129:16
floorboard - 127:4, 134:16
focus - 54:6
focused - 14:15
followed - 156:22
following - 52:3, 75:10
follows - 2:20, 45:3, 70:19, 88:4, 123:10, 136:5, 151:4, 176:8
foot - 75:2, 104:15, 104:17
forced - 221:2
foregoing - 247:9

forensic - 23:3
forget - 36:9, 239:9
forgot - 24:9, 193:4
forth - 174:13
forward - 48:17, 48:22, 52:5, 67:6, 67:13, 67:15
foundation - 100:16, 182:3
four - 27:11, 102:16, 103:3, 141:11, 147:17
Fourth- 172:21, 172:22, 173:2, 207:4
free - 67:3, 67:4, 67:10, 68:16, 68:21, 105:2, 108:19, 207:6, 207:14, 211:5
frequent - 178:5
frequently - 77:1
Friday- 228:5, 228:6
friend - 9:7, 39:5, 39:6, 69:25
friendly - 157:16, 158:5
Friends - 199:1
friends - 5:25, 9:8, 178:19, 178:21, 178:23, 179:4, 179:5, 199:2, 203:15
front - 16:17, 17:8, 21:20, 21:22, 22:21, 37:9, 74:2, 119:7, 128:17, 128:19, 135:14, 191:14
Fuchs- 1:15, 70:14, 70:15, 71:2, 73:7, 73:10, 79:13, 79:23, 80:1, 80:6, 80:11, 80:12, 82:16, 82:18, 85:21, 86:17, 86:19, 87:14, 88:12, 91:11, 96:4, 96:7, 100:3, 100:5, 101:8, 101:24, 102:9, 113:8, 113:14, 113:17, 114:22, 114:24, 118:22, 121:18, 122:22, 122:23, 123:4, 123:5, 123:18, 127:15, 129:8, 131:21, 133:10, 133:11, 135:9, 135:10, 135:12, 135:16, 135:25, 136:11, 140:7, 142:5, 142:8, 146:4, 149:25, 150:1, 150:3, 150:10, 150:18, 150:19, 151:10, 157:23, 159:17, 159:21, 160:24, 161:5, 164:7, 169:14, 169:17, 169:21, 169:23, 170:14, 170:21
fucking - 195:10, 195:21
full - 2:21, 70:20, 83:23, 84:4, 123:12, 136:6, 176:9
Fulton- 203:13, 211:13
Fulton's- 209:18
funny - 205:15
fussing - 25:21, 25:23

**G**

Gabriel- 136:1, 136:3, 136:8

7

**gain** - 100:12
**Galtney** - 46:18, 198:25
**gambled** - 37:1
**game** - 4:11, 14:4, 14:5, 14:6, 14:13, 14:16, 35:14, 35:16, 35:18, 35:19, 36:8, 39:25, 42:1, 42:2, 216:9
**gang** - 25:6, 39:21
**gap** - 179:24, 183:4, 185:23, 185:24, 185:25, 186:21, 187:9, 187:18, 187:21, 188:8, 188:21, 189:1, 198:7, 198:8, 199:6, 201:18
**Gary** - 1:17, 109:10, 109:17, 109:22, 110:6, 120:13, 120:14
**gate** - 22:16
**gather** - 67:23, 68:2, 101:19
**gathered** - 102:1
**gathering** - 100:11
**gauge** - 236:12
**general** - 107:19
**generally** - 164:9, 238:18
**gentleman** - 6:15, 94:25, 97:16, 127:10, 156:5, 156:17, 178:11, 184:7
**gentlemen** - 40:24, 143:10, 163:8, 169:8, 170:22, 226:22, 239:20, 240:5
**George** - 2:18, 2:24
**George's** - 199:10
**Georgia** - 136:15
**Georgie** - 187:2, 219:10, 219:17, 220:1
**Georgie's** - 219:6, 219:24
**Gerald** - 52:19, 99:14, 99:15
**gigantic** - 66:21
**Giglio** - 60:18, 64:25
**girlfriend** - 27:15, 27:17, 195:19, 201:5, 218:24
**given** - 48:17, 161:25, 165:14, 243:25
**glad** - 169:21
**glanced** - 19:2, 40:3
**gloves** - 40:11, 189:12
**gold** - 72:13, 74:23, 76:21, 76:23, 77:8
**government** - 2:3, 44:8, 50:20, 51:3, 52:21, 53:19, 55:13, 55:15, 55:19, 64:22, 68:24, 70:15, 96:22, 112:24, 145:4, 162:2, 162:11, 162:17, 163:2, 164:5, 165:6, 166:4, 166:7, 166:12, 166:18, 167:1, 168:18, 169:13, 170:11, 170:20, 171:12, 171:13, 172:6, 172:7, 172:18, 172:24, 175:18, 179:14, 179:16, 181:19, 191:6, 196:14, 196:25, 197:9, 200:5, 205:10,

206:1, 207:12, 210:18, 210:19, 228:18, 229:12, 230:11, 233:24, 236:18, 236:24, 239:5, 239:7, 240:4, 242:24, 242:25, 243:4, 244:17, 245:10
**Government** - 133:18
**government's** - 24:14, 41:21, 49:20, 71:22, 78:17, 79:14, 88:24, 94:14, 96:8, 124:12, 129:19, 130:16, 134:5, 135:25, 137:20, 142:10, 142:20, 142:23, 144:8, 152:1, 162:1, 169:4, 169:6, 169:18, 170:9, 181:13, 183:5, 186:4
**Government's** - 169:19
**grabbed** - 155:15, 156:14, 195:2
**gram** - 133:7, 133:9, 148:8
**grams** - 85:2, 86:11, 115:18, 132:22, 158:24, 159:12, 173:16, 173:17, 245:4, 245:9, 245:18, 245:21, 246:4, 246:9, 246:11, 246:12, 246:16, 246:17, 246:22
**grand** - 3:18, 10:8, 12:6, 13:15, 13:19, 19:17, 26:24, 29:1, 29:18, 37:5, 37:10, 37:16, 38:15, 45:12, 45:17, 46:10, 47:6, 48:10, 51:2, 51:3, 51:20, 52:15, 52:21, 55:18, 171:2, 219:24, 233:13, 233:22, 233:25
**granted** - 73:9
**great** - 67:19, 163:15
**green** - 23:11, 33:9, 90:23, 95:18
**Green** - 70:16, 70:17, 70:22, 71:3, 74:1, 86:20, 87:16
**Greenbelt** - 49:13
**grew** - 178:8
**gross** - 61:2, 67:1, 86:10
**ground** - 78:6, 156:15, 190:24
**group** - 81:7, 154:5, 154:21, 154:24, 155:2, 155:19
**Guerilla** - 38:25
**guess** - 9:7, 9:24, 10:4, 21:2, 24:9, 27:11, 31:10, 32:7, 54:7, 66:8, 70:3, 83:13, 83:21, 84:2, 84:3, 146:14, 147:20, 148:2, 176:22, 213:21, 216:8, 237:6
**guessing** - 36:1
**Guest** - 5:21, 45:24, 46:1, 46:4, 47:22, 51:22, 99:13, 174:6, 174:10, 174:11, 179:2, 179:23,

181:12, 233:12
**Guest's** - 5:14, 82:11
**guidelines** - 220:24, 247:2
**guilt** - 165:23, 204:5
**guilty** - 172:19, 177:15, 203:5, 203:7, 206:8, 206:18, 207:6, 207:13, 208:16, 208:21, 208:25, 209:11, 210:17, 212:7, 213:23, 214:24, 214:25, 215:2, 215:4, 215:5, 215:11, 222:21, 224:4, 224:13, 226:5, 245:14, 245:20, 245:23, 246:1, 246:4, 246:6, 246:8, 246:21
**Guilty** - 246:6
**gun** - 19:1, 20:17, 23:23, 24:3, 34:18, 38:1, 52:2, 52:7, 52:18, 53:21, 62:3, 65:9, 68:3, 117:14, 118:13, 189:14, 189:15, 194:22, 195:4, 195:5, 201:2, 201:13, 202:11, 202:13, 203:12, 204:23, 209:19, 211:13, 214:4
**guns** - 18:22, 24:7, 37:15, 37:19, 105:17, 107:21, 107:24, 117:17, 117:20, 117:25, 118:19
**gunslinger** - 36:13
**guy** - 6:3, 7:9, 19:13, 19:15, 19:19, 20:17, 20:23, 141:14, 184:11, 186:16, 193:21, 203:23
**guys** - 4:9, 5:25, 14:2, 16:14, 18:10, 19:9, 39:19, 81:7, 81:15, 109:25, 199:9, 210:7

## H

**hair** - 192:23
**half** - 15:10, 41:4, 83:20, 84:3, 84:6, 110:2, 110:15, 120:9, 121:13, 123:23, 136:17, 162:9, 163:4, 163:16
**Halfway** - 239:10
**Hall** - 1:7, 6:7, 6:13, 6:18, 7:2, 7:21, 8:12, 9:25, 10:7, 11:3, 11:25, 12:18, 29:9, 42:21, 42:25, 43:12, 46:20, 46:23, 51:23, 52:1, 52:6, 52:14, 52:16, 53:9, 53:15, 54:14, 73:18, 75:2, 75:25, 76:1, 76:8, 76:16, 77:11, 78:2, 78:12, 78:24, 79:1, 80:14, 80:16, 80:22, 81:13, 81:23, 82:4, 86:20, 91:4, 91:10, 91:12, 91:22, 91:24, 91:25, 92:13, 92:16, 93:7, 95:7, 95:20, 95:24, 97:24, 98:3, 98:9, 99:19, 99:21,

101:9, 101:17, 102:2, 102:11, 102:12, 102:22, 103:14, 103:19, 104:5, 104:10, 105:5, 105:9, 105:15, 105:22, 107:14, 107:18, 108:10, 108:14, 109:10, 109:17, 109:21, 109:23, 110:6, 110:11, 110:18, 110:21, 111:23, 113:18, 114:4, 114:20, 115:8, 115:19, 115:25, 119:23, 120:13, 120:14, 120:24, 122:4, 122:11, 127:8, 127:14, 127:25, 128:11, 128:13, 128:21, 128:25, 129:3, 129:11, 131:12, 131:14, 131:19, 135:1, 140:4, 140:6, 141:18, 141:21, 143:15, 145:19, 145:21, 146:2, 148:21, 149:8, 149:13, 149:18, 154:20, 155:1, 155:15, 155:18, 155:22, 156:9, 156:19, 156:21, 157:7, 157:10, 157:21, 158:5, 158:11, 158:18, 162:19, 165:2, 165:8, 166:15, 166:25, 170:1, 170:12, 170:13, 170:17, 215:20, 225:20, 226:15, 227:10, 228:2, 229:7, 230:17, 231:11, 232:18, 234:12, 234:13, 235:9, 235:14, 235:18, 235:24, 238:18, 238:22, 238:25, 245:20
**Hall's** - 109:13, 117:11, 120:16, 135:14, 149:2, 157:5
**Hamlet** - 55:23
**hand** - 11:10, 16:23, 74:8, 77:18, 78:18, 90:17, 141:13, 143:14, 154:21, 154:22, 155:10, 155:11, 155:20, 156:12, 156:14, 156:18, 189:16, 189:19
**handcuffs** - 106:16, 108:17
**Handcuffs** - 110:24
**handed** - 92:8, 141:12, 143:9
**handguns** - 105:13
**hands** - 154:25, 155:5
**handwriting** - 79:8
**hang** - 11:4, 12:4, 12:10, 16:14, 81:7
**hanging** - 42:11, 81:10, 82:3, 87:8, 183:1
**Hanging** - 81:15
**hard** - 83:12
**harm** - 54:13
**harmful** - 67:1

**Harmon** - 125:19, 125:20, 125:22
**head** - 23:7, 40:14, 59:1, 61:15, 189:9, 195:4, 195:5, 201:3, 201:13
**headed** - 185:13
**heads** - 237:19
**heads-up** - 237:19
**headset** - 232:18
**hear** - 3:11, 13:24, 18:15, 40:1, 41:14, 54:5, 66:21, 72:18, 169:21, 187:16, 190:8, 190:9, 190:15, 214:15, 232:19, 234:13
**heard** - 15:21, 18:17, 25:11, 37:18, 38:21, 39:25, 51:6, 69:21, 83:5, 86:7, 140:11, 180:25, 186:22, 190:10, 223:22, 226:10, 236:25
**hearing** - 21:8, 112:14
**hearsay** - 181:13, 207:3
**heat** - 65:22
**heavily** - 125:25
**heavy** - 236:13
**height** - 19:10, 19:11, 108:7, 192:11, 192:13
**held** - 165:11, 173:3, 211:13, 217:19
**help** - 10:21, 41:3
**helped** - 156:19
**helpful** - 10:15
**helps** - 148:18
**Henry** - 24:24
**Hershel** - 47:14, 198:9, 198:17
**hesitation** - 157:17
**high** - 153:17
**highly** - 112:25
**himself** - 52:19, 54:18, 99:10, 195:13, 228:12
**history** - 228:22
**hit** - 74:8, 78:18
**Hit** - 22:2, 77:18
**Hobbs** - 177:11, 177:12, 208:13
**hold** - 83:6
**Hold** - 164:20, 210:12
**holding** - 154:21, 155:4, 155:9
**hole** - 33:10
**holes** - 60:3, 61:16
**Hollins** - 28:14, 28:16, 28:24, 28:25, 125:17
**home** - 5:10, 47:25, 202:12, 202:16, 202:18, 202:21, 215:3, 238:16
**homes** - 89:3, 95:6
**homicide** - 27:10, 28:1, 30:3, 33:6, 59:1, 61:15
**Honor** - 2:15, 12:13, 29:15, 31:4, 40:25, 43:23, 43:24, 44:8, 44:13, 46:2, 46:5, 60:11, 61:2, 64:19, 66:18, 70:15, 73:8, 73:13, 79:11, 79:23,

8

80:6, 82:17, 86:15,
96:5, 100:3, 114:23,
122:23, 123:5,
131:22, 135:10,
135:17, 135:25,
142:6, 146:5, 150:11,
150:19, 157:24,
159:17, 161:6,
164:14, 167:25,
169:17, 169:23,
169:24, 170:14,
172:4, 176:15, 181:8,
181:16, 181:19,
206:6, 206:11,
207:10, 211:8,
213:16, 223:25,
225:1, 225:5, 226:11,
227:25, 230:13,
231:6, 233:10, 236:4,
238:11, 240:2
**Honorable** - 1:12
**hope** - 13:18
**hopefully** - 126:17
**Horton** - 52:19,
54:18, 99:14, 99:15
**hot** - 117:2, 117:3
**hour** - 162:9, 163:4,
163:16, 180:3, 238:15
**hours** - 193:9,
199:21, 201:12,
236:19, 237:4
**house** - 14:2, 14:24,
15:20, 15:23, 16:8,
16:10, 16:12, 18:10,
21:23, 22:19, 24:6,
24:7, 25:14, 25:17,
31:23, 32:12, 34:21,
34:24, 35:6, 42:16,
156:15, 203:11,
203:14, 204:1, 204:6,
204:22, 208:14,
209:14, 209:18,
210:1, 210:3, 210:11
**housed** - 55:8,
55:11, 55:18
**housekeeping** -
172:5
**houses** - 5:19, 5:20,
160:17
**housing** - 55:6,
55:23, 71:8, 71:13,
71:20
**Howard** - 46:16,
55:24
**hue** - 20:4
**hundred** - 76:10,
94:1, 134:25
**hung** - 4:21, 10:11,
11:5, 12:1, 12:11,
178:10
**hydrant** - 187:10
**Hysterical** - 26:18

## I

**lad** - 58:2, 60:17,
60:20
**idea** - 31:9, 205:17
**identification** -
73:12, 85:18, 144:5,
146:15, 148:19,
206:14
**identified** - 6:12,
26:23, 27:2, 91:10,
100:14, 127:13,
140:6, 144:3
**identify** - 30:14,
195:13
**li** - 97:22, 131:9,
145:17

**lii** - 123:8, 123:14
**illegal** - 125:8,
153:14, 156:24
**illuminated** - 41:25
**Immediately** - 31:22
**immediately** -
34:20, 40:8
**immunity** - 194:6
**impact** - 123:21,
123:25
**impeach** - 49:20,
58:11, 58:21, 62:16,
64:11, 66:16
**impeaching** -
65:24, 66:7
**impeachment** -
58:22, 65:18
**implicating** -
199:16, 199:24
**important** - 170:23
**Imposed** - 48:6
**impossible** - 157:6,
161:4
**imprisonment** -
170:2, 171:4, 171:10
**improper** - 100:8
**incarcerated** -
176:25, 177:22
**incarceration** -
217:25
**inch** - 41:4, 83:20
**inches** - 192:16,
216:14, 216:18
**incident** - 59:14,
61:5, 67:17, 105:5,
142:15
**Incidentally** - 119:7
**inclined** - 67:13,
196:20
**inconsistency** -
60:13, 60:24, 61:4,
61:11, 65:23, 66:14,
66:20
**inconsistent** -
233:15
**incrimination** -
228:13
**indeed** - 173:1
**indicate** - 162:13,
239:7
**indicated** - 65:15,
212:12, 227:12,
227:19, 239:14,
239:15
**indicates** - 58:16
**indicted** - 48:9
**indictment** - 84:14,
84:16, 115:10, 132:7,
132:10, 171:1,
173:18, 244:6, 244:7,
244:8
**individual** - 17:11,
67:16, 68:18, 102:8,
141:11, 144:12,
155:8, 168:10, 225:9
**individuals** - 20:13,
21:11, 41:9, 99:5,
101:12, 139:3,
139:20, 141:1, 141:7,
143:20, 144:14
**inducement** -
107:2, 114:13
**inducements** -
109:5, 111:12
**indulgence** - 41:18
**inference** - 49:14,
50:7, 61:13, 229:2
**inferences** - 172:25,
207:3
**inferentially** -

245:15
**infinitesimally** -
66:20
**influence** - 230:1
**informant** - 173:5
**information** - 51:15,
51:18, 52:9, 100:12,
101:25, 174:12,
243:21, 244:15
**informed** - 53:18
**initiated** - 125:19
**initiating** - 126:9
**innocent** - 60:8
**innocuous** - 106:10
**inquiry** - 113:2
**inseam** - 75:4,
76:17
**inside** - 16:16, 24:7,
126:13, 126:23,
147:23
**insignificant** -
60:23
**instance** - 244:10
**instead** - 216:12
**instruct** - 63:2,
165:16, 169:9
**instruction** - 167:7,
172:1, 229:6
**instructions** -
236:14, 236:15,
236:21, 236:23,
237:11, 238:21,
239:3, 241:7, 242:7,
243:8, 243:18,
243:23, 244:4, 244:7,
244:24, 244:9
**intelligence** -
100:10, 101:19, 102:1
**intelligent** - 232:13
**intend** - 227:13
**intent** - 174:11,
215:17, 217:22, 246:7
**interactions** -
157:14
**interest** - 165:19,
166:14
**interfered** - 32:13
**interference** -
175:11
**internal** - 59:10,
60:20, 65:2, 195:24,
196:6
**internally** - 134:11
**interrupt** - 74:1
**intersection** -
77:22, 98:24, 125:22,
131:3
**interval** - 46:7,
46:22
**interview** - 47:8,
47:18
**interviewed** - 27:9,
27:21, 46:10
**intimidate** - 211:24,
212:4, 213:7
**introduce** - 85:14,
165:7, 165:15,
167:11, 171:18,
207:24
**introduced** - 167:6,
210:18
**invalidate** - 173:18
**invasion** - 47:25,
202:16, 202:18,
202:21
**investigate** - 120:11
**investigating** -
112:6
**investigation** -
45:7, 46:1, 46:4,

59:11, 65:2, 82:11,
82:14, 111:18,
111:20, 112:1,
113:19, 114:20,
131:19, 146:1, 157:21
**involved** - 23:2,
66:10, 111:19, 114:19
**irons** - 175:2, 175:5
**irrelevant** - 49:19,
119:17
**Isaac** - 51:24, 51:25,
52:25, 184:3
**issue** - 60:16,
62:17, 63:8, 64:8,
68:11, 173:13,
230:22, 233:2, 242:21
**issued** - 128:24
**issues** - 64:14,
238:13, 239:2
**items** - 134:3
**itself** - 80:9, 165:14

## J

**jacket** - 23:12, 33:4,
33:9, 33:12, 33:15,
33:17, 95:18
**Jackson** - 72:15,
72:20
**jail** - 167:20, 167:23,
168:4, 217:2
**Jamar** - 46:16, 55:24
**Janu** - 123:6, 123:8,
123:14, 123:17,
123:19, 135:19
**January** - 89:10,
115:6, 136:23
**jeans** - 90:24
**jeopardized** - 54:12
**Jerrell** - 203:20,
203:21, 209:17
**job** - 163:15
**Jocelyn** - 55:23
**John** - 1:15, 103:10
**Jones** - 45:13,
45:16, 45:19, 47:5,
47:21, 47:24, 50:3,
50:9, 50:18, 101:3,
162:18, 168:8,
168:10, 174:25,
175:2, 175:15,
175:25, 176:4, 176:6,
176:11, 176:14,
176:20, 197:24,
212:2, 212:4, 213:9,
213:20, 216:25,
224:21, 230:21
**Jones'** - 100:19,
162:1
**Jr** - 1:15, 88:2, 88:7
**judge** - 5:4, 63:13,
200:10, 208:20,
208:24
**Judge** - 1:13, 44:19,
44:20, 48:6, 49:6,
49:10, 57:15, 57:20,
82:21, 83:5, 85:20,
100:17, 112:8, 119:8,
122:1, 133:14,
133:16, 133:24,
149:21, 161:12,
161:25, 175:9,
200:10, 206:13,
207:17, 216:4, 216:8,
221:4, 221:5, 222:7,
224:17, 238:22,
239:9, 244:3
**judged** - 63:15
**judgment** - 172:15
**July** - 45:10, 46:8,

46:9, 71:7, 72:5,
81:23, 85:24, 87:4,
105:3, 112:14, 115:6,
116:23, 117:7
**jump** - 175:7,
176:23
**jumped** - 186:24
**jurors** - 2:15, 10:14,
240:23, 243:11,
243:12
**Jury** - 1:13, 2:10,
164:2, 168:24, 227:5,
239:19
**jury** - 2:2, 3:11,
3:18, 5:4, 8:2, 9:4,
10:8, 11:9, 11:15,
12:6, 13:15, 13:19,
13:20, 14:10, 16:1,
17:24, 18:5, 18:9,
19:7, 19:12, 19:17,
19:19, 21:16, 23:8,
25:16, 26:24, 28:20,
29:1, 29:18, 37:5,
37:10, 37:16, 38:15,
40:24, 45:12, 45:17,
46:10, 47:6, 48:10,
51:2, 51:3, 51:20,
52:15, 52:21, 54:4,
55:18, 63:2, 63:17,
72:18, 73:22, 74:3,
80:7, 80:10, 83:6,
86:7, 89:22, 90:1,
105:7, 125:15, 139:5,
143:4, 148:15,
153:25, 161:13,
162:7, 164:3, 165:14,
165:16, 167:6,
168:17, 168:23,
171:2, 173:11,
173:23, 183:10,
194:24, 199:19,
203:7, 203:19,
204:20, 205:21,
207:24, 219:24,
225:19, 226:14,
229:8, 229:11,
233:13, 233:23,
233:25, 236:7, 238:1,
238:21, 239:3, 239:8,
239:18, 240:9,
241:21, 241:23,
243:11, 244:4, 244:20

## K

**Kareem** - 5:14, 5:21,
5:22, 45:24, 47:22,
51:22, 82:11, 99:13,
174:6, 174:10, 179:2,
179:10, 179:22,
180:8, 180:11, 181:2,
181:12, 181:22,
182:10, 183:7,
185:21, 186:6, 187:4,
187:18, 187:19,
188:2, 188:7, 188:20,
190:1, 190:15,
196:12, 196:15,
197:10, 197:12,
197:13, 220:2, 224:14
**Kareem's** - 190:23
**keep** - 2:23, 82:4,
99:22, 175:4
**Keep** - 13:7
**keeps** - 175:11,
216:13
**Kelly** - 174:10
**Kent** - 98:25,
153:17, 154:6, 156:16
**Kentucky** - 177:7

9

kept - 21:8
Kermit - 89:25,
90:18, 90:25, 92:14,
95:17
Kev - 7:8, 8:14, 28:2,
193:15, 193:19,
193:25, 202:2, 202:4
Kevin - 7:5, 7:6,
46:11, 46:15, 81:8,
81:10, 99:13
Keyburn - 28:2,
28:3, 28:5, 184:7,
184:8, 201:17, 223:7,
225:6, 225:25, 227:14
Keyburn's - 184:11,
225:25
kid - 4:14
kids - 14:13, 14:22,
24:8
kill - 195:10, 195:21
killed - 4:6, 9:6,
9:11, 9:16, 25:9,
32:22, 35:3, 41:12,
179:10, 182:10,
182:19, 182:23,
196:11, 220:2
killer - 112:16,
112:23
killing - 174:10
kilograms - 160:8
kind - 23:17, 35:18,
36:1, 37:22, 40:3,
67:8, 107:2, 117:23,
153:19, 187:3,
199:13, 230:3
Knot - 177:7
knowing - 232:13
knowingly - 171:5
knowledge - 12:17,
43:3, 129:4
known - 4:12, 4:14,
6:7, 6:18, 25:24,
45:13, 57:3, 76:24,
77:10, 86:12, 90:12,
178:17, 180:21,
227:14
knows - 8:3, 77:7,
113:11, 196:17,
221:24, 242:14

**L**

lab - 145:6, 145:7
ladies - 40:23,
223:9, 240:5
Ladies - 163:7,
169:8, 170:22,
226:21, 239:20
lady - 183:22, 184:3
Lakeland- 104:8,
104:11, 116:5
Lamont- 57:19,
231:14, 231:15,
231:18
lamp - 42:8, 42:17
large - 3:14
Larry- 88:2, 88:7,
88:10
last - 8:23, 21:3,
24:21, 56:7, 57:21,
60:22, 105:11, 109:9,
113:9, 120:6, 121:24,
121:25, 123:15,
183:18, 199:19
late - 87:20, 87:21,
109:8, 117:5, 120:2,
136:23, 227:1
latest - 30:22
latitude - 66:11
laughing - 168:1,

240:17
Laughter- 163:13,
240:16
law - 2:20, 45:3,
70:19, 88:4, 117:10,
117:13, 117:16,
123:10, 136:5, 151:4,
174:12, 176:8, 207:4,
217:4, 238:20,
238:21, 239:3, 241:8,
242:14
Lawler- 49:11,
49:12, 100:20, 101:3,
167:19, 168:2, 227:6
lawsuit - 65:3
lawyer - 49:11,
62:25, 100:19, 101:4,
162:1, 185:1, 197:8,
222:13, 222:15
lawyers - 166:2,
166:3, 169:10,
171:23, 226:25,
227:12, 227:18,
231:10, 232:1, 232:5,
234:15, 238:20, 240:7
lay - 100:16
laying - 182:2
leads - 34:3
lean - 3:11
leaning - 216:10
learned - 47:9
least - 19:17, 45:13,
46:2, 80:18, 83:6,
102:23, 238:15
leave - 13:17, 21:14,
22:10, 74:3, 92:12,
108:19, 139:5, 175:2,
241:18, 245:23
leaving - 21:17,
21:20, 40:16
led - 209:14
left - 4:7, 6:10,
10:19, 11:22, 14:16,
15:5, 15:8, 15:16,
16:23, 19:4, 21:15,
22:2, 22:5, 22:8, 23:4,
25:21, 27:14, 31:23,
34:20, 34:24, 35:24,
40:3, 74:8, 77:18,
78:18, 125:18,
128:16, 128:19,
135:14, 143:13,
143:19, 143:23,
146:20, 152:15,
154:21, 155:10,
156:12, 189:16,
200:9, 200:16,
203:15, 203:25
Left- 191:17
left-hand - 16:23,
74:8, 77:18, 78:18
leg - 175:2, 175:5
legal - 185:16,
239:2, 240:6, 240:13,
247:1
leisure - 207:25
lengths - 75:12
Less- 197:3
less - 57:25, 58:1,
58:19, 160:22,
177:20, 197:4,
245:15, 245:18,
245:20, 246:4,
246:12, 246:16,
246:17, 246:22
letter - 205:16,
208:11, 211:20,
237:19
level - 140:19, 160:7
license - 126:12

lie - 58:9, 194:4
lied - 59:22, 59:23
life - 6:19, 6:20,
6:21, 178:18, 204:17
light - 11:10, 11:15,
23:11, 42:9, 42:11,
42:15, 134:17,
163:12, 172:17
lighter - 20:7, 20:10
Lighter- 20:9, 20:11
lights - 11:19, 42:1,
42:3, 42:7
likely - 86:24
limitation - 211:1
limitations - 117:23
Line- 12:15, 12:19
line - 63:19, 68:13
lines - 132:16
linked - 34:10
Linnard- 2:16, 2:18,
2:24, 3:2
listen - 165:8,
240:14
listening - 53:10,
117:19, 240:15
lit - 41:25
live - 177:24
lived - 4:22, 4:23,
4:24, 5:18
lives - 5:17
living - 39:16
located - 234:1
locating - 44:21
location - 97:14,
131:2, 145:12, 232:16
locations - 160:17
lock - 100:25
look - 5:1, 5:3,
10:19, 16:5, 16:16,
17:12, 18:16, 22:10,
29:1, 41:15, 86:6,
92:4, 95:6, 118:5,
142:22, 147:12,
189:10, 190:10
looked - 20:23,
21:19, 22:19, 24:17,
40:9, 74:23, 91:18,
127:19, 144:18,
146:23, 200:17
looking - 17:21,
19:5, 72:25, 89:7,
112:19, 127:2, 131:5,
152:4, 206:4, 206:9,
206:20, 209:20,
221:19
Looking- 142:10,
152:5
looks - 143:2,
147:19, 148:2, 161:1
lost - 3:14
loud - 35:15, 51:7
louder - 35:17
love - 240:15
lower - 16:23
luck - 222:16, 247:6
Luger- 171:6
lunch - 100:23,
162:4, 162:10, 163:1,
163:4, 163:9, 163:17,
169:1, 238:8, 238:9,
240:21, 240:24,
241:3, 241:8
Lunch- 163:18
lying - 61:9, 64:9,
64:12

**M**

Mack - 6:7, 12:20,
12:25, 28:2, 29:21,

29:23, 42:20, 178:16,
178:17, 180:19,
192:2, 192:7, 192:9,
192:11, 193:2, 193:5,
193:24, 194:4,
196:14, 197:2,
197:10, 197:11,
199:20, 200:14, 223:3
mad - 29:4
Madam - 242:23
Maes - 225:7,
227:13, 230:22,
230:23, 232:17,
232:22, 233:3,
233:11, 234:8, 235:15
mail - 84:7
mailed - 237:13
Maisel - 5:11, 8:5,
21:24, 77:23, 81:4,
98:21, 152:12,
191:22, 201:17,
233:11
male - 20:6, 74:18,
74:20, 74:21, 75:1,
90:6, 90:10, 90:22,
91:21, 91:23, 92:2,
92:9, 92:12, 93:3,
93:9, 93:10, 95:5,
139:21
males - 19:23,
19:25, 154:5
maliciously - 174:9
man - 22:24, 24:15,
25:18, 58:6, 58:7,
58:12, 58:16, 58:24,
59:15, 59:16, 59:18,
61:5, 61:16, 61:20,
61:23, 62:19, 63:11,
63:12, 63:25, 64:10,
64:13, 64:18, 65:16,
65:17, 66:2, 67:21,
67:23, 67:24, 68:10,
91:1, 179:2, 205:8,
214:14, 216:1, 222:16
mandatory - 217:5,
217:6, 217:20, 245:4,
245:5
map - 74:4, 90:1,
90:8, 137:24, 152:10,
152:19, 152:21,
154:8, 179:22
March - 7:13, 124:2,
124:7, 124:20,
131:12, 153:2, 153:23
mark - 74:3, 74:9,
77:19, 79:3, 85:11,
139:5, 146:15,
154:10, 245:15
marked - 41:20,
73:12, 78:17, 169:15,
186:3, 206:1, 221:25
markedly - 66:4
marker - 84:10
marks - 16:24, 80:3
Marks - 78:1
maroon - 176:22
marshal - 175:1
marshal's - 235:10
marshals - 100:24,
176:3
Martie - 4:3, 9:5,
9:6, 9:10, 9:15, 10:6,
12:21, 13:22, 14:24,
16:12, 17:14, 21:6,
22:20, 23:23, 24:9,
24:17, 25:8, 26:10,
30:4, 30:5, 30:23,
35:3, 36:10, 39:14,
42:21, 42:25, 99:13
Martie's - 10:1,

25:4, 37:6
Martin - 153:12
Maryland - 1:1,
60:2, 117:22, 126:1,
217:4
Mask - 192:25,
193:1
mask - 19:20, 21:1,
41:5, 107:20, 107:22,
110:2, 110:11,
118:19, 186:22,
189:11
masks - 26:7, 26:9,
40:21
match - 130:22,
142:14, 142:24
matching - 129:22
material - 65:1
math - 132:21,
159:2, 159:3
matter - 45:22, 64:8,
65:3, 65:5, 173:19,
181:23, 206:9,
207:11, 207:14,
210:23, 210:24,
211:6, 226:15,
226:24, 228:6,
229:20, 230:19,
231:24, 234:24,
238:21, 241:17,
247:11
matters - 164:4,
240:6, 240:13
Maze - 226:2, 226:3,
235:5, 235:9
Mcac - 177:3, 177:4
Mcclinton - 56:1,
56:3, 99:14
Mcdonalds - 199:9
Mclarney - 59:1
mean - 7:3, 9:20,
9:24, 10:11, 14:5,
14:14, 15:9, 17:18,
20:16, 22:17, 23:12,
26:9, 26:16, 29:4,
29:13, 36:12, 36:25,
38:22, 39:18, 41:14,
41:24, 43:1, 66:15,
68:1, 68:10, 69:20,
83:19, 92:24, 105:25,
107:18, 140:13,
140:14, 141:19,
160:14, 196:18,
197:11, 245:1
means - 146:23,
214:3, 243:24
meant - 121:3,
121:8, 122:5, 122:9
measure - 85:4
mechanical - 1:24
Medical - 60:2
medical - 58:10,
58:15, 60:1, 60:5,
65:16
medication - 230:2
meet - 25:7, 27:9,
31:13, 31:15, 163:1,
218:12, 219:10, 241:9
meeting - 54:9, 54:8
Meeting - 101:12
meetings - 54:25
Meka - 53:17
member - 38:19,
39:21, 168:2
members - 183:10
memory - 10:10,
12:16
men - 150:8
mention - 58:18
mentioned -

201:16, 223:9
mentioning - 45:15, 162:14
Mercedes - 219:8
merely - 165:18
mess - 22:22
met - 3:16, 31:11, 97:24, 98:1, 103:18, 131:12, 143:24, 145:21, 157:9, 162:24, 196:10
Michael - 49:11, 100:20, 167:19
microphone - 176:13
Mid - 117:6
nid - 87:20
Mid-afternoon - 117:6
mid-morning - 87:20
middle - 74:14, 152:21, 160:5
Middle - 104:11, 116:6
midst - 44:11
might - 10:21, 23:1, 23:3, 139:16, 158:11, 185:10, 215:7, 225:23, 226:25, 234:9, 242:4, 243:9, 243:24, 243:25
mike - 3:11, 72:18
Mike - 56:7, 183:21
millimeter - 171:6
mind - 93:20, 95:24, 119:24, 141:17, 165:4
minimized - 61:19
minimum - 245:3, 245:4
miniscule - 60:23
minivan - 125:17, 125:25, 126:2, 135:4
minute - 5:3, 60:22, 63:18, 227:4, 234:11
minutes - 15:9, 15:10, 35:22, 87:21, 163:11, 195:3, 198:10, 198:11, 225:14, 227:3, 234:21, 241:16
misconduct - 67:11
misleading - 84:22
Miss - 5:14, 5:16, 5:17, 51:25, 55:21, 84:9, 100:23, 101:2, 101:4, 163:10, 167:21, 179:8, 206:23, 209:18, 211:13, 240:21, 241:9
mistreatment - 67:11
moment - 12:12, 29:15, 43:22, 65:22, 67:19, 170:10, 209:3, 227:10
moments - 32:21, 232:15
money - 36:24, 37:1, 128:22, 129:11, 135:13, 143:9, 143:14, 148:13, 148:15, 148:16, 148:19, 148:24, 149:1, 149:14, 155:4, 155:10, 155:19, 156:18, 194:8, 203:15, 208:15, 209:20, 211:15
monitor - 5:2, 100:11
month - 105:4, 107:13, 116:21, 120:2, 182:14
months - 10:9, 57:3, 121:19, 137:11, 177:20
Moody - 44:9, 45:1, 45:6, 57:19, 59:19, 62:1, 62:8, 62:13, 65:14, 66:2, 66:12, 66:23, 67:5, 67:23, 68:17, 70:11, 121:20, 121:21, 194:18, 200:17, 200:18, 200:23, 201:2, 201:4, 201:13, 223:18, 231:19
morning - 2:11, 2:14, 3:6, 3:7, 31:7, 31:8, 86:21, 87:20, 87:21, 98:13, 117:4, 182:21, 203:7, 231:6, 234:25, 236:9, 236:11, 241:11
Most - 77:8, 98:15
most - 106:3, 106:9, 172:17
mostly - 99:11
motel - 219:12, 219:13
Motel - 219:15
mother - 5:15, 27:16
motion - 21:5, 142:2, 150:8, 166:20, 172:11, 172:15, 173:7, 174:17, 174:18, 174:20, 185:11, 212:17, 212:19, 242:25
motioned - 141:1, 141:24
motions - 239:11
mouth - 92:1, 92:16, 141:12, 156:12, 156:21, 157:5, 193:23
Mouzon - 56:7
Move - 50:13, 213:17, 224:1
move - 72:17, 85:22, 243:1, 244:2
moved - 17:5, 55:19, 57:5
moving - 85:20
murder - 4:2, 4:10, 7:13, 7:18, 8:6, 10:1, 10:7, 11:3, 14:1, 14:3, 14:23, 15:8, 18:4, 25:4, 27:8, 30:6, 30:23, 32:19, 34:10, 45:9, 45:24, 46:9, 46:14, 47:13, 47:22, 51:21, 62:12, 120:25, 121:16, 174:6, 218:11, 218:17, 223:5
murdered - 5:11, 16:12, 179:23
music - 18:11, 18:13, 35:15, 35:17
must - 25:24, 234:24

**N**

name - 2:22, 2:25, 6:6, 8:20, 8:23, 27:18, 28:13, 53:3, 53:7, 70:21, 79:10, 88:6, 88:8, 123:12, 123:13, 123:15, 136:6, 151:6, 176:10, 183:18, 219:13, 225:6, 225:25, 226:1
name's - 146:20
named - 7:9, 24:24, 99:17, 109:10, 179:2, 183:22, 184:3, 184:7, 203:13
names - 203:18
narcotic - 131:10
narcotics - 72:25, 74:25, 81:16, 82:8, 84:17, 92:6, 92:20, 94:20, 138:5, 138:13, 143:5, 153:21, 159:7, 159:23, 160:1
narrowed - 243:9
nature - 43:4
near - 98:24, 150:7
need - 3:10, 10:9, 13:17, 45:21, 50:2, 53:2, 80:8, 80:9, 100:12, 100:15, 165:17, 171:14, 171:15, 171:18, 182:3, 210:22, 211:2, 226:17, 238:19, 240:7, 240:14, 241:20, 242:6, 242:8, 245:7, 245:13, 245:21, 246:3, 246:24
needed - 172:5
needs - 100:22, 234:5
neighborhood - 39:13, 71:16, 71:19, 81:18, 82:5, 88:22, 98:2, 100:10, 101:17, 124:10, 137:18, 151:20, 180:16, 196:7
neighborhoods - 125:9
nephew - 9:12, 9:13, 43:7
Never - 243:5
never - 9:17, 9:21, 10:2, 31:11, 31:18, 36:15, 36:16, 36:25, 37:15, 38:17, 38:18, 48:22, 48:25, 50:18, 62:3, 179:25, 180:3, 196:5, 212:22, 226:10, 229:12, 229:13
new - 55:23, 212:16, 212:17
Next - 44:7, 123:4, 150:18
next - 2:3, 2:13, 2:16, 14:15, 20:16, 22:23, 90:21, 112:16, 112:23, 113:12, 126:8, 127:22, 136:1, 150:19, 155:7, 155:13, 167:3, 204:12, 215:13, 241:15, 244:2
nice - 69:19, 70:5, 169:1, 227:6
nickname - 7:7, 8:25, 109:14, 197:24
night - 23:24, 40:19, 43:12, 45:18, 46:15, 47:13, 50:20, 55:2, 55:7, 57:21, 134:16, 179:10, 182:9, 182:22, 182:23, 183:20, 183:24, 184:5, 184:9, 185:21, 186:1, 193:5, 193:16, 200:6, 201:17, 218:11, 223:3, 223:4, 223:5, 225:8, 230:25
nine - 121:18, 171:6
nobody - 28:19, 99:15, 196:21, 196:22
noise - 19:1, 240:15
none - 34:13, 34:15
None - 157:19
Norfolk - 98:16, 105:8, 107:18, 109:21, 112:6, 113:25
normal - 138:12, 138:19, 157:16
Normally - 100:25
north - 125:23, 155:9
northbound - 154:3
note - 173:12, 173:15, 226:4
noted - 68:14, 236:24
notes - 112:19, 113:2, 237:15
Nothing - 24:22, 57:7, 107:8, 122:21, 135:8, 149:23, 159:14, 197:18, 224:18
nothing - 9:18, 34:12, 34:15, 36:17, 121:17, 162:16, 189:20, 196:5, 201:1, 202:24, 219:23, 232:7
notice - 19:12
notified - 166:24
November - 50:25, 51:1, 55:10, 112:13, 113:1, 224:10
now's - 209:15
number - 58:23, 79:2, 79:22, 84:19, 86:6, 95:1, 95:2, 97:7, 97:8, 97:9, 129:22, 130:21, 130:22, 142:10, 142:14, 142:15, 142:18, 145:8, 208:12
numbers - 142:24, 148:18
numerous - 119:25, 238:13

**O**

o'clock - 94:5, 161:11, 182:20, 182:23, 225:8, 230:25, 234:23, 236:6, 238:16, 240:9, 240:20, 241:5, 241:8
oath - 43:4, 206:19, 206:21, 209:2
object - 60:25, 91:25
objected - 237:1
objection - 68:24, 85:21, 100:15, 102:5, 112:9, 112:16, 181:13, 216:4
Objection - 49:4, 87:12, 99:25, 101:22, 129:6, 160:20, 181:7, 205:23, 213:11, 221:21, 223:25
objection's - 207:19
objections - 236:24, 237:11
observations - 101:25
observe - 19:18
observed - 7:20, 90:6, 90:22, 104:10
observing - 89:25, 153:14
obtained - 50:24
obtaining - 47:20
Obviously - 175:5
obviously - 168:3, 172:14, 245:8
occasion - 3:19, 7:4, 25:1, 27:9, 27:22, 200:7
occasions - 27:12, 27:13, 47:22, 63:20, 120:1
occurred - 27:8, 32:9, 32:19, 55:6, 65:6, 184:14, 193:10, 198:5, 198:7, 198:18, 198:21, 218:18
October - 111:22, 113:21
offender - 220:24, 222:25
offense - 171:8, 171:11, 208:16, 209:1, 215:9
offer - 64:23, 107:2, 109:5, 111:12
offered - 48:11
Office - 65:4, 226:6
officer - 60:4, 63:13, 63:24, 64:9, 64:12, 67:8, 68:21, 71:5, 77:4, 83:9, 88:15, 103:14, 123:22, 126:5, 194:25, 195:13
Officer - 57:19, 66:23, 83:16, 86:3, 125:5, 127:25, 194:18, 223:18
officers - 77:8, 103:12, 174:12
often - 7:1, 16:13, 71:18, 80:16, 89:4, 91:15, 98:3, 102:14, 124:17, 151:24, 158:6
Old - 161:21, 162:14, 164:9, 164:10, 165:10
old - 3:8, 176:20, 203:13, 215:14
older - 6:21, 6:22, 6:24
once - 217:19, 226:12
Once - 7:3, 216:15
One - 19:13, 94:5, 170:25, 171:8, 232:25
one - 3:18, 27:13, 27:21, 29:15, 34:23, 40:22, 42:10, 43:12, 43:14, 43:22, 44:21, 45:15, 46:21, 46:22, 46:25, 47:1, 47:2, 56:14, 63:19, 66:6, 67:17, 75:7, 86:7, 116:2, 117:7, 120:20, 120:22, 121:24, 121:25, 140:8, 141:11, 142:17, 147:19, 152:7, 156:17, 162:21, 164:11, 169:5, 169:9, 170:3, 171:5, 171:10, 171:23, 175:10, 179:16, 184:23,

203:13, 204:24,
210:10, 210:13,
214:6, 214:8, 214:9,
214:11, 214:20,
215:13, 220:17,
221:8, 225:5, 227:13,
237:5, 240:23, 241:1,
244:2, 244:19
**one's** - 142:16
**one-year-old** -
203:13
**ones** - 42:3
**Open** - 153:21
**open** - 133:20,
133:22, 134:2
**opened** - 21:19
**operate** - 140:20
**operations** - 124:3,
137:3, 137:4, 138:6,
149:9
**opinion** - 172:21,
172:22
**opportunities** -
200:2
**opportunity** - 48:11,
48:17, 50:19, 228:3,
229:20
**option** - 57:4
**options** - 203:9,
203:10, 204:15
**order** - 126:1,
128:24, 138:13,
235:10
**ordered** - 156:17
**otherwise** - 46:3,
243:20
**ounce** - 160:25
**ounces** - 160:11,
160:15
**Outlaw** - 241:14
**outlined** - 174:16
**outset** - 45:15
**outside** - 32:5,
104:5
**overreacted** - 67:7,
68:20
**overreaction** -
67:11
**Overruled** - 49:5,
101:23, 102:6, 129:7,
160:21, 205:24
**overruled** - 100:15,
207:19
**overt** - 84:17, 84:19,
115:12, 244:11
**Overt** - 132:12
**overwhelming** -
243:13
**overwhelmingly** -
166:5
**own** - 68:11,
186:20, 223:17,
223:20
**Oxycontins** - 217:17

## P

**pack** - 168:17
**packaged** - 92:6
**packages** - 140:14,
140:15, 141:11,
142:21, 143:7
**packed** - 143:1
**Page** - 12:14, 29:18
**pants** - 76:16,
76:17, 95:19, 189:11
**papers** - 180:11
**Paragraph** - 208:12
**paragraphs** -
243:25

**parenthetically** -
226:4
**parked** - 90:5, 90:8
**part** - 10:11, 12:1,
62:6, 71:9, 71:12,
78:18, 137:15, 146:1,
151:13, 151:22,
152:7, 157:20, 193:6,
206:7, 206:8, 208:3,
208:6, 208:11,
209:20, 210:19,
210:25, 212:6, 222:11
**participate** - 82:11,
131:18
**participated** -
159:9, 159:23, 160:1,
214:19, 214:23,
215:10
**particular** - 7:19,
52:22, 71:12, 99:24,
102:2, 106:12,
142:15, 171:2, 178:1
**particularly** - 19:19,
20:2, 66:14
**parties** - 169:5,
169:25
**partner** - 156:17
**party** - 65:25
**passenger** - 51:24,
126:7, 127:8, 135:2
**past** - 188:2, 188:20
**Patapsco** - 33:19,
34:7
**patrol** - 103:11
**patrolling** - 73:24,
74:11, 104:9
**pattern** - 68:18
**Paul** - 150:20,
151:2, 151:17
**pay** - 102:1, 143:12
**paying** - 243:19
**pen** - 134:13,
191:16
**penalty** - 160:21
**pencil** - 191:16
**pending** - 57:20,
58:1, 58:2, 58:18
**penitentiary** -
202:10
**people** - 8:11,
14:25, 18:1, 18:20,
18:25, 22:18, 25:12,
25:15, 26:9, 27:23,
27:25, 31:22, 34:20,
35:3, 36:6, 40:4,
60:24, 62:7, 66:23,
67:6, 67:12, 67:13,
77:3, 99:10, 99:11,
99:12, 100:12,
101:16, 110:4,
119:18, 120:17,
121:8, 139:13, 146:6,
147:3, 154:23,
154:24, 155:2, 155:4,
155:19, 160:4,
178:24, 196:5,
202:19, 202:20,
203:4, 203:12,
204:19, 204:23
**peoples** - 53:18,
147:6
**perceived** - 99:5
**percent** - 76:10,
134:25
**perhaps** - 54:4,
87:18, 168:3, 233:15
**period** - 217:2,
217:3
**permission** - 80:7
**Permission** - 73:7,

73:9, 79:11, 96:4,
142:5
**permit** - 64:21, 67:2,
67:10, 166:12
**permitted** - 49:25,
63:23, 64:5, 67:14,
68:14, 165:15
**permitting** - 166:11
**person** - 6:6, 17:13,
19:18, 20:7, 24:24,
39:16, 39:22, 46:23,
47:1, 53:7, 59:3,
61:24, 76:13, 93:21,
93:22, 94:6, 95:15,
95:16, 95:24, 117:11,
117:13, 117:17,
120:8, 139:25,
148:22, 149:3,
155:18, 160:14,
160:15, 160:18,
160:19, 170:5,
187:19, 187:22,
187:23, 189:4,
189:19, 189:25,
192:5, 203:2, 221:15,
225:17, 228:11, 246:8
**personal** - 64:21
**Personally** - 36:15
**personally** - 9:17,
9:21, 114:19, 128:13,
138:7
**ph** - 225:7
**phone** - 198:9,
198:13, 198:17, 201:6
**photo** - 10:21,
142:17
**photos** - 69:24,
144:2
**phrased** - 100:7
**pick** - 27:15, 35:8
**Pick** - 245:23
**picked** - 27:17, 35:4
**pickup** - 5:25,
74:11, 74:17
**picture** - 22:7,
30:12, 41:21, 79:2,
79:20, 96:14, 143:2,
144:9, 144:11,
144:12, 186:14,
186:17
**pictures** - 16:3,
17:15, 144:6, 179:12
**piece** - 75:7
**pieces** - 34:10
**Pierpont** - 125:20,
125:22
**pills** - 140:15, 143:6
**Pine** - 177:7
**pink** - 147:9,
147:17, 148:1, 148:2
**pinks** - 147:15
**place** - 8:6, 11:14,
54:8, 70:5, 75:1,
94:11, 139:15, 144:3,
155:16, 156:19,
245:19
**Placed** - 75:2
**placed** - 75:3,
78:12, 94:12, 95:5,
95:14, 127:23, 128:21
**placing** - 128:1
**plainclothes** -
72:10, 77:9, 89:14,
124:25, 137:7,
138:12, 153:7
**Plaintiff** - 1:4, 1:15
**plan** - 241:3
**planned** - 231:11
**planning** - 245:5
**play** - 14:13, 53:2,

54:4
**played** - 54:3
**playing** - 14:4,
14:16, 35:15, 36:8,
39:25, 42:1, 42:2
**Playing** - 4:11
**plea** - 202:23,
204:10, 204:18,
206:8, 206:18,
207:13, 208:21,
210:17, 210:18,
210:24, 226:5
**plead** - 203:5,
213:23, 214:24, 215:5
**pled** - 177:15,
203:7, 207:6, 212:7,
213:21, 214:24,
214:25, 215:2, 215:3,
224:4, 224:13
**plus** - 132:21, 159:4
**Pm** - 89:13, 124:24
**pocket** - 91:24,
94:11, 128:17,
128:19, 135:15,
149:14, 149:17
**podium** - 216:12
**Point** - 108:23
**point** - 2:6, 14:18,
15:22, 17:1, 22:23,
32:21, 34:8, 34:24,
40:8, 45:7, 45:11,
46:1, 46:3, 46:22,
48:9, 48:22, 49:23,
52:2, 52:3, 52:5, 59:6,
62:12, 66:19, 83:14,
84:3, 85:19, 90:8,
91:7, 94:19, 95:20,
106:18, 125:21,
128:20, 130:2,
140:25, 152:11,
152:18, 154:7,
157:20, 168:18,
173:13, 174:24,
175:17, 179:22,
183:10, 186:9,
207:18, 225:20,
227:19, 230:12,
236:18, 239:5,
240:18, 244:1, 246:5,
246:21
**pointed** - 90:18,
111:1
**pointing** - 11:16,
127:9, 134:8
**police** - 23:2, 30:8,
30:11, 30:18, 32:18,
33:5, 58:9, 58:25,
59:21, 59:22, 59:23,
60:4, 63:13, 63:24,
64:9, 64:11, 65:15,
66:5, 67:8, 68:20,
71:5, 77:4, 77:8,
88:15, 103:14,
116:10, 123:22,
134:22, 146:11,
146:23, 149:12,
195:13
**Police** - 71:4, 71:9,
88:14, 96:19, 130:8,
136:21, 145:1, 151:13
**pool** - 69:19, 70:2,
70:5
**pop** - 15:21, 18:17,
40:1
**popping** - 41:14
**pose** - 138:16
**posing** - 68:12
**position** - 17:5,
54:12
**Positive** - 218:23

54:4
**positive** - 97:22,
131:9, 220:8
**possess** - 117:14,
117:17, 171:5
**possessing** -
121:16
**possession** -
165:24, 174:15,
215:17, 217:22, 246:7
**possible** - 175:9
**possibly** - 54:18
**postage** - 84:4
**poster** - 5:3
**potentially** - 52:19
**powder** - 83:24
**predicate** - 164:12
**prefer** - 246:14,
246:15
**prejudicial** - 61:1,
112:25
**premeditation** -
174:10
**prepared** - 64:15,
162:18
**prerecorded** -
148:12, 148:15,
148:16, 148:24
**present** - 4:1, 42:24,
46:24, 50:18, 55:10,
56:5, 56:6, 56:12,
121:6, 168:8, 179:10
**presented** - 55:18
**presentence** -
221:19, 222:2, 222:11
**preserved** - 174:19
**press** - 195:7
**presumably** -
121:16, 132:18
**pretty** - 38:1, 77:9,
102:24, 126:24,
143:1, 203:2
**Pretty** - 124:19
**previous** - 105:5,
105:18, 112:13
**previously** - 45:2,
168:10, 171:3, 186:3,
239:14
**prison** - 49:24,
50:1, 55:22, 177:8
**privilege** - 228:7,
228:13
**probable** - 73:17,
147:13
**probation** - 194:25,
195:18, 215:3, 218:2
**probative** - 61:2
**problem** - 216:16
**problems** - 185:12
**proceed** - 2:12,
44:23, 166:21, 169:2,
174:21, 175:14,
175:16, 175:23,
176:15
**proceeded** - 90:10,
91:22, 91:25, 92:1,
92:12, 92:14, 93:8,
95:6, 104:15
**proceedings** -
227:15, 247:10
**Proceedings** - 1:11,
1:24
**process** - 210:17,
243:16
**Proctor** - 1:17, 2:8,
44:20, 49:4, 49:6,
49:10, 50:6, 57:10,
57:11, 57:15, 58:5,
58:17, 58:25, 59:9,
59:12, 59:21, 60:1,
60:7, 61:14, 61:24,

12

62:3, 62:6, 62:15,
62:20, 62:23, 63:8,
63:16, 63:20, 64:2,
64:6, 64:21, 65:14,
66:17, 67:3, 68:11,
68:25, 69:3, 70:7,
82:19, 82:21, 82:23,
83:3, 83:9, 83:12,
83:15, 85:14, 85:15,
85:19, 86:1, 86:2,
86:14, 87:12, 100:17,
100:21, 101:6,
101:22, 102:5, 112:8,
112:15, 113:6,
114:25, 115:1, 115:3,
122:3, 122:7, 122:18,
122:21, 129:6,
131:23, 131:24,
132:2, 133:12,
133:16, 133:20,
133:23, 133:24,
134:4, 135:7, 146:7,
146:8, 146:10,
149:20, 149:23,
158:1, 158:2, 158:4,
159:14, 160:20,
161:12, 161:16,
161:22, 161:25,
162:6, 162:21,
162:24, 164:18,
166:16, 166:20,
167:13, 167:14,
167:19, 167:24,
168:5, 168:6, 168:12,
168:15, 168:21,
170:17, 170:18,
174:19, 174:24,
175:7, 175:9, 175:21,
176:1, 176:2, 176:15,
176:17, 176:19,
181:21, 182:2, 182:8,
188:17, 197:15,
197:18, 205:23,
206:13, 206:23,
207:2, 207:17,
213:11, 213:15,
216:4, 216:8, 216:15,
216:22, 221:21,
223:13, 223:14,
223:16, 224:3, 224:6,
224:9, 224:16,
226:19, 227:22,
228:1, 229:21,
230:14, 230:16,
231:1, 231:8, 231:20,
233:6, 234:11, 235:4,
235:22, 235:23,
236:22, 237:5,
237:13, 237:14,
237:18, 238:23,
239:9, 239:22,
239:23, 243:5, 244:3,
245:23, 246:18, 247:5
**produced** - 1:24,
141:11
**proffer** - 63:1, 66:1,
232:20, 233:1, 233:4
**proffers** - 231:17
**proficiency** -
158:16
**proficient** - 109:23,
122:12, 158:8
**prohibited** - 117:11,
117:13, 117:16, 170:5
**project** - 89:6,
152:11, 152:13
**projects** - 10:25,
12:11, 13:10, 13:13,
72:25
**promise** - 57:18

**promised** - 57:15
**promises** - 106:24,
109:2, 111:7, 114:11
**promptly** - 240:11
**properly** - 64:11,
117:20
**property** - 95:2,
97:7, 104:11, 118:4
**propose** - 66:15
**prosecuted** - 48:1
**prosecution** -
62:25, 170:6
**prosecutor** -
165:15, 177:16
**protect** - 54:20
**Protection** - 37:24
**protection** - 38:3
**proud** - 200:19,
200:22, 200:23
**prove** - 166:13,
171:12
**proven** - 171:17,
172:25, 173:17
**provide** - 166:6
**provided** - 51:16,
51:18, 52:8, 241:9
**provides** - 228:10,
241:3
**providing** - 174:12
**Public** - 71:8
**publish** - 80:7
**published** - 80:10
**publishing** - 83:6
**Puget** - 28:22
**pull** - 118:12, 133:1,
139:24, 194:22
**pulled** - 61:18,
94:25, 104:13,
104:15, 140:25,
141:13, 141:23
**Pulled** - 74:18
**pulling** - 81:18
**punch** - 221:14,
221:15, 221:17
**punched** - 221:10
**punching** - 221:13
**punishable** - 170:2,
171:4, 171:10
**Purcell** - 1:15, 2:5,
2:13, 2:14, 3:5, 6:14,
10:12, 10:17, 10:23,
11:13, 13:11, 30:25,
41:8, 43:21, 43:22,
44:6, 44:7, 44:8,
44:13, 44:18, 44:23,
44:24, 45:5, 45:22,
45:25, 46:6, 50:4,
50:10, 50:16, 57:7,
57:9, 57:16, 58:3,
60:10, 60:11, 60:21,
61:10, 62:10, 63:6,
63:15, 63:18, 64:19,
66:18, 67:25, 68:5,
69:5, 69:16, 70:9,
70:10, 86:16, 161:17,
164:4, 164:6, 164:14,
164:16, 164:24,
166:22, 166:23,
168:19, 169:3, 169:4,
172:2, 172:4, 174:1,
175:19, 177:14,
177:16, 181:7,
181:15, 181:18,
182:5, 188:16,
196:11, 197:20,
197:21, 197:23,
205:25, 206:5, 206:6,
206:11, 207:8,
207:10, 207:20,
207:22, 210:15,

211:8, 211:10, 212:3,
212:14, 213:13,
213:19, 216:20,
216:24, 221:23,
223:11, 223:25,
224:7, 224:19,
224:20, 226:1,
226:10, 230:13,
234:4, 236:3, 236:4,
236:18, 236:20,
237:8, 237:9, 238:11,
240:1, 240:2, 241:18,
241:22, 242:3,
242:12, 242:17,
243:1, 244:19,
244:22, 245:3,
245:12, 246:5
  **Purcell's** - 216:9
**purchase** - 138:13
**purchased** -
142:12, 142:21,
144:24
**purchases** - 148:17
**purchasing** - 138:5,
138:7
**purple** - 176:22
**purported** - 65:13
**purpose** - 171:25,
204:1, 233:18,
243:16, 244:14
**purposes** - 60:19,
146:15, 162:13,
170:6, 206:14, 246:24
**pursuant** - 164:9,
164:10, 170:6
**pursue** - 93:14,
182:3
  **pursuit** - 104:17
**push** - 11:22
**pushed** - 221:17,
222:17
**Put** - 195:5, 204:20
**put** - 5:2, 10:13,
16:6, 28:5, 36:12,
54:12, 106:16,
107:20, 107:22,
110:1, 113:3, 114:1,
154:16, 156:12,
156:21, 160:16,
170:9, 179:14,
179:17, 183:6,
193:23, 194:8, 195:4,
201:2, 201:13,
206:19, 229:14,
232:17, 245:7
  **putting** - 63:21,
68:11

**Q**

**qualifying** - 222:25
**quantities** - 244:21
**quantity** - 84:17,
115:18, 132:15,
173:14, 173:15,
173:20, 244:25,
245:2, 245:7, 246:3
  **Quarles** - 57:21
**quarter** - 237:22,
237:24, 238:1, 239:2,
240:10, 240:18,
241:4, 241:11
  **quarters** - 83:20
**questioned** -
228:21
**questioning** - 52:14
**questions** - 4:1,
17:19, 29:24, 30:1,
31:1, 33:6, 43:20,
44:14, 45:6, 46:2,

52:16, 53:4, 53:19,
63:2, 63:22, 69:4,
82:16, 87:14, 114:4,
114:22, 131:21,
135:16, 146:5,
150:10, 157:24,
161:5, 209:23,
209:24, 223:12
**quick** - 93:2, 112:8
**quickly** - 166:20,
227:8
**quite** - 41:16,
102:18, 200:19,
200:22
  **quote** - 122:10

**R**

**Rain** - 47:11, 55:21,
183:21, 198:14,
198:15
**raise** - 57:17
**raised** - 90:17,
238:14
  **ramifications** -
165:16
**ran** - 108:8, 116:2,
186:23, 191:13,
191:14, 195:3
**ransacked** - 203:14
**ransacking** -
209:19, 209:22
**ratchets** - 105:12,
106:13, 106:25, 117:8
**rate** - 15:10
**rather** - 236:22
**rational** - 172:18
**Ravens'** - 30:22
**reach** - 76:16,
126:15
**reached** - 74:22,
76:17, 169:13
**reaction** - 40:9
**read** - 13:6, 161:19,
180:19, 180:20,
180:23, 204:10,
204:12, 205:18,
206:20, 207:24,
208:2, 222:5, 222:9,
222:13, 244:9,
244:10, 244:11,
246:24
  **reading** - 164:7,
207:23, 212:6, 237:15
**ready** - 2:2, 2:9,
2:12, 41:12, 164:3,
168:17, 169:1,
174:21, 175:16,
175:23, 239:17,
240:11, 240:21, 241:4
  **Real** - 194:3
**real** - 93:2, 185:7,
204:11, 204:12,
225:6, 225:25, 226:1
**realistic** - 237:2
**realized** - 52:3
**really** - 19:1, 24:18,
35:15, 59:16, 65:11,
66:13, 67:19, 67:20,
67:23, 142:17,
143:12, 182:2, 209:16
**rear** - 92:14, 94:11
**reason** - 40:15,
58:13, 58:14, 104:24,
162:15, 162:25,
167:11, 171:21,
210:20, 213:1, 233:3,
242:3
  **reasonable** -
172:19, 172:25

**reasons** - 231:23,
239:13, 239:15
**rebuttal** - 236:3,
239:7, 240:1, 240:3
**recalled** - 44:14
**received** - 177:18,
230:23
**recently** - 55:24
**recess** - 87:21,
225:14, 232:15,
234:21, 235:1,
241:13, 241:15
  **Recess** - 87:23,
163:18, 235:2
**recognize** - 5:4, 5:7,
16:8, 17:11, 24:15,
71:24, 73:14, 78:17,
78:20, 79:15, 91:1,
94:15, 96:9, 108:2,
108:5, 108:6, 124:13,
127:10, 129:20,
130:17, 137:21,
142:11, 142:20,
144:9, 145:5, 152:2,
206:3, 221:25, 222:2
**recognized** - 210:11
**recollect** - 7:19
**recollection** -
40:18, 60:8, 85:6,
193:11
**recollections** -
103:23, 104:1
**reconvene** - 163:9,
236:7
**Record** - 49:9,
57:14, 100:6, 112:11,
161:15, 172:9,
181:10, 206:17,
210:14, 216:7, 225:4,
232:24, 242:2
**record** - 2:22, 6:11,
7:12, 58:10, 60:19,
68:15, 88:6, 91:9,
123:12, 127:12,
136:7, 140:5, 148:17,
161:19, 166:23,
174:19, 176:10,
205:18, 206:7, 206:8,
206:10, 206:20,
206:24, 207:12,
207:14, 208:24,
208:25, 210:24,
210:25, 211:7, 212:6,
212:7, 213:21,
216:16, 247:10
  **recorded** - 1:24,
53:14
  **recording** - 50:23,
51:7, 53:13
**records** - 65:16,
118:12, 167:1
**recount** - 243:19
**recover** - 157:4,
158:20
**recovered** - 62:3,
75:3, 78:23, 78:24,
79:1, 83:17, 94:12,
94:18, 95:3, 118:4,
128:22, 128:23,
129:25, 144:21,
148:25, 149:1, 149:2,
149:5, 158:24
**recovering** - 126:12
**recross** - 224:19
**red** - 73:25, 74:11,
74:17, 75:7, 77:17,
77:19, 81:20, 125:17
**redacted** - 243:10
**Redacted** - 243:24
**redirect** - 43:21,

70:8, 86:16, 122:22,
135:9, 149:24, 223:13
**Redirect**- 86:18,
135:11, 150:2,
159:20, 223:15
**refer** - 210:22
**reference** - 12:13,
243:23
**referred** - 8:24,
164:8, 226:12
**referring** - 53:19,
207:8
**reflect** - 6:11, 60:19,
65:16, 91:9, 127:12,
140:5, 242:23
**reflected** - 79:6
**reflects** - 7:12,
103:25
**refresh** - 10:10,
85:5, 85:6
**refreshes** - 12:16
**refused** - 200:6
**regard** - 68:23,
229:25, 243:7
**regarding** - 47:21,
51:21
**regardless** - 24:11
**regards** - 196:11
**registration** -
126:11
**regularly** - 102:25
**relates** - 85:24,
167:7
**relation** - 5:18,
77:25, 198:23, 199:4,
199:5
**relationship** - 9:5,
9:10
**release** - 55:21,
217:5, 217:6, 217:20
**released** - 217:3
**Relly**- 9:2, 9:3,
26:11, 26:14, 203:21
**Relly's**- 9:4
**relocate** - 69:17
**relocated** - 55:7,
55:19, 55:22, 55:24,
56:4, 56:18
**relook** - 118:12
**remember** - 8:13,
8:15, 8:17, 8:18, 8:19,
9:3, 12:6, 12:10,
14:10, 14:12, 14:23,
15:7, 18:24, 20:5,
21:16, 21:18, 31:16,
42:15, 69:6, 104:4,
105:10, 119:5,
119:13, 119:14,
119:15, 182:9,
182:12, 182:18,
182:24, 183:1,
183:25, 184:15,
184:21, 184:22,
184:25, 188:3,
189:17, 197:7, 200:9,
200:20, 201:25,
202:1, 218:20,
219:15, 219:17,
219:22, 220:7,
221:11, 221:13,
222:7, 224:4, 228:5,
237:10, 239:10
**reminded** - 122:8,
166:25
**removed** - 91:23,
127:23, 127:25
**removing** - 32:23
**renew** - 239:11
**renewed** - 239:12
**renumber** - 242:19

**repair** - 126:1,
128:23
**repeated** - 54:15
**repeats** - 243:16
**Rephrase**- 181:25
**reply** - 57:22
**report** - 58:9, 58:15,
58:25, 59:17, 59:18,
59:21, 59:22, 59:24,
59:25, 60:1, 60:5,
61:6, 61:8, 61:14,
65:15, 66:5, 73:4,
79:6, 85:7, 85:10,
85:23, 97:2, 97:3,
107:5, 111:15,
115:15, 116:15,
118:3, 118:25,
121:12, 121:22,
134:22, 145:6,
146:12, 146:23,
148:7, 222:2
**represent** - 49:11
**representation** -
208:8
**represented** -
230:24, 232:10
**request** - 51:12,
56:10, 56:15, 56:17
**requested** - 56:3
**require** - 64:14,
235:15
**requirement** - 229:9
**requires** - 100:23,
217:4
**reserved** - 44:15
**resided** - 168:4
**residential** - 152:5
**resolved** - 48:10
**respect** - 68:22,
112:21, 172:13,
173:8, 173:11, 174:2,
207:1, 230:19,
231:18, 231:24,
232:11, 241:16,
244:25
**respected** - 168:2
**responded** -
143:24, 211:15
**response** - 12:17,
36:2
**rest** - 66:22, 116:19,
162:17, 166:18,
169:5, 239:6, 245:24
**resting** - 227:21
**restored** - 170:4
**restraint** - 216:20
**rests** - 164:5, 172:6,
172:7, 236:2, 239:24,
240:1
**result** - 52:10,
145:14
**results** - 97:21,
131:8
**retaliating** - 174:11
**retaliation** - 174:6
**retrieve** - 85:9
**return** - 70:12,
163:4
**returned** - 54:8,
171:1
**reversal** - 212:20
**review** - 146:11
**reviewed** - 60:18,
64:25, 154:13, 208:3,
208:5
**Richard**- 1:12
**rid** - 23:10, 34:9,
35:10, 92:23
**rights** - 57:20,
57:25, 58:19, 59:8,

100:22, 170:4,
226:16, 229:25,
232:11
**ring** - 115:19
**Ritonio**- 225:7,
226:1, 226:3, 227:13,
232:17, 233:3, 234:8,
235:5
**rival** - 236:23
**river** - 33:25, 34:2
**road** - 64:16, 74:13,
143:25, 152:20,
154:4, 247:4
**Road**- 10:24, 12:3,
13:1, 13:9, 13:12,
28:14, 28:16, 28:24,
28:25, 35:5, 37:7,
93:19, 93:21, 98:23,
98:25, 99:4, 125:17,
152:6, 152:19,
152:20, 152:22,
154:3, 154:6, 156:16
**rob** - 213:9
**robbery** - 177:12,
204:2, 208:14,
213:24, 214:1, 214:3,
215:11
**Robert**- 45:13, 47:5,
100:19, 168:8,
168:10, 174:25,
175:15, 175:25,
176:6, 176:11, 176:14
**rock** - 127:3,
127:19, 129:15,
129:16
**Roddy**- 52:2, 52:7,
52:12, 52:17, 52:19,
52:22, 53:3, 53:5,
53:7, 53:21, 54:18,
54:19, 69:8, 69:9,
99:15
**rode** - 72:25
**rogue** - 67:8, 68:20
**role** - 61:17
**Rolland**- 247:13,
247:14
**rolled** - 90:24, 95:19
**Romer**- 172:22
**room** - 3:14, 4:6,
18:2, 39:21, 41:24,
41:25, 42:4, 42:16,
56:15
**Ross**- 45:20, 51:23,
51:25, 52:25, 53:18
**rounded** - 149:12
**rounds** - 171:6
**Rule**- 166:19,
172:11, 172:14,
173:6, 173:7, 226:7,
226:13, 239:11
**rule** - 57:17
**ruled** - 112:23
**rules** - 62:24
**ruling** - 64:15,
68:14, 83:5
**run** - 64:3, 66:8,
104:15, 116:10,
191:19, 195:22,
195:23
**running** - 23:6,
74:13, 74:24, 76:22,
77:12, 78:3, 105:14,
156:17, 175:10,
189:6, 195:10, 195:21
**runs** - 152:20
**rushed** - 141:3,
142:1
**Ryce**- 89:24, 95:1,
97:18, 103:10,
104:17, 105:10,

110:20, 116:19

## S

**safety** - 126:17
**sake** - 166:23
**sale** - 90:20, 95:25
**Sales**- 242:14
**sales** - 99:6, 102:7,
140:19, 153:21
**Sand** - 243:8,
243:23, 243:25
**sandbagging** -
60:14
**Sandrea**- 203:13
**sandwiched** -
134:11, 135:5
**Sarge** - 103:17,
107:19
**sat** - 208:23
**satisfactory** -
226:18
**satisfied** - 171:25,
208:7
**Saunders** - 31:14,
31:18
**saw** - 7:20, 14:8,
18:23, 40:4, 40:19,
45:9, 45:13, 46:14,
47:19, 48:12, 48:18,
48:23, 50:20, 51:3,
56:1, 74:4, 74:17,
74:23, 75:22, 76:9,
76:10, 76:15, 76:16,
76:21, 76:23, 79:19,
80:22, 81:6, 81:14,
81:19, 86:24, 94:10,
95:16, 96:13, 98:9,
99:2, 99:9, 99:12,
99:21, 100:18, 101:9,
102:24, 103:6, 127:3,
127:18, 134:15,
139:2, 139:20,
139:21, 144:22,
148:7, 154:4, 154:20,
155:1, 155:18,
163:11, 185:21,
187:4, 192:4, 199:20,
200:5, 201:16,
201:24, 202:2, 223:9
**Saw** - 73:24
**scan** - 126:13
**scared** - 54:13,
54:14, 195:11
**scattered** - 127:3,
128:17, 144:18
**scene** - 4:2, 15:8,
32:13, 32:18, 45:18,
46:12, 46:14, 65:10,
144:3
**schedule** - 239:8,
239:18
**Schedule** - 97:22,
131:9, 145:16
**scheduled** - 234:9
**School** - 104:12
**scintilla** - 67:22
**screen** - 10:13,
10:14, 11:9, 11:11,
11:15, 16:6, 16:22,
42:5, 42:10, 74:2,
78:19, 83:13, 93:11,
96:14, 134:6, 139:5,
147:17, 152:15,
170:10, 179:14,
179:17
**sean** - 74:22
**search** - 104:20,
128:3, 128:7, 128:11,
128:13

**searched** - 78:8
**seat** - 123:11,
127:20, 132:24
**seated** - 4:5,
178:11, 232:18
**Seattle** - 45:13,
47:5, 69:5, 197:24
**second** - 14:25,
16:6, 42:10, 83:4,
100:18, 117:7,
121:25, 122:18,
133:17, 135:7, 147:8,
149:20, 197:15,
210:13, 221:10,
222:18, 222:21,
224:16, 241:19, 242:4
**seconds** - 40:19,
41:10
**Section** - 170:3,
170:6
**section** - 71:8,
71:13, 71:20, 123:21,
123:25, 137:4, 164:13
**See** - 11:14
**see** - 3:22, 6:9, 6:10,
7:2, 8:3, 9:22, 10:20,
11:15, 11:19, 11:23,
16:18, 17:13, 18:20,
19:20, 19:22, 20:17,
21:1, 21:19, 24:5,
24:18, 24:20, 26:25,
27:14, 29:19, 40:17,
40:20, 41:6, 41:9,
41:15, 42:11, 59:5,
69:24, 74:5, 74:13,
75:15, 75:17, 75:24,
80:16, 80:24, 81:5,
81:10, 81:13, 81:17,
81:23, 81:25, 82:2,
83:13, 84:14, 85:6,
86:20, 86:23, 87:1,
87:4, 87:6, 87:8, 91:5,
94:2, 98:3, 98:11,
98:14, 98:20, 98:21,
98:22, 99:4, 99:7,
99:19, 101:4, 104:14,
118:13, 121:12,
126:23, 127:1, 133:7,
133:9, 133:24, 134:6,
140:1, 141:21,
142:17, 142:23,
143:14, 144:15,
148:9, 155:7, 163:17,
175:13, 176:22,
179:20, 180:14,
183:5, 183:20,
183:24, 184:5, 184:9,
186:1, 186:3, 187:19,
189:1, 190:6, 190:15,
190:23, 191:8,
192:18, 192:23,
193:15, 194:20,
194:25, 196:7, 201:7,
202:22, 205:25,
221:24, 223:6,
223:17, 227:7,
227:15, 233:24,
234:1, 241:14,
241:24, 243:22,
243:23, 243:24
**seeing** - 18:24,
45:19, 184:21, 188:3,
201:25, 202:1,
219:17, 237:10
**seek** - 64:16, 67:4,
67:17, 68:17
**seeking** - 55:23,
58:21, 64:11, 66:8,
212:20
**seem** - 236:15

14

**seized** - 86:11, 149:15, 149:16, 149:18
**self** - 63:12, 68:4, 228:13
**self-defense** - 63:12, 68:4
**self-incrimination** - 228:13
**sell** - 219:23
**selling** - 10:7, 11:3, 11:25, 12:2, 12:18, 12:20, 12:22, 37:6, 81:16, 218:4, 218:6
**sells** - 215:20, 215:21, 215:22, 215:23
**send** - 244:4
**sentence** - 48:5, 49:25, 50:1, 50:13, 175:6, 196:23, 197:1, 197:4, 217:4, 221:1
**sentenced** - 48:16, 168:11, 200:11, 217:2, 217:24, 220:25, 221:2, 221:3, 222:7
**sentencing** - 222:14, 234:9, 234:23, 236:5, 238:13, 238:15
**separate** - 64:8, 68:8
**separately** - 132:19
**September** - 46:7, 46:8, 50:17, 55:9, 112:19, 112:20, 116:23, 169:25, 182:15, 182:16, 182:18, 216:2
**sergeant** - 137:5, 138:4
**Sergeant** - 88:13, 96:8, 101:9, 113:18, 115:4, 122:5, 122:25
**serial** - 148:18
**seriatim** - 67:15
**serve** - 69:10, 69:11, 243:16, 244:13
**served** - 217:3, 225:7, 230:25
**service** - 235:11
**serving** - 48:4, 49:24, 50:1, 50:13, 196:23
**Serving** - 177:11
**Session** - 164:1
**set** - 174:13, 246:13
**Seven** - 6:24
**several** - 27:5, 103:18
**shall** - 228:11
**Shameka** - 45:20, 51:23, 52:25, 53:17, 183:22
**shape** - 91:25, 92:3
**Shaquanda** - 51:24, 52:25, 184:3
**Shawn** - 72:15
**Shearer** - 167:21
**sheet** - 145:6, 173:19, 244:18, 245:17, 246:23
**shift** - 89:12, 124:23
**shifts** - 86:22, 229:12
**shined** - 134:20, 134:23
**shirt** - 6:16, 90:24, 95:19, 189:11

**shock** - 32:10, 32:11
**shoot** - 58:4, 58:6, 65:23
**shooter** - 27:3, 30:15, 43:12, 189:1, 192:4, 192:9, 192:13, 193:1, 193:18, 202:4
**shooter's** - 192:19, 192:23, 193:24
**shooters** - 27:3, 35:24, 40:11, 43:13, 43:15
**shooting** - 15:20, 17:2, 21:2, 25:3, 40:4, 60:17, 63:25, 64:13, 64:18, 66:9, 67:25, 68:5, 107:14, 110:12, 184:14, 193:8, 196:15, 198:5, 198:7, 198:18, 198:20, 199:5, 199:14, 199:21, 200:6, 201:19
**shootings** - 120:12
**shootout** - 65:25
**shoots** - 66:23
**shorter** - 19:15, 19:19, 20:6, 192:14
**shot** - 20:14, 21:6, 22:24, 24:17, 26:10, 28:5, 39:21, 57:19, 58:7, 58:10, 58:12, 58:15, 58:16, 58:24, 59:15, 59:17, 59:18, 59:20, 59:24, 59:25, 61:6, 61:8, 61:16, 61:20, 61:23, 61:25, 62:19, 63:12, 64:10, 65:16, 65:17, 65:20, 65:21, 66:2, 66:22, 67:21, 67:22, 68:9, 109:25, 110:3, 110:4, 110:9, 110:14, 120:8, 120:14, 120:15, 120:16, 121:8, 121:9, 121:13, 183:8, 186:7, 197:10, 197:11, 197:13, 224:14, 233:12
**Shots** - 190:5
**shots** - 21:18, 60:14, 66:6, 186:23, 190:15, 190:17, 191:1, 191:13, 191:25, 193:10
**shoulder** - 19:3, 19:4, 216:10
**show** - 10:24, 10:25, 11:9, 11:16, 12:15, 16:4, 16:25, 17:24, 40:23, 41:20, 71:22, 73:11, 74:3, 77:17, 77:19, 78:16, 88:24, 90:1, 94:14, 96:8, 96:22, 98:17, 124:12, 129:19, 130:16, 137:20, 139:5, 142:9, 142:19, 143:4, 144:1, 144:8, 146:14, 152:1, 179:12, 183:7, 186:6, 206:1
**Show** - 134:1
**showed** - 30:12, 144:2
**showing** - 24:14, 65:24, 145:4
**shown** - 10:18, 115:15

**shows** - 58:11
**shut** - 20:18, 40:7, 40:9
**sic** - 185:11
**side** - 4:8, 65:24, 76:11, 89:6, 99:3, 99:4, 110:1, 126:4, 126:7, 126:10, 127:2, 127:4, 134:16, 135:1, 135:2, 139:22, 152:12, 152:13, 155:9, 156:15, 187:8, 188:22, 188:23, 189:15, 191:15
**sidewalk** - 21:24
**Siffert** - 243:8, 243:24, 244:1
**sign** - 173:25
**signature** - 170:16, 208:1, 208:9
**signed** - 164:21, 164:24, 166:15, 166:18, 170:11, 170:12, 194:10, 204:18, 205:16, 211:12
**significance** - 247:2
**significant** - 66:14
**simple** - 210:17
**simply** - 216:10
**single** - 173:4
**sip** - 147:21
**sit** - 3:10, 43:3, 69:12, 156:19, 197:13, 208:20, 208:23
**Sit** - 176:12
**sitting** - 3:22, 16:1, 17:1, 21:10, 22:23, 42:18, 57:22, 70:2, 93:25, 144:22, 200:13, 200:14, 200:16, 238:19
**situation** - 66:4
**six** - 137:11, 177:20
**size** - 84:6, 92:1, 92:3, 134:13
**skin** - 40:20, 192:19
**skinned** - 20:7, 20:8
**Slide** - 2:22
**Slightly** - 125:23
**slimmer** - 19:16
**slit** - 40:23
**slits** - 40:20, 40:24, 41:10
**slow** - 21:4
**slumped** - 17:12, 24:19
**small** - 66:20, 92:5, 94:13, 143:7
**snitches** - 220:3
**sold** - 11:5, 83:24, 155:12, 218:9
**solicitor** - 57:21
**Solicitor's** - 65:4
**Someone** - 100:8
**someone** - 15:19, 29:20, 75:22, 99:17, 109:10, 147:9, 157:1, 189:2, 207:4
**someplace** - 55:11
**Sometimes** - 243:9
**sometimes** - 20:3, 98:22, 226:6, 240:23
**somewhere** - 23:15, 33:11, 35:9, 50:12
**son** - 112:1, 112:22, 113:12
**soon** - 187:21, 191:1

**sorry** - 6:2, 13:20, 22:8, 34:14, 42:5, 44:20, 53:12, 55:10, 55:14, 58:13, 72:17, 74:1, 90:7, 115:6, 130:11, 132:9, 133:11, 133:16, 142:19, 154:7, 164:15, 173:25, 177:15, 179:13, 181:17, 199:3, 201:11, 214:2
**sort** - 3:11, 51:7, 139:21
**sought** - 173:1, 231:21, 231:23
**sound** - 7:15, 18:18, 41:14, 122:12, 149:6, 158:11, 159:5, 183:14, 224:10, 238:9
**Sounds** - 158:13
**sounds** - 120:25, 159:6
**sources** - 100:11
**south** - 125:16, 155:9
**southern** - 88:19, 102:18, 124:18, 137:10, 137:12, 137:15, 151:17
**Southern** - 71:14, 88:18, 124:3, 124:5, 137:2, 138:5, 151:12
**Spam** - 156:19
**speaking** - 45:25, 47:21, 102:11, 129:25
**speaks** - 80:9
**special** - 244:22
**Special** - 136:1, 136:12, 142:9, 142:22, 150:4, 150:13
**specifically** - 52:20, 208:5, 228:10, 229:15
**specified** - 246:4
**specify** - 245:2
**speculate** - 171:15
**Spell** - 2:25, 88:8, 123:15
**Spit** - 93:2
**spoken** - 49:12, 53:17, 62:7, 76:5, 157:12
**spot** - 126:18, 195:18
**staff** - 238:16
**stage** - 174:17
**stamp** - 84:4, 84:6, 84:7
**stand** - 38:23, 63:10, 63:23, 64:17, 64:23, 85:6, 115:4, 115:21, 135:21, 150:15, 207:5, 224:24, 227:10, 234:21
**standard** - 129:21, 172:14, 173:6, 173:7
**standards** - 173:9, 174:16
**standing** - 87:8, 90:25, 104:10, 139:21, 154:5, 180:6, 186:13, 186:17, 186:21
**stands** - 38:24
**start** - 19:9, 23:6, 106:6, 108:9, 114:16, 207:23, 218:4, 234:24, 237:25
**started** - 52:11,

105:20, 106:1, 110:16, 136:23, 236:10, 237:22, 240:11, 240:12, 240:19
**starting** - 238:3, 238:5, 238:7
**stashed** - 23:14
**state** - 2:21, 70:20, 88:5, 123:12, 151:5, 176:9
**State** - 126:1, 136:6
**statement** - 32:7, 32:12, 39:24, 47:23, 54:17, 58:14, 73:17, 107:3, 107:5, 109:6, 111:13, 114:14, 147:12, 199:13, 200:19, 205:15, 205:17, 205:19, 206:19, 206:23, 207:7, 246:23
**statements** - 53:4, 121:2, 200:25
**states** - 208:12
**States** - 1:1, 1:3, 1:13, 165:11, 172:20, 172:21, 173:2, 177:8, 228:10
**station** - 35:5, 218:15
**status** - 227:3
**statute** - 117:22
**stay** - 21:12, 21:13, 84:2, 216:11
**steal** - 208:14
**stenography** - 1:24
**step** - 44:2, 70:11, 87:15, 122:25, 135:18, 150:12, 159:16, 161:8, 180:7, 180:10, 184:17, 185:1, 187:4
**steps** - 183:14, 190:12, 190:14, 191:10, 191:13, 198:6, 198:22, 199:6
**stick** - 202:13
**sticking** - 202:11, 204:23
**sticks** - 119:24
**Still** - 82:3, 95:18
**still** - 29:4, 43:6, 43:8, 43:15, 57:22, 149:13
**stipulate** - 165:6, 165:12, 165:21, 234:4, 234:7
**stipulated** - 169:24, 171:13, 206:5, 207:2, 207:9, 210:23, 211:4, 211:11
**stipulates** - 165:5
**stipulating** - 164:11, 165:22, 165:25
**stipulation** - 161:18, 161:20, 161:23, 162:12, 164:6, 164:9, 164:18, 166:6, 166:12, 166:14, 167:3, 167:5, 167:10, 167:12, 169:5, 169:9, 169:12, 170:23, 171:19, 171:22, 234:2
**Stomp** - 93:2
**stop** - 21:10, 90:7, 92:15, 125:19, 125:24, 126:9

**stopped** - 21:18, 75:20, 77:18, 77:20, 93:21, 126:11, 191:14
**stopping** - 234:22
**store** - 92:20
**strategy** - 63:22
**street** - 8:6, 28:13, 28:23, 51:7, 51:24, 83:25, 101:12, 105:13, 133:6, 134:17, 140:19, 155:2, 155:9, 156:18, 160:7, 187:5, 188:10, 188:11, 188:22, 191:21, 213:8, 223:22
**Street** - 5:12, 8:5, 98:25, 109:21, 125:20, 156:16
**street-level** - 140:19, 160:7
**streetlights** - 126:20, 126:21
**streets** - 36:15, 67:7, 67:9, 67:12
**stricken** - 213:17, 213:18
**strike** - 224:1
**strong** - 243:14
**stuck** - 203:12, 209:19
**stuff** - 23:6, 24:7, 34:13, 37:1, 185:11
**stumbled** - 118:13
**stunt** - 67:1
**subject** - 112:13, 115:7, 172:5, 181:14, 228:18, 243:18
**submission** - 79:18, 129:22
**submit** - 236:22
**submittal** - 145:6
**submitted** - 78:14, 79:4, 95:2, 96:2, 96:16, 96:19, 97:16, 129:17, 130:5, 132:18, 144:23, 144:25, 145:1, 242:22
**subpoena** - 69:10, 69:11, 225:6, 225:7, 230:24, 231:5, 235:9
**subpoenaed** - 230:21, 230:22
**substance** - 127:3, 140:16, 147:23, 215:18
**suddenly** - 52:11, 210:8
**sufficient** - 62:22, 173:10, 173:22, 174:15
**suit** - 175:7, 176:23
**Sullivan** - 1:17, 31:3, 31:4, 31:6, 41:2, 43:19, 44:19, 82:20, 99:25, 122:3, 122:6, 122:8, 164:18, 167:15, 167:16, 172:12, 174:20, 216:10, 225:1, 225:5, 225:11, 225:22, 227:23, 227:24, 229:21, 230:14, 231:5, 233:9, 233:10, 233:17, 233:20, 235:4, 235:7, 235:8, 235:13, 238:23, 238:24, 244:17, 244:20
**Sullivan's** - 162:25, 233:6
**summarize** - 211:3, 244:6, 244:8
**summarized** - 169:14
**summarizing** - 210:21, 216:16
**summary** - 103:22, 103:25, 210:16
**summer** - 104:4, 104:5, 105:5, 105:11, 105:18, 116:2, 116:20, 117:4
**sun** - 70:2
**Sunday** - 225:8, 230:25, 231:3
**support** - 37:3
**supposed** - 63:13
**supposedly** - 225:11
**suppression** - 112:14, 125:7
**Supreme** - 165:10, 165:11
**surprised** - 27:22
**surprising** - 28:8, 28:9
**survive** - 174:17
**suspect** - 94:22, 101:14
**suspected** - 127:24, 129:11
**suspended** - 217:25
**suspicion** - 52:18
**Sustained** - 87:13, 100:1, 213:12, 221:22, 224:1
**sustained** - 68:24, 112:15
**swallow** - 92:25, 156:24, 161:3, 161:4
**swallowed** - 157:6
**sweat** - 23:12
**sweatshirt** - 23:12
**swimming** - 70:5
**sworn** - 2:19, 45:3, 70:18, 88:3, 123:9, 136:4, 151:3, 176:7

## T

**T-shirt** - 90:24
**table** - 2:22, 6:16, 42:18, 70:12, 127:9, 216:12
**tackle** - 78:6
**tall** - 19:13, 19:15, 193:25
**taller** - 20:23, 192:13, 192:16, 192:17, 193:24
**Taller** - 192:15
**Tamica** - 56:7
**tape** - 47:11, 47:20, 51:6, 53:1, 53:15
**Tatum** - 109:15, 109:17, 110:6, 120:8
**tax** - 240:25, 241:2
**Taylor** - 103:10, 105:10, 110:20, 116:18, 203:21, 211:13
**team** - 143:19, 143:23
**teases** - 226:6
**teasing** - 163:14, 163:15
**teed** - 64:10
**television** - 10:13
**Ten** - 71:6
**ten** - 83:25, 84:1, 87:21, 88:20, 163:10, 225:14, 234:21, 245:3, 245:5
**ten-year** - 245:3
**tend** - 56:22, 226:23, 244:10
**term** - 115:24, 170:2, 171:5, 171:10
**terminology** - 105:13, 120:21
**terms** - 19:8, 19:10, 23:9, 55:2, 55:6, 55:20, 58:22, 64:11, 66:4, 66:12, 67:10, 232:20, 247:3
**test** - 145:15
**Tested** - 97:22
**tested** - 130:13
**testified** - 2:20, 35:22, 45:3, 49:20, 56:9, 70:19, 88:4, 97:24, 119:7, 123:10, 134:19, 136:5, 151:4, 176:8, 197:1, 230:21
**testify** - 56:25, 67:14, 162:19, 196:20, 225:20, 227:20, 228:17, 229:1, 229:7, 229:10, 229:14, 229:16, 230:7, 232:14, 233:11, 235:25, 236:1
**testifying** - 85:15, 115:16, 196:20, 229:3, 232:12
**testimony** - 32:8, 36:5, 36:9, 38:15, 40:1, 40:7, 44:3, 56:6, 69:22, 87:17, 112:14, 114:18, 115:7, 121:11, 123:1, 135:20, 147:2, 149:8, 150:14, 161:9, 173:4, 190:2, 206:21, 224:22, 231:18, 233:5, 233:19, 233:23
**testing** - 96:2, 96:16, 129:17, 130:6, 144:23
**that-away** - 187:24, 191:15
**theirs** - 236:24
**them's** - 120:20
**themselves** - 20:3
**Thereby** - 165:14
**therefore** - 61:9, 170:5
**they've** - 232:9
**thing's** - 63:19
**thinner** - 193:1
**third** - 120:7, 133:7, 133:9
**this-away** - 186:24, 187:6
**Thompson** - 150:20, 151:2, 151:7, 151:11, 159:16, 161:8
**thoroughly** - 232:10
**thousand** - 159:9
**Thousands** - 148:11
**thousands** - 159:23
**threaten** - 106:22, 108:21, 111:3, 114:9
**threatened** - 200:23
**three** - 27:11, 39:18, 58:12, 58:16, 59:18, 59:25, 60:3, 60:6, 60:14, 61:7, 61:8, 61:16, 65:17, 65:21, 65:23, 66:6, 67:19, 83:19, 102:16, 103:3, 119:10, 119:14, 167:1, 167:5, 218:2, 222:24
**threw** - 23:13, 33:18, 33:24, 34:18, 105:14, 105:17
**throw** - 34:2
**thrown** - 118:8, 244:15
**thrust** - 65:12, 65:13, 233:14
**Thursday** - 123:3
**tie** - 119:12, 119:15, 119:17
**tightly** - 143:1
**tilting** - 20:17
**Tim's** - 219:15
**timeframe** - 36:4
**Timothy** - 1:17, 99:14
**Tinkler** - 24:24, 25:22, 33:22, 34:22, 34:25, 35:2, 42:24
**tint** - 128:24, 133:1, 133:7
**tinted** - 125:18, 125:25
**tiny** - 83:13
**Title** - 173:24
**Tobacco** - 136:14
**today** - 6:9, 13:20, 36:10, 41:22, 43:4, 49:1, 69:12, 91:5, 114:19, 154:14, 163:9, 185:6, 194:20, 197:13, 218:13, 230:3
**Todd** - 45:1, 201:4
**toe** - 40:14, 189:9
**together** - 18:6, 18:7, 135:5
**tomorrow** - 87:18, 123:2, 224:25, 234:10, 234:25, 236:8, 236:9, 236:11, 237:17, 237:21, 240:6, 240:7, 241:11, 241:25, 242:10, 243:22
**took** - 8:6, 23:12, 33:9, 33:18, 54:17, 74:23, 76:21, 77:11, 78:2, 79:3, 140:14, 141:15, 144:3, 156:13, 195:19, 209:2
**top** - 11:6, 93:11, 134:13, 198:5
**topic** - 113:4
**total** - 32:10, 32:11, 137:10
**touch** - 11:7, 11:11, 11:12, 11:14, 16:22, 16:23, 74:2, 139:4
**Touch** - 11:9
**touched** - 32:14
**Towards** - 191:5
**towards** - 6:10, 16:1, 20:17, 54:2, 54:17, 93:11, 139:22, 190:12, 190:14
**traffic** - 125:19, 125:24, 126:9, 141:5
**trafficker** - 100:15
**trafficking** - 100:13, 167:2, 174:4, 220:14, 220:16, 220:18
**training** - 129:4
**transaction** - 74:25, 93:22, 93:24, 95:16, 129:14, 144:4
**transactions** - 160:5
**Transcript** - 1:11
**transcript** - 1:24, 247:10
**transcription** - 1:25
**transport** - 160:23
**transported** - 128:22
**traveling** - 125:16
**Tresvant** - 172:20
**Trial** - 1:11
**trial** - 44:3, 87:17, 123:2, 135:21, 150:15, 161:9, 203:8, 212:16, 212:17, 224:23, 224:25, 243:12
**trials** - 243:11
**tried** - 23:4, 177:14
**trier** - 172:18
**trigger** - 61:18
**trouble** - 44:21
**Troy** - 103:10
**truck** - 73:25, 74:11, 74:17, 74:18, 74:19, 74:21, 75:7, 75:10, 75:12, 77:17, 77:19, 81:20, 129:13
**true** - 63:1, 207:15, 211:12, 211:17
**trust** - 28:19
**truth** - 181:23, 194:16
**truthful** - 58:23
**Try** - 203:3
**try** - 38:6, 47:18, 51:4, 60:22, 60:23, 62:10, 93:8, 157:4, 209:9, 211:2, 231:23, 232:20, 236:10, 237:21, 240:19
**Trying** - 138:16
**trying** - 12:13, 25:19, 26:6, 40:13, 66:11, 66:12, 125:8, 138:14, 156:24, 165:9, 200:24, 204:4, 211:24, 227:2, 227:15, 233:1, 236:12, 244:13
**turn** - 18:15, 19:2, 21:9, 40:10, 73:25, 74:12, 74:17, 89:9, 104:3, 105:3, 107:12, 109:8, 111:21, 124:20, 153:1, 190:1, 237:19
**Turn** - 72:5
**turned** - 18:17, 18:19, 22:3, 36:25, 74:23, 76:21, 187:9
**turning** - 139:11, 153:22
**turns** - 147:24, 188:8, 188:21, 188:25
**Tv** - 16:2, 17:6, 17:8, 17:22, 18:11, 42:4
**twice** - 58:10, 58:15, 59:20, 59:24, 60:5, 61:6, 61:8, 61:16, 65:16, 65:20, 66:2, 67:19, 80:18, 80:22, 81:14
**Two** - 22:12, 26:9, 124:6, 220:16, 236:18
**two** - 14:25, 15:2, 15:3, 18:21, 18:24, 22:13, 22:18, 31:22, 34:20, 36:6, 39:18,

39:20, 40:4, 43:15,
47:20, 60:14, 60:24,
61:14, 65:23, 66:6,
75:4, 78:11, 78:23,
83:16, 86:22, 105:12,
105:17, 106:13,
106:25, 107:21,
107:24, 117:8,
117:17, 117:20,
117:25, 118:19,
120:16, 132:15,
136:17, 141:7,
141:11, 141:15,
141:18, 143:6, 143:8,
143:10, 144:13,
147:3, 147:6, 147:9,
147:15, 150:8, 171:5,
190:19, 190:20,
193:9, 199:21,
201:12, 202:18,
202:20, 203:11,
203:15, 204:24,
209:12, 220:14,
223:17, 223:20,
237:4, 243:25
  **type** - 23:6, 23:11,
26:7, 54:1, 126:14
  **typical** - 140:22,
140:23, 160:7, 160:11

## U

  **unarmed** - 58:6,
58:7, 59:16, 61:20,
61:23, 62:9, 62:13,
62:19, 63:4, 63:5,
63:10, 63:25, 64:10,
64:13, 64:18, 67:21,
67:23, 68:9
  **unclear** - 167:24
  **uncorroborated** -
173:3
  **under** - 43:4, 75:3,
78:12, 94:12, 95:14,
106:13, 108:14,
110:21, 114:4,
118:23, 127:24,
128:1, 128:21,
134:17, 155:16,
156:20, 161:21,
162:14, 164:12,
165:10, 167:8, 173:9,
174:16, 206:19,
206:21, 212:23,
220:24, 220:25,
225:6, 228:7, 228:9,
229:8, 230:1, 235:9
  **Under** - 173:7,
207:3, 209:2
  **undercover** - 51:4,
54:9, 54:24, 138:9
  **underlying** - 165:13
  **understandable** -
21:11
  **undertake** - 47:18
  **undocumented** -
119:23
  **unfamiliar** - 104:12
  **unfolded** - 143:3
  **unit** - 72:24, 88:18,
96:20, 130:10,
130:12, 130:14,
137:6, 145:2
  **United** - 1:1, 1:3,
1:13, 165:11, 172:20,
172:21, 173:2, 177:8,
228:9
  **units** - 137:6, 137:7
  **University** - 60:2
  **unless** - 46:3, 239:4

  **unlike** - 108:11,
108:13
  **Unmarked** - 89:16
  **unmarked** - 72:12,
77:6, 125:2, 125:16,
153:9, 154:2
  **untruthfulness** -
65:24
  **unusual** - 105:23
  **up** - 2:22, 2:23,
3:10, 5:2, 5:11, 5:20,
5:24, 10:13, 10:20,
11:8, 11:10, 11:15,
11:19, 12:1, 13:7,
15:22, 16:6, 18:11,
18:12, 22:22, 26:10,
27:15, 27:17, 34:17,
35:4, 35:8, 38:16,
40:16, 41:25, 45:7,
45:11, 46:22, 48:8,
48:10, 48:22, 53:4,
53:9, 53:15, 60:22,
63:10, 63:23, 64:10,
64:17, 64:23, 72:17,
73:18, 74:13, 75:6,
75:7, 81:4, 81:17,
83:7, 90:11, 90:24,
93:16, 94:6, 95:19,
99:5, 99:7, 100:25,
101:10, 102:17,
104:13, 104:15,
104:18, 105:9, 106:6,
107:5, 107:18,
109:22, 111:15,
112:5, 133:20,
133:22, 134:2, 134:6,
136:23, 138:19,
139:11, 139:14,
139:18, 139:20,
139:22, 141:23,
142:14, 142:24,
143:18, 143:24,
144:22, 147:6,
149:12, 150:4,
163:12, 164:20,
170:10, 170:21,
176:12, 178:8,
179:14, 181:22,
181:24, 183:4, 183:6,
186:23, 190:11,
190:12, 190:14,
191:10, 191:13,
191:22, 195:1, 195:2,
208:21, 216:9,
226:24, 237:19,
241:19, 246:13
  **Up** - 52:5, 81:1
  **upset** - 17:18
  **upstairs** - 14:25,
18:12, 36:6, 39:19,
39:20, 209:19, 209:22
  **Usc** - 170:3, 170:6

## V

  **van** - 127:16, 128:3,
128:6, 128:23,
128:24, 129:13
  **variance** - 66:5
  **vehicle** - 51:22,
52:1, 52:17, 53:20,
94:10, 95:5, 105:9,
108:10, 126:14,
126:23, 128:1,
138:20, 139:22,
141:3, 141:9, 155:14,
186:1, 188:2, 188:3,
188:5, 188:20
  **vehicles** - 138:20
  **verbatim** - 122:15,

210:20, 244:6, 244:9,
244:10
  **verbiage** - 243:15
  **verdict** - 173:19,
244:18, 244:22,
245:17, 246:23
  **verify** - 230:19
  **vicinity** - 8:7
  **video** - 4:11, 14:6,
35:14, 35:16, 35:18,
39:25, 42:1, 42:2
  **view** - 2:7, 76:11,
168:18, 175:17,
189:20, 200:5, 239:5
  **viewing** - 172:16
  **violate** - 59:2
  **violated** - 217:6
  **violation** - 126:1,
165:4, 165:21,
165:22, 165:23,
173:24, 174:7
  **violations** - 73:1
  **violence** - 220:15,
220:17
  **violent** - 73:1,
102:8, 123:20, 123:25
  **visit** - 89:4, 124:18
  **visiting** - 167:22,
168:3
  **voice** - 2:23, 13:7
  **Voices** - 3:14
  **voluntarily** - 208:4
  **vs** - 1:6

## W

  **wagon** - 128:20
  **Wait** - 63:18
  **wait** - 227:4, 234:1,
234:8, 234:10, 238:4,
241:23
  **waiting** - 14:13,
225:19, 225:24,
227:1, 232:16
  **waiver** - 232:13
  **walk** - 16:17, 32:4,
92:14, 132:5, 187:3
  **walked** - 35:6,
91:21, 93:7, 93:10,
108:7, 108:10, 192:9
  **Walking** - 99:5,
189:7
  **walking** - 81:17,
90:11, 92:13, 93:4,
99:7, 101:10, 187:5,
187:6, 189:6, 189:25,
192:5, 216:9
  **walks** - 187:18,
188:2, 188:7, 188:25,
192:7
  **wall** - 24:19
  **wander** - 84:9,
106:6, 115:5
  **wants** - 57:5, 207:5,
230:11, 230:15,
233:24, 234:12,
237:18
  **watching** - 17:22
  **water** - 23:13,
23:22, 33:19, 34:4,
34:7, 34:18, 154:21,
156:13, 156:22
  **Waterview** - 35:5,
139:2, 139:7, 139:8,
139:10
  **wave** - 141:21
  **waved** - 139:23,
139:25
  **ways** - 68:18
  **weapon** - 108:23,

126:18
  **weaponry** - 109:24,
122:12, 158:9, 158:14
  **weapons** - 106:18,
126:14
  **Weapons** - 111:1
  **wearing** - 90:22
  **weed** - 217:11,
217:15, 217:17
  **week** - 44:4, 56:7,
80:18, 80:22, 81:14,
87:18, 102:16, 103:3,
116:25, 119:18,
119:19, 119:21,
120:3, 120:6, 120:7,
135:22, 150:16,
161:10, 182:9, 217:16
  **weeks** - 57:16,
61:14, 119:10, 119:14
  **weight** - 86:10,
108:7
  **Weiss** - 127:23,
128:7, 128:21
  **welcome** - 49:20
  **well-known** - 76:24,
77:10
  **west** - 110:1
  **West** - 84:9, 100:23,
101:2, 101:4, 163:10,
240:21, 241:10
  **Westport** - 4:17,
5:5, 5:8, 11:6, 28:11,
28:12, 55:20, 67:7,
67:9, 67:12, 71:15,
71:19, 72:2, 72:8,
73:24, 76:24, 77:3,
80:17, 80:25, 81:25,
86:21, 86:24, 87:6,
88:21, 89:3, 89:4,
89:18, 95:6, 98:2,
98:4, 99:3, 99:21,
101:10, 102:22,
104:5, 104:9, 124:10,
124:16, 124:18,
125:11, 137:13,
137:24, 139:1,
151:19, 151:24,
152:5, 152:7, 153:5,
160:2, 160:5, 160:8,
178:5, 223:19
  **wheelchair** - 28:6,
184:12, 225:10
  **whereas** - 158:18
  **wherein** - 61:15
  **White** - 143:24,
144:25
  **white** - 74:18, 90:6,
90:10, 91:21, 92:9,
92:12, 93:3, 93:9,
93:10, 95:5, 240:15
  **whittle** - 243:14,
244:13
  **whole** - 25:20,
61:12, 65:12, 65:13,
185:10, 192:16,
207:24
  **Wilgrey** - 188:16,
188:18, 188:19
  **William** - 123:6,
123:8, 123:14
  **Williams** - 4:3, 4:6,
4:7, 4:13, 5:10, 5:18,
7:13, 7:20, 9:5, 9:6,
14:2, 30:23, 32:22,
34:11, 35:3, 36:9,
36:11, 36:23, 37:10,
37:13, 38:19, 39:4,
40:5, 43:7, 45:23,
88:2, 88:7, 88:13,
99:13, 113:18, 122:6,

122:25
  **Williams'** - 10:7,
11:3, 38:16
  **Wilson** - 173:2
  **win** - 209:10
  **wind** - 52:16
  **window** - 133:1,
133:6, 133:8, 141:8,
141:14, 143:10, 204:8
  **windows** - 125:18
  **winners** - 14:15
  **Wise** - 127:6
  **wish** - 208:6
  **wishes** - 54:5
  **withdraw** - 182:4
  **withdrawn** - 217:7
  **witness** - 2:3, 2:13,
2:16, 2:19, 6:12, 44:7,
45:2, 45:17, 46:13,
46:25, 49:17, 49:22,
50:3, 52:6, 52:8, 64:1,
70:12, 70:18, 88:3,
91:10, 113:7, 123:4,
123:9, 127:13,
133:13, 134:1,
135:21, 136:1, 136:4,
140:6, 150:15,
150:18, 150:19,
151:3, 162:19,
162:22, 168:14,
173:4, 174:25,
175:10, 175:15,
175:25, 176:7,
181:12, 206:22,
207:5, 207:15,
212:11, 216:14,
216:18, 216:19,
216:21, 221:24,
224:24, 225:6,
226:17, 226:23,
227:1, 227:13, 228:8,
228:12, 233:7, 233:8
  **Witness** - 2:24, 3:2,
13:9, 70:22, 88:7,
88:10, 102:7, 123:13,
123:17, 135:23,
136:8, 151:7, 160:22,
176:11, 176:14, 212:9
  **witness'** - 227:2
  **witness's** - 216:10
  **witnesses** - 45:11,
45:14, 46:9, 51:13,
51:19, 52:11, 52:13,
52:15, 52:22, 52:24,
55:17, 62:6, 62:21,
67:4, 68:22, 69:17,
70:4, 161:18, 162:20,
172:3, 174:22,
210:16, 230:20,
231:9, 231:11,
231:25, 232:2,
233:16, 235:21,
239:22
  **woman** - 202:11,
203:12
  **woman's** - 204:23
  **word** - 158:14,
158:16, 199:3, 223:21
  **words** - 24:21, 74:5,
120:18, 149:9,
186:20, 193:23,
195:20
  **Words** - 25:20,
118:20
  **wore** - 110:11
  **workable** - 238:10
  **worried** - 28:17,
185:15
  **worry** - 165:17,
170:24

**worth** - 84:1
**Wow** - 204:10
**writ** - 225:17
**write** - 73:4, 84:10,
107:5, 111:15,
116:14, 118:3,
118:24, 121:11,
146:11, 146:18,
147:6, 147:9, 147:13
**writing** - 58:25
**written** - 244:4
**wrongdoer** - 181:14
**wrote** - 59:21,
61:14, 73:18, 121:22,
134:22, 147:15

## Y

**yard** - 22:21
**Yates** - 72:16, 72:21
**year** - 88:20, 118:1,
118:6, 118:8, 118:10,
118:11, 119:16,
119:24, 170:3, 171:5,
171:11, 182:16,
203:13, 224:14,
245:3, 245:4
**years** - 4:25, 6:24,
71:6, 83:1, 88:16,
88:20, 102:21,
123:23, 124:6,
136:18, 151:18,
177:11, 177:18,
197:3, 202:11, 209:8,
217:24, 218:2
**yelled** - 200:18
**Yellow** - 147:20
**yellow** - 16:24,
78:23, 94:13
**yellowy** - 147:25
**yells** - 66:23
**Yes/no** - 246:10
**yesterday** - 56:2,
56:3, 228:4, 228:6
**Yesterday** - 177:5
**young** - 4:14
**yourself** - 20:11,
32:23, 37:3, 41:13,
200:19, 228:8

## Z

**zero** - 158:24,
245:7, 245:11
**zip** - 92:5
**ziplock** - 80:4, 92:8,
94:13
**ziplocks** - 75:4,
78:11, 78:23, 78:24,
83:16, 83:22, 143:7,
147:9, 147:18
**zipper** - 74:22, 75:5