UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,


                    Plaintiff,


vs.                          Case No. 1:10-CR-0744-RDB


ANTONIO HALL,


                    Defendant.

------------------------------------------------------

**JULY 22, 2011**

**Transcript of Proceedings**
**HEARING ON PRETRIAL MOTIONS**


**Before The Honorable RICHARD D. BENNETT**
**United States District Judge**

APPEARANCES:

For the Plaintiff:    John F. Purcell, Jr.
                      Clinton J. Fuchs
                      Assistant U.S. Attorneys


For the Defendant:    Gary E. Proctor
                      Timothy J. Sullivan




Proceedings recorded by mechanical stenography,
transcript produced with computer-aided
transcription.

2

```
 1                   P R O C E E D I N G S
 2              THE COURT:  Mr. Purcell, if you'll call
 3       the case, please.
 4              MR. PURCELL:  John Purcell, Assistant
 5       United States Attorney, here with Clinton Fuchs in
 6       the United States versus Antonio Hall, case number
 7       RDB-10-744, and we're here for hearing on pretrial
 8       motions.
 9              THE COURT:  And with you is also
10       Assistant U.S. Attorney Clinton Fuchs and Agent Todd
11       Moody, is that correct?
12              MR. PURCELL:  Agent Moody is in the back.
13              THE COURT:  Nice to see you, Mr. Fuchs,
14       as always.
15              On behalf of the defendant.
16              MR. SULLIVAN:  Good morning, Your Honor.
17       Timothy Sullivan and Gary Proctor on behalf of Mr.
18       Hall who is present and sitting between us.
19              THE COURT:  Mr. Sullivan and Mr. Proctor,
20       nice to see both of you.
21              Mr. Hall, good afternoon.
22              The record will reflect, Mr. Sullivan and
23       Mr. Proctor, you are acting as court appointed
24       counsel in this case, correct?
25              MR. SULLIVAN:  That's correct.
```

1          MR. PROCTOR:  Yes, sir.

2          THE COURT:  I want to thank you both for

3    your service to the court.  Mr. Hall, Mr. Sullivan

4    and Mr. Proctor are among a select group of lawyers

5    who are deemed qualified to handle court appointed

6    cases and they act as officers of the court and have

7    taken on your representation in light of the fact

8    that you're not eligible to have the Public

9    Defender's Office represent you because I gather of a

10   conflict of interest, and they are acting as officers

11   of the court, so I want to thank both of you for your

12   service to the court in that regard.

13          And the record will reflect that two

14   lawyers were appointed because the defendant was

15   initially eligible for the government to seek the

16   death penalty, but the government is not seeking the

17   death penalty in this case, but pursuant to Fourth

18   Circuit law, Mr. Proctor and Mr. Sullivan remain

19   appointed to represent Mr. Hall.

20          So with that we are ready to proceed

21   with, there are five pending motions in this case and

22   the five motions are paper number 38 and the motion

23   to exclude all photographic identification evidence

24   and or to suppress all photographic identification

25   evidence.

1          Paper number 39, the motion to suppress

2     alleged statements of the defendant.

3          Paper number 40, the motion in limine to

4     preclude the admission of other crimes evidence.

5          Paper number 41, a motion to exclude

6     cooperating witness testimony and request for a

7     pretrial reliability determination.

8          And paper number 42, a severance motion

9     seeking to sever counts one and two from counts

10    three, four and five of the superseding indictment.

11         Have I correctly summarized the motions

12    that are before the court today from the point of

13    view of the government?

14         MR. PURCELL:  Yes, Your Honor.

15         THE COURT:  From the point of view of the

16    defendant?

17         MR. PROCTOR:  Well, Your Honor, when Mr.

18    Purcell replied with the government's supplemental

19    response he did, but Mr. Purcell did raise two

20    motions in limine.  I don't know if the court wants

21    to address them today or not.

22         THE COURT:  What are those two?

23         MR. PROCTOR:  The first one would be to

24    admit the Guest FBI 302 pursuant to 804B6 forfeiture

25    by wrongdoing.

1          And the second one would be to exclude,

2     Mr. Hall was charged with the shooting of a Mr.

3     Parsons and was acquitted of that in state court, and

4     the government has moved in limine to preclude the

5     defense from mentioning that he was acquitted in

6     state court.

7          THE COURT:  All right.  Well, the matter

8     of the Kareem Guest FBI 302 we will address today,

9     and the exception to the hearsay under 804, it would

10    be under 804B6 forfeiture by wrongdoing, and I will

11    address that today.

12         And as to that, if one of my clerks on

13    that issue would print out the case of United States

14    versus Gray, 405 F.3d 227, that's 405 F.3d 227, a

15    Fourth Circuit opinion on that precise question and

16    we'll address that as well.

17         With respect to the motion in limine to

18    preclude your introduction of evidence as to an

19    acquittal of your client, I gather that was in the

20    Circuit Court for Baltimore City?

21         MR. PROCTOR:  Yes, sir.

22         THE COURT:  And when was that acquittal?

23         MR. PROCTOR:  2005.  Does that sound

24    right, Mr. Purcell?

25         MR. PURCELL:  Yes, around there.

1          THE COURT:  Who was the victim in that

2     case as to whom Mr. Hall is alleged --

3          MR. PURCELL:  Your Honor, I'll just step

4     in on this.  These two motions in limine were part of

5     the or at the end of the government's supplemental

6     motion in response and they are noted in the caption

7     for that, motions in response.

8          The victim in that case was Robert

9     Parsons, and Robert Parsons is actually one of the

10    witnesses who will be introduced, who will be

11    testifying in this case as to his relationship with

12    Mr. Hall as a drug customer and as a victim of

13    another shooting.  He's one of the persons named in

14    the overt acts section of conspiracy count one.

15         THE COURT:  So essentially Parsons, then

16    I gather the acquittal was of an attempted murder

17    charge?

18         MR. PURCELL:  It was an attempted murder,

19    yes, and he was basically shot at.  The case was

20    brought -- and actually injured very seriously.  The

21    case was brought in Baltimore City and Mr. Hall was

22    acquitted of that case, and we can address it

23    further, but the law as set forth in the government's

24    motion makes it fairly clear --

25         THE COURT:  Wasn't that identical issue

7

1    in the Byers case?

2                   MR. PURCELL:  I don't know if Byers --

3                   THE COURT:  No, wasn't there an issue of

4    someone that was shot by Byers?

5                   MR. PURCELL:  Yes, and that was under 404

6    that was admitted, yes.

7                   THE COURT:  Right.  That was addressed by

8    me in the case involving Mr. Byers in which the

9    Fourth Circuit affirmed my ruling that that evidence

10   was admissible as to Mr. Byers previously shooting

11   someone, correct, in connection with his drug

12   activities?

13                  MR. PURCELL:  That's correct.  The

14   defense has not indicated to me they wanted to even

15   try to introduce that.  I thought that they may, so I

16   just moved in limine.  If they stating that they are

17   not going to try to introduce his acquittal, that

18   ends it.

19                  THE COURT:  We wait for that for further

20   briefing.  I wasn't aware we were going to get into

21   that.  So except for that addition, Mr. Proctor, have

22   we correctly summarized the issues from the point of

23   view of the defense?

24                  MR. PROCTOR:  Yes, sir.

25                  THE COURT:  Then let me just deal with

```
 1        one matter quickly and then we'll get to the others.
 2                    We have, as I understand it the only
 3        witness testimony would be offered with respect to
 4        the motion to suppress statements of the defendant,
 5        correct?
 6                    MR. PURCELL:  We have three brief
 7        witnesses, Your Honor.
 8                    THE COURT:  And those witnesses are being
 9        Officers Kershaw, Moody and Williams, is that right?
10                    MR. PURCELL:  Yes.
11                    THE COURT:  With respect to the paper
12        number 41, motion to exclude cooperating witness
13        testimony and request for reliability hearing, we
14        might want to address this pretty quickly, Mr.
15        Proctor.
16                    I've never seen this motion before.  I've
17        never seen such a motion before, I don't have any
18        case law in support of it.  Essentially it's based on
19        a view that you contend that people are being paid
20        for their testimony, so I just want to address this
21        quickly because I don't know of any authority for
22        this.
23                    MR. PROCTOR:  I think you should address
24        it very quickly, Judge.  We would just submit on the
25        pleadings.
```

1              THE COURT:  Do you know of any Fourth

2      Circuit case, do you know of any federal case in the

3      United States that has ever granted a motion to

4      exclude cooperating witness testimony and a request

5      for a reliability hearing before the trial?

6              MR. PROCTOR:  There is some case law

7      cited in the motion.  It's not Fourth Circuit.  It's

8      not binding upon the court.

9              THE COURT:  And the case law has to do

10     with when there are compensated informants, people

11     being allegedly paid for their testimony, correct?

12             MR. PROCTOR:  And there are witnesses in

13     this case who are not being paid for their testimony

14     but are being housed at government expense.

15             THE COURT:  What would you suggest be

16     done with them?  If they're in custody, where else

17     would they go if they're not housed at government

18     expense?

19             MR. PROCTOR:  I'm not suggesting anything

20     improper happened.  I'm suggesting that they have a

21     motive to say whatever the government wants to hear.

22     That said, I expect Your Honor to deny the motion.

23             THE COURT:  That's fine.  I wasn't sure I

24     wasn't missing something.  I'm not criticizing you, I

25     just have never seen a motion like this before.  I

1    don't have any authority for it, and the government

2    has responded, and I thought maybe I'm missing

3    something here on this.  So clearly there isn't any

4    case law to support it.

5              With respect to the issue of, there's no

6    evidence that witnesses are being paid, there are

7    certain witnesses who are in custody, I gather, is

8    that correct, Mr. Purcell?

9              MR. PURCELL:  Actually in this group of

10   witnesses there will be some witnesses who are in

11   custody, but I think what Mr. Proctor is referring to

12   is that there are a couple of witnesses, and they're

13   not compensated witnesses in the sense as were

14   presented in counsel's motion, there are a couple of

15   witnesses who once they became witnesses they, and

16   for safety reasons, were essentially moved out of

17   Westport and are being housed and they've been given

18   full discovery about that.

19             THE COURT:  I understand.  But

20   essentially in relocation efforts.

21             MR. PURCELL:  But they're not

22   professional witnesses who were retained by the

23   government and compensation based on the testimony.

24             THE COURT:  Again, Mr. Proctor, I'm not

25   criticizing you, you're acting as court appointed

1      counsel and leaving no stone unturned on this case.

2      I'm just trying to verify I haven't missed something

3      here.  If I've missed a major issue, tell me.

4                    With respect to the defendant's motion to

5      exclude cooperating witness testimony and request for

6      reliability hearing, paper number 41, that motion

7      will be denied.

8                    First of all, it appears that it's based

9      upon I think an incorrect characterization of what

10     the situation is here with these eyewitnesses, some

11     are either in custody or some have had to be

12     relocated for security reasons.  I don't think that

13     amounts to compensation.

14                   Furthermore, there is no Fourth Circuit

15     authority that would in any way, even from any

16     federal court that would support a reliability

17     hearing per se.  You did cite the Levenite case, 277

18     F.3d 454, a Fourth Circuit opinion in 2002, but there

19     it had to do with essentially a contingency payment

20     arrangement to a witness.  There's absolutely no

21     indication of that in this case.

22                   And furthermore, in terms of the matter

23     from my review of the proffer of the facts here, I

24     don't know that it's correct to cite that those

25     persons who are at least proffered by the government

1    to be eyewitnesses to the murder of Kareem Guest --

2    am I pronouncing his name correctly, Kareem Guest?

3              MR. PURCELL:  You are, yes.

4              THE COURT:  I don't know that they're

5    necessarily cooperators.  They are eyewitnesses, and

6    apparently the proffer is that there's no indication

7    that they were even accessories in any way.  So I

8    don't see any basis for there to be what I would call

9    a reliability hearing, and I know of no precedent for

10   this.  It's really up to the jury to determine the

11   credibility of witnesses in this matter.

12             So for those reasons, I'm going to deny

13   the request under paper number 41 with respect to a

14   motion to exclude cooperating witness testimony and a

15   request for reliability hearings.  So that will be

16   denied, paper number 41 will be denied for the

17   reasons stated on the record.

18             Now we have four remaining motions that

19   we will deal with and what I would propose to do next

20   is I think that it would make the most sense, we can

21   hear legal argument on some of these other motions,

22   but I think in terms of the context of this case and

23   any other information that might be helpful with

24   respect to addressing these motions that we proceed

25   now with the motion to suppress statements and we

KERSHAW - DIRECT - PURCELL

13

1       take witness testimony.

2                   Is that agreeable to the government?

3                   MR. PURCELL:  Yes.  Thank you, Your

4       Honor.

5                   THE COURT:  Is that agreeable to the

6       defense?

7                   MR. PROCTOR:  Yes, sir.

8                   THE COURT:  With that we will proceed

9       with the witness testimony and we will address paper

10      number, motion number 39, the motion to suppress

11      statements.

12                  MR. PURCELL:  The government first calls

13      Detective Brian Kershaw.

14      Whereupon:

15                        BRIAN KERSHAW,

16      called as a witness, having been first duly sworn

17      according to law, testified as follows:

18                  THE DEPUTY CLERK:  State your name and

19      spell it for the record, please.

20                  THE WITNESS:  Detective Brian Kershaw, K

21      E R S H A W.  Currently assigned to CID homicide,

22      Baltimore City police.

23                        DIRECT EXAMINATION

24      BY MR. PURCELL:

25      Q.      Detective, good morning.

KERSHAW - DIRECT - RYAN

14

```
 1        A.       Good morning.
 2        Q.       You told us you're homicide.  How long have
 3   you been in the homicide unit?
 4        A.       Five years.
 5        Q.       Now, let's direct your attention, please, to a
 6   particular homicide, that of Kareem Guest that
 7   occurred on September 20, 2009.  Were you assigned to
 8   that particular homicide in your capacity as a
 9   Baltimore City detective?
10        A.       Yes, I was.
11        Q.       We'll get into more details about the case
12   number, etcetera, later at trial, but in the course
13   of your investigation did there come a time when, I
14   direct your attention to November 20, 2010, that you
15   attempted, based on investigative information you had
16   received to that point, which we may or may not get
17   into today, did you attempt to undertake an interview
18   of the defendant, Mr. Hall?
19        A.       Yes, I did.
20        Q.       And I'm just going to approach you for a
21   second, if I may, and counsel has a copy of this in
22   front of him for the record, and I know it's in your
23   binder, but can you just tell us whether or not what
24   you're looking at, we can mark as exhibit 1 if you
25   wish, that is a copy of your report of that interview
```

KERSHAW - DIRECT - POTLER

15

1     of Mr. Hall?

2     A.      Yes, it is.

3     Q.      This is what you also have in your binder,

4     your homicide file which is about two inches thick,

5     correct?

6     A.      Correct.

7     Q.      Let's use that one so you don't have to tear

8     your binder apart.

9            Now, can you tell us, please, let's

10    confirm, at that point, that is, at November 22,

11    2010, had Mr. Hall been charged either in Baltimore

12    City or in Baltimore in the United States District

13    Court?

14    A.      No, he had not.

15    Q.      Hadn't been charged, arrested, indicted in

16    either jurisdiction, is that correct?

17    A.      No, sir, he hadn't.

18    Q.      It was a still an investigation that was

19    ongoing before the federal grand jury?

20    A.      Yes.

21    Q.      Now, directing your attention to that day,

22    could you tell the court how it is you went about

23    trying to find Mr. Hall and what happened?

24    A.      During the morning hours, it was probably

25    around eleven a.m., I responded to a location on

1    Wilgrey Court where it was the home of Mr. Hall's

2    girlfriend.

3    Q.     Okay.  When you talk about the Wilgrey Court,

4    the judge will soon know Westport, but just tell us

5    where these places are when you refer to them.

6    A.     Wilgrey Court is one block over from where the

7    homicide happened.  It's in the projects in Westport.

8    Q.     And why did you go there?

9    A.     To try and make contact with Mr. Hall.

10   Q.     And who was it that lived there that you

11   believe might know Mr. Hall's whereabouts?

12   A.     Caprese Diggs.

13   Q.     What did you believe her relationship with Mr.

14   Hall to be?

15   A.     Girlfriend.

16   Q.     So you went to that house.  Did you encounter

17   anybody?

18   A.     No, I did not.

19   Q.     Did you undertake to let anybody know that you

20   had been there?

21   A.     Yes.  I left a card with my cellphone number

22   on it.

23   Q.     Now, after you left the card, did you hear

24   from anybody that same day?  What time was it, you

25   said you got there about --

KERSHAW - DIRECT EXAMINATION

17

```
1    A.      Actually it was 11:15.

2    Q.      All right.  And after leaving your car, did

3    you hear from anyone?

4    A.      Miss Diggs called me.

5    Q.      Tell us what occurred.

6    A.      She called me and said that Mr. Hall didn't

7    live there, but she would get ahold of him and

8    provide him with my cellphone number.

9    Q.      And what happened then?

10   A.      Mr. Hall called me.

11   Q.      About how long was that now after you had been

12   to the house?

13   A.      I would say approximately an hour.

14   Q.      And where were you when he called?

15   A.      Actually I was downtown in my office when he

16   called.

17   Q.      Can you tell us if you had any conversation

18   with Mr. Hall when he called you -- he called you on

19   your cellphone?

20   A.      Yes.

21   Q.      Tell us what occurred, please.

22   A.      He told me, asked me what it was about.  I

23   told him I wanted to talk about a homicide that

24   happened on Maisel Court.  He said he wasn't there,

25   but may have been in the area and may have heard
```

```
 1        gunshots.
 2        Q.      Did you specify to him which homicide you were
 3        speaking about?
 4        A.      I believe I did say Kareem Guest, I did say
 5        the victim's name.
 6        Q.      And what did he say to you in response?
 7        A.      He had said that he wasn't there, but he may
 8        have been in the area and he may have heard gunshots.
 9        Q.      Now, this is what he said to you on the phone?
10        A.      Yes.
11        Q.      Now, after that, did he say anything else to
12        you or did you have any further conversation with
13        him?
14        A.      Well, I asked him to come into homicide so I
15        could do a formal interview, and he declined.
16        Q.      Did he agree to do that?
17        A.      He declined.
18        Q.      So what happened then?
19        A.      I started to author a report in reference to
20        my phone conversation.  Sometime later Mr. Hall
21        called me again and asked to meet with me.
22        Q.      We're talking about the same day?
23        A.      Same day.
24        Q.      And about how much time had passed since your
25        last contact with Mr. Hall?
```

1    A.      About an hour or so.

2    Q.      Another hour?

3    A.      Uh-huh.

4    Q.      Now, I think on your report you actually

5    logged the times more accurately than you're

6    describing them.  You can refer to that if it will

7    help.

8    A.      Okay.  The second time he called me, I met him

9    at 12:50 in the afternoon, so I would approximate

10   maybe around 12:30 he called me.  It takes about 15

11   minutes to get from headquarters to Westport.

12   Q.      So this is still the daytime?

13   A.      Yes.

14   Q.      Did you go out to meet him?

15   A.      Yes, I did.

16   Q.      Did he tell you where to meet him?

17   A.      On Dorton Court.  That would be south of

18   Maisel, I'd say about a block away.

19   Q.      Now, on the -- Your Honor, on the government's

20   motions response, the initial one, I believe there's

21   an aerial map of Westport and this, where they're

22   meeting here, actually Dorton Court may be marked,

23   but it's also near an area what's called the

24   blacktop, is that right?

25   A.      Yes.

```
 1                THE COURT:  Hold on one second, Mr.
 2    Purcell.  It's in the government's response to
 3    defendant's pretrial motions and I believe you're
 4    referring to, I think this would be exhibit 1.  I'm
 5    not sure -- I'm sorry.
 6                MR. PURCELL:  If I can approach, I'll
 7    just hand you one.
 8                THE COURT:  This will be marked as
 9    government exhibit 1 for purposes of today's hearing
10    and this was attachment A to the government's
11    responsive pleading.
12    BY MR. PURCELL:
13    Q.     Now, Detective, you can see the screen next to
14    you?
15    A.     Yes.
16    Q.     I'm just going to point for the court's
17    edification.  This entire area, this is a project, is
18    that right?
19    A.     That's correct.
20    Q.     And referred to as such by the occupants.  And
21    I'm pointing here to blacktop, is that right?
22    A.     Yes.
23    Q.     Okay.  And Dorton Court would be off this
24    particular picture a little bit, but it's at the top
25    of Westport, is that correct?
```

KERSHAW - DIRECT - DWYER

21

```
 1     A.      Correct.

 2     Q.      Did you meet him in a house, in a public

 3     place; where did you meet him?

 4     A.      I parked in that parking lot and he approached

 5     me on foot.

 6     Q.      You parked in the blacktop?

 7     A.      Yes.

 8     Q.      And tell us what occurred.  Now, did you at

 9     any point indicate to Mr. Hall that he was under

10     arrest or in custody or that he had to talk to you?

11     A.      No, I did not.

12     Q.      Did you draw your firearm, handcuff him, pat

13     him down, anything like that?

14     A.      No, I did not.

15     Q.      So tell us what happened, please.

16     A.      I got out of the car, I walked to the back of

17     the vehicle, and he asked me, again, what this was

18     about.  I told him it was about the Guest murder and

19     I wanted to talk to him.  He said, again, he may have

20     been in the area and he may have heard gunshots.  I

21     asked him to come down with me to the office so we

22     could do a formal interview, and he declined and said

23     that he wouldn't talk to me any further without his

24     attorney.

25     Q.      Now, did you tell him why it was you wanted to
```

22

1    talk to him in particular?

2    A.     Yes.  When I met him face-to-face I told him

3    that I had information that he was present when

4    Kareem Guest was killed and I wanted to talk to him.

5    Q.     Now, in fact, at that point you actually had

6    information that he was the killer, is that right?

7    A.     Yes.

8    Q.     Did you tell him that?

9    A.     No.

10    Q.     You just told him that you had information

11    that he was there and you wanted to find out what his

12    explanation was?

13    A.     Yes.

14    Q.     And what was his response when you told him

15    that you had heard he was there?

16    A.     He denied it.  He said he may have been in the

17    area and he may have heard gunshots, but he didn't

18    see anything.

19    Q.     Okay.  And did you ask him then, as I think

20    you just said, to come back to homicide with you to

21    formalize that?

22    A.     Yes.

23    Q.     And did he agree to do so?

24    A.     No.

25    Q.     Did that complete your encounter with him that

1    day?

2    A.      That was it.

3    Q.      Now, at any time did you use any force or

4    threats or did he seem unable to understand what you

5    were doing?

6    A.      No.  When I met him it was actually at his

7    request, he asked to meet me, so I went to the

8    projects and I met him.

9    Q.      Was there anything unusual about his condition

10   or demeanor or sobriety, anything about him that

11   caused you to believe he didn't understand what was

12   going on?

13   A.      No.

14   Q.      How about you, what was your demeanor with

15   him?

16   A.      Relaxed.  I mean obviously I was, knowing that

17   he was a suspect, I was aware of what's going on

18   around me, but it was a conversation.

19   Q.      That was it?

20   A.      That was it.

21           MR. PURCELL:  All right.  Thank you.  I

22   have no further questions.

23           THE COURT:  Thank you, Mr. Purcell.

24           MR. PURCELL:  Other than that, if I may

25   state for the record that the person you're speaking

KERSHAW - CROSS - PROCTOR

24

```
1        of is in court today seated between counsel?
2                    THE WITNESS:  Yes, that's correct.
3                    THE COURT:  The record will reflect the
4        witness has identified the defendant Antonio Hall at
5        the trial table.
6                    Thank you, Mr. Purcell.
7                    Mr. Proctor.
8                    MR. PROCTOR:  Thank you.  Briefly.
9                         CROSS EXAMINATION
10       BY MR. PROCTOR:
11       Q.      How are you this morning?
12       A.      Good.  How are you?
13       Q.      When Mr. Hall called you back, okay, I guess
14       the first thing that happened was, this is Antonio
15       Hall on the line or something, he said something like
16       that, right?
17       A.      I believe he said this is Mack.
18       Q.      Okay.  Had you met Mr. Hall before?
19       A.      No.
20       Q.      Had you ever arrested him before?
21       A.      No.
22       Q.      Had one of your colleagues ever pointed him
23       out before?
24       A.      I knew what he looked like.  I mean as far as
25       being pointed out, no.
```

KERSHAW - CROSS - PROCTER

25

```
1    Q.      Okay.  You knew what he looked like from a mug
2    shot or something because he was a suspect, but you
3    had never seen him in the flesh?
4    A.      Actually, to my recollection, I believed that
5    I had seen him that night in the area of Maisel
6    Court.
7    Q.      Okay.
8    A.      In September.  I've seen him around Maisel
9    Court after the homicide.
10   Q.      Okay.  So when Mr. Guest was shot, you
11   reported to the scene shortly thereafter?
12   A.      Yes.
13   Q.      And you don't recall whether it was right when
14   you got there or a little while later, but at some
15   point you think you saw Mr. Hall that evening?
16   A.      No, I'm sorry, I'm not being clear.  I had the
17   murder, the murder happened in September, I responded
18   to the scene.  I spent a lot of time in Westport
19   thereafter.  I had seen him on Maisel Court further
20   down towards the school, I'm not sure which day that
21   was, but I had seen him in the area is what I'm
22   saying.
23   Q.      But you're not saying that was the night of
24   the murder, you're saying it might have been a day
25   later, it might have been a week later?
```

26

```
 1    A.      It was after the murder.  It was after that
 2    night.
 3    Q.      Okay.
 4    A.      I don't know what day it was.
 5    Q.      Okay.  So not the day of the murder, but
 6    sometime thereafter?
 7    A.      Correct.
 8    Q.      Okay.  So when this person called and said
 9    it's Mack, you've never heard his voice before,
10    right?
11    A.      No, I had never talked to him before.
12    Q.      So you just assume it's him because Caprese
13    said I'll have him call and lo and behold someone
14    identifying himself as Mack called, right?
15    A.      Correct.
16    Q.      And you didn't, I didn't hear you say read him
17    his rights?
18    A.      No, I did not.
19    Q.      You just asked him, hey, you know, I want to
20    talk to you about the Kareem Guest murder, and he
21    basically says might have been there, but don't know
22    anything?
23    A.      That's not correct.  He actually asked me why
24    I wanted to talk to him, and I told him why.  And I
25    told him I wanted to interview him.
```

KERSHAW - CROSS - PROCTOR

1    Q.      Okay.

2    A.      He asked me why I was trying to get ahold of

3    him, and I told him it was about the Kareem Guest

4    murder.

5    Q.      But that's, I mean, you've been doing this a

6    while, right?  When people call police officers, they

7    typically want to know why, what you want with them,

8    right?

9    A.      Sure.  I would want to know if an officer

10   called me.

11   Q.      And then, so when you go to the blacktop to

12   talk to him, or near the blacktop, when he's walking

13   up, at that point you've seen pictures of him or seen

14   him around the neighborhood and you know that's Mack,

15   right?

16   A.      Yes.

17   Q.      And he comes out, and again, remind me how the

18   conversation went.

19   A.      He approached my car.  I get out of the car.

20   I told him that I had information that he was there

21   when the murder happened and that I wanted to

22   interview him.  And again, he said the same thing, he

23   may have been in the area, may have heard gunshots,

24   but he wasn't there.

25            I asked him to come down to homicide for

1    an interview.

2    Q.    And he declined?

3    A.    Yes.

4    Q.    And that was it?

5    A.    That was it.

6    Q.    And when you traveled there, did you go in an

7    unmarked car or in a police car?

8    A.    Unmarked.

9    Q.    Okay.  Are you dressed in a uniform or plain

10   clothes?

11   A.    Suit.

12   Q.    Like today?

13   A.    Yes, sir.

14   Q.    And is your weapon visible?

15   A.    That day it was, my badge and weapon were.  I

16   didn't have my jacket on, it was warm.

17   Q.    And when he comes up and says, hey, you know,

18   here I am, again, you didn't read him his rights,

19   correct?

20   A.    No, I didn't.

21   Q.    And you mentioned he said I won't say anything

22   further without my attorney present?

23   A.    He said that after I asked him to come in for

24   an interview, and he said -- I believe what he said

25   was he wouldn't talk with me without his attorney.

KERSHAW - CROSS - PROCTOR

29

```
 1       Q.      And did he tell you who that attorney was?

 2       A.      I believe he said either Mead or Flynn, I'm

 3   not sure which one, that office.

 4       Q.      Yeah.  And after he said that, did you have

 5   any further discussion?

 6       A.      No, I did not.

 7       Q.      Did he -- what was his demeanor like during

 8   that face-to-face conversation?

 9       A.      Nervous is how I would describe it.  I believe

10   he had had someone with him that walked through

11   before he walked up to my car to kind of see if it

12   was something more than a meeting, and he seemed

13   nervous to me.

14       Q.      Did he seem high?

15       A.      Did he seem?

16       Q.      High.

17       A.      High?

18       Q.      Yeah.

19       A.      No.

20       Q.      Drunk?

21       A.      No.

22       Q.      Was he smoking?

23       A.      I don't believe he was.  I don't recall for

24   certain.

25       Q.      Did you pat him down for officer safety?
```

```
1     A.      No, I did not.
2     Q.      Well, was anyone else present other than the
3     person you believe walked through before?
4     A.      Yes.  I took Detective Joseph Landsman with
5     me.
6     Q.      Okay.  And was he, was it a one-on-one
7     conversation and Landsman sitting in the car or were
8     the two of you both talking to Mr. Hall?
9     A.      It was a one-on-one conversation.  Detective
10    Landsman did get out of the car, but he stood by.  I
11    backed in, he stood by the passenger side door.
12    Myself and Mr. Hall were towards the back of the car.
13    Q.      I know you can't speak for Mr. Landsman, but
14    could he overhear what you were saying?
15    A.      I don't know.
16    Q.      And why did you take Officer Landsman with
17    you, or Detective Landsman?
18    A.      Officer safety.
19    Q.      But there were no civilians present as far as
20    you know, no one else could have been --
21    A.      Someone walked up with Mr. Hall, I don't know
22    who he was.
23    Q.      But while you were having the conversation,
24    the only three people that could have heard it was
25    you, Mr. Hall, and Detective Landsman?
```

31

```
1    A.      That's correct.

2                 MR. PROCTOR:  That's all we have.

3                 THE COURT:  Thank you, Mr. Proctor?

4                 Any redirect, Mr. Purcell?

5                 MR. PURCELL:  I'd like to put an exhibit

6    sticker on this in case be part of the record, the

7    report he's referring to.

8                 THE COURT:  Well, that's 1M for the

9    government.  That's just for identification purposes

10   only for purposes of recollection, and the aerial

11   photo will be marked as government exhibit 1 for

12   purposes of today's hearing.  If you'll make sure

13   that's part of the record, Mr. Purcell.

14                MR. PURCELL:  Actually it is already.

15                THE COURT:  It's attachment A, the record

16   will reflect it's attachment A to your response to

17   defendant's pretrial motions.

18                     REDIRECT EXAMINATION

19   BY MR. PURCELL:

20   Q.     Now, Detective, I only have one question and

21   that is there was a reference that you made to the

22   scene of the murder and where you parked.  Just a

23   couple of things.  Is this where you parked and had

24   the conversation with Mr. Hall, where my pen is

25   pointing?
```

1    A.      It was, that's, that general area right there,

2    right where your pen's at.

3    Q.      Now, that is just off the Kermit Court and

4    where I'm indicating, where there's a three on the

5    map, is that the scene of the murder itself?

6    A.      Yes.

7            MR. PURCELL:  Thank you.  No further

8    questions.

9            THE COURT:  Thank you very much,

10   Detective Kershaw.  You can step down.  You shouldn't

11   discuss your testimony with anyone today until this

12   hearing is concluded.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Thank you very much.  You may

15   step down.

16           All right.  The next witness, Mr.

17   Purcell.

18           MR. PURCELL:  Detective Moody.

19   Whereupon:

20           TODD MOODY,

21   called as a witness, having been first duly sworn

22   according to law, testified as follows:

23           THE DEPUTY CLERK:  State your name and

24   spell it, please.

25           THE WITNESS:  Detective Todd Moody.  T O

```
  1        D D, M O O D Y.

  2                         DIRECT EXAMINATION

  3        BY MR. PURCELL:

  4        Q.      Detective Moody, where are you employed,

  5        please?

  6        A.      I'm employed with the Baltimore City Police

  7        Department.

  8        Q.      Are you assigned to any particular task forces

  9        that have allowed you or required you to become a

 10        deputized federal agent as well?

 11        A.      I am.  I'm assigned to the FBI as a Safe

 12        Streets task force.

 13        Q.      And how long have you been with the FBI as a

 14        task force officer?

 15        A.      Since 1999.

 16        Q.      And how long have you been in the Baltimore

 17        City Police Department?

 18        A.      Since 1998.

 19        Q.      Okay.  Now, we'll be hearing much more from

 20        you at trial, but just to get to the particular issue

 21        at hand today, were you involved in the investigation

 22        of the murder of Kareem Guest, that murder occurring

 23        on September 20, 2009?

 24        A.      I was.

 25        Q.      Now, directing your attention, please, to the
```

1    end of that investigation, did there come a time

2    when, Detective, did there come a time when the

3    defendant, Mr. Hall, was indicted for the murder or

4    basically a murder in retaliation against Mr. Guest?

5    A.      That's correct, he was.

6    Q.      And did that occur on December 2, 2010?

7    A.      It did.

8    Q.      And on that date did the grand jury return an

9    indictment and a bench warrant issue?

10   A.      Yes.

11            MR. PURCELL:  Now, Your Honor, just to

12   make the record clear, I have a copy of the docket of

13   this, of your case, of this case, and it does

14   indicate that the indictment was returned and a

15   warrant was issued on December 2, 2010.

16            THE COURT:  Yes.  The docket in this case

17   reflects that a sealed indictment was returned on

18   December 2, 2010, and there was an order for an

19   issuance of a bench warrant as to Antonio R. Hall,

20   the defendant in this case, which was signed by

21   Magistrate Judge Gesner on that same day.

22            Any dispute about that, Mr. Proctor, from

23   the point of view of the defendant?

24            MR. PROCTOR:  No, sir.

25            THE COURT:  You may continue, Mr.

```
 1    Purcell.
 2    BY MR. PURCELL:
 3    Q.      We heard that in fact there was a bench
 4    warrant issue so let's move right to it.  On that
 5    date did you attempt to locate and arrest Mr. Hall,
 6    the defendant here today, for the charges in the
 7    indictment returned that day?
 8    A.      Yes, we did.
 9    Q.      Can you tell the court where he was located?
10    A.      He was eventually located, not the same day,
11    but he was eventually located on Alaska Court in what
12    we refer to as the blacktop area.
13    Q.      And when was that?
14    A.      I believe that was December 6.  I'm not
15    exactly sure of the date.
16    Q.      It would be helpful if you knew the date.
17    Would it have been the same day?  I'll tell you what.
18    Do you have your report?
19    A.      I don't have it with me, no, I don't.
20    Q.      Okay.  This is an undated --
21            THE COURT:  The record will reflect in
22    this case that the bench warrant was returned
23    executed on December 2, 2010 in the case of Antonio
24    Hall, and the indictment was unsealed the next day.
25            THE WITNESS:  That's correct, it was the
```

1          same night.

2                      THE COURT:  All right.  According to the

3          court file here, it's a matter of record.

4          BY MR. PURCELL:

5          Q.      You can take a look at this report.

6          A.      It was a very busy week that week.

7          Q.      Now, I'm showing --

8                      THE COURT:  I understand.

9          Q.      I'm showing you what counsel has and it's an

10         FBI 302 reporting the arrest, actually you joined in

11         this, reporting the arrest of Mr. Hall, is that

12         correct?

13         A.      That's correct.

14         Q.      And just to be sure, we have the record, is it

15         correct he was arrested the same day?

16         A.      He was.

17         Q.      Tell us where he was found, if you remember.

18         A.      It was on Alaska Court right near the

19         intersection of Alaska and Annor Court.

20         Q.      Were you among the team that located Mr. Hall

21         that day?

22         A.      I was.  I wasn't immediately there when he was

23         placed in handcuffs.  There was some movement, he was

24         in a vehicle.  I came to the scene within a minute or

25         two of him being taken into custody.

MOODY - DIRECT - PURCELL

37

```
 1    Q.      Now, at the time of arrest, did you undertake
 2    to advise Mr. Hall of his Miranda rights?
 3    A.      I did.
 4    Q.      And can you just tell the court on the record
 5    how you did that?
 6    A.      I did it verbally.  I told him he had the
 7    right to remain silent.  Anything that he would say
 8    would be used against him in a court of law.  He had
 9    the right to an attorney.  And if you cannot afford
10    an attorney, one would be appointed to him.  And as I
11    began to say the very first sentence of that, he
12    started saying it at the same time as me.  And I said
13    do you understand your rights; he said yeah, yeah, I
14    understand my rights.
15    Q.      So he was repeating or stating the rights as
16    you were repeating --
17    A.      As I was saying them, he began saying them at
18    the same time.
19    Q.      So did you believe that he understood the
20    rights that you advised him of?
21    A.      Yes, I did.
22    Q.      Now, did you undertake any interrogation or
23    questioning of Mr. Hall at that time?
24    A.      No, I did not.
25    Q.      And can you tell the court where was Mr. Hall
```

1    taken?  I understand it was not late, but it was

2    after court is closed.  What was done with Mr. Hall

3    that night?

4    A.      Immediately after the arrest he was

5    transported to the FBI Baltimore office to be

6    fingerprinted and photographed, and following that we

7    took him to the Baltimore County precinct located in

8    Woodlawn, we use them to temporarily hold prisoners

9    because it's after hours and the marshals don't have

10   a holding facility.

11   Q.      Now, if you need to, you can look at your

12   report if you need to refresh your memory, if it does

13   so, but give the court an idea of what time it was

14   that you actually took him or he was actually taken

15   out to -- did you say White Marsh or Woodlawn?

16   A.      Woodlawn.  It was about 8:34 p.m.

17   Q.      And after you dropped him off, what did you

18   do?

19   A.      I went home.

20   Q.      And who were you with that day in terms of any

21   officers or agents who were in the courtroom today?

22   A.      I was with Agent Loy Cao when we departed the

23   precinct.

24   Q.      Now, up to that point had you undertaken any

25   interrogation of Mr. Hall at all?

MOODY - DIRECT - BURGESS

39

```
1    A.      No.

2    Q.      So you left, good night, see you tomorrow?

3    A.      Right.

4    Q.      And what was the plans before his initial

5    appearance to court?

6    A.      The plan was to return to the precinct in the

7    morning, pick up Mr. Hall and transport him down here

8    and drop him off with the marshal's service.

9    Q.      Now, after you dropped him off whatever it

10   was, around 8:30 that evening, did you have occasion

11   to be contacted by any Baltimore County police

12   officers about his medical condition?

13   A.      No.  I was contacted by Agent Cao.

14   Q.      What were you told by Agent Cao in terms of

15   his medical condition?

16   A.      That he had received a call from the Baltimore

17   County officer at the lockup and Mr. Hall was having

18   an asthma attack and needed to be transported to the

19   hospital for a hospital detail.

20   Q.      Now, did Baltimore county undertake to do that

21   themselves?

22   A.      Yes, they did.  You mean to transport him?

23   No, no.  To call us, yes.

24   Q.      So it wasn't so serious that they took him

25   anywhere.  They waited for you to take him.
```

1    A.      That's correct.

2    Q.      And how long did it take you all to get there,

3    that is, you and Agent Cao to get there and tend to

4    Mr. Hall?

5    A.      From the time the call was made?

6    Q.      Uh-huh.

7    A.      At least an hour.

8    Q.      So when you got there in an hour, did you have

9    occasion to meet then Mr. Hall?

10   A.      I did.

11   Q.      What did you observe about his condition at

12   that particular point?

13   A.      He was very talkative and he was walking

14   around.  He seemed fine.

15   Q.      Did he seem any different when you left him

16   off that evening?

17   A.      No.

18   Q.      Did he have any difficulty speaking or

19   breathing or standing or walking?

20   A.      Not at all.

21   Q.      Have you ever seen anybody have an asthma

22   attack?

23   A.      I have.

24   Q.      Did he have, I'm not asking if you're a

25   doctor, but I'm asking if he manifested any sorts of

1      the symptoms of persons you've seen who were in
2      actually in asthmatic distress?
3      A.      Not anyone that I had seen or been familiar
4      with, no.
5      Q.      And was he talking to you?
6      A.      Very much so.
7      Q.      What do you mean very much so?
8      A.      He was very talkative.  He was talking so much
9      that I recall making a comment to him that if he was
10     having an asthma attack, he would be having a hard
11     time getting oxygen into his lungs and therefore he
12     wouldn't be able to talk as much because he was
13     actually becoming a little annoying, and he talked
14     about everything from just wanting a cigarette to
15     basketball, football.  I mean just everything.
16     Q.      Okay.  Now, in the report that was done, you
17     noted, and we provided to counsel, certain statements
18     that he made that we thought were material enough to
19     actually bring to the court's attention to try to use
20     at trial.  So as to those statements, we don't care
21     about his baseball or football comments, but during
22     the time, and just follow my questioning, if you
23     would, I'll just break this down into segments, but
24     during the time that you took Mr. Hall from the
25     precinct down to the medical center and where did you

MOODY - DIRECT - PURCELL

42

1      take him, please?

2      A.      We took him to Harbor Hospital.

3      Q.      Just over here over the bridge?

4      A.      Correct.

5      Q.      So during the time that you were taking him to

6      that, to, did he make any statements that are of the

7      type that you reported in your 302?

8      A.      He did.

9      Q.      About inquiries about other people relevant to

10     the investigation, anything like that?

11     A.      That's correct, he did.

12     Q.      What did he say?

13     A.      He asked us about Rain.  He did say first

14     names.  He asked what's up with my girl, Rain.

15     Q.      Who did you understand Rain to be?

16     A.      Rain Curtis.

17     Q.      And Rain Curtis is a person who was actually

18     been prosecuted in this case for perjury, is that

19     right?

20     A.      That's correct.

21     Q.      What else did he say?

22     A.      He said what's up with Rain.  What's going on

23     with her case?  Why is she in jail?  What did she do?

24     Q.      Where was she at that point?

25     A.      At that point she was incarcerated.

1    Q.     Just try not to speak over my question, okay,

2    if you would, and I'm going to get yelled at in about

3    two seconds.  I see a head nodding from the reporter,

4    okay?

5                  Where was Rain Curtis at the time that he

6    was asking these questions?

7    A.     In jail.

8    Q.     And who else did he ask about?

9    A.     He asked about Kevin.

10   Q.     And who do you understand Kevin to be?

11   A.     Kevin Duckett.

12   Q.     And where was Kevin Duckett at the time, that

13   is, as of November -- I'm sorry -- the date of the

14   arrest, December 2, 2010, where was Mr. Duckett?

15   A.     He had been relocated to a safe house.

16   Q.     He was out of the area for a while?

17   A.     Correct.

18   Q.     Now, what else did he say on the way down to

19   Harbor Hospital?

20   A.     He also asked about Kevin and he asked us

21   what's going on with Kevin's case.  Mr. Duckett had

22   been arrested in a state case and he said what's

23   going on with that case, are you guys, feds going to

24   be picking that case up.  Just as I had responded

25   about Rain's case, I told him I don't know what's

1    going on with anybody's case.  And there were several

2    times, probably four to six times he asked us, is

3    this going to be in the paper, is this going to be in

4    the newspaper?

5    Q.     And that's on the way to the hospital?

6    A.     On the way to the hospital.

7    Q.     Now, when you got to the hospital, set those

8    statements aside, how long was he in there for

9    treatment, if you remember?

10   A.     Maybe 25 to 30 minutes at the most.

11   Q.     And why you there when he was being treated

12   because he was in custody?

13   A.     I was.

14   Q.     And what he occurred?  If you just tell us

15   from your observation.

16   A.     They came in, they checked his vitals, filled

17   out some paperwork, and they provided him with an

18   inhaler.

19   Q.     An inhaler?

20   A.     Correct.

21   Q.     Did he use it?

22   A.     He did.

23   Q.     And did it seem to make a difference?

24   A.     In my opinion, no.

25   Q.     You didn't see any -- was it the same way?

1     A.      That's correct.

2     Q.      Now, as you left the hospital, I guess you

3     parked in the parking lot?

4     A.      We did.

5     Q.      While you were in the parking lot, were there

6     any other statements made that you noted in your

7     report because you thought they were material?

8     A.      Yes.  We were walking to the vehicle and he

9     asked us where am I going, back out there to

10    Baltimore county?  When am I going to be going to the

11    federal courthouse?  He was curious about the

12    process.  So I explained to him the process, I said

13    we're going to take you out here to Baltimore County

14    and we'll be back in the morning to pick you up and

15    we'll transport you to the marshal service and drop

16    you off.  I said we'll find out tomorrow morning what

17    time you'll have an initial appearance.  And he says

18    what's an initial appearance, he asked about what the

19    initial appearance was.

20            So I explained to him that it would be

21    his first appearance in court, the judge would notify

22    him of the charges and the potential penalties of

23    those charges.  And then he asked me, well, what's

24    the penalties, what am I looking at is what he kept

25    asking.  So I advised him of what the penalties were.

1    I said, well, the penalties are a life sentence, and

2    depending on whether or not there's approval, they

3    may seek the death penalty if that's approved.  And

4    at that point he said, come on, Moody, can't you talk

5    to those people and let me plead to 50?  And I said,

6    well, at your age, 50 years would basically be a life

7    sentence, so that really wouldn't make any sense.

8    Q.      And did he say anything else about penalties

9    or any other remarks at that point?

10   A.      Not at that point, no.  Just talked about

11   everything else.

12   Q.      All right.  But he remained talkative?

13   A.      Very talkative.

14   Q.      Now, at any point did you undertake any

15   interrogation of him?

16   A.      No, we did not.

17   Q.      Now, did you take him back to the precinct?

18   A.      We did.  We dropped him back off at the same

19   Baltimore County lockup that he we picked him up at

20   Woodlawn.

21   Q.      Now, in your report there's a reference to

22   something he said the next day.  Did you have

23   occasion to see Mr. Hall the next morning on December

24   3?

25   A.      We did.  Agent Cao and I picked him up that

1    morning from Woodlawn, we brought him to the marshal

2    office here in this building.  Once we were notified

3    of the initial appearance time we returned to the

4    marshal service and took custody of Mr. Hall again

5    and we came up through the elevator.  And it was once

6    we got off the elevator he had asked me if I had read

7    the paper and whether or not this case had made the

8    paper.

9    Q.    Anything else?

10   A.    That was all.

11   Q.    All right.  Now, I think I've asked you about

12   demeanor and you didn't undertake any questioning.  I

13   don't think I have any further questions.  Thank you.

14             THE COURT:  All right.  Thank you, Mr.

15   Purcell.

16             Mr. Proctor, cross examination.

17             MR. PROCTOR:  Briefly, Judge.

18                   CROSS EXAMINATION

19   BY MR. PROCTOR:

20   Q.    Good morning.  Is it Detective Moody?

21   A.    Yes, sir.

22   Q.    How are you?

23   A.    Good.

24   Q.    Just a few questions.  Before you -- well, do

25   you recall who arrested Mr. Hall?

1      A.      Actually placed him in handcuffs physically?

2      Q.      Yes.

3      A.      No, I was not there when he was physically

4      placed in handcuffs.

5      Q.      And you weren't there to see whether -- well,

6      did you talk to the officers who arrested him?

7      A.      I did.  I mean they were part of our unit.

8      Q.      But when Mr. Hall was arrested, as far as you

9      know, he wasn't in possession of any guns or drugs or

10     contraband or anything like that?

11     A.      No.

12     Q.      And as far as you know he came quietly, he

13     didn't run, didn't put up a fight, anything like

14     that?

15     A.      Not to my knowledge.

16     Q.      So he's sitting in the back of a squad car

17     when you get there?

18     A.      No.  He was standing outside of the vehicle.

19     He, he was operating when I arrived.

20     Q.      Okay.  And this was on the blacktop or

21     thereabouts?

22     A.      Correct.  It was, if you look on this map

23     here, it was right at the intersection of Annor Court

24     and Alaska.

25     Q.      Okay.  And so you walk up to him, and correct

1    me if I'm wrong, you've been knowing Mr. Hall a

2    while, right?

3    A.      I've been knowing him for a while, that's

4    correct.

5    Q.      Because is it fair to say Westport's kind of

6    your primary area of investigation, where you're

7    stationed most?

8    A.      No, that's not correct.  When it comes to this

9    particular investigation, yes.  But this is not the

10   only thing I partake.

11   Q.      But you've spent a lot of time in Westport

12   over the years, right?

13   A.      I've spent quite an a bite of time over there,

14   correct.

15   Q.      Investigated homicides there before?

16   A.      Not directly investigating homicides, no.

17   Q.      Drug crimes over there before?

18   A.      Drug crimes, correct.

19   Q.      Have you ever arrested Mr. Hall before that

20   day?

21   A.      I have never arrested Mr. Hall before that

22   day.

23   Q.      Have you ever sat down and questioned him

24   before that day?

25   A.      No.

1    Q.      But you knew who he was, right?

2    A.      I knew who he was, yes.

3    Q.      And how was that, was it just through seeing

4    photos or had you seen him in the flesh?

5    A.      I had seen him multiple times.

6    Q.      And that was where?

7    A.      In Westport.

8    Q.      And that was just through investigating

9    crimes, seeing him in the hood?

10   A.      I mean I've seen him in the neighborhood, I've

11   seen photographs of him, I have discussed him with

12   cooperating witnesses in our drug investigations.

13   Q.      Had you ever had conversation with him before

14   that day?

15   A.      I've had several conversations with him.

16   Q.      And that was about what?

17   A.      How you doing, what's going on, those sort of

18   things.  The normal police interaction with people on

19   the street.

20   Q.      Okay.  But you never questioned him about

21   crime before that day?

22   A.      I've never questioned him about any crime.

23   Q.      So when you go up, does he -- do you recall

24   roughly what time it was?

25   A.      It was nighttime.

MOORY - CROSS - PROCTOR

51

```
1    Q.      But it's December, so nighttime begins at five
2    o'clock?
3    A.      It was dark out.
4    Q.      Okay.  And does Mr. Hall appear drunk?
5    A.      He didn't appear drunk, no.
6    Q.      Did he appear high?
7    A.      You know, I'm not a drug recognition expert.
8    He was very animated and talkative.
9    Q.      Okay.  And you said you explained his rights
10   and he kind of sung the same song, right?
11   A.      He immediately when I started saying, listen,
12   I want to advise you of your rights, I said you have
13   the right to remain, he said yeah, I know I have the
14   right to remain silent.  And every time I would say
15   something, he would repeat it.  He was yeah, yeah,
16   yeah, I know my rights.  I said okay, so you
17   understand your rights, and he said yes.  And that
18   was it.
19   Q.      Okay.  And then every questioning I've ever
20   seen, which obviously is not as much as you, it
21   finishes by are you willing to waive them?  Did you
22   ask him that question?
23   A.      No.  Because I didn't have any intentions on
24   questioning him about anything.
25   Q.      And you didn't have any, I mean he's just been
```

1       charged with murder, you wouldn't like to talk to him

2       about that?

3       A.      No.

4       Q.      And did he invoke his right to counsel?

5       A.      He didn't say anything.  He said I understand

6       my rights.

7       Q.      Did he say get Catherine Flynn here or

8       Margaret Mead here or anything like that?

9       A.      Not to me.  He was yelling that to -- there

10      were a lot of people in the area and I think his, the

11      mother of his children came at one point and he was

12      screaming to her, call Catherine Flynn.

13      Q.      Okay.  And you knew who Catherine Flynn was,

14      right?

15      A.      I do.

16      Q.      She's asked you questions just like I'm doing,

17      right?

18      A.      No.

19      Q.      So he says call Catherine Flynn, and you

20      didn't question him at all?

21      A.      About?

22      Q.      About anything that night.

23      A.      No.  Because once he yelled to his children's

24      mother to call Catherine Flynn, in my opinion he was

25      essentially invoking his right to an attorney anyway

MOORY - CROSS - PROTO

53

```
 1    and I had no intentions on questioning him about the
 2    crime which we arrested him for.
 3    Q.     So you took him to the FBI and he didn't make
 4    any statements there as far as you know?
 5    A.     He asked if he could smoke a cigarette.  About
 6    30 times.  We actually let him smoke a cigarette.
 7    That was basically it.
 8    Q.     And then you took him out to Woodlawn in
 9    Baltimore County?
10    A.     Correct.
11    Q.     And left him there essentially?
12    A.     We turned custody of him over to Baltimore
13    County, correct.
14    Q.     Okay.  And then so the next statement he makes
15    is when you go back to get him?
16    A.     Correct.
17    Q.     And those statements were -- well, why don't I
18    ask an open-ended question.  What do you recall at
19    Woodlawn him saying?
20    A.     At the precinct?
21    Q.     Yes.
22    A.     Nothing at the precinct I mean other than, you
23    know, him saying that, all I need is an inhaler, I
24    don't need to go to the hospital.  He was very, very
25    talkative.  I mean I couldn't begin to summarize
```

1      everything that he said that night.

2      Q.     Okay.  So he said he didn't need an inhaler.

3      A.     No.  He said all I need is an inhaler, I don't

4      need to go to the hospital.  But at this point we had

5      already been contacted by Baltimore County and their

6      protocol was to have him taken to the hospital.

7      Q.     Okay.  Are you equipped -- did either you or

8      Agent Cao have a tape recorder with you?

9      A.     No.

10     Q.     Would it have been difficult to get one given

11     you're in a police station?

12     A.     I couldn't begin to answer that.  I don't know

13     what equipment's available at hand out there.  I

14     don't know.

15     Q.     Okay.  But certainly there was no recording

16     made, right?

17     A.     No.

18     Q.     And certainly you have, I mean Mr. Duckett,

19     for example, had no problem with a tape recorder

20     talking to Mr. Hall, right?  There's nothing to

21     preclude you from doing the same thing?

22     A.     It wasn't really a tape recorder.  That's a

23     different piece of equipment completely.

24     Q.     Okay.  So he's very talkative, he's talking

25     about basketball and football, and why did you arrest

1    Rain and all that sort of stuff, right?

2    A.      Not at the precinct, no.

3    Q.      That's on the ride over?

4    A.      That's when we driving to the hospital.

5    Q.      How long does that drive take?

6    A.      Maybe about 15 minutes, 20 minutes.

7    Q.      And is he in handcuffs while you're taking

8    him?

9    A.      Absolutely.

10   Q.      Is he in leg irons?

11   A.      I believe so, yes.

12   Q.      Anything else; gun belts, restraints?

13   A.      We may have used a belly band which is

14   something to secure the handcuffs to the front.  I

15   believe we did.  Because we had him cuffed in the

16   front for the drive.

17   Q.      Okay.  And then you go into the hospital.  Is

18   he talking while you're in the hospital?

19   A.      He was talking the whole time he was with us,

20   yes.

21   Q.      Is he asking relevant questions about the case

22   or is he talking about the Knicks or the Ravens?

23   A.      He kind of fluctuated between talking about

24   general things like basketball and then he would

25   inquire about Rain, and then he would talk about

1     just, I mean everything.  Then he'd ask about Kevin.

2     Q.     And remind me again, what did he ask about

3     Kevin?

4     A.     He asked us what's going on with Kevin's case.

5     And I said I don't know.  He said are you guys going

6     to pick that case up.  I said I wasn't involved in

7     the case.  And he goes hmmm.  And that was basically

8     it.

9     Q.     Okay.  Are there any doctors, nurses, we can

10    knock on their doors and they would have heard this?

11    A.     This is while we were driving.  I mean I don't

12    know what -- obviously at the hospital there were

13    doctors and nurses, sure.

14    Q.     Did any of them hear any of this conversation?

15    A.     I don't know what anyone heard.  I mean I only

16    know what I heard.

17    Q.     Okay.  So on the drive back does this

18    conversation, is this conversation going on?

19    A.     About Kevin and Rain?

20    Q.     Just generally about the case.

21    A.     No.  It was actually when we were walking to

22    the car is when he first started asking about where

23    was he going now.  I was explaining the whole

24    process.  And it was once we put him in the car and I

25    got in the car, that's when he just continued on

MOODY - CROSS - PROCTOR

57

```
1     about the penalties and things like that.
2     Q.      Okay.  And I recall seeing it in your report,
3     I don't recall you saying it this morning, but was
4     there discussion of at least 50 being a number?
5     A.      That's what he said, yes.
6     Q.      Okay.  Tell the judge about that.
7     A.      He said Moody, can't you talk to these people
8     and tell them I'll take 50?  And I looked in the
9     mirror and I said, well, why would you take 50 years
10    because essentially 50 years at your age is a life
11    sentence.  And he said, well, at least it's a number.
12    Q.      Do you recall him saying anything else about
13    that?
14    A.      He, no, I don't think he did.
15    Q.      And let me back up for a little, two things.
16    First of all, you said you talked to Mr. Hall before
17    normal police interaction with people on the street;
18    what does that mean?
19    A.      Well, it's very common when you're in an area
20    and you're there investigating certain crimes if you
21    see a bunch of guys who you're familiar with and
22    you're familiar with their activities to pull up and
23    say what's going on, what are you doing, what's going
24    on, things like that.
25    Q.      So that was the conversations that you had
```

MOODY - CROSS - PROCTOR

58

```
 1      with Mr. Hall in the past were what's going on,

 2      what's up?

 3      A.      Basically, yes.

 4      Q.      Did you stop and frisk him before when you did

 5      that?

 6      A.      I don't know if I've ever frisked him.  No, I

 7      don't believe I did.

 8      Q.      And when -- had Mr. Hall ever approached you

 9      before on the street?

10      A.      Yeah, he would approach me, not saying

11      anything, but when we were there doing other things

12      he would approach, sure.

13      Q.      So he would just wonder why you were here and

14      come up to be nosy?

15      A.      Well, if we were doing certain things and we

16      were out there, I mean everybody wants to know what's

17      going on, so he would walk right over to where we

18      are.  In that sense, yeah, he had approached me.

19      Q.      Did you, when you arrested Mr. Hall or when

20      you were present at the arrest, did you make it clear

21      to him why he was being arrested?

22      A.      I told him you're being arrested for the

23      murder of Kareem Guest.

24      Q.      Okay.  And he indicated he understood that?

25      A.      He didn't say anything.
```

1    Q.      Okay.  Can I have a second, please?

2            (DISCUSSION OFF THE RECORD.)

3    Q.      Briefly.  When Mr. Hall would come up and talk

4    to you those days, can you estimate how many times?

5    A.      Well, he never just came over and talked to

6    me.  I mean how many times was he around?

7    Q.      Yeah.

8    A.      I couldn't even, I couldn't begin to give you

9    a number.  I've been working on and off in Westport

10   since 2005.  I've been involved with arresting a lot

11   of people over there who are very close associates

12   with Mr. Hall.  I couldn't even begin to give you a

13   number.

14   Q.      More than ten?

15   A.      I couldn't tell you.  I mean I just, it

16   wouldn't even stand out in my mind to even consider a

17   number.

18   Q.      But when he would be around when you'd be

19   arresting other people or looking for other people or

20   questioning other people or monitoring drug activity,

21   whereas he might approach you or you might approach

22   him, do you recall having a conversation of more than

23   hey, what's up; nothing?

24   A.      Oh, yeah.  We've had conversations about just

25   what's going on, sure.

MOODY - REDIRECT - PURCELL

—60

```
 1     Q.      Did Mr. Hall ever say anything inculpatory?

 2     A.      He said man, Moody, I'm not doing nothing.

 3     I'm not doing nothing.

 4     Q.      Did he ever say, you know, if you come over

 5     here last week --

 6                  MR. PURCELL:  Your Honor, just to be

 7     clear, we're not seeking anything beyond those very

 8     narrow range of things.  If he wants to become the

 9     prosecutor and drag out some inculpatory statements,

10     I'll take them, but we didn't provide notice of them

11     and we're not seeking them, but we'll take them.

12                  THE COURT:  Go ahead, Mr. Proctor, you're

13     welcome to inquire.

14                  MR. PROCTOR:  I'm almost done, Judge.

15     BY MR. PROCTOR:

16     Q.      Prior to the day you arrested him, did Mr.

17     Hall ever say anything that remotely alluded to being

18     involved in a crime or anything of that nature?

19     A.      No.

20                  MR. PROCTOR:  That's all I have, Judge.

21                  THE COURT:  Any redirect?

22                  MR. PURCELL:  Just a couple questions.

23                       REDIRECT EXAMINATION

24     BY MR. PURCELL:

25     Q.      First of all, in terms of your testimony,
```

```
1      other than when you asked him why would he take 50

2      years, did you ask him at any point, interrogate or

3      ask him any questions --

4      A.      No, nothing.

5      Q.      -- that weren't preceded by questions by him?

6      A.      No.

7      Q.      And we've told the court in our papers exactly

8      what comments we're interested in.

9              You've been asked a lot about various

10     conversations over the years with Mr. Hall.  Fair to

11     say that he's a fixture over in Westport, you've seen

12     him many times?

13     A.      That's correct.

14     Q.      Would he ever call out, initiate you, did he

15     seem to know your name?

16     A.      Definitely knew my name.

17     Q.      What do they call you?

18     A.      Moody.

19     Q.      Did he ever yell out to you or speak to you as

20     Moody?

21     A.      Sure.

22     Q.      That night he was arrested, did he seem to

23     know who you were before you even spoke to him?

24     A.      He did.

25     Q.      He called you Moody that night, is that right?
```

WILLIAMS - DIRECT - FUCHS

62

1      A.      He always called me Moody.

2      Q.      Did you have to introduce yourself to him on

3      the night he was arrested?

4      A.      No, I did not.

5                      MR. PURCELL:  No further questions.

6                      THE COURT:  Thank you, Detective Moody.

7      You may step down.  You shouldn't discuss your

8      testimony with anyone until this hearing is over

9      today.  Thank you.

10                     MR. FUCHS:  Your Honor, the government

11     calls Sergeant Larry Williams.

12                     THE COURT:  All right.  This is Sergeant

13     Larry Williams, is that right?

14                     MR. FUCHS:  Yes, sir.

15     Whereupon:

16                     LARRY WILLIAMS,

17     called as a witness, having been first duly sworn

18     according to law, testified as follows:

19                     THE DEPUTY CLERK:  State your name and

20     spell it for the record, please.

21                     THE DEFENDANT:  Larry, L A R R Y,

22     Williams, W I L L I A M S.

23                     DIRECT EXAMINATION

24     BY MR. FUCHS:

25     Q.      Sergeant Williams, where do you work?

WILLIAMS - DIRECT - ZUCKER

63

```
 1    A.      Baltimore City Police Department.

 2    Q.      How long have you been a police officer?

 3    A.      18 years.

 4    Q.      What's your current assignment?

 5    A.      Southern District drug unit.

 6    Q.      How long have you been working in the

 7    southern?

 8    A.      Since 2001.

 9    Q.      Are you familiar with the Westport

10    neighborhood?

11    A.      Yes, sir.

12    Q.      Is that inside the southern?

13    A.      Yes.

14    Q.      Between 2004 and 2010, how often do you think

15    you've visited Westport?

16    A.      Probably four to five days a week.

17    Q.      Do you know Antonio Hall?

18    A.      Yes.

19    Q.      Do you know any of his nicknames?

20    A.      They called him Mack.

21    Q.      How do you know Mr. Hall?

22    A.      He's a resident of Westport, the Westport

23    homes.

24    Q.      Did you often see him on the street?

25    A.      Yes.
```

64

```
 1     Q.      Fair to say he's a fixture of the
 2   neighborhood?
 3     A.      Yes.
 4     Q.      Did you ever arrest Mr. Hall?
 5     A.      Yes.
 6     Q.      All right.  When you were in Westport, how
 7   often would you see Mr. Hall?
 8     A.      Probably three out of the five days.
 9     Q.      Do you see him here in the courtroom today?
10     A.      Yes.
11     Q.      If you would point him out to us.
12             THE COURT:  The record will indicate the
13   witness has identified and pointed out the defendant,
14   Antonio Hall.
15   BY MR. FUCHS:
16     Q.      Sergeant Williams, other than the times you
17   arrested him, did you ever speak to Mr. Hall?
18     A.      Yes.
19     Q.      How often did you speak with Mr. Hall?
20     A.      He would come up to us and talk probably every
21   two to three times.
22     Q.      Is it two to three times a week?
23     A.      A week, uh-huh.
24     Q.      So you would have contact with him on a weekly
25   basis?
```

WILLIAMS - DIRECT - FUCHS

65

```
 1      A.      Yes.

 2      Q.      Did he appear to know who you were?

 3      A.      Yes.

 4      Q.      Did he call you by name?

 5      A.      Yes.  Called me Sarge.

 6      Q.      Did he know you were a police officer?

 7      A.      Yes.

 8      Q.      Is it fair to say between 2004 and 2010 you

 9      had hundreds of contacts with Mr. Hall?

10      A.      Yes.

11      Q.      Sergeant, you and I met and discussed several

12      of these conversations that we think are material to

13      this case, correct?

14      A.      Correct.

15      Q.      And you've reviewed a summary based on those

16      recollections, correct?

17      A.      Correct.

18      Q.      And in fact, you have that summary with you

19      today, is that correct?

20      A.      Correct.

21              MR. FUCHS:  Permission to approach, Your

22      Honor.

23              THE COURT:  Certainly.

24              MR. FUCHS:  Call this government exhibit

25      2, Your Honor.
```

WILLIAMS - DIRECT - FUCHS

66

```
 1                    THE COURT:  Government exhibit 2 is the
 2      summary of comments it's alleged that the defendant
 3      has made to this officer, is that correct?
 4                    MR. FUCHS:  Yes, sir.
 5                    THE COURT:  Over what time period?
 6                    MR. FUCHS:  Within the last year, Your
 7      Honor, roughly the last year.
 8      BY MR. FUCHS:
 9      Q.      Sergeant Williams, you reviewed this summary,
10      correct?
11      A.      Correct.
12      Q.      And is it an accurate recitation of your
13      recollections?
14      A.      Correct.
15      Q.      And you actually have a copy in front of you,
16      correct?
17      A.      Correct.
18      Q.      Sergeant Williams, I want to talk to you about
19      several of those conversations you had.  Turning your
20      attention to the summer of 2009, did you encounter
21      Mr. Hall outside of Westport in the summer of '09?
22      A.      Yes, sir.
23      Q.      Where was that?
24      A.      That was in the Lakeland neighborhood which is
25      adjacent to Westport.  If you leave Westport, you run
```

WILLIAMS - DIRECT - ZUCKER

67

1       into Lakeland.

2       Q.      And what happened?

3       A.      Was myself, Detective Taylor, Detective Ryce,

4       we were riding around in Lakeland and we were coming

5       upon Lakeland Elementary, slash, Middle School, and

6       we saw Mr. Hall standing up on top of the hill, and

7       wasn't familiar with him being in that area, so we

8       were going to see what he was up to.  At which point

9       we were about to get out the car and Mr. Hall started

10      to flee on foot.

11      Q.      Okay.

12      A.      Running away.

13      Q.      Did you give chase?

14      A.      Detective Ryce ran on foot behind Mr. Hall.

15      Q.      Did you eventually catch up to him?

16      A.      Yes.

17      Q.      Did you search him?

18      A.      Yes.

19      Q.      Did he have any contraband on him?

20      A.      No.

21      Q.      Did you arrest him that day?

22      A.      No.

23      Q.      I'd like to turn your attention to July of

24      2010.  Do you remember speaking to Mr. Hall about

25      that incident that occurred the previous summer?

```
 1     A.      Correct.

 2     Q.      Tell us what happened.

 3     A.      We were on Norfolk Street which is in Westport

 4     riding through the neighborhood.  Mr. Hall saw us,

 5     came up to us and was like, remember when y'all

 6     chased me last year in Lakeland?  We said, yeah, I

 7     remember.  He said y'all didn't find anything, but I

 8     threw two ratchets when I was running.  Ratchets is

 9     street term for guns.  And we were like okay.

10     Q.      Again, where did this conversation take place?

11     A.      Norfolk Street in Westport.

12     Q.      Outside?

13     A.      Outside.

14     Q.      Were you in uniform?

15     A.      No.

16     Q.      Plain clothes?

17     A.      Plain clothes.

18     Q.      Were you in a police car?

19     A.      A rental vehicle.

20     Q.      Who initiated the conversation?

21     A.      Mr. Hall.

22     Q.      And who else was with you?

23     A.      Detective Ryce and Detective Taylor.

24     Q.      Did you all get out of the car?

25     A.      No.
```

WILLIAMS - DIRECT - ZUCKER

69

```
 1    Q.      How long do you think the conversation took?

 2    A.      We usually talk to him about five to ten

 3    minutes.

 4    Q.      Was Mr. Hall under arrest?

 5    A.      No.

 6    Q.      Did you put him in handcuffs?

 7    A.      No.

 8    Q.      Did you or anyone else take your weapon out?

 9    A.      No.

10    Q.      Did you do anything to keep him from leaving

11    the conversation?

12    A.      No.

13    Q.      Was he detained in any way?

14    A.      No.

15    Q.      In fact, when the conversation ended, did he

16    walk away?

17    A.      Yes.

18    Q.      Did you, at any time did you threaten Mr.

19    Hall?

20    A.      No.

21    Q.      Did you assault him?

22    A.      No.

23    Q.      Did you threaten him with any charges?

24    A.      No.

25    Q.      Did you make him any promises if he talked to
```

WILLIAMS - DIRECT - ZUCKER

70

1    you?

2    A.    Nope.

3    Q.    Did you offer him any kind of inducements to

4    talk to you that day?

5    A.    No.

6    Q.    If you remember, did Mr. Hall appear impaired?

7    A.    No.

8    Q.    How would you describe his demeanor overall?

9    A.    Just happy-go-lucky.

10   Q.    Turn your attention to August of 2010.  Do you

11   remember if during that timeframe if Mr. Hall

12   discussed being involved in any killings?

13   A.    Yes.

14   Q.    And describe the conversation, please.

15   A.    Riding through Westport one night, one

16   evening, saw Mr. Hall with a group of males on

17   Norfolk Street again.  We pulled up to him, start

18   having a general, he was outdoor having a general

19   conversation and Detective Taylor asked him, he said

20   Mack, how many bodies you got on you, and Mack was

21   like too many to count.

22   Q.    At some point did he describe in that

23   conversation how he committed killing or how he would

24   commit a killing?

25   A.    Yes.  Then he leaned back, I had my window

WILLIAMS - DIRECT - ZUCKER

71

```
 1      down, he was like Sarge, you see me right now.  He

 2      said if I walk around, it was a cut between the

 3      houses, he said if I walk around in between the cut

 4      and I come back with a mask on with two guns, you

 5      won't know it's me.

 6      Q.      Again, how did this conversation begin?

 7      A.      Mr. Hall walked over to us.

 8      Q.      Did you stay in your car the entire time?

 9      A.      Yes.

10      Q.      And what other officers were there?

11      A.      Detective Ryce, Detective Taylor.

12      Q.      Again, was Mr. Hall under arrest during this

13      conversation?

14      A.      No.

15      Q.      Was your weapon out?

16      A.      No.

17      Q.      Did you put handcuffs on him?

18      A.      No.

19      Q.      Did you put him in the police car?

20      A.      No.

21      Q.      Did you do anything to detain him?

22      A.      No.

23      Q.      Was he free to leave at any time?

24      A.      Yes, he was.

25      Q.      And did he leave when the conversation ended?
```

WILLIAMS - DIRECT - ZUCKER

72

```
 1    A.      Yes.

 2    Q.      Did you threaten him in any way?

 3    A.      No.

 4    Q.      Did you assault him in any way?

 5    A.      No.

 6    Q.      Make him any promises if he talked to you?

 7    A.      No.

 8    Q.      Did you offer him any inducements of any kind

 9    to come and talk to you?

10    A.      No.

11    Q.      Did he appear impaired during that

12    conversation?

13    A.      No.

14    Q.      Again, just generally speaking, how would you

15    describe his demeanor that day?

16    A.      Just regular happy, talkative.

17    Q.      Was it like all your other interactions with

18    Mr. Hall?

19    A.      Yes.

20    Q.      I'm going to turn your attention to late

21    August of 2010.  Do you know someone named Gary Hall?

22    A.      Yes.  That's Mr. Hall's brother.

23    Q.      Okay.  Do you remember any conversations in

24    late August of 2010 about Mr. Gary Hall?

25    A.      Yes.  He was saying that his brother had got
```

WILLIAMS - DIRECT - ZUCKER

73

1      shot I think the year before, earlier that year, and

2      I wasn't aware of it at the time.

3      Q.      And just to be clear this conversation is with

4      whom?

5      A.      Mr. Antonio Hall.

6      Q.      Thanks.  Go ahead.

7      A.      And he said I went over west side.  He said I

8      put my mask on and he said I got the guy from half a

9      block away.  He said I'm proficient with my weaponry.

10     Q.      And when he said he got the guy from half a

11     block away, what do you understand him to mean?

12     A.      That he shot the guy from a half block.

13     Q.      Excuse me.  Sergeant, who used the word

14     proficient in that conversation?

15     A.      Mr. Hall.

16     Q.      And again, who started this conversation?

17     A.      Mr. Hall.

18     Q.      And were you in a police car again?

19     A.      Yes, in a rental.

20     Q.      I'm sorry.  The rental car that you use for

21     the ordinary course of your duties?

22     A.      Yes.

23     Q.      And who was with you that day?

24     A.      Detective Ryce and Detective Taylor.

25     Q.      And was Mr. Hall under arrest?

```
 1      A.      No.

 2      Q.      Were your weapons out?

 3      A.      No.

 4      Q.      Was he in handcuffs?

 5      A.      No.

 6      Q.      Did you put him in your car?

 7      A.      No.

 8      Q.      Was he free to leave at any time?

 9      A.      Yes.

10      Q.      Did you threaten him?

11      A.      Nope.

12      Q.      Assault him?

13      A.      No.

14      Q.      Make him any promises?

15      A.      No.

16      Q.      Offer him any kind of inducements?

17      A.      No.

18      Q.      Did he appear impaired during that

19      conversation?

20      A.      No.

21      Q.      And again, generally speaking, what was his

22      demeanor that day?

23      A.      Talkative, happy-go-lucky.

24      Q.      Turn your attention to September of 2010.

25      During that time did you have a discussion with Mr.
```

WILLIAMS - DIRECT - ZUCKER

75

```
 1        Hall about his son?
 2        A.      Yes.
 3        Q.      And if you would describe that conversation.
 4        A.      He just had come to us, talked to us that he
 5     knew that the feds were on to him and he wasn't sure
 6     how long he was going to be out on the street.  He
 7     had just, I think he had just had a son or he was
 8     about to have a son, and he said whenever I go away,
 9     my son will be the next killer out here.
10        Q.      And again, sir, how did this conversation
11     start?
12        A.      Mr. Hall approached us in our vehicle.
13        Q.      And you stayed in your vehicle the entire
14     time?
15        A.      Yes.
16        Q.      What other officers were there?
17        A.      Detective Ryce and Detective Taylor.
18        Q.      Same people who had been present for all these
19     conversations, correct?
20        A.      Yes.
21        Q.      Was Mr. Hall under arrest?
22        A.      No.
23        Q.      Did you put him in handcuffs?
24        A.      No.
25        Q.      Anybody pull their weapons out?
```

```
 1      A.      No.

 2      Q.      Did you put him in the car at any time to talk

 3      to him?

 4      A.      No.

 5      Q.      Was he free to leave?

 6      A.      Yes.

 7      Q.      And did he leave when the conversation ended?

 8      A.      Yes.

 9      Q.      Did you threaten him?

10      A.      No.

11      Q.      Assault him?

12      A.      No.

13      Q.      Did you make him any promises?

14      A.      No.

15      Q.      Offer him any inducements of any kind?

16      A.      No.

17      Q.      Did he appear impaired that day?

18      A.      No.

19      Q.      Generally speaking, how was his demeanor that

20      day?

21      A.      Happy, talkative.

22      Q.      When he referred to the feds coming to get

23      him, were you aware that there was a federal

24      investigation into Mr. Hall?

25      A.      Yes.
```

WILLIAMS - DIRECT - ZUCKER

77

```
 1    Q.      What did you understand that investigation to
 2    be relating to?
 3    A.      Narcotics and also for the murder of Mr.
 4    Kareem Guest.
 5    Q.      Did you know Mr. Guest?
 6    A.      Yes.
 7    Q.      Turn your attention to October of 2010.
 8    During that time I think you already said you were
 9    aware that the FBI was investigating Mr. Hall,
10    correct?
11    A.      Correct.
12    Q.      Did you ever have an occasion to talk to Mr.
13    Hall again about that investigation during that time?
14    A.      Correct.
15    Q.      I'm sorry.  Go ahead.
16    A.      Yes.
17    Q.      And if you would describe that conversation.
18    A.      We were on Norfolk Street, Mr. Hall came up to
19    us, talked to us and that hey, can you all put a
20    state drug case on me so the feds won't come and get
21    me.
22    Q.      Who else was there for that conversation?
23    A.      Detective Ryce, Detective Taylor.
24    Q.      Were the circumstances largely the same as
25    those other incidents you had with Mr. Hall?
```

```
 1    A.    Yes.

 2    Q.    Were you in your rental car?

 3    A.    Yes.

 4    Q.    Did you stay in your car the entire time?

 5    A.    Yes.

 6    Q.    Did you weapon come out at any point?

 7    A.    No.

 8    Q.    Mr. Hall put in handcuffs?

 9    A.    No.

10    Q.    Put in the car?

11    A.    No.

12    Q.    Was he free to leave?

13    A.    Yes.

14    Q.    Did he leave when the conversation ended?

15    A.    Yes.

16    Q.    During that time, during that conversation,

17    did you threaten him?

18    A.    No.

19    Q.    Did you assault him?

20    A.    No.

21    Q.    Did you make him any promises?

22    A.    No.

23    Q.    Offer him any inducements?

24    A.    No.

25    Q.    Did you do anything to force him to talk to
```

WILLIAMS - CROSS - PROCTOR

79

```
1      you at that point?

2      A.      No.

3      Q.      Again, did he appear impaired in that

4      conversation?

5      A.      That conversation he had been drinking that

6      day.

7      Q.      Okay.  Was he slurring his words?

8      A.      No.  You could just smell the alcohol beverage

9      on his --

10     Q.      Generally speaking, how would you describe his

11     demeanor that day?

12     A.      Still happy, talkative.

13             MR. FUCHS:  Court's indulgence.

14             No further questions, Your Honor.

15             THE COURT:  Thank you.

16             Cross examination, Mr. Proctor.

17             MR. SULLIVAN:  Court's indulgence.

18                     CROSS EXAMINATION

19     BY MR. PROCTOR:

20     Q.      Sergeant Williams, how are you?

21     A.      All right.

22     Q.      Before any of these, Mr. Hall made any of

23     these statements, utterances, whatever you want to

24     call them, or after or during for that matter, did

25     you ever read him his rights?
```

WILLIAMS - CROSS - PROCTOR

80

```
 1    A.      No.

 2    Q.      Do you carry a little Miranda card with you

 3    wherever you go?

 4    A.      Yes, I carry one in my vest.

 5    Q.      And presumably Ryce and Taylor carry one, too?

 6    A.      I'm not sure if they carry one or not.

 7    Q.      Had you ever arrested Mr. Hall?

 8    A.      Yes.

 9    Q.      How many times?

10    A.      Once.

11    Q.      And was that prior to these statements being

12    made?

13    A.      Prior.

14    Q.      And what was that for, if you recall?

15    A.      CDS violation.

16    Q.      And am I correct in understanding that every

17    single one of these statements Mr. Hall made that you

18    just testified to, Officers Ryce and Taylor were also

19    present?

20    A.      Correct.

21    Q.      So not one time for any of these statements

22    was it just you and Mr. Hall one on one?

23    A.      Correct.

24    Q.      Do you wear plain clothes or are you in

25    uniform?
```

1    A.     At that time we were in plain clothes.

2    Q.     Okay.  And do you ride around in one car or

3    two?

4    A.     We have two cars for my unit.

5    Q.     Okay.  And your unit is you, Officer Ryce and

6    Officer Taylor?

7    A.     No.  I have three other officers also.

8    Q.     Okay.  And so is it possible there are other

9    officers present as well, you just don't recall?

10   A.     No, there wasn't.

11   Q.     You're sure when you talked to Mr. Hall every

12   one of these times, summer of '09, July 2010, August

13   2010, late August 2010, September 2010 and October

14   2010, each of those -- and I'm sorry I'm speaking

15   fast -- each of those -- K

16          THE COURT:  Very few people have to

17   apologize to me for that, Mr. Proctor, with the

18   speaking quickly, so go right ahead.

19   Q.     So each of those six times it was you, Officer

20   Ryce and Officer Taylor?

21   A.     Correct.

22   Q.     And you mentioned normal interactions on the

23   street, I seem to recall you saying that.  And just

24   explain for people that don't regularly talk to

25   police officers on the street, what does that mean?

1      A.      You have some people in the neighborhood, they

2      would just come up and talk to us.  Mr. Hall was one

3      of the guys that guess we respected him, he respected

4      us, so he would just come up and have general

5      conversations with us.  Some conversations about

6      family, conversations about football, so --

7      Q.      And conversations about all, someone got

8      arrested the night before, he might say hey, what did

9      you bust Bill for, something like that?

10     A.      Correct.

11     Q.      And if something happened in the neighborhood,

12     you might ask him, hey, did you hear anything about

13     Bill being busted or Bill using drugs?

14     A.      No.  Mr. Hall would never have told us

15     anything like that.

16     Q.      And is it fair to say he's never got into an

17     altercation with you?

18     A.      Correct.

19     Q.      And he's never assaulted you and you've never

20     assaulted him?

21     A.      Correct.

22     Q.      In fact, you were cordial?

23     A.      Huh?

24     Q.      You were cordial, it sounds like you were on

25     good terms?

1    A.      Yeah.

2                MR. PROCTOR:  Can I have a second, Judge?

3                THE COURT:  Sure.

4                MR. PROCTOR:  That's all I have.

5                THE COURT:  Any redirect, Mr. Fuchs?

6                MR. FUCHS:  No, thank you.

7                THE COURT:  All right.  Thank you, sir.

8    You can step down.  You shouldn't discuss your

9    testimony with anyone until this hearing is concluded

10   today.  Thank you very much.

11               MR. PURCELL:  That concludes the

12   testimony that we'll be presenting today, Your Honor.

13               THE COURT:  All right.  With respect to,

14   and this testimony is offered with respect to the

15   motion to suppress statements filed by the defendant,

16   specifically paper number 39.

17               Is there any evidence to be presented by

18   the defendant, Mr. Proctor?

19               MR. PROCTOR:  No, sir.

20               THE COURT:  So we're ready for legal

21   argument on this issue?

22               MR. PROCTOR:  Yes, sir.

23               THE COURT:  All right.  The government

24   bears the initial burden of proof with respect to

25   this by a preponderance of the evidence, so I'll be

1    glad to hear from you first, Mr. Purcell, on the

2    introduction of the statements.  What statements are

3    you seeking to introduce?

4            MR. PURCELL:  They are outlined in

5    actually some detail in the response, Your Honor, but

6    let's go through the witnesses first.

7            As to Detective Kershaw, it will be the

8    statement, essentially the statement repeated by Mr.

9    Hall several times during the course of that day, the

10   November 22 or whatever it was, yes, November 22, in

11   which when he finally did meet or when Mr. Hall

12   called him back and he said, which is what he

13   repeated, he says I wasn't there, I may have been

14   around, I may have heard the shots.  And that's the

15   essence of the statement that we're trying to get in

16   through Detective Kershaw.

17           THE COURT:  So the only statement from

18   Kershaw you're seeking to get in is I may have been

19   in the area, I may have heard shots.

20           MR. PURCELL:  Yes.

21           THE COURT:  Now, what as to the officer

22   or Detective Todd Moody?

23           MR. PURCELL:  As to Detective Moody and I

24   know counsel went into it in some depth as to their

25   other conversations that they had or other things

1    that Mr. Hall said, but there's only a couple of

2    things of all of that and, again, it's highlighted in

3    the government response for clarification, and it is

4    simply that is on the way down to the Harbor

5    Hospital, Mr. Hall made inquiries about really two of

6    the main witnesses, actually the two most important

7    witnesses in the case, Rain Curtis and Kevin Duckett,

8    and he made inquiries about them.  And that is the

9    key point that we're trying to, the key admission.

10    The rest of it as you heard is just nothing

11    incriminating.

12             THE COURT:  Are you seeking to introduce

13    the statement to Detective Moody, what am I looking

14    at?  And then come on, Moody, can't you get them down

15    to, can't you talk them down to get a 50 or

16    something?

17             MR. PURCELL:  Yes.  That occurred after

18    he received the inhaler and was now in the parking

19    lot or back in the car and he made an inquiry as to

20    what, you know, what the process is.  He was

21    explained, and it sounds as if when they got to the

22    point you'll be advised of the penalties as well at

23    your initial appearance, he was told what the

24    penalties were, and he responded, which we believe to

25    be a highly incriminating statement and admission,

86

1    come on, Moody, can't you get them down to 50, at

2    least it's a number, and we believe that is an

3    incriminating statement.  And whether it's

4    incriminating or not, if it's an admission, a

5    statement by the defendant and should be admitted as

6    a statement against a party opponent.  And that's the

7    basis.

8                   THE COURT:  Under 801D2A of the Federal

9    Rules of Criminal Procedure.

10                  MR. PURCELL:  Yes.  Really doesn't have

11   to be an admission, it's a statement.

12                  THE COURT:  Well, it has to be relevant

13   for other purposes as well, however.

14                  MR. PURCELL:  Yes.  And we don't really

15   care about what he thought about the Ravens or

16   anything else, but this we really do care about.  And

17   that's really the essence of it, Your Honor.

18                  THE COURT:  And what about as to Sergeant

19   Williams, what statements are you seeking to get in?

20                  MR. PURCELL:  As to Sergeant Williams,

21   and I was keeping notes as counsel was going through

22   the inquiry, but they're set out in the motions,

23   supplemental motions in response we sent to the court

24   in detail, but essentially they are as follows:

25   First, there was the summer 2009 incident where Mr.

1    Hall ran from the various officers.

2              THE COURT:  Just hold on one second, Mr.

3    Purcell.  I have your main response, but you're

4    referring to a supplemental response.

5              MR. PURCELL:  This is the second time

6    I've referred to it and the court has been like --

7              THE COURT:  I don't have it.  I'm sorry.

8    I don't have it.

9              MR. PURCELL:  It was filed some time ago.

10             THE COURT:  I have your main response.

11             MR. PURCELL:  Counsel has it, right?

12             MR. PROCTOR:  Right here.

13             THE COURT:  I'm sorry.  I haven't looked

14   at it.  You keep saying that these things are

15   summarized in great detail and the statement's in

16   great detail and I've got your response in terms of

17   the statements.

18             MR. PROCTOR:  26 of May, Your Honor.  It

19   was filed under seal, Your Honor, because it

20   discussed the cooperating --

21             MR. PURCELL:  It might have been overly

22   sealed.  Let me just give you one, Your Honor, that I

23   haven't written all over.

24             Here it is.

25             THE COURT:  Thank you, Mr. Purcell.  I

1    apologize.

2              MR. PURCELL:  No.  Actually they're set

3    out to page one or two of the supplemental.

4              THE COURT:  Your original response was

5    filed on May 26 and so this is filed thereafter.

6              MR. PURCELL:  Yes.  This was much more

7    recent.  And it was in response to first counsel

8    reminded me that I hadn't addressed the photographic

9    array issue.

10             THE COURT:  Then I got an email saying no

11   one wants to argue the photographic array.  I'm

12   prepared to do that, but the email I got from you

13   implied that as to the photographic array, everyone

14   is just going to submit on it.

15             MR. PURCELL:  That doesn't negate the

16   defense had a valid reason to file that motion.  I

17   think it was fleshed out in my response.

18             THE COURT:  I'm trying to catch up as

19   best I can on this.  Go ahead.

20             MR. PURCELL:  But as I said, Your Honor,

21   Detective Williams' statements and what we're

22   interested in are set forth in the supplemental

23   response, basically in little subparagraphs there,

24   and it's just as he testified.

25             First, as to July 2, very simply, Hall

1    approached them as you've heard and he said hey,

2    remember when I ran from you last year, I got rid of

3    two ratchets, so that's one statement we're trying to

4    get in.  And you can number them if you wish, Your

5    Honor, make them slightly easier.

6                    THE COURT:  All right.  Go ahead.

7                    MR. PURCELL:  Then, so in July of 2010 he

8    approached the officers and said, yes, I had two, he

9    used the word ratchets and we're using the word guns.

10                   Then in August of 2010 one of the

11   officers, when he approached the defendant, was

12   talking to them, and one of the officers just

13   basically asked him, hey, how many bodies you got on

14   you, and Mr. Hall said too many to count, which is,

15   I'm not really particularly interested in that

16   because it doesn't mean much to the government, but

17   we are interested in the following part where Hall

18   stated to the officers, and you just heard this

19   testimony, that if he was to go around the corner and

20   go into the break between the buildings and come out

21   with a mask and two guns, that the officers would

22   never be able to know who he was.

23                   And that's important because in the Guest

24   murder itself, he used a mask, and we have witnesses

25   who will testify that he always used masks, would

1      actually wear two hats and pull one down, this is set

2      out in the motions response as well, and then put it

3      back up.  And I guess he felt invulnerable even

4      though he did it right in front of people that he

5      knew.  But the fact that he made references to the

6      mask actually is supportive and, again, it's an

7      admission whether or not, but it's relevant to his

8      conduct in the actual Guest shooting.  And in the

9      Parsons shooting.

10                 As set forth in the discussion about the

11     identification, Mr. Parsons recognized Mr. Hall as

12     the person who shot him back in 2004, even though

13     Hall was wearing a mask.  In fact, Hall told Mr.

14     Duckett, another one of our witnesses that, yes, I

15     pulled my mask on, but he still knew who I was and I

16     had to start shooting from a distance, and he

17     actually ended up shooting him seven times, but he

18     lived and he'll testify in this trial.

19                 THE COURT:  So your argument there under

20     Rule 404(b) is with respect to the matter of the

21     mask, that it would be admissible to prove

22     preparation, plan and identity of the crime, correct?

23                 MR. PURCELL:  I do.  It isn't really just

24     404(b) conduct we're introducing, certainly the

25     conduct itself I'm arguing the 404(b) and actually is

1    part of the conspiracy.  But here it's his admission,

2    his statement that he uses mask, it's not a 404

3    analysis.  It's an 806 analysis.  It's relevant to

4    the government because we have evidence that he has

5    made other statements about using masks and he has

6    actually used masks on a couple of other occasions.

7    But yes, it's admissible, the conduct itself, under

8    404 and as part of the drug trafficking conspiracy,

9    and as a part of his statement.

10              And then, again, the next statement in

11    late August 2010, he actually described doing a

12    shooting where, again, he stated I put on my mask and

13    shot the guy from half a block away.

14              THE COURT:  Same analysis applies as to

15    the use of the mask.

16              MR. PURCELL:  Right.  And the conduct

17    involving the firearms.  Here he talked about, he was

18    bragging about being proficient with firearms.  And

19    the witnesses we have will testify not only did he

20    use firearms to shoot Guest and Parsons and the

21    Williams murder which is the murder that he did just

22    a couple of months before he killed Guest, but this

23    again goes to the firearm aspect and the mask.  I

24    mean this is, becoming his M.O.

25              THE COURT:  You're not seeking to

1      introduce the evidence when essentially he stated to

2      one of the officers how many bodies you got on you

3      and Hall responded too many to count.

4                MR. PURCELL:  Your Honor, I'm going to

5      withdraw our request on that.

6                THE COURT:  I don't think there's any

7      basis to introduce that.  That is absolutely nothing

8      more than in terms of, it's bravado.  You can argue

9      that it's an admission under Rule 801D2A, but I'm not

10     sure it's an admission as to what.  There's no

11     context as to whether or not it's self defense or

12     not.  And furthermore it's sort of classic in terms

13     of the basis of the introduction would be classic 404

14     evidence indicating that he's a bad person, for

15     example, that, you know --

16                MR. PURCELL:  Well, it is a murder case,

17     but we're talking about something the government is

18     not seeking to put in.

19                THE COURT:  So I'm not going to admit the

20     statement as to how many bodies you got on you and

21     Hall allegedly saying too many to count.  That's not

22     admissible.

23                MR. PURCELL:  As I heard that testimony

24     being elicited today, I was like, you know, I think

25     that's --

1          THE COURT:  I don't see a basis for that

2    to be admitted so that will be excluded.

3          MR. PURCELL:  Thank you, Your Honor.

4          Now, the next statement he initiated

5    really goes to his knowledge of the investigation.

6    It was September of 2010 and this is, he's talking

7    about his son, and in a way that I think is more than

8    just bravado because he's referring himself now to a

9    killer, not a self defender, but a killer, and he

10   says, yeah, the feds are on to me, but I'm about to

11   have a baby and he'll be the next killer out here.

12   And this is a person bragging about things he's

13   alleged to do.

14         THE COURT:  Let me ask you something.

15   Your submission said my next killer out here.  The

16   officer said in his testimony that he would be the

17   next killer out here.  Did he say my killer?  Is the

18   comment that it's my killer out here or the next

19   killer out here?

20         MR. PURCELL:  I think that the officer

21   gave us the basis for saying my killer, but when he

22   testified here today he said the next killer.  I

23   don't know that it makes a difference.  Maybe it does

24   to the court.  I don't see it.  But he's referring to

25   his son, certainly, my son, as the next killer out

1    here or my next killer out here.  He's saying

2    somebody's going to be able to take my place as a

3    killer in Westport.

4              And you'll hear, Your Honor, and I'm

5    getting slightly off, but you'll be hearing witnesses

6    testify about Mr. Hall.  I mean the police weren't

7    watching him and running into him because he was like

8    a person they cared about and he was being threatened

9    by people or what a good citizen.  I have one witness

10   describe him as King Kong, that is, this guy ran this

11   place and he was -- they actually had a party, Your

12   Honor, when he was arrested in Westport, that's how

13   relieved people were he was off the street, and

14   that's how comfortable, that reflects how comfortable

15   he was over there and the way he controlled things.

16   And he controlled it by shooting people.

17             So when he says that, and we're going to

18   prove he's a shooter and a killer, I think that is an

19   admission by him that the court, the jury can

20   certainly give its weight.  Counsel can argue, oh,

21   he's just bagging, he's a kid on the street, he's 31,

22   or he's confirming what he wants people to know.  He

23   wants people to know he's a killer.

24             THE COURT:  Who is the officer to whom

25   he's alleged to have made the comment my next killer

1    out here?

2              MR. PURCELL:  The same officer, Your

3    Honor.  I think he just testified.

4              THE COURT:  Sergeant Williams.

5              MR. PURCELL:  Yes.

6              THE COURT:  Mr. Purcell, I'm going to

7    hear further argument.  Let me try to cut down on

8    some of what the government is seeking.

9              Go ahead.  My point is it is of some

10   interest to the court as to whether or not the

11   statement was my next killer out here or the next

12   killer out here.  And the significance from my point

13   of view, and I'll be glad if the officer is still

14   here to the extent that an individual believes he may

15   or may not be going off to prison and makes a comment

16   about the next killer out here or the level of

17   violence as a general comment upon the plight of

18   younger people without fathers, as opposed to my next

19   killer, is of some significance to me.  I'm trying to

20   parse out in terms of the clear admissions or

21   statements against interests of the defendant under

22   Rule 801D2A.  And those, there's a certain amount of

23   bravado or societal comment.  The two that catch me

24   that you've already yielded on one about how many

25   bodies you got on you, too many to count.  Bravado,

1    I'm not going to permit that it to come in.  And then

2    the one about his son being the next killer, I'd like

3    to know if he said my next killer or the next killer.

4                MR. PURCELL:  The officer's gone, Your

5    Honor.  And we're just, we're not even sure he would

6    be that specific in making that recollection.  Our

7    view is that he sees it as, you're right, as you've

8    mentioned, I see myself as I'm going off, I'm gone,

9    but my son, he's the next killer out here.  Whether

10   it's mine or the, he's basically referring to a

11   substitute for himself referring to himself as a

12   killer, and that's why we see it as relevant.

13               Now, and there is a point, Your Honor,

14   certainly if it's bravado, but if it's a defendant's

15   bravado, I mean there's millions of wiretap calls you

16   hear where people talk about things and juries have

17   to parse out what it is that that person is saying.

18   Is he admitting to a crime or is he really just

19   talking trash?  But I think the jury gets to make or

20   should be able to make in this particular instance

21   that call.

22               Now, I understand what the court is

23   saying and might be saying, you know, I think this is

24   a bit too loose of an interpretation or subject.

25   I'll say what the analysis would be, that maybe a bit

1      more prejudicial than probative and I don't want the

2      jury making that decision.  And we respect that.

3                    THE COURT:  I'll hear from Mr. Proctor

4      and Mr. Sullivan in a moment.  Clearly the matter of

5      reference to mask and guns in terms of the identity

6      of the crime, in terms of the murder of Kareem Guest

7      on September 20 all have great probative value apart

8      from the context under Rule 801D2A probative value.

9      I'm just a little concerned about a general comment

10     about a child who is being born being the next killer

11     or some that would say that that's just a comment

12     upon the fact that the incredible percentage of young

13     people in Baltimore who are born to fathers who have

14     numerous children by numerous women and the number of

15     fatherless children is almost a cliche at this point,

16     Mr. Purcell.

17                    MR. PURCELL:  I don't think he was making

18     a sociological comment.  I think he was talking about

19     there will be a substitute for me.  I'm a killer.

20     I'm gone.  The next killer is on the way.

21                    THE COURT:  I understand the context.  I

22     think the way there is any probative value

23     outweighing prejudice under Rule 403.

24                    MR. PURCELL:  I agree.

25                    THE COURT:  All right.  Anything else?

```
1              MR. PURCELL:  The last one is noted
2    October 10 and here it's basically, we see this as an
3    admission that's relevant because it's evidence of
4    his guilty knowledge.  He's basically asking the
5    officers, and what he said and you heard it from
6    Detective Williams, said hey, the feds are about to
7    get me, take me off the street on a drug charge, I
8    guess he thought it would make him immune from our
9    going after him anyway.  But this is guy who says he
10   knows the feds are after him and help me out by
11   arresting me on a state drug charge.  That we see as
12   a person who in his mind is thinking this can help me
13   avoid the feds, the feds, for a crime that I
14   committed.
15              THE COURT:  Thank you, Mr. Purcell.
16              Mr. Proctor, I'll be glad to hear from
17   you.
18              MR. PROCTOR:  Thank you, Judge.  We would
19   submit on all but two statements and, you know,
20   reserve our objection but basically submit.
21              The first is can't you get me 50 years or
22   something like that.  You know, people plead guilty
23   or have plea discussions and in fact 410 of the Rule
24   of Evidence protects a whole panoply of plea
25   discussions, albeit not this one with an officer.
```

1          THE COURT:  Are you suggesting these are

2     early plea discussions he's undertaking?

3          MR. PROCTOR:  My point is people, when

4     they're arrested think what are my options, what am I

5     going to do.  People have nothing to do with anything

6     often, you know, Alford plea, plea nolo contendere

7     because the stakes are so high.  And can't you get me

8     50 years?  What does that tell you, that he's

9     weighing up his options?

10          THE COURT:  May show consciousness of

11     guilt.  People who are arrested and think that

12     they're wrongfully arrested profess their innocence.

13     They don't talk about trying to work a deal out and

14     maybe take a 50 year sentence.

15          MR. PROCTOR:  Some are pragmatic and say,

16     you know, I realize this is federal court and I don't

17     see a lot of people coming home and half my

18     neighborhood gets arrested and I ought to weigh up my

19     options and the sooner I do that, maybe there's an

20     early bird discount.  I've had a client say that to

21     me before.

22          THE COURT:  To you as a lawyer to

23     negotiate with the government.

24          MR. PROCTOR:  Correct.

25          THE COURT:  So you're seeking to put his

1    comment about can you get me 50 years in the context

2    of Rule 410 in terms of the admissibility of plea or

3    plea discussions?

4               MR. PROCTOR:  Well, it doesn't come in

5    under 410 because it's with an attorney for the

6    government, and this is not with an attorney for the

7    government.

8               THE COURT:  Obviously not.

9               MR. PROCTOR:  My point is under 403, it's

10   confusing.  What does it really tell you, that he was

11   willing at some point right after being arrested to

12   consider a plea.  So I'm not sure there's a great

13   deal of probative worth because he doesn't say, you

14   know, I did it or, you know, man, with the evidence

15   stacked up against me I should really consider

16   pleading.  Can't you get me a number?  So for that

17   reason it's confusing and I don't believe it should

18   come in.

19              The second statement, Your Honor just

20   mentioned it, my next killer, the next generation

21   killer, whatever iteration it was -- and I would note

22   that the officer didn't write a contemporaneous

23   report and he's relying on his memory a year later,

24   or almost a year later, which is no doubt the seed of

25   the confusion.  I just, I don't see any huge

1    relevance, and certainly a jury hearing that my

2    client wants his next, his son or, you know, to grow

3    up to be a potential murderer some day, there's a

4    great deal of prejudice in that.  And it's not

5    probative of anything really.

6              And you know, it's braggadocio, it's

7    street talk, it's appearing tough or whatever you

8    might want to call it.  It's confusing.  It's

9    prejudicial to my client, and there's no real

10   probative worth that this as yet unborn son may some

11   day grow up to unfortunately be a murderer himself in

12   the projects.  So for that reason I would ask you to

13   exclude it, too.

14             THE COURT:  Thank you, Mr. Proctor.

15             With respect to the defendant's motion to

16   suppress statements, paper number 39, it is denied in

17   all respects but granted as to two matters for the

18   reasons stated here on the record.

19             First, with respect to the statement to

20   Brian Kershaw, it's not a custodial statement.  The

21   statement may have been there near the scene and

22   heard the shots, it's not a custodial statement.

23   It's not even necessarily incriminating.  It's a

24   statement the government can offer in terms of a

25   prior response by the defendant that may be deemed to

1    be an admission of some sort even being in the area

2    under Rule 801D2A, and that's the only statement

3    being offered by Detective Kershaw.

4              As to Detective Todd Moody, clearly he

5    advised the defendant of his Miranda rights, that

6    after having been advised of his Miranda rights he

7    inquires of two key witnesses.  Clearly that's a

8    voluntary statement.  He was in custody, but

9    statements volunteered by a defendant while he is in

10   custody are not implicated by Miranda as the Fourth

11   Circuit has noted in United States versus Payne, P A

12   Y N E, 954 F.2d 199, as well as this court's previous

13   opinion in the United States versus Martin, 238

14   F.Supp.2d 714, District of Maryland 2003 opinion.

15             Essentially the applicable test for

16   evaluating the voluntariness of a statement or

17   confession is whether, given the totality of the

18   circumstances, the will of the person making the

19   statement was overborne and his capacity for self

20   determination was critically impaired by coercive

21   government conduct as clearly stated by the Fourth

22   Circuit in United States versus Gray, 137 F.3d 765, a

23   Fourth Circuit opinion, 1998, in which certiorari was

24   denied, and there is absolutely no evidence of his

25   will being overborne or any kind of coercion nor has

1    there been any offered and argued.

2            With respect to the comments what am I

3    looking at, can't you talk them down to, that I'll

4    take 50, that is a statement that has very definite

5    probative value under Rule 401 with respect to making

6    a fact of consequence more probable than not.  It may

7    certainly also amount to an admission depending upon

8    how the jury interprets it under 801D2A in terms of

9    his declaration against interests.  It certainly does

10    not qualify as early plea negotiations under Rule

11    410.  For a defendant to make that kind of comment

12    voluntarily to a police officer does not amount to

13    plea discussions.

14            The other comments with respect to two

15    ratchets, that will be admissible as well with

16    respect to any comments having to do with guns and

17    masks of any kind, that is clearly part and parcel of

18    the identity of the crime in terms of how Kareem

19    Guest was murdered on September 20, 2009.  They are

20    statements against interests by the defendant under

21    Rule 801D2A once again, and they have very definite

22    probative value and they will be admitted.

23            In all extent, the comments that have

24    been made here, the summary of comments made by the

25    defendant would be admissible including the comment I

1      got a guy half a block away.  Again, his reference to

2      getting the mask.  And specifically he put on his

3      mask and got the person who shot his brother

4      apparently from a half a block away.

5                    There are two extents and only two

6      extents in which the motion to suppress will be

7      granted.  First, with respect to there will be no

8      comment made by a police officer as to a question as

9      to how many bodies you got on you and Hall's

10     response, too many to count.  That may be bravado.

11     It may or may not be factual.  I don't necessarily

12     take that to be an admission.  There's no context in

13     terms of how those offenses were, in fact, committed,

14     whether they were self defense or not, and there's

15     great prejudice that would enure to that under Rule

16     403.

17                   And the second statement which I will not

18     permit to come in is the matter of the next killer

19     out there reference to his unborn son.  While the

20     government's submission had said my next killer out

21     there, the testimony was by the police officer, my

22     son will be next killer out there.  That, I think to

23     the extent that it's taken to imply that I am a

24     killer and my son will be the next killer, that's a

25     much thinner probative thread, so to speak, in terms

1      of that kind of comment, and I'm not comfortable with

2      that comment being admitted into evidence.  And I

3      think whatever probative value it might have is I

4      think more than outweighed by heavy prejudice on

5      that.  That is not an admission of his being a killer

6      when he says my son will be the next killer out

7      there.

8                  All these statements that I've heard here

9      today, all of them are admissible for the reasons

10     I've stated here on the record with those two

11     exceptions.

12                  Is there any questions from the point of

13     view of the government?

14                  MR. PURCELL:  No, we completely

15     understand, Your Honor.

16                  THE COURT:  Any questions from the point

17     of view of the defendant?

18                  MR. PROCTOR:  No, sir.

19                  THE COURT:  For those reasons the motion

20     will be denied in all respects with exception of two

21     matters as to which it will be granted and that's the

22     court's ruling on paper number 39.  And with that

23     we'll take a brief recess.  My thought is we'll go

24     until around quarter after one and we'll break for

25     lunch.

1              We'll take a ten minute break.

2              (BRIEF RECESS.)

3              THE COURT:  All right, counsel.  I have

4    denied the motion to exclude cooperating witness

5    testimony, paper number 41.  I have denied the motion

6    to suppress statements of defendant, paper number 39,

7    to all extent except with respect to two statements.

8              We still have three motions pending to

9    address:  The motion to exclude all photographic

10   identification evidence, paper number 38, the 404(b)

11   motion as well as severance motion.

12             Any particular preference as to the order

13   we address these from the point of view of the

14   government?

15             MR. PURCELL:  If we do the easiest first,

16   it seems the photographic array issue.  And the other

17   two are really part of each other.

18             THE COURT:  Do you agree with that, Mr.

19   Proctor, that we'll address the photographic array?

20             MR. PROCTOR:  That would be Mr. Sullivan.

21             THE COURT:  All right, Mr. Sullivan.

22   I'll be glad to hear from you.

23             MR. SULLIVAN:  Thank you, Your Honor.

24   I'm doing the heavy lifting today.

25             Your Honor, we filed this motion on May

1    5, 2011.  The government filed its response on July

2    12, 2011.  And then in the beginning of July provided

3    a photo book that it intends to use at the time of

4    trial.

5              Based on all of that information we are

6    just submitting without argument on paper number 38.

7              THE COURT:  All right.  The government

8    want to be heard further on this?

9              MR. PURCELL:  Your Honor, just to check

10   that part of the record now includes a CD that I sent

11   to the court with the photo book, and you can see

12   that it consists of about at least 148 similar

13   booking photographs from which the witnesses who saw

14   it, and there are only two, made their

15   identification.

16             THE COURT:  I've reviewed the CD, and is

17   the CD already part of the record?

18             MR. PURCELL:  I would ask the court to

19   make it government 3, Your Honor.

20             THE COURT:  I'll make this government

21   exhibit 3 for purposes of today's hearing, Madam

22   Clerk.  The CD, I've reviewed the CD and reviewed all

23   of the photographs in there, and I would note that

24   with respect to the identification of a photograph of

25   the -- hold on one second.  The government in its

1    supplemental submission has essentially noted that

2    with respect to the identification, just summarize

3    for me again those witnesses who are going to be

4    identifying a photograph from that photo book.

5                    MR. PURCELL:  Your Honor, there's not

6    going to be any use of that in court.  These are all

7    people who have known Mr. Hall for years.  And the

8    two witnesses who viewed it, and again, just for the

9    record, the context wasn't, hey, who is the guy who

10   shot Kareem Guest.  It was just we hand them the book

11   in the course of the investigation, here is a hundred

12   and some pictures from Westport; do you know any of

13   these people.  And I attached one of the sheets that

14   they just basically write down.  Two of those

15   individuals will testify, Mr. McClinton and Jamar

16   Howard, when they were shown the book, yes, among the

17   pictures, the many, many pictures they identified,

18   both of them indicated they recognized number 42 to

19   be the person they knew as Mack and they also knew

20   him by his regular name.  And that's it.

21                    THE COURT:  Right.  And it's part of your

22   supplemental submission.  I've looked at the entire

23   book which is now the CD, government exhibit 3, and

24   the defense is not presenting oral argument but just

25   is making its general objection as to this.

1              The due process clause obviously protects

2      a suspect or a defendant against pretrial

3      identification procedures which are deemed to be

4      impermissibly suggestive or otherwise conducive to

5      mistaken identification, those principles being

6      well-established by the Supreme Court in two opinions

7      in the 1970s, Manson versus Brathwaite, B R A T H W A

8      I T E, 482 U.S. 98, as well as Neil, N E I L, versus

9      Biggers, 409 U.S. 188, essentially setting out the

10     five factors to be considered as to whether or not

11     such a pretrial identification procedure is

12     impermissibly suggestive.

13              I've looked at these photographs.  I

14     don't find them to be impermissibly suggestive.  I've

15     looked at the entire book of general pictures and

16     I've particularly noted the government's submission

17     here as to the photographs of other individuals as

18     well as of Mr. Hall.

19              In determining whether or not evidence is

20     impermissibly suggestive, the court considers the

21     factors of the witness's opportunity to view the

22     suspect at the time of the crime or any earlier time.

23     And clearly the evidence is people knew Mr. Hall very

24     well from the neighborhood.  The witness's degree of

25     attention.  The accuracy of the initial description.

1       The level of certainty.  All of these indicate to me

2       that there is just literally no indicia at all of

3       there being any photo spread that's impermissibly

4       suggestive or otherwise conducive to mistaken

5       identification.

6                    And in light of that fact, the pretrial

7       identification procedure and or the in court

8       identification to follow will be permitted.  There's

9       no reason to have any further hearing out of the

10      presence of the jury to determine this issue.  And

11      for those reasons the court will deny paper number

12      38, the motion to exclude all photographic

13      identification.  So that will be denied.

14                   Still remaining before the court to

15      address are the motion for severance, what I'll refer

16      to as the 404(b) motion.  Also, we have the issues as

17      to the government's motion in limine to admit the FBI

18      302 notice of interview or summary of interview of

19      the deceased victim, Kareem Guest, as well as the

20      government's motion to exclude reference to Mr.

21      Hall's state court acquittal in connection with the

22      shooting of Mr. Parsons.

23                   My suggestion is perhaps we might want to

24      address those two first before we get to the more

25      lengthy legal argument as to severance and Rule

1     404(b).  Does the government agree with that?

2                    MR. PURCELL:  Yes, Your Honor.

3                    THE COURT:  Mr. Proctor, is that fine

4     with you?  Mr. Sullivan?

5                    MR. SULLIVAN:  That's fine.

6                    THE COURT:  Now, as to the matter of the

7     302 interview sheet for the witness, Kareem Guest,

8     Mr. Proctor, I'll be glad to hear from you on that.

9     You haven't had time to brief this, I don't think,

10    but I know it's been raised in the government's

11    supplemental motion.  But clearly under Rule 804B6 of

12    the Federal Rules of Evidence there is an exception

13    where the declarant is unavailable and a statement

14    offered against a party that is engaged or acquiesced

15    in wrongdoing that was intended to and did procure

16    the unavailability of the declarant as a witness,

17    there is an exception there, essentially in terms of

18    alleged wrongdoing.

19                    The key case on this, quite frankly, the

20    most recent case on it is the case arising out of

21    this court in the prosecution of Patrick Byers, and

22    that conviction coming out of my court here was

23    recently affirmed and the Fourth Circuit addressed

24    that issue there.  But earlier there was the case of

25    United States versus Gray, a Fourth Circuit opinion,

1    2005, that came out of this court as well and it was

2    out of judge, a case before Judge Chasanow.  And

3    essentially it involved the matter of out-of-court

4    statements made by a husband during the three months

5    preceding his murder was deemed to be admissible

6    under the forfeiture by wrongdoing exception to the

7    hearsay rule.

8           And then this identical issue I think

9    really came up before me in the Byers case, Mr.

10   Proctor, with respect to comments made by the

11   murdered witness, Carl Lackl.  In this case we have a

12   murdered witness, Kareem Guest.  In the Byers case we

13   had the murdered witness, Carl Lackl, and I permitted

14   that introduction of statements made by him and it

15   was affirmed by the Fourth Circuit.

16          So you have some heavy sledding on this,

17   Mr. Proctor, and I've giving you that ahead of time

18   so you have an opportunity to address those cases.

19   I'll be glad to hear from you.

20          MR. PROCTOR:  Thank you, Judge.  I'll be

21   brief.  I read Gray last night as it happens and the

22   case law surrounding it and I'll agree it's adverse

23   to my position.  I just want to preserve some things.

24          First of all, I don't believe the issue

25   is properly before the court at the moment.  What

1        Judge Motz did in another witness murder trial that I

2        did with him in 2009 was admit it subject to at some

3        point the government proving by a preponderance that

4        there was wrongdoing.  We would be pleading guilty if

5        we thought there was any wrongdoing on the part of

6        our client, that was kind of admitting the act, but

7        there will come a time that the government I assume

8        will move the court to find by a preponderance that

9        the defendant's wrongdoing meant that Mr. Guest is

10       unavailable as a witness and at that time Your Honor

11       will rule.

12              THE COURT:  Well, I guess in the context

13       of the trial of the case, Mr. Proctor, I don't really

14       know, no disrespect to Judge Motz, I'm not sure of

15       the context in which he made that ruling, but you

16       have, in a case in which an individual is alleged to

17       have murdered a witness, as I addressed in the Byers'

18       case, the point is the determination of whether or

19       not there's wrongdoing, that's the ultimate issue the

20       jury has to determine in terms of determining whether

21       there's wrongdoing or not.  And you essentially have

22       the context of the matter in which the, first of all,

23       it's clearly relevant in terms of the fact that with

24       respect to the matter of the motive for the murder,

25       whether it was the murder of Carl Lackl in the Byers

```
1    case or it's the murder of Kareem Guest in this case,
2    you have the fact that this evidence, the evidence
3    apparently has been proffered that the evidence will
4    be that a discovery package in connection with
5    another trial in this court not before me, before
6    another judge of this court, included the FBI 302 of
7    Kareem Guest with respect to his providing
8    information to the FBI, and the allegation is that
9    the statements in that 302 made reference to the
10   defendant in this case, Mr. Hall.
11             So essentially it's, first it's
12   essentially been offered for the motive as to the
13   Guest murder, and it's not being offered for the
14   proof of the matters asserted therein.  That's the
15   first position of the government as I understand it,
16   is that correct, Mr. Purcell?
17             MR. PURCELL:  That's correct, Your Honor.
18             THE COURT:  So it's not being offered for
19   the truth of the matter asserted therein, so it's not
20   hearsay.
21             Secondarily, to the extent that there are
22   statements contained therein, even though it's not
23   hearsay, the matter of the Guest 302 is not being
24   offered for the truth of the matter asserted therein
25   as to whether or not Mr. Hall did or did not commit
```

1    the acts alleged by Mr. Guest in connection with the

2    earlier criminal case before this court.  Secondarily

3    that to that extent there would still be, even if it

4    were being admitted for the truth of the matter

5    asserted therein, it would be admissible by the

6    forfeiture by wrongdoing evidentiary Rule 804B6.

7         Does the government anticipate an

8    objection if I give the jury the context of this with

9    respect to a cautionary instruction?

10        MR. PURCELL:  Your Honor, actually I was

11   about to suggest that the court can instruct the jury

12   that, and of course as you noted, the focus of this

13   is that this is a murder in retaliation for what he

14   did here, for this report, 302, and I don't know if

15   you have a copy.  Have you seen it?

16        THE COURT:  I don't think I do.  Before

17   you bring it up, Mr. Purcell, it seems to me that

18   your earlier analysis is the most apt before you even

19   get to 804B6 that it's not being offered for the

20   truth of the matter asserted therein.  It may be that

21   Mr. Guest was totally incorrect as to Mr. Hall's

22   involvement or whatever.  The point is is that it's

23   an element with respect to the government offering

24   this as a motive from what the government contends to

25   have been Mr. Hall's motive to murder Mr. Guest.

1     Whether the statements were totally inaccurate,

2     whether they were lies, whatever, that Mr. Hall,

3     according to the government, was aware of this and it

4     was a motive for him to murder Mr. Guest.  So I don't

5     know that we even get to the 804B6 analysis.

6              MR. PURCELL:  And I agree that if the

7     court were to instruct the jury upon receiving this,

8     and there's only a portion of a page, but all of this

9     relates to the group of people that Mr. Hall we

10    believe was retaliating not just for himself, but

11    others, that, yes, the jury could be instructed that

12    the statement is being admitted to you as evidence of

13    the motive and not, not to presume from this that Mr.

14    Hall did the act that Mr. Guest said that he did.

15             THE COURT:  Right.  And the Fourth

16    Circuit has placed great weight, Mr. Proctor, as you

17    know, and Mr. Sullivan, on cautionary instructions.

18    It seems to me I give them that instruction at the

19    time, that it's not being offered for the truth of

20    the matter asserted therein, it's merely being

21    offered to show motive and this is the contention

22    that Mr. Guest with respect to the statement he gave

23    to the FBI.  So I really even get into Rule 804B6,

24    that would be a secondary basis for it, to the extent

25    that the jury would disregard my instruction.  Is

1      there any objection as to that, Mr. Proctor?

2                    MR. PROCTOR:  No.  I think you hit the

3      nail on the head.  We would object to it coming in

4      under 804B6, but I don't see how the government or

5      the defense for that matter can tell story without

6      the jury knowing that he talked and the people he

7      named, including Mr. Hall.

8                    THE COURT:  I think to that extent then

9      the government's motion in limine to admit the Guest

10     302 will be granted.  It's granted on the basis that

11     it's not hearsay, that it merely is an element of

12     showing the motive of the defendant, and I will give

13     a cautionary instruction at the time when that 302 is

14     introduced.

15                   Then we have the government's motion in

16     limine to exclude reference to Hall's state court

17     acquittal and essentially that relates to a witness,

18     I gather that Robert Parsons will testify in this

19     case for the government, correct, Mr. Purcell?

20                   MR. PURCELL:  That's correct, Your Honor.

21                   THE COURT:  And Mr. Parsons will testify,

22     ironically very similar to evidence, again, that was

23     in the Byers case, with respect to being shot by Mr.

24     Hall previously and in connection with a drug deal

25     that had gone awry apparently.  And apparently Mr.

1    Hall was charged with that shooting in the Circuit

2    Court for Baltimore City and was acquitted by a

3    Baltimore City jury.  And the government has noted

4    that there are two investigating detectives who were

5    not called in the state trial that will testify in

6    this matter.

7               Mr. Proctor or Mr. Sullivan, I'll be glad

8    to hear from you on this.  Quite frankly, no matter

9    how it cuts as to either side in any case, when you

10   get to the matter of a determination by another

11   finder of fact, that is normally something that's not

12   given to a jury in a secondary trial.  You would

13   agree with that, would you not?

14              MR. PROCTOR:  I would, Judge.  And I

15   agree it would be totally impermissible to ask Mr.

16   Parsons, the jury didn't believe you then either, did

17   they, or some question to that effect.  It's not

18   relevant, as Mr. Purcell mentioned, it's different

19   evidence in this case.  I could, however, see a basis

20   for its admission, but in the event we plan to go

21   there, we'll notify the court.

22              If our theory of the defense, and in part

23   it depends on the court's 404(b) ruling, as we stand

24   here we don't know entirely what the theory of the

25   defense is, was that the police were out to get him,

1    Mr. Hall had been arrested multiple times, he had

2    been acquitted of numerous attempted murder charges.

3    You know, the fact that he was acquitted of Mr.

4    Parsons would be, you know, a reason for the police

5    to have a target on Mr. Hall's forehead of a, a

6    vendetta, a witch hunt, whatever term we may come up

7    with in our fertile imaginations.  So it may be

8    relevant in the sense that he was acquitted of that

9    which made the need for the police perception to get

10   him off the streets that much greater.  I believe it

11   could come in under that basis.

12           And we're not introducing it to say to

13   the jury this is weak, you shouldn't credit it.

14   We're introducing it to show motive for the police to

15   continue to search for crimes that they may be able

16   to charge Mr. Hall with.

17           THE COURT:  Well, you're not going to be

18   permitted to get into the matter of an acquittal in

19   the Parsons' case of Mr. Hall.  To the extent that

20   you would like to attack the credibility of any

21   police officer and say that Mr. Hall had been

22   previously successful in beating other previous

23   charges, I think that you may, and led to some police

24   vendetta, you may be able to get into that in a

25   general generic sense.  We're not going to go crime

1    by crime and talk about what jury verdict there was

2    or was not, or verdicts by judges, you know, judges

3    who nol-pros cases in the state system or the state's

4    attorney's office stets a case, we're not going to

5    get into any of that, Mr. Proctor.  It's confusing to

6    the jury.  Under Rule 403, we often speak under Rule

7    403 as to prejudice, but what is often overlooked is

8    the fact that 403 also relates to the matter of

9    confusion of issues and misleading the jury.

10            So we're not going to permit any kind of

11   inquiry to that detail.  You certainly can, if you

12   choose to do so, seek to attack the credibility of

13   the police officer saying that you had a vendetta

14   against my client because he's been able to beat

15   previous charges in some way or the other and leave

16   it at that.  And I'll permit you to go there if you

17   want to go there.

18            MR. PROCTOR:  Of course, Judge, the last

19   thing I want to do is open the door to my client's

20   prior charges.  Depending on the court's 404(b)

21   ruling, the door may be ajar anyway, in which case we

22   may.

23            THE COURT:  As to that then, the

24   government's motion in limine to exclude reference to

25   Hall's state court acquittal will be granted as well.

1      Mr. Sale, if you'll just follow-up with Miss

2      Arrington, that will be on the docket.

3              So with that I think we are now down to

4      the remaining two motions and they are the papers

5      numbers 40 and 42, the matter of the moving for

6      severance and also the 404(b) evidence.  And so with

7      that I'll be glad to hear from you, Mr. Proctor, on

8      this, or Mr. Sullivan, and then I'll hear from the

9      government.

10             MR. PROCTOR:  Thank you, Judge.

11             To me they're not really two separate

12     motions, they're part and parcel of one another.  You

13     know, severance, if they were severed, then arguably

14     it's not 404(b).

15             If Mr. Hall were only charged with the

16     Kareem Guest murder, the trial would look something

17     like Kareem Guest talked to the police and amongst

18     other things what he said to the police was Mr. Hall

19     may have been involved in some shootings, not drug

20     activity.  He never said that.  Shootings.  Following

21     Black being arrested or shot or I forget what the

22     term was.  And then witnesses will come in and say

23     that's the guy, I saw him shoot him.  And a witness

24     would say I saw him shoot him because it was in

25     retaliation for him talking to the police.  And that

1    would be the question before the jury.  Did he or

2    didn't he shoot Kareem Guest in retaliation for him

3    being a witness or talking to Officer Moody or

4    whatever the term may be?

5            If charges one and two were tried

6    separately and apart, there would be witnesses coming

7    in and saying Mr. Hall sold drugs, he was arrested

8    with drugs, and once, you know, and some crimes of

9    violence including attempted murders may have

10   happened in relation to drug activity.  Mr. Parsons

11   was shot because he was a witness against one of Mr.

12   Hall's associates in the drug dealing game.

13           Those, I don't know how to put it, Judge,

14   other than that's a fair fight.  That's a fair fight,

15   the jury can believe the evidence or they cannot

16   believe the evidence.  And interestingly is what the

17   initial indictment was, he was just charged with the

18   Kareem Guest murder.  But when you try the two of

19   them together, the jury has to think there's no smoke

20   without fire.  And especially if you let all the

21   404(b) in, you know, that Mr. Hall must be the kind

22   of person that killed Kareem Guest because he had

23   five non-fatal shootings, two in 2002, one in 2004,

24   one in 2005 and one in 2007, that Mr. Hall must be

25   the kind of person that shot Kareem Guest because he

1    killed Martie Williams or people came in and said he

2    killed Martie Williams a couple of years earlier.

3              You know, that's exactly the harm, the

4    vice that 404(b) was designed to prevent.  You can

5    tell the story of the Kareem Guest murder, and I'm

6    not tying any of the government's hands behind their

7    back without the smorgasbord of rank hearsay and ten

8    year old drug dealings and nine year old shootings.

9              So for those reasons, you know, in an

10   ideal world I'd ask for count one to be separate from

11   count two.  I'm not going to get that.  I'm not going

12   to stand here before the court and ask for it.  I

13   would expect to be laughed out of it.  But Mr.

14   Guest's murder is a separate definitive act.  Mr.

15   Guest, no one said Mr. Hall ever sold drugs for him

16   or to him or that they ever combined their money or

17   that it was a fight over drug turf.  One has got

18   nothing to do with the other.  At best they're

19   tangentially related.  They said hi to each other

20   when they passed on the street.

21              So for those reasons, Judge, and I'm

22   happy to answer any specific questions, I think the

23   most ripe issue is severance because depending on

24   what Your Honor rules on severance, the 404(b) is a

25   different analysis.  But for those reasons I would

1    ask that the first two charges on the indictment be

2    severed from the rest.

3              THE COURT:  All right.  Thank you very

4    much, Mr. Proctor.

5              I'll be glad to hear from you, Mr.

6    Purcell.

7              MR. PURCELL:  Your Honor, let me just

8    clarify the record first.  The government initially

9    indicted, as you know from the superseding indictment

10   charge, what is now count three, murder in

11   retaliation for providing information.

12             THE COURT:  Counts three, four and five

13   of the superseding indictment returned in May of this

14   year were the original counts one, two and three, and

15   the superseding indictment added two counts which are

16   now counts one and two.

17             MR. PURCELL:  And it's basically a drug

18   conspiracy count.  Now, in that drug conspiracy

19   count, I've been listening to Mr. Proctor going

20   through what I guess he thinks from the really lots

21   of discovery we provided thinking what we're going to

22   put in.  We're not putting in, in terms of other acts

23   of this conspiracy, anything in terms of other

24   shootings beyond that which is set forth in count

25   one, and that is the non-fatal shooting of Mr.

1        Parsons who was shot, Your Honor, not just because --

2        well, he was shot for a reason, and that reason is

3        because he was perceived by Mr. Hall to be a snitch.

4        That's why it's in the indictment.  And he was also a

5        customer of Mr. Hall for drugs for the year or so

6        prior to that shooting every day.  Every day.

7                  THE COURT:  That's referenced in

8        paragraph 3A of the superseding indictment.

9                  MR. PURCELL:  Yes.  Let me just double

10       check where that is.

11                 Yes.  Right.  That's the first overt act.

12       So those other shootings that Mr. Proctor was

13       addressing going back in 2000, whatever it was, eight

14       or nine years, the government is not providing those

15       nor would we.  We could, I suppose, but we're not

16       going back that far.

17                 But this, this is, what I was about to

18       say is this:  That was the original indictment.  That

19       original indictment was returned in December really

20       for a simple reason, and you'll hear during the trial

21       that there was this guy Kevin Duckett who is now

22       cooperating with the government and is a

23       co-conspirator with the defendant in the drug

24       trafficking conspiracy and is an accessory to the

25       Martie Williams murder which happened only three

1         months before the Guest murder.

2                  THE COURT:  Are you seeking to introduce

3         evidence as to the Williams murder?

4                  MR. PURCELL:  Yes.  And that's set forth

5         as well.  And counsel has all of these, they have all

6         the files and all the witness transcripts and

7         everything.

8                  THE COURT:  And that's referenced in

9         paragraph 3F of the superseding indictment.

10                 MR. PURCELL:  Now, in terms of what the

11        original indictment was, the original indictment was

12        as it is because in an intercepted conversation

13        between Duckett and the defendant, it became very

14        clear to us that we thought the defendant suspected

15        someone to be a cooperator who wasn't, and we thought

16        he would be killed.  So we moved in the next week,

17        indicted the defendant, had him arrested.  And then

18        as is often the case in federal cases, we took the

19        other evidence that we had, we brought in Mr. Proctor

20        to the grand jury, we brought in some other witnesses

21        and returned a superseding indictment which

22        encompasses --

23                 THE COURT:  You didn't bring Mr. Proctor

24        in; you brought Mr. Parsons in.

25                 MR. PURCELL:  I'm going to do it a lot.

1    I do it in my meetings, too, I always say Mr.

2    Proctor, I mean Mr. Parsons.

3              THE COURT:  Mr. Proctor is the lawyer in

4    the case and to my knowledge he's never been dragged

5    in before the grand jury.

6              MR. PROCTOR:  Well, if Mr. Parsons is

7    devilishly handsome I may not have --

8              THE COURT:  You've used that comment

9    before very accurately, Mr. Proctor, in other

10   matters.  You'll have to explain that to Mr.

11   Sullivan.

12             Go ahead, Mr. Purcell.

13             MR. PURCELL:  At any rate, Mr. Parsons,

14   among others came to the grand jury and testified as

15   to their role and the grand jury then returned a

16   superseding indictment.

17             The superseding indictment names a number

18   of overt acts that were done in furtherance of the

19   drug trafficking conduct of Mr. Hall over many years

20   and goes back far beyond 2004.  But among those

21   things are his use of handguns, and the only shooting

22   are the shootings of Parsons and the shooting of

23   Williams, both of which were directly related to --

24   and of course the shooting of Guest.  He shot Mr.

25   Guest, of course, which is part of the drug

1    trafficking charge in count one, because Mr. Guest by

2    his testimony and his reports to the FBI was now a

3    direct threat, and he retaliated against Mr. Guest

4    for that reason.

5           There was a reason Mr. Guest was killed.

6    It was because he was exposing Mr. Hall.  In fact,

7    Mr. Hall told the person who was at the scene, and it

8    will be Kevin Duckett and defense knows this, right

9    before the shooting, Duckett was actually trying to

10   talk him out of doing it not at all, but at that

11   moment, in front of all these witnesses, and the

12   defendant said, and it's in the statements I've

13   provided the court, the defendant said it's not your

14   name in those papers, it's mine.  And then ran across

15   the street and shot Mr. Guest four times in the head,

16   as is his sort of trademark actually.  He shot other

17   people four times in the head, Martie Williams among

18   others.

19          But you'll only hear about Martie

20   Williams.  But the Martie Williams' shooting just

21   three months before the Guest shooting was directly

22   related to a drug beef in Westport.  Williams, and

23   you'll hear this from Mr. Duckett among others, we

24   have three witnesses who will testify about that.

25   But I guess my meandering point is all of this,

1    what's in count one, including the Guest murder, is

2    all part of a continuing stream of Mr. Guest's drug

3    trafficking.

4              We're going to bring witnesses in here,

5    Your Honor, in relation to this, independent of this

6    what I'm sure will be called a conspiracy or police

7    vendetta, independent of that event of September 20,

8    who will say they bought from Mr. Hall for years.

9    One of them delivered a baby in his mother's house.

10   One of them he threw a brick through her car when she

11   didn't buy from him.  One of them bought from him

12   hundreds of times, sometimes several times a day,

13   that would be Mr. Parsons, and was shot, Mr. Parsons

14   was, when he loaned his car to one of Mr. Hall's

15   friends.  That friend used the car in a murder, which

16   we're not necessarily going to bring out, and the

17   police tracked the car back to Mr. Parsons, who said,

18   yes, whoever it was had my car, that was my car and

19   this is the person that had it.  Mr. Hall shot Mr.

20   Parsons then for telling the police who it was who

21   had his car.  We know that because he told that to

22   Mr. Duckett.  It's all part of one drug trafficking

23   conspiracy.

24             THE COURT:  Your point is is that with

25   respect to count one to charge a conspiracy to

1   distribute and possess with intent to distribute

2   cocaine base in violation of 21 United States Code,

3   Section 846, that among the overt acts in furtherance

4   of that conspiracy were essentially overt acts,

5   certain overt acts of violence in order to enforce

6   the discipline of that conspiracy.  That's

7   essentially your argument.

8                    MR. PURCELL:  He's a drug trafficker.  He

9   does what drug traffickers in Maryland do and

10  Baltimore does.  He's among the ones that will not

11  hesitate to shoot somebody.  He's done it three

12  times.  One of them particularly because he was a

13  snitch.

14                    I point this out, Your Honor.  I was

15  giving the sequence because of this and this is my

16  only final remark.  The 404 motion counsel filed was

17  appropriately filed.  When it was filed, there was no

18  superseding indictment.  So these things that I'm

19  talking about now, these overt acts, were then, had

20  been provided as notice of possible 404.  When we

21  superseded, now they became overt acts in the

22  conspiracy.  That also changes the law.  That means

23  they only come out first if the court severs, and

24  it's the defendant's burden to demonstrate that they

25  are unduly prejudiced by the inclusion.

1                    Only if, and I guess sort of a converse

2       argument as Mr. Proctor noted, and my argument is

3       basically even if this was like the Byers' case, I

4       was bringing these things under 404, they'd still be

5       completely relevant and necessary.  They're going to

6       become more necessary as the court will see when the

7       defendants begin savaging the government's

8       eyewitnesses in this case as we saw in the Lackl

9       case.  That made the 404 evidence that much more

10      necessary, and that was what the Fourth Circuit, what

11      the Fourth Circuit noted as well.  This is exactly

12      the same sort of case.

13                   There's a reason, for instance, that the

14      defense is not opposing the introduction of the 302.

15      And the 302 actually is part of their defense because

16      some of these people who are witnesses to Mr. Hall

17      shooting Mr. Guest are people they will demonstrate

18      or try to demonstrate had relationships that gave

19      them reasons to lie now and basically make Hall the

20      fall guy.  It's the only defense they have, so it

21      doesn't take a genius to figure out, which I wouldn't

22      be able to do, I'm not a genius, I'm just figuring it

23      out anyway because it's all that they have, or that

24      the police are lying.

25                   But the point is that these witnesses are

going to be just as attacked.  They were bought off
by the government or they were bought off by somebody
in jail now who wants to get revenge and they used, I
suspect they'll probably say Mr. Duckett is the
murderer and Mr. Hall is the fall guy.  The point is
once that door is open, and that's what you saw
already in the motion about why they wanted the
reliability hearing for these particular witnesses,
they've already called them snitches, already called
them bought off by the government.  It's already
begun.  So we know the reliability of these
eyewitnesses is the key which makes this once 404
evidence but now conspiracy evidence critical to the
case.

But whether or not it's critical, it's
part of the same conspiracy.  Mr. Hall is a long time
drug trafficker, he shoots people who snitch on him,
he shoots people who snitch on his friends, and it's
really as simple as that.  And there's any number of
cases where other evidence similar to this has come
in.  Actually far worse evidence has come in in a
drug trafficking conspiracy without any witness
murder charge.

I also note as the court has noted that,
and it's unusual in this case because it isn't just a

1     murder case, it's a case where we have to demonstrate

2     that the motive was that we were -- the motive was to

3     retaliate for disclosing crimes, federal crimes that

4     Mr. Hall was involved in.  And that's exactly what we

5     intend to do.  We have to prove he was involved in

6     federal crimes and that he killed in retaliation to

7     protect himself from disclosure of those crimes.

8                    THE COURT:  All right.  Thank you, Mr.

9     Purcell.

10                    I'll be glad to hear from you, Mr.

11    Proctor.  With respect to your severance motion under

12    rule, to argue that severance is required under Rule

13    14, it is your burden, correct, to show prejudice?

14                    MR. PROCTOR:  That's correct.  And I

15    just, I listen to Mr. Purcell and I just --

16                    THE COURT:  In fact, the Fourth Circuit

17    has said you must show strong prejudice.

18                    MR. PROCTOR:  I believe that's correct.

19    And I keep coming back to if the trial was did he

20    kill Kareem Guest or did he not kill Kareem Guest in

21    retaliation for federal crimes.  Mr. Guest put his

22    name on page seven of an eight-page document saying

23    he may have been involved in some shootings, not some

24    drug dealing, some shootings after Black was killed

25    or arrested, I forget what the term was.  The jury

1    would have to decide, you know, if he's involved in

2    some shootings, by definition there's a federal

3    crime, so if the jury credits that statement and he

4    was killed in retaliation for it, and the witnesses

5    come in and say that's the guy, he shot him, then

6    they find him guilty; and if the jury don't believe

7    the witnesses that say that's the guy who shot him,

8    they acquit him.

9            THE COURT:  But count one of the

10   superseding indictment essentially provides a chain

11   of events in terms of the context of the shooting,

12   does it not, Mr. Proctor, in terms of the government

13   theory, in terms of the grand jury indictment?

14           MR. PROCTOR:  No, I don't believe it

15   does, Judge.  The H charge, which is the murder of

16   Kareem Guest, is almost an afterthought.  You know,

17   count 1A through J --

18           THE COURT:  Let me just follow this.  I

19   don't mean to interrupt you, but I want to stay

20   focused.  I don't know how it's an afterthought.

21           Correct me if I'm wrong, Mr. Guest was to

22   be a witness in another case in this court with

23   respect to drug dealing and a 302 was divulged

24   incorrectly and improperly by another lawyer in that

25   other case in this courthouse, correct?  Divulged

1    meaning that it somehow wound up on the streets of

2    Westport in Baltimore City, is that correct?

3              MR. PROCTOR:  Sort of.

4              THE COURT:  Isn't that what the facts are

5    in this case?  And ultimately Kareem Guest is

6    murdered and the theory of the indictment, the

7    indictment returned by the grand jury is that there

8    is essentially a chain of events and a conspiracy and

9    acts of violence in furtherance of the conspiracy and

10   that this essentially is the context of it.  This is

11   intrinsic evidence, is it not, with respect to what

12   happened in the case, allegedly what happened?

13             MR. PROCTOR:  Let me try and explain why,

14   if I may.

15             This is different from Byers and it's

16   different from other cases because when Kareem Guest

17   was killed, there was no active investigation, state

18   or federal, against my client.  When Kareem Guest was

19   killed, it was long after the people had pled who the

20   302 primarily concerned and in the context it was

21   divulged to defense counsel who erroneously sent it

22   out into the stratosphere.  So it was Mr. Hall's name

23   was in those papers and there will be testimony that

24   he knew his name was in those papers and that's why

25   he killed him.  Whether the jury credits that or not,

1       I don't know as we stand here.

2                   So it's different in that it wasn't he

3       sold drugs, people told on him, he carried firearms

4       in relation to them, they fought over turf.  That's

5       all counts one and two.  When you get to the Kareem

6       Guest murder, it's solely his name was in a paper,

7       not about drug dealing, but about maybe being

8       involved in some shootings, and that led him to

9       retaliate against someone who is not a government

10      witness, isn't in witness protection, he is not under

11      subpoena for any case, isn't actively helping in my

12      investigations.  And Mr. Hall, by the way, is also

13      not subject to any state or federal investigations at

14      that time.  It's a standalone murder that has nothing

15      to do with drug dealing and shooting or at least very

16      little or tangentially.

17                  THE COURT:  What is the alleged motive of

18      the murder, Mr. Proctor?

19                  MR. PROCTOR:  The very fact that Mr.

20      Hall's name was included in Guest's 302.

21                  THE COURT:  Isn't the motive, the alleged

22      motive of the murder as to which your client is

23      charged is essentially to enforce his -- the

24      allegation is is to enforce his drug operation and to

25      stifle a person who is apparently providing

1     information to the government in terms of the

2     ongoing -- you say there's no ongoing investigation;

3     quite frankly, I think in most parts of this city

4     there's a continuing ongoing investigation at any and

5     all times with respect to the levels of violence and

6     drug dealings in pockets of this city.  Isn't that

7     really the motive?  What do you understand the

8     allegation to be as to your client's motive, alleged

9     motive to have killed Mr. Guest?

10                 MR. PROCTOR:  The motive is the latter

11    and not the former of what Your Honor said.  It's the

12    government's allegation is Mr. Hall doesn't like

13    snitches.  Mr. Hall shoots snitches.  Mr. Hall is a

14    killer of snitches.  That's what the government will

15    probably say in opening statement or some derivation

16    thereof.  That's the motive.  It's got nothing to do

17    with selling drugs, peddling drugs, shooting other

18    people who are trying to encroach in the drug

19    territory.

20                 If Mr. Hall had been a gardener, I

21    believe the government would still say he's a

22    gardener who doesn't like snitches and that's why he

23    shot him.  The drug evidence doesn't bleed over at

24    all into the shooting of Mr. Guest, I don't believe.

25                 THE COURT:  As I understand the charge,

1    the charge is is that Mr. Hall's drug trafficking and

2    the nature of his business, the allegation, is the

3    reason -- it isn't just that philosophically, it's

4    not an allegation Mr. Hall doesn't like people who

5    cooperate, he doesn't like, quote, snitches, end of

6    quote.  That there's actually jeopardy to his

7    enterprise as a result of Mr. Guest's cooperation.

8    And so in order to enforce his drug trafficking

9    operation, as charged in count one of the indictment

10   that essentially in terms of these other acts to

11   enforce the drug trafficking that your client's

12   allegedly engaged in according to count one, that he

13   committed the act, and it becomes a motive for

14   killing Mr. Guest who, according to the government

15   and according to the grand jury indictment, it

16   represents allegedly a threat to Mr. Hall.  That's

17   really the theory as I understand the case, which

18   means it's very much intrinsic to what the charge is,

19   it seems to me.

20            MR. PROCTOR:  Judge, we are on I think

21   the fifth box of discovery, and I have read every

22   single word, and I do not recall even a single

23   sentence that suggests Mr. Hall was worried about his

24   drug operations, Mr. Hall's drug operations were in

25   jeopardy, Mr. Hall needed to make sure his word was

1    law on the street.  There's nothing like that.

2            As best I could tell, Kevin Duckett's

3    really the only person that alludes to it and he says

4    it wasn't your name in those papers.  I got to go

5    shoot him right now.  Something along those lines.

6            And the reason, and again, the context of

7    it, his name in those papers is not he's someone who

8    peddles drugs in Westport, he's someone if you need

9    crack, he's the guy you go to; if you need heroin,

10   he's the guy you go to.  It's he may have been

11   involved in some shootings after Black got shot.  I

12   get what you're saying, it just it doesn't bleed over

13   into the drug allegations.  It's tangentially

14   connected at best from the government's point of

15   view.

16           THE COURT:  Well, again, the burden that

17   you face it seems to me, Mr. Proctor, I understand

18   the argument that you're making, but we're in the

19   context here of the grand jury having returned the

20   indictment, the superseding indictment, and the

21   Fourth Circuit has clearly held before that under

22   Rule 14 you have to show a strong prejudice.

23           Essentially under Rule 8A of the Federal

24   Rules of Criminal Procedure, defendants may be

25   charged in the same indictment if it's either

1    participated in the same act or in a series of acts

2    or transactions, and then there is a presumption that

3    with respect to once that indictment has been

4    returned and permits a joinder of separate offenses

5    when they're of the same or similar transaction or

6    connected in some way.  And then the inquiry shifts

7    over to Rule 14 where severance is required when

8    there's a serious risk that a joint trial would

9    compromise a specific trial right.

10            And there is a reason for heavy burden

11   because there is, under Rule 8A, the grand jury has

12   returned an indictment essentially in the context of

13   the chain of events here it seems to me, Mr. Proctor.

14   But I understand your argument.

15            Anything further from the point of view

16   of the government on this, Mr. Purcell?

17            MR. PURCELL:  Just the observation, Your

18   Honor, that in, we're familiar with Byers so we'll

19   speak about it.  But in Byers he was, there wasn't an

20   overlapping conspiracy charge.  All there was was the

21   shooting charge.  We had the isolated, as counsel

22   would wish us to have, just that isolated shooting

23   charge, that is, the killing of the witness.  But

24   still we brought in that Byers was a drug trafficker

25   and he had a motive to him killing a witness relating

1    to drug trafficking.  And we brought in another

2    murder and we brought in a shooting and we brought in

3    evidence of his drug trafficking under 404, where it

4    was my burden to demonstrate this it was relevant,

5    necessary and probative.  So here, because of the

6    conspiracy count, the grand jury as you've noted has

7    already made that determination.  But it doesn't take

8    a lot of common sense --

9              THE COURT:  They returned an indictment

10   finding there's probable cause.

11             MR. PURCELL:  True.  But still the court

12   can see that these are logically connected counts.

13   They are the counts related to drug trafficking.

14   We're not adding conduct here that he bribed an

15   official or that he was a child pornographer or he

16   evaded his taxes.  Those things thrown into this

17   indictment I understand one could move to sever them

18   because they're not related.  These counts are all

19   logically related.  And I submit to the court, even

20   if the court were to say, well, they're not, I would

21   then be arguing under 404, can't we bring in the fact

22   that he shot Mr. Parsons, one of his drug customers,

23   for snitching, exactly the same sort of thing here,

24   particularly in light of the fact that the witnesses

25   here will be found, it will be argued to be highly

1   unreliable, and we're going to have to demonstrate

2   the reliability by going outside and showing the

3   defendant's knowledge, intent and the identity of the

4   actor here.  It's I think a pretty easy call

5   relatively.

6               THE COURT:  Thank you, Mr. Purcell.

7               I have reviewed the submissions of the

8   parties on this and the first, the defendant's motion

9   to sever counts one and two of the superseding

10  indictment from counts three, four and five will be

11  denied for the following reasons:  Count one, the

12  drug trafficking charge, is logically connected to

13  the murder in retaliation charge in count three of

14  the superseding indictment.  Joinder is proper under

15  Rule 8A of the Federal Rules of Criminal Procedure

16  because joining the counts is necessary to connect

17  the alleged drug trafficking to the murder charge.

18              And Mr. Purcell's point is well taken.

19  The government is an even stronger position here than

20  it was in the Byers case, and I was the trial judge

21  in the Byers case and I've read carefully the Fourth

22  Circuit opinion affirming my rulings in that case,

23  and this case is very analogous to the Byers case on

24  many issues.

25              The defendant has moved to sever the

1       charges and bears a heavy burden of proof under Rule

2       14 and is required to show a strong showing of

3       prejudice.  United States versus Goldman, 750 F.2d

4       1221, the Fourth Circuit in 1984.  And the Fourth

5       Circuit in 2005 in the Cardwell case at 433 F.3d 378

6       has noted that Rule 8A permits a broad joinder

7       because of the efficiency of trying the defendant on

8       related counts in the same trial.

9               And I would particularly note the Fourth

10      Circuit's opinion this year that's been cited

11      somewhere in the government papers, United States

12      versus Johnson, 415 F.App'x 495, a Fourth Circuit

13      opinion this year in which it was noted by the Fourth

14      Circuit that evidence, when not part of the crime

15      charged but pertaining to the chain of events

16      explaining the context, motive and set-up of the

17      crime, is properly admitted if it forms an integral

18      and natural part of the account of the crime.

19              In that context, there's clearly no

20      prejudice that results here.  It would be admitted

21      under Rule 404(b) anyway.  And the Fourth Circuit in

22      United States versus Mir, M I R, at 525 F.3d, Fourth

23      Circuit opinion in 2008, noted that severing related

24      claims leads to significant inconvenience to the

25      court in terms of judicial efficiency here.

1              The simple fact of the matter is that as

2     the Fourth Circuit noted in Mir and it is true here

3     in terms of the allegations that have been made

4     against Mr. Hall is that the drug trafficking charges

5     provide the motive for the murder retaliation charge.

6     A logical connection exists for joinder as the Fourth

7     Circuit noted in Mir, and that's true here in terms

8     of the context of this case, so that count one is

9     intrinsic to proving the murder retaliation charge in

10    count three.

11             And quite frankly, one of the things that

12    I do note and get from the Mir case is that even if

13    it the charges were severed, if I granted the motion

14    of the defense, the proof of the murder retaliation

15    charge in count three would still require the

16    introduction of evidence pertaining to the underlying

17    drug trafficking in order to provide the context and

18    proof of motive, particularly in light of Mr. Guest's

19    interview with the FBI.

20             Now, with respect to the firearm, that

21    use is properly joined because the firearms are often

22    intertwined with drug trafficking as the Fourth

23    Circuit has noted on numerous occasions, and

24    specifically the United States versus Brewer, 1 F.3d

25    1430, a Fourth Circuit opinion in 1993.

1              So for those reasons that have been

2      generally summarized and the Mir and Johnson cases

3      providing the context of it and the defendant having

4      not met his heavy burden, the motion for severance

5      will be denied.

6              And I would note that clearly would be

7      admissible under Rule 404(b) anyway, even if it were

8      being proffered in that context.  In the Byers case

9      that's how it was proffered was under 404(b) and not

10     under an a conspiracy theory, and it clearly would be

11     admissible to show proof of motive as was allowed in

12     the Byers case by the Fourth Circuit in its

13     affirmance this year of the earlier case before me.

14     And for those reasons similarly paper number 40, for

15     the same reasons, paper number 40 is denied if you

16     were to have this be in the context of Rule 404(b)

17     evidence.  So for those reasons the court denies both

18     paper numbers 40 and 42 for the reasons stated here

19     on the record.

20             Is there anything further from the point

21     of view of the government on any outstanding motions,

22     Mr. Purcell?

23             MR. PURCELL:  No.  Thank you, Your Honor.

24             THE COURT:  Anything further from the

25     point of view of the defendants on any outstanding

1    motions?

2                    MR. PROCTOR:  No, Judge, you got it all

3    covered.

4                    THE COURT:  So with that it's 20 after

5    one.  The government has submitted a proposed voir

6    dire.  The defendant has not yet submitted a proposed

7    voir dire, have you, Mr. Proctor?

8                    MR. PROCTOR:  We just got the

9    government's in court this morning.

10                    THE COURT:  If you want to submit it on

11   Monday, you can come up with some proposed voir dire

12   on Monday if you like.  I'm inclined, my thinking is

13   why don't we, why don't counsel call my chambers

14   Monday morning, I mean it's 20 after one and the

15   court staff has to have lunch.  If you want to come

16   back after lunch or later this afternoon we can go

17   over the pretrial conference, we can handle the

18   pretrial conference I would think next week.

19   Actually the pretrial conference is scheduled for

20   Monday, I believe, is it not?  I'm not sure.  I would

21   think it might be.

22                    Why don't you all call my chambers Monday

23   morning?  I've got another hearing in a matter that's

24   going to take most of the day Monday, but we'll

25   figure out a time to have the pretrial conference the

1    beginning of next week.  And quite frankly, Mr.

2    Proctor and Mr. Sullivan, you can attend it by

3    telephone conference if you want, you don't need to

4    come all way up here.  Is there any objection to that

5    from the government?

6              MR. PURCELL:  No, not at all.  We'll

7    schedule a time, just call my chambers Monday morning

8    and we'll schedule a pretrial conference on this

9    case.

10              So I just want to go over one further

11   matter just in the abundance of caution here.  The

12   government has filed a notice under 21 United States

13   Code, Section 851 that was filed and it provides

14   notice to Mr. Hall that with respect to the offense

15   charged in count one, the conspiracy count, that if

16   the defendant, Mr. Hall, if you are convicted of

17   count one, and count one is found to involve the

18   minimum quantity of cocaine set forth in certain

19   subsections, that there would be a mandatory sentence

20   of life imprisonment without parole in this case.

21   Have I correctly summarized the posture of that

22   notice and the effect of it from the point of view of

23   the government, Mr. Purcell?

24              MR. PURCELL:  Yes, Your Honor.

25              THE COURT:  Mr. Proctor and Mr. Sullivan,

1    have I correctly summarized the procedural posture of

2    this case from the point of view of the defense?

3                  MR. PROCTOR:  Yes, sir.

4                  THE COURT:  Just so you understand, Mr.

5    Hall, on this, if that -- Mr. Hall, if you'll look at

6    me for a moment, so you understand -- if that were

7    the case, you have to understand that I don't have

8    any discretion on that.  Why don't you stand up for a

9    moment, sir, if you will?  I just want to make sure

10   you understand the notice.  Do you understand that,

11   Mr. Hall?

12                 THE DEFENDANT:  No.

13                 THE COURT:  Let me explain that to you.

14   By a statute passed by Congress, if a Section 851

15   notice is provided and there is a proof of a certain

16   amount of cocaine base that Mr. Proctor and Mr.

17   Sullivan can go over with you, if that proof is

18   offered in evidence and if the jury convicts you,

19   then essentially my discretion on the matter of

20   sentence is taken away from me, that there is no

21   choice as to this.  There is an absolute mandatory

22   minimum sentence of life imprisonment without parole.

23   I don't have any discretion on it.  It's not like I

24   look at letters and read letters from your family

25   members or I heard testimony, I use my discretion.

1       The United States Congress has taken my discretion

2       away in that event.

3                   Do you understand that?

4                   THE DEFENDANT:  No.

5                   THE COURT:  Well, you have to talk to

6       your lawyers.  I'm trying to make sure you understand

7       that.  When there's a mandatory minimum placed in

8       effect in a case, it means that the judge does not

9       have the discretion to order say a sentence less than

10      mandatory life imprisonment.  It's by statute.  And

11      that Section 851 notice provided by the government

12      essentially puts you on notice that if you're

13      convicted of that offense with that kind of proof,

14      then there would not be any discretion that I would

15      have at all on it is the bottom line.  It's

16      essentially out of my hands.  There's a mandatory

17      life sentence that's required by statute.  So it's

18      taken out of the discretion of a federal judge.

19                  Now, Mr. Proctor and Mr. Sullivan can

20      explain that to you in more detail, but I want to

21      make sure that you're aware of the legal effect of

22      that Section 851 notice that has been provided by the

23      government.

24                  Is there anything further that defense

25      counsel want me to explain to their client with

1        respect to that?

2                      MR. PROCTOR:  No, sir.

3                      THE COURT:  Because I want to make sure

4        that you understand the implications of that, Mr.

5        Hall.

6                      Again, I'm not, my main purpose is that I

7        don't want you to be in a situation where you don't

8        understand that if, and I say if, I'm not judging the

9        case, the government has to prove your case beyond a

10       reasonable doubt, but the point I'm trying to make

11       sure you understand is that as to some crimes that

12       are charged, if there's a finding of guilt, the

13       discretion is taken away from a federal trial judge.

14       It's not like I can read a lot of letters and

15       exercise my discretion or sentence you to certain

16       number of years.  The law is the law and I have to

17       apply the law, and I just want to make sure you

18       understand the implications of a Section 851 notice.

19                      So with that, we have concluded with the

20       motions hearing and counsel will call my chambers

21       Monday for the pretrial conference.  The government

22       can come over here and participate, but defense

23       counsel can participate by telephone.  And with that

24       we'll then be ready to proceed with the trial

25       starting Monday morning, August 1.

1              Thank you very much.

2              (HEARING CONCLUDED.)

3

4         I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8                        *s/ Anthony Rolland*

9                         ANTHONY ROLLAND

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**'**

**'09** - 66:21, 81:12

# 1

**1** - 14:24, 20:4, 20:9,
31:11, 144:24, 150:25
**10** - 98:2
**11:15** - 17:1
**12** - 107:2
**1221** - 143:4
**12:30** - 19:10
**12:50** - 19:9
**137** - 102:22
**14** - 133:13, 139:22,
140:7, 143:2
**1430** - 144:25
**148** - 107:12
**15** - 19:10, 55:6
**18** - 63:3
**188** - 109:9
**1970s** - 109:7
**1984** - 143:4
**199** - 102:12
**1993** - 144:25
**1998** - 33:18, 102:23
**1999** - 33:15
**1:10-cr-0744-rdb** -
1:6
**1a** - 134:17
**1m** - 31:8

# 2

**2** - 34:6, 34:15,
34:18, 35:23, 43:14,
65:25, 66:1, 88:25
**20** - 14:7, 14:14,
33:23, 55:6, 97:7,
103:19, 129:7, 146:4,
146:14
**2000** - 125:13
**2001** - 63:8
**2002** - 11:18, 122:23
**2003** - 102:14
**2004** - 63:14, 65:8,
90:12, 122:23, 127:20
**2005** - 5:23, 59:10,
112:1, 122:24, 143:5
**2007** - 122:24
**2008** - 143:23
**2009** - 14:7, 33:23,
66:20, 86:25, 103:19,
113:2
**2010** - 14:14, 15:11,
34:6, 34:15, 34:18,
35:23, 43:14, 63:14,
65:8, 67:24, 70:10,
72:21, 72:24, 74:24,
77:7, 81:12, 81:13,
81:14, 89:7, 89:10,
91:11, 93:6
**2011** - 1:11, 107:1,
107:2
**21** - 130:2, 147:12
**22** - 1:11, 15:10,
84:10
**227** - 5:14
**238** - 102:13
**25** - 44:10
**26** - 87:18, 88:5
**277** - 11:17

# 3

**3** - 46:24, 107:19,
107:21, 108:23
**30** - 44:10, 53:6

**302** - 4:24, 5:8,
36:10, 42:7, 110:18,
111:7, 114:6, 114:9,
114:23, 115:14,
117:10, 117:13,
131:14, 131:15,
134:23, 135:20,
136:20
**31** - 94:21
**378** - 143:5
**38** - 3:22, 106:10,
107:6, 110:12
**39** - 4:1, 13:10,
83:16, 101:16,
105:22, 106:6
**3e** - 126:9
**3f** - 126:9

# 4

**40** - 4:3, 121:5,
145:14, 145:15,
145:18
**401** - 103:5
**403** - 97:23, 100:9,
104:16, 120:6, 120:7,
120:8
**404** - 7:5, 91:2, 91:8,
92:13, 130:16,
130:20, 131:4, 131:9,
132:12, 141:3, 141:21
**404(b** - 90:20,
90:24, 90:25, 106:10,
110:16, 111:1,
118:23, 120:20,
121:6, 121:14,
122:21, 123:4,
123:24, 143:21,
145:7, 145:9, 145:16
**405** - 5:14
**409** - 109:9
**41** - 4:5, 8:12, 11:6,
12:13, 12:16, 106:5
**410** - 98:23, 100:2,
100:5, 103:11
**415** - 143:12
**42** - 4:8, 108:18,
121:5, 145:18
**433** - 143:5
**454** - 11:18
**482** - 109:8
**495** - 143:12

# 5

**5** - 107:1
**50** - 46:5, 46:6, 57:4,
57:8, 57:9, 57:10,
61:1, 85:15, 86:1,
98:21, 99:8, 99:14,
100:1, 103:4
**525** - 143:22

# 6

**6** - 35:14

# 7

**714** - 102:14
**750** - 143:3
**765** - 103:14

# 8

**801d2a** - 86:8, 92:9,
95:22, 97:8, 102:2,
103:8, 103:21
**804** - 5:9
**804b6** - 4:24, 5:10,

111:11, 115:6,
115:19, 116:5,
116:23, 117:4
**806** - 91:3
**846** - 130:3
**851** - 147:13,
148:14, 149:11,
149:22, 150:18
**8:30** - 39:10
**8:34** - 38:16
**8a** - 139:23, 140:11,
142:15, 143:6

# 9

**954** - 102:12
**98** - 109:8

# A

**able** - 41:12, 89:22,
94:2, 96:20, 119:15,
119:24, 120:14,
131:22
**above-entitled** -
151:6
**absolute** - 148:21
**Absolutely** - 55:9
**absolutely** - 11:20,
92:7, 102:24
**abundance** - 147:11
**accessories** - 125:4
**accessory** - 125:24
**according** - 13:17,
32:22, 62:18, 116:3,
138:12, 138:14,
138:15
**According** - 36:2
**account** - 143:18
**accuracy** - 109:25
**accurate** - 66:12
**accurately** - 19:5,
127:9
**acquiesced** -
111:14
**acquit** - 134:8
**acquittal** - 5:19,
5:22, 6:16, 7:17,
110:21, 117:17,
119:3, 119:8
**acquitted** - 5:3, 5:5,
6:22, 118:2, 119:2,
119:3, 119:8
**act** - 3:6, 113:6,
116:14, 123:14,
125:11, 138:13, 140:1
**acting** - 2:23, 3:10,
10:25
**active** - 135:17
**actively** - 136:11
**activities** - 7:12,
57:22
**activity** - 59:20,
121:20, 122:10
**actor** - 142:4
**acts** - 6:14, 115:1,
124:22, 127:18,
130:3, 130:4, 130:5,
130:19, 130:21,
135:9, 138:10, 140:1
**actual** - 90:8
**added** - 124:15
**adding** - 141:14
**addition** - 7:21
**address** - 4:21, 5:8,
5:11, 5:16, 6:22, 8:14,
8:20, 8:23, 13:9,
106:9, 106:13,
106:19, 110:15,
110:24, 112:18

**addressed** - 7:7,
88:8, 111:23, 113:17
**addressing** - 12:24,
125:13
**adjacent** - 66:25
**admissibility** -
100:2
**admissible** - 7:10,
90:21, 91:7, 92:22,
103:15, 103:25,
105:9, 112:5, 115:5,
145:7, 145:11
**admission** - 4:4,
85:9, 85:25, 86:4,
86:11, 90:7, 91:11,
92:9, 92:10, 94:19,
98:3, 102:1, 103:7,
104:12, 105:5, 118:20
**admissions** - 95:20
**admit** - 4:24, 92:19,
110:17, 113:2, 117:9
**admitted** - 7:6,
86:5, 93:2, 103:22,
105:2, 115:4, 116:12,
143:17, 143:20
**admitting** - 96:18,
113:6
**adverse** - 112:22
**advise** - 37:2, 51:12
**advised** - 37:20,
45:25, 85:22, 102:5,
102:6
**aerial** - 19:21, 31:10
**affirmance** - 145:13
**affirmed** - 7:9,
111:23, 112:15
**affirming** - 142:22
**afford** - 37:9
**afternoon** - 2:21,
19:9, 146:16
**afterthought** -
134:16, 134:20
**age** - 46:6, 57:10
**agent** - 33:10
**Agent** - 2:10, 2:12,
38:22, 39:13, 39:14,
40:3, 46:25, 54:8
**agents** - 38:21
**ago** - 87:9
**agree** - 18:16,
22:23, 97:24, 106:18,
111:1, 112:22, 116:6,
118:13, 118:15
**agreeable** - 13:2,
13:5
**ahead** - 60:12, 73:6,
77:15, 81:18, 88:19,
89:6, 95:9, 112:17,
127:12
**ahold** - 17:7, 27:2
**aided** - 119:24
**ajar** - 120:21
**Alaska** - 35:11,
36:18, 36:19, 48:24
**albeit** - 98:25
**alcohol** - 79:8
**Alford** - 99:6
**allegation** - 114:8,
136:24, 137:8,
137:12, 138:2, 138:4
**allegations** -
139:13, 144:3
**alleged** - 4:2, 6:2,
66:2, 93:13, 94:25,
111:18, 113:16,
115:1, 136:17,
136:21, 137:8, 142:17
**allegedly** - 9:11,
92:21, 135:12,
138:12, 138:16

**allowed** - 33:9,
145:11
**alluded** - 60:17
**alludes** - 139:3
**almost** - 60:14,
97:15, 100:24, 134:16
**altercation** - 82:17
**America** - 1:3
**amount** - 95:22,
103:7, 103:12, 148:16
**amounts** - 11:13
**analogous** - 142:23
**analysis** - 91:3,
91:14, 96:25, 115:18,
116:5, 123:25
**animated** - 51:8
**Annor** - 36:19, 48:23
**annoying** - 41:13
**answer** - 54:12,
123:22
**Anthony** - 151:8,
151:9
**anticipate** - 115:7
**Antonio** - 1:7, 2:6,
24:4, 24:14, 34:19,
35:23, 63:17, 64:14,
73:5
**anyway** - 52:25,
98:9, 120:21, 131:23,
143:21, 145:7
**apart** - 15:8, 97:7,
122:6
**apologize** - 81:17,
88:1
**appear** - 51:4, 51:5,
51:6, 65:2, 70:6,
72:11, 74:18, 76:17,
79:3
**appearance** - 39:5,
45:17, 45:18, 45:19,
45:21, 47:3, 85:23
**Appearances** - 1:15
**appearing** - 101:7
**applicable** - 102:15
**applies** - 91:14
**apply** - 150:17
**appointed** - 2:23,
3:5, 3:14, 3:19, 10:25,
37:10
**approach** - 14:20,
20:6, 58:10, 58:12,
59:21, 65:21
**approached** - 21:4,
27:19, 58:8, 58:18,
75:12, 89:1, 89:8,
89:11
**appropriately** -
130:17
**approval** - 46:2
**approved** - 46:3
**approximate** - 19:9
**apt** - 115:18
**area** - 17:25, 18:8,
19:23, 20:17, 21:20,
22:17, 25:5, 25:21,
27:23, 32:1, 35:12,
43:16, 49:6, 52:10,
57:19, 67:7, 84:19,
102:1
**arguably** - 121:13
**argue** - 88:11, 92:8,
94:20, 133:12
**argued** - 103:1,
141:25
**arguing** - 90:25,
141:21
**argument** - 12:21,
83:21, 90:19, 95:7,
107:6, 108:24,
110:25, 130:7, 131:2,

2

139:18, 140:14
**arising** - 111:20
**arrangement** -
11:20
**array** - 88:9, 88:11,
88:13, 106:16, 106:19
**arrest** - 21:10, 35:5,
36:10, 36:11, 37:1,
38:4, 43:14, 54:25,
58:20, 64:4, 67:21,
69:4, 71:12, 73:25,
75:21
**arrested** - 15:15,
24:20, 36:15, 43:22,
47:25, 48:6, 48:8,
49:19, 49:21, 53:2,
58:19, 58:21, 58:22,
60:16, 61:22, 62:3,
64:17, 80:7, 82:8,
94:12, 99:4, 99:11,
99:12, 99:18, 100:11,
119:1, 121:21, 122:7,
126:17, 133:25
**arresting** - 59:10,
59:19, 98:11
**Arrington** - 121:2
**arrived** - 48:19
**aside** - 44:8
**aspect** - 91:23
**assault** - 69:21,
72:4, 78:19
**Assault** - 74:12,
76:11
**assaulted** - 82:19,
82:20
**asserted** - 114:14,
114:19, 114:24,
115:5, 115:20, 116:20
**assigned** - 13:21,
14:7, 33:8, 33:11
**assignment** - 63:4
**Assistant** - 1:17,
2:4, 2:10
**associates** - 59:11,
122:12
**assume** - 26:12,
113:7
**asthma** - 39:18,
40:21, 41:10
**asthmatic** - 41:2
**attached** - 108:13
**attachment** - 20:10,
31:15, 31:16
**attack** - 39:18,
40:22, 41:10, 119:20,
120:12
**attacked** - 132:1
**attempt** - 14:17,
35:5
**attempted** - 6:16,
6:18, 14:15, 119:2,
122:9
**attend** - 147:2
**attention** - 14:5,
14:14, 15:21, 33:25,
41:19, 66:20, 67:23,
70:10, 72:20, 74:24,
77:7, 109:25
**Attorney** - 2:5, 2:10
**attorney** - 21:24,
28:22, 28:25, 29:1,
37:9, 37:10, 52:25,
100:5, 100:6
**attorney's** - 120:4
**Attorneys** - 1:17
**August** - 70:10,
72:21, 72:24, 81:12,
81:13, 89:10, 91:11,
150:25
**author** - 18:19

**authority** - 8:21,
10:1, 11:15
**available** - 54:13
**avoid** - 98:13
**awry** - 117:25

**B**

**baby** - 93:11, 129:9
**backed** - 30:11
**bad** - 92:14
**badge** - 28:15
**bagging** - 94:21
**Baltimore** - 5:20,
6:21, 13:22, 14:9,
15:11, 15:12, 33:6,
33:16, 38:5, 38:7,
39:11, 39:16, 39:20,
45:10, 45:13, 46:19,
53:9, 53:12, 54:5,
63:1, 97:13, 118:2,
118:3, 130:10, 135:2
**band** - 55:13
**base** - 130:2,
148:16
**baseball** - 41:21
**Based** - 107:5
**based** - 8:18, 10:23,
11:8, 14:15, 65:15
**basis** - 12:8, 64:25,
86:7, 92:7, 92:13,
93:1, 93:21, 116:24,
117:10, 118:19,
119:11
**basketball** - 41:15,
54:25, 55:24
**bears** - 83:24, 143:1
**beat** - 120:14
**beating** - 119:22
**became** - 10:15,
126:13, 130:21
**become** - 33:9,
60:8, 131:6
**becomes** - 138:13
**becoming** - 41:13,
91:24
**beef** - 128:22
**began** - 37:11,
37:17
**begin** - 53:25,
54:12, 59:8, 59:12,
71:6, 131:7
**beginning** - 107:2,
147:1
**begins** - 51:1
**begun** - 132:11
**behalf** - 2:15, 2:17
**behind** - 67:14,
123:6
**behold** - 26:13
**believes** - 95:14
**belly** - 55:13
**belts** - 55:12
**bench** - 34:9, 34:19,
35:3, 35:22
**Bennett** - 1:13
**best** - 88:19,
123:18, 139:2, 139:14
**Between** - 63:14
**between** - 2:18,
24:1, 55:23, 65:8,
71:2, 71:3, 89:20,
123:6
**beverage** - 79:8
**beyond** - 60:7,
124:24, 127:20, 150:9
**Biggers** - 109:9

**Bill** - 82:9, 82:13
**binder** - 14:23,
15:3, 15:8
**binding** - 9:8
**bird** - 99:20
**bit** - 20:24, 96:24,
96:25
**bite** - 49:13
**Black** - 121:21,
133:24, 139:11
**blacktop** - 19:24,
20:21, 21:6, 27:11,
27:12, 35:12, 48:20
**bleed** - 23:13,
139:12
**block** - 16:6, 19:18,
73:9, 73:11, 73:12,
91:13, 104:1, 104:4
**bodies** - 70:20,
89:13, 92:2, 92:20,
95:25, 104:9
**book** - 107:3,
107:11, 108:4,
108:10, 108:16,
108:23, 109:15
**booking** - 107:13
**born** - 97:10, 97:13
**bottom** - 149:15
**bought** - 129:8,
129:11, 132:1, 132:2,
132:10
**box** - 74:12
**braggadocio** -
101:6
**bragging** - 91:18,
93:12
**Brathwaite** - 109:7
**Bravado** - 95:25
**bravado** - 92:8,
93:8, 95:23, 96:14,
96:15, 104:10
**break** - 41:23,
89:20, 105:24, 106:1
**breathing** - 40:19
**Brewer** - 144:24
**Brian** - 13:13, 13:15,
13:20, 101:20
**bribed** - 141:14
**brick** - 129:10
**bridge** - 42:3
**brief** - 8:6, 105:23,
111:9, 112:21
**Brief** - 106:2
**briefing** - 7:20
**Briefly** - 24:8, 47:17,
59:3
**bring** - 41:19,
115:17, 126:23,
129:4, 129:16, 141:21
**bringing** - 131:4
**broad** - 143:6
**brother** - 72:22,
72:25, 104:3
**brought** - 6:20,
6:21, 47:1, 126:19,
126:20, 126:24,
140:24, 141:1, 141:2
**building** - 47:2
**buildings** - 89:20
**bunch** - 57:21
**burden** - 83:24,
130:24, 133:13,
139:16, 140:10,
141:4, 143:1, 145:4
**business** - 138:2
**bust** - 82:9
**busted** - 82:13
**busy** - 36:6
**buy** - 129:11
**Byers** - 7:1, 7:2, 7:4,

7:8, 7:10, 111:21,
112:9, 112:12,
113:25, 117:23,
135:15, 140:18,
140:19, 140:24,
142:20, 142:21,
142:23, 145:8, 145:12
**Byers'** - 113:17,
131:3

**C**

**cannot** - 37:9,
122:15
**Cao** - 38:22, 39:13,
39:14, 40:3, 46:25,
54:8
**capacity** - 14:8,
102:19
**Caprese** - 16:12,
26:12
**caption** - 6:6
**car** - 17:2, 21:16,
27:19, 28:7, 29:11,
30:7, 30:10, 30:12,
48:16, 56:22, 56:24,
56:25, 67:9, 68:18,
68:24, 71:8, 71:19,
73:18, 73:20, 74:6,
76:2, 78:2, 78:4,
78:10, 81:2, 85:19,
129:10, 129:14,
129:15, 129:17,
129:18, 129:21
**card** - 16:21, 16:23,
117:10, 118:19,
80:2
**Cardwell** - 143:5
**care** - 41:20, 86:15,
86:16
**cared** - 94:8
**carefully** - 142:21
**Carl** - 112:11,
112:13, 113:25
**carried** - 136:3
**carry** - 80:2, 80:4,
80:5, 80:6
**cars** - 81:4
**Case** - 1:6
**case** - 2:3, 2:6, 2:24,
3:17, 3:21, 5:13, 6:2,
6:8, 6:11, 6:19, 6:21,
6:22, 7:1, 7:8, 8:18,
9:2, 9:6, 9:9, 9:13,
10:4, 11:1, 11:17,
11:21, 12:22, 14:11,
31:6, 34:13, 34:16,
34:20, 35:22, 35:23,
42:18, 42:23, 43:21,
43:22, 43:23, 43:24,
43:25, 44:1, 47:7,
55:21, 56:4, 56:6,
56:7, 56:20, 65:13,
77:20, 85:7, 92:16,
132:14, 132:25,
133:1, 134:22,
134:25, 135:5,
135:12, 136:11,
138:17, 142:20,

142:21, 142:22,
142:23, 143:5, 144:8,
144:12, 145:8,
145:12, 145:13,
147:9, 147:20, 148:2,
148:7, 149:8, 150:9
**cases** - 3:6, 112:18,
120:3, 126:18,
132:20, 135:16, 145:2
**catch** - 67:15,
88:18, 95:23
**Catherine** - 52:7,
52:12, 52:13, 52:19,
52:24
**caused** - 23:11
**caution** - 147:11
**cautionary** - 115:9,
116:17, 117:13
**Cd** - 107:10, 107:16,
107:17, 107:22,
108:23
**Cds** - 80:15
**cellphone** - 16:21,
17:8, 17:19
**center** - 41:25
**certain** - 10:7,
29:24, 41:17, 57:20,
58:15, 95:22, 130:5,
147:18, 148:15,
150:15
**certainly** - 54:15,
54:18, 90:24, 93:25,
94:20, 96:14, 101:1,
103:7, 103:9, 120:11
**Certainly** - 65:23
**certainly** - 110:1
**certify** - 151:4
**certiorari** - 102:23
**chain** - 134:10,
135:8, 140:13, 143:15
**chambers** - 146:13,
146:22, 147:7, 150:20
**changes** - 130:22
**characterization** -
11:9
**charge** - 6:17, 98:7,
98:11, 119:16,
124:10, 128:1,
129:25, 132:23,
134:15, 137:25,
138:1, 138:18,
140:20, 140:21,
140:23, 142:12,
142:13, 142:17,
144:5, 144:9, 144:15
**charged** - 5:2,
15:11, 15:15, 52:1,
118:1, 121:15,
122:17, 136:23,
138:9, 139:25,
143:15, 147:15,
150:12
**charges** - 35:6,
45:22, 45:23, 69:23,
119:2, 119:23,
120:15, 120:20,
122:5, 124:1, 143:1,
144:4, 144:13
**Chasanow** - 112:2
**chase** - 67:13
**chased** - 68:6
**check** - 107:9,
125:10
**checked** - 44:16
**child** - 97:10,
141:15
**children** - 52:11,
97:14, 97:15
**children's** - 52:23
**choice** - 148:21

3

**choose** - 120:12
**Cid** - 13:21
**cigarette** - 41:14, 53:5, 53:6
**Circuit** - 3:18, 5:15, 5:20, 7:9, 9:2, 9:7, 11:14, 11:18, 102:11, 102:22, 102:23, 111:23, 111:25, 112:15, 116:16, 118:1, 131:10, 131:11, 133:16, 139:21, 142:22, 143:4, 143:5, 143:12, 143:14, 143:21, 143:23, 144:2, 144:7, 144:23, 144:25, 145:12
**Circuit's** - 143:10
**circumstances** - 77:24, 102:18
**cite** - 11:17, 11:24
**cited** - 9:7, 143:10
**citizen** - 94:9
**City** - 5:20, 6:21, 13:22, 14:9, 15:12, 33:6, 33:17, 63:1, 118:2, 118:3, 135:2
**city** - 137:3, 137:6
**civilians** - 30:19
**claims** - 143:24
**clarification** - 85:3
**clarify** - 124:8
**classic** - 92:12, 92:13
**clause** - 109:1
**clear** - 6:24, 25:16, 34:12, 58:20, 60:7, 73:3, 95:20, 126:14
**Clearly** - 97:4, 102:7
**clearly** - 10:3, 102:4, 102:21, 103:17, 109:23, 111:11, 113:23, 139:21, 143:19, 145:6, 145:10
**Clerk** - 13:18, 32:23, 62:19, 107:22
**clerks** - 5:12
**cliche** - 97:15
**client** - 5:19, 99:20, 101:2, 101:9, 113:6, 120:14, 135:18, 136:22, 149:25
**client's** - 120:19, 137:8, 138:11
**Clinton** - 1:16, 2:5, 2:10
**close** - 59:11
**closed** - 38:2
**clothes** - 28:10, 68:16, 68:17, 80:24, 81:1
**co** - 125:23
**co-conspirator** - 125:23
**cocaine** - 130:2, 147:18, 148:16
**Code** - 130:2, 147:13
**coercion** - 102:25
**coercive** - 102:20
**colleagues** - 24:22
**combined** - 123:16
**comfortable** - 94:14, 105:1
**coming** - 67:4, 76:22, 99:17, 111:22, 117:3, 122:6, 133:19
**comment** - 41:9,

93:18, 94:25, 95:15, 95:17, 95:23, 97:9, 97:11, 97:18, 100:1, 103:11, 103:25, 104:8, 105:1, 105:2, 127:8
**comments** - 41:21, 61:8, 66:2, 103:2, 103:14, 103:16, 103:23, 103:24, 112:10
**commit** - 70:24, 114:25
**committed** - 70:23, 98:14, 104:13, 138:13
**common** - 57:19, 141:8
**compensated** - 9:10, 10:13
**compensation** - 10:23, 11:13
**complete** - 22:25
**completely** - 54:23, 105:14, 131:5
**compromise** - 140:9
**computer** - 1:24
**computer-aided** - 1:24
**concerned** - 97:9, 135:20
**concluded** - 32:12, 83:9, 150:19
**Concluded** - 151:2
**concludes** - 83:11
**condition** - 23:9, 39:12, 39:15, 40:11
**conducive** - 109:4, 110:4
**conduct** - 90:8, 90:24, 90:25, 91:7, 91:16, 102:21, 127:19, 141:14
**conference** - 146:18, 146:19, 146:25, 147:3, 147:8, 150:21
**confession** - 102:17
**confirm** - 15:10
**confirming** - 94:22
**conflict** - 3:10
**confusing** - 100:10, 100:17, 101:8, 120:5
**confusion** - 100:25, 120:9
**Congress** - 148:14, 149:1
**connect** - 142:16
**connected** - 139:14, 140:6, 141:12, 142:12
**connection** - 7:11, 110:21, 114:4, 115:1, 117:24, 144:6
**consciousness** - 99:10
**consequence** - 103:6
**consider** - 59:16, 100:12, 100:15
**considered** - 109:10
**considers** - 109:20
**consists** - 107:12
**conspiracy** - 6:14, 91:1, 91:8, 124:18, 124:23, 125:24, 129:6, 129:23, 129:25, 130:4, 130:6, 130:22, 132:13, 132:16, 132:22,

135:8, 135:9, 140:20, 141:6, 145:10, 147:15
**conspirator** - 125:23
**contact** - 16:9, 18:25, 64:24
**contacted** - 39:11, 39:13, 54:5
**contacts** - 65:9
**contained** - 114:22
**contemporaneous** - 100:22
**contend** - 8:19
**contendere** - 99:6
**contends** - 115:24
**contention** - 116:21
**context** - 12:22, 92:11, 97:8, 97:21, 100:1, 104:12, 108:9, 113:12, 113:15, 113:22, 115:8, 134:11, 135:10, 135:20, 139:6, 139:19, 140:12, 143:16, 143:19, 144:8, 144:17, 145:3, 145:8, 145:16
**contingency** - 11:19
**continue** - 34:25, 119:15
**continued** - 56:25
**continuing** - 129:2, 137:4
**contraband** - 48:10, 67:19
**controlled** - 94:15, 94:16
**conversation** - 17:17, 18:12, 18:20, 23:18, 27:18, 29:8, 30:7, 30:9, 30:23, 31:24, 50:13, 56:14, 56:18, 59:22, 68:10, 68:20, 69:1, 69:11, 69:15, 70:14, 70:19, 70:23, 71:6, 71:13, 71:25, 72:12, 73:3, 73:14, 73:16, 74:19, 75:3, 75:10, 76:7, 77:17, 77:22, 78:14, 78:16, 79:4, 79:5, 126:12
**conversations** - 50:15, 57:25, 59:24, 61:10, 65:12, 66:19, 72:23, 75:19, 82:5, 82:6, 82:7, 84:25
**converse** - 131:1
**convicted** - 147:16, 149:13
**conviction** - 111:22
**convicts** - 148:18
**cooperate** - 138:5
**cooperating** - 4:6, 8:12, 9:4, 11:5, 12:14, 50:12, 87:20, 106:4, 125:22
**cooperation** - 138:7
**cooperator** - 126:15
**cooperators** - 12:5
**copy** - 14:21, 14:25, 34:12, 66:15, 115:15
**cordial** - 82:22, 82:24
**corner** - 89:19
**correct** - 2:11, 2:24, 2:25, 7:11, 7:13, 8:5, 9:11, 10:8, 11:24, 15:5, 15:16, 20:19,

20:25, 24:2, 26:23, 28:19, 31:1, 34:5, 35:25, 36:12, 36:13, 36:15, 40:1, 42:11, 42:15, 43:3, 48:25, 49:4, 49:8, 49:14, 49:18, 53:13, 61:13, 65:13, 65:16, 65:19, 66:3, 66:10, 66:16, 75:19, 77:10, 80:16, 90:22, 114:16, 114:17, 117:19, 117:20, 133:13, 133:14, 133:18, 134:25, 135:2, 151:4
**Correct** - 15:6, 21:1, 26:7, 26:15, 42:4, 43:17, 44:20, 48:22, 53:10, 53:16, 65:14, 65:17, 65:20, 66:11, 66:14, 66:17, 68:1, 77:11, 77:14, 80:20, 80:23, 81:21, 82:10, 82:18, 82:21, 99:24, 134:21
**correctly** - 4:11, 7:22, 12:2, 147:21, 148:1
**counsel** - 2:24, 11:1, 14:21, 24:1, 36:9, 41:17, 52:4, 84:24, 86:21, 88:7, 106:3, 126:5, 130:16, 135:21, 140:21, 146:13, 149:25, 150:20, 150:23
**Counsel** - 87:11, 94:20
**counsel's** - 10:14
**count** - 6:14, 70:21, 89:14, 92:3, 92:21, 95:25, 104:10, 123:10, 123:11, 124:10, 124:18, 124:19, 124:24, 128:1, 129:1, 129:25, 134:9, 134:17, 138:9, 138:12, 141:6, 142:13, 144:8, 144:10, 144:15, 147:15, 147:17
**Count** - 142:11
**counts** - 4:9, 124:14, 124:15, 124:16, 136:5, 141:12, 141:13, 141:18, 142:9, 142:10, 142:16, 143:8
**Counts** - 124:12
**County** - 38:7, 39:11, 39:17, 45:13, 46:19, 53:9, 53:13, 54:5
**county** - 39:20, 45:10
**couple** - 10:12, 10:14, 31:23, 60:22, 85:1, 91:6, 91:22, 123:2
**course** - 14:12, 73:21, 84:9, 108:11, 115:12, 120:18, 127:24, 127:25
**Court** - 1:1, 2:2, 2:9, 2:13, 2:19, 3:2, 4:15, 4:22, 5:7, 5:20, 5:22, 6:1, 6:15, 6:20, 7:3, 7:7, 7:19, 7:25, 8:8, 8:11, 9:1, 9:9, 9:15, 9:23, 10:19, 10:24,

12:4, 13:5, 13:8, 15:13, 16:1, 16:3, 16:6, 17:24, 19:17, 19:22, 20:1, 20:8, 20:23, 23:23, 24:3, 25:6, 25:9, 25:19, 31:3, 31:8, 31:15, 32:3, 32:9, 32:14, 34:16, 34:25, 35:11, 35:21, 36:2, 36:8, 36:18, 36:19, 47:14, 48:23, 60:12, 60:21, 62:6, 62:12, 64:12, 65:23, 66:1, 66:5, 79:15, 81:16, 83:3, 83:5, 83:7, 83:13, 83:20, 83:23, 84:17, 84:21, 85:12, 86:8, 86:12, 86:18, 87:2, 87:7, 87:10, 87:13, 87:25, 88:4, 88:10, 88:18, 89:6, 90:19, 91:14, 91:25, 92:6, 92:19, 93:1, 93:14, 94:24, 95:4, 95:6, 97:3, 97:21, 97:25, 98:15, 99:1, 99:10, 99:22, 99:25, 100:8, 101:14, 105:16, 105:19, 106:3, 106:18, 106:21, 107:7, 107:16, 107:20, 108:21, 109:6, 111:3, 111:6, 113:12, 114:18, 115:16, 116:15, 117:8, 117:21, 118:2, 119:17, 120:23, 124:3, 124:12, 125:7, 126:2, 126:8, 126:23, 127:3, 127:8, 129:24, 133:8, 133:16, 134:9, 134:18, 135:4, 136:17, 136:21, 137:25, 139:16, 141:9, 142:6, 145:24, 146:4, 146:10, 147:25, 148:4, 148:13, 149:5, 150:3
**court** - 2:23, 3:3, 3:5, 3:6, 3:11, 3:12, 4:12, 4:20, 5:3, 5:6, 9:8, 10:25, 11:16, 15:22, 24:1, 35:9, 36:3, 37:4, 37:8, 37:25, 38:2, 38:13, 39:5, 45:21, 61:7, 86:23, 87:6, 93:24, 94:19, 95:10, 96:22, 99:16, 107:11, 107:18, 108:6, 109:20, 110:7, 110:11, 110:14, 110:21, 111:21, 111:22, 112:1, 112:3, 112:25, 113:8, 114:5, 114:6, 115:2, 115:11, 116:7, 117:16, 118:21, 120:25, 123:12, 128:13, 130:23, 131:6, 132:24, 134:22, 141:11, 141:19, 142:10, 143:25, 145:17, 146:9, 146:15
**Court's** - 79:13, 79:17
**court's** - 20:16, 41:19, 102:12, 105:22, 118:23,

120:20
**courthouse** - 45:11, 134:25
**courtroom** - 38:21, 64:9
**covered** - 146:3
**crack** - 139:9
**credibility** - 12:11, 119:20, 120:12
**credit** - 119:13
**credits** - 134:3, 135:25
**crime** - 50:21, 50:22, 53:2, 60:18, 90:22, 96:18, 97:6, 98:13, 103:18, 109:22, 119:25, 120:1, 134:3, 143:14, 143:17, 143:18
**crimes** - 4:4, 49:17, 49:18, 50:9, 57:20, 119:15, 122:8, 133:3, 133:6, 133:7, 133:21, 150:11
**Criminal** - 86:9, 139:24, 142:15
**criminal** - 115:2
**critical** - 132:13, 132:15
**critically** - 102:20
**criticizing** - 9:24, 10:25
**cross** - 47:16
**Cross** - 24:9, 47:18, 79:16, 79:18
**cuffed** - 55:15
**curious** - 45:11
**current** - 63:4
**Curtis** - 42:16, 42:17, 43:5, 85:7
**custodial** - 101:20, 101:22
**custody** - 9:16, 10:7, 10:11, 11:11, 21:10, 36:25, 44:12, 47:4, 53:12, 102:8, 102:10
**customer** - 6:12, 125:5
**customers** - 141:22
**cut** - 71:2, 71:3, 95:7
**cuts** - 118:9

## D

**dark** - 51:3
**date** - 34:8, 35:5, 35:15, 35:16, 43:13
**days** - 59:4, 63:16, 64:8
**daytime** - 19:12
**deal** - 7:25, 12:19, 99:13, 100:13, 101:4, 117:24
**dealing** - 122:12, 133:24, 134:23, 136:7, 136:15
**dealings** - 123:8, 137:6
**death** - 3:16, 3:17, 46:3
**deceased** - 110:19
**December** - 34:6, 34:15, 34:18, 35:14, 35:23, 43:14, 46:23, 51:1, 125:19
**decide** - 134:1
**decision** - 97:2
**declarant** - 111:13,

111:16
**declaration** - 103:9
**declined** - 18:15, 18:17, 21:22, 28:2
**deemed** - 3:5, 101:25, 109:3, 112:5
**Defendant** - 1:9, 1:18, 62:21, 148:12, 149:4
**defendant** - 2:15, 3:14, 4:2, 4:16, 8:4, 14:18, 24:4, 34:3, 34:20, 34:23, 35:6, 64:13, 66:2, 83:15, 83:18, 86:5, 89:11, 95:21, 101:25, 102:5, 102:9, 103:11, 103:20, 103:25, 105:17, 106:6, 109:2, 114:10, 117:12, 125:23, 126:13, 126:14, 126:17, 128:12, 128:13, 142:25, 143:7, 145:3, 146:6, 147:16
**defendants** - 11:4, 20:3, 31:17, 96:14, 101:15, 113:9, 130:24, 142:3, 142:8
**defendants** - 131:7, 139:24, 145:25
**defender** - 93:9
**Defender's** - 3:9
**defense** - 5:5, 7:14, 7:23, 13:6, 88:16, 92:11, 104:14, 108:24, 117:5, 118:22, 118:25, 128:8, 131:14, 131:15, 131:20, 135:21, 144:14, 148:2, 149:24, 150:22
**definite** - 103:4, 103:21
**Definitely** - 61:16
**definition** - 134:2
**definitive** - 123:14
**degree** - 109:24
**delivered** - 129:9
**demeanor** - 23:10, 23:14, 29:7, 47:12, 70:8, 72:15, 74:22, 76:19, 79:11
**demonstrate** - 130:24, 131:17, 131:18, 133:1, 141:4, 142:1
**denied** - 11:7, 12:16, 22:16, 101:16, 102:24, 105:20, 106:4, 106:5, 110:13, 142:11, 145:5, 145:15
**denies** - 145:17
**deny** - 9:22, 12:12, 110:11
**departed** - 38:22
**Department** - 33:7, 33:17, 63:1
**depth** - 84:24
**deputized** - 33:10
**Deputy** - 13:18, 32:23, 62:19
**derivation** - 137:15
**describe** - 29:9, 70:8, 70:14, 70:22, 72:15, 75:3, 77:17, 79:10, 94:10
**described** - 91:11
**describing** - 19:6
**description** -

109:25
**designed** - 123:4
**detail** - 39:19, 84:5, 86:24, 87:15, 87:16, 120:11, 149:20
**details** - 14:11
**detain** - 71:21
**detained** - 69:13
**detective** - 14:9
**Detective** - 13:13, 13:20, 13:25, 20:13, 30:4, 30:9, 30:17, 30:25, 31:20, 32:10, 32:18, 32:25, 33:4, 34:2, 47:20, 62:6, 67:3, 67:14, 68:23, 70:19, 71:11, 73:24, 75:17, 77:23, 84:7, 84:16, 84:22, 84:23, 85:13, 88:21, 98:6, 102:3, 102:4
**detectives** - 118:4
**determination** - 4:7, 102:20, 113:18, 118:10, 141:7
**determine** - 12:10, 110:10, 113:20
**determining** - 109:19, 113:20
**devilishly** - 127:7
**difference** - 44:23, 93:23
**different** - 40:15, 54:23, 118:18, 123:25, 135:15, 135:16, 136:2
**difficult** - 54:10
**difficulty** - 40:18
**Diggs** - 16:12, 17:4, 146:11
**Direct** - 13:23, 33:2, 62:23
**direct** - 14:5, 14:14, 128:3
**directing** - 15:21, 33:25
**directly** - 49:16, 127:23, 128:21
**discipline** - 130:6
**disclosing** - 133:3
**disclosure** - 133:7
**discount** - 99:20
**discovery** - 10:18, 114:4, 124:21, 138:21
**discretion** - 148:8, 148:19, 148:23, 148:25, 149:1, 149:9, 149:14, 149:18, 150:13, 150:15
**discuss** - 32:11, 62:7, 83:8
**discussed** - 50:11, 65:11, 70:12, 87:20
**Discussion** - 59:2
**discussion** - 29:5, 57:4, 74:25, 90:10
**discussions** - 98:23, 98:25, 99:2, 100:3, 103:13
**dispute** - 34:22
**disregard** - 116:25
**disrespect** - 113:14
**distance** - 90:16
**distress** - 41:2
**distribute** - 130:1
**District** - 1:1, 1:14, 15:12, 63:5, 102:14
**divulged** - 134:23, 135:21

**Divulged** - 134:25
**docket** - 34:12, 34:16, 121:2
**doctor** - 40:25
**doctors** - 56:9, 56:13
**document** - 133:22
**done** - 9:16, 38:2, 41:16, 60:14, 127:18, 130:11
**door** - 30:11, 120:19, 120:21, 132:6
**doors** - 56:10
**Dorton** - 19:17, 19:22, 20:23
**double** - 125:9
**doubt** - 100:24, 150:10
**down** - 21:13, 21:21, 25:20, 27:25, 29:25, 32:10, 32:15, 39:7, 41:23, 41:25, 43:18, 49:23, 62:7, 71:1, 83:8, 85:4, 85:14, 85:15, 86:1, 90:1, 95:7, 103:3, 108:14, 121:3
**downtown** - 17:15
**drag** - 60:9
**dragged** - 127:4
**draw** - 21:12
**dressed** - 28:9
**drinking** - 79:5
**drive** - 55:5, 55:16, 56:17
**driving** - 55:4, 56:11
**drop** - 38:4, 45:15
**dropped** - 38:17, 39:9, 46:18
**drug** - 6:12, 7:11, 50:12, 51:7, 59:20, 63:5, 77:20, 91:8, 98:7, 98:11, 117:24, 121:19, 122:10, 122:12, 123:8, 123:17, 124:17, 124:18, 125:23, 127:19, 127:25, 128:22, 129:2, 129:22, 130:8, 130:9, 132:17, 132:22, 133:24, 134:23, 136:7, 136:15, 136:24, 137:13, 137:18, 137:23
**Drug** - 49:17, 49:18
**drugs** - 48:9, 82:13, 122:7, 122:8, 123:15, 125:5, 136:3, 137:17, 139:8
**Drunk** - 29:20
**drunk** - 51:4, 51:5
**Duckett** - 43:11, 43:12, 43:14, 43:21, 54:18, 85:7, 90:14, 125:21, 126:13, 128:8, 128:9, 128:23, 129:22, 132:4
**Duckett's** - 139:2
**due** - 109:1
**duly** - 13:16, 32:21, 62:17
**during** - 29:7, 41:21, 41:24, 42:5,

70:11, 71:12, 72:11, 74:18, 77:13, 78:16, 79:24, 84:19, 112:4, 125:20
**During** - 15:24, 74:25, 77:8, 78:16
**duties** - 73:21

## E

**early** - 99:2, 99:20, 103:10
**easier** - 89:5
**easiest** - 106:15
**easy** - 142:4
**edification** - 20:17
**effect** - 118:17, 147:22, 149:8, 149:21
**efficiency** - 143:7, 143:25
**efforts** - 10:20
**eight** - 125:13, 133:22
**eight-page** - 133:22
**either** - 11:11, 15:11, 15:16, 29:2, 54:7, 118:9, 118:16, 139:25
**element** - 115:23, 117:11
**Elementary** - 67:5
**elevator** - 47:5, 47:6
**eleven** - 15:25
**elicited** - 92:24
**eligible** - 3:8, 3:15
**email** - 88:10, 88:12
**employed** - 33:4, 33:6
**encompasses** - 126:22
**encounter** - 16:16, 22:25, 66:20
**encroach** - 137:18
**end** - 6:5, 34:1, 138:5
**ended** - 53:18, 69:15, 71:25, 76:7, 78:14, 90:17
**ends** - 7:18
**enforce** - 130:5, 136:23, 136:24, 138:8, 138:11
**engaged** - 111:14, 138:12
**enterprise** - 138:7
**entire** - 20:17, 71:8, 75:13, 78:4, 108:22, 109:15
**entirely** - 118:24
**entitled** - 151:6
**enure** - 104:15
**equipment** - 54:23
**equipment's** - 54:13
**equipped** - 54:7
**erroneously** - 135:21
**especially** - 122:20
**essence** - 84:15, 86:17
**Essentially** - 8:18, 102:15, 139:23
**essentially** - 6:15, 10:16, 10:20, 11:19, 52:25, 53:11, 57:10, 84:8, 86:24, 92:1, 108:1, 109:9, 111:17, 112:3, 113:21, 114:11, 114:12, 117:17, 130:4, 130:7,

TONY ROLLAND, RMR-CRR

focr.mdd@gmail.com

5

134:10, 135:8,
135:10, 136:23,
138:10, 140:12,
148:19, 149:12,
149:16
**established** - 109:6
**estimate** - 59:4
**etcetera** - 14:12
**evaded** - 141:16
**evaluating** - 102:16
**evening** - 25:15,
39:10, 40:16, 70:16
**event** - 118:20,
129:7, 149:2
**events** - 134:11,
135:8, 140:13, 143:15
**eventually** - 35:10,
35:11, 67:15
**evidence** - 3:23,
3:25, 4:4, 5:18, 7:9,
10:6, 83:17, 83:25,
91:4, 92:1, 92:14,
98:3, 100:14, 102:24,
105:2, 106:10,
109:19, 109:23,
114:2, 114:3, 116:12,
117:22, 118:19,
121:6, 122:15,
122:16, 126:3,
126:19, 131:9,
132:13, 132:20,
132:21, 135:11,
137:23, 141:3,
143:14, 144:16,
145:17, 148:18
**Evidence** - 98:24,
111:12
**evidentiary** - 115:6
**exactly** - 35:15,
61:7, 123:3, 131:11,
133:4, 141:23
**Examination** -
13:23, 24:9, 31:18,
33:2, 47:18, 60:23,
62:23, 79:18
**examination** -
47:16, 79:16
**example** - 54:19,
92:15
**except** - 7:21, 106:7
**exception** - 5:9,
105:20, 111:12,
111:17, 112:6
**exceptions** - 105:11
**exclude** - 3:23, 4:5,
5:1, 8:12, 9:4, 11:5,
12:14, 101:13, 106:4,
106:9, 110:12,
110:20, 117:16,
120:24
**excluded** - 93:2
**Excuse** - 73:13
**executed** - 35:23
**exercise** - 150:15
**exhibit** - 14:24,
20:4, 20:9, 31:5,
31:11, 65:24, 66:1,
107:21, 108:23
**exists** - 144:6
**expect** - 9:22,
123:13
**expense** - 9:14,
9:18
**expert** - 51:7
**explain** - 81:24,
127:10, 135:13,
148:13, 149:20,
149:25
**explained** - 45:12,
45:20, 51:9, 85:21

**explaining** - 56:23,
143:16
**explanation** - 22:12
**exposing** - 128:6
**extent** - 95:14,
103:23, 104:23,
106:7, 114:21, 115:3,
116:24, 117:8, 119:19
**extents** - 104:5,
104:6
**eyewitnesses** -
11:10, 12:1, 12:5,
131:8, 132:12

### F

**F.2d** - 102:12, 143:3
**F.3d** - 5:14, 11:18,
102:22, 143:5,
143:22, 144:24
**F.app'x** - 143:12
**F.supp.2d** - 102:14
**face** - 22:2, 29:8,
139:17
**face-to-face** - 22:2,
29:8
**facility** - 38:10
**fact** - 3:7, 22:5,
35:3, 65:18, 69:15,
82:22, 90:5, 90:13,
97:12, 98:23, 103:6,
104:13, 110:6,
113:23, 114:2,
118:11, 119:3, 120:8,
128:6, 133:16,
136:19, 141:21,
141:24, 144:1
**factors** - 109:10,
109:21
**facts** - 11:23, 135:4
**factual** - 104:11
**Fair** - 61:10, 64:1
**fair** - 49:5, 65:8,
82:16, 122:14
**fairly** - 6:24
**fall** - 131:20, 132:5
**familiar** - 41:3,
57:21, 57:22, 63:9,
67:7, 140:18
**family** - 82:6,
148:24
**far** - 24:24, 30:19,
48:8, 48:12, 53:4,
125:16, 127:20,
132:21
**fast** - 81:15
**fatal** - 122:23,
124:25
**fatherless** - 97:15
**fathers** - 95:18,
97:13
**Fbi** - 4:24, 5:8,
33:11, 33:13, 36:10,
38:5, 53:3, 77:9,
110:17, 114:6, 114:8,
116:23, 128:2, 144:19
**federal** - 9:2, 11:16,
15:19, 33:10, 45:11,
76:23, 99:16, 126:18,
133:3, 133:6, 133:21,
134:2, 135:18,
136:13, 149:18,
150:13
**Federal** - 86:8,
111:12, 139:23,
142:15
**feds** - 43:23, 75:5,
76:22, 77:20, 93:10,
98:6, 98:10, 98:13
**felt** - 90:3

**fertile** - 119:7
**few** - 47:24, 81:16
**fifth** - 138:21
**fight** - 48:13,
122:14, 123:17
**figure** - 131:21,
146:25
**figuring** - 131:22
**file** - 15:4, 36:3,
88:16
**filed** - 83:15, 87:9,
87:19, 88:5, 106:25,
107:1, 130:16,
130:17, 147:12,
147:13
**files** - 126:6
**filled** - 44:16
**final** - 130:16
**finally** - 84:11
**finder** - 118:11
**fine** - 9:23, 40:14,
111:3, 111:5
**fingerprinted** - 38:6
**finishes** - 51:21
**fire** - 122:20
**firearm** - 21:12,
91:23, 144:20
**firearms** - 91:17,
91:18, 91:20, 136:3,
144:21
**First** - 11:8, 57:16,
60:25, 86:25, 88:25,
101:19, 104:7, 112:24
**first** - 4:23, 13:12,
13:16, 24:14, 32:21,
37:11, 42:13, 45:21,
56:22, 62:17, 84:1,
84:6, 88:7, 98:21,
106:15, 110:24,
113:22, 114:11,
114:15, 124:1, 124:8,
125:11, 130:23, 142:8
**five** - 3:22, 3:22,
4:10, 51:1, 63:16,
64:8, 69:2, 109:10,
122:23, 124:12,
142:10
**Five** - 14:4
**fixture** - 61:11, 64:1
**flee** - 67:10
**flesh** - 25:3, 50:4
**fleshed** - 88:17
**fluctuated** - 55:23
**Flynn** - 29:2, 52:7,
52:12, 52:13, 52:19,
52:22
**focus** - 115:12
**focused** - 134:20
**follow** - 41:22,
110:8, 121:1, 134:18
**follow-up** - 121:1
**following** - 38:6,
89:17, 142:11
**Following** - 121:20
**follows** - 13:17,
32:22, 62:18, 86:24
**foot** - 21:5, 67:10,
67:14
**football** - 41:15,
41:21, 54:25, 82:6
**force** - 23:3, 33:12,
43:14, 78:25
**forces** - 33:8
**foregoing** - 151:4
**forehead** - 119:5
**forfeiture** - 4:24,
5:10, 112:6, 115:6
**forget** - 121:21,
133:25
**formal** - 18:15,

21:22
**formalize** - 22:21
**former** - 137:11
**forms** - 143:17
**forth** - 6:23, 88:22,
90:10, 124:24, 126:4,
147:18
**fought** - 136:4
**four** - 4:10, 12:18,
44:2, 63:16, 124:12,
128:15, 128:17,
142:10
**Fourth** - 3:17, 5:15,
7:9, 9:1, 9:7, 11:14,
11:18, 102:10,
102:21, 102:23,
111:23, 111:25,
112:15, 116:15,
131:10, 131:11,
133:16, 139:21,
142:21, 143:4, 143:9,
143:12, 143:13,
143:21, 143:22,
144:2, 144:6, 144:22,
144:25, 145:12
**frankly** - 111:19,
118:8, 137:3, 144:11,
147:1
**free** - 71:23, 74:8,
76:5, 78:12
**friend** - 129:15
**friends** - 129:15,
132:18
**frisk** - 58:4
**frisked** - 58:6
**front** - 14:22, 55:14,
55:16, 66:15, 90:4,
128:11
**Fuchs** - 11:16, 2:5,
2:10, 2:13, 62:10,
62:14, 62:24, 64:15,
65:21, 65:24, 66:4,
66:6, 66:8, 79:13,
83:5, 83:6
**full** - 10:18
**furtherance** -
127:18, 130:3, 135:9
**Furthermore** - 11:14
**furthermore** -
11:22, 92:12

### G

**game** - 122:12
**gardener** - 137:20,
137:22
**Gary** - 1:18, 2:17,
72:21, 72:24
**gather** - 3:9, 5:19,
6:16, 10:7, 117:18
**general** - 32:1,
55:24, 70:18, 82:4,
95:17, 97:9, 108:25,
109:15, 119:25
**Generally** - 76:19,
79:10
**generally** - 56:20,
72:14, 74:21, 145:2
**generation** - 100:20
**generic** - 119:25
**genius** - 131:21,
131:22
**Gesner** - 34:21
**girl** - 42:14
**girlfriend** - 16:2
**Girlfriend** - 16:15
**given** - 10:17,
54:10, 102:17, 118:12
**glad** - 84:1, 95:13,
98:16, 106:22, 111:3,

112:19, 118:7, 121:7,
124:5, 133:10
**Goldman** - 143:3
**Government** - 66:1
**government** - 3:15,
3:16, 4:13, 5:4, 9:14,
9:17, 9:21, 10:1,
10:23, 11:25, 13:2,
13:12, 20:9, 31:9,
31:11, 62:10, 65:24,
83:23, 85:3, 89:16,
91:4, 92:17, 95:8,
99:23, 100:6, 100:7,
101:24, 102:21,
105:13, 106:14,
107:1, 107:7, 107:19,
107:20, 107:25,
108:23, 111:1, 113:3,
113:7, 114:15, 115:7,
115:23, 115:24,
116:3, 117:4, 117:19,
118:3, 121:9, 124:8,
125:14, 125:22,
132:2, 132:10,
134:12, 136:9, 137:1,
137:14, 137:21,
138:14, 140:16,
142:19, 143:11,
145:21, 146:5, 147:5,
147:12, 147:23,
149:11, 149:23,
150:9, 150:21
**government's** -
4:18, 6:5, 6:23, 19:19,
20:2, 20:10, 104:20,
109:16, 110:17,
110:20, 111:10,
117:9, 117:15,
120:24, 123:6, 131:7,
137:12, 139:14, 146:9
**grand** - 15:19, 34:8,
126:20, 127:5,
127:14, 127:15,
134:13, 135:7,
138:15, 139:19,
140:11, 141:6
**granted** - 9:3,
101:17, 104:7,
105:21, 117:10,
120:25, 144:13
**Gray** - 5:14, 102:22,
111:25, 112:21
**great** - 87:15, 87:16,
97:7, 100:12, 101:4,
104:15, 116:16
**greater** - 119:10
**group** - 3:4, 10:9,
70:16, 116:9
**grow** - 101:2,
101:11
**guess** - 24:13, 45:2,
82:3, 90:3, 98:8,
113:12, 124:20,
128:25, 131:1
**Guest** - 4:24, 5:8,
12:1, 12:2, 14:6, 18:4,
21:18, 22:4, 25:10,
26:20, 27:3, 33:22,
34:4, 58:23, 77:4,
77:5, 89:23, 90:8,
91:20, 91:22, 97:6,
103:19, 108:10,
110:19, 111:7,
112:12, 113:9, 114:1,
114:7, 114:13,
114:23, 115:1,
115:21, 115:25,
116:4, 116:14,
116:22, 117:9,
121:16, 121:17,

6

122:2, 122:18,
122:22, 122:25,
123:5, 123:15, 126:1,
127:24, 127:25,
128:1, 128:3, 128:5,
128:15, 128:21,
129:1, 131:17,
133:20, 133:21,
134:16, 134:21,
135:5, 135:16,
135:18, 136:6, 137:9,
137:24, 138:14
**Guest's** - 123:14,
129:2, 136:20, 138:7,
144:18
**guilt** - 99:11, 150:12
**guilty** - 98:4, 98:22,
113:4, 134:6
**gun** - 55:12
**guns** - 48:9, 68:9,
71:4, 89:9, 89:21,
97:5, 103:16
**gunshots** - 18:1,
18:8, 21:20, 22:17,
27:23
**guy** - 73:8, 73:10,
73:12, 91:13, 94:10,
98:9, 104:1, 108:9,
121:23, 125:21,
131:20, 132:5, 134:5,
134:7, 139:9, 139:10
**guys** - 43:23, 56:5,
57:21, 82:3

**H**

**half** - 73:8, 73:10,
73:12, 91:13, 99:17,
104:1, 104:4
**Hall** - 1:7, 2:6, 2:18,
2:21, 3:3, 3:19, 5:2,
6:2, 6:12, 6:21, 14:18,
15:1, 15:11, 15:23,
16:9, 16:14, 17:6,
17:10, 17:18, 18:20,
18:25, 21:9, 24:4,
24:13, 24:15, 24:18,
25:15, 30:8, 30:12,
30:21, 30:25, 31:24,
34:3, 34:19, 35:5,
35:24, 36:11, 36:20,
37:2, 37:23, 37:25,
38:2, 38:25, 39:7,
39:17, 40:4, 40:9,
41:24, 46:23, 47:4,
47:25, 48:8, 49:1,
49:19, 49:21, 51:4,
54:20, 57:16, 58:1,
58:8, 58:19, 59:3,
59:12, 60:1, 60:17,
61:10, 63:17, 63:21,
64:4, 64:7, 64:14,
64:17, 64:19, 65:9,
66:21, 67:6, 67:9,
67:14, 67:24, 68:4,
68:21, 69:4, 69:19,
70:6, 70:11, 70:16,
71:7, 71:12, 72:18,
72:21, 72:24, 73:5,
73:15, 73:17, 73:25,
75:1, 75:12, 75:21,
76:24, 77:9, 77:13,
77:18, 77:25, 78:8,
79:22, 80:7, 80:17,
80:22, 81:11, 82:2,
82:14, 84:9, 84:11,
85:1, 85:5, 87:1,
88:25, 89:14, 89:17,
90:11, 90:13, 92:3,
92:21, 94:6, 108:7,

109:18, 109:23,
114:10, 114:25,
116:2, 116:9, 116:14,
117:7, 117:24, 118:1,
119:1, 119:16,
119:19, 119:21,
121:15, 121:18,
122:7, 122:21,
122:24, 123:15,
125:3, 125:5, 127:19,
128:6, 128:7, 129:8,
129:19, 131:16,
131:19, 132:5,
132:16, 133:4,
136:12, 137:12,
137:13, 137:20,
138:4, 138:16,
138:23, 138:25,
144:4, 147:14,
147:16, 148:5,
148:11, 150:5
**Hall's** - 16:1, 16:11,
72:22, 104:9, 110:21,
115:21, 115:25,
117:16, 119:5,
120:25, 122:12,
129:14, 135:22,
136:20, 138:1, 138:24
**hand** - 20:7, 33:21,
54:13, 108:10
**handcuff** - 21:12
**handcuffs** - 36:23,
48:1, 48:4, 55:7,
55:14, 69:6, 71:17,
74:4, 75:23, 78:8
**handguns** - 127:21
**handle** - 3:5, 146:17
**hands** - 123:6,
149:16
**handsome** - 127:7
**Happy** - 76:21
**happy** - 70:9, 72:16,
74:23, 79:12, 123:22
**happy-go-lucky** -
70:9, 74:23
**Harbor** - 42:2,
43:19, 85:4
**hard** - 41:10
**harm** - 123:3
**hats** - 90:1
**head** - 43:3, 117:3,
128:15, 128:17
**headquarters** -
19:11
**hear** - 9:21, 12:21,
16:23, 17:3, 26:16,
56:14, 82:12, 84:1,
94:4, 95:7, 96:16,
97:3, 98:16, 106:22,
111:8, 112:19, 118:8,
121:7, 121:8, 124:5,
125:20, 128:19,
128:23, 133:10
**heard** - 17:25, 18:8,
21:20, 22:15, 22:17,
26:9, 27:23, 30:24,
35:3, 56:10, 56:15,
56:16, 84:14, 84:19,
85:10, 89:1, 89:18,
92:23, 98:5, 101:22,
105:8, 107:8, 148:25
**Hearing** - 1:12,
151:2
**hearing** - 2:7, 8:13,
9:5, 11:6, 11:17, 12:9,
20:9, 31:12, 32:12,
33:19, 62:8, 83:9,
94:5, 101:1, 107:21,
110:9, 132:8, 146:23,
150:20

**hearings** - 12:15
**hearsay** - 5:9,
112:7, 114:20,
114:23, 117:11, 123:7
**heavy** - 105:4,
106:24, 112:16,
140:10, 143:1, 145:4
**held** - 139:21
**help** - 19:7, 98:10,
98:12
**helpful** - 12:23,
35:16
**helping** - 136:11
**heroin** - 139:9
**hesitate** - 130:11
**hi** - 123:19
**high** - 29:14, 51:6,
99:7
**High** - 29:16, 29:17
**highlighted** - 85:2
**highly** - 85:25,
141:25
**hill** - 67:6
**himself** - 26:14,
93:8, 96:11, 101:11,
116:10, 133:7
**hit** - 117:2
**hmmm** - 56:7
**hold** - 38:8, 87:2,
107:25
**Hold** - 20:1
**holding** - 38:10
**home** - 16:1, 38:19,
99:17
**homes** - 63:23
**homicide** - 13:21,
14:2, 14:3, 14:6, 14:8,
15:4, 16:7, 17:23,
18:2, 18:14, 22:20,
25:9, 27:25
**homicides** - 49:15,
49:16
**Honor** - 2:16, 4:14,
4:17, 6:3, 8:7, 9:22,
13:4, 19:19, 34:11,
60:6, 62:10, 65:22,
65:25, 66:7, 79:14,
83:12, 84:5, 86:17,
87:18, 87:19, 87:22,
88:20, 89:5, 92:4,
93:3, 94:4, 94:12,
95:3, 96:5, 96:13,
100:19, 105:15,
106:23, 106:25,
107:9, 107:19, 108:5,
111:2, 113:10,
114:17, 115:10,
117:20, 123:24,
124:7, 125:1, 129:5,
130:14, 137:11,
140:18, 145:23,
147:24
**Honorable** - 1:13
**hood** - 50:9
**hospital** - 39:19,
44:5, 44:6, 44:7, 45:2,
53:24, 54:4, 54:6,
55:4, 55:17, 55:18,
56:12
**Hospital** - 42:2,
43:19, 85:5
**hour** - 17:13, 19:1,
19:2, 40:7, 40:8
**hours** - 15:24, 38:9
**house** - 16:16,
17:12, 21:2, 43:15,
129:9
**housed** - 9:14, 9:17,
10:17
**houses** - 71:3

**Howard** - 108:16
**huge** - 100:25
**hundred** - 108:11
**hundreds** - 65:9,
129:12
**hunt** - 119:6
**husband** - 112:4

**I**

**idea** - 38:13
**ideal** - 123:10
**identical** - 6:25,
112:8
**identification** -
3:23, 3:24, 31:9,
90:11, 106:10,
107:15, 107:24,
108:2, 109:3, 109:5,
109:11, 110:5, 110:7,
110:8, 110:13
**identified** - 24:4,
64:13, 108:17
**identifying** - 26:14,
108:4
**identity** - 90:22,
97:5, 103:18, 142:3
**imaginations** -
119:7
**immediately** -
36:22, 51:11
**Immediately** - 38:4
**immune** - 98:8
**impaired** - 70:6,
72:11, 74:18, 76:17,
79:3, 102:20
**impermissible** -
118:15
**impermissibly** -
109:4, 109:12,
109:14, 109:20, 110:3
**implicated** - 102:10
**implications** -
150:4, 150:18
**implied** - 88:13
**imply** - 104:23
**important** - 85:6,
89:23
**imprisonment** -
147:20, 148:22,
149:10
**improper** - 9:20
**improperly** - 134:24
**inaccurate** - 116:1
**incarcerated** -
42:25
**inches** - 15:4
**incident** - 67:25,
86:25
**incidents** - 77:25
**inclined** - 146:12
**included** - 114:6,
136:20
**includes** - 107:10
**including** - 103:25,
117:7, 122:9, 129:1
**inclusion** - 130:25
**inconvenience** -
143:24
**incorrect** - 11:9,
115:21
**incorrectly** - 134:24
**incredible** - 97:12
**incriminating** -
85:11, 85:25, 86:3,
86:4, 101:23
**inculpatory** - 60:1,
60:9
**independent** -
129:5, 129:7

**indicate** - 21:9,
34:14, 64:12, 110:1
**indicated** - 7:14,
58:24, 108:18
**indicating** - 32:4,
92:14
**indication** - 11:21,
12:6
**indicia** - 110:2
**indicted** - 15:15,
34:3, 124:9, 126:17
**indictment** - 4:10,
34:9, 34:14, 34:17,
35:7, 35:24, 122:17,
124:1, 124:9, 124:13,
124:15, 125:4, 125:8,
125:18, 125:19,
126:9, 126:11,
126:21, 127:16,
127:17, 130:18,
134:10, 134:13,
135:6, 135:7, 138:9,
138:15, 139:20,
139:25, 140:3,
140:12, 141:9,
141:17, 142:10,
142:14
**individual** - 95:14,
113:16
**individuals** -
108:15, 109:17
**inducements** -
70:3, 72:8, 74:16,
76:15, 78:23
**indulgence** - 79:13,
79:17
**informants** - 9:10
**information** - 12:23,
14:15, 22:3, 22:6,
22:10, 27:20, 107:5,
114:8, 124:11, 137:1
**inhaler** - 44:18,
44:19, 53:23, 54:2,
54:3, 85:18
**initial** - 19:20, 39:4,
45:17, 45:18, 45:19,
47:3, 83:24, 85:23,
109:25, 122:17
**initiate** - 61:14
**initiated** - 68:20,
93:4
**injured** - 6:20
**innocence** - 99:12
**inquire** - 55:25,
60:13
**inquires** - 102:7
**inquiries** - 42:9,
85:5, 85:8
**inquiry** - 85:19,
86:22, 120:11, 140:6
**inside** - 63:12
**instance** - 96:20,
131:13
**instruct** - 115:11,
116:7
**instructed** - 116:11
**instruction** - 115:9,
116:18, 116:25,
117:13
**instructions** -
116:17
**integral** - 143:17
**intend** - 133:5
**intended** - 111:15
**intends** - 107:3
**intent** - 130:1, 142:3
**intentions** - 51:23,
53:1
**interaction** - 50:18,
57:17

7

**interactions** - 72:17, 81:22
**intercepted** - 126:12
**interest** - 3:10, 95:10
**interested** - 61:8, 88:22, 89:15, 89:17
**interestingly** - 122:16
**interests** - 95:21, 103:9, 103:20
**interpretation** - 96:24
**interprets** - 103:8
**interrogate** - 61:2
**interrogation** - 37:22, 38:25, 46:15
**interrupt** - 134:19
**intersection** - 36:19, 48:23
**intertwined** - 144:22
**interview** - 14:17, 14:25, 18:15, 21:22, 26:25, 27:22, 28:1, 28:24, 110:18, 111:7, 144:19
**intrinsic** - 135:11, 138:18, 144:9
**introduce** - 7:15, 7:17, 62:2, 84:3, 85:12, 92:1, 92:7, 126:2
**introduced** - 6:10, 117:14
**introducing** - 90:24, 119:12, 119:14
**introduction** - 5:18, 84:2, 92:13, 112:14, 131:14, 144:16
**Investigated** - 49:15
**investigating** - 49:16, 50:8, 57:20, 77:9, 118:4
**investigation** - 14:13, 15:18, 33:21, 34:1, 42:10, 49:6, 49:9, 76:24, 77:1, 77:13, 93:5, 108:11, 135:17, 137:2, 137:4
**investigations** - 50:12, 136:12, 136:13
**investigative** - 14:15
**invoke** - 52:4
**invoking** - 52:25
**involve** - 147:17
**involved** - 33:21, 56:6, 59:10, 60:18, 70:12, 112:3, 121:19, 133:4, 133:5, 133:23, 134:1, 136:8, 139:11
**involvement** - 115:22
**involving** - 7:8, 91:17
**invulnerable** - 90:3
**ironically** - 117:22
**irons** - 55:10
**isolated** - 140:21, 140:22
**issuance** - 34:19
**issue** - 5:13, 6:25, 7:3, 10:5, 11:3, 33:20, 34:9, 35:4, 83:21, 88:9, 106:16, 110:10, 111:24, 112:8, 112:24, 113:19, 123:23

**issued** - 34:15
**issues** - 7:22, 110:16, 120:9, 142:24
**iteration** - 100:21
**itself** - 32:5, 89:24, 90:25, 91:7

**J**

**jacket** - 28:16
**jail** - 42:23, 43:7, 132:3
**Jamar** - 108:15
**jeopardy** - 138:6, 138:25
**John** - 1:16, 2:4
**Johnson** - 143:12, 145:2
**joinder** - 140:4, 143:6, 144:6
**Joinder** - 142:14
**joined** - 36:10, 144:21
**joining** - 142:16
**joint** - 140:8
**Joseph** - 30:4
**Jr** - 1:16
**judge** - 16:4, 45:21, 57:6, 112:2, 114:6, 142:20, 149:8, 149:18, 150:13
**Judge** - 1:14, 8:24, 34:21, 47:17, 60:14, 60:20, 83:2, 98:18, 112:2, 112:20, 113:1, 113:14, 118:14, 120:18, 121:10, 122:13, 123:21, 134:15, 138:20, 146:2
**judges** - 120:2
**judging** - 150:8
**judicial** - 143:25
**July** - 1:11, 67:23, 81:12, 88:25, 89:7, 107:1, 107:2
**juries** - 96:16
**jurisdiction** - 15:16
**jury** - 12:10, 15:19, 34:8, 94:19, 96:19, 97:2, 101:1, 103:8, 110:10, 113:20, 115:8, 115:11, 116:7, 116:11, 116:25, 117:6, 118:3, 118:12, 118:16, 119:13, 120:1, 120:6, 120:9, 122:1, 122:15, 122:19, 126:20, 127:5, 127:14, 127:15, 133:25, 134:3, 134:6, 134:13, 135:7, 135:25, 138:15, 139:19, 140:11, 141:6, 148:18

**K**

**Kareem** - 5:8, 12:1, 12:2, 14:6, 18:4, 22:4, 26:20, 27:3, 33:22, 58:23, 77:4, 97:6, 103:18, 108:10, 110:19, 111:7, 112:12, 114:1, 114:7, 121:16, 121:17, 122:2, 122:18, 122:22, 122:25, 123:5, 133:20, 134:16, 135:5, 135:16, 135:18, 136:5

**keep** - 69:10, 87:14, 133:19
**keeping** - 86:21
**kept** - 45:24
**Kermit** - 32:3
**Kershaw** - 8:9, 13:13, 13:15, 13:20, 32:10, 84:7, 84:16, 84:18, 101:20, 102:3
**Kevin** - 43:9, 43:10, 43:11, 43:12, 43:20, 56:1, 56:3, 56:19, 85:7, 125:21, 128:8, 139:2
**Kevin's** - 43:21, 56:4
**key** - 85:9, 102:7, 111:19, 132:12
**kid** - 94:21
**kill** - 133:20
**killed** - 22:4, 91:22, 122:22, 123:1, 123:2, 126:16, 128:5, 133:6, 133:24, 134:4, 135:17, 135:19, 135:25, 137:9
**killer** - 22:6, 75:9, 93:9, 93:11, 93:15, 93:17, 93:18, 93:19, 93:21, 93:22, 93:25, 94:1, 94:3, 94:18, 94:23, 94:25, 95:11, 95:12, 95:16, 95:19, 96:2, 96:3, 96:9, 96:12, 97:10, 97:19, 97:20, 100:20, 102:1, 104:18, 104:20, 104:22, 104:24, 105:5, 105:6, 137:14
**killing** - 70:23, 70:24, 138:14, 140:23, 140:25
**killings** - 70:12
**kind** - 29:11, 49:5, 51:10, 55:23, 70:3, 72:8, 74:16, 76:15, 102:25, 103:11, 103:17, 105:1, 113:6, 120:10, 122:21, 122:25, 149:13
**King** - 94:10
**Knicks** - 55:22
**knock** - 56:10
**knowing** - 23:16, 49:1, 49:3, 117:6
**knowledge** - 48:15, 93:5, 98:4, 127:4, 142:3
**known** - 108:7
**knows** - 98:10, 128:8
**Kong** - 94:10

**L**

**Lackl** - 112:11, 112:13, 113:25, 131:8
**Lakeland** - 66:24, 67:1, 67:4, 67:5, 68:6
**Landsman** - 30:4, 30:7, 30:10, 30:13, 30:16, 30:17, 30:25
**largely** - 77:24
**Larry** - 62:11, 62:13, 62:16, 62:21
**last** - 18:25, 60:5, 66:6, 66:7, 68:6, 89:2, 98:1, 112:21, 120:18
**late** - 38:1, 72:20, 72:24, 81:13, 91:11

**latter** - 137:10
**laughed** - 123:13
**law** - 3:18, 6:23, 8:18, 9:6, 9:9, 10:4, 13:17, 32:22, 37:8, 62:18, 112:22, 130:22, 139:1, 150:16, 150:17
**lawyer** - 99:22, 127:3, 134:24
**lawyers** - 3:4, 3:14, 149:6
**leads** - 143:24
**leaned** - 70:25
**least** - 11:25, 40:7, 57:4, 57:11, 86:2, 107:12, 136:15
**leave** - 66:25, 71:23, 71:25, 74:8, 76:5, 76:7, 78:12, 78:14, 120:15
**leaving** - 11:1, 17:2, 69:10
**led** - 119:23, 136:8
**left** - 16:21, 16:23, 39:2, 40:15, 45:2, 53:11
**leg** - 55:10
**legal** - 12:21, 83:20, 110:25, 149:21
**lengthy** - 110:25
**less** - 149:9
**letters** - 148:24, 150:14
**level** - 95:16, 110:1
**levels** - 137:5
**Levenite** - 11:17
**lie** - 131:19
**lies** - 116:2
**life** - 46:1, 46:6, 57:10, 147:20, 148:22, 149:10, 149:17
**lifting** - 106:24
**light** - 3:7, 110:6, 141:24, 144:18
**limine** - 4:3, 4:20, 5:4, 5:17, 6:4, 7:16, 110:17, 117:9, 117:16, 120:24
**line** - 24:15, 149:15
**lines** - 139:5
**listen** - 51:11, 133:15
**listening** - 124:19
**literally** - 110:2
**live** - 17:7
**lived** - 16:10, 90:18
**lo** - 26:13
**loaned** - 129:14
**locate** - 35:5
**located** - 35:9, 35:10, 35:11, 36:20, 38:7
**location** - 15:25
**lockup** - 39:17, 46:19
**logged** - 19:5
**logical** - 144:6
**logically** - 141:12, 141:19, 142:12
**look** - 36:5, 38:11, 48:22, 121:16, 148:5, 148:24
**looked** - 24:24, 25:1, 57:8, 87:13, 108:22, 109:13, 109:15
**looking** - 14:24, 45:24, 59:19, 85:13,

103:3
**loose** - 96:24
**Loy** - 38:22
**lucky** - 70:9, 74:23
**lunch** - 105:25, 146:15, 146:16
**lungs** - 41:11
**lying** - 131:24

**M**

**Mack** - 24:17, 26:9, 26:14, 27:14, 63:20, 70:20, 108:19
**Madam** - 107:21
**Magistrate** - 34:21
**main** - 85:6, 87:3, 87:10, 150:6
**Maisel** - 17:24, 19:18, 25:5, 25:8, 25:19
**major** - 11:3
**males** - 70:16
**man** - 60:2, 100:14
**mandatory** - 147:19, 148:21, 149:7, 149:10, 149:16
**manifested** - 40:25
**Manson** - 109:7
**map** - 19:21, 32:5, 48:22
**Margaret** - 52:8
**mark** - 14:24
**marked** - 19:22, 20:8, 31:11
**Marsh** - 38:15
**marshal** - 45:15, 47:1, 47:4
**marshal's** - 39:8
**marshals** - 38:9
**Martie** - 123:1, 123:2, 125:25, 128:17, 128:19, 128:20
**Martin** - 102:13
**Maryland** - 1:1, 102:14, 130:9
**mask** - 71:4, 73:8, 89:21, 89:24, 90:6, 90:13, 90:15, 90:21, 91:2, 91:12, 91:15, 91:23, 97:5, 104:2, 104:3
**masks** - 89:25, 91:5, 91:6, 103:17
**material** - 41:18, 45:7, 65:12
**matter** - 5:7, 8:1, 11:22, 12:11, 36:3, 79:24, 90:20, 97:4, 104:18, 111:6, 112:3, 113:22, 113:24, 114:19, 114:23, 114:24, 115:4, 115:20, 116:20, 117:5, 118:6, 118:8, 118:10, 119:18, 120:8, 121:5, 144:1, 146:23, 147:11, 148:19, 151:6
**matters** - 101:17, 105:21, 114:14, 127:10
**Mcclinton** - 108:15
**Mead** - 29:2, 52:8
**mean** - 23:16, 24:24, 27:5, 39:22, 41:7, 41:15, 48:7, 50:10, 51:25, 53:22, 53:25, 54:18, 56:1,

8

56:11, 56:15, 57:18,
58:16, 59:6, 59:15,
73:11, 81:25, 89:16,
91:24, 94:6, 96:15,
127:2, 134:19, 146:14
  **meandering** -
128:25
  **meaning** - 135:1
  **means** - 130:22,
138:18, 149:8
  **meant** - 113:9
  **mechanical** - 1:24
  **medical** - 39:12,
39:15, 41:25
  **meet** - 18:21, 19:14,
19:16, 21:2, 21:3,
23:7, 40:9, 84:11
  **meeting** - 19:22,
29:12
  **meetings** - 127:1
  **members** - 148:25
  **memory** - 38:12,
100:23
  **mentioned** - 28:21,
81:22, 96:8, 100:20,
118:18
  **mentioning** - 5:5
  **merely** - 116:20,
117:11
  **met** - 19:8, 22:2,
23:6, 23:8, 24:18,
65:11, 145:4
  **Middle** - 67:5
  **might** - 8:14, 12:23,
16:11, 25:24, 25:25,
26:21, 59:21, 82:8,
82:12, 87:21, 96:23,
101:8, 105:3, 110:23,
146:21
  **millions** - 96:15
  **mind** - 59:16, 98:12
  **mine** - 96:10,
128:14
  **minimum** - 147:18,
148:22, 149:7
  **minute** - 36:24,
106:1
  **minutes** - 19:11,
44:10, 55:6, 69:3
  **Mir** - 143:22, 144:2,
144:7, 144:12, 145:2
  **Miranda** - 37:2,
80:2, 102:5, 102:6,
102:10
  **mirror** - 57:9
  **misleading** - 120:9
  **Miss** - 17:4, 121:1
  **missed** - 11:2, 11:3
  **missing** - 9:24, 10:2
  **mistaken** - 109:5,
110:4
  **Mo** - 91:24
  **moment** - 97:4,
112:25, 128:11,
148:6, 148:9
  **Monday** - 146:11,
146:12, 146:14,
146:20, 146:22,
146:24, 147:7,
150:21, 150:25
  **money** - 123:16
  **monitoring** - 59:20
  **months** - 91:22,
112:4, 126:1, 128:21
  **Moody** - 2:11, 2:12,
8:9, 32:18, 32:20,
32:25, 33:4, 46:4,
47:20, 57:7, 60:2,
61:18, 61:20, 61:25,
62:1, 62:6, 84:22,

84:23, 85:13, 85:14,
86:1, 102:4, 122:3
  **morning** - 2:16,
13:25, 14:1, 15:24,
24:11, 39:7, 45:14,
45:16, 46:23, 47:1,
47:20, 57:3, 146:9,
146:14, 146:23,
147:7, 150:25
  **most** - 12:20, 44:10,
49:7, 85:6, 111:20,
115:18, 123:23,
137:3, 146:24
  **mother** - 52:11,
52:24
  **mother's** - 129:9
  **motion** - 3:22, 4:1,
4:3, 4:5, 4:8, 5:17,
6:6, 6:24, 8:4, 8:12,
8:16, 8:17, 9:3, 9:7,
9:22, 9:25, 10:14,
11:4, 11:6, 12:14,
12:25, 13:10, 83:15,
88:16, 101:15, 104:6,
105:19, 106:4, 106:5,
106:9, 106:11,
106:25, 110:12,
110:15, 110:16,
110:17, 110:20,
111:11, 117:9,
117:15, 120:24,
130:16, 132:7,
133:11, 142:8,
144:13, 145:4
  **Motions** - 1:12
  **motions** - 2:8, 3:21,
3:22, 4:11, 4:20, 6:4,
6:7, 12:18, 12:21,
12:24, 19:20, 20:3,
31:17, 86:22, 86:23,
90:2, 106:8, 121:4,
121:12, 145:21,
146:1, 150:20
  **motive** - 9:21,
113:24, 114:12,
115:24, 115:25,
116:4, 116:13,
116:21, 117:12,
119:14, 133:2,
136:17, 136:21,
136:22, 137:7, 137:8,
137:9, 137:10,
137:16, 138:13,
140:25, 143:16,
144:5, 144:18, 145:11
  **Motz** - 113:1,
113:14
  **move** - 35:4, 113:8,
141:17
  **moved** - 5:4, 7:16,
10:16, 126:16, 142:25
  **movement** - 36:23
  **moving** - 121:5
  **mug** - 25:1
  **multiple** - 50:5,
119:1
  **murder** - 6:16, 6:18,
12:1, 21:18, 25:17,
25:24, 26:1, 26:5,
26:20, 27:4, 27:21,
31:22, 32:5, 33:22,
34:3, 34:4, 52:1,
58:23, 77:3, 89:24,
91:21, 92:16, 97:6,
112:5, 113:1, 113:24,
113:25, 114:1,
114:13, 115:13,
115:25, 116:4, 119:2,
121:16, 122:18,
123:5, 123:14,

124:10, 125:25,
126:1, 126:3, 129:1,
129:15, 132:23,
133:1, 134:15, 136:6,
136:14, 136:18,
136:22, 141:2,
142:13, 142:17,
144:5, 144:9, 144:14
  **murdered** - 103:19,
112:11, 112:12,
112:13, 113:17, 135:6
  **murderer** - 101:3,
101:11, 132:5
  **murders** - 122:9
  **must** - 122:21,
122:24, 133:17

# N

  **nail** - 117:2
  **name** - 12:2, 13:18,
18:5, 32:23, 61:15,
61:16, 62:19, 65:4,
108:20, 128:14,
133:22, 135:22,
135:24, 136:6,
138:20, 139:4, 139:7
  **named** - 6:13,
72:21, 117:7
  **names** - 42:14,
127:17
  **Narcotics** - 77:3
  **narrow** - 60:8
  **natural** - 143:18,
138:2
  **near** - 19:23, 27:12,
36:18, 101:21
  **necessarily** - 12:5,
101:23, 104:11,
129:16
  **necessary** - 131:5,
131:6, 131:10, 141:5,
142:16
  **need** - 38:11, 38:12,
53:23, 53:24, 54:2,
54:3, 54:4, 119:9,
139:8, 139:9, 147:3
  **needed** - 39:18,
138:25
  **negate** - 88:15
  **negotiate** - 99:23
  **negotiations** -
103:10
  **neighborhood** -
27:14, 50:10, 63:10,
64:2, 66:24, 68:4,
82:1, 82:11, 99:18,
109:24
  **Neil** - 109:8
  **Nervous** - 29:9
  **nervous** - 29:13
  **never** - 8:16, 8:17,
9:25, 25:3, 26:9,
26:11, 49:21, 50:20,
50:22, 59:5, 82:14,
82:16, 82:19, 89:22,
121:20, 127:4
  **newspaper** - 44:4
  **next** - 12:19, 20:13,
32:16, 35:24, 46:22,
46:23, 53:14, 75:9,
91:10, 93:4, 93:11,
93:15, 93:17, 93:18,
93:22, 93:25, 94:1,
94:25, 95:11, 95:16,
95:18, 96:2, 96:3,
96:9, 97:10, 97:20,
100:20, 101:2,
104:18, 104:20,

104:22, 104:24,
105:6, 126:16,
146:18, 147:1
  **Nice** - 2:13
  **nice** - 2:20
  **nicknames** - 63:19
  **night** - 25:5, 25:23,
26:2, 36:1, 38:3, 39:2,
52:22, 54:1, 61:22,
61:25, 62:3, 70:15,
82:8, 112:21
  **nighttime** - 50:25,
51:1
  **nine** - 123:8, 125:14
  **nol** - 120:3
  **nol-pros** - 120:3
  **nolo** - 99:6
  **non** - 122:23,
124:25
  **non-fatal** - 122:23,
124:25
  **Norfolk** - 68:3,
68:11, 70:17, 77:18
  **normal** - 50:18,
57:17, 81:22
  **normally** - 118:11
  **nosy** - 58:14
  **note** - 100:21,
107:23, 132:24,
143:9, 144:12, 145:6
  **noted** - 6:6, 41:17,
45:6, 98:1, 102:11,
108:1, 109:16,
115:12, 118:3, 131:2,
131:11, 132:24,
142:16, 143:6, 143:13,
143:23, 144:2, 144:7,
144:23
  **notes** - 86:21
  **Nothing** - 53:22
  **nothing** - 54:20,
59:23, 60:2, 60:3,
61:4, 85:10, 92:7,
99:5, 123:18, 136:14,
137:16, 139:1
  **notice** - 60:10,
110:18, 130:20,
147:12, 147:14,
147:22, 148:10,
148:15, 149:11,
149:12, 149:22,
150:18
  **notified** - 47:2
  **notify** - 45:21,
118:21
  **November** - 14:14,
15:10, 43:13, 84:10
  **number** - 2:6, 3:22,
4:1, 4:3, 4:5, 4:8,
8:12, 11:6, 12:13,
12:16, 13:10, 14:12,
16:21, 17:8, 57:4,
57:11, 59:9, 59:13,
59:17, 83:16, 86:2,
89:4, 97:14, 100:16,
101:16, 105:22,
106:5, 106:6, 106:10,
107:6, 108:18,
110:11, 127:17,
132:19, 145:14,
145:15, 150:16
  **numbers** - 121:5,
145:18
  **numerous** - 97:14,
119:2, 144:23
  **nurses** - 56:9, 56:13

# O

  **o'clock** - 51:2

  **object** - 117:3
  **objection** - 98:20,
108:25, 115:8, 117:1,
147:4
  **observation** -
44:15, 140:17
  **observe** - 40:11
  **Obviously** - 100:8
  **obviously** - 23:16,
51:20, 56:12, 109:1
  **occasion** - 39:10,
40:9, 46:23, 77:12
  **occasions** - 91:6,
144:23
  **occupants** - 20:20
  **occur** - 34:6
  **occurred** - 14:7,
17:5, 17:21, 21:8,
44:14, 67:25, 85:17
  **occurring** - 33:22
  **October** - 77:7,
81:13, 98:2
  **offense** - 147:14,
149:13
  **offenses** - 104:13,
140:4
  **Offer** - 74:16, 76:15,
78:23
  **offer** - 70:3, 72:8,
101:24
  **offered** - 8:3, 83:14,
102:3, 103:1, 111:14,
114:12, 114:13,
114:18, 114:24,
115:19, 116:19,
116:21, 148:18
  **offering** - 115:23
  **office** - 17:15,
21:21, 29:3, 38:5,
47:2, 120:4
  **Office** - 3:9
  **Officer** - 30:16,
30:18, 81:5, 81:6,
81:19, 81:20, 122:3
  **officer** - 27:9, 29:25,
33:14, 39:17, 63:2,
65:6, 66:3, 84:21,
93:16, 93:20, 94:24,
95:2, 95:13, 98:25,
100:22, 103:12,
104:8, 104:21,
119:21, 120:13
  **officer's** - 96:4
  **Officers** - 8:9, 80:18
  **officers** - 3:6, 3:10,
27:6, 38:21, 39:12,
48:6, 71:10, 75:16,
81:7, 81:9, 81:25,
87:1, 89:8, 89:11,
89:12, 89:18, 89:21,
92:2, 98:5
  **official** - 141:15
  **often** - 63:14, 63:24,
64:7, 64:19, 99:6,
120:6, 120:7, 126:18,
144:21
  **old** - 123:8
  **once** - 10:15, 47:5,
52:23, 56:24, 103:21,
122:8, 132:6, 132:12,
140:3
  **Once** - 47:2, 80:10
  **One** - 123:17, 129:9,
129:10, 129:11,
130:12
  **one** - 4:9, 4:23, 5:1,
5:12, 6:9, 6:13, 6:14,
8:1, 15:7, 16:6, 19:20,
20:1, 20:7, 24:22,
29:3, 30:6, 30:9,

30:20, 31:20, 37:10, 52:11, 54:10, 70:15, 80:4, 80:5, 80:6, 80:17, 80:21, 80:22, 81:2, 81:12, 82:2, 87:2, 87:22, 88:3, 88:11, 89:3, 89:10, 89:12, 90:1, 90:14, 92:2, 94:9, 95:24, 96:2, 98:1, 98:25, 105:24, 107:25, 108:13, 121:12, 122:5, 122:11, 122:23, 122:24, 123:10, 123:15, 124:14, 124:16, 124:25, 128:1, 129:1, 129:14, 129:22, 129:25, 134:9, 136:5, 138:9, 138:12, 141:17, 141:22, 142:9, 142:11, 144:8, 144:11, 146:5, 146:14, 147:10, 147:15, 147:17
**one-on-one** - 30:6, 30:9
**ones** - 130:10
**ongoing** - 15:19, 137:2, 137:4
**open** - 53:18, 120:19, 132:6
**open-ended** - 53:18
**opening** - 137:15
**operating** - 48:19
**operation** - 136:24, 138:9
**operations** - 138:24
**opinion** - 5:15, 11:18, 44:24, 52:24, 102:13, 102:14, 102:23, 111:25, 142:22, 143:10, 143:13, 143:23, 144:25
**opinions** - 109:6
**opponent** - 86:6
**opportunity** - 109:21, 112:18
**opposed** - 95:18
**opposing** - 131:14
**options** - 99:4, 99:9, 99:19
**oral** - 108:24
**order** - 34:18, 106:12, 130:5, 138:8, 144:17, 149:9
**ordinary** - 73:21
**original** - 88:4, 124:14, 125:18, 125:19, 126:11
**otherwise** - 109:4, 110:4
**ought** - 99:18
**out-of-court** - 112:3
**outdoor** - 70:18
**outlined** - 84:4
**outside** - 48:18, 66:21, 142:2
**Outside** - 68:12, 68:13
**outstanding** - 145:21, 145:25
**outweighed** - 105:4
**outweighing** - 97:23
**overall** - 70:8
**overborne** - 102:19, 102:25
**overhear** - 30:14

**overlapping** - 140:20
**overlooked** - 120:7
**overly** - 87:21
**overt** - 6:14, 125:11, 127:18, 130:3, 130:4, 130:5, 130:19, 130:21
**oxygen** - 41:11

**P**

**package** - 114:4
**page** - 88:3, 116:8, 133:22
**paid** - 8:19, 9:11, 9:13, 10:6
**panoply** - 98:24
**paper** - 3:22, 4:8, 8:11, 11:6, 12:13, 12:16, 13:9, 44:3, 47:7, 47:8, 83:16, 101:16, 105:22, 106:5, 106:6, 106:10, 107:6, 110:11, 136:6, 145:14, 145:15, 145:18
**Paper** - 4:1, 4:3, 4:5
**papers** - 61:7, 121:4, 128:14, 135:23, 135:24, 139:4, 139:7, 143:11
**paperwork** - 44:17
**paragraph** - 125:8, 126:9
**parcel** - 103:17, 121:12
**parked** - 21:4, 21:6, 31:22, 31:23, 45:3
**parking** - 21:4, 45:3, 45:5, 85:18
**parole** - 147:20, 148:22
**parse** - 95:20, 96:17
**Parsons** - 5:3, 6:9, 6:15, 90:9, 90:11, 91:20, 110:22, 117:18, 117:21, 118:16, 119:4, 122:10, 125:1, 126:24, 127:2, 127:6, 127:13, 127:22, 129:13, 129:17, 129:20, 141:22
**Parsons'** - 119:19
**part** - 6:4, 31:6, 31:13, 48:7, 89:17, 91:1, 91:8, 91:9, 103:17, 106:17, 107:10, 107:17, 108:21, 113:5, 118:22, 121:12, 127:25, 129:2, 129:22, 131:15, 132:16, 143:14, 143:18
**partake** - 49:10
**participate** - 150:22, 150:23
**participated** - 140:1
**particular** - 14:6, 14:8, 20:24, 22:1, 33:8, 33:20, 40:12, 49:9, 96:20, 106:12, 132:8
**particularly** - 89:15, 109:16, 130:12, 141:24, 143:9, 144:18
**parties** - 142:8
**parts** - 137:3
**party** - 86:6, 94:11,

111:14
**passed** - 18:24, 123:20, 148:14
**passenger** - 30:11
**past** - 58:1
**pat** - 21:12, 29:25
**Patrick** - 111:21
**payment** - 11:19
**Payne** - 102:11
**peddles** - 139:8
**peddling** - 137:17
**pen** - 31:24
**pen's** - 32:2
**penalties** - 45:22, 45:24, 45:25, 46:1, 46:8, 57:1, 85:22, 85:24
**penalty** - 3:16, 3:17, 46:3
**pending** - 3:21, 106:8
**people** - 8:19, 9:10, 27:6, 30:24, 42:9, 46:5, 50:18, 52:10, 57:5, 57:17, 59:11, 59:19, 59:20, 75:18, 81:16, 81:24, 82:1, 90:4, 94:9, 94:13, 94:16, 94:22, 94:23, 95:18, 96:16, 97:13, 98:22, 99:3, 99:17, 108:7, 108:13, 109:23, 116:9, 117:6, 123:1, 128:17, 131:16, 131:17, 132:17, 132:18, 135:19, 136:3, 137:18, 138:4
**People** - 99:5, 99:11
**per** - 11:17
**perceived** - 125:3
**percentage** - 97:12
**perception** - 119:9
**perhaps** - 110:23
**period** - 66:5
**perjury** - 42:18
**Permission** - 65:21
**permit** - 96:1, 104:18, 120:10, 120:16
**permits** - 140:4, 143:6
**permitted** - 110:8, 112:13, 119:18
**person** - 23:25, 26:8, 30:3, 42:17, 90:12, 92:14, 93:12, 94:8, 96:17, 98:12, 102:18, 104:3, 108:19, 122:22, 122:25, 128:7, 129:19, 136:25, 139:3
**persons** - 6:13, 11:25, 41:1
**pertaining** - 143:15, 144:16
**philosophically** - 138:3
**phone** - 18:9, 18:20
**photo** - 31:11, 107:3, 107:11, 108:4, 110:3
**photograph** - 107:24, 108:4
**photographed** - 38:6
**photographic** - 3:23, 3:24, 88:8, 88:11, 88:13, 106:9, 106:16, 106:19,

110:12
**photographs** - 50:11, 107:13, 107:23, 109:13, 109:17
**photos** - 50:4
**physically** - 48:1, 48:3
**pick** - 39:7, 45:14, 56:6
**picked** - 46:19, 46:25
**picking** - 43:24
**picture** - 20:24
**pictures** - 27:13, 108:12, 108:17, 109:15
**piece** - 54:23
**place** - 21:3, 68:10, 94:2, 94:11
**placed** - 36:23, 48:1, 48:4, 116:16, 149:7
**places** - 16:5
**Plain** - 68:16, 68:17
**plain** - 28:9, 80:24, 81:1
**Plaintiff** - 1:4, 1:16
**plan** - 39:6, 90:22, 118:20
**plans** - 39:4
**plea** - 98:23, 98:24, 99:2, 99:6, 100:2, 100:3, 100:12, 103:10, 103:13
**plead** - 46:5, 98:22
**pleading** - 20:11, 100:16, 113:4
**pleadings** - 8:25
**pled** - 135:19
**plight** - 95:17
**Pm** - 38:16
**pockets** - 137:6
**point** - 4:12, 4:15, 7:22, 14:16, 15:10, 20:16, 21:9, 22:5, 25:15, 27:13, 34:23, 38:24, 40:12, 42:24, 42:25, 46:4, 46:9, 46:10, 46:14, 52:11, 54:4, 61:2, 64:11, 67:8, 70:22, 78:6, 79:1, 85:9, 85:22, 95:9, 95:12, 96:3, 97:15, 99:3, 100:9, 100:11, 105:12, 105:16, 106:13, 113:3, 113:18, 115:22, 128:25, 129:24, 130:14, 131:25, 132:5, 139:14, 140:15, 142:18, 145:20, 145:25, 147:22, 148:2, 150:10
**pointed** - 24:22, 24:25, 64:13
**pointing** - 20:21, 31:25
**Police** - 33:6, 33:17, 63:1
**police** - 13:22, 27:6, 28:7, 39:11, 50:18, 54:11, 57:17, 63:2, 65:6, 68:18, 71:19, 73:18, 81:25, 94:6, 103:12, 104:8, 104:21, 118:25, 119:4, 119:9, 119:14, 119:21, 119:23,

120:13, 121:17, 121:18, 121:25, 129:6, 129:17, 129:20, 131:24
**pornographer** - 141:15
**portion** - 116:8
**position** - 112:23, 114:15, 142:19
**possess** - 130:1
**possession** - 48:9
**possible** - 81:8, 130:20
**posture** - 147:21, 148:1
**potential** - 45:22, 101:3
**pragmatic** - 99:15
**preceded** - 61:5
**precedent** - 12:9
**preceding** - 112:5
**precinct** - 38:7, 38:23, 39:6, 41:25, 46:17, 53:20, 53:22, 55:2
**precise** - 5:15
**preclude** - 4:4, 5:4, 5:18, 54:21
**preference** - 106:12
**prejudice** - 97:23, 101:4, 104:15, 105:4, 120:7, 133:13, 133:17, 139:22, 143:3, 143:20
**prejudiced** - 130:25
**prejudicial** - 97:1, 101:9
**preparation** - 90:22
**prepared** - 88:12
**preponderance** - 83:25, 113:3, 113:8
**presence** - 110:10
**present** - 2:18, 22:3, 28:22, 30:2, 30:19, 58:20, 75:18, 80:19, 81:9
**presented** - 10:14, 83:17
**presenting** - 83:12, 108:24
**preserve** - 112:23
**presumably** - 80:5
**presume** - 116:13
**presumption** - 140:2
**Pretrial** - 1:12
**pretrial** - 2:7, 4:7, 20:3, 31:17, 109:2, 109:11, 110:6, 146:17, 146:18, 146:19, 146:25, 147:8, 150:21
**pretty** - 8:14, 142:4
**prevent** - 123:4
**previous** - 67:25, 102:12, 119:22, 120:15
**previously** - 7:10, 117:24, 119:22
**primarily** - 135:20
**primary** - 49:6
**principles** - 109:5
**print** - 5:13
**prison** - 95:15
**prisoners** - 38:8
**probable** - 103:6, 141:10
**probative** - 97:1, 97:7, 97:8, 97:22, 100:13, 101:5,

101:10, 103:5,
103:22, 104:25,
105:3, 141:5
  **problem** - 54:19
  **procedural** - 148:1
  **Procedure** - 86:9,
139:24, 142:15
  **procedure** - 109:11,
110:7
  **procedures** - 109:3
  **proceed** - 3:20,
12:24, 13:8, 150:24
  **Proceedings** - 1:12,
1:24
  **proceedings** -
151:5
  **process** - 45:12,
56:24, 85:20, 109:1
  **Proctor** - 1:18, 2:17,
2:19, 2:23, 3:1, 3:4,
3:18, 4:17, 4:23, 5:21,
5:23, 7:21, 7:24, 8:15,
8:23, 9:6, 9:12, 9:19,
10:11, 10:24, 13:7,
24:7, 24:8, 24:10,
31:2, 31:3, 34:22,
34:24, 47:16, 47:17,
47:19, 60:12, 60:14,
60:15, 60:20, 79:16,
79:19, 81:17, 83:2,
83:4, 83:18, 83:19,
83:22, 87:12, 87:18,
97:3, 98:16, 98:18,
99:3, 99:15, 99:24,
100:4, 100:9, 101:14,
105:18, 106:19,
106:20, 111:3, 111:8,
112:10, 112:17,
112:20, 113:13,
116:16, 117:1, 117:2,
118:7, 118:14, 120:5,
120:18, 121:7,
121:10, 124:4,
124:19, 125:12,
126:19, 126:23,
127:2, 127:3, 127:6,
127:9, 131:2, 133:11,
133:14, 133:18,
134:12, 134:14,
135:3, 135:13,
136:18, 136:19,
137:10, 138:20,
139:17, 140:13,
146:2, 146:7, 146:8,
147:2, 147:25, 148:3,
148:16, 149:19, 150:2
  **procure** - 111:15
  **produced** - 1:24
  **profess** - 99:12
  **professional** -
10:22
  **proffer** - 11:23, 12:6
  **proffered** - 11:25,
114:3, 145:8, 145:9
  **proficient** - 73:9,
73:14, 91:18
  **project** - 20:17
  **projects** - 16:7,
23:8, 101:12
  **promises** - 69:25,
72:6, 74:14, 76:13,
78:21
  **pronouncing** - 12:2
  **proof** - 83:24,
114:14, 143:1,
144:14, 144:18,
145:11, 148:15,
148:17, 149:13
  **proper** - 142:14
  **properly** - 112:25,

143:17, 144:21
  **propose** - 12:19
  **proposed** - 146:5,
146:6, 146:11
  **pros** - 120:3
  **prosecuted** - 42:18
  **prosecution** -
111:21
  **prosecutor** - 60:9
  **protect** - 133:7
  **protection** - 136:10
  **protects** - 98:24,
109:1
  **protocol** - 54:6
  **prove** - 90:21,
94:18, 133:5, 150:9
  **provide** - 17:8,
60:10, 144:5, 144:17
  **provided** - 41:17,
44:17, 107:2, 124:21,
128:13, 130:20,
148:15, 149:11,
149:22
  **provides** - 134:10,
147:13
  **providing** - 114:7,
124:11, 125:14,
136:25, 145:3
  **proving** - 113:3,
144:9
  **public** - 21:2
  **Public** - 3:8
  **pull** - 57:22, 75:25,
90:1
  **pulled** - 70:17,
90:15
  **Purcell** - 1:16, 2:2,
2:4, 2:12, 4:14, 4:18,
4:19, 5:24, 5:25, 6:3,
6:18, 7:2, 7:5, 7:13,
8:6, 8:10, 10:8, 10:9,
10:21, 12:3, 13:3,
13:12, 13:24, 20:2,
20:6, 20:12, 23:21,
23:23, 23:24, 24:6,
31:4, 31:5, 31:13,
31:14, 31:19, 32:7,
32:17, 32:18, 33:3,
34:11, 35:1, 35:2,
36:4, 47:15, 60:6,
60:22, 60:24, 62:5,
83:11, 84:1, 84:4,
84:20, 84:23, 85:17,
86:10, 86:14, 86:20,
87:3, 87:5, 87:9,
87:11, 87:21, 87:25,
88:2, 88:6, 88:15,
88:20, 89:7, 90:23,
91:16, 92:4, 92:16,
92:23, 93:3, 93:20,
95:2, 95:5, 95:6, 96:4,
97:16, 97:17, 97:24,
98:1, 98:15, 105:14,
106:15, 107:9,
107:18, 108:5, 111:2,
114:16, 114:17,
115:10, 115:17,
116:6, 117:19,
117:20, 118:18,
124:6, 124:7, 124:17,
125:9, 126:4, 126:10,
126:25, 127:12,
127:13, 130:8, 133:9,
133:15, 140:16,
142:17, 141:11,
142:6, 145:22,
145:23, 147:6,
147:23, 147:24
  **Purcell's** - 142:18
  **purpose** - 150:6

  **purposes** - 20:9,
31:9, 31:10, 31:12,
86:13, 107:21
  **pursuant** - 3:17,
4:24
  **Put** - 78:10
  **put** - 31:5, 48:13,
56:24, 69:6, 71:17,
71:19, 73:8, 74:6,
75:23, 76:2, 77:19,
78:8, 90:2, 91:12,
92:18, 99:25, 104:2,
122:13, 124:22,
133:21
  **puts** - 149:12
  **putting** - 124:22

## Q

  **qualified** - 3:5
  **qualify** - 103:10
  **quantity** - 147:18
  **quarter** - 105:24
  **questioned** - 49:23,
50:20, 50:22
  **questioning** -
37:23, 41:22, 47:12,
51:19, 51:24, 53:1,
59:20
  **questions** - 23:22,
32:8, 43:6, 47:13,
47:24, 52:16, 55:21,
60:22, 61:3, 61:5,
62:5, 79:14, 105:12,
105:16, 123:22
  **quickly** - 8:1, 8:14,
8:21, 8:24, 81:18
  **quietly** - 48:12
  **Quite** - 118:8
  **quite** - 49:13,
111:19, 137:3,
144:11, 147:1
  **quote** - 138:5, 138:6

## R

  **Rain** - 42:13, 42:14,
42:15, 42:16, 42:17,
42:22, 43:5, 55:1,
55:25, 56:19, 85:7
  **Rain's** - 43:25
  **raise** - 4:19
  **raised** - 111:10
  **ran** - 67:14, 87:1,
89:2, 94:10, 128:14
  **range** - 60:8
  **rank** - 123:7
  **ratchets** - 68:8,
89:3, 89:9, 103:15
  **Ratchets** - 68:8
  **rate** - 127:13
  **Ravens** - 55:22,
86:15
  **Rdb-10-744** - 2:7
  **read** - 26:16, 28:18,
47:6, 79:25, 112:21,
138:21, 142:21,
148:24, 150:14
  **ready** - 3:20, 83:20,
150:24
  **real** - 101:9
  **realize** - 99:16
  **really** - 12:10, 46:7,
54:22, 85:5, 86:14,
86:16, 86:17, 89:15,
90:23, 93:5, 96:18,
100:10, 100:15,
101:5, 106:17, 112:9,
113:13, 116:23,
121:11, 124:20,

125:19, 132:19,
137:7, 138:17, 139:3
  **Really** - 86:10
  **reason** - 88:16,
100:17, 101:12,
110:9, 119:4, 125:2,
125:20, 128:4, 128:5,
131:13, 138:3, 139:6,
140:10
  **reasonable** - 150:10
  **reasons** - 10:16,
11:12, 12:12, 12:17,
101:18, 105:9,
105:19, 110:11,
123:9, 123:21,
123:25, 131:19,
142:11, 145:1,
145:14, 145:15,
145:17, 145:18
  **received** - 14:16,
39:16, 85:18
  **receiving** - 116:7
  **recent** - 88:7,
111:20
  **recently** - 111:23
  **recess** - 105:23
  **Recess** - 106:2
  **recitation** - 66:12
  **recognition** - 51:7
  **recognized** - 90:11,
108:18
  **recollection** - 25:4,
31:10, 96:6
  **recollections** -
65:16, 66:13
  **record** - 2:22, 3:13,
12:17, 13:19, 14:22,
23:25, 24:3, 31:6,
31:13, 31:15, 34:12,
35:21, 36:3, 36:14,
37:4, 62:20, 64:12,
101:18, 105:10,
107:10, 107:17,
108:9, 124:8, 145:19,
151:5
  **Record-** 59:2
  **recorded** - 1:24
  **recorder** - 54:8,
54:19, 54:22
  **recording** - 54:15
  **redirect** - 31:4,
60:21, 83:5
  **Redirect-** 31:18,
60:23
  **refer** - 16:5, 19:6,
35:12, 110:15
  **reference** - 18:19,
31:21, 46:21, 97:5,
104:1, 104:19,
110:20, 114:9,
117:16, 120:24
  **referenced** - 125:7,
126:8
  **references** - 90:5
  **referred** - 20:20,
76:22, 87:6
  **referring** - 10:11,
20:4, 31:7, 87:4, 93:8,
93:24, 96:10, 96:11
  **reflect** - 2:22, 3:13,
24:3, 31:16, 35:21
  **reflects** - 34:17,
94:14
  **refresh** - 38:12
  **regard** - 3:12
  **regular** - 72:16,
108:20
  **regularly** - 81:24
  **related** - 123:19,
127:23, 128:22,

141:13, 141:18,
141:19, 143:8, 143:23
  **relates** - 116:9,
117:17, 120:8
  **relating** - 77:2,
140:25
  **relation** - 122:10,
129:5, 136:4
  **relationship** - 6:11,
16:13
  **relationships** -
131:18
  **relatively** - 142:5
  **Relaxed-** 23:16
  **relevance** - 101:1
  **relevant** - 42:9,
55:21, 86:12, 90:7,
91:3, 96:12, 98:3,
113:23, 118:18,
119:8, 131:5, 141:4
  **reliability** - 4:7,
8:13, 9:5, 11:6, 11:16,
12:9, 12:15, 132:8,
132:11, 142:2
  **relieved** - 94:13
  **relocated** - 11:12,
43:15
  **relocation** - 10:20
  **relying** - 100:23
  **remain** - 3:18, 37:7,
51:13, 51:14
  **remained** - 46:12
  **remaining** - 12:18,
110:14, 121:4
  **remark** - 130:16
  **remarks** - 46:9
  **remember** - 36:17,
44:9, 67:24, 68:5,
68:7, 70:6, 70:11,
72:23, 89:2
  **remind** - 27:17, 56:2
  **reminded** - 88:8
  **remotely** - 60:17
  **rental** - 68:19,
73:19, 73:20, 78:2
  **repeat** - 51:15
  **repeated** - 84:8,
84:13
  **repeating** - 37:15,
37:16
  **replied** - 4:18
  **report** - 14:25,
18:19, 19:4, 31:7,
35:18, 36:5, 38:12,
41:16, 45:7, 46:21,
57:2, 100:23, 115:14
  **reported** - 25:11,
42:7
  **reporter** - 43:3
  **reporting** - 36:10,
36:11
  **reports** - 128:2
  **represent** - 3:9,
3:19
  **representation** - 3:7
  **represents** - 138:16
  **request** - 4:6, 8:13,
9:4, 11:5, 12:13,
12:15, 23:7, 92:5
  **require** - 144:15
  **required** - 33:9,
133:12, 140:7, 143:2,
149:17
  **reserve** - 98:20
  **resident** - 63:22
  **respect** - 5:17, 8:3,
8:11, 10:5, 11:4,
12:13, 12:24, 83:13,
83:14, 83:24, 90:20,
97:2, 101:15, 101:19,

11

103:2, 103:5, 103:14, 103:16, 104:7, 106:7, 107:24, 108:2, 112:10, 113:24, 114:7, 115:9, 115:23, 116:22, 117:23, 129:25, 133:11, 134:23, 135:11, 137:5, 140:3, 144:20, 147:14, 150:1
**respected** - 82:3
**respects** - 101:17, 105:20
**responded** - 10:2, 15:25, 25:17, 43:24, 85:24, 92:3
**response** - 4:19, 6:6, 6:7, 18:6, 19:20, 20:2, 22:14, 31:16, 84:5, 85:3, 86:23, 87:3, 87:4, 87:10, 87:16, 88:4, 88:7, 88:17, 88:23, 90:2, 101:25, 104:10, 107:1
**responsive** - 20:11
**rest** - 85:10, 124:2
**restraints** - 55:12
**result** - 138:7
**results** - 143:20
**retained** - 10:22
**retaliate** - 133:3, 136:9
**retaliated** - 128:3
**retaliating** - 116:10
**retaliation** - 34:4, 115:13, 121:25, 122:2, 124:11, 133:6, 133:21, 134:4, 142:13, 144:5, 144:9, 144:14
**return** - 34:8, 39:6
**returned** - 34:14, 34:17, 35:7, 35:22, 47:3, 124:13, 125:19, 126:21, 127:15, 135:7, 139:19, 140:4, 140:12, 141:9
**revenge** - 132:3
**review** - 11:23
**reviewed** - 65:15, 66:9, 107:16, 107:22, 142:7
**Richard**- 1:13
**rid** - 89:2
**ride** - 55:3, 81:2
**Riding**- 70:15
**riding** - 67:4, 68:4
**rights** - 26:17, 28:18, 37:2, 37:13, 37:14, 37:15, 37:20, 51:9, 51:12, 51:16, 51:17, 52:6, 79:25, 102:5, 102:6
**ripe** - 123:23
**risk** - 140:8
**Robert**- 6:8, 6:9, 117:18
**role** - 127:15
**Rolland**- 151:8, 151:9
**roughly** - 50:24, 66:7
**rule** - 112:7, 113:11, 133:12
**Rule**- 90:20, 92:6, 95:22, 97:8, 97:23, 98:23, 100:2, 102:2, 103:5, 103:10, 103:21, 104:15, 110:25, 111:11,

115:6, 116:23, 120:6, 133:12, 139:22, 139:23, 140:7, 140:11, 142:15, 143:1, 143:6, 143:21, 145:7, 145:16
**Rules**- 86:9, 111:12, 139:24, 142:15
**rules** - 123:24
**ruling** - 7:9, 105:22, 113:15, 118:23, 120:21
**rulings** - 142:22
**run** - 48:13, 66:25
**Running**- 67:12
**running** - 68:8, 94:7
**Ryce**- 67:3, 67:14, 68:23, 71:11, 73:24, 75:17, 77:23, 80:5, 80:18, 81:5, 81:20

## S

**Safe** - 33:11
**safe** - 43:15
**safety** - 10:16, 29:25, 30:18
**Sale** - 121:1
**Sarge** - 65:5, 71:1
**sat** - 49:23
**savaging** - 131:7
**saw** - 25:15, 67:6, 68:4, 70:16, 107:13, 121:23, 121:24, 131:8, 132:6
**scene** - 25:11, 25:18, 31:22, 32:5, 36:24, 101:21, 128:7
**schedule** - 147:7, 147:8
**scheduled** - 146:19
**School** - 67:5
**school** - 25:20
**screaming** - 52:12
**screen** - 20:13
**se** - 1:17
**seal** - 87:19
**sealed** - 34:17, 87:22
**search** - 67:17, 119:15
**seated** - 24:1
**second** - 5:1, 14:21, 19:8, 20:1, 59:1, 83:2, 87:2, 87:5, 100:19, 107:1, 107:25
**Secondarily**- 114:21, 115:2
**secondary** - 116:24, 118:12
**seconds** - 43:3
**section** - 6:14
**Section** - 130:3, 147:13, 148:14, 149:11, 149:22, 150:18
**secure** - 55:14
**security** - 11:12
**see** - 2:13, 2:20, 12:8, 20:13, 22:18, 29:11, 39:2, 43:3, 44:25, 46:23, 48:5, 57:21, 63:24, 64:7, 64:9, 67:8, 71:1, 93:1, 93:24, 96:8, 96:12, 98:2, 98:11, 99:17, 100:25, 107:11, 117:4, 118:19, 131:6, 141:12
**seed** - 100:24

**seeing** - 50:3, 50:9, 57:2
**seek** - 3:15, 46:3, 120:12
**seeking** - 3:16, 4:9, 60:7, 60:11, 84:3, 84:18, 85:12, 86:19, 91:25, 92:18, 95:8, 99:25, 126:2
**seem** - 23:4, 29:14, 29:15, 40:15, 44:23, 61:15, 61:22, 81:23
**sees** - 96:7
**segments** - 41:23
**select** - 3:4
**self** - 92:11, 93:9, 102:19, 104:14
**selling** - 137:17
**sense** - 10:13, 12:20, 46:7, 58:18, 119:8, 119:25, 141:8
**sent** - 86:23, 107:10, 135:21
**sentence** - 37:11, 46:1, 46:7, 57:1, 99:14, 138:23, 147:19, 148:20, 148:22, 149:9, 149:17, 150:15
**separate** - 121:11, 123:10, 123:14, 140:4
**separately** - 122:6
**September** - 14:7, 25:8, 25:17, 33:23, 74:24, 81:13, 93:6, 97:7, 103:19, 129:7
**sequence** - 130:15
**Sergeant** - 62:11, 62:12, 62:25, 64:16, 65:11, 66:9, 66:18, 73:13, 79:20, 86:18, 86:20, 95:4
**series** - 140:1
**serious** - 39:24, 140:8
**seriously** - 6:20
**service** - 3:3, 3:12, 39:8, 45:15, 47:4
**set** - 6:23, 44:7, 86:22, 88:2, 88:22, 90:1, 90:10, 124:24, 126:4, 143:16, 147:18
**set-up** - 143:16
**setting** - 109:9
**seven** - 90:17, 133:22
**sever** - 4:9, 141:17, 142:9, 142:25
**several** - 44:1, 50:15, 65:11, 66:19, 84:9, 129:12
**severance** - 4:8, 106:11, 110:15, 110:25, 121:6, 121:13, 123:23, 123:24, 133:11, 133:12, 140:7, 145:4
**severed** - 121:13, 124:2, 144:13
**severing** - 143:23
**severs** - 130:23
**sheet** - 111:7
**sheets** - 108:13
**shifts** - 140:6
**shoot** - 91:20, 121:23, 121:24, 122:2, 130:11, 139:5
**shooter** - 94:18
**shooting** - 5:2, 6:13, 7:10, 90:8, 90:9,

90:16, 90:17, 91:12, 94:16, 110:22, 118:1, 124:25, 125:6, 127:21, 127:22, 127:24, 128:9, 128:20, 128:21, 131:17, 134:11, 136:15, 137:17, 137:24, 140:21, 140:22, 141:2
**shootings** - 121:19, 122:23, 123:8, 124:24, 125:12, 127:22, 133:23, 133:24, 134:2, 136:8, 139:11
**Shootings** - 121:20
**shoots** - 132:17, 132:18, 137:13
**shortly** - 25:11
**shot** - 6:19, 7:4, 25:2, 25:10, 73:1, 73:12, 90:12, 91:13, 104:3, 108:10, 117:23, 121:21, 122:11, 122:25, 125:1, 125:2, 127:24, 128:15, 128:16, 129:13, 129:19, 134:5, 134:7, 137:23, 139:11, 141:22
**shots** - 84:14, 84:19, 101:22
**show** - 99:10, 116:21, 119:14, 133:13, 133:17, 139:22, 143:2, 145:11
**showing** - 36:7, 36:9, 117:12, 142:2, 143:2
**shown** - 108:16
**side** - 30:11, 73:7, 118:9
**signed** - 34:20
**significance** - 95:12, 95:19
**significant** - 143:24
**silent** - 37:7, 51:14
**similar** - 107:12, 117:22, 132:20, 140:5
**similarly** - 145:14
**simple** - 125:20, 132:19, 144:1
**simply** - 85:4, 88:25
**single** - 80:17, 138:22
**sitting** - 2:18, 30:7, 48:16
**situation** - 11:10, 150:7
**six** - 44:2, 81:19
**slash** - 67:5
**sledding** - 112:16
**slightly** - 89:5, 94:5
**slurring** - 79:7
**smell** - 79:8
**smoke** - 53:5, 53:6, 122:19
**smoking** - 29:22
**smorgasbord** - 123:7
**snitch** - 125:3, 130:13, 132:17, 132:18
**snitches** - 132:9, 137:13, 137:14, 137:22, 138:5
**snitching** - 141:23
**sobriety** - 23:10
**societal** - 95:23

90:16, 90:17, 91:12, ... 
**sociological** - 97:18
**sold** - 122:7, 123:15, 136:3
**solely** - 136:6
**Someone** - 30:21
**someone** - 7:4, 7:11, 26:13, 29:10, 72:21, 82:7, 126:15, 136:9, 139:7, 139:8
**Sometime** - 18:20
**sometime** - 26:6
**sometimes** - 129:12
**somewhere** - 143:11
**son** - 75:1, 75:7, 75:8, 75:9, 93:7, 93:25, 96:2, 96:9, 101:2, 101:10, 104:19, 104:22, 104:24, 105:6
**song** - 51:10
**soon** - 16:4
**sooner** - 99:19
**sorry** - 20:5, 25:16, 43:13, 73:20, 77:15, 81:14, 87:7, 87:13
**Sort** - 135:3
**sort** - 50:17, 55:1, 92:12, 102:1, 128:16, 131:1, 131:12, 141:23
**sorts** - 40:25
**sound** - 5:23
**sounds** - 82:24, 85:21
**south** - 19:17
**Southern** - 63:5
**southern** - 63:7, 63:12
**speaking** - 18:3, 23:25, 40:18, 67:24, 72:14, 74:21, 76:19, 79:10, 81:14, 81:18
**specific** - 96:6, 123:22, 140:9
**specifically** - 83:16, 104:2, 144:24
**specify** - 18:2
**spell** - 13:19, 32:24, 62:20
**spent** - 25:18, 49:11, 49:13
**spread** - 110:3
**squad** - 48:16
**stacked** - 100:15
**staff** - 146:15
**stakes** - 99:7
**stand** - 59:16, 118:23, 123:12, 136:1, 148:8
**standalone** - 136:14
**standing** - 40:19, 48:18, 67:6
**start** - 27:16, 75:11, 90:16
**started** - 18:19, 37:12, 51:11, 56:22, 67:9, 73:16
**starting** - 150:25
**State** - 13:18, 32:23, 62:19
**state** - 5:3, 5:6, 23:25, 43:22, 77:20, 98:11, 110:21, 117:16, 118:5, 120:3, 120:25, 135:17, 136:13
**state's** - 120:3
**statement** - 53:14, 84:8, 84:15, 84:17, 85:13, 85:25, 86:3,

86:5, 86:6, 86:11,
89:3, 91:2, 91:9,
91:10, 92:20, 93:4,
95:11, 100:19,
101:19, 101:20,
101:21, 101:22,
101:24, 102:2, 102:8,
102:16, 102:19,
103:4, 104:17,
111:13, 116:12,
116:22, 134:3, 137:15
  **statement's** - 87:15
  **statements** - 4:2,
8:4, 12:25, 13:11,
41:17, 41:20, 42:6,
44:8, 45:6, 53:4,
53:17, 60:9, 79:23,
80:11, 80:17, 80:21,
83:15, 84:2, 86:19,
87:17, 88:21, 91:5,
95:21, 98:19, 101:16,
102:9, 103:20, 105:8,
106:6, 106:7, 112:4,
112:14, 114:9,
114:22, 116:1, 128:12
  **States** - 1:1, 1:3,
1:14, 2:5, 2:6, 5:13,
9:3, 15:12, 102:11,
102:13, 102:22,
111:25, 130:2, 143:3,
143:11, 143:22,
144:24, 147:12, 149:1
  **stating** - 7:16, 37:15
  **station** - 54:11
  **stationed** - 49:7
  **statute** - 148:14,
149:10, 149:17
  **stay** - 71:8, 78:4,
134:19
  **stayed** - 75:13
  **stenography** - 1:24
  **step** - 6:3, 32:10,
32:15, 62:7, 83:8
  **stets** - 120:4
  **sticker** - 31:6
  **stifle** - 136:25
  **Still** - 79:12, 110:14
  **still** - 15:18, 19:12,
90:15, 95:13, 106:8,
115:3, 131:4, 137:21,
140:24, 141:11,
144:15
  **stone** - 11:1
  **stood** - 30:10, 30:11
  **stop** - 58:4
  **story** - 117:5, 123:5
  **stratosphere** -
135:22
  **stream** - 129:2
  **street** - 50:19,
57:17, 58:9, 63:24,
68:9, 75:6, 81:23,
81:25, 94:13, 94:21,
98:7, 101:7, 123:20,
128:15, 139:1
  **Street** - 68:3, 68:11,
70:17, 77:18
  **Streets** - 33:12
  **streets** - 119:10,
135:1
  **strong** - 133:17,
139:22, 143:2
  **stronger** - 142:19
  **stuff** - 55:1
  **subject** - 96:24,
113:2, 136:13
  **submission** -
93:15, 104:20, 108:1,
108:22, 109:16
  **submissions** -

142:7
  **submit** - 8:24,
88:14, 98:19, 98:20,
141:19, 146:10
  **submitted** - 146:5,
146:6
  **submitting** - 107:6
  **subparagraphs** -
88:23
  **subpoena** - 136:11
  **subsections** -
147:19
  **substitute** - 96:11,
97:19
  **successful** - 119:22
  **suggest** - 9:15,
115:11
  **suggesting** - 9:19,
9:20, 99:1
  **suggestion** -
110:23
  **suggestive** - 109:4,
109:12, 109:14,
109:20, 110:4
  **suggests** - 138:23
  **Suit** - 28:11
  **Sullivan** - 1:19,
2:16, 2:17, 2:19, 2:22,
2:25, 3:3, 3:18, 79:17,
97:4, 106:20, 106:21,
106:23, 111:4, 111:5,
116:17, 118:7, 121:8,
127:11, 147:2,
147:25, 148:17,
149:19
  **summarize** - 53:25,
108:2
  **summarized** - 4:11,
7:22, 87:15, 145:2,
147:21, 148:1
  **summary** - 65:15,
65:18, 66:2, 66:9,
103:24, 110:18
  **summer** - 66:20,
66:21, 67:25, 81:12,
86:25
  **sung** - 51:10
  **superseded** -
130:21
  **superseding** - 4:10,
124:9, 124:13,
124:15, 125:8, 126:9,
126:21, 127:16,
127:17, 130:18,
134:10, 139:20,
142:9, 142:14
  **supplemental** -
4:18, 6:5, 86:23, 87:4,
88:3, 88:22, 108:1,
108:22, 111:11
  **support** - 8:18,
10:4, 11:16
  **supportive** - 90:6
  **suppose** - 125:15
  **suppress** - 3:24,
4:1, 8:4, 12:25, 13:10,
83:15, 101:16, 104:6,
106:6
  **Supreme** - 109:6
  **surrounding** -
112:22
  **suspect** - 23:17,
25:2, 109:2, 109:22,
132:4
  **suspected** - 126:14
  **sworn** - 13:16,
32:21, 62:17
  **symptoms** - 41:1
  **system** - 120:3

_T_

  **table** - 24:5
  **talkative** - 40:13,
41:8, 46:12, 46:13,
51:8, 53:25, 54:24,
72:16, 76:21, 79:12
  **Talkative** - 74:23
  **tangentially** -
123:19, 136:16,
139:13
  **tape** - 54:8, 54:19,
54:22
  **target** - 119:5
  **task** - 33:8, 33:12,
33:14
  **taxes** - 141:16
  **Taylor** - 67:3, 68:23,
70:19, 71:11, 73:24,
75:17, 77:23, 80:5,
80:18, 81:6, 81:20
  **team** - 36:20
  **tear** - 15:7
  **telephone** - 147:3,
150:23
  **temporarily** - 38:8
  **ten** - 59:14, 69:2,
106:1, 123:7
  **tend** - 40:3
  **term** - 68:9, 119:6,
121:22, 122:4, 133:25
  **terms** - 11:22,
12:22, 38:20, 39:14,
60:25, 82:25, 87:16,
92:8, 92:12, 95:20,
97:5, 97:6, 100:2,
101:24, 103:8,
103:18, 104:13,
104:25, 111:17,
113:20, 113:23,
124:22, 124:23,
126:10, 134:11,
134:12, 134:13,
143:25, 144:3, 144:7
  **territory** - 137:19
  **test** - 102:15
  **testified** - 13:17,
32:22, 62:18, 80:18,
88:24, 93:22, 95:3,
127:14
  **testify** - 89:25,
90:18, 91:19, 94:6,
108:15, 117:18,
117:21, 118:5, 128:24
  **testifying** - 6:11
  **testimony** - 4:6, 8:3,
8:13, 8:20, 9:4, 9:11,
9:13, 10:23, 11:5,
12:14, 13:1, 13:9,
32:11, 60:25, 62:8,
83:9, 83:12, 83:14,
89:19, 92:23, 93:16,
104:21, 106:5, 128:2,
135:23, 148:25
  **themselves** - 39:21
  **theory** - 118:22,
118:24, 134:13,
135:6, 138:17, 145:10
  **thereabouts** - 48:21
  **thereafter** - 25:11,
25:19, 26:6, 88:5
  **therefore** - 41:11
  **therein** - 114:14,
114:19, 114:22,
114:24, 115:5,
115:20, 116:20
  **thereof** - 137:16
  **they've** - 10:17,

132:9
  **thick** - 15:4
  **thinking** - 98:12,
124:21, 146:12
  **thinks** - 124:20
  **thinner** - 104:25
  **thread** - 104:25
  **threat** - 128:3,
138:16
  **threaten** - 69:18,
69:23, 72:2, 74:10,
76:9, 78:17
  **threatened** - 94:8
  **threats** - 23:4
  **three** - 4:10, 8:6,
30:24, 32:4, 64:8,
64:21, 64:22, 81:7,
106:8, 112:4, 124:10,
124:12, 124:14,
125:25, 128:21,
128:24, 130:11,
142:10, 142:13,
144:10, 144:15
  **threw** - 68:8, 129:10
  **thrown** - 141:16
  **timeframe** - 70:11
  **Timothy** - 1:19, 2:17
  **today** - 4:12, 4:21,
5:8, 5:11, 14:17, 24:1,
28:12, 32:11, 33:21,
35:6, 38:21, 62:9,
64:9, 65:19, 83:10,
83:12, 92:24, 93:22,
105:9, 106:24
  **today's** - 20:9,
31:12, 107:21
  **Todd** - 2:10, 32:20,
32:25, 84:22, 102:4
  **together** - 122:19
  **tomorrow** - 39:2,
45:16
  **took** - 30:4, 38:7,
38:14, 39:24, 41:24,
42:2, 47:4, 53:3, 53:8,
69:1, 126:18
  **top** - 20:24, 67:6
  **totality** - 102:17
  **totally** - 115:21,
116:1, 118:15
  **tough** - 101:7
  **towards** - 25:20,
30:12
  **tracked** - 129:17
  **trademark** - 128:16
  **trafficker** - 130:8,
132:17, 140:24
  **traffickers** - 130:9
  **trafficking** - 91:8,
125:24, 127:19,
128:1, 129:3, 129:22,
132:22, 138:1, 138:8,
138:11, 141:1, 141:3,
141:13, 142:12,
142:17, 144:4,
144:17, 144:22
  **transaction** - 140:5
  **transactions** -
140:2
  **Transcript** - 1:12
  **transcript** - 1:24,
151:5
  **transcription** - 1:25
  **transcripts** - 126:6
  **transport** - 39:7,
39:22, 45:15
  **transported** - 38:5,
39:18
  **trash** - 96:19
  **traveled** - 28:6
  **treated** - 44:11

  **treatment** - 44:9
  **trial** - 9:5, 14:12,
24:5, 33:20, 41:20,
90:18, 107:4, 113:1,
113:13, 114:5, 118:5,
118:12, 121:16,
125:20, 133:19,
140:8, 140:9, 142:20,
143:8, 150:13, 150:24
  **tried** - 122:5
  **true** - 144:2, 144:7
  **True** - 141:11
  **truth** - 114:19,
114:24, 115:4,
115:20, 116:19
  **try** - 7:15, 7:17,
16:9, 41:19, 43:1,
95:7, 122:18, 131:18,
135:13
  **trying** - 11:2, 15:23,
27:2, 84:15, 85:9,
88:18, 89:3, 95:19,
99:13, 128:9, 137:18,
143:7, 149:6, 150:10
  **turf** - 123:17, 136:4
  **Turn** - 67:23, 72:20
  **Turn-** 70:10, 74:24,
77:7
  **turned** - 53:12
  **Turning-** 66:19
  **Two-** 108:14
  **two** - 3:13, 4:9,
4:19, 4:22, 6:4, 15:4,
30:8, 36:25, 43:3,
57:15, 64:21, 64:22,
68:8, 71:4, 81:3, 81:4,
85:5, 85:6, 88:3, 89:3,
89:8, 89:21, 90:1,
95:23, 98:19, 101:17,
102:7, 103:14, 104:5,
105:10, 105:20,
106:7, 106:17,
107:14, 108:8, 109:6,
110:24, 118:4, 121:4,
121:11, 122:5,
122:18, 122:23,
123:11, 124:1,
124:14, 124:15,
124:16, 136:5, 142:9
  **tying** - 123:6
  **type** - 42:7
  **typically** - 27:7

_U_

  **ultimate** - 113:19
  **ultimately** - 135:5
  **unable** - 23:4
  **unavailability** -
111:16
  **unavailable** -
111:13, 113:10
  **unborn** - 101:10,
104:19
  **undated** - 35:20
  **Under-** 86:8, 120:6
  **under** - 5:9, 5:10,
7:5, 12:13, 21:9, 69:4,
71:12, 73:25, 75:21,
87:19, 90:19, 91:7,
92:9, 95:21, 97:8,
97:23, 100:5, 100:9,
102:2, 103:5, 103:8,
103:10, 103:20,
104:15, 111:11,
112:6, 117:4, 119:11,
120:6, 131:4, 133:11,
133:12, 136:10,
139:21, 139:23,
140:11, 141:3,

TONY ROLLAND, RMR-CRR

focr.mdd@gmail.com

141:21, 142:14, 143:1, 143:21, 145:7, 145:9, 145:10, 147:12
**underlying** - 144:16
**understood** - 37:19, 58:24
**undertake** - 14:17, 16:19, 37:1, 37:22, 39:20, 46:14, 47:12
**undertaken** - 38:24
**undertaking** - 99:2
**unduly** - 130:25
**unfortunately** - 101:11
**uniform** - 28:9, 68:14, 80:25
**unit** - 14:3, 48:7, 63:5, 81:4, 81:5
**United** - 1:1, 1:3, 1:14, 2:5, 2:6, 5:13, 9:3, 15:12, 102:11, 102:13, 102:22, 111:25, 130:2, 143:3, 143:11, 143:22, 144:24, 147:12, 149:1
**unmarked** - 28:7
**Unmarked** - 28:8
**unreliable** - 142:1
**unsealed** - 35:24
**unturned** - 11:1
**unusual** - 23:9, 132:25
**up** - 12:10, 27:13, 28:17, 29:11, 30:21, 38:24, 39:7, 42:14, 42:22, 43:24, 45:14, 46:19, 46:25, 47:5, 48:13, 48:25, 50:23, 56:6, 57:15, 57:22, 58:2, 58:14, 59:3, 59:23, 64:20, 67:6, 67:8, 67:15, 68:5, 70:17, 77:18, 82:2, 82:4, 88:18, 90:3, 90:17, 99:9, 99:18, 100:15, 101:3, 101:11, 112:9, 115:17, 119:6, 121:1, 135:1, 143:16, 146:11, 147:4, 148:8
**uses** - 91:2
**utterances** - 79:23

## V

**valid** - 88:16
**value** - 97:7, 97:8, 97:22, 103:5, 103:22, 105:3
**various** - 61:9, 87:1
**vehicle** - 21:17, 36:24, 45:8, 48:18, 68:19, 75:12, 75:13
**vendetta** - 119:6, 119:24, 120:13, 129:7
**verbally** - 37:6
**verdict** - 120:1
**verdicts** - 120:2
**verify** - 11:2
**versus** - 2:6, 5:14, 102:11, 102:13, 102:22, 109:7, 109:8, 111:25, 143:3, 143:12, 143:22, 144:24
**vest** - 80:4
**vice** - 123:4
**victim** - 6:1, 6:8, 6:12, 110:19
**victim's** - 18:5

**view** - 4:13, 4:15, 7:23, 8:19, 34:23, 95:13, 96:7, 105:13, 105:17, 106:13, 109:21, 139:15, 140:15, 145:21, 145:25, 147:22, 148:2
**viewed** - 108:8
**violation** - 80:15, 130:2
**violence** - 95:17, 122:9, 130:5, 135:9, 137:5
**visible** - 28:14
**visited** - 63:15
**vitals** - 44:16
**voice** - 26:9
**voir** - 146:5, 146:7, 146:11
**voluntarily** - 103:12
**voluntariness** - 102:16
**voluntary** - 102:8
**volunteered** - 102:9
**vs** - 1:6

## W

**wait** - 7:19
**waited** - 39:25
**waive** - 51:21
**walk** - 48:25, 58:17, 69:16, 71:2, 71:3
**walked** - 21:16, 29:10, 29:11, 30:3, 30:21, 71:7
**walking** - 27:12, 40:13, 40:19, 45:8, 56:21
**wants** - 4:20, 9:21, 58:16, 60:8, 88:11, 94:22, 94:23, 101:2, 132:3
**warm** - 28:16
**warrant** - 34:9, 34:15, 34:19, 35:4, 35:22
**watching** - 94:7
**weak** - 119:13
**weapon** - 28:14, 28:15, 69:8, 71:15, 78:6
**weaponry** - 73:9
**weapons** - 74:2, 75:25
**wear** - 80:24, 90:1
**wearing** - 90:13
**week** - 25:25, 36:6, 60:5, 63:16, 64:22, 64:23, 126:16, 146:18, 147:1
**weekly** - 64:24
**weigh** - 99:18
**weighing** - 99:9
**weight** - 94:20, 116:16
**welcome** - 60:13
**well-established** - 109:6
**west** - 73:7
**Westport** - 10:17, 16:4, 16:7, 19:11, 19:21, 20:25, 25:18, 49:11, 50:7, 59:9, 61:11, 63:9, 63:15, 63:22, 64:6, 66:21, 66:25, 68:3, 68:11, 70:15, 94:3, 94:12, 108:12, 128:22, 135:2, 139:8

**Westport's** - 49:5
**whereabouts** - 16:11
**whereas** - 59:21
**White** - 38:15
**whole** - 55:19, 56:23, 98:24
**Wilgrey** - 16:1, 16:3, 16:6
**Williams** - 8:9, 62:11, 62:13, 62:16, 62:22, 62:25, 64:16, 66:9, 66:18, 79:20, 86:19, 86:20, 91:21, 95:4, 98:6, 123:1, 123:2, 125:25, 126:3, 127:23, 128:17, 128:20, 128:22
**Williams'** - 88:21, 128:20
**willing** - 51:21, 100:11
**window** - 70:25
**wiretap** - 96:15
**wish** - 14:25, 89:4, 140:22
**witch** - 119:6
**withdraw** - 92:5
**Witness** - 13:20, 24:2, 32:13, 32:25, 35:25
**witness** - 4:6, 8:3, 8:12, 9:4, 11:5, 11:20, 12:14, 13:1, 13:9, 13:16, 24:4, 32:16, 32:21, 62:17, 64:13, 94:9, 106:4, 111:7, 111:16, 112:11, 112:12, 112:13, 113:1, 113:10, 113:17, 117:17, 121:23, 122:3, 122:11, 126:6, 132:22, 134:22, 136:10, 140:23, 140:25
**witness's** - 109:21, 109:24
**witnesses** - 6:10, 8:7, 8:8, 9:12, 10:6, 10:7, 10:10, 10:12, 10:13, 10:15, 10:22, 12:11, 50:12, 84:6, 85:6, 85:7, 89:24, 90:14, 91:19, 94:5, 102:7, 107:13, 108:3, 108:8, 121:22, 122:6, 126:20, 128:11, 128:24, 129:4, 131:16, 131:25, 132:8, 134:4, 134:7, 141:24
**women** - 97:14
**wonder** - 58:13
**Woodlawn** - 38:8, 38:15, 38:16, 46:20, 47:1, 53:8, 53:19
**word** - 73:13, 89:9, 138:22, 138:25
**words** - 79:7
**world** - 123:10
**worried** - 138:23
**worse** - 132:21
**worth** - 100:13, 101:10
**wound** - 135:1
**write** - 100:22, 108:14
**written** - 87:23
**wrongdoing** - 4:25,

5:10, 111:15, 111:18, 112:6, 113:4, 113:5, 113:9, 113:19, 113:21, 115:6
**wrongfully** - 99:12

## Y

**y'all** - 68:5, 68:7
**year** - 66:6, 66:7, 68:6, 73:1, 89:2, 99:14, 100:23, 100:24, 123:8, 124:14, 125:5, 143:10, 143:13, 145:13
**years** - 14:4, 46:6, 49:12, 57:9, 57:10, 61:2, 61:10, 63:3, 98:21, 99:8, 100:1, 108:7, 123:2, 125:14, 127:19, 129:8, 150:16
**yell** - 61:19
**yelled** - 43:2, 52:23
**yelling** - 52:9
**yielded** - 95:24
**young** - 97:12
**younger** - 95:18
**yourself** - 62:2